# 22-1481 22-1982 (con)

## UNITED STATES COURT OF APPEALS

*for the*

## SECOND CIRCUIT



**UNITED STATES OF AMERICA,**

*Respondent-Appellee,*

-v.-

**ROBERT SYLVESTER KELLY**

*Petitioner-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**PETITIONER-APPELLANT'S SPECIAL APPENDIX
VOLUME I OF I
(Pages SpA 1 to SpA 204)**

JENNIFER BONJEAN
ASHLEY COHEN
BONJEAN LAW GROUP, PLLC
750 Lexington Avenue, 9th Floor
New York, NY 10022
(718) 875-1850

# **TABLE OF CONTENTS**

Order denying Defendant's Motion to Dismiss and Motion to Strike dated May 22, 2020……………………………………………………………………….. SpA 1

Memorandum Decision and Order Denying Second Motion to Dismiss the Indictment dated October 26, 2021…………………………………………… SpA 19

Order Granting in Part and Denying in Part the Government's *Motions in Limine* dated November 4, 2021…………………………………………………… SpA 31

Trial Transcript Excerpt from Judge Ann Donnelly's Ruling on Prior Bad Act Evidence from September 14, 2021…………………………………………... SpA 52

Memorandum Decision and Order Denying Defendant's Motion for a Judgement of Acquittal and Motion for a New Trial from June 29, 2022……………………… SpA 54

Memorandum Decision and Order Granting the Government's Request for a Turnover Over dated September 9, 2022………………………………………... SpA 157

Memorandum Decision and Order Regarding Restitution dated November 8, 2022……………………………………………………………… SpA 166

December 7, 2022, Amended Judgment……………………………………… SpA 190

California Health & Safety Code § 120290 (Eff. to May 26, 2016)………………. SpA 198

California Health & Safety Code § 120290 (Eff. January 1, 2018)………………... SpA 199

New York Consolidated Law Services Public Health Law § 2307 (Eff. June 1, 1954)……………………………………………………………….. SpA 203

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
**UNITED STATES OF AMERICA**,                                :
                                                             :
                                                             :     **ORDER**
                         **-** against **-**                 :     19-CR-286 (AMD)
                                                             :
                                                             :
**ROBERT SYLVESTER KELLY**,                                  :
                                                             :
                                                             :
                              Defendant.                     :
------------------------------------------------------------ X

**ANN M. DONNELLY**, United States District Judge:

The defendant is awaiting trial on charges of racketeering in violation of 18 U.S.C.

§§ 1962(c) and 1963, three counts of Mann Act transportation to engage in illegal sexual activity

in violation of 18 U.S.C. § 2421(a), three counts of Mann Act coercion and enticement to engage

in illegal sexual activity in violation of 18 U.S.C. § 2422(a), one count of Mann Act coercion of

a minor to engage in illegal sexual activity in violation of 18 U.S.C. § 2422(b), and one count of

Mann Act transportation of a minor with intent to engage in illegal sexual activity in violation of

18 U.S.C. § 2423(a).  (ECF No. 43.)  Currently before the Court are the defendant's motions to

dismiss the racketeering charge and to strike the allegations that cite Section 2307 of the New

York Public Health Law.  (ECF Nos. 41, 42).  The Government opposes.  (ECF Nos. 46, 47.)

For the reasons that follow, the motions are denied.

## BACKGROUND

The third superseding indictment,[1] returned on March 12, 2020, charges the defendant

with racketeering and violations of the Mann Act.  (ECF No. 43.)  The racketeering charge

---

[1]  The grand jury indicted the defendant in June of 2019 with racketeering and Mann Act crimes.  (ECF
No. 1.)  The Government has twice sought and obtained superseding indictments.  (ECF Nos. 30, 43.)

alleges an enterprise that includes the defendant and his managers, bodyguards, drivers, personal assistants, runners and members of his entourage.  (*Id.* ¶ 1.)  According to the indictment, the enterprise, which engaged in and affected interstate commerce, "constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the [e]nterprise."  (*Id.*)  The purposes of the enterprise were to promote the defendant's music and brand, to recruit women and girls to engage in illegal sexual activity with the defendant and to produce pornography, including child pornography.  (*Id.* ¶ 2.)  The defendant, through the means and methods of the enterprise (*see id.* ¶ 9), is alleged to have committed fourteen racketeering acts against six victims between January of 1994 and 2017.  (*Id.* ¶¶ 11-38.)

Two of the racketeering acts (twelve and fourteen) and four of the Mann Act counts (six through nine) involve allegations that the defendant had sexual intercourse with Jane Doe #6 in violation of Section 120.20 of the New York Penal Law—reckless endangerment in the second degree—and Section 2307 of the New York Public Health Law, which prohibits someone who knows that he is infected with "an infectious venereal disease" from having sexual intercourse with another person.  In particular, the indictment alleges that the defendant "engaged in unprotected sexual intercourse with Jane Doe #6 without first informing Jane Doe #6 that he had contracted herpes and obtaining her consent to sexual intercourse in these circumstances."  (ECF No. 43 ¶¶ 33-34, 37-38, 43-46.)

## DISCUSSION

The defendant makes two challenges to the third superseding indictment.  First, he argues that the racketeering count must be dismissed because the indictment does not allege a legally cognizable enterprise within the meaning of 18 U.S.C. § 1962(c).  (ECF No. 41 at 5-10.)

Second, he moves to strike the charges that cite Section 2307 of the New York Public Health

Law on the theory that the law is "facially invalid, overbroad, and vague." (ECF No. 49 at 1.)

Neither claim is persuasive.

**I.     Motion to Dismiss Count One**

"The dismissal of an indictment is an extraordinary remedy reserved only for extremely

limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d

157, 165 (2d Cir. 2001) (citation and internal quotation marks omitted). Rule 7 of the Federal

Rules of Criminal Procedure requires that an indictment contain a "plain, concise, and definite

written statement of the essential facts constituting the offense charged." Fed. R. Crim. P.

7(c)(1). An indictment satisfies this rule if it "first, contains the elements of the offense charged

and fairly informs a defendant of the charge against which he must defend, and, second, enables

him to plead an acquittal or conviction in bar of future prosecutions for the same offense."

*United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *Hamling v. United States*,

418 U.S. 87, 117 (1974) (internal quotation marks and citations omitted)).

To withstand a motion to dismiss pursuant to Rule 12, an indictment "need do little more

than to track the language of the statute charged and state the time and place (in approximate

terms) of the alleged crime." *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008)

(citation omitted); *see also Hamling*, 418 U.S. at 117 ("It is generally sufficient that an

indictment set forth the offense in the words of the statute itself, as long as 'those words of

themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the

elements necessary to constitute the offence intended to be punished.'") (citation omitted).

Indictments do not "have to specify evidence or details of how the offense was committed,"

*United States v. Wey*, No. 15-CR-611, 2017 WL 237651, at *5 (S.D.N.Y. Jan. 18, 2017)

(citations omitted), and "[a] pretrial motion to dismiss an indictment must not weigh the

sufficiency of the evidence," *United States v. Tucker*, No. 16-CR-91, 2017 WL 3610587, at *2

(S.D.N.Y. Mar. 1, 2017) (citing *United States v. Alfonso*, 143 F.3d 772, 777 (2d Cir. 1998)).

Finally, "[w]hen considering a motion to dismiss, the Court must treat the indictment's

allegations as true." *Wey*, 2017 WL 237651, at *5 (citing *United States v. Velastegui*, 199 F.3d

590, 592 n.2 (2d Cir. 1999), *cert. denied*, 531 U.S. 823 (2000)).

The first count of the third superseding indictment charges the defendant with

racketeering in violation of 18 U.S.C. § 1962(c).  An indictment charging a violation of Section

1962(c) is sufficient if it alleges the following elements: "(1) that the defendant was employed by

or associated with an enterprise; (2) that the defendant knowingly conducted or participated

directly or indirectly in the conduct of the affairs of the enterprise through a pattern of

racketeering activity; (3) that the defendant knowingly committed or aided and abetted the

commission of at least two acts of racketeering; and (4) that the activities of the enterprise

affected interstate or foreign commerce."  *United States v. Triumph Capital Grp., Inc.*, 260 F.

Supp. 2d 444, 449 (D. Conn. 2002) (citing *United States v. Long*, 917 F.2d 691, 696 (2d Cir.

1990) (citations omitted)).

The indictment alleges all four elements.  Count One charges that from 1994 to "present,"

the defendant was a member and leader of an enterprise, the activities and affairs of which

affected interstate and foreign commerce.  (ECF No. 43 ¶ 12.)  It alleges that the defendant

knowingly participated in "the conduct of the affairs of the [e]nterprise through a pattern of

racketeering activity" which was designed to achieve the common purposes of the enterprise: to

recruit women and girls for illegal sexual activity and to produce child pornography.  (*Id.* ¶¶ 1,

10, 11-38.)  Further, it alleges that the defendant and other members of the enterprise committed

fourteen separate acts consistent with the enterprise's purpose, and includes the approximate times and places of those acts.  (*Id.* ¶¶ 13-38.)  Accordingly, Count One states the elements of the offense of racketeering.  *See Alfonso*, 143 F.3d at 776 ("We have no doubt that Count One of the indictment in the instant case meets these basic pleading requirements by accurately stating the elements of the offense charged and the approximate time and place of the robbery that defendants allegedly conspired to commit . . . ."); *United States v. Cooper*, 17-CR-296, 2020 WL 2307646, at *3 (E.D.N.Y. May 8, 2020) ("Because the government's allegations in the superseding indictment clearly track and satisfy the elements, if proven, of the charged racketeering-related counts, they are sufficient under Rule 7(c).") (citation omitted).

Nevertheless, the defendant maintains that the allegations in the indictment do "not form a legally cognizable RICO enterprise under the law."  (ECF No. 41 at 5.)  First, citing *Boyle v. United States*, 556 U.S. 938 (2009), he argues that the Government does not sufficiently identify the enterprise's purpose, the identities of the enterprise's members, the members' relationships with the enterprise or the longevity of the enterprise.  (*Id.* at 7.)  Second, citing a host of civil cases, he argues that the indictment's description of the enterprise is flawed as a matter of law because "<u>a party cannot be both the defendant 'person' and the 'enterprise.</u>'"  (*Id.* at 8 (emphasis in the original).)  Neither argument is persuasive.

The essence of the defendant's first argument is that the "structural features" discussed in *Boyle* are sub-elements of an "enterprise" that also must be alleged in an indictment.  The Government responds that the *Boyle* features are not essential elements of a racketeering offense that need to be pleaded to satisfy Rule 7; it maintains that the allegation of an association-in-fact enterprise by itself is sufficient and that requiring it to plead an enterprise with the *Boyle* features is tantamount to challenging the evidentiary sufficiency of a properly pleaded indictment.  (ECF

No. 46 at 6 ("[A] motion to dismiss an indictment for its failure to describe a valid enterprise, as the defendant argues, is premature at this stage.").)

In *Boyle*, the Supreme Court defined the element of an "enterprise" not in the context of evaluating the sufficiency of an indictment, but in ruling on the trial judge's final instructions to the jury.  556 U.S. at 945-49.  An indictment, by contrast, "do[es] not have to set forth evidence or details of how a crime was committed."  *Triumph Capital Grp., Inc.*, 260 F. Supp. 2d at 448 (citing *United States v. Carrier*, 672 F.2d 300, 303-04 (2d Cir. 1982)).  Because an indictment is "tested by its allegations, not by whether the government can prove its case," it is "not subject to dismissal on the basis of factual questions, the resolution of which must await trial."  *Id.* (quoting *Alfonso*, 143 F.3d at 776-77) (citation omitted).

Whether the Government can prove that the enterprise in this case had the structural hallmarks required by *Boyle* is a question of fact to be resolved by a jury at trial.  In claiming that the indictment is insufficiently detailed in describing the enterprise, the defendant confuses the standards of pleading with the standards of proof at trial.  *See, e.g.*, *Cooper*, 2020 WL 2307646, at *3 ("However, the arguments in support of their claim reveal that the true nature of Defendants' objections are not the sufficiency of the allegations, but rather the sufficiency of the factual and evidentiary support that the government will likely use to prove the existence of the Enterprise at trial."); *United States v. Raniere*, 384 F. Supp. 3d 282, 301 (E.D.N.Y. 2019) ("Raniere posits that an indictment must spell out why a RICO conspiracy's predicate acts are both horizontally and vertically related.  These arguments confuse the standards of pleading with standards of proof.") (citation and internal quotation marks omitted); *United States v. Messina*, No. 11-CR-31, 2012 WL 463973, at *4 (E.D.N.Y. Feb. 13, 2012) (rejecting pretrial challenge to relatedness as "confus[ing] the standards of pleading with [the] standard[] of proof"); *Triumph*

*Capital Grp., Inc.*, 260 F. Supp. 2d at 449 (continuity is not an element of "a RICO offense that must be alleged with particularity to survive a motion to dismiss . . . the defendants' arguments conflate what the government must prove at trial with what it must allege in the indictment").

The Government is entitled to marshal and present its evidence at trial, and the defendant is entitled to challenge the sufficiency of that evidence pursuant to Rule 29 of the Federal Rules of Criminal Procedure. *See Raniere*, 384 F. Supp. 3d at 302 ("[T]he sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss the indictment, but rather on a post-trial motion for a judgment of acquittal pursuant to [Rule] 29.") (citations and internal quotation marks omitted); *United States v. Gambino*, 809 F. Supp. 1061, 1079 (S.D.N.Y. 1992) ("It is axiomatic that, in a criminal case, a defendant may not challenge a facially valid indictment prior to trial for insufficient evidence.  Instead, a defendant must await a Rule 29 proceeding or the jury's verdict before he may argue evidentiary insufficiency.") (citations omitted).  Accordingly, the motion to dismiss count one on this ground is denied.[2]

The defendant also argues that the description of the enterprise in the indictment is flawed because it does not distinguish between the defendant "person" and the "enterprise." (ECF No. 41 at 8-10.)  To support his claim, the defendant cites only civil RICO cases.  But unlike criminal RICO charges, civil RICO claims are governed by the heightened pleading standards in Rule 9 of the Federal Rules of Civil Procedure and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  Criminal RICO charges, of course, are governed by Rule 7 of the Federal

---

[2]  The indictment pleads the *Boyle* requirements in any event.  First, it alleges the enterprise's common purpose: to promote the defendant's music, to recruit women and girls to engage in illegal sexual activity with the defendant and to produce child pornography.  (ECF No. 43 ¶ 2.)  Second, it describes the relationships among the defendant and the other members of the enterprise, and alleges that the various members participated in the pattern of racketeering activity.  (*Id.* ¶¶ 1, 4-6.)  Finally, the indictment alleges that the enterprise operated for nearly twenty-four years, which is sufficient longevity to permit the members to pursue the enterprise's purpose.  (*Id.* ¶ 12.)

Rules of Criminal Procedure and are contained in an indictment returned by a grand jury.  *See United States v. Mavroules*, 819 F. Supp. 1109, 1118 (D. Mass. 1993) ("[A] criminal indictment containing a RICO charge is not subject to the same type of analysis to which a civil RICO complaint would be subject on a motion to dismiss pursuant to Rule 12(b)(6)."); *United States v. Marchese*, No. 89-CR-229, 1991 WL 60338, at *2 (S.D.N.Y. Apr. 11, 1991) ("The cases cited by the RICO Defendants in support of their motion . . . are inapposite, involving as they do motions to dismiss civil RICO complaints, and not criminal indictments."); *see also United States v. Vaughn*, 772 F.3d 918, 926 (7th Cir. 2013) (declining to apply *Iqbal*/*Twombly* pleading standard to a criminal indictment).  In other words, the enterprise/person distinction requirement from civil RICO cases is not relevant to the legal sufficiency of a properly pleaded criminal indictment.  *See United States v. Gatto*, 295 F. Supp. 3d 336, 347-48 (S.D.N.Y. 2018) ("Defendants' reliance on two civil RICO cases is confounding" in moving to dismiss a properly pleaded indictment).[3]

The indictment in this case contains a "plain, concise, and definite written statement of the essential facts constituting the offense charged," Fed. R. Crim. P. 7(c)(1), and makes out the offense of racketeering under Section 1962(c).  Accordingly, the motion to dismiss count one on this ground is also denied.

## II.   Motion to Strike

The indictment alleges that the defendant transported one of the victims in interstate commerce intending that she "engage in sexual activity for which a person could be charged with a criminal offense."  (ECF No. 43 ¶¶ 33-34, 37-38, 43-46.)  The indictment identifies two

---

[3]   The cases upon which the defendant relies are further distinguishable because they concern corporate defendants that were not sufficiently distinct from the alleged enterprise.  Here, the indictment charges that the defendant, an individual, was the leader of an enterprise comprised of other individual members.

offenses with which the defendant could be charged: Section 2307 of the New York Public
Health Law, which makes it a misdemeanor for "[a]ny person who, knowing himself or herself
to be infected with an infectious venereal disease, has sexual intercourse with another," and
Section 120.20 of the New York Penal Law, reckless endangerment in the second degree, which
is "recklessly engag[ing] in conduct which creates a substantial risk of serious physical injury to
another person," a class A misdemeanor.  The defendant argues that the racketeering acts and the
Mann Act counts that incorporate the violation of Section 2307 must be dismissed because
Section 2307 is "facially unconstitutional," and "facially invalid, overbroad, and vague."  (ECF
Nos. 42, 49.)  According to the defendant, the statute is overbroad because it bans people with
infectious venereal disease from having consensual sex, and is vague because it "fails to define
what is meant by sexual intercourse, and what is meant by a sexually transmittable disease."
(ECF No. 49 at 10.)

 Even if the defendant were to succeed on his challenge to Section 2307, his motion to
dismiss would fail, because the indictment also alleges that he could be charged with violating
the reckless endangerment statute, the constitutionality of which he does not challenge.  In any
event, his challenge to Section 2307 is meritless in the context of this case.

  a. *Facial vs. As-Applied Challenges*

 "A facial challenge is an attack on a statute itself as opposed to a particular application."[4]
*City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2449 (2015).  Such challenges are "generally
disfavored" because they assert the legal rights and interests of third parties.  *Dickerson v.*

---

[4] *See generally* Alex Kreit, *Making Sense of Facial and As-Applied Challenges*, 18 Wm. & Mary Bill
Rts. J. 657 (2010) (citations omitted) ("A facial attack is typically described as one where no
application of the statute would be constitutional.  In contrast, courts define an as-applied challenge as
one under which the plaintiff argues that a statute, even though generally constitutional, operates
unconstitutionally as to him or her because of the plaintiff's particular circumstances.") (citations and
internal quotation marks omitted).

*Napolitano*, 604 F.3d 732, 741-42 (2010) (listing the four rationales for limiting third-party, or *jus tertii*, standing); *see also Farrell v. Burke*, 449 F.3d 470, 494 (2d Cir. 2006) ("Federal courts as a general rule allow litigants to assert only their own legal rights and interests, and not the legal rights and interests of third parties.").

Nevertheless, courts permit facial challenges in First Amendment cases in which "the plaintiff is allowed to challenge a law that may be legitimately applied to his or her own expressive conduct if the law has the potential to infringe unconstitutionally on the expressive conduct of others." *Dickerson*, 604 F.3d at 742 (citing *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 129 (1992) ("It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable.")). Facial challenges to laws implicating First Amendment rights "may go forward only if the challenged regulation 'reaches a substantial amount of constitutionally protected conduct.'" *Farrell*, 449 F.3d at 496 (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983) (citation omitted)).

Facial challenges outside the First Amendment context are different. First, the challenged law must infringe on a constitutionally-protected right. *See Patel*, 135 S. Ct. at 2449 ("[T]he Court has allowed [facial] challenges to proceed under a diverse array of constitutional provisions.") (citations omitted); *Dickerson*, 604 F.3d at 744 ("*Morales* does suggest that facial challenges are permissible outside of the First Amendment context, but that case only permitted such a challenge in the presence of a constitutionally-protected right.") (citing *City of Chicago v. Morales*, 527 U.S. 41, 53 (1999) (Stevens, J., plurality opinion)); *Farrell*, 449 F.3d at 496 ("When fundamental rights are implicated," the rules against *jus tertii* standing "are different.").

10

SpA 10

Second, the complainant must demonstrate that "no set of circumstances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 746 (1987); *see also Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982) ("To succeed, however, the complainant must demonstrate that the law is impermissibly vague in all of its applications.").  This has been described as "the most difficult challenge to mount successfully" because the fact that the law "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid."  *Salerno*, 481 U.S. at 745 (citation omitted).

As the Second Circuit has recognized, the *Salerno* standard "effectively eliminates facial challenges outside of the First Amendment context that could not also be brought as an as-applied challenge, since any law that is unconstitutional in every set of circumstances is also necessarily unconstitutional when applied to any plaintiff."  *Dickerson*, 604 F.3d at 743-44; *see also United States v. Rybicki*, 354 F.3d 124, 129-30 (2d Cir. 2003) (en banc) (collecting cases that have "held that when . . . the interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness only 'as applied,' i.e., in light of the specific facts of the case at hand and not with regard to the statute's facial validity").

The defendant is claiming a violation of his right to substantive due process.[5]  As the defendant explains in his opening brief:

> As written, [Section 2307] is an improper invasion of the right to privacy because it makes it illegal to have private, consensual, sexual intercourse.  Substantive Due Process prohibits the government from limiting the right to engage in private, consensual, sexual intercourse without fear of criminal liability.

(ECF No. 42 at 4.)

---

[5]  The defendant does not specify whether he is asserting a right to substantive due process under the Fifth Amendment or the Fourteenth Amendment.  In any event, the same analysis applies to substantive due process claims under either amendment.  *Molina-Aviles v. District of Columbia*, 824 F. Supp. 2d 4, 9 n.8 (D.D.C. 2011) (citation omitted).

Accordingly, the defendant cannot succeed on a facial challenge to Section 2307 unless he can establish that there is no set of circumstances under which it would be valid.

There are factual circumstances—including the conduct ascribed to the defendant—in which the statute is neither unconstitutionally vague nor infringes on substantive due process rights.  Indeed, the defendant's claim that the law sweeps too broadly and captures some constitutionally protected conduct is fatal to his argument that the statute is facially unconstitutional.  Under *Salerno*, a defendant lodging a facial challenge to a law that does not implicate the First Amendment must establish "that no set of circumstances exists under which the [law] would be valid."  481 U.S. at 745.  That Section 2307 "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid."  *Id.*

> b.   *As-Applied Substantive Due Process Challenge*

Under the Due Process Clause of the Fifth Amendment, "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  The Supreme Court has interpreted the due process clause to include a "substantive component guarding the individual against 'the exercise of power without any reasonable justification in the service of a legitimate governmental objective.'"  *Lombardi v. Whitman*, 485 F. 3d 73, 79 (2d Cir. 2007) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998)).

In assessing whether a government law impinges on a substantive due process right, "the first step is to determine whether the asserted right is 'fundamental.'"  *Leebaert v. Harrington*, 332 F.3d 134, 140 (2d Cir. 2003).  "Rights are fundamental when they are implicit in the concept of ordered liberty, or deeply rooted in this Nation's history and tradition."  *Id.* (quoting *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 460-61 (2d Cir. 1996)) (citations and internal quotation marks omitted), *cert. denied*, 519 U.S. 813 (1996).  "Where the right infringed is

fundamental, strict scrutiny is applied to the challenged governmental regulation." *Leebaert*, 332 F.3d at 140 (citing *Reno v. Flores*, 507 U.S. 292, 302 (1993)).  "Where the claimed right is not fundamental, the governmental regulation need only be reasonably related to a legitimate state objective." *Immediato*, 73 F.3d at 461 (citing *Reno*, 507 U.S. at 303-06).

The defendant argues that he is asserting a fundamental liberty interest established by *Griswold v. Connecticut*, 381 U.S. 479 (1965), *Lawrence v. Texas*, 539 U.S. 558 (2003) and *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015).  According to the defendant, these cases "stand for the proposition that private sexual decisions made by consenting adults invariably involve a fundamental liberty interest protected by the Due Process Clause . . . one that absolutely shields private sexual conduct from the reach of government intervention."  (ECF No. 42 at 5; *see also id.* at 4 ("Private sexual contact between consenting adults involves a fundamental liberty interest that triggers a non-deferential review whenever the government seeks to proscribe such conduct."); ECF No. 49 at 9 ("The Court has recognized intimacy as a fundamental right.").)

The defendant's reliance on the lofty principles enunciated in *Griswold* and its progeny is misplaced.  The charges against him are not, as he claims, premised on his "private sexual decisions" or "private sexual conduct."  (ECF No. 42 at 5.)  Rather, the allegation is that the defendant knew that he had herpes and engaged in sexual activity without telling the victim that he was infected.  And, the liberty interest enshrined in *Lawrence* was not, as the defendant claims, the right to make "private sexual decisions," but the "liberty of persons" to form personal relationships that find expression in intimate conduct.  539 U.S. at 567; *see also United States v. Stagliano*, 693 F. Supp. 2d 25, 38 (D.D.C. 2010) ("What is evident from the Supreme Court's decision [in *Lawrence*] is its intent to prevent the state from burdening certain intimate, consensual relationships by criminalizing the private sexual acts that are instrumental to those

relationships."); *Seegmiller v. LaVerkin City*, 528 F.3d 762, 770 (10th Cir. 2008) ("A broadly-defined 'right to private sexual activity' will clearly not suffice . . . the Court has never endorsed an all-encompassing right to sexual privacy under the rubric of substantive due process.") (citation omitted); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 745 n.32 (5th Cir. 2008) ("*Lawrence* did not categorize the right to sexual privacy as a fundamental right, and we do not purport to do so here."); *Muth v. Frank*, 412 F.3d 808, 817 (7th Cir. 2005) ("*Lawrence* also did not announce, as Muth claims it did, a fundamental right, protected by the Constitution, for adults to engage in all manner of consensual sexual conduct, specifically in this case, incest."); *Williams v. Att'y Gen. of Ala.*, 378 F.3d 1232, 1236 (11th Cir. 2004) ("Although many of the Court's 'privacy' decisions have implicated sexual matters . . . the Court has never indicated that the mere fact that an activity is sexual and private entitles it to protection as a fundamental right.") (internal citation omitted).  Accordingly, the defendant has not asserted a fundamental liberty interest that warrants the highest and most stringent standard of judicial review.

Section 2307 survives rational basis review as applied to the defendant's conduct.  Public health is a legitimate state interest, *see Gary D. Peake Excavating Inc. v. Town Bd. of Town Hancock*, 93 F.3d 68, 76 (2d Cir. 1996) ("Legislation pertaining to public health and safety consistently has been recognized as an important local interest.") (citation omitted), and Section 2307 rationally serves that interest by penalizing those who, like the defendant, have unprotected sex knowing they are infected with venereal disease.  *See Grattan v. People*, 65 N.Y.2d 243, 245 (1985) ("Article 23 of the Public Health Law . . . was enacted for the protection of the public.  To promote the detection and eradication of sexually communicable diseases, the statute requires certain examinations, provides for isolation and treatment, and includes criminal penalties," including Section 2307.).  In other words, Section 2307 is rational as applied to the defendant.

Section 2307 might very well be unconstitutional if it were enforced against someone who informed his sexual partner of his diagnosis before sexual contact, and obtained consent. That prospect seems unlikely, as New York courts have construed Section 2307 to include a disclosure element. *See Fan v. Sabin*, Index No. 158780/2012, 2015 WL 5547775, at *6 (N.Y. Sup. Ct. Sept. 21, 2015) ("Public Health Law § 2307 also imposes a duty to disclose."); *Maharam v. Maharam*, 510 N.Y.S.2d 104, 107 (1st Dep't 1986) ("A duty to speak in the circumstances, given the relationship of trust between the parties, can also be predicated upon Section 2307 of the Public Health Law.").

In any event, the defendant is not charged with having consensual sex with an informed partner. As explained above, the defendant cannot allege an infringement of the rights of third parties. "[T]he courts of the United States are not often willing to hear claims based on third-party or *jus tertii* standing, in which litigants argue the unconstitutionality of hypothetical enforcements of the law rather than the actual enforcement that triggered the litigation . . . This means, of course, that there will be some situations in which an unconstitutionally vague regulation is allowed to stand because the enforcement of that regulation caused no direct constitutional injury to the parties before the court—an unfortunate but necessary consequence of courts' reluctance to adjudicate broad constitutional challenges." *Farrell*, 449 F.3d at 482. Thus, the defendant must show that the application of Section 2307 to *his* conduct—having unprotected sex knowing he had herpes and without informing his partner—violated *his* substantive due process rights. As explained above, he cannot do so.

c.  *As-Applied Vagueness Challenge*

The Due Process Clause of the Fourteenth Amendment requires that every criminal statute "(1) give the person of ordinary intelligence a reasonable opportunity to know what is

prohibited, and (2) provide explicit standards for those who apply the statute." *Dickerson*, 604

F.3d at 741 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (alterations and

citation omitted)).  "A plaintiff making an as-applied challenge must show that the statute in

question provided insufficient notice that his or her behavior at issue was prohibited." *Id.* at 745

(citation omitted).  The standard, however, is an objective one: "whether the law presents an

ordinary person with sufficient notice of or the opportunity to understand what conduct is

prohibited or proscribed, not whether a particular plaintiff actually received a warning that

alerted him or her to the danger of being held to account for the behavior in question." *Id.* at

745-46 (internal citation and quotation marks omitted).

     "Even if a person of ordinary intelligence has notice of what a statute prohibits, the

statute nonetheless may be unconstitutionally vague 'if it authorizes or even encourages arbitrary

and discriminatory enforcement.'" *Id.* at 747 (quoting *Hill v. Colorado*, 530 U.S. 703, 732

(2000)).  Nevertheless, a law need not "achieve meticulous specificity, which would come at the

cost of flexibility and reasonable breadth." *Id.* (citations and internal quotation marks omitted).

"Moreover, a statute that provides what may be unconstitutionally broad discretion if subjected

to a facial challenge may still be upheld as constitutional on an as-applied challenge if the

particular enforcement at issue is consistent with the core concerns underlying the statute such

that the enforcement did not represent an abuse of the discretion afforded under the statute." *Id.*

at 748 (citation, alterations and internal quotation marks omitted).

     Section 2307 of the New York Public Health Law provides that "[a]ny person who,

knowing himself or herself to be infected with an infectious venereal disease, has sexual

intercourse with another shall be guilty of a misdemeanor."  A person of ordinary intelligence

would understand that he could be charged under Section 2307 for engaging in sexual intercourse knowing himself to be infected with herpes.

The defendant argues that the law is vague because it does not define "sexual intercourse" or "what constitutes an STD." (ECF No. 49 at 10, 11.) According to the defendant, it is not clear to an ordinary person that "sexual intercourse" means sexual intercourse—and not kissing or anal intercourse—or that venereal disease includes herpes. (*Id.*) "Even if there is ambiguity as to the margins of what conduct is prohibited under the statute," *Dickerson*, 604 F.3d at 747, it is clear to an ordinary person that Section 2307 prohibits him from having sex knowing that he is infected with herpes.[6]

Finally, the conduct alleged in the indictment falls within the "core concern" of the statute—to protect the public from the spread of infectious diseases.

---

[6] The defendant does not argue that Section 2307 authorizes arbitrary or discriminatory enforcement, a challenge reserved for statutes that authorize law enforcement to make subjective determinations in enforcing the statute. *See, e.g.*, *Dickerson*, 604 F.3d at 747 (statute criminalizing possession of articles "in any way resembling" those worn by police officers); *Kuck v. Danaher*, 822 F. Supp. 2d 109, 134 (D. Conn. 2011) (statute requiring a discretionary "suitability" determination before issuing a pistol permit in order to determine whether the applicant possesses the "essential character and temperament necessary to be entrusted with a weapon") (citation omitted).

**CONCLUSION**

The defendant's motion to dismiss and motion to strike are denied.

**SO ORDERED.**

                               s/Ann M. Donnelly

                           _____

                           Ann M. Donnelly

                           United States District Judge

Dated: Brooklyn, New York
       May 22, 2020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
**UNITED STATES OF AMERICA**,                                :
                                                             :
             – against –                                     :    **MEMORANDUM DECISION AND**
                                                             :    **ORDER**
**ROBERT SYLVESTER KELLY**,                                  :    19-CR-286 (AMD)
                                                             :
                                      Defendant.             :
------------------------------------------------------------ X

**ANN M. DONNELLY**, United States District Judge:

      The defendant was charged with racketeering in violation of 18 U.S.C. §§ 1962(c) and

1963, three counts of Mann Act transportation to engage in illegal sexual activity in violation of

18 U.S.C. § 2421(a), three counts of Mann Act coercion and enticement to engage in illegal

sexual activity in violation of 18 U.S.C. § 2422(a), one count of Mann Act coercion of a minor to

engage in illegal sexual activity in violation of 18 U.S.C. § 2422(b), and one count of Mann Act

transportation of a minor with intent to engage in illegal sexual activity in violation of 18 U.S.C.

§ 2423(a). (ECF No. 43.) On September 27, 2021, the jury convicted the defendant of all

counts. (T. Tr. 4765-73.)

      In February and March 2020, the defendant moved to dismiss Count One of the

indictment and the counts of the indictment incorporating New York Public Health Law Section

2307. (ECF Nos. 41, 42.) I denied the motion. (ECF No. 69.) On the morning of jury selection,

the defendant filed a second motion to dismiss the indictment, making some of the same

arguments he made in the first motion.[1] (ECF No. 159.) The government opposed. (ECF No.

---

[1] In the second motion, the defendant sought dismissal of the entire indictment.

168.)  I denied the motion on August 18, 2021.  (T. Tr. 4.)   This opinion sets forth the basis for

that decision.

## BACKGROUND

The third superseding indictment, returned on March 12, 2020, charged the defendant

with racketeering and violations of the Mann Act.  (ECF No. 43.)  Specifically, and as is relevant

to the motion to dismiss:

Two of the racketeering acts (Racketeering Acts Twelve and Fourteen) and four of the

Mann Act counts (Counts Six through Nine) included allegations that the defendant had sexual

intercourse with Jane Doe #6 in violation of Section 120.20 of the New York Penal Law

("CPL")—reckless endangerment in the second degree—and Section 2307 of the New York

Public Health Law ("PHL"), which prohibits someone who knows that he has "an infectious

venereal disease" from having sexual intercourse with another person.  The indictment alleged

that the defendant "engaged in unprotected sexual intercourse with Jane Doe #6 without first

informing [her] that he had contracted herpes and obtaining her consent to sexual intercourse in

these circumstances."  (*Id.* ¶¶ 33-34, 37-38, 43-46.)

Racketeering Act One charged that the defendant, together with others, bribed a public

employee "[o]n or about August 30, 1994" "in violation of Illinois Criminal Code Sections 5/33-

1(a) and 5/5-1."  (*Id.* ¶ 13.)  Racketeering Act Three charged that the defendant, together with

others, confined Jane Doe #3 against her will "[i]n or about and between 2003 and 2004" "in

violation of Illinois Criminal Code Sections 5/10-1 and 5/5-1."  (*Id.* ¶ 15.)

Three of the racketeering acts charged (Racketeering Acts Two, Seven and Ten) accused

the defendant of inducing a minor "to engage in sexually explicit conduct for the purpose of

producing one or more visual depictions of such conduct."  (*Id.* ¶¶ 14, 21, 30.)

## DISCUSSION

The defendant raised three challenges to the third superseding indictment.[2]  First, he

argued that the PHL Section 2307 and CPL Section 120.20 charges should have been dismissed

on the theory that the government could not prove the elements as a matter of law; the defendant

contended that dismissing these charges would make venue inappropriate in the Eastern District

of New York, and that the indictment should have been dismissed accordingly.  (ECF No. 159 at

5-10.)  Next, the defendant argued that Racketeering Acts One and Three should have been

dismissed because they were untimely under Illinois state statutes of limitations.  (ECF No. 159

at 11.)  Third, the defendant claimed that Racketeering Acts Two, Seven and Ten, which charged

the defendant with coercing a minor to create child pornography, should have been dismissed

because "there [was] no evidence that visual depictions exist[ed]."  (*Id.* at 12.)

**I.**     **Racketeering Acts Twelve and Fourteen and Counts Six Through Nine**

The defendant moved to dismiss Racketeering Acts Twelve and Fourteen, as well as

Counts Six though Nine.  These counts charged that the defendant violated the Mann Act when

he "engaged in unprotected sexual intercourse with Jane Doe #6 without first informing [her]

that he had contracted herpes and obtaining her consent to sexual intercourse in these

circumstances," in violation of PHL Section 2307 and CPL Section 120.20.  (ECF No. 43 ¶¶ 33-

---

[2] It is not clear that this second motion to dismiss was timely.  The defendant filed it on August 9, 2021, after prospective jurors completed questionnaires, and on the morning that questioning of individual prospective jurors began.  Federal Rule of Criminal Procedure 12(b)(3) requires certain motions to "be raised . . . pretrial."  Motions that fall under 12(b)(3) include claims of improper venue and defects in the indictment.  Fed. R. Crim. P. 12(b)(3).  Rule 12(c)(3) provides that "if a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely."  The defendant's attempt to evade this result by styling his motion as a 12(b)(2) motion not subject to 12(c)(3) is not persuasive.  The arguments in this motion (which are discussed in detail in the sections below) clearly fall within 12(b)(3).  Nor did the defendant establish good cause for the tardy filing.  Indeed, the defendant moved to dismiss many of the same charges more than a year and a half before filing this motion.  (*See* ECF Nos. 41, 42.)

34, 37-38, 43-46.)  The defendant argued that pretrial dismissal was warranted because as a matter of law, the government could not establish that the defendant violated either state statute. This argument is unavailing for the reasons explained below; thus, the venue challenge also fails.

> **a.** **PHL Section 2307**

PHL Section 2307 prohibits someone who knows that he has "an infectious venereal disease" from having sexual intercourse with another person.  The indictment charged that the defendant had sexual intercourse with Jane Doe #6 without informing her that he had herpes, or obtaining her consent to have sexual intercourse in those circumstances.  (ECF No. 43 ¶¶ 33-34, 37-38, 43-46.)  According to the defendant, herpes is not a "venereal disease" within the meaning of the statute.  (ECF No. 159 at 5-8.)  This argument is not persuasive.

The language of PHL 2307 is unambiguous, and provides that "[a]ny person who, knowing himself or herself to be infected with an infectious venereal disease, has sexual intercourse with another shall be guilty of a misdemeanor."  Herpes falls within the statute's plain terms.  *See People ex rel. Negron v. Superintendent, Woodbourne Corr. Facility*, 36 N.Y.3d 32, 36 (2020) (quoting *State of New York v. Patricia II.*, 6 N.Y.3d 160, 162 (2006)) ("[W]here the language of a statute is clear and unambiguous, courts must give effect to its plain meaning.").  Courts "construe words of ordinary import with their usual and commonly understood meaning" and "dictionary definitions [are] useful guideposts in determining the meaning of a word or phrase."  *Walsh v. New York State Comptroller*, 34 N.Y.3d 520, 524 (2019) (quoting *Nadkos, Inc. v Preferred Contrs. Ins. Co. Risk Retention Grp. LLC*, 34 N.Y.3d 1, 7 (2019)) (using Merriam-Webster's Collegiate Dictionary and Black's Law Dictionary to interpret a state statute).  "Venereal disease" is just an antiquated term for "sexually transmitted disease."  *See* VENEREAL DISEASE, SEXUALLY TRANSMITTED DISEASE, Black's Law Dictionary (11th ed. 2019) (the entry for "venereal disease" says "see sexually transmitted

disease[;]" which, in turn, is defined as a "disease transmitted only or chiefly by engaging in

sexual acts with an infected person" and "[a]lso termed *venereal disease*.") (emphasis in

original).  Merriam Webster likewise defines "venereal disease" as "a contagious disease (such

as gonorrhea or syphilis) that is typically acquired in sexual intercourse." *Venereal Disease*,

Merriam-Webster.com, https://www.merriam-webster.com/dictionary/venereal%20disease

(last visited Oct. 25, 2021).  Genital herpes is one such disease.  The Centers for Disease Control

("CDC") defines genital herpes as "a common sexually transmitted disease (STD) that any

sexually active person can get." *Genital Herpes – CDC Fact Sheet*, CDC,

https://www.cdc.gov/std/herpes/stdfact-herpes.htm (last visited Oct. 25, 2021).

Moreover, New York courts have found that PHL Section 2307 includes herpes.  *See*

*Maharam v. Maharam*, 123 A.D.2d 165, 170-71 (1st Dep't 1986) (finding a duty to disclose

genital herpes based on PHL Section 2307); *Fan v. Sabin*, 49 Misc. 3d 1201(A) (N.Y. Sup. Ct.

2015) (same).

To support a narrower reading of the statute, the defendant cited not case law, but a

statement by the New York Department of Health's Public Health and Health Planning Council

about a proposed (now adopted) amendment to include HIV in the conditions that "constitute the

definition of sexually transmitted diseases for the purpose of" certain sections of the Public

Health Law.  *See* N.Y. Comp. Codes R. & Regs. tit. 10, § 23.1.  "Some commenters expressed

concern that the proposed regulation could have the effect of making it a misdemeanor under

PHL § 2307 for HIV-positive individuals to have sexual intercourse in some circumstances."

*See* NYDOH, Comments and Reponses on Proposed Amendment to Title 10 of the Official

Compilation of Codes, Rules and Regulations of the State of New York Sections 23.1 and 23.2

(May 18, 2016),

https://regs.health.ny.gov/sites/default/files/pdf/recently_adopted_regulations/Expansion%20of%20Minor%20Consent%20for%20HIV%20Treatment%20%20Access%20and%20Prevention.pdf (last visited Oct. 25, 2021). The agency responded that it "interprets the law as only applying to individuals who knowingly expose another individual to acute, bacterial venereal disease such as syphilis or gonorrhea." *Id.* The agency's response says nothing about herpes; the agency was not asked to and did not express a view about herpes. Nor does the statement overcome the plain meaning of "venereal disease." The statutory language is unambiguous, and the Court need not look beyond the plain meaning of the statute's terms.

      **b.**    **CPL Section 120.20**

In addition to charging violations of PHL Section 2307, Racketeering Acts Twelve and Fourteen, and four of the Mann Act counts charged that the defendant violated New York Penal Law Section 120.20, which provides that "[a] person is guilty of reckless endangerment in the second degree when he [(i)] recklessly engages in conduct [(ii)] which creates a substantial risk of serious physical injury to another person." "Serious physical injury" is "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y. Penal Law § 10.00(10).

The defendant maintained that this charge is a "factual impossibility" because "adult consensual intercourse . . . usually does not lead to a serious physical injury which would create a risk of death." (ECF No. 159 at 9-10.) In fact, there is a "substantial risk" that consensual sexual intercourse can lead to serious physical injury, "protracted impairment of health," "protracted disfigurement," or "protracted loss or impairment of the function of any bodily organ," if, for example, one participant does not inform the other that he has a sexually transmitted disease. The defendant was charged with doing exactly that: having sexual

intercourse with another person, while he knew but did not disclose that he had a sexually transmitted disease.  (ECF No. 43 ¶¶ 33-34, 37-38, 43-46.)  Moreover, "serious physical injury" under the statute need not create a risk of death.  As the statute clearly says, "serious physical injury" also includes "serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ."  N.Y. Penal Law § 10.00(10).  New York courts applying the reckless endangerment statute have determined that infecting someone with a sexually transmitted disease without prior disclosure can lead to criminal liability under the statute.  *People v. Williams*, 24 N.Y.3d 1129 (2015).

The defendant cited *People v. Centola*—a vehicular assault case—as support for his claim that the conduct alleged in the indictment was not "reckless."  (ECF No. 159 at 9-10 (citing 61 Misc.3d 1205(A) (Sup. Ct. 2018)).)  *Centola* is entirely different.  Centola was alleged to have driven his truck into a pedestrian so slowly that the collision merely "push[ed]" the victim and "made [him] stumble."  *Centola*, 61 Misc.3d 1205(A).  The court determined that Centola's conduct was "ill-advised, unwise, and imprudent[,]" but that there did "not appear to be any reasonable evaluation of the facts which would lead to the conclusion that because of the actions of the defendant, [the victim] was in danger of a substantial risk of death, or [that the defendant's actions could cause] death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ."  *Id.*  Those facts have nothing to do with this case.  In short, a person who has sexual intercourse with another, knowing but neither disclosing that he has a sexually transmitted disease nor obtaining his partner's consent, exposes that person to a protracted health impairment—the sexually transmitted disease.

The defendant also argued that the indictment did not "allege[] the defendant caused serious physical injury." (*Id.* at 10.)  Racketeering Acts Twelve and Fourteen, as well as Counts Six through Nine were pled properly.  An indictment "need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (quoting *United States v. Alfonso*, 143 F.3d 722, 776 (2d Cir. 1998)).

18 U.S.C. § 2421(a) makes it a crime to "knowingly transport[] any individual in interstate commerce . . ., with intent that such individual engage in . . . any sexual activity for which any person can be charged with a criminal offense."  Section 2422(a) makes it a crime to "knowingly persuade[], induce[], entice[], or coerce[] any individual to travel in interstate commerce . . . to engage in . . . any sexual activity for which any person can be charged with a criminal offense."

Counts Six and Eight charged that the defendant "did knowingly and intentionally transport an individual, to wit: Jane Doe #6, in interstate commerce, with intent that such individual engage in sexual activity for which a person can be charged with a criminal offense, to wit: violations of New York Penal Law Section 120.20 (reckless endangerment) and New York Public Health Law Section 2307 (knowing exposure of infectious venereal disease)[.]"  (ECF No. 43 ¶¶ 43, 45.)  Counts Seven and Nine charged that the defendant "did knowingly and intentionally persuade, induce, entice and coerce an individual, to wit: Jane Doe #6, to travel in interstate commerce, to engage in sexual activity for which a person can be charged with a criminal offense, to wit: violations of New York Penal Law Section 120.20 (reckless endangerment) and New York Public Health Law Section 2307 (knowing exposure of infectious venereal disease)[.]"  (*Id.* ¶¶ 44, 46.)  Racketeering Acts Twelve and Fourteen charged the same

conduct.  (*Id.* ¶¶ 33-34, 37-38.)  Racketeering Acts Twelve and Fourteen, as well as Counts Six

through Nine, also included approximately when and where the conduct was alleged to have

occurred.  (*Id.* ¶¶ 33-34, 37-38, 43-46.)  Because the indictment recites each element of the

federal offense charged and the approximate time and place each charge was alleged to have

occurred, the charges were well pled.[3]

## II.   Racketeering Acts One and Three

The defendant also moved to dismiss Racketeering Acts One and Three as untimely.[4]

Racketeering Act One charged that the defendant, together with others, bribed a public employee

"[o]n or about August 30, 1994" "in violation of Illinois Criminal Code Sections 5/33-1(a) and

5/5-1."  (*Id.* ¶ 13.)  Racketeering Act Three charged that the defendant, together with others,

confined Jane Doe #3 against her will "[i]n or about and between 2003 and 2004" "in violation

of Illinois Criminal Code Sections 5/10-1 and 5/5-1."[5]  (*Id.* ¶ 15.)  The defendant argued that

because the Illinois Criminal Code provides for a three-year limitations period for these offenses,

these predicate acts should have been dismissed.

RICO charges are not governed by state statutes of limitations.  Moreover, a racketeering

act is not an independent count; instead, it is part of the overarching RICO offense.  The relevant

---

[3] The defendant also asserted that permitting the reckless endangerment charge would amount to "criminalizing adult, consensual, sexual intercourse"—conduct which is "unequivocally legal."  (ECF No. 159 at 9-10.)  This is similar to the challenge to the public health law charges that the defendant raised in his first motion to dismiss.  (*See* ECF No. 42.)  The allegation in this case is that the defendant had sexual intercourse knowing that he had a sexually transmitted disease, without disclosing this information or obtaining his partner's consent to have sexual intercourse in those circumstances.  As discussed above, this is a cognizable theory of reckless endangerment under New York law.  *See Williams*, 24 N.Y.3d 1129 (2015).

[4] The defendant seems to have misstated the charges he moved to dismiss as untimely.  In section IV of his brief, the defendant argued that "[t]he allegations contained in Count 1 racketeering act 1, racketeering act 3, racketeering act 5 should be dismissed . . . ."  (ECF No. 159 at 11.)  But the defendant did not discuss Racketeering Act Five in section IV.  (*See id.*)  In any event, Racketeering Act Five was timely for the same reasons that Racketeering Acts One and Three were.

[5] The jury found Racketeering Act Three "not proved" beyond a reasonable doubt.  (T. Tr. 4765.)

statute for evaluating the timeliness of a RICO action is 18 U.S.C. § 3282, which prescribes a

five-year limitations period.  *See United States v. Hunter*, No. 05-CR-188, 2008 WL 268065, at

*9 (E.D.N.Y. Jan. 31, 2008), *aff'd sub nom. United States v. Payne*, 591 F.3d 46 (2d Cir. 2010),

and *aff'd*, 386 F. App'x 1 (2d Cir. 2010).  The Second Circuit "has held in the statute-of-

limitations context that jurisdiction over a single RICO predicate act confers jurisdiction over

other predicate acts."  *United States v. Wong*, 40 F.3d 1347, 1367 (2d Cir. 1994).  Thus "[a]

prosecution for [allegedly] violating § 1962(c) is [timely if] the defendant committed at least one

predicate act within the limitations period."  *Hunter*, 2008 WL 268065, at *9.  Accordingly, and

as the Second Circuit has recognized, "a defendant may be liable under [§ 1962(c)] for predicate

acts the separate prosecution of which would be barred by the applicable statute of limitations, so

long as that defendant committed one predicate act within the five-year limitations period."[6]

*Wong*, 40 F.3d at 1367.

      The indictment charged the defendant with racketeering acts alleged to have taken place

as recently as December 2018.  (*See* ECF No. 43 ¶ 31.)  Thus, the charges were timely.

**III.**    **Racketeering Acts Two, Seven and Ten**

      The defendant moved to dismiss Racketeering Acts Two, Seven and Ten.  Each charged

the defendant with inducing a minor "to engage in sexually explicit conduct for the purpose of

producing one or more visual depictions of such conduct" in violation of 18 U.S.C. § 2251(a).

(*Id.* ¶¶ 14, 21, 30.)  To prove this charge, the government was required to prove three elements

beyond a reasonable doubt: that "(1) the victim was less than 18 years old; (2) the defendant

used, employed, persuaded, induced, enticed, or coerced the minor to take part in sexually

---

[6] The defendant did not address this well-established rule in his reply brief; instead, he simply reiterated
his claim that state law statutes of limitations govern federal RICO cases.

explicit conduct for the purpose of producing a visual depiction of that conduct; and (3) the visual depiction was produced using materials that had been transported in interstate or foreign commerce." *United States v. Puglisi*, 458 Fed. App'x 31, 33 (2d Cir. 2012) (citing *United States v. Broxmeyer*, 616 F.3d 120, 124 (2d Cir. 2010)).

Racketeering Acts Two, Seven and Ten were pled properly. As explained in section I.b, an indictment "need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Yannotti*, 541 F.3d at 127. The indictment alleged the required elements. Each of Racketeering Acts Two, Seven and Ten stated that the defendant "did knowingly and intentionally employ, use, persuade, induce, entice and coerce a minor . . . to engage in sexually explicit conduct for the purpose of producing one or more visual depictions of such conduct, which visual depictions were produced using materials that had been mailed, shipped and transported in interstate and foreign commerce." (ECF No. 43 ¶¶ 14, 21, 30.) Each also stated the time and place these acts were alleged to have occurred. (*Id.*)

In asserting that "there is no evidence that visual depictions exist," (ECF No. 159 at 12), the defendant confused the standards of pleading with the standards of proof at trial. "Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial . . . , the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." *United States v. Alfonso*, 143 F.3d 772, 776-77 (2d Cir. 1998). The government was entitled to present its evidence at trial, after which the defendant could challenge the sufficiency of that evidence pursuant to a Rule 29 motion. *United States v. Raniere*, 384 F. Supp. 3d 282, 302 (E.D.N.Y. 2019); Fed. R. Crim. P. 29. Before the trial began, the government had not made a full proffer of its evidence in this case. Nor was there a

"stipulated record."  (*See* ECF No. 159 at 3.)  Thus, so long as the indictment was facially

valid—which it was for the reasons described above—pretrial dismissal was not warranted.[7]

**CONCLUSION**

For these reasons, the motion to dismiss was denied.

**SO ORDERED.**

s/Ann M. Donnelly
_____
ANN M. DONNELLY
United States District Judge

Dated:  Brooklyn, New York
        October 26, 2021

---

[7] The defendant also argued that pretrial dismissal is warranted "where the operative facts are undisputed and the government fails to object to the district court's consideration of those undisputed facts in making the determination regarding a submissible case."  (ECF No. 159 at 4 (citing *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994)).)  But the operative facts were disputed.  (*See* ECF No. 168 at 8 n.7.)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

UNITED STATES OF AMERICA,

         – against –

ROBERT SYLVESTER KELLY,

                    Defendant.

------------------------------------------------------------ X

:
:
:
:
:
:
:
:
:

**ORDER**

19-CR-286 (AMD)

**ANN M. DONNELLY**, United States District Judge:

The defendant was charged with racketeering in violation of 18 U.S.C. §§ 1962(c) and

1963, three counts of Mann Act transportation to engage in illegal sexual activity in violation of

18 U.S.C. § 2421(a), three counts of Mann Act coercion and enticement to engage in illegal

sexual activity in violation of 18 U.S.C. § 2422(a), one count of Mann Act coercion of a minor to

engage in illegal sexual activity in violation of 18 U.S.C. § 2422(b), and one count of Mann Act

transportation of a minor with intent to engage in illegal sexual activity in violation of 18 U.S.C.

§ 2423(a).  (ECF No. 43.)  On September 27, 2021, the jury convicted the defendant of all

counts.  (T. Tr. 4765-73.)

Prior to trial, the government filed motions *in limine*, which the defendant generally

opposed.  (ECF Nos. 121, 133, 135, 136, 137, 145, 146, 151.)  At the final pretrial conference on

August 3, 2021, and before opening arguments on August 18, 2021, I ruled on most of these

requests, reserving decision on two of them.[1]  (Hr'g Tr. 35:7-36:11; T. Tr. 4-8.)  On September

---

[1] Rule 404(b)(3) requires the government to provide "reasonable notice" of any Rule 404(b) evidence
before trial, "so that the defendant has a fair opportunity to meet it."  The written notice must "articulate
. . . the permitted purpose for which the [government] intends to offer the evidence and the reasoning
that supports the purpose."  On July 23, 2021, the government filed its motions *in limine*, outlining
evidence it sought to admit at trial—including under Rule 404(b)—and, for each request, the permitted
purpose for the evidence and the corresponding reasoning.  (ECF Nos. 133, 135.)  Thus, the government

27, 2021, the jury delivered its verdict, finding the defendant guilty of each of the nine counts charged.  (T. Tr. 4765-73.)  This opinion explains the rationale for those rulings.[2]

## LEGAL STANDARD

"The purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, trial."  *McLeod v. Llano*, No. 17-CV-606, 2021 WL 1669732, at *2 (E.D.N.Y. Apr. 28, 2021) (quoting *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996)).  "*In limine* rulings are 'subject to change when the case unfolds.'"  *Id.* (quoting *Luce v. United States*, 469 U.S. 38, 41 (1984)).

Under the Federal Rules of Evidence, evidence is admissible only if it is relevant.  Fed. R. Evid. 402.  Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Under Rule 403, evidence that is relevant may nevertheless be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  In applying Rule 403, the court "conscientiously balance[s] the proffered evidence's probative value with the risk" of the enumerated dangers.  *United States v. Awadallah*, 436 F.3d 125, 131 (2d Cir. 2006).

---

met the notice requirement of Rule 404(b).  *See* Fed. R. Evid. 404(b) Advisory Committee's Note to 2020 Amendment ("[I]n many cases, notice is provided when the government moves *in limine* for an advance ruling on the admissibility of Rule 404(b) evidence.")  Nevertheless, based on the defendant's representation at the final pretrial conference that he needed more time to respond to certain requests, the Court reserved decision on those requests and directed the parties to submit supplemental briefing.  Notably, and as explained below, almost all the evidence the government sought to admit was relevant to proving the enterprise and its structure, rather than "other acts" evidence.

[2] The government moved to admit some evidence that it did not ultimately offer.  Accordingly, I do not discuss those rulings.

As a general matter, evidence of a defendant's prior crimes or bad acts is not admissible to prove propensity.  Fed. R. Evid. 404.  That evidence, however, may be admissible for other purposes, including to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  The Second Circuit "follows the 'inclusionary approach[,]' [which] admits all 'other act' evidence that does not 'serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial . . . nor irrelevant.'"[3]  *United States v. Bayon*, 838 F. App'x 618, 621 n.1 (2d Cir. 2021) (summary order) (quoting *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011)).  Moreover, Rule 404(b) does not preclude direct evidence of the existence of a RICO enterprise, evidence that is inextricably intertwined with evidence of a charged offense or evidence that provides necessary background to the charged offenses.  *United States v. Rivera*, No. 13-CR-149, 2015 WL 1875658, at *2 (E.D.N.Y. Apr. 22, 2015) (quoting *United States v. Baez*, 349 F.3d 115, 120 (2d Cir. 2007)) ("When a defendant has been charged with racketeering offenses, it is well settled that 'the government may introduce evidence of uncharged offenses to establish the existence of the criminal enterprise.'"); *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (quoting *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir.1997)) ("[E]vidence of uncharged criminal activity is not considered other crimes evidence under [Rule 404(b)] if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.").

---

[3] The standard of proof under Rule 404(b) is whether a "jury 'could reasonably conclude,' by a 'preponderance of the evidence,' that 'the act occurred and that the defendant was the actor.'"  *Boyce v. Weber*, No. 19-CV-3825, 2021 WL 2821154, at *6 (S.D.N.Y. July 7, 2021) (quoting *United States v. Gilan*, 967 F.2d 776, 789 (2d Cir. 1992)).

Rule 413 permits certain propensity evidence in the specific context of sexual assault cases. "In a criminal case in which a defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault" so long as the evidence is relevant. Fed. R. Evid. 413(a).

Under Rule 412, "evidence offered to prove that a victim engaged in other sexual behavior" or "evidence offered to prove a victim's sexual predisposition" generally is barred. Fed. R. Evid. 412(a). The rule identifies three specified exceptions: (i) "evidence of specific instances of a victim's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence[,]" (ii) "evidence of specific instances of a victim's sexual behavior with respect to the person accused of sexual misconduct, if offered by the defendant to prove consent or if offered by the prosecutor[,]" and (iii) "evidence whose exclusion would violate the defendant's constitutional rights." Fed. R. Evid. 412(b)(1). If the defendant intends to offer Rule 412(b) evidence, he must move to do so at least 14 days before trial (unless the court, for good cause, sets a different schedule) and the motion must "specifically describe[] the evidence and state[] the purpose for which it is to be offered." Fed R. Evid. 412(c). The defendant also must serve this motion on all parties and give notice to the victim. *Id.*

Finally, hearsay—an out-of-court statement offered for the truth of the matter it asserts—is inadmissible unless it falls within an enumerated carveout or exception. Fed. R. Evid. 801, 802, 803.

## DISCUSSION

### I.   Requests to Admit Certain Evidence

**a.     Sexual contact with Jane Doe #1 (a minor) in 1994.**

The government moved to admit evidence that the defendant had sexual contact with

Jane Doe #1 in 1994, when she was a minor.[4]  (ECF No. 133 at 13-14.)  The motion was

**GRANTED**.

In Racketeering Act One, the defendant was charged with bribing a public employee.

(ECF No. 43 ¶ 13.)  According to the government, the defendant and his associates bribed a

public official so that the defendant could marry Jane Doe #1 as part of an effort to conceal the

fact that he had sexual contact with her when she was 15 years old.  (ECF No. 133 at 14.)

Evidence of the defendant's sexual contact with Jane Doe #1 was inextricably intertwined with

the evidence of the bribery and established the motive for it.  The evidence was therefore

relevant and not barred by Rule 404(b).  Nor was it barred by Rule 403—it was relevant and

probative for the reasons just discussed and was no more inflammatory than the charged

offenses.  *United States v. Rivera*, No. 13-CR-149, 2015 WL 1875658, at *3 (E.D.N.Y. Apr. 22,

2015) (quoting *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999)) ("Evidence shall be

excluded as unfairly prejudicial when it is 'more inflammatory than the charged crime.'").

**b.     Sexual contact with Jane Doe #7 (a minor) in 1991.**

The government moved to admit evidence that the defendant had sexual contact with

Jane Doe #7 when she was a minor, and that Jane Doe #7 observed the defendant having sexual

---

[4] Jane Doe #1 is deceased.

contact with Jane Doe #1.  (ECF No. 133 at 14.)  In supplemental briefing on this request, the

defendant argued that the evidence was needlessly cumulative.[5]  (ECF No. 156 at 2.)

On August 18, 2021, before opening arguments, I **GRANTED** the request in part and

**DENIED** the request in part.  (T. Tr. 4.)  I found that evidence that Jane Doe #7 witnessed sexual

contact between the defendant and Jane Doe #1 was admissible for the same reasons that

evidence of the defendant's sexual contact with Jane Doe #1 was admissible.  I also found that

evidence of the defendant's sexual contact with Jane Doe #7 was not admissible because it took

place before the enterprise began, and was needlessly cumulative.  (*Id.*)

On September 4, 2021, the government renewed its request to admit evidence of the

defendant's sexual contact with Jane Doe #7, arguing that it was inextricably intertwined with

the evidence the Court had ruled admissible, and made an additional proffer that when the

defendant had sexual contact with Jane Doe #7 and other minors, his associates knew what the

defendant was doing.  (ECF No. 192.)  The defendant opposed.  (ECF No. 202.)  On September

9, 2021, I **GRANTED** the government's request.  (T. Tr. 2848-50.)  The government's

additional proffer made clear that the evidence was inextricably intertwined with Jane Doe #7's

account of witnessing sexual contact between the defendant and Jane Doe #1, and was

additional, relevant evidence of the enterprise's means and methods.  *Boyle v. United States*, 556

U.S. 938, 946 (2009) (an association-in-fact enterprise must have "a purpose [and] relationships

among those associated with the enterprise.").  Accordingly, the evidence was neither unduly

prejudicial nor cumulative.  Fed. R. Evid. 403.

---

[5] There was no need for a further evidentiary hearing.  (*See* ECF No. 156 at 2.)  The parties briefed these
issues and had an opportunity to make their arguments during the August 3, 2021 pretrial conference.
Moreover, as stated above, rulings on motions *in limine* are subject to change as a trial unfolds.

**c.      Sexual contact with Jane Doe #8 (a minor) in 1994.**

The government moved to admit evidence that the defendant had sexual contact with Jane Doe #8 in 1994, when she was a minor.  (ECF No. 133 at 14-15.)  Specifically, the government sought to present evidence that Jane Doe #8 was at the defendant's concert, and that one of the defendant's associates directed her backstage where she had sexual contact with the defendant.  (*Id.*)  The request was **GRANTED**.

This evidence was direct evidence of the enterprise and its means and methods.  To establish an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), the government was required to prove beyond a reasonable doubt, among other things, "a purpose [and] relationships among those associated with the enterprise."  *Boyle*, 556 U.S. at 946.  The indictment charged the defendant with leading an enterprise that included the defendant, his entourage, and others, and charged that the purpose of the enterprise was "to recruit women and girls to engage in illegal sexual activity with" the defendant, including by recruiting women and girls at concerts.  (ECF No. 43 ¶¶ 1-4.)  Evidence of the defendant's encounter with Jane Doe #8 was probative of the existence of the enterprise and the way it operated.  Thus, it was relevant and not barred by Rule 404(b).  Finally, this evidence was not unduly prejudicial.  It was no more inflammatory than the charged offenses and did not raise other Rule 403 concerns.

**d.      Sexual contact with Jane Doe #9 (a minor) in 1995.**

The government moved to admit evidence that the defendant had sexual contact with Jane Doe #9 in 1995, when she was a minor.  (ECF No. 133 at 15.)  In particular, the government sought to introduce evidence that the defendant began a sexual relationship with Jane Doe #9 when she was 17 years old, that the defendant slapped her when she laughed at another man's joke, that she contracted herpes from the defendant, and that she told him that he had given her herpes.  (ECF No. 133 at 15.)  In supplemental briefing, the defendant argued that this evidence

was needlessly cumulative.  (ECF No. 156 at 2.)  The request was **GRANTED** in part and **DENIED** in part.

Evidence that Jane Doe #9 had a sexual relationship with the defendant in 1995, contracted herpes from him, and disclosed that she had herpes to him, was admissible to show that the defendant knew he had herpes, which was charged in Racketeering Acts Eight, Twelve and Fourteen, as well as in Counts Six through Nine.  (ECF No. 43 ¶¶ 22-24, 32-34, 36-38, 43-46.)  The evidence was therefore relevant.  Fed. R. Evid. 401, 404(b).  The evidence was not unduly prejudicial.  It was not more sensational than the charged offenses and it did not raise other Rule 403 concerns.  Evidence that the defendant slapped Jane Doe #9 when she laughed at another man's joke, although relevant, was needlessly cumulative.  Fed. R. Evid. 401, 403.

### e.      Exposure of Jane Doe #11 to a sexually transmitted disease in 2001.

The government moved to admit evidence that the defendant had sexual contact with Jane Doe #11 without disclosing that he had herpes, that Jane Doe #11 told the defendant she believed she contracted herpes from him in 2001, and that Jane Doe #11 entered a financial settlement with the defendant.  (ECF No. 133 at 17.)

In supplemental briefing on this request, the defendant argued that evidence of the settlement should be excluded because the jury would interpret it, inappropriately, as a concession of guilt, and because allowing the settlement agreement into evidence "would send a chilling effect to any future settlements."  (ECF No. 156 at 1; ECF No. 164 at 1-2.)  Citing Rule 701(c), which prohibits a lay witness from testifying "based on scientific, technical, or other specialized knowledge within the scope of Rule 702," the defendant also argued that Jane Doe #11 should not be permitted to testify that she contracted herpes from the defendant.  (ECF No. 164 at 1-2.)  The government responded that the settlement agreement was admissible under Rule 408.  (ECF No. 162 at 2.)

The government's request was **GRANTED**.

Evidence that Jane Doe #11 told the defendant that she believed she contracted herpes from him was relevant—it was evidence that he knew he had herpes, which the government was required to establish beyond a reasonable doubt to prove Racketeering Acts Eight, Twelve and Fourteen, as well as Counts Six through Nine.  (ECF No. 43 ¶¶ 22-24, 32-34, 36-38, 43-46); Fed. R. Evid. 401.  The defendant's Rule 701 argument was unavailing.  Jane Doe #11's testimony about her interactions and communications with the defendant, and about her own medical status, is not "expertise" within the meaning of Rule 702.

Jane Doe #11's settlement agreement was also admissible.  It was evidence of the enterprise and its means and methods—in particular, the efforts the enterprise undertook to conceal and perpetuate the enterprise.  Fed. R. Evid. 401.  Nor was it precluded by Rule 408. While evidence of a settlement agreement "to prove . . . the validity or amount of a disputed claim" "is not admissible," Fed. R. Evid. 408(a), "[t]he court may admit this evidence for another purpose."  Fed. R. Evid. 408(b).  In this case, the agreement was admissible "for a purpose other than to prove or disprove the validity of the claims that the [agreement was] meant to settle." *Westside Winery Inc. v. SMT Acquisitions LLC*, No. 19-CV-4371, 2020 WL 8413554, at *4 (E.D.N.Y. Nov. 5, 2020) (quoting *In re Subpoena Issued to Commodity Futures Trading Comm'n*, 370 F. Supp. 2d 201, 210 (D.D.C. 2005)).  As discussed above, the agreement demonstrated the defendant's efforts to conceal the enterprise, and was thus admissible.[6]

---

[6] Moreover, it is not at all clear that the settlement agreement was legal or enforceable.  *See Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 580 (2d Cir. 2006) ("Contracts for an illegal purpose or contrary to public policy are not enforceable."); *Cosby v. Am. Media, Inc.*, 197 F. Supp. 3d 735 (E.D. Pa. 2016) (finding settlement agreement unenforceable as violative of public policy to the extent it prevented parties from cooperating with a criminal investigation); *Royce v. Michael R. Needle, P.C.*, 381 F. Supp. 3d 968, 990 (N.D. Ill. 2019) ("private agreement[s] . . . contrary to public policy" are "not enforce[able]."); 23 Fed. Prac. & Proc. Evid. § 5314

**f.      Sexual contact with Jane Doe #13 (a minor) in 2006.**

The government moved to admit evidence that the defendant had sexual contact with
Jane Doe #13 in 2006, when she was a minor.  (ECF No. 133 at 18.)  According to the
government, the defendant met Jane Doe #13 at a concert when she was 15 years old.  (*Id.*)  He
began a sexual relationship with her, and directed his associates to arrange Jane Doe #13's travel
to visit him in Chicago.  (*Id.*)  The request was **GRANTED**.

The proposed evidence was direct evidence of the enterprise, its purposes and its means
and methods.  It was therefore relevant and not barred by Rule 404(b).  The proposed evidence
was admissible under Rule 403—it was probative of the enterprise and no more inflammatory
than the charged offenses.

**g.      Sexual contact with John Doe #1 (a minor) in 2006.**

The government moved to admit evidence that the defendant had sexual contact with
John Doe #1 in 2006, when John Doe #1 was a minor.  (ECF No. 133 at 18-19.)  The
government sought to present evidence that the defendant promised to help John Doe #1 with his
musical career, began a sexual relationship with him, and directed him to engage in filmed
sexual encounters with others.  (*Id.*)  The request was **GRANTED**.

This evidence was direct evidence of the enterprise's purposes, as well as its means and
methods.  The indictment charged, among other things, that one of the purposes of the enterprise
was "to produce pornography, including child pornography."  (ECF No. 43 ¶ 2.)  Thus, the
evidence was relevant and not barred by Rule 404(b).  Finally, the evidence was not unduly

---

(2d ed.) ("if the compromise agreement is itself illegal . . . evidence of this is admissible under Rule
408.).

prejudicial.  It was no more inflammatory than the charged offenses and did not raise other Rule

403 concerns.

 **h.**  **Threats toward Employee #1 and settlement payment to Jane Doe #15.**

 The government moved to admit evidence that the defendant threatened Employee #1, a

talent manager, and that he entered into a settlement agreement with Jane Doe #15.  (ECF No.

133 at 19-20.)  In particular, the government alleged that the defendant met Jane Doe #15

through her talent manager, Employee #1, when Jane Doe #15 was 17 years old, and that the

defendant promised to act as a mentor to Jane Doe #15 in the music industry.  (*Id.*)  The

government also moved to introduce evidence that Jane Doe #15 subsequently accused the

defendant of sexually abusing her, that the defendant threatened and intimidated Employee #1,

causing her to sign an affidavit falsely stating that she did not witness the defendant do anything

inappropriate to Jane Doe #15, and that the defendant reached a financial settlement with Jane

Doe #15.  (*Id.*)  In supplemental briefing, the defendant argued that the evidence was needlessly

cumulative.  (ECF No. 156 at 2.)  The government's request was **GRANTED**.

 The evidence showed the enterprise's means and methods—specifically, it showed the

enterprise's efforts to perpetuate and conceal the enterprise.  Thus, the evidence was relevant and

not barred by Rule 404(b).  Nor was it unduly prejudicial because it was no more inflammatory

than the charged offenses.

 **i.**  **Abuse of Jane Doe #18 from 2016 to 2017.**

 The government moved to admit evidence that the defendant abused Jane Doe #18,

psychologically and physically.  (ECF No. 133 at 21-22.)  According to the government, Jane

Doe #18 began a sexual relationship with the defendant after one of his associates approached

her at a concert.  (*Id.*)  The defendant then subjected her to his "rules," and punished her,

including physically, when he perceived that she had broken them, directed her to write letters

containing embarrassing false statements about herself, and directed her to have sex with him and others, which was filmed. (*Id.*) The request was **GRANTED**.

This was direct evidence of the enterprise, its purposes and its means and methods. It showed the defendant's control over his associates and the victims of the enterprise. It also was inextricably intertwined with evidence of the charged offenses involving Jane Doe #5. The proposed evidence was also admissible under Rule 413, and was relevant to the charged sexual assaults of Jane Doe #4, Jane Doe #5 and Jane Doe #6. Fed. R. Evid. 413. Moreover, the evidence was not unduly prejudicial or otherwise excludable under Rule 403, because it was no more inflammatory than the charged offenses.

**j.      Threats toward Jane Doe #6 in 2018 and 2019.**

The government moved to admit evidence that the defendant and his associates threatened Jane Doe #6 in an effort to convince her to stop speaking publicly about the defendant and to drop a lawsuit she had filed against him. (ECF No. 133 at 23-27.) According to the government, the defendant and his associates threatened to release compromising photographs of Jane Doe #6; the threats were communicated in person, in text messages to Jane Doe #6's attorney, and through a Facebook page. (*Id.*)  The request was **GRANTED**.

This was direct evidence of the enterprise and its means and methods, including the use of threats and blackmail to conceal and perpetuate the enterprise. It therefore was relevant and not improper Rule 404(b) evidence. Nor was it unduly prejudicial. It was no more sensational than the charged offenses, or otherwise excludable under Rule 403.

**k.      Alleged threats to Jane Doe #19 in 2018.**

The government moved to admit evidence that the defendant directed a former girlfriend, Jane Doe #19, to sign a nondisclosure agreement and to write text messages containing

embarrassing false statements about herself; and that the defendant made veiled threats to her and her family.  (ECF No. 133 at 28.)  The request was **DENIED**.

The proposed evidence was needlessly cumulative.  Fed. R. Evid. 403.  There was other admissible evidence of the enterprise's means and methods.  The government did not explain how this conduct related to the enterprise.

**l.      Bribery of a Cook County clerk in 2019.**

The government moved to admit evidence of a conversation between the defendant and his crisis manager, after the release of a television show about the defendant, and while law enforcement was investigating the defendant.  (ECF No. 133 at 28-29.)  According to the government, the crisis manager told the defendant that he had two people who "know a lot," and that the defendant should "figure out what you can do for them."  (*Id.*)  The defendant responded, "What you do, man, is write something on a piece of paper and give me what I should tip the bailiff.  What I should tip the, uh, the valet.  Like when my uncle come up here and say 'Rob, the valet guy, he parked the car over there.'  I say, 'So what should I give him?'  He say, 'Well, 20, 30, 30 dollars.'  I gave him 30 dollars.  So what I'm saying is I don't know that number."  (*Id.*)  The crisis manager also told the defendant that he had paid a clerk in Cook County $2,500 and given the clerk a "burner" phone to communicate information about the ongoing investigations.  (*Id.*)  The crisis manger said, "That's done . . . You don't know nothing," to which the defendant replied, "Exactly."  (*Id.*)  According to the government, this conversation was evidence of the defendant's willingness to bribe someone, and therefore was probative of the continuity of the enterprise.  (*Id.* at 29, 37.)  The request was **DENIED**.

The proposed evidence was marginally relevant because it went to the means and methods the enterprise undertook to conceal and perpetuate itself, but it was too tenuous to be admitted.  While the evidence demonstrated the defendant's willingness to bribe someone, there

was no proof that he actually followed through.  For these reasons, the proposed evidence had the potential to confuse the jury, and was not admissible.  Fed. R. Evid. 403.

**m.     The defendant's 2008 state criminal case.**

The government moved to admit evidence that the defendant was tried on child pornography charges in 2008 in Cook County, Illinois and that he tried to influence one of the jurors.  (ECF No. 133 at 29-30.)  The request was **DENIED**.

This evidence was not relevant to the alleged enterprise.  Fed. R. Evid. 401.  Moreover, it was impermissible propensity evidence, and cast the defendant as a long-time subject of suspicion.  Fed. R. Evid. 403, 404(b).

**n.     The defendant's efforts to obtain child pornography.**

The government moved to admit evidence that Jane Doe #5 obtained child pornography for the defendant, at his direction.  (ECF No. 133 at 30-31.)  The request was **DENIED**.

This evidence was not admissible.  It was not clearly relevant—the government did not demonstrate that the allegation related to the enterprise or its ends.  Fed. R. Evid. 401.  Moreover, the evidence was unduly prejudicial and potentially confusing, especially given the government's concession that the people in the recordings at issue might not be children.  (*See* ECF No. 133 at 31.)

**o.     Audio recordings of the defendant's physical abuse and threats.**

The government moved to admit two recordings in which the defendant yelled at and physically assaulted women, including Jane Doe #20.  (ECF No. 133 at 31-33.)  In one of the recordings, the defendant berated and threatened Jane Doe #20.  (*Id.*)  The request was **GRANTED**.

This was direct evidence of the enterprise, its purposes, means and methods, and of the defendant's participation in the enterprise.  The proposed evidence demonstrated the defendant's

control over victims of the enterprise and others, as alleged in the indictment.  (ECF No. 43 ¶¶ 7, 9.)  The evidence was no more inflammatory or sensational than the charged offenses, as it was alleged to depict conduct similar to the conduct charged.  The proposed evidence was not otherwise excludable under Rule 403.

**p.      Jane Doe #5's text messages.**

The government moved to admit text messages that Jane Doe #5 sent to her mother and friends.  (ECF No. 135 at 18-20.)  Because the admissibility of these texts turned on trial testimony, I reserved decision for trial.  At trial, the text messages were admitted without objection.  (T. Tr. 800-01, 811-17, 822-24, 830-36, 883, 889-90, 893-96, 898-99, 1386-87, 3656.)

**q.      Employees' text messages.**

The government moved to admit text messages of two of the defendant's employees that recount, among other things, their observations of the defendant's interactions with them and with others.  (ECF No. 135 at 21-26.)  Because the admissibility of these texts turned on trial testimony, I reserved decision for trial.  At trial, the text messages were admitted without objection.  (T. Tr. 2015, 3402-03, 3414, 3418, 3421-22, 3428-29, 3490.)

**r.      Defendant's text messages.**

The government moved to admit the defendant's text message that his "world" was "huge" and had "many rules."  (ECF No. 135 at 27.)  The request was **GRANTED**.  It was admissible as the statement of a party-opponent, Fed. R. Evid. 801(d)(2), and relevant to the enterprise's means and methods, Fed. R. Evid. 401.  It was not unduly prejudicial and did not otherwise violate Rule 403.

**s.      Electronic note.**

The government moved to admit evidence of an electronic note that Jane Doe #5 wrote

on a cell phone in August 2018 containing a list of the defendant's "rules."  (ECF No. 135 at 35-

36.)  The request was **GRANTED**.

The note was not hearsay.  Rather, it was offered to show the existence of the list, and

that Jane Doe #5 authored it.  It was also relevant—it went to the enterprise's means and

methods and the control that the defendant exercised over Jane Doe #5.

As Jane Doe #5 testified, she wrote the note.  Thus, the note was admissible to show that

she authored the list.  The evidence was not unduly prejudicial; nor did it otherwise raise other

Rule 403 concerns.

**t.      Newspaper Articles**

The government moved to admit certain newspaper articles as "ancient documents"

pursuant to Federal Rules of Evidence 803(16).  (ECF No. 135 at 36-38.)  The articles showed

that the defendant performed in Macon, Georgia on August 30, 1994, in Albany, Georgia on

August 31, 1994, and in Miami, Florida on September 2, 1994.  (*Id.*)

The request was **GRANTED** with the acknowledgment that the ruling could be obviated

by a stipulation by the parties.  Ultimately, the government admitted a heavily redacted version

of the August 31, 1994 article concerning the Georgia concert dates without objection.  (T. Tr.

3760-61.)

**II.      Requests to Exclude Certain Evidence**

**a.      Prior conduct of witnesses.**

The government moved to preclude the defendant from eliciting testimony or other

evidence, and from making arguments, about any victim-witness' past sexual behavior with

anyone other than the defendant or with others at the defendant's direction.  (ECF No. 135 at 3.)

The defendant did not move under Rule 412(c) to introduce such evidence.  Thus, the request was **GRANTED**.  Fed. R. Evid. 412.

      **b.**      **Witnesses' mental health histories.**

The government moved to exclude evidence of the prior mental health histories of certain witnesses.  (ECF No. 136 at 9-12.)  The details were submitted under seal.  The motion was **GRANTED**.

Although "[e]vidence of a witness'[] psychological history may be admissible when it goes to [his or her] credibility," the crucial inquiry is the nature of the infirmity and "whether the witness suffered from the problem at the time of the events to which [the witness] is to testify, so that it may have affected [the witness'] ability to perceive or to recall events or to testify accurately."  *United States v. Wilson*, 493 F. Supp. 2d 464, 467 (E.D.N.Y. 2006).  Nothing in the parties' submissions showed that any witness' mental health history implicated that witness' ability to perceive or recall.

      **c.**      **Evidence about the victims' parents.**

The government moved to preclude the defendant from introducing evidence that the parents of certain victims permitted them to spend time with the defendant or tried to profit from their child's relationship with him.  (ECF No. 135 at 12-14.)  This request was **GRANTED** in part and reserved in part for trial.

At the August 3, 2021 hearing, the government represented that it did not intend to call any of the witnesses' parents.  (Hr'g Tr. 46:6-12.)  Because a parent could not consent to the charged conduct, questions to victim-witnesses about whether their parents consented or permitted the defendant to have sexual contact with them would have been improper.  Fed. R.

17

SpA 47

Evid. 401.  However, questioning with a good-faith basis about a coordinated extortion scheme was permissible, including for impeachment.[7]

> **d.      Evidence of the defendant's prior good conduct.**

The government moved to preclude the defendant from introducing evidence of his prior good conduct, including evidence of music awards or honors.  (ECF No. 135 at 14.)  Decision was reserved for trial, at which the defendant did not put on character evidence.

Although criminal defendants may present evidence of a relevant character trait or reputation testimony, Fed. R. Evid. 404(a)(2)(A), 405, that evidence may "not take the form of specific prior act evidence, or evidence that [the defendant] did not commit bad acts on prior occasions," *United States v. Inniss*, No. 18-CR-134, 2019 WL 6999912, at *8 (E.D.N.Y. Dec. 20, 2019).  Any character evidence must be presented in a permissible form under these rules. Specific prior acts, including award or honors received, are not generally admissible.  At trial, some witnesses testified about the defendant's professional achievements.  (*See, e.g.*, T. Tr. 1476-77 (I ruled that defense counsel's questions about celebrities' presence at the defendant's recording studio were permissible to support the defense's argument that certain conduct and protocols the government had elicited testimony about were attributable to security needs.).)

> **e.      Evidence of Jane Doe #8's employment as an exotic dancer.**

The government moved to preclude the defendant from asking Jane Doe #8 whether she worked as an exotic dancer years after her encounter with the defendant, or about her participation in a lawsuit against the owner of the exotic dance establishment for unpaid wages. (ECF No. 135 at 16-17.)  The request was **GRANTED**.

---

[7] At trial, defense counsel asked some of the witnesses questions along these lines.  (*See, e.g.*, T. Tr. 1105-06 (defense counsel asked a witness about her parents' efforts to get the defendant to engage in business endeavors).)

This evidence was inadmissible.  It was not relevant to or probative of Jane Doe #8's

truthfulness.  *See United States v. David*, No. 04-CR-68, 2007 WL 9717514, at *1 (C.D. Cal.

June 27, 2007) (precluding evidence that government witness worked as an exotic dancer

because "nothing about the job" "connotes veracity or a lack thereof."); *see also* Fed. R. Evid.

403.

### III.    Identities of Victim-Witnesses

The government moved to protect the identity of certain victim-witnesses during the trial.

(ECF Nos. 121, 133.)  Specifically, the government sought an order: (i) permitting these victim-

witnesses to testify using a nickname or their first name; (ii) limiting references to each in open

court to their nickname or first name; (iii) preventing public disclosure, via cross-examination or

otherwise, of their respective addresses, names of family members or exact place of employment.

The government requested that these measures apply to the following victim-witnesses:

- Jane Doe #2
- Jane Doe #3
- Jane Doe #5
- Jane Doe #8
- Jane Doe #10
- Jane Doe #11
- Jane Doe #13
- Jane Doe #15
- Jane Doe #16
- Jane Doe #17
- Jane Doe #18
- Jane Doe #20
- John Doe #1
- John Doe #2

The defendant did not object to the request with respect to any victim-witness except for

Jane Doe #5.  (*See* ECF No. 137 at 1; Hr'g. Tr. 53:2-54:14.)  The government's request was

**GRANTED**.

The Sixth Amendment Confrontation Clause protects two primary interests: the

defendant's need to investigate a witness and to elicit information that might be relevant to the

jury's conclusions about the witness' credibility or knowledge.  *United States v. Marcus*, No. 5-

CR-457, 2007 WL 330388, at *1 (E.D.N.Y. Jan. 31, 2007) (citing *United States v. Marti*, 421

F.2d 1263, 1266 (2d Cir. 1970)).  The government must provide a reason for the limitation it

seeks, and the defendant then must demonstrate a "particularized need" for disclosure; the Court

weighs the defendant's need against the risks to the witness.  *Id.* at 1 (citing *United States v. Bennett*, 409 F.2d 888, 901 (2d Cir. 1969) and *United States v. Cavallaro*, 553 F.2d 300, 305 (2d Cir. 1977)).

The government identified legitimate and compelling reasons for Jane Doe #5 to testify using a pseudonym.  Jane Doe #5 was expected to and did testify "in explicit detail about . . . degrading and humiliating treatment."  Order on Motions in Limine, *United States v. Martinez*, 17-CR-281 (E.D.N.Y. Dec. 18, 2017), ECF No. 34 (Cogan, J.).  The trial garnered a lot of media attention, and there was a significant risk of humiliation and reprisals.  *Marti*, 421 F.2d at 1266 (citing *Alford v. United States*, 282 U.S. 687, 694 (1931)) ("[T]he reason [to limit identifying information about a witness] may be that [she] may [be] subject[ed] to reprisals.").

The defendant argued that identifying Jane Doe #5 publicly and by name would be necessary to his in-court and out-of-court investigation of her and "goes to the heart of her credibility."  (ECF No. 137 at 1-3.)  He further argued that permitting the limitations the government requested would undermine the presumption of innocence.  These arguments are unavailing.

The defendant did not identify a clear, particularized need to have Jane Doe #5's name disclosed publicly.  The defendant knew who Jane Doe #5 is, and investigated her background.  Nor was there any need to disclose Jane Doe #5's identity in order to impeach her.  Defense counsel did a thorough cross-examination of Jane Doe #5 about her prior statements without disclosing her name.  Finally, the Court gave the jury an instruction that the use of nicknames or pseudonyms is common in cases that have garnered media attention.  (T. Tr. 17); *Marcus*, 2007 WL 330388, at *4 (granting application for witnesses to testify using their first names only, and

explaining that "[t]he court will instruct the jury [that this is] due to the sensitive nature of the conduct [the witnesses] will describe and the likelihood of embarrassing publicity.").

In sum, a balancing of the risks to the victim-witnesses against the defendant's interests supported permitting the requested limitations. The victim-witnesses testified about humiliating and explicit acts of abuse, some of which took place when they were minors.

## CONCLUSION

For these reasons, the motions *in limine* were granted in part and denied in part.

**SO ORDERED.**

s/Ann M. Donnelly
_____
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
       November 4, 2021

Proceedings                                                 3409

1           (In open court; outside the presence of the jury.)

2           THE COURTROOM DEPUTY:  All rise.

3           (Defendant present.)

4           THE COURT:  Good morning, everybody.  I know we are

5    going to get the witness in a minute.  I am prepared to rule

6    on the motions in limine.  I am going to adhere to my decision

7    with respect to the videos.  I know I've received

8    Mr. Scholar's letter on it.

9           I think that the evidence is relevant.  The

10   witnesses have testified to the almost constant videotaping of

11   various sexual encounters and this is obviously relevant to

12   the videotapes involving the sexual encounters, they're

13   obviously relevant.  I think some witnesses have been

14   questioned about whether it's Mr. Kelly who is taping them

15   and, in any event, I think they are relevant and I adhere to

16   my decision on those videotapes.

17          With respect to the recordings that the Government

18   represents show that the defendant is verbally abusing and

19   threatening someone, I also am going to adhere to my decision

20   that I made before the trial admitting those recordings.

21   Those recordings are -- they're obviously relevant because

22   they demonstrate the defendant behaving in a way that

23   witnesses have described throughout the trial, that he

24   demanded that they adhere to certain rules and that he

25   directed their activities.  The transcript or the evidence

Proceedings                                                    3410

1    that the Government has submitted demonstrates precisely that.

2            I would also say that the defense, appropriately so,

3    has challenged witnesses about the extent to which they are --

4    that their actions were controlled.  As recently as yesterday

5    through Ms. Copeland, the defense brought out her opinion that

6    he had never locked anybody in any kind of a room, that he

7    showered people with gifts, never denied anybody food, and

8    that's been a theme of the cross-examination of several of the

9    witnesses.

10           So this testimony that the Government proffers or

11   the evidence that the Government proffers is absolutely

12   relevant to that question.  I am admitting that and you have

13   an exception to that ruling.

14           MR. CANNICK:  An exception to both the Court's

15   rulings, Your Honor?

16           THE COURT:  Yes.

17           MR. CANNICK:  Thank you.

18           THE COURT:  Is there anything else before we get the

19   witness?

20           All right.  Let's get the witness and they we will

21   get the jurors.

22           (Pause in proceedings.)

23           THE COURT:  One other thing while we are getting the

24   witness.  I know both sides submitted a request to charge.  We

25   are going through the process of drafting the charge.  I just

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

UNITED STATES OF AMERICA,

           – against –

ROBERT SYLVESTER KELLY,

                         Defendant.

-------------------------------------------------------------- X

**MEMORANDUM DECISION AND ORDER**

19-CR-286 (AMD)

**ANN M. DONNELLY**, United States District Judge:

The defendant, an international music star, was charged with using his fame and organization to lure young people into abusive sexual relationships—a racketeering enterprise that the government alleged spanned about 25 years.  Over the course of a six-week trial, the government presented the testimony of 45 witnesses and introduced hundreds of exhibits, including written, videotaped and audiotaped evidence of the abuse to which the defendant, enabled by his employees and associates, subjected his victims.  On September 27, 2021, a jury convicted the defendant for that conduct.[1]

Before the Court are the defendant's motions pursuant to Federal Rules of Criminal Procedure 29 and 33 for a judgment of acquittal, or, in the alternative, for a new trial.  (ECF Nos. 270, 273, 276, 282, 283.)  In seeking this relief, the defendant attacks almost every aspect of his trial—the sufficiency of the evidence, the credibility of the witnesses, his trial lawyers'

---

[1] The defendant is charged in the Northern District of Illinois with participating in a conspiracy to obstruct justice and receive child pornography.  *See United States v. Kelly et al.*, No. 19-CR-567 (N.D. Ill.)  The trial in that case is set to commence on August 15, 2022.  The defendant also faces charges in Illinois and Minnesota state court.

competence and the Court's evidentiary rulings.  The government opposes.  (ECF Nos. 277, 278, 288.)  For the reasons explained below, I deny the defendant's motions in their entirety.

## BACKGROUND

### I.    Indictment

The defendant was charged in a third superseding indictment with racketeering in violation of 18 U.S.C. § 1962(c) (Count 1); transportation of Jane for the purpose of illegal sexual activity in violation of 18 U.S.C. § 2421(a) (Count 2); coercion of Jane for the purpose of illegal sexual activity in violation of 18 U.S.C. § 2422(a) (Count 3); coercion of Jane, as a minor, for the purpose of illegal sexual activity in violation of 18 U.S.C. § 2422(b) (Count 4); transportation of Jane, as a minor, for the purpose of illegal sexual activity in violation of 18 U.S.C. § 2423(a) (Count 5); transportation of Faith for the purpose of illegal sexual activity in violation of 18 U.S.C. § 2421(a) (Count 6); coercion of Faith for the purpose of illegal sexual activity in violation of 18 U.S.C. § 2422(a) (Count 7); transportation of Faith for the purpose of illegal sexual activity in violation of 18 U.S.C. § 2421(a) (Count 8); and coercion of Faith for the purpose of illegal sexual activity in violation of 18 U.S.C. § 2422(a) (Count 9).  (ECF No. 43.)

### II.   *Curcio* Hearing

On June 14 and 24, 2021, the government advised the Court that Nicole Blank Becker, one of the four attorneys who represented the defendant at trial, had potential conflicts of interest in representing the defendant.[2]  (*See* ECF Nos. 107, 114.)  The government asserted that, in the summer of 2019, Ms. Blank Becker may have entered into an attorney-client relationship with

---

[2] Two other lawyers—Steven Greenberg and Michael Leonard—represented the defendant from the time of his indictment until they moved to withdraw in June of 2021.  (ECF No. 99.)  Thomas Farinella and Nicole Blank Becker also represented the defendant beginning in August of 2019 and April of 2021, respectively.  (ECF Nos. 20, 95.)  Devereaux Cannick joined the defense team in June of 2021, and Calvin Scholar joined shortly thereafter in July of 2021.  (ECF Nos. 113, 130.)

2

someone who was then represented by Gloria Rodriguez in Chicago, and who ultimately testified as a government witness.[3]  (*See* ECF No. 114.)  The Court appointed independent counsel—Ilana Haramati—to advise the defendant.  (*See* ECF No. 112.)  The Court conducted a *Curcio* hearing on June 17 and July 15, 2021.  Ms. Blank Becker and Ms. Rodriguez made written submissions, and both answered a series of questions posed by the Court.  (*See* ECF Nos. 108, 110, 125, 126.)[4]

After considering the submissions and the attorneys' representations, the Court concluded that Ms. Blank Becker had potential conflicts in representing the defendant, but that the conflicts were waivable.  (*Curcio* Tr. 32.)[5]  In particular, the Court found that Ms. Blank Becker "had substantial contacts with potential witnesses," including Jane, "and may have developed a relationship of trust with them even though she [was] never formally retained as their lawyer."  (*Id.*)  Due to Ms. Blank Becker's "confidentiality obligations to them," and "given the nature and extent of those communications and the content of them, she would have a conflict if she were to cross-examine either one of them."  (*Id.*)  The Court also determined that Ms. Blank Becker's communications with both women, knowing that they were represented by another attorney, could raise ethical concerns.  (*Id.* at 33.)  That, too, created potential a conflict because "a person would be motivated to defend himself or herself from the accusation in a way that might keep the lawyer from asking certain questions or calling certain witnesses."  (*Id.*)

Addressing the defendant, the Court explained in detail the risks of being represented by a lawyer who had the potential conflicts that the Court identified.  (*Id.* at 34-39.)  The Court also

---

[3] The government raised other potential conflicts of interest that are not relevant to this decision.

[4] The Court conducted a portion of the inquiry of Ms. Rodriguez *in camera*, because it implicated confidential communications between Ms. Rodriguez and her clients.  Those portions are not relevant to the defendant's claims.

[5] "*Curcio* Tr." refers to the July 15, 2021 proceeding.

explained that if the Court determined that the defendant's waiver was knowing and voluntary, the defendant would not be able to cite Ms. Blank Becker's conflict as a reason to overturn a conviction.  (*Id.* at 46.)  The defendant responded that he understood the risks, including his waiver of the right to use the conflict as the basis for a challenge to a conviction, and, at the Court's request, explained his understanding of the potential conflicts.  (*Id.* at 34-46.)  Ms. Haramati, *Curcio* counsel, confirmed that she had sufficient time to meet with the defendant, that she explained the conflicts to him, that he understood them and that he was capable of making an informed waiver of his right to conflict-free counsel.[6]  (*Id.* at 29-31, 37-38.)  The defendant explained that he wanted to continue with Ms. Blank Becker as one of his lawyers, and waived the conflicts.  (*Id.* at 46.)  Based on the record, the Court accepted the defendant's knowing and intelligent waiver.  (*Id.* at 47.)

### III.   Pre-Trial Motions

In February and March 2020, the defendant moved to dismiss Count 1 of the indictment and the counts of the indictment incorporating New York Public Health Law Section 2307. (ECF Nos. 41, 42.)   In moving to dismiss the Count 1, the defendant claimed that the indictment did not allege a legally cognizable enterprise within the meaning of RICO.  (ECF No. 41 at 5-10.)  In the second motion, the defendant moved to strike the charges that cite Section 2307 on the theory that the law is unconstitutionally overbroad and vague.  (ECF No. 42.)  The Court denied both motions in a written decision on May 22, 2020.  (ECF No. 69.)  On the morning that the oral portion of jury selection was set to begin, the defendant moved to dismiss the indictment on other grounds (ECF Nos. 159, 169); the Court denied that motion also, issuing a subsequent written decision.  (ECF No. 252.)  Before the final pre-trial conference on August 3, 2021, both

---

[6] The Court gave the defendant time to consult with Ms. Haramati, first during the period between June 17 and July 15, 2021, and again on July 15, 2021 for approximately a half hour.  (*Curcio* Tr. 28.)

4

parties filed motions *in limine*.  (ECF Nos. 121, 133, 135, 136, 137.)  As relevant here, the

government sought to admit certain uncharged conduct.  (ECF No. 133.)  The defendant

responded.  (ECF No. 146.)  At the August 3, 2021 pre-trial conference and prior to opening

statements on August 18, 2021, the Court ruled on most of the parties' requests, except for those

on which the Court reserved decision pending hearing the trial evidence.  On November 4, 2021,

the Court issued a written opinion explaining the rationale for its rulings.  (ECF No. 255.)

## IV.    Jury Selection

The Court employed the following system for jury selection.  At the Court's direction, the

parties submitted a joint proposed jury questionnaire.  (*See* ECF No. 54.)  Subsequently, both the

government and the defense submitted requests for additions and changes to the questionnaire

(*see, e.g.*, ECF Nos. 96, 105); the Court reviewed the submissions and modified the

questionnaire accordingly.  (*See* ECF No. 115.)[7]  The end result was a 28-page questionnaire

with 108 questions.  Approximately 575 prospective jurors completed the questionnaire.  Next,

the parties reviewed the completed questionnaires, and agreed that 251 jurors should be stricken

for cause.[8]  (ECF Nos. 152, 157.)  The Court directed the remaining prospective jurors, whom

neither party had challenged, to appear for an in-person *voir dire*.  In addition, the Court directed

the parties to submit any questions that they wanted the Court to put to the prospective jurors.

The parties filed those questions before the oral *voir dire*.

On August 9 and August 10, 2021, the prospective jurors appeared for questioning.  The

Court addressed them as a group, and explained the rules that they must follow and the principles

---

[7] In an October 8, 2020 written order, the Court granted the government's motion for an anonymous and
partially sequestered jury.  (ECF No. 79.)  The defendant does not challenge that decision.

[8] The government submitted 34 additional names that it challenged, and the defendant submitted 145
additional names that he challenged.  This group of prospective jurors was not in the final group that
participated in the *voir dire*.

of law that applied, including that the defendant was presumed to be innocent, and that the

government had the burden of proving the defendant's guilt beyond a reasonable doubt.  (J.S. Tr.

17-21, 197-200.)  The Court questioned the prospective jurors individually and asked the written

questions the parties submitted.  The Court also asked the parties whether they had additional

questions for jurors and put those questions to the jurors.  Following the in-person *voir dire*, the

parties exercised their challenges, both peremptory and for cause.[9]  At the end of jury selection,

which took place over the course of three days, the Court empaneled 12 jurors and six alternate

jurors.[10]

## V.    Trial

The evidence at trial established the following facts.  From the early 1990s until his arrest

in 2019, the defendant, a famous recording artist and professional singer and performer, was the

head of an organization comprised of employees and associates, including managers, engineers,

accountants, personal assistants and so-called "runners," who promoted the defendant's music

and brand, but also catered to his personal needs and demands.  For nearly 25 years, the

defendant used his fame and his enterprise to lure young victims—girls, boys, young women and

men—into abusive sexual relationships, often promising to advance their musical careers.  The

defendant exerted control over his victims by limiting their access to family and friends,

requiring them to engage in degrading sexual acts with him and with multiple partners while he

recorded them, forcing them to write and record false and degrading things about themselves or

their families for the defendant to use as "insurance," among other things.  He also exacted

punishments for violations of his rules; he spanked them, beat them, forced them to have sex

---

[9] Both sides exercised all their peremptory challenges.

[10] The Court excused one of the six alternate jurors due to a financial hardship.  (T. Tr. 144, 464-65.)

with him and recorded them during forced sexual encounters and performing other humiliating acts.  His underlings enabled him by recruiting victims, transporting them, and enforcing the defendant's rules.

The defendant lived in various residences in Chicago from the early 1990s until his arrest.  (T. Tr. 4053 (40 East 9th Street), 1336 (1010 George Street), 3143 (Olympia Fields and Trump Towers).)  He recorded music at CRC Recording Company in the 1990s, 865 North Larabee Street (formerly known as Chicago Trax) from 2003 to 2004, and the basement of his Olympia Fields residence beginning in 2004—the Larabee Street and Olympia Fields studios were called the "Chocolate Factory."  (T. Tr. 684, 1420-22, 1424-26, 1464.)

The defendant had many employees who worked for him in various capacities at different times, seeing to his professional and personal needs.  These employees and associates included Demetrius Smith, the defendant's personal assistant and tour manager (T. Tr. 667-68, 673); Barry Hankerson, another manager (T. Tr. 673); Derrel McDavid, an accountant and manager (T. Tr. 707); Donnie Lyle, a musical director (T. Tr. 1518); Tom Arnold, a studio manager and road manager (T. Tr. 1422-24); and Diana Copeland, the defendant's personal assistant, and then executive assistant.  (T. Tr. 3132-34.)  The defendant also hired "runners" including Nicholas Williams and Anthony Navarro.  (T. Tr. 556, 3511, 3514-15.)  Jermaine Maxey, nicknamed "Bubba," was the defendant's close friend and a member of his entourage.  (T. Tr. 1518, 1949.) Cynthia Oliphant ("Candy") handled security.  (T. Tr. 3140.)  "Top Gun" was one of the defendant's drivers.  (T. Tr. 3142.)  The defendant's numerous personal assistants included Suzette Mayweather, her twin sister Alesiette Mayweather, Diana Copeland, Bruce Kelly, George Kelly ("June Bug"), Milton Brown ("June"), Cheryl Mack and Van Pullen.  (T. Tr. 1942, 1946, 1950, 3139, 3341, 3388.)

These people and the defendant's other employees helped the defendant with all aspects of his life.  For example, Arnold "looked after the building," made sure there were runners available, provided cash for supplies and helped engineers with documentation.  (T. Tr. 1422-23.)  He was responsible for stocking the tour buses and coordinating travel and accommodation.  (T. Tr. 1424.)  The runners answered phones, took messages in the studio, transported "guests" and ran errands, among other tasks.  (T. Tr. 488-91, 3514-15.)  Copeland handled "household responsibilities," and made sure the defendant attended meetings on time.  (T. Tr. 3135-36.)

 The defendant's employees were also charged with contacting young women and girls for him, including those that he selected at his concerts or saw at other locations.  For example, members of the defendant's staff routinely handed out the defendant's phone number to young women and girls in the audiences at his concerts (T. Tr. 1507-10), and invited them backstage or to afterparties.  (T. Tr. 771, 2130, 2552, 2819.)  In addition, these employees would look for women and girls at local malls and other places, and would give them the defendant's contact information.  When the defendant wanted a young woman or girl—referred to at the trial as his "girlfriends" or "female guests"—to travel to meet him, the assistants arranged their flights and hotels.  (T. Tr. 3158, 3401.)  The employees were also charged with escorting these "guests" when they went out in public—to shopping malls, to nail salons and to the defendant's basketball games.  (T. Tr. 972-73, 3150, 3413-14.)  The runners drove the defendant's "guests" to and from the Larabee studio and the Olympia Fields residence, and ordered food for young women and girls.  (T. Tr. 495-96, 499-500, 1426-28, 1437.)  In addition, the employees made sure that the defendant had his backpack, which contained his iPads and the other devices that he used to record his sexual encounters and his "guests."  (T. Tr. 792, 845, 971-72, 2165, 2887-88, 3581.)

The defendant relied on his employees to enforce his various rules and to report any transgressions.  For example, if a young woman or girl needed to use the bathroom or wanted to leave the defendant's home or studio, she was required to ask an employee, who then had to get the defendant's permission.  (T. Tr. 821-22, 1439-40, 2003-05, 2029-31, 2209-2210, 2830-33.) If the "guest" wanted something to eat or drink, she had to ask an employee.  (T. Tr. 2829-33.) The defendant required his underlings to report any "guest" who left her room without permission.  (T. Tr. 506-07.)

When the defendant punished young women or girls for breaking his rules, including, for example, by forcing them to stay in a room or on a tour bus, sometimes for days, the defendant's assistants were required to monitor them.  (T. Tr. 2220, 2222-27, 2229-32.)  If the defendant believed that his employees had been insufficiently watchful or had permitted one of the women to break his rules, he confronted them and often punished them, including by docking their pay. (T. Tr. 3167-69.)

### a.    The Defendant's Herpes Diagnoses

Dr. Kris McGrath, the defendant's primary care physician from 1994 until 2019, treated the defendant for herpes, beginning after June 5, 2000, and before March 19, 2007.  (T. Tr. 400-05, 421.)  Dr. McGrath advised the defendant to inform his sexual partners that he had herpes and to use a condom during sex, prompting the defendant to acknowledge that he should use a condom when he had sex.  (T. Tr. 406, 463.)  Dr. McGrath prescribed Valtrex for the defendant, which his underlings often picked up from the pharmacy.  (T. Tr. 407-09.)

### b.    The Charged Crimes and the Victims

#### i.    *Angela*

"Angela" met the defendant in 1991 when she was 14 or 15 years old, through her friend Tiffany.  (T. Tr. 3274-76.)  Angela wanted to be a singer and dancer, and Tiffany, who was also

9

**SpA 62**

in high school, was an aspiring singer.  (*Id.*)  Tiffany told Angela about the defendant, and

brought her to his apartment in Chicago, along with two other girls who were also in high school.

(T. Tr. 3276-77.)  The defendant and members of his entourage—Bruce Kelly, Demetrius Smith

and Larry Hood—were in the apartment when the girls arrived.  (T. Tr. 3278-80.)

 The girls followed the defendant into another room "one by one."  (T. Tr. 3281-82.)

There were already three girls in the room when Angela walked in: one girl was removing her

clothes, another was "standing there," and the third was "taking off her shirt."  (T. Tr. 3282).

The defendant asked Angela "to climb on top of him" and to "straddle [] and [] ride him."  (T.

Tr. 3282-83.)  Angela was "a little startled," but did as the defendant asked.  (T. Tr. 3283.)  She

asked if the defendant had "protection;" he did not, so she got a condom, put it on him, and they

had sexual intercourse in front of the three girls.  (T. Tr. 3284.)  The defendant had intercourse

with at least one other girl in the room, and engaged in sexual contact with all of them.  (*Id.*)

When Angela left the room, Demetrius Smith, Bruce Kelly and Larry Hood were still in the

apartment.  (T. Tr. 3284-85.)

For the next few years, Angela saw the defendant with Tiffany and "a different

assortment of young ladies on a regular basis."  (T. Tr. 3286.)  At some point in 1991, the

defendant told her to choose between going to school or a singing career.  She stopped going to

school, and she, Tiffany and another girl formed a group that the defendant called "Second

Chapter."  (T. Tr. 3286-87, 3293-96.)

From the time she was 15 until she was 17, Angela had sexual intercourse with the

defendant at his apartment, at his recording studio in Chicago, and while they were "on the

road."  (T. Tr. 3287-88.)  She did not want to have sex with him, but the defendant told her and

other girls that they had to "pay [their] dues."  (T. Tr. 3288-89.)

SpA 63

*ii.*      *Aaliyah (Count 1: Racketeering Act 1)*

In 1992, the defendant and Demetrius Smith met Aaliyah Haughton, Barry Hankerson's

niece, in Detroit, Michigan.  (T. Tr. 676-78.)  On Aaliyah's 12th birthday, the defendant

introduced her as "the next up and coming artist" to Angela and the other girls in the group.   (T.

Tr. 3292-94, 3296.)  The defendant told Aaliyah that the three girls would be her friends and her

background vocalists and dancers.  (T. Tr. 3295-96.)  Angela saw Aaliyah regularly in Chicago

while Aaliyah worked on her first album, "Age Ain't Nothing But a Number," which the

defendant wrote and produced.  (T. Tr. 3296-97.)  Demetrius Smith was concerned that the

defendant was "messing with" or "seducing" Aaliyah.  (T. Tr. 687-92.)  In 1992 or 1993,

Aaliyah joined the defendant on tour.  (T. Tr. 3298-99.)  During a stop in Washington, D.C.,

Angela saw the defendant performing oral sex on Aaliyah in the tour bus.  (T. Tr. 3306.)

In the middle of a 1994 tour, the defendant told Smith, "Aaliyah's in trouble, man, we

need to get home."  (T. Tr. 692-93.)  There were still other shows on the tour, but Smith made

travel arrangements, and they flew to Chicago after the show.  (T. Tr. 693, 697.)  During the

flight, the defendant cried, and told Smith that Aaliyah believed she was pregnant (T. Tr. 703,

708), and that Derrel McDavid said he had to marry Aaliyah to avoid going to jail.  (T. Tr. 704,

706.)  When Smith said that Aaliyah was too young, the defendant asked "whose side [he] was

on."  (T. Tr. 710.)

The defendant, Smith, McDavid and Tyree Jameson met Aaliyah in a hotel room.  (T. Tr.

711.)  The defendant and the other men talked about the marriage, including the fact that they

would have to get false identification for Aaliyah, who was only 15 years old and too young to

get a marriage license.  (T. Tr. 712-14.)  Smith said that he could pay someone at the local

"welfare office" to create a fake identification card for Aaliyah.  (T. Tr. 714.)  Smith got $500

from McDavid, and the group drove to the "welfare office."  (T. Tr. 715-18.)  Smith went inside

11

SpA 64

and offered $500 to an employee, who agreed to create the false identification card.  (T. Tr. 718-19.)  The defendant waited in the car while Aaliyah went inside the office.  The employee photographed her, gave her the card and she returned to the car.  (T. Tr. 720-21.)  The defendant knew someone at a local FedEx, where they got a fake work identification card for Aaliyah.  (T. Tr. 722-24.)

Smith, McDavid, the defendant and Aaliyah went to the Maywood City Hall, where the defendant and Aaliyah applied for a marriage license.  (T. Tr. 724-25.)  The defendant, June and Smith asked Keith Williams to find a minister for the wedding; Williams recommended Nathan Edmond.  (T. Tr. 1344-45.)  Edmond officiated the ceremony, which was at most 10 minutes long in the hotel room, and, about an hour later, Smith, the defendant and Jameson flew back to the concert venue.  (T. Tr. 746-47, 2418-19, 2422-23.)  Aaliyah stayed behind.  (T. Tr. 747.)  Shortly after the wedding, the marriage was annulled.  (GX 804.)[11]

### iii.    Stephanie (Count 1: Racketeering Act 2)

Stephanie was born on October 16, 1981, and grew up in Chicago; she graduated from the Chicago Academy for the Arts in 1999.  (T. Tr. 1620.)  She met the defendant when she was 16 years old, at the Rock 'N Roll McDonald's in downtown Chicago.  (T. Tr. 1622.)  A man approached her and asked for her age; she responded that she was 16.  (T. Tr. 1623.)  He asked if she knew R. Kelly, and she said she did; he gestured to the defendant, who was seated at a booth, and said that the defendant wanted her to call him.  (T. Tr. 1623-24.)  He handed her a note with a phone number.  (*Id.*)  Stephanie threw the note away because she did not intend to call the defendant.  (T. Tr. 1624.)

---

[11] Aaliyah died in an August 25, 2001 airplane crash.  (T. Tr. 3291-92.)

12

She saw the defendant about a year later, in the summer of 1999, when she was 17.  (T. Tr. 1625-26.)  She asked if he would listen to her friend, an aspiring singer.  (T. Tr. 1628-29.)  The defendant agreed to meet Stephanie's friend and perhaps help her with her career but wanted to "get to know" Stephanie and asked her if she would "cuddle" with him; Stephanie replied that she would, and the defendant gave her his number.  (T. Tr. 1630.)

Stephanie went to the defendant's recording studio a week or two later.  (T. Tr. 1630-31.)  An employee took her to a second floor waiting room and told her to wait for the defendant.  (T. Tr. 1632-33.)  The defendant arrived a few hours later.  (T. Tr. 1633.)  He told her that he wanted her to call him "daddy," and they had sexual intercourse.  (*Id*.)

Stephanie continued to see the defendant for the next six months, mostly at his studio, and they had sexual intercourse every time she saw him.  (T. Tr. 1634, 1637-38.)  Occasionally, one of the defendant's employees picked her up and dropped her off at the studio.  (T. Tr. 1635-36.)  The defendant "was one of two ways.  He was either very nice and charming, jovial, or he was very controlling, intimidating.  He'd raise his voice at me and he could . . . put the fear of God in me very quickly."  (T. Tr. 1637.)  Sex with the defendant was "humiliating."  (T. Tr. 1638.)  He told her what sounds to make and often ejaculated on her face.  (T. Tr. 1638-39.)  The defendant also "position[ed]" Stephanie's body in "very specific" ways, and sometimes would leave her "completely naked with [her] butt in the air" for "hours."  (T. Tr. 1638.)  If she was not in the same position when the defendant returned, he got "very angry" and yelled at her.  (*Id*.)  He did not allow her to speak to other men.  (T. Tr. 1648.)[12]  Following one of his basketball games, he directed her to perform oral sex on him, even though there were two other people in

---

[12] During a dinner with two rappers, the defendant said that he "like[d] young girls and that people make such a big deal of it but it really isn't a big deal because even, look at Jerry Lee Lewis, he's a genius and I'm a genius and we should be allowed to do whatever we want because of what we give to this world."  (T. Tr. 1648-49.)

the car; he told her to "make noises" because "he wanted the people in the car to know." (T. Tr. 1652.)

While Stephanie was still 17, the defendant videotaped their sexual encounters. On one occasion, he gave her instructions about what she should do, including when to undress. (T. Tr. 1645.) He placed his video camera in front of Stephanie, who was completely naked, had sex with her from behind and put a dildo in her mouth. (T. Tr. 1645-47.)

Following a trip to Florida, during which the defendant used a small, hand-held camera to record her performing oral sex on him, she decided to end the relationship because she "felt used and humiliated and degraded." (T. Tr. 1657.) She also wanted him to destroy the "sex tapes," so she saw him one or two more times, but he did not destroy the tapes. (T. Tr. 1657-58.) When she called and asked if she could get the videotapes, or if they could destroy them together, he said it was possible if she came to the studio. (T. Tr. 1658.) She realized that he did not intend to destroy the tapes, and she never spoke to him again. (*Id*.)

### iv. Addie

"Addie" met the defendant at a Miami concert on September 2, 1994 when she was 17 years old. (T. Tr. 1730; GX 201.) The defendant announced from the stage that women over 18 could go backstage. (T. Tr. 1735, 1737-38.) Addie did not go because she was only 17. (T. Tr. 1736-37.) Minutes later, however, two "bouncers" asked Addie and her friend if they wanted the defendant's autograph. (T. Tr. 1735-36, 1767.) The men did not ask the girls their age, and led them to the defendant's dressing room. (T. Tr. 1738.)

The defendant autographed Addie's program. (T. Tr. 1738-39; GX 201.) When Addie said that she was an aspiring artist, the defendant wrote his hotel room number on her program and suggested that she come to his room for an "audition." (T. Tr. 1740-41; GX 201.) Addie also told the defendant that she was 17. (T. Tr. 1740, 1742.) The defendant said something to

14

his bouncers, who escorted everyone else out of the dressing room; they told Addie and her friend to "stay." (T. Tr. 1742-43.)

The defendant played a song from an upcoming movie, and told the girls that he wanted to play a "game" to determine which girl was the better kisser. (T. Tr. 1743-44.) The defendant kissed Addie's friend, and then kissed Addie; when she tried to pull away, the defendant held her wrists, pulled down her shorts and had unprotected sex with her from behind. (T. Tr. 1744-46.) Addie was in "complete shock," and her mind "just basically went blank." (T. Tr. 1746.) When the defendant finished, Addie pulled up her shorts, opened the door, which had been locked, and ran out of the room with her friend. (T. Tr. 1746-47.)

        *v.*    *Kate*

"Kate" started a sexual relationship with the defendant in 2001 when she was 27. (T. Tr. 2627-28.) Before she had sex with him for the first time, Kate asked if he was "okay," and if he was going to use protection. (T. Tr. 2636-37.) The defendant said that he was not going to use protection. (*Id.*) He did not tell her that he had herpes. (*Id.*)

Kate, who was not sexually active with anyone else at the time, subsequently contracted genital herpes. (T. Tr. 2638.) The defendant did not respond or ask any questions when she said, "I think you gave me something." (T. Tr. 2638-39.) In 2004, Kate retained a lawyer; the defendant paid her $200,000 to release her claims and to refrain from making public statements about her relationship with the defendant. (T. Tr. 2639-44; GX 930.)

        *vi.*    *Sonja (Count 1: Racketeering Acts 3 and 4)*

The jury heard testimony from Sonja, a 21 year-old intern at a local radio station, who met the defendant at a shopping mall in West Valley City, Utah in August 2003 and wanted to interview him. (T. Tr. 2744, 2748.) He invited her to Chicago for the interview. (T. Tr. 2753-54.) Once she arrived at the studio, she was detained in a room for days. (T. Tr. 2759-68.)

15

SpA 68

When an employee brought her something to eat, she passed out after only a few bites.  (T. Tr. 2769.)  She awoke to find that her underwear had been removed, that her vaginal area and thighs were wet, and saw the defendant pulling up his pants.  (T. Tr. 2770.)  The jury found that Racketeering Acts 3 and 4, which charged the defendant with kidnapping and Mann Act violations, were not proven beyond a reasonable doubt.  Nevertheless, the government maintains that the evidence "also constituted evidence of the existence of the enterprise, the means and methods of the enterprise and the defendant's pattern of racketeering."  (ECF No. 278 at 26 n.33.)

> vii.    Alexis

Alexis met the defendant in Jacksonville, Florida on March 26, 2006, when she was 15 years old.  (T. Tr. 2589; GX 212.)  A man told Alexis and her friend that the defendant wanted to meet them backstage.  (T. Tr. 2552.)  The defendant gave Alexis his number, and they met the next day on the defendant's tour bus in a mall parking lot, where he made her sign a nondisclosure agreement.  (T. Tr. 2555-57.)  Alexis "may" have told the defendant that she was only 15 years old; "his general response was just there's nothing wrong with platonic friendship at that time and then if it turns into something over time, then so be it.'  (T. Tr. 2557.)

Alexis saw the defendant repeatedly for the next few years, including in Jacksonville, Miami and Chicago.  (T. Tr. 2557-59.)  She first had sex with the defendant when she was in her "teens," but not before she was 18.  (T. Tr. 2558-59.)  The defendant did not use protection and did not tell her that he had herpes.  (T. Tr. 2559.)

> viii.    Louis

"Louis" was born on February of 1989.  (GX 811.)  He met the defendant in 2006, when he was 17 and working at a McDonald's in Markham, Illinois.  (T. Tr. 1804-06; GX 154.)  The defendant asked Louis if he could "hook it up" for the defendant and Louis's manager.  (T. Tr.

1807.)[13]  The defendant then handed Louis and the manager his phone number, and told Louis to

call.  (T. Tr. 1807-08.)  Louis gave the number to his mother.  She called the defendant and said

that Louis was an aspiring rapper and a "big fan" of the defendant's music.  (T. Tr. 1810.)  Louis

and his parents attended a Christmas party at Olympia Fields.  (T. Tr. 1810-11.)  At one point,

the defendant whispered to Louis that "it would be best" if he came to see the defendant by

himself.  (T. Tr. 1815.)

Louis's mother called the defendant again about Louis's interest in music, and the

defendant invited Louis to his studio.  (T. Tr. 1815-16.)  Louis rapped for the defendant and

another man; they told him he had "potential," and the defendant invited him to come back the

next day.  (T. Tr. 1816-21.)  Louis returned and recorded a song.  (T. Tr. 1821.)  The defendant

listened for only a few seconds but said he did not like it.  (T. Tr. 1821-23.)  Louis left the studio

feeling "discouraged."  (T. Tr. 1823.)

Shortly thereafter, the defendant invited Louis back to the studio.  (T. Tr. 1823-26.)  He

took Louis into a garage, and asked what Louis was "willing to do for the music."  (T. Tr. 1828.)

As Louis started to explain how hard he would work, the defendant interrupted and asked if

Louis had "any fantasies."  (T. Tr. 1828.)  The defendant got onto his knees, unzipped Louis's

pants and performed oral sex on him.  (T. Tr. 1829.)  In the ensuing months, Louis and the

defendant had additional sexual encounters, which the defendant recorded on a "camcorder

tripod or an iPad."  (T. Tr. 1843-44.)  The defendant asked Louis to call him "Daddy," and called

Louis his "little brother."  (T. Tr. 1844.)

The defendant also instructed Louis to have sex with women, which the defendant

recorded.  On one occasion, the defendant took Louis to the garage, and when the defendant

---

[13] The manager did not know who the defendant was.  (T. Tr. 1807.)

17

SpA 70

"snapped his fingers three times," a naked, "very petite" "young lady" crawled out from under a
boxing ring.  (T. Tr. 1844-47.)  When the defendant ordered her to "come here," she crawled
over to him, and performed oral sex on him.  (T. Tr. 1846.)  The defendant told Louis to pull
down his pants, and directed the young woman to "do" Louis "the same way she did him."  (*Id.*)
She complied, and the defendant told her to say Louis's name and tell him that she liked him.
(T. Tr. 1844-46.)

The defendant also met one of Louis's friends, "Alex," who was a year younger than
Louis.  On one occasion, the defendant directed Louis and Alex to kiss and "touch" each other.
(T. Tr. 1862-63.)  Neither wanted to do it, so the defendant told Alex, "[L]et's show him how it's
supposed to be done," and Alex and the defendant had sex.  (T. Tr. 1863-64.)

One of the defendant's "girlfriends," Dominique, went to Louis's high school, and was a
few years younger than Louis.  (T. Tr. 1851-53.)  The defendant found out that Louis was talking
with Dominique on the phone.  (T. Tr. 1853-56.)  He directed her not to talk to Louis, and
"didn't want anything to do" with Louis after that.  (T. Tr. 1856-57.)

In 2019, Louis met the defendant at the Trump Towers in Chicago.  (T. Tr. 1875.)  The
defendant dictated a letter, which Louis wrote, to the effect that "some people" wanted to pay
Louis to say that he had a sexual relationship with the defendant.  (T. Tr. 1875-79.)  The
defendant told Louis that the letter was for their "protection."  (T. Tr. 1878.)

### ix.    Alex

As explained above, the defendant met Alex through Louis.  Alex had multiple sexual
encounters with the defendant, in the defendant's home, studio and tour bus.  (T. Tr. 3345-62,
2883-84.)  The defendant called Alex "Nephew," and told Alex to call him "Daddy."  (T. Tr.
3349, 3352.)  The defendant also directed Alex to have sex with different women while the
defendant recorded the encounters; sometimes the defendant participated, and other times he

18

masturbated.  (T. Tr. 3345-51.)  The defendant was "in charge" during these encounters, and gave instructions to Alex and whichever woman was involved, including to "do it like [you] mean it."  (T. Tr. 3445-46, 3448, 3552-56.)  During these encounters, the women appeared "zombie-ish."  (T. Tr. 3358.)[14]

> x.    *Jerhonda (Count 1: Racketeering Acts 5, 6 and 7)*

Jerhonda Pace, born on April 19, 1993 (T. Tr. 105), admired the defendant and his music, and was a member of his "fan club."  She met him in April 2008 outside a Chicago courthouse when she was 14 years old.  She spoke to him occasionally during the next two months.  (T. Tr. 110-13.)  In May 2009, when she was 16 years old, the defendant's employee "Bubba" invited her to a party at the defendant's house in Olympia Fields, which she attended.  (T. Tr. 114.)  The defendant said he remembered her "from court."  (T. Tr. 118.)  She said she was 19, and they exchanged phone numbers.  (T. Tr. 119.)

The defendant invited her to his house a few days later and told her to bring her bathing suit.  (T. Tr. 119, 121.)  A runner named Anthony picked her up from the train station.  (T. Tr. 120.)  Once at the house, Anthony walked Jerhonda to a room with a swimming pool, and she put on her bathing suit.  (T. Tr. 121-22.)  The defendant arrived and told to take off her bathing suit and to walk back and forth.  (T. Tr. 122.)  After Jerhonda complied, the defendant walked her to another room and performed oral sex on her.  (T. Tr. 123.)  Jerhonda "felt uncomfortable," told him she was 16 years old, and showed him her state ID.  (*Id*.)  The defendant responded that she should "continue to tell everyone that [she] was 19 and to act 21," and then had sexual intercourse with her.  (T. Tr. 124-25.)  The defendant did not use protection and did not tell her that he had herpes.  (T. Tr. 125-26.)  Jerhonda had a drink and felt ill, so the defendant took her

---

[14] The government introduced video and photographic evidence of some of these encounters.  (GX 341, 342, 343.)

to the "mirror room" to rest.  (T. Tr. 126-27.)  The next morning, she texted the defendant that she was leaving; a runner brought her $50, and dropped her off at the train station.  (T. Tr. 128-30.)

The defendant also suggested that she bring a friend to his house; she introduced him to Dominique, who was 17 at the time and another member of "the fan club."  (T. Tr. 130-31, 138-39.)  Jerhonda learned that Dominique was visiting the defendant's house, but did not see her there because, according to the defendant's rules, they were not permitted to leave their rooms.  (T. Tr. 131-32.)  One night, the police came to the house looking for Dominique.  (T. Tr. 139.)  The defendant, using the speaker phone, told his lawyer that the police were at his house.  (T. Tr. 139-40.)[15]

Jerhonda continued to see the defendant over the next six months.  They had sex each time she was there, and the defendant recorded their sexual activities with his Apple iPhone and a Canon camera on a tripod.  (T. Tr. 168-69.)  Jerhonda contracted herpes while she was seeing the defendant.  (T. Tr. 173.)  He arranged for her to see a doctor.  (T. Tr. 173-74.)

The defendant required Jerhonda to follow his rules.  For example, she had to wear baggy clothing and was not permitted to leave a room without the defendant's permission.  (T. Tr. 154, 163.)  If she needed to use the bathroom, she had to text him or call one of his employees.  (T. Tr. 163-64.)  She had to call the defendant "Daddy," and "acknowledge[]" him when he came into the room.  (T. Tr. 164.)  On one occasion, the defendant called her and directed Jerhonda to come outside to his tour bus, which was parked next to the house.  (T. Tr. 165.)  When she arrived, the defendant was there with a naked young woman named "Juice," who the defendant said had been with him since she was 15 years old.  (*Id.*)  He told Jerhonda that he was going to

---

[15] Officer Garrick Amschl went to the defendant's house, looking for "a missing juvenile" on June 13, 2009.  (T. Tr. 370-71.)

"train" her "on how to sexually please him," and then ordered her and Juice to perform oral sex on him.  (T. Tr. 165-66.)

The defendant made Jerhonda sign a non-disclosure agreement.  (T. Tr. 149-50.)  He also directed her to write a letter in which she falsely said that she stole $100,000 in jewelry and cash, that her sister forced her to say that the defendant gave her herpes, that she was the defendant's employee and that he fired her.  (T. Tr. 149-52.)

The defendant punished Jerhonda when she broke his rules.  He slapped her when she disagreed with him.   (T. Tr. 166-68.)  In January 2010, Jerhonda did not greet him appropriately because she was texting with a friend.  (T. Tr. 175-76.)  He slapped her and choked her until she passed out.  (*Id.*)  He "spit in [her] face and told [her] to put [her] head down in shame."  (T. Tr. 176-77.)  The defendant ordered her to perform oral sex on him and ejaculated on her face.  (T. Tr. 177.)  She used her t-shirt to wipe her face.  (T. Tr. 177-78.)

Jerhonda hired a lawyer to bring a civil suit against the defendant.  (T. Tr. 180.)  She gave the firm the t-shirt she used to wipe her face, and her cell phone.[16]  (T. Tr. 183.)  The lawyer settled the case for $1.5 million.  (T. Tr. 190-91.)

> xi.   *Anna*

Anna went to one of the defendant's concerts in 2016 when she was 19 or 20 years old, and afterwards Bubba told her that the defendant wanted to meet her.  (T. Tr. 2818-19.)  Anna met the defendant in his dressing room, and they exchanged contact information.  Shortly thereafter, they began a sexual relationship.  (T. Tr. 2820-21.)  Anna lived in the defendant's Trump Towers apartment in Chicago, and traveled with him in his Sprinter van to his concerts

---

[16] DNA testing confirmed that the defendant's semen was on the t-shirt.  (T. Tr. 1373-74, 2469.)

21

around the country.  (T. Tr. 2822-23.)  The defendant paid for Anna's travel and hotel, which his assistants arranged.  (T. Tr. 2822.)

The defendant became "more controlling" during the course of their relationship and required Anna to follow his rules.  (T. Tr. 2821, 2828.)  She had to call him "Daddy" (T. Tr. 2889), could not talk to or look at other men (T. Tr. 2840), and had to get the defendant's permission go anywhere, even to the bathroom or to get food.  (T. Tr. 2828-29, 2831-33.)  The defendant required her to wear baggy clothing and a baseball cap when she went out in public.  (T. Tr. 2835.)  He also controlled her use of social media and the internet (T. Tr. 2838-40), and monitored her conversations.  (T. Tr. 2834.)

The defendant administered "punishments," which he frequently recorded, when he believed that Anna broke a rule.  (T. Tr. 2857-62, 2840-44; 3018-19.)  He spanked her so hard that he left bruises, and then demanded that Anna send him text messages that she enjoyed the beatings.  (T. Tr. 2842-44.)  On one occasion, he forced Anna, who was crying, to walk back and forth, wearing only high heels, and to repeat, over and over, that she was a "slut" and "stupid," while the defendant slapped her.  (T. Tr. 2836-38, 2845-46, 2852-54; GX 328(a).)  The defendant recorded these "punishments."

The defendant ordered Anna to write letters, which he dictated, in which she made false and embarrassing statements about herself and her family; he kept these letters for "protection" in the event that "down the line . . . something were to happen."  (T. Tr. 2863-65, 3653; GX 420(a), 430(b), 430(c), 430(d), 449.)[17]  The defendant would not let Anna see her mother until the mother wrote a letter falsely admitting to a blackmail scheme against the defendant, in the

---

[17] The defendant ordered his other victims to write similar letters.  (T. Tr. 149-52, 985-99, 2197-99; GX 302, 444, 445, 455, 456, 461.)  Anna found one from Dominique at the defendant's guesthouse.  (T. Tr. 2877-79.)

22

event that Anna's mother "were to come against him in any type of way." (T. Tr. 2879-80.) The defendant told Anna to give the letter to Copeland. (T. Tr. 2880.)

The defendant also forced Anna to do "embarrassing" and dehumanizing things, which he recorded. (T. Tr. 2876.) For example, he ordered her to be "sexual and seductive with bodily fluids"—covering herself with urine and feces, while the defendant told her what to say. (T. Tr. 2876-77.)[18]

Also at the defendant's direction, Anna had sex with him and others, including Jane, Dominique, Joy and Alex, while the defendant recorded the encounters on his iPad. (T. Tr. 2881-86; GX 68.) The defendant never used a condom. (T. Tr. 2886.) Anna was tested for sexually transmitted diseases but did not see the results because the doctor sent them directly to Copeland. (T. Tr. 2825-26.) Anna's relationship with the defendant ended some time in 2018. (T. Tr. 2821, 2888.)

> xii.    *Jane (Count 1: Racketeering Acts 8, 9, 10 and 11; Counts 2, 3, 4 and 5)*

Jane was born on December 30, 1997. (T. Tr. 770.) She met the defendant at an Orlando concert in April 2015, when she was 17 years old. (T. Tr. 769-70.) Jane, a high school junior, was active in varsity sports and in her school choir and hoped to be a professional singer. (T. Tr. 776-77.) During the concert, a member of the defendant's entourage handed Jane a sheet of paper with the defendant's phone number. (T. Tr. 773.) Jane texted with the defendant and spoke with him by video call. (T. Tr. 779.) She told him that she was a musician and that she was 18 years old. (T. Tr. 781.) The defendant invited her to "audition" at his hotel room. (T. Tr. 781-82.) When she arrived, the defendant was in a Sprinter van; he asked her to sit on his lap and give him a kiss, which she did. (T. Tr. 786-88.) They went to his hotel room, and the

---

[18] The government introduced a portion of this recording at trial. (GX 329(a).)

23

defendant told her that he needed to ejaculate before Jane sang.  (T. Tr. 788-89.)  Jane did not

want to have intercourse with him, but at the defendant's direction, took off her clothes, and the

defendant "lick[ed] [her] butt."  (T. Tr. 791-92.)  Meanwhile, Jane's parents were trying to find

her, and security officers arrived.  (T. Tr. 793-94.)  Jane told them that she was 18 and handed

them her identification, which showed that she was only 17, but they left.  (T. Tr. 794-95.)  The

defendant continued the sexual contact, ejaculated, and then told Jane to sing.  (*Id.*)  He praised

her, and said he wanted to "see [her] again and teach [her] a few techniques."  (T. Tr. 795-96.)

The defendant invited Jane travel to Los Angeles, one of the next stops on his tour.  (T.

Tr. 798-99.)  His assistant, Cheryl Mack, made Jane's travel arrangements, and Jane flew to

California.  (T. Tr. 800.)  The defendant had sexual contact with her at a hotel.  (T. Tr. 804-05.)

He also told her about some of his "rules:" that she must wear "loose and baggy" clothing, call

him "Daddy," and get his permission to leave the hotel room.  (T. Tr. 810-11.)[19]  Jane traveled to

Stockton, California, where she and the defendant had sexual intercourse for the first time.  (T.

Tr. 818-19.)  The defendant did not use a condom and did not tell her that he had genital herpes.

(T. Tr. 819-20.)

Jane stayed with the defendant in Chicago during the summer of 2015.  (T. Tr. 837-38.)

The defendant would not permit her to leave her room without calling him or an assistant first.

(T. Tr. 838-40.)  If she had to use the bathroom and could not reach the defendant or one of his

---

[19] During the time she was with the defendant, Jane kept notes to remind herself of the defendant's rules.  In one note, she wrote: "Do not be goofy, extra, or act young when told something in private or around others.  Do not play games when on phone with daddy.  Just say I love you before I hang up. . . . Trust daddy and do whatever he says, [whenever] he says, with no rebuttal, disrespect or rebellion."  (T. Tr. 858-59; GX 325.)  She also wrote other reminders, including, "Tell daddy one thing that I appreciate about him and continue to lift him up," and, "Stop defending myself.  Anything daddy says is to help me.  Thank him and be happy and fix the problem."  (T. Tr. 859-60; GX 331.)

24

employees, she had to urinate in a cup.  (T. Tr. 841.)[20]  She and the defendant had "sex almost

every day," which the defendant frequently recorded using iPads that he kept in a backpack.  (T.

Tr. 843-46.)  Jane, still 17 years old, contracted genital herpes, with pain so severe that she could

not walk.  (T. Tr. 851-52.)  Juice booked a doctor's appointment for Jane.  (T. Tr. 852.)  When

the doctor told her that she had herpes, Jane was "devasted."  (T. Tr. 853.)  She told the

defendant, who was "agitated" and told her that she "could have gotten that from anyone."  (T.

Tr. 853.)  Jane responded that she had "only been intimate with him."  (*Id.*)  From that point on,

Jane got herpes medication either from the defendant or his doctor.  (T. Tr. 853-54.)  The

defendant told her that "everyone has it," and that "it was no big deal."  (T. Tr. 854.)

Before she went back to Orlando for her senior year of high school, Jane told the

defendant she was only 17.  (T. Tr. 860-61.)  He slapped her face and walked away.  (T. Tr. 861.)

He returned and told her that they "would figure this out."  (T. Tr. 861-62.)  Jane went back to

Orlando, but she and the defendant convinced her parents to let her live in Chicago and do

"virtual online" homeschooling.  (T. Tr. 863-64.)  The defendant arranged for Juice's mother to

act as Jane's legal guardian.  (T. Tr. 863-68.)  The defendant's assistant booked Jane's travel to

Chicago, for which the defendant paid.  (T. Tr. 868.)  Afterwards, Jane joined the defendant on

his tour, traveling on his tour bus from city to city.  (T. Tr. 869-70.)  At one point during the tour,

Jane thought she was pregnant and asked the defendant what he would do; he said that "he would

want [her] to get an abortion because he wanted [her] to keep [her] body tight," and that "if [she]

was any other age, it wouldn't make a difference."  (T. Tr. 881-83.)

As Jane learned, the defendant had other so-called "live-in girlfriends"—Juice, V,

Dominique and Joy.  (T. Tr. 969.)  And the defendant had more rules.  Jane had to kiss the

---

[20] The defendant did not allow Jane to leave his van without permission, either, even to use the bathroom,
so there were times when she had to use a cup.  (T. Tr. 974-75.)

defendant as soon as he came into a room.  (T. Tr. 856.)  He did not want Jane to talk to friends

or to have access to social media.  (T. Tr. 856-57.)  She could not share personal information

with the other "girlfriends."  (T. Tr. 908.)  He did not allow any of these young women to look at

or be around other men; they had to turn away, leave the area and tell the defendant

"immediately."  (T. Tr. 970-71.)  They attended the defendant's nightly basketball games but

could look only at him.  (T. Tr. 972-75.)  The defendant required Jane to report any rule-breaking

by the other young women, who in turn had to report Jane and one another.  (T. Tr. 975-76.)

The defendant often made Jane write letters with false admissions for his protection.  (T.

Tr. 992, 995-97.)  Sometimes, he forced Jane to "make videos as punishments."  (T. Tr. 997-99.)

For example, he recorded her making a false claim that her father molested her.  (T. Tr. 995,

998.)  Another time, the defendant forced her to smear feces on her face and to "put it in [her]

mouth and act like [she] liked" it, while he recorded her.  (T. Tr. 998-99.)

The defendant spanked Jane "nearly every two to three days," sometimes with such force

that he bruised her and tore her skin.  (T. Tr. 911-12.)  On one occasion, the defendant

confronted Jane about a conversation she had with a friend.  The defendant accused her of lying,

and hit her "all over her body" first with his hand and then with a shoe, "until [she] finally

broke."  (T. Tr. 913-16.)  He regularly kept her in a room as punishment, for example, when

Juice reported that Jane bought overly "tight" sweatpants.  (T. Tr. 918-25.)  He also held her on

his tour bus or in the studio, sometimes for more than a day.  (T. Tr. 931-32, 2010-11.)[21]  The

defendant also assaulted the other young women, which Jane saw.  (T. Tr. 925.)  At times, the

defendant compelled Jane to have sex with other women and men—the other "girlfriends," his

---

[21] The Mayweather sisters exchanged text messages in which they discussed the punishments.  In one
exchange, they said that the defendant was "holding" Jane in the back room of the studio "all day." (T.
Tr. 2014-19; GX 240(b).)  In another exchange, they wrote that the defendant kept Jane on the Sprinter
van for days without "feed[ing] her."  (T. Tr. 2053-55; GX 240(d).)

employees and Alex, whom Jane knew as "Nephew."  (T. Tr. 955-61, 964-65, 1045-50.)  In

these encounters, which he recorded, the defendant "orchestrate[d] everything."  (T. Tr. 965,

1046-47.)

     *xiii.*    *Faith (Count 1: Racketeering Acts 12, 13 and 14; Counts 6, 7, 8 and 9)*

Faith met the defendant when she was 19 years old, after a March 2017 concert in San

Antonio, Texas.  (T. Tr. 2125-26.)  Two of the defendant's staff members invited Faith and her

sister to an afterparty backstage.  (T. Tr. 2130-31.)  The defendant gave Faith a piece of paper

with his phone number on it (T. Tr. 2133-34), and invited her and her sister to his dressing room.

(T. Tr. 2136-38.)  He asked Faith to text him her name with a picture of herself, which she did

when she got home.  (T. Tr. 2140-41.)  After that, they communicated regularly.  (T. Tr. 2141-

44.)  The defendant told her to call him "Daddy," and hung up on her when she did not.  (T. Tr.

2143-44.)  The defendant told Faith that he loved her and invited her to see him on tour; he told

her that Diana Copeland would arrange her travel, and gave her Copeland's number.  (T. Tr.

2145.)

In May 2017, Faith traveled to New York and went to the defendant's concert.  (T. Tr.

2152-58.)  The defendant went to Faith's hotel room early the next morning, and they had sexual

intercourse, which the defendant recorded on his iPad.  (T. Tr. 2163-66, 2169-74.)  He did not

wear a condom, nor did he tell Faith that he had herpes.  (T. Tr. 2178.)  He also said that she

could tell "Daddy" if she was "really like 16."  (T. Tr. 2174.)

Faith saw the defendant in Chicago in June 2017, and in Dallas in December 2017.  (T.

Tr. 2184, 2190.)  They engaged in sexual activity on both trips.  (T. Tr. 2187-88, 2193, 2195-96.)

The defendant told Faith that her "legs should never be pointed to another man when [she's] in

public with him."  (T. Tr. 2192.)  He said he had "a group of women that [he] raised," but the

defendant dismissed her concerns, telling her that ultimately it was only his sexual gratification

that mattered.  (T. Tr. 2198.)  He also suggested that she sign "some papers" to "protect" him, and to write something about her family, even if it was untrue.  (T. Tr. 2197-99.)  He directed Faith to send him a text message that said, "Daddy I want to be with you and the girls."  (T. Tr. 2199.)  The defendant also told Faith that he had rules for his girlfriends, including a requirement that they greet him whenever he entered a room.  (T. Tr. 2200-01.)

When she went to Dallas, the defendant told Faith that they were going to a hookah bar. Faith, Joy and the defendant got into the back of the Sprinter van, while Diana Copeland got into the front passenger seat.  (T. Tr. 2206-07.)  When they arrived, the defendant and Copeland went inside the bar so that the defendant could see how many men were there, leaving Faith and Joy waiting for "hours."  (T. Tr. 2208.)  Faith had to use the bathroom and tried to open the door, but Joy told her that the door was broken and she had to "ask" to leave.  (T. Tr. 2208-09.)  Faith texted Copeland that she was "about to pass out."  (T. Tr. 2210.)  The defendant and Copeland finally returned, and drove Faith to an IHOP to use the bathroom.  (*Id.*)  Copeland followed her and Joy to the bathroom, and stood outside the stall but did not use the bathroom herself.  (T. Tr. 2210-11.)  They all returned to the hotel.  (T. Tr. 2213.)  Faith continued to communicate with the defendant after the Dallas trip.  He wanted her to get his permission to go out, to tell him where she was going, and who she saw.  (T. Tr. 2214-19.)

In January 2018, the defendant paid for, and Copeland arranged, Faith's travel to Los Angeles, California.  (T. Tr. 2220.)  When Faith arrived at the defendant's studio, Copeland told her to wait in the Sprinter, which was parked outside.  (T. Tr. 2222-23.)  After more than an hour, Faith texted Copeland that she needed to use the bathroom.  (T. Tr. 2224.)  Copeland escorted her to the restroom in the studio, then back to the Sprinter.  (T. Tr. 2224-26.)  Later, Copeland took Faith to a room in the studio.  (T. Tr. 2226.)  At one point, the defendant came

28

SpA 81

into the room, but left.  (T. Tr. 2229.)  Faith asked Copeland if she could go back to her hotel

room, or whether the defendant wanted her to wait; Copeland told her to wait.  (T. Tr. 2230-31.)

When the defendant showed up hours later, he told Faith that he would have come sooner if she

had shown any excitement when he saw her earlier.  (T. Tr. 2247-48.)  The defendant directed

her to take her clothes off and walk back and forth.  (T. Tr. 2248.)  Faith did not want to have sex

with him, and said she was "on [her] period."  (T. Tr. 2248.)  The defendant sighed, and said,

"Well, why did you come?"  (T. Tr. 2249.)  He then told Faith to take off her pants and walk

back and forth in her body suit.  (*Id.*)

When the defendant then took Faith to another room, she hesitated because she saw a gun

on the ottoman.  (T. Tr. 2249-50.)  The defendant told her, "Don't look at it."  (T. Tr. 2250.)  His

"demeanor changed," and "[h]e got real serious," sat in a chair and told her to "stand across from

him;" at this point he had "moved the gun by him."  (T. Tr. 2250-51.)  The defendant told Faith

to "pose" while he took pictures with his iPad, and was irritated because she was "not being sexy

enough."  (T. Tr. 2251.)  He started asking her questions: "How many men have seen you

naked?" "How many male friends do you have?"  (*Id.*)  Faith responded that none of her male

friends had seen her naked, and the defendant said, "You want to take that back?"  (*Id.*)  With a

"stern look on his face," the defendant claimed that he "would know if [Faith] was lying to him."

(T. Tr. 2251-52.)  The defendant then put a pillow on the floor, and told Faith to get on her

knees.  (T. Tr. 2252.)  He "grabbed the back of [her] neck forward," and instructed her to

perform oral sex on him.  (*Id.*)  Faith did not want to give the defendant oral sex but was

intimidated; the gun was now on the defendant's seat, and Faith felt that she could not leave

because she was "under his rules and he had a weapon."  (T. Tr. 2252-54.)

SpA 82

Faith traveled to see the defendant for the last time in New York in February 2018.  (T.

Tr. 2261.)  He tried to have sexual intercourse with her, but she was "clenching on purpose."  (T.

Tr. 2265.)  The defendant got his iPad that he had used to record them, and masturbated while he

watched a video of himself and other women having sex.  (T. Tr. 2266.)

### c.    Other Evidence

The jury heard additional testimony and saw other evidence that corroborated the

victims' testimony, including from the defendant's associates and employees.    In addition, the

government introduced evidence from the defendant's storage facility, including an altered birth

certificate for Jerhonda that changed her birth date from 1993 to 1990, multiple false confession

letters from the victims and employees, and recordings including an audio recording in which the

defendant, accompanied by George Kelly, accused "Kyla" (Jane Doe #20) of stealing one of the

defendant's watches.  (GX 485.)  The defendant said, "You know how I am with cameras," and

claimed to have "cameras everywhere," including in his studio, garage and van.  (*Id.*)  Kyla

admitted that she took a watch, a t-shirt, earrings and "porno tapes," prompting the defendant to

say the following:

> There's only one way you're gonna get rid of this.  For me to trust your ass again.
> You're gonna do the fuck I tell you to do.  When you made the fuckin tape for me
> and I looked at that shit, you was hiding your fucking face all over that shit because
> you didn't want to be seen. . . .  And you ain't gonna hide your fucking face on me.
> You're gonna do what the fuck I tell you to do and you're gonna do it fuckin right.
> Then I'm gonna gain my fuckin trust back with your ass.  If I even detect you trying
> to hide on that shit, I'm gonna blow this shit the fuck up.  Do you hear this shit I'm
> telling you.  I fucking raised your ass.  I raised you. . . .  You better not ever in my
> mother fucking life take from me again or I will be in Florida and something will
> happen to you.

(*Id.*)  The defendant ordered Kyla to the garage and to stay there until he told her she could come

out.  (*Id.*)  He added: "When I come and get you . . . you better be fucking like you're supposed

to fuckin' be. . . .  You're not going to tape until I tell you.  When I tell you, I don't give a fuck if

you're coming out of your sleep.  You better be fucking ready.  Do you understand? . . . You make no fucking calls except the studio or me."  (*Id.*)

> ### d.    Defense Case

The defense called five witnesses at trial: Dhanai Ramnaran, an aspiring rapper who worked with the defendant for approximately 15 years (T. Tr. 3990-91,4000, 4022);[22] Larry Hood, the defendant's childhood friend and a former Chicago police officer was on the defendant's security team (T. Tr. 4038-44); Jeffrey Meeks, who worked for the defendant for more than ten years, including as a "runner" (T. Tr. 4104-07, 4126); John Holder, the defendant's accountant from 2018 to 2019 (T. Tr. 4135, 4138); and Julius Darrington, a music consultant who worked with the defendant for about four years.  (T. Tr. 4214-15.)

The defense witnesses testified that they never saw the defendant "strike a woman," "lock a woman in a room," or prevent a woman from eating or using the bathroom.  (T. Tr. 3991, 3996, 4049, 4106, 4141, 4218-19.)  Some of them testified that the defendant permitted them to be around his "female guests," and that the "female guests" were not required to "look away" or "look at a wall."  (T. Tr. 3992, 4137, 4219-20.)  Hood, who regularly accompanied the defendant from the gym to White Castle or McDonald's and to the studio, did not hand out the defendant's phone number or "recruit women" for the defendant.  (T. Tr. 4046-47.)  He did not see the defendant with "underage women" during his time as the defendant's security guard.  (T. Tr. 4048-49.)[23]  Meeks, who checked IDs at the front desk of the defendant's studio, did not recall any women being "under age," although he was "not sure if [he] inspected every ID, you know,

---

[22] Ramnaran testified that his job was "to observe and to learn and to become."  (T. Tr. 4000.)

[23] Although Hood claimed that he never saw the defendant with a minor, he also said he was with the defendant "when he met Aaliyah in her living room," and that he never saw the defendant act "inappropriately with Aaliyah."  (T. Tr. 4040.)  He saw Angela, whom he described as one of "Aaliyah's little friends," but never saw the defendant act inappropriately with Angela.  (T. Tr. 4043.)

31

thoroughly[.]"  (T. Tr. 4105.)  Ramnaran never saw the defendant "verbally abuse a woman."

(T. Tr. 3991; *see also* T. Tr. 4137-38 (Holder never saw the defendant "abuse any of his

girlfriends").)

## VI.    Verdict

On September 27, 2021, the jury convicted the defendant of all counts.  The jury found

that the government had proved all the predicate racketeering acts except Racketeering Acts 3

and 4 relating to Sonja.  (*See* ECF No. 238.)

### DISCUSSION

## I.    Motion for Acquittal

The defendant makes a Rule 29(c) challenge to the sufficiency of the evidence for every

count of the indictment—the racketeering count, and each predicate act, and all eight Mann Act

counts.[24]  These challenges are unavailing.

A court evaluating a Rule 29(c) motion views "the evidence in the light most favorable to

the prosecution" and will uphold the jury's verdict if it determines that "*any* rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt."  *United States

v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (emphasis in original) (citation omitted); *United

States v. Mahaffy*, 499 F. Supp. 2d 291, 294 (E.D.N.Y. 2007) ("To succeed, any Rule 29 motion

must demonstrate that, viewing the evidence in the light most favorable to the government, no

rational trier could have found the essential elements of the crime charged beyond a reasonable

doubt." (internal quotation marks and citation omitted)), a*ff'd*, 283 F. App'x 852 (2d Cir. 2008).

Viewing the evidence in the light most favorable to the prosecution means "drawing all

---

[24] As relevant here, a defendant may move for a judgment of acquittal pursuant to Rule 29(c) "within 14
days after a jury verdict."  Fed. R. Crim. P. 29(c).  "If the jury has returned a guilty verdict, the court
may set aside the verdict and enter an acquittal."  *Id.*

inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (internal quotation marks and citation omitted).  A court "must consider the Government's case in its totality rather than in its parts," and that the sufficiency test "may be satisfied by circumstantial evidence alone." *United States v. Wexler*, 522 F.3d 194, 207 (2d Cir. 2008) (internal citations omitted).  Thus, a defendant challenging the sufficiency of the evidence "bears a heavy burden."  *United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008) (internal quotation marks and citation omitted).  The defendant has not sustained his burden.

### a.  Racketeering

The RICO statute makes it unlawful for "any person employed by or associated with any enterprise" whose activities affect interstate or foreign commerce "to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  The statute further defines "enterprise" to include "any . . . group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  As the Supreme Court has observed, the "enumeration of included enterprises is obviously broad," and "the term 'any' ensures that the definition has a wide reach."  *Boyle v. United States*, 556 U.S. 938, 944 (2009) (citations omitted); *see also United States v. Gershman*, No. 20-30, 2022 WL 1086464, at *8 (2d Cir. Apr. 12, 2022) ("Congress defined 'enterprise' for purposes of RICO broadly.").  "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Boyle*, 556 U.S. at 946.  An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct."  *United States v. Turkette*, 452 U.S. 576, 583 (1981); *United States v. Pierce*, 785 F.3d 832, 838

(2d Cir. 2015) ("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose." (quoting *Boyle*, 556 U.S. at 948)).

The Supreme Court has consistently rejected arguments aimed at narrowing the statute's broad reach. Thus, an enterprise "need not have 'a hierarchical structure' or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc." *Boyle*, 556 U.S. at 948. Further, "[m]embers of the group need not have fixed roles," and "[t]he group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies." *Id.* "While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence." *Id. Boyle* also makes clear that the RICO statute is not "limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach." *Id.*

Against this backdrop, I address the defendant's arguments that the government did not establish the existence of an enterprise, that the enterprise's activities affected interstate or foreign commerce, or a pattern of racketeering activity.

  *i. Enterprise*

In challenging the existence of the enterprise, the defendant does not appear to contest the evidence that he was at the top of an organization, and that he had groups of employees—an inner circle—who worked to promote the defendant's music and brand, and to tend to his personal needs. (ECF No. 273-1 at 12-20.)

Relying on *First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004), the defendant insists that the government did not prove a RICO enterprise.  In *Satinwood*, the Second Circuit stated that "[f]or an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes."  *Satinwood*, 385 F.3d at 174 (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 820 F. Supp. 89, 98 (S.D.N.Y. 1993) *aff'd*, 27 F.3d 763 (2d Cir. 1994), and *Moll v. U.S. Life Title Ins. Co. of N.Y.*, 654 F. Supp. 1012, 1031 (S.D.N.Y. 1987)).  Citing this language, the defendant contends that the government had to establish that the "Defendant, his employees, and entourage came together with the common purpose of recruiting women and girls to engage in 'illegal sexual activity' and produce pornography—not merely the broader purpose of promoting Defendant's music or brand."  (ECF No. 273-1 at 12-14.)

To the extent that *Satinwood* imposes a more stringent standard for pleading the existence of an enterprise, it conflicts with binding Second Circuit and Supreme Court precedent, as several district courts in this circuit have found.[25]  *See World Wrestling Ent., Inc. v. Jakks Pac., Inc.*, 425 F. Supp. 2d 484, 499 (S.D.N.Y. 2006), *aff'd*, 328 F. App'x 695 (2d Cir. 2009); *JSC Foreign Econ. Ass'n Technostroyexport v. Weiss*, No. 06 CIV. 6095, 2007 WL 1159637, at *9 (S.D.N.Y. Apr. 18, 2007); *United States v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d 422, 474 n.86 (E.D.N.Y. 2007).  In *Technostroyexport*, the Honorable John G. Koeltl explained that in *Turkette,* the Supreme Court distinguished the elements of enterprise and pattern of racketeering:

---

[25] While the Second Circuit has cited the *Satinwood* language in a published decision and a few summary orders, *see Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (quoting *Satinwood*, 385 F.3d at 174)); *see also, e.g.*, *Vidurek v. Koskinen*, 789 F. App'x 889, 894 (2d Cir. 2019), it did not discuss it extensively.  I agree with Judge Koeltl and the other judges who have discussed *Satinwood* that the language at issue conflicts with binding Second Circuit and Supreme Court precedent.

35

> The enterprise is an entity, for present purposes a group of persons associated together for a common purpose in engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise.

452 U.S. at 583. "One element addresses group organization, while the other addresses conduct." *JSC Foreign Econ. Ass'n Technostroyexport*, 2007 WL 1159637, at *10. In *Turkette*, the Supreme Court held that individuals in an enterprise must share a common purpose to engage in a "course of conduct;" the Court did not say that the course of conduct must be "fraudulent." *Turkette*, 452 U.S. at 583; *see also Boyle*, 556 U.S. at 944. The *Satinwood* language conflicts with well-established precedent that RICO covers "both legitimate and illegitimate enterprises."[26] *Turkette*, 452 U.S. at 580; *see Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 164 (2001) ("The [United States Supreme] Court has held that RICO . . . protects the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which 'unlawful . . . activity is committed.'" (internal citations omitted)); *see also United States v. Cianci*, 378 F.3d 71, 88 n.8 (1st Cir. 2004) ("It is true that members of an association-in-fact enterprise, such as is now charged, must be connected by a common thread of purpose; and one might often expect such a purpose to be of a criminal nature. But the ultimate question is whether an association-in-fact exists. For this, it is not required that each participant have a separate mens rea so long as each can reasonably be said to share in the common purpose." (citing *Turkette*, 452 U.S. at 578)).

---

[26] In *Turkette*, the Supreme Court assumed that RICO applied to legitimate enterprises; the issue in *Turkette* was whether "an enterprise consisting of a group of individuals was . . . covered by RICO if the purpose of the enterprise was exclusively criminal." *Turkette*, 452 U.S. at 581; *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 260 (1994) (explaining that in *Turkette*, the Supreme Court addressed "whether 'enterprise' as used in § 1961(4) should be confined to 'legitimate' enterprises").

36

As Judge Koeltl explained, if *Satinwood* required that a plaintiff allege a "course of fraudulent or illegal conduct separate and distinct from the alleged predicate racketeering acts themselves, . . . the decision would appear to conflict with *United States v. Mazzei,* 700 F.2d 85 (2d Cir. 1983), in which the Court of Appeals held that proof of the separate elements of a RICO 'enterprise' and a 'pattern of racketeering activity' need not be "distinct and independent, as long as the proof offered is sufficient to satisfy both elements." *JSC Foreign Econ. Ass'n Technostroyexport*, 2007 WL 1159637, at *9 (citing *Mazzei,* 700 F.2d at 89); *see also World Wrestling Ent.*, 425 F. Supp. 2d at 499 ("[T]here also appears to be no doubt that these same statements are inconsistent with the holdings of *Mazzei* and its progeny."); *Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d at 474 ("This Court agrees with *World Wrestling Entertainment* on that point—the quoted portion of *First Capital* statement is not well-supported by Second Circuit precedent, as evidenced by the fact that *First Capital* cited only one district court opinion in support of it, and it is flatly inconsistent with *Mazzei* and *Turkette*."). And as the Honorable Kenneth M. Karas explained, "neither the Second Circuit nor the Supreme Court has expressly overruled *Mazzei*. This is critical because this Court cannot ignore binding Second Circuit precedent, unless it is expressly or implicitly overruled." *World Wrestling Ent.*, 425 F. Supp. 2d at 499.

Finally, Judge Koeltl noted that "the validity of the enterprise pleading requirement was not in fact squarely before the *Satinwood* court," and that it was "unclear why the Court of Appeals went on to discuss in dicta the adequacy of the complaint with respect to the RICO 'enterprise' element when that issue was not raised on appeal and not briefed by the parties." *JSC Foreign Econ. Ass'n Technostroyexport*, 2007 WL 1159637, at *9.

Accordingly, the government did not need to prove that every member of the enterprise shared a common criminal purpose. *See Crabhouse of Douglaston Inc. v. Newsday Inc.*, 801 F. Supp. 2d 64, 79-81 (E.D.N.Y. 2011) (determining whether the alleged members of the enterprise "shared a common purpose, lawful or unlawful").[27]

I also reject the defendant's claim that one of the enterprise's objectives—promoting the defendant's music—had "no nexus to the underlying racketeering activity." (ECF No. 273-1 at 14.) In this circuit, the "nexus between the RICO enterprise and the predicate racketeering acts may be established by evidence that the defendant was enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise, or that the predicate offenses are related to the activities of that enterprise." *United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992) (internal quotation marks and emphasis omitted).

The jury could rationally find both that the defendant was able to commit the predicate acts—predominantly illegal sexual activity with women and girls—because of his leadership position and control over the affairs of the enterprise, and that his underlings enabled his commission of the predicate acts. *See United States v. White*, 621 F. App'x 889, 894 (9th Cir. 2015) ("The jury could rationally find that Hardiman was able to sell drugs by virtue of his rank within the gang and that his drug sales were related to the gang."); *United States v. Megal*e, 363 F. Supp. 2d 359, 364 (D. Conn. 2005) ("The Government . . . will try to prove that defendants' debt collection was successful because of their positions within the Gambino Family

---

[27] For the same reasons, I reject the defendant's argument that "the government has failed to demonstrate that the purpose of the enterprise was distinct from the racketeering activities." (ECF No 273-1 at 16.) As explained above, the government need not establish that the enterprise had a common illegal purpose. Further, while the enterprise and the pattern of racketeering activity are separate and distinct elements, "proof of a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an . . . enterprise." *Boyle*, 556 U.S. at 951; *see also Mazzei,* 700 F.2d at 89.

38

organization.  If so, such proof would satisfactorily connect the unlawful debt collection [with] the charged RICO enterprise.").  The defendant's employees recruited young women and girls, including by locating them in the audiences of the defendant's concerts and inviting them backstage or to parties, by passing them notes with the defendant's phone number, and by trolling shopping malls and places like McDonald's and handing out the defendant's contact information.  The defendant's employees arranged travel for his victims and enforced his rules.  In turn, the defendant controlled his employees and ensured they implemented his rules.  He punished them when they did not enforce the rules, for example by withholding their pay (*e.g.*, T. Tr. 2037-39 (testimony by Suzette Mayweather about the defendant "fining" her for having discussions with his "girlfriends")), or by requiring them to write letters falsely incriminating themselves.  (*E.g.*, T. Tr. 3198-3201 (testimony by Copeland about the defendant ordering her to write a letter falsely stating that she had stolen from him).)

The defendant also argues that "the government failed to prove an enterprise distinct from the Defendant" because the members of the enterprise—the defendant's inner circle— "associated together for no purpose other than to carry out Defendant's needs."  (ECF No. 273-1 at 17-20.)  The cases on which he relies, however, are distinguishable, as they involve enterprises that "consist[ed] merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant."  *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994) (bank and its employees); *see also Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1063 (2d Cir. 1996) (holding company and its wholly-owned subsidiaries), *vacated on other grounds*, 525 U.S. 128 (1998); *Atkinson v. Anadarko Bank & Tr. Co.*, 808 F.2d 438, 441 (5th Cir. 1987) (bank, its holding company, and its employees).  As the Second Circuit explained, "[b]ecause a corporation can only function through its employees

and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is in reality no more than the defendant itself." *Riverwoods*, 30 F.3d at 344; *see also Palatkevich v. Choupak*, No. 12-CV-1681, 2014 WL 1509236, at *13 (S.D.N.Y. Jan. 24, 2014) ("In the Second Circuit, the distinctness requirement bars a corporate entity from being named as both the defendant 'person' and the 'enterprise' on its own.").

The defendant is not a corporate entity. "[A]n individual defendant" who "acts through a corporation . . . may have formed an association-in-fact with an entity distinct from himself." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1357 (11th Cir. 2016); *see Cedric Kushner*, 533 U.S. at 163 (holding, in a case involving "a corporate employee . . . [who] allegedly conduct[ed] the corporation's affairs in a RICO-forbidden way," that a "corporate owner/employee, a natural person, is distinct from the corporation itself" (internal citation and quotation marks omitted)); *see also Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227 (7th Cir. 1997) ("The prototypical RICO case is one in which a person bent on criminal activity seizes control of a previously legitimate firm and uses the firm's resources, contacts, facilities, and appearance of legitimacy to perpetrate more, and less easily discovered, criminal acts than he could do in his own person."). The defendant is clearly distinct from his enterprise, which included the defendant and a group of other people. The fact that the group associated to support the defendant and meet his needs does not make it indistinguishable from the defendant. As the Supreme Court has held, there is "nothing in the statute that requires more 'separateness' than that." *Cedric Kushner*, 533 U.S. at 163.

### ii.   Interstate Commerce

The defendant also disputes the interstate commerce aspect of the government's case. To satisfy the RICO statute's interstate commerce element, the government must prove that the enterprise "engaged in" interstate or foreign commerce or that its "activities . . . affect[ed]"

interstate or foreign commerce.  18 U.S.C. § 1962(c).  However, "[o]nly a minimal effect on

interstate commerce need be proven."  *United States v. Price*, 443 F. App'x 576, 579 (2d Cir.

2011); *see United States v. Mejia*, 545 F.3d 179, 203 (2d Cir. 2008) ("[A]ny . . . conduct having

even a *de minimis* effect on interstate commerce suffices." (citing *United States v. Davila*, 461

F.3d 298, 306 (2d Cir. 2006))).  "Transporting goods . . . across state lines is a classic example of

engaging in interstate commerce;" "[u]se of an instrumentality of commerce, such as telephone

lines, is also generally viewed as an activity that affects interstate commerce."  *Mejia*, 545 F.3d

at 203.[28]

  At trial, the government established that members of the enterprise arranged travel across

states and internationally for the defendant, other members of the enterprise, and the defendant's

victims.  (*See, e.g.*, T. Tr. 1532-33, 1535, 3158.)  As explained in more detail below, multiple

predicate acts allege that the enterprise members arranged the interstate transportation of the

defendant's victims in violation of the Mann Act.  That evidence, which the jury credited, is

sufficient to establish an effect on interstate commerce.  *See United States v. Carcione*, 272 F.3d

1297, 1301 (11th Cir. 2001) (finding that—in the context of a Hobbs Act violation, which "only

requires a minimal effect on interstate commerce to support a conviction"—the defendant's

travel across states as part of a robbery scheme "clearly demonstrates an effect on interstate

commerce").  The government also presented evidence that the defendant used phones—an

instrumentality of interstate commerce—to communicate with victims located in different states,

---

[28] The defendant takes an overly narrow view of the law, maintaining that if "the purpose of the enterprise
was to promote Defendant's illegal sexual activities and create pornography," the government
was required to prove that "those activities affected interstate commerce."  (ECF No. 273-1 at 22.)  As
explained above, the purpose of the enterprise need not be criminal; on the contrary, a defendant may
use a legitimate enterprise to commit crimes.  Indeed, the defendant concedes that "[i]f Defendant's
legitimate music collective constituted an enterprise for RICO purposes"—which it does—"the
government's argument would be well taken."  (ECF No. 282 at 10.)

and that enterprise members communicated by phone with the defendant's victims.  That, too, is sufficient to establish an effect on interstate commerce.  *See Mejia*, 545 F.3d at 203; *United States v. Muskovsky*, 863 F.2d 1319, 1325 (7th Cir. 1988) (finding effect on interstate commerce based on the "use of the interstate phone system to get approval for credit card transactions").

iii.     *Pattern of Racketeering*

A "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this [statute] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."  18 U.S.C. § 1961(5).  The government "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (emphasis in original).  These requirements "protect defendants from RICO charges based on isolated or sporadic criminal acts." *United States v. Burden*, 600 F.3d 204, 216 (2d Cir. 2010).

"[P]redicate acts must be related to each other and to the enterprise."  *United States v. Daidone*, 471 F.3d 371, 376 (2d Cir. 2006); *Minicone*, 960 F.2d at 1106 ("The racketeering acts must be related to each other ('horizontal' relatedness), and they must be related to the enterprise ('vertical' relatedness).").  Continuity "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."  *H.J. Inc.*, 492 U.S at 241.  The defendant disputes the evidence on every predicate act, and the evidence of relatedness and continuity as to some acts.

1.     Bribery

Racketeering Act 1 charged the defendant with bribing a public official "with the intent to influence . . . the creation of a fraudulent identification document for [Aaliyah]."  (ECF No. 43 ¶ 13.)  The defendant argues that the evidence did not prove that he caused Demetrius Smith to

42

SpA 95

pay a public employee to secure identification for Aaliyah.  Specifically, the defendant contends that the record does not show that he knew of or facilitated the bribery.  He cites portions of Smith's testimony, including Smith's testimony that Derrel McDavid gave him the cash to pay the bribes, and that he was "not positive" whether he discussed the bribery with the defendant. (ECF No. 273-1 at 25; *see* T. Tr. 719, 758-59.)  The evidence, viewed as a whole, sufficiently tied the defendant to the bribery.

Indeed, there was ample evidence from which a rational jury could conclude that the defendant knew of and facilitated the bribery.  After all, the defendant was the only person who stood to gain from the bribery.  He feared that Aaliyah, then only fifteen years old, was pregnant, which would have revealed the defendant's sexual relationship with her.  As he told Smith, he "needed to marry Aaliyah to protect himself."  (T. Tr. 703-06.)  Smith, the defendant and McDavid discussed "how to . . . make the marriage happen," especially since Aaliyah was too young to be married without parental and judicial approval at the time.  Smith suggested that he could obtain fraudulent identification to enable the defendant to marry Aaliyah.  (T. Tr. 712-13.) The defendant was part of the group that drove to the welfare office and a FedEx office to get Aaliyah's fraudulent identification.  (T. Tr. 718, 722.)  Using those documents, the defendant and Aaliyah applied for and received a marriage license at the Maywood City Hall.  (T. Tr. 724-25.) An official, recommended by the defendant's friend, conducted the hasty ceremony that took place in the hotel room.  (T. Tr. 746, 1345, 2419-23.)

The jury was entitled to infer from this evidence, including the defendant's obvious interest in the protecting himself, that he knowingly participated in or facilitated the bribery.  *See United States v. Blackwood*, 366 F. App'x 207, 210 (2d Cir. 2010) ("[A] defendant's knowing and willing participation in a conspiracy . . . may be inferred from his presence at critical stages

SpA 96

of the conspiracy that could not be explained by happenstance, [and] . . . may also be established by evidence that the defendant participated in conversations directly related to the substance of the conspiracy, . . . or engaged in acts exhibiting a consciousness of guilt." (alterations, internal quotation marks and citations omitted)).

To be sure, Smith, a recalcitrant and combative witness, sometimes hedged about the extent of the defendant's role in the bribery.  (*See* T. Tr. 714 ("I actually didn't have any discussion with Robert, it was with Derrel."); T. Tr. 743 ("I'm not sure if Robert was there . . .")).  At other times he confirmed that the defendant was present during the bribery conversation.  (*See* T. Tr. 743 ("I don't remember precisely each time but I'm pretty sure [the defendant] was there."); T. Tr. 744 ("I'm pretty sure [the defendant] was there with me so I guess I could say yes.")).

In deciding a Rule 29 motion, "[w]here there are conflicts in the testimony, [the Court] must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011).  "A jury is entitled to believe part and disbelieve part of the testimony of any given witness." *United States v. Flores*, 945 F.3d 687, 711 (2d Cir. 2019).  Smith was explicit that he did not want to testify (T. Tr. 653 ("Yes, I don't want to be here, period.")), and that he was uncomfortable testifying about the defendant's marriage to Aaliyah.  (T. Tr. 726 ("I'm uncomfortable with this, Your honor.  I'm truly uncomfortable.  We're continuously talking about Aaliyah.  Her parents are not here and I don't understand why I got to do that.").)  Moreover, he was reluctant to incriminate the defendant, having known him since 1984 as "just like [his] brother."  (T. Tr. 759.)  A rational jury could credit the portions of Smith's testimony confirming the defendant's participation in the bribery, and reject his conflicting testimony.

The defendant's further argument that the predicate act of bribery lacks vertical and horizontal relatedness is also unpersuasive.  As explained above, vertical relatedness "may be established by evidence that the defendant was enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise, or that the predicate offenses are related to the activities of that enterprise." *Minicone*, 960 F.2d at 1106 (emphasis and internal quotation marks omitted).  In this case, the defendant was able to commit bribery because of his position as the head of the enterprise, and his ability to direct the members of the enterprise to do his bidding.  Further, the jury could reasonably find that the bribery was necessary to further the enterprise.  The marriage to Aaliyah protected the defendant, his image and his career by shielding him from the consequences of having sex with a minor: prison, shame and disgrace.  The evidence also established horizontal relatedness; the defendant and his associates committed the bribery as part of and in order to facilitate the defendant's sexual activity with women and young girls, including illegal sexual activity.  *See H.J. Inc.*, 492 U.S. at 240 (predicate acts are horizontally related when they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.").[29]

### 2.       Production of Sexually Explicit Material

---

[29] The defendant also posits that "because the Act did not occur within 10 years of any other predicate Act that was sufficiently proven, the Act is time-barred."  (ECF No. 273-1 at 27.)  As explained below, the evidence was sufficient for the jury to conclude that the defendant was guilty of the charged offenses. As to the defendant's timing claim, the bribery took place in 1994, and the conduct alleged in Racketeering Act 2—sexual exploitation of a child, Stephanie—occurred five years later, in 1999, clearly less than 10 years apart.  In any event, Section 1961(5) "requires only that the *last* predicate act happen within ten years of another predicate act."  *Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 329 (E.D.N.Y. 2012) (finding that predicate act that occurred more than 10 years before the next predicate act could still be considered part of a pattern of racketeering activity, where the last predicate act occurred within 10 years of a prior act).

Racketeering Acts 2 (Stephanie), 7 (Jerhonda) and 10 (Jane) charged the defendant with sexual exploitation of a child.  *See* 18 U.S.C. § 2251(a).  The government was required to prove that "(1) the victim was less than 18 years old; (2) the defendant used, employed, persuaded, induced, enticed, or coerced the minor to take part in sexually explicit conduct for the purpose of producing a visual depiction of that conduct; and (3) the visual depiction was produced using materials that had been transported in interstate or foreign commerce."  *United States v. Broxmeyer*, 616 F.3d 120, 124 (2d Cir. 2010).

The defendant does not deny the evidence that he taped his sexual encounters with these three victims; nor does he dispute that they were minors at the time he taped them.  Instead, claiming that the government had to "prove that Defendant did something more than just film the sexually explicit conduct" (ECF No. 273-1 at 28), he contends that the government did not prove that he "did *anything* to persuade, induce, entice or coerce [Stephanie, Jerhonda or Jane] into the sexual activity that was recorded."  (ECF No. 273-1 at 28, 35, 51 (emphasis in original).)  The defendant misstates the applicable law and the facts established at trial.

"[A] defendant can be found to have 'used' a minor to produce child pornography if the minor serves as the subject of the illicit photographs taken by the defendant."  *United States v. Sirois*, 87 F.3d 34, 43 (2d Cir. 1996); *see also Ortiz-Graulau v. United States*, 756 F.3d 12, 18 (1st Cir. 2014) (agreeing with the Second Circuit); *United States v. Fadl*, 498 F.3d 862, 866 (8th Cir. 2007) (same); *United States v. Wright*, 774 F.3d 1085, 1091 (6th Cir. 2014) (same); *United States v. Laursen*, 847 F.3d 1026, 1033 (9th Cir. 2017) (same).  As the defendant concedes, "several circuits, including the Second Circuit, have held that the 'use' element set forth in § 2251(a) is satisfied when a defendant intentionally films a minor's sexually explicit conduct[.]" (ECF No. 282 at 11.)  Nevertheless, the defendant argues that the Second Circuit's interpretation

46

would "render the remaining terms in the statute 'persuade, induce, entice or coerce' superfluous."  (ECF No. 282 at 11-12.)  But district courts are "bound to follow controlling Second Circuit precedent unless that precedent is overruled or reversed," *Unicorn Bulk Traders Ltd. v. Fortune Mar. Enters., Inc.*, No. 08-CV-9710, 2009 WL 125751, at *2 (S.D.N.Y. Jan. 20, 2009); thus, this Court is bound by the Second Circuit's holding in *Sirois*.

In any event, the defendant's challenge is meritless.  Section 2251(a) requires "proof of active or coercive conduct by a defendant upon a minor."  *United States v. Overton*, 573 F.3d 679, 692 (9th Cir. 2009).  The broad interpretation of "use" applies when a defendant engages in active conduct—for example, if the defendant photographs or films a minor, or directs the photography or filming of a minor.  *See Sirois*, 87 F.3d at 43 (finding that the "use" element was satisfied where the photographs were "taken by the defendant"); *Laursen*, 847 F.3d at 1032-33 (finding that the "use" element was satisfied where the defendant directed the minor's actions).[30] A defendant may engage in coercive conduct, and persuade, induce, entice or coerce a minor to produce child pornography, for example, by persuading a minor to take pornographic photographs of herself or himself.  *Cf. Broxmeyer*, 616 F.3d at 126 (finding that the government had not adduced sufficient evidence that certain pornographic photos taken by a minor were "taken at [the defendant's] behest").  Accordingly, the words "persuade, induce, entice or coerce" in Section 2251(a) are not rendered meaningless by the Second Circuit's interpretation of "use."

---

[30] The Ninth Circuit in *Laursen* explained that though "application of the statute in these contexts may lead to harsh results," the court was mindful that "Congress may legitimately conclude that even a willing or deceitful minor is entitled to governmental protection from self-destructive decisions that would expose him or her to the harms of child pornography."  847 F.3d at 1033 (quoting *United States v. Fletcher*, 634 F.3d 395, 403 (7th Cir. 2011)).

In any case, the defense's argument is foreclosed by evidence showing that the defendant engaged in persuasive and coercive conduct with Stephanie, Jerhonda and Jane. They testified, as did other witnesses, about the punishments that the defendant exacted when they broke his rules, and the physical and emotional manipulation they endured to meet the defendant's sexual demands. (*See, e.g.,* T. Tr. 1637-38 (Stephanie); T. Tr. 121-22, 163-70, 173-78 (Jerhonda); T. Tr. 838-41; 858-62; 901; 911-25 (Jane).) Based on this testimony, a reasonable juror could find that the defendant similarly persuaded or coerced the victims to engage in the sexually explicit conduct.

The defendant also argues that the government did not prove that he acted with a purpose of "producing" a visual depiction, and that the jury charge on this element was wrong. (ECF No. 273-1 at 28.) An examination of the charge itself, to which the defendant did not object, refutes that claim. The Court explained that Racketeering Acts 2, 7 and 10 charged the defendant with using a minor "to engage in sexually explicit conduct for the purpose of producing one or more visual depictions of such conduct." (T. Tr. 4648, 4671, 4684-85.) The Court then quoted the relevant portion of 18 U.S.C. § 2251(a), which provides:

> A person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of that conduct, shall be punished . . . if such person knows or has a reason to know that the visual depiction will be transported in interstate or foreign commerce or mailed[,] if that visual depiction was produced using materials that had been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer, or if the visual depiction has actually been transported in interstate or foreign commerce or mailed.

(T. Tr. 4648-49.) Finally, the Court discussed the elements that the government had to prove:

> To prove that the defendant committed this racketeering act, the government must prove the following three elements beyond a reasonable doubt:
>
> First: That Stephanie was under the age of 18 at the time of the acts alleged in the indictment.

Second: That the defendant used, employed, persuaded, induced, or enticed Stephanie to take part in sexually explicit conduct for the purpose of producing or transmitting a visual depiction of that conduct.

Third: That the visual depiction was produced using materials that had been mailed, shipped, or transported in and affecting interstate and foreign commerce.

. . .

While the government must prove that the defendant acted with the purpose of producing a sexually explicit visual depiction, the government does not need to prove that a visual depiction of sexually explicit conduct was actually produced[.]

(T. Tr. 4649-51.)  The Court's charge, viewed in its entirety, made it clear that the jurors had to determine whether the defendant's purpose was to produce a visual depiction.  Accordingly, the jury instructions, "taken as a whole and viewed in light of the evidence, show no tendency to confuse or mislead the jury as to principles of law which are applicable."  *Rippy-El v. Makram*, 210 F.3d 355, at *1 (2d Cir. 2000).

Finally, the defendant maintains that the government failed to prove the interstate commerce element—that the visual depictions were produced using materials that had been mailed, shipped, or transported in interstate or foreign commerce—for Racketeering Acts 2 and 7.  (ECF No. 273-1 at 29, 35.)  This claim is also unpersuasive.  Stephanie testified that the defendant filmed her in Illinois using a video camera with VHS tape.  (T. Tr. 1645.)  The defendant acknowledges that the parties stipulated that the type of film used in VHS tapes was not produced in Illinois during the relevant time period.  (*See* ECF No. 273-1 at 29; GX 1006.)  That is sufficient to satisfy the interstate commerce element.  *See United States v. Culver*, 598 F.3d 740, 747 (11th Cir. 2010) (interstate commerce element met where component of videotape at issue was manufactured out-of-state); *United States v. Joubert*, 778 F.3d 247, 255-56 (1st Cir. 2015) (interstate commerce element met where VHS tape was made out-of-state).

Jerhonda testified that the defendant made a recording of her in Illinois using an iPhone and a Canon camera. (T. Tr. 168-69.) Despite this testimony, the defendant claims that the government did not "establish what device, if any, was used to make these recordings," and therefore its "'affecting interstate' commerce evidence was insufficient." (ECF No. 273-1 at 35.) However, the jury was entitled to credit Jerhonda's testimony about the devices the defendant used, and the government's evidence that both devices were produced out of state. (GX 1006, 957; T. Tr. 2431-32.) Accordingly, there was sufficient evidence to convict the defendant of Racketeering Acts 2, 7 and 10.

### 3. Exposure to a Sexually Transmitted Disease—Intent

Racketeering Acts 8A (Jane), 12A (Faith) and 14A (Faith)[31] charged the defendant with transporting a person in interstate commerce with the intent to engage in sexual activity that exposed the person to herpes, which violated certain state criminal and public health statutes. *See* 18 U.S.C. § 2421(a) ("Whoever knowingly transports any individual in interstate or foreign commerce . . . with intent that such individual engage in . . . any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be" punished). The defendant claims that the government did not prove that he transported Jane or Faith "with the *intent* of exposing her to herpes." (ECF No. 273-1 at 36, 54.) Once again, the Court charged the jury on the element of intent, a charge to which the defendant did not object:

> In order to establish this element, it is not necessary that the Government prove that engaging in illegal sexual activity was the only purpose for crossing the state line. A person may have several different purposes or motives for such travel, and each may prompt in varying degrees the act of making the journey. The Government must prove beyond a reasonable doubt, however, that a significant or motivating purpose of the travel across a state line was that the defendant would engage in illegal sexual activity with [the victim]. In other words, that illegal activity [] can't have been merely incidental to the trip.

---

[31] Racketeering Acts 12A and 14A correspond to Counts 6 and 8, respectively.

50

(T. Tr. 4658.)

The defendant maintains that the illegal sexual activity must be the "dominant purpose"
of the travel, as opposed to "merely a 'significant' or 'motivating' purpose."  (ECF No. 273-1 at
37.)  That is not the standard in this circuit.  The word "'dominant' . . . [does not] appear in the
statutory language;" courts in this circuit have adopted the "significant or motivating purpose"
standard.  *United States v. An Soon Kim*, 471 F. App'x 82, 84 (2d Cir. 2012) (citing 18 U.S.C.
§ 2421) (approving "significant or motivating purpose" standard); *United States v. Maxwell*, No.
20-CR-330, 2021 WL 5999410, at *8 (S.D.N.Y. Dec. 19, 2021) (using "significant or motivating
purpose" standard in jury charge for violation of 18 U.S.C. § 2423(a)—transportation of a minor
with intent to engage in illegal sexual activity); *see also United States v. Hayward*, 359 F.3d 631,
638 (3d Cir. 2004) (approving same standard in 18 U.S.C. § 2423(a) case).

The defendant does not challenge that the evidence at trial demonstrated he contracted
genital herpes between 2000 and 2007, that his doctor, Dr. Kris McGrath, informed him of the
diagnosis, and that Dr. McGrath told him to use a condom during sexual intercourse and to let
his sexual partners know of his diagnosis.  (T. Tr. 404-11, 421, 462-63.)  Nor does he appear to
challenge that the evidence showed that he never used a condom during sex with Jane and Faith,
and that he never told Jane or Faith that he had been diagnosed with herpes.  Rather, the
defendant argues that there is no evidence that "Defendant's actions of arranging for Jane and
Faith to travel to meet him was motivated by an intent to *expose* Jane and Faith to STDs[,] . . .
rather than to simply have sex with them."  (ECF No. 282 at 12-13 (emphasis in original); *see
also* ECF No. 273-1 at 54 ("Because the Defendant's purported violation of a New York Public
Health Law prohibiting him from exposing a partner to herpes was *incidental* to Faith's trip

51

SpA 104

rather than a motivating purpose in transporting Faith, the intent requirement of the statute cannot be sustained." (emphasis in original)).)

The plain language of 18 U.S.C. § 2421(a) requires that the defendant transported Jane and Faith with the "intent" that they "engage in . . . sexual activity for which any person can be charged with a criminal offense."  Thus, as the Court instructed the jury, the government was required to prove that the defendant transported Jane and Faith with the intent of engaging in sexual activity with them, and that the intended sexual activity was illegal.  The record established, and the defendant appears to concede, that his motivation in arranging for Jane and Faith to travel to meet him was to engage in sexual activity with them.  In light of Jane's and Faith's testimony, as well as other witnesses' testimony about their sexual experiences with the defendant, the jury could reasonably conclude that the defendant intended to have sex with them without a condom, and without informing them that he had herpes.  And as explained in Section I.a.iii.5 below, the defendant could be "charged with [] criminal offense[s]" for that sexual activity—because he exposed Jane and Faith to genital herpes, which violated state criminal and public health statutes in existence at the time.  Accordingly, the evidence was sufficient to prove the intent element.

> 4.      Exposure to a Sexually Transmitted Disease—Persuasion, Inducement, Enticement or Coercion

Racketeering Acts 8B (Jane), 12B (Faith) and 14B (Faith)[32] charged the defendant with persuading, inducing, enticing and coercing a person to travel in interstate commerce to engage in sexual activity that exposed the person to herpes, which violated certain state criminal and public health statutes.  *See* 18 U.S.C. § 2422(a) ("Whoever knowingly persuades, induces, entices, or coerces any individual to travel in interstate or foreign commerce . . . to engage in . . .

---

[32] Racketeering Acts 12B and 14B correspond to Counts 7 and 9, respectively.

any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be" punished).

The defendant asserts that there is no evidence that he "took any action to induce, persuade, entice, or coerce Jane into traveling to California in April – May 2015;" instead, he says, citing text messages between Jane and her mother, that "the record shows that Jane's mother purposefully and strategically *enticed* Defendant with her 17-year-old daughter." (ECF No. 273-1 at 41 (emphasis in original); GX 233.) According to the defendant, he merely "invited Jane to join him, and she excitedly accepted." (ECF No. 273-1 at 47.) In his challenge to the evidence about Faith, he maintains that he "invited a grown woman to meet him in New York, and she accepted." (*Id.* at 55.)

The words "'persuade,' 'induce,' 'entice,' or 'coerce,' though not defined in the statute, are words of common usage that have plain and ordinary meanings." *United States v. Gagliardi*, 506 F.3d 140, 147 (2d Cir. 2007). Section 2242 "imposes no requirement that an individual endeavor to 'transform or overcome' the will of his intended victim;" in fact, the jury need only consider whether the defendant "intended to induce, persuade, and/or entice" the victim to travel to engage in sexual activity with him, "regardless of whether she expressed (or felt) reluctance, indifference, or, for that matter, enthusiasm at the prospect of doing so." *United States v. Waqar*, 997 F.3d 481, 487-88 (2d Cir. 2021). The jury was entitled to conclude from the evidence that the government proved the elements of these charges.

As Jane testified, the defendant made it clear from their first meeting, when she was a junior in high school, that his interest in her was sexual. Thus, he persuaded her to engage in sexual contact with him, telling her he needed to ejaculate before she could "audition" for him. (T. Tr. 789-95.) He also told Jane that he wanted to see her again, and "teach [her] a few

techniques." (T. Tr. 795-96.)  He proposed that she meet him in Los Angeles, California and gave her the number of his assistant Cheryl Mack, so that Mack could make the travel arrangements, for which he paid.  (T. Tr. 798-801.)

Similarly, it was clear that the defendant was interested in having sex with Faith when she met him after his San Antonio, Texas concert in March 2017.  (T. Tr. 2128-30.)  After the defendant gave Faith his contact information, they communicated regularly.  (T. Tr. 2133-35.) The defendant told Faith that he loved her, and invited her to meet him while he was on tour so that they could "hang out," which would "be fun."  (T. Tr. 2134, 2142, 2144-46, 2151.)   As he did with Jane, the defendant gave Faith Diana Copeland's number.  Faith contacted Copeland, who arranged her travel to New York in May 2017; the defendant paid for the flight.  (T. Tr. 2151-53.)  Copeland also booked and the defendant paid for her trip to New York in February 2018.  (T. Tr. 2261-62.)

A reasonable jury could find that the defendant did far more than simply "invite" Jane and Faith to meet him, and that he persuaded, induced, or enticed Jane to travel by offering "incentives"—suggesting that he would teach her singing techniques, *Waqar*, 997 F.3d at 487— and by offering to "make and pay for the necessary travel arrangements." *United States v. Rashkovski*, 301 F.3d 1133, 1137 (9th Cir. 2002).  The jury could also rationally find that the defendant persuaded, induced and enticed Faith to travel in May 2017 by telling her that he loved her, by assuring her that the trip would be "fun," and by arranging and paying for all of her travel.  The fact that Jane and Faith may have been willing or even eager to travel is not relevant. *Waqar*, 997 F.3d at 487 (holding that "it is the defendant's intent that forms the basis for his criminal liability, not the victims'"); *Rashkovski*, 301 F.3d at 1137 (holding that "it is not

significant that [the victims] had pre-existing wishes to" travel, when "they never acted upon those desires until [the defendant] made it attainable").

> 5. Exposure to a Sexually Transmitted Disease—Criminal and Public Health Statutes

As discussed above, Racketeering Acts 8 (Jane) and 12 (Faith) charged the defendant with Mann Act violations based on violations of state criminal and public health statutes— specifically, New York Penal Law ("NYPL") § 120.20, New York Public Health Law ("NYPHL") 2307 and California Health and Safety Code ("CHSC") § 120290.  The defendant argues that the evidence at trial was insufficient to establish a violation of NYPL § 120.20, and that NYPHL 2307 is unconstitutionally vague.  (ECF No. 273-1 at 57-59.)  He also asserts that the government improperly charged him with an older version of CHSC § 120290, and in any event that the evidence did not establish a violation of CHSC § 120290.  (*Id.* at 38-41.)  I address these arguments in turn.[33]

NYPL § 120.20 provides that a "person is guilty of reckless endangerment in the second degree when he recklessly engages in conduct which creates a substantial risk of serious physical injury to another person."  "Serious physical injury" is "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ."  N.Y.P.L. § 10.00.  The defendant argues that "unprotected sex with someone who has genital herpes does not establish a substantial risk of serious physical injury" because "[h]erpes

---

[33] In connection with the defendant's Rule 29 motion, the Court directed the parties to submit supplemental letters on two issues: (1) whether the defendant's claims about NYPHL 2307 and CHSC 120290 are the proper subjects of a motion for a judgment of acquittal under Rule 29, and (2) whether the defendant's arguments about CHSC 120290 are untimely because he did not assert them before trial, and if so, whether he waived them.  (May 19, 2022 Order.)  In response, the defendant conceded his claim about NYPHL § 2307, and that some of his claims about CHSC § 120290, are "constitutional" in nature (ECF No. 298), and thus exceed the permissible scope of a Rule 29 motion.

is not deadly and rarely causes any serious, protracted health impairments." (ECF No. 273-1 at 57-58.) He also claims that "there is no evidence that he was contagious or had an outbreak" when he was in New York. (*Id.* at 58; *see* ECF No. 282 at 15.)

The defendant's claim that herpes "is not deadly and rarely causes any serious, protracted health impairments" (ECF No. 273-1 at 58), as an initial matter, ignores the entirety of the statutory definition, which includes not only causing death or creating a substantial risk of death, but also causing "serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y.P.L. § 10.00. A rational jury could find from the trial evidence, expert and otherwise, that the defendant's exposure of his victims to an incurable disease met these definitions. Dr. Iffath Hoskins, the Director of Patient Safety in the Obstetrics and Gynecology Department at New York University, explained that herpes is incurable, and a "very contagious, transmissible virus." (T. Tr. 3027-30, 3035-36.) Once the virus enters the central nervous system, "it's going to stay there" and "it's always there so it can reactivate and when it reactivates, it can cause a result or an effect . . . [in] other parts of the body." (T. Tr. 3037-39.) Herpes manifests as "blisters, ulcers, pustules, vesicles," causing burning, tingling, . . . numbness . . . [and] [s]evere pain." (T. Tr. 3040-42.) Outbreaks can be triggered by various factors—"menstruation," "a common cold or cough," "sunlight," and "other illnesses" such as "asthma, cancer, hypertension, [and] diabetes"—and can "last anywhere from several days to several weeks." (T. Tr. 3044, 3054.) Herpes can cause other medical complications, including to the central nervous system, the brain or the bloodstream. (T. Tr. 3049.) While these complications are "rarer," they "always" remain a risk for someone with herpes. (T. Tr. 3050.) The jury could reasonably find based on Dr. Hoskins's expert testimony that transmission of genital herpes—a permanent and incurable disease that causes recurring

outbreaks with potentially life-threatening complications—constitutes a serious physical injury.
*See United States v. James*, 957 F.2d 679, 680 (9th Cir. 1992) (finding that transmission of
genital herpes constituted a permanent or life-threatening bodily injury); *see also Com. v.
Kerrigan*, 920 A.2d 190, 201 (Pa. Super. Ct. 2007) (finding that transmission of HPV/genital
warts constituted serious bodily injury, and collecting cases).  Moreover, the defendant's victims
testified about the intensity of their physical symptoms, as well as the psychological effects of
being saddled with an incurable sexually transmitted disease.

      As for the defendant's suggestion that he might not have been "symptomatic," Dr.
Hoskins explained that someone with herpes can transmit the virus even if he is asymptomatic,
because the virus can be "excreted" at a time when there is "no evidence that it has reactivated."
(T. Tr. 3046.)  While taking medications like Valtrex—which the defendant took—can reduce
the risk of transmission, "there will never be a situation where there's a [one] hundred percent
protection;" there will still be a "10 to 20 percent" possibility of transmitting the virus, and "a
missed dose" or "a missed window of time" can add to that percentage.  (T. Tr. 3059-61.)
Similarly, the defendant's doctor, Dr. Kris McGrath, not only described the symptoms of herpes
but also advised the defendant to use a condom during sex, prompting the defendant himself to
acknowledge that he should use a condom when having sex.  (T. Tr. 406.)  Dr. McGrath also told
the defendant to warn his partners that he had herpes, and repeatedly prescribed Valtrex for the
defendant.  (T. Tr. 406, 418-19, 463.)  Moreover, Kate and Jane contracted herpes from the
defendant in the early 2000s and 2015.  (T. Tr. 851-53, 2636-39.)  Given this evidence, a rational
jury could find that there was a substantial risk of transmission that the defendant consciously
ignored.

NYPHL § 2307 provides that "[a]ny person who, knowing himself . . . to be infected with an infectious venereal disease, has sexual intercourse with another shall be guilty of a misdemeanor." The defendant repeats the arguments he made before trial in seeking dismissal of these counts: that the statute is "unconstitutionally vague."[34] (ECF No. 273-1 at 59.) In addition, he claims that the statute does not define the term "infected." (*Id.*)

The defendant concedes that his constitutional claims regarding NYPHL § 2307 are not challenges to the sufficiency of the evidence (ECF No. 298 at 2), and thus not properly the subject of a Rule 29 motion. *See United States v. al Ghazi*, No. 07-CR-354, 2009 WL 1605741, at *2 (S.D.N.Y. June 9, 2009) ("Rule 29 . . . only authorizes motions challenging the sufficiency of the evidence presented at trial." (citing Fed. R. Crim. P. 29 and *United States v. McDaniel*, No. 03-CR- 550, 2004 WL 1057627, at *1 (S.D.N.Y. May 10, 2004))); *United States v. Barret*, No. 10-CR-809, 2012 WL 3229291, at *20 (E.D.N.Y. Aug. 6, 2012) (noting that the defendant's vagueness challenge to a charge in the indictment was "not properly raised on a motion for judgment of acquittal pursuant to Rule 29"), *aff'd*, 677 F. App'x 21 (2d Cir. 2017).

The defendant argues that the government did not prove he violated CHSC § 120290, because "the government charged Defendant with a repealed version of the statute no longer in effect" and proposed jury instructions that "rewrote [the statute] in clear violation of various constitutional provisions." (ECF No. 273-1 at 38-41.) He also characterizes the statute as impermissibly vague and claims there was insufficient evidence to prove the charge in any event. (*Id.*) Each of the defendant's arguments is unavailing.

---

[34] The Court incorporates by reference the portion of its May 22, 2020 Order that decided these issues. (*See* ECF No. 69 at 8-18.)

The 1998 version of CHSC § 120290 was in effect at the time of the charged conduct in April and May of 2015.  (ECF No. 43 ¶¶ 23-24.)  That version of the statute, which remained effective through 2017, provided:

> Except as provided in Section 120291 or in the case of the removal of an afflicted person in a manner the least dangerous to the public health, any person afflicted with any contagious, infectious, or communicable disease who willfully exposes himself or herself to another person, and any person who willfully exposes another person afflicted with the disease to someone else, is guilty of a misdemeanor.

CHSC § 120290 (effective 1998).[35]  The current version of Section 120290, which did not take effect until January 1, 2018, makes it unlawful for someone to transmit an infectious or communicable disease, provided that he "knows that he . . . is afflicted with an infectious or communicable disease;" "acts with the specific intent to transmit . . . that disease to another person;" "engages in conduct that poses a substantial risk of transmission to that person;" and "transmits the infectious or communicable disease to the other person."  CHSC § 120290 (effective 2018).  Thus, while the 1998 version required, among other things, that a defendant act willfully in exposing himself to another person, the 2018 version requires that a defendant act with the specific intent to transmit the disease.

The indictment made it clear that the 1998 version of § 120290 formed the basis for the Mann Act violations charged in Racketeering Act 8A and 8B.  (*See* ECF No. 43 ¶ 23 ("[T]he defendant . . . together with others, did knowingly and intentionally transport an individual, to wit: [Jane], . . . in interstate commerce, with intent that such individual engage in sexual activity for which a person can be charged with a criminal offense, to wit: violations of Cal. Health and

---

[35] The 1998 version of CHSC § 120290 included a reference to CHSC § 120291, which made it a felony for "[a]ny person who exposes another to the human immunodeficiency virus (HIV) by engaging in unprotected sexual activity when the infected person knows at the time of the unprotected sex that he or she is infected with HIV, has not disclosed his or her HIV-positive status, and acts with the specific intent to infect the other person with HIV."  CHSC § 120291.

59

Safety Code § 120290 (effective 1998) (willful exposure of a communicable disease), in that [the

defendant] engaged in unprotected sexual intercourse with [Jane] without first informing [her]

that he had contracted herpes and obtaining her consent to sexual intercourse in these

circumstances."); *see also id.* ¶ 24.)  Similarly, when the Court instructed the jury regarding

CHSC § 120290, it quoted the 1998 version of § 120290, and set forth the elements that the

government was required to prove in order to establish a violation under that version:

> In this Racketeering Act, the illegal sexual activity that is charged is a violation of
> California law.  Specifically, California Health and Safety Code Section 120290.
> And under that law, any person who is afflicted with any contagious, infectious or
> communicable disease who willfully exposes himself or herself to another person
> shall be punished.  This is what the Government must prove beyond a reasonable
> doubt:
>
> First, that the defendant knew that he was afflicted with any contagious and
> infectious and communicable disease.
>
> Second, that the defendant exposed himself to Jane by engaging in unprotected
> sexual activity with her.
>
> Third, that the defendant acted willfully.
>
> And fourth, that the defendant did not inform Jane that he had a contagious,
> infectious or communicable disease and obtain her consent to expose himself in
> these circumstances prior to engaging in the exposure.  A communicable disease is
> any disease that was transferable through the exposure incident.  With respect to
> the third element, I have already defined this for you.  I think that's willfully, that
> means with knowledge of the consequences or purposefully.  It does not require
> that the defendant intended to expose another person to a contagious or infectious
> or communicable disease.

(T. Tr. 4674-75.)  The Court then instructed the jury about these same elements for the Mann Act

coercion and enticement offense charged in Racketeering Act 8B.  (T. Tr. 4676.)

Federal Rule of Criminal Procedure 12 requires that certain objections to a prosecution or

indictment "must be raised by pretrial motion if the basis for the motion is then reasonably

available and the motion can be determined without a trial on the merits."  Fed. R. Crim. P.

12(b)(3).  "This requirement serves a number of purposes, including sparing the court, the

witnesses, and the parties, the burden and expense of a trial, and insuring that indictments are not routinely challenged (and dismissed) after the jury has been seated and sworn." *United States v. O'Brien*, 926 F.3d 57, 82 (2d Cir. 2019) (internal quotation marks and citations omitted).

While "[a] motion that the court lacks jurisdiction may be made at any time while the case is pending," a motion that asserts "a defect in instituting the prosecution," or "a defect in the indictment" must be made before trial if (i) "the basis for the motion is then reasonably available" and (ii) "the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(A)-(B); *United States v. Sampson*, No. 13-CR-269, 2016 WL 756565, at *9 (E.D.N.Y. Feb. 26, 2016). Rule 12(b)(3) includes a list of commonly raised claims under each category, including "failure to state an offense" and "lack of specificity" in an indictment, among others. Fed. R. Crim. P. 12(b)(3)(B)(iii) & (v). If a defendant does not make a motion that falls within Rule 12(b)(3) before trial, or by the deadline set for the court for such motions, "the motion is untimely" and is deemed waived absent a showing of "good cause." Fed. R. Crim. P. 12(c)(3); *O'Brien*, 926 F.3d at 83 ("If the motion is untimely, the court may nonetheless entertain it if the movant shows 'good cause' for his failure to make it prior to the deadline.").

The defendant's claims about the California statute should have been made in a Rule 12 motion, because he is claiming that there were "defect[s] in the indictment." Fed. R. Crim. P. 12(b)(3); *see, e.g.*, *O'Brien*, 926 F.3d at 82-84 (rejecting defendant's post-trial constitutional challenge to indictment charging unlawful conduct with respect to methylone, because the claim asserted a defect in the prosecution's institution or a failure to state an offense); *United States v. Muresanu*, 951 F.3d 833, 839 (7th Cir. 2020) (finding that defendant's post-trial challenge to an indictment charging attempted aggravated identity theft was a claim that the indictment was defective for failure to state an offense, not jurisdictional and therefore waived); *Sampson*, 2016

WL 756565, at *7-*11 (finding that the defendant waived his argument that he was improperly

convicted of witness tampering under 18 U.S.C. § 1503 because that argument raised a defect in

the indictment for failure to state an offense, which Rule 12 "treat[s] as a defect that must be

raised before trial").

The defendant has not adequately explained his failure to raise his current arguments

about CHSC § 120290 earlier.  His only justification is that "the government did not apprise the

defense of its intent to have the jury charged pursuant to a repealed version of the statute that it

also rewrote."  (ECF No. 298 at 2 & n.1.)  But the information supporting the defendant's

challenges to § 120290 was reasonably available to him as early as March 12, 2020 when the

superseding indictment was returned against him, making clear that the government charged the

1998 version of § 120290 rather than the 2018 version.  (*See* ECF No. 43 ¶¶ 23-24.)  On July 2,

2021, little more than a month before the trial, the government submitted proposed jury

instructions, which also alerted the defendant that the charge was based on the 1998 version of

the statute.  (ECF No. 117-1 at 57-61.)[36]  The information the defendant cites for his vagueness

argument was also available to him before trial.  *See Sampson*, 2016 WL 756565, at *7 ("The []

Indictment currently at issue is the same document Defendant reviewed before trial; so if that

document is vague now, then it was vague then, which is when Defendant should have voiced his

concerns." (citing *United States v. Crowley*, 236 F.3d 104, 108 (2d Cir. 2000))).  In fact, the

defendant raised vagueness arguments about NYPHL § 2307 in his pre-trial motion to dismiss

---

[36] Defense counsel pointed out that the jury instructions included an older version of the statute in a
September 18, 2021 letter, copied the text of the current version of the statute and asked the Court to
require the government to clarify whether the claim is that the defendant "intentionally exposed others,"
which is required under the current version of § 120290, or that he "willfully exposed others," which is
required under the older version.  (ECF No. 219 at 5-6.)  But as explained above, the defense was on
notice far earlier that the defendant was charged with violating the statute in existence when he
committed the predicate act.

and to strike; he could have made similar challenges to CHSC § 120290, which he did not.  (ECF No. 69.)  The defendant has not established "good cause" for his failure to challenge CHSC § 120290 in a Rule 12 motion.  *See* Fed. R. Crim P. 12(c)(3).  Accordingly, not only are the defendant's constitutional claims about CHSC § 120290 beyond the scope of a Rule 29 motion, *see al Ghazi*, No. 07-CR-354, 2009 WL 1605741, at *2; *Barret*, No. 10-CR-809, 2012 WL 3229291, at *20, they are also untimely and, as a result, waived.[37]

In any event, the defendant's arguments are without merit.  He challenges the 1998 version of the statute on as-applied and facial grounds, arguing that it "fails to provide adequate definitions that put individuals with *any* chronic and potentially contagious diseases on notice of what amounts to criminal conduct, including communicable diseases that are not sexually transmitted."  (ECF No. 273-1 at 40 (emphasis in original).)  He theorizes that "anyone with Herpes Simplex I (also known as cold sores) who kisses another person without disclosing that they have Herpes Simplex I, is guilty of a misdemeanor."  (*Id.*)

The defendant is foreclosed from challenging CHSC § 120290 for vagueness, either on an as-applied or on a facial basis.  The Due Process Clause of the Fourteenth Amendment requires that every criminal statute "(1) give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, and (2) provide explicit standards for those who apply the statute."  *Dickerson v. Napolitano*, 604 F.3d 732, 741 (2d Cir. 2010) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (alterations and citation omitted)); *Johnson v. United States*, 576 U.S. 591, 595 (2015) (a criminal statute is unconstitutionally vague in violation of

---

[37] I address the defendant's constitutional claims in an excess of caution because, even though he conceded that they did not challenge the "sufficiency of the evidence" and "may not constitute a proper Rule 29 issue" (ECF No. 298 at 1), he suggested that the Court must "first decid[e] whether the jury was properly instructed pursuant to the applicable law" before it can decide the Rule 29 question, that is, whether there was sufficient proof at trial.  (*Id.* at 2.)

63

due process if "it fails to give ordinary people fair notice" or is "so standardless that it invites arbitrary enforcement" (citing *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983))). "Even if there is ambiguity as to the margins of what conduct is prohibited under the statute," *Dickerson*, 604 F.3d at 747, it is clear to an ordinary person that CHSC § 120290 would prohibit the defendant's conduct—having unprotected sex knowing he had herpes and without informing his partner. Moreover, an "as-applied vagueness challenge" supported by a law's potential for arbitrary enforcement must fail if "the enforcement at issue is consistent with the 'core concerns' underlying [the statute]." *Id.* at 749. The defendant's conduct falls within § 120290's clear core—protecting the public from the spread of infectious venereal diseases. *See Doe v. Roe*, No. 12-CV-01644, 2013 WL 1787175, at *5 (D. Nev. Apr. 25, 2013) (noting that the transmission of an infectious disease is the type of injury the statute was designed to prevent). Accordingly, the defendant cannot show that the statute is vague as applied to him.

Nor is a facial challenge available to the defendant. "[O]utside of the First Amendment context . . . [facial] challenges are permitted only when 'no set of circumstances exists under which the [law] would be valid,'" *Dickerson*, 604 F.3d at 743 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)), or where the law infringes upon another constitutionally-protected right. *Id.* at 744 ("*Morales* does suggest that facial challenges are permissible outside of the First Amendment context, but that case only permitted such a challenge in the presence of a constitutionally-protected right." (citing *City of Chicago v. Morales*, 527 U.S. 41, 53 (1999) (Stevens, J., plurality))). The defendant does not premise his vagueness challenge to § 120290 on the violation of some other constitutionally-protected right, let alone a First Amendment right. As a result, the defendant cannot challenge § 120290 on facial grounds, unless he can show there is no set of circumstances under which the statute would be valid. As explained above, § 120290

clearly proscribes his conduct and is not vague as applied to him. *Id.* at 743-44 (noting that *Salerno* "effectively eliminates facial challenges outside of the First Amendment context that could not also be brought as an as-applied challenge, since any law that is unconstitutional in every set of circumstances is also necessarily unconstitutional when applied to any plaintiff"); *United States v. Scott*, 979 F.3d 986, 993 (2d Cir. 2020) ("Outside of the First Amendment context, we look to whether the 'statute is vague as applied to the particular facts at issue.'" (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18 (2010))).

Whether the indictment properly charged the 1998 version of CHSC § 120290 presents a closer question. The conduct relevant to this question is the Mann Act conduct—transporting Jane in interstate commerce with the intent to engage in sexual activity criminalized by state law, and coercing or enticing her to travel in interstate commerce to engage in sexual activity criminalized by state law. 18 U.S.C. §§ 2421(a), 2422(a); (s*ee* ECF No. 43 ¶¶ 23-24.) The defendant argues that "[t]he government had no authority to charge [him] with a statute that was repealed or inoperative at the time of prosecution." (ECF Nos. 273-1 at 38, 282 at 16-17.) The government responds that "[i]n the racketeering context, the relevant consideration is whether the predicate racketeering act was a violation of the relevant state or federal law at the time that the underlying conduct was committed." (ECF No. 278 at 91.)

The RICO statute defines "racketeering activity" as, among other things, certain acts "chargeable" under state law, and certain acts "indictable" under federal law. *See* 18 U.S.C. § 1961(1). Neither party cites a case that addresses the issue in this case—whether the underlying sexual acts must violate state law at the time the defendant committed them, or at the time of the indictment. (*See* ECF No. 273 at 38-39; ECF No. 278 at 91; ECF No. 282 at 16-17.) Nevertheless, the case on which the government relies, *United States v. Davis*, 576 F.2d 1065 (3d

Cir. 1978), provides at least persuasive support for the notion that the indictment properly charged the defendant with violating a state law that was in effect at the time he committed the conduct.  In *Davis*, the Third Circuit held that the defendant's violation of a state bribery statute could serve as a RICO predicate, despite the fact that the state law's statute of limitations had expired by the time of the RICO indictment.  576 F.2d at 1066-67.  According to *Davis*, the time-barred bribery properly served as a RICO predicate because the acts were chargeable under state law at the time they were committed.  *Id.*  In so ruling, the court defined "chargeable under State law" in 18 U.S.C. § 1961(1)(A) as "chargeable under State law at the time the offense was committed."  *Id*. (rejecting the defendant's interpretation that "chargeable under State law" meant "presently chargeable under State law"); *see also United States v. Castellano*, 610 F. Supp. 1359, 1383 (S.D.N.Y. 1985) (applying *Davis* and holding that, for statute of limitations purposes, "the relevant question is whether a charge of participating in the enterprise, and not whether particular acts of racketeering could still be charged under applicable state or federal law").[38]

Although *Davis* addressed a slightly different question—whether time-barred state acts could nevertheless constitute racketeering acts in a RICO indictment—its reasoning is persuasive in the context of this case.  Because the defendant's 2015 conduct was "chargeable under State law at the time the offense was committed," *Davis*, 576 F.2d at 1066-67, and thus "indictable"

---

[38] This view also comports with the legislative purpose of RICO, which was not designed to punish the predicate state law violations themselves, but "to punish the impact on commerce caused by conduct which meets the statute's definition of racketeering activity."  *United States v. Forsythe*, 560 F.2d 1127, 1135 (3d Cir. 1977); *see also id.* (concluding that "[s]tate law offenses are not the gravamen of RICO offenses," and are incorporated into RICO for "definitional purpose[s]" only); *United States v. Licavoli*, 725 F.2d 1040, 1047 (6th Cir. 1984) ("The gravamen of section 1962 is a violation of federal law and reference to state law is necessary only to identify the type of unlawful activity in which the defendant intended to engage." (internal quotation marks and citation omitted)).

under the Mann Act at the time he engaged in the conduct, the government appropriately charged the 1998 version of CHSC § 120290.

Finally, the defendant argues that "[e]ven if the elements of the statute were as the government alleged, insufficient evidence existed to sustain the charge." (ECF No. 273-1 at 40-41.) The defendant makes the same claims he makes about Racketeering Act 12 (Faith)—that there was no evidence that he was "contagious, infected, or had the capacity to transmit herpes" when he had sexual contact with Jane in 2015, and that the government cannot show that he acted "willfully with knowledge of the consequences." (*Id.* at 40.) These claims—the only claims about this conduct that are cognizable in a Rule 29 motion—have no merit.

Jane testified that she contracted genital herpes after the defendant had unprotected sex with her in the summer of 2015. (T. Tr. 844-53.) She experienced "discomfort in [her] pelvis and in [her] lower abdomen," and saw a doctor in August 2015 when her symptoms got worse, "to the point where [she] couldn't physically even walk." (T. Tr. 852.) The doctor diagnosed her with herpes and prescribed her medication. (*Id.*) When the defendant told her that she "could have gotten that from anyone," she responded that she had been "intimate" only with him; Jane's medical records also reflect that the defendant was her only sexual partner. (T. Tr. 853.) Jane's testimony, as well as the evidence that the defendant infected multiple other victims with herpes, provided a reasonable basis for the jury to conclude that the defendant was infected with herpes when he had sex with Jane in 2015, and that his act in exposing Jane to the disease was willful or purposeful. *See People v. Valdez*, 27 Cal. 4th 778, 787-88 (2002) ("The word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, or make the omission referred to. It does not require any intent to violate [the] law, or to injure another, or to acquire any advantage." (internal

quotation marks and citation omitted)).  It was equally reasonable for the jury to find that the

defendant acted "with knowledge of the consequences," in that he knew that unprotected sexual

contact with Jane would expose her to herpes; the defendant knew he had herpes, his doctor

warned him of the risk, and directed him to alert his sexual partners of his condition.

### 6.    Sexual Activity with Minors

Racketeering Acts 5 (Jerhonda) and 9 (Jane) charged the defendant with Mann Act

violations based on sexual activity with minors.  *See* 18 U.S.C. § 2421(a); 18 U.S.C. § 2422(a);

18 U.S.C. § 2422(b) ("Whoever, using the mail or any facility or means of interstate or foreign

commerce, . . . knowingly persuades, induces, entices, or coerces any individual who has not

attained the age of 18 years, to engage in . . . any sexual activity for which any person can be

charged with a criminal offense, or attempts to do so, shall be" punished.); 18 U.S.C. § 2423(a)

("A person who knowingly transports an individual who has not attained the age of 18 years in

interstate or foreign commerce, . . . with intent that the individual engage in . . . any sexual

activity for which any person can be charged with a criminal offense, shall be" punished.).

To convict a defendant under Section 2422(b), the government had to prove that the

defendant "(i) used a facility of interstate commerce; (ii) to knowingly persuade, induce or entice

. . . ; (iii) any individual who is younger than eighteen-years old; (iv) to engage in sexual activity

of a criminal nature."  *United States v. Brand*, 467 F.3d 179, 201-02 (2d Cir. 2006), *abrogated

on other grounds by United States v. Cabrera*, 13 F.4th 140 (2d Cir. 2021).

With respect to Racketeering Act 5, the government charged the defendant with violating

Illinois Criminal Code § 5/12-16(d), which provides that an individual "commits aggravated

criminal sexual abuse if he or she commits an act of sexual penetration or sexual conduct with a

victim who was at least 13 years of age but under 17 years of age and the accused was at least 5

years older than the victim."

The defendant contends that the government did not prove the first element—the use of a facility of interstate commerce—because purely intrastate use of cell phones does not constitute use of a facility of interstate commerce.  (ECF No. 273-1 at 29.)  However, the Second Circuit has interpreted use of a facility of interstate commerce to include intrastate use of that facility.  *See United States v. Giordano*, 442 F.3d 30, 39 (2d Cir. 2006) ("[Section] 2425's prohibition on the transmission of the name of a minor 'using . . . any facility or means of interstate . . . commerce' for the specified purposes includes the *intrastate* use of such a facility or means.");  *United States v. Perez*, 414 F.3d 302, 305 (2d Cir. 2005) (finding that "wholly intrastate communications" made using a national telephone network constituted use of a facility of interstate commerce).  Accordingly, intrastate cell phone calls satisfy the first element of Section 2422(b).

Next, the defendant asserts that the government did not show a nexus between the use of the interstate facility and the "persuasion, coercion, enticement or inducement."  (ECF No. 273-1 at 30.)  Jerhonda testified that she attended a party at the defendant's Olympia Fields residence in May 2009, and exchanged phone numbers with the defendant.  (T. Tr. 114, 118.)  They communicated by text messaging and phone calls.  (T. Tr. 119, 153.)  She went to his home "every time [she] was invited;" during the six-month period she spent with the defendant, she had sexual contact with him "[e]very time [she] was there."  (T. Tr. 154, 168.)  On one occasion, when Jerhonda was at the defendant's house, he called her and told her to get in his tour bus and directed her to have sex with him and Juice.  (T. Tr. 165-66.)  This evidence was sufficient to show that the defendant used interstate commerce to "persuade, induce or entice" Jerhonda

A rational jury could also find that the defendant did persuade, induce or entice Jerhonda to engage in sexual conduct.  Words like "persuade," "induce," and "entice" are "all words of

causation." *United States v. Naim*, No. 13-CR-660, 2015 WL 3440253, at *21 (E.D.N.Y. May 20, 2015) (internal quotation marks omitted), *aff'd*, 710 F. App'x 12 (2d Cir. 2017); *see also United States v. Holley*, 819 F. App'x 745, 749 (11th Cir. 2020) (holding that "'induce' means 'to stimulate the occurrence of or to cause'"). The evidence from multiple witnesses—victims and members of the defendant's enterprise—established that the defendant implemented strict rules in and out of his home, that he expected that his victims and employees obey his commands, and that he exacted punishment for perceived violations. A rational juror could infer from the defendant's direction to Jerhonda to leave his house and go to his tour bus that he induced or coerced her into having sex with the defendant and Juice. *Naim*, 2015 WL 3440253, at *21 (finding inducement where the jury could have inferred that the defendant made a request for an additional video of a minor "with the intent to cause, or bring about, the creation of that video").

Equally unpersuasive is the defendant's argument that "no reasonable juror could conclude that Defendant knew that Jerhonda was 16 years old when they allegedly engaged in sexual activity between May 2009 and January 2010." (ECF No. 273-1 at 30.) Jerhonda testified that she told the defendant the first time they engaged in sexual activity that she was 16 years old, and showed him her identification. (T. Tr. 123.) The jury was entitled to credit her testimony, and find that the defendant did not believe that Jerhonda was 17 years or older when he had sex with her.[39]

---

[39] Investigators searched the defendant's storage facility and found a forged birth certificate and state ID card in Jerhonda's name. (GX 413, 414.) Both stated that she was born in 1990 rather than in 1993, the actual year of her birth. (T. Tr. 3635-37.)

In Racketeering Act 9,[40] the government charged the defendant with Mann Act violations based on violations of California Penal Law ("CPL") §§ 261.5(a), (b), which provide that "[a]ny person who engages in an act of unlawful sexual intercourse with a minor who is more than three years younger than the perpetrator is guilty," where "[u]nlawful sexual intercourse is an act of sexual intercourse accomplished with a person who is not the spouse of the perpetrator, if the person is a minor," and "a 'minor' is a person under the age of 18 years."[41]

The defendant acknowledges Jane's testimony that she told the defendant her true age—17 years old—in 2015, but argues that the evidence was nevertheless insufficient because "the record does not reflect precisely when she told Defendant her true age." (ECF No. 273-1 at 48-49.) Jane testified that she told the defendant she was 17 years old in Chicago, when "[s]ummer ended and [she] had to go back to school for [her] senior year in high school." (T. Tr. 860.) She returned to Florida, but moved back to Chicago and then joined the defendant on his tour. (T. Tr. 860-62, 869.) Moreover, the letter from Jane's parents authorizing Juice's mother to be Jane's guardian until she turned 18 years old was dated September 19, 2015 (GX 475(a), 476(a)), and Suzette Mayweather testified that the defendant and his entourage left New York for California on September 29, 2015. (T. Tr. 1966.) Based on this evidence, a rational juror could conclude that the defendant knew Jane was less than 18 years old prior to their California trip.

With respect to Racketeering Acts 9B (18 U.S.C. § 2422(a)) and 9C (18 U.S.C. § 2422(b)), the defendant maintains that there is no evidence that he took any action to induce, persuade, entice or coerce Jane to travel to California between September and October 2015.

---

[40] Sub-predicate Racketeering Acts 9A, 9B, 9C and 9D correspond to Counts 2, 3, 4 and 5, respectively.

[41] In challenging the government's proof for Racketeering Act 9A, the defendant mistakenly incorporates by reference his arguments in connection with Racketeering Act 8A, which was based on a violation of CHSC § 120290 for willful exposure. (ECF No. 273-1 at 48.) Racketeering Act 9A, on the other hand, was based on violations of Sections 261.5(a) and 261.5(b) of the CPL. (ECF No. 43 ¶ 25.)

71

SpA 124

(ECF No. 273-1 at 49.)  As explained previously, the government did not need to prove that the

defendant overcame Jane's resistance, or that Jane did not want to travel.  The evidence showed

that the defendant arranged for Jane to enroll in virtual schooling, and for Juice's mother to serve

as her legal guardian.  (T. Tr. 862-68.)  The defendant paid for Jane to travel back to Chicago.

She subsequently traveled with the defendant from city to city for his shows.  (T. Tr. 868-70.)

Accordingly, a reasonable jury could find that the defendant persuaded, coerced, induced or

enticed Jane to travel to California.

In his challenge to Racketeering Act 9C, the defendant also asserts that there was no

"nexus between the use of a facility of interstate commerce (a cell phone, computer) and the

words of persuasion, entice, or coercion."  (ECF No. 273-1 at 50.)  However, when the defendant

enticed Jane to travel from New York to California in October of 2015, she used interstate

highways, including I-80, which courts recognize as a facility of interstate commerce.  (Tr.

2728); *see, e.g.*, *United States v. D'Souza*, No. 09-CR-131, 2012 WL 487638, at *2 (E.D. Cal.

Feb. 7, 2012) (noting that an interstate highway is an example of an interstate commerce facility

in a Mann Act case); *cf. United States v. Daley*, 564 F.2d 645, 649 (2d Cir. 1977) (noting that

"an interstate highway, [] is an instrumentality of interstate commerce" for purposes of the

Hobbs Act).  A reasonable juror could therefore conclude that the defendant used facilities of

interstate commerce in the course of his criminal conduct involving Jane.

With respect to Racketeering Act 9D (18 U.S.C. § 2423(a)), the defendant argues that his

"purpose in traveling to California was to perform and he arranged for his girlfriend to go with

him," and any sexual activity was "purely incidental to the purpose of the trip."  (ECF No. 273-1

at 50.)  Jane testified that she and the defendant had "sex almost every day" in the summer of

2015, and that they had sexual contact while traveling on tour.  (T. Tr. 844, 872.)  The jury was

entitled to rely on Jane's testimony, as well as testimony from the defendant's other sexual partners, and conclude that sexual activity was the defendant's significant or motivating purpose when he arranged Jane's travel with him.

### 7.    Forced Labor

Racketeering Acts 6 (Jerhonda), 11 (Jane) and 13 (Faith) charged the defendant with forced labor.  *See* 18 U.S.C. § 1589(a) ("Whoever knowingly provides or obtains the labor or services of a person . . . (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished.").  To convict the defendant of forced labor, the government must prove: "(1) the defendant obtained the labor or services of another person; (2) the defendant did so . . . (a) through threats of serious harm to, or physical restraint against that person or any other person; or (b) through a scheme, plan or pattern intended to cause the person to believe that non-performance would result in serious harm to, or physical restraint against, that person or any other person; . . . and (3) that the defendant acted knowingly."  *United States v. Sabhnani*, 539 F. Supp. 2d 617, 629 (E.D.N.Y. 2008), *aff'd*, 599 F.3d 215 (2d Cir. 2010).  "Serious harm" is defined as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm."  18 U.S.C. § 1589(c)(2).

SpA 126

The defendant makes multiple attacks on the evidence supporting the jury's verdict on

Racketeering Acts 6 (Jerhonda), 11 (Jane) and 13 (Faith). The theme of these attacks is that

there was no evidence that the defendant coerced his victims to do what was charged in the

forced labor racketeering acts. In fact, victims' testimony provided a rational basis for the jury's

conclusion that the defendant was guilty of the charges. Moreover, the jurors had a larger

context in which to place the testimony of the individual victims. Not only did the victims

support one another's testimony, the additional evidence that the jurors heard corroborated what

the victims described. Thus, they heard and saw vivid evidence of the defendant's means and

methods of domination and control: a videotape in which he forced Anna to walk back and forth,

completely naked, calling herself "slut" and "stupid," while the defendant smacked her (T. Tr.

2845-46, 2852-55, 3018-19; GX 328(a), 328(b)); an audiotape in which the defendant, convinced

that Kyla had stolen from him, ordered her to describe what she had done, berated her for

"holding back" on a videotape and then directed her to go to the closet in his garage and said,

"When I come and get you this time, you better be fucking like you're supposed to fuckin' be."

(GX 485.) The defendant's employees, too, were well-aware of what the defendant did to his

victims, as evidenced by the text exchanges between the Mayweather sisters, describing the

defendant's treatment of Jane. (T. Tr. 2014-19, 2053-55; GX 240(b), 240(d).) In short, the

evidence supporting the charges was more than sufficient to establish the defendant's guilt, and

his attacks on that proof are nothing more than disagreements with the jury's resolution of the

evidence. Nevertheless, I address each claim in turn.

As to Racketeering Act 6, the defendant argues that the government "did not establish a

causal link between the isolated act of oral sex" with Jerhonda "and any threat of physical

violence." (ECF No. 273-1 at 33.) As explained multiple times in this opinion, Jerhonda, like

other witnesses, testified that the defendant required her to follow his rules (T. Tr. 132, 163-64),

that he severely punished her when she broke them (T. Tr. 148-49), slapped her when she

disagreed with him (T. Tr. 166-67), and when she questioned his direction to use a sex toy on

him (T. Tr. 167-68), ordered her to write a letter to "gain[] his trust," in which she falsely

admitted that she stole one hundred thousand dollars' worth of jewelry.  (T. Tr. 150-51.)

And in January 2010, the defendant was "angry" that Jerhonda did not greet him.  (T. Tr.

176.)  He "slapped" her, choked her into unconsciousness, "spit" on her face and told her to "put

[her] head down in shame."  (*Id*.)  Finally, he forced her to perform oral sex on him and

ejaculated on her face.  (T. Tr. 177.)  The graphic testimony about the defendant's rules and the

consequences of breaking them obviously gave the jury a reasonable basis to infer that Jerhonda

complied with the defendant's orders because she feared that he would hurt her if she disobeyed.

*See United States v. Toure*, 965 F.3d 393, 402 (5th Cir. 2020) (finding sufficient evidence that

the defendant committed forced labor in part because he "employed violence as a consequence

for [the victim's] noncompliance with . . . demands").

Citing *United States v. Toviave*, 761 F.3d 623 (6th Cir. 2014), the defendant also

contends that the forced labor statute does not encompass the conduct alleged in Racketeering

Act 6 because it "bear[s] virtually no resemblance to those paradigmatic forced labor cases and

their victims."  (ECF No. 273-1 at 34.)  *Toviave* is an entirely different case.  There, the Sixth

Circuit held that "forcing children to do household chores" was not "forced labor" within the

meaning of the statute, because such an interpretation would "make a federal crime of the

exercise of . . . widely accepted parental rights."  *Toviave*, 761 F.3d at 625.  The court described

the defendants' conduct as more akin to child abuse, which is "traditionally regulated by the

states," *id.* at 627, and noted the obvious distinction between household chores and

"paradigmatic forced labor, such as prostitution, forced sweatshop work, or forced domestic service." *Id*. at 626.  The defendant had no similar "right" to order Jerhonda to engage in sexual activity, and his conduct—physical and psychological coercion intended to make her submit—is not traditionally addressed by state law.[42]  Accordingly, the forced labor statute covers the defendant's conduct as alleged in Racketeering Act 6.  *See Marcus v. United States*, No. 14-CV-5780, 2015 WL 3869689, at *20-21 (E.D.N.Y. June 22, 2015) (distinguishing *Toviave*, and finding that the forced labor statute applied where the defendant forced the victim, a former sexual partner, to work on a website and punished her with extreme sex acts).[43]

The defendant also attacks the proof that he committed the crimes charged in Racketeering Act 11, asserting that the "record is devoid of any evidence that Jane was forced within the meaning of the statute to have sex with individuals other than the Defendant."  (ECF No. 273-1 at 52.)  Jane testified about the defendant's rules—that he dictated the way she dressed, whether she could talk to or even look at other men, how she was required to greet him, whether she could use her phone, among other things.  (T. Tr. 810, 840, 855-56.)  Just as he did with other victims, the defendant exacted punishment or "chastisements," when 17 year-old Jane stepped out of line: trapping her for days inside a tour bus while his minions stood guard, spanking her so hard that he left bruises and torn skin, beating her with his shoe until she "broke," forcing her to repeat lies about her family, and degrading her in the most egregious

---

[42] Because the defendant exerted both physical and psychological control over Jerhonda, the fact that she was physically able to leave the defendant's house does not undermine the jury's findings.  *See Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 439 (E.D.N.Y. 2017) (holding that forced labor does not require that victims "be kept under literal lock and key," and that the "fundamental purpose of § 1589 is to reach cases of servitude achieved through nonviolent coercion").

[43] The defendant also argues that the forced labor statute does not reach "isolated acts" of labor or service.  (ECF No. 273-1 at 60.)  But the plain language of the statute does not require multiple acts, and the Court declines to read that requirement into the statute.  *See United States v. Sabhnani*, 599 F.3d 215, 244 (2d Cir. 2010) (holding that a single act was sufficient to support the defendant's conviction for conspiracy to commit forced labor).

ways, including forcing her to eat her own feces.  (T. Tr. 909-16, 931-32, 991-99.)  Jane

explained that the defendant "chastised" her "nearly every two to three days."  (T. Tr. 910-11.)

Jane was not the defendant's only victim.  She was witness to his assault on his other

"live-in girlfriends" (T. Tr. 970), and realized that she "needed to listen even more because that

could also happen to [her]."  (T. Tr. 925.)  Given the control—both physical and psychological—

that the defendant exerted over Jane, it would have been rational for the jury to conclude that the

defendant forced her into sexual contact with other women and men, even in the absence of

testimony.  (T. Tr. 955-65.)  But she did testify that the defendant forced her into these

encounters, testimony that the jury was entitled to credit.  She explained that when she resisted

the defendant's direction to have sex with women, the defendant "usually chastised" her by

spanking her.  (T. Tr. 966-67.)  She also testified that the defendant forced her to have sex with

"Nephew" as "punishment" for violating one of the defendant's rules—sharing personal

information with another victim living with the defendant—and that she did not resist because

she would "probably be left somewhere for a long time" or have "gotten chastised."  (T. Tr.

1034-37, 1047-48, 1050.)  In short, this evidence, as well as the evidence of the defendant's

pattern of behavior with other victims, gave the jury ample reason to find that the defendant was

guilty of Racketeering Act 12.

Next, the defendant attacks the proof regarding Racketeering Act 13, which, according to

the defendant, did not establish "a causal link between the isolated act of oral sex" by Faith and

"any threat of physical violence."  (ECF No. 273-1 at 60.)  The jury found otherwise, and there

was a rational basis for its decision.  Just as he did with other victims, the defendant told Faith

about the "rules" that the "group of women that [he] raised" were required to follow, including

that the women needed to greet the defendant in a certain way upon entering a room.  (T. Tr.

2197-98, 2200-01.)  The defendant introduced Faith to one of these young women, Joy, who greeted the defendant by calling him "Daddy" and kissing him and repeatedly complimenting Faith, before the three of them went to the Sprinter van.  (T. Tr. 2202-06.)  When Faith tried to leave the van to use the bathroom, Joy told her, "You have to ask."  (T. Tr. 2208-10.)  She finally was permitted to use the bathroom, but the defendant's employee Copeland followed her and waited outside the stall.  (T. Tr. 2210-11.)

When Faith went to Los Angeles in January 2018, the defendant kept her waiting in a van and in his studio for hours without food or water because she did not greet him properly when he first saw her.  (T. Tr. 2220, 2230-32.)  After he finally arrived, he led Faith to a small room in the studio, where she saw a gun on an ottoman.  (T. Tr. 2249-50.)  The defendant's "demeanor changed," and he "got real serious," moving the gun so that it was next to him, ordering Faith to "pose" while he took pictures with his iPad, and becoming irritated because she was "not being sexy enough."  (T. Tr. 2250-51.)  He grilled her about her relationships with men, how many male friends she had, and how many had "seen [her] naked."  (T. Tr. 2251.)  The defendant moved the gun to his chair, ordered Faith to get on her knees, "grabbed the back of [her] neck forward," and instructed her to perform oral sex on him.  (T. Tr. 2252.)  Faith, "[i]ntimidated" because the defendant was "unpredictable," did not think she could leave because she "was under his rules and he had a weapon."  (T. Tr. 2252-54.)  The jurors were entitled to conclude from this evidence that the defendant obtained oral sex from Faith by means of an implied threat of force, or a pattern of conduct that was intended to cause her to believe that non-performance would result in serious harm.

### b.    Other Counts

The defendant challenges the sufficiency of the evidence as to Counts Two through Nine. As noted throughout this order, these counts correspond to certain predicate acts.  As explained

above, because there is sufficient evidence establishing each predicate act, there is also sufficient

evidence of Counts Two through Nine.

## II.     Motion for a New Trial

Rule 33 provides that, "[u]pon the defendant's motion, the court may vacate any

judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33.  The

court has "broad discretion . . . to set aside a jury verdict and order a new trial to avert a

perceived miscarriage of justice," but that discretion should be exercised "sparingly and in the

most extraordinary circumstances."  *United States v. Ferguson*, 246 F.3d 129, 133-34 (2d Cir.

2001) (internal quotation marks and citation omitted); *see also United States v. Gambino*, 59

F.3d 353, 364 (2d Cir. 1995) ("Because motions for a new trial are disfavored in this Circuit the

standard for granting such a motion is strict.").  "In considering whether to grant a new trial, a

district court may itself weigh the evidence and the credibility of witnesses, but in doing so, it

must be careful not to usurp the role of the jury."  *United States v. Canova*, 412 F.3d 331, 348-49

(2d Cir. 2005).  The court should grant a Rule 33 motion only if "letting a guilty verdict stand

would be a manifest injustice," because of "a real concern that an innocent person may have

been convicted."  *Ferguson*, 246 F.3d at 134 (internal quotation marks and citation omitted).

The defendant's arguments provide no basis for this extraordinary relief.

### a.     Ineffective Assistance of Counsel: *Voir Dire*

The defendant attacks the performance of his trial lawyers during the *voir dire* process;

finding fault with eight of the 12 regular jurors, and with one alternate juror who did not

deliberate, the defendant claims that his counsel did not do a meaningful *voir dire* of potential

jurors, and should have "probe[d]" more by asking additional questions and challenging certain

jurors as unqualified.  (ECF No. 270-1 at 6-8.)  This argument fails for multiple reasons.

A defendant claiming that his lawyer was ineffective must meet the two-pronged test articulated in *Strickland v. Washington*: (1) "that counsel's representation fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 694 (1984).

Under the first prong of *Strickland*, a defendant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." 466 U.S. at 690. "Judicial scrutiny of counsel's performance must be highly deferential," and courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "[R]elief may be warranted when a decision by counsel cannot be justified as a result of some kind of plausible trial strategy." *Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986)).

Selecting a jury and strategy are "inseparable." *United States v. Lawes*, 292 F.3d 123, 128 (2d Cir. 2002); *see also Ciaprazi v. Senkowski*, 151 F. App'x 62, 63-64 (2d Cir. 2005) (recognizing that whether to seat a particular juror is a "paradigmatically strategic" decision). Counsel has to evaluate not only the juror's words but must assess the juror's credibility by considering her demeanor, her reactions to questions, and other intangible factors that a cold record will not reflect. In addition, counsel must make judicious use of peremptory challenges, as well as compare jurors with one another in an effort to select the best jurors for his client. For these reasons, "courts are loathe to second-guess the decisions of counsel during jury selection." *Ptak v. Superintendent*, No. 08-CV-409, 2009 WL 2496607, at *8 (W.D.N.Y. Aug. 13, 2009) (citing *Doleo v. Reynolds*, No. 00-CV-7927, 2002 WL 922260, at *5 (S.D.N.Y. May 7, 2002)).

SpA 133

"It is not the role of the court to second-guess counsel's reasonable strategic decisions at jury

selection, especially considering that 'counsel is strongly presumed to have rendered adequate

assistance and made all significant decisions in the exercise of reasonable professional

judgment.'" *Doleo*, 2002 WL 922260, at *5 (quoting *Strickland*, 466 U.S. at 690); *see also*

*Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001) ("Counsel is . . . accorded particular

deference when conducting *voir dire*.  An attorney's actions during *voir dire* are considered to be

matters of trial strategy."); *Bell v. United States*, 351 F. App'x 357, 360 (11th Cir. 2009)

("Review of counsel's performance is highly deferential in any case, but the case for deference is

even greater when counsel is evaluating credibility.").

To satisfy the prejudice prong of *Strickland*, the petitioner must establish "a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different."  *Strickland*, 466 U.S. at 694.  "The level of prejudice the defendant need

demonstrate lies between prejudice that 'had some conceivable effect' and prejudice that 'more

likely than not altered the outcome in the case.'"  *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir.

2001) (quoting *Strickland*, 466 U.S. at 693).  "The benchmark for judging any claim of

ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the

adversarial process that the trial cannot be relied on as having produced a just result."

*Strickland*, 466 U.S. at 686.

A defendant alleging ineffective assistance during *voir dire* "must show that the juror was

actually biased against him" in order to show prejudice.  *Figueroa v. Heath*, No. 10-CV-121,

2011 WL 1838781, at *12 (E.D.N.Y. May 13, 2011); *see Beard v. Unger*, No. 06-CV-405, 2009

WL 5042696, at *4 (W.D.N.Y. Dec. 15, 2009) ("In order to establish that trial counsel was

ineffective for failing to challenge a prospective juror on *voir dire*, actual bias must be

established.").  "Actual bias is 'bias in fact,'" or "the existence of a state of mind that leads to an

inference that the person will not act with entire impartiality."  *United States v. Torres,* 128 F.3d

38, 43 (2d Cir. 1997).  Actual bias can be found where "the juror admits partiality," or where

partiality can be inferred from "the juror's *voir dire* answers."  *Id.*

       The defendant falls far short of this exacting standard.  The record shows that the lawyer

who conducted the *voir dire*—a lawyer with years of criminal trial experience in both state and

federal courts—participated actively in the process.  Before the Court questioned the prospective

jurors, counsel went through the questionnaires, and made decisions about which jurors were

appropriate to question, and which to challenge for cause.  Once the oral *voir dire* began, counsel

demonstrated a thorough knowledge of the information in questionnaires, and frequently asked

that the Court pose additional questions to prospective jurors.  (*See, e.g.*, J.S. Tr. 41, 46, 54, 129,

169, 180, 215, 223, 242, 261, 270, 296, 301, 309, 315-17, 327, 397.)  He successfully challenged

prospective jurors for cause over the government's objection (*see, e.g.*, J.S. Tr. 130-34, 282-83,

424-25, 429-30), and made *Batson* challenges to the government's use of peremptory challenges.

(J.S. Tr. 435-47.)  He also exercised peremptory challenges when he deemed it appropriate.  (J.S.

Tr. 434-57.)  This "active participation in *voir dire* indicates that any decisions to challenge (or

not to challenge) jurors were made as part of a reasonable trial strategy, rather than as a result of

counsel's failure to provide effective assistance."  *Figueroa*, 2011 WL 1838781, at *11; *see*

*Parsons v. Artus*, No. 06-CV-6462, 2020 WL 2572739, at *39 (W.D.N.Y. May 21, 2020)

(finding that decision to seat juror was "part of a reasonable strategic approach to selecting a

jury" where "counsel actively participated in *voir dire* and asserted a *Batson* challenge").

Not only does the record thoroughly refute the defendant's argument on ineffectiveness, it is also clear that the defendant has not established that any juror was actually biased, let alone all nine about whom the defendant complains.

The defendant claims, nevertheless, that counsel was obligated to challenge any juror who had watched "Surviving R. Kelly," a documentary about the defendant, or who had heard something about the defendant's prior criminal prosecution. (ECF No. 270-1; ECF No. 283.) But "[q]ualified jurors need not . . . be totally ignorant of the facts and issues involved," and "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *York v. Fischer*, No. 04-CV-1467, 2006 WL 6461993, at *9 (E.D.N.Y. July 21, 2006) (quoting *Murphy v. Florida,* 421 U.S. 794, 799-800 (1975)). Each juror confirmed his or her ability to render a fair impartial verdict.

Moreover, none of the challenges the defendant asserts on appeal would have warranted granting a challenge for cause. In an excess of caution, however, I address the defendant's complaints about individual jurors.

### i.   *Juror No. 3 (Prospective Juror No. 25)*

Citing just a portion of Juror No. 3's questionnaire, the defendant argues that counsel should have challenged the juror for cause because the juror said, in response to questions about whether he had heard of the defendant and his "impressions" of what he had heard, that he "heard that [the defendant] has been sleeping with underage girls," and that had "[seen] a documentary about him and his legal troubles." (ECF No. 270-1 at 9; ECF No. 290-1 at 62.) However, the juror also wrote the following: "I don't know the full story, so I have no feelings about it. I remain impartial." (ECF No. 290-1 at 62.) The juror observed, "The media tends to demonize people. I deal with facts." (*Id.* at 63.) During the in-person *voir dire*, he identified himself as "a stickler for the law," and a "rule guy" and confirmed that there was no reason why

he would not be able to give both sides a fair trial.  (J.S. Tr. 63.)  No experienced lawyer would

have expected a challenge for cause to be successful—it would not; nor was there any

nonstrategic reason to exercise a peremptory challenge.[44]

        ii.        *Juror No. 4 (Prospective Juror No. 52)*

      In the questionnaire, Juror No. 4 wrote that he "[found] transmission of STDs in a

nonconsensual act to be particularly repulsive," and had a "close friend" who had been a victim

of "sexual assault and infection with HIV from the police in a foreign country."  (ECF No. 290-

1 at 120, 124.)  He also wrote, in response to a question, that Jeffrey Epstein was the person he

least admired.  (*Id.* at 129.)  The defendant argues that his trial counsel should have "inquire[d]

further," and questioned the juror about these responses on the theory that his statements

reflected an aversion to "precisely" what the government charged.  (ECF No. 270-1 at 9-10.)

      As an initial matter, a juror is not inherently biased simply because he finds "transmission

of STDs in nonconsensual circumstances" objectionable.  Presumably, most normal jurors would

feel the same way.  What counsel had to determine was whether the juror could evaluate the

evidence fairly and dispassionately, and hold the government to its burden of proof.  In this case,

the juror's answers were in the context of an attack on close friend by the police in another

country.  (ECF No. 290-1 at 124.)  During the *voir dire*, at which counsel could evaluate the

juror in person, the juror said that he understood that he must base his decision on the "evidence,

testimony and [the Court's] instructions on the law," an assurance that counsel was entitled to

credit.  (J.S. Tr. 78-79); *see Figueroa*, 2011 WL 1838781, at *9 (holding that trial counsel's

decision not to challenge a juror in a drug case, who initially expressed concerns because of her

family's history with drug addiction, was reasonable where she later affirmed her ability to be

---

[44] As the government points out, this juror also expressed negative feelings about law enforcement, stemming from two arrests.  (ECF No. 277 at 18.)

fair and impartial).  The juror did not seem to be familiar with the defendant—although he had "heard the name" and "seen news articles," he initially thought the defendant might be a cartoonist, and he had to "remind [himself] who it was."  (J.S. Tr. 74, 78.)  Under these circumstances, counsel's strategic choice does not form the basis for a credible ineffective assistance claim.[45]

> iii.    *Juror No. 5 (Prospective Juror No. 87)*

The defendant claims that trial counsel should have challenged Juror No. 5 because she wrote that her "impression" of the defendant was that he "love[s] underage girls."  (ECF No. 270-1 at 10-11; ECF No. 290-1 at 146.)  This claim is based on an incomplete reading of the record.  During the in-person *voir dire*, the Court asked the juror if she could "put aside anything that [she'd] heard about the case," and "judge it on the evidence that [she] hear[s] in the courtroom," the juror responded that she could, and promised to follow the law and the Court's instructions.  (J.S. Tr. 91-93 (THE COURT: "And is there any reason that you can think of that you couldn't give both sides a fair trial in this case?" JUROR #5: ". . . I think I'll give it a shot.").)  (J.S. Tr. 93; ECF No. 270-1 at 11.)  The Court asked again, "Any reason why you can't give both sides a fair trial?"  (J.S. Tr. 94.)  The juror responded, "I don't think so."  (J.S. Tr. 94.)  The Court clarified, "What I want to hear is how you actually feel about it," and the juror responded, "Yeah, I think I can do that."  (J.S. Tr. 94-95.)  The Court asked if the juror was "positive" she could give both sides a fair trial; she said that she could.  (*Id.*); *see Beard*, 2009 WL 5042696, at *5 (finding no actual bias where juror was asked whether his experience as a police officer would carry over into the trial, and he responded, "I would certainly like to be able to say that it wouldn't and I would certainly do my best to see that it did not").

---

[45] This juror, too, had negative views about law enforcement.

85

      iv.    *Jurors No. 7 (Prospective Juror No. 145), No. 8 (Prospective Juror No. 147), No. 9 (Prospective Juror No. 156) and No. 11 (Prospective Juror No. 153)*

For other jurors who had heard about the case or about the defendant, the defendant criticizes counsel because he did not ask the Court to question them about what they had heard. (ECF No. 270-1 at 11-12.)  This simply is not a basis for a challenge to counsel's competence, especially given what the jurors said.  As explained above, jurors "need not . . . be totally ignorant of the facts and issues involved" as long as "the juror can lay aside his [or her] impression or opinion and render a verdict based on the evidence presented in court." *York*, 2006 WL 6461993, at *9.  Like all the jurors whom the defendant criticizes, these jurors all confirmed that they could be fair.

Thus, Juror No. 7 had a "Neutral" impression of the defendant, and explained that "[m]ost of the information you hear about celebrities are not always true.  It's mainly either for or against the person."  (ECF No. 290-1 at 203.)  At the in-person *voir dire*, she confirmed that she could put aside what she had heard, and affirmed her fairness and impartiality.  (J.S. Tr. 152-55.)  Juror No. 8 had a "Neutral" impression of the defendant and "no feeling toward the defendant."  (ECF No. 290-1 at 231.)  He confirmed that he would put aside anything he heard, would follow the court's instructions, and be fair and impartial.  (J.S. Tr. 156-58.)  In any event, Court elicited some information about what Juror No. 8 had heard about the defendant.  (*See* J.S. Tr. 156-57.)

Although Juror No. 9 knew the defendant "had issues with the law before," she "couldn't tell [] exactly what for."  (ECF No. 290-1 at 286.)  She also had a "Neutral" impression of the defendant.  (*Id.* at 287.)  The defendant cites her answer about the effect of the "Me Too" movement—that "[t]he power structure of the male dominated movie industry has been turned on its head"—as something that warranted further inquiry.  (ECF No. 270-1 at 12; ECF No. 290-

1 at 298.)  The defendant's contention is unavailing for two reasons.  First, the juror had never

supported or participated in the movement.  (*Id*.)  Second, during in-person *voir dire*, the juror

assured the Court that she would put aside what she had heard about the defendant's prior legal

issues, and promised to be fair and impartial.  (J.S. Tr. 175-77.)[46]

Juror No. 11 "saw the case mentioned on the news when [the defendant] was first being

investigated," and knew "there were allegations of misconduct lodged against him."  (ECF No.

290-1 at 258.)  However, she had a "Neutral" impression of the defendant and "[did] not know

enough information about the defendant or the case."  (*Id*. at 259.)  She promised to put aside

what she had heard, and affirmed that she would be fair and impartial.  (J.S. Tr. 220-25.)

> v.      *Juror No. 12 (Prospective Juror No. 163)*

In answering what he had heard about the defendant, Juror No. 12 wrote in the

questionnaire that he had heard about "sex with minors, specific details do not come to mind,

parodies on TV regarding details of defendant's personal life (Saturday Night Live, Dave

Chapelle), was in jail prior then released."  (ECF No. 290-1 at 314.)  The defendant faults trial

counsel for not asking the Court to question the juror about these responses.  (ECF No. 270-1 at

12-13 ("It is beyond comprehension that trial counsel would not have sought to inquire further of

this juror about his prior knowledge about allegations against Defendant . . . .").)

The juror had a "Somewhat Negative" impression of the defendant, which was "an

emotional one impacted by the nature of the charges against him."  (ECF No. 290-1 at 315.)  In

another part of the questionnaire, the juror stated that because his friend was related to Bill

Cosby, he had followed Cosby's case "closely."  (*Id*. at 321.)  The juror believed that "trial by

media is scarier to me than a jury."  (*Id*.)  During the in-person *voir dire*, the juror explained that

---

[46] Juror No. 9 had a relative who had been convicted of a crime.

he had heard "minor things in the press," and could not "recall any specific details;" in fact, he learned of some "accusations" through the questionnaire.  (J.S. Tr. 227.)  In any event, he promised to put aside whatever he had heard (J.S. Tr. 227-28), and to follow the Court's instructions and give both sides a fair trial.  (J.S. Tr. 231-32.)

> vi.      *Alternate Juror No. 4 (Prospective Juror No. 206)*

Since Alternate Juror 4 was precisely that—an alternate, whose "presence had no effect on the verdict" *United States v. Teman*, 465 F. Supp. 3d 277, 331 (S.D.N.Y. 2020)—there is no reason to address the particulars of the defendant's complaint, except to point out that counsel did ask the Court to excuse the juror after she told the Court's deputy that she wanted Gloria Allred's autograph.  (T. Tr. 3265-66); *see United States v. Hill*, 643 F.3d 807, 836 (11th Cir. 2011) (finding that the defendant "cannot prove that he was prejudiced by the district court's failure to exclude [the allegedly biased juror] because [she] was an alternate juror who never participated in the jury's deliberations").[47]

"There are countless ways to provide effective assistance in any given case."  *Strickland*, 466 U.S. at 689.  The defendant's criticisms of counsel, viewed collectively or independently, are precisely the kind of "Monday morning quarterbacking" that *Strickland* rejected.  *See DiMattina v. United States*, 949 F. Supp. 2d 387, 414 (E.D.N.Y. 2013) ("Perceptive Monday morning quarterbacking . . . does not trump well-reasoned, on-the-scene decision-making."); *United States v. Peterson*, 896 F. Supp. 2d 305, 315 n.7 (S.D.N.Y. 2012) ("In applying the

---

[47] In an effort to demonstrate that he did not acquiesce in counsel's strategic decisions, the defendant submits a declaration, in which he claims that counsel did not consult with him, that he expressed concerns that certain jurors watched "Surviving R. Kelly" (simultaneously claiming that he did not know they had seen the show), and that he was merely a "bystander" during *voir dire*.  (ECF No. 283 at 4; ECF No. 283-1.)  The defendant raised none of these concerns during jury selection, and does not include a declaration from any of the four lawyers who represented him.  In any event, counsel's decisions were well within the realm of sound trial strategy, and the defendant has not come close to establishing bias.

*Strickland* test . . . courts must resist a natural temptation to engage in 'Monday morning quarterbacking.'" (quoting *Mui v. United States*, 614 F.3d 50, 57 (2d Cir. 2010))).

####    b.    Conflict of Interest

The defendant argues that he is entitled to a new trial because "he was denied his Sixth Amendment constitutional guarantee of conflict-free counsel." (ECF No. 270-1 at 17.) This claim has no merit. The Court held a *Curcio* hearing after the government advised the Court that Ms. Blank Becker might have a conflict. The defendant does not claim that the hearing was deficient. Nor does he deny that the Court appointed competent counsel to advise the defendant, that the evidence established that the defendant was capable of making a knowing and intelligent waiver, or that he waived the conflict. (*Curcio* Tr. 32-47.) The defendant also does not deny that, as part of that waiver, he acknowledged that he was "giving up the right to have [Ms. Blank Becker] represent [him] without a conflict of interest," and that he could not "later claim that [his] lawyer, Ms. [Blank] Becker, wasn't an effective lawyer because she had these conflicts or potential conflicts." (*Id*. at 46.) Nevertheless, the defendant now asserts that the conflict that he explicitly waived—Ms. Blank Becker's possible attorney-client relationship with Jane—was not waivable. According to the defendant, the supposedly unwaivable, *per se* conflict was Ms. Becker's "communicat[ion] about the case with the government's key witness, notwithstanding that the witness had her own counsel and did not consent to the communications," which subjected Ms. Becker to "accusations of misconduct."[48] (ECF No. 270-1 at 20.)

"The right to counsel under the Sixth Amendment encompasses 'a correlative right to representation that is free from conflicts of interest.'" *United States v. Lewis*, 850 F. App'x 81, 82 (2d Cir. 2021) (quoting *Wood v. Georgia*, 450 U.S. 261, 271 (1981)). "When a district court

---

[48] There is no basis for the defendant's claim that Ms. Blank Becker could have been accused of "an attempt to influence a government witness on behalf of her client." (ECF No. 270-1 at 20.)

is sufficiently apprised of even the possibility of a conflict of interest"—as the Court was here—it "must investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all." *United States v. Levy*, 25 F.3d 146, 153 (2d Cir. 1994).  If the Court finds that defense counsel has a "genuine conflict, it has to determine whether the conflict is so severe as to require the attorney's disqualification or whether it is a lesser conflict that can be waived in a *Curcio* hearing."  *United States v. Arrington*, 941 F.3d 24, 40 (2d Cir. 2019).

The defendant may knowingly and intelligently waive his right to conflict-free counsel "[i]n most cases where a defendant's attorney has a conflict;" only "[i]n rare cases" is "an attorney's conflict . . . unwaivable."  *Id.*; *see also United States v. Perez*, 325 F.3d 115, 127 (2d Cir. 2003) (recognizing that attorney's conflict is unwaivable if "no rational defendant . . . would have knowingly and intelligently desired that attorney's representation" (alternations omitted)). The Second Circuit has found "*per se*" conflicts of interest "only where trial counsel is not authorized to practice law and where trial counsel is implicated in the same or closely related criminal conduct for which the defendant is on trial."  *United States v. Williams*, 372 F.3d 96, 103 (2d Cir. 2004) (internal quotation marks omitted); *United States v. Marley*, No. 16-CR-374, 2022 WL 1210844, at *5 (S.D.N.Y. Apr. 25, 2022) ("A *per se* conflict exists only where trial counsel is not authorized to practice law or is implicated in the very crime for which his client is on trial.").

The fact that Ms. Blank Becker's contact with the witness might have subjected her to claims of professional misconduct—a subject that the Court explored thoroughly at the *Curcio* hearing—does not make the conflict unwaivable.  As explained in *Fulton*, "[t]he *per se* rule applies when an attorney is implicated in the crimes of his or her client since, in that event, the

attorney cannot be free from fear that a vigorous defense should lead the prosecutor or the trial judge to discover evidence of the attorney's own wrongdoing." *United States v. Fulton*, 5 F.3d 605, 611 (2d Cir. 1993). But "the *per se* rule does not apply any time a court learns that an attorney may have committed a crime; the attorney's alleged criminal activity must be sufficiently related to the charged crimes to create a real possibility that the attorney's vigorous defense of [her] client will be compromised." *Id*. As the Court explained at the *Curcio* hearing, Ms. Blank Becker's communications with Jane in 2019, knowing she was represented by another attorney, could have been an ethical violation. But that is neither a crime nor sufficiently related to the crimes with which the defendant was charged—RICO and Mann Act violations committed in 2018 and earlier—to constitute a *per se* conflict.

Next, the defendant asserts that Ms. Blank Becker "suffered from an actual conflict of interest that could not be waived" because she had previously represented Jane, and "[t]hat conflict was imputed to her trial partners."[49] (ECF No. 270-1 at 21.) The defendant cites *United States v. Stein*, in which the court held that "an attorney's conflicts are ordinarily imputed to his firm based on the presumption that 'associated' attorneys share client confidences." 410 F. Supp. 2d 316, 325 (S.D.N.Y. 2006) (alterations omitted). But the lawyers in that case were part of the same "small tax firm." *Id.* The lawyers in this case were not partners, they did not work in the same firm, and there is no evidence that Ms. Blank Becker shared any confidential information with the other lawyers. "[N]o presumption of confidence sharing arises between a law firm that received confidential information and a separate firm serving as co-counsel with it." *Benevida Foods, LLC v. Advance Mag. Publishers Inc.*, No. 15-CV-2729, 2016 WL

---

[49] The defendant's reference to Ms. Blank Becker's "simultaneous representation of Defendant and government witness, Jane" is inaccurate. (ECF No. 283 at 7.) As the Court found, Jane "never formally retained" Ms. Blank Becker (*Curcio* Tr. 32), and nothing in the record suggests she represented Jane at the time of the trial.

3453342, at *12 (S.D.N.Y. June 15, 2016) (internal quotation marks omitted); *see Anwar v. United States*, 648 F. Supp. 820, 827 (N.D.N.Y. 1986), *aff'd*, 823 F.2d 544 (2d Cir. 1987) (finding that conflict was not imputed to co-counsel where the evidence did not "indicate a general partnership relationship between [the attorneys] extending beyond the representation of petitioner himself").

The defendant was represented by four lawyers, three of whom had no conflict or potential conflict.  Ms. Blank Becker's conflict related only to Jane, whom Ms. Blank Becker did not cross-examine.  Mr. Cannick, lead trial counsel, cross-examined Jane.  (T. Tr. 1073-1221.)

In short, to the extent that Ms. Blank Becker had an actual conflict of interest, that conflict was clearly waivable.  *See Anwar*, 648 F. Supp. at 826 ("Whenever a defense attorney has previously represented an important government witness who testifies against [her] client, the possibility of a conflict of interest exists."); *Perez*, 325 F.3d at 127 ("[L]esser conflicts, such as an attorney's representation of two or more defendants or [her] prior representation of a trial witness, are generally waivable"); *United States v. Basciano*, 384 F. App'x 28, 34 (2d Cir. 2010) (affirming district court's refusal to order a new trial based on lead defense counsel's "conflict of interest arising from his previous representation of a cooperating witness for the government," where the defendant waived the conflict).

### c.     Evidentiary Rulings

The defendant also challenges the Court's evidentiary rulings, and claims that the Court permitted "irrelevant and excessive bad character evidence" that was minimally probative and unduly prejudicial.  (ECF No. 276-1 at 2.)  Specifically, the defendant challenges the Court's admission of (1) Angela's testimony that she saw the defendant perform oral sex on Aaliyah, (2) evidence that defendant exposed other women to herpes, (3) testimony by Addie, Alexis, Kate, Anna, Angela, Louis and Alex and (4) the defendant's video recordings of sexual activity

involving the defendant, Alex, Dominique and Anna.  (*Id.* at 4-11.)  The defendant also contends

that his lawyers did not adequately challenge the introduction of some of this evidence.  (*Id.* at 2-

3, 6, 8, 10-11.)  As explained below, none of the defendant's arguments has any merit, let alone

warrants a new trial.

      Under the Federal Rules of Evidence, evidence is admissible only if it is relevant.  Fed.

R. Evid. 402.  Evidence is relevant if "it has any tendency to make a fact more or less probable

than it would be without the evidence," and "the fact is of consequence in determining the

action."  Fed. R. Evid. 401.  Under Rule 403, evidence that is relevant may nevertheless be

excluded "if its probative value is substantially outweighed by a danger of one or more of the

following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time,

or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  In applying Rule 403, the

court "conscientiously balance[s] the proffered evidence's probative value with the risk" of the

enumerated dangers.  *United States v. Awadallah*, 436 F.3d 125, 131 (2d Cir. 2006).

      As a general matter, although evidence of "any other crime, wrong, or act" cannot be

used to show a person's bad character, it is admissible to prove other purposes, including motive,

opportunity and intent, among other things.  *See* Fed. R. Evid. 404(b)(1), (2); *United States v.

Cadet*, 664 F.3d 27, 32 (2d Cir. 2011).  Thus, the Second Circuit "follows the 'inclusionary'

approach to 'other crimes, wrongs, or acts' evidence, under which such evidence is admissible

unless it is introduced for the sole purpose of showing the defendant's bad character, or unless it

is overly prejudicial under Fed. R. Evid. 403 or not relevant under Fed. R. Evid. 402."  *United

States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996) (internal citations omitted).

      Moreover, evidence of other crimes or acts can be admitted without reference to Rule

404(b) if it is direct evidence of the existence of a RICO enterprise, if it is inextricably

intertwined with the evidence regarding the charged offense or if it provides necessary

background to the charged offenses. *See United States v. Rivera*, No. 13-CR-149, 2015 WL

1875658, at *2 (E.D.N.Y. Apr. 22, 2015) ("When a defendant has been charged with

racketeering offenses, it is well settled that 'the government may introduce evidence of

uncharged offenses to establish the existence of the criminal enterprise.'" (quoting *United States*

*v. Baez*, 349 F.3d 115, 120 (2d Cir. 2007))); *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir.

2000) ("[E]vidence of uncharged criminal activity is not considered other crimes evidence under

[Rule 404(b)] if it arose out of the same transaction or series of transactions as the charged

offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is

necessary to complete the story of the crime on trial." (quoting *United States v. Gonzalez*, 110

F.3d 936, 942 (2d Cir. 1997))).  The admissibility of the evidence for these additional purposes

must also meet the Rule 403 requirement that its probative value outweigh the danger of unfair

prejudice.  *See United States v. Robinson*, 702 F.3d 22, 37 (2d Cir. 2012).

> *i.    Angela's Testimony about Sexual Contact Between the Defendant and Aaliyah*

The defendant argues that the Court should have excluded Angela's testimony that she

saw the defendant perform oral sex on Aaliyah in 1992 or 1993, when Aaliyah was 13 or 14

years old.  (ECF No. 276-1 at 8-9; T. Tr. 3298.)

Angela's testimony was relevant to the bribery charge in Racketeering Act 1 and was not

barred by Rule 404(b).  *See* Fed. R. Evid. 403, 404(b).  In particular, evidence that the defendant

had a sexual relationship with Aaliyah was evidence of his motive in connection with the bribery

case.  The government asserted that the defendant concocted the plan to marry Aaliyah—which

could only be accomplished by bribing the official—in order to keep secret his sexual

relationship with a young teenager.  Thus, testimony from a witness who actually saw them

having sex was relevant.  Nor was the testimony's probative value substantially outweighed by a

risk of unfair prejudice, as evidence of the defendant's sexual contact with Aaliyah was no more inflammatory than the charged offenses.  *See* Fed. R. Evid. 403; *Rivera*, 2015 WL 1875658, at *3 ("Evidence shall be excluded as unfairly prejudicial when it is 'more inflammatory than the charged crime.'" (quoting *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999))).

The defendant contends that the government established the defendant's motive for bribery in other ways, including Demetrius Smith's testimony that "[the defendant] mentioned . . . that Aaliyah was in trouble" and thought she was pregnant.  (T. Tr. 692, 702; ECF No. 276-1 at 8-9.)[50]  But Smith, unlike Angela, did not see the defendant having sexual contact with Aaliyah while she was a minor.  As the government points out, Angela's testimony was particularly probative in view of defense counsel's refusal to concede that the defendant and Aaliyah engaged in sexual activity before their marriage.  (*See* ECF No. 288 at 3-4; Aug. 3, 2021 Pre-Trial Conf. Tr. 13-14.)  Therefore, Angela's testimony was admissible.

### ii.     *Evidence that the Defendant Exposed Other Women to Herpes*

As discussed above, Racketeering Acts 8 (Jane), 12 (Faith) and 14 (Faith) charged the defendant with Mann Act violations based on the defendant's exposing Jane and Faith to herpes in violation of certain state criminal and public health statutes.  The defendant asserts that other evidence about the other victims the defendant exposed to herpes was "unnecessary, cumulative, and unduly prejudicial," because the defendant's physician, Dr. McGrath, testified that the defendant had herpes and about the course of treatment.  (ECF No. 276-1 at 7.)  Specifically, the defendant objects to the testimony that (1) the defendant had herpes before his sexual relationship with Jane and Faith, (2) that he infected Jerhonda with herpes, (3) infected Kate with

---

[50] In his motion for acquittal, however, the defendant asserts that Smith's testimony was insufficient to prove the bribery.  (ECF No. 273-1 at 25-26.)

herpes and (4) infected Anna with herpes.[51]  (*Id.*)  According to the defendant, this evidence was unsupported by other theories of admissibility and therefore amounted to "rank propensity evidence."  (*Id.* at 7-8.)  The defendant is wrong.

Jerhonda testified that she contracted genital herpes in 2009 or 2010, and told the defendant about it.  (T. Tr. 172-73.)  Similarly, Kate testified that she contracted genital herpes, and told the defendant that she believed he gave her a sexually transmitted disease.  (T. Tr. 2638-39.)  Evidence that Jerhonda and Kate conveyed this information to the defendant was probative of the defendant's knowledge that he had herpes, which the government was required to establish beyond a reasonable doubt to prove Racketeering Acts 8, 12 and 14, as well as Counts 6 through 9.  (ECF No. 43 ¶¶ 22-24, 32-34, 36-38, 43-46); Fed. R. Evid. 401.

Contrary to the defendant's assertions, the record does not reflect that the defendant conceded that he had genital herpes, knew he had the disease or knowingly exposed others to the disease.[52]  During the August 3, 2021 pretrial conference the Court asked the defense if it would stipulate that the defendant knew he had herpes; the defense did not stipulate.  (Aug. 3, 2021 Tr. at 16-17 ("I don't know to what extent the defense has considered stipulating to some of this evidence.  This is regarding the transmission of . . . herpes.  . . . [T]he government is saying that this is relevant to show the defendant's knowledge of the condition, but I think some of this, if there's a stipulation about that it becomes less relevant.").)  Moreover, the defense suggested in

---

[51] Anna did not, as the defendant claims, testify that the defendant gave her herpes.  Rather, she testified that the defendant did not use protection when he had sex with her and other people, and that a doctor tested her for STDs but she never saw the results because the doctor sent them directly to the defendant's assistant, Diana Copeland.  (T. Tr. 2825-26, 2886.)

[52] The defense appears to fault the Court for admitting the very evidence that he says the government did not establish.  In his motion for acquittal, the defendant asserts that there was insufficient evidence to establish that "he was contagious or had an outbreak" when he had intercourse with Faith, or that he was "contagious, infected, or had the capacity to transmit herpes" when he had sexual contact with Jane in 2015.  (ECF No. 273-1 at 40-41, 58.)

cross-examining Drs. McGrath and Hoskins that the defendant did not have herpes, because no one had given him a blood test.[53]  Kate and Jerhonda's testimony was relevant to show that the defendant knew he had herpes, which established his knowledge for the charged offenses involving Jane and Faith.  (T. Tr. 4-5; ECF No. 255 at 8-9.)

The testimony was relevant even if counsel had stipulated, as it corroborated other victims' testimony that the defendant's practice was to have unprotected sex without disclosing his sexually transmitted disease.  The testimony was thus admissible as probative of one of the enterprise's means and methods charged in the indictment—in particular, "engaging in and facilitating sexual activity without disclosing a sexually transmitted disease [the defendant] had contracted[.]"  (ECF No. 43 ¶ 9(a)); Fed. R. Evid. 401.

The defendant faults trial counsel for not challenging "the excessive amount of herpes evidence from numerous other witnesses" (ECF No. 276-1 at 8), but does not cite any specific piece of "herpes evidence" to which his trial counsel failed to make an objection.  To the extent that he means to complain about testimony discussed above, there were multiple grounds supporting the testimony's admissibility under the Federal Rules of Evidence.  Thus, trial counsel's decision not to object to the evidence was not objectively unreasonable.  Nor can the defendant claim that the result of the proceeding would have been any different if counsel had objected, since the evidence was admissible.  *See Strickland*, 466 U.S. at 694.

iii.    *Testimony by Addie, Alexis, Kate, Anna, Angela, Louis and Alex*

The defendant also argues that the Court improperly allowed testimony by "seven additional witnesses"—Addie, Alexis, Kate, Anna, Angela, Louis and Alex—"to testify about

---

[53] Counsel asked Dr. McGrath, "Is it fair to say, Dr. McGrath, that from your experience in treating Mr. Kelly, sitting here in court today you cannot say that 100 percent he has herpes?"  (T. Tr. 439.)  In a similar effort to suggest that the defendant might not have herpes, defense counsel asked Dr. Hoskins if a blood test was "the best way to determine if a person has herpes[.]"  (T. Tr. 3074.)

graphic uncharged bad act evidence[.]"  (ECF No. 276-1 at 9.)  The defendant challenges this

witness testimony as "cumulative and unduly prejudicial," and faults trial counsel for not

"competently" objecting to it.  (*Id.* at 10-11.)  The defendant's arguments do not warrant relief

under Rule 33.

As explained at the trial and in my earlier written decision, the testimony of Addie,

Alexis, Kate,[54] Anna, Angela, Louis and Alex was admissible to show either the existence of the

enterprise, "a purpose [and] relationships among those associated with the enterprise," *Boyle*,

556 U.S. at 946, or the enterprise's means and methods as charged in the indictment.  (*See* ECF

No. 255 at 7 (Addie's testimony about the defendant's sexual contact with her while she was a

minor was evidence of one of the purposes of the enterprise—to recruit girls to have sex with the

defendant—and thus "probative of the existence of the enterprise and the way it operated" (citing

ECF No. 43 ¶ 1-4)); *id.* at 10 (Alexis's testimony about the defendant's sexual contact with her

while she was a minor was "evidence of the enterprise, its purposes and its means and

methods");[55] *id.* at 11-12 (Anna's testimony that the defendant sexually abused her was

admissible under multiple theories, including as evidence of the enterprise's purposes and means

and methods, as it "showed the defendant's control over his associates and the victims of the

enterprise"); T. Tr. 2849-50 (Angela's testimony that the defendant had sexual contact with her

was relevant to the existence of the enterprise, including because it tended to show that the

defendant's associates knew what he was doing, and because it was inextricably intertwined with

her testimony about observing the sexual encounter between the defendant and Aaliyah); ECF

---

[54] The Court properly allowed Kate's testimony about contracting herpes from the defendant for the
reasons explained above.  Accordingly, the Court need not repeat that rationale here.

[55] It is unclear why the defendant cites Alexis's testimony as unfairly prejudicial because while she
testified that she had sex with the defendant when she was in her "teens," it was not before she was 18.
(T. Tr. 2557-58.)

No. 255 at 5-6 (reiterating the Court's ruling regarding Angela's testimony); *id.* at 10 (Louis's testimony about the defendant's sexual contact with him while he was a minor was "evidence of the enterprise's purposes, as well as its means and methods," particularly because one of the enterprise's purposes was to produce pornography, including child pornography (citing ECF No. 43 ¶ 2)); Aug. 3, 2021 Tr. 27-28, 30-31 (finding testimony that the defendant required Alex to engage in sexual encounters with other women, and that the defendant filmed those encounters was "direct evidence of the enterprise's means and methods" and showed "the control that the defendant exercised over victims as alleged in the indictment")).  In addition, I balanced the probative value of each piece of evidence against the potential for undue prejudice, as required by Rule 403, and concluded that the proffered testimony was not unduly prejudicial.  Fed. R. Evid. 403; (*see* ECF No. 255 at 5-6, 7, 10-12; Aug. 3, 2021 Tr. 19, 21, 27-28, 30-31; T. Tr. 2850.)[56]

The defendant argues that his lawyers did not make adequate objections to the introduction of the bad act evidence at trial, and that they "affirmatively introduce[d] other prior bad act evidence."  (ECF No. 276-1 at 10-11.)  As a threshold matter, since the evidence was properly admitted, counsel cannot be ineffective, even if they did not challenge the evidence at all.  In any event, counsel did object that the defense had not been given timely notice of the government's intent to offer the evidence, and argued that the Court should exclude the testimony regardless of the timeliness issue.  (ECF No. 146 at 4.)  Trial counsel filed a supplemental brief on August 6, 2021, objecting to the admission of uncharged crime evidence under Rule 404(b) and Rule 403.  (ECF No. 156.)  In addition, in an August 26, 2021 letter filed

---

[56] The victims' testimony about the defendant's uncharged acts was also admissible under Rule 413 because it was relevant to the charged sexual assaults of Jerhonda, Jane and Faith.  *See* Fed. R. Evid. 413(a) ("In a criminal case in which a defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault" so long as the evidence is relevant.).

under seal, the defendant's lawyers moved to preclude the testimony of Addie and Louis.  (ECF No. 180.)  Under these circumstances, there is simply no basis to find that trial counsel's representation fell outside "the wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 689).[57]

      *iv.*    *Video Exhibits*

The defendant also disagrees with the Court's decision to admit certain "graphic" video evidence.  (ECF No. 276-1 at 11.)  Government Exhibits 341 through 343 depict sexual encounters between Alex, Dominique and the defendant.  (GX 341, 342, 343.)  In one of these recordings, the defendant guided Dominique's head while she performed oral sex on Alex.  In Government Exhibit 328(a), the defendant spanked Anna, who was naked while she walked back and forth, crying and robotically repeating that she was a "slut" and "stupid".  (GX 328(a); T. Tr. 2845-46, 2852-55.)  In Government Exhibit 329(a), a nine-minute recording of which the jury saw only a few minutes (T. Tr. 3674), Anna spread feces on her naked body and called the defendant "Daddy."  (GX 329(a).)  The defendant objects that this evidence "was not relevant to any 'means and methods' of an enterprise since there was no enterprise," and "[w]hatever probative value it had, was substantially outweighed by its prejudicial effect."  (ECF No. 276-1 at 11.)

The video depictions of sexual activity between Alex, Dominique and the defendant were properly admitted into evidence.  First, the evidence showed the control that the defendant exerted over his victims, and therefore demonstrated the means and methods of the enterprise alleged in the indictment.  (ECF No. 43 ¶¶ 7-9.).  The defendant directed Alex and Dominique (whom Alex described as "zombie-ish" (T. Tr. 3358)) how to have sex, what to do to each other

---

[57] Nor was counsel ineffective because he "opened the door" to evidence that the defendant was the subject of a criminal case in Illinois, for the simple reason that the jury never heard that evidence.

and how to react.  Second, the videos were direct evidence of one of the purposes of the enterprise—to recruit women and girls to engage in sexual activity with the defendant as well as to produce pornography.  (ECF No. 43 ¶¶ 2-3.)  Third, the video evidence corroborated Alex's testimony and provided support for the testimony of other victims, including Jane and Louis, that the defendant required them to have sexual contact with others, which the defendant filmed. (*See* T. Tr. 956, 1034-50, 1844-47, 1865-72.)  The videos were admissible under Rule 403 because they were relevant and probative, and not unduly prejudicial.  The exhibits corroborated the trial testimony, and were "no more inflammatory than the offenses" with which the defendant was charged.  *See Rivera*, 2015 WL 1875658, at *19.

The video recording of the defendant's "punishing" Anna, while graphic and disturbing, was properly admitted under Rule 404(b), and its probative value was not substantially outweighed by any risk of unfair prejudice.  *See* Fed. R. Evid. 401, 403, 404(b).  The means and methods of the enterprise included, among other things, "[d]emanding absolute commitment to [the defendant] and not tolerating dissent;" "[o]btaining sensitive information about sexual partners and members and associates of the Enterprise to maintain control over them;" and "[c]reating embarrassing and degrading videos of sexual partners to maintain control over them." (ECF No. 43 ¶ 9.)  The video recording of Anna (Government Exhibit 328(a)) was direct evidence of the enterprise and the way it operated.  It was an "embarrassing and degrading video," which the defendant created, and demonstrated the force he used to control his victims— spanking them and ordering them to say degrading things about themselves.  The video also corroborated Anna's testimony as well as Jane's and Jerhonda's about the ways that the defendant punished them for breaking his rules.  (T. Tr. 148-49, 166-68, 901, 909-18, 973-78, 1053-57, 1318, 2840-46, 2852-55, 3015, 3018-3019.)

SpA 154

The second video exhibit—also explicit and horrifying—was similarly admissible as evidence of the ways in which the defendant used humiliation and punishment to control his victims.  The recording supported Anna's testimony that the defendant made her do dehumanizing, humiliating acts involving bodily fluids.  (T. Tr. 2876-77, 2880.)  The video also corroborated Jane's testimony that the defendant punished her by forcing to eat feces and spread it on her body.  (T. Tr. 998-1000.)  Because the recordings served these legitimate purposes, they were appropriately admitted.  The video recordings were awful, but the crimes charged were awful, involving (1) sexual exploitation of minors, (2) forced labor—the defendant's violent, degrading assault on Jerhonda to force her to perform oral sex on him (T. Tr. 176-79) and the defendant's threats, including the presence of gun, to force Faith into oral sex (T. Tr. 2249-55)—(3) kidnapping, and (4) aggravated criminal sexual abuse.  Therefore, the Court's decision to admit the foregoing video recordings does not warrant a new trial.[58]

Finally, the defendant faults trial counsel for challenging the videos "belatedly."  (ECF No. 276-1 at 11.)  As explained above, the evidence was admissible, so counsel could not have been ineffective, even if "making a belated objection" constituted ineffective assistance of counsel.  In any event, counsel moved *in limine* to exclude the evidence involving Alex and Dominique as "highly inflammatory, needlessly cumulative, and [because] the probative value, if any, of the material is outweighed by the danger of unfair prejudice to the defendant."  (ECF No. 203.)  The defense initially objected to the admission of Government Exhibit 329(a) (*see* T. Tr. 2518), objected to playing Government Exhibit 328(a) (*see* T. Tr. 3671-72), and successfully

---

[58] The government played only a "very short portion" of the video (T. Tr. 3669, 3674; *see also* T. Tr. 2254 ("[W]e are going to play very limited snippets.")), and did not play it again during summation.  (T. Tr. 4424 ("I'm not going to play [GX 329(a)] for you again.").)

challenged the admissibility of another video of Joy.[59]  In sum, the Court's evidentiary rulings were appropriate exercises of discretion.

## CONCLUSION

For these reasons, the defendant's motions for a judgment of acquittal and for a new trial are denied.

**SO ORDERED.**

s/ Ann M. Donnelly
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
June 29, 2022

---

[59] The Court excluded the video of Joy with feces as "cumulative . . . unfairly prejudicial and [] not related to anybody who [wa]s testifying."  (T. Tr. 2520-28.)

103

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                            :
**UNITED STATES OF AMERICA**,                               :
                                                            :
          – against –                                       :    **MEMORANDUM DECISION AND**
                                                                 **ORDER**
                                                            :
**ROBERT SYLVESTER KELLY**,                                 :    19-CR-286 (AMD)
                                                            :
                              Defendant.                    :
                                                            :
------------------------------------------------------------ X

**ANN M. DONNELLY**, United States District Judge:

　　　　Before the Court is the government's motion for an order authorizing the Bureau of

Prisons (the "BOP") to turn over funds in the defendant's inmate trust account to the Clerk of

Court.  (ECF Nos. 323, 326.)  The defendant opposes.  (ECF No. 325.)  The government's

request for a turnover order is warranted and appropriate under the circumstances of this case

pursuant to statutory authorities discussed below.  Accordingly, the motion is granted.[1]

## BACKGROUND

　　　　Following a six-week trial, on September 27, 2021, a jury convicted the defendant of one

count of racketeering in violation of 18 U.S.C. §§ 1962(c), 1963 and eight counts of sex

trafficking in violation of the Mann Act, 18 U.S.C. §§ 2421, *et seq*.  (ECF Nos. 43, 238.)  On

---

[1] This Court has jurisdiction to consider the government's motion notwithstanding the defendant's
pending appeal.  *See United States v. Jenkins*, No. 15-CV-18, 2015 WL 5023731, at *3 (N.D.N.Y. Aug.
25, 2015) (finding that district court is not "automatically deprived of jurisdiction" over the
government's application for a writ of garnishment "upon the filing of an appeal").  Courts have found
that Fed. R. Crim. P. 38(c), which provides that a stay of a sentence to pay a fine or restitution may be
obtained only in certain circumstances, "implicitly recognize[s]" "the ability to execute upon a monetary
judgment notwithstanding a pending appeal."  *United States v. Kieffer*, No. 08-CR-54, 2010 WL
2231806, at *4 (D.N.D. Apr. 28, 2010) (collecting cases), *report and recommendation adopted*, 2010
WL 2231804 (D.N.D. May 28, 2010).  Furthermore, 18 U.S.C. § 3572(g) recognizes that even "[i]f a
sentence imposing a fine is stayed," the court must nevertheless require security for the payment of the
fine.

June 29, 2022, I sentenced the defendant to thirty years in prison and ordered him to pay a $100,000 fine, a $900 special assessment and an additional assessment of $40,000 pursuant to the Justice for Trafficking Victims Act of 2015 (the "JTVA"), 18 U.S.C. § 3014.  (ECF No. 319.) Those amounts were due and payable immediately.  18 U.S.C. § 3572(d)(1).  While the defendant's Mann Act convictions make restitution mandatory in this case, *see* 18 U.S.C. §§ 2429, 2259, the specific amount that he owes has not yet been determined.[2]

The government represents that the defendant has "accumulated substantial funds in his inmate trust account," totaling $28,328.24.  (ECF No. 323 at 2.)  On August 4, 2022, at the government's direction, the BOP restrained or "froze" $27,824.24 of the money in the defendant's trust account, leaving a balance of $500 for his use in MCC-Chicago, where he is currently incarcerated.  (*Id.*)  The government now seeks an order requiring the BOP to turn over the restrained funds to the Clerk of Court "for deposit into an interest-bearing account pending a determination as to the amount and applicability of a restitution judgment."  (*Id.* at 1.)

The defendant opposes the government's motion, asserting that BOP impermissibly "confiscated" the funds in the defendant's account.  According to the defendant, the government does not have statutory authority to seize the defendant's property "without filing a notice of default or a notice of lien on the property," or where restitution has not been finalized.  (ECF No. 325 at 1-3.)  The defendant urges the Court to order the "immediate return" of the defendant's funds, and to sanction the government and the BOP "for seizing funds without lawful authority." (*Id.*)

---

[2] A hearing for the purpose of determining the defendant's restitution is currently set for September 28, 2022.  *See* 18 U.S.C. § 3664(d)(5) ("If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing.").

## DISCUSSION

Under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A *et seq.*,

"[i]f a person obligated to provide restitution, or pay a fine, receives substantial resources from

any source, including inheritance, settlement, or other judgment, during a period of incarceration,

such person shall be required to apply the value of such resources to any restitution or fine still

owed."  18 U.S.C. § 3664(n).  Furthermore, under 18 U.S.C. § 3613, which sets forth "Civil

remedies for satisfaction of an unpaid fine," a fine, assessment or restitution order acts as a lien

in favor of the government on "all property and rights to property" of the defendant.  *Id.* §

3613(c); *see also United States v. Sayyed*, 862 F.3d 615, 618-19 (7th Cir. 2017) (noting that 18

U.S.C. § 3613(c) creates a lien, entitling the government to "step[] into the defendant's shoes"

and acquire his rights to property).

Unless "the court provides for payment on a date certain or in installments," payment of a

criminal fine or restitution is due "immediately," 18 U.S.C. § 3572(d)(1), and must be disbursed

in the following order:

> (1) A penalty assessment under section 3013 of title 18, United States Code [i.e.,
> the mandatory special assessment of $100 per count of conviction].
>
> (2) Restitution of all victims.
>
> (3) All other fines, penalties, costs, and other payments required under the
> sentence.

*Id.* § 3612(c); *see also id.* § 3572(b) ("[T]he court shall impose a fine or other monetary penalty

only to the extent that such fine or penalty will not impair the ability of the defendant to make

restitution.").  Furthermore, a defendant must "satisf[y] all outstanding court-ordered fines,

orders of restitution, and any other obligation related to victim-compensation," before paying an

assessment under the JTVA.  *See* 18 U.S.C. § 3014(b).

Courts reviewing these provisions have issued orders "authorizing payment from a defendant's inmate trust account where the defendant had not paid an order of restitution either at all or in full." *United States v. Hickman*, 330 F. Supp. 3d 921, 923 (W.D.N.Y. 2018); *see, e.g.*, *United States v. Thornbrugh*, 764 F. App'x 655, 657 (10th Cir. 2019) (finding that the district court properly granted the government's motion to obtain funds from defendant's inmate trust account for unpaid restitution); *United States v. Hester*, 708 F. App'x 441, 443 (9th Cir. 2018) ("Because [defendant]'s Inmate Trust Account showed that he received 'substantial resources' during his period of incarceration . . . , he was required by law to apply those funds to . . . restitution he still owed."); *United States v. Lemberger*, 673 F. App'x 579, 579-80 (7th Cir. 2017) (finding that the "government's request for the court to order the Bureau to turn over the funds in [defendant's] trust account was lawful" pursuant to 18 U.S.C. § 3664(n)); *United States v. Schwartz*, No. 20-CR-6033, 2022 WL 537621, at *2-3 (W.D.N.Y. Feb. 23, 2022) (authorizing the government to remove funds from inmate trust account to satisfy restitution, as defendant's funds were "substantial resources" subject to 18 U.S.C. § 3664(n)).

Courts have also granted similar requests in cases where a defendant owes a fine.  *See, e.g.*, *United States v. Kendrick*, No. 10-CR-6096, 2022 WL 1819390, at *5 (W.D.N.Y. June 3, 2022) ("[B]ecause Section 3664(n) affirmatively mandates that an incarcerated defendant apply 'substantial resources' to any fine that is 'still owed,'" government was justified in collecting defendant's economic stimulus checks to apply toward his $8,000 fine); *United States v. Sabato*, No. 02-CR-236, 2021 WL 826751, at *2 (D. Conn. Mar. 4, 2021) (requiring the BOP to turn over inmate trust account funds as payment toward unpaid fine).  The court in *Kendrick* held that 18 U.S.C. § 3664(n) "triggers an automatic payment requirement."  2022 WL 1819390, at *4 (collecting cases).

At least two courts have held—in the context of an unpaid fine—that section 3664(n) does not require immediate payment absent proof that the defendant is in default on the fine. *See Hickman*, 330 F. Supp. 3d at 924 ("[I]n order to seize funds from Defendant's inmate trust account to pay the outstanding fine, the Court must first conclude that Defendant has defaulted on his payment obligations."); *United States v. Woodard*, No. 08-CR-191, 2016 WL 9406086, at *2-3 (W.D. Mich. June 24, 2016) (denying government's request for an order to remove funds from defendant's inmate trust account absent evidence that the fine is unpaid or in default).

In this case, the government seeks the defendant's funds either "to satisfy the Defendant's restitution judgment, which is yet to be imposed, or to satisfy the Court-ordered fine, which has already been imposed" (ECF No. 326 at 1, 4); the defendant responds that "[t]he authority offered by the government is inapplicable here where there has been no restitution ordered." (ECF No. 325 at 2.)  As explained below, however, because the government can collect the funds as payment for the defendant's unpaid assessment and fines, it is not necessary to decide whether section 3664(n), read together with section 3613(c), authorizes the turnover of funds when restitution has not yet been quantified but is mandatory, and when fines have been imposed and are due immediately.

As it stands, the defendant has not paid his $900 special assessment, $100,000 fine or $40,000 JTVA assessment.  (ECF No. 326-1.)  There is no dispute that these amounts are outstanding; nor is there any dispute that the funds in the defendant's trust account, totaling $28,328.24, constitute "substantial resources" within the meaning of 18 U.S.C. § 3664(n).[3] Thus, the government's request is authorized by section 3664(n)'s plain terms, which

---

[3] *See United States v. Kieffer*, No. 14-CR-30051, 2021 WL 1758815, at *1 (S.D. Ill. May 4, 2021) (finding that $2,707.10 in defendant's inmate trust account was "substantial resource" requiring turnover).

"affirmatively mandate[] that an incarcerated defendant apply 'substantial resources' to any fine that is 'still owed'—that is, to any portion of the total fine that has yet to be satisfied." *Kendrick*, 2022 WL 1819390, at *4.  Moreover, because the fines have already been ordered, section 3613(c) gives the government a lien on the defendant's inmate trust funds.  *Sayyed*, 862 F.3d at 618-19.

Because a lien "arises on the entry of judgment" under 18 U.S.C. § 3613(c), the government was not required to file either a notice of lien or default, as the defendant claims. *See United States v. Smith*, 768 F. App'x 926, 932 (11th Cir. 2019) (government lien "arises automatically and attaches to all property of the defendant . . . ." (citing 18 U.S.C. § 3613(c))). Moreover, the government's lien does not need to be recorded unless it is asserting priority over specific classes of third-party interest holders identified in 18 U.S.C. § 3613(d).  *See id.* ("Generally speaking, the MVRA does not require the government to record the lien . . . ," but it must record one "to be valid against" specific third parties) (internal citations omitted).

The Honorable Frank P. Geraci Jr. rejected a similar claim in *Kendrick*.  Citing 18 U.S.C. § 3664(n), which provides that a defendant must apply a windfall to "any restitution or fine still owed," Judge Geraci explained that the provision "does not, by its terms, expressly include any [] precondition" of default.  *See Kendrick*, 2022 WL 1819390, at *4 (reasoning that the "phrase 'still owed' must refer to the total restitution or fine balance that has yet to be satisfied, regardless of a defendant's compliance with or default on a court-ordered payment schedule," and that "if Congress had intended to limit Section 3664(n)'s application to defaulted or delinquent fines, it could have used the terms 'default' or 'delinquency,' as it did in other

sections of the legislation").[4]  Applying that sound rationale to the facts of this case, the

government is entitled to the defendant's funds because he owes substantial fines.  *See id.* at *3-5

(rejecting defendant's arguments that the government could not seize his funds without first

providing notice or showing he was in default).

      In granting the government's request because the defendant has not paid the fines, I am

also mindful of victims' rights "to full and timely restitution," 18 U.S.C. § 3771(a)(6), as well as

Congress's directive that restitution obligations must be satisfied before other court-ordered

fines.  *Id.* § 3612(c).  Furthermore, the MVRA provides that "[a] restitution order 'may be

enforced by the United States in the manner provided for' in 18 U.S.C. §§ 3571-3574, and §§

3611–3615 or 'by all other available and reasonable means.'"  *Lemberger*, 673 F. App'x at 580

(quoting 18 U.S.C. § 3664(m)).  The government's request—to hold the defendant's funds in an

"interest-bearing account pending a determination" on restitution (ECF No. 323 at 1)—is an

appropriate measure under the circumstances of this case, where the defendant owes unpaid fines

and is also subject to mandatory restitution that has not yet been quantified.  Indeed, courts have

issued restraining orders to secure funds in anticipation of restitution.  *See United States v.

Catoggio*, 698 F.3d 64, 68 (2d Cir. 2012) ("[D]istrict court properly exercised its authority under

the All Writs Act to restrain [defendant's] assets," where restitution was mandatory and

---

[4] The cases the defendant cites in support of his position that a finding of default is required are
distinguishable.  *See Woodard*, 2016 WL 9406086; *Hickman*, 330 F. Supp. 3d 921.  In *Woodard*,
although the court denied the government's turnover request, the defendant had already paid the $100
special assessment and $3,173.83 toward his fine in accordance with the payment plan ordered by the
court, and there was no evidence that the defendant was in default on the outstanding sum he owed.  *See*
2016 WL 9406086, at *1-3.  Similarly, in *Hickman*, the defendant had begun making payments toward
his outstanding fine.  *See* 330 F. Supp. 3d at 921.  Here, by contrast, the defendant has not made any
payments toward the assessment or fine.  (*See* ECF No. 326-1.)  In any event, I decline to follow
*Woodard* and *Hickman* because I agree with Judge Geraci that Congress intended 18 U.S.C. § 3664(n)
"to operate as an independent collection mechanism against an incarcerated defendant, without reference
to the defendant's compliance with or default on his court-ordered payment schedule."  *See Kendrick*,
2022 WL 1819390, at *5.

restitution amount was likely to exceed the amount sought to be restrained); *see also, e.g.*, *United States v. Hatfield*, No. 06-CR-550, 2010 WL 4235815, at *1 (E.D.N.Y. Sept. 27, 2010) (finding that district court had authority to restrain defendant's funds as collateral for future restitution order); *United States v. Garrett*, No. 13-CR-149 (Matsumoto, J.), ECF No. 494 (granting order, pursuant to the All Writs Act, prohibiting defendant from receiving the funds of a civil settlement before a restitution judgment had been entered).

The defendant's remaining claims—that the BOP unlawfully "encumbered Mr. Kelly's funds" and that the BOP and the government should be sanctioned—have no merit.  (*See* ECF No. 325.)  The BOP acted properly and in accordance with its policies when it placed the defendant's funds "in hold until this Court could adjudicate the pending motion."  *See United States v. Sabato*, No. 02-CR-236, 2021 WL 826751, at *2 (D. Conn. Mar. 4, 2021) (rejecting defendant's argument that the government inappropriately seized his inmate trust funds on due process grounds, and explaining that "[t]he inmate trust account is just that a trust account, which is controlled by the BOP and can be encumbered at the Warden's discretion" (citing *Trust Fund/Deposit Fund Manual*, Federal Bureau of Prisons at § 8.8 (Apr. 9, 2015), http://www.bop.gov/policy/progstat/4500_011.pdf)).[5]

---

[5] Even if the BOP and the government had acted improperly—and they did not—the imposition of sanctions would be excessive.  The Court has inherent authority to impose sanctions only if an attorney has "'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"  *Smith v. Westchester Cty. Dep't of Corr.*, 577 F. App'x 17 (2d Cir. 2014) (summary order) (quoting *United States v. Int'l Bhd. of Teamsters*, 948 F.3d 1338, 1345 (2d Cir. 1991)).  The Second Circuit has held that "bad faith is a prerequisite for imposing sanctions under a court's inherent authority where the behavior at issue was conduct that led to the lawsuit or took place during litigation and was taken on behalf of the client[.]"  *Laface v. E. Suffolk BOCES*, No. 18-CV-1314, 2019 WL 4696434, at *5 (E.D.N.Y. Sept. 26, 2019) (citing *United States v. Seltzer*, 227 F.3d 36, 41-42 (2d Cir. 2000).  The defendant's further allegation that he is "the repeated victim of BOP criminality" is not properly before the Court and is, in any event, irrelevant.

## CONCLUSION

For these reasons, the government's motion is granted.  Within ten days of the date of this order, the BOP must issue a check to the Clerk of the Court for the Eastern District of New York for $27,828.24.  The check should be made payable to the "Clerk of the Court, EDNY" and reference "U.S. v. Kelly, No. 19-cr-286."  The check should be mailed to:

> Clerk of the Court
> Eastern District of New York
> United States Courthouse
> 225 Cadman Plaza East
> Brooklyn, New York 11201

The Clerk of the Court should deposit this money into an interest-bearing account pending the determination by the Court as to the amount and applicability of restitution.

Once restitution is determined by the Court, the Clerk of Court should apply the monies held in the interest-bearing account first to the $900 special assessment and then to the restitution judgment, as set forth in 18 U.S.C. § 3612(c).

If the amount held in the interest-bearing account exceeds the amount of restitution and special assessments imposed, the remaining balance in the interest-bearing account should be applied first to the $100,000 fine and then to the $40,000 JTVA assessment, as required by 18 U.S.C. §§ 3612(c) and 3014.

**SO ORDERED.**

s/Ann M. Donnelly

_____

ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
September 9, 2022

9

SpA 165

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                                               :
**UNITED STATES OF AMERICA**,                                  :
                                                               :
            – against –                                        :  **MEMORANDUM DECISION AND**
                                                                  **ORDER**
                                                               :
**ROBERT SYLVESTER KELLY**,                                    :  19-CR-286 (AMD)
                                                               :
                        Defendant.                             :
                                                               :
-------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

At a September 28, 2022 restitution hearing, I ruled on the government's requests and

directed the parties to file additional briefing on one aspect of a request regarding one of the

victims.  This decision resolves the open issues, explains the rulings I made at the hearing and

sets a payment schedule.

## BACKGROUND[1]

On September 27, 2021, a jury convicted the defendant of racketeering in violation of 18

U.S.C. §§ 1962(c) and 1963, and eight counts of sex trafficking in violation of the Mann Act, 18

U.S.C. §§ 2421 *et seq.*  (ECF Nos. 43, 238.)  I sentenced the defendant on June 29, 2022 to thirty

years in prison and ordered him to pay a $100,000 fine, a $900 special assessment and an

additional assessment of $40,000 pursuant to the Justice for Trafficking Victims Act of 2015

("JTVA"), 18 U.S.C. § 3014.  (ECF No. 319.)  The government requested restitution for certain

victims, to which the defendant objected.  (*See* ECF Nos. 307, 313.)  I deferred decision pending

additional briefing by the parties.  In accordance with 18 U.S.C. § 3664(d)(5), which requires a

---

[1] Familiarity with this case is assumed.  I discuss background only to the extent necessary to explain my
rulings.

court to reach the final determination on restitution within "90 days after sentencing," I set a

hearing for September 28, 2022.

In advance of that hearing, the government filed additional submissions, seeking (1)

$357,218.18 for Jane pursuant to 18 U.S.C. § 2429 and 18 U.S.C. § 3663 for genital herpes-

related medical expenses, therapy costs and lost income for three and three-quarters years; (2)

$78,981.72[2] to Stephanie pursuant to 18 U.S.C. § 3663 for genital herpes-related medical

expenses and therapy costs; and (3) $5,200.00 to Sonja pursuant to 18 U.S.C. § 3663 for a year

of therapy.[3]  (ECF Nos. 331, 338.)  The defendant opposed the government's requests.  (ECF

No. 336.)

I made the following rulings at the September 28, 2022 hearing.  Pursuant to 18 U.S.C. §

2429—the statute that mandates restitution for victims of Mann Act offenses[4]—I imposed

$300,668.18 in restitution for Jane, which included the amount the government requested for

herpes treatment ($281,168.18) and the cost of therapy for three and three-quarters years

($19,500.00).  (September 28, 2022 Restitution Hearing Tr. ("Hr'g Tr.") 13:23—21:14; 35:16–

18.)  I disallowed the government's request for additional $56,550.00 for lost income.  (Hr'g Tr.

---

[2] In a September 27, 2022 letter, the government informed the Court that it had undercalculated the
amounts for Stephanie's herpes treatment.  (*Compare* ECF No. 331 *with* ECF No. 338.)  The
government clarified that it sought $78,981.72 for Stephanie, not the $31,713.24 amount it requested in
its original submission.  (*Id.*)

[3] The government received affidavits of loss from other victims, but informed the Court that it was not
seeking restitution on their behalf, because one victim withdrew her claim, and the other "advised the
government that her medical and therapy expenses are covered by her insurance."  (ECF No. 331 at 3.)

[4] Jane is the victim of the defendant's conduct in Racketeering Act 8, which charges the defendant with
racketeering for Mann Act violations based on exposing Jane to genital herpes in violation of a public
health statute, *see* 18 U.S.C. §§ 2421(a), 2422(a).  (ECF No. 43 ¶¶ 22–24.)  She is also a victim of
Racketeering Acts 9A, 9B, 9C and 9D, which correspond to Counts 2, 3, 4 and 5, respectively, charging
the defendant with Mann Act violations based on sexual activity with Jane when she was a minor, *see*
18 U.S.C. §§ 2421(a), 2422(a), 2422(b), 2423(a).  (ECF No. 43 ¶¶ 25—29, 39—42.)   In addition, Jane
is the victim of the Racketeering Acts 10 and 11, which charge the defendant with offenses for forced
labor and sexual exploitation of a child.  (*Id.* ¶¶ 30—31.)

21:15–22:5.)  For Stephanie—the victim of the defendant's sexual-exploitation-of-a-child

conduct in Racketeering Act 2—I imposed restitution in the amount of $8,200.00 for her past

therapy expenses pursuant to 18 U.S.C. § 3663.  (Hr'g Tr. 29:1–20.)  Although I found that the

defendant owed Stephanie restitution for her herpes-related expenses pursuant to 18 U.S.C. §

3663, I deferred decision on the amount,[5] and directed the government to clarify whether

Stephanie was taking Valtrex, or valacyclovir, a cheaper generic version of the drug, which the

government's exhibit showed she was taking.  (Hr'g Tr. 27:11–28:25; ECF No. 331-1.)  Finally,

I denied restitution to Sonja.  (Hr'g Tr. 29:21–30:24.)

On October 5, 2022, the government revised its calculations for Stephanie, estimating

that she was owed $45,587.20 for herpes treatment.  (ECF No. 341.)  At my direction, the

government also submitted a proposed restitution order, and a proposed payment schedule for

restitution and the other criminal monetary penalties imposed in this case.  (ECF Nos. 341-1–2.)

In an October 12, 2022 response, the defendant objected to the proposed payment schedule,

urged the Court to modify the $100,000.00 fine imposed at sentencing and challenged the

---

[5] The Court directed the parties to submit supplemental filings on the appropriate loss amount for
Stephanie, which means that the final restitution order will be entered after the 90-day statutory deadline
under 18 U.S.C. § 3664(d)(5).  However, "a sentencing court that misses the 90-day deadline . . . retains
the power to order restitution . . . where . . . the sentencing court made clear prior to the deadline's
expiration that it would order restitution, leaving open (for more than 90 days) only the amount."  *Dolan
v. United States*, 560 U.S. 605, 608 (2010); *United States v. Pickett*, 612 F.3d 147, 149 (2d Cir. 2010).
Because I made clear that Stephanie was entitled to restitution for medical expenses in an amount to be
determined (Hr'g Tr. 27:11—28:25), "the Court's restitution order today is not barred by 18 U.S.C §
3664(d)(5)."  *United States v. Hatfield*, No. 06-CR-550, 2015 WL 13385926, at *2 n.6 (E.D.N.Y. Mar.
27, 2015).  Moreover, the Second Circuit has explained that "the purpose behind the statutory ninety-
day limit on the determination of victims' losses is not to protect defendants from drawn-out sentencing
proceedings or to establish finality; rather, it is to protect crime victims from the willful dissipation of
defendants' assets."  *United States v. Douglas*, 525 F.3d 225, 252 (2d Cir. 2008) (citation omitted).
Therefore, "an extension of the proceedings beyond the 90-day period provides no basis for vacating the
restitution order unless the defendant can show that the extension caused him actual prejudice."  *Id*. at
252–53.  The defendant has not claimed that a restitution order finalized after the 90-day period is
invalid.

$281,168.18 portion of restitution that I awarded to Jane on the grounds that reliance on the price of Valtrex rather than the generic brand was "unreasonable." (ECF No. 342.)

## DISCUSSION

### I.  Applicable Restitution Statutes

Because district courts "have no inherent power to order restitution . . . [a] sentencing court's power to order restitution . . . depends upon, and is necessarily circumscribed by, statute." *United States v. Zangari*, 677 F.3d 86, 91 (2d Cir. 2012).  In this case, the government seeks restitution for Jane pursuant to 18 U.S.C. § 2429—the mandatory restitution provision for Mann Act violations—and 18 U.S.C. § 3663—the Victim and Witness Protection Act ("VWPA").  Because Stephanie and Sonja are not victims of the defendant's Mann Act convictions, the government seeks restitution for them pursuant to 18 U.S.C. § 3663 only.

Under 18 U.S.C. § 2429, a court "shall order" restitution to victims of Mann Act offenses in the "full amount of the victim's losses." 18 U.S.C. § 2429(a)–(b)(1).  For purposes of this statute, "victim" means "the individual harmed as a result of a crime under this chapter." *Id.* § 2429(d).  The "full amount of the victim's losses" is defined as:

> any costs incurred, or that are reasonably projected to be incurred in the future, by the victim, as a proximate result of the offenses involving the victim . . . including— (A) medical services relating to physical, psychiatric, or psychological care; (B) physical and occupational therapy or rehabilitation; (C) necessary transportation, temporary housing, and child care expenses; (D) lost income; (E) reasonable attorneys' fees, as well as other costs incurred; and (F) any other relevant losses incurred by the victim.

18 U.S.C. §§ 2429(b)(3), 2259(c)(2).

The VWPA provides that a court sentencing "a defendant convicted of [offenses under Title 18 and others], may order . . . that the defendant make restitution to any victim of such offense." 18 U.S.C. § 3663(a)(1)(A).  Although restitution under the VWPA is not mandatory, the Second Circuit instructs that the "purpose of section 3663 "is to require restitution whenever

4

possible." *United States v. Donaghy*, 570 F. Supp. 2d 411, 421 (E.D.N.Y. 2008) (quoting *United States v. Porter*, 41 F.3d 68, 70 (2d Cir. 1994)).  As relevant here, "in the case of an offense resulting in bodily injury to a victim," a court may require a defendant to:

> (A) pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment; (B) pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and (C) reimburse the victim for income lost by such victim as a result of such offense.

18 U.S.C. § 3663(b)(2).

A "victim" under the VWPA "means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." *Id*. § 3663(a)(2).  "Courts have noted that this definition, which was amended to its present form in 1990, is broad." *Donaghy*, 570 F. Supp. 2d at 420 (collecting cases).  Thus, section 3663(a)(2) authorizes a court "to order a participant in a conspiracy to pay restitution even on uncharged or acquitted counts," *id.* at 425 (citing *United States v. Boyd*, 222 F.3d 47, 51 (2d Cir. 2000)), and to "order restitution for any harm directly caused by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern, even though such conduct is not the specific conduct that is the basis of the offense of conviction." *Id.* at 425–26 (quoting *United States v. Kones*, 77 F.3d 66, 70 (3d Cir. 1996)).

In deciding whether to order restitution under the VWPA, "the district court must consider (1) the amount of the loss sustained by each victim as a result of the offense, (2) the financial resources of the defendant, (3) the financial needs and earning ability of the defendant and the defendant's dependents and (4) such other factors as the court deems appropriate." *Id.* at

421 (citing 18 U.S.C. § 3663(a)(1)(B)(i)(I)).  "While the district court need not make detailed factual findings on each factor, the record must demonstrate that the court considered the factors."  *United States v. Kinlock*, 174 F.3d 297, 300 (2d Cir. 1999) (citation omitted).

The government has the burden of proving the restitution amount, and "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence."  18 U.S.C. § 3664(e).  Although a restitution award "must be tied to the victim's actual, provable loss," *Zangari*, 677 F.3d at 91, a "reasonable estimate" of those losses is all that courts in this Circuit require.  *Donaghy*, 570 F. Supp. 2d at 423; *United States v. Tanner*, 942 F.3d 60, 67 (2d Cir. 2019) ("[T]he amount of restitution ordered must reflect a 'reasonable approximation of losses supported by a sound methodology.'" (quoting *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013))).  "[A] court must base its restitution award on more than mere speculation about a victim's actual losses," *Donaghy*, 570 F. Supp. 2d at 423, but absolute precision is not required, "especially in cases in which an exact dollar amount is inherently incalculable."  *Gushlak*, 728 F.3d at 196.  "Uncertainties with respect to the amount in question should be resolved in favor of the victim in accord with the statutory focus on making the victim whole."  *Donaghy*, 570 F. Supp. 2d at 423 (first citing *United States v. Boccagna*, 450 F.3d 107, 119 (2d Cir. 2006); then citing *United States v. Coriaty*, 300 F.3d 244, 253 (2d Cir. 2002)).  With these general principles in mind, the Court addresses the restitution amounts at issue here.

## II.    Amount of Restitution

### a.    Jane

The government requested three categories of restitution for Jane: (i) projected costs for herpes treatment, totaling $281,168.18; (ii) projected costs for therapy, totaling $19,500.00; and (iii) compensation for lost wages, totaling $56,550.00.  (ECF Nos. 307, 331, 337.)

#### i.    *Herpes Medical Expenses*

At the restitution hearing, I held that the defendant owed Jane $281,168.18 for medical expenses associated with genital herpes. The defendant made multiple objections, each of which I considered and found unpersuasive, as explained below.

First, the defendant argued that Jane is not entitled to mandatory restitution pursuant to 18 U.S.C. § 2429 because her losses do not necessarily result from the offenses of conviction. Although the defendant did not dispute that 18 U.S.C. § 2429 applies in theory to the Mann Act convictions, he argued that Jane is "not a 'victim' for the purpose of 18 U.S.C. § 2429," because a victim is defined as a person "harmed as a result of a [Mann Act] crime," 18 U.S.C. § 2429(d); according to the defendant, Jane cannot "connect her contraction of herpes" to the sexual encounters that formed the basis for the defendant's Mann Act convictions. (ECF No. 336 at 2–3.)

In the context of determining restitution under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, a court must (1) "identify the 'offense' of conviction" and (2) "ascertain whether the putative 'victim' was 'directly and proximately harmed' by the defendant's commission of that 'offense.'" *United States v. Goodrich*, 12 F.4th 219, 228 (2d Cir. 2021). "[R]estitution may be imposed only for losses arising from 'the specific conduct that is the basis of the offense of conviction.'" *Goodrich*, 12 F.4th at 228 (quoting *United States v. Vilar*, 729 F.3d 62, 97 (2d Cir. 2013)); *accord Gushlak*, 728 F.3d at 195 n.6.

Applying the same principles of causation to this case, I find that the defendant's Mann Act conduct is sufficiently connected to Jane's harm to mandate restitution under 18 U.S.C. § 2429. The defendant was charged in Racketeering Act 8 with Mann Act violations for transporting Jane and enticing or coercing her to travel with the intent to engage in sexual activity that exposed her to genital herpes, and in Racketeering Act 9 for having sexual contact

with Jane, who was a minor, in violation of state criminal law.  A jury convicted the defendant of

that conduct.  In my prior order on the defendant's Rule 29 motion for acquittal, I rejected the

claim—which is a version of the one that the defendant presses here—that there was insufficient

evidence that the defendant was "contagious, infected, or had the capacity to transmit herpes"

when he had sexual contact with Jane in 2015.  (ECF No. 318 at 67.)  On the contrary, the

evidence at trial established that the defendant willfully exposed Jane to herpes during the sexual

activity giving rise to his Mann Act violations.  Jane testified that she contracted herpes from the

defendant in the summer of 2015 after he had unprotected sexual contact with her.  (Trial Tr.

("T. Tr.") 844–53.)  A doctor thereafter diagnosed Jane with herpes and prescribed her

medication.  (T. Tr. 852.)  When the defendant told her that she "could have gotten that from

anyone," she responded that she had been "intimate" only with him.[6]  (T. Tr. 853.)  Not only did

the evidence at trial establish—as the jury reasonably concluded—that the defendant exposed

Jane to herpes when he had unprotected sex with her in 2015, the record also established by a

preponderance of the evidence that the defendant gave her herpes during the specific sexual

encounters in question.  Accordingly, I concluded that the government satisfied its burden in

showing that the defendant's Mann Act conduct is attributable to the harm for which Jane seeks

restitution.

      Even if the defendant were not subject to mandatory restitution under 18 U.S.C. § 2429,

he is liable to Jane for restitution under the VWPA, as I held at the September 28, 2022 hearing.

(Hr'g Tr. 14:18–15:2.)  "[I]n the case of an offense that involves as an element a scheme,

conspiracy, or pattern of criminal activity," a victim under the VWPA includes "any person

directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or

---

[6] Jane's medical records corroborated that the defendant was her only sexual partner.

pattern." 18 U.S.C. § 3663(a)(2).  Because the defendant was convicted of racketeering, which

requires among other things proof of a "pattern of racketeering activity," 18 U.S.C. § 1961(5),

the Court may look to the defendant's criminal conduct "in the course of" of that pattern as a

basis for restitution.  *See Donaghy*, 570 F. Supp. 2d at 426 (the VWPA "permits recovery for

conduct that was part of the applicable scheme, conspiracy, or pattern of conduct that is the

offense of conviction" and collecting cases); *cf. Goodrich*, 12 F.4th at 228 ("Where, as here, the

offense of conviction is a conspiracy, we look to the defendant's criminal conduct in the course

of that conspiracy as the basis for restitution." (internal quotation marks and citation omitted));

*Hatfield*, 2015 WL 13385926, at *11 ("[M]aking a victim whole . . . requires restitution for the

entirety of losses suffered at the hands of the conspiracy, not just those resulting from the

Offenses of Conviction." (citations omitted)).

The conduct at issue here—exposing Jane to genital herpes—was an act in furtherance of

the defendant's pattern of racketeering activity.  Racketeering Acts 8, 12 and 14 charged the

defendant with engaging in sexual activity that exposed victims to genital herpes.  Moreover, one

of the means and methods of the defendant's racketeering enterprise was "engaging in and

facilitating sexual activity without disclosing a sexually transmitted disease."  (ECF No. 43 ¶

9(a).)  Accordingly, even if restitution is not mandatory under 18 U.S.C. § 2429, Jane is entitled

to recover the losses associated with treating her genital herpes under the VWPA.

Second, the defendant challenged the government's calculation of Jane's losses as

speculative.  A court must order restitution in "the full amount of each victim's losses," 18

U.S.C. § 3664(f)(1)(A), which under 18 U.S.C. § 2429 includes "any costs incurred, or that are

reasonably projected to be incurred in the future, by the victim, as a proximate result of the

offenses involving the victim."  18 U.S.C. §§ 2429(b)(1), 2259(c)(2).  In calculating the

$281,168.18 estimate, the government estimated that Jane would spend approximately $5,255.48 on herpes-related medical expenses per year, which included the costs of drug treatment and an annual gynecological exam.  (ECF No. 307 at 4.)

Where, as here, "an exact dollar amount" cannot be calculated with precision, "a reasonable approximation will suffice."  *Gushlak*, 728 F.3d at 195–96 (internal quotation marks and citation omitted); *see also id.* at 196 ("[T]he preponderance standard must be applied in a practical, common-sense way.  So long as the basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution." (quoting *United States v. Savoie*, 985 F.2d 612, 617 (1st Cir. 1993); *United States v. Ageloff*, 809 F. Supp. 2d 89, 104 (E.D.N.Y. 2011) ("*A fortiori*, absolute precision is not required."), *aff'd sub nom*. *United States v. Catoggio*, 698 F.3d 64 (2d Cir. 2012).

Based on pricing estimates on a public website, the government estimated that without insurance,[7] Jane would spend approximately $421.29 per month for a 30-day, 500-mg supply of Valtrex, which is commonly used to treat genital herpes.  (ECF No. 307 at 4 (citing *Valtrex Prices, Coupons and Patient Assistance Programs*, DRUGS.COM, https://www.drugs.com/price-guide/valtrex (last visited Nov. 1, 2022)).)  The government further estimated that each annual gynecologist appointment would cost approximately $200.  (*Id.*)  The government multiplied the annual loss amount by 53.5 years, assuming that the average life expectancy for a woman in the United States is 82 years.  (*Id.*)[8]  While the government's estimates are not especially precise or extremely detailed, they are reasonable calculations of Jane's medical expenses, based upon

---

[7] The government submits that Jane does not have medical insurance.  (ECF No. 331 at 3.)

[8] In support of the life expectancy figure, the government cites a 2019 report from Centers for Disease Control and Prevention ("CDC").  *See* Elizabeth Arias, Ph.D *et al.*, *U.S. State Life Tables, 2019*, National Vital Statistics Report Vol. 70 No. 18 at 3, https://www.cdc.gov/nchs/data/nvsr/nvsr70/nvsr70-18.pdf.

reasonable, common-sense assumptions.  *Gushlak*, 728 F.3d at 196 (restitution need only be a "reasonable approximation of losses supported by a sound methodology").

The defendant's arguments to the contrary are unpersuasive.  He claims that the amount is conjectural because the government has not demonstrated that Jane will follow a "suppressive treatment" regimen and therefore require a 12-month, 30-day supply of Valtrex.  (ECF No. 336 at 3–4.)  While restitution may not "allow a victim to recover more than [her] due," it is designed "to make victims of crime whole, to fully compensate [] victims for their losses and to restore these victims to their original state of well-being."  *United States v. Qurashi*, 634 F.3d 699, 703 (2d Cir. 2011) (internal quotation marks, citation and alterations omitted).  To that end, restitution must compensate the victim for the "full amount" of her loss.  18 U.S.C. § 3664(f)(1)(A).  Although it cannot be established conclusively that Jane will require suppressive treatment for the duration of her life, "[u]ncertainties with respect to the amount in question should be resolved in favor of the victim in accord with the statutory focus on making the victim whole."  *Donaghy*, 570 F. Supp. 2d at 423.  Thus, Jane is entitled to be compensated for the full scope of her potential treatment, which fairly includes the monthly 30-day regimen proposed by the government.

Citing the cost disparity between Valtrex and its generic version, valacyclovir, the defendant also argues that the government's estimates of Jane's medication expenses are "inflated."  (ECF No. 336 at 4.)  The defendant contends that awarding Jane restitution for the cost of Valtrex would result in a "windfall" because she will have received money "for a drug she may not ever take and can actually obtain" at a lower cost.  (ECF No. 342 at 3–4.)  While the defendant is correct that restitution should not give victims an impermissible windfall, *United States v. Maynard*, 743 F.3d 374, 379–80 (2d Cir. 2014), the circumstances of this case do not

establish that covering Jane's costs for a non-generic drug would be a windfall.  In *Maynard*, the Second Circuit found that the district court's restitution order created a windfall for the victim— a bank that had been robbed—because the restitution included employees' salaries, which the bank would have had to pay regardless of the robbery.  *Id.* ("[G]iven the goal of restoring victims to their original state of well-being, we need to take into account that the bank would have paid the regular staff in any event." (internal quotation marks and citation omitted)).  Jane, in contrast, would not have had to spend money on herpes medication had the defendant not infected her with the incurable disease when she was 17 years old.  The defendant cites no legal authority— and the Court is aware of none—supporting the notion that a victim, when faced with two reasonable courses of treatment, must pursue the cheapest option to minimize a defendant's restitution expenses.[9]

For these reasons, Jane is entitled to an award of $281,168.18 under 18 U.S.C. § 2429, or alternatively, under 18 U.S.C. § 3663.

     ii.    *Psychological Treatment Expenses*

---

[9] The defendant argues that the so-called "arguable windfall of money that is *not* an actual cost that Jane has incurred created *Brady* obligations for the government."  (ECF No. 342.)  The defendant cites no case law for the proposition that the government has an obligation to alert a defendant that in the event of a conviction it might seek restitution to cover a victim's use of brand name medications when a generic version is available.  Under *Brady v. Maryland*, 373 U.S. 83 (1963), the government has a continuing obligation to disclose "evidence that is both favorable to the accused and 'material either to guilt or to punishment.'"  *United States v. Bagley*, 473 U.S. 667, 674 (1985) (quoting *Brady*, 373 U.S. at 87).  A defendant claiming a *Brady* violation "must show that: (1) the government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice."  *United States v. Kirk Tang Yuk*, 885 F.3d 57, 86 (2d Cir. 2018) (internal quotation marks and citation omitted).  The difference between the price of Valtrex and the generic version is not exculpatory, and the government did not "suppress" the information since the calculations are based on publicly available pricing information.  *United States v. Barcelo*, 628 F. App'x 36, 39 (2d. Cir. 2015) (summary order) (evidence is not "suppressed" if the defendant "'either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.'" (quoting *DiSimone v. Phillips*, 461 F.3d 181, 197 (2d Cir. 2006))).

The government also sought $19,500 restitution to cover her projected expenses of psychological treatment for three and three-quarters years.  (ECF No. 307 at 4.)  The government calculated this loss by estimating that Jane would require therapy for "approximately the time-period over which the defendant abused her (i.e., the time period between September 2015 and July 2019)," *id.*, though the government submitted that its estimate was "likely well below the actual amount of therapy that Jane will need as a direct result of the defendant's conduct."  (ECF No. 331 at 2–3.)  The government estimated that a weekly therapy session would cost approximately $100, citing a public blog that states "[i]n most areas of the country, a person can expect to pay $100-$200 per session" for therapy.  (*Id.* at 3 (citing *How Much Does Therapy Cost?*, https://www.goodtherapy.org/blog/faq/how-much-does-therapy-cost (last visited Nov. 2, 2022)).)

Under 18 U.S.C. § 2429, a court must compensate a victim for losses, including "medical services . . . relating to psychological care," that are "reasonably projected to be incurred in the future . . . as a proximate result of the offenses involving the victim."  18 U.S.C. §§ 2429(b)(3), 2259(c)(2).  The Second Circuit has held that this language includes restitution for estimated future medical expenses, such as counseling.  *United States v. Pearson*, 570 F.3d 480, 486 (2d Cir. 2009) (noting that restitution for future medical expenses is properly awarded where the loss amount can be projected with "reasonable certainty," though an award may be "inappropriate where the loss amount is too difficult to confirm or calculate" (internal quotation marks, citations alterations omitted)).

In considering whether the government established by a preponderance of the evidence that slightly less than four years of mental health treatment was warranted, I reviewed the trial evidence, which established that the defendant subjected Jane to sexual and physical assaults, as

well as psychological abuse, beginning when she was only 17, including during the 2015 encounters that formed the basis for the Mann Act convictions.[10]  Given the extent and nature of the harm the defendant inflicted on Jane, the government's request for $19,500 to cover a limited period of therapy is conservative.  The record establishes by a preponderance of the evidence that the government's calculation is a reasonable prediction of Jane's loss and is grounded in a sound methodology.[11]

### iii.   Lost Income

Pursuant to 18 U.S.C. § 3663, the government sought $56,550 in restitution to Jane, for lost income for three and three-quarters years.  (ECF No. 307 at 4-5.)  I denied the government's request.  (Hr'g Tr. 21:15–22:5.)

The VWPA provides that a court "may require" restitution for "lost income . . . as a result of [an] offense," if the offense "result[ed] in bodily injury to a victim."  18 U.S.C. § 3663(b)(2)(C).  "[A] restitution award, whether for lost income or otherwise, cannot be based on mere speculation."  *United States v. Messina*, 806 F.3d 55, 69 (2d Cir. 2015).  Although the defendant harmed Jane, both physically and psychologically as part of the racketeering conduct, the government did not show by a preponderance of the evidence that Jane was unemployed as a result of the defendant's conduct.

### b.   Stephanie

The government requested restitution to Stephanie for past and future expenses relating to her genital herpes treatment, and for past therapy costs.  (ECF Nos. 307, 331, 337, 338, 341.)  At

---

[10] The Court's decision on the defendant's post-trial motions includes a more detailed description of the extensive abuse which the defendant inflicted on Jane.  (*See* ECF No. 318 at 23–27.)

[11] The defendant challenges the government's estimate of $100 per session, because another victim, Stephanie, paid $75 per session.  But as explained above in connection with Jane's medication expenses, the Court is aware of no authority requiring a victim to follow a less expensive course of treatment in order to minimize a defendant's restitution obligations.

the September 28, 2022 restitution hearing, I awarded Stephanie $8,400 for past therapy costs, but reserved a decision on the cost of Stephanie's herpes treatment, pending the government's recalculation.

      i.  *Herpes Medical Expenses*

   In a supplemental filing dated October 5, 2022, the government now seeks $45,587.20 in restitution for Stephanie's herpes treatment expenses.  (ECF No. 341 at 1–2.)

   Before considering the propriety of the government's calculations, I first address the arguments that the defendant made before the restitution hearing.  The defendant argued that Stephanie was not eligible for restitution under the VWPA, because she could not show that she contracted genital herpes from the defendant or during the specific conduct underlying Racketeering Act 2.  (ECF No. 336 at 6–7.)  According to the defendant, his negative herpes test in June 2000, as well as trial testimony from his doctor saying that he did not diagnose the defendant with herpes until 2000, contradicts Stephanie's assertion that she contracted herpes from the defendant in 1999.  (T. Tr. 404–07; GX 237.)  But Dr. McGrath also testified that "[y]ou don't always get a positive culture" even when there is a herpes infection, and that the defendant's negative test in June 2000 "was not conclusive;" Dr. McGrath "could not conclude that [the defendant] did not have herpes" based on the test, and "had to follow the clinical course to see if [the defendant] called or reported any more future bumps or penis lesions."  (T. Tr. 404–05.)  Thus, the fact that the defendant's test was negative does not mean that the defendant did not give Stephanie herpes in 1999, particularly in light of the circumstantial evidence to the contrary.  Stephanie testified that she first had sex with the defendant when she was 17 years old, and that their sexual relationship that lasted for six months.  (T. Tr. 1633–34.)  According to the 3500 material, Stephanie told government investigators that she was diagnosed with genital herpes when she was 17 years old, after months of unprotected sex with the defendant.  (3500-

SW at 3.)  She also told them that she was not having sex with anyone else at the time.  (*Id.*)  On this record, there is sufficient evidence that Stephanie contracted genital herpes from the defendant in 1999.

The defendant also argued that Stephanie's genital herpes is not attributable to the defendant's offense of conviction, because the government did not establish that Stephanie contracted herpes during the specific incidents of sexual exploitation of a child charged in Racketeering Act 2.  (ECF No. 336 at 6–7; ECF No. 43 ¶ 14.)  Racketeering Act 2 charged the defendant with sexual exploitation of a child for engaging in sexually explicit conduct for the purpose of producing one or more visual depictions of that conduct.  18 U.S.C. § 2251(a).  The preponderance of the evidence shows that Stephanie's infection was the direct and foreseeable result of the defendant's pattern of racketeering in Count 1, which included precisely this kind of conduct.  (ECF No. 43 ¶ 9(a) (racketeering enterprise means and methods included "engaging in and facilitating sexual activity without disclosing a sexually transmitted disease"); *Donaghy*, 570 F. Supp. 2d at 426 (the VWPA "permits recovery for conduct that was part of the applicable scheme, conspiracy, or pattern of conduct that is the offense of conviction" and collecting cases).

Regarding the amount to which Stephanie is entitled, the government based its requests on the following calculations and assumptions.  Prior to August 2016, Stephanie did not have health insurance and estimated that she used prescription medication approximately eight to ten times a year to treat genital herpes.  (ECF No. 331 at 4.)  After she became insured, she started taking valacyclovir on a daily basis.  (*Id.*)  According to the government, Stephanie pays an out-of-pocket cost of $35.74 for the monthly valacyclovir prescription, as a receipt dated September 8, 2022 shows.  (*Id.* at 3.)

Because the government's calculations for Stephanie's pre-2016 expenses assumed that she was taking Valtrex, I directed the government to revisit its calculations, given the exhibit which showed that she was prescribed valacyclovir. (Hr'g Tr. 28:7–25.) The government adjusted its calculations, estimating that from 2007 to 2015 Stephanie spent $15.31[12] on a monthly prescription of valacyclovir approximately eight times a year. (ECF No. 341 at 2.) But because, as the government claims, valacyclovir did not become available on the market until 2007,[13] the government assumes that Stephanie used Valtrex from 2000 to 2007, at a cost of $421.29. (*Id*.)[14] Based on these assumptions, the government estimates that Stephanie incurred a loss of $50,638.80 between 2000 and 2015; and a loss of $19,942.92 from 2016 onward.[15] (ECF No. 338.)

Given the passage of time, Stephanie's past and future expenses cannot be calculated with certainty, but as explained above, "absolute precision is not required." *Ageloff*, 809 F. Supp. 2d at 104. The government relied on similar assumptions and sources of public information in calculating Jane's loss amount. The government has shown by a preponderance of the evidence a reasonable estimate of Stephanie's loss that is grounded in a sound

---

[12] The same website on which the government relies to approximate cost of Valtrex provides that a 30-day supply of 500-mg valacyclovir ranges from $15.31 to $60.04 in cost without insurance. *See Valacyclovir Prices, Coupons and Patient Assistance Programs*, DRUGS.COM, https://www.drugs.com/price-guide/valacyclovir (last visited Nov. 2, 2022). In calculating Stephanie's loss between 2007 and 2015, the government opted to use "the bottom end of the range of generic out-of-pocket medication expenses." (ECF No. 341 at 2.)

[13] For this proposition, the government cites *Generic Valtrex Availability*, DRUGS.COM, https://www.drugs.com/availability/generic-valtrex.html (last visited Nov. 2, 2022), which states that the generic version of Valtrex was first approved in 2007.

[14] As I held above in ordering restitution to Jane, the $421.29 figure proposed by the government is a reasonable estimate of the cost of a 30-day supply of 500-mg Valtrex without insurance.

[15] The government's estimation of Stephanie's future expenses is tethered to the same average life expectancy figure, 82 years, that the government relied on for estimating Jane's future expenses, *see infra*.

methodology.  *See Gushlak*, 728 F.3d at 195–96 ("So long as the basis for reasonable

approximation is at hand, difficulties in achieving exact measurements will not preclude a trial

court from ordering restitution." (internal quotation marks and citation omitted)).  Accordingly,

Stephanie is entitled to $70,581.72 pursuant to 18 U.S.C. § 3663.

> ii.     *Psychological Treatment Expenses*

The government also sought $8,400.00 in restitution for Stephanie's past therapy costs.

(ECF No. 331 at 4.)  The government calculated this amount based on Stephanie's

representations that she went to therapy weekly for one year, and approximately 20 to 25 times

for three years at a cost of $75 per session.  (*Id.*)  In determining whether to order restitution

under the statute, I considered the factors under 18 U.S.C. § 3663(a)(1)(B)(i) as outlined above.

These are reasonable estimates of Stephanie's loss.  Although it is true that her

relationship with the defendant lasted for only six months, therapy was warranted in view of the

nature and extent of the defendant's abuse, which included humiliating and degrading conduct

when she was only 17.  The absence of receipts or invoices is not determinative; a preponderance

of the evidence establishes that the calculations are reasonable approximations of her loss.  *See

Gushlak*, 728 F.3d at 195–96.

Accordingly, the Court ordered the defendant to pay Stephanie $8,400.00 as

compensation for past therapy costs pursuant to 18 U.S.C. § 3663.

**c.     Sonja**

Pursuant to 18 U.S.C. § 3663, the government requested $5,200.00 in restitution to Sonja

for future therapy costs for one year.  (ECF No. 307 at 6; ECF No. 337 at 4.)

The jury found that Racketeering Acts 3 and 4—which charged the defendant with

kidnapping and Mann Act offenses against Sonja—were not proven.  The statute permits

recovery even on uncharged or acquitted conduct if the conduct is part of the scheme, conspiracy, or pattern of criminal conduct that was an element of the offense of conviction.  *See Boyd*, 222 F.3d 47, 50–51 (2d Cir. 2000).  While estimates may be appropriate, "a court must base its restitution award on more than mere speculation about a victim's actual losses." *Donaghy*, 570 F. Supp. 2d at 423.  The government has not cited other evidence in support of its request, beyond the defendant's conduct in Racketeering Acts 3 and 4, which a jury found was not proven.  On this record, I concluded that the government's request was too speculative to demonstrate "actual losses" by a preponderance of the evidence.  Accordingly, I did not order restitution to Sonja under the VWPA.

## III.    The Defendant's Ability to Pay

18 U.S.C. § 3663 requires a court imposing restitution under the VWPA to consider "the amount of the loss sustained by each victim," as well as the "the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate."  18 U.S.C. § 3663(a)(1)(B)(i).  "Although the financial resources of the defendant are one of the mandatory section 3663(a) considerations, even a defendant with no present ability to pay can still be ordered to do so pursuant to section 3663."  *Donaghy*, 570 F. Supp. 2d at 421–22.  The defendant has the burden of demonstrating his "financial resources."  18 U.S.C. § 3664(e).  Thus, "in the absence of a defendant showing a restricted future earnings potential by a preponderance of the evidence, it is entirely reasonable for a district judge to presume future earnings in ordering restitution."  *Donaghy*, 570 F. Supp. 2d at 422 (quoting *United States v. Ben Zvi*, 242 F.3d 89, 100 (2d Cir. 2001); *cf. Kinlock*, 174 F.3d at 301 (2d Cir. 1999) (restitution order requiring immediate payment was improper, where the defendant's "financial information indicated he has no assets").

The defendant submitted an affidavit to the Probation Department in which he described his financial resources, portions of which are incorporated in the presentence report (the "PSR"). (ECF No. 284 ¶ 280.)  According to the PSR, the defendant has "no bank accounts, securities (stocks/bonds), property, or life insurance," but "believes he is owed hundreds of millions of dollars" based on a contract dispute with Sony.  (*Id.* ¶ 281.)  He reports that there are two pending civil default judgments against him, totaling more than $7 million, which offset any royalty income he receives from his music.  (*Id.* ¶¶ 281–83.)  The PSR also notes that there are liens against the defendant, and that he owes debts, including for child support.  (*Id.* ¶¶ 282, 284.)  A PSR addendum reports that one of the defendant's sources of income has generated around $4.3 million for Sony between January 1, 2018 and December 31, 2021, but that the money is subject to a default judgment, and thus the defendant has not received the amounts from Sony.  (ECF No. 305 ¶ 281B.)  Another addendum to the PSR states that some of the defendant's royalties are periodically deposited into a bank account called "Somebrotherluv LLC," operated by one of the defendant's associates.  (ECF No. 299 ¶ 281.)[16]  Between April 2019 and January 2020, there were four deposits into this bank account totaling more than $1.3 million.  (*Id.*)  It is unclear if these amounts are encumbered by the default judgments.

There is a dispute between the parties about the defendant's access to $5 million under a contract between a company called Music Royalty Consulting Inc. ("MRCI") and the defendant's friend, Keith Albert.  (*See* ECF Nos. 341, 342.)  At sentencing, the government represented that "the defendant has not received the money pursuant to that contract, and we

---

[16] At sentencing, defense counsel said she did not understand there to be another source of royalty income.  (*See* June 29, 2022 Sentencing Tr. ("S. Tr.") 33:12-17 ("[The government is] suggesting that there are two [] contracts that Sony is paying out on royalties and there's this separate source of money. That is not my understanding and I don't know again where the U.S. attorney[] is getting this understanding that it's separate sources of money.").)

provided a copy of that to the defendant, but he's entitled to receive it." (S. Tr. 29–30.)  In a supplemental letter, the government advised that the "agreement was subject to various conditions, including diligence conditions, that the government understands from conversations with counsel to MRCI have yet to be met, and accordingly the funds have not been paid. However, the agreement remains in force, and should the conditions be met in the future, the defendant, via Calbert, would be paid a substantial sum." (ECF No. 341 at 2.)  The defendant maintains that he has not received the $5 million and "is not due to receive [it] from MRCI" because he never signed the paperwork, and therefore the agreement is not enforceable.  (ECF No. 342 at 2–3.)

Although the defendant may not have current access to the Sony royalty income, or to the $5 million from the MRCI contract, the record before me reflects that the defendant "has a reasonable potential for future earnings." *Donaghy*, 570 F. Supp. 2d at 422.  Despite the two civil judgments against the defendant and the existence of the liens, the record shows that the defendant's copyrights are generating significant royalties at a pace that will eventually exceed the judgments and liabilities against him.  Moreover, the earnings in the "Somebrotherluv" bank account and the fact that the defendant recently accumulated $28,328 in his inmate trust account suggest that his present ability to pay is greater than he claims.[17]  Under these circumstances, the defendant has not shown, as he must, "a restricted earnings potential by a preponderance of the evidence." *Id*.

Nor has the defendant identified a sufficient basis for modifying the $100,000 fine.  The defendant claims that he does not have access to the $5 million, and that the government's

---

[17] In an order dated September 9, 2022, I granted the government's application requiring the Bureau of Prisons to turn over $27,828.24 of the funds in the defendant's account to the Clerk of Court, pending a determination on restitution.  (ECF No. 330.)

representations at sentencing were inaccurate.  (ECF No. 342 at 1–3.)  Section 5E1.2(a) of the

U.S. Sentencing Guidelines provides that "[t]he court shall impose a fine in all cases, except

where the defendant establishes that he is unable to pay and is not likely to become able to pay

any fine."  A court is not required to make "explicit findings . . . concerning the defendant's

ability to pay the fine," and the defendant bears the burden of proving an inability to pay.  *United

States v. Tocco*, 135 F.3d 116, 133 (2d Cir. 1998) (citations omitted).  The defendant has not

carried this burden.  In view of his substantial royalty income, which demonstrates a reasonable

likelihood of future income, I would have imposed a $100,000 fine regardless of whether the

defendant stood to gain $5 million from MRCI.

## IV.    Payment Schedule

A court ordering restitution must "specify in the restitution order the manner in which,

and the schedule according to which, the restitution is to be paid, in consideration of . . . (A) the

financial resources and other assets of the defendant, including whether any of these assets are

jointly controlled; (B) projected earnings and other income of the defendant; and (C) any

financial obligations of the defendant, including obligations to dependents."  18 U.S.C. §

3664(f)(2).  "While the restitution ordered should be for the full amount of the victim's loss, the

court will consider the defendants' financial circumstances when deciding whether payment of

any restitution should be by lump-sum or pursuant to a payment schedule."  *United States v.

Agate*, No. 08-CR-76, 2008 WL 4449637, at *2 (E.D.N.Y. Oct. 2, 2008) (citing *United States v.

Gurung*, 58 F. App'x 871, 873–74 (2d Cir. 2003)).

Under the government's proposed payment schedule, the defendant's restitution

obligation is due and payable immediately at a rate of 25 percent of his gross monthly income

while he is incarcerated, and 25 percent of his gross monthly income upon release.  (ECF No.

341 at 3.)  The government's schedule would further require the defendant to file annual sworn statements providing information about his assets and income.  (*Id.*)  The defendant objects to the schedule, maintaining that the government "overstates Mr. Kelly's future financial prospects" and that "Mr. Kelly has zero ability to provide annual financial affidavits."  (ECF No. 342 at 4.)  The defendant does not, however, propose an alternative schedule.  (*Id.*)

I have considered the defendant's financial condition, including his present circumstances, the judgment and liens against him, and his future earning potential from his royalties, and find that the defendant has not shown by a preponderance of the evidence that he will be unable to pay restitution in the future.  *See Kinlock*, 174 F.3d at 301 ("While we recognize the difficulty the district court may encounter in fashioning a precise dollar amount for the period of incarceration, a payment schedule expressed as a percentage of the defendant's monthly income while incarcerated, e.g. 10% of monthly income, is satisfactory.").  In light of the sustained royalty income as demonstrated by information in the PSR, I also find that it is appropriate to require the defendant to submit annual affidavits.[18]

## CONCLUSION

For these reasons, the defendant is ordered pay restitution to Jane in the amount of $300,668.18 and to Stephanie in the amount of $78,981.72 in accordance with the payment schedule in the government's proposed orders, which the Court modifies to reflect these sums.

---

[18] A defendant must "notify the court and the Attorney General of any material change in [his] economic circumstances that might affect [his] ability to pay restitution. The court may also accept notification of a material change in the defendant's economic circumstances from the United States or from the victim."  18 U.S.C. § 3664(k).  Once a court receives notice, "the court may, on its own motion, or the motion of any party, including the victim, adjust the payment schedule, or require immediate payment in full, as the interests of justice require."  *Id.*

As the Court previously ordered, the $27,828.24 seized from the defendant's inmate trust account is to be applied first to the defendant's $900 special assessment and then to the restitution amounts.  18 U.S.C. § 3612(c).

The Court will enter an amended judgment consistent with this order.  The Court has filed this decision and the accompanying orders under seal.  Because they contain references to the victims' names, the government is directed to email chambers with proposed redactions in accordance with the Court's order by November 21, 2022.  A public, redacted version of this opinion will be posted once the appropriate redactions have been determined.

**SO ORDERED.**

s/Ann M. Donnelly
_____
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
      November 8, 2022

AO 245C (Rev. 10-13-21)   Amended Judgment in a Criminal Case                    (NOTE: Identify Changes with Asterisks (*))
Sheet 1

# UNITED STATES DISTRICT COURT

Eastern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>**v.**<br><br>ROBERT SYLVESTER KELLY | )   **AMENDED JUDGMENT IN A CRIMINAL CASE**<br>)<br>)   Case Number:   1:19-cr-00286-AMD-1<br>)   USM Number:   09627-035 |

**Date of Original Judgment:**   6/30/2022       )   Jennifer Ann Bonjean - Retained
             *(Or Date of Last Amended Judgment)*   )   Defendant's Attorney

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
     which was accepted by the court.

☑ was found guilty on count(s)   1 sss,2sss,3sss,4sss,5sss,6sss,7sss,8sss, and 9sss
     after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| **Title & Section** | **Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|---|
| 18 U.S.C . §§ 1962(c)<br>and 1963 | Racketeering | 6/30/2019 | 1 |
| 18 U.S.C . § 2421(a) | Mann Act Transportation - Jane Doe Five | 10/30/2015 | 2 |

     The defendant is sentenced as provided in pages 2 through ___8___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

     It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

                                      6/29/2022
                                 Date of Imposition of Judgment

                                 s/Ann M. Donnelly

                                 Signature of Judge

                                 Ann M. Donnelly,          U.S. District Judge
                                 Name and Title of Judge

                                 December 7, 2022
                                 Date

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 1A

(NOTE: Identify Changes with Asterisks (*))

Judgment — Page __2__ of __8__

DEFENDANT:  ROBERT SYLVESTER KELLY
CASE NUMBER:  1:19-cr-00286-AMD-1

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 2422(a) | Mann Act Coercion and Enticement - Jane Doe Five | 10/30/2015 | 3 |
| 18 U.S.C. § 2422(b) | Mann Act Coercion of Minor - Jane Doe Five | 10/30/2015 | 4 |
| 18 U.S.C. § 2423(a) | Mann Act Transportation of Minor - Jane Doe Fi | 10/30/2015 | 5 |
| 18 U .S.C. § 2421 (a) | Mann Act Transportation - Jane Doe Six | 5/18/2017 | 6 |
| 18 U.S.C . § 2422(a) | Mann Act Coercion and Enticement - Jane Doe Six | 5/18/2017 | 7 |
| 18 U .S.C. § 2421 (a) | Mann Act Transportation - Jane Doe Six | 2/2/2018 | 8 |
| 18 U.S.C. § 2422(a) | Mann Act Coercion and Enticement - Jane Doe Six | 2/2/2018 | 9 |

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 2 — Imprisonment

(NOTE: Identify Changes with Asterisks (*))

Judgment — Page __3__ of __8__

DEFENDANT:  ROBERT SYLVESTER KELLY
CASE NUMBER:  1:19-cr-00286-AMD-1

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of :

Three hundred and sixty months (360) on count 1; Ten (10) years on counts 2, 6, and 8; Twenty (20) years on counts 3, 4, 5, 7, and 9. All counts to run concurrently

☐ The court makes the following recommendations to the Bureau of Prisons:

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m.  on _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 3 — Supervised Release

(NOTE: Identify Changes with Asterisks (*))

Judgment—Page __4__ of __8__

DEFENDANT:  ROBERT SYLVESTER KELLY
CASE NUMBER:  1:19-cr-00286-AMD-1

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :

Five (5) years.

# MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   - ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. § 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page ___5___ of ___8___

DEFENDANT:   ROBERT SYLVESTER KELLY
CASE NUMBER:   1:19-cr-00286-AMD-1

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines based on your criminal record, personal history and characteristics, and the nature and circumstances of your offense, you pose a risk to another person (including an organization), the probation officer, with prior approval of the Court, may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk..
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____   Date _____

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 3D — Supervised Release                                                (NOTE: Identify Changes with Asterisks (*))

|  |  |  |  |
|---|---|---|---|
| Judgment—Page | **6** | of | **8** |

DEFENDANT:  ROBERT SYLVESTER KELLY
CASE NUMBER:  1:19-cr-00286-AMD-1

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall comply with any applicable by the probation officer, the Bureau of Prisons, or any state offender registration agency in the state where he resides, works, or is a student.

2. The defendant shall participate in a mental health treatment program, which may include participation in a treatment program for sexual disorders. as approved by the U.S. Probation Department. The defendant shall contribute to the cost of such services rendered and/or any psychotropic medications prescribed to the degree he is reasonably able, and shall cooperate in securing any applicable third-party payment. The defendant shall disclose all financial information and documents to the Probation Department to assess his ability to pay. As part of the treatment program for sexual disorders, the defendant shall participate in polygraph examinations and/or visual response testing to obtain information necessary for risk management and correctional treatment.

3. The defendant shall not associate with or have any contact with convicted sex offenders unless in a therapeutic setting and with the permission of the U.S. Probation Department.

4. The defendant shall not associate with children under the age of 18, unless a responsible adult is present, and he has prior approval from the Probation Department. Prior approval does not apply to contacts which are not known in advance by the defendant where children are accompanied by a parent or guardian or for incidental contacts in a public setting. Any such non-pre-approved contacts with children must be reported to the Probation Department as soon as practicable, but no later than 12 hours. Upon commencing supervision, the defendant shall provide to the Probation Department the identity and contact information regarding any family members or friends with children under the age of 18, whom the defendant expects to have routine contact with, so that the parents or guardians of these children may be contacted and the Probation Department can approve routine family and social interactions such as holidays and other family gatherings where such children are present and supervised by parents or guardians without individual approval of each event.

5. If the defendant cohabitates with an individual who has minor children, the defendant will inform that other party of his prior criminal history concerning his sex offense. Moreover, he will notify the party of his prohibition of associating with any child(ren) under the age of 18 , unless a responsible adult is present.

6. The defendant shall report to the Probation Department any and all electronic communications service accounts [as defined in 18 U.S.C. § 2510(15)] used for user communications, dissemination and/or storage of digital media files (i.e. audio, video, images). This includes, but is not limited to, email accounts, social media accounts, and cloud storage accounts. The defendant shall provide each account identifier and password, and shall report the creation of new accounts, changes in identifiers and/or passwords, transfer, suspension and/or deletion of any account within 5 days of such action. Failure to provide accurate account information may be grounds for revocation of release. The defendant shall permit the Probation Department to access and search any account(s) using the defendant's credentials pursuant to this condition only when reasonable suspicion exists that the defendant has violated a condition of his supervision and that the account(s) to be searched contains evidence of this violation. Failure to such a search may be grounds for revocation of release.

7. The defendant shall submit his person , property, house, residence, vehicle, papers, computers (as defined in 18 U .S.C . § 1030(e)(l)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer. Failure to submit to a search may be grounds for revocation of release. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer may

conduct a search pursuant to this condition only when reasonable suspicion exists that the defendant has violated a condition of his supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

8. The defendant is not to use a computer, Internet capable device, or similar electronic device to access any "visual depiction" (as defined in 18 U.S.C. § 2256), including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of"sexually explicit conduct" (as defined in 18 U.S.C. § 2256). The defendant shall also not use a computer, Internet capable device or similar electronic device to view images of naked children. The defendant shall not use his computer to view sexually explicit conduct or visual depictions of naked children stored on related computer media, such as CDs or DVDs, and shall not communicate via his computer with any individual or group who promotes the sexual abuse of children. The defendant shall cooperate with the United States Probation Office's Computer and Internet Management/Monitoring ("CIMP") program . Cooperation shall include, but not be limited to, identifying computer systems (as defined in 18 U.S.C. § l 030(e)( 1 )), Internet-capable devices, and/or any electronic media capable of data storage the defendant has access to , allowing an initial examination of the device(s), and installation of monitoring software/hardware on the device(s), at the defendant's expense. The monitoring software/hardware is authorized to capture and analyze all data processed by and/or contained on the device, including the geolocation of the device. The Probation Office may access the device and /or data captured by the monitoring software/hardware at any time with or without suspicion that the defendant has violated the conditions of supervision. The defendant may be limited to possessing only one personal Internet capable device, to facilitate the Probation Office's ability to effectively manage and monitor the device. The defendant shall also permit seizure and removal of computer systems, Internet-capable

devices, and any electronic media capable of data storage for further analysis by law enforcement or the Probation Office based upon reasonable suspicion that a violation of a condition of supervision or unlawful conduct by the defendant has or is about to occur. Failure to comply with the monitoring, seizure and/or search of any computer systems, Internet-capable devices, and any electronic media capable of data storage may result in adverse action such as sanctions and/or revocation. The defendant shall inform all parties that access a monitored device, that the device is subject to search and monitoring.

9. The defendant shall refrain from contacting the victims of the offense. This means that he shall not attempt to meet in person, communicate by letter, telephone,email. the Internet, or through a third party, without the knowledge and permission of the Probation Department.

I 0 . Upon request, the defendant shall provide the U .S. Probation Department with full disclosure of his financial records, including co-mingled income, expenses, assets and liabilities, to include yearly income tax returns. With the exception of the financial accounts repo1ted and noted within the presentence report, the defendant is prohibited from maintaining and/or opening any additional individual and /or joint checking, savings, or other financial accounts, for either personal or business purposes, without knowledge and approval of the U.S. Probation Department. The defendant shall cooperate with the Probation Officer in the investigation of their financial dealings and shall provide truthful monthly statements of their income and expenses. The defendant shall cooperate in the signing of any necessary authorization to release information forms permitting the U.S. Probation Department access to their financial information and records.

11. The defendant shall comply with any possible restitution orders.

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
    Sheet 5 — Criminal Monetary Penalties                               (NOTE: Identify Changes with Asterisks (*))

| | Judgment — Page 7 of 8 |
|---|---|

DEFENDANT:  ROBERT SYLVESTER KELLY
CASE NUMBER:  1:19-cr-00286-AMD-1

## CRIMINAL MONETARY PENALTIES

    The defendant must pay the following total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $ 900.00 | $ 379,649.90 | $ 100,000.00 | $ | $ 40,000.00 |

☐   The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐   The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

    If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Jane | | $300,668.18 | |
| Stephanie | | $78,981.72 | |

| TOTALS | $ 0.00 | $ 379,649.90 |
|---|---|---|

☐   Restitution amount ordered pursuant to plea agreement  $ _____

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐   The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

    ☐   the interest requirement is waived for   ☐  fine   ☐  restitution.

    ☐   the interest requirement for the   ☐  fine   ☐  restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245C (Rev. 09/19)  Amended Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

(NOTE: Identify Changes with Asterisks (*))

| | Judgment — Page | 8 | of | 8 |

DEFENDANT:  ROBERT SYLVESTER KELLY
CASE NUMBER:  1:19-cr-00286-AMD-1

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A  ☑ Lump sum payment of $ __900.00__ due immediately, balance due

     ☐ not later than _____ , or
     ☐ in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

B  ☐ Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C  ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E  ☐ Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

Case Number
Defendant and Co-Defendant Names
*(including defendant number)*      Total Amount      Joint and Several
Amount      Corresponding Payee,
if appropriate.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

§ 120290. Willful exposure of self or others to disease; offense, CA HLTH & S § 120290

---

West's Annotated California Codes
    Health and Safety Code (Refs & Annos)
        Division 105. Communicable Disease Prevention and Control (Refs & Annos)
            Part 1. Administration of Communicable Disease Prevention and Control (Refs & Annos)
                Chapter 4. Violations (Refs & Annos)

This section has been updated. Click here for the updated version.

West's Ann.Cal.Health & Safety Code § 120290

§ 120290. Willful exposure of self or others to disease; offense

Effective: [See Text Amendments] to May 26, 2016

Except as provided in Section 120291 or in the case of the removal of an afflicted person in a manner the least dangerous to the public health, any person afflicted with any contagious, infectious, or communicable disease who willfully exposes himself or herself to another person, and any person who willfully exposes another person afflicted with the disease to someone else, is guilty of a misdemeanor.

**Credits**

(Added by Stats.1995, c. 415 (S.B.1360), § 7. Amended by Stats.1998, c. 1001 (S.B.705), § 2.)

West's Ann. Cal. Health & Safety Code § 120290, CA HLTH & S § 120290
Current with Ch. 1 of 2023-24 1st Ex.Sess, and urgency legislation through Ch. 2 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

---

End of Document          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Cal Health & Saf Code § 120290

Deering's California Codes are current through the 2023 Extra Session Ch 1, 2023 Regular Session Ch. 2.

*Deering's California Codes Annotated > HEALTH AND SAFETY CODE (§§ 1 — 151003) > Division 105 Communicable Disease Prevention and Control (Pts. 1 — 7.7) > Part 1 Administration of Communicable Disease Prevention and Control (Chs. 1 — 4) > Chapter 4 Violations (§§ 120275 — 120305)*

## § 120290. Intentional transmission of infectious or communicable disease

(a)

   (1) A defendant is guilty of intentional transmission of an infectious or communicable disease if all of the following apply:

   (A) The defendant knows that he or she or a third party is afflicted with an infectious or communicable disease.

   (B) The defendant acts with the specific intent to transmit or cause an afflicted third party to transmit that disease to another person.

   (C) The defendant or the afflicted third party engages in conduct that poses a substantial risk of transmission to that person.

   (D) The defendant or the third party transmits the infectious or communicable disease to the other person.

   (E) If exposure occurs through interaction with the defendant and not a third party, the person exposed to the disease during voluntary interaction with the defendant did not know that the defendant was afflicted with the disease. A person's interaction with the defendant is not involuntary solely on the basis of his or her lack of knowledge that the defendant was afflicted with the disease.

   (2) A defendant is guilty of willful exposure to an infectious or communicable disease if a health officer, or the health officer's designee, acting under circumstances that make securing a quarantine or health officer order infeasible, has instructed the defendant not to engage in particularized conduct that poses a substantial risk of transmission of an infectious or communicable disease, and the defendant engages in that conduct within 96 hours of the instruction. A health officer, or the health officer's designee, may issue a maximum of two instructions to a defendant that may result in a violation of this paragraph.

(b) The defendant does not act with the intent required pursuant to subparagraph (B) of paragraph (1) of subdivision (a) if the defendant takes, or attempts to take, practical means to prevent transmission.

(c) Failure to take practical means to prevent transmission alone is insufficient to prove the intent required pursuant to subparagraph (B) of paragraph (1) of subdivision (a).

(d) Becoming pregnant while infected with an infectious or communicable disease, continuing a pregnancy while infected with an infectious or communicable disease, or declining treatment for an infectious or communicable disease during pregnancy does not constitute a crime for purposes of this section.

(e) For purposes of this section, the following definitions shall apply:

   (1) "Conduct that poses a substantial risk of transmission" means an activity that has a reasonable probability of disease transmission as proven by competent medical or epidemiological evidence.

Conduct posing a low or negligible risk of transmission as proven by competent medical or epidemiological evidence does not meet the definition of conduct posing a substantial risk of transmission.

**(2)** "Infectious or communicable disease" means a disease that spreads from person to person, directly or indirectly, that has significant public health implications.

**(3)** "Practical means to prevent transmission" means a method, device, behavior, or activity demonstrated scientifically to measurably limit or reduce the risk of transmission of an infectious or communicable disease, including, but not limited to, the use of a condom, barrier protection or prophylactic device, or good faith compliance with a medical treatment regimen for the infectious or communicable disease prescribed by a health officer or physician.

**(f)** This section does not preclude a defendant from asserting any common law defense.

**(g)**

**(1)** A violation of paragraph (1) of subdivision (a) or paragraph (2) of subdivision (a) is a misdemeanor, punishable by imprisonment in a county jail for not more than six months.

**(2)** A person who attempts to intentionally transmit an infectious or communicable disease by engaging in the conduct described in subparagraphs (A), (B), (C), and (E) of paragraph (1) of subdivision (a) is guilty of a misdemeanor punishable by imprisonment in a county jail for not more than 90 days.

**(h)**

**(1)** When alleging a violation of subdivision (a), the prosecuting attorney or the grand jury shall substitute a pseudonym for the true name of a complaining witness. The actual name and other identifying characteristics of a complaining witness shall be revealed to the court only in camera, unless the complaining witness requests otherwise, and the court shall seal the information from further disclosure, except by counsel as part of discovery.

**(2)** Unless the complaining witness requests otherwise, all court decisions, orders, petitions, and other documents, including motions and papers filed by the parties, shall be worded so as to protect the name or other identifying characteristics of the complaining witness from public disclosure.

**(3)** Unless the complaining witness requests otherwise, a court in which a violation of this section is filed shall, at the first opportunity, issue an order that prohibits counsel, their agents, law enforcement personnel, and court staff from making a public disclosure of the name or any other identifying characteristic of the complaining witness.

**(4)** Unless the defendant requests otherwise, a court in which a violation of this section is filed, at the earliest opportunity, shall issue an order that counsel and their agents, law enforcement personnel, and court staff, before a finding of guilt, not publicly disclose the name or other identifying characteristics of the defendant, except by counsel as part of discovery or to a limited number of relevant individuals in its investigation of the specific charges under this section. In any public disclosure, a pseudonym shall be substituted for the true name of the defendant.

**(5)** For purposes of this subdivision, "identifying characteristics" includes, but is not limited to, the name or any part of the name, address or any part of the address, city or unincorporated area of residence, age, marital status, relationship of the defendant and complaining witness, place of employment, or race or ethnic background.

**(i)**

**(1)** A court, upon a finding of probable cause that an individual has violated this section, shall order the production of the individual's medical records or the attendance of a person with relevant knowledge thereof, so long as the return of the medical records or attendance of the person pursuant to the subpoena is submitted initially to the court for an in-camera inspection. Only upon a finding by the court that the medical records or proffered testimony are relevant to the pleading offense, the information

produced pursuant to the court's order shall be disclosed to the prosecuting entity and admissible if otherwise permitted by law.

**(2)**  A defendant's medical records, medications, prescriptions, or medical devices shall not be used as the sole basis of establishing the specific intent required pursuant to subparagraph (B) of paragraph (1) of subdivision (a).

**(3)**  Surveillance reports and records maintained by state and local health officials shall not be subpoenaed or released for the purpose of establishing the specific intent required pursuant to subparagraph (B) of paragraph (1) of subdivision (a).

**(4)**  A court shall take judicial notice of any fact establishing an element of the offense upon the defendant's motion or stipulation.

**(5)**  A defendant is not prohibited from submitting medical evidence to show the absence of the stated intent required pursuant to subparagraph (B) of paragraph (1) of subdivision (a).

**(j)**  Before sentencing, a defendant shall be assessed for placement in one or more community-based programs that provide counseling, supervision, education, and reasonable redress to the victim or victims.

**(k)**

**(1)**  This section does not apply to a person who donates an organ or tissue for transplantation or research purposes.

**(2)**  This section does not apply to a person, whether a paid or volunteer donor, who donates breast milk to a medical center or breast milk bank that receives breast milk for purposes of distribution.

## History

Added Stats 2017 ch 537 § 5 (SB 239), effective January 1, 2018.

Annotations

## Notes

**Prior Law:**

**Prior Law:**

Former H & S C § 120290, similar to the present section, was added Stats 1995 ch 415 § 7 (SB 1360), amended Stats 1998 ch 1001 § 2 (SB 705), Stats 2016 ch 18 § 6 (SB 1408), effective May 27, 2016, and repealed Stats 2017 ch 537 § 4 (SB 239), effective January 1, 2018.

**Derivation:**

(a) Former H & S C § 2601, as enacted 1939.

(b) Former H & S C § 3353, as added Stats 1957 ch 205 § 20.

(c) Former H & S C § 120290, as added Stats 1995 ch 415 § 7, amended Stats 1998 ch 1001 § 2, Stats 2016 ch 18 § 6.

(d) Former Pen C § 394.

## Research References & Practice Aids

**Hierarchy Notes:**

Cal Health & Saf Code Div. 105

Cal Health & Saf Code Div. 105, Pt. 1

Deering's California Codes Annotated
Copyright © 2023 Matthew Bender & Company, Inc.
a member of the LexisNexis Group. All rights reserved.

**End of Document**

# NY CLS Pub Health § 2307

Current through 2023 released Chapter 1-49, 61-123

*New York Consolidated Laws Service  >  Public Health Law (Arts. I — 50)  >  Article 23 Control of Sexually   Transmitted Diseases (Titles I — II)  >  Title I Care and Treatment (§§ 2300 — 2312)*

## § 2307. Venereal disease; person knowing himself to be infected

Any person who, knowing himself or herself to be infected with an infectious venereal disease, has sexual intercourse with another shall be guilty of a misdemeanor.

## History

Add, L 1953, ch 879, § 1, eff June 1, 1954.

Annotations

## Notes

**Derivation Note**

With substance derived from former § 343–nn.

## Notes to Decisions

**1. In general**

Former husband was not entitled to summary judgment where his former wife's fraud and negligence claims alleged that he had infected her with genital herpes, and affidavits from medical personnel were submitted showing that he had been diagnosed as having condition prior to appearance of her symptoms, although husband maintained that it would be virtually impossible as matter of law for wife to establish definitively that he had transmitted disease to her and to conclusively rule out all other possible means of infection, since husband could be found to have affirmative legal duty to speak based on either CLS Pub Health § 2307 or relationship of trust between parties who had been married for 31 years. Maharam v Maharam, 123 A.D.2d 165, 510 N.Y.S.2d 104, 1986 N.Y. App. Div. LEXIS 60659 (N.Y. App. Div. 1st Dep't 1986).

In action against decedent's estate arising out of decedent's alleged wrongful transmission of AIDS virus to plaintiff, cause of action for alleged violation of CLS Pub Health § 2307 (which punishes "any person who, knowing himself to be infected with an infectious venereal disease, has sexual intercourse with another") was properly dismissed, even if decedent knew that he was HIV positive when he had sex with plaintiff; CLS Pub Health Art 27-F, in providing separate statutory scheme for HIV-related testing, clearly excludes HIV infection from category of "venereal disease." Plaza v Estate of Wisser, 211 A.D.2d 111, 626 N.Y.S.2d 446, 1995 N.Y. App. Div. LEXIS 4569 (N.Y. App. Div. 1st Dep't 1995).

## Research References & Practice Aids

**Hierarchy Notes:**

NY CLS Pub Health

NY CLS Pub Health, Art. 23

New York Consolidated Laws Service

Copyright © 2023  Matthew Bender, Inc.,
a member of the LexisNexis (TM) Group All rights reserved.

**End of Document**