# 22-1481 22-1982 (con)

## UNITED STATES COURT OF APPEALS
*for the*
## SECOND CIRCUIT



**UNITED STATES OF AMERICA,**

*Respondent-Appellee,*

-v.-

**ROBERT SYLVESTER KELLY**

*Petitioner-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**PETITIONER-APPELLANT'S APPENDIX
VOLUME 3 OF 5
(Pages A 546 to A 845)**

JENNIFER BONJEAN
ASHLEY COHEN
BONJEAN LAW GROUP, PLLC
750 Lexington Avenue, 9th Floor
New York, NY 10022
(718) 875-1850

# TABLE OF CONTENTS

Electronic Index to Record on Appeal in *USA v. Kelly*, 19-cr-00286.... A 1

Voir dire of Juror 3 (Prospective Juror 25)................................ A 45

Voir dire of Juror 4 (Prospective Juror 52)................................ A 53

Voir dire of Juror 5 (Prospective Juror 87)................................ A 59

Voir dire of Juror 7 (Prospective Juror 145)............................... A 66

Voir dire of Juror 8 (Prospective Juror 147)............................... A 70

Voir dire of Juror 9 (Prospective Juror 156)............................... A 74

Voir dire of Juror 11 (Prospective Juror 153)............................. A 80

Voir dire of Juror 12 (Prospective Juror 163)............................. A 85

Voir dire of Alternate Juror 4 (Prospective Juror 206)................... A 93

Trial Testimony of Jerhonda Johnson Pace from August 18, 2021 and
August 19, 202.......................................................... A 97

Trial Testimony of Kris McGrath, MD from August 19, 2021........... A 352

Trial Testimony of Anthony Navarro from August 20, 2021............. A 433

Trial Testimony of Demetrius Smith from August 20, 2021............ A 546

Trial Testimony of Thomas Arnold from August 26, 2021.............. A 624

Trial Testimony of Faith from September 1, 2021...................... A 759

Trial Testimony of Anna from September 10, 2021..................... A 911

Trial Testimony of Iffath Hoskins from September 10, 2021........... A 951

Trial Testimony of Diana Copeland from September 10, 2021 and
September 13, 2021………………………………………………… A 1036

Trial Testimony of Angela from September 13, 2021………………… A 1156

Trial Testimony of Alex from September 13, 2021…………………… A 3322

Trial Testimony of Alesiette Mayweather from September 13, 2021
and September 14, 2021…………………………………………….. A 1268

Trial Testimony of Nicholas Williams from September 14, 2021……... A 1383

Declaration of Robert S. Kelly dated April 4, 2022…………………… A 1438

Notice of Appeal dated July 11, 2022………………………………… A 1440

Notice of Appeal dated September 9, 2022…………………………… A 1441

Notice of Appeal dated November 22, 2022………………………... A 1442

Proceedings                                              653

1    **DEMETRIUS SMITH**,

2          called by the Government, having been duly sworn, was

3          examined and testified as follows:

4          THE COURT:  Mr. Smith, just have a seat.  There is a

5    microphone right there.  I am going to ask you a couple of

6    questions.

7          I'm told if you are called to testify you plan to

8    assert your Fifth Amendment privilege against self

9    incrimination; is that correct?

10         THE WITNESS:   Yes, I don't want to be here, period.

11         THE COURT:  I can't hear what you're saying.

12         THE WITNESS:  Yes.

13         THE COURT:  Ms. Cruz Melendez.

14         MS. CRUZ MELENDEZ:  Your Honor, the Government would

15   like to now read into the record an order signed by Judge

16   Mauskopf dated October 22, 2019.

17         It reads:  In re testimony of Demetrius Smith.

18         On motion of Richard P. Donoghue, United States

19   Attorney for the Eastern District of New York, by Assistant

20   United States Attorney Maria Cruz Melendez, filed in this

21   matter on October 22, 2019, it appearing to the satisfaction

22   of the Court; that Demetrius Smith, the witness, has been

23   called to testify or provide other information before the

24   grand jury; that in the judgment of the United States Attorney

25   the witness is likely to refuse to testify or provide other

Proceedings                                    654

1   information on the basis of his privilege against

2   self-incrimination; that in the judgment of the United States

3   Attorney the testimony or other information from the witness

4   may be necessary to the public interest and that the aforesaid

5   motion filed herein has been made with the approval of

6   Jennifer A.H. Hodge, Acting Deputy Assistant of the Attorney

7   General of the Criminal Division of the United States,

8   Department of Justice, pursuant to the authority vested in her

9   by Title 18, United States Code, Section 6003(b) and Title 28,

10  Code of Federal Regulations, Section 0.175(a).

11          Now, therefore, it is ordered, pursuant to Title 18,

12  United States Code, Sections 6002 and 6003, that the witness

13  give testimony or provide other information which he refuses

14  to give or to provide on the basis of his privilege against

15  self-incrimination as to all matters about which he may be

16  questioned before the grand jury, and in any further

17  proceedings resulting therefrom or ancillary thereto.

18          It is further ordered that, pursuant to Title 18,

19  United States Code, Sections 6002 and 6003, no testimony or

20  other information compelled under this order or any

21  information directly or indirectly derived from such testimony

22  or another information may be used against the witness in any

23  criminal case, except in a prosecution for perjury, giving a

24  false statement, obstruction of justice, or otherwise failing

25  to comply with this order.

Proceedings                                    655

1        This Order shall become effective only if, after the

2   execution of this Order, the witness refuses to testify or

3   provide other information on the basis of his privilege

4   against self-incrimination.

5        It is dated October 23, 2019, in Brooklyn, New York.

6        It is signed by the Honorable Roslyn R. Mauskopf,

7   United States District Judge Eastern District of New York.

8        THE COURT:  Okay.  Mr. Smith, have you discussed

9   this with your attorney?

10       THE WITNESS:  I do have a question for you right

11   now.

12       THE COURT:  Speak to your lawyer about it.  Okay.

13       (Pause.)

14       THE WITNESS:  She is telling me stuff, but I don't

15   understand it.

16       THE COURT:  So I'm going to give you a little more

17   time to consult with your lawyer, but the bottom-line here is

18   you had invoked your Fifth Amendment privilege against self

19   incrimination, and I know you know what that means; correct?

20       THE WITNESS:  Yes, I was told that was given to me

21   -- offered to me, but I didn't want to be here anyway, but.

22       THE COURT:  Well, you would be in good company.

23   There are lots of people who don't want to testify, but that's

24   really not the question.  The question is now that the

25   Government has secured an order signed by another district

Proceedings                                          656

1    judge in this courthouse, that if you testify, you cannot be

2    prosecuted for anything that you talk about.

3              THE WITNESS:  All right.

4              THE COURT:  So you don't have -- well, you can't

5    take the Fifth anymore because they have an order that you

6    have immunity from prosecution.  So you have a good lawyer

7    here with you.  She will explain what that means to you, but

8    the bottom-line is that you have to testify about those things

9    that you were concerned that you could yourself face

10   prosecution for.

11             Do you understand that?

12             THE WITNESS:  Yeah.  I don't feel like I did on the

13   first prosecution for, so why do I have to testify here?

14             THE COURT:  Do you want to speak to your lawyer for

15   a minute?

16             MS. MARCUS:  May I have a moment?

17             THE COURT:  Yes.  Go ahead.

18             (Pause.)

19             MS. GEDDES:  Your Honor, can I address something?

20             THE COURT:  Of course.  You can take your mask off.

21             MS. GEDDES:  Your Honor previously admitted

22   Government Exhibit 241 subject to connection.  That was that

23   blue T-shirt that Ms. Pace identified as one that she had used

24   to wipe semen from her face.

25             The Government is prepared to call two witnesses

Proceedings                                    657

1  next week who will testify that there was, in fact, semen

2  found on the shirt and the semen matched that of the

3  defendant's.  Your Honor previously admitted subject to

4  connection, but I believe it should be admitted period because

5  the witness identified it as the t-shirt that she used to wipe

6  off the defendant's semen.  The defense counsel claimed that

7  they wanted to challenge the chain of custody, but any

8  challenges to chain of custody go to weight, not to

9  admissibility.

10         The Government is planning to call additional

11  witnesses who will establish a chain of custody, but I want to

12  be able to call the DNA witnesses next week and I'm not sure

13  that those other custody witnesses are going to testify before

14  them.

15         THE COURT:  I don't think you would have any

16  objection to that, do you?

17         It is true essentially that the chain of custody

18  issue in this circumstance really will go to weight, not

19  admissibility.  But they are planning to establish it anyway.

20         You can take your mask off too.

21         MR. CANNICK:  Your Honor, I would maintain my

22  objection.

23         I -- I certainly would not object to the witnesses

24  testifying without that custody chain.

25         THE COURT:  Okay.

Proceedings                    658

1          MR. CANNICK:  Okay.

2          THE COURT:  And then -- I mean, it sounds like

3     whatever objection you have will be, if the Government can do

4     it, will be made moot by the testimony of the chain of custody

5     people, assuming they can.  So I think we are in agreement

6     about that.

7          MS. GEDDES:  So that exhibit is now in evidence.

8          MR. CANNICK:  No.

9          THE COURT:  It is still subject to connection.  It's

10    fine.  Your DNA people can testify.

11         MS. GEDDES:  Okay.

12         THE COURT:  It's not a thing.

13         MS. GEDDES:  Okay.  Thank you, Judge.

14         MR. CANNICK:  Your Honor, while they are talking,

15    can I run out?

16         THE COURT:  Yes.

17         MS. GEDDES:  I have one other procedural matter.

18    I'm sorry.

19         THE COURT:  Maybe co-counsel can handle it.

20         MS. GEDDES:  Your Honor, we previously discussed not

21    sitting on the two-day Rosh Hashanah holiday and I think Your

22    Honor was going to perhaps talk with the jury about whether

23    they wanted to take both days, if there was anyone who

24    celebrated both days.

25         THE COURT:  I don't know that they celebrate both.

Proceedings                                              659

1    I know there are that celebrate one day.  We will find out.

2                MS. GEDDES:  Okay.

3                MS. BLANK BECKER:  Judge, for the record, I'm Jewish

4    as well.  I do celebrate Rosh Hashanah.

5                THE COURT:  We are taking the day off.

6                MS. BLANK BECKER:  Okay, I just thought that was a

7    discussion we were having.

8                MS. GEDDES:  I think the question is whether we take

9    off one or two days.

10               THE COURT:  Do you want to take both days off?

11               MS. BLANK BECKER:  I would, Your Honor, because I

12   have to fly home and come back.  All right.  That's the plan.

13               THE COURT:  That would have been good to know

14   before.  When is Rosh Hashanah?

15               MS. GEDDES:  The 7th and 8th.  Labor Day is Monday

16   the 6th and then the 7th and 8th are Tuesday and Wednesday.

17   My understanding, and certainly Ms. Becker can correct me, is

18   that the first day is the day that is celebrated almost by

19   all, but the second day is for more religious individuals.

20               THE COURT:  Well, Donnellys generally don't weigh in

21   on things like this.  I'm not telling you you have to, but

22   since it is going to be Labor Day before, you're going to have

23   the whole weekend, can you consider coming back on the Tuesday

24   assuming the jurors don't want to?

25               It's just that we have a long road ahead of us, and

Proceedings                                                        660

1    if we can make the most of the time that we have.  It may all

2    be rendered moot if there is also a juror -- I got the idea

3    from Ms. Becker that this was a travel issue rather than an

4    observation issue.

5               MS. BLANK BECKER:  Judge, because I hadn't been

6    asked about it before, I wasn't trying to keep anything from

7    you.

8               THE COURT:  I know.  Listen, it's not my habit to

9    inquire of the lawyers what their particular religious

10   observances are.  I'm simply trying to keep this trial on

11   schedule.  There are a lot of moving parts here and if you

12   want to take both days, you know, you can take them.  But I'm

13   just suggesting that because it's on the Tuesday after a long

14   holiday that if you don't need it, you don't have to.  But

15   let's not get into a debate about it.  Let's find out from the

16   jurors what they are doing and we will deal with that issue

17   when we have to deal with it.

18               MS. GEDDES:  Thank you.

19               MS. BLANK BECKER:  Thank you, Judge.

20               MS. CRUZ MELENDEZ:  Your Honor, we have just

21   received word that Mr. Smith and his attorney are done.  So I

22   think we might be able to bring them back in.

23               THE COURT:  All right.  Did he testify in the grand

24   jury?

25               MS. CRUZ MELENDEZ:  He did, Your Honor.

Proceedings                                        661

1          THE COURT:  Okay.  Thanks.

2          MS. BLANK BECKER:  Judge.

3          THE COURT:  Wait.  Why don't we wait until Mr.

4    Cannick gets back.

5          (Pause.)

6          THE COURT:  There he is.  Now you can go and get the

7    witness.

8          (Witness takes stand.)

9          THE COURT:  Okay.  Mr. Smith, you can take your mask

10   off.  I want to make sure the court reporter can hear what you

11   are saying.

12         Have you had a chance to speak with your lawyer?

13         THE WITNESS:  Yes, I have.

14         THE COURT:  And you understand the consequences of

15   what we talked about earlier?

16         THE WITNESS:  Yes.

17         THE COURT:  All right.  So I think we can get the

18   jury.

19         He is going to be here and this is just because of

20   our COVID protocol.

21         And if you need at any time during the course of

22   your examination to consult with your lawyer, just let me

23   know, okay, and then we will make the arrangements.

24         THE WITNESS:  Yes, ma'am.

25         How's everybody doing today?

Proceedings                                                    662

1          THE COURT:  Let's just wait until we start the

2    questioning.  Okay?  It won't be that bad.

3          THE COURTROOM DEPUTY:  All rise.

4          (The jury enters the courtroom.)

5          THE COURTROOM DEPUTY:  You may be seated.

6          THE COURT:  All right.  Ladies and gentlemen, we are

7    ready to continue.

8          Are you ready to call your next witness?

9          MS. CRUZ MELENDEZ:  Yes, Your Honor.

10         The Government calls Demetrius Smith.

11         THE COURT:  And here he is.

12         Mr. Smith, I'm just going to give you a couple of

13   directions before the testimony starts.

14         The first thing is our court reporter takes down

15   everything that you say.  So it's important first that you

16   speak into the microphone so she can hear you, and second,

17   that you not speak too quickly, and the third part is that you

18   don't speak over whoever is questioning you.  It just makes it

19   hard for them to do their job.

20         The next thing is if there is a question that isn't

21   clear or you want to have repeated, just let me know.

22         And, finally, do your best to just answer the

23   question that you are being asked, okay?

24         THE WITNESS:  Yes, ma'am.

25         THE COURT:  Great.

1          Go ahead.

2    DIRECT EXAMINATION

3    BY MS. CRUZ MELENDEZ:

4    Q    Good afternoon, Mr. Smith.

5          Did you receive a subpoena to appear here today?

6    A    Yes, I did.

7    Q    You don't want to be here testifying, do you?

8    A    No, I'd rather not.

9    Q    Have you also received a grant of immunity for your

10   testimony today?

11   A    Yes.

12   Q    What do you understand that to mean?

13   A    That I won't be prosecuted for anything that I say.

14   Q    Now, do you also understand that that grant of immunity

15   does not extend to perjury?

16   A    Yes.

17   Q    Or giving a false statement, do you understand that?

18   A    Yes.

19   Q    Or obstruction of justice, do you understand that?

20   A    Yes.

21   Q    Or otherwise failing to comply with the immunity order

22   issue, do you understand that?

23   A    Yes.

24   Q    Mr. Smith, how old are you?

25   A    65.

D. Smith - direct - Cruz Melendez                    664

1   Q    Where did you grow up?

2   A    In Chicago, Illinois.

3   Q    Are you employed?

4   A    At the present, no.

5   Q    And what did you do before your unemployment status?

6   A    I worked as a limousine driver and then COVID hit.  I

7   worked as a limousine driver and the COVID hit.  Since then, I

8   have been unemployed.

9          THE COURT:  Just do your best to use that

10  microphone.  It's a big room.

11         THE WITNESS:  Yes, ma'am.

12         THE COURT:  That's great.  Go ahead.

13  Q    Do you have any nicknames?

14  A    My family calls me Johnny.

15         MS. CRUZ MELENDEZ:  I'm showing the witness what has

16  been marked for identification purposes as Government Exhibit

17  6.

18  Q    Do you see Government Exhibit 6 for identification

19  purposes there?  Do you see that there on the monitor?

20  A    Yes, I do.

21  Q    Do you recognize the individual in that photograph?

22  A    Yes.

23         MS. CRUZ MELENDEZ:  If the defense has no objection,

24  the Government moves to admit Government Exhibit 6 into

25  evidence.

D. Smith - direct - Cruz Melendez                665

1          MR. CANNICK:  No objection.

2          THE COURT:  All right.  That will be in evidence.

3          (Government's Exhibit 6 received in evidence.)

4          THE WITNESS:  You can publish it.

5          (Exhibit published.)

6   BY MS. CRUZ MELENDEZ:

7   Q    Are you familiar with an individual named Robert Kelly,

8   also known as R. Kelly?

9   A    Yes, ma'am.

10  Q    I'm sorry.  I need to back up for a moment.

11         Who is the individual in this photograph?

12  A    That's me.

13         MS. CRUZ MELENDEZ:  I moved too soon.

14  Q    So back to my other question:  Are you familiar with an

15  individual named Robert Kelly, also known as R. Kelly?

16  A    Yes, I am.

17  Q    Have you met Robert Kelly in person?

18  A    Yes, I have.

19  Q    I'm showing you what is in evidence as Government Exhibit

20  1.  Do you recognize the individual in this photograph?

21  A    It looks like Robert.

22  Q    When you say Robert, do you mean Robert Kelly?

23  A    Yes.

24  Q    Do you see Robert Kelly in the courtroom here today?

25  A    Take your mask off.

1   Q    If you see him, can you please point him out?

2   A    That's Robert.

3   Q    And indicate an item of clothing he is wearing?

4   A    He's wearing a gray suit with a brown shirt.

5          THE COURT:  Indicating the defendant.

6   BY MS. CRUZ MELENDEZ:

7   Q    Mr. Smith, approximately when did you first meet the

8   defendant?

9   A    I met Robert Kelly in '84.

10  Q    And how did you meet the defendant?

11  A    I met him at a talent show, at Kenwood Academy.

12  Q    And what's Kenwood Academy?

13  A    It's -- it was a park district function and Kenwood

14  Academy is a high school.

15  Q    Now, when you met the defendant, were you in the

16  entertainment business?

17  A    Yes.

18  Q    What did you do in the entertainment business?

19  A    I was a singer.  I had a band.

20  Q    After meeting the defendant, what, if any, relationship

21  did you have with him?

22  A    When I met Robert, he was performing.  He was a

23  youngster.  He was singing original songs.  And at that time I

24  was looking for songs and Robert totally impressed me and I

25  approached him for it.  And from that moment, we began working

D. Smith - direct - Cruz Melendez                    667

1   together.

2   Q    And in what capacity did you start working for the

3   defendant?

4   A    Well, I just assisted him with anything he needed to

5   further his career.

6   Q    And approximately when did you begin working with him?

7   A    1984.

8   Q    Over what total period of time did you work with the

9   defendant?

10  A    I worked with Robert from '84 to '96, I think is when we

11  ended.  '94, we ended.  I went back again.  Pretty much '96 it

12  all ended.

13  Q    Would it be fair to say that you took some breaks from

14  your employment with the defendant?

15  A    A couple, yes.  Yes.

16  Q    Now, during periods of these breaks that you mentioned,

17  did you maintain contact with the defendant?

18  A    We ran back into each other.  As far as me calling him on

19  a regular basis, in the beginning, no.  We got separated

20  again.  You know, I went to prison at one time.

21  Q    Now, you had mentioned that you had almost immediately

22  began working for the defendant?

23  A    Uh-hum.

24  Q    What was your title?  How would you describe yourself?

25  A    Well, in the beginning I would -- you know, I would say I

D. Smith - direct - Cruz Melendez                    668

1   just wanted to be somebody that he could look up to that could

2   help.  But as time developed, I was like a personal assistant

3   to him.

4                    (Continued on following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  EXAMINATION CONTINUES

2  BY MS. CRUZ MELENDEZ:

3  Q    And what were your responsibilities as his personal

4  assistant?

5  A    Again, just seeing to it that he got things that he

6  needed to further his career.  I mean I just wanted him to be

7  comfortable to -- to -- to write.

8  Q    What, if any, responsibilities did you have with respect

9  to the defendant's schedule?

10  A    When we signed with the record company, you know, they

11  gave me tours to do.  So, I would do the scheduling.  Yeah, I

12  did pretty much everything.

13  Q    Did you have any responsibilities with respect to travel?

14  A    I did scheduling, scheduling included traveling.  If he

15  needed something to get something to his family or something,

16  I would do that, you know.

17  Q    Now, were you paid when you were the defendant's personal

18  assistant?

19  A    Well, in the beginning there was no money.  And as time

20  went on, I got -- I was paid.

21  Q    And how were you paid as time went on?

22  A    I was paid in check.

23  Q    Prior to being paid in check, did you have any other --

24  what was the agreement in terms of how much you would be paid?

25  A    In the beginning me and Robert, we've always discussed

1    5 percent.  That was with me, him and a former manager, Chuck

2    Smith, and we discussed 5 percent.  And pretty much Robert, in

3    the beginning we would make money in the subways.  You know,

4    he'll make his money, he'll give me 5 percent, which was a

5    little bit.

6    Q    Now, when you were working for the defendant, did you

7    have an opportunity to meet people in the defendant's inner

8    circle?

9    A    Yes, I did.

10   Q    Who did you meet?

11   A    I met his buddies.

12   Q    And who were they?

13   A    They had --

14          MR. CANNICK:  Your Honor, I am going to object to

15   relevance.

16          THE COURT:  Overruled.

17   BY MS. CRUZ MELENDEZ:

18   Q    You can answer.

19   A    Well, I met his buddies.  I met his family.  I met his

20   brother.  I met his, you know, brothers.  I met his sisters,

21   his mom.  His buddy Larry, Torrey.

22   Q    Do you remember Larry's last name?

23   A    Larry?  I mean we don't -- if I may say, you know --

24   Q    Sir.

25          THE WITNESS:  If I may ask?

1    THE COURT:  Oh, you want to speak to your counsel?

2    THE WITNESS:  Yes.

3    THE COURT:  Okay.

4    (The witness consults with his counsel.)

5  A    Yeah, I know Larry Hood.

6  Q    And what other names do you recall of people you met

7  while working with the defendant?

8  A    Torrey Diggs, Jim Pratts.  Neighborhood friends, you

9  know.

10 Q    Are you familiar with an individual named Bruce Kelly?

11 A    That's his brother.

12 Q    When you say "his," who do you mean?

13 A    That's Robert's brother.

14 Q    And are you familiar with an individual named Tyree

15 Jameson?

16 A    Tyree Jameson; yes, I know Tyree.

17 Q    And what, if any, job or responsibility did Tyree Jameson

18 have with the defendant?

19 A    Tyree was hired as --

20    MR. CANNICK:  Objection.

21 A    -- security for Robert.

22    THE COURT:  Overruled.

23    I want to make sure your microphone is on.  We're

24 having a little trouble hearing.  And you can take your mask

25 off, too.

1          Sorry about that.  Go ahead, Ms. Cruz Melendez.

2    BY MS. CRUZ MELENDEZ:

3    Q    You had mentioned that you originally met the defendant

4    at a talent show.

5          At some point did the defendant begin singing

6    professionally?

7    A    Yes.

8    Q    And was the defendant signed to a record label?

9    A    Yes.

10   Q    And which record label was the defendant signed to?

11   A    Signed to Jive Records.

12   Q    And approximately when was he signed to Jive Records?

13   A    About '89, '88, something like that maybe.

14   Q    Now, as part of the defendant working with the record

15   labels, did the defendant release any songs?

16   A    Yes, he did.

17   Q    And when you were working with the defendant, did the

18   defendant release any albums under Jive Records?

19   A    Can you repeat that?

20   Q    Did the defendant release any albums under Jive Records?

21   A    Yes.

22   Q    And what was the name of the defendant's first album?

23   A    Born Into The 90's.

24   Q    Generally speaking, who wrote the songs released by the

25   defendant?

Smith - direct - Cruz Melendez                    673

1  A    Robert Kelly.

2  Q    And after releasing the Born Into The 90's album, did the

3  defendant release any other albums?

4  A    Yes, he did.

5  Q    Now, at the time the defendant was signed with Jive

6  Records, did he have a manager?

7  A    Yes, he did.

8  Q    And what was his manager's name?

9  A    Barry Hankerson.

10 Q    After signing with Jive Records, did the defendant ever

11 perform live?

12 A    Yes.

13 Q    And did people come to see his performances?

14 A    Yes, they did.

15 Q    Now, you testified earlier that you first began working

16 as the defendant's personal assistant, and then at some point

17 you were also assisting with tours; is that correct?

18 A    Yes.  I worked as a tour manager as well.

19 Q    And approximately when did you become his tour manager?

20 A    Our first tour.

21 Q    And do you recall when that first tour was?

22 A    The Born Into The 90's album.

23 Q    Do you remember an approximate date?

24 A    Not off the top of my head.  Let me see.  Born Into The

25 90's we did -- we did shows way before that.  We did shows

1    with Heavy D and the boys.  We did -- this was before his

2    deal.  So, signed with Jive.  We got Born Into The 90's came

3    out.  So, I would say '90, in 1990, you know.

4    Q    In the vicinity of that timeframe?

5    A    In the vicinity, yeah.

6    Q    So, as his tour manager, what were your responsibilities?

7    A    To get him to and from the tour and on stage on time,

8    safe.  And at the same time, make sure everything was

9    accommodated, you know, his payroll.  I took care of the

10   artists.  I took care of the crew.  My responsibility was a

11   lot.

12   Q    Now, you mentioned that you assisted with the tour

13   responsibilities.

14         Did the defendant ever perform live outside of

15   Illinois?

16   A    Yes.

17   Q    And did you travel on tour with the defendant?

18   A    Yes.

19   Q    What locations do you recall traveling to with the

20   defendant on tour?

21   A    We did -- we had tours over down south.  We had tours all

22   over the states.

23   Q    Are you --

24   A    We went overseas.  We did a lot of tours.  We covered a

25   lot of ground.

Smith - direct - Cruz Melendez                    675

1   Q    Are you familiar with an individual named Jovante?

2   A    Yes, I remember Jovante.

3   Q    And did Jovante ever travel on tour with you and the

4   defendant?

5   A    One time I remember, yes.

6   Q    And what, if any, role did Jovante have with respect to

7   the defendant's tour?

8   A    She didn't have a role, they were just like little

9   singers.  They were singers and he wanted them to see what it

10  was like on the road and watch the other acts that were out

11  there as well.

12  Q    So, you testified that you traveled on tour with the

13  defendant outside of Illinois, around the country?

14  A    Yes.

15  Q    Did people come to see the defendant perform when he

16  performed outside of Illinois on tour?

17  A    Yes.

18  Q    And when the defendant performed live at shows, did any

19  other musicians perform in any of those shows?

20  A    Yes.

21  Q    Earlier you also testified that the defendant generally

22  wrote his songs.

23       Did Kelly ever -- did the defendant ever write or

24  produce any songs for other musical artists?

25  A    Yes, he did.

Smith - direct - Cruz Melendez                    676

1  Q    And did the defendant ever collaborate on music projects
2  with any other artists?
3  A    Yes, he did.
4  Q    Are you familiar with an individual name Aaliyah
5  Haughton?
6  A    Yes, I'm familiar with Aaliyah.
7  Q    Did you ever meet Aaliyah Haughton in person?
8  A    Yes, I did.
9           MS. CRUZ MELENDEZ:  I'm showing just the witness
10  what's been marked for identification purposes as Government's
11  Exhibit 54.
12  BY MS. CRUZ MELENDEZ:
13  Q    Mr. Smith, do you recognize the individual in this
14  photograph?
15  A    Yes.
16  Q    And who do you recognize it to be?
17  A    That's Aaliyah.
18           MS. CRUZ MELENDEZ:  Your Honor, if there's no
19  objection from the defense, the Government moves to admit
20  Government Exhibits's 54.
21           MR. CANNICK:  No objection, Your Honor.
22           THE COURT:  All right, that's in evidence.  You can
23  publish it.
24           (Government's Exhibit 54 was received in evidence.)
25           (Exhibit published.)

Smith - direct - Cruz Melendez                    677

1   BY MS. CRUZ MELENDEZ:

2   Q    Is Aaliyah still living?

3   A    No, she's not.

4   Q    How did you come to meet Aaliyah?

5   A    I met Aaliyah through her -- through her -- through her

6   uncle, Barry Hankerson.

7   Q    And what, if any, relation, again, did Barry Hankerson

8   have with the defendant?

9   A    Barry was Robert's manager.

10  Q    And do you recall approximately when you first met

11  Aaliyah?

12  A    Yes.

13  Q    When was that?

14  A    We went -- we went to Detroit to meet Aaliyah and her

15  family.

16  Q    Do you remember approximately what date that was?

17  A    No, I don't remember.

18  Q    If I showed you -- is there something that might refresh

19  your recollection?

20  A    Uh-hum.

21       MS. CRUZ MELENDEZ:  May I approach, Your Honor?

22       THE COURT:  Yes.

23  A    Fall of '92, that's about right.

24  Q    So, this refreshes your recollection?

25  A    Maybe, yeah.  I'm not sure if I was precise, but it's

Smith - direct - Cruz Melendez                    678

1  around that time.

2              THE COURT:  Did you say the fall of 1992?

3              THE WITNESS:  Yes, ma'am.

4              THE COURT:  Okay.  Go ahead.

5              THE WITNESS:  Could have been around that time, it

6  could have been a little later, you know.

7              THE COURT:  Okay.

8  BY MS. CRUZ MELENDEZ:

9  Q    And I think you mentioned that you met the defendant --

10 excuse me, that you met Aaliyah in Detroit.

11             Who, if anyone else, was with you?

12 A    I think the first time was me and Robert and --

13 Q    Okay, and when we're talking about Detroit, we're talking

14 about Detroit, Michigan?

15 A    Uh-hum.

16 Q    And is that where Aaliyah lived?

17 A    Yes.

18 Q    And who, if anyone else, did Aaliyah live with in

19 Detroit?

20 A    I met her, she was with her dad, her mom, and her

21 brother.

22 Q    Do you recall her brother's name?

23 A    Rashad.

24 Q    Do you recall her parents' names?

25 A    Michael and Diane.

Smith - direct - Cruz Melendez                           679

1   Q    At the time that you and the defendant met Aaliyah in
2   Detroit, did you also meet her brother at that time?
3   A    Yes.
4   Q    And I'm sorry if you answered this already, but what was
5   her brother's name?
6   A    Rashad.
7   Q    And approximately how old was her brother at the time
8   that you first met him?
9   A    If I said how old he was, I would be assuming, you know.
10  Q    So, you currently don't recall?
11  A    I mean I don't recall his exact -- you know, how old he
12  actually was.
13  Q    Is there something that might refresh your recollection?
14  A    If I -- if I said it even before, maybe 15 or 14,
15  something like that.
16  Q    Okay.  So, you think --
17  A    That's an assumption of his age.  No one ever told me his
18  age.
19  Q    But he appeared to you to be about 15 or 16?
20  A    He appeared to be a young teenager.
21  Q    Now, was Rashad older or younger than Aaliyah?
22  A    I think Rashad was older than Aaliyah.
23       MR. CANNICK:  I'm going to object.  If he knows, he
24  knows.  If he doesn't, then he's speculating.
25       THE COURT:  He can say he thinks.

1        What made you think that?

2        THE WITNESS:  Well, he was a big boy.  You know,

3  taller, you know.  You know, I never really knew their

4  birthdays or nothing like that.

5        THE COURT:  Okay, so you're not sure?

6        THE WITNESS:  Yeah, I'm not sure.

7        THE COURT:  All right.

8        THE WITNESS:  I think Rashad was older.

9  BY MS. CRUZ MELENDEZ:

10 Q    Do you recall how old Aaliyah was at that time?

11 A    I think at that time Barry told me she was --

12       MR. CANNICK:  Objection to what he was told.

13       THE COURT:  Overruled.

14       THE WITNESS:  Your Honor, can my attorney sit here?

15       THE COURT:  If it makes you more comfortable.  Let's

16 just do it two seats apart, if that's okay.

17       THE WITNESS:  It's okay.

18       MS. MARCUS:  It's fine with me.

19       THE COURT:  Okay.

20       MS. CRUZ MELENDEZ:  Your Honor, I just want to make

21 sure that the jury can see Mr. Smith.

22       THE COURT:  Can everybody see the witness?

23       THE JURY:  (Collectively) yes.

24       MS. MARCUS:  Would you prefer I sit here?

25       THE JURY:  (Collectively)  That's fine.

1          MS. MARCUS:  Okay.

2          THE COURT:  So, what was the last question?

3          I'm sorry, do you mind reading it back?  Thanks.

4          (Record read.)

5    BY MS. CRUZ MELENDEZ:

6    Q    So, you can answer.

7          How old do you think Aaliyah was?

8    A    I think at the time she was maybe 14, 15.  I remember

9    they told me that she did a -- she had won some kind of a TV

10   show, American Got Talent, something like that, back in the

11   day.  She was about 13, 14, yeah.

12   Q    Where were you and the defendant when you met Aaliyah?

13   A    We were at her house with her mom and her dad.

14   Q    And why were you and the defendant in Detroit?

15   A    Barry wanted us to -- he wanted Robert to meet Aaliyah

16   because she had talent and he wanted to see if Robert thought

17   she had something.

18   Q    And where had the two of you, you and the defendant,

19   where had you traveled from?

20   A    Chicago.

21   Q    And did you travel together to go to the Detroit?

22   A    Yes.

23   Q    How did you get there?

24   A    I think we drove.  I mean I know if we got there, we

25   drove, you know, so, from Detroit, you know, Chicago, yeah, we

Smith - direct - Cruz Melendez                    682

1    drove.

2    Q    Can you explain to the jury what happened when you and

3    the defendant first met Aaliyah?

4              MR. CANNICK:  I'm going to object, Your Honor.

5              THE COURT:  Again, I can't hear you.

6              MR. CANNICK:  It's on.

7              THE COURT:  I know, but I guess I'm getting old.

8              MR. CANNICK:  Well, join the club.

9              Your Honor, I'm going to object to form.

10             THE COURT:  Okay, the objection is overruled.

11             Go ahead.

12   BY MS. CRUZ MELENDEZ:

13   Q    Mr. Smith, can you please explain to the jury what

14   happened when you and the defendant first met Aaliyah?

15   A    When we first met Aaliyah, first of all, her mom and her

16   dad were just special, you know, it's like -- it was like

17   walking into the Cosby house, you know, Bill Cosby and Felicia

18   Rashad and that's how the family greeted us.

19             THE COURT:  You have to speak into the microphone.

20   A    That's how the family greeted us.  It was open.  It was

21   warm.  It was just a good place to be at that time.

22             And Robert -- and Aaliyah was kinda shy when he

23   asked her to sing, so Robert went to the piano.  And he'll

24   play something and that relaxed everybody.  And he'll have

25   Aaliyah do something very simple and it brought her voice out

Smith - direct - Cruz Melendez                    683

1  and we started hearing some angelic stuff out of her, and it
2  was like a special time.
3  Q    So, Aaliyah sang --
4  A    Yes, she did.
5  Q    -- for you and the defendant?
6  A    Yes.
7  Q    And what, if anything, did the defendant say about
8  Aaliyah singing after Aaliyah sang for you and the defendant?
9  A    Thought she had something special.  Barry asked him:
10 What do you think?  And he thought she had something special.
11 Q    During your trip to Detroit with the defendant, did you
12 and the defendant spend any additional time with members of
13 Aaliyah's family?
14 A    We went to play basketball with Rashad.  We played with
15 his -- with her uncle, Jomo Hankerson.  We played with Tommy
16 Turns and, you know, we went out and had fun, you know.
17 Q    And how long were you and the defendant in Detroit for
18 that trip?
19 A    Maybe a day or two.
20 Q    Now, you mentioned, you testified that Barry Hankerson
21 had wanted the defendant to hear Aaliyah sing?
22 A    Yes.
23 Q    At some point did the defendant begin working with
24 Aaliyah on her music?
25 A    Later.

Smith - direct - Cruz Melendez                684

1  Q   And once he began working with Aaliyah, the defendant

2  began working with Aaliyah on her music, what, if anything,

3  did the defendant do with Aaliyah with respect to her music?

4  A   I mean he wrote her songs.

5  Q   Did Aaliyah put out any albums?

6  A   Yes, she did.

7  Q   And who wrote that album?

8  A   Robert Kelly wrote her first album.

9  Q   And what was the name of her first album?

10 A   Age Ain't Nothing But a Number.

11 Q   Did Aaliyah ever travel to Chicago to work in the studio

12 with the defendant?

13 A   Yes, she did, with her parents.

14 Q   Now, when Aaliyah came to Chicago to record in the

15 studio, which studio did she and the defendant use to record

16 music?

17 A   As I remember, it was CRC Studios downtown, Ohio Street.

18 Q   And did you and the defendant ever travel back to Detroit

19 to visit Aaliyah?

20 A   We went back to Detroit several times.  We did visit

21 Aaliyah's house, and we had other musicians in Detroit that

22 Robert worked a lot with.  And so we had other purpose in --

23 in -- in Detroit, other than Aaliyah.

24 Q   Did Aaliyah and the defendant ever socialize outside of

25 the studio?

1    MR. CANNICK:  Objection.

2    THE COURT:  Overruled.

3  A    Did they socialize outside of the studio?

4    Yes, I mean we all socialize.  We went out, had ice

5  cream, went to movies.

6  Q    Including Aaliyah and the defendant?

7  A    Whatever Robert did with Aaliyah was all about music.  I

8  mean if Robert wanted to be alone with Aaliyah in the other

9  room, in the studio, it was over vocals and stuff like that.

10    I would just say if Robert took Aaliyah out by

11  herself, I couldn't say she did that; no.  Didn't see that,

12  no.

13    But leave her alone in her room while -- or if

14  Robert was in the studio doing something and Aaliyah was

15  uncomfortable, he would clear the studio and he would be there

16  with her.  If he wanted to go eat with her, I would take them

17  to eat.  If he wanted to spend time, it was all about her

18  music.

19  Q    So, sir, you just testified that at times defendant might

20  clear the room when he was with Aaliyah, is that correct?

21  A    Well, I mean the studio.  Not just clear a room to, like,

22  just him and her.  It's like if -- if Aaliyah is not bringing

23  out a note, he might say:  Turn the lights down in there, and

24  he'll be on one side and she'll be on the other side or he'll

25  go in and talk to her.  Stuff like that, you know.

Smith - direct - Cruz Melendez                686

1  Q    Sir, is your testimony here today that the defendant did

2  not spend time alone with Aaliyah?

3  A    No, I'm not saying that.

4  Q    Okay, so did the defendant spend time alone on

5  occasion --

6  A    Yes.

7  Q    -- with Aaliyah?

8  A    Yes.

9  Q    What did the defendant say to you about needing to be

10 alone with Aaliyah?

11          THE COURT:  Mr. Smith, please have pity on our court

12 reporter.  She can't hear what you're saying.

13          THE WITNESS:  Speak into the microphone.

14          THE COURT:  Do you need to have your recollection

15 refreshed?

16          THE WITNESS:  Yes.

17          MS. CRUZ MELENDEZ:  Your Honor, may I approach?

18          THE COURT:  Yes.

19          THE WITNESS:  Yes.

20 BY MS. CRUZ MELENDEZ:

21 Q    So, what, if anything, did the defendant say to you about

22 needing to spend time alone with Aaliyah?

23 A    To work on her vocals, as it says in there, that he would

24 say he need to spend time with her to work on her vocals.  In

25 other words, I'm always under him, so go get you something to

1  eat.

2  Q    In a private setting, is that correct?

3  A    A private setting is a studio, wherever we are, it's a

4  studio, yeah.

5  Q    But alone, correct?

6  A    Yeah.

7            MR. CANNICK:  Objection, Your Honor.

8            THE COURT:  Overruled.

9  BY MS. CRUZ MELENDEZ:

10  Q    To your knowledge, were there times when the defendant

11  and Aaliyah ended up being alone in the defendant's apartment?

12  A    Yes, I could -- I would think so, yes.

13  Q    And how long might they spend time alone in his

14  apartment?

15  A    I mean her mom would come up with her and they'd all

16  sleep -- you know, all stay over.  And if her mom left out,

17  Robert would be there with her and stuff like that.

18  Q    Sir, my question is --

19  A    I'm just trying to see where you're trying to drive me

20  with your question.

21            THE COURT:  So, here is the deal.  You listen to the

22  question that Ms. Cruz Melendez is asking you and then answer

23  that question.

24            Remember that instruction I gave you at the

25  beginning to answer the question that you are being asked?

Smith - direct - Cruz Melendez                    688

1          What is the question that you're asking?

2          MS. CRUZ MELENDEZ:  I asked how long might they

3   spend at his apartment.

4          THE COURT:  Do you know how long that --

5          MS. CRUZ MELENDEZ:  The defendant and Aaliyah, when

6   they were alone, how long might they spend at his apartment?

7          THE COURT:  That's the question.  A, did they spend

8   time alone at Mr. Kelly's apartment?

9          THE WITNESS:  Yes.

10         THE COURT:  And when they did that, how long did

11  that happen?  How long were they alone together?

12         THE WITNESS:  Maybe about an hour, maybe sometimes

13  fifteen minutes, sometimes ten minutes.  I'll go back and

14  forth sometimes.  You know, it's like I don't know what you're

15  asking me.

16         THE COURT:  Okay, again --

17         THE WITNESS:  Yes.

18         THE COURT:  -- listen to the question --

19         THE WITNESS:  I listened to the question.

20         THE COURT:  -- and if you don't understand --

21         THE WITNESS:  I heard the question.  I understand

22  the question.

23         THE COURT:  Okay, so remember, I also told you at

24  the beginning if you don't understand a question --

25         THE WITNESS:  I understand the question.

1          THE COURT:  You do, okay.

2          THE WITNESS:  Yeah.

3          THE COURT:  So do your best to answer it, all right?

4          THE WITNESS:  Yes, ma'am.  Yes, ma'am.

5          THE COURT:  Thank you so much.

6          Go ahead.

7    BY MS. CRUZ MELENDEZ:

8    Q    I think you said you mentioned fifteen minutes, ten

9    minutes, but you also said an hour, correct?

10   A    Maybe an hour, yeah.

11   Q    Did you ever have any conversations with the defendant

12   about his behavior with Aaliyah?

13   A    Okay, can you ask that again, please?

14   Q    Yes.

15          Did you ever have any conversations -- sir, did you

16   ever have any conversations with the defendant about his

17   behavior with Aaliyah?

18   A    I've asked Robert at times.  I thought that they were,

19   you know, playful.  They played a lot.  And I thought that at

20   times I was concerned that Robert -- that it was all playful,

21   yes, so at times -- at times I have asked him:  Robert,

22   everything cool with you and Aaliyah, man?

23   Q    And what did you mean by that when you asked the

24   defendant if everything cool there?

25   A    I mean I just thought they were playful, you know, just

Smith - direct - Cruz Melendez                    690

1   over-playful and -- sometimes.

2   Q    Sir --

3   A    And I might have asked him every time, Robert,

4   everything -- you ain't messing with Aaliyah or nothing like

5   that or something like that, yeah.  And he'll say no.  He said

6   no, and I believed it.

7   Q    What, if anything, did you see or hear that made you ask

8   the defendant about his behavior with Aaliyah?

9   A    Being too playful.  Just being together and being too

10  playful.  That was just like, you know, it was just being too

11  playful and Aaliyah was young and I didn't want people to have

12  the wrong vision of things.

13  Q    Did you raise concerns with the defendant more than one

14  time?

15  A    A couple times, maybe.  I just don't remember all of

16  that, but maybe.

17  Q    Now --

18  A    I remember that one time, and I remember a time --

19  that's -- I only remember one time actually right now.

20  Q    You had used the phrase you asked the defendant whether

21  or not he was "messing with Aaliyah."

22           What did you mean by "messing with Aaliyah"?

23  A    Yes, I did ask him that before.  I did ask him that.

24  Q    Okay, can you explain to the jury --

25  A    This was a few years after.  Well, what I meant by that

1  was -- well, I just thought they were too playful.  I just

2  thought that -- I didn't assume anything, and I don't want to

3  assume anything now.

4  Q    I'm not asking you to assume anything, sir, I'm asking

5  you --

6  A    What I meant by that --

7            MR. CANNICK:  Your Honor, can he be allowed to

8  answer?

9            THE COURT:  Well, I think she needs to put the

10 question.

11           So, let her finish the question and you let him

12 finish the answer, and just listen to the question and answer

13 it.

14           Go ahead.

15 BY MS. CRUZ MELENDEZ:

16 Q    I'm asking you, sir, what did you mean by the phrase

17 "messing with Aaliyah" when you spoke to the defendant about

18 his behavior with Aaliyah?

19 A    Again, I thought they were kinda too friendly, and by

20 being so friendly I just wanted to make sure that Robert

21 wasn't messing with Aaliyah.

22           Messing with Aaliyah means flirting, being

23 flirtacious, seducing her, Aaliyah.

24 Q    At some point did you, in fact, learn that Aaliyah and

25 the defendant were more than friends?

1    MR. CANNICK:  Objection.

2    THE COURT:  Overruled.

3  A    Ask that again.

4  Q    Did you learn that Aaliyah and the defendant were more

5  than friends?

6  A    They were more than friends from the very beginning,

7  Aaliyah was a happy spirit, and at the same time Robert seemed

8  to be on the same page with Aaliyah in respect to their

9  communication.  They just had -- and, wait, ask again.

10  Q    I'll rephrase my question, sir.

11        Was there a time when you learned that Aaliyah's and

12  the defendant's relationship was more than professional or

13  more than platonic?

14  A    Well, yes.  That was when I -- boy, boy, boy.

15        We were on tour and Robert mentioned to me that

16  Aaliyah was in trouble.  And we didn't explain anything until

17  we got into the airport and got us home.  And that was the

18  only time.

19  Q    Okay, so I want to back you up for a moment.  You

20  mentioned that you were on tour.

21  A    Uh-hum.

22  Q    Were you outside of Chicago?

23  A    Yes, yes.

24  Q    Do you recall sitting here today what city you were in

25  when you and the defendant were on tour?

Smith - direct - Cruz Melendez                  693

1   A    I think we were in Orlando, I think.

2   Q    Is it fair to say you're not sure?

3   A    Yes.

4   Q    And as part of this tour, did the defendant have a

5   performance schedule?

6   A    Yes.

7   Q    And what, if anything, did the defendant say to you prior

8   to his going on stage?

9   A    Aaliyah's in trouble, man, we need to get home.

10  Q    And did he tell you what he meant by Aaliyah was in

11  trouble?

12  A    No.  Not at the time, no.

13  Q    What, if anything, did you say in response to the

14  defendant telling you that Aaliyah was in trouble?

15  A    I asked -- I wanted to call Barry Hankerson.  I wanted to

16  call her uncle and figure out what was going on.

17  Q    And what did the defendant say when --

18  A    He said:  Don't call Barry.  He said:  It's deeper than

19  you think, you know, so I'll tell you about it.

20        And I made the arrangements and after the show we

21  went, boarded a plane to Chicago.

22  Q    Okay, and I just want to make sure that things are clear

23  for the defendant -- I mean, excuse me, clear for the jury.

24        What was the defendant's demeanor when he said that

25  Aaliyah was in trouble?

1  A    His demeanor?

2  Q    Yes.

3  A    He was about to go on stage.

4  Q    But when he told you that Aaliyah was in trouble, what

5  was he like?  What was his demeanor?

6  A    He was concerned.

7  Q    And I think you mentioned you testified that you had

8  suggested calling Barry Hankerson?

9  A    Uh-hum.

10  Q    Can you just remind the jurors who Barry Hankerson was

11  with respect to the defendant?

12  A    Barry Hankerson was Robert Kelly's manager and Aaliyah's

13  uncle.

14  Q    So, you testified that at some point you made the

15  arrangements, I believe that's what you said?

16  A    Yes.

17  Q    What arrangements did you make?

18  A    I called our travel agent and she got us some flight to

19  Chicago.

20  Q    Why did you call the travel agent?

21  A    Because that's who arranged our flights.

22  Q    But who asked you to call the travel agent or to arrange

23  flights?

24  A    Robert said we need to get home, so I called my travel

25  agent.

Smith - direct - Cruz Melendez                    695

1   Q    Okay.  And did the defendant say when he wanted to leave
2   to go back to Chicago?
3   A    We had to leave after the show.
4   Q    And so, what arrangements did you make?
5   A    I called my travel agent.
6   Q    Do you remember the travel agent's name at the time?
7   A    I actually don't.
8   Q    So, what kind of tickets did you arrange, were they
9   one-way, round-trip?
10  A    I don't remember.
11  Q    So, is there something that would refresh your
12  recollection?
13  A    Sure.
14           MS. CRUZ MELENDEZ:  May I approach, Your Honor?
15           THE COURT:  Yes.
16           (Pause.)
17  BY MS. CRUZ MELENDEZ:
18  Q    Does that refresh your recollection?
19  A    Yeah, they were round-trip.
20  Q    What kind of tickets?
21  A    Yeah, it was round-trip tickets.
22  Q    I'm sorry, I just want to ask the question.
23           What kind of tickets did you arrange?
24  A    Round-trip tickets.
25           (Continued on the following page.)

D. Smith - Direct/Ms. Cruz Melendez          696

1    EXAMINATION BY

2    MS. CRUZ MELENDEZ:

3    (Continuing.)

4    Q    And you said you contacted the travel agent.  How did

5    you contact that travel agent?

6    A    Wrote a letter.

7              THE COURT:  Come on.

8    A    I used the telephone.

9    Q    And who paid for the tickets?

10   A    Who paid for the tickets?

11   Q    Yes.

12   A    The company we were under Black Round Records.

13   Q    And when you say the company in Black Round Records?

14   A    Jive Records, whoever paid for his transit.  I would

15   submit the bill, they paid it.  Who paid it directly?

16   Q    You didn't pay, specifically, for the tickets, though?

17   A    Not out my pocket, no.  Travel agent had hooked up with

18   Jive Records or Black Round Records.

19   Q    Where was the defendant while you were making the travel

20   arrangements?

21   A    Performing.

22   Q    Now, you had testified earlier that the defendant was on

23   tour at the time and you also testified that he went on

24   stage.

25              With respect to this tour, was this day the last

D. Smith - Direct/Ms. Cruz Melendez          697

1    day of the tour?

2    A    I wouldn't think so, no, because they got roundtrip

3    tickets.

4    Q    So were there other performances scheduled after that

5    day as part of the tour?

6    A    Yes.

7    Q    Were you surprised by the defendant's request to leave

8    the location of the show to go to Chicago?

9    A    Yes.

10              MR. CANNICK:  Objection.

11              THE COURT:  Overruled.

12              Can I see the parties at the side, please.

13              (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                                    698

1          (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4          THE COURT:  You've got to move this along.  Just

5    cut to the chase with him.  You're not going to get every

6    single detail out of him and I would love to finish him today

7    but I suspect you have --

8          MR. CANNICK:  I have some cross.

9          THE COURT:  -- a fair amount of cross with him.

10   But the longer spend with him, the more difficult it is to

11   get information out of him.

12         MS. CRUZ MELENDEZ:  I do understand, your Honor.  I

13   think he is testifying with respect to Racketeering Act 1.

14         THE COURT:  I know, I get it, but some of it is --

15   let's go.  I mean, it's -- I'm not -- I'm kind of telling you

16   how to do your direct, but I would like to move it along a

17   little bit, but I recognize he's a difficult guy.  But if we

18   can just move the ball a little bit forward to see as much as

19   we can get done he'll be back on you Monday.

20         MR. CANNICK:  That's what I was going to tell you.

21         THE COURT:  But still.  Just try.  I'm not going to

22   yell and scream but I'm --

23         MR. CANNICK:  Also, note my objection.  I don't

24   know if it was -- I think it was not intended but there were

25   questions being asked where the question presupposed an

Sidebar                                                        699

1   answer and there was no connectivity.  It's the kind of a

2   situation where the witness had already gave that testimony.

3   I think the question was just asked ahead of the foundational

4   question to get that answer.

5            THE COURT:  I don't remember what it was.

6            MR. CANNICK:  I don't remember now.

7            THE COURT:  It seemed like whatever it was, I

8   remember the context seemed like it wasn't an earth

9   shattering performance.

10           MR. CANNICK:  Right.  It wasn't earth shattering.

11           THE COURT:  We have to move it along.

12           MS. CRUZ MELENDEZ:  To your point, your Honor, if

13  I'm going to move things along I anticipate that there would

14  not need to be some leeway with respect to --

15           THE COURT:  I don't supposed you're going to object

16  to leading through sort of obvious things.

17           MR. CANNICK:  There are certain things that I

18  probably should be objecting to but I'm letting it go.  I'm

19  just letting it go so we can move on.

20           THE COURT:  I don't want the court reporters to

21  quit because he's freestyling a lot.  He's hard to hear and

22  he likes to add his own.  Some leading I think is fine on

23  this to direct him to an answer.  I've be been looking at his

24  §3500 material so I know we can get there.  All right?

25           MR. CANNICK:  There's a hurricane coming I'm told

Sidebar                                                700

1   about that I want to get out of here.

2              (Sidebar discussion concludes.)

3              (Continued on the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D. Smith - Direct/Ms. Cruz Melendez          701

1           (In open court.)

2           THE COURT:  Mr. Smith.

3           THE WITNESS:  Yes, ma'am.

4           THE COURT:  I want you to listen to the question

5  and answer the question that you're being asked as best as

6  you can.  Try not to add color to the answer, all right?

7  Just listen to Ms. Cruz Melendez's question and answer that

8  question.  Deal?  Yes, Judge.

9           THE WITNESS:  Yes, Judge.

10          THE COURT:  Thank you so much.  Go ahead.

11 EXAMINATION BY

12 MS. CRUZ MELENDEZ:

13 (Continuing.)

14 Q    Your Honor, I believe my last question was, "Were you

15 surprised by the defendant's request to leave the location of

16 the show to go to Chicago.

17 A    Yes.

18 Q    And why were you surprised?

19 A    It wasn't in the schedule.

20 Q    Now, you had mentioned that you had made travel

21 arrangements who did you make travel arrangements for?

22 A    Me, Robert, and Tyree Jamieson went with us.

23 Q    Do you recall approximately what time the defendant's

24 performance had started?

25 A    Normally, they start about 7:30, 8:00 o'clock.

D. Smith - Direct/Ms. Cruz Melendez          702

1   Q    How long was the show, if you recall?

2   A    To about 10:30, 11:00 o'clock.

3   Q    And after the show, you had mentioned you made travel

4   arrangements.  Did you head to the airport?

5   A    Yes.

6   Q    And how long after the show, did you head to the

7   airport?

8   A    As soon as the show was over, we get in the car, we go

9   to the airport.

10  Q    And you had mentioned being in the car.  Who was in the

11  car?

12  A    The limo driver, me, Robert, and Tyree.

13  Q    And what was the defendant's demeanor during the car

14  ride to the airport?

15  A    Quiet.

16  Q    What, if any, conversations did you have with the

17  defendant while on the drive?

18  A    We didn't talk.  He was quiet.

19  Q    And you arrived to the airport and got on the plane, is

20  that fair to say?

21  A    Yes.

22  Q    Now, what, if anything, did the defendant say to you

23  once you were on the plane about Aaliyah?

24  A    He asked me, well, I asked him what was going on?

25  Q    And what did the defendant say?

D. Smith - Direct/Ms. Cruz Melendez        703

1   A    Give me a moment.  Just a moment.  I'm just trying to

2   think.  I want to say it right.  We got on the plane and.

3           THE COURT:  Into the microphone.

4   A    We got on the plane.  Robert, again, quiet all the way

5   to the airport until we got on the plane.  I said, What's

6   going on?  He said, Aaliyah, man, she think she pregnant.

7   And that was a shock.

8   Q    And what was the defendant's demeanor when he was

9   telling you that Aaliyah thought she was pregnant?

10  A    Well, his demeanor was he was concerned about her.  He

11  was concerned and I didn't know what was going on or they

12  were like, you know, talking all the time.  So I didn't know

13  what was really going on, his demeanor, he was worried about

14  her.

15  Q    How did he appear to her during that plane ride?

16  A    Worried about her.  He spoke to his sister about it.

17  She told him, and I told him, you know, what you can say it

18  was him but, you know.  And that's where we left it, we

19  didn't really talk about anything else about that until we

20  got to the Chicago and I saw Derrel and it was crazy.

21  Q    Mr. Smith?

22  A    Yes.

23  Q    Is it your testimony that you didn't have any other

24  conversations with the defendant on the plane?

25  A    Well, while on the plane, I think I told him, like I

D. Smith - Direct/Ms. Cruz Melendez          704

1  said, she thinks she's pregnant.  I said, Robert -- I don't

2  remember that.  Let me see what I said.

3          THE COURT:  You need your recollection refreshed?

4          THE WITNESS:  Yes, can I refresh it?  I don't want

5  to say yes to anything.  I'm on medications.

6          Like I said, he told me that Derrel knew he was

7  making arrangements for him to marry Aaliyah.

8  Q    And did the defendant say why he had to marry Aaliyah?

9  A    Well, they told him that he -- that's what he told me

10 that they told him, Derrel and him, to protect himself.

11 Q    To protect himself from what?

12 A    To protect Aaliyah.  That was --

13         MR. CANNICK:  Your Honor, I'm going to object.

14 A    -- you're asking me stuff.

15         THE COURT:  First of all, the objection is

16 overruled.

17         Don't have an argument with the Assistant United

18 States Attorney, she's asking you a question.

19         THE WITNESS:  I have to use the bathroom.

20         THE COURT:  You need a break?

21         THE WITNESS:  Yes, ma'am.

22         THE COURT:  All right.  Ladies and gentlemen, we're

23 going to take a five-minute break.

24         And can you escort the witness out, please.

25         COURTROOM DEPUTY:  All rise.

D. Smith - Direct/Ms. Cruz Melendez          705

1          (Jury exits courtroom at 4:48 p.m.)

2          (Witness leaves the witness stand.)

3          THE COURT:  All right.  We can take Mr. Kelly in

4     the back, but I'm staying here so don't anybody go too far.

5     As soon as he comes back, we'll continue.

6          (Defendant enters the courtroom at 4:49 p.m.)

7          (A recess in the proceedings was taken.)

8          (Witness takes the witness stand.)

9          THE COURT:  Just before the jury comes out,

10    Mr. Smith.  Mr. Smith.

11         THE WITNESS:  Yes, ma'am.

12         THE COURT:  This will go a lot smoother and a lot

13    faster if you listen to the question and answer the question.

14    I'm running a little bit out of patience here.  If you can

15    answer the question, answer the question.

16         THE WITNESS:  You running out of patience?

17         THE COURT:  I am and I run the show.

18         THE WITNESS:  Then we can go home then, right?

19         THE COURT:  No, you can't.  You answer the

20    questions that you're asked and cooperate with the prosecutor

21    and answer the questions that she asks you it's five to 5:00.

22    Let's go, let's get the jury in.

23         (A brief pause in the proceedings was held.)

24         COURTROOM DEPUTY:  All rise.

25         (Jury enters courtroom at 4:57 p.m.)

D. Smith - Direct/Ms. Cruz Melendez          706

1          COURTROOM DEPUTY:  You may be seated.

2          THE COURT:  Okay.  Ladies and gentlemen, we're

3   ready to continue.

4          Go ahead, Ms. Cruz Melendez.

5          MS. CRUZ MELENDEZ:  Your Honor, if I could have the

6   last question read back.

7          THE COURT:  Sure.

8          COURTROOM DEPUTY:  The witness is reminded he is

9   still under oath.

10          (The requested portion of the record was read back

11   by the Official Court Reporter.)

12          MS. CRUZ MELENDEZ:  Can I have the witness remove

13   his mask?

14          THE COURT:  Take your mask off, Mr. Smith.

15   EXAMINATION BY

16   MS. CRUZ MELENDEZ:

17   (Continuing.)

18   Q    Mr. Smith, when the defendant said that Derrel had said

19   that he needed to marry Aaliyah to protect himself, protect

20   the defendant from what?

21   A    I guess jail, I guess.

22   Q    I'm sorry.

23   A    I guess jail.

24          MR. CANNICK:  Objection.  If he doesn't know.

25          THE COURT:  Overruled.

D. Smith - Direct/Ms. Cruz Melendez          707

1  Q    Did the defendant say that?

2         MR. CANNICK:  Objection.

3  A    Yes.

4         THE COURT:  Overruled.

5  Q    And you mentioned Derrel, who was Derrel.

6  A    Derrel McDavid.

7  Q    Who is he in relation to the defendant?

8  A    He was Robert's accountant as well as Robert's acting

9  manager.

10 Q    What, if anything, did the defendant say to you on the

11 plane with respect to where Aaliyah was?

12 A    With respect to where Aaliyah -- at the hotel.

13 Q    What hotel?

14 A    I think it was the Sheraton in Maywood.  Sheraton or I

15 think it was the Sheraton.

16 Q    In what city, though?

17 A    What was that?  Maywood.

18 Q    What state is that located in?

19 A    Illinois.

20 Q    On that plane ride who, if anyone else, did the

21 defendant tell you he had spoken to about Aaliyah possibly

22 being pregnant?

23 A    He spoke to his sister, he told me that.

24 Q    And what did he say about that?

25 A    He spoke to his sister.  He spoke to his sister.

D. Smith - Direct/Ms. Cruz Melendez          708

1  Q    And what did he tell you that he told his sister?

2  A    His sister said that, well, if Aaliyah said she's

3  pregnant, doesn't mean she's pregnant, you know.

4  Q    And when the defendant was telling you these things,

5  what was his demeanor?

6  A    Concerned.

7  Q    Is it your testimony here today that he was -- his

8  demeanor was just concerned?

9          MR. CANNICK:  Objection.

10         THE COURT:  Overruled.  Was it anything else

11 besides concerned?

12         THE WITNESS:  I mean, what did I say before?

13         THE COURT:  You need to have your recollection

14 refreshed?

15         THE WITNESS:  Yes.

16         MS. CRUZ MELENDEZ:  May I approach, your Honor.

17         THE COURT:  Yes.

18         (Approaching the witness.)

19         (Showing to the witness.)

20         THE WITNESS:  Yeah, he was crying a lot.  Yeah he

21 was crying.

22 Q    So did you and the defendant and Tyree ultimately land

23 in Chicago?

24 A    Yes.

25 Q    And what time did the plane land in Chicago,

D. Smith - Direct/Ms. Cruz Melendez          709

1  approximately?

2  A    I don't recall.

3  Q    Was it in the morning, evening?

4  A    Early morning, probably.  Yeah, early morning.

5  Q    And once you landed what happened?  Where did you go

6  after you landed?

7  A    Can you ask that again?

8  Q    Where did you go after you landed?  You, the defendant,

9  and Tyree, where did you go?

10 A    I remember correctly we went to the hotel, to the

11 Sheraton Hotel.  I remember correctly.

12 Q    Okay.  Mr. Smith, do you recall giving grand jury --

13 A    Can I just read that so we don't have to keep on going

14 through this here.

15          THE COURT:  Does it refresh your recollection?

16          THE WITNESS:  Yes, it does.

17          THE COURT:  Why don't you show him, direct him to

18 the page.

19          THE WITNESS:  I feel like I'm on trial for Aaliyah.

20 Shit.  Aaliyah not even here to say where you go after that.

21          We went home to his house.  When you say, Home to

22 his house, what do you mean?

23 Q    Don't read it.

24 A    Lake Point Towers.

25 Q    Don't read it.

D. Smith - Direct/Ms. Cruz Melendez          710

1    THE WITNESS:  I'm sorry, Judge.

2    THE COURT:  That's all right.  Just answer the

3    questions.

4  Q    And when you say, his house, whose house did you go to?

5  A    Lake Point Towers, Robert's house.

6  Q    And when you were at the defendant's house what, if any,

7  conversations did you have with the defendant there about the

8  situation with Aaliyah?

9  A    I remember that and I told Robert that this is something

10 that just couldn't happen; that he shouldn't listen to

11 Derrel.  I told him that he couldn't marry Aaliyah, that she

12 was too young and, you know, that she couldn't go to school

13 without a truant officer coming after her.  So that's

14 something you shouldn't do.  That's what I do remember about

15 that.

16 Q    And what did the defendant say to you?

17 A    He was confused.  He was confused and he just asked me

18 whose side I was on.

19 Q    And you said he asked which side were you?

20 A    Who you with, me or them?  That's, you know.

21 Q    And, at some point, did you leave the defendant's

22 apartment?

23 A    Yes.

24 Q    After leaving the defendant's apartment, where did

25 you -- where did you go?

1  A    I think to the hotel.

2  Q    And who went with you to the hotel?

3  A    Me and Robert.  I think me and Robert were together, I

4  think.

5  Q    And you testified earlier that you thought it was a

6  Sheraton?

7  A    Yes.

8  Q    And why did you go to that Sheraton?

9  A    To meet with Derrel.

10  Q    And was anyone else at that Sheraton?

11  A    I don't remember.

12         THE COURT:  Do you need to have your recollection

13  refreshed?

14         THE WITNESS:  Yes, please.

15         THE COURT:  All right.  You just need to ask.

16         THE WITNESS:  Yes.

17         THE COURT:  Go ahead.

18         MS. CRUZ MELENDEZ:  I think I can ask a question

19  that might assist.

20         THE COURT:  Whatever will be best.

21  Q    Was Aaliyah there at the hotel?

22  A    Yes.

23  Q    And when you say you went to the hotel, where in the

24  hotel did you go?

25  A    To the room.

D. Smith - Direct/Ms. Cruz Melendez                712

1  Q    And do you recall what kind of room it was?

2  A    It was a hotel suite.

3  Q    Now, once you reached the hotel, what, if any,

4  conversation did you have with the defendant about his plan

5  to marry Aaliyah?

6            MR. CANNICK:  Objection.

7            THE COURT:  Overruled.

8            MR. CANNICK:  It's not the testimony.

9            THE COURT:  Overruled.  You got to use the

10 microphone, I can barely here you.

11           Thanks.

12 A    I was always an objection to what Robert was being told

13 to do.

14 Q    What, if any, next steps did you discuss?

15 A    They wanted to figure out how to make that happen, make

16 the marriage happen.  And I felt I was going to get ready to

17 get pushed out the loop in respect to and I wanted to keep

18 ahold of Robert.  So I suggested that I could get

19 identification.  I wanted to stay in the loop, I wanted to

20 stay -- I want to just do things to make it happen but not

21 happen.

22 Q    Okay.

23 A    I said that I could get the I.D.ss I know somebody who

24 could get her I.D. or something like that and that's what I

25 did.

D. Smith - Direct/Ms. Cruz Melendez                 713

1   Q    I.D.s for what?

2   A    For it I.D.s to prove her age.

3   Q    And why did you need an I.D. for Aaliyah?

4   A    Aaliyah was underage.

5   Q    When you say, "underage,' under 18?

6   A    Yes.

7   Q    Okay.  Did you discuss at all what kinds of

8   identification you needed to get for Aaliyah?

9   A    I felt that when you go to get a marriage license you

10  would need to have proper identification, state I.D. And only

11  state I.D. I knew was to get a welfare I.D. and so...

12  Q    Did you discuss any other types of identification that

13  Aaliyah might need?

14  A    She needed more than one piece of I.D.

15  Q    How did you know she needed one more than piece of

16  identification?

17  A    I figured you need that to do anything to get a license,

18  to get a marriage license, to get on an airplane or you need

19  more than piece of I.D. and that I.D. was not official

20  identification it was just an I.D. for that office.  It

21  suppose that there.

22  Q    So were there -- did you have any other discussions

23  about the other types of identification?

24  A    Yes, there was a FedEx work I.D., a school I.D., those

25  were the three pieces of I.D.

D. Smith - Direct/Ms. Cruz Melendez          714

1  Q    So going back to the identification that you mentioned

2  from the welfare office.  What, if any, discussion did you

3  have with the defendant about how you could obtain the

4  welfare office identification?

5  A    Well, I actually didn't have any discussion with Robert,

6  it was with Derrel.

7  Q    What did you discuss with Derrel?

8  A    I said I could probably get that.  I could probably go

9  in there and talk her into it.  You know, everybody needs

10  some money.

11  Q    Now, was when you -- I'm sorry can you say that again?

12         MS. CRUZ MELENDEZ:  Can you read back to me his

13  answer.

14         (The requested portion of the record was read back

15  by the Official Court Reporter.)

16  Q    And what did you mean, "Everybody needs some money"?

17  A    I mean, I felt like I could offer somebody some money to

18  give me an I.D.

19  Q    Who would you be offering money to get?

20  A    Whoever would open up to it.  To be receptive to it.

21  Q    Who would you be offering money to get the

22  identification from?

23  A    Well, I went to the welfare office and I went in and I,

24  hey, want to make some money?

25  Q    And before we get there, though, did you have a

D. Smith - Direct/Ms. Cruz Melendez          715

1  discussion about how much money you would need?

2  A    I told Derrel give me about 500 bucks.

3

4              (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D. Smith - direct - Cruz Melendez                716

1   DIRECT EXAMINATION (Continuing)

2   BY MS. CRUZ MELENDEZ:

3   Q    Now, did you have any discussion with the defendant about

4   the amount of money you would need in order to get this

5   identification from the welfare office?

6            MR. CANNICK:  Objection.

7            THE COURT:  Overruled.

8   A    Did I have a discussion with Robert about -- recall.

9   Q    Do you not recall?

10  A    You got it write it down.  I said it before.  I don't

11  want to say what I said, because I don't remember discussing

12  money with Robert about anything in that respect.  I don't

13  remember that.

14           Again, I might have mentioned it, but, you know, my

15  communication was with Derrel.

16  Q    You might have mentioned it to whom?

17  A    I might have mentioned it to Robert.

18  Q    So you testified that at some point you did, in fact, go

19  to a welfare office to get an identification card; is that

20  correct?

21  A    Yes, I did.

22  Q    Okay.  Who went with you?

23  A    Aaliyah and...I think -- I don't remember who I was with.

24  Q    How did you get there?

25  A    Drove.

1   Q    And was Aaliyah in the car with you?

2   A    I don't remember.

3        THE COURT:  But eventually -- but she went to the

4   same place --

5        THE WITNESS:  If she wasn't in the car with me, then

6   she was in the car behind me.

7        THE COURT:  All right.  Next question.

8   Q    And who, if anyone, was in the car with Aaliyah?

9   A    If Aaliyah was in the car, she probably was in the car

10  with Robert.

11       MR. CANNICK:  Objection.

12       THE COURT:  Overruled.

13       Do you remember?

14       Is there anything that would refresh his

15  recollection?

16       MS. CRUZ MELENDEZ:  Yes, Judge.  I'm going to show

17  him his grand jury testimony, which is 3500...I'm sorry, Your

18  Honor.  It's 3500-DS1-4.

19       THE COURT:  Okay.

20       MS. CRUZ MELENDEZ:  Just for the record, Your Honor,

21  when I have been refreshing Mr. Smith's recollection, it's

22  been 3500-DS1-4.

23       THE COURT:  Got it.  Great.

24       THE WITNESS:  Uh-hum.  Let me see.  I mean, like I

25  said, if she wasn't with me, she was in the car behind me, as

1  that says.

2  Q    My question was whether or not the defendant was with

3  Aaliyah in the car behind you?

4  A    Yes.

5  Q    Now, you testified that you thought that you could get an

6  ID from a welfare office.  Had you ever had public benefits

7  from the welfare office before?

8  A    Yes.

9  Q    So had you ever been to the welfare office that you went

10  to?

11  A    Yes.

12  Q    Do you recall where it was that you went to, which

13  welfare office you went to?

14  A    22nd Street and State.  22nd and State, I think it was.

15  21st.

16  Q    What happened once you got to the welfare office?

17  A    I went inside, you know, felt my way around, and I

18  approached a person, and she agreed and she made an ID.

19  Aaliyah came in.  She took the ID.

20  Q    Now, when you say you approached a person, who did you

21  approach?

22  A    I don't know her.

23  Q    Okay.  Do you recall -- you said it was a her.  It was a

24  woman?

25  A    Uh-hum.

D. Smith - direct - Cruz Melendez                    719

1    Q    And what was the woman's race?

2    A    She was African-American.

3    Q    And what, if any -- what was her position at the welfare

4    office?

5    A    Taking photos.

6    Q    And what, if anything, did you say to the woman who took

7    photos at the welfare office?

8    A    I don't remember word for word, but I made her an offer

9    and she took the money.

10   Q    How much money did you give her?

11   A    I gave her 500 bucks.

12   Q    Where had you gotten that money from?

13   A    Derrel.

14   Q    And how did he give the money to you?

15   A    Cash.

16   Q    Now, you had earnings inned that the woman at the welfare

17   office took photos there.  Did she work at the welfare office?

18   A    Yes, I would assume.

19            MR. CANNICK:  Objection to the assumption.

20            THE COURT:  Overruled.

21   A    I mean, she -- I went in there.  She took a photo.

22   Apparently she had to work there, I don't think she would've

23   been able to do that.

24   Q    You didn't know her specifically?

25   A    I don't know her personally, specifically, I never seen

D. Smith - direct - Cruz Melendez                720

1   her --

2           THE COURT:  It appeared to you that she worked

3   there, right?

4           THE WITNESS:  Yes.

5           THE COURT:  That's why you gave her the money?

6           THE WITNESS:  Yes.  Yes.

7           THE COURT:  All right.  Next question.

8   BY MS. CRUZ MELENDEZ:

9   Q   So after you gave her the money, what did you do?

10  A   Aaliyah came in, she went and took the ID and we left.

11  Q   And --

12  A   It was just that fast.

13  Q   What kind of identification was it?

14  A   It was a public aid ID.  It wasn't a State -- it wasn't

15  an official identification or anything.  It was just a picture

16  with a -- an ID with a picture on it.  It didn't have her age

17  or anything.

18  Q   So did the woman who you gave the money to, the woman who

19  worked at the welfare office, did she take Aaliyah's photo?

20  A   Yes.

21  Q   Once you obtained the photo and the identification was

22  given to Aaliyah, what happened next?

23          Oh, actually, I'm sorry, just to back up for a

24  moment.

25          You had previously testified that you had obtained

D. Smith - direct - Cruz Melendez                721

1  -- you had gone to a welfare office before?

2  A    Yes.

3  Q    Now, in applying for public assistance, did you ever --

4  did you have to fill out any paperwork?

5  A    Yes.

6  Q    And did you have to provide any documentation when you

7  applied for --

8  A    Yes.

9  Q    -- for welfare services?

10 A    Yes.

11 Q    And generally speaking, what types of documents did you

12 have to provide?

13 A    State ID, birth certificate, social security card.

14 Q    Did you provide your name when you were seeking benefits?

15 A    State ID, social security card, birth certificate.

16 Q    Okay.  And at the time that you took Aaliyah to the

17 welfare office, did she fill out any paperwork?

18 A    No.

19 Q    Now, when you and Aaliyah went into the welfare office,

20 did the defendant come inside?

21 A    No.

22 Q    Where was he?

23 A    In the car.

24 Q    So what happened after you left the welfare office with

25 the ID that you had obtained for Aaliyah?

D. Smith - direct - Cruz Melendez                722

1   A    Went back to the hotel or -- let me see.  She needed to

2   get another ID, so we went somewhere else, I think like a Fed

3   Ex, something like that.

4   Q    And who went to --

5   A    Got another work ID.

6   Q    You believe it was a Fed Ex.  Who went there?

7   A    Me, Robert, Aaliyah and...Tyree, I guess.

8   Q    Why did you go to the Fed Ex that you went to?

9   A    To get work ID.

10  Q    But why specifically a Fed Ex?

11  A    Somebody knew somebody there.

12  Q    Who do you recall knowing someone there?

13  A    I don't know.  I didn't know that person.  I didn't know

14  --  the guy that said he knew somebody, I went with him and I

15  didn't know who he was.  I forgot his name.  He was with us.

16  Q    So you don't recall his name at the moment?

17  A    I don't remember his name at all, no.

18  Q    Is there something that would refresh your recollection?

19  A    What's his name?

20          THE COURT:  Well, she'll show you the transcript.

21          MS. CRUZ MELENDEZ:  I'm showing the witness again

22  3500-DS-14.

23  A    Mr. Williams.

24  Q    Does that refresh your recollection?

25  A    Mr. Williams.  I remember a Williams, but I don't

D. Smith - direct - Cruz Melendez          723

1   remember his name.  I don't remember it.  I remember the

2   Williams, though.

3   Q    And do you recall anything about Williams in terms of --

4   do you recall any information about Williams?

5   A    No.  He was one of Robert's friends.

6   Q    And what, if anything, did Williams do for a living?

7   A    Real estate or something like that, if I remember

8   correctly.

9   Q    And, so, when you arrived at this shipping place, or the

10  Fed Ex place -- excuse me, who -- did you go inside?

11  A    Yes.

12  Q    Who went inside?

13  A    Me, and Aaliyah, and Williams.

14  Q    And what happened once you went inside?

15  A    She took a work ID.

16  Q    What do you mean she took a work ID?

17  A    She took a picture.

18  Q    When you say a work ID, work from where?

19  A    The company, the Fed Ex office, wherever we went.  I

20  don't remember if it was Fed Ex or what, because I don't know

21  if Fed Ex existed there.

22  Q    What type of company was it?

23  A    It was a courier company.

24          THE COURT:  Is it correct, when you say she got an

25  ID, an ID like --

D. Smith - direct - Cruz Melendez                724

1          THE WITNESS:  A work ID.

2          THE COURT:  As though she worked there?

3          THE WITNESS:  Yes.

4          THE COURT:  All right.  Next question.

5   BY MS. CRUZ MELENDEZ:

6   Q    So what happened after Aaliyah obtained the ID card from

7   the courier location?

8   A    We went back to the hotel.

9   Q    And what happened after you went to the hotel?

10  A    We went to get the marriage license.

11  Q    And who went to go get the marriage license?

12  A    Derrel McDavid, me, Robert, and Aaliyah.

13  Q    Do you recall where you went to go get the marriage

14  license?

15  A    City Hall in Maywood.

16  Q    How did you get there?

17  A    Drive.

18  Q    So who went into the City Hall?

19  A    Me, Derrel McDavid, Robert and Aaliyah.

20  Q    Was anyone else there?

21  A    No.

22  Q    Was Tyree there?

23  A    Maybe Tyree possibly was there, yes.  I mean....

24  Q    What happened once you got into the City Hall?

25  A    They applied for their marriage license.

D. Smith - direct - Cruz Melendez                725

1   Q   When you say "they," who do you mean?

2   A   Robert and Aaliyah.

3   Q   From what you observed, when Aaliyah and the defendant

4   went into the Maywood City Hall, did anyone review Aaliyah's

5   ID?

6   A   Yes.

7   Q   What, if anything, happened when -- was it an employee at

8   the City Hall?

9   A   Yes.

10  Q   Okay.  What, if anything, happened when the employee at

11  the City Hall reviewed Aaliyah's ID?

12  A   She let them sign the marriage license.

13  Q   Did she let them sign the marriage license right away?

14  A   She reviewed the ID and she gave the marriage license.

15  Q   Do you recall giving testimony in the grand jury?

16  A   Yes.

17  Q   And do you recall taking an oath to tell the truth?

18          MR. CANNICK:  Objection.

19          THE COURT:  Overruled.

20  A   You keep on threatening me.  I'm ready to go home.

21          THE COURT:  Well, we're not going home yet.

22          Do you want to show him something and see if it

23  refreshes his recollection?  Let's do that.  Okay?

24          MS. CRUZ MELENDEZ:  Absolutely.

25          THE WITNESS:  I mean --

D. Smith - direct - Cruz Melendez                726

1          THE COURT:  We are almost.

2          THE WITNESS:  Yes, ma'am.

3          THE COURT:  Thank you so much.  All right.

4          THE WITNESS:  And the lady was a little hesitant.

5          MS. CRUZ MELENDEZ:  Read it to yourself.

6          THE WITNESS:  Let me just read it because you keep

7  asking me stuff over and over.  I'm getting older and I can't

8  just remember everything.

9          THE COURT:  Well, look at it and see if it refreshes

10  recollection.

11          Does that refresh your recollection?

12          THE WITNESS:  I'm uncomfortable with this, Your

13  Honor.  I'm truly uncomfortable.  We're continuously talking

14  about Aaliyah.  Her parents are not here and I don't

15  understand why I got to do that.

16          THE COURT:  Well, we can have a conversation about

17  that another time.  Let's try to move this along.

18          The question is does that refresh your recollection

19  about --

20          THE WITNESS:  Yes, it does.

21          THE COURT:  -- what happened?

22          THE WITNESS:  Yes.

23          THE COURT:  And what happened?

24          THE WITNESS:  Okay.  Yes, because the IDs didn't

25  have her age on it, yes.

D. Smith - direct - Cruz Melendez                727

1   Q    So what --

2   A    I don't know what Derrel did.  I don't know, you know.

3            THE COURT:  But you said Derrel talked -- is that

4   what you said, Derrel --

5            THE WITNESS:  Yes, Derrel talked to somebody in

6   there.  I don't know what he did.

7            THE COURT:  All right.  And then what happened next?

8            THE WITNESS:  Then they signed the marriage license.

9            THE COURT:  All right.  Next question.

10           THE WITNESS:  Then they went and got married.

11  BY MS. CRUZ MELENDEZ:

12  Q    And did they obtain a marriage license?

13  A    Yes.

14  Q    And what, if anything, happened with the marriage

15  license?

16  A    Took it to a preacher, right.

17  Q    So where did you all go after the --

18  A    Back to the hotel.

19  Q    The same hotel?

20  A    Yes.

21  Q    And what happened once you got back to the hotel?

22  A    They had arranged for a minister and a ceremony took

23  place.

24  Q    Was there a minister there?

25  A    Yes.

D. Smith - direct - Cruz Melendez                728

1  Q    And do you recall the name of the minister?

2  A    No, I do not.

3        You can show it to me and I'll remember his name.  I

4  don't know his name.

5        I mean, I didn't remember his name because it wasn't

6  important to me.

7        THE COURT:  But he was a preacher, right?

8        THE WITNESS:  Yes, ma'am.

9        THE COURT:  Next question.

10        MS. CRUZ MELENDEZ:  Your Honor, I would like to

11  refresh the witness' recollection.

12        THE WITNESS:  What's his name?

13  Q    Can you read that and see if it refreshes your

14  recollection?

15  A    Edmond, I think, something like that, yes.

16        MS. CRUZ MELENDEZ:  One moment, Your Honor.

17        THE COURT:  Sure.

18        Actually, this is a good time to break.  It is

19  almost 5:30 and I know some of the jurors have to get home.

20        MS. CRUZ MELENDEZ:  Okay.  Your Honor, if I could.

21        THE COURT:  Do you want to finish up?  Whatever you

22  want to do.  Two minutes.

23        MS. CRUZ MELENDEZ:  I want him to repeat his last

24  answer.

25        THE COURT:  Okay.

Proceedings                                        729

1   BY MS. CRUZ MELENDEZ:

2   Q    What was the name?

3   A    It said Edmond.  I think Edmond something.

4   Q    Was the name of the officiant who was at the hotel?

5   A    Yes.  Yes.

6            MS. CRUZ MELENDEZ:  I'm fine with ending there.

7            THE COURT:  Ladies and gentlemen, we are going to

8   break for the weekend.

9            Please do not talk about the case, don't look

10  anything up, don't read any articles about it, don't watch any

11  news or anything like that.

12           I thank you for your patience this week.  I will see

13  you Monday morning.  We will begin at 9:30.  And, again, don't

14  look anything up, don't talk to anybody about the case, don't

15  read anything.

16           Have a great weekend.

17           THE COURTROOM DEPUTY:  All rise.

18           (Jury exits the courtroom.)

19           THE COURT:  Okay, you can take the witness out.

20           MS. CRUZ MELENDEZ:  Your Honor, just one moment, if

21  you could instruct the witness he does need to return.

22           THE COURT:  You need to be here on Monday morning.

23  And what time do you want him here?

24           We are starting at 9:30.  So I will see you both

25  then.  Thank you so much.  Have a great weekend.

Proceedings                                                  730

1          MS. CRUZ MELENDEZ:  Thank you.

2          THE WITNESS:  Tell the judge to do things --

3          THE COURT:  See you later.  Have a good weekend.

4          (Witness exits courtroom.)

5          THE COURT:  Let's talk about schedule.  I assume

6    there will come a time when we finish this witness and then if

7    that happy day arrives, then I take it you will have some more

8    witnesses on Monday.

9          Are there any more witnesses of a category -- I

10   assume this person is his own unique fellow, but are there any

11   other people that fall into this same category?

12         MS. GEDDES:  It is within the realm of possibility.

13         THE COURT:  I see.  Okay, well, you will let me

14   know.  I'm not going to ask you how much time you expect to

15   spend with this gentleman, but I'm sure it will be productive.

16         MR. CANNICK:  I hope.

17         THE COURT:  I take it you don't really have a whole

18   lot more left.

19         MS. CRUZ MELENDEZ:  I don't know.

20         MR. CANNICK:  Your Honor, could I get an

21   understanding as to Court's ruling as to overruling my

22   objection?

23         The Government was impeaching its witness by --

24         THE COURT:  I didn't let her do it.

25         MR. CANNICK:  Okay.  Okay.

1   DIRECT EXAMINATION

2   BY MS. GEDDES:

3   Q    Good morning.

4   A    Good morning.

5   Q    Yesterday, before we ended, you testified about the time

6   that you worked at Chicago Trax and then the Chocolate Factory

7   at 865 North Larrabee and in your testimony, you referenced a

8   room on that floor plan called, that referred to Rockland

9   Records.  Do you recall that?

10  A    Yes.

11           THE COURT:  Is your microphone on?

12           THE WITNESS:  There it is.  Power cycle.

13           THE COURT:  All right.  Go ahead.

14  Q    What is Rockland Records?

15  A    It was a record label and production company that

16  Mr. Kelly had or has.  I don't know.

17           MS. GEDDES:  And I am showing the witness only

18  what's been marked for identification as Government

19  Exhibit 525(u).

20  Q    Do you recognize what's shown in 525(u)?

21  A    Yes.

22  Q    What is in 525(u)?

23  A    It is the gated entrance to 865 Larrabee.

24           MS. GEDDES:  And, again, the government offers

25  525(u).

Arnold - direct - Geddes                    1482

1          THE COURT:  Any objection?

2          MR. FARINELLA:  No objection.

3          THE COURT:  Okay.  It's in evidence.  You can

4     display it.

5          (Government Exhibit 525(u) so marked.)

6     Q    This barbed wire fence, from where to where did that

7     extend?

8     A    To the end of the property which would have been the

9     north-most side of the parking lot along Larrabee.  It

10    extended down to the, connect to the buildings, actually to

11    the adjoining structure.

12    Q    And in order to get into the parking lot for Chicago Trax

13    and then the Chocolate Factory on Larrabee, did an individual

14    need to enter through this entrance?

15    A    Yes, that's correct.

16    Q    And in order to leave Chicago Trax and the Chocolate

17    Factory on Larrabee, did an individual need to go out this

18    entrance?

19    A    Yes, that's correct.

20         MS. GEDDES:  I'm showing the witness what's in

21    evidence as Government Exhibit 502(a).

22    Q    Do you recognize 502(a)?

23    A    Yes.

24    Q    What is that?

25    A    It's the gates to the house in Olympia Fields at 1 Maros

Arnold - direct - Geddes                    1483

1    Lane.

2           MS. GEDDES:  And if you could show the witness only

3    what's been marked for identification and 502(b).

4    Q    What's 502(b), if you recognize it?

5    A    Yeah, it's part of the fence that runs along the property

6    line of 1 Maros Lane.

7    Q    And 502(c), do you recognize that?

8    A    Yes.  That's the view of the same house when you pass,

9    once you're inside the gates to the property.

10   Q    And whose house is that?

11   A    That's Mr. Kelly's.

12          MS. GEDDES:  The government offers 502(b) and (c).

13          THE COURT:  Any objection?

14          MR. FARINELLA:  No objection.

15          THE COURT:  Okay.  That's in evidence and you can

16   display it.

17          (Government Exhibit 502(b) and 502(c) so marked.)

18   Q    So I'm showing 502(b) first.  There appears to be a court

19   of some kind.  What is that?

20   A    I can't tell from the photo but depending on the time

21   frame, it's either a tennis court or a basketball court.

22   Q    So during the time period you were there, it was used for

23   two different purposes, is that correct?

24   A    Correct.

25   Q    And just to be clear, that court is on the defendant's

Arnold - direct - Geddes                                   1484

1   property?

2   A    Yes, that's correct.

3   Q    Can you describe the different structures that are on the

4   defendant's property at 1 Maros Lane in Olympia Fields?

5   A    Sure.  There was the main house.  To the right side if

6   you're facing the house was a large garage.  It had three bay

7   doors, I believe, if I remember correctly.  There would have

8   been a pathway from the garage towards what was the tennis

9   court/basketball court and there was sort of a gazebo

10  structure there that at one point in time was also closed in

11  to make sort of a small, like a cabin.

12       From the garage and between the garage and the house

13  would be a pathway that went back to the side entrance of the

14  house, that went into the basement.  There's a yard to that

15  side.  That would have been either empty or had a tent or had

16  ultimate, a larger tent.

17  Q    You talked about the enclosed gazebo.  Was there a name

18  that people who worked at the defendant's residence referred

19  to?

20  A    I believe it was called the cabin at one point in time.

21  Q    And you mentioned the garage with the three bays.  Was

22  that an attached or detached garage?

23  A    It was detached.

24  Q    Can you describe -- did you have an opportunity to go

25  inside that detached garage?

Arnold - direct - Geddes                1485

1   A    Yes.

2   Q    Can you describe what was inside the garage?

3   A    Excuse me.  As far as I remember, there was always a

4   basketball or, I'm sorry, a boxing ring inside the garage.  It

5   was always used as a gym when I worked at that property.

6   Q    The area inside the detached garage was used as a gym, is

7   that correct?

8   A    That's correct.

9   Q    Can you describe the basketball ring?

10  A    I'm sorry?

11  Q    I'm sorry.  Can you describe the boxing ring?

12  A    Yes.  It was a regulation sized, to my knowledge full

13  sized boxing ring with the ropes around the outside.

14  Q    You testified that it was elevated.  How was it elevated?

15  A    I mean it was, it was -- I'm not exactly sure of the

16  construction of a boxing ring, but it's probably two and a

17  half, three feet above the ground and it's springy so there's

18  some sort of spring mechanism underneath it with ropes around

19  the top of it, just as you would see it as a boxing ring on

20  television.

21  Q    Are you aware of whether an individual could crawl

22  underneath the boxing ring?

23  A    It would have a curtain around the outside.

24           THE COURT:  We're having trouble with that mic

25  again.

1          (Pause.)

2    A    There was a curtain around the bottom of the ring.  It

3    would have been open underneath and we used a lot for storage

4    as I recall.

5    Q    You also described that there were tent, there was a

6    tent.  Where was the tent situated?

7    A    On the side of the property, so between where the garage

8    would stand and the house would be a path that went back to

9    the side of the house.  There would have been a patio, not

10   originally, it would have been just a big open yard, but at

11   some point in time while we were at that address, the patio

12   was built and the tent was put on there and then a bigger

13   tent, like a kind of, a very large tent was put on there

14   ultimately.

15   Q    And was that tent there on a semi-permanent basis or was

16   it just used for parties?

17   A    Maybe the original tent that was there was more of a

18   temporary structure but this was a permanently installed tent

19   at one point in time.

20   Q    Can you -- you mentioned that there was a, I think you

21   said there was a side entrance to the basement.  Is that

22   correct?

23   A    That's correct.

24   Q    And what was inside the basement?

25   A    That was the entrance to the studio at the house.

Arnold - direct - Geddes                    1487

1   Q    Can you describe the layout of the studio?

2   A    Sure.

3        So when you came in from downstairs, there would be

4   an entry into, like, what was a reception area, a desk there,

5   a bathroom and then a closet.  The basement was renovated to

6   make a kitchen down there as well and there was a proper

7   reception desk but, otherwise, it was, like, a little closet

8   turned into an office when we first started there and that

9   would be where you could control the gate.  People would come

10  in there and then you would walk down a hallway to a room, to

11  kind of an opening where the actual studio was.

12       So it was -- so when you come into reception, the

13  wall you're looking at is the backside of the actual studio

14  and you would walk around it.  There would be a vocal booth

15  much smaller than the ones that were at Larrabee and then

16  there would be a large control room which would be the next

17  room down.  And double doors there that sectioned off the rest

18  of the house which previously, which originally was storage

19  through there.

20  Q    Was there a name for that first studio that you

21  described?

22  A    I believe we called it Music I.

23  Q    What, if anything else, was located in that basement

24  area?

25  A    So there would be -- when you go through those double

Arnold - direct - Geddes                    1488

1   doors, there would be stairs that led up to the first floor of

2   the house and a long hallway where there would be a door to

3   what would be underneath the aquarium.  There was a big

4   aquarium upstairs.  So there would be a storage room

5   underneath the aquarium there.  Then there was, originally,

6   when we went to Olympia Fields, two sort of rooms used for

7   storage.  I think may have been a classroom at one point in

8   time for his family.  I'm not entirely sure what it was used

9   for originally.  We ultimately turned those rooms into one

10  more studio.

11  Q    And can you describe the interior of that studio?

12  A    Yes.  It had logs on the wall and it was called the Cabin

13  Studio.

14  Q    Why was it -- and was there anything across from that

15  Cabin Studio?

16  A    No, across still would have been the hallway, I think.

17  Q    What, if anything else, was located in that basement

18  area?

19  A    Then there would have been another door.  So as we, as he

20  was developing the basement for studio space, that kind of

21  moved the storage further and further.  So there was another

22  storage room right there after you passed through and then on

23  the left side would have been where the studio storage would

24  have been, where there would have been some technical

25  equipment and amplifiers and things like that.  Then past

1  that, you would be, was storage and then it turned into a

2  theater room.  And then you would be at the other side of the

3  house.

4  Q    When you say a theater room, what are you referring to?

5  A    It was an actual, like, movie theater with raised seats

6  not unlike this, these chairs here.

7  Q    And did you also have an opportunity to go inside the

8  main house apart from the basement area?

9  A    Yes.

10 Q    Can you describe the -- how many floors was the main

11 house?

12 A    The basement and two floors above ground.

13 Q    Can you describe that first floor above the basement?

14 A    Sure.

15       If you were to come in the main front door of the

16 house, there was an entryway with an office room just to the

17 right as you come in and a bathroom to the left.  Then you

18 walked into a grand living room two stories high with big

19 windows on the back wall that were kind of curved.

20       Off the living room would be a kitchen to the left.

21 Once you got into the living room, to the right was a huge

22 projection TV, like, movie theater-size projection screen.  If

23 you go, you can go into the kitchen and then off the back of

24 the kitchen was a sun room.  Instead of walking into the

25 living room, you walked down the hallway, there would be a

Arnold - direct - Geddes                    1490

1    dining room that was later converted into, like, a lounge

2    which would sit across from the kitchen.  And then there would

3    be the servants' entrance at that far side of the house which

4    would be where the dumpsters were kept.

5           And then, sorry, that part.  If you walked in the

6    door and you turned to the right instead of coming into the

7    living room, there would be a long hallway that curved around

8    with a huge aquarium that had sharks and fish in it, big fish.

9    And then to the right as you come around the corner would be

10   the swimming pool area.

11          Then next to the swimming pool was a billiard room

12   and a game room.  So past the swimming pool, you go to the

13   game room.  It was a very large room again with windows that

14   are kind of curved on one side.  And then a bathroom that was

15   accessible through, like, a small little room that at one

16   point in time, I believe, had mirrors on it.  It was kind of

17   like a dance room, a bar, like a dancers' bar.

18   Q    How were the game room and the dancers' studio that you

19   just described connected if at all?

20   A    There was a door from the game room that entered into

21   that room and the bathroom was in that, was connected to that

22   room.

23   Q    So there was the game room/billiard room, and then that

24   was connected to the room with the mirror along the walls, and

25   then there was a bathroom connected to that, is that correct?

Arnold - direct - Geddes                    1491

1   A    Correct.

2         There was also a bathroom on the backside of that

3   which was meant for the pool, that was only accessible from

4   the pool.  And from the game room, you can go from one door to

5   go to the pool area.

6   Q    And the defendant's residence in Olympia Fields, what is

7   the neighborhood there like?

8   A    It was fairly large houses.  None as big as his house

9   was, but pretty big-sized houses.  It was a pretty large

10  neighborhood.

11  Q    And the defendant's residence, was it set back from the

12  main road?

13  A    Yes.  So it was a normal neighborhood street and then you

14  would go down this lane where there was only one house on each

15  side and there would be the gate and you would go inside it.

16  I think it was probably the size of, you know, a few lots in

17  size.  I don't know the actual acreage of the property, but it

18  was a decent drive from the gate to back to the house.

19  Q    When you started working at the defendant's studio within

20  Olympia Fields, how, if at all, did your responsibilities

21  change?

22  A    The runs were a lot further having to drive to -- in the

23  City of Chicago, things were a lot closer.  Out there, we

24  would go to the mall which was in Orland Park or to

25  restaurants which were further away.  Going to get petty cash

1    and cashing checks, the bank was in the city and Bass

2    Productions' office was in Oak Park so I would have to drive

3    to Oak Park so I did a lot of that.  The concept -- the job

4    was pretty much the same.  Just that there was a lot more

5    driving.

6            There was only the one studio to start so there

7    wasn't as many, as much production going on.  Once we had the

8    second studio built, the first studio was used a lot for

9    production and people writing music while he could use his

10   other studio for his primary recording.

11   Q    When you were working at the defendant's studio in

12   Olympia Fields, what, if anything, protocols did you follow

13   for transport -- I think you said that -- did you continue to

14   transport some of the defendant's personal guests?

15   A    I did sometimes, yes.

16   Q    And when you were working -- so now I want to talk about

17   the time when you were in Olympia Fields.  I won't continue to

18   say "Olympia Fields."  I'll make clear if I ask you a question

19   about your time at the Chocolate Factory on Larrabee.

20           So when you were in Olympia Fields, how would you

21   transport guests when you were there?

22   A    It would be the same as before.

23   Q    Whose vehicle would you use, your own or somebody else's?

24   A    No, we always had a runner van or else there would be an

25   Excursion that security had so we could use the security, the

1  runners or myself would be able to use those vehicles for

2  transporting.

3  Q    And are you aware of what other vehicles the defendant

4  had at Olympia Fields?

5  A    Yes.

6  Q    What type of cars did he have?

7  A    He had a lot of cars over a long period of time.  He had

8  a Maybach, Mercedes-Benz Maybach.  He had Lamborghini at one

9  point.  A Mercedes-Benz SLR, I think it was called.  He had a

10 couple of Jeeps at one point.  There was a Chrysler 300 car.

11 Q    Do you remember what color the Chrysler 300 was?

12 A    It was black and red.  I think black across the bottom

13 and red across the top, if I remember correctly.

14 Q    And what -- you mentioned that he -- and by the way, were

15 there other cars in addition to the cars that you just

16 described?

17 A    Yes.  There would have been a couple of Excursions, a

18 black one, and then at one point in time, we had one that was

19 red and brown.  And then the runner would have a minivan.  So

20 there would be a red van.  I think there was a brown van at

21 one point in time too.  And he had a, for a brief time, he had

22 a Rolls-Royce.

23 Q    You mentioned that there were a couple of Excursions.  Is

24 that correct?

25 A    Yes.

1  Q    What do you mean by an Excursion?

2  A    It's the large Ford SUVs, I guess, that were made at that

3  time.

4  Q    Did you ever use the defendant's cars that you just

5  described aside from the Excursion and the minivan to

6  transport guests?

7  A    Yes.  I may have used -- I used the Maybach to take

8  people to places before.

9  Q    And by "people," who are you referring to?

10  A    Your question was about guests.  I've used the Maybach to

11  taking guests.

12  Q    Including female guests?

13  A    That's correct.

14  Q    When one of the defendant's personal guests arrived at

15  the Chocolate Factory, again, in Olympia Fields, what was the

16  protocol for letting them in?

17  A    If the person arrived to the gate and used the call box

18  or called from a cell phone, it would be the same process.

19  We'd either receive instructions as to what to do with the

20  person, to let them in or where they wanted to go, or we would

21  have to call and get instructions.

22  Q    Who would you call?

23  A    I would call Rob or I would call someone that I knew that

24  was with Rob.

25  Q    And who, again, are some of the individuals that you

Arnold - direct - Geddes                    1495

1  might call then if you wanted to get in touch with Rob, the

2  defendant?

3  A    I'm sorry.  One more thing.  If Rob was in the studio or

4  around, we'd run a note to him.  The same as in the studio.

5  We'd let him know that someone was at the gate.

6         I'm sorry.  Could you repeat your question?

7  Q    Sure.

8         Who are some of the individuals that you would call

9  to get in touch with the defendant if you weren't able to get

10 in touch directly with the defendant?

11 A    The same individuals that would have been before that,

12 either June Bug or Donnie who was his music director or

13 anybody that I knew was with him, a security guard, someone

14 that can just have a phone to pass to him.  So it didn't

15 really matter.  As long as I know I could get ahold of him, I

16 could call anybody who could hand the phone to him.

17 Q    Now, you saw earlier that gate and I think you referenced

18 as well the gate that was in front of the property.

19        How did an individual get into the gate?  What had

20 to happen?

21 A    So there was a button in reception that could open the

22 gate.

23 Q    And that was the reception in the studio itself?

24 A    So as soon as you come down the basement stairs, there's

25 that opening area that was receiving people.  There was a desk

Arnold - direct - Geddes                    1496

1   there and then the button would be there to open up the gate.

2   Q    And was there any security situated near the gate?

3   A    Depending on the time frame, there was one point in time

4   a guardhouse on the property where somebody would be situated.

5   Otherwise, there would be somebody sitting in an Excursion,

6   but there was frequent times where there was nobody there and

7   there was a security camera in reception so you could actually

8   see the gate clearly on the security camera.

9   Q    And when you said that there were times when there was an

10  Excursion there, was anyone inside that Excursion?

11  A    Oftentimes there would be a single security person and

12  two security persons sitting in that Excursion.

13  Q    So once you learned where a guest was to be escorted to,

14  what, if anything, would you have the guest do before the

15  guest was escorted to that particular location?

16  A    There was a large period of time when we were having

17  people sign confidentiality agreements.

18  Q    What did you understand to be in this confidentiality

19  agreement?

20       Did you have an opportunity to read the agreements?

21  A    Yes.

22  Q    What did you understand that they said?

23  A    The agreement said that the person was not to film, take

24  photographs or talk about anything that they had seen or had

25  experienced or been around at the, at the time at the studio.

1  Q    And what, if anything, would a guest, did a guest provide

2  upon signing, when they were presented with this

3  confidentiality agreement?

4  A    We would have photocopied a driver's license as we did,

5  the same process we did in the city or we'd take a Polaroid of

6  them and staple it to the actual confidentiality agreement.

7  Q    And what was the purpose -- what did you understand the

8  purpose to be of taking -- I'm assuming you take a Polaroid

9  person of the individual signing the picture, is that right?

10 A    Yes, a Polaroid of the person.

11 Q    What was the purpose of taking a Polaroid picture of the

12 person signing the agreement?

13 A    To connect the person as to who is that signed it so you

14 can know who that person was.

15 Q    And you said that at times, you also make copies of an

16 individual's driver's license, is that right?

17 A    That's correct.

18 Q    Where would those copies be made?

19 A    There was a photocopier in the reception area and there

20 was one at one point in the guardhouse that was used for when

21 people came in and people would check in at the guardhouse.

22 Q    Now, you testified earlier that you started working at

23 the Chocolate Factory at Olympia Fields after you left

24 865 North Larrabee, is that correct?

25 A    My employment was continuous but, yes, the studio itself

Arnold - direct - Geddes                    1498

1  started at -- once it left Chicago, it started.

2  Q    And did you continue working at the Chocolate Factory at

3  Olympia Fields through the time when the defendant left

4  Olympia Fields?

5  A    Yes, I was.  Yes, I was.

6  Q    And so you were there the entire time that the Chocolate

7  Factory was located at Olympia Fields, is that correct?

8  A    Sorry.  There was a brief period of time in 2008 when I

9  was not employed but aside from that time, yes, the whole time

10 I was employed by him, I worked there.

11 Q    During the time, so minus the short period in 2008,

12 during that time, was there ever a time when a guest had to

13 provide their identification twice?

14 A    Not that I'm aware of.

15 Q    Okay.  So you testified earlier that there was a, I think

16 you said that there was a photocopier machine in that guard

17 shack, is that correct?

18 A    Yes.

19 Q    And there was also a photocopy machine in the studio

20 itself, is that right?

21 A    Yes.

22 Q    Fair to say that the guest would sign one confidentiality

23 agreement?

24 A    Yes.  Anybody that came in either had signed that at the

25 gate or else would have done it in reception at the time we

1   were collecting confidentiality agreements.

2   Q    And they also would have only provided their

3   identification or had a Polaroid picture taken once, correct?

4   A    Correct.

5   Q    Now, for guests -- did all guests sign confidentiality

6   agreements and provide either a driver's license or have their

7   picture taken using a Polaroid camera?

8   A    I can't be certain it was a hundred percent, but that was

9   the policy, to always try to get it during that time frame.

10  Q    How about when guests came on a regular basis to the

11  Chocolate Factory, did they sign each time they came?

12  A    Not necessarily.  There were certainly times where we

13  would know that they had already signed one, either they -- it

14  doesn't matter what -- they would have been there before or

15  whatever, and I'm sure, I know I didn't make somebody sign

16  something because I knew there was already one and I knew

17  somebody did the same thing especially when it was busy.

18  Q    Beside, again, referring to the time in Olympia Fields,

19  beside escorting a guest to a particular location within

20  Olympia Fields, what, if any, interaction would you have with

21  the defendant's personal guests?

22  A    I may receive a phone call either from reception or else

23  to a cell phone that I had asking to speak to Mr. Kelly would

24  be the most common call.

25          (Continue on next page.)

1  EXAMINATION CONTINUES

2  BY MS. GEDDES:

3  Q    And who would -- who would be -- who called you?

4  A    Anybody who was a guest that was in -- that was there

5  would call me or was -- anybody that was trying to reach

6  Mr. Kelly would call either the reception phone or would call

7  my cell phone.

8  Q    What other interaction would you have -- did you have

9  with the defendant's guests?

10 A    If they could have been delivering food or escorting

11 somebody or giving someone a ride.

12 Q    Did you receive guests from individuals who wanted to

13 move around the -- did you receive calls from guests who

14 wanted to move around the studio?

15 A    Yeah, I would have received a call if someone asked to be

16 taken to a specific place.

17 Q    Such as where?

18 A    To, say, from the lounge to the studio could be one

19 place.  Can you take me to the studio?

20 Q    If you were -- when you received a call like that, what

21 did you do?

22 A    If I had been previously told to expect the call, I would

23 already know to -- to take the person or how to, action.  If I

24 hadn't, then I'd have to ask for permission or find Mr. Kelly

25 to ask what to do.

Arnold - direct - Geddes                    1501

1  Q    And who would you -- who did you ask permission from?

2  A    I'd either call Rob or someone I knew that was with him,

3  could get to him, so I could speak to him.

4  Q    When a guest was ready to leave Olympia Fields, what

5  happened?

6  A    They would either just leave or, I'd get a phone call or

7  we'd get instructions to escort somebody.

8  Q    And can you describe the telephone -- the type of

9  telephone call that you would receive from guests who wanted

10  to leave?

11  A    It would either be someone -- where somebody would call

12  to ask to speak to Mr. Kelly, and then he would give us

13  instructions as to what to do next.  Those instructions could

14  be to escort them to their vehicle or to give them a ride

15  somewhere.

16          Or else, somebody may call and say:  Can I get a

17  ride to someplace?  And if we had gotten instructions, we

18  would take the person where they were supposed to go, or else

19  I'd have to reach out and find out from him or someone who was

20  near him to find out where to -- what to do with the request.

21  Q    Were there times that you were not able to reach the

22  defendant after you received a request from a guest to leave?

23  A    I can't be for sure, but there was often times when I was

24  unable to -- to reach him when there was a phone call.

25  Q    And what, if anything, would you do if you had not

1  received permission -- if you were not able to contact the

2  defendant?

3  A    Continue to keep trying to reach him until I did.

4  Q    And what would the guest do as you tried to reach the

5  defendant?

6  A    Would wait to hear back from me, or else would call back

7  to see if there had been an update.  And then as soon as I

8  would -- until I could -- and I'd say, we're still trying to

9  reach him.

10 Q    Now, in the time that you spent at The Chocolate Factory

11 in Olympia Fields when you were there, did you see guests

12 freely roaming around the Olympia Fields, the defendant's

13 residence at Olympia Fields?

14 A    From time to time people would walk, like walk into the

15 room that you'd be in or if we'd be outside someone would walk

16 out of a car or walk out of the house to a car, that did

17 happen.

18 Q    On a regular basis?

19 A    Semi-regular.  We would -- I just remember that we'd

20 always scatter as soon as somebody, like, stepped out of the

21 house, we'd leave to get out the way.

22 Q    And who are you referring to, what do you mean you would

23 scatter?

24 A    So -- so, if it was a female guest we'd just clear out,

25 like, that's the best way I could describe it, just like

1  actually just clearing out, just like leaving the area.

2  Q    Why is that?

3  A    That was what we were instructed to do is just to --

4  to -- to leave if we were in the area where they were coming

5  through.

6  Q    So, you testified that you did see individuals in -- in

7  the area, itself, but would you describe -- would you describe

8  the guests's time -- when guests were at Olympia Fields, were

9  they able to roam freely?

10  A    Generally, no, people would ask for permission to go from

11  place to place.

12  Q    And when you say "people," who are you referring to?

13  A    Guests would -- guests would call to ask to move from

14  place to place or we would get notification when somebody was

15  going to need to be moved.

16  Q    And, again, who were you receiving notification from?

17  A    Directly or indirectly from Rob.

18  Q    Did you -- I think you testified earlier that you worked

19  at Olympia Fields or you worked at The Chocolate Factory at

20  Olympia Fields for the entire time that the defendant had that

21  studio, is that correct?

22  A    Yes, that's correct.

23  Q    Were you there when the defendant no longer was at

24  Olympia Fields?

25  A    Yes, I still worked for him for an additional, at least a

Arnold - direct - Geddes                1504

1   year, I think, after -- or around a year after we left Olympia

2   Fields.

3   Q    What, if any, studio did the defendant use after he was

4   not at Olympia Fields?

5   A    There was a studio on Ohio Street, just off the

6   interstate in downtown Chicago.

7   Q    And do you recall when the defendant stopped working at

8   Olympia Fields or stopped using the studio at Olympia Fields?

9   A    Yeah, I don't know officially, but I think it was in

10  mid -- midway through 2010.

11          MS. GEDDES:  I am showing the witness what's in

12  evidence as Government Exhibit 505(a).

13          (Exhibit published.)

14  BY MS. GEDDES:

15  Q    Do you recognize 505(a)?

16  A    Not necessarily, no.

17  Q    Okay.  And 505(c)?

18          (Exhibit published.)

19  A    Yes.

20  Q    What is 505(c)?

21  A    Sorry, that's the entrance to the building off of Ohio

22  that the studio was located in.

23  Q    And 505(b)?

24          (Exhibit published.)

25  A    Yep, same entrance.  It didn't have the name on it at the

1  time, I don't believe.  I believe that was added later.

2  Q    But that was the --

3  A    That's the entrance.

4  Q    And that was the entrance to the building where the

5  studio the defendant was using on Ohio Street was located?

6  A    Correct.

7  Q    You testified earlier, I believe, that you also held a

8  position as a road manager.

9         Is that correct?

10 A    Yes.

11 Q    When did you serve as the road manager?

12 A    When we would travel for tour between 2006-ish, 2006 I

13 think was the first summer -- 2006 until the last tour we did,

14 which was in 2011.

15 Q    Do you recall which tours you accompanied the defendant

16 on?

17 A    Yes.  The Light It Up tour.  The Double Up tour, Ladies

18 Make Some Noise tour, and Love Letter tour.

19 Q    And did you also go on the Best of Both Worlds tour?

20 A    I did, yes.

21 Q    Were you serving as the road manager for each of those

22 tours?

23 A    Not on the Best of Both Worlds tour.

24 Q    But on the other tours that you just described?

25 A    I believe so, yes.

Arnold - direct - Geddes                    1506

1  Q    What were your duties and responsibilities when you were

2  acting as the road manager, in effect?

3  A    To make sure that the buses were stocked, that the

4  drivers were where they needed to be, that we were able to get

5  to our destinations.

6         There was other people that we would coordinate

7  scheduling with, make sure that the hotels -- we were checking

8  hotels, got all the room keys for the hotels that were needed.

9  Arranging some travel for people coming in and out, coming in

10 to see a show.

11        And also, if there was an SUV, making sure that we

12 had an SUV available.  If there was one that was following us,

13 that that person knew where to be for each -- the driver of

14 the SUV knew where we were going to be.

15        There would often be basketball played before every

16 show and often an after-party or appearance after the concert

17 and coordinated to make sure everybody was where they needed

18 to be.

19 Q    How did you travel when you were on tour with the

20 defendant?

21 A    On a -- on a separate bus.

22 Q    How many buses traveled along with the defendant when he

23 was on tour?

24 A    It varied on the tour, but it could be anywhere between

25 three and six.

Arnold - direct - Geddes                    1507

1  Q    When you were on tour with the defendant, what, if

2  anything, did you do to connect the defendant to women that he

3  didn't previously know?

4           MR. FARINELLA:  Objection.

5           THE COURT:  Overruled.

6  A    There -- there would be instances where I would be told

7  to hand a small piece of paper with his phone number on it to

8  somebody, or I may have been given instruction -- or I may

9  have been given instructions to either escort somebody to

10 either -- to either the backstage area or to a hotel or to a

11 vehicle.

12 Q    You said there may be instances when you might give out a

13 piece of paper.

14           On how regular of a basis did you give out pieces of

15 paper with the defendant's number?

16 A    It was infrequent for me to do that in the concert

17 setting.  Sometimes maybe in the after-party at a club or

18 after-party in the venue would be more common for me to -- to

19 be asked to do that.

20           If we were traveling or if we went to a mall or

21 something, it might be possible he would ask me to -- to hand

22 a number to somebody as well.

23 Q    Again, you said it might be possible for you to hand out

24 a number.

25           How regularly did you distribute the defendant's

Arnold - direct - Geddes                    1508

1  number when you were on tour with him at any of the different

2  venues that you just described?

3  A    It -- it -- it would be asked of me to do so fairly

4  regularly.

5  Q    And who asked you to do that?

6  A    Rob would ask me to.

7  Q    What were the different types of venues where you would

8  distribute the defendant's telephone number?

9  A    It could be at the mall -- the mall, the after-party.

10 Q    How about when you were at restaurants with the

11 defendant?

12 A    I -- I can't think of a specific instance, but there

13 could -- there could certainly have been times when I was

14 asked to hand a number off at a restaurant.

15 Q    You testified that you would distribute a piece of paper.

16       Who created that piece of paper?

17 A    Myself or somebody else from the entourage or one of the

18 runners or engineers, we'd print up -- either use a computer

19 to type up the number on a bunch of slips of paper and cut

20 them up, or else we would tear sheets of paper up and write

21 the number on it by hand.

22 Q    And how regularly were those pieces of paper created?

23 A    As far as I can remember, we always had those or somebody

24 always had those on hand.

25 Q    Who carried the pieces of paper?

1  A    Any -- anybody who was -- a lot of people carried the

2  paper.

3  Q    And by "a lot of people," what -- what roles did those

4  people serve in who were carrying the pieces of paper?

5  A    All of us that were in his traveling party.  Not -- not

6  necessarily all of us, that's an overstatement, most of us in

7  the traveling party.  So, myself or another assistant, a

8  runner would have some, other people that were traveling.

9  Even sometimes -- even sometimes probably, I think, Donnie

10 might have had someone on him, too.

11 Q    Who was Donnie again?

12 A    The music director.

13 Q    And who identified a particular female to give one of

14 these pieces of paper with the defendant's number?

15 A    I would only give it out at direction from -- from Rob.

16 Q    Did you always receive directions directly from Rob or

17 did you sometimes receive them from other people as well?

18 A    Yes, I could have received it indirectly, but from

19 someone who I knew was speaking to him.

20 Q    Speaking on behalf of the defendant?

21 A    That's correct, speaking on behalf.

22 Q    Now, you testified earlier that it was infrequent that

23 you would distribute the defendant's number at concerts.

24       Is that right?

25 A    That's correct.

Arnold - direct - Geddes                    1510

1  Q    Were you aware of whether other individuals distributed
2  the defendant's number to individuals, to females at concerts?
3  A    Yes, I believe there were.
4  Q    And why is it that you believe that?
5  A    Because I would give those sheets of paper to -- to other
6  people that were traveling with us.
7  Q    Now, and when you say -- who did you give those sheets of
8  paper to?
9  A    To -- to anybody else that was in the traveling party,
10 any of the guys that were playing -- some of the guys who
11 played basketball with him had numbers.  Some of the --
12 anybody -- anybody that was around some people -- some of the
13 friends that might have flown into town would have some
14 numbers as well.
15 Q    And, again, you're referring to pieces of paper with the
16 defendant's number on it, correct?
17 A    Pieces of paper with Rob's number on it, yes.
18 Q    You testified that it was infrequent that you would
19 distribute it at concerts.
20        Why is that?
21 A    Usually while he was performing or while he was in
22 concert was my downtime, so I could -- it's either take a nap,
23 sleep on the bus.  I'd make sure his dressing room was cleaned
24 up and ready to go, that the food was swapped out, that if he
25 needed a special meal that it had been picked up.

1          And I didn't have any responsibilities for the
2     actual performance, so that was my time to get away and rest.
3     Q     All right.  So, fair to say you just weren't in the
4     location where the numbers were being distributed?
5     A     That's correct.
6     Q     You testified that you -- there were three to four
7     buses -- I don't know, how many buses would you say would
8     travel at a time?
9     A     Depending on the tour, three to six or eight could be on
10    the tour.
11    Q     Who else traveled on these buses that were going on the
12    defendant's tour?
13    A     There would be a bus for the band.  If there was dancers,
14    the dancers would have their own bus.  There were some tours
15    where security had their own bus.  Then there would be a crew
16    bus, the bus that the traveling party would have.  And
17    sometimes there would be a bus for female guests.
18    Q     Female guests of whom?
19    A     Of Mr. Kelly.
20    Q     Are you aware of who traveled on the bus that the
21    defendant traveled on?
22    A     Sometimes, depending on the tour, it could have been the
23    family -- his family could have been on the bus with him.  He
24    may have been traveling with a guest.  He may have been
25    traveling by himself.

Arnold - direct - Geddes                    1512

1  Q    While you were working for the defendant, were you

2  provided with a cellular telephone for work?

3  A    Yes, I was.

4  Q    Do you recall that telephone number?

5  A    Yes.  Yes, I do.

6  Q    What is it?

7  A    (312) 213-9348.

8  Q    Other than you, who, if anyone, else used that phone?

9  A    Rob would use the phone.  And it's -- and I probably have

10 handed it over to another runner to use from time to time, but

11 primarily it would be my phone or Rob that would use it.

12 Q    Why would Rob use your cellular phone?

13 A    If I received a phone call that was for him, I would take

14 and give him the phone.  And I wouldn't necessarily get it

15 back right away, maybe for some time before I get it.

16       But it was his phone for me to carry around and take

17 calls.  I didn't take personal calls on that phone, it was

18 always only for my job that I had that phone.

19 Q    Now, going back to your time when you were not on tour

20 and you were working at The Chocolate Factory at Olympia

21 Fields, where in Olympia Fields were the defendant's female

22 guests escorted to, which different areas?

23 A    Depending on the timeframe while we were there, into the

24 studio.  There would have been a lounge down there or into one

25 of the studio rooms or one of the vocal booths, the live

Arnold - direct - Geddes                          1513

1  rooms.  There was other rooms used.  The poolroom, somebody
2  could have been put in the poolroom.  Someone could have been
3  put in the game room where the pool table was.  There was a
4  theater, somebody could be put down into the theater.  The
5  garage would be a place where the basketball -- I'm sorry, the
6  boxing ring was, some people could go into the garage.
7  Q    Where were the defendant's -- where were the tour buses
8  when the defendant was not on tour?
9  A    We always had one, almost always had one bus.  It would
10 either park in the driveway in front of the garage or on the
11 long drive to the gate.
12         And sometimes when we would get, especially towards
13 the last couple of tours, we could have three or four tour
14 buses inside the -- the gate before we'd be ready to leave to
15 depart for the tour.
16 Q    Who, if anyone, spent time on that tour bus while it was
17 parked at Olympia Fields?
18 A    That would -- Rob would often sleep on the tour bus.  And
19 sometimes there would be female guests on the bus as well.
20 Q    Now, on how regular of a basis did the defendant have
21 female guests arriving at The Chocolate Factory and Olympia
22 Fields?
23 A    I'm sorry, could you repeat the question?
24 Q    How regularly did the defendant have female guests coming
25 to Olympia Fields?

Arnold - direct - Geddes                    1514

1   A    All -- all the time.

2   Q    And was there one guest there at a time or more than one

3   guest there at a time?

4   A    There was frequently more -- more than one guest.  There

5   could be just one.  There could be quite a few.  There were a

6   lot of people coming and going.

7   Q    And were there some individuals who stayed at the

8   defendant's house in Olympia Fields or on its property for

9   days at a time?

10  A    Yes.

11  Q    Did you become familiar with some of the individuals who

12  came on a regular basis to Olympia Fields?

13  A    We'd become, yeah, with the names, with some of the names

14  for sure.

15  Q    Who are some of the individuals, just first names,

16  please, who are some of the individuals that you recall

17  spending time, female, spending time at Olympia Fields on a

18  regular basis?

19  A    Kathy, Ebony, Mary Jane, Rebecca, Tamika, Keva, that --

20  I'm sure there's more.  I'm sure -- I'm sure there's more.  If

21  you want me to keep thinking, I can.

22       THE COURT:  I'm sorry, could I just ask, what

23  timeframe are we talking about here?

24       Generally, in what years?

25       THE WITNESS:  So, 2004 till 2011.

Arnold - direct - Geddes                    1515

1          THE COURT:  2011, okay.

2          I'm sorry, go ahead.

3    BY MS. GEDDES:

4    Q    The individuals that you just named, did you become aware

5    of whether those were true names or not true names?

6    A    In some instances where I would book, maybe had booked a

7    flight for somebody, I could know what their first name was --

8    would be, but sometimes it seemed like it -- the same name was

9    used for multiple people.

10   Q    While you were working for the defendant, did you become

11   aware of the different roles that the defendant employed

12   people to fulfill?

13   A    Yes.

14   Q    What are the different buckets of jobs that the defendant

15   employed people to do?

16   A    There was -- so, music director, engineer, assistant

17   engineer, receptionist, runner, assistant, personal assistant,

18   housekeeper, nanny.  There was a guy who took care -- a fish

19   guy who took care of the fish tank.  Security, female security

20   and male security, personal trainer, bus drivers, a driver for

21   some of the vehicles.

22   Q    Now, for some of those jobs like runner and assistant,

23   you used the singular.

24          Was there just one runner and one assistant or was

25   there more than one runner and more than one assistant?

1  A    Yeah, there was -- there was more than one runner.  There

2  would frequently be a couple of assistants, but there could be

3  times that there was a single person who was the assistant.

4            MS. GEDDES:  I'm showing what's in evidence as

5  Government Exhibit 12.

6            (Exhibit published.)

7  BY MS. GEDDES:

8  Q    Do you recognize Government Exhibit 12?

9  A    Yes.

10 Q    Who is that?

11 A    Derrel McDavid.

12 Q    What did he do for the defendant?

13 A    Derrel was Rob's business manager.

14           MS. GEDDES:  I'm showing what's in evidence as

15 Government Exhibit 4.

16           (Exhibit published.)

17 Q    Do you recognize that individual?

18 A    Yes.

19 Q    Who is that?

20 A    That's June Bug.

21 Q    What did June Bug do for the defendant?

22 A    He was his -- he's his uncle and he was an assistant.

23 Q    And do you know is June Bug a true name or a nickname?

24 A    No, his name is George K.

25 Q    George Kelly?

Arnold - direct - Geddes                    1517

1    A    Yes, George Kelly.

2         MS. GEDDES:  I'm showing what's in evidence as

3    Government Exhibit 3.

4         (Exhibit published.)

5    BY MS. GEDDES:

6    Q    Do you recognize who's shown in Government Exhibit 3?

7    A    Yes.

8    Q    Who is that?

9    A    June Brown.

10   Q    What, if anything, did June Brown do for the defendant?

11   A    He was part of the management team, and he was an

12   assistant.  Over the -- over the course of the time in which I

13   worked for Mr. Kelly, he had different jobs.

14   Q    And by the way, June Bug, over what period of time did he

15   serve as an assistant for the defendant?

16   A    I'm not sure exactly when he started, but he was working

17   for Mr. Kelly when I started working directly for him in Bass

18   Productions in 2004.  I believe he might have left from time

19   to time over the course of the duration, but I would say 2009,

20   2010 was when he stopped working for him when I was still

21   working for Bass Productions.

22        MS. GEDDES:  I'm showing what's in evidence as

23   Government Exhibit 32.

24        (Exhibit published.)

25   BY MS. GEDDES:

1  Q    Do you recognize that individual?

2  A    Yes.

3  Q    Who is it?

4  A    Donnie Lyle.

5  Q    Is this the individual you testified earlier served as

6  the musical director?

7  A    That's correct.

8  Q    And did you also sometimes, I think you said this

9  earlier, that you reached out to Donnie Lyle to get

10 instructions from the defendant, is that correct?

11 A    Yes.

12 Q    Or he reached out to you?

13 A    Yes, or he would have called me or I would call him.

14       MS. GEDDES:  I'm showing the witness what's in

15 evidence as Government Exhibit 9.

16       (Exhibit published.)

17 BY MS. GEDDES:

18 Q    Do you recognize that?

19 A    Yes.

20 Q    Who is that?

21 A    His name is Bubba.

22 Q    What, if anything, did he do for the defendant?

23 A    Played basketball.

24       MS. GEDDES:  I am showing the witness only what's

25 been marked for identification as Government Exhibit 18.

Arnold - direct - Geddes                    1519

1    THE COURT:  Let me just ask, Mr. Farinella, do you

2    have any objection to that, Government Exhibit 18?

3    MR. FARINELLA:  No, Your Honor.  No, Your Honor.

4    THE COURT:  Okay.

5    MS. GEDDES:  Can I have one moment?

6    THE COURT:  Sure, sure.

7    (Pause.)

8    MS. GEDDES:  It's my understanding that counsel has

9    no objection to admitting the following exhibits and I would,

10   therefore, offer them.

11   Government Exhibit 18, 21, 19, 23, 16, 15, 36, 24,

12   25, 28, 27, 30, 26, 29.

13   THE COURT:  All right, no objection, is that right,

14   Mr. Farinella?

15   MR. FARINELLA:  That is correct, Your Honor.

16   THE COURT:  Okay, great, those are all in evidence.

17   (Government's Exhibits 15, 16, 18, 19, 21, 23, 24,

18   25, 26, 27, 28, 29, 30 and 36 were received in evidence.)

19   MS. GEDDES:  Thank you.

20   So, I am now showing what's in evidence as

21   Government Exhibit 18.

22   (Exhibit published.)

23   BY MS. GEDDES:

24   Q    Do you recognize that individual?

25   A    I do.

Arnold - direct - Geddes                    1520

1   Q   Who is that?

2   A   I can't remember his name.

3   Q   What, if anything, did he do for the defendant?

4   A   Security, if I remember the correct person, but I can't

5   remember his name right now.

6           MS. GEDDES:  Government Exhibit 21 in evidence.

7           (Exhibit published.)

8   BY MS. GEDDES:

9   Q   Do you recognize that individual?

10  A   I do.

11  Q   Who is it?

12  A   His name was Baldy.

13  Q   What, if anything, did he do for the defendant?

14  A   He was a friend of the defendant.

15          MS. GEDDES:  Government Exhibit 19.

16          (Exhibit published.)

17  Q   Do you recognize that individual?

18  A   Yes.

19  Q   Who is it?

20  A   His name is Hardy.

21  Q   What, if anything, did he do for the defendant?

22  A   He was Rob's security.

23          MS. GEDDES:  And Government Exhibit 22.

24          (Exhibit published.)

25  Q   Do you recognize that individual?

Arnold - direct - Geddes                    1521

1   A    I do.

2   Q    Who is it?

3   A    Her name is Candy.

4   Q    Is that her true name or a nickname?

5   A    I believe that was her true name.

6   Q    And what, if anything, did Candy do for the defendant?

7   A    She was security.

8   Q    And when you identified the individuals who served as

9   security, what do you mean by that, what did they do for the

10  defendant?

11  A    They would either be the person that was sitting at the

12  gate in the call box at the house monitoring the gate, or when

13  we traveled would be part of the entourage and security,

14  performing the role of security in public.

15        MS. GEDDES:  I am showing Government Exhibit 8.

16        (Exhibit published.)

17  BY MS. GEDDES:

18  Q    Do you recognize that individual?

19  A    I do.

20  Q    Who is it?

21  A    His name is Blackie.

22  Q    What did he -- if anything, did he do for the defendant?

23  A    He was related to Mr. Kelly, and I don't know exactly

24  other than just being around in that -- in that capacity what

25  his role was.

Arnold - direct - Geddes                    1522

1   Q    How regularly was he around?

2   A    Infrequently, but around.  Like, perhaps, when we were

3   traveling.

4   Q    Traveling on tour?

5   A    Or video performances, but he was -- he was at the studio

6   in Chicago as well.

7   Q    Which studio, by the way?

8   A    Chicago Trax and Chocolate Factory.

9   Q    Government Exhibit 23, do you recognize that individual?

10        (Exhibit published.)

11  A    I do.

12  Q    Who is it?

13  A    Big John.

14  Q    What did Big John do for the defendant?

15  A    He was security.

16  Q    Over what time period?

17  A    When I started at Chicago Trax in 1998 until, I'd say,

18  sometime in 2000 maybe '7.

19  Q    And when you started at Chicago Trax in 1998, was Big

20  John performing security for defendant?

21  A    To my recollection, yes.

22        MS. GEDDES:  Government Exhibit 16.

23        (Exhibit published.)

24  BY MS. GEDDES:

25  Q    Do you recognize that individual?

Arnold - direct - Geddes                                    1523

1    A    I do.

2    Q    Who is it?

3    A    Joe Allen.

4    Q    What did Joe Allen do for the defendant, if anything?

5    A    He was a bus driver.

6            MS. GEDDES:  Government Exhibit 15.

7            (Exhibit published.)

8    BY MS. GEDDES:

9    Q    Do you recognize that individual?

10   A    I do.

11   Q    Who is it?

12   A    Terry Allen.

13   Q    What, if anything, did Terry Allen do for the defendant?

14   A    He was a bus driver.

15   Q    And when the defendant's bus drivers were or when you

16   were not on tour, what, if anything, did the defendant's bus

17   drivers do?

18   A    They would continue to -- to drive the bus.  The bus was

19   frequently with us, regularly with us, even when we were at

20   the house in Olympia Fields or just -- or sometimes we'd do

21   trips to the gym or movies and the bus driver would always be

22   with us.

23           So, the -- they would change in shifts, where one

24   bus driver would be driving at one point and another one would

25   come in.  There was always a bus driver around.

Arnold - direct - Geddes                    1524

1          MS. GEDDES:  Government Exhibit 36.

2          (Exhibit published.)

3    BY MS. GEDDES:

4    Q    Do you recognize that individual?

5    A    I do.

6    Q    Who is it?

7    A    Diana Copeland.

8    Q    What, if anything, did Diana Copeland do for the

9    defendant?

10   A    She was an assistant.

11         MS. GEDDES:  Government Exhibit 49.

12         (Exhibit published.)

13   Q    Who is that?

14   A    That's Ian Mereness.

15   Q    What, if anything, did he do for the defendant?

16   A    He was his audio engineer.

17   Q    Over what time period?

18   A    The entire time I worked at Chicago Trax to the time I

19   left base productions.

20   Q    So 1997 to 2011?

21   A    1998 to 2011.

22   Q    Government Exhibit 50.

23         (Exhibit published.)

24   A    Yes.

25   Q    Who is that?

1   A    Abel Garibaldi.

2   Q    What did he do for the defendant?

3   A    He was also an audio engineer.

4   Q    Over what time period?

5   A    I don't know when he started, but off and on -- sometime

6   in the '90s or early 2000s all the way to when I left in 2011.

7            MS. GEDDES:  Government Exhibit 24.

8            (Exhibit published.)

9   BY MS. GEDDES:

10  Q    Do you recognize that individual?

11  A    I think so.

12  Q    Who is it?

13  A    I think that's Jeff, but I can't remember Jeff's last

14  name.

15  Q    Okay.

16           MS. GEDDES:  Government Exhibit 25.

17  Q    What do you think that individual did for the defendant?

18  A    No, he was an assistant engineer and an engineer.

19  Q    Government Exhibit 25.

20           (Exhibit published.)

21  A    Yes.

22  Q    Who is that?

23  A    Ryan Sailsbery I think was his last name.

24  Q    What, if anything, did he do for the defendant?

25  A    He was a runner.

Arnold - direct - Geddes                    1526

1   Q    Over what time period?

2   A    2004 to I -- maybe 2008, maybe less, maybe it's 2007.

3   I'm not sure.

4            MS. GEDDES:  Government Exhibit 28.

5            (Exhibit published.)

6   BY MS. GEDDES:

7   Q    Do you recognize that individual?

8   A    I don't.

9   Q    Government Exhibit 27.

10           (Exhibit published.)

11  A    Yes.

12  Q    Who is that?

13  A    Nate Wheeler.

14  Q    What, if anything, did he do for the defendant?

15  A    He was an assistant engineer.

16  Q    Over what time period?

17  A    2001, perhaps, till maybe 2005, 2006.

18  Q    Now, earlier you testified that Ian Mereness and Abel

19  Garibaldi worked through the time that you were at Olympia

20  Fields.

21  A    Uh-hum.

22  Q    Do you know whether they continued to work for the

23  defendant?

24  A    After I left?

25  Q    Yes.

Arnold - direct - Geddes                    1527

1   A    I believe they did.

2   Q    Okay.  So, you're not saying that they left in 2011, just

3   that you left in 2011?

4   A    That's correct, I left in 2011.

5            MR. FARINELLA:  Objection, Your Honor.

6            THE COURT:  Overruled.

7   BY MS. GEDDES:

8   Q    Government Exhibit 34.

9            (Exhibit published.)

10  A    Yes.

11  Q    Who is that?

12  A    Anthony.

13  Q    What, if anything, did Anthony do for the defendant?

14  A    He was a runner.

15  Q    Over what time period?

16  A    I don't know when he started, 2005 or 2006 to maybe --

17  maybe around 2009.

18           MS. GEDDES:  And lastly, Government Exhibit 26.

19           (Exhibit published.)

20  Q    Do you recognize that individual?

21  A    I'm sorry, I misread -- I misnamed somebody earlier on.

22           This is Jeff, and Jeff's last name is Meeks.

23  Q    And what did Jeff Meeks do for the defendant?

24  A    He was an audio engineer.

25  Q    All right, so when you identified Government Exhibit 24,

Arnold - direct - Geddes                    1528

1    is that the individual you previously identified as Jeff?

2         (Exhibit published.)

3    A    That's correct, that's -- I know who that is.

4    Q    Who is that?

5    A    That's Blake.

6    Q    Do you know Blake's last name?

7    A    I think it's either -- it's *KHAY-FIN* or *KHAFF-IN* --

8    Chaffin.

9    Q    What did Blake do for the defendant?

10   A    Well, he was an assistant engineer and an engineer and a

11   technician.

12   Q    Over what time period?

13   A    '98, when I started, until before we left -- before

14   Chicago Trax became The Chocolate Factory.  So, probably 2003.

15   Q    And do you recall the hairstyle that he had when he was

16   working at Chicago Trax/The Chocolate Factory?

17   A    Blake's hairstyle?

18   Q    Yes.

19   A    No, I don't.

20   Q    Do you remember if it was short or long?

21        MR. FARINELLA:  Objection.  He said he doesn't know

22   the hairstyle.

23   A    I don't recall.

24   Q    Okay.

25        THE COURT:  Overruled.

Arnold - direct - Geddes                1529

1          MS. GEDDES:  I am showing Government Exhibit 523(a)

2     through (c).

3          With the consent of the defendant, the Government

4     offers 523(a) through (c).

5          THE COURT:  Any objection?

6          MR. FARINELLA:  No, Your Honor.

7          THE COURT:  Okay, it's in evidence.

8          (Government's Exhibit 523(a) through 523(c) was

9     received in evidence.)

10         MS. GEDDES:  I'm showing what's in evidence as

11    Government's Exhibit 523(a).

12    BY MS. GEDDES:

13    Q    Do you recognize that?

14    A    I believe that's the basketball gym in Markham.

15    Q    And 523(b)?

16    A    That's the interior of the gym in Markham.

17    Q    And finally, 523(c)?

18    A    The opposite view of the same gym.

19    Q    And where is Markham?

20    A    It's a suburb of Chicago, south westside of Chicago.

21    Q    And what, if anything, did you do with the defendant at

22    that gym in Markham that is shown in Government Exhibit 523(a)

23    through (c)?

24    A    He frequently played basketball there in the evenings, so

25    would travel to and from either the studio or from wherever to

1    go there to play basketball.

2    Q    What were your responsibilities with respect to

3    basketball?

4    A    Some -- sometimes it was my job to reach out to all the

5    people that were playing to make sure they were gonna be

6    there.

7          I would also coordinate the timing to make sure

8    everybody knew where to go.

9          I may also -- I would have also maybe driven people

10   to and from the gym or escorted guests into the gym and out.

11   Q    How far is the basketball gym in Markham to the

12   defendant's residence in Olympia Fields?

13   A    Fifteen minutes.

14   Q    By car?

15   A    By car.

16   Q    And who played basketball with the defendant?

17   A    There's -- there was a lot of people that played

18   basketball, and it rotated over many years.

19   Q    How would -- how would a team be set each night or each

20   time you played, the defendant played basketball?

21   A    I think as long as we had three people on each side, they

22   would play some sort of pickup game, but generally tried to do

23   five-on-five.

24   Q    And who would find the players for the basketball game?

25   A    Either I had a list of people to reach out to or one of

Arnold - direct - Geddes                    1531

1  the guys that he played basketball with would call some

2  people.

3           It -- for the -- for the better part of the time

4  which I worked for Rob, June Bug also was responsible for

5  coordinating the basketball.

6  Q    How regularly did you coordinate basketball games for the

7  defendant?

8  A    I -- I didn't coordinate it all the time.  When I was

9  responsible for coordinating it, it would be nightly.

10 Q    Are you familiar with the Avenues Mall?

11 A    Yes.

12 Q    Where is the Avenues Mall located?

13 A    In Jacksonville.

14 Q    Florida?

15 A    Yes, Jacksonville, Florida.

16 Q    What, if anything, do you recall happening at the Avenues

17 Mall involving the defendant and a female guest?

18 A    The Avenues Mall is the mall in Jacksonville we went to

19 every time we were in town.  There was a store called Belk, I

20 think, that we parked on that side where Belk was, and there

21 would be -- guests would come in and out.  We could pull up

22 there so that the guests could go in there and go shopping, or

23 else somebody could arrive to the mall to be escorted onto the

24 bus or into the mall.

25 Q    Do you have a specific memory of an incident that

Arnold - direct - Geddes                1532

1  happened at the Avenues Mall involving a specific female

2  guest?

3  A    There was a guest that lived in Jacksonville that was a

4  frequent visitor or traveler that came to shows or stuff.

5  Q    What was her name?

6  A    That was -- that's Alexia or Alexis.

7  Q    And you said that she was a frequent traveler.

8        What do you mean by that?

9  A    Meaning that we would -- she would be in Jacksonville.

10  She'd always be at the Jacksonville show, or else I may have

11  to -- I may have booked a flight for her to another venue or

12  else she came to Chicago.  She had been a guest in Chicago.

13  Q    Now, was one of your responsibilities during the time

14  that you worked for the defendant to arrange travel for the

15  defendant's female guests?

16  A    Yes.

17  Q    How would you do that?

18  A    At one point we had a travel management company that we

19  would book all flights through.  When we stopped booking

20  travel through them, I would book the flights on Orbitz.

21  Q    What was the name of the travel company that you used?

22  A    Preferred Travel.

23  Q    And over what time period did you arrange travel for of

24  the defendant's female guests?

25  A    I -- I don't know when it started for sure, but I

Arnold - direct - Geddes                1533

1  probably arranged some travel while we were still at The

2  Chocolate Factory in Chicago.  So, probably around 2003, 2004.

3  Q    And did you continue to arrange travel?

4  A    Yes, off and on until 2011.

5  Q    When you stopped working for the defendant?

6  A    That's correct.

7  Q    What, if anything, would you request -- how would you --

8  how would it come to be that you were arranging travel for a

9  particular female guest?

10 A    By direction of Mr. Kelly or someone that I knew that the

11 directions came directly from him through.  So, directly or

12 indirectly from Mr. Kelly.

13 Q    What, if anything, did the defendant say that would cause

14 you to arrange travel?

15 A    He would -- he would tell me to book travel for a certain

16 person, or else I would ask.  I'd say, so and so-called to ask

17 for flights, and he would say book travel for them.

18 Q    So, did you receive communications from some of the

19 defendant's female guests looking for you to arrange travel

20 for them?

21 A    There was times in which I was asked.  Primarily, the

22 direction came from Rob to book travel for somebody.

23 Q    What, if any, information did the defendant provide when

24 he wanted you to book travel for him?

25 A    He would give me either their number to contact them or

1    tell them that -- to expect a phone call.

2    Q    And when you arranged travel for a female guest, what, if

3    any, information would you get from that guest?

4    A    In order to book travel, I would need their name as it

5    appears on their ID and date of birth.

6    Q    Do you recall an occasion where the defendant had

7    appendicitis?

8    A    I do.

9    Q    In what city were you when that happened?

10   A    Miami.

11   Q    Do you recall why you were in Miami?

12   A    There was -- it was a Superbowl.

13   Q    Do you remember what Superbowl it was?

14   A    I do.  It was the Bears and the Colts, so it was 2000

15   and -- 2005.

16   Q    All right.  Was it the Superbowl when the Colts played

17   the Bears?

18   A    That's correct.

19   Q    Fair to say -- you look unsure, but you tell me, are you

20   sure of the date that the Superbowl occurred?

21   A    Unsure of the date, sure of the teams that participated.

22   Q    And where did the Superbowl -- where was the Superbowl

23   held?

24   A    In Miami.

25   Q    And when the defendant had appendicitis, where, if

Arnold - direct - Geddes                1535

1  anywhere, did he go?

2  A    There was a hospital in Miami that we went to.  I don't

3  remember the name of the hospital.

4  Q    All right.  But it was in Miami, he didn't return to

5  Chicago, is that correct?

6  A    Correct, the hospital was in Miami.

7  Q    Did you travel outside of the United States with the

8  defendant?

9  A    I did.

10 Q    Where did you travel to?

11 A    We went to South Africa and Nigeria.  We went to Angola,

12 Ethiopia, Uganda, we did a European tour where we went to

13 Switzerland, Amsterdam, France, Germany, and the UK.  And the

14 last trip I took was to Gabon.

15 Q    You testified that you traveled to South Africa.

16       Do you recall when you traveled to South Africa with

17 the defendant?

18 A    We went twice.  The first time in 2009, I believe, June

19 or July.  And then for the World Cup opening ceremonies in

20 2010.

21 Q    Do you recall how long the trip to South Africa in 2009

22 was?

23 A    I'm not sure.  I believe it was two weeks.

24

25       (Continued on the following page.)

Arnold - direct - Geddes                    1536

1    DIRECT EXAMINATION

2    BY MS. GEDDES:

3    Q    Do you recall whether the defendant had a personal lawyer

4    when you were working for him?

5    A    Yes.

6    Q    What was his name?

7    A    Eddie Genson.

8    Q    Have you been to his office?

9    A    Yes.

10   Q    Where was his office located?

11   A    In Chicago, in downtown Chicago.

12   Q    Who, if anyone, have you brought to the defendant's

13   personal lawyer's office in downtown Chicago?

14   A    I brought Rob there, I brought Derrel McDavid there.  I

15   believe I brought June Brown there.  We made some frequent

16   trips there.  I'm not entirely sure everybody I would have

17   brought there.

18   Q    Fair to say there may be others that you brought to that

19   office?

20   A    Yes.

21   Q    During the time period that you worked for the defendant,

22   did you always receive the paycheck that you believed you were

23   owed?

24   A    No.

25   Q    What happened?

Arnold - direct - Geddes                    1537

1    A    Sometimes I would be fined, so money would be taken off

2    my check for errors I made or mistakes.

3    Q    Who did you understand what determined if you were fined

4    on a particular occasion?

5    A    Could you repeat the question.

6    Q    Who did you understand decided if you were going to be

7    fined on a particular occasion?

8    A    Rob.

9    Q    On how many occasions were you fined?

10   A    I'm not sure.  It was quite a few especially towards the

11   end of my tenure.

12   Q    When you say you were fined, what do you mean?

13   A    So maybe just a hundred or $200 for some mistakes towards

14   the end of my -- and in fact, the reason I ultimately left, I

15   was -- I received a paycheck that tax had been taken out but

16   the dollar amount on the check was zero dollars.

17   Q    Do you recall some of the reasons -- did you learn the

18   reasons why you'd been fined, were you told those?

19   A    Yes.

20   Q    Do you recall some of the reasons that you were told that

21   you had been fined?

22   A    For not getting -- not getting his lunch, I was fined for

23   sleeping through a call, he tried to reach out to me several

24   times and I didn't answer.  I was fined for buying a sweatband

25   for a guest.

Arnold - direct - Geddes                    1538

1  Q    What happened with the sweatband?

2  A    We were -- I was escorting a guest to the bathroom and

3  the guest asked to get a wristband, a sweatband from the shop

4  and it was right outside the merch shop so I purchased the

5  sweatband, I believe it was five or $10, didn't even think

6  anything about it, and then I got fined for that 'cause I

7  didn't ask if it was okay to purchase the wristband.

8  Q    What type of guest was it who you purchased a five to

9  10-dollar sweatband for?

10 A    It was a personal guest.

11 Q    Female?

12 A    Female, yes.

13 Q    Were there other reasons that you were told you'd been

14 fined?

15 A    I was fined for not getting the correct tour guide in

16 Disney, that was the last fine that I received.  We were all

17 fined because someone ate his donuts once.  We all had to

18 purchase donuts.  It's -- it's -- there's other menial --

19 other menial things, and it could be mistakes like not getting

20 us to a video shoot on time or not having the correct

21 destination escorts too, so it would also be not just based on

22 job performance stuff as well, but fines.

23 Q    All right.  But it sounds -- are you drawing a

24 distinction where there were some fines when it was related to

25 your job performance for the defendant and sometimes where it

Arnold - direct - Geddes                    1539

1   seemed more menial than that?

2   A    That's correct.

3   Q    Do you recall other -- any other -- do you recall being

4   fined for purported infractions related to the defendant's

5   female guests, aside from the one that you just described

6   involving the sweatband?

7   A    I can't recall a specific instance, but I'm sure I was.

8   Q    When did you stop working for the defendant?

9   A    October 2011.

10  Q    And why did you stop working for the defendant?

11  A    We had a very busy day of driving, we went to two after

12  parties on two different sides of Florida in the same night

13  and on the way back to the hotel after both club appearances I

14  had -- I insisted that I needed to ride in the car and

15  somebody else was going to have to drive because I was going

16  to fall asleep, and I was woken up on the side of road as the

17  person that was driving they fell asleep and almost drove off

18  the road.  We got back to the hotel to put everybody into the

19  hotel room and my wife called me before I go to sleep and said

20  we received a paycheck and it was for zero dollars.  And my --

21  that I had been fined for my whole week's paycheck, but Uncle

22  Sam received their money.

23         I realized at that moment that my wife wasn't happy,

24  I wasn't happy and Rob wasn't happy and so therefore there was

25  no point for me to continue working for him anymore.

Arnold - direct - Geddes                    1540

1  Q    You said that you had been fined and I think you

2  testified earlier that -- well, did you learn why you had been

3  fined on that final paycheck?

4  A    Yes.  I was instructed to get Walt Disney set up for him

5  with a hotel room and a tour guide and to have the whole

6  experience set up.  It was --

7  Q    When you said that you were instructed to have the whole

8  experience set up for him, who is the "him" in that sentence?

9  A    Rob asked me to set up the tour guide and the hotel.  It

10 was very last minute.  I chose to get the hotel room set up

11 first, hotel room and rooms set up for everybody, and once

12 that was confirmed and I knew I could actually get the hotel

13 rooms, I was paying in cash and I wasn't sure if that would be

14 allowed or not; it was.  I was able to get the room secured.

15 I called up to ask for a tour guide to escort us around for

16 the -- for the park and there was nobody that was available,

17 and so they had to ask for someone to volunteer to either

18 leave their current assignment or come in off hours to

19 actually tour -- to escort him --

20 Q    Let me stop you for a moment.  What, if any,

21 understanding did you have regarding the qualifications for a

22 tour guide?

23 A    It needed to be a woman.

24 Q    Why is that?

25 A    His request was that it always be a female tour guide.

Arnold - direct - Geddes                    1541

1   Q    Who is the "his" in that sentence?

2   A    Rob.

3   Q    Who did you understand was going to be accompanying the

4   defendant on this tour at Disney?

5   A    It would have been Rob, some security, myself, there

6   could have been other members of the traveling party, and

7   female guests.

8   Q    Were you able to find a female to serve as a tour guide

9   for the defendant?

10  A    In this instance I was not.

11  Q    What did you do?

12  A    He was on his way to Disney so I took the first person I

13  could get, it was a gentleman who was there to greet us as the

14  bus pulled up.  I did not notify Mr. Kelly that this person

15  was -- that there was going to be a guy, and we pulled up, he

16  realized it was a gentleman and we canceled the VIP

17  experience.

18  Q    So was there a tour that day?  Did the defendant go on a

19  tour that day?

20  A    No, we did not.

21  Q    And what was the consequence for having secured a male

22  tour guide instead of a female tour guide?

23  A    For not having the correct tour guide and not

24  communicating it, was a week's pay.

25  Q    How much was a week's pay at that time?

Arnold - direct - Geddes                1542

1  A     I believe it was 1500.

2           MS. GEDDES:  One moment.

3           Nothing further.

4           THE COURT:  I know it's a little early for our

5  morning break, but I think it makes sense to take the break

6  now.  So we'll be in recess for about 10 minutes.

7           Please don't talk about the case at all, but enjoy

8  the break.  I'll see you in a few minutes.

9           THE COURTROOM DEPUTY:  All rise.

10          (Jury exits courtroom.)

11          THE COURT:  Everybody can have a seat and the

12 witness can step out.  We'll see you in a few minutes.

13          (Witness steps down.)

14          THE COURT:  Anything before we break?  All right,

15 see you in a few minutes.

16          (Recess.)

17          (In open court; jury not present.)

18          THE COURTROOM DEPUTY:  All rise.

19          THE COURT:  I think we should probably get the

20 witness.

21          MS. SHIHATA:  Your Honor, there is one matter I

22 wanted to just make your Honor aware of.  The witness

23 following this witness is a witness who will have a lawyer

24 present --

25          THE COURT:  Okay.

Proceedings                                      1543

1          MS. SHIHATA:  -- and so we may just need like a tiny

2     short break to logistically work that out.

3          THE COURT:  That's fine.

4          I have another question for you, I take it you have

5     a number of experts; is that correct?

6          MS. GEDDES:  We have three experts, three more

7     experts.

8          THE COURT:  One will be the DNA.

9          MS. GEDDES:  Yes, then --

10          THE COURT:  What's just the general area of

11     expertise of the other two --

12          MS. GEDDES:  The other --

13          THE COURT:  -- so I can be thinking about it.

14          MS. GEDDES:  Yes.  One will testify about trauma

15     bonding and some of the experiences -- some of how the

16     experiences the witnesses' testified might affect somebody,

17     and another will testify about herpes.

18          THE COURT:  All right, thanks so much.  Go ahead.

19          MR. CANNICK:  May we inquire who is the witness who

20     has the attorney.

21          THE COURT:  Can you stop trying to drive me insane

22     and turn on your microphone.

23          MR. CANNICK:  May we inquire as who the witness --

24          MS. SHIHATA:  Certain of the victim witnesses --

25          THE COURT:  Is this John Doe Number One?

Proceedings                                          1544

1           MS. SHIHATA:  No.  This is -- yes, she'll be

2    testifying as Stephanie, which is her first name only.

3           MR. CANNICK:  Okay.

4           THE COURT:  All right.

5           MS. CRUZ MELENDEZ:  The victim witness who will be

6    testifying as Addie will also have a lawyer present.

7           THE COURT:  Okay.

8           MR. CANNICK:  Are there any pending charges or any

9    *Giglio* materials that we missed?

10          MS. SHIHATA:  It's unrelated to criminal charges.

11   It's because they are victims and we made a request to the

12   Court to allow them since the courtroom is not how it's

13   usually configured for the pandemic to allow them to have

14   their attorneys present given the nature of the testimony and

15   so forth.

16          MR. CANNICK:  I just wanted to make sure I wasn't

17   missing anything.

18          THE COURT:  You never are.  All right, thanks so

19   much.

20          Let's get the jury please.  Thanks.

21          (Jury enters courtroom.)

22          THE COURTROOM DEPUTY:  You may be seated.

23          THE COURT:  All right, everybody we're ready to

24   continue with the cross-examination of the witness.

25          Go ahead, Mr. Farinella.

Arnold - cross - Mr. Farinella          1545

1    MR. FARINELLA:  Thank you, your Honor.

2    THE COURTROOM DEPUTY:  The witness is reminded he is

3  still under oath.

4    THE WITNESS:  Yes.

5  CROSS EXAMINATION

6  BY MR. FARINELLA:

7  Q    Good morning --

8  A    Good morning.

9  Q    -- Mr. Arnold.

10    So let's start back to your education.  Isn't it a

11  fact that you said that you went -- essentially received a

12  certificate for engineering from a university in Arizona,

13  correct?

14  A    It wasn't a university it was like a, almost like a trade

15  school just specifically for audio engineering and studios and

16  for live sound.

17  Q    Okay.  And so as a result of that experience you were

18  then -- you I guess offered or received an internship at

19  Chicago Trax, right?

20  A    I applied for the internship.

21  Q    And at the time Chicago Trax had no relation to

22  Mr. Kelly, correct?

23  A    R. Kelly was a customer, booked studio time at Chicago

24  Trax.

25  Q    But they were separate and distinct?

Arnold - cross - Mr. Farinella                1546

1  A     Yes.

2  Q     Chicago Trax didn't advertise that you can get this

3  internship with us and work with R. Kelly or anything like

4  that, right?

5  A     That's correct.

6  Q     All right.  So when -- when you were intern -- when did

7  your internship end?

8  A     It was a four-month internship.  I started picking up

9  phone shifts, answering calls for Chicago Trax within the

10  first month or so just to make money.  Before I was hired on

11  as the assistant to the chief engineer, probably about four,

12  five months into my time at Chicago Trax.

13  Q     And so when you were eventually hired, who were you hired

14  by?

15  A     The chief engineer.

16  Q     At Chicago Trax?

17  A     At Chicago Trax.

18  Q     Do you remember his name?

19  A     Yes, it was Chris Steinmetz.

20  Q     And so how long was it before you transitioned from

21  Chicago Trax to working for Mr. Kelly?

22  A     So that would have been around 19 -- January 1999,

23  December 1999 was when I started working at Chicago Trax as

24  the assistant to the head engineer.  I started working

25  directly for Bass Productions in 2003.

Arnold - cross - Mr. Farinella          1547

1  Q    So it was in about I believe you said March of 2003 that

2  you exclusively worked for Mr. Kelly?

3  A    That's correct.

4  Q    And the entity's name that you were working for or hired

5  by I should say?

6  A    Yes.  Bass Productions.

7         THE COURTROOM DEPUTY:  Sorry, they can't hear you in

8  overflow, Mr. Farinella, your mic.

9         THE COURT:  It might just be where you have the mic

10 positioned.

11        MR. FARINELLA:  I don't know if I can get it closer

12 to my mouth.

13        THE COURT:  Just slow down a little bit too.

14        MR. FARINELLA:  Yes, I'm a fast talker.  So is that

15 better?  No.

16        THE COURT:  I think so.

17        MR. FARINELLA:  I don't know why --

18        THE COURT:  I mean, the other option, if you like,

19 is just to use the standing mic if you're not a walker.

20        MR. FARINELLA:  I'm not a walker, no.

21        THE COURT:  You might just want to use the

22 microphone, it might be better.  Let's see if that's a little

23 easier.

24        MR. FARINELLA:  I apologize, your Honor, I will

25 try --

Arnold - cross - Mr. Farinella                1548

1      THE COURT:  That's okay, whatever works, take your
2  time.
3      MR. FARINELLA:  Is that better?
4      THE COURT:  That's good.
5      MR. FARINELLA:  All right.  So I'm going to sit here
6  like this.  All right.  I will do my best.  Thank you, your
7  Honor.
8  Q    So in 2003, when you were hired by Mr. Kelly, isn't it
9  true that you were hired by his manager?
10 A    I was hired by Derrel McDavid.
11 Q    And what -- and you had testified yesterday that your
12 initial duties were -- were errands and assisting with the --
13 assisting the engineers at the studio, right?
14     THE COURT:  I think we lost you again.
15     MR. FARINELLA:  How is that?
16     THE COURT:  That's perfect.
17     MR. FARINELLA:  How is that?  Is that better?
18     THE COURT:  Good, good, good.
19     MR. FARINELLA:  If you could please repeat the
20 question back.
21     (Record read.)
22 A    Yes.  In addition to that getting petty cash and
23 answering phones and making sure that there was a runner and
24 phone person staffed.  And managed the building for any, if
25 there was any maintenance that needed to be done on the

Arnold - cross - Mr. Farinella          1549

1  facility.

2  Q    And both yesterday and today you mentioned the term

3  "runner," right?

4  A    Yes.

5  Q    And you said these runners would go out and get food for

6  people, correct?

7  A    Yes.

8  Q    And isn't it a fact that the runners or personal

9  assistants are commonplace in the entertainment industry, or

10 more specifically the music industry?

11 A    In the studio industry there would always be an intern or

12 runner available at a studio, a recording studio.  I can know

13 that from other studios that I worked at.  I've only ever

14 worked for one celebrity so I can't speak on what it's like

15 for other celebrities.

16 Q    But it didn't seem uncommon, correct?

17            MS. GEDDES:  Objection.

18            THE COURT:  Overruled.

19            Do you have any basis for claiming -- or for stating

20 whether it's common or not?

21            THE WITNESS:  No.

22            THE COURT:  Next question.

23 BY MR. FARINELLA:

24 Q    So you had testified yesterday that if someone came to

25 the studio or the gate you notified Mr. Kelly, correct?

Arnold - cross - Mr. Farinella          1550

1  A    Did you say I would notify Mr. Kelly?  I couldn't hear
2  you.
3  Q    Yes.
4  A    Yes, I would notify Mr. Kelly.
5  Q    And this is -- this was during the time period where
6  Mr. Kelly had already achieved some success, correct?
7  A    Yes.
8  Q    And Mr. Kelly achieved some level of notoriety, right?
9  A    Yes.
10 Q    And so it started to become overwhelming in terms of the
11 general public wanting access to Mr. Kelly, right?
12          MS. GEDDES:  Objection.
13          THE COURT:  Sustained as to form.
14          Did his increasing success have any effect on the
15 nature of the work that you did, and if you can't answer the
16 question just you can say that.
17          THE WITNESS:  Yeah, I don't know.
18 Q    Well, you would agree that it affected Mr. Kelly's public
19 exposure more so than when he wasn't as popular, right?
20 A    As long as I've known him he's been famous, hugely
21 famous.
22 Q    So when you say famous, you mean he's known both
23 nationally and internationally, correct?
24 A    Yes.
25 Q    And as someone who is working for someone who's famous,

Arnold - cross - Mr. Farinella                    1551

1  your job duties become a little more difficult because of that

2  fame, correct?

3  A    I don't know if I would say they're more difficult.  They

4  were -- to me they always were difficult, it was always the

5  same.

6  Q    So when you would meet someone at the gate did you think

7  it was unusual?

8  A    No, it was common.

9  Q    Right.  So it made sense to you that somebody of

10  Mr. Kelly's fame had basic security measures in place, right?

11  I mean --

12            MS. GEDDES:  Objection.

13            THE COURT:  Overruled.

14            Did that make sense to you?

15            THE WITNESS:  To -- to expect that there would be

16  security in place or a separation between the celebrity and

17  the public seems logical to me.

18  Q    Isn't it a fact that Mr. Kelly worked long hours at the

19  studio?

20  A    Yes.

21  Q    Okay.  And yesterday and I believe even today you said

22  one of your job responsibilities was to ensure that the

23  refrigerator in the studio and the refrigerator in the tour

24  bus was stocked, right?

25  A    Not just specifically the refrigerator, all -- like any

Arnold - cross - Mr. Farinella                    1552

1  supplies were required to be stocked for the bus which would

2  include food.

3  Q    So is it fair to say that while you were employed by

4  Mr. Kelly fulfilling this responsibility, those -- that

5  responsibility was always taken care of, correct?

6  A    I can't speak for all the time.  When it was my

7  responsibility to purchase supplies or to do an inventory of

8  supplies at Chicago Trax, yes, I would make sure that all the

9  supplies were purchased and food was on that list of supplies.

10 Q    And so when it was yours -- at any given point in time of

11 your employment when it was your specific responsibility to

12 ensure that the bus and -- the tour bus and the studio that

13 food was replaced you went and did that, right?

14 A    I myself would or the task would be assigned to another

15 assistant or runner or somebody else that was working --

16 Q    Right, but you made sure that got done, correct?

17 A    Yes.

18 Q    Okay.  And isn't it a fact that you can't remember a time

19 when that wasn't done, right?

20        THE COURT:  What, food getting stocked?

21 Q    Ensuring that the refrigerators on the bus and the studio

22 were properly stocked?

23 A    Yeah, I -- I wasn't there all the time, I can't speak to

24 when I wasn't around.

25 Q    Well, isn't it true you had a number of interviews with

Arnold - cross - Mr. Farinella                    1553

1   the government regarding this case, right?

2   A    Yes.

3   Q    Okay.  In one of those interviews you said that you also

4   worked very long hours, right?

5   A    I did work long hours, yes.

6   Q    And I'm assuming that those long hours were at the

7   studio, correct?

8   A    In the Chicago Trax days and the Chocolate Factory days

9   on Larrabee it would have been in the studio.  Most of the

10  time then was started out 9 to 5, so normal business hours,

11  but still would voluntarily be there very late for the Chicago

12  Trax days.  The Chocolate Factory days quite frequently were

13  12-hour shifts often without weekends off.  The Chocolate

14  Factory after that became a lot more 24-hour shifts.

15  Q    So -- thank you.  So going back to Mr. Kelly and the

16  success he had in the music business, it's also true that

17  Mr. Kelly would have people in the music business who were

18  just as famous as him come to the studios, correct?

19  A    There was instances where other celebrities came to the

20  study, yes.

21  Q    Do you remember those instances?

22  A    A few of them, yes.

23  Q    And can you please tell me who -- or tell us who those

24  people were?

25  A    Sure.  Over the duration of the time I worked with him or

Arnold - cross - Mr. Farinella                1554

1   just a specific time?

2   Q    Well, when you were working at the studio, so over the

3   course of your time with Mr. Kelly is sufficient.

4   A    Okay.  Jay-Z and Puff Daddy came in.

5   Q    We'll go one at time.  When Jay-Z or Puff Daddy came in,

6   did they have a security team?

7   A    Yes.

8   Q    Did they have a lot of people with them?

9   A    Yes.

10  Q    So it wasn't three or four people, right, it's more like

11  10, 12, 15, 20 people, correct?

12  A    I -- I'm not sure.  More than three people I would say

13  would be safe to say.

14  Q    More than five people?

15  A    Yes, in both of these instances, yes.

16  Q    Ten, up to 10 people maybe?

17  A    Not necessarily, but I can't be a hundred percent sure.

18  Q    How many vehicles did they pull up in?

19  A    I don't recall for sure.

20  Q    So would they travel in a -- do you recall if they

21  traveled in vans or Suburbans or limousines or --

22  A    Yeah.

23  Q    Do you recall the mode of travel that they used?

24  A    For Puff Daddy I remember it being like a turtle top type

25  van, like a black van that pulled into the gate.  There may

1  have been an additional SUV, but I don't recall for sure.

2  Q    And so when they pulled up -- forgive me one second.

3  Let's do this.  Let's go back to the government's exhibit.  So

4  I'm going to refer you to Government Exhibit -- I'm referring

5  you to what has been admitted as Government Exhibit 525.

6           Do you remember seeing this?

7  A    Yes.

8  Q    And you said that this is where guests would come?

9  A    Yes, that's the entrance to the parking lot at the studio

10 on Larrabee.

11 Q    When guests would come, in this particular instance Jay-Z

12 or Puff Daddy's, I guess how would you say it, entourage, if

13 you will, they would come through this gate, right?

14 A    Correct, into the studio.

15 Q    How would -- where would the cars be?

16 A    Oftentimes pulled -- the main vehicle that had somebody

17 would pull up right up to the front right by the main door

18 where that -- on the other picture there was a light up sign

19 that said Trax, that's where somebody would pull up unless

20 Mr. Kelly's car was already parked there, then they would park

21 in the parking lot.  There was parking spots along the side of

22 the building, all along -- well, you can see there's quite a

23 lot of spots inside the lot.

24 Q    Right.  So wouldn't it be the ordinary course that they

25 would actually park in that lot, right?

Arnold - cross - Mr. Farinella                 1556

1  A    Yes.  But there also could be -- there'd also be cars

2  parked on the street possibly.  If there was a large amounts

3  of vehicles.  I wouldn't know.

4  Q    Sure.  On a whole it was likely that Jay-Z or Puff Daddy,

5  their main vehicle or vehicles would be in the lot, right?

6  A    Correct.

7  Q    And so you see that the lot there has some barbed wire at

8  the top, right?

9  A    Yes.

10 Q    So there's a need for a secured lot there, right?

11 A    Yes.

12 Q    And so going back to the secured lot, when Puff Daddy and

13 Jay-Z weren't there with their vehicles and people, the studio

14 was also in a, what you would say, a rough neighborhood,

15 correct?

16 A    Yes.

17 Q    So that was also there to ensure that the studio was

18 protected because it had millions of dollars in recording

19 equipment and things of that nature in there, right?

20 A    At the time the studio was built it was -- it was

21 difficult --

22 Q    Right.  So in your mind that was a totally reasonable

23 security measure, right?

24         MS. GEDDES:  Objection.

25         THE COURT:  Well, first of all, you always have to

Arnold - cross - Mr. Farinella                1557

1  let the witness finish his answer.  I don't know, did you

2  think -- what are we talking about as a reasonable security

3  measure, having barbed wire?

4           MR. FARINELLA:  Yes.

5           THE COURT:  Any question about that?

6           THE WITNESS:  I never thought it was strange.

7  BY MR. FARINELLA:

8  Q    Did you think it was unreasonable that guests could come

9  and park in a secured lot?

10 A    No.

11 Q    So we were on Jay-Z and Puff Daddy, who is the next

12 person that you remember coming to the studio?

13 A    Shaquille O'Neal.

14 Q    What was that like?

15 A    He came with -- it was a smaller group, he had an

16 assistant and he came with another -- another Chicago rapper

17 named Twista who had a few people with him.  There was

18 probably another --

19 Q    You said -- I'm sorry, Twista?

20 A    Yes.

21 Q    And he was a rapper?

22 A    Yes.

23 Q    So Shaquille O'Neal and Twista.  How many people with

24 Shaquille O'Neal, about five?

25 A    That sounds about right.  Though I'm not sure and tell

Arnold - cross - Mr. Farinella                    1558

1  you whether they actually came to work with Mr. Kelly or

2  whether they came to work at Chicago Trax but that was another

3  celebrity that came through.

4  Q    And Twista, how many people did Twista have?

5  A    I don't recall, it could have been another four or five

6  people too.

7  Q    Although it may not seem Mr. O'Neal needs security, did

8  he have security with him?

9  A    He probably had one individual with him.

10  Q    What about Twista?

11  A    Probably had one individual also.

12  Q    So do you recall the cars that they arrived in?

13  A    I don't in this scenario, no.

14  Q    But it was probably likely they parked in the secured

15  lot, right?

16  A    They would have parked in the lot.

17  Q    And they were -- they probably arrived in something like

18  you had described Mr. Kelly driving a Maybach or maybe a

19  Suburban, something along those lines?

20        MS. GEDDES:  Objection.

21        THE COURT:  Sustained as to form.

22        Do you have any recollection of the kind of vehicles

23  that these various people would arrive in when they came to

24  the studio?

25        THE WITNESS:  I'm fine to answer generally that it

1    would be probably a rental vehicle or like a limousine service

2    a car service.

3          THE COURT:  Okay, next question.

4    BY MR. FARINELLA:

5    Q    And so do you recall anyone else other than Jay-Z, Puff

6    Daddy, Twista and Shaquille O'Neal?

7    A    Yeah, I'm sure -- well, over the long time which I worked

8    for him, Whitney Houston was a -- had come into work in the

9    studio with him as well.

10   Q    Right.  So Whitney Houston arrived at the studio and she

11   had security detail, correct?

12   A    Yeah, like one or two people were with her.

13   Q    She arrived in a vehicle that was probably parked in the

14   secured lot, right?

15   A    Yes.  Yeah, actually that might have been at Olympia

16   Fields that she actually came by, but yes --

17   Q    Okay.  Same thing though, I mean, right?

18   A    Yes.

19         THE COURT:  I'm sorry, can I just ask, is it fair to

20   say that whenever somebody would come to visit or to record

21   and the person was famous, is it fair to say that they brought

22   other people with them?

23         THE WITNESS:  Yes.

24         THE COURT:  All right.  Can you just give an

25   estimate, whoever the person is, what the range of people they

Arnold - cross - Mr. Farinella               1560

1  would bring with them was?

2              THE WITNESS:  Sure, sure.  It could be as small as

3  two people because they brought one security guard or

4  assistant or their own engineer.  And there was instances

5  where there would be a community, you know, 10, 15 people.

6  Not just necessarily celebrities to the caliber of Mr. Kelly,

7  but local celebrities as well could bring an entourage.  It

8  always varied.

9              But I would just like to say that, depending on the

10 circumstances if someone is there for an appearance there

11 would be more and if someone's there just to do a recording

12 session, there could be less.

13             THE COURT:  I see.

14             THE WITNESS:  That would be the distinction.

15             THE COURT:  Okay.  Next question.

16             MR. FARINELLA:  Thank you, your Honor.

17 Q    With that being said, I know that you had mentioned some

18 job titles, but these celebrities would bring -- or they could

19 bring sometimes a hairstylist, right?  Or a manager, right?  A

20 personal assistant that did there wardrobe, right?

21 A    Yes, yes.

22 Q    And personal assistants that went and did the same

23 activities that runners do for Mr. Kelly, right?

24 A    Yes.

25 Q    Like get food and get coffee, right?

1  A    Not necessarily, we would have done that, yes --

2  Q    Okay.

3         THE COURT:  Let him finish the answer.  Let him

4  finish the answer.

5  A    We'd have done that as a mechanism of the studio.  It

6  would be -- the expectation would be there would be somebody

7  at a studio that would always be able to take care of getting

8  food and things like that.

9  Q    So there was a definite need to ensure that there was a

10 runner that could fulfill those responsibilities, right?

11 A    We always had somebody at Chicago Trax and at the

12 Chocolate Factory.

13 Q    And I think you had said that there was a distinction

14 between a planned event versus an unplanned event, right?  Or

15 no event planned, right?

16 A    I'm sorry, in terms of?

17 Q    So let me rephrase.  So I think you had said that the

18 range of people that would be at the studio varied as to

19 whether it was a planned event where that -- or a planned

20 appearance I believe you said, I'm sorry, right?  So if

21 Whitney Houston is coming to sing as an appearance, it would

22 draw many, many people outside of the inner circle of the

23 person, right?

24 A    Correct.  And in an instance where someone is coming into

25 record a simple vocal, the entourage or the traveling party

Arnold - cross - Mr. Farinella                    1562

1   could be very, very minimal.

2   Q    But that person would have their own people and it would

3   be -- generally it's more than one, right?

4   A    Yes, I would say so.

5   Q    And so with that being said, when they arrived didn't --

6   didn't -- I think you -- I believe you said that you would

7   notify Mr. Kelly when these guests arrived, right?

8   A    I would be notified if somebody was to be -- if we're to

9   expect somebody to open the gate for somebody we'd be notified

10  of who they were, but any time anybody was coming and if it

11  was a scheduled booking when it was Chicago Trax as the

12  studio -- when I was the studio manager I would know who was

13  expected to come that day.

14  Q    And there might be even, you know, some tendency for that

15  information to get out and maybe it could draw a crowd, right,

16  outside the studio just wanting to see the person?

17  A    Yeah, I would say that if -- if it was published that a

18  celebrity was going to be at our recording studio, it would

19  have drawn a crowd in some instances.

20  Q    So if --

21       THE COURT:  Can I just ask you if you remember that

22  happening?

23       THE WITNESS:  I do.

24       THE COURT:  Okay.  Go ahead.

25  Q    And so was that something that was common?

GEORGETTE K. BETTS, RPR, FCRR, CCR
A 705

Arnold - cross - Mr. Farinella                1563

1  A    Was it common for it to be publicized that somebody was
2  going to be at the studio?
3  Q    Yes.
4  A    It happened -- it happened frequently, but it wasn't -- I
5  would say it was common.
6  Q    So there on any given occasion there could be anywhere
7  from 10 to a hundred people, you know, unexpected, right?
8         THE COURT:  Where?
9         MR. FARINELLA:  Let me rephrase.
10        THE COURT:  Okay.
11 Q    So let me follow up.  So that's what you meant by a
12 planned appearance, right, a scheduled appearance coming to
13 the studio to record, right?
14 A    The public was more I would say there would be a larger
15 group of people appearing for a publicized appearance or --
16 yeah, but a scheduled appearance would be common for an artist
17 to know that the artist is coming, but in terms of it being
18 open and there to be public knowledge would be the difference
19 between whether there would be a larger security detail in
20 terms of entourage or people that were with him, would
21 determine the nature -- I would say that the nature of the
22 reason for them being at the studio would determine how many
23 other people were there for the event.
24 Q    Right.
25 A    I'm sorry, if that made --

Arnold - cross - Mr. Farinella                1564

1  Q    I'm following.  So I think what you're saying -- or even
2  the degree their celebrity, right, so would affect that as
3  well?
4            MS. GEDDES:  Objection.
5            THE COURT:  Sustained as to form.
6  Q    So the degree of celebrity meaning, if when Whitney
7  Houston came she necessarily wasn't as -- you know, as famous
8  as Michael Jackson or Prince, right?
9            THE COURT:  I'm going to sustain.  I mean, that's a
10  matter of taste.
11           MR. FARINELLA:  Well, your Honor --
12           THE COURT:  So let's put a different question to the
13  witness.
14  Q    So there are more famous people who would come to the
15  studio and they generally had larger, larger people -- I'm
16  sorry, a larger entourage, right?
17           MS. GEDDES:  Objection.
18           THE COURT:  Is that true -- I think the difficulty
19  is defining who is more famous.  But let's ask this, is it
20  fair to say that certain people had larger groups with them
21  than others?
22           THE WITNESS:  Absolutely.
23           THE COURT:  Next question.
24  BY MR. FARINELLA:
25  Q    What about if they -- if they perform a certain genre of

Arnold - cross - Mr. Farinella                1565

1  music, did that affect the amount of people that traveled with

2  them or not?

3          MS. GEDDES:  Objection.

4          THE COURT:  Are you able to say that?

5          THE WITNESS:  Yeah, I'm not sure that actually the

6  genre of music makes the difference.

7  Q    Okay, thank you.

8          So when they arrived, they would see you first,

9  right?  You'd be the first face that they would -- or the

10 first person they would encounter?

11         MS. GEDDES:  Objection just as to the form.

12 Q    Isn't it true that you were the first person to greet the

13 guests when they arrived -- when they came actually inside the

14 studio?

15 A    I, myself, was not -- I am not necessarily the first

16 person.  If I was the person responsible for opening the gate

17 or in the reception, serving that duty I would be the first

18 person that they would see.

19 Q    So that job responsibility, it's fair to say, rotated as

20 to who was -- rotated as to who was working during a given

21 time period the person was there, right?

22 A    Correct.

23 Q    And so somebody, you know, a famous person or any --

24 let's just say anybody that's a professional guest of

25 Mr. Kelly's arrives, they're greeted by somebody initially,

Arnold - cross - Mr. Farinella                1566

1    correct?

2    A    Correct.

3    Q    And so after that they're taken to the music lounge,

4    correct?

5    A    To the lounge or the studio to wherever they need to be.

6    Q    Right.  And they are escorted because many of these

7    people don't know where they -- where to go within the studio,

8    correct?

9    A    Yeah, they would not have been to the building or know

10   which room they were to be recording in.

11   Q    They would need -- and that goes for professional or not

12   professional, right.  If Mr. Kelly was just having a regular

13   guest come and they weren't familiar with the studio, he

14   wouldn't want them wandering around the studio aimlessly,

15   right?

16             MS. GEDDES:  Objection.

17             THE COURT:  Overruled.  Is that one of the reasons?

18             THE WITNESS:  Repeat the question, please.

19   Q    Whether it was a professional guest or a personal guest,

20   they arrived to the studio, I believe you said they don't know

21   where to go or where anything is, right?

22   A    Yes.

23   Q    So they would generally -- they generally they need an

24   escort to get to and from wherever they're going, correct?

25   A    Correct.          (Continued on the next page.)

1        MR. FARINELLA:  Is that better?

2        THE COURT:  You're doing fine.  We can hear you.

3   BY MR. FARINELLA:  (Continuing)

4   Q    Okay.  Mr. Arnold.  I'm showing you what has been entered

5   as Government Exhibit 235.  Do you remember this from

6   yesterday?

7   A    Yes.

8   Q    I'm going to turn it over and direct your attention to

9   the center here or the right side of the diagram.  Right?  So

10  here is labeled Music I studio area, right?

11  A    Yes.

12  Q    And I believe you said yesterday that this is Mr. Kelly's

13  main studio where he recorded, right?

14  A    Yes.

15  Q    And so with that being said, if you go to the back of the

16  wall or over to the next area, it's called the control room,

17  Music I control room, right?

18  A    Yes.

19  Q    And now what I don't think you said yesterday is that

20  aren't these two rooms connected?

21  A    There's a, a window between the two rooms but you can't

22  pass directly from the control room into the studio area

23  without going out to the hallways on either side.

24  Q    No, but so as an engineer, where would you sit?

25  A    The engineer would sit in the Music I control room where

Arnold - cross - Farinella                    1568

1   the words are actually written.

2   Q    Okay.  And would there be anybody else in the control

3   room other than the engineer?

4   A    Yes.  There could be -- there would be -- where that

5   square is below it, that would be sort of an island that has

6   lots of gear in it.

7   Q    So right there?  (Indicating)

8   A    Yes.

9         On the other side -- if you just move your pen a

10  little further down -- there would be a couch back there and

11  there would be some chairs, there would be keyboards and

12  equipment on top of the console and people would be able to

13  work there to perform and they, and work from there as well.

14  Q    Okay.  So just to be clear, so at any given time, when

15  Mr. Kelly is in the studio recording, Music I, is it safe to

16  say there would be more, more than three people in the control

17  room?

18  A    There could be times where there's more than three.

19  Q    Okay.  More than five?

20  A    There could be.

21  Q    And they all serve specific functions, right?

22  A    In regards to there being more than five people?

23  Q    Well, let me rephrase.

24        You said earlier that there's a box here where they

25  may be, they may be accessed.  In order for this to function,

Arnold - cross - Farinella                    1569

1   a control room in conjunction with the recording studio, you

2   mean other engineers than the main engineer, right?

3   A    It's quite common there would be one engineer and an

4   assistant engineer, correct.

5   Q    And let's just say somebody that Mr. Kelly was

6   collaborating with, were they, on any given occasion, where

7   would they be, they would be in Music I with him?

8   A    They could be in the control room with him to do the work

9   or else, if they were recording the vocals or a band or choir

10  or larger group, they would be in the Music I studio area, the

11  live room.

12  Q    And isn't it accurate and fair to say that if there was

13  collaboration, if Mr. Kelly was collaborating, that person who

14  came to collaborate with Mr. Kelly would also have people with

15  him or her?

16  A    That's fair to say.

17  Q    And assistants and runners or, you know, managers, those

18  types of people, right?

19  A    They could.

20  Q    They search specific functions for the person that was

21  there?

22  A    I, I don't know for sure.

23  Q    I'm saying on most, on most occasions where the artist

24  was collaborating with Mr. Kelly.  If they were there working,

25  they got, they had people there who assisted them in their

Arnold - cross - Farinella          1570

1    work, correct?

2    A    I can't speak to what everybody would be there for.  What

3    I can say is that when I traveled with Mr. Kelly, and if I was

4    in the studio, it would be because I was functioning as part

5    of his, his team, people that were working for him.  My

6    perception would be that when other artists came and brought

7    people, they would be a part of their team as well though I

8    don't know their jobs or their specific roles.

9    Q    Thank you.

10        Music I, the studio area, it seems to be a large

11   area, right?

12   A    The Music I studio area?

13   Q    Right.

14   A    Yes.

15   Q    And the Music I studio area had obviously in there a

16   microphone, correct?

17   A    Yes, it had many.

18   Q    How many would you say there were?

19   A    There was jacks on the wall to plug in microphones.  You

20   could have 30, 40 if needed.

21   Q    Was there anything else in Music I?

22   A    Sure.  There would be -- there was often a grand piano in

23   there, like a rolling baffles, these tall absorbent structures

24   that could go behind the person to isolate the sound.  It was

25   very common to have it set up as a vocal area with the baffles

Arnold - cross - Farinella                    1571

1  behind and then a microphone in front.  Maybe there would be a

2  couple of chairs, a stool, maybe some other microphones and

3  other gear in there.

4  Q    Okay.  So Mister -- and Mr. Kelly -- I'm sorry.

5        Mr. Kelly played the piano obviously, right?

6  A    Yes.

7  Q    And there were occasions when there were people that were

8  working with Mr. Kelly that played the piano and Mr. Kelly

9  sang, right?

10  A    Yes.

11  Q    And so just to be clear, by the way, the two rooms, you

12  said there's a window, right?

13  A    Yes.

14  Q    Okay.  Are you familiar with what an IFB mic is?

15  A    No.

16  Q    Okay.  So there's a microphone in the control room and,

17  so that the engineer can communicate to the person in Music I,

18  right?

19  A    Correct.

20  Q    So they can go back and forth, correct?

21  A    Correct.

22  Q    And they can communicate?

23  A    Yes.

24  Q    Now, this was a recording studio, obviously, right?

25  A    Yes.

Arnold - cross - Farinella                    1572

1   Q    And with a recording studio while you were recording

2   music, the only way to do it is to have absolute silence,

3   correct?

4   A    That would be the preference.

5   Q    Right.  So these rooms were soundproofed for that

6   purpose?

7   A    Correct.

8   Q    Now, in the event Mr. Kelly is working in Music I in the

9   studio area, Mr. Kelly would have to use -- and he needed to

10  use the restroom, he would have to get to, have to leave the

11  studio and go to the back to the restrooms, right?

12  A    Correct.

13  Q    So was it the same for Studio II?

14       THE COURT:  I hear the question.

15  Q    I said am I, when Mr. Kelly was working in Studio I, he

16  was doing -- I'll say he was doing so for long hours and that

17  the restroom that he used was the one behind him?

18       MS. GEDDES:  Objection.

19       THE COURT:  I'll sustain the objection to the form.

20       I think the witness already testified about the

21  restroom, right?

22       THE WITNESS:  I'm not --

23       THE COURT:  Put another question to the witness.

24       MR. FARINELLA:  I'm sorry.  You didn't hear me about

25  the second studio.  I apologize.

Arnold - cross - Farinella                    1573

1          THE COURT:  That's okay.

2     Q    Okay.  So the question was next to Music I is another

3     studio, right?

4     A    Uh-huh.

5     Q    And the same goes for Music II, that you can have an

6     engineer and you have, you can have the performer inside the

7     studio, right?

8     A    Yes, the concept is the same.  It's set up exactly the

9     same.

10    Q    Okay.  And as I had just asked you the question about

11    each studio being soundproofed, it is, you are able to have,

12    you know, work be done in Studio II while there's also someone

13    in Studio I, right?

14    A    Correct.

15    Q    So they can go back and forth while, you know, at the

16    same time?

17    A    I'm sorry.  Is the -- sorry.  Ask the question again.  I

18    just misunderstood you.  Sorry.

19    Q    So you have two studios next to each other, correct?

20    A    Uh-huh.

21    Q    At any given time, they can both be utilized at the same

22    time, correct?

23    A    Yes.

24    Q    Which would generate people being also in Studio II if

25    that's happening on a particular day, right?

Arnold - cross - Farinella                    1574

1   A    Yes.

2   Q    And that would mean somebody in the engineering, in the

3   control room and somebody in the studio, right?

4   A    Yes.

5   Q    Or even more than one person?

6   A    Yes.

7   Q    Okay.  And so is it fair to say as an engineer that if

8   Mr. Kelly was in Studio I performing and somebody either

9   walked into the control room, right, and walked into the

10  window, it could be distracting?

11  A    I would think so.

12  Q    Okay.  And the same goes that if Mr. Kelly is working in

13  Studio I and someone just randomly pops in to the studio or

14  goes into that door by accident, right, while Mr. Kelly is in

15  session, that certainly could be distracting?

16  A    Yes, it would be disruptive.

17  Q    And in this type, you know -- when you're recording like

18  that, it could be that there's, you know, a good session

19  happening and it could be interrupted, right?

20  A    Might, sure.

21  Q    And so it makes sense that when people who were coming to

22  the studio that didn't know where things were were escorted by

23  people, right?

24  A    Yes, everybody, when they came into the studio.

25  Q    Okay.  And it could be, and you just said that -- and the

Arnold - cross - Farinella                1575

1    reason for that is because it was an active, it was an active

2    business place, an active studio where things were really

3    happening, right?

4    A    That could be one of the reasons, yes.

5    Q    People were working?

6    A    Yes.

7    Q    And so wasn't it also true that any guest that was being

8    transported to and from -- withdrawn.

9          Privacy was important to Mr. Kelly, correct?

10          MS. GEDDES:  Objection.

11          THE COURT:  Overruled -- well, I'll sustain it as to

12   form.

13   Q    So while you worked for Mr. Kelly, isn't it a fact that

14   you understood that privacy was important to Mr. Kelly?

15   A    A level of -- I can't think of necessarily the right word

16   but I'll say control in terms of there were times in which he

17   would want to be private, for sure.  There were also times

18   where he wanted to be public, where he openly wanted to be out

19   and available for people to see.  So in those times in which

20   he wanted to be private, I could certainly say that would be

21   important to him.

22   Q    And isn't it true that was the same for other celebrities

23   that came to the studio; they wanted their privacy, right?

24          MS. GEDDES:  Objection.

25          THE COURT:  Sustained.

Arnold - cross - Farinella                1576

1   Q    So there was a policy that you talked about with

2   Mr. Kelly that was initiated by his former manager, something

3   known as signing confidentiality agreements, right?

4   A    Yes.

5   Q    And didn't you tell the government that the reason why --

6   I'm sorry.  It was Mr. McDavid, his manager's idea and his

7   lawyer, Mr. Genson's idea and that Mr. Kelly knew nothing

8   about those confidentiality agreements?

9            THE COURT:  Sustained.

10  Q    Did Mr. Kelly -- to your knowledge, did Mr. Kelly know

11  that Genson and McDavid instituted the policy of

12  confidentiality agreements?

13  A    I don't know who formally instigated it.

14  Q    Okay.  So you had said, you testified earlier that there

15  had been a number of occasions or there had been at least one

16  occasion that you sat down and spoke to the government with

17  regard to this matter, right?

18  A    I'm sorry.  About the confidentiality agreements?

19  Q    There was at least one time where you sat down with the

20  government and talked to them about this, this case, right?

21  A    Yes.

22  Q    Okay.  So I'm going to show you what, to see if I can

23  refresh your recollection as to what you told the government.

24  A    Okay.

25  Q    Okay?

Arnold - cross - Farinella                    1577

1          MS. GEDDES:  What are you showing him?

2          THE COURT:  Just give her the exhibit number on the

3     bottom.

4          MR. FARINELLA:  3500TA-T-2.

5          THE COURT:  And why are you showing him this?

6          MR. FARINELLA:  I'm asking to refresh his

7     recollection that that's what he told the government.

8          THE COURT:  Regarding what?

9          MR. FARINELLA:  Well, I had asked him about whether

10    or not Mr. McDavid and Mr. Genson --

11         THE COURT:  Oh, I see.  Sure.  Show it to him.

12         MR. FARINELLA:  May I approach, Your Honor?

13         THE COURT:  Yes.  Go ahead.

14    Q   So can you read the line here that starts with "Arnold"

15    to yourself and to the end of the paragraph.

16         (Pause.)

17    Q   Does that refresh your recollection as to what you told

18    the government?

19    A   It's a paraphrase as opposed to a quote, but I believe

20    what I said, if I remember correctly, was that it was

21    instituted at the time in which --

22    Q   That's not the question --

23         THE COURT:  Let him finish.

24    A   I'm sorry.  I was just thinking.  I apologize.

25         It is safe to say that my belief is that it

Arnold - cross - Farinella                    1578

1   originated from Derrel McDavid and Ed Genson for the process

2   to take place at the studio.  I believe that's accurate.

3   Q    Okay.  And in this agreement, I think you said it

4   included provisions like the person that was there as a guest

5   could not take photographs, right?

6   A    Yes.

7   Q    They could not record, right?

8   A    Correct.

9   Q    Okay.  And other maybe provisions along those lines,

10  right?

11  A    Yes.

12  Q    Okay.  So it is safe to say that if a guest that was

13  there for the first time saw somebody that they recognized in

14  the public eye, a celebrity, that they might be inclined to

15  take pictures of that person?

16          MS. GEDDES:  Objection.

17          THE COURT:  Sustained as to form.

18          I mean I take it one of the reasons that you had

19  these rules was to keep people from photographing people or

20  approaching them, is that right?

21          THE WITNESS:  Yes, and taking materials or recording

22  audio, music, and things like that.

23  Q    So this particular policy was there or implemented, as

24  you just stated, to protect Mr. Kelly's or Mr. Kelly's

25  professional guests' intellectual property, right?

Arnold - cross - Farinella                    1579

1   A    It would be to protect anything that happened at the

2   Chocolate Factory.

3   Q    Well, I think you also told the government that --

4   withdrawn.  Okay.

5           So that wasn't an unusual policy that was

6   implemented then, right?

7           THE COURT:  Do you know whether it's a usual policy

8   to have nondisclosure agreements for people that arrive at the

9   studio?

10          THE WITNESS:  I can't speak to other studios.

11          THE COURT:  Okay.  Next question.

12  Q    Now, you talked about transporting guests, right?

13  A    Yes.

14  Q    Okay.  And that when you did that, you turned the

15  rearview mirror up, right?

16  A    Correct.

17  Q    And so that too, wasn't that a policy to ensure the

18  guests' privacy?

19  A    Yes.

20  Q    And you also said that you would turn on the radio to a

21  reasonable volume not loud and making sure it wasn't loud,

22  right?

23  A    Yes.

24  Q    Now, so going back to the confidentiality agreements,

25  isn't it a fact that these were used, like you said, to

Arnold - cross - Farinella                1580

1  protect the music and also Mr. Kelly's privacy, right?

2  A    I believe I said it was to protect all things that

3  happened within the, that person's time at the studio or at

4  the Chocolate Factory, anything that occurred there.

5  Q    So isn't it a fact that you didn't believe these

6  confidentiality agreements were being used to cover up

7  criminal activity, did you?

8         THE COURT:  Sustained.

9  Q    As a matter of fact, didn't you tell the government that

10 the confidentiality agreements were in place because there

11 were people or were implemented, this policy was implemented

12 because people were always, quote, unquote, "thirsty," seeking

13 different angles to sue Mr. Kelly, correct?

14 A    I -- in the context, I don't understand using the quote

15 of the word "thirsty," but people eager to sue Mr. Kelly at

16 the time of being in, at Larrabee Street, that was my belief.

17 Q    Right.  And so that, any type of thing could lead to a

18 potential lawsuit, right?

19         THE COURT:  Could I see the parties at the side with

20 the court reporter for just a moment, please.

21         (Continued on next page.)

22

23

24

25

GEORGETTE K. BETTS, RPR, FCRR, CCR

A 723

Sidebar                                          1581

1      (The following occurred at sidebar.)

2      THE COURT:  I would tread very carefully in this

3  regard because you are going to open the door to some of the

4  things that people are accusing him about.  If you're just

5  trying to say that people are doing useless lawsuits which is

6  where I feel this is going, I would not do that, I think that

7  is extremely unwise, because at the time that we're talking

8  about, you've got the criminal case going on in Chicago and if

9  you start trying to leave the impression that he's just beset

10  by people that are suing him to get a buck out of him, you

11  really are -- it's just not a good idea.  It is not a good

12  idea.  I think I would move on to something else and then when

13  you, then when we take the lunch break, talk to your

14  colleagues about it but this is going into a place that you

15  are going to regret.

16      Isn't that what you're trying to show?

17      MR. FARINELLA:  Absolutely not.

18      THE COURT:  What --

19      MR. FARINELLA:  I want to know what he thinks.

20      THE COURT:  But who cares what he thinks?

21      MR. FARINELLA:  Well, my --

22      THE COURT:  Let me finish.  It doesn't matter --

23      MR. FARINELLA:  Well --

24      THE COURT:  -- because's it's what the jury thinks.

25  So what a witness' personal opinion about what -- first of

Sidebar                                                    1582

1   all, he's not a lawyer.  He did not draft the confidentiality

2   agreements.  I mean, I suppose if he you wanted to go into why

3   they were instituted, the person that you would speak to is

4   the person who drafted them.  This is a guy who's like a

5   studio engineer.

6          MR. FARINELLA:  But they're trying to use him to

7   cooperate that he was assisting in criminal activity.  So it's

8   essential to know because at him, as a member --

9          THE COURT:  Right.

10         MR. FARINELLA:  -- of the enterprise cannot

11  knowingly, knowingly assist.  If he has no idea what's going

12  on behind the scenes, that's, that goes to what he knew versus

13  what he didn't know and what he thought.

14         THE COURT:  You still have to do this within the

15  bounds of rules of evidence and the rules of just general

16  trial advocacy and whether or not -- I mean, I'm not going to

17  have a whole conversation here about the purpose of this

18  witness, whether he's a member of the enterprise or not, but

19  he's certainly part of the day-to-day operations of the

20  defendant's business, but that doesn't mean that you can ask

21  him what he thinks about all kinds of things.  We'd never ask

22  him, even the government didn't ask him whether he thought

23  Mr. Kelly was committing a crime.  It's totally improper.

24         MR. FARINELLA:  Your Honor, I'm faced with the fact

25  that the government is saying that Mr. Kelly used surrogates

Sidebar                                                        1583

1   to drop people off, right?

2               THE COURT:  Right.

3               MR. FARINELLA:  They have to establish those people

4   knew they were assisting Mr. Kelly in a criminal enterprise.

5               THE COURT:  They do not.  They do not have to do

6   that.  So all I'm going to suggest is that you move on to

7   something that's less troublesome than this and I'm really

8   doing this to help you out because if I let you go --

9               MR. FARINELLA:  I have no further questions in

10  regard to that matter.

11              THE COURT:  Okay.  All right.

12              MR. FARINELLA:  So I wasn't planning on going onto

13  that drag strip, maybe a ramp to it, but not on it.

14              THE COURT:  You were heading over the cliff there.

15              So what I would say is that if you think that there

16  is some productive reason to do it, consult with your

17  co-counsel and then let me, you can do that at the lunch hour,

18  but I think that we should probably -- you can certainly ask

19  him about stuff that he did or things that he has knowledge

20  of, but his opinion about things, his, his, I mean no lawyer

21  would be permitted to do that and I wouldn't let the

22  government do it.  So that's my ruling.

23              All right.  Let's keep going.

24              (End of sidebar.)

25              (Continued on next page.)

Arnold - cross - Farinella                    1584

1          THE COURT:  All right.  Go ahead.

2          MR. FARINELLA:  Thank you, Your Honor.

3    BY MR. FARINELLA:

4    Q    Okay.  So let's go now to Olympia Fields.  Let's move

5    from the studio in Chicago to Olympia Fields.

6          Many of the same things -- withdrawn.

7          So the government showed you a picture of a gate,

8    right, at Olympia Fields when you first go in?

9    A    Yes.

10   Q    When you first arrive?

11   A    Yes.

12   Q    And you said at that gate was, a security person was

13   stationed, right?

14   A    Yes.  If a security person wasn't sitting out there, we

15   would be monitoring it from the camera in the reception area.

16   Q    Okay.  And so the same policy applied at Olympia Fields

17   as the studio where if a guest came to Olympia Fields, that

18   they would be escorted, right?

19   A    Yes.

20   Q    And then they would also I believe you said sign a

21   confidentiality agreement, right, either at the front gate or

22   when they got to the studio?

23   A    Yes.  As the course of time at Olympia Fields -- it was

24   much more enforced early on at Olympia Fields than later on

25   but early, when we first started having a studio there at

Arnold - cross - Farinella                1585

1  Olympia Fields, we would follow the exact same process as

2  Chocolate Factory downtown.

3  Q    Okay.  And the process was that when a guest arrived,

4  they would obviously sign this agreement that they were

5  presented, would you either take a Polaroid or driver's

6  license or did you do both?

7  A    It's possible we did both at some point, but to my

8  recollection, we did one or the other.  More likely, we were

9  doing the driver's licenses -- I don't recall when it would

10 switch between one or the other or why we stopped taking

11 driver's licenses or when we did Polaroids but I remember we

12 did quite a lot of Polaroids and photos to attach to the

13 confidentiality agreement.

14 Q    Okay.  So if the person didn't have a driver's license

15 with them, would Polaroid be a method that was utilized?

16 A    Yes.  Potentially, yes.

17 Q    Okay.  And, again, the purpose was to ensure that

18 Mr. Kelly's privacy and safety were protected while that guest

19 was at the property, right?

20 A    The purpose of the Polaroid was to attach it to the

21 confidentiality agreement to identify who was the person that

22 had signed the agreement.

23 Q    So if somebody came as a guest and burned down Olympia

24 Fields, you would know who it was, right?

25 A    Not, not necessarily.

Arnold - cross - Farinella          1586

1  Q    You had either a photo ID, not identification, but a

2  picture of her or him, right?

3  A    We would have a photograph of people that had come in and

4  signed the agreements.

5  Q    And then the other reason why you took the driver's

6  license was to ensure that the person who signed the agreement

7  was, in fact, that person on the driver's license?

8  A    Yes.

9  Q    And there was a period of time when Mr. Kelly's family

10 was living in Olympia Fields as well, right?

11 A    Yes.

12 Q    Okay.  And Mr. Kelly -- withdrawn.  I'm getting ahead of

13 myself.

14      Mr. Kelly was married at the time, partially married

15 during the time that you worked for him, correct?

16 A    Yes.

17 Q    Okay.  And he also had small children, correct?

18 A    Yes, he had children.

19 Q    And this is while he --

20      THE COURT:  I'm so sorry.  I think one of the jurors

21 is having trouble hearing, is that correct?

22      THE JUROR:  No.

23      THE COURT:  I thought you were signaling to me.

24      THE JUROR:  I am.  Okay.  Donna will come to you.

25      (Pause.)

1         THE COURT:  I think what we'll do now is take our

2   lunch break and we will be back at 2:15.

3         Please don't talk about the case, don't look

4   anything up, but have a great, have a great lunch.

5         (Jury exits.)

6         THE COURT:  All right.  Everybody can sit down.  The

7   jurors needed a break.

8         You can take the witness out.

9         (Witness steps down.)

10        THE COURT:  Mr. Farinella, do you have a sense of

11  how much longer you are going to be with this witness?

12        MR. FARINELLA:  Not much longer, Your Honor.

13        THE COURT:  To me, not much longer means something

14  different, I think, than what that means to the lawyers.

15        MR. FARINELLA:  Yes, well --

16        THE COURT:  To me, not much longer means less than

17  ten minutes.  That's my favorite number.

18        MR. FARINELLA:  It could be ten minutes.  It could

19  be an hour.

20        THE COURT:  Well, that's not at all helpful.  Let's

21  try to make it closer to the ten minutes.  All right?

22        MR. FARINELLA:  Yes.

23        THE COURT:  All right.  We'll break for lunch.

24        Anything else we have to put on the record?

25        All right.  Thanks so much.    (Luncheon recess.)

Proceedings                                              1588

1              **AFTERNOON SESSION**

2                    (In open court - jury not present.)

3              THE COURTROOM DEPUTY:  All rise.

4              (Judge ANN M. DONNELLY entered the courtroom.)

5              THE COURT:  Everybody can sit down.

6              (Defendant entered the courtroom.)

7              MS. GEDDES:  Your Honor, should we bring in the

8     witness?

9              THE COURT:  In just a minute.  I just wanted to

10    clarify what we discussed at the sidebar regarding certain

11    questions that were posed to the witness.  I just want to make

12    sure that counsel understands the reason for my concern.

13             The first rule is, and I think it is sort of a

14    general rule that I believe everybody understands, is that

15    questions to witnesses about whether they think certain things

16    are criminal are just not proper questions.  Really, in any

17    case.

18             But the other concern that I had, which I just

19    wanted to make sure I expressed clearly, was that questions

20    regarding, which seemed to me were directed at showing that

21    the defendant was -- that there were sort of, I guess for lack

22    of a better word, kind of nuisance lawsuits that were filed on

23    a regular basis against the defendant, I expressed to counsel

24    that I think that is an extremely risky path to go down,

25    given, I believe at around this time, the defendant was

SAM     OCR     RMR     CRR     RPR

A 731

Proceedings                                                      1589

1   charged in Chicago with the crime that we already discussed.

2   And it was my concern that questions along those lines would

3   open the door in a way that counsel really didn't intend for

4   it to do.

5              So, that was the reason for the discussion.

6              Are we ready for the witness?

7              I think we are.  Let's get the witness.

8              And if we could get the jury, too.

9              (Witness entered and resumed the stand.)

10             (Pause.)

11             THE COURTROOM DEPUTY:  All rise.

12             (Jury enters.)

13             THE COURTROOM DEPUTY:  You may be seated.

14             THE COURT:  All right, everybody, back from lunch.

15   We are ready to resume with the cross-examination of the

16   witness.

17             Go ahead, Mr. Farinella.

18             THE COURTROOM DEPUTY:  The witness is reminded he is

19   still under oath.

20             THE WITNESS:  Yes.

21

22             (Continued on the following page.)

23

24

25

Arnold - cross - Farinella                1590

1   **THOMAS ARNOLD**,

2       called as a witness by the Government, having been

3       previously duly sworn/affirmed by the Courtroom Deputy,

4       was examined and testified further as follows:

5   CROSS-EXAMINATION

6   BY MR. FARINELLA:

7   Q    Good afternoon, Mr. Arnold.

8   A    Good afternoon.

9   Q    Just to go back to something we talked about earlier with

10  regard to the visit when Jay-Z came to the studio.

11          Wasn't the studio shut down, essentially?

12  A    I -- I don't recall that it was shut down.  There may

13  have been other -- I believe it was while it was still Chicago

14  Trax, so I believe there may have been other artists

15  performing in other studios.  So, I wouldn't say that the

16  whole studio was shut down.

17  Q    So, it wasn't -- it wasn't exclusive just for Jay-Z's

18  appearance and he would be the only person there?

19  A    The -- Chicago Trax had, like, four total, like, actual

20  studios in it around that time, so there could have been, and

21  I don't know for sure whether there were or not, other people

22  performing in other studios.

23          The studio that -- the actual studio room that he'd

24  have been using would have been restricted just for his

25  session.

Arnold - cross - Farinella                    1591

1    Q    So, you don't recall if specifically the entire building

2    was shut down and there was -- there was no movement around

3    while he was -- he was visiting the studio?

4             MS. GEDDES:  Objection.

5             THE COURT:  I'll sustain it as to form.

6             I also think your microphone might be out again.

7    Now I can hear, all right.

8             MR. FARINELLA:  How's that?

9             THE COURT:  Better.

10            MR. FARINELLA:  Sorry.

11            THE COURT:  So, that objection is sustained.

12   BY MR. FARINELLA:

13   Q    So, based upon your recollection, when he visited the

14   studio it wasn't shut down completely where there was no

15   movement within -- inside the studio during the time he was

16   there?

17   A    I -- I don't recall a time where the whole building was

18   shut down for a particular artist when it was Chicago Trax any

19   time.

20   Q    Thank you.

21            Now, did there ever come -- now, isn't it -- isn't

22   it true that you -- you, along with Donnie Lyle, hired and

23   fired many of the runners, right?

24   A    Yes.  Yes, as well as the engineers would also be helping

25   to hire, and training, and could fire as well.

Arnold - cross - Farinella                1592

1  Q    And you also had the -- the authority to -- to fine any
2  one of these employees if you felt it was necessary to do so,
3  correct?
4  A    I -- I did not -- I would not have ever fined somebody on
5  my own authority.
6  Q    So, when you and Donnie Lyle would be interviewing a new
7  potential employee, it was a rather rigorous process, right?
8  A    It was -- it was formalized process.  We would meet --
9  either somebody would come into the studio and we'd meet
10 there; or else, I know at the Olympia Fields time I would meet
11 somebody at Panera Bread to actually conduct an interview with
12 them.
13 Q    And you did that because of the fact of what Mr. Kelly
14 did for a living and the circumstances surrounding this --
15 this new person that you were relatively unfamiliar with,
16 correct?
17 A    Yeah -- yes.
18 Q    So, again, for Mr. Kelly's privacy and safety, right?
19 A    Not entirely, but that would enter into it, that would be
20 factors.
21 Q    And so, did -- did Donnie always assist you in the
22 interview process?
23 A    No, I would imagine he could have led the process as well
24 at some point.  Engineers could have led the process.  I could
25 have assisted the engineers with the process as well.

Arnold - cross - Farinella                 1593

1  Q    But isn't it true that you screened the new employees

2  because they were going to have access to the studio, right?

3  A    Not -- not all of them, but it was one of my

4  responsibilities was to be a part of the hiring process and

5  the training process.  But I wasn't exclusively hiring people

6  to work at the studio.

7  Q    And during the interview process, wasn't it typical to

8  explain to these new, especially potential runners, what their

9  responsibilities were going to entail?

10 A    Yes.

11 Q    And you also explained the job duties to the runners and

12 engineers, right?

13 A    The runners, yes.  I didn't hire the engineers as -- at

14 The Chocolate Factory.

15        At Chicago Trax I would hire engineers to do a

16 specific job, assign them to a session, but the -- the

17 employees that became engineers employed by Chicago Trax that

18 were freelancers -- sorry, to be clear, I did hire freelance

19 engineers -- would have been promoted from being interns at

20 the studio.

21        So, they would have already come into an internship,

22 earned their rights to be an engineer, and then as the studio

23 manager I would hire them for a particular session.

24 Q    Okay.

25        And so, in the event that you were going to hire a

Arnold - cross - Farinella                    1594

1  new employee, you explained to them that as part of the hiring

2  process, them being hired, that they would have to simply sign

3  what's known as a non-disclosure agreement, not to discuss,

4  you know, the workings of the studio, right?

5  A    I don't recall that being part of, like, an interview

6  process, but upon being -- upon starting the first day at --

7  at The Chocolate Factory in Larrabee, I'm sure they would have

8  been -- I'm sure I would have asked them to sign a

9  Confidentiality Agreement.

10 Q    And, again, that was to protect Mr. Kelly's privacy,

11 safety and, like you said, the other -- the other recordings

12 and things of that nature, right?

13 A    At that point in time it would have been more of an

14 inherent part of the process where you wouldn't think anything

15 about it.  It would just be part of what your routine was.

16        But the initial reason for the confidentiality form

17 would be to protect, so that anything that happens within the

18 Chocolate Factory would stay protected.

19 Q    So, you had said -- let's go back to the Superbowl.

20        You had indicated with relative certainty that the

21 Superbowl between the Indianapolis Colts and Chicago Bears was

22 in 2005, right?

23 A    I -- I'm fairly confident on the date, but the Superbowl

24 that we were down in Miami for was the Bears and the Colts.

25 Q    Okay.

Arnold - cross - Farinella                1595

1      And, in fact, would you be surprised to learn it was

2  actually 2007?

3  A    No, I wouldn't be surprised.

4  Q    So, let's talk about the time that you -- you had said

5  that you assisted Mr. Kelly as a tour manager, right?

6  A    A road manager.

7  Q    Okay, but -- okay.  But you did go with Mr. Kelly on

8  several tours, right?

9  A    Yes.

10 Q    And was the South Africa -- I believe you had testified

11 that you had went on really what was the European tour and

12 also South Africa, right?

13 A    I did go to Europe for the tour, and we did go to South

14 Africa twice.

15 Q    Okay.  So, were they separate or were they -- were

16 they -- was it one tour or were they two separate tours?

17 A    I wouldn't have said -- no, no, they weren't.  They were

18 all -- yeah, I'm sorry.  Rephrase the question.  Repeat the

19 question.

20 Q    So, if it was one tour, Mr. Kelly would have been out of

21 the country for a relative period of time, right?

22 A    Yes.

23 Q    And do you -- do you have an estimate, six months, a

24 year, four months, some sort of understanding of time with

25 regard to how long the tour took?

Arnold - cross - Farinella                    1596

1   A    When we went to Europe, it was about a month in, I

2   believe it was, April of 2011.

3        A separate time we went to South Africa, on two

4   separation occasions.  They weren't part of the same tour.

5   Q    And so, during the time that you worked with Mr. Kelly,

6   did you ever keep, like, your own personal datebook where you

7   tracked the dates as to where you were and when?

8   A    No, not that I recall.

9   Q    So, let's talk about the World Cup event that you

10  attended with Mr. Kelly.

11       You recall that event, right?

12  A    Yes.

13  Q    And you recall that it was where it was?

14  A    The World Cup was in South Africa.

15  Q    And that event was where Mr. Kelly performed, right?

16  A    Yes.

17  Q    Okay.  And he -- he performed to a crowd of about 90,000

18  people, right?

19            MS. GEDDES:  Objection.

20            THE COURT:  I don't really see the relevance of

21  this, so I'll sustain the objection.

22  BY MR. FARINELLA:

23  Q    Well, you were, obviously, there because Mr. Kelly was

24  performing, correct?

25  A    Yes.

Arnold - cross - Farinella               1597

1  Q    And so, best -- based upon your recollection, were there

2  a lot of people at that event?

3           MS. GEDDES:  Objection.

4           THE COURT:  Overruled.

5           Were there a lot of people at the event?

6           THE WITNESS:  There was a lot of people at the World

7  Cup.

8           THE COURT:  All right, next question.

9  BY MR. FARINELLA:

10 Q    So, at that -- during -- with that being the case,

11 Mr. Kelly needed more security than he would normally need,

12 right, because of the potential crowd?

13 A    We brought quite a bit of security.  There was a large

14 amount of security that was provided, as well, once we were

15 there.

16           I'm sorry, correction.  I don't know who -- who it

17 was provided by, but we had a large amount of security while

18 we were there.

19 Q    And did there ever come a time where there was a

20 situation where -- where Mr. Kelly and the people that were

21 traveling with him were overtaken by -- by a crowd and he was

22 forced to remain in one place for an extended period of time?

23           MS. GEDDES:  Objection.

24           THE COURT:  Sustained.

25 Q    Did there ever come a time when Mr. Kelly's safety or

Arnold - cross - Farinella                1598

1    security came into question during that trip?

2            MS. GEDDES:  Objection.

3            THE COURT:  Did that ever happen?

4            THE WITNESS:  Not that I recall during the World

5    Cup.

6    BY MR. FARINELLA:

7    Q    Did it happen on another occasion?

8    A    In another occasion where we were traveling?

9    Q    Yes.

10   A    Yes.

11   Q    Do you know how many times it happened?

12   A    I -- I wouldn't be able to give an accurate number, but

13   it happened every now and then where we'd be someplace and it

14   could -- it could -- a dangerous situation could have started

15   to occur.

16   Q    And so, when you were -- when you -- you had testified

17   before, before lunch, that you were -- you, essentially, quit

18   after this -- this situation that happened with Disneyland or

19   Disney World.

20           I don't remember which park it was specifically, but

21   that that was your tipping point, right?

22   A    It was the -- it was the events that followed after

23   Disney World where we had the -- to go to multiple club dates,

24   and I was fatigued and tired and that's where I found out that

25   the -- that -- that my check had been fined, and that was when

Arnold - cross - Farinella                1599

1  I quit.

2  Q    And so, did there ever come a time when, going back to

3  the South African tour, where you were instructed to mail an

4  expensive painting back to the United States on behalf of

5  Mr. Kelly to the studio?

6           MS. GEDDES:  Objection.

7           THE COURT:  Again, I don't really see the relevance

8  of it, but you can answer.

9           Go ahead, you can answer it.

10 A    Not -- not in South Africa, no.

11 Q    Somewhere else?

12 A    Yes.

13 Q    Where was that?

14 A    I think it was in Ethiopia that there was a picture that

15 he wanted to purchase as we were leaving to go to the airport.

16 Q    And didn't he, in fact, purchase it?

17 A    Yes, after we -- yes.

18 Q    Okay.  And it was approximately around $30,000 or

19 something, right?

20 A    I don't recall the dollar amount, but it was -- it was

21 expensive.

22 Q    And so, you were tasked with the responsibility of

23 ensuring that painting got back to Mr. Kelly's home here in

24 the United States, right?

25 A    Yes.

Arnold - cross - Farinella                1600

1  Q    And did that painting ever make it back to Mr. Kelly's
2  home in the United States?
3  A    After I was no longer employed.  After I had left working
4  for Mr. Kelly, I was told by other people that continued to
5  work for him that it did, ultimately, arrive.
6  Q    But do you have any personal knowledge that it returned?
7  A    Only what I was told.
8  Q    And so, there did come a time where was -- there was --
9  that this incident occurred that, you know, it's obvious that
10 Mr. Kelly was upset about that, right?
11           THE COURT:  Upset about what?
12 BY MR. FARINELLA:
13 Q    Well, he was upset that the painting never arrived
14 after -- after purchasing it, right?
15 A    There was -- I've had conversation with him where he was
16 upset that the painting had not arrived.
17 Q    Okay.  And so, with that being said -- and there was a
18 fine that was associated with that, right?
19 A    I don't recall.  There may have been.
20 Q    And wasn't that in or around the time that you left
21 working for Mr. Kelly?
22 A    It would have been -- it would have been a few months
23 prior to -- no, in or around the time, possibly.  It was
24 within the same year.
25 Q    And so, wasn't that the issue that ultimately led to

Arnold - cross - Farinella                    1601

1  your -- to your leaving Mr. Kelly's employment?

2  A    The fining for the picture?

3  Q    Yes.

4  A    The -- not -- not specifically.

5  Q    But it weighed heavily in your decision, right?

6  A    The fining did, yes.

7  Q    And so, when the Government showed you numerous pictures

8  of people that -- that you had described for them, these are

9  people -- many of the photos they showed you were people that

10 you actually hired, right?

11 A    I -- I'd have to look at it again to make sure, but I

12 don't think I hired very many, maybe only a couple of those

13 people.

14          MR. FARINELLA:  Your Honor, may I have one moment?

15          THE COURT:  Sure.

16          (Pause.)

17 BY MR. FARINELLA:

18 Q    Mr. Larrabee -- I'm sorry, Mr. Arnold, did there ever

19 come a time when Limp Bizkit performed at one of the studios

20 on the roof?

21 A    Yes.

22 Q    And during that performance, there was a long line of

23 women or women and men, but I mean there was a majority of

24 women wanting to see that show?

25 A    I don't know the demographic.  There was a lot of people

Arnold - cross - Farinella                    1602

1  in the parking lot and on the streets of Larrabee to -- to see

2  that performance.

3  Q    And that was something that happened regularly at the

4  studio, right, other artists performing and creating crowds?

5  A    That is the only instance of somebody performing on the

6  rooftop to a large crowd.

7  Q    And just to go back to yesterday, you talked about a

8  black room, right?

9  A    (No response.)

10  Q    Was there a black room at one of the studios?

11  A    I -- I don't recall a black room.

12  Q    Okay.

13          MR. FARINELLA:  Sorry, Your Honor.

14          THE COURT:  That's okay.

15  BY MR. FARINELLA:

16  Q    When an artist was performing, in particular Mr. Kelly,

17  in regular studio session, it was expensive to do a session,

18  right?  I mean it cost -- let me rephrase.

19          The studio sessions were an expensive cost that

20  Mr. Kelly had to endure while recording, right?

21  A    At Chicago Trax?

22  Q    Yes.

23  A    Yeah, it would be a daily, a weekly, a monthly or hourly

24  charge.  So, it would be significant and the clock always

25  ticked.

SAM    OCR    RMR    CRR    RPR

A 745

Arnold - cross - Farinella                    1603

1  Q    And so, there would be occasions where Mr. Kelly would be
2  there for hours, even, you know, almost days, because of
3  that -- that reason, right?
4  A    I'm not sure exactly all of his reasoning, but -- but
5  yes, he would be there many hours quite often.
6  Q    And I think you had testified earlier that you had picked
7  up not only women, but you also transported Mr. Kelly's
8  friends, right?
9  A    Yes.
10  Q    Okay.  And you had -- you had said that the instances in
11  which Mr. Kelly played basketball, you took his friends back
12  and forth from wherever they were to the basketball court,
13  right, to the gym?
14  A    Potentially, I could have driven them or they could have
15  followed.
16  Q    And did there ever come a time when you picked up
17  Mr. Kelly's friend Keith Calbert?
18  A    Yes.
19  Q    And you did that regularly, right, or frequently?
20  A    I don't know of the frequency, but I'm sure I did it
21  several times.
22  Q    And you also took Mr. Kelly to and from where he had to
23  go at times, right?
24  A    Yes.
25  Q    And so, is it fair to say that during some of these

Arnold - cross - Farinella                1604

1  basketball events that his friends would be there and

2  Mr. Kelly was working or tied up on work matters and they

3  would have to wait for long periods of time?

4  A    I'm sorry, could you repeat the question?

5  Q    Is it fair to say that during some of these basketball

6  games that were arranged or coordinated, if Mr. Kelly got

7  caught up with work and he was delayed, his friends, or the

8  people that were playing or intending to play with Mr. Kelly,

9  would be there for long periods of time?

10 A    Yes, waiting for him.

11 Q    Until he finished doing what he had to do, right?

12 A    Yes.

13 Q    And just a couple more questions.

14       You had talked about a tent that was -- became a

15 permanent fixture at the Olympia Fields property, right?

16 A    Yes.

17 Q    And, so, that tent was used for large events, correct?

18 A    Yes.

19 Q    And so, that was -- but -- and there were many of these

20 large events that occurred at Olympia Fields, right?

21 A    Yes.

22 Q    And that would include shows or -- or things of that

23 nature, and there would be many people on the property?

24 A    Yes.

25 Q    Okay.  Let's go back quickly to just when you picked up

Arnold - cross - Farinella                    1605

1  guests, male or female, in particular, you said female, you

2  would -- you would put up the rearview mirror, right?

3  A    Yes.

4  Q    And I think you said that you would pick up male guests,

5  but with regard to the rearview mirror, you would only place

6  it upright for female guests, right?

7  A    To my recollection, yes.

8  Q    So, you also testified that you drove the Sprinter,

9  right?

10  A    No, I never drove a Sprinter.

11  Q    You never -- you never picked female guests up in the

12  Sprinter?

13  A    Just to clarify my reasoning, I'm considering the

14  Sprinter to be a type of -- a specific type of van.  And when

15  I worked for Mr. Kelly, we did not have a Sprinter van.

16  Q    Did you have large vans?

17  A    Well, a minivan, yes.

18  Q    Yes.  And that minivan, did you use to pick up female

19  guests?

20  A    I would have, yes.

21  Q    And would you use that minivan to transport his male

22  friends to the basketball games and things like that?

23  A    We could have, yes.  I could have.

24  Q    So, before we broke for lunch I had asked you about

25  security.

Arnold - cross - Farinella                    1606

1    And there did come a point in time when Mr. Kelly

2  was residing at Olympia Fields with his wife and children,

3  young children, right?

4  A    Yes.

5  Q    And do you recall the ages of his children that were

6  living there while you were working there?

7         MS. GEDDES:  Objection.  I think he needs to specify

8  a timeframe.

9         THE COURT:  Do you want to direct him to a

10  particular time?

11         MR. FARINELLA:  Excuse me, Your Honor.

12         (Pause.)

13  BY MR. FARINELLA:

14  Q    So, Mr. Kelly moved to Olympia Fields around what time?

15  A    He had the house built, I would be taking a guess that it

16  was probably in the late '90s that he had the house built.  I

17  don't know for sure.

18  Q    And when did it become -- do you -- do you recall the

19  year it became a studio?

20  A    Before -- before Chicago -- I'm sorry, before the

21  building at 865 Larrabee was torn down and the studio was

22  still, The Chocolate Factory was still at that address, there

23  was a studio built at his house.

24         So, there was one there before we actually moved The

25  Chocolate Factory out there.  But The Chocolate Factory, I

Arnold - cross - Farinella                    1607

1   believe, moved out there in 2004.

2   Q    Okay.  And, so, did Mr. Kelly have children when he moved

3   out there in 2004?

4   A    Yes.

5   Q    And how old were they?

6   A    I don't know their ages, but they were all young.  I

7   would say all under -- under ten years old.  I don't know the

8   varying ages, but I think his son was very young, maybe even

9   just still an infant.

10           I could be wrong, I don't know the ages.

11  Q    So, given what Mr. Kelly did for a living and the fact

12  that he had young children, weren't the security measures in

13  place also in place to protect his wife and children as well

14  and to maintain their privacy as well?

15           MS. GEDDES:  Objection.

16           THE COURT:  I'll sustain as to form.

17           MR. FARINELLA:  I know, I --

18  BY MR. FARINELLA:

19  Q    The security measures in place during that period of time

20  when Mr. Kelly's wife and children resided there, was also to

21  ensure that his -- his family, the family's privacy was

22  maintained?

23           MS. GEDDES:  Objection.

24           THE COURT:  Do you have any knowledge about that?

25           THE WITNESS:  I don't remember a specific instance

Arnold - cross - Farinella                    1608

1   where I can say, yes, this was a policy.  But it was

2   understood that people didn't go into the house and we stayed

3   in the studio.

4          That's as clear as I could say that I --

5   BY MR. FARINELLA:

6   Q    Right, but also, though, the security measures were for

7   the -- for his wife, and his wife and children's safety as

8   well, right?

9          MS. GEDDES:  Objection.

10          THE COURT:  Do you have any knowledge about that one

11  way or the other?

12          THE WITNESS:  I -- I -- not -- no.  Sorry.

13  BY MR. FARINELLA:

14  Q    And to the best of your knowledge, isn't it a fact that

15  Mr. Kelly never held anyone against their will?

16          MS. GEDDES:  Objection.

17          THE COURT:  Sustained.

18          MR. FARINELLA:  I'm sorry, Your Honor, just one more

19  second.

20          THE COURT:  That's okay.

21          (Pause.)

22          MR. FARINELLA:  One last question.

23  BY MR. FARINELLA:

24  Q    You had said that you arranged travel, correct?

25  A    Yes.

Arnold - cross - Farinella                1609

1  Q    And didn't there come a time when that -- the travel

2  arrangements were not exclusively your responsibility?

3  A    There were other people that arranged travel as well.

4  Q    Okay, so you weren't the only -- that wasn't your only --

5  that responsibility wasn't only delegated to you, right?

6  A    Correct.

7  Q    And so, again, you had testified just before that you

8  don't recall ever fining any particular employee?

9  A    Not at my own -- not at my own decision.

10  Q    So, when you worked for Mr. Kelly were there occasions

11  where Mr. Kelly would be in the studio all day and all night

12  to ensure that he -- he would get a song right or to his

13  liking?

14            MS. GEDDES:  Objection.

15            THE COURT:  Sustained as to form.

16  BY MR. FARINELLA:

17  Q    When you worked for Mr. Kelly did he ever stay in the

18  studio for more than twelve hours, maybe even a day or two, to

19  ensure that he -- that his --

20            THE COURT:  I am just going to stop you because the

21  question -- he can't answer what the reason, what his

22  particular reasons for being there.  But you can surely ask

23  him if he spent any particular amount of time there.

24  Q    To the best, to the best of your knowledge, were there

25  ever occasions where Mr. Kelly was in the studio for days

Arnold - redirect - Geddes                    1610

1    straight trying to get a song right?

2              MS. GEDDES:  Objection.

3              THE COURT:  Again, the question is okay up to the

4    trying to get the song right.

5    BY MR. FARINELLA:

6    Q    Again, to the best of your knowledge, were there ever

7    occasions where Mr. Kelly was in the studio for days straight?

8    A    Yes.

9              MR. FARINELLA:  Thank you, Your Honor.  Nothing

10   further.

11             THE COURT:  Okay, any redirect?

12             MS. GEDDES:  Very briefly.

13   REDIRECT EXAMINATION

14   BY MS. GEDDES:

15   Q    On cross-examination you were asked whether the

16   defendant's wife and children were at the Olympia Fields

17   house.

18             Do you recall that?

19   A    Yes.

20   Q    While the defendant's wife and children were there, were

21   there also female guests who were present?

22             MR. FARINELLA:  Objection.

23             THE COURT:  Overruled.

24   A    There may have been, yes.

25   Q    And you testified on cross-examination that while the

Arnold - redirect - Geddes                1611

1  defendant's wife and children were present, you would confine

2  yourself to the studio; is that correct?

3  A    Yes.

4  Q    And were there also female guests in the studio?

5  A    I'm not -- I'm not sure.  There -- there -- there could

6  have been, but I don't -- I can't say for sure.  Not all the

7  time.  Sorry.

8  Q    I'm not asking about all the time.

9         I'm asking at some of the time when the defendant's

10 wife and children were in the house, were there also female

11 guests in the studio area?

12 A    There were instances, yes.

13 Q    You were asked on cross-examination about the defendant

14 incurring fees for time in which he was at Chicago Trax using

15 the recording studio.

16        Do you recall that?

17 A    If I said fees, I miss -- the normal charges, the charges

18 for the studio time, yes.

19 Q    My mistake.

20 A    Yeah.

21 Q    But he was charged for the time he was in the studio,

22 right?

23 A    Yes.

24 Q    He wasn't charged for the time when he wasn't using the

25 recording studio, but was at Chicago Trax, was he?

1  A    Well, there -- he would have that studio all the time.

2  So, whether he was in the studio working or elsewhere, he

3  would pay to have that studio still be his studio.

4

5              (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    REDIRECT EXAMINATION

2    BY MS. GEDDES:

3    Q    All right.  So he was already just paying the -- whatever

4    the cost of the studio is, he paid whether he used it or he

5    didn't use it, is that what you're saying?

6    A    So when it was Chicago Trax, yes, we would bill him every

7    single month for the studio time.

8    Q    But not only the studio time that he used, he was paying

9    to have the studio time on reserve; is that correct?

10   A    For that studio.  He would book additional studios in the

11   building as well and pay for that, that could be a separate

12   payment, so that could be a separate billing set up.  But for

13   his main studio when it was Chicago Trax before -- when it

14   was -- yes, I'm sorry, yes, it would be billed monthly.

15   Q    On cross-examination you were asked whether you trained

16   new employees who started working for the defendant; is that

17   correct?

18             MR. FARINELLA:  Objection.

19             THE COURT:  Overruled.

20   Q    Was part of their training that the employees needed to

21   fulfill the defendant's instructions?

22   A    Yes.

23   Q    You were also asked about the interviews that you

24   conducted at Panera, do you recall that?

25   A    Yes.

ARNOLD - REDIRECT - GEDDES                1614

1  Q    Fair to say that's a common practice, to interview

2  employees before they started working at a new job?

3  A    Yes.

4  Q    And by the way, once the 865 -- once Chicago Trax was no

5  longer Chicago Trax and it became the Chocolate Factory on

6  North Larrabee, was the defendant billed at all for his time

7  in studio?

8  A    No.

9  Q    It was just his studio, correct?

10 A    Yes.

11 Q    On cross-examination you were asked extensively about

12 times when certain celebrities were present at the studio, you

13 recall those questions?

14 A    Yes.

15 Q    Did female guests stay in their assigned location even

16 when female -- even when celebrities weren't at Chicago Trax?

17 A    They -- it would have been same as normal, where either

18 we would have gotten a phone call to request for people to

19 move around if there was a need for it, or would have gotten

20 instructions to move people around if it was warranted.

21 Q    So fair to say the presence of a celebrity in the studio

22 didn't affect the protocols that you operated under with

23 respect to the defendant's female guests?

24 A    It may have changed logistics on where you would walk

25 through, but the broader concept of receiving phone calls and

ARNOLD - REDIRECT - GEDDES                1615

1   moving people around stayed the same.

2   Q    Just to be clear, the broader concept was that the

3   defendant needed to authorize movement around the studio,

4   correct?

5   A    Yes.

6   Q    You were also asked about whether your responsibilities

7   including stocking the refrigerator.  When female guests

8   wanted food, you would not provide them food from the

9   refrigerator, would you?

10  A    They would call to ask for us to go pick up food for

11  them.

12  Q    And you would go to locations outside of the studio,

13  correct?

14  A    Yes.

15           MS. GEDDES:  One moment.  Nothing further.

16           THE COURT:  Any recross, Mr. Farinella?

17           MR. FARINELLA:  Your Honor, just one moment.

18           THE COURT:  Sure.

19           MR. FARINELLA:  Nothing further, your Honor.

20           THE COURT:  Thank you so much.  You can step down.

21           (Whereupon the witness was excused.)

22           THE COURT:  Are you ready to call your next witness?

23           MS. SHIHATA:  Yes, your Honor.  Can we just have a

24  two-minute break?

25           THE COURT:  Oh, yes.  I'm wondering -- I always like

Faith - Direct - Shihata                    2242

1          THE WITNESS:  Yes.

2    CONTINUING DIRECT EXAMINATION

3    BY MS. SHIHATA:

4    Q    Good morning.

5    A    Good morning.

6    Q    Now, at the end of the court session yesterday, you were

7    testifying about a trip to Los Angeles that the defendant's

8    assistant Diana made your travel arrangements for, correct?

9    A    Correct.

10   Q    And the defendant paid for that trip, correct?

11   A    Correct.

12   Q    Now, you testified yesterday that prior to that trip you

13   traveled to Dallas and saw the defendant there; is that right?

14   A    Correct.

15   Q    And you testified that it was in Dallas that you had a

16   conversation where the defendant told you about other girls

17   that he had been, to use his word, raising, correct?

18   A    Correct.

19   Q    And that's where you first met an individual introduced

20   to you as Joy; is that right?

21   A    Correct.

22   Q    Now, yesterday you testified about a time you were in the

23   Sprinter van with Joy and the defendant; is that right?

24   A    Correct.

25   Q    And during your time in the Sprinter with Joy and the

1  defendant, did you have any opportunity to observe their

2  interactions?

3  A    I did.

4  Q    And what, if anything, did you observe?

5  A    Their interaction was very unnatural, almost.  Anything

6  he said, even if it had no humor to it, she got this odd

7  smile.  Or if he laughed, she laughed even louder.  He pulled

8  out a cigar, she's lighting it.  He wants to hear music, she's

9  playing it.  Anything -- any demand he really had, she was

10  just on it.  Anything he said, she's at his attention,

11  listening, very just on him.

12  Q    Now, you also testified yesterday about a time that you

13  and Joy were alone in the Sprinter in the back; is that right?

14  A    Correct.

15  Q    And you testified about needing to use the bathroom while

16  you were in the back with Joy, correct?

17  A    Correct.

18  Q    And what do you recall Joy telling you about that when

19  that happened?

20  A    That I had to ask to use the bathroom.

21  Q    And I think you testified yesterday that you also tried

22  to open the door to the Sprinter and it wouldn't open; is that

23  right?

24  A    Correct.

25  Q    Now, yesterday you testified about -- you also testified

1    about -- or you were also -- you testified about and you were

2    shown text messages between you and the defendant where you

3    were keeping him apprised of where you were and what you were

4    doing even when you weren't physically with him; is that

5    right?

6    A    Correct.

7    Q    And why did you do that?

8    A    Those were his rules.

9    Q    Now, I think where we left off yesterday, you were

10   testifying -- you had just testified about being in L.A.

11   outside the studio in a Sprinter; is that right?

12   A    Correct.

13   Q    And you testified about needing to use the bathroom when

14   you were in the Sprinter in L.A. as well, correct?

15   A    Correct.

16   Q    And again, who did you contact when you needed to use the

17   bathroom?

18   A    Diana Copeland.

19   Q    And why did you contact Diana Copeland?

20   A    Because R. Kelly told me to contact her.  Whenever I

21   needed anything, she was his assistant.

22   Q    And did you feel like you could just open the door and

23   leave the Sprinter?

24   A    No.

25   Q    Why not?

Faith - Direct - Shihata                    2245

1    A    Because I had to wait for somebody to come open it.

2    Q    Now, you testified that at some point Diana did take you

3    to the bathroom inside the studio, correct?

4    A    Correct.

5    Q    And what did she do when -- after taking you to the

6    bathroom?

7    A    Once we got to the bathroom, she waited outside the stall

8    for me to finish, sat there while I washed my hands, escorted

9    me back to the Sprinter.

10   Q    So she physically went inside the bathroom with you?

11   A    Yes.

12   Q    Did she use the bathroom?

13   A    No.

14   Q    And then she escorted you back to the Sprinter?

15   A    Correct.

16   Q    Yesterday you testified that at some point Diana took you

17   from the Sprinter to a room at the studio; is that right?

18   A    Correct.

19   Q    In L.A.?

20   A    Yes.

21   Q    And you testified that initially at some point the

22   defendant came in the room quickly and left?

23   A    Correct.

24   Q    And then that you waited there for several hours; is that

25   right?

Faith - Direct - Shihata                    2246

1  A    Correct.

2  Q    I'm going to show you what's in evidence as Government

3  Exhibit 208(b).

4          Now, these are, again, texts between you and Diana?

5  A    Correct.

6  Q    And I think you testified yesterday about the text about

7  the bathroom that are on this page of the exhibit, so I won't

8  go over that again, but is there another text where you write

9  "Can I leave back to the room lol or he wants me to wait?"

10 A    Correct.

11 Q    And what room -- where were you when you sent that text?

12 A    I was in the studio still waiting on him.

13 Q    And when you say "back to the room," what were you

14 referring to?

15 A    My hotel room.

16 Q    And Diana responds about an hour later, "please wait," is

17 that right?

18 A    Correct.

19 Q    Now, by the way, the text in Government Exhibit 208(b)

20 between you and Diana, you provided those to the government;

21 is that right?

22 A    Correct.

23 Q    And do you recall in what manner you provided them to the

24 government?

25 A    I provided the screen recording of my text between me and

Faith - Direct - Shihata                    2247

1  Diana.

2  Q    And do you recall where you were when you provided the

3  screen recording?

4  A    In New York.

5  Q    Was that in the presence of agents?

6  A    Correct.

7  Q    And the time stamps in this exhibit, this screen

8  recording, was that in the local time where you were when you

9  made the screen recording?

10 A    Correct.

11 Q    So in New York time?

12 A    Correct.

13 Q    Now, why was it that you wrote -- that you texted Diana

14 to ask her if you could leave the room?

15 A    Because I had to get permission whenever I needed to go

16 somewhere.  Diana was the one to take me wherever I needed to

17 go, call an Uber if I needed to go somewhere.

18 Q    And according to who did you need permission for such

19 things?

20 A    According to R. Kelly, you needed his permission.

21 Q    Now, I think where we left off yesterday, you talked

22 about that after several hours, the defendant came into the

23 room you were in again; is that right?

24 A    Correct.

25 Q    And what, if anything, did he say when he came back into

Faith - Direct - Shihata                    2248

1  the room?

2  A    Once he came back into the room he had told me that had I

3  stood up or showed some type of excitement about him entering

4  the room, that he would have came back sooner.

5  Q    Was he referring to the first time he came into the room?

6  A    Correct.

7           The first time he quickly came in the room, I didn't

8  get up, I didn't say "hey, Daddy."  I didn't show any type of

9  excitement.  So the second time when he came back, hours

10  later, he let me know that that was why.

11  Q    And what happened next?

12  A    Shortly after that, he came in.  He -- I was sitting on

13  the couch, so he had told me to come over to where he was

14  across the room.  There was a piano right there, maybe like

15  two little rollie chairs, and he sat in the chair.  And he

16  told me to take my clothes off again and walk back and forth.

17  I had told him that I was on my period.  I wasn't at the time,

18  but I told him I was.

19  Q    Why did you tell him you were on your period if you

20  weren't?

21  A    I didn't want to have sex with him.

22  Q    All right.  So you testified he told you to take your

23  clothes off?

24  A    Correct.

25  Q    And what, if anything, did you do?

1  A    I had told him that I was on my period.  He let out this

2  sigh.  He was like "Well, why did you come?"  I said, "You

3  wouldn't want me to come just because I was on my period?"  He

4  nodded his head.  He said, "Take off your pants."  I took off

5  my pants -- I had on a body suit -- and he told me to walk

6  back and forth three times, keep on my shoes, and I did.

7            Shortly after that, he paused for a minute and we

8  went into one of the other rooms inside of the studio.

9  Q    I'm going to show you -- I am showing you what's in

10 evidence as Government Exhibit 946(d).

11           Do you see the smaller room you're referring to

12 here?

13 A    Correct.

14 Q    And can you describe where in the picture the room you're

15 referring to is?

16 A    It is the room on the left of the piano with the square

17 window next to it.

18 Q    This room right here?

19 A    Correct.

20 Q    All right.  And what happened next?

21 A    After I walked back and forth three times, he told me to

22 come into the room.  I kind of like hesitated when I entered

23 the room because when I looked, there was about like -- the

24 room is not that big, also.  So probably the room is about

25 from here to maybe like that third -- well, there's computers

Faith - Direct - Shihata                    2250

1   right here.  It's like that third computer, so where that cart

2   is.  It's not that big at all.  And it was two chairs and like

3   an ottoman-looking thing.  And there was a gun.

4   Q    So just a moment.

5          You described the size of the room and you said it

6   was from kind of the corner where you are at to the cart, the

7   first cart in the courtroom?

8   A    Yes.

9   Q    Can you estimate approximately how many feet that is

10  or...

11  A    I'm not going to lie to you, I can't.  It's just a small

12  room.

13  Q    Okay.

14  A    Almost like closet size.  Maybe like a walk-in closet

15  size.  Maybe that's a better description.

16         But when I entered the room, there was a gun right

17  in the middle, an ottoman, and I kind of hesitated.  And he

18  walked over and he was like "don't look at it."  So I looked

19  away and I kind of gave a weird look.  He didn't say anything

20  different.  He said, "Come in the room."  Came in the room.

21  His demeanor changed.  He got real serious.  So I'm just

22  seeing what's about to happen.  I'm not really knowing where

23  he's going with this or what he's about to ask me.  And he

24  sits down in a chair and he tells me to go stand across from

25  him.  So he's sitting and he's looking at me.  He had moved

1    the gun by him.  It was still next to him, but not to where I

2    could see it.  So he's looking at me and he says, "I want to

3    ask you a question."  I said, "Yes?"  He paused.  Before he

4    got into the questions, at this point I'm still in my body

5    suit, my boobs are kind of out.  He gets his iPad and he is

6    like "pose."  And he starts taking pictures.  "Pose, pose."

7    He was like "you're not being sexy."  Again, I'm trying to

8    change my body, I'm trying to change my face.  He's like

9    "you're not being sexy enough."  And I could tell he just got

10   kind of irritated with me.

11           So after that, I stepped back.  He said he had

12   something to ask me and I said "Yes?"  He said, "How many men

13   have seen you naked?"  I just literally said a number.  And he

14   said, "Okay.  How many male friends do you have?"  I have a

15   lot of male friends, I know a lot of people; I just gave a

16   random number like ten.  He said, "How many of those male

17   friends have seen you naked?"  I said, "None of my male

18   friends have seen me naked.  They're really my male friends."

19   And he paused.  He said, "You want to take that back?"  I'm

20   like -- of course I'm like no, even though if I did know the

21   exact number I just wasn't going to take it back because I

22   didn't know what reaction I was going to get if I did.  So I

23   said no and he paused.  He had this real like stern look on

24   his face.  He just paused for a minute and he was like, you

25   know -- he said, "Me and your father, we have the same gift."

Faith - Direct - Shihata                    2252

1    He said he had the spiritual discernment so that I would know

2    -- he would know if I was lying to him.  And that kind of took

3    me aback because me and him had never discussed my father

4    besides the first time we met with me and my sister; we said

5    we were pastor's kids.  You know, that was it.  But that kind

6    of took me aback, that he said spiritual discernment.  So I

7    said, "Okay, I'm not lying," even though I knew I was.  After

8    that he just gave me that look.  He kind of has this look when

9    he's grilling you down.  He just gets real serious.

10              So after that, he got up.  There was a little pillow

11   on the chair.  He put the pillow on the floor.  He told me to

12   get on my knees.  I did.  And he pulled out his penis, grabbed

13   my neck again and told me to suck his dick.

14   Q    Where was the gun at this point?

15   A    Right where he had left it, in his seat.

16   Q    When you saw the gun in the room and when he kept it next

17   to him, how did that make you feel?

18   A    Intimidated.  I really just -- at that point, like, I was

19   like okay, he's unpredictable, because how do we go from this

20   to that?

21   Q    Now, you said he grabbed -- he pulled his penis out and

22   grabbed you.  Where did he grab you?

23   A    He grabbed the back of my neck forward.  Once I was on my

24   knees, he grabbed my neck forward to make -- so my mouth made

25   contact with his penis.

1   Q    Did you want to be giving him oral sex?

2   A    No.

3   Q    And while his penis was in your mouth, where was his

4   hand?

5   A    On the back of my neck, guiding.

6   Q    And did it stay there throughout?

7   A    Yes.

8   Q    Now, you testified earlier that you were wearing a body

9   suit that day and that he had asked -- and that you had taken

10  off your pants; is that right?

11  A    Correct.

12  Q    When he told you to, correct?

13  A    Correct.

14  Q    Can you just explain to the jury what you mean by "body

15  suit"?

16  A    A body suit is a one-piece, like a leotard.  It's not a

17  top.  It's like one whole piece.

18  Q    Now, you testified a moment ago about certain questions

19  the defendant asked you in that small room within the studio.

20  What, if anything, did the defendant say to you about

21  consequences if you didn't answer?

22  A    He just said that there would be an issue if I didn't

23  answer the questions truthfully.  When we were in that

24  setting, his demeanor was just real serious and I felt like he

25  still was upset about the whole me not getting up thing.

Faith - Direct - Shihata                    2254

1          Also, when we were having that conversation where he

2     was questioning me, he had let me know that he likes a woman

3     that reminds him of a puppy, his daughter or his mom.  He said

4     that when it came to sex, when it came to pleasing him, that I

5     need to be excited like a puppy would when they see their

6     owner or like a little girl is when she sees her dad.

7     Q     And when the defendant was telling you these things, what

8     was his tone?

9     A     Stern, serious.  There was no smiling, no laughing, dead

10    in my eye, straight contact.

11    Q     When you were in that smaller room and the events you

12    just described took place, did you feel like you could leave?

13    A     No.

14    Q     Why not?

15    A     I was under his rules and he had a weapon, so I wasn't

16    even going to step out of line.

17    Q     What happened after the oral sex?

18    A     After the oral sex, he proceeded to tell me to get

19    dressed.  And he laid on the couch, I sat in the chair, he

20    went to sleep.

21    Q     And where were you at that point when he was laying on

22    the couch and --

23    A     We were outside in the smaller room.  We were in the

24    recording part of the studio where the microphone and the

25    piano was.  There was a big couch.  He just laid down and he

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Faith - Direct - Shihata                    2255

1  went to sleep.

2  Q    At some point after that, did you need to use the

3  bathroom?

4  A    Yes.

5  Q    And what, if anything, did you do?

6  A    I woke him up and I told him I had to use the bathroom.

7  He said, "You know where it is, right?"  I said yes.  He said,

8  "Okay.  Make sure you don't talk to nobody.  Go straight to

9  the bathroom and come back."

10 Q    And why did you wake the defendant up to use the bathroom

11 if you knew where it was already?

12 A    I didn't want to just leave and upset him without him

13 knowing where I was going.

14 Q    Was it part of his rules?

15 A    Correct.

16 Q    Now at some point did you return to your hotel?

17 A    Yes.

18 Q    And how did that come about?

19 A    When he woke up, he told me to text Diana and tell her to

20 call a car and I would see him later.

21 Q    And did you, in fact, do that?

22 A    I did.

23 Q    Now, did you see the defendant again during your trip to

24 L.A.?

25 A    Yes, I did.

Faith - Direct - Shihata                        2256

1  Q    And when did you see him again?

2  A    I saw him before my flight back out to Texas.

3  Q    And was that -- actually, withdrawn.

4        Where did you see him again?

5  A    At the studio.

6  Q    The same studio you had been in before?

7  A    Correct.

8  Q    And how did you get to the studio that time?

9  A    Diana had called an Uber to pick me up and take me to the

10 studio.

11 Q    And what happened when you arrived at the studio?

12 A    Once I got to the studio, it was just him and I.  Again,

13 Diana walked me to the room.  She was already there -- excuse

14 me -- so I met her at the door.  She walked me to where he

15 was.

16        This time he was listening to his music, so I caught

17 him in the middle of just working.  We were sitting down.  He

18 didn't ask me -- this time he didn't ask me to strip as soon

19 as I walked through the door.  This time he was a little more

20 calm, it seemed like.  He wasn't hypersexual.  Like what

21 happened yesterday, it didn't seem to affect today, so I

22 didn't really get a bad feeling.  He was playing me music.  He

23 had offered me something to drink.  That was, I would say, a

24 better moment.  It didn't feel as forced.  It felt natural at

25 the time.

Faith - Direct - Shihata                          2257

1    Not long though into the conversation he just

2   reminded me again, like he was like "I still have a lot to

3   teach you."  And in the middle of our interactions, we were

4   listening to his music, he gets up and he just puts out his

5   iPad and he starts recording us.  And we're -- he's like "come

6   sit next to me."  So I was sitting next to him or across from

7   him and he's just like "okay, rub Daddy's head, look at me."

8   Like he's directing my movements, just sitting there.  He's

9   telling me to sit up straight again and -- okay, and he's like

10  "just stare at me."  So what I thought was, like, a better

11  moment, it just kind of got like really awkward.

12  Q    And what room were you in when these events transpired?

13  A    We were in the studio.

14  Q    The same room that you had initially been taken to the

15  day before?

16  A    Correct.

17         MS. SHIHATA:  I'm showing the witness only a CD

18  containing Government Exhibits 327(a) and 327(b).

19  Q    Prior to your testimony today, did you have an

20  opportunity to review the contents of this CD?

21  A    Yes, I did.

22  Q    And after reviewing the contents of this CD, did you

23  initial the CD?

24  A    I did.

25  Q    Are these your initials here?

Faith - Direct - Shihata                    2258

1   A    Correct.
2        MS. SHIHATA:  I move to admit Government Exhibits
3   327(a) and (b).
4        THE COURT:  Any objection?
5        MR. CANNICK:  Just one second, please.
6        THE COURT:  Okay.
7        MS. SHIHATA:  And, actually, I can ask some more
8   foundational questions.
9   Q    So you testified a moment ago about a video recording
10  that the defendant made of you while you were at the studio
11  the second day; is that right?
12  A    Correct.
13  Q    Prior to -- actually, withdrawn.
14       And that was in the studio room while you were
15  sitting interacting with him?
16  A    Correct.
17  Q    And the contents of Government Exhibit 327A and 327(b)
18  that you reviewed, did you recognize the videos in -- on that
19  CD?
20  A    I'm sorry, can you repeat the question?
21  Q    Sure.  Sorry.
22       Did you recognize -- after viewing the videos on
23  Government Exhibits -- on this CD, did you recognize where
24  they were taken?
25  A    Correct.

Faith - Direct - Shihata                    2259

1   Q    And did you recognize who was in them?

2   A    Correct.

3   Q    And based on your review, where did you recognize the

4   videos as having been taken?

5   A    They were taken by him on his iPad.  They were from his

6   iPad.

7   Q    Did you recognize where physically you were?

8   A    Correct.  In the studio in L.A.

9   Q    And who did you see in the videos?

10  A    R. Kelly and I.

11       THE COURT:  All right.  Any objection to this coming

12  into evidence?

13       MR. CANNICK:  No.

14       THE COURT:  Okay.  It is in evidence.

15       MS. SHIHATA:  Thank you, Your Honor.

16       (Government Exhibits 327(a) and 327(b) were received

17  in evidence.)

18       THE COURT:  Is this -- are you playing it?

19       MS. SHIHATA:  I will be playing it.

20       THE COURT:  Do you want it to be jury only?

21       MS. SHIHATA:  These don't need to be jury only,

22  Judge.

23       THE COURT:  Okay.

24       (Pause.)

25  Q    So I am going to start first with Government Exhibit

Faith - Direct - Shihata                    2260

1    327(b).

2            You testified you had an opportunity to review that

3    prior to your testimony here today, correct?

4    A    Correct.

5    Q    And is that video approximately 20 minutes long?

6    A    Correct.

7    Q    All right.  The whole video is now in evidence.  I am not

8    going to play the whole video.  I am just going to play

9    certain portions of it.  Okay?

10   A    Okay.

11           MS. SHIHATA:  All right.

12           (Pause.)

13           Your Honor, this may -- I know it's a little soon,

14   but I think we're having some technical difficulties.

15           THE COURT:  That IS okay.  Do you want to move on to

16   something else and come back to it?

17           MS. SHIHATA:  Sure.

18           THE COURT:  Okay.  I am also just going to remind

19   the jury.  I think I told you this before, but any item of

20   evidence, you will be able to see in the course of your

21   deliberations.

22           But if you move on to something else, we will see if

23   we can work it out.  Okay?

24           MS. SHIHATA:  Yes, Your Honor.

25   Q    So we'll come back to that.

Faith - Direct - Shihata                    2261

1          Now, after what you just described at the studio,
2    did you go back home?
3    A    Yes, I did.
4    Q    To San Antonio?
5    A    Correct.
6    Q    And what, if any, communications did you have with the
7    defendant after returning to San Antonio?
8    A    Same; phone calls, texting, FaceTime.
9    Q    And did you travel to see the defendant one more time
10   after that?
11   A    Correct.
12   Q    And where did you end up traveling to?
13   A    I went to New York.
14   Q    And around when was that?
15   A    Around February of 2018.
16   Q    And why did you travel to New York?
17   A    I had traveled to New York to see Mr. Kelly.
18   Q    And why did you decide to do that on that occasion?
19   A    On this time I really was just like let me see how it's
20   going to go one last time.  It had been a couple of weeks
21   since I seen him in L.A., so I wanted to see how this time was
22   going to be.
23   Q    And who booked your flights to New York?
24   A    Diana Copeland.
25   Q    Who paid for your flights?

Faith - Direct - Shihata                    2262

1   A    R. Kelly.

2   Q    And where did you fly from to New York?

3   A    I flew from San Antonio to New York.

4   Q    And when you say "New York," are you referring to

5   New York City?

6   A    Correct.

7   Q    And after you arrived in New York, where did you go?

8   A    I went to the Mondrian Hotel.

9   Q    And how did you know to go to the Mondrian Hotel?

10  A    Diana had texted me and arranged for the Uber to pick me

11  up and take me to the airport -- I mean, excuse me, to the

12  hotel.

13  Q    I am showing you page -- what's in evidence as Government

14  Exhibit 208(b), page 76.

15          Again, are these texts between you and Diana?

16  A    Correct.

17  Q    And at the top, is there kind of an Uber map that she

18  sent you of the car?

19  A    Correct.

20  Q    And in blue, are you texting her "it's the Mondrian"?

21  A    Correct.

22  Q    And she responds, "Yes.  Stand by in the lobby for just a

23  moment, please."  And thereafter says, "Go to the 18th floor."

24  Is that right?

25  A    Correct.

Faith - Direct - Shihata                    2263

1  Q    And the Mondrian, is that in Manhattan?

2  A    Correct.

3  Q    And did you, in fact, go to the 18th floor?

4  A    I did.

5  Q    And after you arrived on the 18th floor, who, if anyone,

6  did you see?

7  A    Diana met me on the 18th floor.  And she had the key to

8  his hotel suite and she let me in.

9  Q    When you say "his hotel suite," who are you referring to?

10 A    R. Kelly.

11 Q    After Diana took you to his hotel suite -- well, first,

12 was that on the 18th floor?

13 A    Yes.

14 Q    And after she took you there, what did she do?

15 A    She opened the door for me and let me in.

16 Q    And did she stay or leave?

17 A    She left.

18 Q    Was anyone in the suite when you arrived?

19 A    No.

20 Q    And after you arrived, did you stay in the suite?

21 A    Yes.

22 Q    Did you go anywhere?

23 A    No.

24 Q    Why?

25 A    Don't leave anywhere without his permission.

Faith - Direct - Shihata                    2264

1  Q    The defendant's?

2  A    Correct.

3  Q    Now, at some point did you end up seeing the defendant?

4  A    I did.

5  Q    And when was that?

6  A    So I had got there like late, early morning, maybe like

7  1:00 a.m.  He came in around 8:00 a.m.

8  Q    And what happened -- well, when he came in, what were you

9  doing?

10  A    Sleep.

11  Q    And what happened after the defendant came into the room?

12  A    He knocked and I came to the door.  Of course I was

13  yawning.  And he was like "you're going to have to get used to

14  my schedule."  Again he asked me to take off my clothes.

15  Again I did.  He comes in this time -- this time his energy

16  was just like -- it was just a little more hyper.  He came in,

17  he was smiling.  He had a smile on his face.  And he said,

18  "You don't miss me?  You're not acting like you miss me."  And

19  any time, you know, my reaction wasn't the way he wanted, he

20  just let out that deep sigh, like.  He opened the curtains,

21  let all the light in at 8:00 in the morning and he said I

22  wasn't acting like I miss him, so he asked me to give him a

23  hug again.  I gave him a hug.  I kissed him.  My kiss, it

24  wasn't what he liked again.  He told me to kiss him again the

25  right way, so I did again.

1        After that he got right into it, put out his iPad.

2    He told me to pose again.  He said I wasn't being sexy.  He

3    said, "You're not being sexy."  He said, "Okay, let's try

4    something else."  He said, "Okay, I want you to play with

5    yourself."  And I just couldn't do it.  I was like "I can't do

6    that."  Again, a sigh of dissatisfaction, like.

7        So after that I follow him to the bedroom.

8    Q    Can you hold on one moment?

9        The suite, could you describe how many rooms it was

10   and what the layout was?

11   A    So when you walk into the suite, it's like a living area,

12   there's a TV.  And then there is a room with the bathroom and

13   there's a chair and a TV in there as well.

14   Q    And the events you just described, where in the suite did

15   those take place?

16   A    We were in the front part of the living area.

17   Q    And then what happened next?

18   A    I followed him into the bedroom.  He asked me to lie on

19   my back.  And right away he just -- he plays with himself for

20   a little bit and then he starts to penetrate me.  My whole

21   body language just was off.  I was clenching on purpose and I

22   knew he could feel it because he kept trying to enter.  And it

23   was literally to the point where he was getting frustrated

24   that he couldn't get inside me, he started grunting.  And

25   after a while, like maybe, like, a minute of just tussling

Faith - Direct - Shihata                    2266

1  with me but we're in silence, like I'm not saying anything,
2  I'm just clenching up.  And he's telling me to relax, I'm not
3  relaxing.  I'm not telling him I'm not relaxing though, I'm
4  just clenching.  And I could tell he was getting upset.  So he
5  kind of let out that last, and he sat up.  Like, he sat up.

6          So when he got up, I just got up, I didn't say
7  anything and I went in the living room, and there was a chair
8  that we could still see each other through the door.  I wasn't
9  saying anything.  I knew I had pissed him off.  I knew I had
10 pissed him off, so I just didn't say anything.

11         And he got his iPad -- he already was recording us.
12 He got his iPad and he literally started jacking off, but it
13 was like high speed.  Like, the way he was masturbating was,
14 like, so fast, it was like an itch, like he had to scratch.
15 And he turned the volume up on loud.  So as I am sitting here,
16 I can hear him watching other females on the iPad.  And I know
17 he's in the video because I can hear him saying the names of
18 the women who are on the iPad.
19 Q    Now, without saying the names of the women that you could
20 hear on the iPad or hear him saying on the iPad video he was
21 watching, do you recall the names you heard?
22 A    Yes.

23         MS. SHIHATA:  I'm showing the witness only what's
24 been marked for identification as Government Exhibit 954 and
25 then I will also show Government Exhibit 955.

Faith - Direct - Shihata                    2267

1  Q    So showing you first 954, was that one of the names that
2  you heard the defendant say on the video that he was watching?
3  A    Correct.
4  Q    And now showing you Government Exhibit 955, was that
5  another name you heard him say on the video?
6  A    Correct.
7         MS. SHIHATA:  The government moves to admit
8  Government Exhibits 954 and 955.
9         MR. CANNICK:  No objection.
10        THE COURT:  All right.  Those are in evidence.
11        (Government Exhibits 954 and 955 were received in
12  evidence.)
13        Display to jury only?
14        MS. SHIHATA:  Yes, Your Honor.
15        And publishing first to the jury only, Government
16  Exhibit 955.
17        And, actually, 954 doesn't need to be to the jury
18  only.
19        THE COURT:  Okay.
20  Q    Now, Government Exhibit 954, is that the name Joy?
21  A    Correct.
22  Q    And was that the individual that the woman that the
23  defendant introduced you to in Dallas?
24  A    Correct.
25  Q    Now, you testified a moment ago that you were clenching

Faith - Direct - Shihata                    2268

1  your body while the defendant was trying to penetrate you.

2  Why were you clenching your body?

3  A    I didn't want to have sex with him.

4  Q    And you indicated that he was getting frustrated; is that

5  right?

6  A    Yes.

7  Q    Now, was the defendant able to fully penetrate you?

8  A    No.

9  Q    Was he able -- was he, nonetheless, putting his penis

10  somewhat inside your vagina?

11  A    Yes.

12  Q    Now, after you -- well, you testified you saw the

13  defendant masturbating to the video, to a video that he was

14  in, and using the two names we just discussed; is that right?

15  A    Correct.

16               (Continuing on the next page.)

17

18

19

20

21

22

23

24

25

Faith - direct - Shihata                    2269

1   EXAMINATION CONTINUES

2   BY MS. SHIHATA:

3   Q    And what, if anything, happened after that?

4   A    After that, he had told me that I needed to be like them

5   and he called me back into the room.  He ordered food, he

6   ordered room service.  He had asked me if I wanted something;

7   I said:  No.  He kinda just said:  Okay.

8            He laid down and he said, he asked me if I knew how

9   to give a massage.  And I said:  I think so.  He said:  It's a

10  yes or no question.  I said:  Yes.  He said:  Come rub my

11  back.  And he literally went to sleep within maybe minutes of

12  me doing that.

13  Q    Now, at any point before the defendant was putting his

14  penis inside you that day, had he told you he had herpes?

15  A    No.

16  Q    Or any other sexually-transmitted disease?

17  A    No.

18  Q    Did he use a condom that day?

19  A    No.

20  Q    Now, earlier you testified these events that you just

21  described all occurred at the Mondrian Hotel in Manhattan, is

22  that right?

23  A    Correct.

24           MS. SHIHATA:  I'm showing the witness only what's

25  been marked for identification as Government Exhibit 514(a).

Faith - direct - Shihata                    2270

1  BY MS. SHIHATA:

2  Q    Do you recognize this photo?

3  A    Correct.

4  Q    And what do you recognize this photo to be?

5  A    The Mondrian.

6  Q    And is that the hotel where the events you just described

7  took place?

8  A    Correct.

9        MS. SHIHATA:  I move to admit Government

10 Exhibit 514(a).

11       MR. CANNICK:  No objection.

12       THE COURT:  All right, that's in evidence.

13       (Government's Exhibit 514(a) was received in

14 evidence.)

15       MS. SHIHATA:  And may we publish it?

16       THE COURT:  Yes.

17       (Exhibit published.)

18 BY MS. SHIHATA:

19 Q    Now, you also described the events occurring on a suite

20 on the 18th floor of the Mondrian, is that right?

21 A    Correct.

22       MS. SHIHATA:  I'm showing the witness only what's

23 been marked for identification as Government Exhibits 514(c)

24 through (i).

25       And may I approach, Your Honor?

Faith - direct - Shihata                    2271

1        THE COURT:  Yes.

2   BY MS. SHIHATA:

3   Q    Can you just take a moment to look through those, the

4   pages of that exhibit?

5   A    (Witness complies.)

6   Q    And do you recognize what's depicted in Government

7   Exhibits 514(c) through (i)?

8   A    Yes.

9   Q    And what is depicted in those photographs?

10  A    The hotel suite I was in.

11  Q    At the Mondrian?

12  A    Correct.

13       MS. SHIHATA:  The Government moves to admit

14  Government Exhibits 514(c) through (i).

15       MR. CANNICK:  No objection.

16       THE COURT:  Okay, that's in evidence.

17       (Government's Exhibits 514(c) through 514(i) were

18  received in evidence.)

19  BY MS. SHIHATA:

20  Q    All right, I am showing you what's in evidence as 514(c).

21       (Exhibit published.)

22  Q    Is that the entrance to the suite?

23  A    Correct.

24  Q    And do you see, is that the living area you testified

25  about earlier?

Faith - direct - Shihata                    2272

1  A    Correct.

2  Q    I am now showing you 514(d).

3             (Exhibit published.)

4  Q    Is this another view of that living area?

5  A    Correct.

6  Q    And 514 again, the living area, 514(e)?

7             (Exhibit published.)

8  A    Correct.

9  Q    And now I'm showing you 514(f).

10            (Exhibit published.)

11 Q    What's depicted here?

12 A    The hotel suite.

13 Q    And the doorway that you see, what does that enter into?

14 A    The actual hotel room.

15 Q    The bedroom area?

16 A    Correct.

17 Q    And you testified earlier you were sitting on a chair in

18 the living room area when you saw the defendant masturbating

19 and watching a video on his iPad, is that right?

20 A    Correct.

21 Q    Do you see where you were in the room at that time?

22 A    Correct.

23 Q    Where were you?

24 A    Right in that corner where that chair is.

25 Q    I am showing you Government Exhibit 514(g).

Faith - direct - Shihata                    2273

1           (Exhibit published.)

2    Q    Is this just another view of the chair area and the

3    entrance to the bedroom area?

4    A    Correct.

5    Q    And I am showing you Government Exhibit 514(h).

6           (Exhibit published.)

7    Q    Is this the bedroom area?

8    A    Correct.

9    Q    And I am showing you 514(i).

10          (Exhibit published.)

11   Q    Is this another photograph of the bedroom area?

12   A    Correct.

13   Q    And just to be clear, fair to say that these are

14   photographs of the hotel room, but not from the day you were

15   there; is that right?

16   A    Correct.

17   Q    Now, you testified a moment ago about rubbing the

18   defendant's back and then his falling asleep, is that right?

19   A    Correct.

20   Q    What happened after that?

21   A    Shortly after he fell asleep, his phone had kept going

22   off, just kept ringing, like, nonstop.  Just kept going off,

23   going off.  I had maybe shook him a couple of times, told him

24   his phone was ringing, he didn't say anything.  It just kept

25   going off and going off and going off, so I picked it up.

Faith - direct - Shihata                     2274

1      And when I picked the phone up, it was like a whole

2  group thread and one of the person's name was Mommabear.

3           MR. CANNICK:  Objection.

4           THE COURT:  Overruled.

5  BY MS. SHIHATA:

6  Q    You can continue.

7  A    I picked the phone up and there was a whole group text

8  and it was like multiple numbers.  And it was one contact that

9  said, like, Mommabear and it had a family emoji next to it,

10 and it was like a group text.  And some numbers were saved,

11 some numbers weren't.  They were all women.  And that kind

12 of --

13          MR. CANNICK:  Objection.

14          THE COURT:  I can't hear you.  Are you objecting?

15          MR. CANNICK:  Yes.

16          THE COURT:  Okay, overruled.

17 BY MS. SHIHATA:

18 Q    Go ahead.

19          THE COURT:  Are you still -- I hear noises.  I don't

20 know what you want.

21          Do you want a sidebar?

22          MR. CANNICK:  Yes, why not.

23          THE COURT:  Okay, let's have the court reporter come

24 over.

25          (Discussion off the record.)

Faith - direct - Shihata                    2275

1          THE COURT:  I think we decided we don't need the

2     sidebar.

3          MR. CANNICK:  Thank you, Your Honor.

4          MS. SHIHATA:  All right, you can continue with your

5     answer.

6     A    I had noticed that there was a whole bunch of numbers,

7     including some unsaved numbers and one that said Mommabear and

8     it had a family emoji.  And then I could see multiple phone

9     calls, Facetimes, like they were back to back to back to back.

10         And I looked at his other phone, he had multiple

11    phones, and it was the same thing -- back to back to back to

12    back in group text and this Mommabear.

13         And it kinda startled me, confused me a little bit,

14    like the Mommabear.  I know he had said it was like a family,

15    but that kinda just, like, put it in this is really happening

16    and I don't want to be a part of this.

17         I had took a picture on my phone of it, and after

18    that his phone was going off and there was a knock at the door

19    and it was Diana.

20         MS. SHIHATA:  All right, I am showing the witness

21    only what's been marked for identification as Government

22    Exhibit 239.

23    BY MS. SHIHATA:

24    Q    Do you recognize this?

25    A    I do.

Faith - direct - Shihata                    2276

1    Q    And what is there?

2    A    A picture I took of his phone.

3    Q    The defendant's phone?

4    A    Correct.

5    Q    And was that the picture you just described taking of one

6    of his phones while you were in the hotel room, in the hotel

7    suite in the Mondrian?

8    A    Correct.

9            MS. SHIHATA:  I move to admit Government Exhibit

10   239.

11           MR. CANNICK:  No objection.

12           THE COURT:  Okay, it's in evidence.

13           (Government's Exhibit 239 was received in evidence.)

14           (Exhibit published.)

15   BY MS. SHIHATA:

16   Q    And the date on the top here, that's Saturday,

17   February 3rd?

18   A    Correct.

19   Q    And does this appear to show messages, multiple messages

20   from someone saved as Joyce, a 646 number, messages from

21   someone saved as Mommabear?

22   A    Correct.

23   Q    Some missed calls from Diana Copeland?

24   A    Correct.

25   Q    Facetimes with Joyce?

Faith - direct - Shihata                    2277

1   A    Correct.

2   Q    And another -- and a 646 number?

3   A    Correct.

4   Q    I think before I showed you that exhibit you said that

5   Diana came to the room, is that right?

6   A    Correct.

7   Q    What happened at that point?

8   A    Shortly after she entered the room, she stayed in the

9   living part and she let him know he had a meeting, he was

10  late.  He got up, he kind of rushed.  Put on his clothes.

11       Again, before he left, he was giving me constructive

12  criticism, again, about my positions.  I didn't bend over

13  right.  He said, his words were:  Something's not right.

14       And I kinda got upset at that point because I just

15  felt embarrassed, like, nothing at this point was gonna work.

16  It's nothing I could do to make our intimacy better.  It just

17  seemed very unnatural and it never was gonna be natural.

18       So I kinda -- this time -- I never said anything

19  back, but this time I did because when he left he kinda gave

20  me like a -- like a pat on my shoulder, like, better luck next

21  time.  And I was like, you just patted my shoulder like you're

22  a coach and I'm like a team player, like my feelings were

23  hurt.  And he looked at me and he said:  'Cause you are.  He

24  said:  I'm a fuckin' legend.

25       I looked at him and he -- he just looked at me.  And

Faith - direct - Shihata                2278

1  I was just like:  That doesn't mean -- and he stopped me.  And

2  he said:  I'm not one of them niggas you fuck with.  He said:

3  I'm not gonna go back and forth with you.

4          Diana was standing right there.  This was one of

5  them times, like I said, I had never spoke up for myself and I

6  had never really seen him get close to me.  We weren't

7  directly in each other's face, but we were pretty close.  I

8  definitely was looking up at him.  He said what he had to say

9  and he walked out.  I didn't see him again on that trip.  I

10  knew he was mad, too, because he didn't give me a kiss or say

11  he'll see me later or say anything.  Him and Diana, they just

12  walked out.  And that was the last time we saw each other.

13  Q    Now, at some point after that did you leave New York?

14  A    I did.

15  Q    And do you recall when that was?

16  A    I believe it was the next day.

17  Q    And where did you fly to when you left New York?

18  A    Back to San Antonio.

19  Q    Prior to leaving or at some point did you send a text to

20  the defendant?

21  A    I did.

22  Q    And what do you recall about that?

23  A    After I left I sent him sort of a apologetic text.  I

24  didn't really say too much, but I just let him know, you know,

25  I was embarrassed.  I just -- I really didn't know what was

Faith - direct - Shihata                    2279

1 | gonna happen, if he was gonna be mad.

2 |        Like, there was no conversation. I didn't know how

3 | the chapter was ending. I didn't hate him. You know, I was

4 | gonna go about my business, that was the plan. I just hoped

5 | he didn't have any harsh feelings to me.

6 |        So, I apologized to him. I tried to get a response.

7 | He never replied. Well, he did respond, but we never spoke

8 | after that on another romantic level.

9 | Q   Did you have any concerns regarding anything that the

10 | defendant had related to you?

11 | A   Yeah. Once I had got back to San Antonio, mind you

12 | I'm -- I'm from Texas, so the climate is very hot there, even

13 | in February. So, when I got back to Texas, maybe like three

14 | days after I got back home, I was coming down with a cold and

15 | I thought I just had the flu. And on the fourth day of having

16 | a cold, my mouth had bumps everywhere and my tongue was

17 | inflamed with bumps. My mouth, it looked like disgusting.

18 |        I had went to urgent care because my sister -- my

19 | other sister's a nurse and I hd sent her a picture of my mouth

20 | and she said: That looks like herpes. So, me, I'm freaking

21 | out. Mind you, my parents are like: What's on your mouth?

22 |        And that was the first thing that made me be like,

23 | ugh, okay, I gotta go see what this is. And I went to urgent

24 | care and they had tested me for herpes and it came back

25 | positive.

Faith - direct - Shihata                    2280

1        I didn't -- I kinda was in shock.  So, I always go

2   to my OB/GYN every three months.  I was on birth control, so I

3   get the Depo shot and they test you, but I had went just -- I

4   needed her to just check, check me then.  So, she gave me a

5   pee test and a blood test and confirmed that I did have

6   herpes.

7   Q    And, what, if any, understanding did you have about what

8   type of herpes you had?

9   A    At the time she told me I had Type 1 herpes.  So, I

10  really just -- I didn't know what herpes was, that was my

11  first time learning that there was two different types.  I had

12  Type 1.

13  Q    Now, after you learned you had herpes, what, if anything,

14  did you do?

15  A    I reached out to him a couple times.  He never texted me

16  back.

17  Q    When you say you "reached out to him," who are you

18  referring to?

19  A    R. Kelly.

20  Q    And why did you reach out to him?

21  A    I wanted to know if he knew, like, what this was or if he

22  knew, like, anything, just -- it was just like I came home.

23  We weren't speaking and, boom, I find out I have herpes and

24  you said nothing to me.

25          I really just wanted him to maybe give me answers on

1  how to fix it or just acknowledge, like, he did it.  I knew it

2  was him.  And he just totally like cut off communication with

3  me and wouldn't respond to me.

4        When I was texting him, I wasn't saying:  Text me

5  back, I know you have herpes, that's -- I was saying, let's

6  have a conversation.  He would not reach back out to me.

7  Q    And why did you want to have a conversation with him?

8  A    I wanted to discuss my STD status.

9  Q    And did he respond?

10 A    No.

11 Q    After receiving no response from the defendant, did you

12 contact a lawyer?

13 A    Correct.

14 Q    And why did you do that?

15 A    Because there was no other way for me to get resolvement

16 [sic] [sic] in this.

17 Q    And the lawyer you contacted, was that a lawyer in Texas?

18 A    Correct.

19 Q    Where you were living?

20 A    Correct.

21 Q    And after contacting a lawyer in Texas, did you and the

22 lawyer go to report anything anywhere?

23 A    Yes.  So, shortly after I had obtained a lawyer, he heard

24 everything that happened between me and Mr. Kelly.  He had let

25 me know that it's actually illegal for somebody to give you a

Faith - direct - Shihata                    2282

1  STD and they know.

2          MR. CANNICK:  Objection.

3          THE COURT:  Well, sustained as to that.

4          You had a conversation with the lawyer and what

5  happened next.

6  A    After my conversation with my attorney, we went to Dallas

7  Police first and we tried to get some type of resolvement

8  [sic] there.  They told me that because the basis of my --

9  Q    Well, just while you were at the Dallas Police

10 Department, what, if anything, did the police you met with

11 while you were there try to do?

12 A    They had told me that I had to --

13         MR. CANNICK:  Objection.

14         THE COURT:  I know, it is difficult.  Don't tell us

15 what they told you.

16         Did you do something with them?

17         THE WITNESS:  Correct.

18         THE COURT:  Okay.  What did you do?

19         THE WITNESS:  So, I was -- I called him.

20         THE COURT:  You called who?

21         THE WITNESS:  I called R. Kelly and he did not

22 answer.  So, after I called --

23 BY MS. SHIHATA:

24 Q    Okay, so let's just stop there for a moment.

25         When you called R. Kelly, the defendant's phone

Faith - direct - Shihata                    2283

1    number, was that in the presence of Dallas Police personnel?

2    A    Correct.

3    Q    And was the plan to record that phone call?

4    A    Correct.

5    Q    What, if anything, were you planning to discuss with the

6    defendant if he answered the phone?

7    A    If he answered the phone, we were gonna discuss the

8    herpes.

9    Q    And I think you testified the defendant did not answer,

10   is that right?

11   A    Correct.

12   Q    Following that, were you advised to try to make another

13   recording or to make a recording of the defendant?

14   A    Correct.

15   Q    Discussing the herpes?

16   A    Correct.

17   Q    And after you left the Dallas Police Department that day,

18   did you and your lawyer attempt to do that?

19   A    We did.

20   Q    And how, if at all, did you try to get the defendant on

21   the phone after that?

22   A    In the wee hours of the morning a couple days later I had

23   got a phone call from Mr. Kelly.  I answered.  We had a

24   conversation.

25   Q    Prior to that, had you sent him any text messages?

Faith - direct - Shihata                    2284

1   A    Yes.

2   Q    And what was the purpose of sending him text messages?

3   A    So, that we could have a conversation to talk.

4   Q    Now -- and then I think you -- at some point did you, in

5   fact, speak to the defendant over the phone?

6   A    Correct.  He ended up calling me back.  I answered.  He

7   let me know, he said:  Your name came up.  And he said:

8   You're the only Faith I know.  He said:  I just want to let

9   you know you still have a friend in me.  You really do.

10              And I said:  I do?

11              He said:  Yeah.

12              And I said:  Well, why you didn't tell me?

13              He said:  Tell you what?

14              I said:  You didn't tell me you had anything.

15              He said -- well, basically he said if he had some --

16  excuse me, if he had something, we weren't gonna discuss it

17  over the phone.  He said:  I don't know what you're talking

18  about, but if I did know what you're talking about, we're not

19  gonna have that conversation over the phone.

20              He advised me to come to Chicago, but this time he

21  said, you know:  You get your flight and I'll give you the

22  money back.  He said:  You come up here, you meet me and you

23  just let me know.  And I said:  Okay.

24  Q    And did you go to Chicago?

25  A    No.

Faith - direct - Shihata                    2285

1   Q    Did you have any intention of going to Chicago?

2   A    No.

3   Q    When the defendant called you and you had the

4   conversation you just described, did -- what, if anything, did

5   you do during that phone call?

6   A    I had put my lawyer on three-way and he recorded the

7   call.

8   Q    Your lawyer recorded the call?

9   A    Yes.

10  Q    Now, in addition to the Dallas Police Department, did you

11  go to another police department after that?

12  A    Correct.

13  Q    And do you recall where that was?

14  A    In New York.

15  Q    And was that in Long Island?

16  A    Correct.

17  Q    And did you make a report there?

18  A    Yes.

19  Q    Now, at some point did your lawyer in Texas refer you to

20  a lawyer in New York?

21  A    Correct.

22  Q    And what, if anything, did the lawyer in New York file?

23  A    She filed my lawsuit.

24  Q    And that was a lawsuit against the defendant?

25  A    Correct.

Faith - direct - Shihata                    2286

1   Q    And was that lawyer's name Lydia Hills?

2   A    Correct.

3   Q    I am showing you what's in evidence as Government

4   Exhibit 231.

5              (Exhibit published.)

6   BY MS. SHIHATA:

7   Q    Do you see this envelope on your screen?

8   A    Correct.

9   Q    And is it addressed to Lydia C. Hills, Esquire at an

10  address in Brooklyn, New York?

11  A    Correct.

12  Q    And was that the lawyer who filed the lawsuit for you in

13  New York?

14  A    Correct.

15  Q    And was it sent by certified mail, this letter?

16  A    Correct.

17  Q    And is there a name and address indicated in the top left

18  corner?

19  A    Yes.  Robert Kelly, 219 North Justine Street, Chicago

20  Illinois.

21  Q    And just looking at Government Exhibit 231 again, I am

22  just going to zoom in.

23              Do you see the USPS postage on this?

24  A    Yes.

25  Q    And do you see a date where my finger is (indicating)?

Faith - direct - Shihata                    2287

1   A    Yes, November 20th, 2018.

2   Q    Now, at this point had your lawyer already filed the

3   lawsuit?

4   A    Correct.

5   Q    I am showing you what's in evidence as Government

6   Exhibit 231(a).

7            (Exhibit published.)

8            MS. SHIHATA:  Actually, I'm sorry, to the jury only,

9   please.

10           (Exhibit published to the jury only.)

11           THE COURTROOM DEPUTY:  You have to wait.

12           MS. SHIHATA:  I'm sorry.

13           THE COURTROOM DEPUTY:  It's okay.  You can go.

14           MS. SHIHATA:  Thank you.

15  BY MS. SHIHATA:

16  Q    Now, is this --

17           MS. SHIHATA:  Actually, may I approach for one

18  moment, Your Honor?

19           THE COURT:  Sure.

20  Q    Can you just take a look at the documents in Government

21  Exhibit 231(a) that I just handed you?

22  A    (Witness complies.)

23  Q    Having looked at the documents in Government

24  Exhibit 231(a), at some point did your lawyer show you these

25  documents?

Faith - direct - Shihata                    2288

1   A    Correct.

2          MS. SHIHATA:  Now, for the jury only.

3          (Exhibit published to the jury only.)

4   BY MS. SHIHATA:

5   Q    I am starting with the first page of Government

6   Exhibit 231(a).

7          THE COURT:  You are not going to read the whole

8   thing, are you?

9          MS. SHIHATA:  No, I'm not, don't worry, Judge.

10  BY MS. SHIHATA:

11  Q    Does this have a case caption with your full name and the

12  defendant's -- versus the defendant's full name?

13  A    Correct.

14  Q    And is this purportedly something -- a document titled

15  Notice of Delivery?

16  A    Correct.

17  Q    And it's addressed to the Law Office of Lydia C. Hills in

18  Brooklyn, New York?

19  A    Correct.

20  Q    And it has a declaration from someone named June Barrett

21  that she caused the foregoing notice of delivery to be

22  delivered, is that right?

23  A    Correct.

24  Q    And do you see the name and address of June Barrett on

25  the bottom of this?

Faith - direct - Shihata                    2289

1    A    Correct.

2    Q    And is that the address listed 1826 South Millard Avenue,

3    Chicago, Illinois, with a phone number listed and an e-mail,

4    junespointofview@yahoo.com?

5    A    Correct.

6    Q    All right, I am showing the second page of this exhibit.

7          And, again, does this appear to be a letter

8    addressed to your lawyer, Lydia C. Hills?

9    A    Correct.

10   Q    And it has a date on the top of October 22nd, 2018?

11   A    Correct.

12   Q    Now, I want to focus on a particular portion of this

13   letter.

14         Do you see the paragraph the second from the bottom

15   that I'm pointing to (indicating)?

16   A    Yes.

17   Q    And I'm not going to ask you to read the whole thing, but

18   does it state:

19         Please advise, and then your last -- Ms. and your

20   last name, your client, to abandon this heartless effort to

21   try to destroy my musical legacy for selfish personal

22   enrichment.  If she persists in court action, she will be

23   subjected to public opinion during the discovery process.

24         For example, my law team is prepared to request the

25   production of the medical test results proving the origin of

Faith - direct - Shihata                    2290

1    her STD claim, as well as ten personal male witnesses

2    testifying under oath about her sex life in support of her

3    claim and complete records of her texts, Facetime message

4    exchanges, which will be reviewed to match and be

5    authenticated by the recipient to ensure there are no

6    omissions or deletions.

7                And then the following paragraph --

8                THE COURT:  Just slow down a little bit please, just

9    for the court reporter.

10               MS. SHIHATA:  I apologize.

11               THE COURT:  That's all right.

12   BY MS. SHIHATA:

13   Q    And then the last paragraph on that page says:

14               If Ms. and your last name, really cares about her

15   own reputation, she should cease her participation and

16   association with the organizers of this negative campaign.

17   Counteractions are in the developmental stages and due to be

18   released soon.

19               And do you see a sincerely, a signature, and then

20   the name Robert Sylvester Kelly?

21   A    Correct.

22   Q    Now, I am showing you the third page of this exhibit.

23               Now, does this appear to be a page from the lawsuit

24   or the complaint that your attorney filed in New York Supreme

25   Court?

Faith - direct - Shihata                    2291

1  A    Correct, that's what it is.

2  Q    And do you see a stamp on it?

3  A    Correct.

4  Q    And what does the stamp say?

5  A    I do not accept this offer to contract and I do not

6  consent to these proceedings.

7  Q    And do you see a notary signature?

8  A    Yes, from June Barrett.

9  Q    And is that dated October 29th?

10  A    October 29th, 2018.

11  Q    And then is there also a notary stamp, June A. Barrett,

12  Notary Public, State of Illinois?

13  A    Correct.

14  Q    And on that page, same page, does there also appear to

15  be -- above June Barrett's signature, does there appear to be

16  another line next to the word "by" and a signature written

17  there?

18  A    Correct.

19  Q    Now, I'm showing you the next page of the exhibit.

20        Again, is this stamped with:  I do not accept this

21  offer to contract and I do not consent to these proceedings?

22  A    Correct.

23  Q    And, again, is it -- is there a notary stamp for June A.

24  Barrett, signature for June A. Barrett and a date?

25  A    Correct.

Faith - direct - Shihata                    2292

1  Q    And above that, again, does there appear to be another

2  signature there?

3  A    Correct.

4  Q    Showing you the next page of the exhibit, does this

5  appear to be a summons for the lawsuit that your lawyer filed?

6  A    Correct.

7  Q    And, again, does it state:  I do not accept this offer to

8  contract, I do not accept these proceedings?

9  A    Correct.

10 Q    And signed and notarized by June A. Barrett?

11 A    Correct.

12 Q    And another signature on top of June A. Barrett's

13 signature?

14 A    Correct.

15 Q    Showing you the following page, is this titled Testimony?

16 A    Correct.

17 Q    And at the bottom is there a signature?

18 A    Yes.

19 Q    And a date?

20 A    Yes.

21 Q    And then a witness signature?

22 A    Correct.

23 Q    I am showing you the next page of the exhibit.

24       What do you see written at the top?

25 A    Here is Faith, your client.

Faith - direct - Shihata                    2293

1   Q    And yes, I apologize, make sure not to say your last

2   name.

3          Now, below where it says:  Here is Faith, your

4   client, do you see a series, first, of three photographs?

5   A    Yes.

6   Q    And are those photographs of you?

7   A    Yes.

8   Q    And the first two photographs, are those from television?

9   A    Correct, all -- the first three are.

10  Q    Okay.  And underneath those three photographs, can you

11  see what's written?

12  A    Here a sample of the real Faith ████ --

13  Q    I'm sorry, I'm sorry.  Just remember not to say your last

14  name.

15         How about this, I'll read it, okay?

16  A    Okay.

17         THE COURT:  Is this in evidence?

18         MS. SHIHATA:  Yes, this is part of the same

19  Government Exhibit 231(a).

20         THE COURT:  Okay, go ahead.

21  BY MS. SHIHATA:

22  Q    Here is a sample of the real Faith, and then your last

23  name.  Remember, she lives in Texas, so her claim of being

24  intimidated falls flat because these pics were sent via text.

25         Is that right?

Faith - direct - Shihata                    2294

1    A    Correct.

2    Q    Did I read that correctly?  Okay.

3         And below that is there a series of four

4    photographs?

5    A    Correct.

6    Q    And the first photograph, do you recognize who is in that

7    photograph?

8    A    R. Kelly and I.

9    Q    And do you recognize the room you're in?

10   A    Yes.

11   Q    Where was that from?

12   A    In the recording studio that I was in, in LA.

13   Q    And is there another photograph right next to that?

14   A    Correct.

15   Q    Is that a photograph of you?

16   A    Correct.

17   Q    And is part of your breast exposed?

18   A    Yes.

19   Q    And do you recall anything about where this photograph

20   was taken?

21   A    I don't know where it was taken, but I know it was a

22   picture he took of me.

23   Q    When you say "he," who are you referring to?

24   A    R. Kelly.

25   Q    And is there another photograph of you next -- next to

Faith - direct - Shihata                    2295

1  that picture?

2  A    Correct.

3  Q    And in that picture does it show an exposed portion of

4  your buttocks?

5  A    Correct.

6  Q    And then the final photograph on that row, do you

7  recognize what that is a picture of?

8  A    Yes, he told me to send him a picture, and I sent him a

9  picture of my outfit.

10 Q    So, is that a photograph of text messages between you and

11 the defendant?

12 A    Correct.

13 Q    And in these, are what you sent -- is what you sent on

14 the left side and in gray?

15 A    Correct.

16 Q    And the pictures?

17 A    Correct.

18 Q    And is what the defendant said on the right side and in

19 blue?

20 A    Correct.

21 Q    And below a photograph of you, did you write:  Is this

22 better, Daddy?

23 A    Correct.

24 Q    And at the bottom of this page, is there some text

25 written?

Faith - direct - Shihata                    2296

1  A    Yes.

2  Q    And does it state:  I assure you, this would not be

3  considered a Sunday go-to-meeting dress.  The next two

4  pictures have been cropped for the sake of not exposing her

5  extremities to the world yet!!!  I'm a singer, not a doctor.

6  So, how does Ms. -- and your last name -- justify her

7  transmission of these kinds of pictures?

8         Is that what it said?

9  A    Correct.

10  Q    I'm now showing you the final page of Government

11  Exhibit 231(a).

12         And is there some text at the top of this page

13  followed by photographs of text messages?

14  A    Correct.

15  Q    And at the top of the page, does it state:  Ms., and your

16  last name, Ms. your last name's usage of daddy is/was her

17  choice!  It's very interesting how the difference in age only

18  becomes a factor when things didn't go as she planned.

19         Is that what it says?

20  A    Correct.

21  Q    Now, focusing on the first text message on this page.

22         Again, are the -- do you recognize who these texts

23  are between?

24  A    They're between him and I.

25  Q    The defendant and you?

Faith - direct - Shihata                    2297

1  A    Correct.

2  Q    And in these texts, are what you wrote to the defendant,

3  is that on the left side in gray?

4  A    Yes, it is on the left side in gray.

5  Q    And what the defendant wrote to you is on the right side

6  in blue?

7  A    Yes.

8  Q    And at some point in this text message exchange do you --

9  did you send the defendant an address?

10 A    Correct.

11 Q    And do you have any memory of why you were doing that?

12 A    I was going out.  I was sending him where I was going.

13 Q    And why did you need to send the defendant the address of

14 where you were going?

15 A    Those were his rules.

16 Q    Now, turning to the second text message, the middle text

17 message on this page.  I want to focus here on the date of

18 these text messages.

19        First of all, do you recognize -- do you have a

20 memory of these text messages?

21 A    Absolutely.

22 Q    And are these from April?

23 A    Correct.

24 Q    Do you know -- well, do you know April of what year?

25 A    April of 2018.

Faith - direct - Shihata                    2298

1  Q    And was this after your final trip to New York to see the

2  defendant?

3  A    Correct.

4  Q    And what are these texts, why were you sending the texts

5  in gray?

6  A    The texts in April, the first one, I sent that when I was

7  in Dallas.  And the one on the 21st was after he called me and

8  said he wanted to talk.

9  Q    And so, when you said you sent it when you were in

10  Dallas, what were you in Dallas doing?

11  A    Trying to file a police report.

12  Q    So, that was at the time or this was in the vicinity of

13  the time that you had tried to -- that you had gone to the

14  Dallas Police Department to make a report?

15  A    Correct.

16  Q    And as you testified earlier, while you were in the

17  police officer's presence, you attempted to make a recorded

18  call and the defendant did not answer?

19  A    Correct.

20  Q    And I think you testified earlier that thereafter you

21  contacted the defendant again via text message to try to make

22  another -- to make a recording as the police had advised you,

23  correct?

24  A    Correct.

25             (Continued on the following page.)

Faith - Direct - Shihata                    2299

1  BY MS. SHIHATA:

2  Q    Is that the text messages we're seeing here?

3  A    Correct.

4  Q    Why did you send the defendant:  I've been thinking and I

5  don't want to do this.  Can we talk about how to make it go

6  away?

7  A    That was after we had that conversation when he had told

8  me that I could come to Chicago and things like that, that was

9  supposed to be the follow-up conversation after that once he

10  had learned.  We didn't speak on the phone actually until the

11  news got out that I had obtained a lawyer to file a lawsuit.

12  If you see, those texts have the 12-day difference.

13  Q    Was it after these texts that you spoke to him on the

14  phone?

15  A    Correct.

16  Q    Fair to say you were trying to get him to call you?

17  A    Correct.

18  Q    Looking at the third photograph of text messages on this

19  page, is this a continuation of the second set of text

20  messages?

21  A    Correct.

22  Q    The items I just showed you including the photographs of

23  you and the text messages, those were all sent to your lawyer

24  Lydia Hills?

25  A    Correct.

Faith - Direct - Shihata                2300

1  Q    After you had filed the lawsuit?

2  A    Correct.

3         MS. SHIHATA:  Your Honor, this might be a good time

4  for a break.

5         THE COURT:  Okay.  Ladies and gentlemen, let's take

6  our morning break.  Please don't talk about the case at all.

7  We'll see you in ten minutes.

8         (Jury exits the courtroom.)

9         THE COURT:  The witness can step out.

10        (Whereupon, the witness steps down.)

11        THE COURT:  Do you have an estimate of how long

12 you're going to be?

13        MS. SHIHATA:  I think probably half an hour.

14        THE COURT:  All right.  Everybody can sit down.

15        Anything from either side before we break?

16        MS. SHIHATA:  Not from the Government.

17        MR. CANNICK:  No, your Honor.

18            (Brief recess.)

19        THE COURT:  Let's bring the witness back in.

20        (Whereupon, the witness resumes the stand.)

21        MS. SHIHATA:  I spoke with Mr. Cannick.  I think

22 there is one thing we wanted to raise with your Honor before

23 his cross, if you'd like to do it now or if you want to wait

24 until --

25        THE COURT:  Let's come over to the side with the

Sidebar                                                          2301

1   court reporter.  I might as well get a preview of it any way.

2              (Sidebar conference.)

3              THE COURT:  What is the issue?

4              MS. SHIHATA:  I had inquired in the break whether

5   Mr. Cannick intended to cross-examine Faith, the witness,

6   about Lydia.  So Lydia Hills, the lawyer who initially filed

7   the lawsuit for her in New York -- completely unrelated to the

8   lawsuit or anything like that -- was charged and convicted of

9   a federal offense.

10             THE COURT:  What did she do?

11             MS. SHIHATA:  I think it had something to do with

12  mortgage for her aunt or something like that.

13             THE COURT:  You're really going to ask her about

14  that?

15             MR. CANNICK:  They've made the lawyers here so

16  prominent.  I don't know what she's going to say in response

17  to my questions.  My answer was, if an answer comes out that

18  begs a question, then I would.  But if we get a ruling on it

19  beforehand.

20             THE COURT:  I don't see how it's relevant.  It looks

21  like she got two lawyers who -- wasn't the first guy who

22  leaked something to TMZ, that's in the 3500 material.  Then

23  you got this person who gets convicted.  Not really her fault.

24             MS. SHIHATA:  I don't think it's relevant Judge.

25             THE COURT:  I don't think that is relevant.  It's

Sidebar                                        2302

1   relevant to ask her about did she file the lawsuit.

2          MR. CANNICK:  Right.

3          THE COURT:  You didn't represent him on that.

4          MR. CANNICK:  No.  That was Mr. Farinella.

5          THE COURT:  Really?

6          MS. SHIHATA:  No, no.  I don't think so.  No I don't

7   believe anybody in this courtroom is involved in that other,

8   than the defendant.

9          MR. CANNICK:  I know that Farinella was involved in

10  one a case in New York Supreme Court that was represented.

11         MS. SHIHATA:  I have no idea about that.  But I have

12  no information that Mr. Farinella was involved in the mailing

13  that went to --

14         MR. CANNICK:  Oh, the mailing, neither did my

15  client.

16         THE COURT:  This is not sealed?

17         MS. SHIHATA:  No.

18         THE COURT:  Not sealed, okay.

19         MR. CANNICK:  Actually, the portion where we mention

20  Mr. Farinella representing him in New York Supreme, any

21  references to Mr. Farinella, I ask that be sealed.

22         THE COURT:  That's fine.  I don't think it's such a

23  big deal.  Isn't it a public filing?

24         (End of sidebar conference.)

25         (In open court.)

Faith - Direct - Shihata                    2303

1    THE COURT:  Let's get the jurors.

2    (Jury enters the courtroom.)

3    THE COURTROOM DEPUTY:  You may be seated.

4    THE COURT:  First of all, let me apologize for the

5  delay.  We had a little bit of technical difficulty with some

6  of our ultra modern equipment.  I think we've got it resolved

7  and are ready to resume.  Go ahead.

8    MS. SHIHATA:  Thank you, your Honor.

9  BY MS. SHIHATA:

10 Q    So earlier this morning you testified about your trip to

11 L.A. and the studio you went to when you saw the defendant in

12 L.A.  Do you recall that?

13 A    Yes.

14 Q    I think we got to the point where you were talking about

15 what happened the second day you were in the studio.  And you

16 testified that the defendant started making certain videos of

17 you and him; is that right?

18 A    Correct.

19 Q    And I think at that point we were having some technical

20 difficulties and couldn't play them.  I want to start with

21 what is in evidence as Government's Exhibit 327B.  And as you

22 testified earlier today, you had a chance to review these

23 recordings prior to your testimony here today, correct?

24 A    Correct.

25 Q    And Government's Exhibit 327B, that is a video that is

Faith - Direct - Shihata                    2304

1  approximately 20 minutes long, correct?

2  A    Correct.

3       MS. SHIHATA:  The entire video in this evidence but

4  we'll only play certain portions of it here today.

5       THE COURT:  So I think all the jurors have

6  headphones.

7       MS. SHIHATA:  Yes, but before we get to that point I

8  want to ask.

9  Q    Do you see the screen in front of you?

10 A    Correct.

11 Q    And do you recognize the people in the video?

12      THE COURT:  It's in evidence.  You asked her all

13 these questions.  I think she testified that she's in the

14 video, she initialed.  It, I'm not trying to rush you, except

15 I am.

16      MS. SHIHATA:  I will take your note, Judge.

17      If everyone can turn their headphones on, there is a

18 little button.

19      THE COURT:  Everybody should have a green light on

20 their headphones, there is a little button on the side.  It's

21 a sad day when I'm giving you technological advice.  Let us

22 know if it doesn't work and we'll figure something out.

23      You want to play it

24      MS. SHIHATA:  Yes.

25      We'll stop at about 32 seconds in.

Faith - Direct - Shihata                    2305

1          (Video played)

2          THE COURTROOM DEPUTY:  It's on every where, you

3    don't need headphones.

4          THE COURT:  Just keep playing.

5          MS. SHIHATA:  It's playing in both.  So keep your

6    headphones on.

7          (Video played)

8    BY MS. SHIHATA:

9    Q    Did you see what was going on in the video at that point?

10   A    Correct.

11   Q    Could you hear anything about -- could you hear the

12   defendant saying anything to you?

13   A    Fix my legs.

14   Q    Could you hear anything else about that?

15   A    No.

16   Q    And then did you proceed to fix your legs?

17   A    Correct.

18          (Video played)

19   Q    Could you hear what the defendant was saying to you

20   there?

21   A    Whenever we out in the club or anywhere, my legs should

22   never be pointed towards another man, my energy should be

23   turned towards him.

24          MS. SHIHATA:  If we could fast forward to

25   approximately 305.

Faith - Direct - Shihata                    2306

1          (Video played)

2               If we could stop it.

3    Q    Can you tell the jury what was going on at this point?

4    A    He told me to give him a kiss and then rub his beard.

5    Q    Did you in fact do as he directed?

6    A    Correct.

7    Q    Did that rubbing of the beard go on for several minutes?

8    A    Correct.

9          MS. SHIHATA:  If we could fast forward to

10   approximately 620.

11          (Video played)

12               We appear to have lost the sound.  We can just press

13   play?

14          (Video played)

15   Q    Do you see yourself getting up there?

16   A    Yes.

17   Q    What, if anything, had the defendant asked you to do?

18   A    To go get his phones for him.

19   Q    Is that you coming back with the phones?

20   A    Correct.

21   Q    And how many phones does he appear to have there?

22   A    Three.

23          MS. SHIHATA:  If we could fast forward to 1025.

24   Q    I know the sound is not on, but do you see the defendant

25   get up and appear to be speaking to somebody?

Faith - Direct - Shihata                    2307

1  A    Correct.

2  Q    Who was he speaking to then?

3  A    The engineer in the other room.

4  Q    Where did you understand the engineer to be at that time?

5  A    Behind the curtain.

6  Q    Is that the curtain that is behind you in the video?

7  A    Correct.

8  Q    Covering that window you testified about earlier?

9  A    Correct.

10 Q    Based on your review of this video prior to your

11 testimony here today, were there various -- was there a point

12 in the video where the defendant said:  Talk to Daddy?

13 A    Correct.

14 Q    At the point, after he said something to the engineer

15 behind the curtain, did you and the defendant listen to

16 various tracks that the defendant had made?

17 A    Correct.

18      MS. SHIHATA:  I'd like to turn to Government's

19 Exhibit 327A.(Video played)

20 Q    Is this video in the same location?

21 A    Correct.

22 Q    Based on your review prior to your testimony here today,

23 is this video approximately four minutes and 25 seconds?

24 A    Correct.

25 Q    Was this recorded on the same day as the last one?

Faith - Direct - Shihata                    2308

1   A    Correct.

2             MS. SHIHATA:  If we could press play, please.

3             (Video played)

4             Pause it.

5   Q    What did the defendant ask you to do there?

6   A    Rub the top of his head real slowly.

7   Q    Did you then do as he directed?

8   A    Correct.

9   Q    Based on your prior review of this video, does that

10  rubbing of his head and looking at him, does that go on for

11  the rest of the video?

12  A    Correct.

13  Q    I'm showing the witness and the jury only what is in

14  evidence, a page of Government's Exhibit 231A, the items sent

15  to your lawyer in New York.  I want to focus on the photograph

16  on the bottom left corner.  Do you see that?

17  A    Correct.

18  Q    Did you see the same scene in the video we just watched?

19  A    Yes.

20  Q    You rubbing the defendant's head at the L.A. studio?

21  A    Correct.

22  Q    Just turning again to the last page of Government's

23  Exhibit 231A, you testified before the break about the text

24  messages on the left side where you sent the defendant an

25  address where you were; is that right?

Faith - Direct - Shihata                    2309

1    A    Correct.

2    Q    That's an address in San Antonio, Texas?

3    A    Correct.

4    Q    The defendant was not in San Antonio, Texas, with you at

5    that time, right?

6    A    Correct.

7    Q    Did you participate in a docuseries known as Surviving R.

8    Kelly?

9    A    Correct.

10   Q    I want to direct your attention to early December 2018.

11   Did you travel to New York City at that time?

12   A    Yes.

13   Q    Did you travel alone or with someone else?

14   A    I traveled with my mother and one of my friends.

15   Q    Why were you coming to New York City at that time?

16   A    There was going to be a preview -- a premiere, excuse

17   me -- of surviving R. Kelly.

18   Q    In Manhattan?

19   A    Correct.

20   Q    Do you recall where you stayed when you were in New York

21   for that trip?

22   A    At the Pearl.

23   Q    Is that a hotel?

24   A    Correct.

25   Q    I'm showing the witness only what is marked for

Faith - Direct - Shihata                          2310

1   identification as Government's Exhibit 517A.  Do you recognize

2   this?

3   A    Yes.

4   Q    What is this a photo of?

5   A    The Pearl.

6          MS. SHIHATA:  I move to admit 517A.

7          MR. CANNICK:  No objection.

8          THE COURT:  That's in evidence.

9          (Government Exhibit 517A, was received in evidence.)

10  BY MS. SHIHATA:

11  Q    Did you end up attending premiere for Surviving R. Kelly?

12  A    Yes.

13  Q    Did something happen while you were there?

14  A    Yes.

15  Q    What happened?

16  A    During about maybe less than ten minutes into the

17  premiere, we had to evacuate.  The producers let us know that

18  there --

19          MR. CANNICK:  Objection.

20          THE COURT:  Don't tell us what the producer said.

21  But you had to evacuate?

22          THE WITNESS:  Correct.

23          THE COURT:  Next question.

24  BY MS. SHIHATA:

25  Q    Did you later learn why you had to evacuate?

Faith - Direct - Shihata                      2311

1   A    Yes.

2   Q    Why was that?

3              MR. CANNICK:  Objection.

4              THE COURT:  Sustained.

5   A    There had been --

6              THE COURT:  That means you can't answer.

7              THE WITNESS:  I'm sorry.

8              THE COURT:  Everybody had to leave the building

9   though, right?

10             THE WITNESS:  Correct.

11             THE COURT:  Did you get back in?

12             THE WITNESS:  No.

13             THE COURT:  Next question.

14  BY MS. SHIHATA:

15  Q    Was that the end of the event that night?

16  A    Yes.

17  Q    Where did you go after you were evacuated from the

18  location of the premiere?

19  A    Back to the Pearl.

20  Q    The hotel?

21  A    Correct.

22  Q    I'm showing the witness only what is marked for

23  identification as Government's Exhibit 80.  Do you recognize

24  the person in this photograph?

25  A    Correct.

Faith - Direct - Shihata                    2312

1   Q    Who do you recognize it to be?

2   A    Kash Jones.

3   Q    Have you met Kash Jones in person?

4   A    Yes.

5           MS. SHIHATA:  I move to admit Government's Exhibit

6   80.

7           MR. CANNICK:  No objection.

8           THE COURT:  That's in evidence.  You can publish.

9           (Government Exhibit 80, was received in evidence.)

10  BY MS. SHIHATA:

11  Q    When did you first meet Kash Jones?

12  A    In January of 2019.

13  Q    Did you meet her when you were in New York for the

14  premiere?

15  A    Yes.

16  Q    And did you meet her after you were evacuated from the

17  premiere?

18  A    Yes.

19  Q    Was it later that same night?

20  A    Yes.

21  Q    Where were you -- where did you first encounter her?

22  A    I first encountered her at the Pearl.

23  Q    The hotel you were staying at?

24  A    Correct.

25  Q    And what, if anything, did she say to you?

Faith - Direct - Shihata                    2313

1  A    She said nothing --
2             MR. CANNICK:  Objection.
3             THE COURT:  Overruled.
4  A    She said nothing to me directly.
5  Q    At some point did you speak to her on the phone?
6  A    Yes.
7  Q    And what, if anything, did she say to you then?
8             MR. CANNICK:  Same objection.
9             THE COURT:  Overruled.
10 A    She had said she wanted to meet up with me to discuss
11 some file she had.
12 Q    Do you know where she was when she was telling you this?
13 A    In New York.
14 Q    Did she -- did you end up meeting with her?
15 A    Yes.
16 Q    And where did you end up meeting with her?
17 A    We met at an Applebee's.
18 Q    Where in relation to your hotel was the Applebee's?
19 A    About a five-minute walk.
20 Q    Near your hotel?
21 A    Correct.
22 Q    Who, if anyone, went with you to meet Kash Jones at the
23 Applebee's?
24 A    My mother and my friend at that time.
25 Q    I'm showing the witness only what is marked for

Faith - Direct - Shihata                    2314

1   identification as Government's Exhibit 510.  Do you recognize

2   this?

3   A    Yes.

4   Q    What is this?

5   A    The Applebee's I met Kash Jones at.

6         MS. SHIHATA:  I move to admit Government's Exhibit

7   510.

8         MR. CANNICK:  No objection.

9         THE COURT:  That's in evidence.

10        (Government Exhibit 510, was received in evidence.)

11  Q    When you arrived at the Applebee's, who was there?  Did

12  you meet with Kash Jones at the Applebee's?

13  A    Correct.

14  Q    Was she with anyone else?

15  A    Yes.

16  Q    What, if anything -- can you describe the person or

17  persons she was with?

18  A    She had someone she described as her cousin with her, and

19  she had a security guard with her.

20  Q    And the security guard, was that a male or female?

21  A    A male.

22  Q    What, if anything, did you notice regarding that male

23  person while you were at the Applebee's?

24  A    When me and Kash were engaging, he was at a distance in

25  the corner.  He had on a black suit, black tie.  And had his

1  hand on his gun, on his hip.

2  Q    Was he wearing a jacket?

3  A    Correct.

4  Q    At some point did you see the -- were you able to notice

5  a handgun?

6  A    Correct.

7  Q    Under his jacket?

8  A    Correct.

9  Q    Did you and Kash Jones speak at the Applebee's?

10 A    Yes.

11 Q    What, if anything, did she show you?  And what, if

12 anything, did she say to you?

13 A    She stated to me that she was --

14         MR. CANNICK:  I'm going to object.

15         THE COURT:  The objection is overruled to the

16 conversation between this witness and Ms. Jones.  Go ahead.

17 A    She stated to me that she wasn't a fan of Mr. Kelly, that

18 she worked for him.  But she said she wasn't against us, but

19 she wasn't for the women coming forward.  She was just trying

20 to figure out who was telling the truth and who was lying.

21         She told me she had a file.  And I asked her to see

22 it.  In the file it was like little profiles of me and other

23 women that were in the documentary.

24         She showed me my profile picture and it was a

25 picture of me.  It was some mug shots that weren't me.  And my

Faith - Direct - Shihata                    2316

1  nude pictures were in there.  And she had let me know that

2  basically this is what he plans on putting out if you guys

3  move forward with the documentary.

4           MR. CANNICK:  Objection.

5           THE COURT:  The objection is overruled.

6  Q    At that point you were there for the premiere, but is it

7  correct that the documentary had not yet aired on television?

8  A    Correct.

9  Q    The nude photos that you saw, did you recognize when or

10  where those had been taken?

11  A    Yes.

12  Q    What did you recognize about them?

13  A    I recognized they were the same pictures that I had seen

14  before that were sent to my attorney's offices, except you

15  could see the full thing, I wasn't covered.  There were more

16  pictures that I knew he took of me I was never sent, they were

17  taken of me.

18  Q    When you say you recognized pictures he take of you.  Who

19  is "he" that you're referring to?

20  A    Robert Kelly.

21  Q    After that, did Surviving R. Kelly air on Lifetime

22  television in early January 2019?

23  A    Yes.

24  Q    Are you familiar with a Facebook page called Surviving

25  Lies?

Faith - Direct - Shihata                    2317

1   A    Yes.

2   Q    And in relation to when Surviving R. Kelly aired on

3   television, can you say, do you have a recollection of when

4   you became aware of the Surviving Lies Facebook page?

5   A    It was maybe not that long after the documentary had

6   aired, maybe about a week.  I just woke up to a whole bunch of

7   messages and people were screenshoting me my nude body parts

8   all over the Internet as well as addresses.

9   Q    Did you understand that those items had been posted on

10  the Surviving Lies Facebook page?

11  A    Yes.

12  Q    Was what was posted similar to what you testified about

13  here, the photos and text messages in Government's Exhibit

14  231A?

15  A    Yes, they were the same pictures except they were not

16  cropped.

17  Q    You testified earlier that during the course of the time

18  that you communicated and saw the defendant, that you

19  sometimes spoke using Facetime; is that right?

20  A    Correct.

21  Q    I'm showing the witness only what is marked for

22  identification as Government's Exhibit 207A.  Do you recognize

23  that?

24  A    Correct.

25  Q    Is this a screenshot of a Facetime conversation between

Faith - Direct - Shihata                    2318

1  you and the defendant?

2  A    Correct.

3         MS. SHIHATA:  I move to admit Government's Exhibit

4  207A.

5         MR. CANNICK:  No objection.

6         THE COURT:  That's in evidence.

7         (Government Exhibit 207A, was received in evidence.)

8  BY MS. SHIHATA:

9  Q    You testified earlier -- Government's Exhibit 207A is

10  this a screenshot that you provided to the Government?

11  A    Correct.

12  Q    You testified earlier that prior to the first time you

13  went to see the defendant, you engaged in texting

14  communications with him?

15  A    Correct.

16  Q    And I'm showing the witness only what is marked for

17  identification as Government's Exhibit 207B and 207C.  Do you

18  recognize the documents I just showed you?

19  A    Correct.

20  Q    And are these text message communications between you and

21  the defendant from early on in your communications?

22  A    Correct.

23         MS. SHIHATA:  I move to admit Government's Exhibit

24  207B and 207C.

25         THE COURT:  Any objection?

Faith - Direct - Shihata                    2319

1          MR. CANNICK:  No objection.

2          THE COURT:  Those are in evidence.

3          (Government Exhibit 207B & 207C, was received in

4    evidence.)

5    BY MS. SHIHATA:

6    Q    Starting with 207B, if we can publish them.  Are these

7    text messages from March 2017 prior to your first trip?

8    A    Correct.

9    Q    You also testified before the break about that final trip

10   to New York.  And you testified that you texted the defendant

11   after that trip or after the events that occurred in the hotel

12   room that day?

13   A    Correct.

14   Q    Showing the witness only Government's Exhibit 207I.  Do

15   you recognize this?

16   A    Correct.

17   Q    Is this a text between you and the defendant from

18   February 3rd, 2018?

19   A    Correct.

20          MS. SHIHATA:  I move to admit Government's Exhibit

21   207I.

22          MR. CANNICK:  No objection.

23          THE COURT:  That's in evidence.

24          (Government Exhibit 207I, was received in evidence.)

25          MS. SHIHATA:  If we can publish it please?

Faith - Direct - Shihata                    2320

1   Q    The texts in blue are from you?

2   A    Yes.

3   Q    The texts in gray on this one are from the defendant,

4   correct?

5   A    Correct.

6   Q    Where it says:  Daddy coming now.  That was written by

7   the defendant?

8   A    Correct.

9   Q    And was that before he came to the hotel room?

10  A    Correct.

11  Q    And that's a morning time stamp; is that right?

12  A    Correct.

13  Q    And then later the same day in the evening time did you

14  write him a text message?

15  A    Correct.

16  Q    Can you explain why you wrote him this text message?

17  A    I sent him that text because after the interaction in

18  that room I didn't know if he was mad or what was going to

19  happen next.  I was trying to fix the situation, make sure

20  there wasn't anything like bad blood after that interaction.

21  Q    Why were you concerned about bad blood?

22  A    I didn't want there to be any repercussions for anything

23  that I said or did that may have made him upset.

24  Q    What do you mean by repercussions?

25  A    I didn't know.  I didn't know what was going happen.

Faith - Cross - Cannick                    2321

1  Q    At that point, had the defendant filmed you?

2  A    Yes.

3  Q    Engaged in sexual intercourse with him?

4  A    Yes.

5  Q    Had he taken pictures of you and your naked body?

6  A    Yes.

7  Q    Were you concerned about those coming out at some point?

8  A    Absolutely.

9  Q    Did they in fact come out on the Surviving Lies Facebook

10 page?

11 A    Ultimately, yes, they did.

12         MS. SHIHATA:  No further questions.

13         THE COURT:  Okay.  Cross-examination.

14 CROSS-EXAMINATION

15 BY MR. CANNICK:

16 Q    Before you started your testimony yesterday, you had met

17 with the Government to go over the questions that they were

18 going to ask of you in this courtroom, am I correct?

19 A    Correct.

20 Q    And you also spoke with them last night?

21 A    Incorrect.

22 Q    You didn't speak with them last night?

23 A    I didn't speak with them last night.

24 Q    You said you did or you didn't?

25 A    I didn't.

Faith - Cross - Cannick                          2322

1    Q    You did?

2         THE COURT:  Did not.

3    A    Did not.

4    Q    When was the last time you spoke with them?

5    A    This morning when we said good morning.

6    Q    And other than the good morning, you had no communication

7    about the facts that you just testified to today or yesterday?

8    A    Can you ask your question again?

9    Q    When you spoke with them and said good morning this

10   morning, did you discuss any of the details concerning what

11   you've been telling the jury?

12   A    No.  We discussed me looking at something that I had

13   already seen.

14   Q    What was it that you looked at?

15        THE WITNESS:  Do I have to answer that question?

16        THE COURT:  Yes.  I'll let you know if you don't.

17   A    Okay.  It was a picture of my texts.  I was looking at

18   the time.

19   Q    That was something concerning about the case, am I

20   correct?

21        MS. SHIHATA:  Objection as to form.

22        THE COURT:  Did you look at anything else besides

23   that text?

24        THE WITNESS:  No, I just looked at the text.

25        THE COURT:  Okay.  Next question.

Faith - Cross - Cannick                    2323

1   BY MR. CANNICK:

2   Q    Now, before yesterday, when was it that you last met with

3   the Government to discuss the case here?

4           MS. SHIHATA:  Objection as to form.  She testified

5   she didn't meet yesterday.

6           MR. CANNICK:  I said before yesterday.

7           THE COURT:  The objection is overruled.

8   A    Can you ask the question again?

9   Q    Before yesterday, when was the last time you met with the

10  Government to discuss this case?

11  A    I saw them on Sunday.

12  Q    What time you saw them on Sunday?

13  A    I'm not sure.

14  Q    You saw them in the morning?

15  A    I don't remember what time I saw them.

16  Q    So you don't remember what time you saw them on Sunday,

17  but you remember all these details from three years ago?

18          MS. SHIHATA:  Objection.

19          THE COURT:  Overruled.

20  A    Correct.

21  Q    Do you remember what time you left them on Sunday?

22  A    No.

23  Q    Do you remember what time -- how much time you spent with

24  them on Sunday?

25  A    No.

Faith - Cross - Cannick                    2324

1  Q    What about other than Sunday, had you met with them
2  before to discuss the details of this case?
3  A    Correct.
4  Q    Does that mean you did?
5  A    Yes.
6  Q    And what date was that?
7  A    I'm not sure of the exact date.
8  Q    And was it a week prior?
9  A    I'm not sure of the exact date.
10 Q    I'm not asking you about the exact date, I'm asking you
11 if it was a week prior?
12       THE COURT:  I'm a little confused right now.  Are
13 you asking before Sunday, the time before that?
14       MR. CANNICK:  Yes.
15       THE COURT:  Okay.  Just approximately, did you meet
16 with -- you met with them before Sunday, correct?
17       THE WITNESS:  Correct.
18       THE COURT:  Do you remember about when that was
19 generally?
20       THE WITNESS:  I met with them last month I believe
21 as well.
22 BY MR. CANNICK:
23 Q    How many times have you met with the Government before
24 coming and giving testimony to this Court?
25 A    I'm not sure to be exact.

Faith - Cross - Cannick                                    2325

1   Q    Now, was it more than three?

2   A    Correct.

3   Q    More than five?

4   A    I'm not sure.

5   Q    Before speaking to the Government, well at least --

6   withdrawn.

7            You also made talk show appearances concerning what

8   you're telling us about now, am I correct?

9   A    You're correct.

10  Q    What talk shows have you been on to give your account as

11  to what you said happened here?

12  A    I've been on a few.  I'm not exactly sure of all the

13  names, but I've been on a few.

14  Q    You've been on Dr. Oz?

15  A    Correct.

16  Q    Were you also on some social media shows?

17  A    Correct.

18  Q    And you participated in Surviving R. Kelly, correct?

19  A    Correct.

20  Q    When did you start your participation in Surviving R.

21  Kelly?

22  A    My participation in Surviving R. Kelly happened after my

23  lawsuit was filed.

24  Q    My question is, when was it that you started your

25  participation in Surviving R. Kelly?

Faith - Cross - Cannick                    2326

1    A    I'm not sure of the exact date.

2    Q    It was certainly before you went to New York for the

3    premiere, am I correct?

4    A    I'm sorry, can you ask that question again?

5    Q    Your participation in Surviving R. Kelly started before

6    you came to New York for the premiere, am I correct?

7    A    Correct.

8    Q    When was it that you made the trip to New York for the

9    premiere?

10   A    January 2019.

11   Q    When you participated in Surviving R. Kelly, did you

12   receive compensation?

13   A    I received compensation for the picture of me, my sister,

14   and R. Kelly.

15   Q    So you did receive compensation?

16   A    For a picture, yes.

17   Q    How much compensation did you receive?

18   A    $1,000 for the picture.

19              (Continued on next page.)

20

21

22

23

24

25

Faith - Cross - Cannick                    2327

1    CROSS-EXAMINATION

2    BY MR. CANNICK:   (Continuing)

3    A    A thousand dollars for the picture.

4    Q    That's all the monies that you received from your

5    involvement with *Surviving R. Kelly?*

6    A    Correct.

7    Q    Did you receive any monies for any of the talk shows that

8    you participated in?

9    A    No.

10   Q    What about any of the social media appearances?

11   A    Podcasts; no, sir.

12   Q    Now, what were you doing before -- withdrawn.

13        And when was it you met R. Kelly?

14   A    In 2017.

15   Q    And you were in college at that time?

16   A    Correct.

17   Q    And you said that you realized college was not for you

18   and you decided that you would -- you weren't going to pursue

19   that anymore, correct?

20   A    Correct.

21   Q    Now, after you made that decision, did you seek

22   employment?

23   A    No, sir.

24   Q    And so at any point in time during your relationship with

25   Mr. Kelly, were you employed?

Faith - Cross - Cannick                    2328

1  A    No, sir.

2  Q    Now, before meeting Mr. Kelly, had you been in pursuit of

3  an acting career?

4  A    No, sir.

5  Q    Before your involvement with *Surviving R. Kelly*, were you

6  in pursuit of an acting career?

7  A    No, sir.

8  Q    After *Surviving R. Kelly*, did you start pursuit of an

9  acting career?

10 A    The opportunity came and went.  No, sir.

11 Q    And when the opportunity came -- when you say that the

12 opportunity came and went, what do you mean?

13 A    I was asked to be a part of something, I considered it, I

14 decided not to move forward.

15 Q    And was that a project in Los Angeles?

16 A    No, sir.

17 Q    You appeared on a podcast in L.A.?

18 A    Yes, sir.

19 Q    What was the name of that podcast?

20 A    I don't remember.

21 Q    You appeared on a podcast.  Was there a host or a

22 hostess?

23 A    Correct.

24 Q    And you sat opposite that hostess, am I correct?

25 A    Correct.