# 22-1481 22-1982 (con)

# UNITED STATES COURT OF APPEALS

*for the*

## SECOND CIRCUIT



**UNITED STATES OF AMERICA,**

*Respondent-Appellee,*

-v.-

**ROBERT SYLVESTER KELLY**

*Petitioner-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## PETITIONER-APPELLANT'S APPENDIX
### VOLUME 5 OF 5
### (Pages A 1146 to A 1442)

JENNIFER BONJEAN
ASHLEY COHEN
BONJEAN LAW GROUP, PLLC
750 Lexington Avenue, 9th Floor
New York, NY 10022
(718) 875-1850

## TABLE OF CONTENTS

Electronic Index to Record on Appeal in *USA v. Kelly*, 19-cr-00286…. A 1

Voir dire of Juror 3 (Prospective Juror 25)……………………………. A 45

Voir dire of Juror 4 (Prospective Juror 52)……………………………. A 53

Voir dire of Juror 5 (Prospective Juror 87)……………………………. A 59

Voir dire of Juror 7 (Prospective Juror 145)………………………….... A 66

Voir dire of Juror 8 (Prospective Juror 147)………………………….... A 70

Voir dire of Juror 9 (Prospective Juror 156)………………………….... A 74

Voir dire of Juror 11 (Prospective Juror 153)…………………………. A 80

Voir dire of Juror 12 (Prospective Juror 163)…………………………. A 85

Voir dire of Alternate Juror 4 (Prospective Juror 206)……………….... A 93

Trial Testimony of Jerhonda Johnson Pace from August 18, 2021 and August 19, 202…………………………………………………………… A 97

Trial Testimony of Kris McGrath, MD from August 19, 2021………..... A 352

Trial Testimony of Anthony Navarro from August 20, 2021………….. A 433

Trial Testimony of Demetrius Smith from August 20, 2021………… A 546

Trial Testimony of Thomas Arnold from August 26, 2021……………. A 624

Trial Testimony of Faith from September 1, 2021…………………….. A 759

Trial Testimony of Anna from September 10, 2021…………………… A 911

Trial Testimony of Iffath Hoskins from September 10, 2021…………. A 951

Trial Testimony of Diana Copeland from September 10, 2021 and
September 13, 2021……………………………………………………….    A 1036

Trial Testimony of Angela from September 13, 2021………………….    A 1156

Trial Testimony of Alex from September 13, 2021…………………….    A 3322

Trial Testimony of Alesiette Mayweather from September 13, 2021
and September 14, 2021……………………………………………….…..    A 1268

Trial Testimony of Nicholas Williams from September 14, 2021……...    A 1383

Declaration of Robert S. Kelly dated April 4, 2022……………………    A 1438

Notice of Appeal dated July 11, 2022…………………………………..    A 1440

Notice of Appeal dated September 9, 2022…………………………….    A 1441

Notice of Appeal dated November 22, 2022…………………………...    A 1442

Copeland - Redirect - Geddes 3251

1  defendant?

2  A    Yes, they did.

3  Q    While you worked for the defendant?

4  A    (No audible response.)

5  Q    You were asked on cross-examination about what you

6  would do when you shopped for the defendant; is that

7  correct?

8  A    Right.

9  Q    And you testified that you would interact with

10  salespeople on behalf of the defendant, correct?

11  A    That is correct.

12  Q    And would you interact with both female and male sales

13  employees when you were with the defendant?

14  A    No, just the males.

15  Q    You wouldn't help them with the female employees?

16  A    I'm sorry.  I don't think -- can you repeat the

17  question?

18  Q    Sure.  When you were shopping with the defendant --

19  A    Okay.

20  Q    -- acting as his executive assistant, you testified

21  that you would interact with salespeople; is that correct?

22  A    That's correct.

23  Q    And would you interact when you were with the defendant

24  with both men and women?

25  A    Correct.

Copeland - Redirect - Geddes                    3252

1  Q    When you were with the defendant's live-in girlfriend
2  at the mall, who would you interact with?
3  A    The male.
4  Q    And the defendant's live-in girlfriends would interact
5  on their own with female salespeople, correct?
6  A    That is correct.
7  Q    When you were working for the defendant, who was in
8  charge of what you did on a day-to-day basis?
9  A    Robert.
10 Q    And at any point, who did you consider to be your boss?
11 A    Robert.
12 Q    And as your boss, is it fair to say that he gave you
13 direction?
14 A    Correct.
15 Q    And I don't want to put words into your mouth.  How
16 would you describe what -- the words that the defendant gave
17 you?
18 A    In terms of which words.
19          (Continued on the next page.)
20
21
22
23
24
25

Copeland - redirect - Geddes                3253

1   EXAMINATION CONTINUES

2   BY MS. GEDDES:

3   Q    When the defendant asked you to do something, did you

4   understand that it was something the defendant wanted you to

5   do?

6   A    That is correct.

7   Q    And did you do it because the defendant asked you to do

8   it?

9   A    Correct.

10  Q    And over your 15 years, did the defendant ask you to do

11  many different things?

12  A    Correct.

13  Q    And because the defendant was your boss, is it fair to

14  say that you followed through with his requests?

15  A    That is correct.

16  Q    And as part of your working for the defendant, did the

17  defendant ask you to assist him with his female guests and

18  live-in girlfriends?

19  A    That is correct.

20  Q    And did you follow through with what the defendant asked

21  you to do and help out with his female guests and live-in

22  girlfriends?

23  A    Yes.

24  Q    You were asked on cross-examination about whether you saw

25  Anna smoking marijuana.

Copeland - redirect - Geddes                    3254

1              Do you recall that?

2    A    I do.

3    Q    Who told the defendant about Anna smoking marijuana?

4    A    I believe it was me.

5    Q    And did you do that because you understood that was

6    something the defendant would want to know?

7    A    I knew that it was against the rules, yes.  So, yes.

8    Q    And on -- did you sometimes act as an extension of the

9    defendant when he was not around?

10   A    Yes.

11   Q    In fact, were those your words in characterizing your

12   responsibilities in working for the defendant?

13   A    Can you clarify that question?

14   Q    Sure.  Did you view one of your responsibilities in

15   working for the defendant to be an extension of him when he

16   could not be present?

17   A    Yes.

18   Q    And did you use those words to describe to the Government

19   how you viewed your role in working for the defendant?

20   A    I did, yes.

21   Q    You were asked on cross-examination about the computer

22   that went missing when you were at the defendant's studio.

23             Do you recall those questions?

24   A    Yes.

25   Q    Did the defendant buy you that computer?

Copeland - redirect - Geddes                    3255

1    A    No.

2    Q    Did the defendant reimburse you for that computer?

3    A    No.

4    Q    Has the defendant ever given you back that computer?

5              MR. CANNICK:  Objection.

6              THE COURT:  Well, sustained as to form.

7              Have you ever gotten the computer back?

8              THE WITNESS:  No.

9              THE COURT:  Okay.

10   BY MS. GEDDES:

11   Q    Were you present -- were you able to hear the

12   defendant's, all of the defendant's interactions with his

13   live-in girlfriends?

14   A    No.

15   Q    Fair to say, that you don't know exactly what went on

16   behind closed doors?

17   A    Fair to say, yes.

18   Q    And when you received requests -- when you testified

19   about what happened at the LA Fitness when Anna needed to use

20   the bathroom, what did Anna ask you to do?

21   A    Call Mr. Kelly.

22   Q    And what did you do?

23   A    I called Mr. Kelly.

24   Q    And why was it that -- were you able to get in touch with

25   the defendant?

1    A    No.

2    Q    And did you call him repeatedly?

3    A    Yes.

4    Q    You were asked on cross-examination about various

5    girlfriends and female guests of the defendant; is that right?

6    A    That is correct.

7    Q    And you were asked about certain events and opportunities

8    afforded to some of those -- to those female guests and

9    live-in girlfriends, correct?

10   A    Correct.

11   Q    And you answered yes to a lot of the defense attorney's

12   questions about what those individuals were afforded, correct?

13   A    That is correct.

14   Q    Fair to say that the defendant had many different guests

15   and live-in girlfriends over the course of your fifteen years?

16   A    Yes.

17   Q    And that as you sit here today, can you speak for each of

18   those female guests and live-in girlfriends?

19              MR. CANNICK:  Objection.

20              THE COURT:  Overruled.

21   A    No.

22   Q    And while you testified about certain things that were

23   given to them, you were talking about them as a whole,

24   correct?

25   A    That is correct.

Copeland - redirect - Geddes                3257

1  Q    You weren't talking about each of the defendant's guests,
2  female guests or live-in girlfriends individually, correct?
3  A    Correct.
4  Q    You were asked about the defendant's reading and writing
5  abilities.
6           Do you recall that?
7  A    Correct.
8  Q    Did you communicate with the defendant by text message?
9  A    Yes.
10 Q    And would you write texts to the defendant?
11 A    Yes.
12 Q    And would you receive text messages from the defendant?
13 A    Yes.
14 Q    And on occasion did you help the defendant read certain
15 text messages that he had received?
16 A    Yes.
17 Q    And how was it that the defendant was able to send you
18 text messages?
19 A    Mostly talk-to-text.
20 Q    So, he was able to dictate communications, and then it
21 was translated into text; is that correct?
22 A    Correct.
23 Q    And on occasion did you also help him draft text messages
24 before that talk-to-text function existed?
25 A    I have, yes.

Copeland - cross - Cannick                3258

1   Q    And were you relieved when talk-to-text came into place?

2   A    Yes.

3   Q    Took away some of your responsibilities, yes?

4            MS. GEDDES:  One moment.

5            (Pause.)

6            MS. GEDDES:  Nothing further.

7            THE COURT:  All right, any recross?

8            MR. CANNICK:  Very briefly.

9   RECROSS-EXAMINATION

10  BY MR. CANNICK:

11  Q    Ms. Copeland, you were just asked a few minutes ago about

12  your ability to roam around Mr. Kelly's home.

13           Do you remember that question just being asked?

14  A    Yes.

15  Q    You were, essentially, for lack of a better word, the CEO

16  of the operation of the home, am I correct?

17           MS. GEDDES:  Objection.

18  A    That's correct.

19           THE COURT:  Were you the CEO?

20  Q    Your job was to manage that home, am I correct?

21  A    Yes.

22  Q    And so, it was natural that you would have access to roam

23  and do whatever you wanted in order to keep that home

24  afloat --

25  A    That is correct.

Copeland - cross - Cannick                    3259

1   Q    -- am I correct?

2           And even with that ability to roam and do whatever

3   you wanted to do, you still had to knock, am I correct?

4   A    I did, yes.

5   Q    Everyone had to knock, am I correct?

6   A    That is correct.

7   Q    Now, you were just also asked about assisting Mr. Kelly

8   and his female guests and his live-in guests.

9           That was also part of your task, as well as that of

10  the runners and their personal assistants, is that correct?

11  A    That is correct.

12  Q    Mr. Kelly wanted them to have their conference and their

13  safety and their needs addressed?

14           MS. GEDDES:  Objection.

15           THE COURT:  Sustained.

16  BY MR. CANNICK:

17  Q    Well, wasn't that part of your responsibility, to take

18  care of their safety?

19  A    Yes.

20  Q    Their comfort?

21  A    Yes.

22  Q    Their needs?

23  A    Yes.

24  Q    Now, the Government asked you about a computer, did you

25  ever receive the computer back.

Copeland - cross - Cannick                3260

1          You don't know who took your computer, am I correct?

2    A    I do not.

3    Q    And the computer, basically, had Mr. Kelly's information

4    on it, am I correct?

5    A    That's correct.

6    Q    Okay.  And you filed a report for the computer, am I

7    correct, a police report?

8    A    I did.

9          MR. CANNICK:  Just one second, please, Your Honor.

10          (Pause.)

11    BY MR. CANNICK:

12    Q    And you were asked this just a second ago about Anna

13    being on the bus, on the Sprinter, and needing to go to the

14    bathroom.

15          I think you told us that when Mr. Kelly returned, he

16    got on you because you didn't prod Anna enough to make sure

17    that she took care of herself?

18    A    That is correct.

19          MR. CANNICK:  Nothing further.

20          THE COURT:  All right, anything else?

21          MS. GEDDES:  No.

22          THE COURT:  All right, thanks so much.  The witness

23    can step down.

24          (Witness steps down and exits courtroom.)

25          THE COURT:  All right, I am going to dismiss you for

Angela - direct - Shihata                    3270

1   **ANGELA**,

2        called as a witness by the Government, having been

3        duly sworn/affirmed by the Courtroom Deputy, was examined

4        and testified as follows:

5   DIRECT EXAMINATION

6   BY MS. SHIHATA:

7   Q    Good afternoon.

8   A    Good afternoon.

9            THE COURT:  Woops, I don't think it's on.  There is

10  a button on the top.

11           THE WITNESS:  Good afternoon.

12           THE COURT:  There you go.  Try it again.

13           THE WITNESS:  Good afternoon.

14           THE COURT:  Okay, it works.

15           Go ahead.

16           MS. SHIHATA:  I am showing the witness only what's

17  been marked for identification as Government Exhibit 82.

18  Q    Do you recognize this photo?

19  A    Yes, I do.

20  Q    Who is this a photo of?

21  A    That is myself.

22           MS. SHIHATA:  I move to admit Government Exhibit 82.

23           THE COURT:  Any objection?

24           MR. CANNICK:  None.

25           THE COURT:  Okay, that's in evidence.

Angela - direct - Shihata                    3271

1          (Government's Exhibit 82 was received in evidence.)

2   BY MS. SHIHATA:

3   Q    I am now showing you what's been marked for

4   identification as Government Exhibit 82(a).

5          Is this the same photograph with your true first and

6   last name?

7   A    That is correct.

8          MS. SHIHATA:  I move to admit Government Exhibit 82

9   and publish for the jury only, please.

10          THE COURT:  Any objection?

11          MR. CANNICK:  No.

12          MS. SHIHATA:  Sorry, 82(a).

13          THE COURT:  No objection, right?

14          MR. CANNICK:  None.

15          THE COURT:  All right, that's in evidence.

16          (Government's Exhibit 82(a) was received in

17   evidence.)

18          MS. SHIHATA:  And may we publish to the jury only,

19   please?

20          (Exhibit published to the jury only.)

21   BY MS. SHIHATA:

22   Q    Now, for purposes of your testimony here today, we are

23   going to refer to you as Angela.  Okay?

24   A    Yes, ma'am.

25   Q    And I am showing you what's been marked for

SAM    OCR    RMR    CRR    RPR
A 1157

Angela - direct - Shihata                3272

1    identification as Government Exhibit 82(b).

2              Is this the same photograph that I've just shown you

3    with the name "Angela" underneath?

4    A    Yes, it is.

5              MS. SHIHATA:  I move to admit Government

6    Exhibit 82(b).

7              MR. CANNICK:  No objection.

8              THE COURT:  That's in evidence.

9              (Government's Exhibit 82(b) was received in

10   evidence.)

11             MS. SHIHATA:  Thank you.

12   BY MS. SHIHATA:

13   Q    How old are you?

14   A    I am 44 years old.

15   Q    And when were you born?

16   A    November 19th, 1976.

17   Q    Where did you grow up?

18   A    Chicago, Illinois.

19             THE COURT:  I'm sorry.  I don't think there's

20   anything on.

21             A JUROR:  It wasn't on before either.

22             THE COURT:  Let's try it again.

23             MS. SHIHATA:  I'll just quickly publish the photos

24   that we entered into evidence.

25             So, here is 82.

Angela - direct - Shihata                           3273

1      (Exhibit published to the jury only.)

2      THE COURT:  You got it now?  Good, good, thanks.

3      MS. SHIHATA:  82(b), sorry, 82(a).

4      (Exhibit published to the jury only.)

5      MS. SHIHATA:  And 82(c) -- (b), sorry.

6      (Exhibit published to the jury only.)

7      THE COURT:  Okay.

8  BY MS. SHIHATA:

9  Q    All right, now, you grew up in Chicago, is that right?

10 A    Yes, ma'am.

11 Q    And how far did you -- did you go in school?

12 A    I have a degree in clinical massage therapy.

13 Q    And did you finish high school or did you get your go

14 ahead?

15 A    I got my go ahead, ma'am.

16 Q    Approximately when did you stop going to high school?

17 A    In 1991.

18 Q    And approximately, when did you get your go ahead?

19 A    2008.

20 Q    Are you currently employed?

21 A    Yes, I am.

22 Q    And what kind of work do you do?

23 A    I am in retail, and I am also a clinical massage

24 therapist.

25 Q    I am showing you Government Exhibit 1.

Angela - direct - Shihata                    3274

1          Do you recognize this person?

2    A    Yes, I do.

3    Q    And who is this person?

4    A    That's Rob.

5    Q    Do you know his full name?

6    A    Robert Sylvester Kelly.

7    Q    Have you met Robert Kelly in person?

8    A    Yes, I have.

9    Q    Do you see him in the courtroom here today?

10   A    Yes, I do.

11   Q    Can you point him out and identify him by an item of

12   clothing he's wearing?

13   A    He's the gentleman in the gray suit, black glasses.

14        THE COURT:   Indicating the defendant.

15   BY MS. SHIHATA:

16   Q    Around when did you first meet the defendant?

17   A    1991.

18   Q    Do you recall what grade you were in at the time?

19   A    It was the break between freshman and sophomore year.

20   Q    And about how old were you at that time?

21   A    Fourteen, fifteen.

22   Q    And at that time in your life, what, if anything -- what,

23   if any, career aspirations did you have?

24   A    I wanted to sing and to dance, entertainment.

25   Q    Now, you testified you met the defendant in 1991.

Angela - direct - Shihata                                    3275

1          After meeting him, did you spend time regularly with
2    the defendant for several years after that?
3    A    Yes, I did.
4    Q    Until approximately when did you spend time regularly
5    with him?
6    A    Mid '90s.
7    Q    And did that include times when you worked for him as a
8    backup dancer?
9    A    That is correct.
10   Q    And after you stopped -- did there come a point where you
11   stopped working for him as a backup dancer?
12   A    That is correct.
13   Q    And after that, did you still see him on occasion?
14   A    Yes, I did.
15   Q    Until approximately when?
16   A    1998.
17   Q    Okay.  Now, where did you first meet the defendant?
18   A    At his apartment.
19   Q    Do you recall where the defendant's apartment was at the
20   time you met him?
21   A    I believe the address was 8 East 9th at Burnham Place
22   Apartments, Chicago, Illinois, South Loop.
23   Q    And how did you end up at the defendant's apartment on
24   that occasion?
25   A    I met him through a friend of mine named Tiffany.

Angela - direct - Shihata                    3276

1  Q   And did Tiffany invite you to go to the apartment?

2  A   Yes, she did.

3  Q   How long had you known Tiffany at that time?

4  A   I had met her the day before, two days before prior.

5  Q   And was Tiffany also in high school at the time?

6  A   Yes, she was.

7  Q   Do you know what high school she attended?

8  A   Kenwood Academy, Chicago, Illinois.

9  Q   And was that the same high school as you or a different

10 high school?

11 A   That was a different school.

12 Q   Now, when Tiffany was in high school, what, if anything,

13 did she want to be?

14 A   Tiffany wanted to be a singer.

15 Q   When Tiffany invited you to go to the defendant's

16 apartment with her, did you initially know who the defendant

17 was?

18 A   No, I did not.

19 Q   And did she explain to you who he was?

20 A   Yes, she did.

21 Q   And what do you recall her explaining to you?

22 A   Actually, his first album had just come out and "Vibe"

23 was the single, and she showed me the video.  And I was like:

24 Yeah, I'll go.

25 Q   Now, did anyone else go to the defendant's apartment with

SAM    OCR    RMR    CRR    RPR

Angela - direct - Shihata                3277

1  you and Tiffany at that time?

2  A    Yes, they did.

3  Q    And without saying their names, how many other people

4  went to the apartment with you and Tiffany?

5  A    There were two other young ladies.

6  Q    And do you know whether or not they were in high school?

7  A    Yes, I do.  They're both in -- they both were in high

8  school at the time.

9  Q    Now, how long, if at all, had you known either of the two

10 girls that went with you and Tiffany to the defendant's

11 apartment, how long had you known them before you went?

12 A    One of them I met the day that I met Tiffany; the other

13 two I met the day that I went to Robert's house.

14 Q    Okay.  How many people -- so, it's -- just so we're

15 clear, it's you and Tiffany that go to the apartment.

16       And then how many other people go to the apartment?

17 A    There are two other young ladies that go along with us.

18 Q    Okay.  Now, when you and Tiffany and the two other young

19 ladies arrive at the apartment, was there anyone at the

20 apartment when you arrived?

21 A    Yes, there was.

22 Q    And when you got to the apartment, did you know anyone

23 who was present inside the apartment when you arrived at that

24 time?

25 A    No, I did not.

Angela - direct - Shihata                                    3278

1   Q    Did you learn any of their nicknames while you were in

2   the apartment?

3   A    Yes, I did.

4   Q    And over the years that you knew the defendant, did you

5   see these individuals again?

6   A    Yes, I did, ma'am.

7   Q    And did you later learn their real names?

8   A    Yes, I did, ma'am.

9   Q    Who do you recall was present at the apartment when you

10  arrived that first time with Tiffany and the two other young

11  ladies?

12  A    Bruce Kelly was at the apartment.  Demetrius Smith was at

13  the apartment.  Larry Hood was at the apartment.

14  Q    And was the defendant at the apartment?

15  A    Yes, the defendant was also at the apartment.

16  Q    Now, what, if any -- what, if any, nickname did you know

17  Demetrius Smith by?

18  A    We called Demetrius Smith "Johnny."

19  Q    And I am showing you Government Exhibit 6.

20       Do you recognize this person?

21  A    That's Demetrius Smith.

22       THE COURT:  I don't know that --

23       MS. SHIHATA:  And this can be published.

24       THE COURTROOM DEPUTY:  Oh, I'm sorry.

25       (Exhibit published.)

Angela - direct - Shihata                    3279

1    BY MS. SHIHATA:

2    Q    And you mentioned -- well, I am showing you Government

3    Exhibit 2.

4              (Exhibit published.)

5    Q    Do you recognize this person?

6    A    That's BK.

7    Q    And that was his nickname?

8    A    That's his nickname.  His government name is Bruce Kelly.

9    Q    And what, if any, relation to the defendant does Bruce

10   Kelly have?

11   A    Bruce Kelly is Robert Kelly's older brother.

12   Q    And you previously identified a photo of Demetrius Smith.

13             Over the years that you knew the defendant, did you

14   learn what, if any, role Demetrius Smith had with respect to

15   the defendant?

16   A    Yes, ma'am.

17   Q    And what was that?

18   A    Demetrius was Robert's road manager.

19             MS. SHIHATA:  I am showing the witness only what's

20   been marked for identification as Government Exhibit 92.

21   BY MS. SHIHATA:

22   Q    Do you recognize this person?

23   A    Yes, I do.

24   Q    And who is that?

25   A    That is Larry Hood.

SAM    OCR    RMR    CRR    RPR

A 1165

Angela - direct - Shihata                    3280

1           MS. SHIHATA:  I move to admit Government Exhibit 92.

2           MR. CANNICK:  No objection.

3           THE COURT:  Okay, that's in evidence.

4           (Government's Exhibit 92 was received in evidence.)

5           MS. SHIHATA:  And may we publish?

6           THE COURT:  Yes.

7           (Exhibit published.)

8    BY MS. SHIHATA:

9    Q    And was Larry Hood also present that day, along with

10   Bruce Kelly and Demetrius Smith, when you first went to the

11   defendant's apartment?

12   A    That is correct.

13   Q    And over the years that you knew the defendant, did you

14   learn what, if any, relationship the defendant had with Larry

15   Hood?

16   A    Yes, I did, ma'am.

17   Q    And what was that?

18   A    That is Robert's childhood best friend.

19   Q    And at some point did you learn whether Larry Hood became

20   employed by the City of Chicago in any capacity?

21   A    Yes, ma'am.

22   Q    And what capacity was that?

23   A    He was a Chicago police officer.

24   Q    Now, after you, Tiffany, and the two other young ladies

25   got to the defendant's apartment that first time, what

1  happened?

2  A    When we arrived at the apartment, we entered the space.

3  We sat down and we actually played Yo Mama jokes and the

4  dozens.

5  Q    And what does it mean to play the dozens?

6  A    That means to signify, to talk about each other in a

7  playful way.

8  Q    Okay.  Fair to say you were joking around?

9  A    Yes, ma'am.

10 Q    And who was participating in that?

11 A    Everyone that was there at that time, ma'am.

12 Q    Okay.  So, the people that you identified already that

13 were present at the apartment when you arrived, as well as you

14 and the three other girls?

15 A    That is correct, ma'am.

16 Q    And do you recall about how long that went on for?

17 A    Maybe an hour or so.  I don't recall the exact amount of

18 time, but a sizeable amount.

19 Q    And at some point did the defendant go -- well,

20 withdrawn.

21       Where -- do you recall where that joking around

22 occurred, where in the apartment?

23 A    In a communal space in the apartment, right across from

24 where the kitchen is.

25 Q    And at some point did the defendant go into another room

Angela - direct - Shihata                    3282

1   of the apartment?

2   A    Yes, he did.

3   Q    And after the defendant went into another room, who, if

4   anyone else, went into the same room as him?

5   A    All of us, one by one.

6   Q    And when you say "all of us," who are you referring to

7   specifically?

8   A    All of the young ladies that were in the home.  None of

9   the gentlemen moved, outside of the defendant.

10  Q    Okay.  And so, at some point did you go inside the room?

11  A    Yes, ma'am, I did.

12  Q    And do you recall how that came about?

13  A    I don't recall if it was Tiffany or if it was Robert that

14  invited me into the room, but I was asked to come into the

15  room.

16  Q    And what, if anything, did you observe once you entered

17  the room?

18  A    When I entered the room, three of the other young ladies

19  were stationed in different spots.  One of them was unrobing,

20  the other one was standing there, and the other one was also

21  taking off her shirt.

22  Q    And when you say "unrobing," do you mean taking off her

23  clothes?

24  A    Yes, ma'am.

25  Q    What, if anything, did the defendant say to you after you

Angela - direct - Shihata                    3283

1  entered the room?

2  A    He asked me to climb on top of him.

3  Q    And what happened next?

4  A    I paused for a moment.  I was a little startled.  I

5  wasn't really sure what I should do, but then I did exactly

6  what he asked me to do.

7  Q    And what happened after you climbed on top of the

8  defendant?

9  A    I asked the defendant -- actually, the defendant asked me

10 to straddle him and to ride him, and I asked him if I could

11 grab a condom.

12            THE COURT:  Could I just ask, at this point what

13 were you wearing?

14            THE WITNESS:  I had on a dress.

15 BY MS. SHIHATA:

16 Q    And how old were you at this time, approximately?

17 A    Between 14 and 15.  It's close -- I would assume closer

18 to 15 since it's the break between freshman and sophomore

19 year.

20 Q    And after you asked about getting a condom, what

21 happened?

22 A    The defendant said he didn't have any.

23 Q    And what happened next?

24 A    I said I had one.

25 Q    And what, if anything, did you do?

Angela - direct - Shihata                    3284

1   A    I asked to get it.  I don't recall if I retrieved it or I

2   had my friend retrieve it, my bag.

3   Q    Okay.  And after that, what happened?

4   A    After that, I proceeded to put the condom on the

5   gentleman and then I straddled him.

6   Q    And did the defendant have sexual intercourse with you

7   that day?

8   A    Yes, he did.

9   Q    And was that vaginal penetration?

10  A    Yes, it was.

11  Q    And who, if anyone else, was in the room when that

12  happened?

13  A    Tiffany and the other two young ladies, as well.

14  Q    After the defendant had intercourse with you, do you

15  recall anything else that happened in the room that day?

16  A    The defendant had intercourse with more than one of us,

17  and there was sexual contact with all of us.

18  Q    When you say "sexual contact," what do you mean?

19  A    One young lady's breasts were caressed, the other young

20  lady's breasts were suckled, and one young lady was fingered.

21  Q    And was that all by the defendant?

22  A    Yes, ma'am.

23  Q    Now, at some point did you leave the room?

24  A    We all did, ma'am.

25  Q    And when you left the room, were Demetrius Smith, Bruce

Angela - direct - Shihata                     3285

1    Kelly and Larry Hood still in the apartment?

2    A    Yes, they were.

3    Q    Now, at some point did you leave the defendant's

4    apartment that day?

5    A    Yes, we did.

6    Q    By the way, do you recall around what time of day you

7    went to the defendant's apartment?

8    A    It was night, ma'am.

9    Q    Now, before you left the apartment, do you recall whether

10   the defendant said anything to you and Tiffany and the other

11   two girls?

12   A    Yes, he invited us to come back the following day.

13   Q    And did you go back the following day?

14   A    Yes, we did.

15   Q    How often did you see the defendant after that?

16   A    Every day for quite a few years.

17   Q    And at what locations did you generally see him?

18   A    If we weren't at the apartment, we were at CRC Recording

19   Company in Chicago, Illinois, downtown.

20   Q    And is CRC Recording Company, is that a recording studio?

21   A    Yes, it is.

22   Q    And do you recall where that studio's located?

23   A    I believe the first address is 232, where the Apple store

24   is located, downtown Chicago.

25            The other one is a block east of that, closer to

Angela - direct - Shihata                    3286

1  McClurg Court on the opposite side, north side of the street,

2  and it is also Chicago Recording Company.

3  Q    Okay, and you said a number 232 when you said where the

4  Apple store is.

5         Is the location now where an Apple store is in

6  Chicago?

7  A    The location is no longer a recording studio, it is now

8  the Apple store.

9  Q    And do you remember what street, 232 of what street?

10 A    It's Michigan Avenue and Eire, I believe.

11 Q    Okay.  And how about the other location?

12 A    It's also -- actually, no, I'm wrong.  That's Ohio, Ohio

13 and -- right before you get to the lake.

14 Q    Okay.

15        And who, if anyone, did you generally go to these

16 locations with to see the defendant?

17 A    Tiffany and myself were together every day, and a

18 different assortment of young ladies on a regular basis.

19 Q    Now, at some point did you stop going to school?

20 A    Yes, ma'am.

21 Q    And why did you stop going to school?

22 A    We were given an option, we were either gonna sing or we

23 were gonna go to school.

24 Q    And who gave you that option?

25 A    Robert did.

Angela - direct - Shihata                    3287

1  Q    What, if any, discussions do you recall having with the
2  defendant about that?
3  A    We were leaving or trying to attempt to leave one day and
4  he was like:  Where are you, guys, going?
5            And we were like:  We gotta go to school tomorrow.
6            And he was like:  Well, look, if you guys are gonna
7  sing, you're gonna sing.  You don't have time for school.  So,
8  you're either gonna sing or you're gonna go to school.
9            And we made a decision to sing.
10 Q    Now, apart from the first time you met the defendant that
11 you've already testified about, were there other times that
12 the defendant had sexual intercourse with you?
13 A    Yes, there was.
14 Q    And do you recall on how many occasions that occurred?
15 A    No, I do not.
16 Q    Was it multiple occasions?
17 A    Yes, it was.
18 Q    And do you recall the locations where sexual intercourse
19 with the defendant occurred?
20 A    It was either at the apartment, at the studio, and there
21 were a few times while we were on the road.
22 Q    Now, other than sexual intercourse, did the defendant
23 ever touch you in other ways?
24 A    Outside of fondling , no.
25 Q    Okay, but fondling was one of the ways?

Angela - direct - Shihata                    3288

1   A    Yes, ma'am.

2   Q    Now, you testified you went -- that apartment that you

3   initially went to when you met the defendant, you went there

4   on multiple occasions, is that correct?

5   A    Yes, ma'am.

6   Q    And can you describe for the jury kind of how big of an

7   apartment it was?

8   A    It's a small apartment.  If I recall correctly, there are

9   two bedrooms, one communal space and a kitchen, and a

10  bathroom.

11  Q    Now, you testified that there were multiple occasions

12  where you had sexual intercourse with the defendant.

13       About how old were you over the span of time that

14  you had sexual intercourse with the defendant?

15  A    Roughly, 15, 16, 17.

16  Q    And did you want to have sexual intercourse with the

17  defendant?

18  A    No.

19  Q    Why did you do so?

20  A    Keep in mind, I just met the young ladies the day before.

21  I wasn't sure whether or not I was getting ready to get jumped

22  on, so...

23  Q    Okay, so that's the first occasion?

24  A    Yes, ma'am.

25  Q    You testified you had intercourse with him again after

Angela - direct - Shihata                    3289

1   that, is that right?

2   A    Yes, ma'am.

3   Q    Why did you do so?

4   A    He told us that we had to pay our dues.  It was a

5   requirement to be around.

6

7                (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Angela - direct - Shihata                    3290

1  BY MS. SHIHATA:  (Continuing.)

2  Q    Now, did the defendant ever ask you to bring other girls

3  around?

4  A    Yes, he did.

5  Q    What do you recall him saying?

6  A    Get me some girls or bring me some new talent.

7  Q    Now, at a certain point did the defendant's sexual

8  interactions with you become less frequent?

9  A    Yes, ma'am.

10  Q    And do you recall around when that happened?

11  A    '92-ish going into '93.

12  Q    Did there come a time when the defendant employed you?

13  A    Yes, ma'am.

14  Q    In what capacity?

15  A    As a dancer.

16  Q    And as a dancer for what?

17  A    On the road for touring.  We were the first set of road

18  dancers.

19  Q    And around when was that?

20  A    '92.

21  Q    About how old were you then?

22  A    Sixteen.

23  Q    Did you travel with the defendant as one of his backup

24  dancers?

25  A    Yes, I did.

Angela - direct - Shihata                    3291

1  Q    And how would you travel with him on the road?

2  A    We traveled via tour bus.

3  Q    When you were working as a backup dancer for the

4  defendant, were you paid?

5  A    Yes and no.

6  Q    What do you mean by that?

7  A    We were given a per diem which was an amount of money

8  that you use for food while we were out on the road and we

9  were given cash.  Any time we were given any form of a check,

10  it never went through.

11  Q    What do you mean it never went through?

12  A    It would bounce.  Oak Street Bank, Chicago, Illinois.

13  Q    I'm showing you what's marked as Government Exhibit 54.

14        (Exhibit published.)

15  Q    Do you recognize this person?

16  A    Yes, I do.

17  Q    Who do you recognize this person to be?

18  A    That is Aaliyah Dana Haughton.

19  Q    Have you met Aaliyah in person?

20  A    Yes, I have.

21  Q    Is Aaliyah currently deceased?

22  A    Yes, she is.

23  Q    Do you know around when she passed away?

24  A    Early 2000s, August 25, I believe, 2001.  I could be

25  wrong about the year.

Angela - direct - Shihata                    3292

1   Q    And do you know how she passed away?

2   A    In a plane crash.

3   Q    Around when did you first meet Aaliyah?

4   A    January of 1992.

5   Q    Prior to meeting Aaliyah, had the defendant spoken to you

6   about her?

7   A    Yes, he did.

8   Q    What had the defendant told you about Aaliyah before you

9   met her?

10  A    That she was the next up and coming artist, the next

11  hottest wave coming out of Detroit.

12  Q    And who, if anyone, introduced you to Aaliyah?

13  A    Robert did.

14  Q    The defendant?

15  A    Yes, ma'am.

16  Q    Do you recall where you were when you first met her?

17  A    CRC Studios.

18  Q    And do you recall who if anyone else was there when you

19  first met her?

20  A    It was Aaliyah, it was Robert.  It was also her brother

21  Rashad and that was it.

22  Q    Were any of your other friends there?

23  A    Yes, ma'am.

24  Q    And who was that or, well, actually, was Tiffany there?

25  A    Yes, she was.

Angela - direct - Shihata          3293

1  Q    And was any -- without saying the names, was anyone else

2  there?

3  A    Yes, she was.

4  Q    And you mentioned someone's brother Rashad.  Whose

5  brother was that?

6  A    Rashad is Aaliyah's brother.

7  Q    Is that an older brother?

8  A    Yes, he is.

9  Q    Now, you had testified -- you testified earlier that at a

10 certain point you stopped going to school because you were

11 given a choice between school and singing; is that right?

12 A    That is correct.

13 Q    And at that point were you singing with anybody else?

14 A    I don't understand the question.

15 Q    Sure.  Were there any other girls that you were singing

16 with?

17 A    Yes, ma'am.

18 Q    And was one of those girls Tiffany?

19 A    Yes, ma'am.

20 Q    And was there a third person that you were singing with

21 as well?

22 A    Yes, ma'am.

23 Q    Now, was it those two girls, Tiffany and the other girl,

24 that were with you when you met Aaliyah?

25 A    Yes, ma'am.

Angela - direct - Shihata                    3294

1          MS. SHIHATA:  I'm showing the witness only what's
2    been marked for identification as Government Exhibit 964
3          (Exhibit published to witness only.)
4    BY MS. SHIHATA:
5    Q    Do you recognize this photo?
6    A    Yes, I do.
7    Q    Does this photo include you, Tiffany and the third person
8    that was in your singing group?
9    A    Yes, it does.
10   Q    And is that person's face blurred out, that third person?
11   A    Yes, it is.
12         MS. SHIHATA:  The Government offers, for the jury
13   only, Government Exhibit 964
14         MR. CANNICK:  Just one question.  Are these members
15   of the singing group or dancers?
16         THE COURT:  The witness would know the answer to
17   that?
18         THE WITNESS:  Members of the singing group.
19         MR. CANNICK:  No objection.
20         THE COURT:  Okay.
21         (Government Exhibit 964 received in evidence.)
22         MS. SHIHATA:  If we could publish to the jury only.
23         (Exhibit published for jury only.)
24   BY MS. SHIHATA:
25   Q    And where I am pointing on the left of the photograph, is

Angela - direct - Shihata                    3295

1   that you?

2   A    Yes, it is.

3   Q    And on the right of the photograph, is that Tiffany?

4   A    Yes, it is.

5   Q    And in the middle is the third member of the group?

6   A    Yes, it is.

7   Q    Now, when the three of you met Aaliyah and her brother

8   Rashad, what, if anything, did the defendant tell Aaliyah

9   about the three of you?

10           MR. CANNICK:  Objection.

11           THE COURT:  Were you present when he said something?

12           THE WITNESS:  Yes, ma'am.

13           THE COURT:  Okay, overruled.

14   BY MS. SHIHATA:

15   Q    And what did he say?

16   A    He told her that we were going to be her background just

17   like he had Public Announcement, we were going to be her

18   background as well.

19   Q    You mentioned Public Announcement.  What is that?

20   A    Public Announcement is a group that used to sing

21   background and dance with Robert as well.

22   Q    And do you recall whether the defendant said anything

23   else to Aaliyah about the three of you?

24   A    He told her that we were going to give her her street

25   vibe and that we were going to be there to be her friends as

Angela - direct - Shihata                    3296

1   well.

2   Q    Now, at some point around the time that you met Aaliyah,

3   did the defendant name your girl group after that?

4   A    Yes, he did.

5   Q    And what did he call it?

6   A    Second Chapter.

7   Q    Now, do you recall anything specific about the day you

8   met Aaliyah?

9   A    It was her birthday.

10  Q    And do you recall whether the defendant said anything

11  about what birthday it was?

12  A    He told us exactly how old she was going to be that year.

13  Q    And to the best of your recollection, how old did you

14  believe her to be at that time?

15  A    She was 12.

16  Q    Now, did you see Aaliyah again after that?

17  A    Regularly, daily.

18  Q    And what types of places would you see Aaliyah at?

19  A    At the studio, at the hotel.  We would sneak her out,

20  take her on the train, to my dad's house.  Riding all around

21  the south side of Chicago, Tiffany and myself.

22  Q    And what was Aaliyah doing in Chicago during that time

23  period?

24  A    Aaliyah was working on her first album.

25  Q    And are you aware of who, if anyone, wrote and produced

Angela - direct - Shihata                    3297

1  that album?

2  A    Yes, I am.

3  Q    And who is that?

4  A    Robert.

5  Q    And do you know what that album was called?

6  A    *Age Ain't Nothing But a Number*.

7  Q    Now, when Aaliyah was in Chicago working on her album, do

8  you know where she stayed?

9  A    At the Inn of Chicago, Best Inn of Chicago, directly

10 across the street from CRC Studios.

11 Q    And who, if anyone, came with Aaliyah to Chicago?

12 A    Her mother occasionally, but she had a chaperone as well.

13 Q    And did you ever meet the chaperone?

14 A    Yes, I did.

15 Q    Was her chaperone always around?

16 A    No, she was not.

17 Q    And did her older brother Rashad also travel with her

18 sometimes as well?

19 A    Yes, he did.

20 Q    Was he always around?

21 A    No, he was not.

22 Q    Now, you testified earlier that you were employed as a

23 backup dancer on certain tours with the defendant; is that

24 right?

25 A    That is correct.

Angela - direct - Shihata                    3298

1  Q    Do you recall a tour that you worked as a backup dancer
2  on where a performer called Gerald Levert was also on tour
3  with the defendant?
4  A    Yes, I do.
5  Q    To the best of your recollection around when do you
6  recall that tour being?
7  A    '93-ish.
8  Q    And approximately how old were you at that time?
9  A    Maybe 17.
10 Q    And how --
11 A    It's between '92 and '93.  I'm not sure, but between
12 those two years.  So between 16 or 17.
13 Q    Fair to say you are not -- sitting here today in 2021
14 you're not sure of the exact date of that tour?
15 A    That is correct.
16 Q    Now, how did you travel from city to city?
17 A    By tour bus.
18 Q    And was there more than one tour bus traveling from city
19 to city?
20 A    Yes, there was.
21 Q    Do you remember anything about the tour bus you traveled
22 on, what it looked like?
23 A    Yes, ma'am.
24 Q    What do you recall about that tour bus?
25 A    There are small tables and couch-like chairs in the very

Angela - direct - Shihata                3299

1  front.  There are sleeping bunks that are on either side of

2  the bus and at the very rear of the bus is the main cabin and

3  there's also a bathroom as well.

4  Q   Now, do you recall a tour stop during that tour in

5  Washington, D.C.?

6  A   Yes, I do.

7  Q   And about how long were you in Washington, D.C. for that

8  tour stop?

9  A   A couple of days.

10 Q   And after you got to Washington, D.C., where did you

11 stay?

12 A   I don't recall what hotel we stayed in, ma'am.

13 Q   But it was at a hotel?

14 A   Yes, ma'am.

15 Q   And did the defendant become upset with you at any point

16 while you were at that tour stop in D.C.?

17 A   Yes, he did.

18 Q   Was that once or more than once?

19 A   It was more than one occasion, ma'am.

20 Q   Do you recall what happened the first time he became

21 upset with you while at that tour stop?

22 A   Yes, I do, ma'am.

23 Q   What do you recall about that?

24 A   I recall that myself, Tiffany, Aaliyah and one of the

25 other dancers, Gerald Levert had a swim party, a splash party

Angela - direct - Shihata                    3300

1   and we went to the splash party.  We were in the swimming pool

2   and the defendant came and got us out of the pool.

3   Q    And did he say anything about why he was upset?

4   A    Yes, we were always instructed not to associate with

5   other artists on the tour.  He was always afraid that someone

6   may do something --

7            MR. CANNICK:  Objection.

8            Your Honor, I objected to that.

9            MS. SHIHATA:  I think there was an objection, Judge.

10           THE COURT:  I did not hear it.  I'm sorry.

11           Well, sustain it as to the last part, he was always

12   afraid.

13           But did he tell you not to associate with other

14   people?

15           THE WITNESS:  Yes, he did.

16           THE COURT:  And did he tell you why?

17           THE WITNESS:  Yes, he did.

18           THE COURT:  What did he say?

19           THE WITNESS:  He didn't want anybody dropping drugs

20   on his tour bus.  He always felt that people were out to get

21   him.

22           MR. CANNICK:  I withdraw my objection.

23           THE COURT:  Okay.

24   BY MS. SHIHATA:

25   Q    Did he say anything specific about the pool party why he

Angela - direct - Shihata                    3301

1  didn't want you at the pool party?

2  A    He didn't want us communicating or congregating with

3  other artists, period.

4  Q    And when you say other artists, is that any other artist

5  or certain types of artists?

6  A    Any other artist.  He didn't like people looking at his

7  girls.

8  Q    Now, you mentioned that there was another time that the

9  defendant got upset with you during that tour stop; is that

10 right?

11 A    That is correct.

12 Q    And what do you recall about that second time he became

13 upset?

14 A    After he got us out of the pool, they were attending an

15 after party for himself so --

16 Q    Who is the "they" that you're referring to?

17 A    Public Announcement, R. Kelly and the entourage of people

18 that were allowed to go to the after party.

19 Q    And were those people men?

20 A    Yes, ma'am.

21 Q    Okay, continue.

22 A    We were told to stay put and not to leave the hotel or

23 our rooms and we decided to go out for food.

24 Q    And you say we were told, who is the "we" in that

25 sentence?

Angela - direct - Shihata                    3302

1  A    All of us, all of the dancers including Aaliyah were told

2  to stay put and not leave the hotel and Tiffany as well.

3  Q    And what, if anything, was Aaliyah doing on this trip to

4  D.C.?

5  A    She was seeing what traveling road life was like.  She

6  was protege.  At the time she wasn't performing but she was

7  getting her feet wet.

8  Q    You said you went to get food.  Do you recall where you

9  went?

10 A    We went to the 7-11.

11 Q    And what happened after you went to the 7-11?

12 A    We thought we were lost on our way coming back.

13 Q    And what happened then?

14 A    We were trying to find our way back, making a bunch of

15 noise walking over the bridge, and we saw a group of guys.  We

16 weren't sure who they were.  Aaliyah started freaking out

17 saying we shouldn't have left.  Robert told us don't leave.

18 In the interim, we realized that it was Robert and the rest of

19 the guys.

20 Q    That was the group of guys you saw?

21 A    Yes, ma'am.

22 Q    And what happened after that?

23 A    Once we got back to the hotel lobby, Robert told all of

24 us we would have to put out that night.

25 Q    What did you understand him to mean by "put out"?

Angela - direct - Shihata                    3303

1   A    It was dues time.

2              THE COURT:  What does that mean, dues time?

3              THE WITNESS:  When Robert tells you that you have to

4   pay your dues, that means he wants to have sexual contact or

5   sexual intercourse with you.

6   BY MS. SHIHATA:

7   Q    Now, you testified earlier that at a certain point after

8   you met the defendant, the frequency of your sexual

9   interactions with him diminished; is that right?

10  A    Yes, ma'am.

11  Q    And while you were -- at the time that you were in D.C.

12  the events you just described, had it been a while since the

13  defendant had engaged with in sexual intercourse with you at

14  that point?

15  A    Sexual intercourse, yes; sexual contact, no.

16  Q    Okay.  And by sexual contact, what do you mean?

17  A    He would still ask me to take my clothes off and dance

18  periodically and still fondle.

19  Q    Now, did you end up engaging in sexual intercourse with

20  him that night?

21  A    No, ma'am, I did not.

22  Q    And what happened?

23  A    He let us -- he told us that he would let us know when it

24  was time for us to come up and when he told me to come up,

25  when I got off the elevator before we got to the room, I said

Angela - direct - Shihata                                    3304

1   I wasn't doing it that time.

2   Q    And how did he respond?

3   A    He said he was going to send me home.

4   Q    And what happened next?

5   A    I told him I would call my mom and she would have me home

6   on a private jet faster than he could get me there on a

7   commercial plane and he responded:  I was just joking.

8   Q    Did you end up staying on the tour?

9   A    Yes, I did.

10  Q    Now, did there come a point in time when -- while you

11  were in D.C. at that tour stop where you were playing pranks?

12  Is that a yes?

13  A    Yes, ma'am.

14  Q    And were you playing pranks by yourself or with someone

15  else?

16  A    I was playing pranks with someone else.

17  Q    Okay.  And what kind of pranks were you playing at that

18  time?

19  A    On that particular day we were tossing water.

20  Q    Can you explain what you mean by that?

21  A    Should I start with how the game starts --

22  Q    Well, let's start --

23  A    -- or that specific day?

24        THE COURT:  What do you mean by tossing water, water

25  balloons?

Angela - direct - Shihata                    3305

1           THE WITNESS:  No just water out of a cup or the ice

2    buckets from the hotel.

3           THE COURT:  Go ahead.

4    BY MS. SHIHATA:

5    Q     What happened that day with respect to the prank playing

6    and the water?

7    A     Well, we had a game that we would play on the bus called

8    All Out GD Fucking.  And that was like a truth or dare.

9    Somebody would dare you to do something crazy or you would

10   have to tell the truth, but the name that Robert gave it was

11   All Out GD Fucking.  And so this particular day we were going

12   to get them back.  Robert has a thing where he likes to play

13   jokes.  He'll put salt or pepper in your nose or your mouth or

14   put your hand in warm water so you pee on yourself, things

15   like that.

16          And so this particular day we were going to get the

17   guys back.  And so we started at the hotel and we started with

18   Public Announcement having the maids open their doors and

19   tossing water into their rooms.

20   Q     And at some point you decide to continue this game or

21   this prank playing on the tour bus?

22   A     Yes, we did.  We were in the process of getting ready to

23   leave for a show and people were moving about, in and out of

24   bus, and we got wind that Robert was in his quadrant and we

25   were going to go and toss water on him.

Angela - direct - Shihata                    3306

1  Q    And when you say his quadrant, what are you referring to?

2  A    There's a main cabin at the rear of the bus where he

3  slept.

4  Q    And what, if anything, happened after you got on the bus?

5  A    I proceeded to the rear of the cabin.  I slightly opened

6  the door and saw --

7  Q    Which door did you open?

8  A    The door to the main cabin.

9  Q    And what, if anything, did you see after you opened that

10  door?

11  A    I saw Robert and Aaliyah in a sexual situation.

12  Q    And what specifically did you see?

13  A    It appeared that he had his head up in between her legs

14  and was giving her oral sex.

15  Q    And do you recall where in the room that was when that

16  was happening?

17  A    There's a small portion that you can sit on and that's

18  where she was sitting.  Just like a little couch thing.  It's

19  a small sitting area.  I don't know if you would call it a

20  couch.

21  Q    And how was Aaliyah seated on the couch?

22  A    She was seated with her legs open.

23  Q    Was she seated upright?

24  A    Upright, yes, ma'am.

25  Q    And where did you see the defendant?

Angela - direct - Shihata                3307

1   A    On his knees, ma'am.

2   Q    And where was his head?

3   A    In between her legs.

4   Q    In her vaginal area?

5   A    That's what it appeared to me, ma'am.

6   Q    What did you do after seeing that?

7   A    I closed the door abruptly and pushed the other girl

8   behind me away from the door.

9   Q    Now, prior to that date, did you know that the defendant

10  was engaged sexually with Aaliyah?

11           MR. CANNICK:  Objection?

12           PROSPECTIVE JUROR:  No, I did not.

13           THE COURT:  Overruled.

14  BY MS. SHIHATA:

15  Q    Did you ever talk to the defendant about what you saw

16  that day?

17  A    No, I did not.

18  Q    At some point did you stop working as a dancer for the

19  defendant?

20  A    Yes, I did.

21  Q    And around when was that?

22  A    Right before the Download Tour.

23  Q    Do you recall around when that was?

24  A    Mid-'90s.  I'm not certain what year.

25  Q    After you stopped working as a dancer for the defendant,

Angela - direct - Shihata                    3308

1  did you continue to work with any other artists that were

2  affiliated with him after that?

3  A    Yes, I did.

4  Q    Which artist did you work with?

5  A    I danced for Sparkle.

6  Q    You were a dancer for an artist named Sparkle?

7  A    Yes, ma'am.

8  Q    And in that capacity did you sometimes continue to see

9  the defendant?

10 A    Yes, I did.

11 Q    At what types of locations?

12 A    In passing, the studio.

13 Q    Are you familiar with a docuseries called *Surviving*

14 *R. Kelly*?

15 A    Yes, I am.

16 Q    Did you participate in that docuseries?

17 A    Yes, I did.

18 Q    What, if anything, did you provide to the producers of

19 that docuseries?

20 A    Photographs only.

21 Q    What types of photographs did you provide?

22 A    Of me during that time period.

23 Q    And what, if anything, did you receive for those -- for

24 the use of those photographs?

25 A    I don't recall the amount.

Angela - direct - Shihata                          3309

1    Q    Did you receive money?

2    A    Yes, I did.

3    Q    You don't recall about how much?

4    A    I don't recall the exact amount.

5    Q    Do you have an estimate of how much?

6    A    A few grand.

7    Q    Did you talk about Aaliyah on *Surviving R. Kelly*?

8    A    Yes, I did.

9    Q    And did you talk about the defendant having sex with you

10   as a minor on the docuseries?

11   A    No, I did not.

12   Q    Why not?

13            MR. CANNICK:  Objection.

14            THE COURT:  Overruled?

15            PROSPECTIVE JUROR:  I was embarrassed.  I never

16   wanted anyone to know that I had been in that situation at

17   all.

18   Q    Now, during the course of time that you knew and spent

19   time with the defendant what, if anything, did he say about

20   protecting him?

21   A    We were taught from day one to protect Robert and that

22   people were always out to get him.  So from day one we were

23   told to make sure that we protected him.

24            MS. SHIHATA:  One moment, Your Honor.

25            Nothing further.

Angela1 - cross - Cannick                          3310

1          THE COURT:  Cross-examination?

2          MR. CANNICK:  Yes, briefly, Your Honor.

3   CROSS-EXAMINATION

4   BY MR. CANNICK:

5   Q    What year was it that you were hired to be a dancer for

6   Robert?

7   A    1992.

8   Q    And how old were you then?

9   A    16, roughly.

10  Q    And who hired you?

11  A    Robert.

12  Q    Did you have a contract?

13  A    No.

14  Q    You went on the road with him?

15  A    Yes, I did.

16  Q    And did you perform in any videos with him?

17  A    Yes, I have.

18  Q    So then if we were to look we would find your name on the

19  credit side of these performances; am I correct?

20  A    No, you would not.

21  Q    We would not.  We would not because you didn't do it;

22  right?

23  A    That's incorrect, sir.

24  Q    So you are telling us that you performed with him on

25  videos but we would not see you receiving any credit for it on

Angela1 - cross - Cannick                         3311

1    the video label?

2    A    I don't know if tour dancers get credits on concerts that

3    are recorded that people perform in.

4    Q    I didn't ask you about concerts.  You testified and told

5    us just a short while ago that you performed on videos with

6    him.

7    A    Perhaps maybe I didn't understand you.  When you say

8    video do you mean a music video or do you mean being in a

9    concert and those videos being recorded and then replayed?

10   Q    Ma'am --

11        THE COURT:  Can you clarify that question?

12   A    Please.

13   Q    Ma'am, when you think of a music video what do you think

14   of?

15        MS. SHIHATA:  Objection.

16        THE COURT:  Sustained.

17        Just clarify what the difference is.

18        Were you ever on a video like on MTV, a non-concert

19   video?

20        THE WITNESS:  No.

21   BY MR. CANNICK:

22   Q    On those videos are dancers; correct?

23   A    The majority of his music videos in the early 90s didn't

24   have dancers in the videos.

25        THE COURT:  Just do your best to answer the question

Angela1 - cross - Cannick                          3312

1   that he's asking?

2              PROSPECTIVE JUROR:  I'm sorry, sir.

3              THE COURT:  Just put the question again.

4   BY MR. CANNICK:

5   Q    I'm not asking about the majority.  On the video there

6   are dancers; am I correct?

7   A    Well, that would be a two-part question, sir.  A part of

8   that would be yes and a part of that would be no.  Some videos

9   have dancers and some videos do not.

10  Q    So, now where was it that you would perform with Robert?

11  A    I was a tour dancer, sir, over several states.

12  Q    Again, my question is -- withdrawn.

13             Did you perform with him in arenas?

14  A    Yes.  Let me ask you, are theaters and arenas the same

15  thing, sir, so I have clarity.

16             THE COURT:  If you don't want to clarify, don't.

17  BY MR. CANNICK:

18  Q    Tell us the venues that you performed in with him.

19  A    Sir, you just asked me that --

20  Q    The venues.

21             THE COURT:  He didn't say videos?

22             PROSPECTIVE JUROR:  I don't recall the names of the

23  venues.  That was 25 years ago.  Chicago Theater is one.

24  That's because I'm from Chicago and it was a really big deal

25  that he was at the Chicago Theater and we were excited to be

SN        OCR        RPR

A 1198

1    there.

2    Q    I'm sure you were excited to be at the other venues as

3    well; correct?

4    A    Yes, but I don't recall the names of the venues, sir.  I

5    do apologize.

6    Q    You said you performed with him in D.C., do you remember

7    telling us that?

8    A    That is correct.

9    Q    What kind of venue was it in D.C.?

10   A    We did several different things, even a high school.

11   Q    Again, when you said you did several types of things, did

12   you perform in arenas?

13   A    We performed in arenas, we performed in high schools.

14   We've performed in gyms.

15   Q    Did you perform in a nightclub?

16   A    No, sir we did not.

17   Q    And when you say you performed in an arena, did you have

18   a recollection as to which arena?

19   A    No, sir, I do not.

20   Q    And do you recall performing in arenas that had -- where

21   they also played basketball?

22   A    That's correct and I also remember the Ohio State Fair.

23   Q    Now, the arenas that you performed in, you were still 15,

24   16 years old when you were performing?

25   A    That is correct, sir.

Angela1 - cross - Cannick                3314

1  Q    And the arenas had no age requirements for performers?

2  A    I wouldn't be aware of that, sir.

3  Q    Well, you do know that Aaliyah was not allowed to perform

4  in certain arenas because of her age; correct?

5           MS. SHIHATA:  Objection.

6           THE COURT:  Sustained as to form.

7  Q    Were you aware that Aaliyah wasn't able to perform in

8  certain arenas with Robert because of her age?

9  A    I think I specified earlier --

10 Q    I --

11          THE COURT:  Mr. Cannick.

12          The question is do you know whether or not she was

13 prohibited from performing because of her age.

14          THE WITNESS:  I do not.

15 BY MR. CANNICK:

16 Q    Are you aware that arenas have age requirements that

17 underage folks are not allowed to perform?

18 A    I wouldn't be aware of that, sir.

19 Q    Now, when did you hire a lawyer?

20 A    Last year, sir.

21 Q    And when was it that you were engaged by *Surviving*

22 *R. Kelly*?

23 A    That was in 2018, sir.

24 Q    And you testified and told us that on that show where you

25 were paid money to provide photographs, you did not tell

Angela - redirect - Shihata                          3315

1  anyone on that show that Robert Kelly assaulted you sexually?

2  A    That is correct, sir.

3            MR. CANNICK:  Nothing further.

4            THE COURT:  Any redirect?

5            MS. SHIHATA:  Just briefly, Your Honor.

6            THE COURT:  Okay.

7  REDIRECT EXAMINATION

8  BY MS. SHIHATA:

9  Q    Have you been asked in other media outlets whether

10 anything occurred between you and Robert Kelly sexually?

11 A    Yes, I have, sir -- I mean, ma'am.  I'm sorry.

12           MR. CANNICK:  Objection.

13 Q    And how if at all did you respond on those occasions?

14           MR. CANNICK:  Objection.

15           THE COURT:  Could I see the parties at the side just

16 for a moment, please?

17           (Sidebar held outside of the hearing of the jury.)

18           (Continued on next page.)

19

20

21

22

23

24

25

Sidebar                                                           3316

1          (The following sidebar took place outside the

2      hearing of the jury.)

3          THE COURT:  What is your objection?

4          MR. CANNICK:  It's beyond the scope of cross.  She

5      asked specifically about *Surviving R. Kelly* and I asked very

6      specifically about what -- my question only pertained to

7      *Surviving R. Kelly* and what her response was and that was in

8      direct relationship to a question that was asked of her on

9      direct.

10         THE COURT:  What is your answer to that?

11         MS. SHIHATA:  He clearly ended on that question.

12     It's beyond the scope.  He's making it seem like she has never

13     said anything prior to today.  I think her response will be

14     when she was directly asked that question by another media

15     outlet she said that is not something I want to discuss.  That

16     is consistent and he opened the door by asking this question.

17         MS. SHIHATA:  I'm allowed redirect

18         THE COURT:  It's certainly related to the topic.  At

19     least in my view.  Certainly part of it was directed for

20     undercutting her credibility.  Correct so far?

21         MR. CANNICK:  Correct.

22         THE COURT:  And part of it was leaving the jury with

23     the impression that she's never said anything to anybody about

24     it.

25         MR. CANNICK:  She still hasn't.

Sidebar                                                    3317

1          MS. SHIHATA:  There's a difference between nothing

2     happened and I don't want to talk about it.

3          THE COURT:  I am going to permit the question.

4          (Sidebar ends.)

5          (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Angela - redirect - Shihata                3318

1   BY MS. SHIHATA:

2           THE COURT:  The objection is overruled go ahead.

3   BY MR. CANNICK:

4   Q    So when you were asked in the media directly whether

5   anything happened sexually happened between you and the

6   defendant how if at all did you respond?

7   A    There were things that had occurred that I chose not to

8   discuss at that time.

9   Q    And that's how you responded?

10  A    Yes, ma'am.

11          MS. SHIHATA:  Nothing further.

12          THE COURT:  Anything else?

13          MR. CANNICK:  Nothing.

14          THE COURT:  Thank you so much.  You can step down.

15  And then are you ready to call another witness?

16          MS. CRUZ MELENDEZ:  We are, Your Honor.

17          THE COURT:  And who is that.

18          MS. CRUZ MELENDEZ:  Jerie Ortez.

19          MR. CANNICK:  Your Honor, may we speak at sidebar,

20  please.

21          THE COURT:  Yes.

22          (Sidebar held outside of the hearing of the jury.)

23          (Continued on next page.)

24

25

Proceedings                                        3322

1    some evidence, but they're going to call a different witness

2    now.

3              Go ahead.

4              MS. SHIHATA:  The Government calls Alex.

5              THE COURTROOM DEPUTY:  Please stand and raise your

6    right hand.

7    **A L E X**,

8              called as a witness having been first duly

9              sworn/affirmed, was examined and testified as

10             follows:

11             THE COURTROOM DEPUTY:  You may be seated.

12             THE COURT:  You can remove your mask.

13             So a couple of things:  I want to make sure the

14   microphone is working.  Will you just give it a tap.

15             THE WITNESS:  All right.

16             THE COURT:  There's a button on the top, maybe...

17             (Pause in proceedings.)

18             THE COURT:  Try it again.  Just speak into it.

19             (Pause in proceedings.)

20             THE COURT:  Okay.  So just a couple of things:

21   First of all, I want to make sure that everybody can hear

22   you.

23             THE WITNESS:  Hello.

24             THE COURT:  Okay.  Good.

25             All right.  So speak into the microphone.  Our

Alex - Direct - Shihata                    3323

1    court reporter is taking down everything that you say.

2                THE WITNESS:  Okay.

3                THE COURT:  So I actually think it's easier just

4    to hold onto it.  Yeah.  Then you won't have to keep leaning

5    in.  But the court reporter takes down everything that you

6    say, so try not to speak too quickly.  I want to make sure

7    he can get it all.

8                If there is a question that you don't understand

9    or that you want repeated, just let me know and I'll have

10   the lawyers rephrase.  Just do your best to answer what best

11   answers the particular question that you're being asked.

12               Okay.

13               THE WITNESS:  Yes.

14               THE COURT:  All right.  Go ahead.

15   DIRECT EXAMINATION BY

16   BY MS. SHIHATA:

17   Q    Good afternoon.

18   A    Good afternoon.

19   Q    I'm showing you what's in evidence as

20   Government's Exhibit 68.

21               Do you recognize the person in this photograph?

22   A    Yes.

23   Q    And who is this is photograph of?

24   A    Myself.

25               MS. SHIHATA:  I'm showing the witness only what's

Alex - Direct - Shihata                    3324

1   been marked for identification as Government's Exhibit 68 A.

2   Q    Is this is the same photograph of you with your true

3   first and last name?

4   A    Yes, it is.

5            MS. SHIHATA:  I move to admit

6   Government's Exhibit 68A to the jury only.

7            THE COURT:  Any objection?

8            MR. CANNICK:  None.

9            THE COURT:  Okay.  That's in evidence.

10           (Government's Exhibit 68A marked and received in

11  evidence.)

12           MS. SHIHATA:  And may we publish it the jury only?

13           (Exhibit published.)

14  Q    Now, for purposes of your testimony here today, we're

15  going to refer to you as Alex, okay?

16  A    Yes.

17  Q    I'm showing you what's been marked for identification

18  as Government's Exhibit 68B.  Is this the same photograph

19  with your name, Alex, underneath?

20  A    Yes.

21           MS. SHIHATA:  I move to admit Government Exhibit

22  68B.

23           MR. CANNICK:  No objection.

24           THE COURT:  Okay.  It's in evidence.

25           (Government's Exhibit 68B marked and received in

Alex - Direct - Shihata                    3325

1   evidence.)

2               MS. SHIHATA:  And may we publish it?

3               THE COURT:  Yes.

4               (Exhibit published.)

5               (Pause in proceedings.)

6               THE COURT:  Okay.  Go ahead.

7               MS. SHIHATA:  Thank you.

8   BY MS. SHIHATA:

9   Q    How old are you?

10  A    Thirty-one.

11  Q    And when were you born?

12  A    2/13/90.

13  Q    Is that February 13th, 1990?

14  A    Yes, ma'am.

15  Q    And in what neighborhood did you grow up?

16  A    In the south suburbs of Chicago.

17  Q    What neighborhood was that?

18  A    Hazel crest.

19  Q    Now, where did you go to high school?

20  A    Hillcrest High School.

21  Q    And when did you graduate from Hillcrest High School?

22  A    2008.

23  Q    And after high school, did you continue your education?

24  A    Yes, some college.

25  Q    And after college -- after high school and some

1  college, did you work?

2  A    Yes.

3  Q    What kind of work did you do?

4  A    After high school, I immediately -- I was working at

5  McDonald's after high school.

6  Q    And do you recall where the McDonald's that you worked

7  at was?

8  A    Markham, Illinois.

9  Q    Now, are you currently employed?

10  A    Yes.

11  Q    What kind of work do you do?

12  A    Construction.

13  Q    And do you also have your own business?

14  A    Yes.

15  Q    What kind of business?

16  A    Clothing line.

17  Q    I'm showing you what's in evidence as

18  Government's Exhibit 1.  Do you recognize this person?

19  A    Yes.

20  Q    Who do you recognize this to be?

21  A    Mr. Kelly.

22  Q    Do you know his full name?

23  A    Robert Sylvester Kelly.

24  Q    And have you met Robert Kelly before?

25  A    Yes.

Alex - Direct - Shihata                      3327

1   Q    Do you see him in the courtroom here today?

2   A    Yes.

3   Q    And can you please point him out and identify by an

4   article of clothing he's wearing?

5   A    White -- oh, right there (indicate), in the gray.

6        THE COURT:  Indicating.

7   Q    Now, what stage in your life were you in when you first

8   met the defendant?

9   A    I was a teenager in high school.

10  Q    And approximately how old were you when you first met

11  him?

12  A    Approximately 16.

13  Q    What grade were you in in high school?

14  A    When I met the defendant?  A junior.

15  Q    And apart from here today in the courtroom,

16  approximately when was the last time you saw the defendant?

17  A    2019.

18  Q    Now, do you recall where you were when you first met

19  the defendant when you were a junior in high school?

20  A    Yes.  At a party at his resident in Olympia Fields.

21  Q    And over the years, did you go to the defendant's

22  Olympia Fields residence multiple times?

23  A    Yes.

24  Q    I'm showing you what's in evidence as

25  Government's Exhibit 502A.  Do you recognize this?

Alex - Direct - Shihata                    3328

1   A    Yes.

2   Q    What is this?

3   A    The gates of the Olympia Fields residence of Mr. Kelly.

4   Q    Is this is gate to enter the residence?

5   A    Yes.

6   Q    Now, over the years, approximately how many parties did

7   you attend at the defendant's Olympia Fields residence?

8   A    Upwards of, like, nine.

9   Q    Now, you testified you first met the defendant at the

10  party at the Olympia Fields residence.  Without saying the

11  person's name, did you go with someone to that party?

12  A    Yes, my best friend at that time.

13  Q    I'm showing you what's in evidence as

14  Government's Exhibit 64.  Do you recognize this person?

15  A    Yes.

16  Q    And without saying his full name, do you know his full

17  name?

18  A    Yes.

19  Q    I'm showing the jury only what's in evidence as

20  Government's Exhibit 64A.

21       Is this is same photograph with this individual's

22  full name written underneath.

23  A    Correct.

24  Q    Now, for purposes of your testimony here today, we're

25  going to refer to the individual in the photograph that I

1  just showed you as Louis.  Okay?

2  A    Yes.

3  Q    And now I'm showing you what's in evidence -- I'm

4  showing everyone what's in evidence as

5  Government's Exhibit 64B.  Is this the same photograph with

6  the name Louis underneath?

7  A    Yes.

8  Q    Now, you testified that you went with your best friend

9  at the time to the party where you first met the defendant

10 at Olympia Fields; is that right?

11 A    Correct.

12 Q    And was Louis your best friend at that time?

13 A    Yes.

14 Q    And did you live in the same neighborhood?

15 A    Yes.

16 Q    And did you go to high school together?

17 A    Yes.

18 Q    Was Louis the same age as you?

19 A    One year older.

20 Q    And was he in the same class as you in high school?

21 A    No, one year above me.

22 Q    So when you were a junior, he was a senior?

23 A    Correct.

24 Q    How was it that you ended up going to the party at the

25 Olympia Fields residence with Louis?

1  A    Louis got invited and he invited me also to come with

2  him.

3  Q    Did you understand that Louis had already met the

4  defendant before you?

5  A    Correct.

6  Q    And where did Louis work where you guys were in high

7  school?

8  A    McDonald's.

9  Q    Do you recall which McDonald's he worked at?

10  A    Markham, Illinois.

11  Q    And what, if any, understanding did you have about how

12  Louis had met the defendant?

13  A    Through a drive through at McDonald's.

14  Q    At which McDonald's?

15  A    In Markham.

16  Q    Where Louis was working?

17  A    Yes.

18  Q    I'm showing you Government's Exhibit 522A and 522B.  Do

19  you recognize these photos?

20  A    Yes.  It's the McDonald's in Markham.

21  Q    And is that the McDonald's that Louis worked at --

22  A    Yes.

23  Q    -- when you were in high school?

24  A    Yes, that's correct.

25  Q    Now, you testified earlier that you recall first

Alex - Direct - Shihata                    3331

1  meeting the defendant at the party at Olympia Fields when

2  you were 16 during your junior year of high school.  Do you

3  recall approximately what time of year it was when you

4  attended that first party?

5  A    Around 2007, Januaryish.

6  Q    And your birthday is in February, correct?

7  A    Correct.

8  Q    Now, when you got to the defendant's residence at

9  Olympia Fields -- well, actually withdrawn.

10         Do you recall how you got to the residence for the

11 party that first time?

12 A    My best friend at that time.

13 Q    Okay.  And what happened when you were -- how did you

14 physically get in the party, if you recall?

15 A    We had to go to a Holiday Inn and get shuttled over to

16 the party.

17 Q    A shuttle, is that what you say?

18 A    Yes.

19 Q    Okay.  And what do you mean by shuttle?

20 A    Well, we go to the Holiday Inn and just tell them -- we

21 all get on the shuttle to the -- to the residence of

22 Mr. Kelly's.

23 Q    So was that just a bus transporting people --

24 A    Correct.

25 Q    -- from the hotel nearby to the residence?

Alex - Direct - Shihata                    3332

1   A    Yes.

2   Q    And after you got to the residence, what, if anything,

3   happened?

4   A    Just -- just a live party.

5   Q    Okay.  And did you have to go through any security or

6   anything before you got in?

7   A    Yes?  Around the side there, they was doing waivers and

8   checking ID's.

9   Q    And did anyone check your ID?

10  A    No.

11  Q    Did anyone ask you to sign a waiver?

12  A    No.

13  Q    Did you see that happen to others?

14  A    Yes.

15  Q    Now, once you got to the party, what was the atmosphere

16  like?

17  A    It was -- it was real nice, nice music, good time,

18  people was dancing, you know...

19  Q    And was any alcohol being served?

20  A    Yes.

21  Q    And what was the gender makeup of the party?

22  A    98 percent women, 2 percent men.

23  Q    Now, at that first party, did you speak to the

24  defendant at that party?

25  A    Just a casual, brief greet.

Alex - Direct - Shihata                    3333

1    Q    And how did that come about?

2    A    My best friend at the time introducing me.

3    Q    Louis?

4    A    Yes.

5    Q    And how long was that interaction with the defendant?

6    A    Very brief, it was very brief.

7    Q    After that first party, did you attend other parties at

8    Olympia Fields?

9    A    Yes, I have.

10   Q    And what kinds of parties did you attend at the

11   defendant's Olympia Fields residence?

12   A    Album release; party birthday parties; regular

13   Saturday, Friday night parties.

14   Q    And when you say "birthday parties," for whose

15   birthday?

16   A    Mr. Kelly.

17   Q    The defendant?

18   A    Yes.

19   Q    And who, if anyone, do you recall attending those

20   parties with?

21   A    My best friend, Louis.

22   Q    Louis?

23   A    Uh-huh.

24   Q    You mentioned album release parties.  Do you recall any

25   specific album release party you attended at Olympia Fields?

Alex - Direct - Shihata                    3334

1   A      Double Up album release party.

2   Q      And was that the defendant's album.  Double Up?

3   A      Yes.

4   Q      And approximately when did you attend the Double Up

5   album release party?

6   A      The spring of 20 -- 2007.

7   Q      And were you still a junior in high school at that

8   time?

9   A      Yes -- yes, going to be -- yeah, going into my senior

10  year.  But I was still a junior, yes.

11  Q      So it was toward the end of your junior year?

12  A      Yes.

13  Q      And do you recall speaking with the defendant at that

14  party?

15  A      Yes.

16  Q      What, if anything, do you recall about that

17  conversation with the defendant?

18  A      He slipped me his number.

19  Q      And how did he slip you his number?

20  A      Just a balled up piece of paper in his hand and he slap

21  it in my hand.

22  Q      And at some point did you look at what was on the piece

23  of paper?

24  A      Correct.

25  Q      And what was on the piece of paper?

Alex - Direct - Shihata                    3335

1    A    His phone number.

2    Q    And how was it written?

3    A    It was handwritten.

4    Q    Handwritten?

5    A    Yes.

6    Q    Did you have a cell phone when you were in high school?

7    A    Yes.

8    Q    And was your cell phone in your name or someone else's

9    name?

10   A    My brother-in-law's name.

11   Q    And without saying his name, do you recall your

12   brother-in-law's name?

13   A    Yes, correct.

14   Q    I'm showing you what's been marked for identification

15   at Government's Exhibit 969.  Do you recognize this?

16   A    Yes.

17   Q    Is that your brother-in-law's name?

18   A    Correct.

19        MS. SHIHATA:  I move to admit

20   Government's Exhibit 969.

21        MR. CANNICK:  Not a problem.

22        THE COURT:  Okay.

23        (Government's Exhibit 969 marked and received in

24   evidence.)

25        MS. SHIHATA:  And may we publish it to the jury

Alex - Direct - Shihata                    3336

1    only?

2            (Exhibit published.)

3    Q    And your sister -- when you were in high school was

4    this person your brother-in-law already or was he seeing

5    your sibling?

6    A    I believe they was married already.

7    Q    Okay.  And was he married to your sister?

8    A    Correct.

9    Q    Now, did your brother-in-law know the defendant

10   personally?

11           MR. CANNICK:  Objection.

12   A    No.

13           THE COURT:  Overruled.

14   Q    Did your sister know the defendant personally?

15   A    No.

16   Q    Now, when the defendant -- I'm sorry.  Withdrawn.

17           When the defendant gave you his phone number, I

18   think you testified you were toward the end of your junior

19   year in high school, correct?

20   A    Correct.

21   Q    And at that time, how did the defendant giving you his

22   phone number make you feel?

23   A    Feel pretty good, you know, getting a number from a

24   celebrity, you know, his status, it made me feel really

25   good.

Alex - Direct - Shihata                    3337

1   Q     Now, after the defendant gave you his phone number, at
2   some point did you communicate with the defendant by phone?
3   A     Yes.
4   Q     In what manner?
5   A     He just wanted to -- he just wanted me to keep in
6   contact with him, so -- through texts, you know, just --
7   Q     Okay.
8   A     -- just make sure I -- you know, just check up on me.
9   Q     He would check up on your?
10  A     Yeah.
11  Q     And you said that was mainly through texts; is that
12  right?
13  A     Yeah.  And I would check up on him.  We would also
14  check up on each other.
15  Q     Now, other than seeing the defendant at parties at his
16  residence in the Olympia Fields, did you also see him at
17  other times?
18  A     Yes.
19  Q     And what other places did you see the defendant in?
20  And let me ask you it this way:  When you were -- when he
21  was still living at Olympia Fields, what other places would
22  you see the defendant?
23  A     At he residence or at the rec center where he plays
24  ball.  Around that time, that was pretty much it.
25  Q     Okay.  And when you say "ball," do you mean basketball?

Alex - Direct - Shihata                    3338

1   A    Yes.

2   Q    And do you recall where the rec center was where the

3   defendant played basketball when he was living in

4   Olympia Fields?

5   A    Markham, Illinois.

6   Q    And did you attend those basketball games?

7   A    Correct.

8   Q    And about how far was the Markham Rec Center where the

9   defendant played basketball from his -- from the defendant's

10  house in Olympia Fields?

11  A    No less than five other ten minutes.

12  Q    Okay.  And is that driving?

13  A    Yes, just straight shot.

14  Q    Now I'm showing you Government's Exhibits 523 -- what's

15  in evidence Government's Exhibit 523 A, B and C.  Do you

16  recognize these photographs?

17  A    Yes, that's the rec center in Markham.

18  Q    Where the defendant played basketball?

19  A    Correct.

20  Q    And how often -- about how many times did you attend

21  basketball games at that rec center where the defendant was

22  playing?

23  A    Two or three times.

24  Q    And did you ever play during any of those basketball

25  games?

Alex - Direct - Shihata                    3339

1   A    Not there.  I played once with him before, but not at

2   that one.

3   Q    At a different location?

4   A    Yes.

5   Q    After he left Olympia Fields, did you also see the

6   defendant play basketball somewhere else?

7   A    Yeah.  He used to play at a church in the city of

8   Chicago.

9           (Pause in proceedings.)

10          MS. SHIHATA:  I'm sorry.  My watch just started

11  speaking to me.  I apologize.

12          THE COURT:  All right.

13  Q    I'm sorry.  Where else did you see --

14  A    At a church in the city of Chicago.

15  Q    And was there a basketball court there?

16  A    Yes.

17  Q    And did you see the defendant play basketball multiple

18  times there?

19  A    Yes.

20  Q    And I think you testified is that where you also played

21  in one basketball game?

22  A    Yes.

23  Q    And how did you generally learn about the basketball

24  games when they were played at the Markham Rec Center?

25  A    My best friend Louis at the time.

Alex - Direct - Shihata                    3340

1    Q    He would let you know about them?

2    A    Yes, he would go play.

3    Q    And what were these basketball games like?

4    A    Pretty much Kelly ball.  You get the rebound, pass it

5    to him, let him shoot.

6    Q    And you called that Kelly ball; is that what you called

7    it?

8    A    Yes.

9    Q    Okay.  Now, other than you, what other types of people

10   did you see who attended the defendant's basketball game?

11   A    You had the regular ongoing watchers.  You had the

12   hoopers that got invited.  And you had, you know, his

13   ladies, his lady friends, you would have.

14   Q    And when you say "the hoopers that got invited," do you

15   mean other players?

16   A    Yes.

17   Q    And you said you also saw ladies there; is that right?

18   A    Yeah, his lady friends.

19   Q    Do you mean the defendant's?

20   A    Yes.

21   Q    From where, if anywhere, did you see the defendant's

22   female friends watch the games?

23   A    Apart from everyone else.

24   Q    Apart from everyone else; is that what you said?

25   A    Yes, correct.

Alex - Direct - Shihata                    3341

1    Q    And was everyone, when you were there, at least, were
2    those men?
3    A    Yes.
4    Q    Now, during those earlier days when the defendant still
5    lived at Olympia Fields when you would go to the parties at
6    Olympia Fields and basketball games in Markham, did you see
7    or meet any of the defendant's employees or associates?
8    A    Yes.
9    Q    I'm showing you what's in evidence as
10   Government's Exhibit 4.  Do you recognize this person?
11   A    Yes.
12   Q    Who is this?
13   A    I think they call him "June Bug."
14   Q    And do you know what, if any, role "June Bug" had with
15   the defendant?
16   A    Personal assistant, you know, someone like his
17   right-hand guy for different matters.
18   Q    I'm showing you Government's Exhibit 31.  Do you
19   recognize this person?
20   A    Yes.  I believe his name is Tom, I'm not sure.  He was
21   an assistant for Mr. Kelly.
22   Q    I'm showing you what's in evidence as
23   Government's Exhibit 21.  Do you recognize this person?
24   A    Yes.
25   Q    Who is that?

Alex - Direct - Shihata                    3342

1    A    They called him Bowden.

2    Q    And what, if any, role did he have with the defendant?

3    A    Just longtime friend, good friend of Mr. Kelly's.

4    Q    I'm showing you Government's Exhibit 9.  Do you

5    recognize this person?

6    A    I've seen him before.

7    Q    Do you know his name or nickname?

8    A    No, I don't.

9    Q    Where do you recall seeing this person?

10   A    At the earlier days at parties at Olympia Fields.

11   Q    I'm showing you Government's Exhibit 22.  Do you

12   recognize this person?

13   A    I believe so.  I believe she did -- she did security

14   for Mr. Kelly.

15   Q    Do you know her name?

16   A    Cookie.  I'm not for sure, but I would say Cookie.

17   Q    Okay.  Now, did there come a time when the defendant

18   asked you to come to his resident at Olympia Fields, and it

19   wasn't for a party?

20   A    Correct.

21   Q    And how did that come about?

22   A    He just wanted to see me and told me to come on by.

23   Q    And what, if anything -- and did you go?

24   A    Yes.

25   Q    And what, if anything, happened once you got to the

Alex - Direct - Shihata                        3343

1  Olympia Fields residence?

2  A    He opened the gates for me and told me to wait inside

3  his Maybach at that time.

4  Q    And did you wait inside the Maybach?

5  A    Yes.

6  Q    And did the defendant stay or leave after letting you

7  inside?

8  A    He -- he told me to wait on him for like 20 minute.

9  Q    And actually just to be clear, when he opened the gates

10  for you, did you actually see him at that time?

11  A    No.  He was already gone from the house.

12  Q    Okay.  So how did he tell you to a wait in the Maybach;

13  was that by phone.

14  A    Yes.  I believe through texts, he told me to get inside

15  the Maybach and wait for him.

16  Q    And about how long did you wait inside the Maybach?

17  A    Roughly around 20 minutes.

18  Q    And what, if anything, happened after 20 minutes,

19  roughly?

20  A    Then Mr. Kelly came out and we got inside the Maybach,

21  as well.

22  Q    And after the defendant got inside the Maybach with

23  you, what do you recall happening?

24  A    I recall him just talking to me, then forcefully

25  kissing me and licking my face.

1  Q    And how, if at all, did you react at that time?

2  A    Numb, shocked, that's about all I could do.

3  Q    What, if anything, do you recall the defendant saying

4  to you at that time?

5  A    Just to be open-minded --

6  Q    And what --

7  A    -- just to be open-minded.

8  Q    Do you recall anything else about that encounter?

9  A    No.  That was just a brief contact that night, and then

10  like I went home.

11  Q    Now, did the defendant stop making sexual advances to

12  you after that?

13  A    No.

14  Q    And what other sexual advances do you remember him

15  making to you?

16  A    One time he told me to take off my pants, sit down in

17  the chair, and he began to give me oral sex.

18  Q    And who initiated that encounter?

19  A    Mr. Kelly, the defendant.

20  Q    Do you remember where that took place?

21  A    At his residence in Olympia Fields.

22  Q    And do you remember anything about where in the

23  residence that was?

24  A    That particular time, no.  It was in one of the rooms

25  upstairs.

Alex - Direct - Shihata                    3345

1  Q    And do you recall whether that encounter was recorded?

2  A    Yes.

3  Q    Do you remember how it was recorded?

4  A    IPad.

5  Q    And whose iPad was it?

6  A    Mr. Kelly's.

7  Q    And who set up the recording?

8  A    The defendant.

9  Q    Now, did there also come a time when the defendant --

10 well, actually, withdrawn.

11        At some point did you have a sexual encounter with

12 the defendant and another person?

13 A    Yes.

14 Q    And how did that come about, the first time that

15 happened?

16 A    He said he had a gift for me and to come by his house.

17 Q    Who said that to you?

18 A    The defendant.

19 Q    And where did you go after you arrived at

20 Olympia Fields?

21 A    He told me to wait in one of the rooms upstairs.  I

22 believe it was one of his kids' rooms.

23 Q    And what happened after you waited in the room?

24 A    He came in and told me to, you know, don't be nervous,

25 and, you know, take off my clothes, and he sent a half-naked

Alex - Direct - Shihata                                    3346

1    lady into the room.

2    Q    And did you know the lady he sent into the room before?

3    A    No.

4    Q    Did the defendant tell you her name?

5    A    No.

6    Q    Prior to that day, had you asked the defendant to

7    provide you with a girl or a woman?

8    A    No.

9    Q    What happened after this person entered the room?

10   A    He pretty much just told us to go at.  But we didn't

11   know what to do because he was still in the room, so we

12   didn't know what to do.

13   Q    And after that, what happened?

14   A    So he instructed us to start kissing and mean it.

15   Q    He told you to "mean it"?

16   A    Yeah, he told us to mean it.  Start kissing each other.

17   Q    And what, if anything, did you notice was in the room

18   while this was happening?

19   A    IPad, recording camera, lights, production lights.

20   Q    And after the defendant told you and the female present

21   to start kissing and to mean it, what happened?

22   A    He started recording it and started masturbating.

23   Q    And what, if anything, else did the defendant tell you

24   to do?

25   A    Pretty much to have sex with her, before she gave us --

Alex - Direct - Shihata                    3347

1  should I say, "blow jobs"?  Can I say blow jobs?

2        She gave us blow jobs.

3  Q    Okay.  So who, if anyone, told the female to give you a

4  blow job?

5  A    The defendant.

6  Q    Okay.  And by "blow job," do you mean oral sex?

7  A    Yes.

8  Q    And who, if anyone, told the female to give the

9  defendant oral sex?

10  A    Nobody.

11        What's you mean?  Rephrase that question.

12  Q    Did anyone tell the female to give Rob oral sex?

13  A    The defendant.

14  Q    Now, after the oral sex, what, if anything, did the

15  defendant tell you to do?

16  A    After the oral sex and everything, he told me to wait

17  in the room.

18  Q    Okay.  When you say "and everything" what are you

19  referring to?

20  A    Because I had to penetrate the young lady at that time.

21  Q    And by "penetrate," do you mean you had sexual

22  intercourse with her?

23  A    Yes.

24  Q    And did you penetrate her vaginally?

25  A    Yes.

Alex - Direct - Shihata                    3348

1    Q    During this encounter, who, if any, was in charge?

2    A    The defendant.

3    Q    Why did you do what the defendant told you to do?

4    A    Actually, I have no idea.

5    Q    And after the encounter you just described with this

6    other female at Olympia Fields, did you have other sexual

7    encounters with the defendant?

8    A    Correct.

9    Q    Including with other females?

10   A    Correct.

11   Q    And did the sexual encounters, sometimes were they just

12   you and the defendant?

13   A    Yes.

14   Q    When you had sexual encounters with you and just the

15   defendant, who was in control?

16   A    The defendant.

17   Q    What did the defendant tell you to do to him?

18   A    Give him oral -- oral sex.

19   Q    Did he ask you to do anything else, as well?

20   A    Drive up his butt.

21   Q    How, if at all, were these encounters recorded?

22   A    IPad.

23   Q    Where did these sexual encounters with just the

24   defendant take place?

25   A    At his residence, at his studio, tour bus.

Alex - Direct - Shihata                    3349

1  Q     And when you say "his residence," which residence --
2  which residence or residences are you referring to?
3  A     The Olympia Fields residence, the Trump Towers
4  apartment.
5  Q     And when you say "studios," which studios are you
6  referring to?
7  A     The studio off Ohio and the studio off Justine.
8  Q     Showing you what's in evidence as
9  Government's Exhibit 503A.  Do you recognize this?
10 A     Sure.  Yes, I do.
11 Q     What is this a photograph of?
12 A     The studio on Justine.
13 Q     Now, during your sexual encounters with the defendant,
14 what, if anything, did the defendant tell you to call him?
15 A     Daddy.
16 Q     You also mentioned a sexual encounter with the
17 defendant on a tour bus; is that correct?
18 A     Correct.
19 Q     And where on the tour bus did that take place?
20 A     Back room.
21 Q     The back room of the tour bus?
22 A     Yes.
23 Q     And was the tour bus parked or moving when that
24 happened?
25 A     Parked.

Alex - Direct - Shihata                    3350

1    Q    And do you recall where it was parked?

2    A    Downtown Chicago.

3              (Continued on the next page.)

Alex - direct - Shihata                    3351

1  EXAMINATION CONTINUES

2  BY MS. SHIHATA:

3  Q    Now, apart from, I think you testified that apart from

4  the first encounter with the defendant and a female at Olympia

5  Fields that you've already described, that there were other

6  times, other encounters with the defendant and other females,

7  is that right?

8  A    Correct.

9  Q    About how many times do you recall having an encounter

10 with the defendant and another female?

11 A    Countless.

12 Q    Countless?

13 A    Correct.

14 Q    And who was in charge during those encounters?

15 A    The defendant.

16 Q    What types of sexual acts did he direct you to engage in

17 with these females?

18 A    Penetration, they put they mouth on me, you know, hugging

19 and kissing.

20 Q    And when you say put their mouth on me, what part of your

21 body are you referring to?

22 A    My genitals.

23 Q    And while these acts were going on, what was the

24 defendant doing?

25 A    Either masturbating or watching.

Alex - direct - Shihata                3352

1  Q    Did the defendant tell you or the female what you should

2  be doing?

3  A    Correct.

4  Q    And did he record these interactions?

5  A    Yes.

6  Q    And how did he record them?

7  A    By iPad.

8  Q    Did the defendant ever engage with you and the females

9  during these interactions, did he ever engage with you or the

10  females sexually during the interactions?

11  A    Correct, yes.

12  Q    What, if anything, did the defendant call you during

13  these encounters with other females?

14  A    Nephew.

15  Q    Are you the defendant's nephew?

16  A    No.

17  Q    Are you in any way related to the defendant?

18  A    No.

19  Q    At the times you engaged in these sexual acts with other

20  females that the -- withdrawn.

21        At the time you engaged in these sexual acts, did

22  you know the names of any of these females?

23  A    No.

24  Q    In what locations do you recall engaging in sexual acts

25  with these females?

Alex - direct - Shihata                    3353

1  A    His residence, his studio, trips out the state.

2  Q    And do you recall -- do you recall whether any of these

3  encounters ever occurred in hotel rooms?

4  A    Yes.

5  Q    What, if any, rules were there during these encounters?

6  A    Not that -- we wasn't allowed to talk to each other.

7  Q    And when you say "we" weren't allowed to talk to each

8  another, who is the "we" you're referring to?

9  A    His lady, the female.

10 Q    And yourself?

11 A    Yes.

12 Q    Now, did you engage in sexual acts with certain of these

13 females more than once?

14 A    Correct.

15 Q    And were all of these encounters in the defendant's

16 presence?

17 A    Correct.

18 Q    Do you recall what some of the females the defendant told

19 you to engage in sexual acts with, what they looked like?

20 A    Yes.

21 Q    And fair to say you don't recall all of them?

22 A    Fair to say.

23 Q    I'm showing you what's in evidence as Government

24 Exhibit 69(b).

25       Do recognize this person?

Alex - direct - Shihata                    3354

1              (Exhibit published.)

2    A    Correct.

3    Q    And is this one of the females that the defendant

4    directed you to engage in sexual acts with?

5    A    Yes, one of the first ones, yes.

6    Q    Did you engage in sexual acts with her once or multiple

7    times?

8    A    Multiple.

9    Q    At the time of those acts, did you know her name?

10   A    No.

11   Q    What type of acts do you recall engaging in with the

12   individual in Government Exhibit 69(b)?

13   A    Sexual.

14   Q    And what do you mean by that?

15   A    Sexual acts and things sexual.

16   Q    What type of sexual acts?

17   A    Penetration or kissing or orally, she giving me orally.

18   Q    And did the defendant ever engage in sexual acts with

19   both you and this individual?

20   A    Yes.

21   Q    And, again, were these interactions recorded?

22   A    Yes.

23   Q    And do you recall how they were recorded?

24   A    iPad.

25   Q    And who, if anyone, told you what to do during your

Alex - direct - Shihata                    3355

1   encounters with the individual in 69(b)?

2   A    The defendant.

3   Q    And who, if anyone, told the individual in 69(b) what to

4   do during these encounters?

5   A    The defendant.

6   Q    I am showing you what's in evidence as Government

7   Exhibit 75.

8            Do you recognize this person?

9            (Exhibit published.)

10  A    Correct.

11  Q    Is this one of the females that the defendant directed

12  you to engage in sexual acts with?

13  A    Correct.

14  Q    Was that once or more than once?

15  A    More than once.

16  Q    And at the time of these sexual encounters, did you know

17  this person's name?

18  A    No.

19  Q    And what types of acts did he -- did the defendant direct

20  you to engage in --

21  A    Sexual.

22  Q    -- with this person?

23  A    Sexual acts.

24  Q    Including penetration?

25  A    Yes.

Alex - direct - Shihata                    3356

1   Q    And by that I mean sexual intercourse?

2   A    Yes.

3   Q    And during those encounters with this individual in

4   Government Exhibit 75, who directed you, who, if anyone,

5   directed what you should be doing during those encounters?

6   A    The defendant.

7   Q    And who, if anyone, directed what the individual in

8   Government Exhibit 75 should be doing during those encounters?

9   A    The defendant.

10  Q    Were these encounters with this individual recorded?

11  A    Yes.

12  Q    How were they recorded?

13       THE COURT:  Can I just ask, is it fair to say that

14  for all of these people that you're describing, you were

15  instructed to do the same types of sexual acts?

16       THE WITNESS:  Correct.

17       THE COURT:  All right, go ahead.

18       MS. SHIHATA:  Thank you.

19  BY MS. SHIHATA:

20  Q    How --

21       THE COURT:  Let me ask one other question, sorry.

22       And is it also fair to say for all of them they were

23  recorded?

24       THE WITNESS:  A hundred percent.

25       THE COURT:  On an iPad?

Alex - direct - Shihata                    3357

1          THE WITNESS:  Yes.

2          THE COURT:  Sorry, go ahead.

3   BY MS. SHIHATA:

4   Q    I'm showing you Government Exhibit 78.

5          Do you recognize this person?

6          (Exhibit published.)

7   A    Yes.

8   Q    And is this one of the females that the defendant

9   directed you to engage in sexual acts with?

10  A    Correct.

11  Q    Once or more than once?

12  A    More than once.

13  Q    I'm showing you what's in evidence as Government

14  Exhibit 76.

15          Do you recognize this person?

16          (Exhibit published.)

17  A    She looks familiar, but I'm not a hundred percent sure --

18  Q    Okay.

19  A    -- I recognize.

20  Q    Where do you think she looks familiar from?

21  A    One time in Miami.

22  Q    And what happened in Miami?

23  A    In the room, sexual, sexual intercourse with a young lady

24  and the defendant.

25  Q    Fair to say she looks familiar, but you're not sure if

Alex - direct - Shihata                    3358

1   that's the person --

2   A    Fair to say.

3   Q    -- that you engaged in a sexual act with?

4   A    Very fair to say.

5   Q    But was there a female in Miami that you engaged in a

6   sexual -- in sexual acts with at the defendant's direction?

7   A    Correct.

8   Q    And, again, was this recorded?

9   A    Correct.

10  Q    And at the time of -- at the time of these acts, fair to

11  say, like all the others, you didn't know the female's name?

12  A    No; fair to say.

13  Q    Now, during these encounters with these females and the

14  defendant, how did the females appear to you during these

15  encounters?

16       MR. CANNICK:  Objection.

17       THE COURT:  Well, I'll sustain it as to form.

18       Are you asking about demeanor and things like that?

19       MS. SHIHATA:  Yes.

20       THE COURT:  All right.

21       Describe what you noticed about all or some of the

22  women that you've discussed so far.

23       THE WITNESS:  I don't know, zombie-ish.

24  BY MS. SHIHATA:

25  Q    Apart from telling you what sexual acts to engage in with

Alex - direct - Shihata                     3359

1   these women, what, if any -- what other types of things would

2   the defendant tell you and the -- and the females during these

3   encounters?

4   A    Can you rephrase that?

5   Q    Sure.

6        I think you testified he would direct what acts --

7   A    Correct.

8   Q    -- sexual acts should happen, is that fair to say?

9   A    Correct.

10  Q    And other than that, would he also tell you other than,

11  you know, have sex or give oral or whatever, did he also

12  direct you in other ways or say other things during these

13  encounters?

14  A    Yeah, like, we kissing, do it like we mean it, you know,

15  things like that.

16  Q    And when he said "do it like you mean it," was that only

17  in reference to kissing or other things as well?

18  A    Just every -- just other things.  Like, he might tell us

19  to moan, you know.  Moan like you mean it or something like

20  that.

21  Q    Now, I think just going back for a moment to the first

22  sexual encounter you had, the first time there was a female

23  brought into the room by the defendant in Olympia Fields.

24       I think you mentioned on that occasion you remember

25  some lights, is that right?

Alex - direct - Shihata                    3360

1  A    Yes.

2  Q    And an iPad, is that correct?

3  A    Yes.

4  Q    And do you remember any other recording equipment on that

5  occasion?

6  A    Just that -- just the recorder I mentioned.

7  Q    Which recorder was that, what type of recorder?

8  A    Like a regular video recorder on a tripod.

9  Q    Now, after your sexual encounters with the defendant or

10 with these other women and the defendant, were there times the

11 defendant gave you something?

12 A    Yeah, he had gave me a few dollars, you know.

13 Q    And what do you mean by a few dollars?

14 A    He'd slap a hundred or two in my hand, you know, just for

15 my time and my gas and everything.

16 Q    Were there ever times you traveled to see the defendant?

17 A    Yes.

18 Q    And where do you recall traveling to see the defendant?

19 A    I believe twice in Atlanta and once in Miami.

20 Q    And approximately when do you recall those two times that

21 you traveled to Atlanta, approximately when was that?

22 A    Around 2014.

23 Q    And how about when you traveled to Miami, approximately

24 when was that ?

25 A    Approximately 2017.

Alex - direct - Shihata                                    3361

1   Q    And who paid for your travel to Atlanta and Miami?

2   A    The defendant.

3   Q    And did you stay at a hotel?

4   A    Correct.

5   Q    And did he pay for the hotel?

6   A    Correct.

7   Q    And who made those arrangements for you?

8   A    Some lady, I believe her name was Diana, his assistant.

9   Q    And who put you in touch with Diana?

10  A    The defendant.

11  Q    How, if at all, did you communicate with Diana?

12  A    Strictly text.

13  Q    Did you ever meet Diana in person?

14  A    No.

15  Q    When you traveled to see the defendant, what was the

16  purpose of the travel?

17  A    Sexual.

18  Q    And did you engage in sexual encounters during those

19  trips?

20  A    Correct.

21  Q    With the defendant?

22  A    Yes, correct.

23  Q    How about with any others?

24  A    Yes, correct.

25  Q    Other females?

Alex - direct - Shihata                    3362

1   A    Yes.

2   Q    During the time you knew the defendant, did he ever

3   invite you to any of his concerts?

4   A    No.

5   Q    Did he ever take you out publicly anywhere?

6   A    No.

7   Q    Now, you mentioned you went to parties at Olympia Fields.

8        Did you also sometimes go to parties at the

9   defendant's studios?

10  A    Correct.

11  Q    And do you recall what types of parties you went to at

12  the studio?

13  A    Just regular Saturday night parties he would throw,

14  Friday night; regular Friday, Saturday night parties that he

15  would throw over the weekend.

16  Q    Now, you mentioned earlier that you traveled to Atlanta

17  twice and Miami or that you recall traveling to those

18  locations to see the defendant, correct?

19  A    Correct.

20  Q    At any of those locations do you recall the defendant

21  telling you anything about what you should tell people, who

22  you should tell people you were?

23  A    Yeah, I was his stylist.

24  Q    And what do you recall him telling you about that?

25  A    Just -- just if anybody ever asked, he said you my

Alex - direct - Shihata                    3363

1   stylist.

2   Q    Over the time you knew the defendant, were there times

3   when you distanced yourself from him?

4   A    Yes.

5   Q    And why did you distance yourself from him?

6   A    Just feeling used, abused, lied to.  So many emotions, so

7   many reasons for different times.

8   Q    Did this happen more than once?

9   A    Correct.

10  Q    Do you recall around what time periods this happened?

11  A    Yes, 2015, 2016, half of 2017.

12  Q    Now, did those periods of distance last?

13  A    No.

14  Q    Why not?

15  A    My best friend at the time, he would reach out to him and

16  try to get in contact with me each and every time.

17  Q    And when you say your best friend, are you --

18  A    Louis.

19  Q    -- referring to Louis?

20       And when you say he would reach out to him, who is

21  the "he" in that sentence and who is the "him" in that

22  sentence?

23  A    The defendant would reach out to Louis.

24  Q    And reach out to him for what?

25  A    To -- to tell me to call him or just to get in contact

Alex - direct - Shihata                                    3364

1   with me.

2   Q    To tell you to call the defendant?

3   A    Yes.

4   Q    Have you ever stolen anything from the defendant?

5   A    Yes.

6   Q    What did you steal?

7   A    Cash.

8   Q    Approximately how much money did you steal from the

9   defendant?

10  A    Around 8,000.

11  Q    And do you recall around when that happened?

12  A    2013.

13  Q    And where did you steal that money from?

14  A    Out of his backpack.

15  Q    And how did that come about, why were you -- why were you

16  at his backpack?

17  A    I think I was in his backpack to retrieve a iPad or

18  something.

19  Q    And what did you -- what, if anything -- well, is that

20  where you noticed cash inside of the backpack?

21  A    Yes.

22  Q    And do you recall anything about what the backpack looked

23  like?

24  A    It was a designer backpack, could have been a Gucci

25  backpack.

Alex - direct - Shihata                                    3365

1  Q    After you met, going back to when you met the defendant
2  back in high school, did the defendant ever tell you he would
3  look out for you?
4  A    All the time.
5  Q    And what did he say to you?
6  A    How he got me and how he will give me a job, you know, or
7  make me his height man.  Just things like that.
8  Q    And when the defendant began telling you this, was that
9  before or after your first sexual encounter with him?
10 A    Both.
11 Q    And did that ever happen?
12 A    No.
13 Q    I'd like to direct your attention to the year 2011.
14        Were you arrested that year?
15 A    Yes.
16 Q    And what were you arrested for?
17 A    At the time it was robbery, but it was theft.
18 Q    Did you end up pleading guilty to theft?
19 A    Yeah.
20 Q    And following your arrest, were you immediately released
21 on bond or did you spend some time in jail?
22 A    No, I spent some time in jail.
23 Q    And were you eventually released on bond?
24 A    Yes.
25 Q    After about how long?

Alex - direct - Shihata                    3366

1   A    About four months.

2   Q    And who, if anyone, posted your bond to get you released?

3   A    My mom.

4   Q    What, if anything, did you learn about the defendant

5   providing money for your bond?

6   A    I learned that he gave my best friend at the time money

7   towards my bond that my mom had never -- my mom never

8   received.

9   Q    And when you say your best friend, are you referring to

10  Louis?

11  A    Yes.

12  Q    And who did you learn that from?

13  A    From the defendant and from Mr. -- Louis.

14  Q    After that, what, if anything, happened regarding your

15  friendship with Louis?

16  A    Soured.

17  Q    Did you stop speaking to Louis for a period of time?

18  A    Correct.

19  Q    And did you eventually start speaking with Louis again?

20  A    Correct.

21  Q    Are you familiar with the docuseries "Surviving

22  R. Kelly"?

23  A    Yes, I am.

24  Q    Did you see the defendant after "Surviving R. Kelly"

25  aired on television?

Alex - direct - Shihata                    3367

1   A    Yes.

2   Q    And where did you see him?

3   A    Where did I see him?  I seen him several occasions.

4   Q    Okay.  Did there come a point where you saw the defendant

5   at his residence in Trump Tower?

6   A    Yes.

7   Q    In 2019?

8   A    Yes.

9   Q    And how did it come about that you were at the

10  defendant's apartment in Trump Tower on that occasion?

11  A    He said he needed me to do something for him, and stop on

12  by.

13  Q    When you say "he," are you referring to the defendant?

14  A    To the defendant, yes.

15  Q    And after you arrived at the defendant's apartment at

16  Trump Tower, what happened?

17  A    I gets there and he say he need me to write something for

18  him.

19  Q    And what did the defendant tell you he needed you to

20  write for him?

21  A    Pretty much just saying we had no sexual relationship

22  with each other.

23  Q    Did you write the letter the defendant asked you to

24  write?

25  A    Yes.

Alex - direct - Shihata                    3368

1  Q    And did the defendant ask you to sign the letter?

2  A    Correct.

3  Q    Who decided, who, if anyone, decided what would be

4  written in that letter?

5  A    He told me word for word.

6  Q    When you say --

7  A    Word for word, the defendant.

8  Q    The defendant.

9        And after you wrote and signed the letter, who, if

10  anyone, did you give it to?

11  A    The defendant.

12  Q    Was what you wrote in the letter false?

13  A    Correct.

14  Q    Why did you write the letter?

15  A    Just for him.

16  Q    Did you receive a subpoena to be here today?

17  A    Correct.

18  Q    Do you want to be here today testifying about these

19  matters?

20  A    No.

21  Q    Have you ever spoken publicly about these matters before

22  today?

23  A    No.

24        MS. SHIHATA:  No further questions.

25        THE COURT:  Cross-examination?

Alex - cross - Cannick                    3369

1        MR. CANNICK:  Yes, ma'am.

2   CROSS-EXAMINATION

3   BY MR. CANNICK:

4   Q    You testified and told us about being arrested for

5   robbery?

6   A    Yes.

7   Q    And when was that?

8   A    Around 2012.

9   Q    That was 2012.

10       You were arrested along with Louis for that robbery,

11  am I correct?

12  A    Correct.

13  Q    Yes.  You and Louis robbed somebody, am I correct?

14  A    Not somebody, but a business, yes.

15  Q    A business?

16  A    Yes.

17  Q    Okay.  What did you take from the business?

18  A    Cash.

19  Q    Cash?

20  A    Yes.

21  Q    How much cash?

22  A    I don't know.

23  Q    How old were you?

24  A    I was twenty -- probably 22.

25  Q    Okay.  Rob didn't direct you to do that, am I correct?

Alex - cross - Cannick                    3370

1   A    No.

2   Q    Rob didn't instruct you to do that, am I correct?

3   A    Not at all.

4   Q    In fact, you and Louis did that on your own, am I

5   correct?

6   A    Yeah, I did it as a favor for Louis, yes.

7   Q    You did it as a favor?

8   A    Yes.

9   Q    So, Louis asked you for a favor and you did it?

10  A    Took some real pulling, but yes.

11  Q    Took some real pulling.

12         But he pulled you -- it took some pulling, but you

13  did it.

14         How did you get in the place?

15  A    A key.

16  Q    A key.  How did you get the key?

17  A    From Louis.

18  Q    Louis.  How did Louis get the key?

19  A    He worked there.

20  Q    How was you caught?  How were you caught?

21  A    Louis came back for his last check.

22  Q    So, Louis set up the place that he worked for?

23  A    Yeah.

24  Q    And you -- after that you stole, at some point you stole

25  from Mr. Kelly?

SAM     OCR     RMR     CRR     RPR

A 1253

Alex - cross - Cannick                    3371

1    A    Yeah, correct.

2    Q    And Louis stole from Mr. Kelly as well, am I correct?

3              MS. SHIHATA:  Objection.

4              THE COURT:  Did you see anything like that?

5              THE WITNESS:  So, I'll say yes.

6    BY MR. CANNICK:

7    Q    Well, yes, you'll say yes because he stole from him, am I

8    correct?

9    A    Yeah, yeah, he stole a camera before I left, that's how I

10   know that.

11   Q    And according to you, he also stole the bail money that

12   Mr. Kelly put up?

13   A    Yes, correct.

14   Q    Would you call him a thief?

15             MS. SHIHATA:  Objection.

16             THE COURT:  Sustained.

17   BY MR. CANNICK:

18   Q    Would you call yourself a thief?

19             MS. SHIHATA:  Objection.

20             THE COURT:  Sustained.

21   Q    Now, you testified and told us that you got Mr. Kelly's

22   number when you were in your junior high school year?

23             MS. SHIHATA:  Objection.  Junior high school or

24   junior in high school?

25   BY MR. CANNICK:

Alex - cross - Cannick                    3372

1   Q    Junior year in high school?

2   A    Okay.

3   Q    Okay what?

4   A    Correct.

5   Q    Well, how old were you in your junior year in high

6   school?

7   A    When I met Mr. Kelly, I was 16.

8   Q    No, I'm not asking you when you met Mr. Kelly, I'm asking

9   you how old were you when you were in your junior year in high

10  school?

11  A    I was 16 going on 17.

12  Q    And how old were you when you got Mr. Kelly's number?

13  A    Seventeen.

14  Q    Okay.  Are you sure about that?

15  A    Yeah, I'm pretty positive.

16  Q    You're pretty positive?

17  A    Yeah.

18  Q    Would it surprise you that you told the Government that

19  you met -- when you got his number -- that you didn't get his

20  number until around 2009?

21  A    No, false.

22  Q    What?

23  A    False.

24  Q    That's false, right?

25  A    Yes.

Alex - cross - Cannick                    3373

1   Q    Didn't happen, right?

2   A    What you mean?

3   Q    That if it's in here and the Government wrote down that

4   you told them that you got Mr. Kelly's number around 2009,

5   that would be false, am I correct?

6   A    No, I didn't get his number around 2009.

7   Q    Right, because you would have been 19 at that time, am I

8   correct?

9   A    Yes, correct.

10  Q    I want you to look at this document and see if it

11  refreshes your recollection that you told the Government that

12  this was around 2009?

13       PROSPECTIVE JUROR:  It's not gonna reflect [sic].  I

14  don't remember it saying 2009.

15  Q    Without even looking at it --

16       THE COURT:  Just take a look at it and see if it

17  refreshes your recollection.

18       And just questions, Mr. Cannick, not statements.

19       MR. CANNICK:  Right.

20       (Pause.)

21  BY MR. CANNICK:

22  Q    Down to the bottom in the highlighted yellow portion.

23  You read it?

24  A    (No response.)

25  Q    Did you read it?

Alex - cross - Cannick                3374

1  A    Correct.

2  Q    Does it refresh your recollection that you told the

3  Government it was in 2009 that you got Mr. Kelly's number?

4              THE COURT:  Do you understand the question?

5              THE WITNESS:  Yeah, I understand the question.

6              THE COURT:  Okay.  So, he wants to know if it

7  refreshes your recollection?

8              THE WITNESS:  No, but I didn't get his number in

9  2009.  So, I don't know what happened with that statement.

10 BY MR. CANNICK:

11 Q    But you read it in that document, am I correct?

12 A    Correct.

13 Q    The document said you told them that you got it -- got

14 Mr. Kelly's number in 2009, am I correct?

15             MS. SHIHATA:  Objection.

16             THE COURT:  Sustained as to form.  It doesn't

17 refresh his recollection.

18 BY MR. CANNICK:

19 Q    It's written in the document that you got Mr. Kelly's

20 number --

21             MS. SHIHATA:  Objection.

22             THE COURT:  Sustained.

23 BY MR. CANNICK:

24 Q    You interviewed with the Government, am I correct?

25 A    Correct.

Alex - cross - Cannick                    3375

1  Q    And you were the one who gave the information about when

2  it was that you supposedly got Mr. Kelly's number, am I

3  correct?

4  A    Correct.

5  Q    Now, these things that you said that happened between you

6  and Mr. Kelly sexually, how old were you?

7  A    I was around twenty.

8  Q    You were twenty years old or older?

9  A    Hum?

10  Q    Is that a yes or a no, sir?

11  A    I said I was twenty years old.

12  Q    You were at least twenty years old?

13  A    Yeah, I was at least twenty years old; yes.

14  Q    And then you testified and told us about Mr. Kelly,

15  according to you, directed you to be involved in a sexual

16  encounter with a female?

17  A    Correct.

18  Q    And how old were you the first time that happened?

19  A    Twenty.

20  Q    Twenty as well?

21  A    Yes.

22  Q    Now, and you testified and told us that there came a

23  point in time that you had a sexual encounter, according to

24  you, at Mr. Kelly's direction with --

25            MR. CANNICK:  May I see the photograph 75?

Alex - cross - Cannick                    3376

1   BY MR. CANNICK:

2   Q    Is it on your monitor?

3   A    Yes.

4   Q    You testified and told us that Mr. Kelly directed you,

5   according to you, to have sex with this person?

6            (Exhibit published.)

7   A    Correct.

8   Q    When you had sex with this person, did you -- did you use

9   a condom?

10  A    Sometimes, sometimes not, no.

11  Q    But sometimes you didn't, am I correct?

12  A    Yes.

13  Q    And you testified that Mr. Kelly also asked you or

14  instructed you, according to you, to have sex with a number of

15  females?

16  A    Correct.

17  Q    And do you recall having sex with these females with a

18  condom?

19  A    Sometimes there wasn't a condom.

20  Q    But most of the times it was no condom according to you?

21  A    Yeah -- I mean not most of the time.  Most of the time it

22  probably was with a condom.

23  Q    Oh, most of the time it was with a condom?

24  A    It was probably less time without a condom.

25  Q    Oh, okay.

SAM    OCR    RMR    CRR    RPR

Alex - cross - Cannick                    3377

1          MR. CANNICK:  Your Honor, if the Court would just

2    bear with me for a few minutes.

3          THE COURT:  Sure.

4          (Pause.)

5    BY MR. CANNICK:

6    Q    Did you ever work for Mr. Kelly?

7    A    No.

8    Q    Never ironed his clothes or anything like that?

9    A    No.

10   Q    And you testified that there were times that you tried --

11   that you distanced yourself from Mr. Kelly?

12   A    Correct.

13   Q    And then you then went back because of a phone call or

14   something like that?

15   A    Yes.

16   Q    Okay.  And you did that of your own choosing, am I

17   correct?

18   A    Correct.

19         MR. CANNICK:  Your Honor, I am trying to find a

20   document.

21         THE COURT:  That's all right.

22         (Pause.)

23   Q    And you weren't paid to be his personal shopper?

24   A    No, one time I shopped for him from his request.

25   Q    Okay.  Now, during your interview with the Government,

Alex - cross - Cannick                3378

1  didn't you tell the Government that Kelly hired you to pick

2  out his clothes day-to-day and assist in his wardrobe for his

3  concert, didn't you tell that to the Government?

4  A    Those are the things he wanted me to --

5  Q    Beg your pardon?

6  A    Those are the things he wanted me to say that I did.

7  Q    But that's what you told the Government, am I correct?

8  A    Yeah, I told --

9  Q    Mr. Kelly wasn't there with you at the Government's

10 office?

11         THE COURT:  You have to let him finish answering --

12         MR. CANNICK:  Okay.

13         THE COURT:  -- and then you can --

14 BY MR. CANNICK:

15 Q    Mr. Kelly wasn't with you at the Government's office when

16 you were giving this interview, am I correct?

17 A    Correct.

18 Q    You were there alone with U.S. Marshals, am I correct?

19         MS. SHIHATA:  Objection.

20 A    No.

21         THE COURT:  Overruled.

22         Do you know who was there?

23         THE WITNESS:  Yes.  Some agents, but not marshals.

24 I don't think they marshals.

25 BY MR. CANNICK:

Alex - cross - Cannick                    3379

1  Q   Okay, so you were there with some federal agents?

2  A   Yes.

3  Q   You were there with some federal lawyers?

4  A   Okay.

5  Q   Okay what?

6  A   Yes, true.

7  Q   But you weren't there with Mr. Kelly?

8  A   Correct.

9  Q   You were giving them information?

10 A   Yes.

11 Q   "Them" being these government officials that you just

12 spoke of?

13 A   Correct.

14 Q   And when you gave them this information, isn't it a fact

15 that you told them that during 2012 to 2004 [sic] that Kelly

16 paid you to be his personal shopper, Kelly hired you to pick

17 out his clothing for day-to-day wear and wardrobe his concert,

18 didn't you tell them that?

19 A   No, he told me to -- to lie and say I did those things,

20 but I did pick out his clothes once.

21 Q   So, you lied to the federal agent?

22 A   No, those are things he told me that I did.

23 Q   Well, if he told you and it wasn't true, then it's a lie?

24 A   I'm telling them what he told me.

25 Q   No, my question is he wasn't in the room when you were

Alex - cross - Cannick                                    3380

1    telling the federal government this, am I correct?

2    A    No; correct.

3    Q    You were sitting there in front of them, am I correct?

4    A    Correct.

5    Q    You were giving them information, am I correct?

6    A    Correct.

7    Q    Mr. Kelly was no place to be found, am I correct?

8    A    Correct.

9    Q    So, when they asked you about what you were doing for

10   him, you told them that he hired you to be his personal

11   shopper?

12   A    Yeah, when you brainwashed along, yeah.

13   Q    Oh, you were brainwashed now?

14   A    When you brainwashed along, that's how.

15   Q    Okay.  You were brainwashed for how long, sir?

16   A    Objection.

17            THE COURT:  You can't object.  Do you understand the

18   question?

19            THE WITNESS:  No, I don't.  I don't know how -- I

20   don't know what time.

21            MR. CANNICK:  You want an objection, don't you?

22            THE COURT:  Do you want to put another question?

23            MR. CANNICK:  No, Your Honor, I'm done.

24            THE COURT:  I overruled his objection.

25            No more questions?

Alex - redirect - Shihata                    3381

1          MR. CANNICK:  I'm done.

2          THE COURT:  Any redirect?

3          MS. SHIHATA:  Yes.

4          THE COURT:  Okay.

5   REDIRECT EXAMINATION

6   BY MS. SHIHATA:

7   Q    The first time you met with federal agents, they came to

8   your house, correct?

9   A    Correct.

10  Q    And you had no idea how they found you, correct?

11  A    No idea.

12  Q    Were you expecting them --

13  A    No.

14  Q    -- when they came?

15  A    No.

16  Q    And you told them -- I think you testified on

17  cross-examination -- did you tell them that you told them

18  things the defendant had told you to say previously, is that

19  right?

20  A    Correct.

21  Q    That you were his stylist?

22  A    Correct.

23  Q    And previously the defendant had told you to say these

24  things if anybody asked, right?

25  A    Correct.

SAM    OCR    RMR    CRR    RPR

A 1264

Alex - recross - Cannick                    3382

1          MS. SHIHATA:  Nothing further.

2          THE COURT:  Anything else?

3          MR. CANNICK:  Just one thing.

4          THE COURT:  Only one?

5          MR. CANNICK:  Give me four.

6    RECROSS-EXAMINATION

7    BY MR. CANNICK:

8    Q    When they came, when the agents came to you, they

9    introduced themselves as federal marshals -- federal agents?

10         THE COURT:  As what?

11         MR. CANNICK:  Federal agents.

12   A    No, no, I was at home at the time.

13   Q    No, at some point in time you met them?

14   A    Yeah, yeah.

15   Q    And they introduced themselves to you as federal agents,

16   am I correct?

17   A    Like Homeland Security or something.

18   Q    Yes, Homeland Security?

19   A    Right.

20   Q    You you understood that they were federal agents, am I

21   correct?

22   A    Correct.

23   Q    And they also told you that making a false statement to

24   them was a crime, am I correct?

25   A    Correct -- no.

Alex - recross - Cannick                3383

1  Q    Oh, they didn't tell you that?

2  A    They didn't tell me nothing like that, no.

3  Q    Oh, okay.

4           MR. CANNICK:  No more questions, Your Honor.

5           THE COURT:  All right, anything else?

6           MS. SHIHATA:  Nothing further.

7           THE COURT:  All right, thank you so much.  You can

8  step down.

9           THE WITNESS:  Thank you.

10           (Witness steps down and exits the courtroom.)

11           THE COURT:  How is everybody doing?  Good?  Do you

12  want a break?

13           All right, so a few people want a break.  We will

14  break for -- you do want to go or you don't?

15           THE JURORS:  Yes.

16           THE COURT:  All right.

17           THE COURTROOM DEPUTY:  All rise.

18           (Jury exits.)

19           THE COURT:  Everybody have a seat.

20           Do you have another witness?

21           MS. GEDDES:  Yes.

22           THE COURT:  And who is the witness?

23           MS. GEDDES:  Alesiette Mayweather.

24           THE COURT:  Oh, could I see the parties at the side

25  for just a second?

Alex - recross - Cannick                    3384

1          (Sidebar held off the record with the Court and
2    counsel only.)
3              THE COURT:  We're in recess.
4              (Recess taken.)
5              (Judge ANN M. DONNELLY exited the courtroom.)
6
7              (Continued on the following page.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Mayweather - direct - Geddes                    3387

1    **ALESIETTE MAYWEATHER**,

2              called by the Government, having been

3              first duly sworn, was examined and testified

4              as follows:

5    DIRECT EXAMINATION

6    BY MS. GEDDES:

7              THE COURT:  Just a couple of things before you

8    start, the microphone is on, isn't it?  The key thing is want

9    to be sure that everybody can hear you.  Make sure you use the

10   microphone.  Don't speak too quickly.  I want to be sure that

11   the Court reporter can get down everything you say.  If

12   there's a question that isn't clear or you want it repeated,

13   tell me and I will direct the lawyers to rephrase it.  And do

14   your best to just answer the question that you are being asked

15   Q    Did you receive a subpoena to testify here today?

16   A    I did.

17   Q    Do you want to be here today?

18   A    Absolutely not.

19   Q    I am showing you what's in evidence as Government Exhibit

20   1.  Do you recognize the individual shown in Government

21   Exhibit 1?

22   A    I do.

23   Q    Who is that?

24   A    It's Robert.

25   Q    Do you know him personally?

Mayweather - direct - Geddes                3388

1   A    I do.

2   Q    Do you see him in the courtroom today?

3   A    I do.

4   Q    Can you point to him and describe and article of his

5   clothing?

6   A    He has on a gray suit.

7            THE COURT:   Indicating the defendant.

8   Q    I want to direct your attention to 2015.  What was your

9   relationship to the defendant at that time?

10  A    I was a friend.

11  Q    Did you start -- go ahead.

12  A    And then I later became an employee.

13  Q    And what type of employee were you with the defendant?

14  A    A personal assistant.

15  Q    For how long were you a personal assistant for the

16  defendant?

17  A    Formally about eight months.

18  Q    And do you recall when you formally became his personal

19  assistant?

20  A    Around December of that year.

21  Q    Of 2015?

22  A    Of 2015.

23  Q    And do you recall when you stopped working as his

24  personal assistant?

25  A    Somewhere in June of 2016.

Mayweather - direct - Geddes                    3389

1    Q    And prior to formally starting to work for the defendant,

2    did you accompany him on some bus trips while he was on tour?

3    A    I did.

4    Q    Do you have any siblings?

5    A    I do.

6    Q    How many?

7    A    One.

8    Q    How old is she compared to you?

9    A    We're twins.

10   Q    And do you have a nickname?

11   A    Yes.

12   Q    What is that?

13   A    Twin.

14   Q    Now you testified that you formally started working for

15   the defendant at the end of 2015.  When did you meet him,

16   approximately?

17   A    Sometime in the late '90s.

18   Q    And how did you meet him?

19   A    Through mutual friends.

20   Q    Prior to being introduced to him through mutual friends,

21   had you attended any R. Kelly concerts?

22   A    I had, yes.

23   Q    And would you consider yourself a fan?

24   A    Yes.

25   Q    Before you started to work for the defendant either on an

1  informal or a formal basis, where did you see the defendant?

2  A    Where did I see him?

3  Q    Yes, just generally speaking where would you see the

4  defendant?

5  A    At shows, at parties.

6  Q    And where did you attend parties?

7  A    At his house or at the studio.

8  Q    Where was he -- what house did you attend parties at?

9  A    Olympia Fields.

10 Q    Is that a suburb of Chicago?

11 A    Yes.

12 Q    And you testified that you also went to some parties at

13 his studios; is that correct?

14 A    Yeah, I did.

15 Q    Or that you saw him at his studio?

16 A    I saw him at his studio, yes.

17 Q    Which studios do you recall seeing the defendant at?

18 A    His studio in downtown Chicago and then of course the

19 Justine studio.

20 Q    And the second studio that you mentioned, was that a

21 studio on Justine Street?

22 A    Yes.

23 Q    Also in Chicago?

24 A    Yes.

25 Q    Now, when you started to work for the defendant, what was

Mayweather - direct - Geddes                          3391

1  your schedule?

2  A    Two weeks on, two weeks off.

3  Q    And when you were not -- when you were on a two-week

4  break or you were on a two-week break not working, who was

5  working and performing your job?

6  A    My sister.

7  Q    Your twin sister?

8  A    My twin sister.

9  Q    What were your responsibilities as a personal assistant

10 for the defendant?

11 A    Just basically taking care of his daily needs whether it

12 was running errands or making sure he was awake for meetings

13 when someone would come to the studio.

14 Q    While you were working for the defendant did you

15 accompany him on any tours?

16 A    I did.

17 Q    Which tour or tours did you go on?

18 A    One was the Buffet tour and I think some other dates were

19 just dates.  I'm not sure if it was an actual tour.

20 Q    So, in addition to accompanying the defendant on the

21 Buffet tour did you also go to other cities where he was

22 playing at these one-off concerts?

23 A    I did, yes.

24 Q    And when you were on tour with the defendant or going to

25 other cities where he was performing, while you were working

Mayweather - direct - Geddes                    3392

1    for minimum would you attend the concerts?

2    A    Yes.

3    Q    And what if any responsibilities did you have during

4    those concerts?

5    A    Just making sure his guests were seated where they needed

6    to be seated or making sure he needed what he needed.

7    Q    And what you're referring to -- in your last answer when

8    you refer to guests, what type of guests are you referring to?

9    A    Any guests that were invited to the show or his

10   girlfriends.

11   Q    I'm showing you what's in evidence as Government Exhibit

12   75.

13          (Exhibit published.)

14   BY MS. GEDDES:

15   Q    Without saying this individual's name, do you recognize

16   her?

17   A    Yes.

18   Q    And do you know her first and last name?

19   A    Yes.

20   Q    And I am showing the jury only what's in evidence as 75A.

21          (Published to jury only.)

22   Q    Is that -- is that that same photograph shown in

23   Government Exhibit 75 with the true first and last name of

24   that individual?

25   A    Yes.

Mayweather - direct - Geddes                    3393

1   Q    For today we're going to call her Jane, okay?

2   A    Okay.

3   Q    Where did you first meet Jane?

4   A    In New York.

5   Q    And through whom did you meet Jane?

6   A    Through Rob.

7   Q    And what happened, where did you meet her?

8   A    At would have been of his shows at the Barclay, but

9   initially it was he and my sister were on a FaceTime call.

10  Q    And were you with your sister when she was on a face time

11  call with the defendant?

12  A    I was, yes.

13  Q    And during that call, did you see Jane on the other end

14  of the FaceTime call?

15  A    Yes.

16  Q    And then subsequently you saw her when you were in New

17  York for the concert at the Barclays; is that correct?

18  A    Yes.

19  Q    What if any nicknames did you and your sister use for

20  Jane?

21  A    We called her Niece.

22  Q    And do you recall how the defendant introduced you or --

23  you and your sister to Jane?

24  A    I don't know how he introduced me but he introduced my

25  sister.

Mayweather - direct - Geddes                    3394

1  Q    Were you present for that conversation?

2           MR. CANNICK:  Objection.

3           THE COURT:  Overruled.

4  BY MS. GEDDES:

5  Q    I want to direct your attention tension to September 25

6  of 2018.  Do you recall where you were that day?

7  A    No.

8  Q    I'm showing the defendant what's been marked for

9  identification as 540K and I'm going to direct your attention

10 to where my pen is pointed.  Can you read that?

11 A    It says, Okay --

12 Q    Does it refresh your recollection as to where you were?

13 A    Yes, yes.

14 Q    Where were you?

15 A    In New York.

16          THE COURT:  Are these in evidence?

17          MS. GEDDES:  This is not.  This was just to refresh

18 her recollection.

19 BY MS. GEDDES:

20 Q    And why were you in New York?

21 A    For Rob's concert.

22 Q    And was that the concert at the Barclays?

23 A    Yes.

24 Q    Where did you go after the concert -- do you know where

25 the Barclays is?

Mayweather - direct - Geddes                    3395

1   A    Yes.

2   Q    Where is it?

3   A    In Brooklyn.

4   Q    Here in Brooklyn, New York?

5   A    Yes.

6   Q    And did you -- where did you go after Brooklyn?  Did you

7   continue to travel -- did you go somewhere else with the

8   defendant?

9   A    Yes.

10  Q    Where did you go?

11  A    From New York to D.C.

12  Q    And how did you travel between New York and D.C.?

13  A    On the Sprinter.

14  Q    And how about your sister?  I -- you testified earlier

15  that you -- was your sister in Brooklyn with you?

16  A    Yes.

17  Q    And did she travel to D.C. with you?

18  A    No.

19  Q    What did she do?

20  A    She went back to the airport.

21  Q    And did you then meet her in D.C.?

22  A    Yes.

23  Q    Or did she return to D.C..

24       How did you get from New York to D.C.?

25  A    On a Sprinter.

Mayweather - direct - Geddes          3396

1  Q    Whose Sprinter?

2  A    Rob's Sprinter.

3  Q    Who if anyone else was on the Sprinter with you from that

4  trip between New York and D.C.?

5  A    Jane, and Rob was on and off.

6  Q    The defendant was on and off during the trip between New

7  York and D.C.; is that correct?

8  A    Correct.

9  Q    What, if anything, did you observe about Jane during that

10 trip?

11 A    She slept most of the trip.

12 Q    Did she get off the Sprinter van?  Did you answer or are

13 you thinking?

14 A    I'm thinking.  Only when we made one particular stop that

15 I recall.

16 Q    And which stop are you recalling, where did you stop?

17 A    I think it was a Best Buy.

18 Q    And did do you recall why you were at the Best Buy?

19 A    To purchase a computer.

20 Q    For whom?

21 A    For Jane.

22 Q    And who purchased the computer for Jane?  Who paid for

23 that?

24 A    I believe Robert did.

25 Q    And by the way when you said that the defendant was on

Mayweather - direct - Geddes                    3397

1   and off the Sprinter van, what do you mean by that?

2   A    He, well part of the way on the Sprinter and then he

3   would get on the tour bus.  He got on the tour bus at some

4   point.

5   Q    What, if anything, did you hear Jane call the defendant

6   during that trip?

7   A    Daddy.

8   Q    Once you arrived in D.C., what did you do?

9   A    Checked into a hotel and then I flew out the next

10  morning.

11  Q    And do you recall why you were in D.C.?

12  A    I believe he had a show.

13  Q    In D.C.?

14  A    Yes.

15  Q    And you then returned to Los Angeles; is that correct?

16  A    Correct.

17  Q    Were you living in Los Angeles at that time?

18  A    Yes.

19  Q    Now, when you started to -- at the time when you traveled

20  with Jane from New York to D.C., were you formally working for

21  the defendant at that time?

22  A    No.

23  Q    But you did later start to formally work for him; is that

24  correct?

25  A    Correct.

Mayweather - direct - Geddes                    3398

1    Q    When you did start to formally work for him, were there

2    females who were effectively living with the defendant?

3    A    Yes.

4    Q    And was Jane one of those females?

5    A    Yes.

6    Q    I'm showing you what's in evidence as Government Exhibit

7    69B?

8              (Exhibit published.)

9    Q    Do you recognize that individual?

10   A    Yes.

11   Q    What is her first name only?

12   A    Dominique.

13   Q    And do you know her true first and last name without

14   saying it?

15   A    Yes.

16   Q    Was Dominique one of the females effectively living with

17   the defendant when you started to formally work for him?

18   A    Yes.

19   Q    I'm showing you what's in evidence as Government Exhibit

20   52B?

21             (Exhibit published.)

22   Q    Do you recognize that individual?

23   A    Yes.

24   Q    Without saying it do you know her true first and last

25   name?

Mayweather - direct - Geddes                    3399

1   A    Yes.

2   Q    Do you also know a nickname for her?

3   A    Yes.

4   Q    What is her nickname?

5   A    Juice.

6   Q    And when you started to formally work for the defendant,

7   was Juice one of the females who were effectively living with

8   him?

9   A    Yes.

10           MS. GEDDES:  I'm showing the witness what's in

11   evidence as Government Exhibit 72.

12           (Exhibit published.)

13   Q    Do you recognize the individual shown in Government

14   Exhibit 72?

15   A    Yes.

16   Q    And do you know her true first and last name?

17   A    Yes.

18   Q    And do you also know a nickname for her?

19   A    Yes.

20   Q    What is her nickname?

21   A    Vee.

22   Q    And was Vee one of the females who was effectively living

23   with the defendant when you started to work for him formally?

24   A    Yes.

25   Q    And I'm showing you what's in evidence as Government

Mayweather - direct - Geddes                    3400

1   Exhibit 78?

2              (Exhibit published.)

3   Q    Do you recognize that individual?

4   A    Yes.

5   Q    And without saying it, do you know her first and last

6   name?

7   A    Yes.

8   Q    What is her first name?

9   A    Jocelyn.

10  Q    During the period that you were working for the

11  defendant, what was her relationship with the defendant?

12  A    A girlfriend.

13  Q    Was she living with him at the time that you worked for

14  the defendant?

15  A    Not immediately, no.

16  Q    And during any point during the eight-month period that

17  you were formally working for the defendant, was she

18  effectively living with the defendant?

19  A    She was transitioning in at the end when I was leaving,

20  right before I left.

21  Q    And when you say transitioning, what do you mean?

22  A    She was moving in, I guess, I would say.

23  Q    And prior to that time, what was her relationship with

24  the defendant?

25  A    She was the girlfriend who would fly in and out to visit.

Mayweather - direct - Geddes                    3401

1  Q    And did you sometimes arrange her travel to see the
2  defendant?
3  A    Yes.
4  Q    Now, what if any rules did the defendant tell you about
5  during your employment with him?
6  A    Just one was to knock before entering rooms and then not
7  to talk to any guys around his girlfriends.
8  Q    Now, from the time that you first met the defendant in,
9  did you say, the late '90s?
10 A    Yes.
11 Q    Until you started to formally work for him, had you met
12 some of the men who worked for an associated with the
13 defendant?
14 A    Yes.
15 Q    And had you become friendly with them?
16 A    Yes.
17 Q    And when the defendant told you that he didn't want you
18 to interact with those individuals, what did you understand
19 him to mean?
20 A    Only not to interact with them around his girlfriends.
21 Q    So it's fair to say that you were free under the
22 defendant's rule to interact with them as long as the
23 defendant's girlfriends were not present?
24 A    Yes.
25 Q    Did you interact with any of the defendants girlfriends

SN      OCR      RPR
A 1282

Mayweather - direct - Geddes                    3402

1  by telephone?

2  A    Yes.

3  Q    Who did you interact with?

4  A    Juice.

5  Q    Did you have an opportunity other than Jane to hear how

6  the defendant's girlfriends referred to the defendant in his

7  presence?

8  A    Yes.

9  Q    What did they call him?

10 A    Daddy.

11 Q    All of them?

12 A    Yes.

13 Q    How did the defendant's female guests and live-in

14 girlfriends refer to the defendant when they were talking

15 about him to you?

16 A    Mr. Kelly.

17 Q    And would all of them do that?

18 A    Yes.

19 Q    I'm showing you what is --

20      MS. GEDDES:  Well, the Government offers 240U.  I

21 think this is one that there is no objection to.

22      THE COURT:  All right.

23      No objection; right, Counsel?

24      MR. CANNICK:  No.

25      THE COURT:  That is in evidence.

Mayweather - direct - Geddes                    3403

1          (Government Exhibit 240U received in evidence.)

2    BY MS. GEDDES:

3    Q    Now, are these text messages that you sent on September

4    27 of 2015?

5    A    Yes.

6    Q    Are these messages that you exchanged with your twin

7    sister?

8    A    Yes.

9    Q    And in the column marked Name, does that indicate your

10   twin sister and her telephone number?

11   A    Yes.

12   Q    And we're going to cover up her telephone number so it

13   can be published to the jury or to the public.

14          (Exhibit published.)

15   Q    In the first text where it says:  She says yes, sir, no,

16   sir to him.  He makes them respect him.  Do you recall who you

17   were referring to, the "she"?

18   A    Jane.

19   Q    And who was the "he" in that sentence?

20   A    Rob.

21   Q    And then continuing on you say:  And Daddy.  So I figured

22   that's why he told her we are her aunties because we are his

23   sisters.  Who is the "her" in that sentence?

24   A    Jane.

25   Q    And the "his"?

Mayweather - direct - Geddes                    3404

1   A      Rob.

2              THE COURT:  Is this a good time to break?  I think

3   I've got us right to 6 o'clock.

4              MS. GEDDES:  Sure.

5              THE COURT:  So the witness can step out.  We will

6   see you tomorrow.

7              (Witness steps down.)

8              THE COURT:  Ladies and gentlemen we are going to

9   break for tonight.  I will see you tomorrow morning, same

10  time.  Don't talk about the case in any way, shape or form.

11  Don't look anything up about the case, don't listen to any

12  reports about it or read anything about it or anything like

13  that.  Do have a good night.  I will see you tomorrow morning.

14  Thank you so much.

15             THE COURTROOM DEPUTY:  All rise.

16             (Jury exits.)

17             THE COURT:  Everybody can have a seat.

18             Is there anything that we have to do before we break

19  for the day?

20             MR. CANNICK:  Nothing from us, Your Honor.

21             THE COURT:  Okay.

22             MS. GEDDES:  Can we just address one issue at

23  sidebar?

24             THE COURT:  The reporter isn't needed for this?

25             MS. GEDDES:  No, Your Honor.  It's just for

Mayweather - direct - Geddes                3405

1  scheduling purposes.

2          THE COURT:  Okay.  Thank you.

3

4

5      (Matter adjourned until September 14, 2021 at 9:30 a.m.)

6

7                    - ooOoo -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mayweather - direct - Geddes                    3411

1  want people to be aware if there are additional things that

2  you want me to include in the charge, I would like those

3  sooner rather than later.  I know that there were -- they were

4  pretty standard at the beginning but I don't want to be doing

5  this at the last minute so I would like those by the end of

6  the week.

7              MR. CANNICK:  Can I ask for the Court's indulgence

8  for maybe a five-minute recess?  There's some questions that

9  Mr. Kelly has.  I got here late this morning because of the

10  traffic.

11              THE COURT:  You want to do it now?

12              MR. CANNICK:  Yes, please.

13              THE COURT:  Do you want to go in the back?

14              MR. CANNICK:  Yes, please.

15              THE COURT:  That is fine.

16              (Pause in proceedings.)

17              (Witness takes the stand.)

18              (Jury enters.)

19              THE COURTROOM DEPUTY:  You may be seated.

20              THE COURT:  Good morning, everybody.  Sorry for the

21  late start, but the good news is again we are doing some

22  time-saving work.  So we are ready to continue with the direct

23  examination of the witness.

24              THE COURTROOM DEPUTY:  The witness is reminded she

25  is still under oath.

Mayweather - direct - Geddes                                    3412

1   **ALESIETTE MAYWEATHER**, having been previously duly

2        sworn/affirmed, testified as follows:

3   DIRECT EXAMINATION

4   BY MS. GEDDES:

5   Q    Good morning.

6   A    Good morning.

7   Q    When we stopped yesterday we were talking about your

8   employment with the defendant when you served as one of his

9   assistants.

10  A    Okay.

11  Q    What, if anything, did you notice about the defendant's

12  female guests or his live-in girlfriends' reaction when the

13  defendant entered a room where they were in?

14  A    They would get up to kiss him.

15  Q    How many of them would do that?

16  A    All of them.

17  Q    Now, when you were working for the defendant, what if any

18  requests did you receive regarding the use of a restroom?

19  A    Just a text message to ask him if they could go.

20  Q    And when you're referring to "they," who are you

21  referring to?

22  A    Whoever needed to go.

23  Q    Referring to the defendant's --

24  A    Girlfriends.

25  Q    -- live-in girlfriends?

Mayweather - direct - Geddes                    3413

1   A    Yes.

2   Q    And what would you do when you would receive those

3   messages?

4   A    I would reach out to him.

5   Q    Did you spend time on the defendant's Sprinter vans?

6   A    I did.

7   Q    And when you were on the Sprinter, what would you do if

8   you were stopped and you needed to use a restroom?

9   A    I would get off the Sprinter and use the restroom.

10              MR. CANNICK:  Can you please repeat --

11              THE COURT:  Just repeat what you said?

12              PROSPECTIVE JUROR:  I would get off the Sprinter to

13   use the restroom.

14   Q    And what, if anything, did you notice about his female

15   girlfriends -- female guests or live-in girlfriends what they

16   would do when they needed do use a restroom on the Sprinter

17   van?

18   A    They would use cups.

19   Q    And were there cups in the Sprinter van available for

20   their use?

21   A    Sometimes, yes.

22   Q    Did you accompany the defendant's female guests or his

23   live-in girlfriends on public outings?

24   A    I did.

25   Q    Where would you accompany them?

Mayweather - direct - Geddes                    3414

1   A    To the mall, to the nail salon, to get massages.

2   Q    And what was your role in going with the defendant's

3   female guests or live-in girlfriends to these locations?

4   A    I didn't have a particular role, but if -- if we went to

5   the mall and there was a male cashier, then I took care of the

6   transaction.

7   Q    And how, if at all, would you keep the defendant apprised

8   of what you were doing when you were with his girlfriends on

9   public outings?

10  A    If I needed to keep him apprised, I would text him.

11           MS. GEDDES:  The Government offers Government

12  Exhibit 240(p).  I believe there is no objection.

13           MR. CANNICK:  I just need to see what it is.

14           MS. GEDDES:  No problem.  The Government offers

15  240(p).

16           MR. CANNICK:  No objection.

17           THE COURT:  All right.  That's in evidence.

18           (Government Exhibit 240(p) received in evidence.)

19           MS. GEDDES:  May I publish?

20           THE COURT:  Yes.

21           (Exhibit published.)

22  BY MS. GEDDES:

23  Q    I'm going to direct your attention to page three of

24  Government Exhibit 240(p) and looking at line 20542 going down

25  to 20575, who are those text messages from?

Mayweather - direct - Geddes                    3415

1   A    They're from me.

2   Q    And who were you sending those messages to?

3   A    To Rob.

4   Q    The defendant?

5   A    Yes.

6   Q    And were those text messages on October 27th of 2015?

7   A    Yes.

8   Q    And I'm going to quickly read them and ask you a

9   question.  20540 says:  We're together.  Then it's:  Going to

10  410 North Wells.  In taxi.  At nail shop.  In taxi headed back

11  to hotel.  She's back in her room.

12          Now, as you sit here today do you know who was the

13  "she" in those particular text messages?

14  A    I don't recall.

15  Q    Even if you don't know who, is it fair to say that that

16  related to one of the defendant's female guests or live-in

17  girlfriends?

18          MR. CANNICK:  Objection.

19          THE COURT:  Overruled.

20          Do you know?

21          THE WITNESS:  Do I know --

22          THE COURT:  Do you know if these referred -- these

23  texts referred to one of the defendant's live-in girlfriends

24  or his female guests?

25          THE WITNESS:  Yes.

Mayweather - direct - Geddes                3416

1   BY MS. GEDDES:

2   Q    I am now directing your attention to page ten of that

3   same Government exhibit and I will start with the text message

4   labeled 40867 and go down to 40901.

5            Again, looking at those text messages, are those

6   text messages that you sent to the defendant?

7   A    Yes.

8   Q    And were those sent on March 27th of 2016?

9   A    Yes.

10  Q    While you were working for him?

11  A    Yes.

12  Q    The first one reads:  Headed to Water Tower now.  Just

13  noticed my last text didn't go through.  We just left Old Navy

14  and now at the Gap on State.  We are headed back.  Taxi is

15  five minutes away.

16            What is the Water Tower?

17  A    It's a mall.

18  Q    It's a mall?

19  A    Yes.

20  Q    Is that in Chicago?

21  A    Yes.

22  Q    Now, what if any rules did you learn that the defendant

23  had with respect to his live-in girlfriends going to the salon

24  or a salon?

25  A    The person who provided the services needed to be a

1  female.

2  Q    And how did you learn that?

3  A    I know he mentioned it once.

4  Q    Do you recall what he said to you?

5  A    Well, it was when they were getting massages.  He just

6  wanted the person to be a female when they were getting

7  massages.

8  Q    And to be clear, the "he" in that sentence is the

9  defendant?

10  A    Yes, Rob, yes.

11  Q    And the "they" in that sentence, does that refer to his

12  live-in girlfriends?

13  A    Yes.

14  Q    Have you had an opportunity to ride in an elevator with

15  the defendant's live-in girlfriends?

16  A    Yes.

17  Q    What, if anything, did you see?  What, if anything, did

18  you observe during that?

19  A    If there were males on the elevator, they would face the

20  wall.

21  Q    Such that their back was to the door?

22  A    Yes.

23  Q    Are you familiar with punishment imposed by the

24  defendant?

25  A    Yes.

Mayweather - direct - Geddes                    3418

1   Q    What do you know about punishment, generally speaking,
2   imposed by the defendant?
3   A    That maybe being on the tour bus or either in a room,
4   just left in a room.
5   Q    And who are you referring to when --
6   A    The girlfriends.
7   Q    And who was responsible for leaving the girlfriends on a
8   tour bus or in a room?
9   A    The defendant.
10  Q    I want to direct your attention to December 27th of 2015
11  during the time period that you worked for the defendant.  Do
12  you recall where you were that day?
13  A    No.
14          MS. GEDDES:  The Government offers 240(c).
15          MR. CANNICK:  No objection.
16          THE COURT:  That is in evidence.
17          (Government Exhibit 240(c) received in evidence.)
18          (Exhibit published.)
19  BY MS. GEDDES:
20  Q    Please take a look at 240(c) and let me know if that
21  refreshes your recollection as to where you were the day
22  before these text messages were sent.
23  A    Yes.
24  Q    Where were you?
25  A    At the studio.

Mayweather - direct - Geddes                    3419

1  Q    Which studio?

2  A    On Justine.

3  Q    That's in Chicago?

4  A    Yes.

5  Q    Do you know where Jane was that evening of December 27 of

6  2015?

7  A    In a room.

8  Q    Which room?

9  A    A room on the first level of the studio.

10  Q    And where did she stay that evening?

11  A    In the room on the first level of the studio.

12  Q    Approximately what time did she -- was she -- did she

13  start to be in that room?

14  A    According to this exhibit around 8 p.m. the day before.

15  Q    And just to be clear, are these text messages that you

16  sent?

17  A    Yes.

18  Q    And are they text messages that you sent on December 28th

19  of 2015?

20  A    Yes.

21  Q    I'm going to start by reading -- who did you send them

22  to?

23  A    My sister.

24  Q    I'm going to start by reading the first one.  It says:

25  Niece has been confined to the room since around -- around 6

Mayweather - direct - Geddes                    3420

1   p.m. and he has Juice, V and D are upstairs but he's gone

2   home.  And then you received a text question:  6 p.m.

3   yesterday?  And one text later you say:  Yes.  Yesterday after

4   maybe around 8 p.m.

5            Who were you referring to when you said Niece had

6   been confined to her room?

7   A    Jane.

8   Q    And when you referenced he has Juice, V and D upstairs,

9   who is the "he" in that sentence?

10  A    Rob.

11  Q    And are Juice, V and D -- who does D refer to?

12  A    Dominique.

13  Q    And are Juice, V and D some of the defendant's live-in

14  girlfriends that you defendant about yesterday?

15  A    Yes.

16  Q    Now, you sent these text messages at 7:30 p.m. on

17  December 28th of 2015; is that correct?

18  A    Yes.

19  Q    As you sit here today, do you know how long Jane stayed

20  in that room after you sent those text messages?

21  A    No.

22  Q    You can only -- and the reason -- do you recall that

23  particular day?

24  A    I do now, yes.

25  Q    Okay.  But is it fair to say that you recall having now

Mayweather - direct - Geddes                    3421

1  reviewed your text messages from that day?

2  A    Yes.

3  Q    I'm going to direct your attention to Mother's Day

4  weekend of 2016.

5         Do you recall where you were that weekend?

6  A    No.

7         MS. GEDDES:  I'm going to show the witness what's

8  been marked only for identification.  I'm not going to mark

9  this exhibit.  I'm going to show the witness what's been

10 marked for identification Government Exhibit 240(f).

11        (Exhibit published to witness only.)

12 Q    Does that refresh your recollection as to where you were

13 at lease as of May 5th of 2016?

14 A    In Chicago.

15 Q    Working for the defendant?

16 A    Yes.

17        MS. GEDDES:  And I now offer Government Exhibits

18 240(w) and 240(f).

19        THE COURT:  Any objection?

20        MR. CANNICK:  None, but while it's being retrieved

21 can I see the last document that was used to refresh her

22 recollection?

23        MS. GEDDES:  Yes.

24        The Government also offers Government Exhibit 971.

25        MR. CANNICK:  No objection.

Mayweather - direct - Geddes                    3422

1           THE COURT:  Okay.  That's in evidence.

2           (Government Exhibits 240(w), 240(f) and 971 received

3   in evidence.)

4           (Exhibit published.)

5   BY MS. GEDDES:

6   Q    I'm showing what's in evidence as Government Exhibit 971

7   and it's a calendar from May 2016 showing that Mother's Day

8   was on Sunday, May 8th.

9           (Exhibit published.)

10  Q    Now showing you what's in evidence as 240(f)?

11          (Exhibit published.)

12  Q    I'm going to start by showing you line 47816, which is

13  this text message where my pen is pointing.  Is that a text

14  message that you sent to your twin sister on May 10th of 2016?

15  A    Yes.

16  Q    And it says:  IDK.  We're on here now but she's in the

17  back.  No, I stayed with her Sunday night from around 9:30

18  p.m. - 9:30 a.m.  She was in the back and it was peaceful.  I

19  didn't hear her move at all, no restroom or nothing.  I got

20  much-needed sleep.  Then J went to the bus for a few hours.

21  We just left the bus.  She is still there.  Something is

22  strange.

23          And just going back to so that text message that I

24  just read was sent on May 10, 2016 which, looking back on

25  Government Exhibit 971, was a Tuesday; is that correct?

SN        OCR        RPR
A 1298

Mayweather - direct - Geddes                3423

1    A    Correct.

2    Q    And in the text message you refer to -- you wrote, you

3    said:  I stayed with her Sunday night.

4              It's fair to say that Sunday was Mother's Day

5    Sunday, May 8, 2016?

6    A    Yes.

7    Q    Now, when you wrote:  I stayed with her Sunday night from

8    around 9:30 p.m. to 9:30 a.m., what were you referring to?

9    A    The tour bus.

10   Q    And where was the tour bus parked?

11   A    Across the Main Street from the Justine studio.

12   Q    In Chicago?

13   A    In Chicago.

14   Q    Is that in downtown Chicago?

15   A    I don't think it's considered downtown.

16   Q    Okay.  Is it in the city of Chicago though?

17   A    It is in the city of Chicago.

18   Q    And when you said, I stayed with her Sunday night, who

19   was the "her" in that sentence?

20   A    Jane.

21   Q    Where did you stay that evening?

22   A    On the tour bus.

23   Q    And where did Jane stay?

24   A    On the tour bus as well.

25   Q    Why did you stay with the tour bus -- why did you stay

Mayweather - direct - Geddes                    3424

1  with Jane on the tour bus on Sunday evening, May 8th?

2  A    I'm sure I was asked to stay with her.

3            MR. CANNICK:  Objection.

4            THE COURT:  Overruled -- sustained as to form.

5            Do you have a recollection of why you stayed with

6  her?  Was there a hotel available?

7            THE WITNESS:  I don't know.  I don't know about the

8  hotel, but we were just on the bus on the same street as the

9  studio.

10           THE COURT:  You were outside the studio, I see, but

11 you stayed on the bus with Jane?

12           THE WITNESS:  Yes.

13           THE COURT:  Why did you do that?

14           THE WITNESS:  I would have done it because I was

15 asked to do it.

16           THE COURT:  Okay, go ahead.

17 BY MS. GEDDES:

18 Q    By whom?

19 A    Mr. Kelly.

20 Q    And just to be clear, there were rooms in the studio on

21 Justine Street; correct?

22 A    Yes.

23 Q    And you you've already testified earlier about -- I will

24 ask you again.

25           Did Jane stay in the studio sometimes?

Mayweather - direct - Geddes                    3425

1   A    Yes.

2   Q    And was there a particular room within the studio where

3   she often stayed?

4   A    Yes.

5   Q    Fair to say there was room for her in the studio if she

6   had been allowed to stay there?

7   A    Yes.

8   Q    Now I'm going to read line 40872 on that same Exhibit

9   240(f).

10          (Exhibit published.)

11  Q    And this is a text message that you sent on May 10, 2016

12  to your sister; is that correct?

13  A    Yes.

14  Q    And, again, May 10th looking at 971 was a Tuesday?

15  A    Yes.

16  Q    Two days after Mother's Day Sunday?

17  A    Yes.

18  Q    The text reads:  He left a female sitting in the little

19  foyer in the studio and we are gone.  Unless he text and tell

20  her to leave she will be there three hours.  SMDH.  Also, N is

21  still on the bus since Saturday.  He has J and V and Rebecca

22  with him.  We're headed to the gym, rolling.

23          When you wrote, also, N still on the bus since

24  Saturday, who were you referring to when you wrote N?

25  A    Jane.

Mayweather - direct - Geddes                    3426

1  Q    And what was the nickname that you and your sister used

2  for Jane?

3  A    Niece.

4  Q    And when you said N is still on the bus since Saturday,

5  what bus are you referring to?

6  A    The tour bus.

7  Q    The same tour bus where you spent the night on Mother's

8  Day, sun May 8, 2016 with Jane?

9  A    Yes.

10 Q    And when it says, He has J and V and Rebecca with him,

11 who are you referring to when you said "he" in that sentence?

12 A    Bob.

13 Q    The defendant?

14 A    Yes.

15 Q    And when you wrote J, who are you referring to?

16 A    Juice.

17 Q    And V is that the V that you previously testified was one

18 of the defendant's girlfriends?

19 A    Yes.

20 Q    And who are you referring to when you mentioned Rebecca?

21 A    A friend of the defendant.

22 Q    A female friend?

23 A    Yes.

24 Q    Did you ever have any conversations with the defendant

25 about Juice and whether she had ever been on punishment --

Mayweather - direct - Geddes                    3427

1    MR. CANNICK:  Objection.

2         THE COURT:  Overruled.

3  Q    -- with the defendant?  I'm sorry.

4         THE COURT:  Overruled.

5  Q    Did you ever have any conversations with the defendant

6  and Juice about whether she had been on punishment?

7  A    Yes.

8  Q    When did you have the conversation with the defendant;

9  was it during the time you were working for him?

10 A    Yes.

11 Q    What, if anything, did the defendant say to you?

12 A    Well, I asked him about -- I led the conversation.

13 Q    And what did you ask the defendant?

14 A    I asked him something about Juice being on punishment

15 because she didn't travel with us for a couple of days.

16 Q    Because you noticed that she hadn't been traveling for a

17 couple of days; is that correct?

18 A    Yes.

19 Q    And when you say you noticed that she hadn't been

20 traveling, traveling where?  What are you referring to?

21 A    To the outings, to the gym particularly, yeah.

22 Q    To locations in the particular city where you happened to

23 be at that time?

24 A    Yes.

25 Q    How, if at all, did the defendant respond when you asked

SN      OCR      RPR

A 1303

Mayweather - direct - Geddes                          3428

1   him that?

2   A    Well, I used the word "punishment" and he just responded

3   back with the same word I used and he said, yeah, Juice gets

4   punished too.

5   Q    I want to direct your attention to Monday, May 16th of

6   2016.  Do you remember where you were that day?

7   A    No.

8        MS. GEDDES:  I'm going to show the witness only

9   Government Exhibit 240T.

10       (Exhibit published to witness only.)

11  Q    I'm going to direct your attention to line 48138.  Does

12  that refresh your recollection as to where you were on May 16,

13  2016?

14  A    Chicago.

15  Q    And when did you arrive in Chicago, approximately?

16  A    The morning of the 16th.

17  Q    And had you -- where had you traveled from?

18  A    From L.A.

19  Q    And did you take a red eye to get to Chicago that

20  morning?

21  A    I did.

22  Q    Where did you go when you arrived?

23  A    To the studio on Justine.

24  Q    Do you remember where you went after you went to the

25  studio?

Mayweather - direct - Geddes                    3429

1   A    No.

2              MS. GEDDES:  The Government offers 240(g).

3              THE COURT:  Any objection?

4              MR. CANNICK:  None.

5              THE COURT:  That is in evidence.

6              (Government Exhibit 240(g) received in evidence.)

7              MS. GEDDES:  And the Government also offers 240(x).

8              THE COURT:  Any objection?

9              MR. CANNICK:  Let me see what it is.

10             No objection.

11             THE COURT:  Okay.  That's in evidence.

12             (Government Exhibit 240(x) received in evidence.)

13             (Exhibit published.)

14  BY MS. GEDDES:

15  Q    Is this a text message that you sent on May 16, 2016?

16  A    Yes.

17  Q    And did you send it at 7:33 a.m. in Chicago time?

18  A    Yes.

19  Q    And it says:  Fucking tour bus with N.  I got to the

20  studio about 30 minutes ago so I relieved Diana from the tour

21  bus so she could leave.

22             Who are you referring to when you said N?

23  A    Jane.

24  Q    And is that the shorthand for the nickname Niece that you

25  and your sister used to refer to Jane?

Mayweather - direct - Geddes                     3430

1    A    Yes.

2    Q    And when you say I got to the studio about 30 minutes

3    ago, what studio are you referring to?

4    A    On Justine.

5    Q    Then it says:  So I relieved Diana from the tour bus so

6    she could leave.

7              Who is the Diana that you're referring to?

8    A    At that time Diana was the -- was a previous assistant.

9    Q    And what's Diana's last name?

10   A    Copeland.

11   Q    Did you then -- after you went to the studio does this

12   refresh your recollection as to where you went after that?

13   A    To the tour bus.

14   Q    And who was on the tour bus when you arrived?

15   A    Diana and Jane.

16   Q    And did Diana then leave?

17   A    She did.

18   Q    How long did you stay on the tour bus that day?

19   A    Maybe a couple of hours.

20   Q    And did you see Jane again that day?

21   A    I don't recall.

22   Q    I am showing you line -- I'm going back to Government

23   Exhibit 240(g).

24              (Exhibit published.)

25   BY MS. GEDDES:

Mayweather - direct - Geddes                    3431

1   Q    I'm going to direct your attention to line 48229 right up

2   here and you received a text that said Mr. Kelly said to come

3   to the bus to pick --

4              THE COURT:  Do you want to take that down, please?

5              MS. GEDDES:  Sorry.  Can I just show the jury only,

6   please?

7              THE COURT:  Yes.

8              MS. GEDDES:  Thank you, Judge.

9              (Exhibit published to jury only.)

10  BY MS. GEDDES:

11  Q    All right.  It says:  Mr. Kelly said to come to the bus

12  to pick, and then it uses the true first name of Jane.  And

13  then it says, Up.  Do you see that?

14  A    Yes.

15  Q    And you responded, Okay; correct?

16  A    Yes.

17  Q    And who did you receive that text message from where it

18  says, Mr. Kelly said to come to the bus?

19  A    Juice.

20  Q    And is the bus referenced here the tour bus?

21  A    Yes.

22  Q    Did you, in fact, then go and pick up Jane from the tour

23  bus as the defendant requested through Juice?

24  A    I did.

25  Q    Do you recall where you brought her?

SN        OCR        RPR

A 1307

Mayweather - direct - Geddes                    3432

1    A    To the studio on Justine.

2    Q    How did Jane appear when you picked her up on the bus?

3    A    I don't recall.

4              (Exhibit published.)

5              MS. GEDDES:  This can be displayed to the public and

6    this is page five of Government Exhibit 240(g).

7              (Exhibit published.)

8    BY MS. GEDDES:

9    Q    Is this a text message that you sent on May 17, 2016 --

10   I'm sorry, I'm referring to the text message where my pen is

11   which is item number 48362.

12   A    Yes.

13   Q    And who did you send that text message to?

14   A    Cash.

15   Q    Who is Cash?

16   A    She was Rob's stylist.

17   Q    What is her last name?

18   A    Howard.

19   Q    And the text message reads:  When she gets to Florida she

20   needs to run and never look back.  She should be living the

21   fun life of an 18-year-old high school senior.  She was on the

22   bus again.  I relieved Diana on the bus when I got here

23   yesterday morning at 7 a.m. and Juice relieved me at 10 a.m.

24   and then he had me to pick her up from the bus around 7 p.m.

25   and she has been in the back room...  she look rough eyes...

Mayweather - direct - Geddes                    3433

1  eyes puffy and et cetera.  She was left here last night.

2          Now, the text message that is shown in 240(f) where

3  you said that I got to the studio about 30 minutes ago and

4  relieved Diana from the tour bus so she could leave, that was

5  sent on the morning of May 16th; is that correct?

6  A    Yes.

7  Q    And the text message that is shown where my pen is

8  pointing to Cash, that one was sent the following evening; is

9  that correct?

10  A    Yes.

11  Q    May 7th at 9:55 p.m.?

12  A    Yes.

13  Q    About 36 hours after you got to Chicago and relieved --

14  I'm sorry, I might have said it wrong.

15          This text message where my pen is pointing on page

16  five of Government Exhibit 240(g) which is number 48362, was

17  sent on May 17th, 2016; is that correct?

18  A    Yes.

19  Q    And is that about 36 hours after you got -- arrived in

20  Chicago and went to the tour bus to relieve Diana Copeland?

21  A    Yes.

22  Q    And in this text message that you sent, when you refer to

23  "she," who are you referring to?

24  A    Jane.

25  Q    And in this text message you sent where it says, she

Mayweather - direct - Geddes                    3434

1   looked rough, eyes puffy and et cetera who are you referring

2   to in that one?

3   A    Jane.

4   Q    Describing how she appeared when you saw her?

5   A    Yes.

6   Q    And then when it goes on to say:  She was left here last

7   night.  Are you referring to the evening of May 16, 2016, the

8   day before you sent -- the evening before you sent this text

9   message?

10  A    Yes.

11  Q    Do you know where the "here" was that you're referring

12  to?

13  A    The studio.

14  Q    In Chicago?

15  A    In Chicago.

16  Q    And I am now directing your attention to 48358.  Is that

17  a text message that you also sent that same evening to that

18  same Cash Howard?

19  A    Yes.

20  Q    And it says:  Something is really strange about the

21  treatment and behavior of the little one.  The punishment is

22  real.

23       Who were you referring to when you wrote, the little

24  one?

25  A    Jane.

Mayweather - direct - Geddes                3435

1  Q    Now, when you reported to the studio on the morning of

2  May 16th and then went to the tour bus, at whose direction

3  were you acting?

4  A    Rob, the defendant's.

5  Q    Did there come a time where you obtained a cellular

6  telephone for one of the defendant's live-in girlfriends?

7  A    Yes.

8  Q    Who did you obtain a phone for?

9  A    Dominique.

10  Q    Do you recall when you obtained that phone?

11  A    No.

12       MS. GEDDES:  I am showing the witness only what's

13  been marked for identification as 240H.

14       (Exhibit published to witness only.)

15  Q    Do you recognize what's shown in 240H?

16  A    Yes.

17  Q    Does this refresh your recollection as to the general

18  timeframe when you obtained a cellular telephone for

19  Dominique?

20  A    Yes.

21  Q    Approximately when did you obtain that phone?

22  A    In June of 2016.

23  Q    And shown in 240H, are those text messages that you

24  ultimately exchanged with Dominique on the cell phone that you

25  obtained for her?

Mayweather - direct - Geddes                    3436

1  A    Yes.

2  Q    And what are the dates of those text messages?

3  A    June 12th, June -- June 12th, June 15th, June 16th and

4  June 17th.

5  Q    But the first text message was sent on June 12th of 2016?

6  A    Yes.

7  Q    And do you believe you obtained the phone prior to the

8  date of the first text message?

9  A    I did.

10 Q    Did you and Dominique discuss a code that you would use

11 to speak with each other?

12 A    Yes.

13 Q    And what, if anything, did you tell Dominique?

14 A    To just send her room number as her name.

15 Q    Rather than identifying her as Dominique?

16 A    Yes.

17 Q    And why did you tell Dominique to use her room number

18 rather than just say that it's Dominique?

19 A    So, I told her to text me if she needed me and to use her

20 room number instead of her name in case I was with Rob, the

21 defendant, so he wouldn't see her name if he saw my phone.

22 Q    Did the defendant ever confront you about obtaining that

23 cellular telephone for Dominique?

24 A    Not directly, no.

25 Q    And after Dominique sent you that first text message

```
                Mayweather - direct - Geddes              3437
```

1  identifying herself by a room number, did you ultimately save

2  her telephone number as Dominique in your phone?

3  A    I don't recall.

4             (Continued on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mayweather - Direct - Geddes                3438

1   DIRECT EXAMINATION (CONTINUED)

2   BY MS. GEDDES:

3   Q    If you look at Government's Exhibit 240H, does that

4   refresh your recollection as how her phone number was saved

5   in your phone?

6   A    It does not.

7   Q    Looking at that second --

8   A    The 9th.

9   Q    -- third column is that Dominique's name?

10  A    That's her name.

11  Q    And do you recall when you stopped working for the

12  defendant?

13  A    It was sometime in -- around June of 2016.

14        MS. GEDDES:  And I'm showing the witness only.

15  I'm showing the witness only what's been marked for

16  identification as 240Y.

17  Q    I want to direct your attention to the last three

18  entries.  Can you read them to yourself and let us know if

19  that refreshes your recollection as to the approximate date

20  when you stopped working for the defendant?

21  A    Yes.

22        MR. CANNICK:  May I have the Exhibit Number,

23  again, please.

24        MS. GEDDES:  Yes, 240Y.

25  Q    When did you stop working for the defendant?

Mayweather - Direct - Geddes                    3439

1   A    Around June 10th prior to -- just prior to June 10th.

2   Q    And so when Dominique sent you those text messages

3   starting on May 12th, was that after you had stopped working

4   for the defendant?

5   A    On May 12th?

6   Q    Yes -- I'm sorry.  June 12th, June 12th.

7   A    Yes.

8   Q    Okay.  You testified earlier that the defendant did not

9   confront you directly about obtaining a cellular phone for

10  Dominique.  What did you mean by that?

11  A    He spoke with my sister about it.

12  Q    Were you present for that conversation?

13  A    Not the initial conversation.

14  Q    Were you present for a subsequent conversation?

15  A    Only over the phone.

16  Q    Who called you?

17  A    My sister.

18  Q    Did you learn whether anyone else was listening to that

19  telephone call?

20          MR. FARINELLA:  Objection.

21          That part I'll withdraw.  Did you learn, there was

22  substantive stuff in there.

23          THE COURT:  I don't -- are you objecting on the

24  grounds -- I'm not --

25          MR. CANNICK:  It was --

Mayweather - Direct - Geddes                    3440

1          THE COURT:  Why don't I sustain it as to form.

2   Q    Who was on that telephone -- who was listening to that

3   telephone call?

4   A    Rob.

5   Q    And what, if anything, did your sister tell you -- say

6   to you during that call?

7          MR. CANNICK:  Objection.

8          THE COURT:  Let me make sure I understand.  There

9   were three people on the call?  You, your sister and the

10  defendant?

11         THE WITNESS:  No, just my sister on the phone.

12         THE COURT:  Okay.

13  Q    Where was the defendant?

14  A    He was with my sister.

15  Q    And was the call on speaker phone?

16         THE COURT:  How do you know he was there, that's

17  the question?  Was it on speaker?

18         THE WITNESS:  I don't remember if it was on

19  speaker.  But she called to find out if I had purchased the

20  phone in his presence.

21         THE COURT:  How do you know he was there?

22         THE WITNESS:  She told me.

23         THE COURT:  At that time or later?

24         THE WITNESS:  No, at the time.

25         THE COURT:  She said he's right here?

Mayweather - Direct - Geddes                    3441

1       THE WITNESS:  She said, I'm with Rob and did you
2   purchase Dominique a phone.
3       THE COURT:  The objection's overruled.
4   Q    Now, why did you stop working for the defendant on or
5   about June 10th, 2016?
6   A    Well, it started with a confrontation with Jane.
7   Q    What happened?
8   A    We were at one of his shows and we -- I walked in with
9   his guest and his girlfriend and a couple of other
10  girlfriends of his that was not living with him.  And there
11  was a venue security person -- personnel in the area -- near
12  the area where we needed to enter to stand in front of the
13  stage.  And Jane felt like that person, who was a male, was
14  standing too close when we entered.  And she raised her
15  voice at me and we had words.  And then after the concert,
16  she told him what happened.
17  Q    And did you have a conversation with the defendant
18  about what happened?
19  A    No.
20  Q    Did you send a message to the defendant?
21  A    I did.
22  Q    What was the message that you sent?
23  A    I don't recall the message that I sent to him.  I don't
24  recall the message I sent to him, because it would have been
25  later.  But that particular night we did not have a

Mayweather - Direct - Geddes                3442

1  conversation.  I waited for him to have a conversation with
2  me, but we didn't.
3  Q    What made you believe that you might have a
4  conversation with the defendant that evening?
5  A    Because two of the girlfriends who did not live with
6  him, they came back and told me --
7          MR. CANNICK:  Objection.
8          THE COURT:  Sustained.
9  Q    Did you end up talking to the defendant?
10 A    No.
11 Q    And did the fact that you didn't end up talking to the
12 defendant contribute to your leaving that day?
13 A    Yes.
14 Q    Since that evening, or since about May 10, 2016, have
15 you seen -- until you testified today, have you -- I'm
16 sorry.  I keep saying May 10, 2016.
17          Until -- have you seen the defendant since June 10
18 of 2016 prior to seeing him in court yesterday?
19 A    Only on FaceTime once.
20 Q    And the FaceTime call where you saw the defendant, who
21 was on a FaceTime call with the defendant?
22 A    Him and my sister.
23 Q    And were you just in the room at some point during that
24 conversation?
25 A    Yeah.  I didn't realize she was on FaceTime with him

Mayweather - Direct - Geddes                3443

1    and I just basically walked into the frame.  I had a stance

2    and I saw him.

3    Q    Aside from seeing him on FaceTime during that one

4    conversation, have you seen the defendant in person between

5    the time that you stopped working for him on or about June

6    10, 2016 --

7    A    No.

8    Q    -- and when you showed up in court yesterday?

9    A    No.

10   Q    Have you spoken to him other than during that the

11   FaceTime conversation?

12   A    No.

13   Q    And during the FaceTime conversation, did you have any

14   substantive conversations with the defendant?

15   A    It was just hi, hi, love you, love you, miss you, miss

16   you, and that was it.

17          MS. GEDDES:  One moment.  I just need to find one

18   exhibit.

19          THE COURT:  Sure.

20          (Pause in proceedings.)

21          MS. GEDDES:  Your Honor, there's one additional

22   exhibit that I need to locate.  But I have spoken with

23   counsel and I believe there's no objection to my admitting

24   it afterwards, so I have no further questions at this time.

25          THE COURT:  All right.  Cross-examination?

Mayweather - Cross - Cannick                    3444

1          MR. CANNICK:  Yes.

2    CROSS-EXAMINATION

3    BY MR. CANNICK:

4    Q    Good morning.

5    A    Good morning.

6    Q    Now, you've have a role -- had a role in

7    *Surviving R. Kelly*; am I correct?

8    A    Somewhat.

9    Q    Well, when you say somewhat, what was that role?

10   A    I was a story advisor.

11   Q    So you were the story advisor, you were the one who

12   helped to narrate or put together the narrative?

13   A    No.  They only consulted with me about, you know, fact

14   finding.

15   Q    Fact finding?

16   A    Right.

17   Q    Now, *Surviving R. Kelly* was a fiction; am I correct?

18   A    I wouldn't call it a fiction.

19   Q    Yeah.

20          Now, when was it that you started with

21   *Surviving R. Kelly*?

22   A    I don't recall the date.

23   Q    And how long was it that you worked for them?

24   A    It wasn't like working for them.  I would get a phone

25   call like someone said X, Y, Z, do you think this is true.

Mayweather - Cross - Cannick                    3445

1    That type of thing.

2    Q    Okay.  But you -- you did conclude it was a fictional

3    production?

4    A    I'm sorry?

5    Q    You did conclude it was a fictional production, right?

6              MS. GEDDES:  Objection.

7              THE COURT:  Can I see the parties at the side for

8    just a minute with the court reporter.

9              (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar Conference                                    3446

1          (The following occurred at sidebar.)

2          THE COURT:  Here's my concern, did we start

3    talking about whether or not -- I mean, I had thought that

4    we would avoid the content of *Surviving R. Kelly* just

5    because it really doesn't -- should not play any role in the

6    trial.  I have no problem with asking witnesses the extent

7    which they participated in it to the extent that it might

8    somehow show their basis or undermine their credibility.

9    But talking about whether the content of it is just true, is

10   really not a good road to go down because I don't think the

11   truth or nontruth of a television show really should be

12   playing in -- is it a TV is show?  I don't even know.  But I

13   don't think that we should be asking witnesses for their

14   evaluation of whether it's true or not.

15         Maybe she said something I don't know about and

16   there may be some other way of getting that out.

17         Is there something I'm missing?

18         MR. CANNICK:  Well, I believe the Government has

19   brought up with other folks' role in *Surviving R. Kelly*, and

20   I believe that leaving the impression with the jury that

21   there's factual basis for it, I just wanted -- know this

22   witness worked as a consultant, and I know from the labeling

23   that's on the program, it's a fictional program, and having

24   that role, I just wanted to clarify that and then move on.

25         THE COURT:  No.

Sidebar Conference                          3447

1          MR. CANNICK:  Okay.

2          (Continued on the next page.)

Mayweather - Cross - Cannick                    3448

1          (Sidebar ends; in open court.)

2          THE COURT:  Okay.  The objection is sustained.

3    Q    Now, you testified and told us that you worked for

4    Mr. Kelly?

5    A    Yes, I did.

6    Q    You started your employment with Mr. Kelly in December

7    of 2015?

8    A    Around that time, yes.  Formally, yes.

9    Q    Okay.  And then you worked for him until about June

10   10th of 2016?

11   A    Correct.

12   Q    So in essence you worked for him for about six months;

13   am I correct?

14   A    Formally, yes.

15   Q    And then when you were there you formed a lot of

16   opinions?

17   A    Did I form a lot of opinions?

18   Q    Yeah, about what you saw?

19   A    No.

20   Q    Okay.  You made assumptions?

21   A    No.

22   Q    Now you testified and told us about some text messages

23   that you sent regarding Jane.  Those text messages go back

24   to September of 2015?

25   A    I'm not sure how far they go back.

Mayweather - Cross - Cannick                    3449

1    Q    Well, the text message that you were shown this morning

2    about when you were at the Barclay's Center, that was in

3    September of 2016; am I correct -- 2015; am I correct?

4    A    If I recall it correctly, what I saw yesterday, yes.

5    Q    And you weren't working for him at that time; am I

6    correct?

7    A    No.

8    Q    And when I say him, I am talking about Mr. Kelly?

9    A    No, not formally, no.

10   Q    So basically you were in his presence or around his

11   business and you were recording certain, what you -- what

12   appeared to be observations to you?

13   A    You might --  you could probably say that, yes.

14   Q    And so you were basically gossiping with your sister;

15   am I correct?

16   A    I was having a conversation with my sister.

17            THE COURT:  What was the word you said?

18            MR. CANNICK:  Gossiping.

19   A    We can use gossiping, that's fine.

20   Q    Okay.  Now before your employment with Mr. Kelly, you

21   worked in law enforcement?

22   A    I did.

23   Q    As a probation officer?

24   A    I did.

25   Q    And as a correction officer?

1   A   I did.

2   Q   You also have had a criminal record, too; am I correct?

3   A   No, I did not.

4   Q   Never had a criminal record?

5   A   No.

6   Q   Never arrested?

7           MS. GEDDES:  Objection.

8           THE COURT:  I'll sustain as to an arrest.

9           MR. CANNICK:  I'll move on and come back to it.

10          THE COURT:  Okay.

11  Q   Now, before working for Mr. Kelly, you attended his

12  concert; am I correct?

13  A   I did.

14  Q   And you had attended a number of his concerts; am I

15  correct?

16  A   Yes.

17  Q   Okay.  And there came a point in time that you received

18  a pass to go backstage for a meet and greet?

19  A   There was many times.  I didn't necessarily receive a

20  pass, but there were many times I went backstage.

21  Q   Didn't you go back at one point because you had a

22  backstage pass?

23  A   Yes.

24  Q   Okay.  And who gave you that backstage pass?

25  A   Friends in the circle.

1   Q    Friends in the circle of people who worked with him?

2   A    And people who worked with him.

3   Q    Okay.  And how old were you when you got that first

4   pass?

5   A    When I got the first pass?  I don't recall, I was an

6   adult.

7   Q    And when you say you were an adult, you were 18 years

8   old?

9   A    No, I was older.

10  Q    25?

11  A    I'm thinking.  It would have been over -- at least 20

12  years ago.  So I was definitely probably in my twenties.

13  Q    In your 20s.  You were given a pass and then you went

14  backstage and it was -- how were you dressed?

15          MS. GEDDES:  Objection.

16          THE COURT:  Sustained.

17  Q    You weren't dressed in revealing clothes, were you?

18          MS. GEDDES:  Objection.

19  A    No.

20          THE COURT:  Sustained.  Don't answer that

21  question.

22  Q    Did you see other women at that backstage meet and

23  greet?

24  A    There were other people there, yes.

25  Q    It was a large crowd there; am I correct?

Mayweather - Cross - Cannick                    3452

1    A    Correct.

2    Q    And there were lots of women there, am I correct?

3    A    Correct.

4    Q    And these women covered the gamut in terms of ages; am

5    I correct?

6    A    I didn't pay attention to the women like that.  I don't

7    believe.

8              (Pause in proceedings.)

9              MR. CANNICK:  I'll return to it in a bit, Your

10   Honor.

11   Q    Now, there came a point in time before you started

12   working with Mr. Kelly, you went to a party at his home?

13   A    I went to more than one party at his home.

14   Q    Before you started working for him you went to a party

15   at his home; am I correct?

16   A    Yes.

17   Q    And when you went to that party at his home, you were

18   with your sister?

19             MS. GEDDES:  Can you clarify which party I think

20   she testified --

21             MR. CANNICK:  The first party.

22             THE COURT:  The first party she ever went to?

23             MR. CANNICK:  Yes.

24   A    No.

25   Q    Did you go with somebody by the name of Rowenna --

Mayweather - Cross - Cannick                3453

1    Ramina?

2    A    Yes.

3    Q    And you saw a number of people at that party?

4    A    It was a small crowd, yeah.

5    Q    It was a small crowd?

6    A    Yes.

7    Q    Okay.  And you saw a bunch -- you saw women in the

8    crowd; am I correct?

9    A    Yes.

10   Q    None of them appeared to be underage; am I correct?

11   A    No.

12   Q    Now, you also went to another party with someone called

13   Niecy?

14   A    Yes.

15   Q    Okay.  And you were also denied at that party

16   because -- entry to that party because Niecy started, or was

17   trying to take pictures of stars?

18   A    No.

19   Q    No?  That never happened, right?

20   A    Being denied, almost being denied entry?

21   Q    Yes.

22   A    No.

23   Q    Okay.  And now, when you were at that party with Niecy

24   you didn't see any underage women there at that party; am I

25   correct?

Mayweather - Cross - Cannick                    3454

1  A    Correct.

2  Q    And at one of the parties there was a time that a

3  male -- you were all in a room and the male came to the room

4  and knocked on the door to give Mr. Kelly a note?

5  A    No.

6  Q    You don't remember that?

7  A    I don't recall that.

8  Q    You don't recall that either?

9  A    No.

10 Q    Okay.  And you don't recall telling the Government that

11 the male who knocked on the door and basically turned his

12 head not to make eye contact with Mr. Kelly?

13 A    No, I don't recall.

14 Q    I don't recall that either.

15        Now, you brought musicians to Mr. Kelly to

16 audition; am I correct?

17 A    Only one singer.

18 Q    Only one singer?

19 A    Yes.

20 Q    Okay.  Who was that singer?

21 A    Her name is Nickie, and it wasn't an audition.

22 Q    And it wasn't an addition?

23 A    No.

24 Q    What was it?

25 A    It was just asking him to provide some music for her.

Mayweather - Cross - Cannick                    3455

1    Q    To provide some music for her?

2    A    Yeah.

3    Q    And how did that work out?

4    A    He said he was going to.  He played several songs.

5    Q    Uh-huh.

6    A    And he said he was -- he started to work with her.

7    Q    Niecy is that a male or female?

8    A    Nickie.

9    Q    Nickie?

10   A    A female.

11   Q    And how old was Nickie?

12   A    At the time?

13   Q    Yes.

14   A    At least in her 30s, maybe 40s.

15   Q    And that was someone that you were working with?

16   A    Yes.

17   Q    Okay.  She was from Houston?

18   A    I'm sorry.

19   Q    Was she from Houston?

20   A    Yes.

21   Q    And you brought her to Mr. Kelly's home; am I correct?

22   A    Studio.

23   Q    Okay.  The studio.  And basically that didn't work out

24   because it was concluded that she was a lazy artist; am I

25   correct?

Mayweather - Cross - Cannick                3456

1          MS. GEDDES:  Objection.

2    A    Well --

3          THE COURT:  I don't really see the relevance, but

4    overruled.

5          Was lazy, is that what you said?

6          MR. CANNICK:  Yes.

7          THE COURT:  Was that true?

8          THE WITNESS:  He never said that.

9    Q    No, did you come to that conclusion?

10   A    I said that, yes.

11   Q    Right.

12         And so that situation didn't work out but

13   Mr. Kelly did try to help?

14   A    He did.

15   Q    And what about Kim Burrell?

16         MS. GEDDES:  Objection.

17   A    Kim Burrell?

18         THE COURT:  Overruled.

19   A    What about Kim Burrell?

20   Q    You brought Kim Burrell to him; am I correct?

21   A    I didn't bring Kim Burrell to him.

22   Q    You didn't introduce Kim Burrell and ask Mr. Kelly to

23   work with her?

24   A    No.

25   Q    No?

Mayweather - Cross - Cannick                3457

1          And do you know whether or not Kim Burrell ever
2    worked with Mr. Kelly?
3    A    She did.
4    Q    And you had nothing to do with the introduction?
5    A    I intro -- well, my sister and I introduced her musical
6    to his music director.
7    Q    Uh-huh.
8    A    And this was in like the late '90s and the musical
9    director let him hear it.
10   Q    And it was not with Mr. Kelly that you made the
11   introduction?
12   A    No.
13   Q    And when you were at Mr. Kelly's studio for business or
14   for employment, did you ever see him with underaged women?
15   A    No.
16   Q    Now, when you testified earlier about Jane being on the
17   tour bus you said it was?
18   A    Yes.
19   Q    For a protracted period of time?
20   A    Yes.
21   Q    Do you recall what year Jane graduated from high
22   school?
23   A    I think it was 2016.
24   Q    Okay.  And would that be in May of 2016?
25   A    I don't recall the month.

Mayweather - Cross - Cannick          3458

1    Q    And you had certain work requirements in order to
2    fulfill -- withdrawn.
3         Jane had to fulfill certain work requirements in
4    order to graduate; am I correct?
5              MS. GEDDES:  Objection.
6              THE COURT:  Overruled.
7              Do you know that?
8              THE WITNESS:  I'm not sure what work requirements
9    he's talking about.
10             THE COURT:  He's talking about schoolwork.
11   A    Schoolwork, yes.
12   Q    And Jane was on that bus trying to finish her
13   schoolwork; am I correct?
14   A    I have no knowledge of that.
15   Q    You don't know that Jane was left behind with your
16   sister so that --
17             MS. GEDDES:  Objection.
18             THE COURT:  Well, let him finish the question.
19             Maybe it might not be a bad idea to rephrase it.
20             MR. CANNICK:  I thought it was perfectly good.
21             THE COURT:  I know, but sometimes we disagree.
22             MR. CANNICK:  I know.  Many times.
23   Q    Now are you aware that your sister was on the bus with
24   Jane so that she could continue to work -- complete her
25   schoolwork?

Mayweather - Cross - Cannick                3459

1          MS. GEDDES:  Objection.

2          THE COURT:  Were you aware of that?

3    A    No.

4    Q    And if she was here and testified and told the jury

5    that --

6          MS. GEDDES:  Objection.

7          THE COURT:  Well, let him finish the question.

8    Q    If she was here and told the jury that she was on the

9    bus with Jane because she was left behind because she had

10   not finished her work, she would not have been mistaken; am

11   I correct?

12         THE COURT:  The objection is sustained.

13   Q    Now, I asked you a short while ago about the situation

14   where you were almost not allowed inside of the --

15   Mr. Kelly's party because Niecy was star struck and began

16   taking pictures and you said that didn't happen.

17         I want to show you this document and see if it

18   refreshes your recollection if that's, in fact, what you

19   told the Government?

20         MS. GEDDES:  What document are you showing her?

21         MR. CANNICK:  It -- I'll show you.

22         (Pause in proceedings.)

23         MR. CANNICK:  What's the number?

24         MR. FARINELLA:  AM186.

25         MS. GEDDES:  Okay, thanks.

1    Q    I believe the section is highlighted right there.

2    A    Oh, I read it.

3    Q    Does that refresh your recollection that you told the

4    Government in your meeting with them that there was a party

5    that you went to attend along with Niecy and you were almost

6    denied entry because she was star struck and taking

7    pictures?

8    A    No.

9    Q    That does not refresh your recollection?

10   A    No.

11   Q    Okay.  You saw it here though, correct?

12   A    I see it.

13   Q    Okay.  And you were the person who had the interview

14   with the Government; am I correct?

15   A    Well, it says Mayweather.

16   Q    Yes.

17   A    I don't believe that was me.

18   Q    You don't believe it was you?

19   A    No.

20   Q    Okay.

21            MR. CANNICK:  Let me have the...

22            (Pause in proceedings.)

23   Q    You were, in fact, interviewed by the Government?

24   A    I was.

25   Q    How many times?

1    A    Like three times.

2    Q    Now, your first interview, was that before you started

3    your role with *Surviving R. Kelly*?

4    A    No.

5    Q    It was after?

6    A    After.

7    Q    And by the way, how much money were you paid for your

8    participation in *Surviving R. Kelly*?

9    A    I don't recall the exact amount.

10   Q    Okay.  What's the approximate amount?

11   A    About $3,000.

12   Q    And you said that you made yourself available for phone

13   calls?

14   A    I did.

15   Q    And I'm going to show you this document.  Do you recall

16   being interviewing by the Government on --

17          MR. FARINELLA:  On Page 1.

18   Q    -- March 6, 2009?

19          MS. GEDDES:  2019.

20   Q    2019?

21   A    No, I do not.

22   Q    Look at that document and see if it refreshes your

23   recollection that you had an interview with them on that

24   particular day.

25   A    It says March 6th, 2019, I don't recall.

Mayweather - Cross - Cannick                    3462

1   Q    You don't recall, but it says it there; am I correct?

2   A    It does.

3   Q    Okay.  And you were the person who was being

4   interviewed not your sister; am I correct?

5   A    That was incorrect.

6   Q    Okay.  May I have it back?

7        And having look at that document, you said earlier

8   that you didn't know whether or not it was you who gave this

9   interview or you twin sister.  Did you look through from

10  Page 1 -- do you see your name and then go to Page 6 and see

11  if you were, in fact, the person who gave that interview to

12  the Government on...

13  A    It has my name.

14  Q    Okay.

15  A    Yes.

16  Q    So -- and it says that you were the person who told the

17  Government that you were at this party and almost couldn't

18  get in because Niecy being star struck and taking pictures;

19  am I correct?

20  A    Well, that's what you showed me.

21  Q    Okay.

22  A    But that's not what I said.

23  Q    That's not what you said?

24  A    No, it's not.

25  Q    So the Government got it wrong?

Mayweather - Cross - Cannick                3463

1  A    Yes.

2  Q    Let me see if the Government got a few more things

3  wrong.

4           MS. GEDDES:  Objection.

5           THE COURT:  Please don't do that.

6  Q    Now, I asked you earlier about Kim Burrell and

7  Mr. Kelly's involvement.  Are you familiar with the person

8  by the name of Percy Brady?

9  A    No.

10  Q    Okay.  And --

11  A    Not by the name you just called.

12  Q    Okay.  Now, do you recall that in 1996 you and your

13  sister asked Percy Brady if he would be able to request that

14  Kelly -- Mr. Kelly audition Kim Burrell?

15           MS. GEDDES:  Objection.

16           THE COURT:  Overruled.

17           Did that happen?

18  A    Okay.  So the person you're referring to Percy Badie.

19  Q    Uh-huh.

20  A    And, no, we did not ask for an audition for Kim

21  Burrell.

22  Q    Okay.  Isn't it a fact that you told the Government

23  during that interview that you asked Percy Brady or whatever

24  you said the person's name is, if they could -- if they were

25  able to request that Kelly audition Kim Burrell?

Mayweather - Cross - Cannick                3464

1   A    No, that is not what I said.

2   Q    Didn't tell them that, right?

3   A    I'm sorry?

4   Q    You didn't tell the Government that; am I correct?

5   A    No, not in those words, no.

6   Q    Well, what words did you use?

7   A    Okay.  So Kim Burrell was already a national recording

8   artist so she didn't need an audition.  I may have told them

9   what I already told you, that we allowed Percy to hear Kim's

10  music and he was so impressed with the music he wanted to

11  let Rob hear it.

12  Q    Isn't it a fact that you told the Government during

13  that interview that in 1996 you, your sister asked Percy if

14  he would be able to request that Kelly audition Kim Burrell?

15  A    That's not true.

16  Q    And if -- I'm going to show you this document and see

17  if it --

18  A    Okay.

19  Q    -- you see it in there.

20  A    I see it.

21  Q    So yeah; am I correct?

22  A    It's in here.

23  Q    And your testimony is that's not what you told during

24  that interview?

25  A    That's not what I said.

Mayweather - Cross - Cannick                    3465

1  Q    When Jane graduated from high school, were you at the

2  ceremony?

3  A    No, I was not.

4  Q    Your sister was at the ceremony; am I correct?

5          MS. GEDDES:  Objection.

6          THE COURT:  Do you know where your sister was?

7          THE WITNESS:  She was not at the graduation

8  ceremony.

9  Q    You nor your sister?

10 A    No.

11 Q    Okay.  And do you know what month Jane graduated in,

12 what month of the year?

13 A    I don't recall the month.

14 Q    Uh-huh.

15 A    And I believe the year was 2016.

16 Q    Okay.  And when you testified and told the jury that

17 Jane was on this particular tour bus for an extended period

18 of time, you don't know why she was on the bus; am I

19 correct?

20 A    No, I do not.

21 Q    You never spoke to her about her reasons for being on

22 the bus; am I correct?

23 A    Correct.

24         MS. GEDDES:  Objection.

25 Q    You didn't have any conversation with Mr. Kelly as to

1   why she was on that bus; am I correct?

2   A    Correct.

3   Q    And that bus was the luxury tour bus; am I correct?

4   A    It was a tour bus.

5   Q    It was a tour bus?

6   A    Yes.

7   Q    It was not a luxury bus?

8   A    Not in our opinion.

9   Q    Okay.  So it didn't have a bathroom?

10  A    It did.

11  Q    A bedroom?

12  A    It did.

13  Q    Lofts?

14  A    (No response.)

15  Q    Loft beds?

16  A    Well, if you called it a bunkbed?  Yes.

17  Q    Refrigerator?

18  A    Yes.

19  Q    Microwave?

20  A    Yes.

21  Q    But not a luxury bus?

22  A    Not in our opinion.

23  Q    Not in your opinion.

24       How many buses did Mr. Kelly have?

25  A    He had a couple of buses.

Mayweather - Cross - Cannick                3467

1    Q    Okay.  Was his Sprinter a luxury bus?

2    A    It was.

3    Q    But not the tour bus?

4    A    Not in our opinion.

5    Q    Okay.  And Mr. Kelly would ride those tour buses; am I

6    correct?

7    A    One of them, yes.

8    Q    He would ride cross country; am I correct?

9    A    He did.

10   Q    Okay.  And he would be on them for hours; am I correct?

11   A    Yes.

12   Q    In fact, he would go from the east coast to the west

13   coast on those buses; am I correct?

14   A    Correct.

15   Q    Now you've been on the buses as they would travel

16   through the mountains?

17   A    Yes.

18   Q    And were there any bathrooms -- withdrawn.

19        There were certain stretches on those trips from

20   the east coast to the west coast where there were be no

21   bathrooms in sight; am I correct?

22   A    Correct.

23   Q    Okay.  And you also were in situations sometimes where

24   there were no phone services; am I correct?

25   A    Correct.

1  Q    Okay.  And you testified and told the jury that there
2  were people who would urinate in cups?
3  A    Yes.
4  Q    And would that be one of the times that they would
5  urinate in cups when they were on this long stretch without
6  bathrooms?
7  A    Not in my presence.
8  Q    Not in your presence.
9         How many trips did you take on the bus with him?
10 A    I don't remember a number.  It was a number of trips.
11 I don't remember how many.
12 Q    Okay.  And how many times you saw someone urinating in
13 a cup?
14 A    I never saw that.
15 Q    You heard that?
16         MS. GEDDES:  Objection.
17         THE COURT:  Overruled.
18         Did you hear it?  What do you mean when you say
19 did you hear that people urinated in cups?
20         THE WITNESS:  He said I heard that, I didn't say
21 that.
22         THE COURT:  You didn't hear it either?
23         Well, you tell us.  Did you hear about people
24 urinating in cups?
25         THE WITNESS:  I knew they were doing it.  I said I

Mayweather - Cross - Cannick                3469

1  didn't see it.

2          THE COURT:  I see.

3          THE WITNESS:  Right.

4          THE COURT:  How did you know they were doing it?

5          THE WITNESS:  Because they had the cups and there

6  were times when they would dispose of the cups.

7          THE COURT:  I see.

8          Go ahead.

9  Q   So who?

10 A   I'm sorry?

11 Q   Who did you see have a cup and dispose of the cup?

12 A   His girlfriends or...

13 Q   Which one?

14 A   All of them.

15 Q   All of them?

16         When?

17 A   Well, we would get off of the vehicle, they would leave

18 the cups on the vehicles.

19 Q   But you would take the cups off?

20 A   No, not me.

21 Q   Okay.

22         Did you ever pick up a cup?

23 A   No.

24 Q   Ever smell the cup?

25 A   No.

1  Q   Ever looked in the cup?

2  A   No.

3  Q   But you knew it was urine in there, right?

4  A   I knew they were using the cups to urinate.

5  Q   Okay.  But you never saw them do it, right?

6  A   No.

7  Q   Never handled the cups?

8  A   No.

9  Q   Never smelled the cups?

10 A   No.

11 Q   Never carried the cups?

12 A   No.

13 Q   But you knew they were doing it?

14 A   Yes.

15 Q   You told that to *Surviving R. Kelly* lifetime as well?

16 A   No.

17 Q   Now, when you were travelling with the Kelly --

18 withdrawn.

19        How many times did you take a cross country trip

20 with Mr. Kelly on the tour bus?

21 A   At least -- oh, there were a couple of times but not a

22 number of times probably east to the west.

23 Q   Okay.

24 A   A couple of times.

25 Q   And that stretch that I was just talking about where no

1  bathrooms around, was there ever a situation where you had

2  to use the facilities?

3  A    Yes.

4  Q    And you held it; am I correct?

5  A    I did.

6  Q    Some people did?

7  A    I'm sorry?

8  Q    Withdrawn.

9         Now, when you started first hanging out with

10 Mr. Kelly and going around with Mr. Kelly, he would allow

11 you and your sister to go on his road trips; am I correct?

12 A    Correct.

13 Q    You weren't working for him; am I correct?

14 A    No.

15 Q    Okay.  In fact, he would pay for your airfare?

16 A    No.

17 Q    He wouldn't pay for your airfare?

18 A    I don't recall.

19 Q    Okay.

20 A    Honestly.

21 Q    Do you recall whether or not he paid for your hotel?

22 A    He did.

23 Q    Do you recall whether or not he paid for your meals?

24 A    He would.

25 Q    Now while you were going on those trips cross country

1   with Mr. Kelly, did you ever see him hit any of his

2   girlfriends?

3   A    No.

4   Q    Did you ever see him deny them the right to -- he would

5   deny them going to the bathroom?

6   A    I didn't see him deny them the right, no.

7   Q    And did you ever see him deny them food?

8   A    No.

9   Q    Did you ever see Mr. Kelly in any of the properties

10  deny them the use of the bathroom?

11  A    Any of the properties?

12  Q    Yeah.  Any of his properties that he was staying in?

13  A    No.

14  Q    Did you see him deny them food?

15  A    No.

16  Q    Did you see him deny them water?

17  A    No.

18  Q    But you did see him giving them lavish gifts; am I

19  correct?

20  A    There were the times.

21  Q    There were times.

22       When you would take them shopping, what kind of

23  stores would you take them shopping?

24  A    Nordstrom's, Sak's, and then the -- just the other

25  brands, Gap.  Whatever store they wanted to go to, actually.

Mayweather - Cross - Cannick                3473

1   Q    Whatever store they wanted to go they could go; am I
2   correct?
3   A    Correct.
4   Q    Okay.  Now, did you handle their money --
5   A    No.
6   Q    -- when they went to the store?
7         They had their own money; am I correct?
8   A    Correct.
9   Q    And you would give their money to the cashier?
10  A    If the cashier was a male.
11  Q    Okay.
12  A    Only.
13  Q    If the cashier was a male.
14        Now, you never had an occasion where one of them
15  told you that I was glad to have the privilege to go
16  shopping at Nordstrom's, I don't want to do that.
17  A    No.
18  Q    They all went; am I correct?
19  A    Yes.
20            (Continued on the next page.)
21
22
23
24
25

Mayweather - cross - Cannick                    3474

1  CROSS EXAMINATION

2  BY MR. CANNICK:   (Continuing)

3  Q    They all went, am I correct?

4  A    Yes.

5  Q    Now, you testified that when Rob would come into a room,

6  his girlfriends would get up and kiss him?

7  A    Yes.

8  Q    He would kiss them back too, am I correct?

9  A    Yes, ma'am.

10 Q    Would he stand when they came into the room?

11 A    I'm sorry, what did you say?

12 Q    Would he stand when women came into the room?

13 A    Would he stand up?  I don't recall.

14 Q    Would he open the door for women?

15 A    I don't recall.

16 Q    Now, when you were there and you were around Jane, you

17 saw her speak on the phone regularly with her parents, am I

18 correct?

19 A    With her father more than her mom.

20 Q    But --

21 A    Yes.

22 Q    -- with her parents and then more so with her father?

23 A    Yes.

24 Q    And those conversations seemed to be happy conversations,

25 were they not?

Mayweather - cross - Cannick                3475

1          MS. CRUZ MELENDEZ:  Objection.

2          THE COURT:  Sustained as to form.

3   Q    Describe the conversations.  How did they appear?

4          THE COURT:  Let me just ask you, did you hear both

5   sides?

6          THE WITNESS:  No, not both sides.

7          THE COURT:  Go ahead and ask, Mr. Cannick, the next

8   question.

9   Q    Isn't it a fact that you told the Government that they

10  were happy conversations?

11  A    They were general conversations.  I don't remember using

12  the word happy.

13  Q    Now, during Jane's stay with Mr. Kelly when you were

14  working there, her brother would fly into Chicago to visit

15  her, am I correct?

16  A    He flew in once that I know of.

17  Q    Mr. Kelly paid for that airfare?

18  A    He did.

19  Q    And the hotel?

20  A    Yes.

21  Q    Do you recall her parents coming in to visit?

22  A    Only her mother.

23  Q    And Mr. Kelly paid for that airfare?

24  A    I only know of once and, yes, he did.

25  Q    And the hotel?

Mayweather - cross - Cannick                3476

1   A    He did.

2   Q    You testified and told the jury about a fight --

3   withdrawn -- about an altercation that you and Jane had.  Do

4   you remember telling us about that?

5   A    Yes.

6   Q    Okay.  And that was a verbal altercation, am I correct?

7   A    It was verbal.

8   Q    And, basically, it was a situation where you were going

9   through an arena, you were escorting them to their seat, am I

10  correct, Kelly's girlfriends?

11  A    No.

12  Q    It's not correct?

13  A    No.

14  Q    This was an arena?

15  A    It was an arena.

16  Q    What happened?  What was it about?

17  A    I actually was not escorting them per se.  We were

18  escorted in, me with their girlfriends by another employee.

19  Q    But someone was escorting her in, am I correct?

20  A    Yes.

21  Q    And something happened between her and one of the

22  security people, am I correct?

23  A    No.

24  Q    That's not correct?

25  A    No.

Mayweather - cross - Cannick                    3477

1   Q    Okay.  What happened?

2   A    We, the group of us, me and his girlfriends, we were

3   walking to the area where he wanted them to stand, directly in

4   front -- on side of the stage, and the security guy --

5              THE COURT:  Hold on for just a second.

6              So, I let you sit here for too long.  We are going

7   to take a 10-minute break and then we will resume.  Please

8   don't talk about the case at all.

9              THE COURTROOM DEPUTY:  All rise.

10             (Jury exits the courtroom.)

11             THE COURT:  All right.  Everybody can have a seat.

12  And the witness can step down.

13             (Witness steps down.)

14             THE COURT:  Anything before we break?

15             MR. CANNICK:  Nothing from us, Your Honor.

16             THE COURT:  Do you have just a general idea of how

17  much longer you might be?

18             MR. CANNICK:  Maybe 20, 30 minutes.

19             THE COURT:  Okay, and do you have a lot of redirect?

20             MS. GEDDES:  No.

21             THE COURT:  All right.  And then what are we doing

22  after that?

23             MS. CRUZ MELENDEZ:  We have a witness Nicholas

24  Williams.

25             THE COURT:  How long is that witness, do you think?

Mayweather - cross - Cannick                3478

1   A long one?

2              MS. CRUZ MELENDEZ:  No.  I probably wouldn't go over

3   an hour.

4              THE COURT:  All right.  And if you can agree on any

5   exhibits that will come in, that would be great, too.  We can

6   just use our time-wisely.  We will be in recess for a few

7   minutes.

8              (Recess taken.)

9              THE COURTROOM DEPUTY:  All rise.

10             THE COURT:  Everybody can sit down.  Let's get the

11  witness.

12             (Witness resumes stand.)

13             THE COURTROOM DEPUTY:  All rise.

14             (The jury enters the courtroom.)

15             THE COURTROOM DEPUTY:  You may be seated.

16             THE COURT:  All right.  Everybody, we are ready to

17  resume with the cross-examination.  First remind the witness.

18  Go ahead.

19             THE COURTROOM DEPUTY:  The witness is reminded she

20  is still under oath.

21             THE WITNESS:  Yes.

22             MR. CANNICK:  Your Honor, may I have the last

23  question and answer read back?

24             THE COURT:  Sure.

25             (Record read.)

Mayweather - cross - Cannick                    3479

1    BY MR. CANNICK:

2    Q    Now, I asked you earlier whether or not you were

3    escorting Mr. Kelly's girlfriends to the area that they were

4    to be in and you told me that you were not escorting them.  Do

5    you remember telling me that?

6    A    I do.

7    Q    Now, when you met with the Government, you did tell them

8    that you were the one who was escorting them, am I correct?

9    A    Well, I would like to rephrase what I said.

10   Q    No, I'm asking you when you met with the Government, you

11   told the Government that you were the one who was escorting

12   them, am I correct?

13   A    I don't recall what I told the Government.

14   Q    Let's see if this refreshes your recollection.

15   A    Okay.

16   Q    I'm going to show you the highlighted portion up top and

17   read it to yourself and see if it refreshes your recollection.

18   A    I see that.

19   Q    Have you read it?

20   A    I did.

21   Q    Does it refresh your recollection that you told the

22   Government that you were the one who escorted Kelly's

23   girlfriends?

24   A    It does not.

25   Q    But it's there; right?

Mayweather - cross - Cannick                    3480

1   A    It's there.

2   Q    And you do recall being interview by the Government, am I

3   correct?

4   A    I do.

5   Q    And you recall them taking notes while you spoke?

6   A    I don't recall them taking notes.

7   Q    You didn't see any of them with pens, writing?

8   A    I wasn't paying attention to anyone on the side.

9   Q    Isn't it a fact that and you were escorting them through

10  the crowd and security personnel accidentally bumped into

11  Jane?

12  A    Okay, so we were escorted in by another employee and then

13  the part I want to rephrase is that after he took us a certain

14  point in the crowd, then, yes, I walked us to the area that he

15  wanted us to stay in.  And then as far as the employee bumping

16  into her, I don't quite recall.

17  Q    Let's see if this refreshes your recollection, the same

18  document.  It is the same paragraph.

19  A    Okay, I saw it.

20  Q    Okay?

21  A    Yeah.

22  Q    Isn't it a fact that you told the Government that the

23  security personnel bumped into Jane?

24  A    I don't recall saying that a security person bumped into

25  her.

Mayweather - cross - Cannick                                3481

1   Q    But it's in the document?

2   A    It's in the document.

3   Q    Now -- and isn't it a fact that after the security

4   personnel bumped into Jane, Jane became extremely belligerent?

5   A    That's not how it happened, no.

6   Q    And you saw that in the document?

7   A    I saw it.

8   Q    And you said the document is not accurate?

9   A    I would say the document is not accurate.

10  Q    Now, and then after this bumping into between Jane and

11  the security person, Jane became belligerent and starting

12  arguing, am I correct?

13  A    That's not what happened.

14  Q    Tell us what happened.

15  A    Okay.  So as we were coming to the area where  he wanted

16  them to stay in, it was blocked off by partitions, partitions,

17  and so there was a young man who was venue security who needed

18  to open that part to let us into the area closer to the stage.

19  She felt like the guy was standing too close to her, Jane felt

20  like the guy was --

21  Q    How do you know what Jane felt like?

22  A    She said it.

23  Q    What did she say?

24  A    That he was standing too close.

25  Q    Where was he standing in relationship to her?

Mayweather - cross - Cannick                     3482

1  A    He was standing between me -- well, I was standing

2  between him and Mr. Kelly's girlfriends was standing.

3  Q    And where was he standing in relationship to Jane?

4  A    He was standing opposite of me in relationship to Jane.

5  Q    Was he to Jane's rear, side or front?

6  A    I don't even think Jane was the closest one to me, but --

7  Q    I'm not asking you --

8  A    -- he would have been behind me, which would have been --

9  I don't know.  If she was facing him, he would have been to

10 her front.  If her back was turned, he would have been to her

11 back.

12 Q    I'm not asking what you think.  I'm asking you what was

13 her position -- what was the security person's position

14 vis-à-vis Jane?

15 A    He was not near her.

16 Q    He was not near her?

17 A    No.

18 Q    Okay.  And after that, what happened?

19 A    So I had to tell him to let us in, into that part because

20 he was venue security.  So he didn't know that we needed to go

21 to that part.  So I had to tell him to open the little gate

22 that had that part blocked off to let us in.

23 Q    And what happened between you and Jane?

24 A    He opened the gate and she was like -- I don't remember

25 her exact words, but it was basically she was telling me he

Mayweather - cross - Cannick                          3483

1  was too close and I needed to tell him to move.

2  Q    Okay.  And what happened between you and Jane?

3  A    And I told her to not raise her voice at me.

4  Q    And what happened next?

5  A    And then I told her basically she needed to chill, do not

6  raise your voice at me because I don't have time for this.

7  Q    So her voice was elevated?

8  A    Yes.

9  Q    Was yelling at you?

10 A    Yes.

11 Q    And she got in your face?

12 A    No, she didn't get in my face.  She raised her voice.

13 Q    Did you get in her face?

14 A    No, I did not.

15 Q    Did you point at her?

16 A    I don't recall pointing at her.

17 Q    Okay.  Now, after you told her to lower her voice, did

18 she lower her voice?

19 A    We stopped talking and she started texting.

20 Q    And she started texting?

21 A    Yes.

22 Q    What did you do?

23 A    I think I started texting as well.

24 Q    Okay.  And who did you text?

25 A    I think I texted Robert.

Mayweather - cross - Cannick                3484

1  Q    When Jane did this, you became furious, am I correct?

2  A    No.

3  Q    You weren't angry?

4  A    I wasn't furious --

5  Q    What were --

6  A    -- and I wasn't angry, but I told her do not yell at me.

7  Q    And how long did this encounter between you and Jane

8  last?

9  A    Just a couple of minutes.

10 Q    Okay.  And afterwards, you quit?

11 A    Not immediately.

12 Q    Well, when did you quit?

13 A    After the show and we got back to the hotel.

14 Q    Right, and you felt as though Jane disrespected you, am I

15 correct?

16 A    Well, I didn't say that, but that's how I felt, yes.

17 Q    And you felt so disrespected you decided if you weren't

18 going to be respected, you were going to quit, am I correct?

19 A    No, that's not why I quit.

20 Q    That's not why you quit?

21 A    No.

22 Q    Why did you quit?

23 A    Because I felt like they had -- Jane and Juice and two of

24 Mr. Kelly's other girlfriends had the conversation with him

25 about what had happened, and I felt like he needed to have an

Mayweather - cross - Cannick                3485

1  adult conversation with me to hear my side of what happened

2  because he told his girlfriends, two of the other girlfriends

3  that he only believed what his girlfriends said because his

4  girlfriends don't lie to him.

5  Q    Okay.  That's not what you told the Government; right?

6  A    I don't know what I told the Government, but that should

7  have been what I told the Government.

8  Q    I know it should have been now.

9         MS. GEDDES:  Objection?

10        PROSPECTIVE JUROR:  I don't know what's on that

11  paper, but I know I should have told them.

12  Q    Do you recall telling the Government that you and another

13  person -- that two other people tried to speak with Mr. Kelly

14  and explain the entire situation and Kelly said whatever my

15  girlfriend said happened, that's what happened?

16  A    That's what I just said, yes.  But I said the end result.

17  So, yes, I did have a conversation with two other girlfriends

18  of his.  They came back and had a conversation with me and

19  they told me that they tried to explain to him what happened,

20  he didn't believe it, and he said because whatever his

21  girlfriends tell him, that that's what he believes because

22  they would not lie to him.

23  Q    He's loyal to those girls?

24  A    You're saying he's loyal to them?

25        MS. GEDDES:  Objection.

Mayweather - cross - Cannick                    3486

1          THE COURT:  Overruled.

2          Is that what they told you, that he said he was

3     loyal to them?

4          THE WITNESS:  No.

5     Q    When he said that whatever they said happened, that's

6     what he's going to believe; right?

7     A    That's what they said.

8          THE COURT:  I think your microphone might be off.

9     No?  I guess my hearing is getting bad.

10    Q    Now, there came a point in time that you quit and Mr.

11    Kelly offered you your job back, am I correct?

12    A    No, he didn't offer me my job back.  He had my sister

13    call me.

14    Q    Okay.  Well, your sister couldn't give you the job;

15    correct?

16    A    She called me and told me what he said.  No, I didn't

17    have a direct conversation with him.

18    Q    Okay.  But there was communication between someone and

19    you where Mr. Kelly offered you an opportunity to return to

20    your job?

21    A    Right.

22    Q    Now, when Mr. Kelly initially hired you, he hired you to

23    assist with his girlfriend Summer, am I correct?

24    A    He hired me to be his assistant, but he did say that he

25    would need me to help Summer, like with her doctor's

Mayweather - cross - Cannick                3487

1   appointments.

2   Q    So he hired you to be his executive assistant?

3   A    Well, I would call it personal assistant because I didn't

4   do anything executive.

5   Q    Now, weren't you hired to take care of the needs of his

6   girlfriends?

7   A    No.

8   Q    So, you were hired to take care of Mr. Kelly's needs, is

9   that what you're saying?

10  A    Yes.

11  Q    And you were also hired to take care of Summer's needs?

12  A    No.

13  Q    Just Mr. Kelly?

14  A    Yes.

15  Q    And then it involved Summer's needs?

16  A    No.

17  Q    Didn't you just testify a few seconds ago that you also

18  had to take care of Summer and her pregnancy?

19  A    That was a part of the conversation that we had prior to

20  me being hired.

21  Q    Okay.  But you didn't take on that responsibility?

22  A    No.

23  Q    Now, when you were given an opportunity to have your job

24  back, you refused the job, the offer, am I correct?

25  A    Correct.

Mayweather - cross - Cannick                                    3488

1  Q    Okay.  And you made that choice?  You made a decision

2  that you weren't going back, am I correct?

3  A    Correct.

4  Q    Okay.  And Mr. Kelly didn't make any further contact or

5  have anyone contact you to try to get you to come back, am I

6  correct?

7  A    Correct.

8  Q    Now, I asked you a short while ago did Mr. Kelly pay for

9  your airfares and you told us you didn't remember that

10 happening.  Do you remember telling us that?

11 A    Yes.

12 Q    I'm showing you this document and see if it refreshes

13 your recollection --

14 A    Okay.

15 Q    -- that you told the Government that he paid for your

16 air, hotel and food.

17           MS. GEDDES:  What document?

18           MR. CANNICK:  The same document, page 7.

19           MS. GEDDES:  Thank you.

20 BY MR. CANNICK:

21 A    Okay.  Which one?

22 Q    Where your thumb is, highlighted in yellow?

23 A    Okay.

24 Q    Where your thumb is, highlighted in yellow.

25 A    Okay.  Okay.

Mayweather - cross - Cannick                    3489

1   Q    You read it?

2   A    I did.

3   Q    Does that refresh your recollection that you told the

4   Government Mr. Kelly, before you started working for him,

5   would take care of your airfare, hotel and food on various

6   trips?

7   A    Before I started work for him, yes.

8   Q    And I also asked you before we took the recess if you

9   recall -- if you recall telling the Government that the

10  conversations that Jane had with her parents seemed to be

11  happy ones, that you heard them?

12  A    I recall, yes.

13  Q    Right.  And you testified and told us that you don't

14  recall saying that they were happy ones?

15  A    I don't recall using the word happy.

16  Q    Okay.  I'm going to show you this document and see if it

17  refreshes your recollection that you told the Government that

18  those conversations seemed to be happy.

19  A    Okay.

20  Q    Where my thumb is.

21  A    Okay.

22       THE COURT:  What page?

23       MR. CANNICK:  13 of 24.

24  A    Okay.

25  Q    Have you looked at it?

Mayweather - cross - Cannick                          3490

1   A    I did.

2   Q    Does it refresh your recollection that you told the

3   Government during those interviews that the conversation that

4   Jane and her parents had seemed to be happy ones?

5   A    I see it on the paper, I just don't remember using the

6   word happy.

7   Q    But that's what's on the paper?

8   A    It is.

9   Q    Now, during the six months or so that you worked with Mr.

10  Kelly, did he ever ask you to deny anyone food?

11  A    No, he did not.

12  Q    Did he ever ask you to deny anyone water?

13  A    No, he did not.

14  Q    Did he ever ask you to deny someone the freedom to move

15  about?

16  A    No, he did not.

17  Q    Did he ever ask you to go out and recruit women for him?

18  A    No, he did not.

19          MR. CANNICK:  Thank you, Your Honor.

20          THE COURT:  Any redirect?

21          MS. GEDDES:  Yes, Your Honor.

22          The Government offers 240(z).  I don't believe there

23  is any objection from defense counsel.

24          MR. CANNICK:  No objection.

25          (Government's Exhibit 240(z) received in evidence.)

Mayweather - cross - Cannick                3491

1          MS. GEDDES:  May I publish?

2          THE COURT:  Yes.

3          (Exhibit published.)

4    REDIRECT EXAMINATION

5    BY MS. GEDDES:

6    Q    I'm showing you what's now in evidence as Government

7    Exhibit 240-Z.

8          Are those three telephone numbers that you had saved

9    in your telephone for the defendant?

10          MR. CANNICK:  Your Honor, this is beyond the scope.

11          MS. GEDDES:  This was the exhibit that we discussed.

12          THE COURT:  This is what you discussed before.  So

13   if that's an objection, it is overruled.  Go ahead.

14   A    If this came from my cell phone, then, yes.

15   Q    On cross-examination, you were asked about text messages

16   that you exchanged with your sister and others and you

17   testified on direct examination about it.

18          Do you recall those?

19   A    I do.

20   Q    And in your cross-examination you said something along

21   the lines of, you know, you could call it gossip.  Do you

22   recall that?

23   A    I do.

24   Q    When you wrote to your sister and others what you

25   observed during your employment with the defendant, were you

Mayweather - cross - Cannick                    3492

1  writing truthfully about what you saw and heard?

2  A    I was.

3  Q    And were you writing truthfully about what you saw and

4  heard firsthand?

5  A    I was.

6  Q    And fair to say sometimes gossip also has the benefit of

7  being true?

8  A    Yes.

9  Q    And in this case, was it true?

10 A    Yes.

11 Q    And when you -- you were asked about your participation

12 on *Surviving R. Kelly*.  Those text messages that you wrote

13 were well before *Surviving R. Kelly*; correct?

14 A    Correct.

15           MR. CANNICK:  Objection to the leading.

16           THE COURT:  Overruled.

17 Q    You were also asked about whether you ever saw any

18 underaged girl at the defendant's parties, houses, studios.

19 Do you recall those questions?

20 A    I do.

21 Q    Now, prior to -- well, when you were working for the

22 defendant, did you sometimes attend parties at the defendant's

23 studio?

24 A    Yes.

25 Q    And was there a particular location where his female

Mayweather - cross - Cannick                    3493

1    guests or live-in girlfriends would spend their time?

2    A    During the parties?

3    Q    Yes?

4         PROSPECTIVE JUROR:  If they attended, there was a

5    VIP section for them.

6    Q    And in that VIP section, was there anything separating

7    that section from the rest of the party?

8    A    Black pipe and drape.

9    Q    There were curtains, drapes?

10   A    Yes.

11   Q    And when you attended parties prior to starting to work

12   for the defendant, were you always in that VIP section?

13   A    At the black pipe and drape area was at the studio while

14   I was working for him.

15   Q    Right.  And prior to when you were working for him, were

16   you always in any VIP sections where the defendant's female

17   guests or live-in girlfriends were at that time?

18   A    Prior to working for him?

19   Q    Yes?

20        PROSPECTIVE JUROR:  Yes.

21   Q    And were you always there?

22   A    Not always.

23   Q    Sometimes you were there, though; correct?

24   A    Yes.

25   Q    And when you were back there, did you ask for the

Mayweather - cross - Cannick                3494

1  identification documents of each and every female that was

2  back there?

3  A    No.

4  Q    And you were asked whether or not you ever saw anyone --

5  any females who were underage at that locations.

6        Fair to say that when you met Jane she was 17 years

7  old?

8        MR. CANNICK:  Objection.

9        THE COURT:  Overruled.

10 A    She was, but I didn't know she was.

11 Q    But you later learned she was, in fact, underage,

12 correct?

13       MR. CANNICK:  Objection.

14       THE COURT:  Didn't you ask her what the birthday

15 was?  I think.

16       MR. CANNICK:  No, I didn't ask her that.

17       THE COURT:  I think you did.

18       The objection is overruled.

19 Q    Fair to say she was 17?

20 A    She was 17.

21 Q    You were also asked about whether you ever saw the

22 defendant physically hit any of his guests or girlfriends.  Do

23 you recall that?

24 A    I do.

25 Q    Now, were there times when the defendant was alone in

Mayweather - cross - Cannick                3495

1  rooms with his female guests and girlfriends?

2  A    Yes.

3  Q    And were you always in that same room with them?

4  A    No.

5  Q    So can you say what happened behind closed doors?

6  A    No.

7  Q    Was there a time when you were on the tour bus with the

8  defendant and Jane?

9  A    Yes.

10 Q    Several times; right?

11 A    Yes.

12 Q    And was there ever a time when the defendant and Jane

13 were in that back room of the tour bus and you were in more of

14 the main cabin area of the tour bus?

15        MR. CANNICK:  Your Honor, I'm objecting.  This is

16 beyond the scope.

17        THE COURT:  Overruled.

18 A    Yes.

19 Q    Did you ever hear -- even though you didn't see the

20 defendant physically hit any of his live-in girlfriends or

21 female guests, did you ever hear anything that was consistent

22 with a hit or a spanking?

23 A    I did once.

24 Q    What did you hear?

25 A    Something that sounded like maybe a lick.

Mayweather - cross - Cannick                3496

1  Q   Like a spanking?

2  A   Like a lick.

3  Q   When you say lick, what do you mean?

4  A   Like an open hand sound.

5  Q   And where was the defendant when you heard that?

6  A   In the bedroom.

7  Q   I'm sorry?

8  A   In the bedroom.

9  Q   In the bedroom?

10 A   Uh-hum.

11 Q   Where were you at that time?

12 A   In the area where the couch was, one of the couches.

13 Q   Were you in the bus or the studio?

14 A   The tour bus.  We were on the tour bus.

15 Q   Who was with him in the bedroom at that time?

16 A   Jane.

17 Q   On cross-examination you were asked about whether you

18 were told the reasons for which Jane was on the tour bus on

19 those occasions when you would stay on the tour bus with her.

20 Do you recall those questions?

21 A   I do.

22 Q   Based on your time working for the defendant, what did

23 you believe she was on the tour bus for?

24         MR. CANNICK:  Objection.

25         THE COURT:  Sustained as to form.

Mayweather - cross - Cannick                    3497

1   Q    You were asked whether it was the case that the -- you

2   were asked whether it was the case that Jane was simply doing

3   -- had work to do.  Do you recall those questions?

4   A    I do.

5   Q    And whether she may have been on the tour bus just doing

6   work that she had for high school; correct?

7   A    Correct.

8   Q    Now, was Juice in high school when you worked for the

9   defendant?

10  A    No.

11            MR. CANNICK:  Ob --

12            THE COURT:  I heard a noise.  Is that an objection?

13            MR. CANNICK:  No.

14            THE COURT:  All right.

15  Q    Was there a time that you, in fact, discussed Juice being

16  on punishment?

17  A    No.

18  Q    With the defendant.  By the way, you testified that

19  punishment was your word; correct?

20  A    Yes.

21  Q    Did the defendant say what are you talking about?

22  A    No.

23  Q    Did the defendant respond when you asked him about

24  punishment?

25  A    He did.

Mayweather - cross - Cannick                    3498

1   Q    And what did he say again?

2   A    He just said yeah, Juice gets punished too.

3   Q    He used the term "punished" in that sentence; correct?

4   A    After I used it, yes.

5   Q    You were asked -- oh, by the way, you were asked about

6   whether Jane might have been doing homework on the tour bus.

7   Are there tables in the studio?

8   A    Yes.

9   Q    Pens?

10  A    Yes.

11  Q    Papers?

12  A    Yes.

13  Q    Room for a laptop to sit somewhere?

14  A    Yes.

15  Q    Is it fair to say that someone can also do homework in

16  the room within the studio?

17  A    Yes.

18  Q    You were asked on cross-examination whether the

19  defendant's live-in girlfriends went shopping.  Do you recall

20  those questions?

21  A    Yes.

22  Q    Based on your time working for the defendant, when one of

23  his live-in girlfriends was, in your words, on punishment, did

24  they get to go shopping?

25  A    No.

Mayweather - cross - Cannick                    3499

1    Q    Where would they stay?

2    A    At the studio.

3    Q    You were asked about the time that you quit working for

4    the defendant and I think you testified on cross-examination

5    that you -- your sister communicated an offer from the

6    defendant to come back.  Do you recall those questions?

7    A    I do.

8    Q    What were the terms under which the defendant offered for

9    you to come back as communicated by your sister?

10   A    Six months without pay.

11   Q    How many months?

12   A    Six months without pay.

13   Q    And by the way, you were also asked several questions

14   regarding events that occurred in the late '90s, maybe early

15   2000s before you started working for the defendant; correct?

16   A    Correct.

17   Q    And you weren't working for him in the '90s or, you know,

18   the first ten years of 2000; correct?

19   A    No.

20   Q    You were also asked several questions about an incident

21   involving Niecy, if I remember correctly?

22   A    Correct.

23   Q    Niecy, do you recall who Mr. Cannick was referring to

24   when he used the term Niecy?

25   A    Yes.

Mayweather - cross - Cannick                    3500

1  Q    That's not Jane?

2  A    No.

3  Q    And was it Niecy where there were some questions about

4  whether there was an incident involving taking photographs?

5  A    It was Niecy, yes.

6  Q    And do you recall a situation involving Niecy taking

7  photographs?

8  A    Yes.

9  Q    What happened?

10 A    I believe she snapped a photo of a poster, the banner

11 that was in front of the house.

12 Q    And what happened at that time?

13 A    One of the security asked her did she take a photo.

14 Q    And how did she respond?

15 A    I believe she told him yes.

16 Q    And then what happened?

17 A    And he just basically told her she couldn't take photos,

18 as far as I recall.

19 Q    And then did you go inside to the party?

20 A    Yes.

21 Q    You were shown several reports on cross-examination about

22 certain statements that reflected -- during meetings that you

23 had with the Government.  Do you recall those questions and

24 those reports?

25 A    Yes.

Mayweather - cross - Cannick                3501

1  Q    Did you write those reports?

2  A    No.

3  Q    Prior to your testimony today, had you read any of those

4  reports?

5  A    No.

6  Q    And ever had an opportunity to check them for accuracy?

7  A    No.

8         MS. GEDDES:  I'm showing the witness only what has

9  been marked for identification as 3500-AM1-1, page two.

10  Q    Do you see what's written in this paragraph where my pen

11  is pointed?

12  A    Yes.

13  Q    Fair to say these reports make clear that they are not

14  verbatim accounts of the statements made during those

15  meetings?

16  A    Yes.

17  Q    And fair to say it also makes clear that it doesn't

18  memorialize all statements made during a particular interview?

19  A    Yes.

20  Q    By the way, you were asked about times that you escorted

21  some of the defendant's female guests and live-in girlfriends

22  into a concert venue.  Do you recall those questions?

23  A    Yes.

24  Q    Was your job to provide security for the defendant -- I

25  mean for those live-in girlfriends or female guests?

Mayweather - cross - Cannick                    3502

1   A    No.

2   Q    And did the defendant employ other people to provide

3   security for him?

4   A    For him, yes.

5   Q    Were those other people who he employed as security, were

6   they there to provide security for the defendant's female

7   girlfriends and live-in guests?

8   A    No.

9   Q    By the way, you were asked on cross-examination about

10  whether the defendant would stand up when a female -- one of

11  his female guests entered the room.  Do you recall those

12  questions?

13  A    I do.

14  Q    Did the defendant stand up when you walked into a room?

15  A    No.

16           MS. GEDDES:  Nothing further.

17           THE COURT:  Any recross?

18           MR. CANNICK:  Yes.

19           THE COURT:  Okay.

20  RECROSS-EXAMINATION

21  BY MR. CANNICK:

22  Q    You were asked some questions about being at one of Mr.

23  Kelly's party and it was your responsibility to check the IDs

24  of his guests.

25           Do you remember that question just being of you?

Mayweather - cross - Cannick                3503

1   A    Yes.

2   Q    That was the role of security, am I correct?

3   A    Yes.

4   Q    Okay.  He had, as you just testified, a staff, a security

5   staff that would check ID for age, am I correct?

6   A    I don't think they checked ID for every party.

7   Q    My question was not that.  My question was simply this:

8   He had a staff that was there and that staff was a security

9   staff and they would check ID's am I correct?

10  A    I can't say they did.

11  Q    You can't say that they did?

12  A    No.

13  Q    But you can't say that they didn't?

14  A    I cannot say they did not.

15  Q    Now, just like you can't say -- you were asked a question

16  about what happened behind closed doors.  Do you remember that

17  question being asked of you?

18  A    Yes.

19  Q    Well, you don't know what happened behind closed doors,

20  am I correct?

21  A    Correct.

22  Q    You testified and talked about hearing something that

23  sounded like a spank?

24  A    I said lick.

25  Q    A lick.  After you heard the lick, did you hear any

Mayweather - cross - Cannick                    3504

1  screams?

2  A     No.

3  Q     Did you hear any crying?

4  A     No.

5  Q     Did you hear any muffled noise whatsoever?

6  A     No.

7  Q     Now, the bottom line is that you never saw an underaged

8  female at one of Mr. Kelly's parties, am I correct?

9  A     Correct.

10  Q     And you never saw Mr. Kelly physically hit anyone, am I

11  correct?

12  A     Correct.

13  Q     And when you testified that Jane was on this bus, on the

14  tour bus, you don't know why she was on the tour bus, am I

15  correct?

16  A     Correct.

17  Q     Now, you were asked about whether or not there were pens

18  and paper and a desk in the studio, am I correct?

19  A     Correct.

20  Q     But there's also recording going on in the studio, am I

21  correct?

22  A     Correct.

23  Q     People are recording songs, am I correct?

24  A     Correct.

25  Q     Loud music, am I correct?

Proceedings                                    3505

1   A    Correct.

2   Q    There's no recording going on in the studio bus, is it?

3   A    No.

4   Q    There was no loud noise in the studio when Jane was there

5   and you were there, am I correct?

6   A    No.

7            MR. CANNICK:  Nothing further, Your Honor.

8            THE COURT:  Any --

9            MS. GEDDES:  Just one question.

10           THE COURT:  Okay.

11  REDIRECT EXAMINATION

12  BY MS. GEDDES:

13  Q    In the recording studio, is the recording studio itself

14  soundproof?

15  A    The recording part, yes.

16  Q    Where someone would record?

17  A    Yes.

18           MS. GEDDES:  Nothing further.

19           THE COURT:  Anything else?  Any other questions?

20           MR. CANNICK:  Just one second, please.

21           No questions.

22           THE COURT:  All right.  I'm trying to think about

23  using our time well.  I think we might start another witness

24  since we are staying a little bit late and we will begin lunch

25  at like 1:20 or so, does that work for everybody?  Nobody is

Proceedings                                    3506

1    saying no.

2              THE COURTROOM DEPUTY:  It's not here any way.

3              THE COURT:  Let's soldier on.  Can you call your

4    next witness, please.

5              MS. CRUZ MELENDEZ:  The Government calls Nicholas

6    Williams to the stand.

7              THE COURT:  Okay, we can take this witness away.

8    Thank you so much.

9              THE WITNESS:  You're welcome.

10             (Witness steps down.)

11             THE COURTROOM DEPUTY:  Please stand and raise your

12   right hand.

13             Do you solemnly swear or affirm that the testimony

14   you're about to give will be the truth, the whole truth, and

15   nothing but the truth?

16             THE WITNESS:  I do.

17             THE COURTROOM DEPUTY:  Thank you.  You may be

18   seated.

19             THE COURT:  All right.  You can take your mask off.

20             Just a couple of things.  The microphone is on,

21   right?  Do you want to tap it?

22             THE WITNESS:  Yes, it is.

23             THE COURT:  I want to make sure the jury can hear

24   what you have to say.  You are also perfectly free to take it

25   out and hold it if it makes it easier.  I want to make sure

1  **NICHOLAS WILLIAMS**,

2       called by the Government, having been duly sworn, was

3       examined and testified as follows:

4  DIRECT EXAMINATION

5  BY MS. CRUZ MELENDEZ:

6  Q    Mr. Williams, where did you grow up?

7  A    I grew up in Springfield, Illinois.

8  Q    Are you currently employed?

9  A    I am.

10 Q    How are you employed?

11 A    I am a product designer for a medical device

12 manufacturer.

13 Q    And how far did you go in school?

14 A    Officially I obtained an associate's degree.  I've taken

15 coursework in electrical engineering and computer programming,

16 but officially the associate's is the furthest I have gone.

17 Q    Where did you get your associate's degree?

18 A    Full Sail University.

19 Q    Where is Full Sail University located?

20 A    Winter Park, Florida near Orlando.

21 Q    And what field did you get your associate's degree?

22 A    Audio engineering.

23       (Continued on next page.)

24

25

1  BY MS. GEDDES:  (Continuing.)

2  Q    Why did you get a degree in audio engineering?

3  A    I played drums growing up since I was a kid and I wanted

4  to move into doing sounds in recording studios and wanted to

5  do it professionally.

6  Q    After you completed Full Sail University, did you get a

7  job related to the music industry?

8  A    I did, but not immediately.

9  Q    Where did you get a job once you got one in the music

10  industry?

11  A    I stayed in contact with Full Sail's placement department

12  and they put me in contact with what I thought was Chicago

13  Trax in Chicago.

14  Q    What's Chicago Trax?

15  A    Chicago Trax was a recording studio.

16  Q    And when did you obtain the job?

17  A    I believe that I interviewed in April of 2003 and then

18  obtained the job roughly May or June.

19  Q    Now you testified that Chicago Trax Studio was located in

20  Chicago; correct?

21  A    Correct.

22  Q    Do you recall do recall the address of the studio?

23  A    I do.  It was 865 North Larrabee.

24  Q    North Larrabee Street in Chicago?

25  A    Yes.

1  Q    I believe that you testified that you obtained the job in

2  May or June of 2003; correct?

3  A    That's correct.

4  Q    Or, excuse me, that you started your job approximately

5  May or June of 2003; correct?

6  A    Yes, correct.

7  Q    And how long did you work at Chicago -- the studio?

8  A    It was roughly one year.

9  Q    Approximately how old were you when you first began

10 working at Chicago Trax?

11 A    I would have been 19.

12 Q    I'm showing you what's in evidence as Government Exhibit

13 30.

14       MS. CRUZ MELENDEZ:  We can show this to the jury and

15 the public.

16       (Exhibit published.)

17 BY MS. CRUZ MELENDEZ:

18 Q    Do you recognize that?

19 A    Unfortunately, I do.

20 Q    And who is that?

21 A    That's a very embarrassing picture of myself.

22 Q    And approximately how old were you at that time?

23 A    I believe I was 19 at that point.

24 Q    Now when you first started working at what you believed

25 was going to be Chicago Trax Studio, did you know who you

1  would be working for?

2  A    When I accepted the position or was offered the position,

3  I did not know.  I found out my first day of work.

4  Q    And said on your first day of work you found out?

5  A    Yes.

6  Q    And who did you find out you would be working for?

7  A    I was told by Tom Arnold, the studio manager, that I

8  would be -- the way the conversation went is when I sat down

9  for my first day of work to get my instructions for what to do

10 I was told that basically my job was to do whatever Rob

11 wanted.

12 Q    And --

13 A    And I asked who Rob was.  And he was like, are you

14 serious.  No, I don't.  He said you are working for Robert

15 Kelly.  You are working for R. Kelly and your job is to do

16 whatever he wants for him.

17 Q    At the time did you know who Rob Kelly was?

18 A    I did, yes.

19 Q    Who did you understand him to be?

20 A    A global musician R&B performing artist.

21 Q    And are you excited the prospect of working with

22 R. Kelly?

23 A    I was.

24 Q    Now, you testified when you originally started working at

25 the studio, you thought you were going to be working for

1  Chicago Trax Studios and then you learned that you were going

2  to be working for Robert Kelly.

3              What was the difference between working for Chicago

4  Trax or working for Robert Kelly?

5  A    So, I believe I found out in the first week that Chicago

6  Trax was no longer an actual studio.  It was purchased by

7  Robert Kelly to use for his own studio.  And Chicago Trax

8  itself was no longer in business.

9  Q    So you mentioned Tom Arnold is the studio manager?

10 A    Correct.

11             (Exhibit published.)

12 Q    I am showing you what's in evidence as Government Exhibit

13 31.  Do you recognize this individual?

14 A    I do.

15 Q    And who is that?

16 A    That is Tom Arnold.

17 Q    I'm also showing you what's in evidence as Government

18 Exhibit 1.  Do you recognize the individual in that

19 photograph?

20 A    I do.

21 Q    Who is that?

22 A    That's Robert Kelly.

23 Q    At some point when you started working at the studio that

24 was owned by Robert Kelly, did you have an opportunity to meet

25 him?

Williams - direct - Geddes                3513

1   A    I did.  I -- from early on I worked with him or saw him

2   or interacted with him daily.

3   Q    Do you see him in the courtroom here today?

4   A    It's difficult to tell with the mask, but I do believe I

5   see the gentleman with a blue striped tie, blue suit

6   between --

7           THE COURT:  Why don't we make it easier if Mr. Kelly

8   can take his mask off.

9           THE WITNESS:  Can you please lower it?

10  A    Yes, that is Rob.

11          THE COURT:  Indicating the defendant.

12  BY MS. CRUZ MELENDEZ:

13  Q    Now when you first started working at the studio, what if

14  any paperwork were you required to sign when you began working

15  there?

16  A    I signed a confidentiality agreement.

17  Q    And who presented you with that confidentiality

18  agreement?

19  A    That would have been Tom Arnold.

20  Q    And what did you understand your obligations to be under

21  the confidentiality agreement?

22  A    Basically, like most agreements or NDAs, anything that

23  was sought -- anything that was seen, discussed, talked about,

24  any interactions that occurred within the walls of the studio

25  or out publicly, if out in public with Rob, was to be kept to

Williams - direct - Geddes                    3514

1    myself, not released to the public, not talked about with

2    friends, not talked about on social media, et cetera.

3    Q    Now, you stated that when you first learned that you were

4    going to be working with R. Kelly, the defendant, that you

5    were excited about that prospect.  Did that change at some

6    point?

7    A    It did.  Over time it did.

8    Q    Why?

9    A    Well, many of the things that I saw that I was required

10   to do, they made me uncomfortable.  It seemed -- there were

11   times when there was hostility from the defendant and it felt

12   like a hostile work environment.  In addition, I was under the

13   impression that I would be eventually able to use audio

14   equipment and I wasn't able to do that.

15   Q    You testified you started -- when you started at this

16   studio, what was your position again?

17   A    When I first started, I was an intern.

18   Q    And was that a paid position?

19   A    It was not, no.

20   Q    What were your duties and responsibilities when you first

21   started as an unpaid intern?

22   A    As an intern, I was required to do basic cleaning,

23   vacuuming, wiping down of any bathrooms, sinks, toilets,

24   cleaning the floors, making coffee in the morning and just any

25   general requests that came in from Tom, Rob or any other

Williams - direct - Geddes                           3515

1    employees that were above me.

2    Q    Now, at some point did your position as an intern change?

3    A    It did.  After three months, I was promoted to -- I don't

4    know if there was ever a technical name for the position, but

5    I basically sat at the front security desk and answered phones

6    and let people in and out of the gated parking lot outside.

7    Q    Now, was that a paid position?

8    A    That was.  That was $6 an hour.

9    Q    And how long were you in that position?

10   A    I was in that position for roughly nine months since the

11   internship was three months so a total of about 12.

12   Q    When you were answering phones at the security desk at

13   the studio did you work a particular shift?

14   A    Yes.  I worked four days a week from 10 p.m. until noon

15   the following day.

16   Q    And did you ever work hours longer than that designated

17   shift?

18   A    I did.  The individual that was supposed to replace me

19   would generally come in a couple of hours late.  So a 14-hour

20   shifts ends up being 16 or 17 hours.

21   Q    Now, when you worked, did you have to keep track of your

22   time in some way?

23   A    I did.  There was an old manual timecard machine on the

24   wall with paper timecards that you would slide in, press the

25   button and it would record the time and you would enter that

Williams - direct - Geddes                                    3516

1   in a box, your arrival and end time.

2   Q    Were the timesheets used for the purposes of you

3   receiving your pay?

4   A    Yes, they would have been.

5   Q    When you filled out your timesheets, fair to say that you

6   wanted to be accurate on those timesheets?

7   A    That's accurate, yes.

8   Q    When you received payment, how did you get paid?

9   A    I believe it would have been in the form of a check.

10  Q    And who issued your checks?

11  A    Those came from a company called Bass Productions.

12  Q    Now, you testified that you worked the late shift from 10

13  p.m. to 12 p.m. the following day when you worked shifts and

14  that there was another individual who would often show up

15  late.  Who if anyone worked that day shift while you were

16  working at the studio?

17  A    That would have been Blake Chaffin.

18        MS. CRUZ MELENDEZ:  Showing the witness what's in

19  evidence as Government Exhibit 24.

20        (Exhibit published.)

21  BY MS. CRUZ MELENDEZ:

22  Q    Do you recognize that individual?

23  A    I do.

24  Q    Who is that?

25  A    Blake Chapman with much shorter hair.

Williams - direct - Geddes                    3517

1  Q   During your time working for the defendant at the studio

2  on Larrabee Street, did you have an opportunity to meet other

3  individuals who worked for the defendant?

4  A   I did.  There were the positions of what I knew to be

5  business manager which would have been Donnie Lyle along with

6  head of security which would have been Big John.

7  Q   Now, you mentioned a Donny Lyle.  I'm showing you what's

8  in evidence as Government Exhibit 32.

9          (Exhibit published.)

10 Q   Do you recognize that individual?

11 A   Yes.

12 Q   Who is that?

13 A   That is Donny Lyle.

14 Q   What was his position?

15 A   As far as I knew it was business manager.

16 Q   For the defendant?

17 A   Correct.

18 Q   You also mentioned a Big John as working security?

19 A   That's correct.

20 Q   I'm showing you what's in evidence as Government Exhibit

21 23.

22          (Exhibit published.)

23 Q   Do you recognize that individual?

24 A   I do.

25 Q   And who is that?

Williams - direct - Geddes                3518

1    A    That is Big John.

2    Q    Do you know Big John's full name?

3    A    Unfortunately I do not.

4    Q    I'm also showing you what's in evidence as Government

5    Exhibit 49.

6              (Exhibit published.)

7    Q    Do you recognize this individual?

8    A    I believe I do.

9    Q    And who is that?

10   A    That would have been one of the engineers, Ian Mereness.

11   Q    And did he work at the studio at the time that you were

12   working at the studio?

13   A    He did, yes.

14   Q    And did he work as an engineer for the defendant?

15   A    He was one of the primary engineers, yes.

16   Q    I'm showing you what's in evidence as Government Exhibit

17   50.

18             (Exhibit published.)

19   Q    Do you recognize that individual?

20   A    I do.

21   Q    Who is that?

22   A    That is Abel Garibaldi.

23   Q    And what, if anything, did he do?

24   A    He was also one of the primary engineers, if not the

25   primary audio engineer for Rob.

SN       OCR       RPR

A 1393

1  Q    Okay.  I'm also showing what's in evidence as Government
2  Exhibit 26.
3            (Exhibit published.)
4  Q    Do you recognize this individual?
5  A    I do recognize that individual.
6  Q    And what if -- how do you recognize him?
7  A    I believe he was one of the assistant engineers at the
8  studio.
9  Q    Do you recall his name?
10 A    I think it might be Jeff but I don't recall the last
11 name.
12 Q    So you testified that you answered telephones as part of
13 your responsibilities once you moved into your paid position.
14 How many telephone lines were there at this studio?
15 A    There were four telephone lines.  There was one primary,
16 but four total lines.
17 Q    Were you responsible for answering all of those telephone
18 lines?
19 A    I was, yes.
20 Q    Other than the telephone at the reception area where you
21 worked and answered telephone, were there telephones in other
22 locations around the studio?
23 A    Yes.  There were -- I don't recall exactly the location
24 or the number of them, but there would have been one in Tom's
25 office, his main office, as the studio manager.  There were

Williams - direct - Geddes                    3520

1  two or three spread out on the wall in the hallway.  So if we
2  were -- since it was primarily two stories.  If I had to run
3  up a note upstairs and I needed to answer the phone upstairs
4  there was one in the hallway and then there were occasional
5  rooms that had phones.
6  Q    So you mentioned a couple of different types of phones in
7  the studio.  You mentioned the hallway area.  Obviously you
8  mentioned the offices.  What other types of rooms were there
9  at is the studio?
10 A    So there were -- I know there was a large warehouse that
11 had garage access.  There was a room for, like, telephone
12 service and IT-type things.  There was a waiting room up
13 front.  There was a small lounge/waiting room for any music
14 artists that came through the studio and upstairs what used to
15 be, I believe, four or five different industry-standard
16 recording studios, only two of those were kept open to be
17 operated as recording Studios and the rest then were turned
18 into lounges for guests.
19 Q    And who turned them into lounges?
20 A    It occurred before I arrived there, but I believe it
21 would have been at Rob's direction.
22            MR. CANNICK:  Well --
23            THE COURT:  If you don't know, don't testify.
24            Did you object?
25            MR. CANNICK:  Yes.

1    THE COURT:  All right, the objection is sustained as

2  to that part.

3  BY MS. CRUZ MELENDEZ:

4  Q    But fair to say that there were lounges inside of the

5  studio?

6  A    Yes.

7  Q    You also testified about Tom Arnold's office do you

8  recall what floor that was on?

9  A    It was on the first floor right next to the security

10  area.

11  Q    Now, while you were on shift did anyone other than you

12  use or answer the studio telephone lines?

13  A    Occasionally Rob would pick up the phone himself but if I

14  was there overnight, it would generally be me picking up.

15  Q    Now if someone called into the studio, what would you say

16  when you answered the phone?

17  A    Initially whenever I would pick up the phone it was just

18  a simple "Studio" and that's it.  As time progressed we were

19  instructed to call is the studio the Chocolate Factory.  I

20  would answer the phone saying "Chocolate Factory."

21  Q    Why would you answer the phone as Chocolate Factory?

22  A    Rob directed us to answer the phone as Chocolate Factory.

23  Q    While working at the studio did you answer calls of

24  people trying to reach the defendant?

25  A    I did.

Williams - direct - Geddes                3522

1   Q    And what types of people would call the studio asking to

2   speak to the defendant?

3   A    It could be any number of people; his personal trainer,

4   other musical artists or actors that needed to be in touch

5   with him.  Anybody that arrived at the front gate to come into

6   the studio or other fans or guests that were within the walls

7   of the studio.

8   Q    When you say fans or guests, did you ever receive calls

9   from female individuals looking to speak with the defendant?

10  A    I did, yes.

11  Q    So if someone called the studio trying to reach the

12  defendant what, if any, process did you have for alerting the

13  defendant to a call?

14  A    So, next to the phone we had a stack of cut up pieces of

15  paper that were roughly one and a half by two and a half

16  inches in dimension and the process was to write down the name

17  of the person who was on the phone line, along with the

18  four-digit extension of that particular phone that they were

19  calling in on.  Once that's written down, I would run up to

20  whatever location I knew Rob to be.  It was generally the

21  recording studio, the primary recording studio.

22          I would wait for music to stop, open the door, step

23  in and stand in the corner without looking at anybody waiting

24  to be acknowledged and then I would hand that piece of paper

25  to Rob when I was and he would say either, Yeah man, I got it

1    or I'm not here.

2    Q    When he said I'm not here, meaning for you to tell the

3    individual on the phone that Rob was not there?

4    A    Correct.  That I'm sorry, I can't find him.

5    Q    So just to be clear, you previously testified that

6    individuals would call the studio lines; correct?

7    A    That's correct.

8    Q    And some of those individuals were females; correct?

9    A    Correct.

10   Q    Okay.  Did some of these calls come from outside of the

11   studio?

12   A    Yes.

13   Q    And while working reception did you ever answer calls

14   from inside the studio from individuals trying to reach the

15   defendant?

16   A    I did, yes.

17   Q    And did you ever receive calls from inside of the studio

18   from females trying to reach the defendant?

19   A    That is correct, yes.

20   Q    Generally speaking who would these females be?

21   A    These would be female guests that came to see Rob and

22   were in one of the lounges, one of the lounges on the second

23   floor.

24   Q    You testified that --

25            MS. CRUZ MELENDEZ:  One second, Your Honor.

Williams - direct - Geddes                    3524

1          THE COURT:  Okay.

2    BY MS. CRUZ MELENDEZ:

3    Q    Just backing up for a moment when you were talking about

4    answering calls, you mentioned a four-digit extension?

5    A    That's correct.

6    Q    What were you referring to?

7    A    The -- IT would be the last four digits of whatever the

8    phone number was that they were calling from.

9    Q    From inside the studio?

10   A    So, basically if somebody is calling down from -- down to

11   the front lobby area from any other phone, they would pick up

12   and choose a line and the last four digits of that particular

13   line would then light up as they were calling me on the main

14   line and then I would write down which room that they were in

15   and who it was if I knew who it was.

16   Q    So someone calling from inside the studio when you saw

17   the four-digit extension, that's the extension to the

18   telephone number from whatever phone it is inside of the

19   studio?

20   A    You could select different four-digit phone numbers from

21   whatever phone you were at.  So it wouldn't tell me which room

22   they were in.

23   Q    But it's fair to say it's from inside of the studio?

24   A    Correct, yes.

25             THE COURT:  Okay, I think now is a good time to stop

Williams - direct - Geddes                          3525

1    for lunch.

2              The witness can step down.

3              (Witness steps down.)

4              THE COURT:  Folks I'm going to excuse you for lunch.

5    Don't talk about the case in any way, shape or form but have a

6    good lunch.  We will be back here at 2:30.

7              THE COURTROOM DEPUTY:  All rise.

8              (Jury exits.)

9              THE COURT:  Everybody can sit down.  How much more

10   do you think you have with this witness?

11             MS. CRUZ MELENDEZ:  Maybe half an hour.

12             THE COURT:  Is this your witness, Mr. Cannick?

13             MR. CANNICK:  Yes.

14             THE COURT:  Okay.  I wondered how much more we're

15   going to get done today.  Who is after this witness?

16             MS. GEDDES:  Our case agent.  We have one witness --

17             THE COURT:  Somebody had surgery?

18             MS. GEDDES:  Yes.  We have a short witness for

19   tomorrow which we may ask to take out of order because that

20   witness is flying in and two more witnesses on Friday.

21             THE COURT:  Anything anybody has to bring up BEFORE

22   we break?

23             MS. GEDDES:  No.

24             MR. CANNICK:  No.

25             (Luncheon recess taken.)

Proceedings                                          3526

1                A F T E R N O O N   S E S S I O N

2                        (In open court.)

3              (The Hon. Ann M. Donnelly, presiding.)

4                       (Defendant present.)

5      (The following occurs outside the presence of the jury.)

6              THE COURT:  We've been talking about scheduling a

7      little bit.  I had told the jurors that we would go to 6 today

8      and I am told by the optimistic representatives of both sides

9      that that's not necessary.  I think we will just see because

10     if the plan is to finish the Government's case on Friday, I

11     really would like that to happen and I would rather have extra

12     time on Friday than today.  The other thing is that obviously

13     for anyone who observes Yom Kippur, it will be nicer to leave

14     earlier tomorrow.

15             I think I'm going to stick with the 6 o'clock unless

16     there's a burst of speed here that moves us along which I

17     don't sense.  So let's get the witness and then we will get

18     the jury.

19             (Witness takes the stand.)

20             (Jury enters.)

21             THE COURTROOM DEPUTY:  You may be seated.

22             THE COURT:  We had a few little matters to discuss

23     but we are doing fine schedule-wise so we will continue with

24     the direct examination.

25             Go ahead.

Proceedings                                                    3527

1    THE COURTROOM DEPUTY:  The witness is reminded he is

2    still under oath.

3         THE WITNESS:  Yes, agreed.

4    NICHOLAS WILLIAMS having been previously duly sworn/affirmed,

5         testified as follows:

6    CONTINUED DIRECT EXAMINATION

7    BY MS. CRUZ MELENDEZ:

8    Q    Prior to the lunch break you were testifying about

9    receiving calls from both inside and outside the studio.  Do

10   you recall that?

11   A    Yes.

12   Q    I believe you testified that when you received calls, you

13   received calls from females both outside and inside the studio

14   looking to speak with the defendant; is that correct?

15   A    That's correct.

16   Q    With respect to both calls coming from outside and inside

17   of the studio, did you use that same process you testified

18   earlier before, writing the message down and then going to the

19   defendant wherever he was in the studio?

20   A    Yes, that's correct.

21   Q    So, you testified that as part of your responsibilities

22   while working the reception desk that also included letting

23   visitors into the studio premises?

24   A    Correct.

25   Q    Can you describe the exterior of the building that housed

Proceedings                                                    3528

1   the defendant's studio?

2   A    Okay.  North Larrabee Street if you were on the street

3   facing the facility, on the right side is the primary facility

4   and on the left side is a chain link fenced-in parking lot.

5   From the street on the main part of the building, there was a

6   rollup garage door.  That was the only other entrance that I

7   was aware of from outside of the gated parking lot.

8        When you pull up to the gated parking lot surrounded

9   by a very tall chain link fence, there was a phone call keypad

10  on the left in front of an automatic sliding chain link fence

11  and someone could come up to that to call into me.  When you

12  enter the parking lot, the main entrance was on the first

13  level to the left.  If you're now facing the side of the

14  building and there was also a stairway that led upstairs to a

15  second story on the right side of that facing the building.

16       MS. CRUZ MELENDEZ:  So I'm showing the witness

17  what's in evidence as Government Exhibit 525(u).

18       (Exhibit published.)

19  BY MS. CRUZ MELENDEZ:

20  Q    What do we see in 525(u)?

21  A    If you look under the sign that says Chicago Trax, that's

22  the call keypad that you would use to call whoever was working

23  the front desk to enter, but this is the chain link that

24  surrounds the parking lot part of Chicago Trax along with the

25  automatic gates.

Proceedings                                              3529

1  Q     Showing you 525(b) below the center of the photographs is

2  that the keypad that you testified about?

3  A     Yes, yes.

4  Q     Also showing you Government Exhibit 525(q) which is in

5  evidence what do we see here?

6  A     That is the main first floor entrance to the facility.

7  Q     And showing you what's in evidence as Government Exhibit

8  525(r) what do we see here?

9  A     I see the rolltop garage door, but this looks slightly

10  different from what I remember during my employ.

11  Q     Now, what kinds of visitors would come see the defendant

12  at a studio?

13  A     Visitors that would come see Rob could vary from other

14  professional artists, musicians, actors that he was doing

15  projects with, his personal trainer, some of his close

16  entourage.  Obviously any of the other employees that worked

17  there can come to the facility.  But to see Rob directly were

18  the folks that I just listed before and any female guests that

19  he invited to the studio after a show or after a performance,

20  something of that nature.

21  Q     Now, when -- focusing on the visitors who came to the

22  studio, how did you know who to let into the studio to see the

23  defendant?

24  A     This was a similar process to the phone call.  If

25  somebody came to the front gate, I would write down who the

Proceedings                                           3530

1  person was at the front gate instead of the four-digit number

2  and the name of the person who it was and run that up to Rob.

3  Q    And once an individual was inside of the chain link fence

4  that you testified about, what, if anything, would you do to

5  let people in?

6  A    I would -- I feel like I recall a buzzer at the front

7  door that I would have to buzz to let them open the main door

8  to the building itself.

9  Q    Was there access into the studio building other than

10 through the front door?

11 A    There was, but not public access.  That stairway that

12 goes upstairs, that was another entrance and then of course

13 the rolltop door where he parked his vehicle.

14 Q    When you say "he" who do you mean?

15 A    Where Rob, the defendant, would park his vehicle.

16 Q    Where would he park his vehicle?

17 A    He entered the garage that was accessed from the street

18 and pull into a garage type room within the facility.

19 Q    And if someone entered in through the garage, how would

20 they get into the building?

21 A    There was an elevator that went directly up to the second

22 floor from there.

23 Q    Were there cameras inside the garage from what you could

24 see?

25 A    Not that I was aware of, no.

SN        OCR        RPR

A 1405

Proceedings                                          3531

1  Q    If there was a visitor inside the gate by the front door
2  where you would let them in?
3  A    There were cameras at the front entrance, cameras in the
4  front main hallway leading to the waiting area.  So, facing
5  the door and then also facing down the hallway in the other
6  direction I believe was another camera.
7  Q    You testified that some of the defendant's guests who
8  came to visit him were females; is that correct?
9  A    That's correct.
10 Q    And during your time working for the defendant did you,
11 in fact, let female guests into the studio who came to see the
12 defendant?
13 A    I did, yes.
14 Q    And on those instances, would you alert the defendant to
15 their presence?
16 A    Before they would be let into the building, I would have
17 to get permission of where to move those guests within the
18 building.  I would generally be told something in the nature
19 of put them in lounge two.
20 Q    Who would tell you that?
21 A    Rob would tell me that.
22 Q    To be clear, if a female came to see Rob, you would speak
23 with Rob, the defendant, and he would tell you where in the
24 studio to place that female guest?
25 A    That's accurate, yes.

Proceedings                                                    3532

1   Q     Now, you mentioned that there were times when the

2   defendant left to do performances and concerts and parties, I

3   believe you said.  On those occasions would female guests come

4   to the studio?

5   A     On occasion, they would.  I believe they would come in --

6   I know that they would come into -- I know that they would

7   come to the front gate either immediately after Rob returned

8   or within the next hour or so, but I also am aware that some

9   of the female guests entered the garage with him.

10  Q     What, if anything, did you notice about some of the

11  female guests that came to see the defendant after these

12  concerts and parties?

13  A     All of them were very young.

14  Q     And how old were you at the time?

15  A     19.

16  Q     Now, did any of the defendant's female guests who came to

17  see the defendant remain at the studio overnight?

18  A     On a regular basis, yes.  Generally if there was a guest

19  that came to the studio they would arrive on a Thursday or

20  Friday and stay until Sunday or Monday.

21  Q     When you say "guests" are you referring to female guests

22  that would stay that long?

23  A     I am, yes.

24  Q     What if any instructions were you given regarding how you

25  were interact with the defendant's female guests?

Proceedings                                        3533

1   A    My direct rules were that I did not interact with the

2   female guests at all.  None of us were allowed to.  You

3   couldn't look them in the eye or greet them when they entered

4   the door in the building.  You were not allowed to talk to

5   them in their room.  You don't have extra conversation if they

6   happen to call down to the front desk.  There was basically no

7   interaction with these guests.

8   Q    Who gave you these instructions?

9   A    These instructions came from Rob.

10  Q    And did you follow these instructions?

11  A    I did.

12  Q    So, you testified that you would get instruction from the

13  defendant as to where to put female guests when they visited

14  the studio; is that correct?

15  A    That's correct.

16  Q    Were there times where you escorted female guests to

17  various locations within the studio?

18  A    As directed as just described, yes.

19  Q    So you previously testified in answering phone calls you

20  received calls from inside the studio from the defendant's

21  guests.  When you received the defendant's female guests'

22  calls, what types of calls would they be calling for?

23  A    It was rare that I would receive a call but the majority

24  of the time it was requesting food.

25  Q    And if you received a request from -- fair to say, just

Proceedings                                                    3534

1   to be clear we're talking about defendants' guests who were

2   already inside the studio; correct?

3   A     That's correct.

4   Q     And if you received a request from the defendant's female

5   guests seeking food what, if anything, were you supposed to

6   do?

7   A     Find the location of Rob, go let him know and ask him how

8   to proceed.

9   Q     Now, in these instances in which you received phone calls

10  from the defendants' female guests, what if Rob wasn't

11  available, what would you do?

12  A     This scenario was not as familiar to me, but generally

13  there would be --

14              MR. CANNICK:  Objection.

15              THE COURT:  Overruled?

16              PROSPECTIVE JUROR:  Generally there would be some

17  other representative of Rob's entourage in the building that I

18  could reach out to and have him get ahold of Rob, but I do not

19  remember what would happen when Rob was not in the building.

20  Q     You testified previously about individuals who worked for

21  the defendant including Donnie Lyle and Big John.

22              Did you communicate with them with respect to -- on

23  occasion with respect to the defendant's female guests?

24  A     Yes, I did.  And, I'm sorry, I would like to clarify my

25  answer on the last question.

Proceedings                                                3535

1          When I said I don't know -- I don't remember what

2     happened when Rob wasn't in the building, what I was referring

3     to -- I was referring to what I would do when none of the

4     entourage was in the building.  If Donnie Lyle or Big John

5     were in the building --

6          I'm sorry, can you repeat the second question?

7     Q    Whether or not you had conversations with Donnie Lyle or

8     Big John with respect to female guests in the event that the

9     defendant wasn't around.

10    A    Yes.  Occasionally one of the individuals, Donnie Lyle or

11    Big John would be the one to escort one of the girls in or out

12    of the building.  It wasn't always my responsibility.

13    Sometimes it was -- they on their own would retrieve food or

14    items that were requested by any of the guests.

15    Q    Now, you testified that when you got such a request for

16    food from the defendant's female guests that you would seek

17    some form of authorization.  What, if anything, would you do

18    if you couldn't get authorization from either the defendant or

19    Donnie Lyle or Big John?

20    A    If they were in the building or just in general?

21    Q    If for -- if they were busy or if they were not in the

22    building would you wait before doing -- before acting?

23    A    That is the portion that I don't recall.  I don't

24    remember what my procedure was if none of them were available

25    or I couldn't reach them.

Proceedings                                                  3536

1  Q    So when you did order food and food arrived, what, if

2  anything, would you do with the food once it arrived?

3  A    So, this could also be any number of scenarios where

4  either I delivered it myself and knocked on the door and set

5  it outside of the door and left, or the door was cracked and

6  it was handed to whichever female guest was in that room.  The

7  door is not open very far.  You hand it and go, no

8  conversation or Rob, Donnie or Big John would deliver it

9  themselves once it arrived.

10 Q    And you mentioned that you would knock on the door and

11 deliver the food or leave it in front of the door, perhaps

12 crack the door a little bit.  Why did you deliver the food in

13 this manner?

14 A    In the manner of very little interaction?

15 Q    Yes.

16 A    Because we were not allowed to interact with the guests.

17 Q    Based on the rules that you said were set forth by the

18 defendant?

19 A    That is correct.

20 Q    How would the defendant's female guests interact with you

21 if at all when you dropped off the food?

22 A    They wouldn't.  Any time that I did see one of them their

23 eyes were down to the ground.  They wouldn't say anything.

24 There wouldn't be a thank you or anything like that.  They

25 just seemed -- I don't know, they seemed sad.  But they would

Proceedings                                              3537

1  take the food, close the door and that was it.

2  Q    Now, based on your observations while working at the

3  defendant's studio were the defendant's female guests allowed

4  to move freely around the studio?

5  A    Absolutely not.

6  Q    Did you ever observe the defendant's female guests moving

7  freely around the studio?

8  A    I did not.

9  Q    Were the defendant's male friends and employees able to

10 move about the studio freely?

11 A    They were, yes, unless there a moment that was called a

12 blackout.

13 Q    Can you explain what you mean by that?

14 A    There were numerous occasions where I would get a call

15 directly from Rob that would say it's blackout upstairs or

16 entire nights or it could be for the next hour.  And what a

17 blackout is that nobody -- nobody that wasn't Donnie or Big

18 John could be upstairs.  I couldn't be upstairs, none of the

19 other engineers could be in the hallway.  It was -- what's the

20 word I'm looking for, off limits.  The area was off limits.

21 Q    With respect to these blackout -- withdrawn.  You had

22 previously testified that there were times where Donnie, Lyle

23 or Big John would escort the defendant's female guests around

24 the studio.  Were there blackout moments during those times?

25 A    If there was a blackout, I wasn't allowed to go upstairs

Proceedings                                          3538

1  so unfortunately I don't know if that's what was occurring

2  upstairs.

3  Q    What, if anything, to you recall being told to you if the

4  defendant's female guests was going to be moved from one area

5  to another area?

6          MR. CANNICK:  Objection, hearsay.

7          THE COURT:  Sustained as to form.

8  BY MS. CRUZ MELENDEZ:

9  Q    You previously testified that there were instances in

10 which Donnie Lyle or Big John would escort the defendant's

11 female guests through the studio.  Would you interact with the

12 defendant's female guests when they were being moved through

13 the studio?

14 A    No, not at all.

15 Q    Now, you also testified that the -- what, if anything,

16 would you hear from the defendant's employees or the defendant

17 himself about where you should be when the defendant's female

18 guests were being moved through the studio?

19         MR. CANNICK:  Same objection.

20         THE COURT:  Overruled?

21         PROSPECTIVE JUROR:  If I knew that there was a

22 blackout period, which is the moment in time when there was

23 movement upstairs, I was required to stay in my seat

24 downstairs by the phone.

25 Q    Movement by female guests?

SN        OCR        RPR

A 1413

Proceedings                                    3539

1   A     Correct.

2   Q     Now, you previously testified that some of the

3   defendant's guests, female guests excuse me, would be escorted

4   to stay in various rooms including lounges throughout the

5   studio.  Did the rooms used as lounges all have bathrooms in

6   them?

7   A     I don't believe they did, no.

8   Q     And you also said that female guests couldn't move freely

9   around the studio.  So if, for example, the female guest

10  needed to use the bathroom, what would happen?

11  A     If they were able to talk to Rob they would likely -- let

12  me retract that, because I don't know that.

13          This would be, I guess another one of the scenarios

14  where I believe I stated before, I testified before, that it

15  was generally only food calls that came down.  I could

16  occasionally get a call saying I need to use the restroom and

17  the process would be the same.

18  Q     They would be escorted by someone to the bathroom?

19          MR. CANNICK:  Objection.

20          THE COURT:  Sustained as to form.

21          Did you ever get these calls for somebody who wanted

22  to go to the bathroom?

23          THE WITNESS:  Yes, that's -- yes.

24          THE COURT:  And what happened if a female guest was

25  calling to say saying that she wanted to go to the bathroom?

Proceedings                                    3540

1          THE WITNESS:  I'm sorry?

2          THE COURT:  Are you saying that you got calls at the

3    desk?

4          THE WITNESS:  I did.

5          THE COURT:  From a female guest that said that she

6    needed to use the bathroom?

7          THE WITNESS:  Yes.

8          THE COURT:  Did you escort the person?

9          THE WITNESS:  I was never allowed to escort that

10   person.

11         THE COURT:  What did you do when you got the calls?

12         THE WITNESS:  The same process with the food

13   request.  The paper would have the person calling and what the

14   request was and you would deliver that piece of paper to Rob

15   and he would handle it.

16         THE COURT:  Okay, next question.

17

18         (Continued on the following page.)

19

20

21

22

23

24

25

1    DIRECT EXAMINATION (CONTINUED)

2    BY MS. CRUZ MELENDEZ:

3    Q    Were there any bathrooms on the first floor of the

4    studio?

5    A    I believe I recall one towards the back of the first

6    floor, but not in the main area up front.

7    Q    And did any of the bathrooms have showers in them at

8    the studio?

9    A    The bathroom on the second floor at the end of the

10   hallway, did have a bathroom, yes.

11   Q    I'm showing you what's in evidence as

12   Government's Exhibit 525F.  Do you recognize that?

13   A    I do.

14   Q    And what is that?

15   A    That is the bathroom that's at the end of the hallway,

16   the stand-alone bathroom with regular studio hallway access

17   not within a room.

18   Q    And looking at the left-most portion of the photograph,

19   is that the shower that you were referring to?

20   A    That is the shower, yes.

21   Q    You testified that the defendant's female guests were

22   not able to move freely about the studio.  What did you

23   observe about whether the defendant's female guests were

24   able to leave the studio?

25   A    Since they were never allowed freely in the hallways, I

Williams - Direct - Cruz Melendez          3542

1  don't believe it ever got to a point where they would just

2  freely walk around.

3          MR. CANNICK:  Objection.

4          THE COURT:  Sustained.

5  Q    You testified that individuals employed with the

6  defendant would escort the defendant's female guests around

7  the studio.  Do you recall testifying about that?

8  A    Yes.

9  Q    Were they also escorted when they left the studio?

10 A    They would have been, yes.

11         MR. CANNICK:  Objection.

12 A    The answer is yes.

13 Q    During your time working at the --

14         THE COURT:  Did you make an objection?

15         MR. CANNICK:  I did, yes.

16         THE COURT:  Okay.  Okay.  I didn't hear you.  I'm

17 sorry.

18         MR. CANNICK:  Okay.

19         THE COURT:  The objection is overruled.

20 Q    During your time working at the studio, did you ever

21 observe the defendant going into the room where some of the

22 female guests were staying in the studio?

23 A    Yes.

24 Q    And were there any occasions when you had an

25 opportunity to hear anything after the defendant entered a

1    room with a female guest?

2    A    Yes.

3    Q    What, if anything, did you hear while the defendant was

4    in a room with the female guests?

5    A    Even though it was formally a recording studio and the

6    walls ideally are soundproof, the volume involved of the two

7    difference scenarios could be heard through the walls.

8    Q    What did you hear?

9    A    I heard sexual activity and yelling.

10   Q    Who was yelling?

11   A    Rob.

12   Q    Was the defendant married during any period of time

13   that you worked for him?

14   A    Yes.  He was married the entire time, yes.

15   Q    Did the defendant's wife visit the studio?

16   A    She did, yes.

17   Q    At times when the defendant's wife came to the studio,

18   were there times when the defendant had female guests there?

19   A    Yes.

20   Q    What, if any, responsibilities did you have when the

21   defendant's wife came to the studio?

22   A    Rob's wife had a personal assistant that drove her

23   around, and she would call me in advance of the process to

24   let me know that she was on the way.

25   Q    And what did you do once you learned that the

1  defendant's wife was coming to the studio?

2  A    As soon as I received this information, I worked a fast

3  as I can to take one of those pieces of paper and write

4  down, Important.  His wife's code name was Important.  So

5  wrote down Important and 15 minutes away, and I brought it

6  as fast as I can up to Rob to find out wherever he is and

7  hand it to him.

8  Q    And then what would happen -- or why would you write

9  Important and deliver a message like that to the defendant?

10  A    Because it -- it was to alert Rob that his wife was

11  coming so that there were no young female guests available

12  in the hallway, and that he was available, you know, to meet

13  with her.

14  Q    Generally speaking -- oh, strike that.

15          So turning your attention to rooms used as lounges

16  at the defendant's studio, what, if anything, do you recall

17  about the lighting in those rooms?

18  A    It was rare that we got to observe these rooms.  But

19  what I could see on moments of the door being cracked was

20  very low lighting.  There were in one or two of the rooms

21  Christmas lights and white or warm-white light Christmas

22  lights strung on the back wall.  And there were also in

23  every one of these rooms a battery-powered LED Coleman

24  remote control lantern light.

25  Q    And who had the remote controls for those lights?

Williams - Direct - Cruz Melendez       3545

1  A    Rob carried the remotes around and would activate the
2  remote before entering a room.
3  Q    Now, you mentioned Christmas lights.  How often were
4  those Christmas lights up?
5  A    Year-round.
6  Q    While you were working at the studio, were there any
7  rooms throughout the studio with locks on the doors?
8  A    There would be locks on the front door, the offices,
9  the IT room, bathrooms, and that is what I know -- the
10 extent of what I know.
11 Q    And with respect to the offices, could any of these be
12 locked from the outside?
13 A    I seem to recall that offices like Tom's office could
14 be locked and just with a key.
15 Q    Fair to say that there may be other types of room in
16 the studio that had locks on them, but you don't
17 necessary -- because of the passage of time, approximately
18 17 years, that you may not recall every room that had locks
19 on it?
20        MR. CANNICK:  Objection.
21 A    Exactly.
22        THE COURT:  Sustained, sustained.
23 Q    Do you recall whether or not there was a copy machine
24 at the studio?
25 A    I don't recall.

1   Q    How long did you work for the defendant at his studio

2   at Larrabee Street?

3   A    For one year.

4   Q    And I believe you testified that you stopped working

5   there from in approximately May or June of 2004?

6   A    That's accurate.

7   Q    And why did you stop working there?

8   A    It is for a number of reasons.  It had become clear

9   that -- you know, as I testified earlier, I wanted a career

10  in this industry.  The way that it works to become an

11  engineer in the industry is you start as an intern, move up

12  to assistant engineer, and then you move up to head

13  engineer -- or lead engineer, rather.  None of this ever

14  happened.  After an entire year there, I never touched a

15  single piece of audio equipment.  I had to experience

16  running pieces of paper warning that his wife was coming to

17  make sure his wife didn't see the girls in and out of the

18  studio.  He was angry all the time.

19        I was nervous when I first came in here because I

20  finally had the opportunity to look at him -- look him in

21  the eye --

22        MR. CANNICK:  Your Honor, I'm going to object

23  to --

24        THE COURT:  Sustained, sustained, sustained.

25        Don't say anything.

Williams - Direct - Cruz Melendez                3547

1             THE WITNESS:  Okay.

2             THE COURT:  Could I see the parties at the side,

3    please.

4             (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                    Sidebar Conference                    3548

 1              (The following occurred at sidebar.)

 2              THE COURT:  What's going on?

 3              MS. CRUZ MELENDEZ:  I don't know.  I -- I did not

 4     expect -- my question was not to elicit that.

 5              THE COURT:  How much more do you have with him?

 6              MS. CRUZ MELENDEZ:  Literally three more

 7     questions.

 8              THE COURT:  Okay.  Let's end it.  I'm going to

 9     instruct the jury to disregard.  Not that much came out yet,

10     and I'm just going to instruct him to just answer the

11     questions that you're asking.

12              MR. CANNICK:  Thank you, Your Honor.

13              (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (In open court, sidebar ends.)

2          THE COURT:  Okay, folks, I'm going to instruct you

3  to disregard that last little bit.

4          And I'm going to instruct the witness, please,

5  just answer the questions that you're being asked.  Okay?

6  All right.  Thanks so much.

7          All right.  Go ahead.

8  BY MS. CRUZ MELENDEZ:

9  Q    After you stop --

10          THE WITNESS:  Can I say something?

11          THE COURT:  No, you can't.  That's not the way it

12  works.  The Assistant United States Attorney will ask you

13  questions and just answer the questions that she's asking

14  you.

15          Go ahead.

16  Q    After you stopped working for the defendant what, if

17  anything, happened to the building where the defendant's

18  studio was?

19  A    Eventually the building was demolished.

20  Q    And approximately when was that?

21  A    It would have been shortly after I left.

22          MS. CRUZ MELENDEZ:  Nothing further.

23          THE COURT:  All right.  Cross-examination?

24          MR. CANNICK:  Yes.

25

1  CROSS-EXAMINATION

2  BY MR. CANNICK:

3  Q    Did you see the location after the building was

4  demolished?

5  A    I have seen it, yes.

6  Q    Did you see it -- when was it that you saw that

7  location?

8  A    When -- when did I see what was -- what replaced it?

9  Q    After the building was demolished --

10 A    Yes.

11 Q    -- when was it that you saw the building in a

12 demolished state?

13 A    I didn't see the building demolished.

14 Q    Okay.

15       You talked about blackouts.  What is a blackout?

16 A    Repeat, please.

17 Q    You testified and told the jury about a blackout.  Do

18 you remember telling us that?

19 A    Yes.

20 Q    What was a blackout?

21 A    What was a blackout?

22 Q    Yes.

23 A    I meant that none of the employees were -- none of the

24 employees that were not part of Rob's entourage were allowed

25 upstairs.

1   Q    How do you know who was moving if you weren't allowed

2   upstairs?

3   A    I do not know.

4   Q    Yeah.

5        Because the movement was upstairs, right?

6   A    Yes.

7   Q    And you were supposed to be downstairs; am I correct?

8   A    Yes.

9   Q    And you were supposed to stay there; am I correct?

10  A    That's correct.

11  Q    And you didn't know what was going on upstairs; am I

12  correct?

13  A    I did not know.

14  Q    When you worked at the front desk, you worked pretty

15  much as a receptionist; am I correct?

16  A    That's accurate, yes.

17  Q    And when you first started, you started as an intern;

18  am I correct?

19  A    That's correct.

20  Q    And within three months you got to be -- offered a job

21  position; am I correct?

22  A    Correct.

23  Q    And you were offered minimum wage; am I correct?

24  A    Less than because we were not paid overtime.

25  Q    Okay.  Well, you were offered minimum wage for the

Williams - Cross - Cannick                    3552

1  hours you worked; am I correct?

2  A    I believe the minimum wage at that time was $6.15.

3  Q    And you were paid $6?

4  A    $6.

5  Q    And then that spoke to -- and that offer was made to

6  you and you accepted that offer; am I correct?

7  A    I did, yes.

8  Q    And you worked there for another nine months; am I

9  correct?

10  A    That's correct.

11  Q    During that nine months that you worked there, did you

12  ever have any exchange or conversation with any of the

13  engineers?

14  A    On a regular basis, yes.

15  Q    On a regular basis.

16        And after having exchanges with them on a regular

17  basis, you were not offered a job as an engineer; am I

18  correct?

19  A    Engineers are not --

20  Q    Am I correct, sir?

21  A    I was not, no.

22  Q    Okay.  And isn't it a fact, sir, that you never got an

23  opportunity to work with them after speaking with them for

24  nine months?

25  A    That is what I testified, yes.

1  Q    And they would -- you didn't even handle their

2  equipment; am I correct?

3  A    Correct.

4  Q    You testified and told the jury that Mr. Kelly's female

5  guests couldn't move freely around the building; do you

6  remember telling us that?

7  A    Yes.

8  Q    Well, no one could; am I correct?  None of his guests

9  could?

10  A    That's not true.  Any music artists or actors that came

11  to see him were able to freely move around the building.

12  Q    And when you say "actors," you're talking about folks

13  who were A-list actors coming to visit with him; am I

14  correct?

15  A    That's correct.

16  Q    All right.  Did his friends move around the building?

17          THE COURT:  Whose friends?

18          MR. CANNICK:  Mr. Kelly's.

19  A    What friends would these be besides the music artists

20  and actors that I just stated?

21  Q    You testified and told us that he had other friends

22  visiting and other folks visiting him, am I correct?

23  A    Yes, that's correct.

24  Q    Okay.  So does his trainer move freely around the

25  building?

Williams - Cross - Cannick                3554

1   A    Yes.

2   Q    Okay.  Where did his trainer go?

3   A    I'm sorry?

4   Q    Where would his trainer generally go around the

5   building?

6   A    The trainer would most of the time be in the training

7   room upstairs.

8   Q    Right.  Would you see him in the training room?

9   A    If I went up to deliver a message to Rob, yes.

10  Q    But that's only if you went upstairs to deliver a

11  message; am I correct?

12  A    That I would see him in the training room?  Yes.

13  Q    Because your job was to stay at the receptionist desk

14  until Rob -- Mr. Kelly received a message; am I correct?

15  A    That's not true at all.  I was not required to stay

16  there unless there was a blackout.

17  Q    Were you allowed to go upstairs?

18  A    Absolutely, yes.

19  Q    And when you went upstairs, did you see any of his male

20  guests moving around?

21  A    Sure, yeah.

22  Q    You did?

23  A    Yeah.

24  Q    So the only people you didn't see moving around were

25  female guests?

1   A    That's correct.

2   Q    And do you know if he had managers?

3   A    The only manager that I was aware of was Don Russell.

4   Q    Now, when you moved around, did you knock on doors that

5   you moved around?

6   A    (No audible response.)

7   Q    When you went from one room to the next, did you knock

8   on a door?

9   A    Most of the area that I resided in --

10  Q    That's not my question.

11        My question is, when you --

12  A    I didn't --

13  Q    -- knocked on the door --

14  A    That's the wrong question.  I didn't knock on any

15  doors.

16  Q    Don't tell me it's the wrong question.

17        THE COURT:  Mr. Cannick, let's take its down a

18  notch, please.

19        Put another question to the witness.

20  Q    When you went from one room to the next, did you knock

21  on the door?

22  A    I did not go from room to room.

23  Q    You never -- when you walked into a room to find

24  Mr. Kelly, did you knock on a door?

25  A    No.

1  Q    When you walked to find the trainer in the training

2  room, did you knock on that door?

3  A    The door was open.

4  Q    Never a time that the door was closed?

5  A    Not to the training room.

6  Q    Any other room that you walked in to see?  Let's say

7  Tom, did you knock on the door?

8  A    If the door was closed.

9  Q    Now, Tom was a manager; am I correct?

10  A    Correct.

11  Q    Where was Tom's office in relationship to yours?

12  A    Directly next door.

13  Q    And he would have his door open?

14  A    Most of the time, yes.

15  Q    And you just walked right on in?

16  A    Yes.

17  Q    Now, you testified about getting food for Mr. Kelly's

18  female guests.  Did you get food for anyone else?

19  A    I would get food for Mr. Kelly and for -- if any of the

20  music artists requested it.  I would get food for Big John

21  and Donny.

22  Q    What about artists who were there visiting him?

23  A    If there was an artist that was with him and they

24  requested food also, yes.

25  Q    What about if a record label executive was there?

1    A    I'm sorry?

2    Q    A record label executive, did you get food for that

3    person as well?

4    A    Yes.

5    Q    And when the record label executives were in the

6    building, were you able to move around?

7    A    I don't recall a record label executive in the

8    building.

9    Q    Don't recall that, right?

10   A    I don't.

11   Q    Okay.  But you do recall actors in the building?

12   A    Yes.

13   Q    And were you able to move around when the actors were

14   in the building?

15   A    Yes.

16   Q    Were you able to move around when other artists were in

17   the building?

18   A    Yes.

19   Q    Now, were you able -- you testified and told the jury

20   that you were not allowed to have any interaction with

21   Mr. Kelly's female guests; am I correct?

22   A    That's correct.

23   Q    Were you allowed to have interactions with any of those

24   artists who visited?

25   A    Yes.

1  Q    You could walk up -- which artists?

2  A    Tyrese Gibson, B2K when they were coming up.  Beyoncé

3  was there at one point.  Regarding actors, Sylvester

4  Stallone was there.  Members of *Cash Money Millionaires* were

5  there, and I interacted with all of them.

6  Q    You interacted with all of them?

7  A    Yeah.

8  Q    What was that interaction?

9  A    That interaction required being allowed to great

10 individuals.

11 Q    So your interaction was good morning?

12 A    If it was morning, yes.

13 Q    Or good evening?

14 A    If it was evening, yes.

15 Q    Nothing more than that?

16 A    You could talk to them, say, How are you doing?

17 Q    I'm not asking whether you could talk to them.  I'm

18 asking about your interaction?

19 A    I was able to interact more than that, yes.

20 Q    How often would you see Mr. Kelly on a daily basis?

21 A    It varied.  I could not see him for three to four days,

22 or I could see him five to ten times a night, throughout the

23 night.

24 Q    What were your hours?

25 A    My hours were 10:00 p.m. until 12:00 noon the following

1    day.

2    Q    Did you see him during the hours of 10:00 p.m. to

3    2:00 a.m.?

4    A    Occasionally, yes.  Artists like to record at night.

5    Q    I beg your pardon?

6    A    Artists like to record at night, so, yes, they --

7    Q    I'm not asking you what artists like to do.  I'm asking

8    you whether you saw him --

9    A    Yes.

10   Q    -- during those hours?

11        Well, isn't it a fact that those were the hours

12   that he played basketball every night?

13   A    That is not true.

14   Q    That is not true.

15        Do you know -- did you know him to play

16   basketball?

17   A    Yes.

18   Q    Did he play basketball every night?

19        MS. CRUZ MELENDEZ:  Objection.

20        THE COURT:  Overruled.

21   A    I don't know.

22   Q    Do you know where he played basketball?

23   A    He played basketball at a number of locations, but I

24   don't know what the locations are.

25   Q    And do you know who he played with?

1   A    I don't know everybody that he played with, no.

2   Q    Name me one person that he played with.

3   A    I believe he always went with an individual by the name

4   of "June Bug."

5   Q    You believe he went with -- always played with an

6   individual by the name of "June Bug"?

7   A    Yes.

8   Q    And where -- do you know what time he and "June Bug"

9   would leave to go?

10  A    I didn't keep track of their hours, no.

11  Q    Now, what time would he come back in the -- what time

12  would he normally be in the studio at night?

13  A    There were no normal times.

14  Q    There were no normal times.

15       And when you would see him go to a basketball

16  game, it would just be he and "June Bug" who would go?

17  A    It could vary.  But generally, Big John went with him

18  everywhere.

19  Q    Okay.  Well, just those two?

20  A    I said it can vary.

21  Q    Well, who -- when you --

22  A    I don't know who else would go with him, but I know

23  that he would go with an entourage.

24  Q    Well --

25  A    And if he didn't leave the building with an entourage,

Williams - Redirect - Cruz Melendez          3561

1  he would meet people outside the facility.

2  Q    Did he have live-in girlfriends?

3  A    I don't know the answer to that.

4  Q    Isn't it a fact that he went to play basketball every

5  night and his live-in girlfriend would go with him?

6  A    I don't know.

7       MR. CANNICK:  May I have a second, please, Your

8  Honor?

9       THE COURT:  Sure.

10      (Pause in proceedings.)

11 Q    You wanted to be an engineer?

12 A    I did, yes.

13 Q    Didn't work out for you?

14 A    That's correct.

15      MR. CANNICK:  Thank you.

16      THE COURT:  Anything else from the Government?

17      MS. CRUZ MELENDEZ:  Just very briefly.

18 REDIRECT EXAMINATION.

19 BY MS. CRUZ MELENDEZ:

20 Q    After working at the defendant's studio, were you able

21 to work in other -- in the music industry in other studios?

22 A    Did you say after or before?

23 Q    After.

24 A    Afterwards, no.

25 Q    Did you work in other studios or with other artists

1  after working with the defendant?

2  A    I did not work for studios.  I ended up moving to live

3  sound.

4  Q    And so you continued to work in the music industry?

5  A    I did, yes.

6  Q    On cross-examination defendants counsel asked you about

7  how often you might see the defendant.  How often did you

8  deliver messages to the defendant?

9  A    I can't put a number on the number of times that I

10  would deliver a message to him.  But if he was in the

11  building, it would be numerous times throughout any shift.

12  Q    And I believe defense counsel on cross-examination

13  asked you questions about knocking on doors before entering

14  to be able to get to Rob?

15  A    That's correct.

16  Q    From where you were in reception, what route would you

17  take to get to the recording area where Rob might be?

18  A    So most of my travels in that building were through

19  hallways.

20          MS. CRUZ MELENDEZ:  Nothing further.

21          THE COURT:  All right.  Anything else,

22  Mr. Cannick?

23          MR. CANNICK:  Not at all.

24          THE COURT:  All right.  The witness can step down.

25          (The witness is excused.)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA,                          :

                                                   :        19 Cr 286 (AMD)

                                                   :
-vs-
                                                   :

ROBERT SYLVESTER KELLY,                            :
        also known as "R. Kelly,"                  :

                                                   :
                        Defendant.                 :
-------------------------------------------------------X

### DECLARATION OF ROBERT S. KELLY

1.      I am the Defendant in the above-captioned matter.

2.      I am making this declaration to provide additional facts about my participation in
the jury selection process at my trial.

3.      I did not participate in jury selection in any meaningful way.

4.      I was not asked by my attorneys to offer any input about what types of questions
should be included in the jury questionnaires that were submitted to potential jurors.

5.      I also did not review any of the completed jury questionnaires with my attorneys
prior to trial. Because of my limited literacy, I relied on my attorneys to review the
questionnaires with me prior to trial but that did not happen.

6.      During the jury selection process, I did not participate in any side bars related to
questioning of jurors and I was not asked for my opinions about potential jurors. My lawyers
picked my jury; I did not.

7.      At certain points during jury selection, I did hear that some  jurors may have seen
the Surviving R. Kelly docuseries and that concerned me greatly.

8.      I raised my concerns with my attorneys but they shooed me off. I was nothing
more than a bystander in the process.

A 1438

9.     I did not ~~even~~ know that some of my jurors had seen the docuseries Surviving R. Kelly. I also did not know that some of my jurors were familiar with prior allegations against me, including my prior criminal proceedings in Illinois.

10.    Had I known that information I would have challenged those jurors as unqualified. I also would have told my attorneys to strike the jurors.

11.    I did not consent to any jurors sitting on my jury who had knowledge and familiarity with the intimate details of my case or who had watched the Surviving R. Kelly docuseries.

12.    There was no strategy involved in choosing the jurors that sat on my jury as far as I could tell. At least there was no trial strategy that involved my input.

4/4/22                                      ROBERT S. KELLY

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------X
                                                  :
UNITED STATES OF AMERICA,                         :
                                                  :        NOTICE OF APPEAL
                                                  :
-vs-                                              :        19 CR 286 (AMD)
                                                  :
                                                  :        The Honorable Ann M. Donnelly
ROBERT SYLVESTER KELLY,                           :        District Court Judge
        also known as "R. Kelly,"                 :
                                                  :
                        Defendant.                :
---------------------------------------------------X

        Notice is hereby given that Robert Sylvester Kelly appeals to the United States Court of
Appeals for the Second Circuit from the District Court's final judgment entered in this action on
June 30, 20222.


                                                  /s/JENNIFER BONJEAN
                                                  Bonjean Law Group PLLC
                                                  750 Lexington Avenue, 9th Floor
                                                  New York, NY 10022
                                                  P: (718) 875-1850
                                                  Email: Jennifer@bonjeanlaw.com


Dated: July 11, 2022

**Criminal Notice of Appeal - Form A**

# NOTICE OF APPEAL

## United States District Court

_____ District of _____

Caption:

_____  v.

_____                          Docket No.: _____

                                                                    _____
                                                                    (District Court Judge)

Notice is hereby given that _____ appeals to the United States Court of

Appeals for the Second Circuit from the judgment [____], other [____] _____
                                                                                    (specify)

entered in this action on _____.
                                    (date)

This appeal concerns: Conviction only [____]   Sentence only [____]   Conviction & Sentence [____]   Other [____]

Defendant found guilty by plea [____] trial [____] N/A [____].

Offense occurred after November 1, 1987?   Yes [____]   No [____]   N/A [____]

Date of sentence: _____   N/A [____]

Bail/Jail Disposition: Committed [____]   Not committed [____]   N/A [____]

Appellant is represented by counsel?  Yes [____] No [____]   If yes, provide the following information:

Defendant's Counsel: _____

Counsel's Address: _____

_____

Counsel's Phone: _____

Assistant U.S. Attorney: _____

AUSA's Address: _____

_____

AUSA's Phone: _____

_____
*Ashley Cohen*
Signature

A 1441

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
                                           :

UNITED STATES OF AMERICA,      :

                                           :           AMENDED NOTICE OF APPEAL

                                           :

-vs-                                      :           19 CR 286 (AMD)

                                         :

                                         :           The Honorable Ann M. Donnelly

ROBERT SYLVESTER KELLY,     :           District Court Judge
       also known as "R. Kelly,"    :

                                           :

                    Defendant.     :
-----------------------------------------------------X

        PLEASE TAKE NOTICE that Robert Sylvester Kelly amends his Notice of Appeal

previously filed in this matter on July 11, 2022, to include this Court's November 8, 2022, order

amending the judgment in this matter to include a restitution award of $300,668.18.

                                             /s/ASHLEY COHEN
                                           Bonjean Law Group PLLC
                                           750 Lexington Avenue, 9th Floor
                                           New York, NY 10022
                                           P: (718) 875-1850
                                           Email: Ashley@bonjeanlaw.com

Dated:  November 22, 2022