# 22-1481 22-1982 (con)

## UNITED STATES COURT OF APPEALS

*for the*

## SECOND CIRCUIT

——————▶◀——————

**UNITED STATES OF AMERICA,**

*Appellee,*

-v.-

**ROBERT SYLVESTER KELLY**
**AKA R. KELLY**

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**DEFENDANT-APPELLANT'S APPENDIX**
**VOLUME I OF 5**
**(Pages A 1 to A 300)**

JENNIFER BONJEAN
ASHLEY COHEN
BONJEAN LAW GROUP, PLLC
750 Lexington Avenue, 9th Floor
New York, NY 10022
(718) 875-1850

## **TABLE OF CONTENTS**

Electronic Index to Record on Appeal in *USA v. Kelly*, 19-cr-00286....   A 1

Voir dire of Juror 3 (Prospective Juror 25)................................   A 45

Voir dire of Juror 4 (Prospective Juror 52)................................   A 53

Voir dire of Juror 5 (Prospective Juror 87)................................   A 59

Voir dire of Juror 7 (Prospective Juror 145).............................   A 66

Voir dire of Juror 8 (Prospective Juror 147).............................   A 70

Voir dire of Juror 9 (Prospective Juror 156).............................   A 74

Voir dire of Juror 11 (Prospective Juror 153)............................   A 80

Voir dire of Juror 12 (Prospective Juror 163)............................   A 85

Voir dire of Alternate Juror 4 (Prospective Juror 206)...................   A 93

Trial Testimony of Jerhonda Johnson Pace from August 18, 2021 and
August 19, 202............................................................   A 97

Trial Testimony of Kris McGrath, MD from August 19, 2021...........   A 352

Trial Testimony of Anthony Navarro from August 20, 2021.............   A 433

Trial Testimony of Demetrius Smith from August 20, 2021............   A 546

Trial Testimony of Thomas Arnold from August 26, 2021...............   A 624

Trial Testimony of Faith from September 1, 2021.......................   A 759

Trial Testimony of Anna from September 10, 2021......................   A 911

Trial Testimony of Iffath Hoskins from September 10, 2021.............   A 951

Trial Testimony of Diana Copeland from September 10, 2021 and September 13, 2021…………………………………………………………….    A 1036

Trial Testimony of Angela from September 13, 2021…………………    A 1156

Trial Testimony of Alex from September 13, 2021……………………    A 3322

Trial Testimony of Alesiette Mayweather from September 13, 2021 and September 14, 2021……………………………………………………..    A 1268

Trial Testimony of Nicholas Williams from September 14, 2021……...    A 1383

Declaration of Robert S. Kelly dated April 4, 2022……………………    A 1438

Notice of Appeal dated July 11, 2022…………………………………..    A 1440

Notice of Appeal dated September 9, 2022……………………………    A 1441

Notice of Appeal dated November 22, 2022…………………………...    A 1442

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

**DEBRA ANN LIVINGSTON**
**CHIEF JUDGE**

Date: November 29, 2022
Docket #: 22-1481
Short Title: United States of America v. Kelly

**CATHERINE O'HAGAN WOLFE**
**CLERK OF COURT**

DC Docket #: 1:19-cr-286-1
DC Court: EDNY
(BROOKLYN)DC Docket #:
1:19-cr-286-1
DC Court: EDNY (BROOKLYN)
DC Judge: Donnelly

**NOTICE OF RECORD ON APPEAL FILED**

In the above referenced case the document indicated below has been filed in the Court.

_____ Record on Appeal - Certified List

_____ Record on Appeal - CD ROM

_____ Record on Appeal - Paper Documents

__X__ Record on Appeal - Electronic Index

_____ Record on Appeal - Paper Index

Inquiries regarding this case may be directed to 212-857-8514.

**CA02db Intake**

| | |
|---|---|
| **From:** | ecf_bounces@nyed.uscourts.gov |
| **Sent:** | Wednesday, November 23, 2022 4:30 PM |
| **To:** | nobody@nyed.uscourts.gov |
| **Subject:** | Activity in Case 1:19-cr-00286-AMD USA v. Kelly Electronic Index to Record on Appeal |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### U.S. District Court

### Eastern District of New York

## Notice of Electronic Filing

The following transaction was entered on 11/23/2022 at 4:30 PM EST and filed on 11/23/2022

| | |
|---|---|
| **Case Name:** | USA v. Kelly |
| **Case Number:** | 1:19-cr-00286-AMD |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
**Electronic Index to Record on Appeal as to Robert Sylvester Kelly sent to US Court of Appeals [354] Subsequent Notice of Appeal - Final Judgment Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (VJ)**

**1:19-cr-00286-AMD-1 Notice has been electronically mailed to:**

Elizabeth Geddes    liz@shihatageddes.com, caseview.ecf@usdoj.gov, usanye-crdocket@usdoj.gov

Jennifer Ann Bonjean    jennifer@bonjeanlaw.com, ashley@bonjeanlaw.com, haley@bonjeanlaw.com

Maria E. Cruz Melendez    maria.cruzmelendez@usdoj.gov

Lauren Howard Elbert    lauren.elbert@usdoj.gov, caseview.ecf@usdoj.gov

Daniel G. Saavedra    daniel.saavedra@usdoj.gov

Ashley Blair Cohen    ashley@bonjeanlaw.com, abcohen2@gmail.com

Kayla C Bensing    Kayla.Bensing@usdoj.gov

A 2

Nadia Shihata    nadia@shihatageddes.com

**1:19-cr-00286-AMD-1 Notice will not be electronically mailed to:**

2

A 3

APPEAL,CUSTAPP

# U.S. District Court
## Eastern District of New York (Brooklyn)
## CRIMINAL DOCKET FOR CASE #: 1:19−cr−00286−AMD All Defendants

Case title: USA v. Kelly

Date Filed: 06/20/2019

Date Terminated: 06/30/2022

Assigned to: Judge Ann M
Donnelly

**Defendant (1)**

**Robert Sylvester Kelly**
*TERMINATED: 06/30/2022*
*also known as*
R. Kelly
*TERMINATED: 06/30/2022*

represented by **Douglas C. Anton**
Law Office of Douglas C. Anton, Esq.
3 University Plaza Drive
Suite 207
Hackensack, NJ 07601
201−487−2055
Fax: 201−487−9698
Email: douganton@aol.com
*TERMINATED: 10/22/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Ilana Haramati**
Meister Seelig & Fein LLP
Litigation
125 Park Ave
8th Floor
New York, NY 10017
646−860−3130
Email: ih@msf−law.com
*TERMINATED: 07/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Jennifer Ann Bonjean**
Bonjean Law Group, PLLC
750 Lexington Avenue
9th Floor
New York, NY 10022
718−875−1850
Fax: 718−230−0582
Email: jennifer@bonjeanlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Steven A Greenberg**
Greenberg Trial Lawyers
53 West Jackson
Suite 1260
Chicago, IL 60604−6060
312−879−9500
Email: steve@greenbergcd.com
*TERMINATED: 07/15/2021*
*LEAD ATTORNEY*

A 4

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Ashley Blair Cohen**
Bonjean Law Group
750 Lexington Avenue
9th Floor
New York, NY 10022
718–875–1850
Fax: 718–230–0582
Email: ashley@bonjeanlaw.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Calvin Harold Scholar**
The C.H. Scholar Law Firm PLLC
225 Broadway
Suite 225
New York, NY 10007
(212)323–6922
Fax: (212)323–6923
Email: chscholar@aol.com
*TERMINATED: 01/31/2022*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Devereaux Leon Cannick**
Aiello & Cannick
69–06 Grand Avenue
Maspeth, NY 11378
718–426–0444
Fax: 718–803–9764
Email: dcannick@aiellocannick.com
*TERMINATED: 01/31/2022*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Michael I. Leonard**
LeonardMeyer LLP
Illinois
120 N. LaSalle
Ste 20th Floor
Chicago
Chicago, IL 60602
312–380–6559
Fax: 312–264–0671
Email: mleonard@leonardmeyerllp.com
*TERMINATED: 07/15/2021*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Nicole Blank Becker**
Blank Law, PC
444 S. Washington Ave.
Royal Oak, MI 48067
248–505–5929
Email: law@nicoleblankbecker.com
*TERMINATED: 02/02/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Thomas A. Farinella**

A 5

The Law Office of Thomas A. Farinella
260 Madison Avenue
8th Floor
New York, NY 10016
917–319–8579
Fax: 646–349–3209
Email: tf@lawtaf.com
*TERMINATED: 02/02/2022*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:1962(c), 1963 and 3551 et seq. – RACKETEERING (1sss) | The defendant is sentence to 360 months on count 1; Ten years on counts 2,6, and 8; Twenty years on counts 3,4,5,7, and 9. All counts to run concurrently. Five years supervised release. $900 special assessment. 100,000 fine. |
| 18:2421(a), 2 and 3551 et seq – Mann Act Transportation – Jane Doe #5 (2sss) | The defendant is sentence to 360 months on count 1; Ten years on counts 2,6, and 8; Twenty years on counts 3,4,5,7, and 9. All counts to run concurrently. Five years supervised release. $900 special assessment. 100,000 fine. |
| 18:2422(a), 2 and 3551 et seq – Mann Act Coercion and Enticement – Jane Doe #5 (3sss) | The defendant is sentence to 360 months on count 1; Ten years on counts 2,6, and 8; Twenty years on counts 3,4,5,7, and 9. All counts to run concurrently. Five years supervised release. $900 special assessment. 100,000 fine. |
| 18:2422(b), 2 and 3551 et seq – Mann Act Coercion of Minor – Jane Doe #5 (4sss) | The defendant is sentence to 360 months on count 1; Ten years on counts 2,6, and 8; Twenty years on counts 3,4,5,7, and 9. All counts to run concurrently. Five years supervised release. $900 special assessment. 100,000 fine. |
| 18:2423(a), 2 and 3551 et seq – Mann Act Transportation of Minor – Jane Doe #5 (5sss) | The defendant is sentence to 360 months on count 1; Ten years on counts 2,6, and 8; Twenty years on counts 3,4,5,7, and 9. All counts to run concurrently. Five years supervised release. $900 special assessment. 100,000 fine. |
| 18:2421(a), 2 and 3551 et seq – Mann Act Transportation – Jane Doe #6 (6sss) | The defendant is sentence to 360 months on count 1; Ten years on counts 2,6, and 8; Twenty years on counts 3,4,5,7, and 9. All counts to run concurrently. Five years supervised release. $900 special assessment. 100,000 fine. |
| 18:2422(a), 2 and 3551 et seq – Mann Act Coercion and Enticement – Jane Doe #6 (7sss) | The defendant is sentence to 360 months on count 1; Ten years on counts 2,6, and 8; Twenty years on counts 3,4,5,7, and 9. All counts to run concurrently. Five years supervised release. $900 special assessment. 100,000 fine. |
| 18:2421(a), 2 and 3551 et seq – Mann Act Transportation – Jane Doe #6 (8sss) | The defendant is sentence to 360 months on count 1; Ten years on counts 2,6, and 8; Twenty years on counts 3,4,5,7, and 9. All counts to run concurrently. Five years supervised release. $900 special assessment. 100,000 fine. |
| 18:2422(a), 2 and 3551 et seq – Mann Act Coercion and Enticement – Jane Doe #6 (9sss) | The defendant is sentence to 360 months on count 1; Ten years on counts 2,6, and 8; Twenty years on counts 3,4,5,7, and 9. All counts to run concurrently. Five years supervised release. $900 special assessment. 100,000 fine. |

**Highest Offense Level**

A 6

**(Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 18:1962 RACKETEERING (1) | Dismissed |
| 18:1962(c), 1963 and 3551 et seq. – RACKETEERING (1s) | Dismissed |
| 18:1962(c), 1963 and 3551 et seq – RACKETEERING (1ss) | Dismissed |
| 18:2421(a), 2 and 3551 et seq. – TRANSPORTING FOR PROSTITUTION (2) | Dismissed |
| 18:2421(a), 2 and 3551 et seq. – TRANSPORTING FOR PROSTITUTION (2s) | Dismissed |
| 18:2421(a), 2 and 3551 et seq – Mann Act Transportation – Jane Doe #6 (2ss) | Dismissed |
| 18:2422)(a), 2 and 3551 et seq. – COERCION OR ENTICEMENT OF FEMALE (3) | Dismissed |
| 18:2422(a), 2 and 3551 et seq. – COERCION OR ENTICEMENT OF FEMALE (3s) | Dismissed |
| 18:2422(a), 2 and 3551 et seq – Mann Act Coercion and Enticement – Jane Doe #6 (3ss) | Dismissed |
| 18:2421(a), 2 and 3551 et seq. – TRANSPORTING FOR PROSTITUTION (4) | Dismissed |
| 18:2421(a), 2 and 3551 et seq. – TRANSPORTING FOR PROSTITUTION (4s) | Dismissed |
| 18:2421(a), 2 and 3551 et seq – Mann Act Transportation – Jane Doe #6 (4ss) | Dismissed |
| 18:2422(a), 2 and 3551 et seq. – COERCION OR ENTICEMENT OF FEMALE (5) | Dismissed |
| 18:2422(a), 2 and 3551 et seq. – COERCION OR ENTICEMENT OF FEMALE (5s) | Dismissed |

A 7

18:2422(a), 2 and 3551 et seq –
Mann Act Coercion and
Enticement – Jane Doe #6
(5ss)

Dismissed

**Highest Offense Level
(Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

**Plaintiff**

USA          represented by    **Elizabeth Geddes**
United States Attorneys Office
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201–1820
718–254–6430
Fax: 718–254–6478
Email: liz@shihatageddes.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Government Attorney*

**Kayla C Bensing**
U.S. Attorney's Office, EDNY
United States Court of Appeals for the
Second Circuit
271 Cadman Plaza East
Brooklyn, NY 11201
718–254–6279
Fax: 718–254–6076
Email: Kayla.Bensing@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren Howard Elbert**
United States Attorney's Office, EDNY
271 Cadman Plz E
Brooklyn, NY 11201
718–254–7577
Fax: 718–254–6076
Email: lauren.elbert@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maria E. Cruz Melendez**
U.S. Attorney's Office
271 Cadman Plaza East
Brooklyn, NY 11201
718–254–6408
Fax: 718–254–6076
Email: maria.cruzmelendez@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel G. Saavedra**
U.S. Attorney's Office
Financial Litigation Unit
271A Cadman Plaza

A 8

Ste 8064
Brooklyn, NY 11201
718–254–6360
Email: daniel.saavedra@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Nadia Shihata**
Shihata & Geddes LLP
155 Water Street
Brooklyn, NY 11201
646–974–1145
Email: nadia@shihatageddes.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/20/2019 | 1 | SEALED INDICTMENT as to Robert Sylvester Kelly (1) count(s) 1, 2, 3, 4, 5. (Attachments: # 1 Criminal Information Sheet, # 2 Indictment Sealing Form, # 3 Sealing Cover Sheet) (Piper, Francine) (Entered: 06/21/2019) |
| 07/10/2019 | 3 | SEALED SUPERSEDING INDICTMENT (S–1) as to Robert Sylvester Kelly (1) count(s) 1s, 2s, 3s, 4s, 5s. (Attachments: # 1 Criminal Information Sheet, # 2 Sealing Cover Sheet, # 3 Indictment Sealing Form, # 4 Grand Jury Sealing Form) (Piper, Francine) (Entered: 07/10/2019) |
| 07/12/2019 | 4 | ORDER: Order to Unseal Case as to Robert Sylvester Kelly. Signed by Magistrate Judge James Orenstein on 7/12/2019. (Brown, Marc) (Entered: 07/12/2019) |
| 07/12/2019 | 5 | Letter *in support of a permanent order of detention* as to Robert Sylvester Kelly (Geddes, Elizabeth) (Main Document 5 replaced on 7/12/2019) (Piper, Francine). (Entered: 07/12/2019) |
| 07/12/2019 | 6 | NOTICE OF ATTORNEY APPEARANCE Nadia Shihata appearing for USA. (Shihata, Nadia) (Entered: 07/12/2019) |
| 07/15/2019 | 7 | NOTICE OF ATTORNEY APPEARANCE: Douglas C. Anton appearing for Robert Sylvester Kelly (Anton, Douglas) (Entered: 07/15/2019) |
| 07/15/2019 | 8 | NOTICE OF ATTORNEY APPEARANCE Maria E. Cruz Melendez appearing for USA. (Cruz Melendez, Maria) (Entered: 07/15/2019) |
| 07/19/2019 | 9 | MOTION to Appear Pro Hac Vice Filing fee $ 150, receipt number ANYEDC–11681516. by Robert Sylvester Kelly. (Anton, Douglas) (Entered: 07/19/2019) |
| 07/22/2019 |  | ORDER as to Robert Sylvester Kelly. By July 26, 2019, counsel for the defendant is directed to produce updated certificates of good standing issued within the past 30 days. Ordered by Judge Ann M. Donnelly on 7/22/2019. (Greene, Donna) (Entered: 07/22/2019) |
| 07/25/2019 | 10 | Letter *with attached updated (7/24/19) Certificate of Good Standing from Michigan* as to Robert Sylvester Kelly (Anton, Douglas) (Entered: 07/25/2019) |
| 07/25/2019 |  | ORDER as to Robert Sylvester Kelly(1) granting 9 Motion for Leave to Appear. The attorney shall register for ECF, registration is available online at www.pacer.gov. Once registered, the attorney shall file a notice of appearance and ensure that s/he receives electronic notification of activity in this case. Also, the attorney shall ensure the 150 admission fee be submitted to the Clerks Office via filing the event *Pro Hac Vice Filing Fee*. Ordered by Judge Ann M. Donnelly on 7/25/2019. (Greene, Donna) (Entered: 07/25/2019) |
| 07/25/2019 |  | SCHEDULING ORDER as to Robert Sylvester Kelly. Status Conference set for 8/2/2019 at 10:30 a.m., in Courtroom 4G North. Ordered by Judge Ann M. Donnelly on 7/25/2019. (Greene, Donna) (Entered: 07/25/2019) |
| 07/27/2019 | 11 | MOTION to Appear Pro Hac Vice *Steven Greenberg* Filing fee $ 150, receipt number ANYEDC–11705533. by Robert Sylvester Kelly. (Attachments: # 1 Affidavit, # 2 Exhibit Certificate of Good Standing) (Greenberg, Steven) (Entered: 07/27/2019) |

| 07/29/2019 | | ORDER as to Robert Sylvester Kelly (1) granting 11 Motion for Leave to Appear. The attorney shall register for ECF, registration is available online at www.pacer.gov. Once registered, the attorney shall file a notice of appearance and ensure that s/he receives electronic notification of activity in this case. Also, the attorney shall ensure the 150 admission fee be submitted to the Clerks Office via filing the event *Pro Hac Vice Filing Fee*. Ordered by Judge Ann M. Donnelly on 7/29/2019. (Greene, Donna) (Entered: 07/29/2019) |
| --- | --- | --- |
| 07/29/2019 | 12 | NOTICE OF ATTORNEY APPEARANCE: Steven A Greenberg appearing for Robert Sylvester Kelly (Greenberg, Steven) (Entered: 07/29/2019) |
| 07/31/2019 | 13 | Letter *for Pre Trial Release* as to Robert Sylvester Kelly (Anton, Douglas) (Entered: 07/31/2019) |
| 07/31/2019 | | RESCHEDULING ORDER as to Robert Sylvester Kelly. The status conference scheduled for 8/2/2019 at 10:30 a.m., will be an arraignment before Magistrate Judge Steven Tiscione in Courtroom 4G North. Ordered by Judge Ann M. Donnelly on 7/31/2019. (Greene, Donna) (Entered: 07/31/2019) |
| 07/31/2019 | 14 | MOTION to Appear Pro Hac Vice Filing fee $ 150, receipt number ANYEDC−11717822. by Robert Sylvester Kelly. (Attachments: # 1 Affidavit Affidavit, # 2 Admission Information Good Standing letter) (Leonard, Michael) (Entered: 07/31/2019) |
| 08/01/2019 | | ORDER as to Robert Sylvester Kelly (1) granting 14 Motion for Leave to Appear The attorney shall register for ECF, registration is available online at www.pacer.gov. Once registered, the attorney shall file a notice of appearance and ensure that s/he receives electronic notification of activity in this case. Also, the attorney shall ensure the 150 admission fee be submitted to the Clerks Office via filing the event *Pro Hac Vice Filing Fee*. Ordered by Judge Ann M. Donnelly on 8/1/2019. (Greene, Donna) (Entered: 08/01/2019) |
| 08/01/2019 | 15 | Letter *to Court from Douglas C. Anton, Esq.* as to Robert Sylvester Kelly (Anton, Douglas) (Entered: 08/01/2019) |
| 08/02/2019 | 16 | NOTICE OF ATTORNEY APPEARANCE: Michael I. Leonard appearing for Robert Sylvester Kelly (Leonard, Michael) (Entered: 08/02/2019) |
| 08/02/2019 | 18 | Minute Entry for proceedings held before Magistrate Judge Steven Tiscione:Arraignment as to Robert Sylvester Kelly (1) Count 1,1s,2,2s,3,3s,4,4s,5,5s held on 8/2/2019. Plea entered by Robert Sylvester Kelly (1) Count 1,1s,2,2s,3,3s,4,4s,5,5s by Robert Sylvester Kelly Not Guilty on ALL counts. Status Conference set for 8/2/2019 01:00 PM in Courtroom 4G North before Judge Ann M Donnelly. Defense Counsel argued for bail; Government opposed on basis of flight and dangerousness; court denied bail. Order of Detention entered. (Court Reporter Annette Montalvo.) (Herrera, Isaiah) (Entered: 08/02/2019) |
| 08/02/2019 | 19 | ORDER OF DETENTION as to Robert Sylvester Kelly. Ordered by Magistrate Judge Steven Tiscione on 8/2/2019. (Herrera, Isaiah) (Entered: 08/02/2019) |
| 08/02/2019 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Status Conference as to Robert Sylvester Kelly held on 8/2/2019. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Douglas Anton (Retained), Steven Greenberg (Retained), and Michael Leonard (Retained) for defendant Kelly (present in custody). Case called. Discussion held. Next conference set for 10/2/2019 at 10:30 a.m., in Courtroom 4G North. Time excluded from 8/2/19 to 10/2/19. (Court Reporter Annette Montalvo.) (Greene, Donna) (Entered: 08/02/2019) |
| 08/02/2019 | 20 | NOTICE OF ATTORNEY APPEARANCE: Thomas A. Farinella appearing for Robert Sylvester Kelly (Farinella, Thomas) (Entered: 08/02/2019) |
| 08/09/2019 | 21 | MOTION for Protective Order by USA as to Robert Sylvester Kelly. (Attachments: # 1 Proposed Order) (Geddes, Elizabeth) (Entered: 08/09/2019) |
| 08/13/2019 | 22 | STIPULATION AND ORDER granting 21 Motion for Protective Order as to Robert Sylvester Kelly (1)Ordered by Judge Ann M. Donnelly on 8/13/2019. (Greene, Donna) (Entered: 08/13/2019) |

| 08/15/2019 | 23 | Letter *Dated August 15, 2019 Regarding Disclosures Pursuant to Rule 16 of the Federal Rules of Criminal Procedure* as to Robert Sylvester Kelly (Cruz Melendez, Maria) (Entered: 08/15/2019) |
|---|---|---|
| 09/27/2019 | 24 | Letter *to Reset Time−Agreed* as to Robert Sylvester Kelly (Greenberg, Steven) (Entered: 09/27/2019) |
| 09/27/2019 | | ORDER granting the request as to Robert Sylvester Kelly (1). The conference scheduled for 10/2/19 at 10:30 a.m. will instead be held at 1:00 p.m., in Courtroom 4G North. Ordered by Judge Ann M. Donnelly on 9/27/2019. (Greene, Donna) (Entered: 09/27/2019) |
| 09/30/2019 | 25 | MOTION for Release from Custody by Robert Sylvester Kelly. (Attachments: # 1 Exhibit Transcript, # 2 Exhibit Motion for Release in the NDIL, # 3 Exhibit Letter) (Greenberg, Steven) (Entered: 09/30/2019) |
| 09/30/2019 | | ORDER as to Robert Sylvester Kelly. The government is respectfully directed to respond to the defendant's 25 MOTION for Release from Custody before 12:00 noon on October 2, 2019. Ordered by Judge Ann M. Donnelly on 9/30/2019. (Greene, Donna) (Entered: 09/30/2019) |
| 09/30/2019 | 26 | Letter from Kimberly Fashauer (non party) dated 9/18/19 to Judge Donnelly to provide a character reference about Robert Sylvester Kelly. (Herrera, Isaiah) (Entered: 10/01/2019) |
| 10/02/2019 | 27 | RESPONSE in Opposition re 25 MOTION for Release from Custody (Geddes, Elizabeth) (Entered: 10/02/2019) |
| 10/02/2019 | 28 | RESPONSE in Opposition re 25 MOTION for Release from Custody (Geddes, Elizabeth) (Entered: 10/02/2019) |
| 10/02/2019 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Status Conference as to Robert Sylvester Kelly held on 10/2/2019. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Douglas Anton (Retained), Steven Greenbberg (retained), Michael Leonard (Retained), and Thomas Fairnella (Retained) appeared for defendant Kelly (not present, in custody). Case called. Discussion held. Defendants appearance waived. Motion for release denied 25 . Jury selection and trial set for 5/18/20 at 9:30 a.m. Motions in limine are due by 4/13/20 and oppositions are due by 4/27/20. The parties joint requests to charge, vire dire, and verdict sheets are due by 5/4/20. The parties are directed to the Courts Individual Practices and Rules. Final pretrial conference set for 5/14/20. Next status conference set for 12/9/2019 at 4:30 p.m., in Courtroom 4G North. Time excluded from 10/2/19 to 12/9/19. (Court Reporter Stacy Mace.) (Greene, Donna) Modified on 10/2/2019 to correct deadline dates(Greene, Donna). (Entered: 10/02/2019) |
| 12/04/2019 | 29 | Letter *regarding the defendant's appearance at the December 9, 2019 status conference* as to Robert Sylvester Kelly (Geddes, Elizabeth) (Entered: 12/04/2019) |
| 12/05/2019 | | ORDER: In light of the government's 29 letter, defendant Robert Kelly's appearance for the status conference set for 12/9/19 is waived. Ordered by Judge Ann M. Donnelly on 12/5/2019. (Greene, Donna) (Entered: 12/05/2019) |
| 12/05/2019 | 30 | SUPERSEDING INDICTMENT as to Robert Sylvester Kelly (1) count(s) 1ss, 2ss, 3ss, 4ss, 5ss. (Herrera, Isaiah) (Additional attachment(s) added on 12/5/2019: # 1 Criminal Information Sheet) (Herrera, Isaiah). (Entered: 12/05/2019) |
| 12/05/2019 | 31 | Letter *dated 12/5/19 re Rule 16 Discovery* as to Robert Sylvester Kelly (Shihata, Nadia) (Entered: 12/05/2019) |
| 12/09/2019 | | Minute Entry for proceedings held before Judge Ann M. Donnelly:Status Conference as to Robert Sylvester Kelly held on 12/9/2019. Appearances by AUSA Elizabeth Geddes, AUSA Maria Melendez, and AUSA Nadia Shihata. Douglas Anton (Retained), and Thomas Farinella (Retained) for defendant Kelly (not present in custody). Case called. Discussion held. Arraignment set for 12/18/2019 at 2:30 p.m., via video in Courtroom 4G North. Time excluded from 12/9/19 to 12/18/19. (Court |

A 11

| | | Reporter Lisa Schmid.) (Greene, Donna) (Entered: 12/09/2019) |
|---|---|---|
| 12/11/2019 | 32 | Letter MOTION to Continue by Robert Sylvester Kelly. (Greenberg, Steven) (Entered: 12/11/2019) |
| 12/13/2019 | | ORDER as to Robert Sylvester Kelly. The government is directed to respond to the defendant's 32 motion by the close of business today. Ordered by Judge Ann M. Donnelly on 12/13/2019. (Greene, Donna) (Entered: 12/13/2019) |
| 12/13/2019 | 33 | RESPONSE in Opposition re 32 Letter MOTION to Continue (Geddes, Elizabeth) (Entered: 12/13/2019) |
| 12/13/2019 | | ORDER granting in part and denying in part 32 Motion to Continue as to Robert Sylvester Kelly (1). The Arraignment set for 12/18/20 at 2:30 p.m. is reset for 4:00 p.m. (EST). Defendant Kelly is to appearance via video. Ordered by Judge Ann M. Donnelly on 12/13/2019. (Greene, Donna) (Entered: 12/13/2019) |
| 12/18/2019 | | Minute Entry for proceedings held before Judge Ann M. Donnelly:Arraignment as to Robert Sylvester Kelly (1). Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihala. Douglas Anton (Retained) and Steven Greenberg (Retained) for defendant Robert Kelly (present via video in custody). Case called. Defendant Kelly arraigned on Counts 1ss,2ss,3ss,4ss,5ss. Defendant Robert Sylvester Kelly enters a Not Guilty plea to counts 1ss, 2ss, 3ss, 4ss, 5ss. Time excluded from 12/18/19 to 5/18/20. (Court Reporter Linda Marino.) (Greene, Donna) (Entered: 12/18/2019) |
| 12/20/2019 | 34 | MOTION in Limine *to preclude disclosure* by USA as to Robert Sylvester Kelly. (Geddes, Elizabeth) (Entered: 12/20/2019) |
| 01/09/2020 | 35 | MOTION for Discovery by Robert Sylvester Kelly. (Greenberg, Steven) (Entered: 01/09/2020) |
| 01/09/2020 | 36 | RESPONSE in Support re 35 MOTION for Discovery , 34 MOTION in Limine *to preclude disclosure* (Greenberg, Steven) (Entered: 01/09/2020) |
| 01/21/2020 | 37 | REPLY TO RESPONSE to Motion re 34 MOTION in Limine *to preclude disclosure* (Geddes, Elizabeth) (Entered: 01/21/2020) |
| 01/29/2020 | 38 | ORDER as to Robert Sylvester Kelly(1). The Government's request to preclude the disclosure of the identities of Jane Does #2 and #3 is granted. Ordered by Judge Ann M. Donnelly on 1/29/2020. (Greene, Donna) (Entered: 01/29/2020) |
| 01/29/2020 | | SCHEDULING ORDER as to Robert Sylvester Kelly: A status conference will be held on 2/6/2020 at 3:00 p.m., in Courtroom 4G North. Ordered by Judge Ann M. Donnelly on 1/29/2020. (Abdallah, Fida) (Entered: 01/29/2020) |
| 01/29/2020 | | ORDER as to Robert Sylvester Kelly: As the defendant is currently housed at MCC Chicago, any request to waive the defendant's appearance at the conference scheduled for 2/6/2020 must be made by noon on 1/30/2020. Response, if any, by 5:00 p.m. on 1/30/2020. Ordered by Judge Ann M. Donnelly on 1/29/2020. (Abdallah, Fida) (Entered: 01/29/2020) |
| 01/30/2020 | 39 | MOTION for Hearing *Waiver of Defendant's appearance and to appear by phone* by Robert Sylvester Kelly. (Greenberg, Steven) (Entered: 01/30/2020) |
| 01/30/2020 | 40 | RESPONSE in Opposition re 39 MOTION for Hearing *Waiver of Defendant's appearance and to appear by phone* (Geddes, Elizabeth) (Entered: 01/30/2020) |
| 02/03/2020 | | ORDER denying 39 Motion for Hearing as to Robert Sylvester Kelly (1). The defendant will appear by video, accompanied by his attorney, for the status conference on February 6, 2020, at 3:00 p.m., in Courtroom 4G North of the Brooklyn courthouse. Mr. Anton will attend the conference in Brooklyn in person. Ordered by Judge Ann M. Donnelly on 2/3/2020. (Lefkowitz, Jacob) (Entered: 02/03/2020) |
| 02/06/2020 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Status Conference as to Robert Sylvester Kelly held on 2/6/2020. Appearances by AUSA Elizabeth Geddes and AUSA Maria Cruz Melendez. Douglas Anton (Retained) and Steven Greenberg (Retained) for defendant Robert Kelly (present via video in custody). |

| | | |
|---|---|---|
| | | Case called. Discussion held. Jury selection and trial set for 5/18/20 at 9:30 a.m. is reset for 7/7/20 at 9:30 a.m. Motions in limine are due by 6/16/20 and oppositions are due by 6/23/20. The parties joint requests to charge, voire dire, and verdict sheets are due by 6/30/20. The parties are directed to the Courts Individual Practices and Rules. |
| | | Joint proposed questionnaire submissions due 4/14/2020. Jury questionnaires will be distributed to prospective jurors in the Ceremonial Courtroom on the second floor on 5/12/2020. Time not set. Time excluded from 5/18/2020 to 7/7/2020. (Court Reporter Nicole Barrna.) (Greene, Donna) (Entered: 02/06/2020) |
| 02/06/2020 | | RESCHEDULING ORDER as to Robert Sylvester Kelly. Motions in limine are due by 5/4/20 and oppositions are due by 5/25/20. The parties' joint requests to charge, voir dire, and verdict sheets are due by 6/8/20. The parties are directed to the Court's Individual Practices and Rules. Final pretrial conference set for 6/18/20 at 11:15 a.m. in Courtroom 4G–North. Ordered by Judge Ann M. Donnelly on 2/6/20. (Greene, Donna) (Entered: 02/06/2020) |
| 02/28/2020 | 41 | MOTION to Dismiss by Robert Sylvester Kelly. (Greenberg, Steven) (Entered: 02/28/2020) |
| 03/02/2020 | | ORDER as to Robert Sylvester Kelly. The Government is directed to respond to the defendant's 41 motion to dismiss on or before 3/20/2020; defendants reply, if any, by 3/27/2020. Ordered by Judge Ann M. Donnelly on 3/2/2020. (Greene, Donna) (Entered: 03/02/2020) |
| 03/02/2020 | 42 | MOTION to Dismiss , MOTION to Strike by Robert Sylvester Kelly. (Greenberg, Steven) (Entered: 03/02/2020) |
| 03/03/2020 | | ORDER as to Robert Sylvester Kelly. The Government is directed to respond to the defendant's 42 motion to dismiss on or before 3/23/2020; The Defendant's reply, if any, is due by 3/30/2020. Ordered by Judge Ann M. Donnelly on 3/3/2020. (Greene, Donna) (Entered: 03/03/2020) |
| 03/12/2020 | 43 | SUPERSEDING INDICTMENT as to Robert Sylvester Kelly (1) count(s) 1sss, 2sss, 3sss, 4sss, 5sss, 6sss, 7sss, 8sss, 9sss. (Herrera, Isaiah) (Entered: 03/13/2020) |
| 03/19/2020 | 44 | Letter *detailing additional discovery provided to the defendant on March 17, 2020* as to Robert Sylvester Kelly (Geddes, Elizabeth) (Entered: 03/19/2020) |
| 03/19/2020 | 45 | Letter *advising the Court that a third superseding indictment was filed and requesting that the defendant's arraignment be delayed* as to Robert Sylvester Kelly (Geddes, Elizabeth) (Entered: 03/19/2020) |
| 03/20/2020 | 46 | RESPONSE in Opposition re 41 MOTION to Dismiss (Geddes, Elizabeth) (Entered: 03/20/2020) |
| 03/23/2020 | | ORDER as to Robert Sylvester Kelly. The request to postpone the arraignment of Mr. Kelly on the third superseding is granted. The video arraignment is postponed until 4/30/2020 at 2:30 p.m. The time period is excluded under the Speedy Trial Act, 18 U.S.C. § 3161(h)(7)(A).(7)(A), consistent with Administrative Order No. 2020–06 of this Court, in view of the current public health crisis caused by the COVID–19 virus. The the ends of justice served by taking this action outweigh the interests of the parties and the public in a speedy trial. Ordered by Judge Ann M. Donnelly on 3/23/2020. (Greene, Donna) (Entered: 03/23/2020) |
| 03/23/2020 | 47 | MEMORANDUM in Opposition re 42 MOTION to Dismiss MOTION to Strike *by USA* (Shihata, Nadia) (Entered: 03/23/2020) |
| 03/26/2020 | 48 | MOTION for Bond by Robert Sylvester Kelly. (Farinella, Thomas) (Entered: 03/26/2020) |
| 03/27/2020 | | ORDER as to Robert Sylvester Kelly. The government is respectfully directed to respond to the defendant's 48 motion for bond by March 30, 2020. Ordered by Judge Ann M. Donnelly on 3/27/2020. (Greene, Donna) (Entered: 03/27/2020) |
| 03/29/2020 | 49 | REPLY TO RESPONSE to Motion re 42 MOTION to Dismiss MOTION to Strike (Greenberg, Steven) (Entered: 03/29/2020) |

A 13

| 03/30/2020 | 50 | RESPONSE in Opposition re 48 MOTION for Bond (Geddes, Elizabeth) (Entered: 03/30/2020) |
|---|---|---|
| 03/30/2020 | 51 | RESPONSE in Opposition re 48 MOTION for Bond (Geddes, Elizabeth) (Entered: 03/30/2020) |
| 03/30/2020 | | ORDER as to Robert Sylvester Kelly. The defendant's reply to the government's opposition 51 , if any, is due by close of business Tuesday, March 31, 2020. Ordered by Judge Ann M. Donnelly on 3/30/2020. (Greene, Donna) Modified on 3/30/2020 to reflect the correct reference document number.(Greene, Donna). (Entered: 03/30/2020) |
| 03/31/2020 | 52 | REPLY TO RESPONSE to Motion re 48 MOTION for Bond (Greenberg, Steven) (Entered: 03/31/2020) |
| 04/07/2020 | 53 | ORDER as to Robert Sylvester Kelly: For the reasons stated in the attached, the defendant's 48 motion for a bail hearing and an order granting his temporary release is denied. Ordered by Judge Ann M. Donnelly on 4/7/2020. (Abdallah, Fida) (Entered: 04/07/2020) |
| 04/14/2020 | 54 | Proposed Voir Dire by USA as to Robert Sylvester Kelly (Attachments: # 1 Exhibit Joint Proposed Juror Questionnaire) (Cruz Melendez, Maria) (Entered: 04/14/2020) |
| 04/15/2020 | | SCHEDULING ORDER as to Robert Sylvester Kelly. Telephone status conference set for 4/16/2020 at 4:00 p.m. Each party should call the following conference number: (888) 363–4734, and use access code: 9057625. Ordered by Judge Ann M. Donnelly on 4/15/2020. (Greene, Donna) (Entered: 04/15/2020) |
| 04/16/2020 | 55 | MOTION for Release from Custody *Emergency Renewed Motion for Release from Custody based upon Changed Circumstances* by Robert Sylvester Kelly. (Leonard, Michael) (Entered: 04/16/2020) |
| 04/16/2020 | | SCHEDULING ORDER as to Robert Sylvester Kelly. The government is directed to respond to the motion for release 55 by 12:00 p.m. on April 17, 2020. Ordered by Judge Ann M. Donnelly on 4/16/2020. (Lefkowitz, Jacob) (Entered: 04/16/2020) |
| 04/16/2020 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Telephone Status Conference as to Robert Sylvester Kelly held on 4/16/2020. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Douglas Anton (Retained), Steven Greenberg (Retained), Michael Leonard (Retained), and Thomas Farinella (Retained) for defendant Kelly (not present).<br><br>Case called. Discussion held. Defendants appearance waived. Jury selection and trial set for 7/7/20 at 9:30 a.m. is reset for 9/29/20 at 9:30 a.m. Motions in limine are due by 9/8/20 and oppositions are due by 9/15/20. The parties joint requests to charge, voire dire, and verdict sheets are due by 9/22/20. The parties are directed to the Courts Individual Practices and Rules.<br><br>Jury questionnaires will be distributed to prospective jurors in the Ceremonial Courtroom on the second floor on 9/14/20. Time excluded from 4/16/20 to 9/29/20. (Court Reporter Anthony Frisolone.) (Entered: 04/17/2020) |
| 04/17/2020 | 56 | RESPONSE in Opposition re 55 MOTION for Release from Custody *Emergency Renewed Motion for Release from Custody based upon Changed Circumstances* (Shihata, Nadia) (Entered: 04/17/2020) |
| 04/17/2020 | | SCHEDULING ORDER as to Robert Sylvester Kelly. The defendant's reply to the government's opposition 56 , if any, is due by Sunday, April 19, 2020 at noon. Ordered by Judge Ann M. Donnelly on 4/17/2020. (Greene, Donna) (Entered: 04/17/2020) |
| 04/19/2020 | 58 | REPLY TO RESPONSE to Motion re 55 MOTION for Release from Custody *Emergency Renewed Motion for Release from Custody based upon Changed Circumstances Re−File to correct designation of ex parte* (Attachments: # 1 Exhibit Tax Lien) (Leonard, Michael) (Entered: 04/19/2020) |
| 04/20/2020 | 59 | Letter *Update on Covid at MCC* as to Robert Sylvester Kelly (Greenberg, Steven) (Entered: 04/20/2020) |

| 04/21/2020 | 60 | Letter *dated 4/21/20* as to Robert Sylvester Kelly (Shihata, Nadia) (Entered: 04/21/2020) |
|---|---|---|
| 04/21/2020 | | RESCHEDULING ORDER as to Robert Sylvester Kelly. Arraignment currently scheduled for 4/30/2020 at 2:30 p.m., will be held before the Magistrate on duty. Ordered by Judge Ann M. Donnelly on 4/21/2020. (Greene, Donna) (Entered: 04/21/2020) |
| 04/21/2020 | 61 | ORDER as to Robert Sylvester Kelly (1). The defendant's 55 Motion for Release is denied. Ordered by Judge Ann M. Donnelly on 4/21/2020. (Greene, Donna) (Entered: 04/21/2020) |
| 04/23/2020 | | Minute Entry for proceedings held before Chief Magistrate Cheryl L. Pollak:Status Conference as to Robert Sylvester Kelly held on 4/23/2020 via telephone. (Court Reporter Michele Lucchese.) AUSA Liz Geddes. Defense counsel Steven Greenberg. Defendant not present for the call. Status re the capability of providing video conference call discussed. Counsels agreed to do the scheduled 4/30/2020 2:30pm arraignment via telephone conference, instead of video conference. (Yuen, Sui−May) (Entered: 04/23/2020) |
| 04/30/2020 | 62 | Minute Entry for proceedings held before Chief Magistrate Cheryl L. Pollak: Arraignment as to Robert Sylvester Kelly (1) Count 1sss,2sss,3sss,4sss,5sss,6sss,7sss,8sss,9sss held via Telephone on 4/30/2020. Plea entered by Robert Sylvester Kelly Not Guilty on ALL counts. (FTR Log #2:4−2:43.) (Herrera, Isaiah) (Entered: 04/30/2020) |
| 05/01/2020 | 63 | Third MOTION for Bond *Because of Covid 19* by Robert Sylvester Kelly. (Greenberg, Steven) (Entered: 05/01/2020) |
| 05/01/2020 | | SCHEDULING ORDER as to Robert Sylvester Kelly. The government is directed to respond to the motion for release 63 by close of business Monday, May 4, 2020. Ordered by Judge Ann M. Donnelly on 5/1/2020. (Greene, Donna) (Entered: 05/01/2020) |
| 05/04/2020 | 64 | RESPONSE in Opposition re 63 Third MOTION for Bond *Because of Covid 19* (Cruz Melendez, Maria) (Entered: 05/04/2020) |
| 05/04/2020 | | SCHEDULING ORDER as to Robert Sylvester Kelly. The defendant's reply to the government's opposition 64 is due by close of business Wednesday, May 6, 2020. Ordered by Judge Ann M. Donnelly on 5/4/2020. (Greene, Donna) (Entered: 05/04/2020) |
| 05/06/2020 | 66 | REPLY TO RESPONSE to Motion re 63 Third MOTION for Bond *Because of Covid 19* (Leonard, Michael) (Entered: 05/06/2020) |
| 05/08/2020 | 67 | REPLY TO RESPONSE to Motion re 63 Third MOTION for Bond *Because of Covid 19 Additional (Redacted)* (Greenberg, Steven) (Entered: 05/08/2020) |
| 05/15/2020 | 68 | ORDER as to Robert Sylvester Kelly(1). The defendant's motion for reconsideration of the Court's pretrial detention orders and his motion for temporary release are denied. Ordered by Judge Ann M. Donnelly on 5/15/2020. (Greene, Donna) (Entered: 05/15/2020) |
| 05/22/2020 | 69 | ORDER as to Robert Sylvester Kelly (1). The defendant's motion to dismiss and motion to strike are denied. Ordered by Judge Ann M. Donnelly on 5/22/2020. (Greene, Donna) (Entered: 05/22/2020) |
| 06/01/2020 | 70 | NOTICE OF APPEAL of Conditions of Release by Robert Sylvester Kelly Filing fee $ 505, receipt number BNYEDC−12868361. (Farinella, Thomas) (Entered: 06/01/2020) |
| 06/02/2020 | | Electronic Index to Record on Appeal as to Robert Sylvester Kelly sent to US Court of Appeals 70 Notice of Appeal – Conditions of Release Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (McGee, Mary Ann) (Entered: 06/02/2020) |
| 07/08/2020 | 71 | MOTION in Limine *for an anonymous and partially sequestered jury* by USA as to Robert Sylvester Kelly. (Geddes, Elizabeth) (Entered: 07/08/2020) |

A 15

| 07/08/2020 | 72 | MOTION for Extension of Time to File Response/Reply as to 71 MOTION in Limine *for an anonymous and partially sequestered jury AGREED MOTION TO SET BRIEFING SCHEDULE ON GOVT.'S MOTION* by Robert Sylvester Kelly. (Leonard, Michael) (Entered: 07/08/2020) |
| --- | --- | --- |
| 07/09/2020 | | ORDER granting 72 Motion for Extension of Time to File Response/Reply as to Robert Sylvester Kelly (1). The briefing schedule is adopted as follows: Defendant shall file his response on or before July 29, 2020, and the Government shall file its Reply on or before August 5, 2020. Ordered by Judge Ann M. Donnelly on 7/9/2020. (Greene, Donna) (Entered: 07/09/2020) |
| 07/29/2020 | 73 | RESPONSE in Opposition re 71 MOTION in Limine *for an anonymous and partially sequestered jury* (Leonard, Michael) (Entered: 07/29/2020) |
| 08/05/2020 | 74 | REPLY TO RESPONSE to Motion re 71 MOTION in Limine *for an anonymous and partially sequestered jury by USA* (Shihata, Nadia) (Entered: 08/05/2020) |
| 08/10/2020 | | SCHEDULING ORDER as to Robert Sylvester Kelly. Telephone Status Conference set for 8/19/2020 at 2:30 p.m. The conference number is: (888) 363–4734, and use access code: 9057625. Ordered by Judge Ann M. Donnelly on 8/10/2020. (Greene, Donna) (Entered: 08/10/2020) |
| 08/19/2020 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Telephone Conference as to Robert Sylvester Kelly held on 8/19/2020. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Douglas Anton (Retained), Steven Greenberg (Retained), Michael Leonard (Retained), and Thomas Farinella (Retained) appeared for defendant Kelly (present on phone, in custody). |
| | | Case called. Discussion held. Government's supplemental motion in limine for an anonymous and partially sequestered jury due 8/26/2020, defendant's response due 9/2/2020. All other Court rulings remain in place. The trial scheduled for 9/29/2020 is converted into a status conference and will be held at 10:30 a.m. EST. Time excluded until 9/29/2020. (Court Reporter Georgette Betts.) (Greene, Donna) (Entered: 08/19/2020) |
| 08/26/2020 | 75 | Letter *in further support of the government's motion for an anonymous and partially−sequestered jury* as to Robert Sylvester Kelly (Geddes, Elizabeth) (Entered: 08/26/2020) |
| 09/02/2020 | 76 | Letter *in response to government's motion for an anonymous and partially−sequestered jury* as to Robert Sylvester Kelly (Farinella, Thomas) (Entered: 09/02/2020) |
| 09/08/2020 | 77 | ORDER of USCA (certified copy) as to Robert Sylvester Kelly re 70 Notice of Appeal – Conditions of Release. Defendant–Appellant Robert Sylvester Kelly (Kelly) appeals from a May 15, 2020 order of the U.S. District Court for the Eastern District of New York (Donnelly, J.), which denied Kellys motion for reconsideration of the District Courts prior denial of pretrial release under 18 U.S.C. § 3142(e) and denied Kellys motion for temporary release under 18 U.S.C. § 3142(i). We have jurisdiction over this appeal under 18 U.S.C. § 3145(c) and 28 U.S.C. § 1291. See Fed. R. App. P. 9(a). [W]e apply deferential review to a District Courts order of detention and will not reverse except for clear error, i.e. unless on the entire evidence we are left with the definite and firm conviction that a mistake has been committed. United States v. Sabhnani, 493 F.3d 63, 75 (2d Cir. 2007) (quoting United States v. Shakur, 817 F.2d 189, 195 (2d Cir. 1987)). Accordingly, we AFFIRM the District Courts denial of release for substantially the reasons set forth in its well–reasoned order of May 15, 2020. See document for further details. PLEASE NOTE: The USCA Mandate has not yet been issued. Certified Copy Issued: 9/8/20. USCA #20–1720. (McGee, Mary Ann) (Entered: 09/08/2020) |
| 09/29/2020 | 78 | MANDATE of USCA (certified copy) as to Robert Sylvester Kelly. It is Ordered that we AFFIRM the District Courts denial of release for substantially the reasons set forth in its well–reasoned order of May 15, 2020. See document and entry 77 USCA Order for more details. Issued as Mandate: 9/29/20. USCA #20–1720. (McGee, Mary Ann) (Entered: 09/29/2020) |

A 16

| 09/29/2020 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: TelephoneStatus Conference as to Robert Sylvester Kelly held on 9/29/2020. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Douglas Anton (Retained), Steven Greenberg (Retained), Michael Leonard (Retained), and Thomas Farinella (Retained) appeared for defendant Kelly (present on phone, in custody). Case called. Discussion held. (Court Reporter Sophie Nolan.) (Greene, Donna) (Entered: 09/29/2020) |
|---|---|---|
| 10/08/2020 | 79 | ORDER as to Robert Sylvester Kelly (1). The government's motion to empanel an anonymous and partially sequestered jury is granted. Signed by Judge Ann M. Donnelly on 10/8/2020. (Greene, Donna) (Entered: 10/08/2020) |
| 10/14/2020 | 80 | MOTION to Unseal Document by Robert Sylvester Kelly. (Greenberg, Steven) (Entered: 10/14/2020) |
| 10/14/2020 | 81 | MOTION to Exclude *time on the Speedy Trial Clock* by USA as to Robert Sylvester Kelly. (Geddes, Elizabeth) (Entered: 10/14/2020) |
| 10/14/2020 | | ORDER as to Robert Sylvester Kelly(1). At the last status conference, the Court suggested a trial date of January 6, 2021, which was not convenient for the defense. The parties requested an opportunity to confer on a mutually agreeable trial date. On October 14, 2020, the Government advised the Court that the parties had agreed on a potential date but needed some additional time to confer. The Government requests that the Court exclude time until January 4, 2021, and the defense consents. Accordingly, the time from 9/29/2020 to 1/4/2021 is excluded in the interest of justice. Ordered by Judge Ann M. Donnelly on 10/14/2020. (Greene, Donna) (Entered: 10/14/2020) |
| 10/22/2020 | | ORDER as to Robert Sylvester Kelly. The government is directed to respond to the motion to unseal document 80 by Tuesday, October 27, 2020. Defendant's reply, if any, due by October 30, 2020. Ordered by Judge Ann M. Donnelly on 10/22/2020. (Greene, Donna) (Entered: 10/22/2020) |
| 10/27/2020 | 83 | RESPONSE to Motion re 80 MOTION to Unseal Document (Cruz Melendez, Maria) (Entered: 10/27/2020) |
| 10/30/2020 | | ORDER: The defendant's motion to unseal ECF No. 79 is granted. Signed by Judge Ann M. Donnelly on 10/30/2020. (Greene, Donna) (Entered: 10/30/2020) |
| 11/12/2020 | | ORDER: No later than November 19, 2020, the parties are directed to file a joint letter updating the court on their proposed trial date. The letter should include a proposed schedule for completing juror questionnaires and voir dire. Ordered by Judge Ann M. Donnelly on 11/12/2020. (Greene, Donna) (Entered: 11/12/2020) |
| 11/18/2020 | 84 | Letter *on behalf of all parties regarding a proposed trial schedule* as to Robert Sylvester Kelly (Geddes, Elizabeth) (Entered: 11/18/2020) |
| 11/18/2020 | | ORDER: The proposed trial schedule is adopted as follows: March 15, 2021 to March 25, 2021, Distribution of juror questionnaires; April 6, 2021, Voir Dire; and April 7, 2021, Trial commences. Jury questionnaires will be distributed to prospective jurors in the Ceremonial Courtroom on the second floor. Time to be determined. Time excluded from 1/4/2021 to 4/6/2021. Ordered by Judge Ann M. Donnelly on 11/18/2020. (Greene, Donna) Modified on 11/18/2020 to correct a typographical error. (Greene, Donna). (Entered: 11/18/2020) |
| 11/18/2020 | | SCHEDULING ORDER as to Robert Sylvester Kelly. Pretrial Conference set for 2/17/2021 at 11:30 a.m. EST and will be held via telephone. Each party should call the conference number: (888) 363–4734, and use access code: 9057625. Ordered by Judge Ann M. Donnelly on 11/18/2020. (Greene, Donna) (Entered: 11/18/2020) |
| 01/24/2021 | 85 | MOTION to Compel *Government to produce disovery materials* by Robert Sylvester Kelly. (Leonard, Michael) (Entered: 01/24/2021) |
| 01/25/2021 | 86 | RESPONSE in Opposition re 85 MOTION to Compel *Government to produce disovery materials* (Geddes, Elizabeth) (Entered: 01/25/2021) |
| 01/26/2021 | 87 | Letter MOTION for Reconsideration *of Portions of Order for an Anonymous Jury* by Robert Sylvester Kelly. (Greenberg, Steven) (Entered: 01/26/2021) |

| 01/28/2021 | | ORDER as to Robert Sylvester Kelly. The government is directed to respond to the defendant's motion for reconsideration 87 no later than February 4, 2021. Ordered by Judge Ann M. Donnelly on 1/28/2021. (Strong, Ardis) (Entered: 01/28/2021) |
|---|---|---|
| 02/02/2021 | 88 | First MOTION for Protective Order *as to 3500 Material* by USA as to Robert Sylvester Kelly. (Attachments: # 1 Proposed Order Proposed Protective Order for 3500 Material) (Geddes, Elizabeth) (Entered: 02/02/2021) |
| 02/02/2021 | 89 | MEMORANDUM in Opposition re 88 First MOTION for Protective Order *as to 3500 Material* (Leonard, Michael) (Entered: 02/02/2021) |
| 02/04/2021 | 90 | ORDER granting in part 88 motion for protective order. I grant the government's motion for a protective order of the Section 3500 materials but will allow the defendant to keep a paper copy of the materials in his cell for his own review, provided that he does not discuss or disseminate the information to anyone other than his attorneys or staff working with his attorneys. Ordered by Judge Ann M. Donnelly on 2/4/2021. (Greene, Donna). Order Modified on 2/4/2021 (Greene, Donna). (Entered: 02/04/2021) |
| 02/04/2021 | | SCHEDULING ORDER as to Robert Sylvester Kelly. Status Conference set for 2/9/2021 at 11:00 a.m. EST and will be held via telephone. Each party should call the conference number: (888) 363–4734, and use access code: 9057625. Ordered by Judge Ann M. Donnelly on 2/4/2021. (Greene, Donna) (Entered: 02/04/2021) |
| 02/04/2021 | 91 | RESPONSE in Opposition re 87 Letter MOTION for Reconsideration *of Portions of Order for an Anonymous Jury by USA* (Shihata, Nadia) (Entered: 02/04/2021) |
| 02/05/2021 | | RESCHEDULING ORDER as to Robert Sylvester Kelly. Status Conference set for 2/9/2021 at 11:00 a.m. EST will instead by held at 11:30 a.m. EST and will be held via telephone. Each party should call the conference number: (888) 363–4734, and use access code: 9057625. Ordered by Judge Ann M. Donnelly on 2/4/2021. Ordered by Judge Ann M. Donnelly on 2/5/2021. (Greene, Donna) (Entered: 02/05/2021) |
| 02/08/2021 | 92 | DECISION AND ORDER. The defendant's motion for reconsideration is denied. Ordered by Judge Ann M. Donnelly on 2/8/2021. (Greene, Donna) (Entered: 02/08/2021) |
| 02/09/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Status Conference as to Robert Sylvester Kelly held on 2/9/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Steven Greenberg (Retained), Michael Leonard (Retained), and Thomas Farinella(Retained) for defendant Kelly (present via telephone in custody). <br><br> Case called. Discussion held. Jury selection and trial set for 4/7/2021 is reset for 8/9/2021 at 9:00 a.m. Motions in limine are due by 7/19/2021 and oppositions are due by 7/26/2021. The parties joint requests to charge, voir dire, and verdict sheets are due by 7/2/2021. <br><br> July 19, 2021 to July 30, 2021, Distribution of juror questionnaires; August 9, 2021, Voir Dire; and August 11, 2021, Trial commences. Jury questionnaires will be distributed to prospective jurors in the Ceremonial Courtroom on the second floor. Time to be determined. The Court orally notified the prosecutor of its obligations pursuant to Rule 5(f) of the Rules of Criminal Procedure and the prosecution acknowledge same. Next Status Conference set for 4/15/2021 at 11:30 a.m. and will be held via telephone. Each party should call the following conference number: (888) 363–4734, and use access code: 9057625. Time excluded from 4/7/2021 to 8/9/2021. (Court Reporter Lisa Schmid.) (Greene, Donna) (Entered: 02/09/2021) |
| 02/09/2021 | 93 | ORDER: This order is entered pursuant to Federal Rule of Criminal Procedure 5(f) to confirm the prosecution's disclosure obligations under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, and to summarize the possible consequences of violating those obligations. Ordered by Judge Ann M. Donnelly on 2/9/2021. (Greene, Donna) (Entered: 02/09/2021) |
| 02/11/2021 | 94 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on 02/09/2021, before Judge Ann M. Donnelly. Court Reporter/Transcriber Lisa Schmid, Telephone number (718)613–2644. Email address: LisaSchmidCCR.RMR@gmail.com. Transcript may be viewed at the court public |

| | | |
|---|---|---|
| | | terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 3/4/2021. Redacted Transcript Deadline set for 3/15/2021. Release of Transcript Restriction set for 5/12/2021. (Schmid, Lisa) (Main Document 94 replaced on 2/19/2021) (Marziliano, August). (Entered: 02/11/2021) |
| 03/26/2021 | | RESCHEDULING ORDER: Distribution of the juror questionnaires scheduled for July 19, 2021 to July 30, 2021, is reset for distribution on 7/26/2021 to 8/6/2021. Ordered by Judge Ann M. Donnelly on 3/26/2021. (Greene, Donna) (Entered: 03/26/2021) |
| 04/15/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Status Conference as to Robert Sylvester Kelly held via telephone on 4/15/2021. Appearances by AUSA Elizabeth Geedes, AUSA Maria Cruz–Melendez, and AUSA Nadia Shihata. Steven Greenberg (Retained), Michael Leonard (Retained), and Thomas Farinella (Retained) for defendant Kelly (present via telephone in custody). Case called. Discussion held. (Court Reporter Androniki Barna.) (Greene, Donna) (Entered: 04/15/2021) |
| 04/19/2021 | 95 | MOTION to Appear Pro Hac Vice Filing fee $ 150, receipt number ANYEDC–14385734. by Robert Sylvester Kelly. (Becker, Nicole) (Entered: 04/19/2021) |
| 04/21/2021 | | ORDER granting 95 Motion for Leave to Appear. The attorney shall register for ECF, registration is available online at www.pacer.gov. Once registered, the attorney shall file a notice of appearance and ensure that she receives electronic notification of activity in this case. Also, the attorney shall ensure the 150 admission fee be submitted to the Clerks Office via filing the event *Pro Hac Vice Filing Fee*.Ordered by Judge Ann M. Donnelly on 4/21/2021. (Greene, Donna) (Entered: 04/21/2021) |
| 05/17/2021 | 96 | Letter *dated 5/17/21 re jury questionnaire* as to Robert Sylvester Kelly (Shihata, Nadia) (Entered: 05/17/2021) |
| 05/28/2021 | 97 | NOTICE *Proposed Agreed Order* as to Robert Sylvester Kelly (Leonard, Michael) (Entered: 05/28/2021) |
| 06/06/2021 | 98 | Proposed Voir Dire by Robert Sylvester Kelly (Leonard, Michael) (Entered: 06/06/2021) |
| 06/07/2021 | | SCHEDULING ORDER as to Robert Sylvester Kelly. Status Conference set for 6/9/2021 at 11:00 a.m. EST and will be held via telephone. Each party should call the conference number: (888) 363–4734, and use access code: 9057625. Ordered by Judge Ann M. Donnelly on 6/7/2021. (Greene, Donna) (Entered: 06/07/2021) |
| 06/07/2021 | 99 | MOTION to Withdraw as Attorney by Greenberg and Leonard. by Robert Sylvester Kelly. (Greenberg, Steven) (Entered: 06/07/2021) |
| 06/08/2021 | | RESCHEDULING ORDER as to Robert Sylvester Kelly. Status Conference set for 6/9/2021 at 11:00 a.m. EST will instead be held at 11:30 a.m. EST and will be held via telephone. Each party should call the conference number: (888) 363–4734, and use access code: 9057625. Ordered by Judge Ann M. Donnelly on 6/8/2021. (Greene, Donna) (Entered: 06/08/2021) |
| 06/09/2021 | 100 | MOTION to Withdraw as Attorney *and/or Motion to Relieve Steven Greenberg and Michael Leonard* by Thomas A. Farinella. by Robert Sylvester Kelly. (Farinella, Thomas) (Entered: 06/09/2021) |
| 06/09/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly:Status Conference as to Robert Sylvester Kelly held via telelphone on 6/9/2021. Appearances by AUSA Elizabeth Geedes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Steven Greenberg (Retained), Michael Leonard (Retained), Thomas Farinella (Retained), and Nicole Becker (Retained) for defendant Kelly (present via telephone in custody). Case called. Discussion held. The Court directed defense counsel Steven Greenberg and Michael Leonard to submit a letter, under seal, detailing their reasons for seeking withdrawal. The final pretrial conference will be an in person proceeding on 8/2/2021 at 10:00 a.m., in Courtroom 4G North. (Court Reporter Holly Driscoll.) (Greene, |

| | | |
|---|---|---|
| | | Donna) (Entered: 06/10/2021) |
| 06/11/2021 | | SCHEDULING ORDER as to Robert Sylvester Kelly. Curcio Hearing set for 6/17/2021 at 10:00 AM in Courtroom 4G North. Ordered by Judge Ann M. Donnelly on 6/11/2021. (Greene, Donna) (Entered: 06/11/2021) |
| 06/11/2021 | 103 | Letter *dated 6/11/21 re Jury Questionnaire* as to Robert Sylvester Kelly (Shihata, Nadia) (Entered: 06/11/2021) |
| 06/11/2021 | 104 | Letter *re Jury Questionnaire* as to Robert Sylvester Kelly (Farinella, Thomas) (Entered: 06/11/2021) |
| 06/11/2021 | 105 | Letter *re Jury Questionnaire – Amended* as to Robert Sylvester Kelly (Farinella, Thomas) (Entered: 06/11/2021) |
| 06/11/2021 | 106 | Letter *in Response to Defendant's Request for Additions and Changes to the Juror Questionnaire* as to Robert Sylvester Kelly (Cruz Melendez, Maria) (Entered: 06/11/2021) |
| 06/14/2021 | 107 | Letter *Motion for Curcio Hearing* as to Robert Sylvester Kelly (Shihata, Nadia) (Entered: 06/14/2021) |
| 06/16/2021 | 111 | Order on agreed motion for early return of subpoenas. Ordered by Judge Ann M. Donnelly on 6/16/2021. (Greene, Donna) (Entered: 06/16/2021) |
| 06/17/2021 | 112 | CJA 20 as to Robert Sylvester Kelly: Appointment of Attorney Ilana Haramati for Robert Sylvester Kelly. Ordered by Judge Ann M. Donnelly on 6/17/2021. (Greene, Donna) (Entered: 06/17/2021) |
| 06/17/2021 | | Minute Entry for proceedings held before Judge Ann M Donnelly: Curcio inquiry held. Appearances by AUSA Maria Cruz Melendez. Steven Greenberg (Retained), Michael Leonard (Retained), Thomas Farinella(Retained), Nicole Blank Becker (Retained) for defendant Kelly (present via video in custody). CJA Attorney Ilana Haramati present on standby. Case called. Discussions held. Parties should promptly file, under seal, any additional submissions relevant to the inquiry. (Court Reporter Anthony Frisolone.) (Greene, Donna) (Entered: 06/17/2021) |
| 06/21/2021 | | ORDER: Any additional submissions relevant to the inquiry must be received via ecf, under seal, by 5 p.m. ET on June 24, 2021. Ordered by Judge Ann M. Donnelly on 6/21/2021. (Greene, Donna) (Entered: 06/21/2021) |
| 06/22/2021 | 113 | NOTICE OF ATTORNEY APPEARANCE: Devereaux Leon Cannick appearing for Robert Sylvester Kelly (Cannick, Devereaux) (Entered: 06/22/2021) |
| 06/24/2021 | | SCHEDULING ORDER as to Robert Sylvester Kelly. Curcio Hearing set for 6/30/2021 at 2:00 p.m., in Courtroom 4G North. Ordered by Judge Ann M. Donnelly on 6/24/2021. (Greene, Donna) (Entered: 06/24/2021) |
| 06/24/2021 | 114 | Letter *under seal supplementing the government's June 14, 2021 motion for a Curcio hearing* as to Robert Sylvester Kelly (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2) (Geddes, Elizabeth) (Entered: 06/24/2021) |
| 06/25/2021 | | ORDER as to Robert Sylvester Kelly. The Curcio hearing set for June 30, 2021 is adjourned and will be rescheduled at a later date. Ordered by Judge Ann M. Donnelly on 6/25/2021. (Greene, Donna) (Entered: 06/25/2021) |
| 06/30/2021 | 115 | ORDER: Following its review of the parties' submissions, the Court has modified the written jury questionnaire. This version of the questionnaire is adopted by the Court to be used for selection of a jury for the trial of this case. A copy of the questionnaire will be transmitted to the Jury Clerk for processing. Counsel are directed to submit the names and organizations to be included on page 22 of the questionnaire no later than July 14, 2021. Ordered by Judge Ann M. Donnelly on 6/30/2021. (Greene, Donna) (Entered: 06/30/2021) |
| 07/01/2021 | 116 | MOTION for Bond by Robert Sylvester Kelly. (Farinella, Thomas) (Entered: 07/01/2021) |
| 07/01/2021 | | SCHEDULING ORDER: The government should file a response to the defendant's 116 motion for bond by July 6, 2021. Signed by Judge Ann M. Donnelly on 7/1/2021. |

| | | (Lawoyin, Feyilana) (Entered: 07/01/2021) |
|---|---|---|
| 07/02/2021 | 117 | Proposed Jury Instructions/Verdict Form by USA as to Robert Sylvester Kelly (Attachments: # 1 Exhibit Joint Proposed Jury Charge, # 2 Exhibit Joint Proposed Verdict Form, # 3 Exhibit Defense Objections to Jury Charge) (Geddes, Elizabeth) (Entered: 07/02/2021) |
| 07/03/2021 | 118 | RESPONSE to Motion re 116 MOTION for Bond (Leonard, Michael) (Entered: 07/03/2021) |
| 07/05/2021 | 119 | STATUS REPORT *Request* by Robert Sylvester Kelly (Cannick, Devereaux) (Entered: 07/05/2021) |
| 07/06/2021 | | SCHEDULING ORDER as to Robert Sylvester Kelly. Status Conference set for 7/8/2021 at 2:00 p.m., in Courtroom 4G North. Ordered by Judge Ann M. Donnelly on 7/6/2021. (Greene, Donna) (Entered: 07/06/2021) |
| 07/06/2021 | 120 | RESPONSE in Opposition re 116 MOTION for Bond & *Motion for Adjournment of Trial* (Shihata, Nadia) (Entered: 07/06/2021) |
| 07/08/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Status Conference as to Robert Sylvester Kelly held on 7/8/2021. Appearances by AUSA Maria Cruz Melendez, AUSA Elizabeth Geddes, and AUSA Nadia Shihata. Steven Greenberg (Retained, present via telephone), Michael Leonard (Retained, present via telephone), Thomas Farinella (Retained), Nicole Blank Becker (Retained), and Devereaux Cannick (Retained) for defendant Kelly (present in custody). CJA Attorney Ilana Haramati present on standby.

Case called. Discussion held. For the reasons stated on the record the motion for bond is denied. Jury selection will take place on August 9th, and the openings and presentation of evidence will be on August 18th. The Curcio hearing is set to continue on 7/15/2021 at 2:00 p.m., in Courtroom 4G North. (Court Reporter Linda Marino.) (Greene, Donna) (Entered: 07/09/2021) |
| 07/09/2021 | | ORDER: The Curcio inquiry is set to continue on July 15, 2021 at 2 p.m. The parties are directed to coordinate to confirm Gloria Rodriguez's availability to attend via teleconference, and should inform the Court once they have confirmed, and no later than 5 p.m. on July 13, 2021. Ordered by Judge Ann M. Donnelly on 7/9/2021. (Greene, Donna) (Entered: 07/09/2021) |
| 07/10/2021 | 121 | MOTION in Limine *To Protect the Identities of Certain Charged Victim–Witnesses* by USA as to Robert Sylvester Kelly. (Cruz Melendez, Maria) (Entered: 07/10/2021) |
| 07/11/2021 | | RESCHEDULING ORDER as to Robert Sylvester Kelly. The Curcio Hearing set for 7/15/2021 at 2:00 p.m. will instead by held at 1:00 p.m., in Courtroom 4G North. Ordered by Judge Ann M. Donnelly on 7/11/2021. (Greene, Donna) (Entered: 07/11/2021) |
| 07/12/2021 | 122 | STATUS REPORT by Robert Sylvester Kelly (Cannick, Devereaux) (Entered: 07/12/2021) |
| 07/12/2021 | 124 | ORDER: The Court directs Metropolitan Detention Center ("MDC") to ensure that the defendant is able to meet with his counsel in a private room at MDC. MDC will ensure that these meetings can take place as frequently as the defendant and his counsel request, and for the duration that the defendant and his counsel request, within MDC's normal visiting hours. Defense counsel is directed to inform the Court without delay if they face difficulties booking or having client visits. Ordered by Judge Ann M. Donnelly on 7/12/2021. (Greene, Donna) (Entered: 07/13/2021) |
| 07/13/2021 | 123 | Letter *in response to the defendant's request for an Order as to the Brooklyn MDC* as to Robert Sylvester Kelly (Geddes, Elizabeth) (Entered: 07/13/2021) |
| 07/13/2021 | 125 | Letter *6–16–21 previously provided to Court* as to Robert Sylvester Kelly (Leonard, Michael) (Entered: 07/13/2021) |
| 07/14/2021 | 126 | Letter *in Response to Government's Supplemental Letter Supporting Motion for Curcio Hearing* as to Robert Sylvester Kelly (Becker, Nicole) (Entered: 07/14/2021) |

| 07/14/2021 | 127 | Letter *filed under seal dated 7/14/21 re Lists of Persons, Organizations, and Places* as to Robert Sylvester Kelly (Attachments: # 1 Exhibit Lists of Persons, Organizations, and Places) (Shihata, Nadia) (Entered: 07/14/2021) |
| 07/15/2021 | 128 | STATUS REPORT by Robert Sylvester Kelly (Cannick, Devereaux) (Entered: 07/15/2021) |
| 07/15/2021 | 129 | LIMITED UNSEALING ORDER: That the government may furnish copies of the 21 MJ 814 Affidavit to defense counsel in the above–captioned matter. Ordered by Judge Ann M. Donnelly on 7/15/2021. (Greene, Donna) (Entered: 07/15/2021) |
| 07/15/2021 | 130 | NOTICE OF ATTORNEY APPEARANCE: Calvin Harold Scholar appearing for Robert Sylvester Kelly (Scholar, Calvin) (Entered: 07/15/2021) |
| 07/15/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Curcio Hearing scheduled for 7/15/2021 held. Appearances by AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Steven Greenberg (Retained, present via telephone), Michael Leonard (Retained, present via telephone), Thomas Farinella (Retained), Nicole Blank Becker (Retained), and Devereaux Cannick (Retained) for defendant Kelly (present in custody). CJA Attorney Ilana Haramati present on standby. |
| | | Case called. Discussion held. CJA Counsel Ilana Haramati relieved with the thanks of the Court. Mr. Greenberg and Mr. Leonard's motion to withdraw is granted. After being advised of the potential conflicts and consequences that could arise from his present representation by attorney Nicole Blank Becker, the defendant affirmed on the record his decision to continue with his current counsel. The final pretrial conference set for 8/2/2021 is reset for 8/6/2021 at 11:00 a.m. in Courtroom 4G North.(Court Reporter Sophie Nolan.) (Greene, Donna) (Entered: 07/16/2021) |
| 07/19/2021 | 131 | Letter *Requesting Extension to File Motions In Limine* as to Robert Sylvester Kelly (Farinella, Thomas) (Entered: 07/19/2021) |
| 07/19/2021 | | SCHEDULING ORDER: The requested extension is granted. Motions in Limine are due by July 23, 2021. Oppositions are due by July 30, 2021. No further extension will be granted without good cause shown. Any future extension request should comply with the Court's Individual Practices and Rules, 2.F. Signed by Judge Ann M. Donnelly on 7/19/2021. (Lawoyin, Feyilana) (Entered: 07/19/2021) |
| 07/22/2021 | 132 | Letter *Filed By American Broadcasting Companies, Inc., The Associated Press, Buzzfeed News, CBS Broadcasting Inc., Cable News Network, The Daily Beast, Dow Jones & Company, NBCUniversal, The New York Times Company, NYP Holdings, Inc., Vox Media LLC, The Washington Post* as to Robert Sylvester Kelly (Strom, Rachel) (Entered: 07/22/2021) |
| 07/23/2021 | 133 | MOTION in Limine *to Admit Uncharged Acts* by USA as to Robert Sylvester Kelly. (Shihata, Nadia) (Entered: 07/23/2021) |
| 07/23/2021 | 134 | Letter *dated 7/23/2021 re Expert Disclosure* as to Robert Sylvester Kelly (Shihata, Nadia) (Entered: 07/23/2021) |
| 07/23/2021 | 135 | MOTION in Limine *to admit certain evidence and preclude other evidence* by USA as to Robert Sylvester Kelly. (Attachments: # 1 Exhibit Exhibit A (Proposed Text Messages by Employee #1 and Employee #2)) (Geddes, Elizabeth) (Attachment 1 replaced on 7/26/2021) (Greene, Donna). (Entered: 07/23/2021) |
| 07/23/2021 | 136 | MOTION in Limine *to admit certain evidence and preclude certain evidence (publicly–filed version with redactions)* by USA as to Robert Sylvester Kelly. (Attachments: # 1 Exhibit Exhibit A (Proposed Text Messages by Employee #1 and Employee #2)) (Geddes, Elizabeth) (Attachment 1 replaced on 7/26/2021) (Greene, Donna). (Entered: 07/23/2021) |
| 07/23/2021 | 137 | MOTION in Limine by Robert Sylvester Kelly. (Cannick, Devereaux) (Entered: 07/23/2021) |
| 07/23/2021 | 138 | Letter *dated 7/23/2021 Re: Expert Disclosure* as to Robert Sylvester Kelly (Becker, Nicole) (Entered: 07/24/2021) |

| 07/25/2021 | 139 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on July 15, 2021, before Judge Donnelly. Court Reporter/Transcriber Sophie Nolan, Telephone number 718–613–2622. Email address: NolanEDNY@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 8/16/2021. Redacted Transcript Deadline set for 8/25/2021. Release of Transcript Restriction set for 10/25/2021. (Nolan, Sophie) Modified on 12/21/2021 (Marziliano, August). (Entered: 07/25/2021) |
|---|---|---|
| 07/28/2021 | 140 | **MEMORANDUM** re 132 Letter *Filed By American Broadcasting Companies, Inc., The Associated Press, Buzzfeed News, CBS Broadcasting Inc., Cable News Network, The Daily Beast, Dow Jones & Company, NBCUniversal, The New York Times Company, NYP Holdings, Inc., Vox Media LLC, The Washington Post.* **SEE ATTACHED ORDER.** Ordered by Judge Ann M. Donnelly on 7/28/2021. (Greene, Donna) (Entered: 07/28/2021) |
| 07/29/2021 | 141 | Letter *Motion to Judge* as to Robert Sylvester Kelly (Becker, Nicole) (Entered: 07/29/2021) |
| 07/29/2021 | | RESCHEDULING ORDER as to Robert Sylvester Kelly. The final pretrial conference set for 8/6/2021 at 11:00 a.m. is reset for 8/3/2021 at 11:00 a.m., in Courtroom 4G North. Ordered by Judge Ann M. Donnelly on 7/29/2021. (Greene, Donna) (Entered: 07/29/2021) |
| 07/30/2021 | 143 | REPLY TO RESPONSE to Motion re 121 MOTION in Limine *To Protect the Identities of Certain Charged Victim–Witnesses* (Geddes, Elizabeth) (Entered: 07/30/2021) |
| 07/30/2021 | 144 | Letter *Motion to Judge* as to Robert Sylvester Kelly (Attachments: # 1 Exhibit A) (Cannick, Devereaux) (Entered: 07/30/2021) |
| 07/30/2021 | 145 | MEMORANDUM in Opposition re 135 MOTION in Limine *to admit certain evidence and preclude other evidence*, 136 MOTION in Limine *to admit certain evidence and preclude certain evidence (publicly–filed version with redactions)* (Farinella, Thomas) (Entered: 07/31/2021) |
| 07/31/2021 | 146 | MEMORANDUM in Opposition re 133 MOTION in Limine *to Admit Uncharged Acts* (Farinella, Thomas) (Entered: 07/31/2021) |
| 08/02/2021 | 147 | Letter *to Judge* as to Robert Sylvester Kelly (Becker, Nicole) (Entered: 08/02/2021) |
| 08/02/2021 | | ORDER: No later than August 4, 2021, the parties are to provide the Court with their list of jurors who are acceptable to both sides and jurors whom both sides believe should be excused. Ordered by Judge Ann M. Donnelly on 8/2/2021. (Greene, Donna) (Entered: 08/02/2021) |
| 08/02/2021 | 148 | REPLY TO RESPONSE to Motion re 133 MOTION in Limine *to Admit Uncharged Acts* (Geddes, Elizabeth) (Entered: 08/02/2021) |
| 08/02/2021 | 149 | REPLY TO RESPONSE to Motion re 135 MOTION in Limine *to admit certain evidence and preclude other evidence FILED UNDER SEAL* (Shihata, Nadia) (Entered: 08/02/2021) |
| 08/02/2021 | 150 | REPLY TO RESPONSE to Motion re 135 MOTION in Limine *to admit certain evidence and preclude other evidence PUBLIC REDACTED VERSION* (Shihata, Nadia) (Entered: 08/02/2021) |
| 08/03/2021 | 151 | MEMORANDUM in Opposition re 135 MOTION in Limine *to admit certain evidence and preclude other evidence* (Scholar, Calvin) (Entered: 08/03/2021) |
| 08/03/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Final Pretrial Conference as to Robert Sylvester Kelly held on 8/3/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained, via telephone) for defendant Kelly (present in custody) |

| | | Case called. Discussion held. The Court ruled on the parties motions *in limine* in part, and reserved decision on certain requests subject to additional letter briefing by the parties. The defendant must file a letter on the outstanding evidentiary requests by 8/6/2021. The governments response is due 8/9/2021. The defendants reply, if any, is due 8/10/2021. (Court Reporter Georgette Betts.) (Greene, Donna) (Entered: 08/04/2021) |
|---|---|---|
| 08/04/2021 | | ORDER: By 5 p.m. on August 5, 2021, the parties should provide the Court with a list of additional questions they would like the Court to ask prospective jurors during *voir dire* . Ordered by Judge Ann M. Donnelly on 8/4/2021. (Greene, Donna) (Entered: 08/04/2021) |
| 08/04/2021 | 152 | Letter *regarding "for cause" challenges to the venire* as to Robert Sylvester Kelly (Geddes, Elizabeth) (Entered: 08/04/2021) |
| 08/05/2021 | 153 | Letter as to Robert Sylvester Kelly, TRANSCRIPT REQUEST by Robert Sylvester Kelly (Scholar, Calvin) (Entered: 08/05/2021) |
| 08/05/2021 | 154 | Letter *Dated August 5, 2021, Regarding the Government's Proposed Additional Questions to Potential Jurors* as to Robert Sylvester Kelly (Cruz Melendez, Maria) (Entered: 08/05/2021) |
| 08/05/2021 | 155 | Letter as to Robert Sylvester Kelly (Farinella, Thomas) (Entered: 08/05/2021) |
| 08/05/2021 | | ORDER: The request for CJA Funds for Transcripts is granted. Ordered by Judge Ann M. Donnelly on 8/5/2021. (Greene, Donna) (Entered: 08/05/2021) |
| 08/06/2021 | 156 | RESPONSE in Opposition re 133 MOTION in Limine *to Admit Uncharged Acts* (Farinella, Thomas) (Entered: 08/06/2021) |
| 08/06/2021 | 157 | Letter *Dated August 6, 2021, Updating the Court Regarding the Parties' Challenges for Cause Concerning Potential Jurors* as to Robert Sylvester Kelly (Attachments: # 1 Exhibit Attachments B and C) (Cruz Melendez, Maria) (Entered: 08/06/2021) |
| 08/09/2021 | 158 | Letter as to Robert Sylvester Kelly (Scholar, Calvin) (Entered: 08/09/2021) |
| 08/09/2021 | 159 | MOTION to Dismiss by Robert Sylvester Kelly. (Attachments: # 1 Exhibit A) (Farinella, Thomas) (Entered: 08/09/2021) |
| 08/09/2021 | 160 | Letter *providing additional proposed questions to the venire* as to Robert Sylvester Kelly (Geddes, Elizabeth) (Entered: 08/09/2021) |
| 08/09/2021 | 162 | REPLY TO RESPONSE to Motion re 133 MOTION in Limine *to Admit Uncharged Acts* (Geddes, Elizabeth) (Entered: 08/09/2021) |
| 08/09/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly:Jury Selection as to Robert Sylvester Kelly held on 8/9/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present in custody). Case called. Jury selection held and continued to 8/10/2021 at 9:30 a.m. in Courtroom 2E North. (Court Reporter Linda Danelczyk.) (Greene, Donna) (Entered: 08/11/2021) |
| 08/10/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Selection as to Robert Sylvester Kelly held on 8/10/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present in custody). Case called. Jury selection held and continued to 8/11/2021 at 9:30 AM in Courtroom 2E North. (Court Reporter Linda Danelczyk.) (Greene, Donna) (Entered: 08/11/2021) |
| 08/11/2021 | 164 | RESPONSE in Opposition re 133 MOTION in Limine *to Admit Uncharged Acts* (Farinella, Thomas) (Entered: 08/11/2021) |
| 08/11/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Selection as to Robert Sylvester Kelly held on 8/11/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present in custody). Case called. Jury selection |

| | | held and completed. Jury empaneled. Trial set for 8/18/2021 at 9:30 a.m., in Courtroom 4G North. (Court Reporter Linda Danelczyk.) (Greene, Donna) (Entered: 08/12/2021) |
|---|---|---|
| 08/12/2021 | 166 | Order of Sustenance. Ordered by Judge Ann M. Donnelly on 8/9/2021. (Greene, Donna) (Entered: 08/12/2021) |
| 08/12/2021 | 167 | Order of Sustenance. Ordered by Judge Ann M. Donnelly on 8/10/2021. (Greene, Donna) (Entered: 08/12/2021) |
| 08/13/2021 | 168 | RESPONSE in Opposition re 159 MOTION to Dismiss *by USA* (Shihata, Nadia) (Entered: 08/13/2021) |
| 08/13/2021 | | SCHEDULING ORDER: The Court has received the government's 168 opposition to the defendant's 159 motion to dismiss. The defendant must file a reply, if any, by August 16, 2021. Signed by Judge Ann M. Donnelly on 8/13/2021. (Lawoyin, Feyilana) (Entered: 08/13/2021) |
| 08/16/2021 | 169 | REPLY TO RESPONSE to Motion re 159 MOTION to Dismiss (Farinella, Thomas) (Entered: 08/16/2021) |
| 08/17/2021 | 170 | MOTION for Leave to File Document *Letter Motion Requesting Use of a Printer During Trial by Defense* by Robert Sylvester Kelly. (Scholar, Calvin) (Entered: 08/17/2021) |
| 08/17/2021 | 171 | REPLY TO RESPONSE to Motion re 159 MOTION to Dismiss − *Amended Reply* (Farinella, Thomas) (Entered: 08/17/2021) |
| 08/18/2021 | | ORDER: The 170 request is granted. Ordered by Judge Ann M. Donnelly on 8/18/2021. (Lawoyin, Feyilana) (Entered: 08/18/2021) |
| 08/18/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Trial as to Robert Sylvester Kelly held on 8/18/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present in custody). Opening statements made. Witness sworn and testified. Exhibits marked and entered into evidence. Jury trial continued to 8/19/2021 at 9:30 a.m., in Courtroom 4G North. (Court Reporter Stacy Mace.) (Greene, Donna) (Entered: 08/18/2021) |
| 08/18/2021 | 173 | Order of Sustenance as to Robert Sylvester Kelly. Ordered by Judge Ann M. Donnelly on 8/18/2021. (Greene, Donna) (Entered: 08/18/2021) |
| 08/19/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Trial as to Robert Sylvester Kelly held on 8/19/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present in custody). Witnesses sworn and testified. Exhibits marked and entered into evidence. Alternate juror number 3 excused with the thanks of the Court. Jury trial continued to 8/20/2021 at 9:30 a.m., in Courtroom 4G North. (Court Reporter Stacy Mace.) (Greene, Donna) (Entered: 08/20/2021) |
| 08/19/2021 | 174 | Order of Sustenance as to Robert Sylvester Kelly. Ordered by Judge Ann M. Donnelly on 8/19/2021. (Greene, Donna) (Entered: 08/20/2021) |
| 08/20/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Trial as to Robert Sylvester Kelly held on 8/20/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present in custody). Witnesses sworn and testified. Exhibits marked and entered into evidence. Jury trial continued to 8/23/2021 at 9:30 a.m., in Courtroom 4G North. (Court Reporter Stacy Mace.) (Greene, Donna) (Entered: 08/23/2021) |
| 08/20/2021 | 177 | Order of Sustenance. Ordered by Judge Ann M. Donnelly on 8/20/2021. (Greene, Donna) (Entered: 08/23/2021) |

A 25

| 08/23/2021 | 176 | Letter *in response to Government's request re: Jane Doe #5* as to Robert Sylvester Kelly (Scholar, Calvin) (Entered: 08/23/2021) |
|---|---|---|
| 08/23/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Trial as to Robert Sylvester Kelly held on 8/23/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present in custody). Witnesses sworn and testified. Exhibits marked and entered into evidence. Jury trial continued to 8/24/2021 at 9:30 a.m., in Courtroom 4G North. (Court Reporter Charleane Heading.) (Greene, Donna) (Entered: 08/23/2021) |
| 08/23/2021 | 178 | Order of Sustenance. Ordered by Judge Ann M. Donnelly on 8/23/2021. (Greene, Donna) (Entered: 08/23/2021) |
| 08/24/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Trial as to Robert Sylvester Kelly held on 8/24/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present in custody). Witness testimony continued. Exhibits marked and entered into evidence. Jury trial continued to 8/25/2021 at 9:30 a.m., in Courtroom 4G North. (Court Reporter Charleane Heading.) (Greene, Donna) (Entered: 08/24/2021) |
| 08/25/2021 | 179 | Order of Sustenance. Ordered by Judge Ann M. Donnelly on 8/24/2021. (Greene, Donna) (Entered: 08/25/2021) |
| 08/25/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Trial as to Robert Sylvester Kelly held on 8/25/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present in custody). Witnesses sworn and testified. Exhibits marked and entered into evidence. Jury trial continued to 8/26/2021 at 9:30 a.m., in Courtroom 4G North. (Court Reporter Charleane Heading.) (Greene, Donna) (Entered: 08/25/2021) |
| 08/25/2021 | 181 | Order of Sustenance. Ordered by Judge Ann M. Donnelly on 8/25/2021. (Greene, Donna) (Entered: 08/26/2021) |
| 08/26/2021 | 180 | MOTION in Limine by Robert Sylvester Kelly. (Attachments: # 1 Exhibit A) (Scholar, Calvin) (Entered: 08/26/2021) |
| 08/26/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Trial as to Robert Sylvester Kelly held on 8/26/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present in custody). Witnesses sworn and testified. Exhibits marked and entered into evidence. Jury trial continued to 8/30/2021 at 9:30 a.m., in Courtroom 4G North. (Court Reporter Charleane Heading.) (Greene, Donna) (Entered: 08/26/2021) |
| 08/26/2021 | 182 | Order of Sustenance. Ordered by Judge Ann M. Donnelly on 8/26/2021. (Greene, Donna) (Entered: 08/26/2021) |
| 08/27/2021 | 183 | MOTION in Limine *to preclude certain avenues of cross examination of Jane Doe #11* by USA as to Robert Sylvester Kelly. (Geddes, Elizabeth) (Entered: 08/27/2021) |
| 08/27/2021 | | SCHEDULING ORDER: The Court has received the government's motion *in limine*. The defendant should submit a response, under seal, by August 29, 2021 at 5:00 p.m. Signed by Judge Ann M. Donnelly on 8/27/2021. (Lawoyin, Feyilana) (Entered: 08/27/2021) |
| 08/30/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Trial as to Robert Sylvester Kelly held on 8/30/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present in custody). Witnesses sworn and testified. Exhibits marked and entered into evidence. Jury Trial continued to for |

| | | |
|---|---|---|
| | | 8/31/2021 at 9:30 a.m., in Courtroom 4G North. (Court Reporter Andronikh Barna.) (Greene, Donna) (Entered: 08/30/2021) |
| 08/30/2021 | 184 | MOTION in Limine *re Jane Doe #6* by USA as to Robert Sylvester Kelly. (Shihata, Nadia) (Entered: 08/30/2021) |
| 08/30/2021 | 186 | Order of Sustenance. Ordered by Judge Ann M. Donnelly on 8/30/2021. (Greene, Donna) (Entered: 08/31/2021) |
| 08/31/2021 | 185 | MOTION for Leave to File Document *Request that the Bureau of Prisons provide Mr. Kelly with his Legal Documents* by Robert Sylvester Kelly. (Scholar, Calvin) (Entered: 08/31/2021) |
| 08/31/2021 | | ORDER as to Robert Sylvester Kelly(1). The requested that the Court Order that the BOP and U.S. Marshals provide Mr. Kelly his legal mail and documents from MCC Chicago is granted. Ordered by Judge Ann M. Donnelly on 8/31/2021. (Greene, Donna) (Entered: 08/31/2021) |
| 08/31/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Trial as to Robert Sylvester Kelly held on 8/31/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present in custody). Witnesses sworn and testified. Exhibits marked and entered into evidence. Jury trial continued to 9/1/2021 at 9:30 a.m., in Courtroom 4G North. (Court Reporter Andronikh Barna.) (Greene, Donna) (Entered: 08/31/2021) |
| 08/31/2021 | 188 | Order of Sustenance. Ordered by Judge Ann M. Donnelly on 8/31/2021. (Greene, Donna) (Entered: 08/31/2021) |
| 09/01/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Trial as to Robert Sylvester Kelly held on 9/1/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present in custody). Witnesses sworn and testified. Exhibits marked and entered into evidence. Jury trial continued to 9/2/2021 at 9:30 a.m., in Courtroom 4G North. (Court Reporter Andronikh Barna.) (Greene, Donna) (Entered: 09/01/2021) |
| 09/01/2021 | 189 | Order of Sustenance. Ordered by Judge Ann M. Donnelly on 9/1/2021. (Greene, Donna) (Entered: 09/01/2021) |
| 09/02/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Trial as to Robert Sylvester Kelly held on 9/2/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present in custody). Witnesses sworn and testified. Exhibits marked and entered into evidence. Jury trial continued to 9/3/2021 at 9:30 a.m., in Courtroom 4G North. (Court Reporter Andronikh Barna.) (Greene, Donna) (Entered: 09/02/2021) |
| 09/03/2021 | 190 | MOTION in Limine by Robert Sylvester Kelly. (Scholar, Calvin) (Entered: 09/03/2021) |
| 09/03/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Trial as to Robert Sylvester Kelly held on 9/3/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present in custody). Witnesses sworn and testified. Exhibits marked and entered into evidence. Jury trial continued to 9/9/2021 at 9:30 a.m., in Courtroom 4G North. (Court Reporter Andronikh Barna.) (Greene, Donna) (Entered: 09/03/2021) |
| 09/03/2021 | 191 | Letter *Filed By Victoria Bekiempis and Guardian News and Media LLC* as to Robert Sylvester Kelly (Murray, Heather) (Entered: 09/03/2021) |
| 09/04/2021 | 192 | MOTION in Limine *re Jane Doe #7* by USA as to Robert Sylvester Kelly. (Shihata, Nadia) (Entered: 09/04/2021) |

| 09/07/2021 | 193 | Order of Sustenance. Ordered by Judge Ann M. Donnelly on 9/2/2021. (Greene, Donna) (Entered: 09/07/2021) |
|---|---|---|
| 09/07/2021 | 194 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on August 23, 2021, before Judge Donnelly. Court Reporter/Transcriber Charlene M. Heading, Telephone number 718−613−2643. Email address: cheading@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 9/28/2021. Redacted Transcript Deadline set for 10/8/2021. Release of Transcript Restriction set for 12/6/2021. (Heading, Charleane) (Main Document 194 replaced on 12/2/2021) (Fernandez, Erica). (Entered: 09/07/2021) |
| 09/07/2021 | 195 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on August 24, 2021, before Judge Donnelly. Court Reporter/Transcriber Charlene M. Heading, Telephone number 718−613−2643. Email address: cheading@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 9/28/2021. Redacted Transcript Deadline set for 10/8/2021. Release of Transcript Restriction set for 12/6/2021. (Heading, Charleane) (Main Document 195 replaced on 12/2/2021) (Fernandez, Erica). (Entered: 09/07/2021) |
| 09/07/2021 | 196 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on August 25, 2021, before Judge Donnelly. Court Reporter/Transcriber Charleane M. Heading, Telephone number 718−613−2643. Email address: cheading@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 9/28/2021. Redacted Transcript Deadline set for 10/8/2021. Release of Transcript Restriction set for 12/6/2021. (Heading, Charleane) (Main Document 196 replaced on 12/2/2021) (Fernandez, Erica). (Entered: 09/07/2021) |
| 09/07/2021 | 197 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on August 26, 2021, before Judge Donnelly. Court Reporter/Transcriber Charleane M. Heading, Telephone number 718−613−2643. Email address: cheading@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 9/28/2021. Redacted Transcript Deadline set for 10/8/2021. Release of Transcript Restriction set for 12/6/2021. (Heading, Charleane) (Main Document 197 replaced on 12/2/2021) (Fernandez, Erica). (Entered: 09/07/2021) |
| 09/08/2021 | 202 | RESPONSE to Motion re 192 MOTION in Limine *re Jane Doe #7* (Scholar, Calvin) (Entered: 09/08/2021) |
| 09/08/2021 | 203 | MOTION in Limine by Robert Sylvester Kelly. (Scholar, Calvin) (Entered: 09/08/2021) |
| 09/08/2021 | 204 | RESPONSE in Opposition re 203 MOTION in Limine *to preclude certain recordings* (Geddes, Elizabeth) (Entered: 09/08/2021) |
| 09/09/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Trial as to Robert Sylvester Kelly held on 9/9/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present in custody). Witnesses sworn and testified. Exhibits marked and entered into evidence. Jury trial continued to 9/10/2021 at 9:30 a.m., in Courtroom 4G North. (Court Reporter Linda Marino.) (Greene, Donna) |

| | | (Entered: 09/09/2021) |
|---|---|---|
| 09/10/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Trial as to Robert Sylvester Kelly held on 9/10/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present in custody). Witnesses sworn and testified. Exhibits marked and entered into evidence. Jury trial continued to 9/13/2021 at 12:00 p.m., in Courtroom 4G North. (Court Reporter Linda Marino.) (Greene, Donna) (Entered: 09/10/2021) |
| 09/13/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Trial as to Robert Sylvester Kelly held on 9/13/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present in custody). Witnesses sworn and testified. Exhibits marked and entered into evidence. Jury rial continued to 9/14/2021 at 9:30 a.m., in Courtroom 4G North.(Court Reporter Sophie Nolan.) (Greene, Donna) (Entered: 09/13/2021) |
| 09/14/2021 | 205 | MOTION in Limine by Robert Sylvester Kelly. (Scholar, Calvin) (Entered: 09/14/2021) |
| 09/14/2021 | 206 | MOTION in Limine *to admit GX 484 and GX 485* by USA as to Robert Sylvester Kelly. (Geddes, Elizabeth) (Entered: 09/14/2021) |
| 09/14/2021 | 207 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on 8/30/2021, before Judge Ann M. Donnelly. Court Reporter/Transcriber Andronikh Barna, Telephone number 7186132178. Email address: ambarna.crr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 10/5/2021. Redacted Transcript Deadline set for 10/15/2021. Release of Transcript Restriction set for 12/13/2021. (Barna, Andronikh) (Entered: 09/14/2021) |
| 09/14/2021 | 208 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on 8/31/2021, before Judge Ann M. Donnelly. Court Reporter/Transcriber Andronikh Barna, Telephone number 718–613–2178. Email address: ambarna.crr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 10/5/2021. Redacted Transcript Deadline set for 10/15/2021. Release of Transcript Restriction set for 12/13/2021. (Barna, Andronikh) (Entered: 09/14/2021) |
| 09/14/2021 | 209 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on 9/1/2021, before Judge Ann M. Donnelly. Court Reporter/Transcriber Andronikh Barna, Telephone number 718–613–2178. Email address: ambarna.crr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 10/5/2021. Redacted Transcript Deadline set for 10/15/2021. Release of Transcript Restriction set for 12/13/2021. (Barna, Andronikh) (Entered: 09/14/2021) |
| 09/14/2021 | 210 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on 9/2/2021, before Judge Ann M. Donnelly. Court Reporter/Transcriber Andronikh Barna, Telephone number 718–613–2178. Email address: ambarna.crr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 10/5/2021. |

| | | |
|---|---|---|
| | | Redacted Transcript Deadline set for 10/15/2021. Release of Transcript Restriction set for 12/13/2021. (Barna, Andronikh) (Entered: 09/14/2021) |
| 09/14/2021 | 211 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on 9/3/2021, before Judge Ann M. Donnelly. Court Reporter/Transcriber Andronikh Barna, Telephone number 718–613–2178. Email address: ambarna.crr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 10/5/2021. Redacted Transcript Deadline set for 10/15/2021. Release of Transcript Restriction set for 12/13/2021. (Barna, Andronikh) (Entered: 09/14/2021) |
| 09/14/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Trial as to Robert Sylvester Kelly held on 9/14/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present in custody). Witnesses sworn and testified. Exhibits marked and entered into evidence. Jury trial continued to to 9/15/2021 at 9:30 a.m., in Courtroom 4G North.(Court Reporter Sophie Nolan.) (Greene, Donna) (Entered: 09/14/2021) |
| 09/14/2021 | 213 | Order of Sustenance. Ordered by Judge Ann M. Donnelly on 9/14/2021. (Greene, Donna) (Entered: 09/15/2021) |
| 09/15/2021 | 212 | Order of Sustenance. Ordered by Judge Ann M Donnelly on 9/13/2021. (Greene, Donna) (Entered: 09/15/2021) |
| 09/15/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Trial as to Robert Sylvester Kelly held on 9/15/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present in custody). Witnesses sworn and testified. Exhibits marked and entered into evidence. Jury trial continued to 9/17/2021 at 9:30 a.m., in Courtroom 4G North. (Court Reporter Sophie Nolan.) (Greene, Donna) (Entered: 09/15/2021) |
| 09/16/2021 | 218 | Order of Sustenance. Ordered by Judge Ann M. Donnelly on 9/15/2021. (Greene, Donna) (Entered: 09/16/2021) |
| 09/17/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Trial as to Robert Sylvester Kelly held on 9/17/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present in custody). Witnesses sworn and testified. Exhibits marked and entered into evidence. Jury trial continued to 9/20/2021 at 9:30 a.m.,M in Courtroom 4G North.(Court Reporter Sophie Nolan.) (Greene, Donna) (Entered: 09/17/2021) |
| 09/18/2021 | 219 | Proposed Jury Instructions/Verdict Form by Robert Sylvester Kelly (Scholar, Calvin) (Entered: 09/18/2021) |
| 09/19/2021 | 220 | Letter *re Defendant's Proposed Supplemental Jury Charge & Government's Proposed Clarifications/Amendments to Jury Charge* as to Robert Sylvester Kelly (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Shihata, Nadia) (Entered: 09/19/2021) |
| 09/19/2021 | 221 | Letter *Motion Dated September 19, 2021, Regarding Admission of Prior Sworn Statements Pursuant to F.R.E. 801(d)(1)(A)* as to Robert Sylvester Kelly (Attachments: # 1 Exhibit Exhibit A) (Cruz Melendez, Maria) (Entered: 09/19/2021) |
| 09/20/2021 | 222 | Order of Sustenance. Ordered by Judge Ann M. Donnelly on 9/17/2021. (Greene, Donna) (Entered: 09/20/2021) |
| 09/20/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Trial as to Robert Sylvester Kelly held on 9/20/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank |

A 30

| | | |
|---|---|---|
| | | Becker (Retained) for defendant Kelly (present in custody). Witnesses sworn and testified. Exhibits marked and entered into evidence. The Government rest. Jury trial continued to 9/21/2021 at 9:30 a.m., in Courtroom 4G North. (Court Reporter Michele Lucchese.) (Greene, Donna) (Entered: 09/20/2021) |
| 09/20/2021 | 223 | Letter *Filed with the Court on behalf of Press Organizations Requesting Access to Evidence* as to Robert Sylvester Kelly (Attachments: # 1 Attachment A) (Strom, Rachel) (Entered: 09/20/2021) |
| 09/20/2021 | 231 | Order of Sustenance. Ordered by Judge Ann M. Donnelly on 9/20/2021. (Greene, Donna) (Entered: 09/24/2021) |
| 09/21/2021 | 224 | Letter *dated 9/21/21 re Proposed Jury Charge* as to Robert Sylvester Kelly (Shihata, Nadia) (Entered: 09/21/2021) |
| 09/21/2021 | 225 | NOTICE *Expert Notice* as to Robert Sylvester Kelly (Attachments: # 1 Exhibit Dr. Resnick CV) (Scholar, Calvin) (Entered: 09/21/2021) |
| 09/21/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Trial as to Robert Sylvester Kelly held on 9/21/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present, in custody). Witnesses sworn and testified. Exhibit marked and entered into evidence. Jury trial continued to 9/22/2021 at 9:30 a.m., in Courtroom 4G North. (Court Reporter Georgette Betts.) (Greene, Donna) (Entered: 09/21/2021) |
| 09/21/2021 | 232 | Order of Sustenance. Ordered by Judge Ann M. Donnelly on 9/21/2021. (Greene, Donna) (Entered: 09/24/2021) |
| 09/22/2021 | 226 | Letter *Dated September 22, 2021, Submitted in Reply to Defendant's Response to the Government's Motion to Admit Certain Prior Sworn Statements Pursuant to Fed. R. Evidence 801(d)(1)(A)* as to Robert Sylvester Kelly (Cruz Melendez, Maria) (Entered: 09/22/2021) |
| 09/22/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Trial as to Robert Sylvester Kelly held on 9/22/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present in custody). Witness sworn and testified. Defense rests. Summations begun and continued to 9/23/2021. Jury trial continued to 9/23/2021 at 9:30 a.m., in Courtroom 4G North(Court Reporter Denis Parisi.) (Greene, Donna) (Entered: 09/22/2021) |
| 09/22/2021 | 228 | Letter *Regarding Proposed Supplemental Jury Charge Related to Cooperator Testimony and Grant of Immunity* as to Robert Sylvester Kelly (Cruz Melendez, Maria) (Entered: 09/22/2021) |
| 09/22/2021 | 229 | Letter *setting forth the government's opposition to the introduction of certain statements* as to Robert Sylvester Kelly (Geddes, Elizabeth) (Entered: 09/22/2021) |
| 09/22/2021 | 233 | Order of Sustenance. Ordered by Judge Ann M. Donnelly on 9/22/2021. (Greene, Donna) (Entered: 09/24/2021) |
| 09/23/2021 | 230 | Proposed Jury Instructions/Verdict Form by Robert Sylvester Kelly (Attachments: # 1 Exhibit Proposed Jury Instruction) (Scholar, Calvin) (Entered: 09/23/2021) |
| 09/23/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Trial as to Robert Sylvester Kelly held on 9/23/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present in custody). Summations heard and continued to 9/24/2021. Jury trial continued to 9/24/2021 9:30 a.m., in Courtroom 4G North. (Court Reporter Charleane Heading.) (Greene, Donna) (Entered: 09/23/2021) |
| 09/23/2021 | 234 | Order of Sustenance. Ordered by Judge Ann M. Donnelly on 9/23/2021. (Greene, Donna) (Entered: 09/24/2021) |

| | | |
|---|---|---|
| 09/24/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Trial as to Robert Sylvester Kelly held on 9/24/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), Calvin Scholar (Retained), and Nicole Blank Becker (Retained) for defendant Kelly (present in custody). Summations heard. Jury charged. U.S. Deputy Marshal sworn. Deliberation begun. Jury deliberation continued to 9/27/2021 at 9:30 a.m., in Courtroom 6G North. (Court Reporter Stacy Mace.) (Greene, Donna) (Entered: 09/24/2021) |
| 09/24/2021 | 235 | Order of Sustenance. Ordered by Judge Ann M. Donnelly on 9/24/2021. (Greene, Donna) (Entered: 09/29/2021) |
| 09/27/2021 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Jury Trial as to Robert Sylvester Kelly held on 9/27/2021. Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Devereaux Cannick (Retained), Thomas Farinella (Retained), and Calvin Scholar (Retained) for defendant Kelly (present, in custody). Deliberations continued and completed. Jury verdict reached. Jurors polled and excused with the thanks of the Court. The following motion scheduled is set: Defendant's motion due 11/1/2021; Government's response 11/22/2021; reply if any, 12/6/2021. Sentencing set for 5/4/2022 at 10:00 a.m., in Courtroom 4G North. (Court Reporter Avery Armstrong.) (Greene, Donna) (Entered: 09/27/2021) |
| 09/27/2021 | 236 | Order of Sustenance. Ordered by Judge Ann M. Donnelly on 9/27/2021. (Greene, Donna) (Entered: 09/29/2021) |
| 09/27/2021 | 237 | Jury Notes marked as court exhibit 3 – 6. (Greene, Donna) (Entered: 09/30/2021) |
| 09/27/2021 | 238 | JURY VERDICT as to Robert Sylvester Kelly (1). Guilty on Count 1sss,2sss,3sss,4sss,5sss,6sss,7sss,8sss, and 9sss. (Greene, Donna) (Entered: 09/30/2021) |
| 09/27/2021 | 303 | Jury Instructions marked Court Exhibit 1. (Greene, Donna) (Entered: 06/08/2022) |
| 10/04/2021 | 239 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on September 22, 2021, before Judge Donnelly. Court Reporter/Transcriber Denise Parisi, Telephone number 7186132605. Email address: deniseparisi72@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 10/25/2021. Redacted Transcript Deadline set for 11/4/2021. Release of Transcript Restriction set for 1/2/2022. (Parisi, Denise) (Entered: 10/04/2021) |
| 10/06/2021 | 240 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on 08–18–2021, before Judge AMD. Court Reporter/Transcriber Stacy Mace. Email address: smacerpr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 10/27/2021. Redacted Transcript Deadline set for 11/8/2021. Release of Transcript Restriction set for 1/4/2022. (Mace, Stacy) (Entered: 10/06/2021) |
| 10/06/2021 | 241 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on 08–19–2021, before Judge AMD. Court Reporter/Transcriber Stacy Mace. Email address: smacerpr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 10/27/2021. Redacted Transcript Deadline set for 11/8/2021. Release of Transcript Restriction set for 1/4/2022. (Mace, Stacy) (Entered: 10/06/2021) |
| 10/06/2021 | 242 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on 08–20–2021, before Judge AMD. Court Reporter/Transcriber Stacy Mace. Email address: smacerpr@gmail.com. Transcript may be viewed at the |

| | | |
|---|---|---|
| | | court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 10/27/2021. Redacted Transcript Deadline set for 11/8/2021. Release of Transcript Restriction set for 1/4/2022. (Mace, Stacy) (Entered: 10/06/2021) |
| 10/06/2021 | 243 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on 09–24–2021, before Judge AMD. Court Reporter/Transcriber Stacy Mace. Email address: smacerpr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 10/27/2021. Redacted Transcript Deadline set for 11/8/2021. Release of Transcript Restriction set for 1/4/2022. (Mace, Stacy) (Entered: 10/06/2021) |
| 10/07/2021 | 244 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on September 23, 2021, before Judge Donnelly. Court Reporter/Transcriber Charleane M. Heading, Telephone number 718–613–2643. Email address: cheading@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 10/28/2021. Redacted Transcript Deadline set for 11/8/2021. Release of Transcript Restriction set for 1/5/2022. (Heading, Charleane) (Entered: 10/07/2021) |
| 10/11/2021 | 245 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on 09/09/2021, before Judge Ann M. Donnelly. Court Reporter/Transcriber Michele Lucchese, Telephone number 718–613–2272. Email address: MLuccheseEDNY@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 11/1/2021. Redacted Transcript Deadline set for 11/11/2021. Release of Transcript Restriction set for 1/9/2022. (Lucchese, Michele) (Entered: 10/11/2021) |
| 10/11/2021 | 246 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on 09/10/2021, before Judge Ann M. Donnelly. Court Reporter/Transcriber Michele Lucchese, Telephone number 718–613–2272. Email address: MLuccheseEDNY@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 11/1/2021. Redacted Transcript Deadline set for 11/11/2021. Release of Transcript Restriction set for 1/9/2022. (Lucchese, Michele) (Entered: 10/11/2021) |
| 10/11/2021 | 247 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on 09/20/2021, before Judge Ann M. Donnelly. Court Reporter/Transcriber Michele Lucchese, Telephone number 718–613–2272. Email address: MLuccheseEDNY@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 11/1/2021. Redacted Transcript Deadline set for 11/11/2021. Release of Transcript Restriction set for 1/9/2022. (Lucchese, Michele) (Entered: 10/11/2021) |
| 10/12/2021 | 250 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on 9/17/2021, before Judge Ann M. Donnelly. Court Reporter/Transcriber Andronikh Barna, Telephone number 718–613–2178. Email address: ambarna.crr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for |

| | | |
|---|---|---|
| | | Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 11/2/2021. Redacted Transcript Deadline set for 11/12/2021. Release of Transcript Restriction set for 1/10/2022. (Barna, Andronikh) (Entered: 10/12/2021) |
| 10/26/2021 | 252 | MEMORANDUM DECISION AND ORDER. On August 18, 2021, the Court denied the defendant's 159 second motion to dismiss the indictment. This opinion sets forth the basis for that decision. Ordered by Judge Ann M. Donnelly on 10/26/2021. (Greene, Donna) (Entered: 10/26/2021) |
| 10/26/2021 | | ORDER finding as moot 227 , 183 , 184 , 190 , 203 , and 205 . Motions resolved on the record. Ordered by Judge Ann M. Donnelly on 10/26/2021. (Greene, Donna) (Entered: 10/26/2021) |
| 10/29/2021 | 253 | NOTICE OF ATTORNEY APPEARANCE: Jennifer Ann Bonjean appearing for Robert Sylvester Kelly (Bonjean, Jennifer) (Entered: 10/29/2021) |
| 10/29/2021 | 254 | First MOTION for Extension of Time to File *post−trial motions* by Robert Sylvester Kelly. (Bonjean, Jennifer) (Entered: 10/29/2021) |
| 10/29/2021 | | ORDER granting 254 Motion for Extension of Time to File. The defendant's post−trial motion is due by January 4, 2022. The government's response is due by January 25, 2022. The defendant's reply, if any, is due by February 8, 2022.Ordered by Judge Ann M. Donnelly on 10/29/2021. (Lawoyin, Feyilana) (Entered: 10/29/2021) |
| 11/04/2021 | 255 | ORDER: At the final pretrial conference on August 3, 2021, and before opening arguments on August 18, 2021, the Court ruled on the government's pretrial motions in limine. The attached opinion explains the rationale for those rulings. Ordered by Judge Ann M. Donnelly on 11/4/2021. (Greene, Donna) (Entered: 11/04/2021) |
| 11/04/2021 | 256 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on 9/13/2021, before Judge Donnelly. Court Reporter/Transcriber Sophie Nolan, Telephone number 718−613−2622. Email address: NolanEDNY@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 11/25/2021. Redacted Transcript Deadline set for 12/6/2021. Release of Transcript Restriction set for 2/2/2022. (Nolan, Sophie) (Entered: 11/04/2021) |
| 11/04/2021 | 257 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on 9/14/2021, before Judge Donnelly. Court Reporter/Transcriber Sophie Nolan, Telephone number 718−613−2622. Email address: NolanEDNY@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 11/25/2021. Redacted Transcript Deadline set for 12/6/2021. Release of Transcript Restriction set for 2/2/2022. (Nolan, Sophie) (Entered: 11/04/2021) |
| 11/04/2021 | 258 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on 9/15/2021, before Judge Donnelly. Court Reporter/Transcriber Sophie Nolan, Telephone number 718−613−2622. Email address: NolanEDNY@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 11/25/2021. Redacted Transcript Deadline set for 12/6/2021. Release of Transcript Restriction set for 2/2/2022. (Nolan, Sophie) (Entered: 11/04/2021) |
| 12/07/2021 | 259 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on June 9, 2021, before Judge Donnelly. Court Reporter/Transcriber H. Driscoll, Telephone number 17186132274. Email address: |

| | | hdrisc@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 12/28/2021. Redacted Transcript Deadline set for 1/7/2022. Release of Transcript Restriction set for 3/7/2022. (Driscoll, Holly) (Entered: 12/07/2021) |
|---|---|---|
| 12/27/2021 | 260 | Second MOTION for Extension of Time to File *Post Trial Motions* by Robert Sylvester Kelly. (Bonjean, Jennifer) (Entered: 12/27/2021) |
| 12/29/2021 | | ORDER granting 260 Motion for Extension of Time to File. The defendant's post–trial motion is due by February 3, 2022. The government's response is due by February 24, 2022. The defendant's reply, if any, is due by March 10, 2022. Ordered by Judge Ann M. Donnelly on 12/29/2021. (Baer, Nicholas) (Entered: 12/29/2021) |
| 01/30/2022 | 261 | First MOTION to Withdraw as Attorney by Deveraux L. Cannick. by Robert Sylvester Kelly. (Cannick, Devereaux) (Entered: 01/30/2022) |
| 01/31/2022 | 262 | MOTION to Withdraw as Attorney by Calvin H. Scholar. by Robert Sylvester Kelly. (Scholar, Calvin) (Entered: 01/31/2022) |
| 01/31/2022 | | ORDER granting 261 Motion to Withdraw as Attorney. Devereaux Leon Cannick withdrawn from case as to Robert Sylvester Kelly (1). Ordered by Judge Ann M. Donnelly on 1/31/2022. (Greene, Donna) (Entered: 01/31/2022) |
| 01/31/2022 | | ORDER granting 262 Motion to Withdraw as Attorney. Calvin Harold Scholar withdrawn from case as to Robert Sylvester Kelly(1). Ordered by Judge Ann M. Donnelly on 1/31/2022. (Greene, Donna) (Entered: 01/31/2022) |
| 02/01/2022 | 263 | Third MOTION for Extension of Time to File *Post–Trial Motions* by Robert Sylvester Kelly. (Bonjean, Jennifer) (Entered: 02/01/2022) |
| 02/01/2022 | 264 | Letter MOTION for Extension of Time to File *Post–Trial Motions (Corrected)* by Robert Sylvester Kelly. (Bonjean, Jennifer) (Entered: 02/01/2022) |
| 02/01/2022 | | ORDER granting 264 Motion for Extension of Time to File as to Robert Sylvester Kelly (1). The defendant's post–trial motion is due by February 17, 2022. The government's response is due by March 10, 2022. The defendant's reply, if any, is due by March 24, 2022. Ordered by Judge Ann M. Donnelly on 2/1/2022. (Greene, Donna) (Entered: 02/01/2022) |
| 02/01/2022 | 265 | MOTION to Substitute Attorney *Nicole Blank Becker with Attorney Jennifer Bonjean* by Robert Sylvester Kelly. (Becker, Nicole) (Entered: 02/01/2022) |
| 02/01/2022 | 266 | MOTION to Substitute Attorney *Thomas A. Farinella with Attorney Jennifer Bonjean* by Robert Sylvester Kelly. (Farinella, Thomas) (Entered: 02/01/2022) |
| 02/01/2022 | | ORDER: The Court has received 265 266 both counsels motions to substitute counsel. Local Civil Rule 1.4 provides, An attorney who has appeared as attorney of record for a party may be relieved or displaced only by order of the Court and may not withdraw from a case without leave of the Court granted by order. Such an order may be granted only upon a showing by affidavit or otherwise of satisfactory reasons for withdrawal or displacement and the posture of the case, including its position, if any, on the calendar, and whether or not the attorney is asserting a retaining or charging lien. All applications to withdraw must be served upon the client and (unless excused by the Court) upon all other parties. Loc. Civ. R. 1.4. Counsel is directed to file a motion in accordance with Local Civil Rule 1.4. Ordered by Judge Ann M. Donnelly on 2/1/2022. (Greene, Donna) (Entered: 02/01/2022) |
| 02/01/2022 | 267 | MOTION to Withdraw as Attorney by Thomas A. Farinella. by Robert Sylvester Kelly. (Farinella, Thomas) (Entered: 02/01/2022) |
| 02/02/2022 | 268 | MOTION to Withdraw as Attorney *for Defendant Robert S. Kelly* by Nicole Blank Becker. by Robert Sylvester Kelly. (Becker, Nicole) (Entered: 02/02/2022) |
| 02/02/2022 | | ORDER granting 267 268 Motion to Withdraw as Attorney. Nicole Blank Becker and Thomas A. Farinella withdrawn from case as to Robert Sylvester Kelly (1). Ordered by Judge Ann M. Donnelly on 2/2/2022. (Greene, Donna) (Entered: 02/02/2022) |

| 02/17/2022 | 269 | MOTION for Acquittal by Robert Sylvester Kelly. (Attachments: # 1 Memorandum in Support) (Bonjean, Jennifer) (Entered: 02/17/2022) |
|---|---|---|
| 02/17/2022 | 270 | First MOTION for New Trial by Robert Sylvester Kelly. (Attachments: # 1 Memorandum in Support) (Bonjean, Jennifer) (Entered: 02/17/2022) |
| 02/17/2022 | 271 | MOTION for Extension of Time to File *Supplement to Rule 33 Motion* by Robert Sylvester Kelly. (Bonjean, Jennifer) (Entered: 02/17/2022) |
| 02/18/2022 |  | ORDER as to Robert Sylvester Kelly: The Court has received the defendant's Rule 29 and Rule 33 motions 269 270 , and the defendant's request for an additional 30 days to supplement his Rule 33 motion 271 . The defendant's submissions do not comply with my Individual Practices and Rules in two respects. First, the defendant's Rule 29 motion 269 is 56 pages long and no application for extra pages was made. Under my Individual Practices and Rules 4.C, "[u]nless prior permission has been granted, memoranda of law in support of or in opposition to motions are limited to 25 pages, double spaced," and "[r]equests to file memoranda exceeding the page limits must be made in writing five days prior to the due date[.]" The 269 motion is therefore denied without prejudice to refile in accordance with my Individual Practices and Rules. The defendant must refile the motion no later than February 28, 2022; the government's response is due by March 20, 2022; and the defendant's reply, if any, is due by April 4, 2022. Second, the defendant's 271 request for 30 days to supplement his Rule 33 motion, which I construe as an extension request, must state, among other things, the government's position on the request. The defendant's submission does not provide this information. I therefore deny the motion without prejudice to refile; any resubmission must state "Whether the adversary consents, and, if not, the reasons given by the adversary for refusing to consent." *See* Individual Practices and Rules 2.F. Ordered by Judge Ann M. Donnelly on 2/18/2022. (Baer, Nicholas) (Entered: 02/18/2022) |
| 02/19/2022 | 272 | Letter MOTION for Leave to File Excess Pages *Memorandum of Law In Support of Defendant's Rule 29 Motion* by Robert Sylvester Kelly. (Bonjean, Jennifer) (Entered: 02/19/2022) |
| 02/21/2022 |  | ORDER granting 272 Motion for Leave to File Excess Pages as to Robert Sylvester Kelly (1). Ordered by Judge Ann M. Donnelly on 2/21/2022. (Greene, Donna) (Entered: 02/21/2022) |
| 02/27/2022 | 273 | MOTION for Acquittal by Robert Sylvester Kelly. (Attachments: # 1 Memorandum in Support) (Bonjean, Jennifer) (Entered: 02/27/2022) |
| 02/27/2022 | 274 | Letter MOTION for Extension of Time to File *Supplemental Rule 33 Motion* by Robert Sylvester Kelly. (Bonjean, Jennifer) (Entered: 02/27/2022) |
| 03/01/2022 |  | ORDER granting 274 Motion for Extension of Time to File. The defendant's supplemental Rule 33 motion, if any, is due by March 21, 2022. No further extension will be granted. Ordered by Judge Ann M. Donnelly on 3/1/2022. (Dang, Michelle) (Entered: 03/01/2022) |
| 03/10/2022 |  | SCHEDULING ORDER as to Robert Sylvester Kelly. The Court has received the defendant's 273 motion for acquittal. The government's response is due by March 21, 2022, and the defendant's reply, if any, is due by April 4, 2022. Ordered by Judge Ann M. Donnelly on 3/10/2022. (Greene, Donna) (Entered: 03/10/2022) |
| 03/17/2022 | 275 | MOTION for Leave to File Excess Pages *In Response to the Defendant's Federal Rules of Criminal Procedure Rule 29 and Rule 33 Motions* by USA as to Robert Sylvester Kelly. (Cruz Melendez, Maria) (Entered: 03/17/2022) |
| 03/17/2022 |  | ORDER granting 275 Motion for Leave to File Excess Pages In Response to the Defendant's Federal Rules of Criminal Procedure Rule 29 and Rule 33 Motions by USA as to Robert Sylvester Kelly (1). Ordered by Judge Ann M. Donnelly on 3/17/2022. (Greene, Donna) (Entered: 03/17/2022) |
| 03/21/2022 | 276 | Supplemental MOTION for New Trial by Robert Sylvester Kelly. (Attachments: # 1 Memorandum in Support) (Bonjean, Jennifer) (Entered: 03/21/2022) |
| 03/21/2022 | 277 | RESPONSE in Opposition re 270 First MOTION for New Trial (Cruz Melendez, Maria) (Entered: 03/21/2022) |

| 03/21/2022 | 278 | RESPONSE in Opposition re 273 MOTION for Acquittal (Geddes, Elizabeth) (Entered: 03/21/2022) |
|---|---|---|
| 03/29/2022 | 279 | First MOTION to Continue Sentencing by Robert Sylvester Kelly. (Bonjean, Jennifer) (Entered: 03/29/2022) |
| 03/30/2022 | | SCHEDULING ORDER as to Robert Sylvester Kelly. The Court has received the defendant's 279 motion to continue sentencing. The government's response is due by April 4, 2022, and the defendant's reply, if any, is due by April 7, 2022. Ordered by Judge Ann M. Donnelly on 3/30/2022. (Greene, Donna) (Entered: 03/30/2022) |
| 04/03/2022 | 280 | MOTION for Leave to File Excess Pages *in Reply to Government's Response in Opposition to Defendant's Rule 29 Motion* by Robert Sylvester Kelly. (Bonjean, Jennifer) (Entered: 04/03/2022) |
| 04/04/2022 | | ORDER granting 280 Motion for Leave to File Excess Pages as to Robert Sylvester Kelly (1). Ordered by Judge Ann M. Donnelly on 4/4/2022. (Dang, Michelle) (Entered: 04/04/2022) |
| 04/04/2022 | 281 | RESPONSE in Opposition re 279 First MOTION to Continue Sentencing *by USA* (Shihata, Nadia) (Entered: 04/04/2022) |
| 04/04/2022 | 282 | REPLY TO RESPONSE to Motion re 273 MOTION for Acquittal (Bonjean, Jennifer) (Entered: 04/04/2022) |
| 04/04/2022 | 283 | REPLY TO RESPONSE to Motion re 270 First MOTION for New Trial (Attachments: # 1 Declaration Robert S. Kelly) (Bonjean, Jennifer) (Entered: 04/04/2022) |
| 04/05/2022 | | ORDER granting in part and denying in part 279 Motion to Continue Sentencing as to Robert Sylvester Kelly (1). The Court denies the application to adjourn the sentence until after the completion of the trial in the Northern District of Illinois, but because the Presentence Report was filed today, grants an adjournment until 6/16/2022 at 10:30 a.m., in Courtroom 4G North. Fed. R. Crim. P. 32(e)(1). The parties are reminded that any objections to the pre–sentence report are due by April 19, 2022. Fed. R. Crim. P. 32(f)(1). Ordered by Judge Ann M. Donnelly on 4/5/2022. (Greene, Donna) (Entered: 04/05/2022) |
| 04/05/2022 | 285 | Letter MOTION for Reconsideration re Order on Motion to Continue Sentencing,, by Robert Sylvester Kelly. (Bonjean, Jennifer) (Entered: 04/05/2022) |
| 04/05/2022 | | ORDER as to Robert Sylvester Kelly. The government is directed to respond to the defendant's 285 motion for reconsideration by April 7, 2022. Ordered by Judge Ann M. Donnelly on 4/5/2022. (Greene, Donna) (Entered: 04/05/2022) |
| 04/07/2022 | 286 | RESPONSE in Opposition re 285 Letter MOTION for Reconsideration re Order on Motion to Continue Sentencing,, *by USA* (Shihata, Nadia) (Entered: 04/07/2022) |
| 04/09/2022 | 287 | REPLY TO RESPONSE to Motion re 285 Letter MOTION for Reconsideration re Order on Motion to Continue Sentencing,, (Bonjean, Jennifer) (Entered: 04/09/2022) |
| 04/11/2022 | 288 | RESPONSE in Opposition re 276 Supplemental MOTION for New Trial (Attachments: # 1 Exhibit Exhibit A) (Geddes, Elizabeth) (Entered: 04/11/2022) |
| 04/13/2022 | | SCHEDULING ORDER as to Robert Sylvester Kelly. No later than April 20, 2022, the government is directed to file under seal the jury questionnaires completed by the prospective jurors who were ultimately selected as jurors, as well as those who were questioned and excused. Ordered by Judge Ann M. Donnelly on 4/13/2022. (Dang, Michelle) (Entered: 04/13/2022) |
| 04/14/2022 | 289 | ORDER as to Robert Sylvester Kelly (1). The defendant 285 motion for reconsideration is denied. Ordered by Judge Ann M. Donnelly on 4/14/2022. (Greene, Donna) (Entered: 04/14/2022) |
| 04/19/2022 | 290 | Letter *Filed Under Seal Regarding Juror Questionnaires Pursuant to the Court's April 13, 2022 Electronic Order* as to Robert Sylvester Kelly (Attachments: # 1 Questionnaires For Seated Jurors and Alternate Jurors, # 2 Questionnaires for Potential Jurors Who Were Questioned But Excused 1 of 2, # 3 Questionnaires for Potential Jurors Who Were Questioned But Excused 2 of 2) (Cruz Melendez, Maria) (Entered: |

| | | 04/19/2022) |
|---|---|---|
| 04/19/2022 | 291 | MOTION for Extension of Time to File *Objections to PSR* by Robert Sylvester Kelly. (Bonjean, Jennifer) (Entered: 04/19/2022) |
| 04/20/2022 | | ORDER granting 291 Motion for Extension of Time to File objections as to Robert Sylvester Kelly (1). Ordered by Judge Ann M. Donnelly on 4/20/2022. (Greene, Donna) (Entered: 04/20/2022) |
| 04/20/2022 | 292 | OBJECTION TO PRESENTENCE INVESTIGATION REPORT by Robert Sylvester Kelly (Bonjean, Jennifer) (Entered: 04/20/2022) |
| 04/21/2022 | 293 | Letter *Dated April 21, 2022, CORRECTING AND SUPPLANTING the Government's April 19, 2022 Letter Regarding Filing of Juror Questionnaires Pursuant to the Court's April 13, 2022 Order With Attachments* as to Robert Sylvester Kelly (Attachments: # 1 Exhibit Questionnaires For Seated Juror and Alternate Jurors, # 2 Exhibit Questionnaires for Potential Jurors That Were Questioned But Excused 1 of 2, # 3 Exhibit Questionnaires for Potential Jurors That Were Questioned But Excused 2 of 2) (Cruz Melendez, Maria) (Entered: 04/21/2022) |
| 04/27/2022 | | RESCHEDULING ORDER as to Robert Sylvester Kelly. Due to a change in the Court's schedule the sentencing set for 6/16/2022 is reset for 6/15/2022 at 10:30 a.m., in Courtroom 4G North. Ordered by Judge Ann M. Donnelly on 4/27/2022. (Greene, Donna) (Entered: 04/27/2022) |
| 05/16/2022 | 294 | OBJECTION TO PRESENTENCE INVESTIGATION REPORT by USA as to Robert Sylvester Kelly (*Gov't's Response to the Defendant's Objections*) (Geddes, Elizabeth) (Entered: 05/16/2022) |
| 05/16/2022 | 295 | OBJECTION TO PRESENTENCE INVESTIGATION REPORT by USA as to Robert Sylvester Kelly (*filed with the Probation Dep't on April 19, 2022*) (Geddes, Elizabeth) (Entered: 05/16/2022) |
| 05/19/2022 | | ORDER: The government and the defendant are directed to submit supplemental letters on the following questions in connection with the 273 defendant's Rule 29 motion.<br><br>(1) Are the defendant's claims about Section 120290 of the California Health and Safety Code (*see* ECF No. 273–1 at 38–41), and about Section 2307 of the New York Public Health Law (*id.* at 59), the proper subjects of a motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29? *See, e.g., United States v. al Ghazi*, No. 07–CR–354, 2009 WL 1605741, at *2 (S.D.N.Y. June 9, 2009) ("Rule 29... only authorizes motions challenging the sufficiency of the evidence presented at trial." (citations omitted)). (2) Are any of the defendant's arguments about Section 120290 of the California Health and Safety Code untimely because he did not assert them before trial, and if so, did the defendant waive these claims because he did not raise them at the appropriate time? *See, e.g., United States v. O'Brien*, 926 F.3d 57, 82–84 (2d Cir. 2019).<br><br>By May 24, 2022 at 5 p.m., the parties are directed to submit letters, not exceeding three pages, that address the above questions. Ordered by Judge Ann M. Donnelly on 5/19/2022. (Baer, Nicholas) (Entered: 05/19/2022) |
| 05/19/2022 | 296 | NOTICE OF ATTORNEY APPEARANCE: Ashley Blair Cohen appearing for Robert Sylvester Kelly (Cohen, Ashley) (Entered: 05/19/2022) |
| 05/19/2022 | 297 | Letter MOTION for Extension of Time to File *Supplemental Sentencing Memo with Supporting Mitigation Expert Report (Unopposed) or Alternatively to Extend Time for Filing of Single Submission* by Robert Sylvester Kelly. (Bonjean, Jennifer) (Entered: 05/19/2022) |
| 05/20/2022 | | ORDER granting 297 the defendant's motion to submit a supplement to his sentencing submission. The existing deadlines for the parties' sentencing submissions will not be extended, except the defense is permitted to file its supplement by June 13, 2022. The sentencing hearing currently set for June 15, 2022 is adjourned to June 29, 2022 at 10:30 a.m. No further adjournments will be granted. Ordered by Judge Ann M. Donnelly on 5/20/2022. (Baer, Nicholas) (Entered: 05/20/2022) |

| 05/24/2022 | 298 | Letter *in Connection with Court's Order Dated May 19, 2022 re: California Health and Safety Code Section 120290 and New York Public Health Law Section 2307* as to Robert Sylvester Kelly (Bonjean, Jennifer) (Entered: 05/24/2022) |
|---|---|---|
| 05/24/2022 | 300 | Letter *dated 5/24/22 Responding to Court's Questions* as to Robert Sylvester Kelly (Shihata, Nadia) (Entered: 05/24/2022) |
| 05/27/2022 | 301 | SENTENCING MEMORANDUM by Robert Sylvester Kelly (Bonjean, Jennifer) (Entered: 05/27/2022) |
| 06/03/2022 | 302 | OBJECTION TO PRESENTENCE INVESTIGATION REPORT by USA as to Robert Sylvester Kelly (Geddes, Elizabeth) (Entered: 06/03/2022) |
| 06/08/2022 | 304 | SENTENCING MEMORANDUM by USA as to Robert Sylvester Kelly (Shihata, Nadia) (Entered: 06/08/2022) |
| 06/13/2022 | 306 | SENTENCING MEMORANDUM by Robert Sylvester Kelly, SENTENCING MEMORANDUM SUPPLEMENT by Robert Sylvester Kelly (Attachments: # 1 Exhibit Report of Dr. Park Dietz, M.D., M.P.H., Ph.D, # 2 Exhibit Report of Dr. Renee Sorrentino, M.D., # 3 Exhibit CVs of Dr. Park Dietz, Dr. Renee Sorrentino, Dr. Daniel Martell, and Dr. Shawante Alexander, # 4 Exhibit Character Letters) (Bonjean, Jennifer) (Entered: 06/13/2022) |
| 06/17/2022 | 307 | Letter *Dated June 17, 2022 Regarding Restitution* as to Robert Sylvester Kelly (Cruz Melendez, Maria) (Entered: 06/17/2022) |
| 06/23/2022 | 308 | SENTENCING MEMORANDUM SUPPLEMENT by USA as to Robert Sylvester Kelly (Shihata, Nadia) (Entered: 06/23/2022) |
| 06/24/2022 | 310 | Letter *filed under seal dated 6/24/22 re CVRA* as to Robert Sylvester Kelly (Shihata, Nadia) (Entered: 06/24/2022) |
| 06/24/2022 | | ORDER: The Court has received the defendant's supplemental sentencing memorandum and exhibits (ECF Nos. 306, 306–1–4), and the government's letter in response (ECF No. 308). The defense filed the entirety of its submission under seal without any accompanying explanation of why sealing is necessary. The government also filed its response under seal, but explained that it does not believe any of the information is confidential, and that it filed its submission under seal because the defendant did so.<br><br>"[D]ocuments may be sealed if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006) (citation omitted). By 5 p.m. on June 26, 2022, the defendant and the government are directed to file letters, not to exceed three pages, addressing whether the defendant's supplemental submission 306 should be sealed, in whole or in part. To the extent that the defendant seeks to file 306 under seal or with redactions, the defendant must explain why doing so is necessary, cite relevant authority, and must provide the Court and the government with proposed redactions, if any. Ordered by Judge Ann M. Donnelly on 6/24/2022. (Baer, Nicholas) (Entered: 06/24/2022) |
| 06/26/2022 | 311 | Letter *in connection with the Court's Order dated June 24, 2022* as to Robert Sylvester Kelly (Geddes, Elizabeth) (Entered: 06/26/2022) |
| 06/27/2022 | | ORDER: On June 24, 2022 the Court directed the parties to file letters "addressing whether the defendant's supplemental submission 306 should be sealed, in whole or in part" by "5 p.m. on June 26, 2022." The government submitted a letter on June 26, 2022, proposing certain redactions to the defendant's supplemental sentencing submission. The defense did not respond. The Court agrees with the government's proposed redactions. By 7pm on June 27, 2022, the defendant is directed provide the Court with a redacted version of his supplemental submission, consistent with the government's 311 letter. Ordered by Judge Ann M. Donnelly on 6/27/2022. (Baer, Nicholas) (Entered: 06/27/2022) |
| 06/27/2022 | 312 | Letter *Related to Sealing* as to Robert Sylvester Kelly (Bonjean, Jennifer) (Entered: 06/27/2022) |

| 06/27/2022 | 313 | Letter *in Response to Government's Letter Dated June 17, 2022 Re: Restitution* as to Robert Sylvester Kelly (Bonjean, Jennifer) (Entered: 06/27/2022) |
|---|---|---|
| 06/27/2022 | 314 | Letter *providing the government's proposed redactions to the defendant's supplement sentencing submission* as to Robert Sylvester Kelly (Attachments: # 1 Exhibit Ex A: Proposed redactions to Exhibit A of Def's Supp. Sent. Submission, # 2 Exhibit Ex B: Proposed executed redactions to Exhibit A of Def's Supp. Sent. Submission, # 3 Exhibit Ex C: Proposed redactions to Exhibit B of Def's Supp. Sent. Submission, # 4 Exhibit Ex D; Ex A: Proposed executed redactions to Exhibit B of Def's Supp. Sent. Submission) (Geddes, Elizabeth) (Entered: 06/27/2022) |
| 06/28/2022 | 315 | MEMORANDUM DECISION AND ORDER: By no later than 3 p.m. on June 28, 2022, the defendant is directed to file on the docket unsealed redacted versions of ECF Nos. 306–1, 306–2, 306–3 and 306–4 that incorporate the governments proposed redactions at ECF Nos. 314–1, 314–2, 314–3 and 314–4. The defendant may file his 12–page main sentencing memorandum (ECF No. 306) with the limited redactions that his counsel proposed via email, as the Court finds that those redactions comport with the principles discussed herein, and thus are justified. Ordered by Judge Ann M. Donnelly on 6/28/2022. (Greene, Donna) (Entered: 06/28/2022) |
| 06/28/2022 | 316 | REDACTION by Robert Sylvester Kelly to 315 Order,, 306 Sentencing Memorandum,, Sentencing Memorandum Supplement, filed by Robert Sylvester Kelly (Attachments: # 1 Exhibit A – Redacted, # 2 Exhibit B – Redacted, # 3 Exhibit C, # 4 Exhibit D) (Bonjean, Jennifer) (Entered: 06/28/2022) |
| 06/28/2022 | 317 | Letter *dated 6/23/22 by USA (Now Public Sentencing Memo Supplement – Previously filed under seal)* as to Robert Sylvester Kelly (Shihata, Nadia) (Entered: 06/28/2022) |
| 06/29/2022 | 318 | MEMORANDUM DECISION AND ORDER: The defendant's motions for a judgment of acquittal and for a new trial are denied. Ordered by Judge Ann M. Donnelly on 6/29/2022 (Baer, Nicholas) (Entered: 06/29/2022) |
| 06/29/2022 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Sentencing held on 6/29/2022 for Robert Sylvester Kelly (1). Appearances by AUSA Elizabeth Geddes, AUSA Maria Cruz Melendez, and AUSA Nadia Shihata. Jennifer Bonjean and Ashley Cohen (Retained) for defendant Kelly (present in custody. Probation Officer Frank Nikolaidis and Probation Officer Patricia Sullivan present. Case called. Statement from defense counsel, government, and victims heard. Defendant sentenced on Count(s) 1sss, 2sss, 3sss, 4sss, 5sss, 6sss, 7sss, 8sss, 9sss. The defendant is sentenced to three hundred and sixty months on count 1; Ten years on counts 2,6, and 8; Twenty years on counts 3,4,5,7, and 9. All counts to run concurrently. Five years supervised release. $900 special assessment. $100,000 fine. The defendant informed of right to appeal. The parties are directed to submit a proposed schedule for submissions for the hearing on restitution. Restitution hearing set for 9/28/2022 at 11:00 a.m. (Court Reporter David Roy.) (Greene, Donna) (Entered: 06/29/2022) |
| 06/30/2022 | 319 | JUDGMENT as to Robert Sylvester Kelly (1). Defendant Robert Sylvester Kelly sentence on count(s) 1sss, 2sss, 3sss, 4sss, 5sss, 6sss, 7sss, 8sss, and 9sss. The defendant is sentence to Three hundred and sixty (360)months on count 1. Ten (10) years on counts 2,6, and 8. Twenty (20)years on counts 3,4,5,7, and 9. All counts to run concurrently. Five years supervised release. $900 special assessment. 100,000 fine. Ordered by Judge Ann M. Donnelly on 6/30/2022. (Greene, Donna) (Entered: 06/30/2022) |
| 07/11/2022 | 321 | NOTICE OF APPEAL by Robert Sylvester Kelly re 319 Judgment, Filing fee $ 505, receipt number ANYEDC−15734634. (Bonjean, Jennifer) (Entered: 07/11/2022) |
| 07/12/2022 | | Electronic Index to Record on Appeal as to Robert Sylvester Kelly sent to US Court of Appeals 321 Notice of Appeal – Final Judgment Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (Jones, Vasean) (Entered: 07/12/2022) |
| 08/04/2022 | 322 | NOTICE OF ATTORNEY APPEARANCE Daniel G. Saavedra appearing for USA. (Saavedra, Daniel) (Entered: 08/04/2022) |
| 08/04/2022 | 323 | MOTION for Writ *(Letter) respectfully requesting that the Court issue an order for the turn over of funds in the defendant's inmate trust account for application to the* |

| | | |
|---|---|---|
| | | *defendant's outstanding criminal monetary penalties* by USA as to Robert Sylvester Kelly. (Attachments: # 1 Proposed Order) (Saavedra, Daniel) (Entered: 08/04/2022) |
| 08/05/2022 | | SCHEDULING ORDER: The Court has received the government's 323 motion for a court order directing BOP to withdraw funds held in the defendant's inmate trust account. The defendant is directed to respond in a letter, not exceeding five pages, by August 9, 2022. Ordered by Judge Ann M. Donnelly on 8/5/2022. (Baer, Nicholas) (Entered: 08/05/2022) |
| 08/08/2022 | 324 | TRANSCRIPT REQUEST by Robert Sylvester Kelly for proceedings held on 10/2/19, 12/9/19, 12/18/19, 2/6/20, 4/16/20, 4/23/20, 4/30/20, 8/19/20, 9/29/20, 4/15/21 before Judge Donnelly. (Bonjean, Jennifer) (Entered: 08/08/2022) |
| 08/08/2022 | | NOTICE: All transcript requests are to be made to the Court Reporter listed in the minute entry. (Greene, Donna) (Entered: 08/08/2022) |
| 08/09/2022 | 325 | RESPONSE in Opposition re 323 MOTION for Writ *(Letter) respectfully requesting that the Court issue an order for the turn over of funds in the defendant's inmate trust account for application to the defendant's outstanding criminal monetary penalties* (Bonjean, Jennifer) (Entered: 08/09/2022) |
| 08/10/2022 | | SCHEDULING ORDER: The Court has received the government's 323 motion and the defendant's 325 letter in opposition. The government is directed to file a reply by August 15, 2022. Ordered by Judge Ann M. Donnelly on 8/10/2022. (Baer, Nicholas) (Entered: 08/10/2022) |
| 08/15/2022 | 326 | REPLY TO RESPONSE to Motion re 323 MOTION for Writ *(Letter) respectfully requesting that the Court issue an order for the turn over of funds in the defendant's inmate trust account for application to the defendant's outstanding criminal monetary penalties* (Attachments: # 1 Exhibit A) (Saavedra, Daniel) (Entered: 08/15/2022) |
| 09/06/2022 | 327 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on August 19, 2020, before Judge Ann M. Donnelly. Court Reporter/Transcriber Georgette K. Betts, Telephone number 718.804.2777. Email address: georgetteb25@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 9/27/2022. Redacted Transcript Deadline set for 10/7/2022. Release of Transcript Restriction set for 12/5/2022. (Betts, Georgette) (Entered: 09/06/2022) |
| 09/07/2022 | 328 | Letter *dated 9/7/22 re Joint Proposed Briefing Schedule re Restitution* as to Robert Sylvester Kelly (Shihata, Nadia) (Entered: 09/07/2022) |
| 09/08/2022 | | SCHEDULING ORDER adopting the parties' joint proposed briefing schedule as set forth in ECF No. 328. The government must file its supplemental submission on restitution by September 9, 2022. The defendant must file a response, if any, by September 21, 2022. Ordered by Judge Ann M. Donnelly on 9/8/2022. (Baer, Nicholas) (Entered: 09/08/2022) |
| 09/08/2022 | 329 | NOTICE OF ATTORNEY APPEARANCE Lauren Howard Elbert appearing for USA. (Elbert, Lauren) (Entered: 09/08/2022) |
| 09/09/2022 | 330 | MEMORANDUM DECISION AND ORDER. The government's motion 323 is granted. Within ten days, the Bureau of Prisons must issue a check to the Clerk of the Court for the Eastern District of New York for $27,828.24, as outlined in the attached memorandum and order. Ordered by Judge Ann M. Donnelly on 9/9/2022. (Greene, Donna) (Entered: 09/09/2022) |
| 09/09/2022 | | ORDER: The government is directed to serve a copy of the order at ECF No. 330 on the Bureau of Prisons today, September 9, 2022. Ordered by Judge Ann M. Donnelly on 9/9/2022. (Greene, Donna) (Entered: 09/09/2022) |
| 09/09/2022 | 331 | Letter *dated 9/9/22 re Supplemental Restitution Submission* as to Robert Sylvester Kelly (Attachments: # 1 Exhibit A) (Shihata, Nadia) (Entered: 09/09/2022) |

| 09/09/2022 | 332 | NOTICE OF APPEAL by Robert Sylvester Kelly re 330 Order on Motion for Writ, Filing fee $ 505, receipt number ANYEDC–15924767. Appeal Record due by 10/9/2022. (Cohen, Ashley) (Entered: 09/09/2022) |
|---|---|---|
| 09/09/2022 | | Supplemental Electronic Index to Record on Appeal as to Robert Sylvester Kelly sent to US Court of Appeals 332 Notice of Appeal – Final Judgment Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (Jones, Vasean) (Entered: 09/09/2022) |
| 09/12/2022 | 333 | NOTICE OF ATTORNEY APPEARANCE Kayla C Bensing appearing for USA. (Bensing, Kayla) (Entered: 09/12/2022) |
| 09/12/2022 | 334 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on September 29, 2020, before Judge Ann M. Donnelly. Court Reporter/Transcriber Sophie Nolan, Telephone number 718–613–2622. Email address: NolanEDNY@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 10/3/2022. Redacted Transcript Deadline set for 10/13/2022. Release of Transcript Restriction set for 12/11/2022. (Nolan, Sophie) (Entered: 09/12/2022) |
| 09/14/2022 | 335 | Letter *requesting that Mr. Kelly be permitted to appear via zoom for the September 28 restitution hearing* as to Robert Sylvester Kelly (Cohen, Ashley) (Entered: 09/14/2022) |
| 09/15/2022 | | ORDER as to Robert Sylvester Kelly. The request that defendant Kelly be permitted to appear via zoom for the September 28th hearing is granted. Ordered by Judge Ann M. Donnelly on 9/15/2022. (Greene, Donna) (Entered: 09/15/2022) |
| 09/21/2022 | 336 | Letter *response to government's restitution submissions* as to Robert Sylvester Kelly (Bonjean, Jennifer) (Entered: 09/21/2022) |
| 09/22/2022 | | SCHEDULING ORDER: The Court has received the government's supplemental submission on restitution 331 and the defendant's response 336 . The government is directed to file a reply by no later than 3 p.m. on Monday, September 26, 2022. Ordered by Judge Ann M. Donnelly on 9/22/2022. (Baer, Nicholas) (Entered: 09/22/2022) |
| 09/23/2022 | | ORDER: In its submissions regarding restitution 331 337 , the government asks the Court to seal its letters and documents relating to restitution. "[D]ocuments may be sealed if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006) (citation omitted). Although protecting the identities of victims and their personal medical information are higher interests that may justify sealing, the Court does not find that sealing the parties' letters in their entirety is "narrowly tailored" to those interests. The victims testified in court, under pseudonyms, about many of the things that underlie the restitution requests. Therefore, by September 27, 2022, the parties are instructed to confer and submit to the Court joint proposed redactions of their letters at ECF Nos. 331, 336 and 337. Public versions of the letters will be issued once appropriate redactions have been determined. Ordered by Judge Ann M. Donnelly on 9/23/2022. (Baer, Nicholas) (Entered: 09/23/2022) |
| 09/27/2022 | 340 | Letter *re Restitution* as to Robert Sylvester Kelly (Bonjean, Jennifer) (Entered: 09/27/2022) |
| 09/28/2022 | | Minute Entry for proceedings held before Judge Ann M. Donnelly: Restitution hearing as to Robert Sylvester Kelly held on 9/28/2022. Appearances by AUSA Lauren Elbert. Jennifer Bonjean and Ashley Cohen for defendant Kelly (present via zoom). Case called. Discussion held. The Court ordered restitution for Jane Doe #5 under 18 U.S.C. § 2429, and reserved judgment on an aspect of Jane Doe #2's restitution pending additional calculations by the government. The Court declined to order restitution as to |

| | | |
|---|---|---|
| | | Jane Doe #3. The Court inquired further about the defendant's financial resources, and asked the parties to provide an update to the Court to the extent they have new information. The government must file a supplemental letter regarding restitution by October 5, 2022; that letter must (i) clarify the government's calculations with respect to Jane Doe #2, and include (ii) a proposed restitution order and (iii) a proposed payment schedule for both the restitution and the other criminal monetary penalties imposed in this case. The defense must submit a response, if any, by October 12, 2022. The parties should determine whether they can agree on a payment schedule, and if so, to submit a joint proposed plan. (Court Reporter Stacy Mace.) (Greene, Donna) (Entered: 09/28/2022) |
| 10/12/2022 | 342 | Letter as to Robert Sylvester Kelly (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Bonjean, Jennifer) (Entered: 10/12/2022) |
| 11/04/2022 | | ORDER granting in part and denying in part the government's motions to seal. On September 23, 2022, the Court issued an order directing the parties to confer and submit joint proposed redactions of their letters relating to restitution. On September 27, 2022, the government responded in a letter setting forth the parties' respective positions on redactions, and also emailed the government's proposed redactions to chambers. While the parties agree "that any documents stating victims true names should have those names redacted" (ECF No. 339 at 1), the government takes the position that other information in the letters referring to the victims' medical condition or treatment should be redacted, too.

Judicial documents, which are normally subject to a presumption of access, "may be sealed if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 120 (2d Cir. 2006) (citation omitted). "In considering whether sealing is appropriate, an important consideration is, of course, whether the information sought to be kept confidential is already public." United States v. Avenatti, No. 19–CR–373, 2020 WL 70952, at *6 (S.D.N.Y. Jan. 6, 2020).

The Court has reviewed the government's submission and its proposed redactions and concludes that they are overbroad. While protecting the identities of victims and their personal medical information are higher interests that may justify sealing, the government's proposed redactions are not narrowly tailored to those interests. As to Jane Doe #5, some of the information that the government proposes to redact is already part of the record in various forms, such Jane's testimony in open court about her medical condition and treatment. See, e.g., United States v. Basciano, No. 03–CR–929, 2010 WL 1685810, at *4 (E.D.N.Y. Apr. 23, 2010) ("Shielding third parties from unwanted attention arising from an issue that is already public knowledge is not a sufficiently compelling reason to justify withholding judicial documents from public scrutiny."). Moreover, the letters refer to Jane Doe #5 using a pseudonym ("Jane"), a measure that the Court adopted to protect her anonymity throughout this case. Because Jane Does #2 and #3 testified at trial using their first names, the parties may redact references in their restitution letters to these victims' names. The government has not pointed to any other information in the parties' letters that, if disclosed, would risk exposing the victims' identities.

Accordingly, by November 9, 2022, the government and the defendant are directed to file redacted public versions of their restitution letters at ECF Nos. 331, 336, 337, 338, 339, 340, 341, and 342 (including exhibits) and to redact only the portions of those submissions that reference the victims names. Ordered by Judge Ann M. Donnelly on 11/4/2022. (DG) (Entered: 11/04/2022) |
| 11/08/2022 | 343 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Robert Sylvester Kelly held on 09–28–2022, before Judge AMD. Court Reporter/Transcriber Stacy Mace. Email address: smacerpr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request – Transcript" located under "Other Filings – Other Documents". Redaction Request due 11/29/2022. Redacted Transcript Deadline set for 12/9/2022. Release of Transcript Restriction set for 2/6/2023. (Mace, Stacy) (Entered: 11/08/2022) |

| 11/09/2022 | 345 | Letter *by the government, previously filed under seal on June 17, 2022, relating to restitution* as to Robert Sylvester Kelly (Elbert, Lauren) (Entered: 11/09/2022) |
|---|---|---|
| 11/09/2022 | 346 | Letter *by the government, previously filed under seal on September 9, 2022, relating to restitution* as to Robert Sylvester Kelly (Attachments: # 1 Exhibit A (receipt)) (Elbert, Lauren) (Entered: 11/09/2022) |
| 11/09/2022 | 347 | Letter *by the government, previously filed under seal on September 23, 2022, relating to restitution* as to Robert Sylvester Kelly (Elbert, Lauren) (Entered: 11/09/2022) |
| 11/09/2022 | 348 | Letter *by the government, previously filed under seal on September 27, 2022, regarding restitution* as to Robert Sylvester Kelly (Elbert, Lauren) (Entered: 11/09/2022) |
| 11/09/2022 | 349 | Letter *by the government, originally filed under seal on October 5, 2022, regarding restitution* as to Robert Sylvester Kelly (Attachments: # 1 Proposed Order) (Elbert, Lauren) (Entered: 11/09/2022) |
| 11/09/2022 | 350 | Letter *originally filed on June 27, 2022 at Dkt. 313 regarding restitution* as to Robert Sylvester Kelly (Cohen, Ashley) (Entered: 11/09/2022) |
| 11/09/2022 | 351 | Letter *by Defendant, originally filed on September 21, 2022 at Dkt. 336 regarding restitution* as to Robert Sylvester Kelly (Cohen, Ashley) (Entered: 11/09/2022) |
| 11/09/2022 | 352 | Letter *by Defendant, originally filed on September 27, 2022 at Dkt. 340 regarding restitution* as to Robert Sylvester Kelly (Cohen, Ashley) (Entered: 11/09/2022) |
| 11/09/2022 | 353 | Letter *by Defendant, originally filed on October 12, 2022 at Dkt. 342 regarding restitution* as to Robert Sylvester Kelly (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Cohen, Ashley) (Entered: 11/09/2022) |
| 11/22/2022 | 354 | SUBSEQUENT NOTICE OF APPEAL by Robert Sylvester Kelly re 344 1 – Applicable Party Docket Entry AND Document CR,,,,, Order,,,, Filing fee $ 505, receipt number ANYEDC–16165593. Appeal Record due by 12/6/2022. (Cohen, Ashley) (Entered: 11/22/2022) |
| 11/23/2022 | | Electronic Index to Record on Appeal as to Robert Sylvester Kelly sent to US Court of Appeals 354 Subsequent Notice of Appeal – Final Judgment Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (VJ) (Entered: 11/23/2022) |

1

1  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK
2  ------------------------------x
                                    19-CR-286(AMD)
3  UNITED STATES OF AMERICA,
                                    United States Courthouse
4          Plaintiff,              Brooklyn, New York

5          -against-               August 9, 2021
                                    9:30 a.m.
6  ROBERT KELLY,

7          Defendant.
   ------------------------------x
8
           TRANSCRIPT OF CRIMINAL CAUSE FOR JURY SELECTION
9             BEFORE THE HONORABLE ANN M. DONNELLY
                 UNITED STATES DISTRICT JUDGE
10                    BEFORE A JURY

11  APPEARANCES

12  For the Government:        UNITED STATES ATTORNEY'S OFFICE
                               Eastern District of New York
13                             271 Cadman Plaza East
                               Brooklyn, New York 11201
14                             BY:  ELIZABETH GEDDES, ESQ.
                                    MARIA CRUZ MELENDEZ, ESQ.
15                                  NADIA SHIHATA, ESQ.
                               Assistant United States Attorneys
16
    For the Defendant:         THE C.H. SCHOLAR LAW FIRM PLLC
17                             225 Broadway – Suite 225
                               New York, New York 10007
18                             BY:  CALVIN HAROLD SCHOLAR, ESQ.

19                             THE LAW OFFICE OF THOMAS A. FARINELLA
                                  260 Madison Avenue – 8th Floor
20                                New York, New York 10016
                                  BY:  THOMAS A. FARINELLA, ESQ.
21
                               AIELLO & CANNICK
22                                69-06 Grand Avenue
                                  Maspeth, New York 11378
23                                BY:  DEVEREAUX LEON CANNICK, ESQ.

24

25

JURY SELECTION                    58

1              (In open court; Jury present.)

2              THE COURT:  One other question.  What is the kind of

3    work that the nonprofit do?

4              PROSPECTIVE JUROR:  It was human rights.

5              THE COURT:  In any particular area?

6              PROSPECTIVE JUROR:  I was the administrator to the

7    director.

8              THE COURT:  But when you say human right that covers

9    a fairly broad topic.  Did it have a particular focus?

10             PROSPECTIVE JUROR:  Do you want the organization?

11             THE COURT:  No, what were the goals?  Were they

12   international human rights.

13             PROSPECTIVE JUROR:  Both international and domestic

14   human right.

15             THE COURT:  All right.  Thank you so much.

16             (Prospective juror exits.)

17             (Prospective juror enters.)

18             THE COURT:  All right, this is Juror No. 25.  Good

19   morning.

20             THE DEFENDANT:  Good morning, Your Honor.

21             THE COURT:  How are you doing today?

22             PROSPECTIVE JUROR:  I'm okay.

23             THE COURT:  Good, good.  I have a couple of

24   additional questions.  I know you filled out the

25   questionnaire.  One of the questions asked whether you or

JURY SELECTION                                          59

1   anyone close to you has ever had either a positive or negative

2   experience involving the police or any law enforcement agency.

3   I know you have had -- you've had your share of experiences?

4            PROSPECTIVE JUROR:  Of course.

5            THE COURT:  Anything about those experiences that

6   had you form an opinion about law enforcement, positive or

7   negative?

8            PROSPECTIVE JUROR:  I'm not biased against law

9   enforcement if that's what you want to know.  I'm biased

10  against people in law enforcement that do these things.

11           THE COURT:  In your personal experience, did you

12  have, in your interactions, say when you were the victim of a

13  crime, did you have any negative or positive experience either

14  with the officer who interviewed you or to the extent there

15  was any prosecutor involved.

16           PROSPECTIVE JUROR:  I've had both negative and

17  positive experiences.  Good people are people.  Good people,

18  bad people.  There's bad everywhere.

19           THE COURT:  All right.  Given the things that

20  have -- you were -- even though these things happened some

21  time ago, they stick with you and despite all the things that

22  have happened to you it sound like you can judge people on

23  their own merit; is that right?

24           PROSPECTIVE JUROR:  That's correct.

25           THE COURT:  And that these past experiences won't --

JURY SELECTION                                    60

1     PROSPECTIVE JUROR:  They won't cloud my judgment if

2  that's what you're asking me, Your Honor.

3     THE COURT:  You said that much better than I did.

4  Thank you very much.  I have a couple of just sort of general

5  things to talk to you about but I do want to check with the

6  lawyers to see if they have something else that they want me

7  to put to you.  So hold on for just a moment.

8     PROSPECTIVE JUROR:  Okay.

9     THE COURT:  While we are waiting for that.  I'm

10  assuming the schedule is okay with you; is that right?

11     PROSPECTIVE JUROR:  It's fine.

12     THE COURT:  Okay.

13     (Sidebar held outside of the hearing of the jury.)

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                                        61

1            (The following sidebar took place outside the

2     hearing of the jury.)

3            MS. GEDDES:  Your Honor, he answered the question

4     that he's not biased against law enforcement but he's biased

5     against people in law enforcement.

6            THE COURT:  He said he's biased against the people

7     who do these things.

8            MS. GEDDES:  I want to be sure that that does not

9     extend to prosecutors.

10            THE COURT:  I can ask him more questions about it if

11     you want, but he did say he judges people on their own merit.

12     I will ask again if you want to be sure.  It's completely

13     fine.

14            MS. GEDDES:  I agree that I think he was talking

15     about the people in his particular incident.

16            MR. CANNICK:  The question was left off about the

17     same sex.

18            THE COURT:  I've got too many pieces of paper.

19     Thank you for reminding me.

20            (Sidebar ends.)

21

22

23

24

25

1              (In open court; Jury present.)

2              THE COURT:  Bear with me for just a second.

3              PROSPECTIVE JUROR:  Sure, sure.

4              THE COURT:  The evidence in this case may involve

5    testimony either by witnesses or exhibits that have to do with

6    sexual activity between people of the same sex.  Anything

7    about that evidence that would affect your ability to be a

8    fair and impartial juror in this case?

9              PROSPECTIVE JUROR:  Absolutely not.

10             THE COURT:  Are you familiar or have you heard of

11   any of the follow people:  Courtenay Wilson, Michael Trimarco

12   and Evangeline ████████?

13             PROSPECTIVE JUROR:  No.

14             THE COURT:  And to clarify you've seen a lot in

15   terms of your interactions with law enforcement.  Do I

16   understand you correctly to say that you are judging people as

17   individuals and not on whether they work for the prosecutor's

18   office or --

19             PROSPECTIVE JUROR:  Yes, individuals.

20             THE COURT:  I just wanted to double check to make

21   sure that that was true.

22             PROSPECTIVE JUROR:  No problem.

23             THE COURT:  We talked about this in the larger room

24   but I wanted to clarify a couple of things.  The first has to

25   do with a presumption of innocence.  Mr. Kelly is presumed

1   innocent and it is the Government that has the burden of

2   proving his guilt beyond a reasonable doubt.  If you are

3   selected as a juror I will explain what those terms mean in

4   more detail but is there any reason you can't follow that

5   instruction?

6              PROSPECTIVE JUROR:  No reason at all.

7              THE COURT:  Just generally, a juror is required to

8   follow the Judge's instructions on the law.  Any reason why

9   you wouldn't be able to follow my instruments on the law?

10             PROSPECTIVE JUROR:  No, I'm a stickler for the law

11  on my job.  I'm the rule guy.

12             THE COURT:  I'm the rule guy here?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  The other thing is, as I said in the

15  larger room, that you may not look up anything about the case

16  at all, research anything, research the law, read any

17  articles, look up the people in the case.  Any reason why you

18  couldn't follow that instruction?

19             PROSPECTIVE JUROR:  There's no reason at all.

20             THE COURT:  Is there any reason at all why you

21  wouldn't be able to give both sides a fair trial?

22             PROSPECTIVE JUROR:  No.

23             THE COURT:  And just another caution; I'm just going

24  to remind you not to speak to anybody about this process

25  either, okay?

JURY SELECTION                                    64

1          PROSPECTIVE JUROR:  Okay.

2          THE COURT:  Thank you so much?

3          PROSPECTIVE JUROR:  Thank you, Your Honor.

4          (Prospective juror exits.)

5          (Prospective juror enters.)

6          THE COURT:  Is this Juror No. 38?

7          THE COURTROOM DEPUTY:  Yes.

8          PROSPECTIVE JUROR:  Good afternoon.

9          THE COURT:  Time flies?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  How are you doing this morning?

12          PROSPECTIVE JUROR:  Good, thank God.

13          THE COURT:  All right.  One question that I have for

14   you just in terms of the trial itself, you expressed some

15   concern about serving on a case for this period of time.  Is

16   there any reason why -- jury service is obviously a burden for

17   everyone, but if you're selected as a juror in this case, you

18   know what the time commitment is, are you going to be able to

19   do that?

20          PROSPECTIVE JUROR:  Actually I'm a day trader too.

21   I do day trading and my I use margin money for my company.  So

22   if I'm in the case I think at the end of the trial I have to

23   file bankruptcy.

24          THE COURT:  I take it that would obviously be a

25   distraction for you?

 1          (In open court; Jury present.)

 2          THE COURT:  Ms. Greene, what number are we on here.

 3          THE COURTROOM DEPUTY:  52.

 4          THE COURT:  How are you doing?

 5          PROSPECTIVE JUROR:  I'm going good.

 6          THE COURT:  Good.  I have a couple of additional

 7  questions and some questions that are based on your

 8  questionnaire that you filled out.  The first thing I would

 9  like to start with is you were uncertain about whether or not

10  any obligations that you had would interfere with your ability

11  to be a juror in this case.

12          PROSPECTIVE JUROR:  I've arranged things at work and

13  I'll be making an international trip after it's over, which I

14  will have to do at the last minute, but it's nothing

15  unworkable.

16          THE COURT:  You've rearranged your schedule for us?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  I have a couple of other questions based

19  on your questionnaire.  First, I think you had some thoughts

20  that maybe Mr. Kelly was the cartoonist?

21          PROSPECTIVE JUROR:  It was actually R. Crumb.  It's

22  a completely -- it's from 40 years ago.

23          THE COURT:  So we're clear on that.  You in your

24  spare time it sounds like you like to do a lot of traveling;

25  is that right?

JURY SELECTION                          75

1        PROSPECTIVE JUROR:  I have.  I have a boyfriend in

2   India so I've been there twice during the pandemic.  He will

3   be in Germany so I'm hoping to go to Europe when this is over.

4   I'm not a recreational traveler.  And I don't do it for work.

5        THE COURT:  And then you also said you had done some

6   work with American Civil Liberties Union?

7        PROSPECTIVE JUROR:  No, I just have a card.  I got

8   my card when Trump was elected.

9        THE COURT:  Is there anything else you like to do in

10  your spare time?  You say you crochet?

11       PROSPECTIVE JUROR:  A lot of things.  I do a lot of

12  sketching, I read, antiques.  I do all sorts of other things.

13       THE COURT:  I'm going to ask you a couple of other

14  questions.  I'm quite certain I know the answer to one of the

15  questions.  There's going to be testimony in this case

16  possibly or exhibits that have to do with sexual activity

17  between people of the same sex.  Any problem with evidence

18  relating to that.

19       PROSPECTIVE JUROR:  None whatsoever.

20       THE COURT:  And the other -- there are three

21  individuals whose names might be mentioned during the course

22  of the trial and I think --

23       Do you have a list of them?

24       MS. GEDDES:  I do, Your Honor.

25       THE COURT:  Give them to Ms. Greene.

JURY SELECTION                    76

1          Look at these names and see if you recognize any of

2   them.

3          PROSPECTIVE JUROR:  I don't recognize them.

4          THE COURT:  Thank you so much.  Let me see if the

5   lawyers have additional questions that they want to put to

6   this prospective juror?

7          MR. CANNICK:  Yes.

8          (Sidebar held outside of the hearing of the jury.)

9          (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    77

1          (The following occurred at sidebar.)

2          MS. GEDDES:  As it relates to question number 32,

3    now that he knows it's not the cartoonist, does his answer

4    change.

5          THE COURT:  All right.

6          (Sidebar ends.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JURY SELECTION                          78

1           (In open court; Jury present.)

2           THE COURT:  I am assuming that now that you know

3      we're not talking about the cartoonist, your answer doesn't

4      change does it?  Are you familiar at all with Mr. Kelly.

5           PROSPECTIVE JUROR:  I've heard the name and I've

6      seen news articles and every single time I had to remind

7      myself who it was.

8           THE COURT:  Anything that you've read that would

9      affect your ability to be fair and impartial in this case?

10          PROSPECTIVE JUROR:  Not that I know of.

11          THE COURT:  And obviously as I said in the larger

12     room, is that jurors base their decision not on something

13     they've read or heard about or read about in a news article or

14     anything like that.  You have to base your decision on the

15     evidence in this case.

16          PROSPECTIVE JUROR:  The evidence, testimony and your

17     instructions on the law.

18          THE COURT:  That's very good.  Obviously you have to

19     follow those instructions as well.  Finally, just a reminder

20     as I said in the larger room with the presumption of innocence

21     that it's the Government that has the burden of proving

22     Mr. Kelly's guilt beyond a reasonable doubt.

23          PROSPECTIVE JUROR:  Right.

24          THE COURT:  And he is presumed to be innocent.  No

25     trouble following that instruction; correct?

1           PROSPECTIVE JUROR:  No problem.

2           THE COURT:  Anything you could think of that would

3   affect your ability to be a fair and impartial juror?

4           PROSPECTIVE JUROR:  I'm having a little trouble

5   hearing.  I'm assuming if I had to get the volume turned up on

6   something I could do that.  I've heard everything.  It's taken

7   a little effort on a couple of occasions.

8           THE COURT:  I'm a low talker so I will keep that in

9   mind as well.

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  You've been able to hear everything; is

12  that right?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  Thank you so much.

15          PROSPECTIVE JUROR:  All right.

16          (Prospective juror exits.)

17          MS. GEDDES:  Your Honor, this is an individual who

18  failed to answer a majority of the questionnaire so there may

19  well be a language issue.

20          THE COURT:  Are we on number 53?

21          MS. GEDDES:  Sorry.

22          THE COURT:  Did you agree on this one or not?

23          MS. GEDDES:  I'm sorry, 53 I thought was not here.

24  No, no.  He was one of the ones who raised his hand and had an

25  issue.  So I think we're now on 57 if I'm following my sheet

JURY SELECTION                                    89

```
1              THE COURT:  Donna, I think we've excused this juror.

2              THE COURTROOM DEPUTY:  65?

3              Oh, you did sorry.

4              THE COURT:  Sorry about that.

5              Thank you much so have a good day.

6              (Prospective Juror exits the courtroom.)

7              (Potential Juror enters the courtroom.)

8              THE COURT:  Juror 87?  Okay, great.

9              Good afternoon.

10             THE PROSPECTIVE JUROR:  Hi.  Good afternoon.

11             THE COURT:  How are you today?

12             THE PROSPECTIVE JUROR:  I'm great.

13             THE COURT:  I'm okay.  Good.  I've gone through your

14   questionnaire, I have a couple of questions for you.

15             My first question is, are you going to be paid if

16   you're a juror in this case by your employer?

17             THE PROSPECTIVE JUROR:  I guess so.

18             THE COURT:  You guess so?

19             THE PROSPECTIVE JUROR:  Sure.

20             THE COURT:  So the reason I'm asking is that, you

21   know, it's a time about four weeks.

22             THE PROSPECTIVE JUROR:  Yes.

23             THE COURT:  Would that be a hardship for you if your

24   employer didn't pay you?

25             THE PROSPECTIVE JUROR:  It would be.
```

JURY SELECTION                    90

1          THE COURT:  Is there a way you can find out?

2          THE PROSPECTIVE JUROR:  Yes, but I guess most likely

3   I would be getting paid because where I work.

4          THE COURT:  Okay.  So you think the kind of place

5   that you -- obviously, don't tell me what it is.

6          THE PROSPECTIVE JUROR:  Yes.

7          THE COURT:  I'm going to ask you a few more

8   questions, but I'm also going to ask you to confirm that

9   that's the case.

10          THE PROSPECTIVE JUROR:  Yes, I sure will.

11          THE COURT:  Okay, that's great.  Thank you so much.

12          THE PROSPECTIVE JUROR:  You're welcome.

13          THE COURT:  Now you say you like to cook in your

14   spare time.

15          THE PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Anything in particular?

17          THE PROSPECTIVE JUROR:  Yes.  I love cooking curry

18   chicken, making roast beef.

19          THE COURT:  You're making me hungry.

20          THE PROSPECTIVE JUROR:  Chow mein.

21          THE COURT:  Anything else you like to do in your

22   spare time?

23          THE PROSPECTIVE JUROR:  Apart from cooking, I guess

24   I work so hard, I sleep.

25          THE COURT:  Yes, okay, all right.

JURY SELECTION                          91

1        And you said that you have some familiarity with

2   this case.  You've heard about it.

3        But are you able to put aside anything that you've

4   heard about the case and just judge it on the evidence that

5   you hear in the courtroom?

6             THE PROSPECTIVE JUROR:  Yes.

7             THE COURT:  Okay.  And put aside all those other

8   things you might have heard.

9             THE PROSPECTIVE JUROR:  Yes.

10            THE COURT:  Okay.

11       Now I think -- is that piece of paper in the jury

12  box?

13            THE COURTROOM DEPUTY:  I gave it to her.

14            THE COURT:  There's some names on that piece of

15  paper.  Could you just look at those and tell me if you know

16  any of those people?

17            THE PROSPECTIVE JUROR:  None of them are familiar.

18            THE COURT:  Okay.  And the other thing is that in

19  this case they'll be either testimony and/or exhibits that

20  have to do with sexual activity between people of the same

21  sex.

22       Anything about that that would maybe it hard for you

23  to fair and impartial in this case?

24            THE PROSPECTIVE JUROR:  No.

25            THE COURT:  Okay.  Let me check with the lawyers to

JURY SELECTION                    92

1   and see if they have any additional questions they want me to

2   ask you.

3           MS. GEDDES:  No, Your Honor.

4           MR. CANNICK:  No.

5           THE COURT:  Okay, great.  I just have a few other

6   things I want to talk to you about.

7           And we talked about some of these things in the big

8   room but I just want to go over them again.

9           The first has to do with the presumption of

10  innocence.  Mr. Kelly is presumed to be innocent, and it's the

11  government that has the burden of proving his guilt beyond a

12  reasonable doubt.

13          If you are selected as a juror in this case, I'll

14  talk to you about what that means at the appropriate time.

15          THE PROSPECTIVE JUROR:  Okay.

16          THE COURT:  But is there any reason you wouldn't be

17  able to follow that law?

18          THE PROSPECTIVE JUROR:  No.

19          THE COURT:  I'm not picking on you, but you seem

20  like you're hesitating a little bit.

21          THE PROSPECTIVE JUROR:  No, there wouldn't be no

22  reason that I wouldn't be able to.  Where I work, you have to

23  work...

24          THE COURT:  You have to?

25          THE PROSPECTIVE JUROR:  Where I work, we have to

JURY SELECTION                                      93

1    follow the order.

2              THE COURT:  Okay.  All right.  Well, that's an

3    important principle of criminal law, the presumption.

4              And you'll follow that?

5              THE PROSPECTIVE JUROR:  Yes.

6              THE COURT:  And I take it from what you said, you'll

7    also follow all of my instructions on the law?

8              THE PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Okay.  The other thing is that you can't

10   look anything up about the case on the internet or --

11             THE PROSPECTIVE JUROR:  I know you made it clear.

12   Yes, nothing should be looked up.

13             THE COURT:  Can you follow that instruction?

14             THE PROSPECTIVE JUROR:  Yes.

15             THE COURT:  And is there any reason that you can

16   think of that you couldn't give both sides a fair trial in

17   this case?

18             THE PROSPECTIVE JUROR:  Well, as you mentioned,

19   according to when you listen, whatever you hear.  So I think

20   I'll give it a shot.

21             THE COURT:  All right.  So sometimes when I'm

22   instructing jurors, I tell them to think about it this way:

23   If you were flying on an airplane and you asked the pilot if

24   she could land the plain safely and she said "I think so," you

25   probably wouldn't want to be on that plane, correct?

JURY SELECTION                                    94

1              THE PROSPECTIVE JUROR:  Right, because she's too

2      guessing.

3              THE COURT:  Yes.  This the same thing.  You have to

4      be absolutely certain that you can give both sides a fair

5      trial.

6              THE PROSPECTIVE JUROR:  Right.

7              THE COURT:  And if you can't do that, that's

8      completely fine, but we have to know about it.

9              THE PROSPECTIVE JUROR:  Yes.

10             THE COURT:  Any reason why you can't give both sides

11     a fair trial?

12             THE PROSPECTIVE JUROR:  I don't think so.

13             THE COURT:  I don't think so.

14             Okay.  But you have to be positive.

15             Can you be positive?

16             THE PROSPECTIVE JUROR:  Yes.

17             THE COURT:  You can?

18             THE PROSPECTIVE JUROR:  Yes.

19             THE COURT:  It's okay if you can't.

20             THE PROSPECTIVE JUROR:  Yes.

21             THE COURT:  You don't have to tell me that because

22     you think I want to hear it.

23             THE PROSPECTIVE JUROR:  Right.

24             THE COURT:  What I want to hear is how you actually

25     feel about it.

JURY SELECTION                    95

```
 1              THE PROSPECTIVE JUROR:  Yeah, I think I can do that.
 2              THE COURT:  Okay.  All right.  Thank you so much.
 3    I'm going to --
 4              Ms. Greene will take you...
 5              THE PROSPECTIVE JUROR:  Thank you so much.
 6              (Prospective Juror exits the courtroom.)
 7              THE COURT:  So I don't know about you, but when
 8    someone says they think they can do something in this context,
 9    I don't think that's an unqualified assurance.  And I don't
10    know what the parties' position is on that.  I think I pushed
11    her pretty hard on it, and we still ended up with "I think
12    so."
13              Let me hear from the government, if you have a
14    position on that.
15              MS. GEDDES:  Your Honor, I think that she did
16    indicate that she was positive she could be fair.  It's almost
17    like a reflective at the end when she said "I think I can be
18    fair."
19              THE COURT:  Even after that wonderful speech about
20    landing the plane?
21              MS. GEDDES:  I'm not sure she totally understood.
22              THE COURT:  All right.  Well, I thought she did, but
23    it's up to you.
24              MR. SCHOLAR:  It's probably nothing is going to
25    happen, but we are going to agree with the government.
```

JURY SELECTION                    151

1          THE COURT:  And you really must continue to do that

2   because it really does have a bad effect on the ability to do

3   justice.

4          PROSPECTIVE JUROR:  I would think so because you're

5   hearing other people's opinions.

6          THE COURT:  So congratulations so far and please

7   continue to exercise that discipline.

8          PROSPECTIVE JUROR:  All right, thank you.

9          THE COURT:  And then my last question is whether you

10  can promise to be fair and impartial to both sides.

11         PROSPECTIVE JUROR:  Absolutely.

12         THE COURT:  Thank you so much.  Ms. Greene is going

13  to tell you where to go.

14         (Prospective juror exits.)

15         (Prospective juror enters.)

16         THE COURT:  This is juror 145.  Good afternoon.

17         PROSPECTIVE JUROR:  Good afternoon.

18         THE COURT:  How are you doing?

19         PROSPECTIVE JUROR:  I'm okay.

20         THE COURT:  Since you have that piece of paper let

21  me ask you that first.  Do you know any of the names that are

22  on that piece of paper?

23         PROSPECTIVE JUROR:  No.

24         THE COURT:  Thank you.  Those are in addition to the

25  other names from the questionnaire.  So, is it still the case

JURY SELECTION                                    152

1   that you are a fraud investigator?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  And tell me about that.  Don't give me

4   the name of the place or anything like that, but what does

5   that involve?  And use the microphone.

6          PROSPECTIVE JUROR:  It's mostly like a place where

7   clients come for help and so when we do that, we need to

8   investigate.  So whatever they tell us we take it but we need

9   to have proof and then we investigate whether it's warranted,

10  whether or not they get the help they need based on the

11  evidence and the proof that they give us.

12         THE COURT:  It sounds interesting.

13         PROSPECTIVE JUROR:  It could be sometimes.

14         THE COURT:  And in your spare time I know you are

15  active in your church.

16         PROSPECTIVE JUROR:  Yes.

17         THE COURT:  What else do you do in your spare time?

18         PROSPECTIVE JUROR:  I read a lot.

19         THE COURT:  What kinds of things do you like to

20  read?

21         PROSPECTIVE JUROR:  Books, fiction.

22         THE COURT:  You said in your questionnaire that you

23  heard something about the case before.  It doesn't sound like

24  you heard very much about the case, but I am going to ask if

25  you can put aside whatever you heard about the case and just

JURY SELECTION                          153

1    rely on the evidence that you hear in the courtroom if you are

2    selected as a juror.

3                    PROSPECTIVE JUROR:  Sure.

4                    THE COURT:  Now, you said that -- I think this was

5    you, have you testified in front of a grand jury before?

6                    PROSPECTIVE JUROR:  Yes.

7                    THE COURT:  On how many occasions?

8                    PROSPECTIVE JUROR:  Once.

9                    THE COURT:  You hope you never have to do it again?

10                   PROSPECTIVE JUROR:  That was the first time, I was

11   so nervous.

12                   THE COURT:  How long ago was that?

13                   PROSPECTIVE JUROR:  More than ten years ago.

14                   THE COURT:  Were you also -- did you also serve on a

15   grand jury?

16                   PROSPECTIVE JUROR:  No.

17                   THE COURT:  I see.  And you've never been a juror

18   before?

19                   PROSPECTIVE JUROR:  No.

20                   THE COURT:  Okay.  Let me check with the lawyers to

21   see if they have any additional questions.  I think I forgot

22   to ask that one question.  I will definitely do that.

23   Do you have any additional questions to put to this juror?

24                   MR. CANNICK:  No, Your Honor.

25                   MS. GEDDES:  No, Your Honor.

1          THE COURT:  Okay.  You are going to hear evidence in

2     this case that involves testimony and exhibits that are

3     related to sexual activity between people who are of the same

4     sex.  Is there anything about that kind of evidence that makes

5     you feel that you couldn't be fair and impartial to both

6     sides?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  All right.  And then we talked about

9     some of these things in the ceremonial courtroom.  I'm just

10    going to go over just a few of them.  The first thing is that

11    Mr. Kelly is presumed to be innocent and the Government has

12    the burden of proving his guilt beyond a reasonable doubt.

13         If you are selected as a juror, I will explain that

14    rule, that law, in more detail, but will you be able to follow

15    that instruction on the law?

16         PROSPECTIVE JUROR:  Of course.

17         THE COURT:  And do you promise to follow all of my

18    instructions on the law?

19         PROSPECTIVE JUROR:  Of course.

20         THE COURT:  You can't look up anything on the

21    internet or read anything the case.  Some people find that

22    difficult to do.

23         PROSPECTIVE JUROR:  I'm not savvy with that.

24         THE COURT:  Well, that's a good quality for this

25    case but it's very important that you don't look anything up

JURY SELECTION                                    155

1  or if there are any news articles that you read.

2          PROSPECTIVE JUROR:  No, no, not me.

3          THE COURT:  Do you promise that you will be a fair

4  and impartial juror to both sides?

5          PROSPECTIVE JUROR:  Of course.

6          THE COURT:  Thank you so much.  Ms. Greene is going

7  to take you to the next room.

8          (Prospective juror exits.)

9          (Prospective juror enters.)

10          THE COURT:  This is Juror No. 147?

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  Good afternoon.

13          PROSPECTIVE JUROR:  Good afternoon.

14          THE COURT:  How are you doing?

15          PROSPECTIVE JUROR:  Fine.

16          THE COURT:  So you indicate that you are a

17  superintendent; is that right.

18  PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Don't tell us where you work but what

20  kind of a place do you work in?

21          PROSPECTIVE JUROR:  Transportation.

22          THE COURT:  I see.  And how long have you been doing

23  that?

24          PROSPECTIVE JUROR:  22 years.

25          THE COURT:  And you said in your spare time you like

JURY SELECTION                                    156

1   sports?

2           PROSPECTIVE JUROR:  Yes.

3           THE COURT:  Is there any particular sport that you

4   like to watch and play?

5           PROSPECTIVE JUROR:  Start with cock soccer, but I

6   can't play anymore.  I'm too old for that.

7           THE COURT:  Never too old.  But you watch it now?

8           PROSPECTIVE JUROR:  Every chance I get.

9           THE COURT:  Any other sports you like to watch?

10          PROSPECTIVE JUROR:  Baseball, football, Formula One

11  NASCAR races.

12          THE COURT:  That covers one them all.

13          PROSPECTIVE JUROR:  One more, cricket.

14          THE COURT:  What about basketball?

15          PROSPECTIVE JUROR:  I do watch basketball.

16          THE COURT:  Do you do anything else in your spare

17  time?

18          PROSPECTIVE JUROR:  No.

19          THE COURT:  You said in your questionnaire that you

20  heard something about this case before on television.  Is that

21  correct?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  And do you promise that you can put

24  aside whatever you heard about the case if you are selected as

25  a juror and just listen to the evidence?

JURY SELECTION                    157

1          PROSPECTIVE JUROR:  Sure, but I don't think it's

2   this particular case.

3          THE COURT:  You're thinking of a different case?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Why do you think that?

6          PROSPECTIVE JUROR:  Because I thought it was from a

7   different state.

8          THE COURT:  Whether this case or not, whatever you

9   thought you heard will you be able to put it aside?

10         PROSPECTIVE JUROR:  Sure.

11         THE COURT:  Okay, great.  There is a list of names

12  on that piece of paper.  Do you know any of those people?

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  And another thing about this case is

15  that you will hear some testimony and some exhibits that have

16  to do with sexual activity between people who are of the same

17  sex.  Anything about that kind of evidence that would make it

18  hard for you to be fair and impartial?

19         PROSPECTIVE JUROR:  No.

20         THE COURT:  Okay.  Let me see from the parties if

21  they have any additional questions to put to this gentleman.

22         MR. CANNICK:  Nothing from us.

23         MS. GEDDES:  Not from the Government.

24         THE COURT:  I want to go over a few things that we

25  talked about in the big jury room.  The first is that

1    Mr. Kelly is presumed to be innocent and the Government has

2    the burden of proving his guilt beyond a reasonable doubt.  If

3    you are selected as a juror in this case I will explain more

4    about what that means, but do you promise to follow that

5    instruction?

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  And do you promise to follow all of my

8    instructions?

9              PROSPECTIVE JUROR:  Sure.

10             THE COURT:  Do you also promise that you won't do

11   any research about the case and look up anything on the

12   internet?

13             PROSPECTIVE JUROR:  No.

14             THE COURT:  You won't do that?

15             PROSPECTIVE JUROR:  No.

16             THE COURT:  And finally, do you promise that you

17   will be fair and impartial to both sides?

18             PROSPECTIVE JUROR:  Sure.

19             THE COURT:  All right.  Thank you so much.

20             (Prospective juror exits.)

21             (Prospective juror enters.)

22             THE COURT:  And this is Juror No. 149?

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  Good afternoon, sir.

25             PROSPECTIVE JUROR:  Good afternoon.

JURY SELECTION                    173

1  going to be just too physically exhausting for you; is that

2  right?

3          THE PROSPECTIVE JUROR:  Yes, Your Honor.

4          THE COURT:  You feel like you're not up to the task?

5          THE PROSPECTIVE JUROR:  Exactly.

6          THE COURT:  I see.  Okay.

7          I think I'm going to excuse you from this case,

8  because we don't want to do that to you.  Okay?

9          THE PROSPECTIVE JUROR:  Okay.

10          (Prospective Juror exits the courtroom.)

11          THE COURT:  All right, okay.

12          So be healthy, all right?

13          THE PROSPECTIVE JUROR:  Thank you.  I'll try.

14          THE COURT:  Okay.  Take care.

15          (Prospective Juror exits the courtroom.)

16          (Prospective Juror enters the courtroom.)

17          THE COURT:  Okay, this is Juror 156.

18          Good afternoon.  How are you doing?

19          THE PROSPECTIVE JUROR:  I'm doing well.  How are

20  you?

21          THE COURT:  That's all right.  I didn't mean to

22  scare you there.

23          Let's start with that piece of paper in front of

24  you.

25          Those are just some additional names to that list

JURY SELECTION                                    174

1   that you looked at in connection with the questionnaire.

2          Do you know any of the people on that list?

3          THE PROSPECTIVE JUROR:  No, I do not.

4          THE COURT:  Okay.  So I have been through the

5   questionnaire, and I just have a couple of questions for you

6   based on the questionnaire.

7          In your spare time, you talk about doing some

8   mentoring and volunteer opportunities.

9          Is that in connection with the sale force community,

10  or do you it do more generally?

11         THE PROSPECTIVE JUROR:  Both inside my corporation

12  and inside the sales force of the system.

13         THE COURT:  And what does that entail?

14         THE PROSPECTIVE JUROR:  Mostly entails helping

15  people who have gotten the training but don't know how to get

16  their first job.  Sometimes coaching them on interview

17  techniques.  Interview questions.  Mock interviews.  You know,

18  sometimes people don't know what it wear to interviews.

19  Things like that.

20         THE COURT:  I see.  And what else do you like to do

21  in your spare time?

22         THE PROSPECTIVE JUROR:  I don't have much spare

23  time.

24         THE COURT:  You have an eighth grader and a junior.

25         THE PROSPECTIVE JUROR:  Uh-huh.

JURY SELECTION                    175

1          THE COURT:  Okay, so that probably keeps you plenty
2    busy.
3          THE PROSPECTIVE JUROR:  It does.
4          THE COURT:  In your answers you said that you have
5    heard something about either the defendant or the case; is
6    that correct?
7          THE PROSPECTIVE JUROR:  Well, I mean I know who he
8    is.
9          THE COURT:  Uh-huh.
10          But what I'm going to ask you is, it doesn't sound
11    like you follow, you know, this kind of stuff on television --
12          THE PROSPECTIVE JUROR:  No.
13          THE COURT:  -- or any other way.
14          Anything that you have heard about him before I'm
15    just going to ask you to forget about and to base -- to focus
16    on the evidence that you hear in the courtroom.
17          Can you do that?
18          THE PROSPECTIVE JUROR:  Yes, I can.
19          THE COURT:  Okay.
20          Now, the evidence is this case will also include
21    testimony and exhibits having to do with sexual activity
22    between people who are of the same sex.
23          Any reason that that would cause you any difficulty
24    in being fair and impartial?
25          THE PROSPECTIVE JUROR:  Absolutely not.

JURY SELECTION                                    176

```
1              THE COURT:  Okay.

2              Do either of the lawyers have any additional

3    questions?  No?  Okay.

4              I just want to review with you a couple of the

5    things that we talked about in the larger jury room.

6              The first is that Mr. Kelly is presumed to be

7    innocent, and the government has the burden to prove his guilt

8    beyond a reasonable doubt.  If you're selected as a jury in

9    this case, I'll explain what that means in more detail.

10             But do you promise that you'll follow that

11   instruction?

12             THE PROSPECTIVE JUROR:  Yes, I do.

13             THE COURT:  All right.  And will you follow all of

14   my instructions on the law?

15             THE PROSPECTIVE JUROR:  Yes.

16             THE COURT:  The other prohibition in this case, or

17   one of the prohibitions in this case, is that you can't look

18   anything up about the case at all; social media, anything.

19             Can you promise to abide by that restriction?

20             THE PROSPECTIVE JUROR:  I promise.

21             THE COURT:  And obviously not talk to anybody about

22   the case.

23             THE PROSPECTIVE JUROR:  No problem.

24             THE COURT:  And finally, do you promise that you'll

25   be a fair and impartial juror to both sides?
```

JURY SELECTION                              177

1              THE PROSPECTIVE JUROR:  Yes, I do.

2              THE COURT:  Okay.  Ms. Greene is going to direct you

3    where you have to go next.

4              (Prospective Juror exits the courtroom.)

5              (Prospective Juror enters the courtroom.)

6              THE COURT:  And this is Juror Number 160; is that

7    right?

8              THE PROSPECTIVE JUROR:  Yes.

9              THE COURT:  How are you doing?

10             THE PROSPECTIVE JUROR:  Good.

11             THE COURT:  Good.  Good.  I've reviewed your

12   questionnaire and I'm just going to ask you some additional

13   questions about some of your answers.

14             So the first question is, you indicated on your

15   questionnaire that you have a little bit of some vision

16   problems because of glaucoma; is that right?

17             THE PROSPECTIVE JUROR:  Yes.

18             THE COURT:  Go ahead.

19             MR. SCHOLAR:  My right eye is -- the vision.  But I

20   see you.

21             THE COURT:  Okay.  I just want to -- you'll be

22   looking at exhibits and things like that if you're selected as

23   a juror.

24             Is that going to be a problem for you?

25             THE PROSPECTIVE JUROR:  I don't think so.

186

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ------------------------------x
                                        19-CR-286(AMD)
3   UNITED STATES OF AMERICA,
                                        United States Courthouse
4            Plaintiff,                 Brooklyn, New York

5            -against-                  August 10, 2021
                                        9:30 a.m.
6   ROBERT KELLY,

7            Defendant.
    ------------------------------x
8
              TRANSCRIPT OF CRIMINAL CAUSE FOR JURY SELECTION
9             BEFORE THE HONORABLE ANN M. DONNELLY
                   UNITED STATES DISTRICT JUDGE
10                      BEFORE A JURY

11  APPEARANCES

12  For the Government:        UNITED STATES ATTORNEY'S OFFICE
                               Eastern District of New York
13                             271 Cadman Plaza East
                               Brooklyn, New York 11201
14                             BY:  ELIZABETH GEDDES, ESQ.
                                    MARIA CRUZ MELENDEZ, ESQ.
15                                  NADIA SHIHATA, ESQ.
                               Assistant United States Attorneys
16
    For the Defendant:         THE C.H. SCHOLAR LAW FIRM PLLC
17                             225 Broadway - Suite 225
                               New York, New York 10007
18                             BY:  CALVIN HAROLD SCHOLAR, ESQ.

19                             THE LAW OFFICE OF THOMAS A. FARINELLA
                               260 Madison Avenue - 8th Floor
20                             New York, New York 10016
                               BY:  THOMAS A. FARINELLA, ESQ.
21
                               AIELLO & CANNICK
22                             69-06 Grand Avenue
                               Maspeth, New York 11378
23                             BY:  DEVEREAUX LEON CANNICK, ESQ.

24

25

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

A 79

JURY SELECTION                                        220

1          THE PROSPECTIVE JUROR:  Sorry.

2          THE COURT:  That's all right.  Have a good trip.

3          THE PROSPECTIVE JUROR:  Thank you.

4          THE COURT:  Hope the people are nice.

5          (The prospective juror exits.)

6          (The prospective juror approaches.)

7          THE COURT:  This is Juror Number 153.

8          If you want, you can remove your mask.

9          Good morning.

10         THE PROSPECTIVE JUROR:  Good morning.

11         THE COURT:  How are you doing?

12         THE PROSPECTIVE JUROR:  I'm good.

13         THE COURT:  I'm going to start with that piece of

14    paper in front of you, which is just some additional names

15    that you might hear either who will testify or whose names

16    might be mentioned during the course of the trial.

17         Are you familiar with any of them?

18         THE PROSPECTIVE JUROR:  No.

19         THE COURT:  And so I've gone through your

20    questionnaire.  I'm just going to ask you some additional

21    questions.

22         THE PROSPECTIVE JUROR:  Sure.

23         THE COURT:  You wrote that you have heard about some

24    of the allegations or some allegations about Mr. Kelly.

25         Can you put aside anything that you might have heard

JURY SELECTION                    221

1    and just evaluate this case based on the evidence that's

2    presented at trial?

3              THE PROSPECTIVE JUROR:  Yes.

4              THE COURT:  You also wrote that you've had some

5    people in your family who have been in prison before.

6              THE PROSPECTIVE JUROR:  Yes.

7              THE COURT:  Including someone who is currently in

8    prison.

9              THE PROSPECTIVE JUROR:  Yes.  I have a cousin, yeah.

10             THE COURT:  Anything about those circumstances that

11   would affect your ability to be --

12             THE PROSPECTIVE JUROR:  No.

13             THE COURT:  -- fair and impartial?

14             Okay.  And then you also have a cousin who is at the

15   Department of Homeland Security.

16             THE PROSPECTIVE JUROR:  Yes.

17             THE COURT:  Anything about that position that would

18   make it hard for you to be fair and impartial?

19             THE PROSPECTIVE JUROR:  No.  We don't discuss work.

20             THE COURT:  Okay.  All right.

21             I'm going to ask you one other favor.  Our court

22   reporter takes down everything that we say, so just let me

23   finish before you answer.  It just makes her job a lot easier.

24             THE PROSPECTIVE JUROR:  Okay.

25             THE COURT:  So during the course of this trial, you

JURY SELECTION                                    222

1   are going to hear evidence and see some exhibits that have to

2   do with sexual activity between people of the same sex.

3          Is there anything about that kind of evidence that

4   would affect your ability to be a fair and impartial juror?

5          THE PROSPECTIVE JUROR:  No.

6          THE COURT:  Okay.

7          Let me check with the lawyers to see if there's

8   anything else they would like me to ask you.

9          (Continued on the next page.)

10         (Sidebar conference.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    223

1              (Sidebar conference held on the record out of the

2     hearing of the prospective juror.)

3              MR. CANNICK:  Your Honor, she said her cousin works

4     for Homeland Security, and she said they don't discuss his

5     work, but I want to know whether or not if members of Homeland

6     Security testify here in the court, would she favor that

7     testimony over that of --

8              THE COURT:  Are we having Homeland Security testify?

9              MR. CANNICK:  Yes.  That's the lead agency in this

10    case.

11             THE COURT:  Oh, all right.

12             (Sidebar end.)

13             (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

JURY SELECTION                                   224

```
 1              (In open court.)
 2              THE COURT:  I know you said that you don't discuss
 3    your cousin's work with him or her, and the position is
 4    paralegal in the --
 5              THE PROSPECTIVE JUROR:  Yes.
 6              THE COURT:  -- Department of Homeland Security.  It
 7    may be that there are employees of Homeland Security who
 8    testify here.
 9              Will you be able to view their testimony fairly and
10    impartially even though you have a cousin who is also employed
11    at Homeland Security?
12              THE PROSPECTIVE JUROR:  Yes.  I don't know any of
13    her co-workers, so that wouldn't be an issue.
14              THE COURT:  All right.  It's probably not going to
15    be her that testifies, so --
16              THE PROSPECTIVE JUROR:  Right.
17              THE COURT:  -- all right.
18              Okay.  So I just want to review some of the
19    principles that we talked about in the larger courtroom, and
20    the first is the presumption of innocence; that Mr. Kelly is
21    presumed to be innocent, and the Government has to prove his
22    guilt beyond a reasonable doubt.  I will give more
23    instructions on that if you're selected as a juror, but can
24    you follow that principle of law?
25              THE PROSPECTIVE JUROR:  Yes.
```

JURY SELECTION                                    225

1          THE COURT:  And can you also promise that you will

2   follow all of my instructions on the law?

3          THE PROSPECTIVE JUROR:  Yes.

4          THE COURT:  And there's also, as I said before,

5   complete restriction on looking anything up about the case or

6   researching it or talking about it with anybody else.

7          Can you also follow that rule?

8          THE PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Okay.  And, finally, if you are selected

10  as a juror in this case, do you promise to be fair and

11  impartial to both sides?

12         THE PROSPECTIVE JUROR:  Yes.

13         THE COURT:  All right.  Thank you so much.

14         Ms. Greene is going to direct you to where you're

15  supposed to go.

16         (The prospective juror exits.)

17         (The prospective juror approaches.)

18         THE COURT:  This is Juror 163; is that right?

19         THE PROSPECTIVE JUROR:  Yes, ma'am.

20         THE COURT:  All right.  Good morning.

21         How are you doing?

22         THE PROSPECTIVE JUROR:  I'm well.  Thank you.

23         THE COURT:  Good.

24         So since we have the microphone, let's make use of

25  it.

JURY SELECTION                    226

1          THE PROSPECTIVE JUROR:  Okay.

2          THE COURT:  So much better.

3          Okay.  So I've gone over your questionnaire, and I

4    have a couple of additional questions to ask you or just some

5    clarifications.

6          THE PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Let's start with the piece of paper

8    that's in front of you.  That's just some additional names

9    that you may hear mentioned during the course of the trial or

10   perhaps who will testify.

11         Are any of those familiar to you?

12         THE PROSPECTIVE JUROR:  They are not.

13         THE COURT:  And how long have you been a flight

14   attendant?

15         THE PROSPECTIVE JUROR:  Eighteen and a half years.

16         THE COURT:  Okay.  And I take it that your schedule

17   won't interfere with your ability to serve as a juror in this

18   case?

19         THE PROSPECTIVE JUROR:  No.  They have the

20   provisions for covering my position.

21         THE COURT:  Okay.  Good.  Good.

22         And your spouse is also in the travel industry; is

23   that right?

24         THE PROSPECTIVE JUROR:  Hotel sales.

25         THE COURT:  Okay.  What kinds of -- is it --

JURY SELECTION                    227

1          THE PROSPECTIVE JUROR:  So he works with high-end

2    travel agents to have their clients stay at the properties he

3    represents.

4          THE COURT:  I see.  Okay.

5          And then you also wrote that you've heard some

6    things about this case before; is that correct?

7          THE PROSPECTIVE JUROR:  Just minor things in the

8    press.  Nothing -- I can't recall any specific details.

9          THE COURT:  Okay.

10         THE PROSPECTIVE JUROR:  There were things that I

11   found -- I was like, oh, I had no idea that was in the

12   questionnaire.

13         THE COURT:  Yes, okay.  Oh, I see what you mean.

14         THE PROSPECTIVE JUROR:  There were accusations there

15   that I had absolutely zero idea of.

16         THE COURT:  Okay.  Well, as I think I said in the

17   larger courtroom, you know, if you're a juror in this case,

18   you will have to base your decision only on the evidence that

19   you hear in the courtroom.

20         THE PROSPECTIVE JUROR:  Of course.

21         THE COURT:  And I think you made reference at

22   another portion of your questionnaire that trial by media is

23   worse than trial by jury.

24         THE PROSPECTIVE JUROR:  It most definitely is.

25         THE COURT:  But what I'm making doubly sure of is

JURY SELECTION                    228

1   that you can put aside anything you might have heard about the

2   case, or that you heard about Mr. Kelly before, and just base

3   your decision on the evidence that you hear in the courtroom.

4           Can you do that?

5           THE PROSPECTIVE JUROR:  Of course.

6           THE COURT:  Okay.  And then you also told us that

7   you have a friend who's in Bill Cosby's family -- is that

8   right? -- and that you followed that case.

9           THE PROSPECTIVE JUROR:  I did, because of the

10  relation.

11          THE COURT:  Okay.  Do you have any opinions about

12  how Bill Cosby was treated during the course of that

13  investigation or trial?

14          THE PROSPECTIVE JUROR:  It -- I have to go by what

15  the verdict is.

16          THE COURT:  Okay.

17          THE PROSPECTIVE JUROR:  So I don't know all the

18  details regarding the case 100 percent, what the jury was

19  told; they were given facts, and they made their decision.

20          THE COURT:  All right.  I take it that you didn't go

21  to the trial; is that right?

22          THE PROSPECTIVE JUROR:  I did not.

23          THE COURT:  Okay.  Anything about just knowing

24  somebody in his family or anything about that trial that would

25  make it harder for you to be fair and impartial in this case?

JURY SELECTION                                    229

1          THE PROSPECTIVE JUROR:  No.

2          THE COURT:  Okay.  Now, during the course of this

3   trial, there will be evidence that involves testimony and some

4   exhibits that's related to sexual activity between people of

5   the same sex.

6          Anything about that fact that would make it hard for

7   you to be fair and impartial in this case?

8          THE PROSPECTIVE JUROR:  No.

9          THE COURT:  Okay.

10         Let me just see from counsel if they have any

11  additional questions.  Give me just one second.

12         THE PROSPECTIVE JUROR:  Of course.

13         (Continued on the next page.)

14         (Sidebar conference.)

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                              230

1          (Sidebar conference held on the record out of the

2     hearing of the prospective juror.)

3          MS. GEDDES:  I apologize for not putting this in our

4     submission, but he indicated that he had a friend who was

5     convicted, I think, in federal court for drug distribution and

6     served ten years.  Can you ask him whether there was anything

7     about his prosecution that, you know, would affect his ability

8     to be fair and impartial?

9          THE COURT:  Yes.

10          He's also been the victim of a crime, so maybe I

11     will ask him about both of those.

12          MS. GEDDES:  Thank you.

13          (Sidebar end.)

14          (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

JURY SELECTION                                231

```
 1              (In open court.)

 2              THE COURT:  So I neglected to ask you about this

 3    before.

 4              It's been a little while, but you were mugged some

 5    time ago, which I'm sure was an awful experience.

 6              Anything about that experience that would make it

 7    hard for you to be fair and impartial in this case?

 8              THE PROSPECTIVE JUROR:  No.

 9              THE COURT:  Okay.  And then you also had a friend

10    who served time for distributing drugs.

11              Anything about the circumstances of that case that

12    would affect your ability to be fair and impartial?

13              THE PROSPECTIVE JUROR:  No.

14              THE COURT:  Okay.  All right.  I just want to review

15    some of the things that we discussed in the big courtroom.

16              The first is that Mr. Kelly is presumed to be

17    innocent, and the Government has to prove his guilt beyond a

18    reasonable doubt.  If you are selected as a juror, that's

19    something that I will explain to you in more detail, but is

20    that a principle that you promise to follow?

21              THE PROSPECTIVE JUROR:  100 percent.

22              THE COURT:  All right.  And do you also promise that

23    you will follow all of my instructions on the law?

24              THE PROSPECTIVE JUROR:  Yes, ma'am.

25              THE COURT:  And that prohibition against researching
```

JURY SELECTION                    232

1   the case or looking anything up on the internet, it's critical

2   to the fair trial that we have.

3          Can you follow those rules?

4          THE PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Okay.  And, finally, do you promise that

6   you will give both sides a fair trial?

7          THE PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Okay.

9          Ms. Greene is going to direct you where to go next.

10         THE PROSPECTIVE JUROR:  Okay.

11         Thank you.

12         THE COURT:  Thank you.

13         THE PROSPECTIVE JUROR:  Thank you, all.

14         (The prospective juror exits.)

15         (The prospective juror approaches.)

16         THE COURT:  And this is Juror 165; is that right?

17         THE PROSPECTIVE JUROR:  Correct.

18         THE COURT:  Good morning.

19         How are you?

20         THE PROSPECTIVE JUROR:  All right, Your Honor.

21         THE COURT:  Let's just start with the piece of paper

22  that you've got there.  That's just some additional names that

23  you may hear during the course of the trial and that may

24  possibly testify.

25         Do you know any of them?

JURY SELECTION                    341

1          (The prospective juror approaches.)

2          THE COURT:  So this is Juror Number 206.

3          First of all, good afternoon.

4          THE PROSPECTIVE JUROR:  Good afternoon.  Sorry.

5          THE COURT:  That's all right.

6          My first question to you is that you wrote on your

7  questionnaire that you weren't certain about whether you would

8  be paid --

9          THE PROSPECTIVE JUROR:  I've checked with them since

10  then, and I will be.

11          THE COURT:  Okay.  So that's good to know.

12          All right.  Now you've got that piece of paper.

13  That's just some names of some people who might testify or who

14  might be mentioned; and the question is, are you familiar with

15  any of them?

16          THE PROSPECTIVE JUROR:  Absolutely not.

17          THE COURT:  You also said you like to knit in your

18  spare time.

19          THE PROSPECTIVE JUROR:  Yes.

20          THE COURT:  Any other things that you like to do

21  when you've got some free time?

22          THE PROSPECTIVE JUROR:  I'm boring.  I knit, I

23  crochet, I read, I spin -- not on a bicycle -- I spin wool

24  into yarn.

25          THE COURT:  Oh, really, that doesn't sound boring.

JURY SELECTION                    342

1   That sounds very nice.

2          You also said that you read a little bit about the

3   case having to do with something that happened a while ago.

4          Is there anything that you've read or heard about

5   the case that would affect your ability to be fair and

6   impartial in this case?

7          THE PROSPECTIVE JUROR:  No.  I really haven't heard

8   much of anything about it except what I wrote down.  I don't

9   do news very much and I don't read newspapers.

10         THE COURT:  To the extent that you heard anything,

11  would you be able to put that aside if you're selected as a

12  juror in this case?

13         THE PROSPECTIVE JUROR:  Absolutely.

14         THE COURT:  Now, you are going to hear evidence

15  during the course of the case that involves testimony and some

16  exhibits that relate to sexual activity among people of the

17  same sex.

18         Anything about that that would make it hard for you

19  to be fair and impartial?

20         THE PROSPECTIVE JUROR:  No.

21         THE COURT:  Okay.

22         All right.  Do any of the lawyers have any questions

23  for this juror?

24         MS. GEDDES:  No, Your Honor.

25         MR. CANNICK:  No, Your Honor.

JURY SELECTION                               343

1            THE COURT:  All right.

2            Just a couple of more questions for you really just

3   to review a couple of things.  We talked about this in the

4   ceremonial courtroom, but this is just a reminder that

5   Mr. Kelly is presumed to be innocent and it's the Government

6   that has the burden of proving his guilt beyond a reasonable

7   doubt.  That's a basic principle of criminal law.  I will give

8   you some more instruction on that if you are selected as a

9   juror, but can you promise me that you will follow that

10  principle?

11           THE PROSPECTIVE JUROR:  Yes.

12           THE COURT:  Will you also promise to follow all of

13  my instructions on the law?

14           THE PROSPECTIVE JUROR:  Yes.

15           THE COURT:  And I know you don't watch the news very

16  much or anything like that.

17           Do you also promise not to do any research on the

18  case?

19           THE PROSPECTIVE JUROR:  Oh, no, not at all.  As soon

20  as I got the questionnaire, I just stopped doing it, going in

21  on anything.  I don't want to be at all -- you know, I don't

22  want to hear anything about it.

23           THE COURT:  Okay.  Well that's a good way to be.

24           And then, finally, if you are selected as a juror in

25  this case, do you promise that you will be fair and impartial

JURY SELECTION                    344

1    to both sides.

2              THE PROSPECTIVE JUROR:  Yes.

3              THE COURT:  Okay.

4              Ms. Greene is going to take you to where it is you

5    are supposed to go.

6              Thank you so much.

7              THE PROSPECTIVE JUROR:  Thank you.

8              (The prospective juror exits.)

9              MR. CANNICK:  Your Honor, wait.  Before we get

10   another prospective juror, can we approach?

11             THE COURT:  Sure.

12             (Sidebar.)

13             (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1  **JERHONDA JOHNSON PACE**,

2       called as a witness by the Government, having been

3       first duly sworn/affirmed by the Courtroom Deputy, was

4       examined and testified as follows:

5  DIRECT EXAMINATION

6  BY MS. GEDDES:

7  Q    Good afternoon.  How old are you today?

8  A    Twenty-eight.

9            THE COURT:  It sounds like the mic is not on.

10 Perhaps just hold it.

11 Q    What is your birthday?

12 A    April 19 --

13           (Microphone not working.)

14           THE COURT:  We do have to fix this.

15           It has to be that Ms. Geddes can use the microphone

16 on the desk.  If she uses that one, will the witness's

17 microphone work?

18           THE DEPUTY CLERK:  Yes.  She just can't use the one

19 on her chest.

20           THE COURT:  Put the microphone up to where you can

21 have access to it, Ms. Geddes.

22           MS. GEDDES:  I don't think we can go further than

23 this.  But I can do this.

24           THE COURT:  Let's try that.  And keep your voice up

25 too.

1          I think we established that you're 28 years old,

2   correct?

3          THE WITNESS:  Yes.

4          THE COURT:  Go ahead.

5   BY MS. GEDDES:

6   Q    What is your birthday?

7   A    April 19, 1993.

8   Q    I'm showing the witness only what is marked for

9   identification as Government's Exhibit 1.

10         This is just for -- can we have it just for the

11  witness only?  I think now it's also being published to the

12  jury.

13         I'm showing the witness only what is marked for

14  identification as Government's Exhibit 1.  Do you recognize

15  Government's Exhibit 1?

16  A    Yes.

17  Q    Who is shown in Government's Exhibit 1?

18  A    Rob.

19  Q    Do you know Rob's last name?

20  A    Kelly.

21  Q    Did you personally know Rob Kelly?

22  A    Yes.

23  Q    Is that a fair and accurate photograph of Rob Kelly?

24  A    Yes.

25         MS. GEDDES:  Government offers Government's Exhibit

J. JOHNSON PACE - DIRECT - GEDDES                106

1.

2          THE COURT:  Any objection?

3          MS. BLANK BECKER:  No objection.

4          THE COURT:  That will be in as Exhibit 1.

5          (Government's Exhibit 1 was received in evidence.)

6   BY MS. GEDDES:

7   Q    Do you see Mr. Kelly in the courtroom today?

8   A    Yes, I do.

9   Q    Can you please point to him and identify an article of

10  his clothing?

11  A    He's right there and he's wearing a gray suit.

12         THE COURT:  Indicating the defendant.

13         MS. GEDDES:  Thank you, Judge.

14  Q    Have you ever had sexual contact with the defendant?

15  A    Yes.

16  Q    How old were you when you first had sexual contact with

17  the defendant?

18  A    Sixteen.

19  Q    Approximately when was that?

20  A    May of 2009.

21  Q    How old was the defendant when you first had sexual

22  contact with him?

23  A    Between 41 and 43.

24  Q    Over what period of time did you have sexual contact with

25  the defendant?

J. JOHNSON PACE - DIRECT - GEDDES                    107

1   A     For six months.

2   Q     When did that end?

3   A     January of 2010.

4   Q     Where did you grow up?

5   A     I grew up in a suburb of Chicago.

6   Q     What is the particular neighborhood?

7   A     Streamwood.

8   Q     In what direction is that from downtown Chicago?

9   A     Northwest.

10  Q     Approximately how far from downtown Chicago?

11  A     Forty-five minutes.

12  Q     How far did you go in school?

13  A     Eleventh grade.

14  Q     Did you go to school continuously until the 11 grade?

15  A     Yes.

16  Q     Did you eventually graduate from high school?

17  A     I graduated high school online.

18  Q     Taking classes online?

19  A     Yes.

20  Q     Are you still living in Chicago or its suburb?

21  A     No.

22  Q     Without saying where you are living now, when did you

23  leave Chicago or its suburbs?

24  A     2019.

25  Q     Are you married?

1  A    Yes, I am.

2  Q    Since when?

3  A    2014.

4  Q    You indicated that your last name now is Pace, is that

5  the name that you were born with?

6  A    No.

7  Q    What was the name that you used before you were married?

8  A    Johnson.

9  Q    Do you have any children?

10 A    Yes, I do.

11 Q    How many?

12 A    Four and one on the way.

13 Q    When are you due?

14 A    Any day.

15 Q    What is the age range of your children?

16 A    Ages one to six.

17 Q    Are you currently working?

18 A    I'm a business owner, so yes.

19 Q    What type of business?

20 A    Skin care.

21 Q    Growing up, were you a member of any fan clubs?

22 A    Yes, I was.

23 Q    Who's fan club were you a member of?

24 A    An R. Kelly fan club.

25 Q    What type of fan club was it?

1    A    It was a online fan club, on My Space.

2    Q    What is My Space?

3    A    A social network where people go to talk to other people.

4    Q    It's online, correct?

5    A    Yes, it is.

6    Q    Who, if anyone, from that fan club, that online fan club,

7    did you meet in person?

8    A    Dominique.

9    Q    I'm showing the witness only what is marked for

10   identification as Government's Exhibit 69, for the witness

11   only.

12        Do you recognize the individual in Government's

13   Exhibit 69?

14   A    Yes, I do.

15   Q    Who is that?

16   A    That's Dominique.

17   Q    Without saying it, do you know Dominique's true name?

18   A    Yes, I do.

19        MS. GEDDES:  May I publish Government's Exhibit 69

20   to the jury?

21        THE COURT:  Any objection?

22        MS. BLANK BECKER:  No objection.

23        THE COURT:  That's in evidence.

24        (Government's Exhibit 69 was received in evidence.)

25   Q    Did you know Dominique's true name?

1  A    Yes.

2  Q    I'm showing the witness only what is marked for

3  identification as 69A.

4       Is Dominique's full name written under her

5  photograph on 69A?

6  A    Yes, it is.

7            MS. GEDDES:  The Government offers 69A.

8            THE COURT:  Any objection?

9            MS. BLANK BECKER:  No, Judge.

10           THE COURT:  69A is in evidence.

11           (Government's Exhibit 69A was received in evidence.)

12           THE COURT:  I'm going to remind counsel to use the

13 microphone.

14 BY MS. GEDDES:

15 Q    Where did you first meet Dominique in person?

16 A    At R. Kelly's concert.

17 Q    Do you recall which concert that was?

18 A    The Double Up tour.

19 Q    Where was it that you met Dominique?  Where was the

20 concert?

21 A    In Chicago at the United Center.

22 Q    Do you recall when that was?

23 A    It was in December of 2007.

24 Q    After attending the defendant's Double Up concert in

25 2007, when did you next encounter the defendant?

1    A    I encountered him at court.

2    Q    Do you recall when that was?

3    A    That was in 2008.

4    Q    Do you remember when in 2008?

5    A    April 1st, 2008.

6    Q    April Fool's day?

7    A    Yes.

8    Q    How old were you then?

9    A    I was 14.

10   Q    Why were you at the courthouse?  Why were you at court?

11   A    Being a fan and curiosity.

12   Q    Did you go to court on multiple days to see the

13   defendant?

14   A    Yes, I did.

15   Q    For approximately what period of time did you go to court

16   to see the defendant?

17   A    It was from April until June.

18   Q    Of 2008?

19   A    Yes.

20   Q    Who, if anyone, did you meet by going to court on a

21   regular basis?

22   A    I met his manager.

23   Q    Who was his manager?

24   A    Derrel.

25   Q    Do you know Derrel's last name?

J. JOHNSON PACE - DIRECT - GEDDES                    112

1   A    McDavid.

2   Q    Who, if anyone, else did you meet by going to court on a

3   regular basis?

4   A    I made a friend going to court on a regular basis.

5   Q    Who was that?

6   A    Keyonia.

7   Q    What is Keyonia's last name?

8   A    Jones.

9   Q    How old was Keyonia Jones?

10  A    Approximately 23.

11  Q    During the time that you went to court in Chicago, what

12  if any, contact did you have with the defendant?

13  A    When I would go to court, I would just see him come in

14  and out of court and I was able to speak with him.  And I also

15  got to speak with him at a park where he parked his tour bus

16  at.  So I was able to talk to him there.

17  Q    How did you know to go to the park?

18  A    We were, Keyonia and I was on the bus, and we were

19  leaving the courthouse, and we saw his tour bus.

20  Q    So just to be clear, when you said that you and Keyonia

21  were on the bus, you're not referring to the tour bus, are

22  you?

23  A    No.  We were on the Chicago public transportation bus.

24  Q    You saw the defendant's tour bus; is that correct?

25  A    That is correct.

J. JOHNSON PACE - DIRECT - GEDDES                113

1   Q    What, if anything, did the defendant say to you when you

2   saw him on those days when you went to court?

3   A    He was just speaking to me.  He would say hi to me.  And

4   on April Fool's day when I saw him for the very first time, I

5   was walking next to him.  And I said, like, I was a fan.  And

6   he said, thank you for your support.  And he also -- I said,

7   that it was my birthday coming up.  He said happy early

8   birthday.

9   Q    What, if any, conversation -- what, if anything, did the

10  defendant's manager, Derrel McDavid, say to you?

11  A    Derrel McDavid had promised Keyonia and I a T-shirt and

12  autograph once everything was over.

13  Q    Did you eventually get a T-shirt or an autograph?

14  A    I did not get a T-shirt, but I did get an autograph.

15  Q    Who's autograph?

16  A    R. Kelly's autograph.

17  Q    The defendant's?

18  A    Yes.

19  Q    Have you ever been inside of the defendant's home?

20  A    Yes, I have.

21  Q    Where does the defendant live?  Where did the defendant

22  live when you went there?

23  A    In Olympia Fields.

24  Q    Where is Olympia Fields?

25  A    South suburb of Chicago.

J. JOHNSON PACE - DIRECT - GEDDES                    114

1  Q    Approximately how far is the defendant's residence in
2  Olympia Fields from where you were living in Streamwood?
3  A    On public trans, about two hours.
4  Q    Do you recall the very first time that you were inside of
5  the defendant's home in Olympia Fields?
6  A    Yes.
7  Q    Approximately when was that?
8  A    It was in May of 2009.
9  Q    How old were you?
10  A    I was 16.
11  Q    When you first went to the defendant's house in May 2009,
12  who, if anyone, did you go with?
13  A    I went with Keyonia.
14  Q    Keyonia Jones?
15  A    Yes.
16  Q    What led you to going to the defendant's house in May of
17  2009?
18  A    We were supposed to be going to a tattoo parlor and we
19  ended up getting invited to his home by Bubba.  He invited us
20  to a party.
21  Q    You said you were supposed to be going to a tattoo
22  parlor?
23  A    Originally, yes.
24  Q    How did it come to be that you were going to go to a
25  tattoo parlor?

J. JOHNSON PACE - DIRECT - GEDDES            115

1    A    Keyonia wanted to get a tattoo.  I posted about it on My

2    Space.  And that's when Bubba had messaged me.  He told me he

3    had a tattoo shop in Harvey.

4    Q    Did you and Keyonia start to go to the tattoo shop?

5    A    Yes, we did.

6    Q    What happened?

7    A    On our way to the tattoo shop, that's when Bubba had text

8    me and said that, invited us to R. Kelly's party.

9    Q    Do you know Bubba's -- is Bubba a nickname or true name?

10   A    Bubba is his nickname.

11   Q    Do you know the true name?

12   A    Yes.

13   Q    What is?

14   A    Jermaine Maxey.

15   Q    I'm showing the witness only for identification as

16   Government's Exhibit 9.  Do you recall the individual shown in

17   Government's Exhibit 9?

18   A    Yes, I do.

19   Q    Who is that?

20   A    This is Bubba.

21   Q    Is this photograph a fair and accurate photograph of how

22   Bubba appeared?

23   A    Yes.

24         MS. GEDDES:  Government offers Government's Exhibit

25   9.

J. JOHNSON PACE - DIRECT - GEDDES                116

1          THE COURT:  Any objection?

2          MS. BLANK BECKER:  No objection.

3          THE COURT:  That's in evidence.

4          (Government's Exhibit 9 was received in evidence.)

5          MS. GEDDES:  May we publish to the jury?

6          THE COURT:  Yes.

7          (Exhibit published.)

8    BY MS. GEDDES:

9    Q    What happened -- so you were invited to a party at the

10   defendant's house, did you go?

11   A    Yes.

12   Q    How did you get there?

13   A    We got there on the Metro train.

14   Q    How did you get from -- do you recall what stop you went

15   to?

16   A    211 Street.

17   Q    How did you get from the stop at 211 Street to the

18   defendant's house?

19   A    Keyonia and I walked.

20   Q    Approximately how far was that?

21   A    About a ten-minute walk from the train station.

22   Q    You eventually got to the defendant's residence?

23   A    Yes.

24   Q    Can you describe the outside of the defendant's house?

25   A    The outside of the house there is a gate that leads up --

1   there is a small driveway that leads up to a gate, then a

2   longer driveway that leads up to the house.

3   Q    I'm showing the witness only what is marked for

4   identification as Government's Exhibit 502A.  Do you recognize

5   what is shown in 502A?

6   A    Yes, I do.

7   Q    What is that?

8   A    This is the gate outside of his home.

9   Q    Is that a fair and accurate depiction of the gate outside

10  the defendant's home that you went to?

11  A    Yes, it is.

12          MS. GEDDES:  Government offers 502A.

13          THE COURT:  Any objection?

14          MS. BLANK BECKER:  No, Judge.

15          THE COURT:  That's in evidence.

16          (Government's Exhibit 502A was received in

17  evidence.)

18          MS. GEDDES:  May we publish to the jury, please?

19          THE COURT:  Yes.

20          (Exhibit published.)

21  BY MS. GEDDES:

22  Q    So you testified that you walked from the 211 Street

23  station to the defendant's residence.  What happened when

24  arrived at the gate outside his residence?

25  A    I contacted Bubba and let Bubba know I was there, and

J. JOHNSON PACE - DIRECT - GEDDES                118

1    Bubba came out to get me and Keyonia.

2    Q    Where did you go next?

3    A    We went inside of his house.

4    Q    Do you recall where inside his house you went to?

5    A    We went to the game room.

6    Q    What was going on at the defendant's house when you

7    arrived?

8    A    There was a party going on.

9    Q    You testified that you went to the game room.  Where in

10   the defendant's house was the game room?

11   A    It's on the main level.  So it's right above his

12   basement, the first level above the basement.

13   Q    What, if any, interaction did you have with the defendant

14   that day when you went to his house for a party?

15   A    I talked to him.  He told me that he remembered me from

16   court.  And we exchanged phone numbers.

17   Q    Do you recall how you exchanged phone numbers with the

18   defendant?

19   A    He asked me for my phone, and I handed him my phone and

20   he put his phone number in it.  Then he handed me his iPhone

21   and I put my phone number in it.

22   Q    What type of phone did you have back then?

23   A    I had a pink Palm Centro.

24   Q    What, if anything, did you tell the defendant about how

25   old you were at that party?

J. JOHNSON PACE - DIRECT - GEDDES                    119

1  A    I told him I was 19.

2  Q    Were you 19?

3  A    No, I wasn't.

4  Q    How old you were again?

5  A    I was 16.

6  Q    What, if anything, did you do after you had that

7  conversation with the defendant and got his phone number?

8  A    Once I had his phone number, me and Keyonia and I went

9  to, we left away from his bar area where he was sitting.  We

10 just stayed there, we stayed listening to music for a few

11 minutes then we left.

12 Q    Why did you leave?

13 A    It was a way too loud and you can't really, we couldn't

14 hear each other talk without screaming in each other's ear.

15 Q    Approximately how long did you stay at the defendant's

16 house that night?

17 A    I stayed less than 30 minutes.

18 Q    When did you next speak with the defendant?

19 A    It was a couple days later.

20 Q    What happened when you spoke to him?

21 A    He had invited me to come back to his house.

22 Q    Do you recall how you were communicating with him?

23 A    Through text messaging and phone calls.

24 Q    You testified that he invited you to come to his house.

25 Did you accept his invitation?

1   A    Yes, I did.

2   Q    Where did you go?

3   A    I went back to his home in Olympia Fields.

4   Q    How did you get there?

5   A    On the Metro train.

6   Q    What happened?  Did you go to the same stop or a

7   different one?

8   A    I went to the 211 Street stop.

9   Q    What happened when you got to the 211 Street stop?

10  A    I was picked up.

11  Q    How were you picked up?

12  A    I was picked up by someone in a red and black Chrysler

13  300.

14  Q    Do you know who arranged for you to be picked up?

15  A    Yes, I do.

16  Q    Who?

17  A    Rob did.

18  Q    Do you remember the particular individual who picked you

19  up that day?

20  A    Yes.

21  Q    Who was it?

22  A    It was Anthony.

23  Q    Who is Anthony?

24  A    A runner.

25  Q    When you say a runner, what do you mean?

1  A    He was a runner for Rob, like, so he would run errands.

2  Q    So Anthony picked you up at the train station, and where

3  did you go from there?

4  A    To Rob's house.

5  Q    In Olympia Fields?

6  A    Yes.

7  Q    What happened when you arrived at the defendant's

8  residence in Olympia Fields?

9  A    When I got there I had my bathing suit because he told me

10 to bring my bathing suit from our conversation.  And when I

11 got there, I contacted him and let him know that I was there

12 and I was in the pool area.  And he told me that he was

13 getting a haircut and that he would be down soon, to go change

14 into my bathing suit.

15 Q    You testified that the defendant had told you to bring

16 your bathing suit; is that correct?

17 A    Yes.

18 Q    When did the defendant tell you to bring your bathing

19 suit?

20 A    When he invited me to his house.

21 Q    When Anthony drove you to his house in Olympia Fields,

22 how did you get to the pool room once you arrived there?

23 A    Anthony walked me to the pool room through a side door.

24 Q    Just to be clear to the jury, when you say pool room are

25 you referring to a swimming pool or pool game?

J. JOHNSON PACE - DIRECT - GEDDES                122

1    A    It's a swimming pool.

2    Q    What happened next?

3    A    After I got there, I had contacted him and let him know.

4    And he said he was getting his haircut, he'll be down soon.

5    He told me to change into my bathing suit, which I did.  I

6    went and changed into my bathing suit.  Then I came back out

7    and I was just standing there, then he walked into the pool

8    room.

9    Q    And just to be clear, the pool room is that an outside

10   pool or an indoor pool?

11   A    Indoor pool.

12   Q    You said you changed into your bathing suit, what type of

13   bathing suit was it?

14   A    Two-piece bathing suit.

15   Q    What happened when the defendant came into the pool area?

16   A    He sat down on a lounger and told me to walk back and

17   forth.  And when I walked back and forth, to remove a piece of

18   my bathing suit every time I came back towards him.

19   Q    What did you do?

20   A    I did what I was told.  I walked back and forth and I

21   removed my bathing suit.

22   Q    And when you said you removed your bathing suit, how did

23   you remove your bathing suit?

24   A    I untied it as I was walking and dropped it on the floor.

25   Q    What happened after that?

J. JOHNSON PACE - DIRECT - GEDDES                    123

1  A    I walked over to him and he grabbed me and we started

2  kissing.

3  Q    At that time when the defendant grabbed you what, if

4  anything, were you wearing?

5  A    Nothing.

6  Q    What happened when you started -- when the defendant

7  started kissing you?

8  A    He picked me up and took me into his game room, which is

9  connected to his swimming pool room.

10 Q    What happened in the game room?

11 A    That's when he started performing oral sex on me.

12 Q    When you say oral sex, what do you mean?

13 A    Him using his mouth on my vagina.

14 Q    What, if anything, did the defendant say when he was

15 giving you oral sex?

16 A    He just gave me oral sex, and then, he wasn't saying

17 anything.

18 Q    Okay.  What happened after that?

19 A    That's when I felt uncomfortable and then I told him that

20 I was actually 16.  I told him my real age and I showed him my

21 state ID.

22 Q    Why did you tell the defendant your true age?  You said

23 you felt uncomfortable, what do you mean?

24 A    I felt uncomfortable.  I felt it wasn't right, that I

25 should tell him my age.

J. JOHNSON PACE - DIRECT - GEDDES                    124

1  Q    You testified that you showed the defendant your state
2  ID, do you recall when you got that state ID?
3  A    Yes, it was my 16th birthday gift, so a couple days after
4  my 16th birthday.
5  Q    Who arranged for you to get that state ID?
6  A    My stepfather.
7  Q    At the time when you went to the defendant's house, did
8  you have a driver's license?
9  A    No, I did not.
10 Q    So instead you had a state ID?
11 A    Yes, I did.
12 Q    How, if at all, did the defendant respond when you told
13 him your true age of being just 16 years old?
14 A    He asked me, what is that supposed to mean?  And he told
15 me to continue to tell everyone that I was 19 and to act 21.
16 Q    What happened after that?
17 A    After that I performed oral sex on him.
18 Q    And again, just to be clear, what do you mean by that?
19 A    That was me using my mouth on his penis.
20 Q    What, if anything, did the defendant say as you gave the
21 defendant oral sex?
22 A    He told me that he was going to train me on how to please
23 him sexually and he was going to teach me how to moan and hum
24 on his penis at the same time.
25 Q    Did you have any other sexual contact with the defendant

J. JOHNSON PACE - DIRECT - GEDDES                125

1   on that occasion?

2   A    Yes, I did.

3   Q    What happened?

4   A    He bent me over the back of his sofa and he took my

5   virginity.

6   Q    At the time you were a virgin; is that correct?

7   A    Yes.

8   Q    What, if any, protection did the defendant use?

9   A    None.

10  Q    When you say that he bent you over, just to be clear for

11  the record, what exactly happened between you and the

12  defendant then?

13  A    He just took me behind the back of his couch and he like

14  pushed at my neck and bent me over, and then he put his penis

15  inside of my vagina.

16  Q    Prior to engaging in sexual contact or sexual intercourse

17  with the defendant, what, if anything, did you tell the

18  defendant about your virginity?

19  A    That I was a virgin.

20  Q    Did you tell him that?

21  A    Yes.

22  Q    How did you respond?

23  A    He said that's good.  And that's when he talked that he

24  would train me.

25  Q    Before you had sexual intercourse with the defendant,

1  what, if anything, did he tell you about any sexually

2  transmitted diseases that he had?

3  A    Nothing.

4  Q    What happened after that?

5  A    After?

6  Q    After you had intercourse with the defendant, do you

7  remember, what, if anything, happened after that?

8  A    Yes, we had drinks.

9  Q    What type of drink did you have?

10  A    We had a blue drink and he called it Sex In The Kitchen.

11  Q    Who prepared the drink?

12  A    The defendant.

13  Q    How did you feel after or during -- did you drink the

14  drink?

15  A    I did drink it.

16  Q    How did you it make you feel?

17  A    It was delicious.  I just started feeling a bit ill, and

18  I told the defendant I wasn't feeling well.

19  Q    What happened once you told the defendant you weren't

20  feeling well?

21  A    He opened the door to the mirror room, and he told me I

22  can lay down in the mirror room.

23  Q    Can you describe the mirror room?

24  A    A room where the entire room is just a mirror, there is a

25  huge mirror above the bed.

Case 22-1481, Document 78, 04/18/2023, 3501135, Page123 of 303

1  Q    Where is the mirror room in relation to the game room

2  where you said you had been with the defendant?

3  A    It's connected to the game room.

4

5              (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  EXAMINATION CONTINUES

2  BY MS. GEDDES:

3  Q    What happened once you were inside of the mirror room?

4  A    I just laid down.

5  Q    And where, if anywhere, did the defendant go once you

6  were in the mirror room?

7  A    He told me -- well, he was preparing for a party that he

8  was gonna have later, so he ended up leaving the mirror room.

9  Q    And where did you go?

10 A    About, I want to say, ten minutes later I went

11 downstairs.

12 Q    And what happened downstairs?

13 A    I went into the studio.

14 Q    And what happened once you were in the studio?

15 A    That's where I hung out until 6 o'clock in the morning.

16 Q    And at 6 o'clock in the morning -- by the way, were you

17 hanging out by yourself or with others?

18 A    I was by myself, but there were people coming in and out

19 of the studio.

20 Q    And what happened at 6:00 in the morning?

21 A    That's when I ended up texting the defendant telling him

22 I was ready to leave.

23 Q    And what, if anything, did the defendant say when you

24 texted him this?

25 A    I didn't hear back from him, but then someone came down

1  there and they brought me an envelope and told me that they

2  were gonna drop me off at the train.

3  Q    And when you say someone came down, who are you referring

4  to?

5  A    One of the runners.

6  Q    Someone who was working for the defendant?

7  A    Yes.

8  Q    Now, you said that after you were in the mirror room for

9  a time, you went down in the studio?

10 A    Yes.

11 Q    What type of studio was it?

12 A    The Cabin room.

13 Q    And just to be very clear to the jury, when you say

14 studio, what type of studio was it?

15 A    It's a music recording studio.

16 Q    Okay.

17       And where was the recording studio?

18 A    In the basement of the home.

19 Q    Could you get to the recording studio from the inside of

20 the home?

21 A    Yes, you can.

22 Q    And is that how you got there?

23 A    Yes.

24 Q    You testified that someone, one of the defendant's

25 runners, brought you an envelope.

Pace - direct - Geddes                     130

1          What, if anything, was inside of that envelope?

2  A    It was $50.

3  Q    What did you understand the $50 to be for?

4  A    It was for me to get home.

5  Q    And did you then go home?

6  A    Yes, I did.

7  Q    Did you continue to see -- did you see the defendant

8  again after that?

9  A    Yes.

10 Q    Do you recall how soon after the first time that you had

11 sexual contact with the defendant you saw the defendant?

12 A    I don't recall.

13 Q    Okay.

14         Without saying -- I understand you don't recall the

15 specific date, but approximately how long was it before you

16 saw the defendant again?

17 A    About a week.

18 Q    Who, if anyone, did you introduce to the defendant?

19 A    Dominique.

20 Q    I think your mic just cut out for a minute.  Can you say

21 that again?

22 A    Dominique.

23 Q    Is that the Dominique that was shown in Government

24 Exhibit 69, which is in evidence, and I'll place on the

25 screen?

1          (Exhibit published.)

2    A    Yes.

3    BY MS. GEDDES:

4    Q    Why did you introduce Dominique to the defendant?

5    A    Because I was -- he told me that since I was at the

6    studio and I was gonna be hanging out and he would be working

7    for long periods of time recording music, that I could bring a

8    friend to hang out with so that I'm not bored.

9    Q    And how did you introduce the defendant to Dominique?

10   A    He wanted her phone number because he wanted to keep up

11   with everyone that was coming around him.  So, I gave him

12   Dominique's phone number and I gave Dominique his phone

13   number.

14   Q    And just could you remind the jury how you knew Dominique

15   again?

16   A    Dominique was a part of the fan club on My Space.

17   Q    To your knowledge, had Dominique met the defendant before

18   you gave her his number?

19   A    No.

20   Q    To your knowledge, did Dominique end up meeting the

21   defendant?

22   A    Yes.

23   Q    And did she end up going to the defendant's house?

24   A    Yes.

25   Q    Did you see Dominique inside of the defendant's house at

1  Olympia Fields?

2  A     No.

3  Q     What made you believe then that Dominique was, in fact,

4  going to the defendant's house in Olympia Fields?

5  A     We were texting about being at his house at the same

6  time.

7  Q     And you testified earlier that the defendant had

8  suggested that you bring a friend so that you wouldn't be

9  bored, is that right?

10 A     Yes.

11 Q     What, if anything, prevented you and Dominique from

12 seeing each other inside Olympia Fields if you were both there

13 at the same time?

14 A     We were not able to leave out of the rooms.  Whatever

15 area we were in, we couldn't leave out to go meet up.

16 Q     What made you believe that?

17        MS. BLANK BECKER:  Objection, Judge.

18        THE COURT:  Overruled.

19 BY MS. GEDDES:

20 Q     What made you believe that you were not able to leave the

21 rooms and meet up?

22 A     Because it was a part of the rules.

23 Q     Whose rules?

24 A     Rob's rules.

25 Q     The defendant?

Pace - direct - Geddes                                133

1   A    Yes.

2   Q    Now, you testified earlier that the defendant initially

3   put his telephone number into your pink Palm Centro, is that

4   correct?

5   A    Yes.

6   Q    As you sit here today, do you remember the telephone

7   number for that telephone?

8   A    Yes.

9   Q    What was the telephone number?

10  A    708-337-9300.

11  Q    And just to be clear, whose phone number did you just

12  give?

13  A    That's Rob's number.

14  Q    Okay.

15       And so I was asking do you remember the -- I asked a

16  bad question, but let me ask another question.

17       Do you recall your telephone number that you were

18  using when you had the pink Palm Centro?

19  A    No.

20  Q    Okay.

21       Whose name was your telephone, your telephone number

22  in, that pink Palm Centro?

23  A    My mom's name.

24  Q    What is your mother's name?

25  A    Lutrinia Woods.

Pace - direct - Geddes                    134

1   Q    What, if anything, happened to your pink Palm Centro?

2   A    Rob took it away.

3   Q    Why, what happened?

4   A    He didn't want me -- he told me that he didn't want me in

5   contact with anyone other than him, and he didn't think that

6   Keyonia was a good friend.

7   Q    You just mentioned Keyonia.

8        Is this the Keyonia who you met at court supporting

9   the defendant?

10  A    Yes.

11  Q    How did Keyonia come up when you were -- when the

12  defendant took your pink Palm Centro?

13  A    He told me that she wasn't a good friend and that I

14  needed to stop talking to her and that he only wanted me

15  talking to him.

16  Q    How did you respond when the defendant took your pink

17  Palm Centro?

18  A    I just told him that I wanted my memory card out of the

19  phone.

20  Q    And by "memory card," what are you referring to?

21  A    It's a small SD card that goes inside of a phone to --

22  it's to hold, like, pictures.

23  Q    Why did you want your SD card?

24  A    Because my niece had died and it was, like, the only

25  photos that I had of my niece was on that phone, on my SIM --

Pace - direct - Geddes                    135

1   I mean not my SIM card, it was on my SD card.

2   Q    How did the defendant respond when you asked for the SD

3   card?

4   A    Well, he was okay with it once I told him about me

5   wanting the pictures of my niece dying.  And he allowed me to

6   take my SD card.

7   Q    Did you ever get your pink Palm Centro back?

8   A    No.

9   Q    Did you get a new phone?

10  A    Yes, I did.

11  Q    What did you do?

12  A    Well, he gave me money to get a new phone, and I went to

13  Walmart and I got a Virgin Mobile phone.

14  Q    And when you say he gave you money to get a new phone,

15  who were you referring to?

16  A    Rob.

17  Q    The defendant?

18  A    Yes.

19  Q    And do you recall the telephone number for that new

20  phone?

21  A    I do not.

22  Q    Do you recall whether you used that new phone or if you

23  continued to get additional phones during the time that you

24  were with the defendant?

25  A    I used that new phone and I had an additional phone.

Pace - direct - Geddes                    136

1  Q    And as you sit here today, do you recall the telephone

2  numbers -- the telephone number for that other phone?

3  A    No.

4  Q    Did you have the same -- did you use the same phone

5  for -- when you had -- withdrawn.

6        The telephone number that you had when you got a new

7  phone, did you use it only with the new phone or also with

8  other phones?

9        MS. BLANK BECKER:  Objection.

10       THE COURT:  Overruled.

11 A    Can you repeat the question?

12 Q    Yes.

13       You testified that you got a new phone at Walmart.

14 Is that correct?

15 A    Yes.

16 Q    And was there a telephone number associated with that

17 particular phone?

18 A    Yes.

19 Q    Did you use that telephone number with any other phones,

20 besides the one you got from Walmart?

21 A    No.

22 Q    During the time, those six months that you testified you

23 were spending time with the defendant, who were you most in

24 communication with?

25       And when I mean communication, I'm referring to

1  telephonic communication.

2  A    Dominique and Keyonia, and my other friend, Danika.

3  Q    Any family members?

4  A    My older sister.

5  Q    How about your mom?

6  A    I would talk to my mom, but I would talk to the others

7  more frequently.

8  Q    Okay.

9        What is your grandmother's name?

10 A    Loretta Johnson.

11 Q    Did you speak to her over the telephone?

12 A    I did.

13 Q    And you testified that you also spoke with Keyonia.

14       What is -- do you recall Keyonia's -- do you know

15 Keyonia's mom's name?

16 A    I know her first name, I don't know her last name.

17 Q    What is her first name?

18 A    Pearlann.

19 Q    I'm sorry, can you say it?

20 A    Pearlann.

21 Q    Like two names, Pearlann?

22 A    Yes, two names put together.

23 Q    Okay.

24       Did you use the telephones that you just described

25 to communicate with the defendant?

Pace - direct - Geddes                    138

1  A    Yes, I did.

2             MS. GEDDES:  I want to show the witness only

3  Government Exhibit, what's been marked for identification as

4  Government Exhibit 929.

5  Q    Before I do, do you know your grandmother's telephone

6  number?

7  A    Yes, I do.

8  Q    Okay.

9             MS. GEDDES:  I am going to show the witness only

10 what's been marked for identification as Government Exhibit

11 929.

12 BY MS. GEDDES:

13 Q    Do you recognize what's shown in Government Exhibit 929?

14 A    Yes.

15 Q    What is that?

16 A    My grandmother's telephone number.

17            MS. GEDDES:  The Government offers 929.

18            THE COURT:  Any objection?

19            MS. BLANK BECKER:  No objection, Judge.

20            THE COURT:  Okay, that's in evidence.

21            (Government's Exhibit 929 was received in evidence.)

22 BY MS. GEDDES:

23 Q    You testified earlier that you connected the defendant to

24 your friend Dominique.

25            How old was Dominique when you connected her to the

Pace - direct - Geddes                                          139

1   defendant?

2   A    Seventeen.

3   Q    So, a year older than you?

4   A    Yes.

5   Q    What, if anything, happened when you were inside of the

6   defendant's house at Olympia Fields involving Dominique?

7   A    We would just be texting one another and trying to meet

8   up in the home.

9   Q    Was there a time when there was an incident relating to

10  Dominique that happened at Olympia Fields?

11  A    Yes.

12  Q    What happened?

13  A    The police were called --

14           MS. BLANK BECKER:  Objection, Judge.

15           THE COURT:  Overruled.

16  A    The police were called to his home to look for a

17  17-year-old Dominique.

18  Q    Were you present for that?

19  A    Yes, I was.

20  Q    What do you recall happening?

21  A    I remember being back in his African safari room and him

22  being on the phone talking to someone about the police being

23  at his gate.

24  Q    And just to be clear, when you said you remember him

25  being in the African safari room, who was the "him" in that

Pace - direct - Geddes                    140

1   sentence?

2   A     Rob.

3   Q     And what did you hear him say, the defendant say?

4   A     He was on the phone with his attorney and his attorney

5   told him not to --

6           MR. CANNICK:  Objection.

7           THE COURT:  Hold on a second.

8           Can I see counsel?

9           I think actually this might be a good time for the

10  jury to have a break.  They've been sitting here for a good

11  little while.

12          So, we'll break.  Please do not talk about the case

13  at all.  I am going to say that every time, but I mean it.

14  And then we will see you, it is probably going to be about

15  15 minutes.  Okay?

16          THE COURTROOM DEPUTY:  All rise.

17          (Jury exits.)

18          MS. GEDDES:  Can he escort the witness out?

19          THE COURT:  Yes, let's have the witness taken out.

20          (Witness steps down and exits the courtroom.)

21          THE COURT:  Okay, everybody can have a seat.

22          Okay, first of all, whoever is doing the questioning

23  is the one who objects.  Just one lawyer on a witness.  You

24  can nudge the person and tell them to object, but that's the

25  way we are going to do it.

Pace - direct - Geddes                    141

1      It did sound like something inadmissible was coming

2   out, so I take it that's why you were objecting to what the

3   lawyer said, unless she heard the conversation.

4      MS. GEDDES:  She is testifying about what she heard

5   because she was present in the room when the defendant was

6   talking to his attorney.

7      So, I think there is no privilege because the

8   defendant was aware that she was right there.

9      THE COURT:  And what is the substance of the

10   statement that you anticipate will come out?

11      MS. GEDDES:  I think that he is going to advise his

12   attorney that there was members of the Olympia Fields Police

13   Department there looking for a 17-year-old girl, who was

14   Dominique.

15      And why this is important is that the defense has

16   already brutally attacked Ms. Pace's credibility.  And, in

17   fact, in, I think, the opening said she was only at the

18   defendant's residence on one occasion.

19      This is a second occasion, and the Government will

20   call as a witness the officer who responded to Olympia Fields

21   and will directly corroborate what the witness is testifying

22   to.

23      THE COURT:  Well, I don't have any problem with that

24   and I don't think that counsel is objecting to that, but I

25   think is it your position that the witness could hear both

1   sides of the conversation?

2            MS. GEDDES:  Yes.

3            THE COURT:  And what is the relevance of what the

4   lawyer says?

5            MS. GEDDES:  I don't even think she is going to talk

6   about what the lawyer said, it's just in order to establish

7   that the defendant was saying that there were police officers

8   present at Olympia Fields.  That's how she learns about it.

9            THE COURT:  And why is it relevant that it's the

10  lawyer that he's speaking to and how does she know that?

11           MS. GEDDES:  How does she know that it's an

12  attorney?

13           THE COURT:  Yes.

14           MS. GEDDES:  For one, she recognized the attorney

15  because she had been in court for two months --

16           THE COURT:  Okay.

17           MS. GEDDES:  -- and it was the same attorney, but

18  we're not going to go into that.

19           And -- or two, it just explains to the jury why it

20  is that the defendant would be having this conversation in

21  front of her and the attorney does then respond, you know,

22  don't let them in unless they have a warrant, which gives her,

23  you know, some ease because in addition to a 17-year-old girl

24  being present in Olympia Fields, there was a 16-year-old girl

25  namely her.

Pace - direct - Geddes                                    143

1         THE COURT:  Ms. Becker, what's your position?

2         MS. BLANK BECKER:  (No response.)

3         THE COURT:  I don't think anybody is objecting to

4    the defendant's statements, because those are the defendant's

5    statements.

6         I'm correct about that, right?

7         MS. BLANK BECKER:  That is correct, Judge.

8         THE COURT:  All right.

9         I take it that the objection, I don't see the need

10   to have the person identified as the lawyer.  I think what is

11   relevant is for the fact that the statement was made.  And if

12   you are having a police officer testify that he responded to

13   that, I think that's all you need.

14        And so, then the only question is, when the jury

15   comes back, sometimes lawyers don't want me to highlight

16   statements to tell the jury to disregard something, but what

17   I'll tell them is the objection is sustained and that you can

18   ask the question again, and lead her to ask her what it was

19   that he said.

20        Does that satisfy everybody?

21        MS. BLANK BECKER:  Yes, Judge, understood.

22        THE COURT:  Okay.

23        Then we'll be in recess just for about between five

24   and ten minutes.

25        (Judge ANN M. DONNELLY exited the courtroom.)

1          (Recess taken.)

2          (In open court - jury not present.)

3          THE COURTROOM DEPUTY:  All rise.

4          (Judge ANN M. DONNELLY entered the courtroom.)

5          MS. GEDDES:  Can we bring the witness out now?

6          THE COURT:  Yes.

7          I just have one thing that I want to just raise with

8    you.  Just wait until Mr. Kelly comes out.

9          (Defendant entered the courtroom.)

10          THE COURT:  I don't want to spend a lot of time on

11    this particular thing.

12          Alternate Number 3 is telling Ms. Greene that her

13    new job is not going to pay her and she's not going to get

14    health benefits.  She's not asking to be excused, but I can

15    propose a couple of things.

16          I think I can find out the place where she works and

17    find out what the story is.  I haven't done this in a while,

18    but I can call the employer and see what the story is.  I

19    propose that we do that.

20          She is not asking to be let go, but I feel like

21    that's coming.  And so rather than just doing it, I think

22    maybe what we'll do is bring her in afterwards.  Today we are

23    going to work until 5:30.  After that, I'll bring her in, I'll

24    speak to her, and then I'll have Ms. Greene get whatever

25    information we need to get from her.

1          I am, obviously, not going to ask her where she

2   works on the record or anything like that, but I will get that

3   if everybody is in agreement that that's how we should

4   proceed.

5          I am going to take that as a yes.

6          Let's get the witness.

7          (Witness enters and resumes the stand.)

8          THE COURT:  All right, let's get the jury, please.

9          MS. GEDDES:  And, Your Honor I believe that the

10  witness no longer needs to hold the mic.

11         THE COURT:  You got it working now.

12         MR. CANNICK:  And, Your Honor, you may see me

13  objecting.  I am actually going to take this witness.

14         THE COURT:  Oh, you've changed, all right.

15         (Pause.)

16         THE COURTROOM DEPUTY:  All rise.

17         (Jury enters.)

18         THE COURTROOM DEPUTY:  You may be seated.

19         The witness is reminded that she's still under oath.

20         THE COURT:  All right, folks, I am sustaining the

21  objection to the last question.

22         Why don't you put another question to the witness?

23         MS. GEDDES:  Thank you, Judge.

24  BY MS. GEDDES:

25  Q    What, if anything, do you recall the defendant saying

1  during the telephone conversation that you overheard in

2  Olympia Fields?

3  A    That the police were at his gate looking for a

4  17-year-old Dominique.

5  Q    And who did you understand the Dominique to be?

6  A    The Dominique I introduced him to, my friend.

7          MR. CANNICK:  Objection, Your Honor.

8          THE COURT:  Did you know any other Dominiques

9  besides the one that you had met before?

10          THE WITNESS:  No.

11          THE COURT:  Okay, next question.

12          Mr. Cannick, make sure your microphone is on.

13          MR. CANNICK:  Thank you.

14  BY MS. GEDDES:

15  Q    Now, you testified earlier that you and Dominique never

16  saw each other inside the defendant's residence at Olympia

17  Fields.

18          When, if ever, were the two of you together outside

19  of the defendant's house?

20  A    We hung out a lot.

21  Q    Let me rephrase.  Let me ask another question.

22  A    Okay.

23  Q    Were you and Dominique ever together at Olympia Fields,

24  but outside of the house as opposed to inside?

25  A    Yes.

1  Q    What happened?

2  A    We ran through his gate.

3  Q    And when you say "his gate," who are you referring to?

4  A    Rob.

5  Q    And who went through the defendant's gate?

6  A    Dominique and I.

7  Q    Why were you running through the defendant's gate?

8  A    It was just something childish that we decided to do.

9         MR. CANNICK:  I'm sorry, I didn't hear that.

10        THE COURT:  Just repeat your answer, could you?

11        THE WITNESS:  It was something childish that we

12 decided to do.

13 BY MS. GEDDES:

14 Q    How old were you?

15 A    Sixteen and seventeen.

16 Q    You were sixteen and Dominique was seventeen?

17 A    Yes.

18 Q    What happened when you ran through the gate?

19 A    Well, when we ran through the gate we actually got

20 caught.

21 Q    By who?

22 A    Bubba.

23 Q    Is that the Bubba who first invited you to the

24 defendant's house?

25 A    Yes, it is.

1  Q    And what happened when you were caught?

2  A    Once we were caught, Bubba had came out and he asked us

3  why did we run through the gate and we didn't have an answer,

4  and he called Rob.

5        And then I asked -- I told Bubba that I had some

6  heels that I had left there.

7  Q    You mentioned "heels."

8        Are you referring to shoes?

9  A    Yes.

10 Q    And where did you say you had left the shoes?

11 A    I told him that I left them in Music 1.

12 Q    What is Music 1?

13 A    Music 1 is -- it's a studio inside of Rob's house.

14 Q    At Olympia Fields?

15 A    Yes.

16 Q    Had you, in fact, left a pair of heels in Music 1?

17 A    Yes, I did.

18 Q    Was that why you were there that day?

19 A    No, it wasn't.

20 Q    What, if any, conversations did you have with the

21 defendant about running through his gate?

22 A    Once I ran through the gate, I ended up getting a phone

23 call from him later on that night, later in the night.

24 Q    What did he say?

25 A    He was mad about me running through his gate and I told

1  me that I was, like, childish and that I would be on

2  punishment.

3  Q    Now, when you and Dominique went to the defendant's house

4  that day, had you been invited?

5  A    No.

6  Q    Okay.

7        During the time that you spent with the defendant,

8  what, if anything, did the defendant ever tell you to write or

9  sign?

10 A    I had to sign a non-disclosure agreement and I had to

11 write a letter saying that I had stolen a hundred-thousand

12 dollars' worth of jewelry from him and that I had stolen money

13 from him.  And that my -- my sister had put me up to say that

14 he gave me genital herpes.

15 Q    Let's back up a moment.

16       You first mentioned a non-disclosure agreement.

17       Whose idea was it for you to sign a non-disclosure

18 agreement?

19 A    It was Rob's idea.

20 Q    The defendant's?

21 A    Yes.

22 Q    And why did you understand the defendant to be telling

23 you to sign a non-disclosure agreement?

24 A    Because he had people around him that he couldn't trust,

25 so I had to prove that I was trustworthy.

1  Q    Did you sign the agreement?

2  A    Yes, I did.

3  Q    Prior to signing it, did you read it?

4  A    No, I did not.

5  Q    Were you given a copy of the agreement?

6  A    No.

7  Q    You also just mentioned a letter that the defendant told

8  you to write.

9         Do you recall the circumstances under which the

10  defendant told you to write that letter?

11  A    Yes, it was all about gaining his trust and he told me

12  that if it wasn't true, that I wouldn't mind writing it.

13         THE COURT:  I'm sorry, I didn't hear what you said.

14         THE WITNESS:  It was all about gaining his trust and

15  he told me if it wasn't true, that I wouldn't mind writing it.

16  BY MS. GEDDES:

17  Q    And what is it that the defendant told you to write?

18  A    He told me to write that I had stolen a hundred-thousand

19  dollars' worth of jewelry from him, and that my sister had put

20  me up to say that he had given me genital herpes, and that I

21  had stolen money from him.  And also, that I worked for him.

22  Q    All right, let's start with did you, in fact, then write

23  the letters?

24  A    Yes, I did.

25  Q    Let's start with the part of the letter that said you had

1  stolen a significant amount of jewelry.

2        Had you, in fact, stolen anything from the

3  defendant's house?

4  A    No.

5  Q    And you also testified that he told you to write

6  something about your sister.

7        Was there any truth to that?

8  A    No.

9  Q    Whose idea was it to write about stealing the jewelry and

10  the sister's plan?

11  A    It was Rob's idea.

12  Q    And you, in fact, did write the letter?

13  A    Yes, I did.

14  Q    What did you do with the letter once you had written it?

15  A    I gave it to Rob.

16  Q    Were you given a copy of that letter?

17  A    No.

18  Q    You also mentioned that he asked you to sign something

19  about working for him, is that correct?

20  A    Yes.  I had to sign that I worked -- I had worked for him

21  and sign another letter saying that he fired me.

22  Q    Now, at the time, how old were you?

23  A    I was 16.

24  Q    Who -- what were you given that you had to sign?

25  A    It was two -- two contracts saying that I worked with him

Pace - direct - Geddes                                    152

1   and one saying that I was fired.

2   Q    Had you ever worked for the defendant?

3   A    No.

4   Q    Were you ever fired from working for the defendant?

5   A    No.

6   Q    Did you read those contracts before you signed them?

7   A    Partially.

8   Q    Were you given a copy of either of them?

9   A    No.

10  Q    What, if anything -- what, if any, instructions did the

11  defendant give you regarding signing the letters -- signing

12  that contract, the one about being hired and fired?

13  A    He told me whatever I do, just don't write the date on

14  anything.

15  Q    Did you write a date on it?

16  A    No.

17  Q    At some point after you went to the defendant's house in

18  May of 2009, did he leave the area?

19  A    Can you rephrase the question?

20  Q    Yes.

21       At some point after you met the defendant in -- at

22  his house in May of 2009, did he leave the Chicago area?

23  A    Yes, he did.

24  Q    Where did he go?

25  A    I'm sorry, it wasn't in May of 2009.  It was -- it wasn't

SAM    OCR    RMR    CRR    RPR

A 145

1   in May that he left the Chicago area.

2   Q    Okay, but at some point after May of 2009 --

3   A    Yes.

4   Q    -- did he leave?

5   A    Yes.

6   Q    Do you remember when it was that he left?

7   A    Yes.

8   Q    When was it?

9   A    It was in June of 2009.

10  Q    And what happened in June of 2009, where did he go?

11  A    He went to South Africa.

12  Q    How did you learn that the defendant was going to South

13  Africa?

14  A    He talked about it.

15  Q    And what did you understand the defendant was going to

16  South Africa for?

17  A    I believe it was for the World Cup that was happening in

18  South Africa.

19  Q    Okay.  Approximately how long was the defendant in South

20  Africa or away from Chicago, at least?

21  A    For a couple weeks.

22  Q    What, if any, communication did you have with the

23  defendant while he was outside of the U.S.?

24  A    Text messaging and phone calls.

25  Q    You continued to speak with him?

Pace - direct - Geddes                    154

1    A    Yes.

2    Q    What happened once he returned to the Chicago area, did

3    you see him again?

4    A    Yes, I did.

5    Q    And you testified earlier that you spent approximately

6    six months with the defendant.  Is that correct?

7    A    Yes, it is.

8    Q    How regularly did you see the defendant during that

9    six-month period?

10   A    I would see him every visit that I was at his home.

11   Q    And do you recall how often you would go to his house?

12   A    I would go to his home every time I was invited.

13   Q    Okay.

14        And were you invited on more than one occasion?

15   You've already testified, I think, as much.

16   A    Yes.

17   Q    Did you establish -- was there a routine that you

18   followed when you were invited to go to the defendant's house?

19   A    Yes, I followed the rules.

20   Q    Okay.  I want to back up before you get to that.

21        Was there -- what would happen when -- how would you

22   get to the defendant's house when you would visit him?

23   A    I would get to his house by taking the Metro train to

24   211th Street.

25   Q    And you already testified about one time when you were

1  picked up by one of the defendant's runners --

2  A    Yes.

3  Q    -- at 211th Street.

4        What would happen on the other occasions when you

5  got to 211th Street, when you were going to visit with the

6  defendant?

7  A    I was usually picked up by a runner, and on the rare

8  occasion I was picked up by him.

9  Q    Now, you testified earlier that you remembered one of the

10 runners was named Anthony.

11       Do you recall the names of any of the other runners

12 who picked you up?

13 A    Yes.

14 Q    Who were they?

15 A    There was Anthony.  There was Tom.  There was -- Rob

16 picked me up once.

17 Q    You mentioned that Rob picked you up.

18       You're referring to the defendant, correct?

19 A    Yes.

20       MS. GEDDES:  I am showing the witness only what's

21 been marked for identification as Government Exhibit 34.

22 BY MS. GEDDES:

23 Q    Do you recognize the individual shown in Government

24 Exhibit 34?

25 A    Yes.

Pace - direct - Geddes                          156

1    Q     Who is that?

2    A     That's Anthony.

3    Q     Is that the Anthony who you testified earlier was one of

4    the runners who picked you up?

5    A     Yes.

6    Q     Do you know Anthony's last name?

7    A     I do not.

8    Q     Is that a fair and accurate photograph of Anthony?

9    A     Yes.

10          MS. GEDDES:  The Government offers Government

11   Exhibit 34.

12          THE COURT:  Any objection?

13          MR. CANNICK:  No objection.

14          THE COURT:  That's in evidence.

15          (Government's Exhibit 34 was received in evidence.)

16          MS. GEDDES:  May we publish to the jury, please?

17          THE COURT:  Yes.

18          (Exhibit published.)

19   BY MS. GEDDES:

20   Q     During the time that you went with the defendant, who, if

21   anyone, did you tell about your interactions with the

22   defendant during that time?

23   A     During what time?

24   Q     During between May of 2009, when you met the defendant at

25   his house, and January 2010, who, if anyone, did you tell that

SAM    OCR    RMR    CRR    RPR

A 149

Pace - direct - Geddes                    157

1  you were spending time with the defendant?

2  A    Dominique.

3  Q    Did you tell anybody else?

4  A    I was talking to Keyonia, as well.

5  Q    And aside from Keyonia?

6  A    No.

7  Q    Why not?

8  A    Because I wasn't supposed to tell anyone that I was

9  spending time with him.

10 Q    Why did you believe you weren't supposed to tell anybody?

11 A    He told me not to tell anyone.

12 Q    Who was the "he" in that sentence?

13 A    Rob.

14 Q    Do you have a sense of approximately how many occasions

15 you were at the defendant's house in Olympia Fields?

16 A    No.

17            MR. CANNICK:  Objection.

18            THE COURT:  Overruled.

19            MS. GEDDES:  I am showing the witness what's been --

20 witness only what's been marked for identification as 908(a)

21 through 908(e).

22 BY MS. GEDDES:

23 Q    Do you recognize what was shown to you in Government

24 Exhibit 908(a) through (e)?

25 A    Yes.

Pace - direct - Geddes                          158

1   Q    What are those?

2   A    It was Music 1.

3   Q    Generally speaking, what are they?

4   A    Oh, photos of me.

5   Q    And who took those photographs?

6   A    I took those photos.

7   Q    And where were those photographs taken, generally

8   speaking?

9   A    At Rob's house.

10  Q    And when were the photographs taken?

11  A    In 2009, between, like during my time that I was spending

12  time over there.

13          MS. GEDDES:  The Government --

14  Q    And are those fair and accurate --

15          MS. GEDDES:  Regardless, actually.

16          All right, the Government offers 908(a) to (e).

17          MR. CANNICK:  No objection.

18          THE COURT:  Those are in evidence.

19          (Government's Exhibits 908(a) through 908(e) were

20  received in evidence.)

21          MS. GEDDES:  I want to begin with 908(a).

22          And may we publish to the jury, please?

23          (Exhibit published.)

24  BY MS. GEDDES:

25  Q    What is shown in 908(a)?

Pace - direct - Geddes                    159

1    A    Music 1.

2    Q    And, again, where is Music 1?

3    A    In Rob's house.

4    Q    And what part of Rob's house?

5    A    The basement, his studio.

6    Q    And I think you testified earlier that Music 1 was one of

7    the recording studios, is that correct?

8    A    Yes.

9    Q    Was there another recording studio within the defendant's

10   house?

11   A    Yes.

12   Q    Was there a name for that one?

13   A    That was The Cabin.

14            MS. GEDDES:  All right, let's move on to Government

15   Exhibit 908(b).

16            (Exhibit published.)

17   BY MS. GEDDES:

18   Q    What is shown in 908(b)?

19   A    Music 1.

20   Q    It's another photograph with Music 1?

21   A    Yes.

22   Q    And just to be clear, were you in either 908(a) or

23   908(b)?

24   A    No.

25   Q    But you were taking the photos, is that correct?

Pace - direct - Geddes                    160

1   A    Yes.

2            MS. GEDDES:  All right, let's go on to 908(c).

3            (Exhibit published.)

4   BY MS. GEDDES:

5   Q    What is shown in 908(c)?

6   A    Me in the mirror room.

7   Q    And can you describe the angle from which you were taking

8   this photo?

9   A    I was laying on the bed and I took -- I used the mirror

10  above the bed to take the photo.

11  Q    And you testified earlier that there was a mirror on the

12  ceiling, is that correct?

13  A    Yes.

14  Q    Is that the mirror that is shown in 908(c)?

15  A    Yes.

16           MS. GEDDES:  Let's show 908(d), please.

17           (Exhibit published.)

18           MS. GEDDES:  Can we also publish this to the public

19  as well?

20           (Exhibit published.)

21           MS. GEDDES:  Thank you.

22  BY MS. GEDDES:

23  Q    908(d), do you recognize -- you already indicated you

24  recognize.

25           What is 908(d)?

Pace - direct - Geddes                    161

1    A    A photo of me and Snow.

2    Q    Who is Snow?

3    A    The defendant's dog.

4    Q    And where was this photograph taken?

5    A    In Music 1.

6    Q    In the defendant's house?

7    A    Yes.

8    Q    At the time did the defendant have any other pets?

9    A    Yes, he did.

10   Q    What were those pets' names?  Did you know the names of

11   the pets?

12   A    Yes.  It was another little Yorkie named Buddy.

13   Q    Another dog?

14   A    Yes.

15   Q    And this dog that's in this photograph was named Snow, is

16   that correct?

17   A    Yes.

18        MS. GEDDES:  All right, let's go to 908(e).

19        (Exhibit published.)

20   Q    What is shown in 908(e)?

21   A    A photo of me in the mirror room.

22   Q    And just so everyone can see.

23        Can you let the jury know the angle from which that

24   picture was taken?

25   A    I was laying in the bed and that's one of the walls of

1   the mirror room.

2   Q    All right, and what are the walls in the mirror room?

3   A    The walls are mirrors.

4   Q    And is that how you're able to see yourself in that

5   photograph?

6   A    Yes.

7

8              (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   EXAMINATION BY

2   MS. GEDDES:

3   (Continuing.)

4   Q    Now, what if any -- we can take that off.

5            What, if any, instructions did the defendant

6   share with you for the time that you spent with him?

7   A    Can you rephrase that?

8   Q    Sure.  What, if any, instructions did the defendant tell

9   you that you should follow when you were at the defendant's

10  house?

11  A    I had to wear baggy clothes.  So I had to wear some

12  sweats and a T-shirt.

13  Q    Who told you that you were to wear baggy clothes?

14  A    Rob did.

15  Q    What else?

16  A    And I couldn't leave the room.  Wherever I was, I

17  couldn't leave without permission.  If I had to go to the

18  bathroom, I had to get his permission to go to the bathroom.

19  If I wanted to eat, I had to get his permission to eat.  And

20  when I wanted to make phone calls, I had to get his

21  permission.  And he will -- so that he could walk me through

22  the phone calls.

23  Q    And how would you get the defendant's permission?

24  A    By either calling or texting him.  And -- or reaching

25  out to someone in the studio.

J. Pace - Direct/Ms. Geddes                164

1   Q    Who would you reach out to?

2   A    I would have to call the front desk if I couldn't get

3   ahold of him and whoever picked up at the front desk.

4   Q    And who did you understand would be picking up at the

5   front desk?

6   A    It was usually Anthony or Tom.

7   Q    And, by the way, I asked earlier if you knew Anthony's

8   last name.  Do you know Tom's last name?

9   A    I do not.

10  Q    What, if anything, did the defendant tell you to do when

11  he entered a room?

12  A    When he entered --

13        MR. CANNICK:  Objection.  Leading, your Honor.

14        THE COURT:  Overruled.

15  A    When he entered the room, he needed to be acknowledged.

16  And by acknowledging him, I would have to either stand up to

17  kiss him or just look up at him.

18  Q    What, if anything, did the defendant ask you to call

19  him?

20  A    I had to call him Daddy.

21  Q    What would he call you?

22  A    Nickname Jo-Jo.

23  Q    Is that a nickname that you used with just the defendant

24  or with others as well?

25  A    Well, I carried on with others.

J. Pace - Direct/Ms. Geddes                165

1  Q    Now, do you remember have sexual contact with anyone
2  other than the defendant when you were in the defendant's
3  presence?
4  A    Yes, I did.
5  Q    What happened?
6  A    He called me and told me to come to his tour bus.
7  Q    Where was his tour bus at the time?
8  A    It was parked outside of his home near some tents.
9  Q    Do you remember where you were at the time that he
10 called?
11 A    I was in Music 1.
12 Q    Did you go to his tour bus?
13 A    Yes, I did.
14 Q    What happened when you got to the tour bus?
15 A    When I got to the tour bus, I got on the bus and there
16 was him and a naked -- a woman that was naked.
17 Q    And what, if anything, did the defendant say?
18 A    He told me that she was going to train me on how to
19 sexually please him.
20 Q    What, if anything, did the defendant say about that
21 particular woman who she was?
22 A    He told me that it was -- her name was Juice and she has
23 been around since she was 15 years old.
24 Q    And aside from you and the defendant, who was there?
25 You said there was another woman there; is that correct?

J. Pace - Direct/Ms. Geddes                    166

1    A    Yes.

2    Q    Other than the three of you, was there anyone there?

3    A    No, it was just the three of us.

4    Q    And so, what happened after the defendant told you that

5    she was going to train you?

6    A    I had to follow her lead.

7    Q    And what was -- what happened then?

8    A    He told both of us to perform oral sex on him and we

9    did.  And then he told us to spit his nut from my mouth to

10   her mouth and just go back and forth with it.

11   Q    And did you do that?

12   A    Yes, we did.

13   Q    And to be clear, what do you mean by what "his nut"?

14   A    His semen.

15   Q    You testified earlier about certain instructions that

16   the defendant had given you.  Did you ever break any of those

17   rules?

18   A    Yes, I did.

19   Q    What rules do you recall breaking?

20   A    Not agreeing with him.

21   Q    What happened?

22   A    When I didn't agree with him, it was like a -- it was a

23   dispute about the Cleveland Cavaliers and the Chicago Bulls.

24   Q    How did the Chicago Bulls and Cleveland Cavaliers come

25   up?

J. Pace - Direct/Ms. Geddes                167

1   A    He's a basketball fan and he's a Chicago Bulls fan.  And

2   I said that I liked the Cleveland Cavaliers and he did not

3   agree with that.

4   Q    How did he respond when you said that?

5   A    He responded by slapping me.

6   Q    What, if anything, did he say?

7   A    He told me that he kept just bringing up the Bulls and

8   kept saying that he's a Chicago Bulls fan and told me that I

9   was disrespecting him.

10  Q    You testified that he slapped you.  How did he slap and

11  where did he slap you?

12  A    He slapped me in the face backhanded.

13  Q    With the back of his hand?

14  A    Yes.

15  Q    Were there other rules that you broke when you were

16  spending time with the defendant?

17  A    Yes.

18  Q    And can you tell us about some of these rules and what

19  happened?

20  A    It was a disagreement again.  It was in Music 1 where we

21  were having Chinese food, and he brought up the fact that he

22  wanted me to use a dildo on him.

23  Q    And how did you respond?

24  A    I gave a certain look and I said that that was, like, I

25  was taught that that would be gay.  And he started getting

1  mad and he said that he's not fucking gay.

2  Q    And what, if anything, else happened after that?

3  A    And that's when he slapped me in my face and slapped the

4  food out of my mouth.  And then he asked me to perform -- he

5  told me to perform oral sex on him as he stuck a dildo up his

6  butt.

7  Q    And you testified that he slapped you on your face.  How

8  did he slap you that time?

9  A    It was an open-handed slap.

10  Q    During that six-month period that you spent with the

11  defendant, how often did the defendant have sexual contact

12  with you?

13  A    Every time I was there.

14  Q    What, if anything, else do you recall about your sexual

15  encounters with the defendant?

16  A    I recall, like, him recording everything.  He would

17  record and take photos of me.

18  Q    What did he use to record you?

19  A    He would use his iPhone to record me or he would set up

20  a tripod and use his Canon camera.

21  Q    And when you say that he was recording you, what was

22  he -- what was being recorded?

23  A    Our sexual activities were being recorded.

24  Q    And do you remember, specifically, what type of sexual

25  activities he recorded?

J. Pace - Direct/Ms. Geddes                    169

1    A    He would record me performing oral sex on him, him

2    performing oral sex on me, and both of us engaging in sexual

3    intercourse.

4    Q    Did you ever see any of the recordings that he made of

5    you engaged in sexual conduct with him?

6    A    Yes, I did.

7    Q    What was the circumstances under which you saw those?

8    A    It was for critiquing.

9    Q    Can you explain?

10   A    We would watch the recordings and he would tell me where

11   I could use some improvement or how he wanted me to do

12   something different the next time we do it.

13   Q    Now, during your sexual encounters with the defendant,

14   what, if anything, did the defendant do or say during those

15   encounters?

16   A    He would lead everything and he would, like, guide me

17   and tell me everything.  He would tell me to do this and tell

18   me which ways to do it.

19   Q    And was that a regular occurrence?

20   A    Yes, it was.

21   Q    You testified that he used a tripod and sometimes he

22   used an iPhone.  How would the defendant use an iPhone to

23   record you engaged in sexual activity with him?

24   A    He would have his phone angled, like, he would hold it

25   up like this as I was performing activities on him.

J. Pace - Direct/Ms. Geddes                    170

1  Q     And, again, just to be clear, what do you mean by

2  "performing activities" on him?

3  A     As I was giving him fellatio.

4  Q     And by "fellatio," referring to?

5  A     My mouth on his penis.

6  Q     Thank you.  You also said that the defendant was -- the

7  defendant was telling -- leading you and guiding you through

8  some of these sexual encounters.  Can you recall some of the

9  specific instructions that he would give you during those

10 encounters?

11 A     Yes.  He would tell me to stick the dildo up his butt

12 and he would tell me to get on top of him and he would guide

13 me as I was on top of him.

14 Q     And when you say "guide you," what do you mean?

15 A     He would just grind my hips and everything.  And he

16 would also tell me how to, like, please him when it came to

17 giving fellatio.  He would tell me to moan and to hum and do

18 certain things on his penis.

19 Q     I want to step back a moment.  Can you describe the

20 inside of the defendant's residence of Olympia Fields?  And I

21 want to start with the area where the recording studio was.

22 On what level of Olympia Fields was that, his residence?

23 A     The basement.

24 Q     Can you describe the basement area for the jury?

25 A     Well, you come in through the side door.  There was a

1  desk over to the left, there was a desk.  And over to the

2  right there was a sitting area and a bathroom.  And if you

3  walked down the hallway, I mean, there's a little small

4  kitchenette.  And if you walk down the hallway, there's

5  plaques and awards of all of his music and things like that.

6  Then, when you get to the end of that hallway, to the right

7  there is Music 1 and there is a soundproof room.

8                  And if you go past that, there is some

9  antiques and everything under his stairs.  But if you make a

10 left at the end of that hallway, there is a door that ends

11 and then there is The Cabin room.  And if you keep going

12 down, there is a bathroom and then there is a movie theater.

13 Q    Did you spend any time in the movie theater?

14 A    Yes, I did.

15 Q    At the beginning of your response to my question, you

16 said, "If you come in through the side door."  What are you

17 referring to when you mention the side door?

18 A    There is a side door on the side of his house.

19 Q    And is that an exterior door?

20 A    Yes, it is.

21 Q    And can you describe what's on the first floor of the

22 defendant's residence in Olympia Fields?

23 A    The first level is where his game room is.  And that's

24 where the pool room is as well, and the Mirror Room and the

25 VIP section.  And if you leave out of there and you make a

J. Pace - Direct/Ms. Geddes                    172

1  right, and then you do a quick left that's going to take you

2  into his main area.  He has his kitchen there and that's

3  his -- the living space.  And if you go past that, there is

4  a -- that's where the African Safari Room is in the back and

5  there's another bedroom connected.

6  Q    And during the time that you spent in Olympia Fields,

7  where would you spend your time?

8  A    I spent most of my time between Music 1 and the

9  Mirror Room.

10 Q    And the Mirror Room was located on which floor?

11 A    The may main level.

12 Q    And Music 1 was on which floor?

13 A    The basement.

14 Q    You testified earlier that some of the defendant's

15 runners picked you up from the train station and drove to you

16 Olympia Fields.  Do you recall the cars that were used to

17 pick you up?

18 A    Yes.

19 Q    What are some of the cars that were used?

20 A    A red and black Chrysler 300C.  And there was a Cube

21 used one time.  And there was a black Range Rover used once.

22 Q    What is the Cube?

23 A    It's a car that it just looks like the shape of a cube.

24 Q    What, if any, medical problems did you have between

25 May 2009 and January of 2010?

J. Pace - Direct/Ms. Geddes                    173

1    A    Can you rephrase that?

2    Q    Yes.  Did you have any medical problems during the time

3    that you were with the defendant?

4    A    Yes.

5    Q    What happened?

6    A    I ended up contracting herpes.

7    Q    When did you first come to believe that you had

8    contracted herpes?

9    A    It was towards the end of the summer.

10   Q    And what happened?  What made you believe that you had

11   contracted herpes?

12   A    I had sores on my vagina.

13   Q    What did you do once you believed you had sores on your

14   vagina?

15   A    I told the defendant about it.

16   Q    How did the defendant respond?

17   A    It was -- he didn't really react to it.  He just said

18   okay.

19   Q    And what, if anything, happened after that with respect

20   to that?

21   A    He set me up to see a doctor.

22   Q    Where did that happen?

23   A    In his home.

24   Q    What do you recall -- did you, in fact, then see a

25   doctor at his house?

J. Pace - Direct/Ms. Geddes                174

1  A    Yes, I did.

2  Q    What do you recall about the doctor?

3  A    It was just like an older guy with, like, a white beard.

4  It wasn't, like, fully white but he had a white beard and he

5  was older and he had a white coat on.

6  Q    And what happened when you saw the doctor?

7  A    We went to the back room and he looked at my vagina

8  while Rob was present and then he told him, Yes, that's it.

9  Q    What did you understand him to be saying when he said,

10 Yes, that's it?

11 A    Herpes confirmation.

12 Q    And who was he, by the way, in that?

13 A    Excuse me.

14 Q    When he -- I think you testified that he said, Yes,

15 that's it.

16 A    Yes.

17 Q    Who is the he in that sentence?

18 A    The doctor.

19 Q    What, if anything, did the defendant do once you

20 developed these sores on your vagina?

21 A    He didn't do anything other than the doctor just told me

22 to take some pills and he walked me back to the game room.

23 Q    Were you given those pills to take?

24 A    Yes, I was.

25 Q    Did you, in fact, take the pills?

J. Pace - Direct/Ms. Geddes                    175

1   A    No, I did not.

2   Q    Why not?

3   A    I don't believe in taking medication.

4   Q    What, if any, conversations did you have with the

5   defendant about tattoos?

6   A    He asked me if I had any tattoos.

7   Q    At the time, did you have any tattoos?

8   A    No, I did not.

9   Q    What happened after that?  How did you respond?

10  A    I told him I didn't have any tattoos.

11  Q    What did the defendant say or do?

12  A    He asked me would I get his name tattooed on me.

13  Q    Did you agree?

14  A    I said yeah.

15  Q    Did you, in fact, get a tattoo?

16  A    Yes, I did.

17  Q    What is the -- what was the tattoo of?

18  A    It was a tattoo of his name.

19  Q    Where did you get the tattoo?

20  A    I got the tattoo on my left breast.

21  Q    Do you still have it today?

22  A    It's covered up with a black heart.

23  Q    I want to direct your attention to the last time that

24  you were inside the defendant's residence in Olympia Fields.

25  Do you remember that day?

1    A    Yes, I do.

2    Q    What happened that day?

3    A    I showed up to his house, and before he walked in the

4    room I was texting on my phone and when he, like, he came in

5    so quietly I didn't hear him so I didn't acknowledge him.

6    Q    How did the defendant respond when you didn't

7    acknowledge him?

8    A    He was angry about it and he asked me what I was doing

9    on my phone.  And I told him that I was texting a friend?

10   Q    What happened after that?

11   A    He didn't believe that I was texting a friend and he got

12   mad about it.

13   Q    What, if anything, did he do?

14   A    That's when he slapped me and he choked me until I

15   passed out.

16   Q    I want to start by talking about where he slapped you.

17   Where did he slap you?

18   A    He slapped me in my face.

19   Q    How did he slap you?

20   A    It was an open-handed slap.

21   Q    You testified that he also choked you?

22   A    Yes.

23   Q    What do you remember from that?

24   A    I remember him just putting his hand around my neck and

25   choking me and when I got up I was on the floor.

J. Pace - Direct/Ms. Geddes                177

1  Q    What, if anything, was the defendant saying during this?

2  A    Can you repeat the question?

3  Q    What was the saying as he was doing this to you?

4  A    After he spit in my face and told me to put my head down

5  in shame.

6  Q    What did you understand him to mean by that?

7  A    I just put my head down in shame and embarrassment.

8  Q    Did you do that?

9  A    Yes, I did.

10 Q    What happened next?

11 A    And then after that, I got up off the floor and we

12 walked over to the VIP room and we sat down, and that's when

13 he instructed me to perform oral sex on him.

14 Q    Did you then perform oral sex on him?

15 A    Yes, I did.

16 Q    And, specifically, what did you do?

17 A    I put my mouth on his penis.

18 Q    What happened then?

19 A    He ejaculated on my face.

20 Q    What did you do when he ejaculated on your face?

21 A    I waited for him to tell me what to do next, and he told

22 me to go get a towel so that he could wipe off and I ended up

23 using my T-shirt to wipe off the spit that was running town

24 my face and the semen and I went to the bathroom to get a

25 towel.

J. Pace - Direct/Ms. Geddes                178

1    Q    You testified that you used your T-shirt.  Do you

2    remember the T-shirt that you used?

3    A    Yes, I do.

4    Q    What type of T-shirt was it?  What do you remember about

5    it?

6    A    It was a blue Aeropostale T-shirt.

7    Q    And you indicated that you also wiped spit off your

8    face.  What was that from?

9    A    It was from him spitting in my face.

10   Q    Now, was that the first time when he spit at you or was

11   that a second time?

12   A    It was a second time.

13   Q    What, if anything, did you say or do next?

14   A    I just followed his directions and went to go get the

15   towel.

16   Q    And what happened then?

17   A    Then I took the towel back to him for him to wipe off.

18   Q    And what did you do after that?

19   A    Once all of that was done, he said that he was, like,

20   getting ready for a party.  He was preparing for a party that

21   evening.

22   Q    And what were you going to do?  What did you do?

23   A    And he told me that he wanted me he to put on certain

24   heels for us to have sex.  And I told him that those heels

25   were my uncle's house and I needed to go get them.

J. Pace - Direct/Ms. Geddes                179

1   Q    At the time, where was your uncle living?

2   A    My uncle was living in Olympia Fields.

3   Q    Is that the same Olympia Fields where the defendant

4   lived?

5   A    Yes, it is.

6   Q    What did you do next?  How did the defendant respond

7   when you said you wanted to go get your heels from your

8   uncle's house?

9   A    He told me that I could go get them and to hurry up

10  back.

11  Q    What did you do?

12  A    I left and I didn't return.

13  Q    Were you, in fact, planning to go to your uncle's house?

14  A    No.

15  Q    How old were you at the time?

16  A    I was 16.

17  Q    As you sit here today, do you remember the date that

18  that happened?

19  A    I do not.

20  Q    Approximately when was it?

21  A    January of 2010.

22  Q    Did you go back inside the defendant's house after that

23  particular incident?

24  A    No.

25  Q    What did you do instead?

J. Pace - Direct/Ms. Geddes                180

1    A    I left his house and I went home.

2    Q    At some point, did you find a lawyer or a law firm to

3    represent you?

4    A    Yes, I did.

5    Q    What law firm represented you?

6    A    Susan E. Loggans.

7    Q    Do you remember when you retrained a lawyer?

8    A    In -- towards the end of January.

9    Q    Of 2010?

10   A    Yes.

11   Q    In connection with what did the Loggans Law Firm or

12   Ms. Loggans represent you?

13   A    Can you rephrase the question.

14   Q    Yes.  Why did you get a lawyer?

15   A    I got a lawyer because I wanted to press charges against

16   him.

17   Q    Did you end up pressing charges against the defendant?

18   A    No, I did not.

19   Q    What did you do instead?

20   A    I filed a -- well, I filed a civil suit against him.  I

21   sued him.

22   Q    I want to back up a moment.

23            Do you recall the names of the individuals at

24   Ms. Loggans' law firm that you met?

25   A    Yes, I do.

J. Pace - Direct/Ms. Geddes                181

1   Q    Let's start with Ms. Loggans.  Have you met her in
2   person before?
3   A    No.
4   Q    Who did you meet in person?
5   A    I met Kim Jones and Patrick Condron.
6   Q    Who is Kim Jones?
7   A    Kim Jones is an executive assistant under Susan Loggans
8   Law Firm.
9   Q    And who is Patrick Condron?
10  A    He's an attorney at Susan Loggans Law Firm.
11  Q    What, if anything, did the law firm, the lawyers at the
12  law firm tell you to do when you first went there?
13          MR. CANNICK:  Objection.
14          THE COURT:  Overruled.
15  A    They didn't recommend me pressing charges against him.
16  Q    And so, in preparation for a lawsuit, I think you
17  testified earlier that you were going to pursue a civil
18  lawsuit?
19  A    Yes.
20  Q    What, if anything, did they recommend you to do to
21  prepare for that?
22  A    They recommended that I wrote -- that I write everything
23  down.
24  Q    Did you, in fact, write everything down?
25  A    I did not write everything down, but I wrote some things

J. Pace - Direct/Ms. Geddes                    182

1   down.

2   Q    And when did you do that?

3   A    I did this in January of 2010.

4        MS. GEDDES:  I'm showing the witness only what's

5   been marked for identification as 3500-JP-9 and I'm just

6   showing you that first page.

7        Do you recognize what's shown in 3500-JP-9.

8   A    Yes, I do.

9   Q    What is that?

10  A    That is the front cover of my journal that I wrote.

11  Q    And who, if anyone, did you provide that journal to?

12  A    Susan Loggans Law Firm.

13  Q    And did you later get the journal back?

14  A    Yes, I did.

15  Q    And who did you give it to after that?

16  A    I gave it to law enforcement.

17  Q    Including my office?

18  A    Yes.

19  Q    Now, since you gave it to my office, have you read the

20  contents of this journal?

21  A    No.

22  Q    As you sit here today, do you recall the precise dates

23  on which the various events that you've testified about

24  involving the defendant happened?

25  A    I do not.

1  Q    When you created this journal, was it important for you

2  to be accurate to the best of your abilities?

3  A    Yes.

4  Q    And at the time that you created the journal, was it

5  fresh in your mind?

6  A    Yes, it was.

7  Q    And, in addition to creating this journal, did you also

8  speak with lawyers at Susan Loggans Law Firm regarding your

9  interactions with the defendant?

10 A    Yes.

11 Q    And, again, was it -- when you spoke with the lawyers

12 then, were the events between yourself and the defendant

13 fresh in your mind back then?

14 A    Yes.

15 Q    And was it important at that time for you to be accurate

16 in how you describe what happened with the defendant?

17 A    Yes.

18 Q    And, to the best of your ability, were you, in fact,

19 accurate?

20 A    Yes.

21 Q    What, if anything, did you give your lawyers when you

22 first retained them in January of 2010?

23 A    I gave them my T-shirt.  I gave them my -- that journal

24 that they asked me to tell me to make sure I write everything

25 down and I gave them my cell phone.

J. Pace - Direct/Ms. Geddes                184

1          THE COURT:  Can I just clarify when did you prepare

2     the journal?

3          THE WITNESS:  In January of 2010.

4          THE COURT:  After you left the defendant's --

5          THE WITNESS:  Yes.

6          THE COURT:  -- house.  Okay.

7     Q    What, if anything, regarding your date of birth did you

8     give your lawyers?

9     A    I gave them my birth certificate and I gave them my

10    state I.D.

11    Q    I'm showing the witness only.  Let me back up one

12    moment.

13          You testified that you gave the lawyers a

14    T-shirt.  What T-shirt were you referring to?

15    A    It was the T-shirt that I last wore at Rob's house which

16    was my blue T-shirt.

17    Q    The one that you used to wipe off his semen?

18    A    Yes.

19          MS. GEDDES:  The Government is showing the witness

20    only what's been marked for identification as Government

21    Exhibit 241.

22          Your Honor, may I approach the witness?

23          THE COURT:  Yes.

24          (Approaching the witness.)

25    Q    This is Government Exhibit 241.  Do you recognize this?

J. Pace - Direct/Ms. Geddes                     185

1    A    Yes.

2    Q    What is this?

3    A    That's my T-shirt.

4    Q    Is that the T-shirt that you gave your lawyers that you

5    were just testifying about?

6    A    Yes, it is.

7            MS. GEDDES:  The Government offers Government

8    Exhibit 241.

9            THE COURT:  Any objection?

10            MR. CANNICK:  Yes, Your Honor.

11            THE COURT:  Okay.  Can I see the lawyers at the

12    side.

13            (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                          186

1          (Sidebar conference held on the record in the

2     presence of the Court and counsel, out of the hearing of the

3     jury.)

4          THE COURT:  What's your objection?

5          MR. CANNICK:  Chain of custody.  I think this

6     witness testified that she gave this T-shirt to her attorney

7     and then subsequently got it back and gave it to her

8     attorneys.  I don't think that we know anything from the

9     other folks that she gave the T-shirts to regarding their

10    control and custody of it.

11         THE COURT:  Go ahead.

12         MS. GEDDES:  So continuing on in my questioning, I

13    plan to elicit from the witness that she provided the T-shirt

14    in 2010 to the Loggans Law Firm.  In 2013, she retained a new

15    lawyer who obtained a copy of the file.  In 2017, she

16    retrieved the T-shirt from her new lawyer and that very same

17    day brought it to the Olympia Fields Police Department.

18         I will call a witness from the law firm in 2010 as

19    well as in 2013 who will establish that they maintained the

20    T-shirt in a safe and secure manner in a paper bag.  I have

21    one from the lawyer that retained it from 2010 to 2013; a

22    separate witness who he testified that he kept it from 2013

23    until 2017.  And we will also call a witness from the

24    Olympia Fields Police Department who will testify that it was

25    maintained in a safe and secure way from 2017 until February

Sidebar                                                    187

1  of 2019, at which point, it was transferred to the Illinois

2  State Police Forensic Investigations Division who then did

3  DNA testing.  And we will call a -- two DNA witnesses who

4  will testify that they recovered semen from the T-shirt and

5  that the semen matched the defendant's semen.

6          MR. CANNICK:  Your Honor, I think given that

7  recitation --

8          THE COURT:  Subject to connection.

9          MR. CANNICK:  That's where I was about to go.

10         THE COURT:  I think it's admissible subject to

11 connection.  She's just identifying that it's her T-shirt and

12 so it will come in subject to connection.

13         (Sidebar discussion concludes.)

14         (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

J. Pace - Direct/Ms. Geddes                    188

1              (In open court.)

2              THE COURT:  All right.  The evidence is admissible

3    subject to connection.

4    EXAMINATION BY

5    MS. GEDDES:

6    (Continuing.)

7    Q    The defendant is showing the witness only what's been

8    marked for identification as 241(a).

9              Do you recognize what's shown in 241(a)?

10   A    Yes.

11   Q    What is that?

12   A    That's my T-shirt.

13   Q    Is that a photograph of your T-shirt?

14   A    Yes, it is.

15             MS. GEDDES:  The Government offers 241(a) subject

16   to connection?

17             THE COURT:  Any objection?

18             MR. CANNICK:  No objection.

19             THE COURT:  That's in evidence.

20             (Government's Exhibit 241(a) was received in

21   evidence as of this date.)

22   Q    You testified earlier that you also gave your attorneys

23   a cell phone.  What cellular telephone did you give your

24   attorneys?

25             And just to be clear, I'm referring to the

J. Pace - Direct/Ms. Geddes                    189

1   Susan Loggans Firm?

2   A    I gave them my cell phone that I was -- that I had.  And

3   it should be, like, a Virgin Mobile phone, a sliding one.

4   Q    The cell phone that you provided to your attorneys, when

5   had you been using that cell phone?

6   A    I had been using it since Rob had taken my phone away.

7   Q    So that was in 2009; is that correct?

8   A    Yes.

9              MS. GEDDES:  May I approach again, your Honor.

10             THE COURT:  Yes.

11             (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J. JOHNSON PACE - DIRECT - GEDDES          190

1   BY MS. GEDDES:

2   Q    The Government is showing the witness what is marked for

3   identification as Government's Exhibit 210.

4           Do you recognize what is Government's Exhibit 210?

5   A    Yes.

6   Q    What is Government's Exhibit 210?

7   A    My cellphone.

8   Q    Is that the cellphone that you testified you were using

9   during the period of time when you were with the defendant and

10  that you provided to your lawyers?

11  A    Yes.

12          MS. GEDDES:  The Government offers Government's

13  Exhibit 210.

14          THE COURT:  Any objection?

15          MR. CANNICK:  No objection, subject to connection.

16          THE COURT:  Okay, subject to connection.

17          (Government Exhibit 210, was received in evidence.)

18  BY MS. GEDDES:

19  Q    Did you in fact file a lawsuit in court against the

20  defendant?

21  A    No.

22  Q    What did you do instead?

23  A    It was an out-of-court settlement.

24  Q    Between whom?

25  A    Myself and Rob.

J. JOHNSON PACE - DIRECT - GEDDES                191

1  Q    The defendant?

2  A    Yes.

3  Q    How much money did you -- what were the terms of the

4  settlement?

5  A    In exchange for my silence I was supposed to be --

6           MR. CANNICK:  Objection.

7           THE COURT:  Overruled.

8           This is the terms of the settlement?  That's

9  admissible overruled.

10 A    In exchange for my silence, I would be paid $1.5 million,

11 a million to myself and $500,000 to my attorneys.

12 Q    Do you remember when the settlement agreement was

13 entered?

14 A    I do not.

15 Q    Do you remember approximately when it was?

16 A    Around February of 2010.

17 Q    Do you remember when you were supposed to receive your

18 portion of the proceeds under the settlement agreement?

19 A    For my 18th birthday I was supposed to receive a trust

20 with a million dollars in it.

21 Q    I'm showing the witness only what is marked for

22 identification as Government's Exhibit 928.  I'm going to show

23 you the last page as well.

24           Do you recognize what is shown in Government's

25 Exhibit 928?

J. JOHNSON PACE - DIRECT - GEDDES                    192

1   A    Yes.

2   Q    What is that?

3   A    That is the settlement.

4   Q    Is that the settlement agreement that you reached with

5   the defendant?

6   A    Yes, it is.

7              MS. GEDDES:  The Government offers 928.

8              THE COURT:  Any objection?

9              MR. CANNICK:  No.

10             THE COURT:  That's in evidence.

11             (Government Exhibit 928, was received in evidence.)

12             MS. GEDDES:  May I publish, your Honor?

13             THE COURT:  Yes.

14  BY MS. GEDDES:

15  Q    What is the date listed on the settlement agreement shown

16  here?

17  A    2/19/10.

18  Q    February 19, 2010?

19  A    Yes.

20  Q    How old were you then?

21  A    I was 16.

22  Q    You testified earlier that you were paid a sum of money

23  in exchange for your silence.  Specifically, what did you

24  understand were your obligations under the settlement

25  agreement?

J. JOHNSON PACE - DIRECT - GEDDES                    193

1    A    I was to not talk about anything that happened.

2    Q    Who were you to not talk about anything that happened

3    with?

4    A    I was not supposed to talk about anything that happened

5    between Rob and I.

6    Q    Who were you not allowed to tell?

7    A    Anyone.

8    Q    What, if any, contact did you have with the defendant

9    after you signed that settlement agreement in 2010?

10   A    I still was in contact with him through phone calls, text

11   messaging.

12   Q    You continued to stay in communication with him?

13   A    Yes.

14   Q    After you entered into your settlement agreement with the

15   defendant, did you in fact speak with anyone about the time

16   that you spent with the defendant?

17   A    Yes.

18   Q    Who if anyone learned about that?

19   A    My friend Danika.

20   Q    To be clear, what did Danika learn?

21   A    She learned about the settlement agreement because I

22   talked to her about it.

23   Q    To your knowledge, who if anyone, learned that you had

24   talked to Danika about your time with the defendant?

25   A    The defendant learned about it and so did my attorneys.

J. JOHNSON PACE - DIRECT - GEDDES                194

1    Q    What happened when the defendant learned about the fact

2    that you had spoken to Danika?

3    A    My attorneys told me that I breached the contract and

4    that I wouldn't get any money.

5    Q    Did you learn how it was that the defendant learned that

6    you had spoken about your time with him?

7    A    Yes.

8    Q    What happened?

9    A    She recorded me talking about it.

10   Q    Did you ultimately receive a copy of that recording?

11   A    Yes, I did.

12   Q    You testified that your lawyers indicated that you might

13   have breached the agreement; is that correct?

14   A    Yes.

15   Q    You also testified that you had continued to communicate

16   with the defendant, did you also see him in person?

17   A    Yes.

18   Q    At the time that you saw the defendant, had you received

19   the payments that you were owed under the settlement

20   agreement?

21   A    Some of them.

22   Q    And what, if anything, were you doing with the money that

23   you had received?

24   A    I returned the money.

25   Q    To whom?

J. JOHNSON PACE - DIRECT - GEDDES                195

1  A    To Derrel McDavid to give to the defendant.

2  Q    How did that come about?

3  A    I talked to him.  I talked to Rob and I was, I wasn't

4  happy about like having to go through those steps and I still

5  wanted to be involved with him.  And I talked to him about it.

6  Q    Just to be clear, when you said you weren't happy about

7  having to go through those steps, what are you referring to?

8  A    Such as suing him.

9  Q    How did the defendant respond when you talked to him

10  about that?

11  A    If I wanted to regain his trust, he told me I would have

12  to return the money.

13  Q    How would you -- did you in fact return some of the

14  money?

15  A    Yes.

16  Q    How did you return the money?

17  A    I would return it in -- I would get $50,000 every other

18  month.  I would put a thousand dollars in each envelope.  And

19  I would return it to Derrel McDavid.

20  Q    I'm sorry, how much money were you getting on a

21  bi-monthly basis?

22  A    $50,000.

23  Q    $50,000?

24        THE COURT:  I'm a little unclear.  You said twice a

25  month you got $50,000 or every two months?

1        THE WITNESS:  Every other month.

2        THE COURT:  Go ahead.

3   BY MS. GEDDES:

4   Q    You said that you would put money in an envelope; is that

5   correct?

6   A    Yes, a thousand dollars in each envelope.

7   Q    And what would you do with the envelopes then?

8   A    I would return them to Derrel McDavid so he could give it

9   to the defendant.

10  Q    Where did you do that?

11  A    At his studio.

12  Q    Who's studio?

13  A    At Rob's studio.

14  Q    The studio in Olympia Fields?

15  A    No.

16  Q    What studio was it?

17  A    In Chicago.

18  Q    At the time that you returned these envelopes or gave

19  these envelopes ultimately to the defendant, what had happened

20  to the defendant's studio at his residence in Olympia Fields?

21       MR. CANNICK:  Objection.

22       THE COURT:  Overruled.

23  A    Can you rephrase that?

24  Q    To your knowledge, was the defendant still living at

25  Olympia Fields?

1   A    No.

2   Q    Did the defendant still have the recording studio at

3   Olympia Fields?

4   A    Not to my knowledge.

5   Q    Okay.  Do you remember where this new recording studio

6   was where you gave those envelopes?

7   A    It was downtown Chicago.

8   Q    Do you remember what street it was on?

9   A    It was off of, I believe it was off of New Orleans Street

10  or Orleans, somewhere around Ohio Street.

11  Q    In downtown Chicago?

12  A    Yes.

13  Q    When your lawyers told you that you may have breached the

14  agreement, what happened then, going back to the first

15  agreement that is shown in Government's Exhibit 928.  I think

16  you testified earlier that you had shared what happened with

17  the defendant with your friend Danika and the defendant had

18  learned about that; is that correct?

19  A    Yes.

20  Q    Was that agreement ultimately breached or what happened

21  to that first agreement?

22  A    The first agreement it was considered breached.  And it

23  was not valid.

24  Q    So what happened after that?

25  A    I retained a different attorney a little while later.

J. JOHNSON PACE - DIRECT - GEDDES                198

1  Q    Who did you retain to represent you?

2  A    Jason Fink.

3  Q    Did Jason Fink continue to represent you?

4  A    No.

5  Q    Who did you retain another lawyer after Jason Fink?

6  A    Yes, I did.

7  Q    Who was that?

8  A    David Fish.

9  Q    What, if any, agreements were reached by either Jason

10 Fink or David Fish?

11 A    The agreement with Jason Fink is I had to take another

12 lie detector test and then I would receive another $50,000

13 payment.  I took the lie detector test.

14        MR. CANNICK:  Objection.

15        THE COURT:  Sustained.

16 Q    Without talking about any tests that you might have taken

17 through Mr. Fink, did you ultimately reach another agreement?

18 A    Yes.

19 Q    What was the nature of that agreement?

20 A    It was a $50,000 payment.

21 Q    Was there a written agreement entered between you and the

22 defendant?

23 A    No, it was -- no, it wasn't.

24 Q    Did you eventually -- you said that you also retained

25 another lawyer after that, David Fish?

J. JOHNSON PACE - DIRECT - GEDDES                199

1  A    Yes.

2  Q    What did David Fish represent you in connection with?

3  A    David Fish did another lawsuit that was settled outside

4  of court.

5  Q    With whom?

6  A    Between myself and the defendant.

7  Q    I'm showing you what is marked for identification as

8  3500JP-29.

9          I think it would be easier if I approach.  May I

10  approach?

11          THE COURT:  Yes.

12  Q    Take a look at what is shown here.  Do you recognize

13  that?

14  A    Yes.

15  Q    What is it?

16  A    It's my settlement.

17  Q    Who is it a settlement with?

18  A    A settlement between Rob and I.

19  Q    Is this a settlement reached, negotiated, by your lawyer,

20  David Fish?

21  A    Yes, it is.

22          MS. GEDDES:  The Government offers 3500JP-29?

23          MR. CANNICK:  No objection.

24          THE COURT:  That's in evidence.

25          (Government Exhibit 3500JP-29, was received in

1  evidence.)

2  BY MS. GEDDES:

3  Q    Under the terms of that second agreement, what did you

4  understand your obligations to be?

5  A    I was still was not supposed to speak about anything that

6  happened between Rob and I.

7  Q    Did you abide by that agreement?

8  A    For sometime.

9  Q    And did you --

10        MR. CANNICK:  I didn't understand the answer.

11        THE COURT:  For sometime.

12  Q    Did you continue to abide by that agreement?

13  A    I did not.

14  Q    What did you do instead?

15  A    I ended up speaking out publicly about what happened

16  between Rob and I.

17  Q    Approximately when did you do that?

18  A    In August of 2017.

19  Q    Who, if anyone, did you speak with publicly about the

20  defendant?

21  A    I made a YouTube video.

22  Q    Did you speak with anybody else?

23  A    Yes, I did.

24  Q    Do you recall who else in 2017 that you spoke with

25  publicly about the defendant?

J. JOHNSON PACE - DIRECT - GEDDES                    201

1    A    I did an interview with TV show, The Real.

2    Q    Did you also sit down with reporters?

3    A    Yes, I did.

4    Q    That was also in 2017?

5    A    Yes.

6    Q    What, if any, contact did you have with law enforcement

7    in 2017?

8    A    I went to law enforcement and I filed a police report, I

9    went through that.

10   Q    Who did you file a police report with?

11   A    It was with Olympia Fields.

12   Q    The Olympia Fields Police Department?

13   A    Yes.

14   Q    What was the nature of your complaint to the Olympia

15   Fields Police Department?

16   A    I don't understand your question.

17   Q    Sure.  What did you -- I don't mean word for word, but

18   generally speaking -- what did you report to the Olympia

19   Fields Police Department when you went there in 2017?

20   A    I reported what happened between Rob and I.

21   Q    What, if anything, did you give the Olympia Fields Police

22   Department?

23   A    I turned over the evidence that I had.

24   Q    Which included what?

25   A    It included my T-shirt, my entire file from, it included

J. JOHNSON PACE - DIRECT - GEDDES          202

1  my file from Fish, so my T-shirt, along with my journal, and

2  all of my paperwork from my previous attorney.

3  Q    Did it also include the cellphone that you identified in

4  210?

5  A    Yes, it did.

6  Q    You indicated that you got your whole file from Fish, who

7  is the Fish in that sentence?

8  A    Sorry, David Fish, my attorney.

9  Q    How did you obtain the items that you just described to

10  include the T-shirt and the cellphone?

11  A    I went to his office to pick it up.

12  Q    And how do you recall it being packaged when you picked

13  it up from him?

14  A    It was in a box.

15  Q    What did you do with the box?

16  A    I took the box to the police station.

17  Q    Which police station?

18  A    In Olympia Fields.

19  Q    Did you stop anywhere in between?

20  A    I did not.

21  Q    So was it the same day that you picked up the file from

22  David Fish's office that you then went to the Olympia Fields

23  Police Department?

24  A    Yes.

25  Q    I'm showing the witness only what is marked for

J. JOHNSON PACE - DIRECT - GEDDES          203

1  identification as Government's Exhibit 210E, F, O, M, N, P, R,

2  T, U, V, X, Y, Z, AA, AB.

3          May I approach, your Honor?

4          THE COURT:  Yes.

5  Q    Take a look at those exhibits.  Do you recognize the

6  Government's exhibits that I just showed you?

7  A    Yes.

8  Q    Generally speaking, what are they?

9  A    Those are photos from my phone.

10  Q    From the cellphone in evidence that is Government's

11  Exhibit 210?

12  A    Yes.

13  Q    The cellphone you used when you were spending time with

14  the defendant when you were 16 years old?

15  A    Yes.

16          MS. GEDDES:  The Government offers those exhibits in

17  evidence.

18          THE COURT:  Any objection?

19          MR. CANNICK:  May I just see them?

20          MS. GEDDES:  Yes.

21          MR. CANNICK:  No objection.

22          THE COURT:  Those are in evidence.

23          (Government Exhibits 210E, F, O, M, N, P, R, T, U,

24  V, X, Y, Z, AA, AB, were received in evidence.)

25          THE COURT:  I think given the time, we should find a

Proceedings                                            204

1   convenient time to break.

2               MS. GEDDES:  This is as good as any.

3               THE COURT:  Okay, let's have the witness step

4   down -- let's excuse the jury first.

5               Ladies and gentlemen, just before I excuse you for

6   the night, we'll begin again tomorrow at 9:30 a.m.

7               Please do not look anything up about this case.  Do

8   not read or watch any reports about it, look on anything on

9   social media.  You must report directly to me any effort by

10  any person to influence you improperly or to influence another

11  juror improperly.

12              Have a good night.  I can't predict if it will be

13  hot or cold in here tomorrow, but let's prepare for both.  See

14  you tomorrow.

15              (Jury exits the courtroom.)

16              THE COURT:  I'm going to propose this with respect

17  to all -- let's get the witness out.

18              (Whereupon, the witness was excused.)

19              THE COURT:  I'm going to propose this with counsel's

20  agreement, that rather than having me bring this juror in and

21  speak to her now, she's spoken with Ms. Green.  I also think

22  because I don't know who the juror is, I obviously can't make

23  the call.  And so what Ms. Green suggested, and I think is a

24  good idea, is to have our jury coordinator make the call to

25  the employer to figure out what the situation is.

Pace - direct - Geddes                215

1  **JERHONDA JOHNSON PACE**,

2        called as a witness by the Government, having been

3        previously duly sworn/affirmed by the Courtroom Deputy,

4        was examined and testified further as follows:

5  DIRECT EXAMINATION (CONTINUING)

6  BY MS. GEDDES:

7  Q    Good morning.

8            Yesterday during your direct examination you

9  testified about the different devices that the defendant used

10 to record you.

11           Do you recall that?

12 A    Yes.

13 Q    What, if anything, specifically, do you recall the

14 defendant recording using the video camera on top of a tripod?

15           I think you testified earlier that it was a Canon

16 camera, is that correct?

17 A    Yes.

18 Q    What do you recall the defendant recording you doing

19 using that particular device?

20 A    He recorded us having sexual intercourse.

21 Q    While you were engaged in sexual activity with the

22 defendant, what, if anything, did the defendant request that

23 you wear during those encounters?

24 A    During those encounters, he wanted me to put my hair up

25 in pigtails and dress like a girl scout.

Pace - direct - Geddes                                        216

1  Q    Yesterday you also referenced The Cabin, one of the

2  recordings studios in the defendant's residence.

3         Is that correct?

4  A    Yes.

5  Q    Can you describe how The Cabin appeared?

6  A    It's a recording studio.  It looks like a log cabin.  So,

7  the inside of the room, it was just logs for, like, the walls

8  and everything.

9  Q    You also testified about documents and a camera, not --

10 excuse me.

11        You testified about documents and a cell phone and a

12 T-shirt that you picked up from your lawyer Fish.

13        Do you recall that?

14 A    Yes.

15 Q    How were the documents -- how did you pick up the

16 documents?  When you picked up the shirt and the cell phone,

17 how were the documents packaged?

18 A    They were in a box.

19 Q    And --

20 A    Everything was in a box and he handed me the box.

21 Q    And were the papers, physical papers that you picked up?

22 A    It was a flash drive.

23 Q    Containing scans of those documents?

24 A    Yes.

25        MS. GEDDES:  Your Honor, may I publish Government

Pace - direct - Geddes                    217

1    Exhibit 210(p), which is already in evidence?

2              THE COURT:  Yes.

3              (Exhibit published.)

4    BY MS. GEDDES:

5    Q    Directing your attention to Government Exhibit 210(p),

6    which is shown on the screen in front of you.

7              What was the telephone number for the cellular

8    telephone that you identified yesterday, which was in evidence

9    as Government Exhibit 210?

10   A    This is the number, it was 630-886-2837.

11   Q    And how is it that you would arrange times to go to the

12   defendant's residence?

13   A    It would be through phone calls.

14   Q    Including using this telephone?

15   A    Yes.

16   Q    I am showing Government Exhibit 210(e), which is also in

17   evidence.

18              (Exhibit published.)

19   Q    What is shown in 210(e)?

20   A    A picture of me.

21   Q    And approximately when was that picture taken?

22   A    It was taken probably around the summertime, 2009.

23              MS. GEDDES:  And I am showing now 210(m).

24              (Exhibit published.)

25   Q    What is shown in 210(m)?

Pace - direct - Geddes                    218

1  A    Another photo of me.

2  Q    What are you wearing?

3  A    I am wearing some blue jeans and an Aéropostale T-shirt.

4  Q    Is that the same brand of T-shirts as the one that you

5  identified yesterday as using the last time you were at the

6  defendant's residence?

7  A    Yes, it is the same brand.

8  Q    Fair to say it's a different T-shirt, though?

9  A    Yes, it is.

10        MS. GEDDES:  I am showing the witness -- I am

11 showing everyone Government Exhibit 210(ab).  This is also in

12 evidence.

13        (Exhibit published.)

14 BY MS. GEDDES:

15 Q    What is shown in 210(ab)?

16 A    It's a photo of me.

17 Q    And I want to direct your attention to the tattoo that is

18 on your body shown in the photograph.

19        Do you see that?

20 A    Yes, I do.

21 Q    What is that a tattoo of?

22 A    It's a tattoo of Rob's name.

23 Q    And does that say Rob, R-O-B?

24 A    Yes, it does.

25 Q    And what, again, happened to that tattoo?

Pace - direct - Geddes                           219

1   A    I covered it up with a black heart.

2   Q    So, you filled it in?

3   A    Yes.

4   Q    I am showing what's in evidence as Government

5   Exhibit 210(aa).

6              (Exhibit published.)

7   Q    What is shown on 210(aa)?

8   A    A photo of Dominique.

9   Q    And this was a photo that was on your cellular telephone?

10  A    Yes, it is.

11  Q    Who took this photograph?

12  A    Dominique took that photograph.

13  Q    How did you obtain it?

14  A    She sent it to me.

15             MS. GEDDES:  I am showing what's in evidence as

16  Government Exhibit 210(n).

17             (Exhibit published.)

18  BY MS. GEDDES:

19  Q    What is shown in Government Exhibit 210(n)?

20  A    Rob's contact information.

21  Q    Was this a contact that was saved on your cellular

22  telephone in evidence as Government Exhibit 210?

23  A    Yes, it is.

24  Q    And when you say "Rob," who are you referring to?

25  A    The defendant.

Pace - direct - Geddes                    220

1    Q    What was the telephone number listed for the defendant?

2    A    708-337-9300.

3         MS. GEDDES:  I am showing what's in evidence as

4    Government Exhibit 210(z) as in zebra.

5         (Exhibit published.)

6    BY MS. GEDDES:

7    Q    What is shown in Government Exhibit 210(z)?

8    A    These are my contacts.

9    Q    And there's one contact highlighted there.

10        Do you recognize who that -- what is that a contact

11   for?

12   A    That's Rob's studio.

13   Q    And what was the telephone number for Rob's studio?

14   A    708-747-6 -- 6569.

15   Q    And just to be clear, when you say "Rob," are you

16   referring to the defendant?

17   A    Yes, I am.

18   Q    And was that a contact that was saved in your telephone,

19   Government Exhibit 210?

20   A    Yes, it is.

21        MR. CANNICK:  Your Honor, can I just have the

22   exhibit number before we go?

23        THE COURT:  Can you give the exhibit number again?

24        MS. GEDDES:  Oh, yes, 210(z) as in zebra.

25        THE COURT:  All right.

Pace - direct - Geddes                    221

1              MS. GEDDES:  I'm showing what's in evidence as

2    Government's Exhibit 210(y).

3              (Exhibit published.)

4    BY MS. GEDDES:

5    Q    What is shown in 210(y)?

6    A    My contact --

7              THE WITNESS:  My mic died.

8              MS. GEDDES:  We lost our mic.

9              (Pause.)

10   Q    All right, what is shown in Government Exhibit 210(y)?

11   A    My contacts.

12   Q    And what contact is highlighted there?

13   A    My mom's phone number.

14   Q    And was that a contact saved in your telephone in

15   Government Exhibit 210?

16   A    Yes, it was.

17   Q    Does your mother still have that telephone number?

18   A    No, she does not.

19   Q    What is the telephone number?

20   A    224-387-6519.

21             MS. GEDDES:  I am showing what's in evidence as

22   Government Exhibit 210(x).

23             (Exhibit published.)

24   Q    What's shown on 210X?

25   A    My contacts.

Pace - direct - Geddes                    222

1   Q    Whose telephone number is highlighted in red?

2   A    Keyonia's.

3   Q    Is Keyonia the friend that you testified you first went

4   to the defendant's house back in 2009 with?

5   A    Yes.

6   Q    And was that a contact that was saved in Government

7   Exhibit 210?

8   A    Yes.

9   Q    What was Keyonia's telephone number back then?

10  A    773-612-1900.

11       MS. GEDDES:  I am showing what's in evidence as

12  Government Exhibit 210(v), as in Victor.

13       (Exhibit published.)

14  BY MS. GEDDES:

15  Q    What is shown in 210(v)?

16  A    My contacts.

17  Q    Whose contact is highlighted?

18  A    Dominique's.

19  Q    And how is Dominique referred to in your phone?

20  A    Domo.

21  Q    D-O-M-O?

22  A    Yes.

23  Q    Is that a nickname for her?

24  A    Yes, it is.

25  Q    And, again, was that a contact that was saved in your

Pace - direct - Geddes                    223

1   telephone that you had in 2009 and 2010?

2   A    Yes, it is.

3   Q    What was Dominique's number back then?

4   A    708-623-4142.

5   Q    And just to be clear, you've referred to a photograph of

6   Dominique just a few minutes ago, as well as this contact.

7           Is this the Dominique that was shown yesterday in

8   Government Exhibit 69 who you identified as Dominique?

9   A    Yes.

10          MS. GEDDES:  I am showing the witness what's in

11  evidence as Government Exhibit 210(u).

12          (Exhibit published.)

13  BY MS. GEDDES:

14  Q    What is shown on 210(u)?

15  A    A phone call.

16  Q    And was this a phone call that you -- can you tell

17  whether this is a phone call you sent or received, you made or

18  received?

19  A    No, I cannot.

20  Q    Okay.

21          Who is the phone call with?

22  A    Rob.

23  Q    The defendant?

24  A    Yes.

25  Q    And what telephone number was used to connect to the

Pace - direct - Geddes                               224

1   defendant?

2   A     708-337-9300.

3   Q     What was the date of that telephone call?

4   A     January 23rd.

5   Q     Do you know what year that would have been?

6   A     2010.

7   Q     What time?

8   A     1:36 p.m.

9   Q     And how long did the telephone call last?

10  A     Fifty-seven seconds.

11        MS. GEDDES:  I am showing what's in evidence as

12  Government Exhibit 210(t).

13  Q     What's shown in 210(t)?

14  A     Another phone log.

15  Q     And who is this communication with?

16  A     Rob.

17  Q     The defendant?

18  A     Yes.

19  Q     What is the date of this communication?

20  A     January 23rd.

21  Q     What time?

22  A     2:51 p.m.

23  Q     And, again, what year was that of January 23rd?

24  A     2010.

25  Q     How long did that telephone call last?

SAM     OCR     RMR     CRR     RPR

A 207

Pace - direct - Geddes                    225

1   A    Fifty seconds.

2   Q    I am showing -- I'm sorry, did you say what time that

3   telephone call happened?

4   A    Yes, I did.

5   Q    Okay, thank you.

6           MS. GEDDES:  I am showing what's in evidence as

7   210(s).

8           (Exhibit published.)

9   BY MS. GEDDES:

10  Q    What's shown in 210(s)?

11  A    Another phone log.

12  Q    Who is that -- who is that communication with?

13  A    With Rob.

14  Q    What was the date of it?

15  A    January 23rd.

16  Q    Same date as the prior telephone calls with the

17  defendant?

18  A    Yes.

19  Q    What time?

20  A    4:47 p.m.

21  Q    And how long did that telephone call last?

22  A    Fifty-six seconds.

23          MS. GEDDES:  I'm showing what's in evidence as

24  210(r).

25          (Exhibit published.)

Pace - direct - Geddes                                      226

1   BY MS. GEDDES:

2   Q    What is shown in 210(r)?

3   A    Another phone log.

4   Q    And who is that telephone call with?

5   A    Rob.

6   Q    The defendant?

7   A    Yes.

8   Q    What date?

9   A    January 23rd.

10  Q    And of 2010?

11  A    Yes.

12  Q    How long did it last?

13  A    Twenty-seven seconds.

14  Q    All right, and, oh, what time?

15  A    5:03 p.m.

16          MS. GEDDES:  And finally, I am showing Government

17  Exhibit 210(o).

18          (Exhibit published.)

19  Q    What is 210(o)?

20  A    It's a text message.

21  Q    And who is that text message with?

22  A    It's a text message from Rob.

23  Q    And what was the telephone number of it?

24  A    708-337-9300.

25  Q    And what does the text message say?

Pace - cross - Cannick                    227

1   A    "Please call."

2   Q    And was this a text message that was sent to your phone,

3   Government Exhibit 210?

4   A    Yes.

5   Q    What was the date of this text message?

6   A    February 3rd, 2010.

7   Q    And what time?

8   A    10:02 p.m.

9   Q    How can you tell that that's a message from Rob?

10  A    Because it says message from, and then it has his phone

11  number, and it says Rob.

12          MS. GEDDES:  No further questions for this witness.

13          THE COURT:  Okay, cross-examination.

14          MR. CANNICK:  Thank you, Your Honor.

15          Your Honor, may I move the podium up over here so I

16  can have access to the microphone?

17          THE COURT:  You have it over there, yes.

18          MR. CANNICK:  Okay, it's hidden.

19          THE COURT:  And I am going to keep nagging you to

20  use the microphone.

21          (Pause.)

22  CROSS-EXAMINATION

23  BY MR. CANNICK:

24  Q    Now, you just testified about a number of telephone

25  communications between you and Rob, am I correct?

SAM    OCR    RMR    CRR    RPR
A 210

Pace - cross - Cannick                                    228

1   A    Yes.

2   Q    Okay.  Now, those calls, according to you, and the

3   records, how many were they?

4   A    I don't recall.

5   Q    Would five sound correct?

6   A    Five sounds about right.

7   Q    And those calls were made on the same day, June -- I mean

8   January 23rd, 2010, am I correct?

9   A    Yes.

10  Q    And how long apart were they made?

11  A    I don't recall.

12  Q    Now, when you made those calls or when the calls were

13  made to you, do you recall whether or not you reached an

14  individual or whether or not you got an answering service?

15  A    We talked on the phone.

16  Q    Now, the calls -- you had conversations, and the longest

17  one was -- hold on a second.

18       So, the longest conversation was 57 seconds, am I

19  correct?

20  A    Yes.

21  Q    And you had five conversations, wherein the longest one

22  was 57 seconds?

23  A    Yes.

24  Q    And then you had a text message?

25  A    Yes.

Pace - cross - Cannick                    229

1    Q    Now, when was it that you told -- withdrawn.

2         You told the jury yesterday that you had a

3    relationship with Rob for about six months, am I correct?

4    A    Yes.

5    Q    And you said that that relationship started in May 2009,

6    am I correct?

7    A    Yes.

8    Q    And you said it terminated in January 2010, am I correct?

9    A    Yes.

10   Q    Now, what date did it terminate in January 2010?

11   A    I don't recall the exact date.

12   Q    But you recall you told the jury yesterday that on that

13   particular day that Rob spat on you, am I correct?

14   A    Yes.

15   Q    And he slapped you in your face, am I correct?

16   A    Yes.

17   Q    And he made you wipe semen off of your face with a cloth,

18   am I correct?

19   A    That's incorrect.

20   Q    No, you didn't wipe semen off your face with a T-shirt?

21   A    He didn't make me wipe it off with the T-shirt, I did.

22   Q    You did.

23        But all of this happened the last time you saw him

24   in a romantic relationship, am I correct?

25   A    Yes.

Pace - cross - Cannick                        230

1   Q    And it's your testimony that you have no recollection as
2   to when that date was, am I correct?
3   A    That's correct.
4   Q    But you recall his telephone number from -- you recall
5   his telephone number from ten years ago, am I correct?
6   A    That's correct.
7   Q    Didn't recall your mom's, am I correct?
8   A    I do recall my mom's.
9   Q    No; yesterday when you were asked on the witness stand,
10  you testified and told the jury that you did not recall your
11  mother's testimony -- your mother's telephone number?
12  A    That's incorrect.
13  Q    You didn't recall your own telephone number, is that
14  correct?
15  A    That is correct.
16       THE COURT:  Mr. Cannick, can I see you with counsel
17  at the side?
18       I don't need the court reporter.
19       (Sidebar held with the Court and counsel only,
20  outside of the hearing of the jury and the court reporter.)
21       THE COURT:  So, Mr. Cannick, just do your best --
22       MR. CANNICK:  Yes, Your Honor.
23       THE COURT:  -- to stay tethered.
24       MS. GEDDES:  We do, Your Honor, we have it.
25       THE COURT:  Oh, you do.

Pace - cross - Cannick                    231

1          MR. CANNICK:  May I have the last question read

2   back, question and answer?

3          THE COURT:  Can you hear?  I just want to make sure

4   everybody can hear.  I don't want to have to interrupt you

5   again.

6          MR. CANNICK:  Okay.  Hopefully, this works.

7          THE COURT:  Give it a shot.

8          (Record read back as requested.)

9   BY MR. CANNICK:

10  Q    Now, you may -- so, according to you, there was a

11  50-second communication between you and Rob on January 23rd,

12  2010 at 2:51.

13         Am I correct?

14  A    Yes.

15  Q    And according to you, there was a communication between

16  you and Rob on January 23rd, 2010 for 57 seconds?

17  A    Yes.

18  Q    At 1:36 p.m.?

19  A    Yes.

20  Q    And, again, another telephone communication January 23rd

21  at 4:47 p.m., 56 seconds?

22  A    Yes.

23  Q    And there is another one that does not -- withdrawn.

24         Now, you were, in fact, stalking him, weren't you?

25  A    No.

Pace - cross - Cannick                    232

1  Q    You weren't stalking him?

2  A    I was not.

3  Q    Now, this -- these calls were made after you initiated a

4  lawsuit against Robert, am I correct?

5  A    That is correct.

6  Q    Now, when was your first lawsuit settled against Rob?

7  A    I believe it was February of 2010.

8  Q    What date specifically in February 2010?

9  A    I do not recall.

10  Q    Now, going back to the testimony, 210(n), Government

11  Exhibit 210(n).

12          MR. CANNICK:  Could you?

13          MS. GEDDES:  It is connected to your laptop.

14          (Pause.)

15          MR. CANNICK:  To speed up time, could you just post

16  it?

17          MS. GEDDES:  Here you go.

18  BY MR. CANNICK:

19  Q    Can you see 210(n)?

20  A    No.

21          THE COURT:  Are you connected to --

22          MR. CANNICK:  We are hoping that we are.

23          THE COURT:  Can we use the Government's?

24          I'm sorry.  The other thing we can do is take ten

25  minutes and try to fix it.  I'd rather not.

Pace - cross - Cannick                    233

1          MR. CANNICK:  I'd rather not as well.

2          (Exhibit published.)

3   BY MR. CANNICK:

4   Q    Can you see 210(n)?

5   A    Yes.

6   Q    Now, you testified, you told us that that was a contact

7   of Rob that was stored in your phone?

8   A    Yes.

9   Q    Now, there's a photo there, correct?

10  A    Yes, it is.

11  Q    Where did you get the photo?

12  A    That photo came off the internet.

13  Q    He didn't give you a photo, am I correct?

14  A    That's correct.

15  Q    You went to the internet search and got a picture from

16  your phone?

17  A    Yes, I did.

18         MR. CANNICK:  You can take it down, please.

19  BY MR. CANNICK:

20  Q    Now, before coming and giving testimony to the jury

21  yesterday, how many meetings had you had with the Government?

22  A    I don't recall.

23  Q    Well, let's see if we can work it out.

24         When was the last time you met with the Government

25  before coming in and giving testimony to the jury yesterday?

Pace - cross - Cannick                                    234

1   A    Monday.

2   Q    Okay.  And how long was that meeting?

3   A    I don't recall.

4   Q    Well, was it five minutes?

5   A    It was longer than five minutes.

6   Q    Was it longer than 30 minutes?

7   A    Yes, it was.

8   Q    Was it longer than an hour?

9   A    Yes, it was.

10  Q    Was it longer than two hours?

11  A    Yes, it was.

12  Q    Was it longer than three hours?

13  A    Yes.

14  Q    Four hours?

15  A    Yes.

16  Q    Five hours?

17  A    Yes, it was.

18  Q    Six hours?

19  A    I'm not sure if it reached the six-hour mark.

20  Q    Who was present at the meeting?

21  A    Several of -- several people that's sitting at the table.

22  Q    When you say "several people" sitting at the table, what

23  table?

24  A    This table (indicating) right here.

25  Q    You're talking about the Government's table?

Pace - cross - Cannick                    235

1    A    Yes, I am.

2    Q    Specifically, who were those people?

3    A    Ryan was present.  Maria was present.  Liz was present.

4    And I don't remember your name, I'm sorry.  She was present.

5    Q    She was present, as well?

6    A    She was present, as well, yes.

7              THE COURT:  Ms. Shihata?

8              THE WITNESS:  Yes.

9    BY MR. CANNICK:

10   Q    And you know these two by the first name, correct?

11   A    Yes.

12   Q    Who else?

13   A    Keith was present as well.

14   Q    Who's Keith?

15   A    A part of the government team.

16   Q    Who else?

17   A    I don't recall if there was more people.

18   Q    Now, at that meeting you went over, you rehearsed your

19   testimony, am I correct?

20   A    That is incorrect.

21   Q    You didn't go over the questions that were asked by

22   you -- asked of you by Ms. Geddes?

23   A    I did go over questions, but I did not rehearse.

24   Q    Oh.  So, the very questions that were asked of you by

25   Ms. Geddes yesterday and this morning, you went over them with

1  her in her office at that meeting?

2  A    That is correct.

3  Q    At that meeting did you look at any documents?

4  A    Yes, I did.

5  Q    What documents did you look at?

6  A    The evidence that I presented.

7  Q    The evidence that you presented?

8  A    Yes.

9  Q    Did you look at photographs?

10  A    Yes, I did.

11  Q    Did you listen to audios?

12  A    No, I did not.

13  Q    Videos?

14  A    No, I did not.

15  Q    Now, so this was all done on Monday for about six-plus

16  hours, am I correct?

17  A    I'm not sure it made the six-hour mark.

18  Q    And when I say Monday, I'm talking about three, four days

19  ago.

20        THE COURT:  Well, today is Thursday.

21        MR. CANNICK:  Okay, let's back it up.

22  BY MR. CANNICK:

23  Q    Four days ago?

24  A    It was on Monday of this week.

25  Q    Okay.  Before that, when was the last time you spoke with

Pace - cross - Cannick                          237

1   the Government or met with the Government?

2   A    I don't recall.

3   Q    And you have no recollection as to how many times you met

4   with the Government?

5   A    I do not.

6   Q    Now, you did meet with the Government on prior occasions,

7   am I correct?

8   A    That is correct.

9   Q    Before Monday?

10  A    Yes.

11  Q    And would it be fair to say you met with them more than

12  once, am I correct?

13  A    That is correct.

14  Q    More than twice, am I correct?

15  A    That would be correct.

16  Q    More than three times, am I correct?

17  A    I'm not sure how many times it was.

18  Q    And when you met with them, you did the very same thing,

19  you went over your testimony, am I correct?

20  A    I did not go over my testimony.

21  Q    Well, didn't they ask you the questions that were asked

22  of you yesterday and this morning?

23  A    No, not at every meeting.

24  Q    Not at every meeting.

25       But you didn't go there to have cocktails with them,

Pace - cross - Cannick                238

1   am I correct?

2   A    That is correct.

3   Q    You didn't have lunch with them, correct?

4   A    That's correct.

5   Q    You went there to prepare to give your testimony, am I

6   correct?

7   A    That is correct.

8   Q    And each time you went there, there were a number of

9   government officials in the room taking notes, am I correct?

10  A    That is correct.

11  Q    Now, you've also had interviews regarding your story as

12  to what you say happened here, am I correct?

13  A    That is correct.

14  Q    How many?

15  A    I'm unsure of how many interviews it was.

16  Q    Was it more than one?

17  A    It was more than one.

18  Q    More than two?

19  A    Yes, it was more than two.

20  Q    More than three?

21  A    I'm not sure how many it was.

22  Q    Can you approximate?

23        MS. GEDDES:  Objection.

24        THE COURT:  Well, do you have any idea how many it

25  was?

Pace - cross - Cannick                    239

1        THE WITNESS:  I do not.

2        THE COURT:  But was it more than two, right?

3        THE WITNESS:  Yes, it was.

4        THE COURT:  All right, go ahead.

5   BY MR. CANNICK:

6   Q    And you've done YouTube postings?

7   A    One YouTube posting, yes.

8   Q    When did you do that?

9   A    That was in 2017.

10  Q    And when did you have your first television, give your

11  first television interview?

12  A    The same year, 2017.

13  Q    And the second one?

14  A    That, I'm unsure of.

15  Q    And did you do any Instagram posting?

16  A    Yes, I did.

17  Q    How many?

18  A    I'm not sure how many Instagram posts I did.

19  Q    More than one, though?

20  A    Yes, it was more than one.

21  Q    Now, when you gave the television interview, were you

22  compensated?

23  A    No, I was not.

24  Q    YouTube, any compensation there?

25  A    No.

Pace - cross - Cannick                    240

1   Q    Instagram, any compensation there?

2   A    No.

3   Q    But you wrote a book, am I correct?

4   A    Yes, I did.

5   Q    And any compensation for the book?

6   A    Yes.

7   Q    How much was the compensation for the book?

8   A    I don't recall the exact number.

9   Q    Well, give me the not-exact number.

10  A    It would be more than 25,000.

11  Q    More than a hundred-thousand?

12  A    Less than a hundred-thousand.

13  Q    So, it would be fair to say more than 25, but less than a

14  hundred?

15  A    Yes.

16  Q    And when was it that you received these monies?

17  A    It happened over a period of months.

18  Q    And who was it that you got it from?

19  A    Amazon.

20  Q    And did you have an agent?

21  A    No, it was a self-published book.

22  Q    Self-published book, okay.

23       And what you wrote in the book was accurate, am I

24  correct?

25  A    Yes.

Pace - cross - Cannick                          241

1          THE COURT:  I'm sorry, I just couldn't hear what you

2     said.

3          MR. CANNICK:  Accurate.

4     A    Yes, it was.

5     Q    No embellishment?

6     A    No.

7     Q    Okay.  Now, I want to go over your testimony from

8     yesterday.

9          You testified and told us that -- you testified and

10    told us that you first had sexual contact with Robert when you

11    were 16 years old.

12         Do you remember telling us that?

13    A    Yes.

14    Q    And incidentally, before you came, when you came here

15    yesterday and you gave testimony to the jury, you swore to

16    tell the truth, am I correct?

17    A    That is correct.

18    Q    And you said that the initial encounter was in May of

19    2009, am I correct?

20    A    Yes.

21    Q    And you said you were 16 years old at that time, am I

22    correct?

23    A    Yes.

24    Q    And you said that this relationship lasted for about six

25    months, am I correct?

Pace - cross - Cannick                                    242

1   A     That's correct.

2   Q     And I think you testified and told us that it terminated

3   in January 2010, am I correct?

4   A     That is correct.

5   Q     But you testified here this morning that you don't know

6   specifically the date that it terminated?

7   A     That's correct.

8   Q     Now, you told us yesterday that you had an encounter with

9   Robert in 2008.

10          Do you remember telling us that?

11  A     Yes.

12  Q     And you told us that that encounter came about on

13  April 1st, 2008; am I correct?

14  A     Yes.

15  Q     Now, in fact, you told us it was April Fool's Day?

16  A     Yes.

17  Q     Now, you testified and told the jury that at that -- at

18  the time of that encounter, you were 14 years old; am I

19  correct?

20  A     Yes.

21  Q     So, let's try to do the math here.

22          You met him April 1st, 2008.  Am I correct so far?

23  A     Yes.

24  Q     And you were 14 years old?

25  A     Yes.

Pace - cross - Cannick                    243

1  Q    And then you had your sexual encounter with him May in

2  2010?

3  A    Yes.

4  Q    2010 or 2009?

5  A    2009.

6  Q    Okay.

7          See, so in May 2009 you had your encounter with him,

8  am I correct?

9  A    That's correct.

10  Q    And you told the jury that you were 16 years old at that

11  time, am I correct?

12  A    That's correct.

13  Q    Now, you would agree with me that from May 1st, 2008

14  to -- I'm sorry, April 1st, 2008 to May 2009 is one year and

15  one month, am I correct?

16  A    That's correct.

17  Q    But according to you, you were 14 years old May 1st --

18  A    April.

19  Q    -- 2008?

20  A    April 1st.

21  Q    -- April 1st, 2008 and you were 16 in May 2009?

22  A    My birthday is April 19th.

23  Q    I didn't ask you when your birthday was.

24          I said that you told us yesterday that on April 1st,

25  2008 when you met Rob you were 14 years old?

Pace - cross - Cannick                    244

1    A    Yes.

2    Q    On April 1st, 2008?

3    A    Yes.

4    Q    Sexual encounter with Rob, a year-and-a-month later,

5    you're 16 years old?

6    A    Yes.

7    Q    Okay.

8         So, you advanced two years in that year-and-a-month?

9    A    That's incorrect.

10   Q    Okay.  I know.

11        Now, when you went to the court in 2008 to support

12   Rob, you were 14 years old?

13   A    Yes, I was.

14   Q    But you told the court officers that you were 19 years

15   old?

16   A    That is true --

17   Q    You lied?

18   A    I told them I was 18.

19   Q    I beg your pardon?

20   A    I told them I was 18.

21   Q    Either way, you lied to them, am I correct?

22   A    That's correct.

23   Q    And you lied to them for three months, am I correct?

24   A    That's correct.

25   Q    And you presented identification to them verifying that

Pace - cross - Cannick                    245

1  age, am I correct?

2  A    That's incorrect.

3  Q    You didn't give them identification?

4  A    I gave them my high school ID.  I did not present

5  anything that represented 18.

6  Q    So, you're telling us now that you gave the court

7  officers your high school identification?

8  A    Yes, I did.

9  Q    What high school were you attending?

10            THE COURT:  Go ahead.

11  A    At the time I was attending Schaumburg High School.

12  Q    What grade were you in?

13  A    At the time, I was a freshman.

14  Q    And you stayed out of school for three months to attend

15  that proceeding, am I correct?

16  A    That's incorrect.

17  Q    Didn't you testify that it was April 1st?

18  A    Yes, I did.

19  Q    Okay.  Now, and it lasted until June, am I correct?

20  A    That's correct.

21  Q    And you went every day, am I correct?

22  A    I did not go every day.

23  Q    How many days per week did you go?

24  A    I went to some of the hearings, so that took some time in

25  between, that wasn't every day.  So, for -- I'm not sure how

Pace - cross - Cannick                   246

1  many days I went.

2          MR. CANNICK:  Your Honor, we're going to try to pull

3  up another photograph that an investigator brought us.

4          THE COURT:  You don't have to explain where it came

5  from, but does the Government have it?

6          MS. GEDDES:  We do not.

7          MR. CANNICK:  No.  It's something that we --

8          THE COURT:  That's okay.

9          Do you want to come over to the side with the court

10 reporter and we can discuss it?

11         MR. CANNICK:  Yes.

12         (Sidebar held outside the hearing of the jury.)

13

14         (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                              247

1              (The following sidebar took place outside the

2    hearing of the jury.)

3              MR. CANNICK:  Your Honor, there's a photograph,

4    there's two photographs, in fact, that we want to introduce

5    into evidence.

6              THE COURT:  Can I see them?

7              MR. CANNICK:  Actually, we're trying to get them.

8    We have them on the phone -- we have them on the computer, but

9    investigators are trying to get a color photo of it.

10             THE COURT:  What is it?

11             MR. CANNICK:  It's a picture of her and she's at the

12   court proceeding walking near the defendant trying to grab

13   him, reach out to him.

14             And then the other one is just a picture of her with

15   a newspaper with his picture against her chest.

16             THE COURT:  Do you have any objection?

17             MS. GEDDES:  I have no objection.  I'd just like to

18   see them, but I have no objection.

19             MR. CANNICK:  We need to get them, so I am going to

20   ask for a break at this time.

21             THE COURT:  You can't ask about some other stuff and

22   come back to it?

23             MR. CANNICK:  I can.

24             THE COURT:  I don't want her to have a baby on the

25   stand, so I would really like to move this along.

Sidebar                                         248

1          MR. CANNICK:  Okay.

2          THE COURT:  Yes, and then I know you know this

3     already, but you're really talking a lot about the trial in

4     2008.  I don't think there's any reason, I am just saying it's

5     out there.

6          MR. CANNICK:  It's out there.

7          MS. GEDDES:  But I would just say, part of what she

8     was trying to explain, but couldn't because I've instructed

9     her not to use the word trial, is that there was a hearing on

10    April 1st, 2008.  Jury selection in the trial doesn't start

11    until May, and so there's a period of weeks that she doesn't

12    go.

13         THE COURT:  You can bring that out on redirect.

14         MR. CANNICK:  Okay.

15         (Sidebar concluded.)

16

17         (Continued on the following page.)

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

A 231

J. Pace - Cross/Mr. Cannick                    249

1          MR. CANNICK:  May I, your Honor?

2          THE COURT:  Yes, go ahead.

3          MR. CANNICK:  Okay.  Thank you.

4    EXAMINATION BY

5    MR. CANNICK:

6    (Continuing.)

7    Q    Now, at the court proceeding you met someone and became

8    friendly with him, am I correct?

9    A    Yes.

10   Q    That person's name was Keyonia Jones?

11   A    Yes.

12   Q    You are no longer friendly with her; am I correct?

13   A    That's correct.

14   Q    And that friendship terminated when?

15   A    I don't recall.

16   Q    And you testified there came a point in time that you

17   spoke to someone connected with Robert about your being there

18   and being supportive and you were promised a T-shirt or an

19   autograph.  Do you remember telling us that?

20   A    An autograph, yes.

21   Q    An autograph, both.  And did that come to pass?

22   A    The autograph did.

23   Q    Okay.  And the autograph came to pass because,

24   basically, you stood in front of his tour bus and would not

25   move until you were given an autograph, am I correct?

J. Pace - Cross/Mr. Cannick                    250

1   A    That's incorrect.

2   Q    What did you do with the autograph?

3   A    I kept the autograph.

4   Q    Where?

5   A    I put it in my closet.  It was in my closet for a while.

6   Q    What was the autograph on?

7   A    It was on Keyonia's bank statement.

8   Q    Now, you testified and told us there came a point in

9   time this you were invited to a party at Robert's home, am I

10  correct?

11  A    That's correct.

12  Q    And you testified that you and Keyonia were invited and

13  you went, am I correct?

14  A    That's correct.

15  Q    And you testified and told us that you took the train

16  there?

17  A    That's correct.

18  Q    And the train was a two-hour ride?

19  A    From my home to the suburbs, yes.

20  Q    And after you got to the stop that you got off on, it

21  was a ten-minute walk, am I correct?

22  A    That's correct.

23  Q    So, in essence, to get from your home to this party took

24  you two hours and 10 minutes by public transportation and

25  walking the rest, am I correct?

J. Pace - Cross/Mr. Cannick                251

1  A     That's correct.

2  Q     And you testified that you got there and you saw

3  security, am I correct?

4  A     That's incorrect.

5  Q     What happened when you got there?

6  A     Bubba came to the gate and let us in.

7  Q     Now, when Bubba came to the gate, you didn't encounter

8  security at the gate at all?

9  A     No.

10 Q     Did anyone ask you for your identification at that time?

11 A     No.

12 Q     Did anyone ask you to sign a nondisclosure agreement at

13 that time?

14 A     No.

15 Q     So you got there and you just got with Bubba and then

16 just, basically, Bubba took you back up to the party?

17 A     That's correct.

18 Q     Now, you never told -- there was never a situation where

19 you were asked for identification and you told them that you

20 have to come right back because you left your identification

21 at your uncle's house?

22 A     No.

23 Q     Never told them that, right?

24 A     No.

25 Q     You are as truthful about as you are everything else you

J. Pace - Cross/Mr. Cannick                252

1    testified about and told this jury today?

2    A    Yes.

3    Q    Now, you got to the party --

4         MR. CANNICK:  Withdrawn.

5    Q    How much money did you pay to get the train out there?

6    A    It took about $15.

7    Q    And was that for a roundtrip, or was that for a single

8    fare?

9    A    It was roundtrip both ways.

10   Q    And you testified and told us that you stayed at the

11   party for about 30 minutes?

12   A    Less than 30 minutes.

13   Q    Less than 30 minutes.  So you took a two-hour ride

14   there, a ten-minute walk, went there to the party, stayed for

15   less than ten minutes, I mean, 30 minutes and then you went

16   back on your way?

17   A    Yes.

18   Q    So, in essence, you traveled four hours and 20 minutes

19   for less than 30 minutes of partying?

20   A    Yes.

21   Q    And you left because the music was too loud?

22   A    Yes.

23   Q    Now, you knew when you left home you were going to

24   R. Kelly's party, am I correct?

25   A    That's incorrect.

J. Pace - Cross/Mr. Cannick                    253

1  Q   You didn't know you were going to R. Kelly's party?

2  A   I did not.

3  Q   But you knew you were going to a party?

4  A   No, I did not.

5  Q   And you were truthful about that as everything else you

6  told us about?

7  A   Yes.

8  Q   Now, during this less than 30 minutes that you were at

9  the party, did you see any other celebrities?

10 A   No.

11 Q   About how many folks were at the party?

12 A   There was about 30 to 35 people.

13 Q   Do you remember what time you got to the party?

14 A   I do not.

15 Q   Do you remember what time you left the party?

16 A   I do not.

17 Q   Do you remember what time you left your home?

18 A   I do not.

19 Q   Do you remember if you saw Robert at the party?

20 A   I do.

21 Q   Now, when you saw Robert, did you subsequently have a

22 conversation with him?

23 A   I did have a conversation with him.

24 Q   Did you initiate that conversation or did Robert?

25 A   He did.

J. Pace - Cross/Mr. Cannick                254

1  Q    He did.

2              I want to go back to when you met Robert.  You

3  told him that you were 19 years old?

4  A    That's correct.

5  Q    How did that come about?

6  A    He asked me my age.

7  Q    And you told him 19?

8  A    Yes.

9  Q    You lied?

10 A    I did.

11 Q    Just like you lied to the court officers?

12 A    That is incorrect.

13 Q    When you were going to Robert's court appearance back in

14 2018, did you tell your mom you were going to court?

15 A    No, I did not.

16 Q    Where did you tell her you were going?

17 A    I was supposed to be going to school.

18 Q    So you lied to her, too?

19 A    She didn't ask.

20 Q    And you didn't tell her?

21 A    I did not.

22 Q    So we have a lie to your mom, a lie to the corrections

23 officer, and a lie to Robert?

24         MS. GEDDES:  Objection.

25         THE COURT:  Sustained as to form.

J. Pace - Cross/Mr. Cannick                255

1          Now, when you went to Robert's party, you didn't

2    expect loud music?

3          THE WITNESS:  I did not.

4          MR. CANNICK:  Before going to Robert's party, have

5    you ever been to a party?

6          THE WITNESS:  I have.

7    Q    Loud music at those parties?

8    A    No.

9          MS. GEDDES:  Objection.

10         THE COURT:  Overruled.

11   Q    There was no loud music at those parties?

12   A    No.

13   Q    Were these parties attended -- hosted by

14   African-Americans?

15         THE COURT:  Which parties are you talking about?

16         MR. CANNICK:  Let me just back up.

17         THE COURT:  Okay.

18   Q    How many parties did you attend before going to

19   Robert's?

20   A    I don't recall.

21   Q    But you do recall going to parties?

22   A    Yes.

23   Q    And were any of them hosted by African-Americans?

24         MS. GEDDES:  Objection.

25         THE COURT:  Sustained.  Come on, Mr. Cannick, move

J. Pace - Cross/Mr. Cannick                256

1  along.

2  Q    You didn't hear loud music at any of those parties that

3  you went to before?

4              MS. GEDDES:  Objection.

5              THE COURT:  Overruled.  Did anybody play loud music

6  at a party that you went to?

7              THE WITNESS:  No.

8  Q    Now, you went to the party and you left after about

9  30 minutes and you went home?

10 A    Yes.

11 Q    Do you recall what time you got home?

12 A    I do not.

13 Q    And you were 16 years old when you went to this party?

14 A    Yes, I was.

15 Q    Now, you testified and told us earlier that you had an

16 uncle who lived in the Olympia fields area?

17 A    Yes.

18 Q    What was the address?

19 A    I don't recall the address.

20 Q    What was his name?

21 A    His name is Perry.

22 Q    Perry, what's his last name?

23 A    His last name is Marion.

24 Q    Perry Marion?

25 A    Yes, that's correct.

J. Pace - Cross/Mr. Cannick                257

1    Q    And before the night of the party how many times have

2    you been to his home?

3    A    I hadn't.

4    Q    You had not?

5    A    No.

6    Q    Have you ever been to his home?

7    A    I have.

8    Q    When?

9    A    The first time was in May of 2009.

10   Q    May of 2009.  The same month that you went to the party?

11   A    Yes.

12   Q    Was it before or after you attended the party?

13   A    Can you rephrase your question?

14            THE COURT:  Before you rephrase your question, can

15   you adjust your microphone.  It's getting buried.

16   Q    You testified and told us you visited your uncle in May

17   of 2009.  Do you remember telling us that?

18   A    That's incorrect.

19   Q    May I have that last question before that one read back.

20            (The requested portion of the record was read back

21   by the Official Court Reporter.)

22   Q    When was it that you visited your uncle?

23   A    I was visiting my uncle throughout the years.

24   Q    Short while ago, I asked you before --

25            Short while ago, I asked you when is it that

J. Pace - Cross/Mr. Cannick                258

1    you visit your uncle.  Do you remember me asking you that?

2    A    I recall you -- I thought you were talking about Rob.

3    When you asked me when was the first time I went to his home

4    because you were speaking a party.

5              THE COURT:  I think the question was:  Do you

6    remember -- you can rephrase it -- I thought the question

7    was, do you remember the first -- you said you had an uncle

8    that lived nearby, right?

9              THE WITNESS:  Yes.

10             THE COURT:  When did you first go to his house,

11   that's the question.

12             THE WITNESS:  Oh, I went to my uncle's house

13   probably back about in 2006.

14   Q    And since that first visit in 2006, how many other times

15   have you visit with him?

16   A    We used to go there yearly for celebrations.  So since

17   2006, it was like every year for celebrations.

18   Q    But you don't know his address?

19   A    No, I do not.

20   Q    You testified and told us yesterday by subsequent visits

21   you had at Rob's home.  Do you remember telling us about

22   that?  Subsequent to the party?

23   A    Yes.

24   Q    And you testified and told us that someone by the name

25   of Anthony picked you up from the Metro station?

J. Pace - Cross/Mr. Cannick                    259

1   A    That's correct.

2   Q    And that, you know, that this person that you identified

3   as Anthony, did he introduce himself to you?

4   A    Yes, he did.

5   Q    So he spoke with you?

6   A    Yes.

7   Q    Wasn't wearing a name tag or anything like that?

8   A    No.

9   Q    And you testified that he took you to Rob's home, am I

10  correct?

11  A    Yes.

12  Q    And you testified that when you arrived at Rob's home,

13  basically, you called him to let him know that you were there

14  and that he told you to go to the pool to change?

15  A    That's correct.

16  Q    And you did that, am I correct?

17  A    That's correct.

18  Q    And, at some point, you contacted them and let him know,

19  in fact, you had changed?

20  A    That's correct.

21  Q    And according to you, he came to the pool area and he

22  sat down on the lounge and told you to walk back and forth?

23  A    Yes.

24  Q    Okay.  And what did you take that to mean?

25  A    To just walk back and forth.

J. Pace - Cross/Mr. Cannick                 260

1  Q    Okay.  And you walked -- and you did walk back and forth
2  am I correct?
3  A    Yes.
4  Q    Where did you walk?
5  A    Along the pool.
6  Q    And when you were walking, did you walk model-like?
7  A    No, I was just regular walking.
8  Q    Regular walking.  And how many times you walk back and
9  forth?
10 A    I'm not sure.
11 Q    Were you removing your bathing suit each time you walked
12 back and forth?
13 A    That's correct.
14 Q    Did you do that on your own?
15 A    At the instruction of Rob.
16 Q    Tell me what that instruction was?
17 A    He told me to walk back and forth and remove my bathing
18 suit as I did it.
19 Q    And you did it.  Well, did you say to him when he asked
20 you to do this, no?
21 A    No.
22 Q    Did you say, I'm going home?
23 A    No.
24 Q    So you just took off your clothes?
25       MS. GEDDES:  Objection.

J. Pace - Cross/Mr. Cannick                    261

1          THE COURT:  Overruled.

2   A    Yes.

3   Q    Then, according to you, that after that happened he gave

4   you oral sex?

5   A    Yes.

6   Q    Then you said that after that happened that you felt

7   uncomfortable and you told him that you were 16?

8   A    Yes.

9   Q    Now, what about that that made you feel uncomfortable to

10  tell him you were 16?

11  A    I was uncomfortable with the situation.  I knew I had

12  lied about my age and I wanted to tell him my age.

13  Q    But you were not so uncomfortable with the situation

14  that you decided:  Hell, no, I'm not taking off my clothes;

15  I'm going home.

16  A    That's correct.

17  Q    And this didn't come about because some law enforcement

18  was at the home looking for a 17-year-old Dominique?

19  A    That's correct.

20  Q    That's not the reason why you told him that, correct?

21  A    That's correct what you're saying.

22  Q    Now, you testified, and you told us yesterday, that at

23  this point in time when you were telling Robert your real age

24  that you showed him your state I.D., am I correct?

25  A    That's correct.

J. Pace - Cross/Mr. Cannick                    262

1    Q    Now, do you recall being arrested and charged for having

2    a bogus I.D.?

3    A    No.

4    Q    Do you recall being arrested and convicted at all?

5    A    No.

6    Q    Never happened, right?

7    A    I don't recall.

8    Q    Do you recall being arrested in Bloomfield, Illinois?

9    A    No.

10   Q    Do you remember where Bloomfield, Illinois is located?

11   A    I do not.

12   Q    Do you know of any city by the name of Bloomfield?

13   A    I've heard of Bloomfield.

14   Q    But you've never been to Bloomfield?

15   A    I've never been to Bloomfield.

16           THE COURT:  Mr. Cannick, can I see and you the

17   Government for a second.  No court reporter necessary.

18           (Discussion held off the record.)

19           THE COURT:  All right.  Ladies and gentlemen, I

20   think we'll take our morning break now.  It'll probably be

21   about 15 minutes.  Please don't talk about the case or

22   anything having to do with the case, but I'll see new about

23   15 minutes.

24           COURTROOM DEPUTY:  All rise.

25           (Jury exits courtroom at 10:58 a.m.)

Proceedings                    263

1        THE COURT:  All right.  The witness can step down

2   and everybody can sit down.

3        Just I wanted -- I think what we're going to try to

4   accomplish is to fix whatever is going on over here with your

5   connection and then I just want to make sure that

6   Mr. Cannick's microphone is properly attached.

7        What else do you want to say, I'm sorry.

8        MS. GEDDES:  That's all right, your Honor.  I

9   wanted to raise with the Court that with the defense

10  counsel's line of questioning regarding the witness's -- why

11  she was uncomfortable once she engaged in sexual activity

12  with the defendant and why she felt the need to explain that

13  she was 16.

14       One of the reasons I anticipate she would testify

15  that she felt uncomfortable is because the year before the

16  defendant was on trial for making a recording of an underage

17  female and that --

18       THE COURT:  I think counsel is aware that the line

19  of questioning will open that door.  We had a slight

20  conversation about it at the side, but if that's part of the

21  explanation, it seems like something that's appropriate on

22  redirect.

23       MS. GEDDES:  Thank you.

24       THE COURT:  But, anyway, let's be back here in

25  about 15 minutes, all right?

Proceedings                                    264

1          (A recess in the proceedings was taken.)

2          MS. GEDDES:  Your Honor, may we raise one thing

3   briefly before?

4          THE COURT:  Let's have the defendant come out

5   first.

6          MS. GEDDES:  Yes, sorry about that.

7          THE COURT:  I'm assuming we've straightened out the

8   issues with the exhibits and the display.

9          MR. CANNICK:  That's what I'm told, your Honor.

10         (Defendant enters the courtroom at 11:24 a.m.)

11         MR. CANNICK:  The hard copy we were supposed to get

12  is 15 minutes away.

13         THE COURT:  What did you want to raise Ms. Geddes.

14         MS. GEDDES:  On cross, defense counsel referenced a

15  prior arrest and conviction for using a false I.D. or

16  something along those lines.  The witness does not have a

17  conviction for using a false I.D. and, therefore, I don't

18  think it's a proper basis for cross-examination.

19         THE COURT:  Was she arrested for it?

20         MS. GEDDES:  She was arrested.  She was also not

21  arrested in Bloomfield.  She was arrested for shoplifting in

22  Bloomingdale.

23         THE COURT:  In Bloomingdale's?  You didn't know

24  what that was?

25         MS. GEDDES:  Bloomingdale, Illinois.

Proceedings                                          265

1          THE COURT:  So, first of all, an arrest is really

2     not probative of anything.  So I do agree that's not a proper

3     question.  I can't hear you.  I'm sorry.

4          MR. CANNICK:  I just turned it off, too.

5          THE COURT:  Just to drive me out of my mind.

6          MR. CANNICK:  I asked the question, it was a

7     good-faith based question based on the information I had.

8     Waiting for it, she denied it, so I moved on.

9          MS. GEDDES:  As long as we're not going back there,

10    it's fine.

11         THE COURT:  Yeah, that's fine.  I think generally,

12    you know, we're all on the same page about arrests then, so

13    it won't happen again I'm sure.

14         All right.  Anything else before we get the

15    witness?  Okay.  Let's get the witness.

16         MS. GEDDES:  Your Honor, one other note.  When I

17    redirect this witness, I've instructed her not to talk about

18    the trial.  Can I have a minute with her or just lead her

19    through it.

20         THE COURT:  When cross is done.  How much longer do

21    you have?

22         MR. CANNICK:  Maybe about an hour and a half.

23         THE COURT:  You can't see my aghast face under my

24    mask.  Okay.

25         MR. CANNICK:  It may go faster.

Proceedings                                          266

1          THE COURT:  We won't talk about how loud the music

2    was.  Whatever.  I'm sure it will be fine.

3          (Witness takes the witness stand.)

4          THE COURT:  If that's the case, that'll take us to

5    about the lunch break anyway, so we'll handle it that way.

6    Of course, no requirement that you go for an hour and a half.

7          MR. CANNICK:  I certainly understand, your Honor.

8          THE COURT:  All right.  And I'm correct that we've

9    remedied whatever the problem was with the displaying of your

10   evidence.

11         MR. CANNICK:  I think we have.

12         THE COURT:  Is that right, Donna.

13         COURTROOM DEPUTY:  Yes, it is.

14         THE COURT:  I just want to make sure we were

15   connected.  The witness is here.  Let's get the jury.

16         (A brief pause in the proceedings was held.)

17         COURTROOM DEPUTY:  All rise.

18         (Jury enters courtroom at 11:29 a.m.)

19         COURTROOM DEPUTY:  You may be seated.

20         THE COURT:  All right, everybody.  Welcome back.

21   We're ready to continue with the cross-examination by

22   Mr. Cannick?

23         MR. CANNICK:  Thank you, your Honor.

24         COURTROOM DEPUTY:  The witness is reminded that she

25   is still under oath.

J. Pace - Cross/Mr. Cannick                267

1      THE WITNESS:  Yes.

2  EXAMINATION BY

3  MR. CANNICK:

4  (Continuing.)

5  Q    So, earlier this morning, you told us there came a point

6  in time that you told Robert your true age according to you

7  as being 16?

8  A    Yes.

9  Q    And you told us, well, I asked based on your testimony

10  this morning, you told us that this happened after you had a

11  sexual encounter with Robert?

12  A    Yes.

13  Q    And when you said, "a sexual encounter with Robert,"

14  what -- would you describe is that sexual encounter?

15  A    It was oral sex that he performed on me.

16  Q    Now, you testified and told us earlier this morning that

17  you had a number of interviews with the Government prior to

18  coming in and giving testimony here am I correct?

19  A    Yes.

20  Q    Do you recall giving an interview to the government on

21  February 27, 2019?

22  A    I don't recall the exact date.

23      MR. CANNICK:  Your Honor, may I approach the

24  witness and see if it refreshes her recollection?

25      THE COURT:  Sure.

J. Pace - Cross/Mr. Cannick                    268

1      (Approaching the witness.)

2      MR. CANNICK:  You can hold it and see if you need

3   to look at it.

4      THE WITNESS:  Yes.

5   Q    You've had an opportunity to look at the document?

6   A    Yes.

7   Q    Does it refresh your recollection that you had an

8   interview with the Government on February 27, 2019?

9   A    Yes.

10  Q    Now, and that meeting that you had on February 27, 2019,

11  would it be fair to say it was similar to all of the other

12  meetings that you had with the Government wherein there were

13  a number of prosecutors and agents in the room?

14  A    Yes.

15  Q    And there were folks taking notes?

16  A    Yes.

17  Q    And you saw them when they were taking notes, am I

18  correct?

19  A    Yes.

20  Q    Now, do you recall telling during this meeting that you

21  and Robert moved from the pool area to the game room which is

22  located inside the home and this was the area that the party

23  was previously held and that Robert brought in your personal

24  bag with your belongings into that game room and you were

25  still naked when you guys entered the game room and you and

J. Pace - Cross/Mr. Cannick                    269

1  Robert sat down on the couch?

2            MS. GEDDES:  Objection.

3            THE COURT:  Is it to the form of the question?

4            MS. GEDDES:  Yes.

5            THE COURT:  It sounds rather compound.  Maybe you

6  could break it down.

7            MS. GEDDES:  There's another objection as well.

8            THE COURT:  Well, let's start by breaking it down

9  and see if that fixes the problem.

10  EXAMINATION BY

11  MR. CANNICK:

12  (Continuing.)

13  Q    At that meeting, do you recall telling the Government

14  that you and Robert were sitting on the couch?

15  A    Yes.

16  Q    And this was in the game room, am I correct?

17  A    Yes.

18  Q    And it was there according to you that you told Robert

19  that you were 16 years old?

20  A    Yes.

21  Q    And, according to you, you removed your identification

22  from the bag and showed it to Robert, am I correct?

23  A    Yes.

24  Q    And according to you, Robert told you to tell everyone

25  that you're 19 but act like you're 21?

J. Pace - Cross/Mr. Cannick                    270

1  A    That's correct.

2  Q    Now, do you recall telling your civil lawyers a

3  different story?

4  A    No.

5  Q    Do you recall telling your civil lawyers that Robert

6  told you to tell people that you were 19 but act like you're

7  25?

8  A    No.

9  Q    You did tell us yesterday that your lawyer that you were

10  working with was Patrick Condron of Susan Loggans &

11  Associates, am I correct?

12  A    Yes.

13  Q    And you did have a meeting with him on February 1, 2010,

14  am I correct?

15  A    I don't recall the exact date.

16        MR. CANNICK:  May I approach again?

17        THE COURT:  Yes.

18        (Approaching the witness.)

19        MS. GEDDES:  Can you let me know what exhibit

20  you're talking about.

21        MR. CANNICK:  3500-JP-16.

22        Just look at the document and see if it refreshes

23  your recollection.

24        THE WITNESS:  Yes.

25  Q    When you say "yes," does it refresh your recollection

J. Pace - Cross/Mr. Cannick                            271

1   that you had a meeting with your lawyers, your civil lawyers,

2   on of the Loggans Law Firm February 1, 2010?

3   A    Yes.

4   Q    Now, you're testifying and telling us that at that

5   meeting you did not tell them that Rob told you to act -- to

6   tell folks you're 19 and act like you're 25?

7   A    I did not say that.

8   Q    Now, when you had those meetings with them, were they

9   taking notes?

10  A    No.

11  Q    Tell us how those meetings would go?

12  A    The meetings with my previous attorneys?

13  Q    Meetings with Patrick Condron of the Susan Loggans &

14  Associates Law Firm?

15  A    I only had a few meetings with them.  But I just went

16  there and I told them that I wanted to press criminal charges

17  against him originally and they did not recommend that I

18  press criminal charges against him.

19  Q    Okay.  Now, my question to you is tell us how the

20  meetings went.  Did you sit down in an office with them?

21  A    Yes, I did sit down in an office.

22  Q    And they took information from you?

23  A    Yes, they took -- they collected evidence from me.

24  Q    Did they ask you for a recitation of what your claim

25  was?

J. Pace - Cross/Mr. Cannick                  272

1   A    Can you rephrase the question?

2   Q    Did they ask you to explain why you're there?

3   A    Yes.

4   Q    And you told them, correct?

5   A    Yes, I did.

6   Q    And you're telling this jury that they didn't take any

7   notes?

8   A    They did not take notes.

9   Q    Did you speak to anyone else?  Did they have you speak

10  to anyone else in connection with your claim?

11  A    I was able to speak with Susan over the phone.

12          MS. GEDDES:  Can I have one moment with counsel?

13          THE COURT:  Yes.  You don't need me, do you.

14          MS. GEDDES:  No.

15          (A brief pause in the proceedings was held.)

16          (Continued on the next page.)

17

18

19

20

21

22

23

24

25

Sidebar                                                                273

1          (The following sidebar conference was held outside

2     the hearing of the jury.)

3          MR. CANNICK:  The witness was interviewed by a

4     polygrapher.  What I'm asking her is did the law firm have her

5     speak to someone else.  Because I'm trying to make sure that I

6     don't open the door about bringing out the polygraph.

7          THE COURT:  I assume she passed it?

8          MR. CANNICK:  She passed portions of it.

9          MS. GEDDES:  She passed this one.

10          MR. CANNICK:  She said he told her, tell people that

11     she was 19 but act 25, but a prior inconsistent statement.

12     And I think the way I'm asking it does not open the door by

13     saying to her they had you speak to someone else, and in fact

14     you told them this.

15          THE COURT:  You already have done that.  I don't

16     know to what extent they permitted her to review whatever

17     their report was.

18          MS. GEDDES:  She hasn't.

19          THE COURT:  I'm just saying.  I think you're bound

20     by her answer unless you get the person in to say that she

21     said it.

22          MR. CANNICK:  I'm sure the Government will stipulate

23     to that.

24          MS. GEDDES:  I don't know about that.

25          MR. CANNICK:  You're not going to stipulate?  Then

Sidebar                                                    274

1    we'll drag them in.

2           THE COURT:  The only stipulation would be that

3    whoever it was prepared the notes at some time afterwards and

4    didn't show them to her.  I'm assuming that's what it is.  I'm

5    not trying to tell you how to do your business.  It doesn't --

6    you ask her the question if she says --

7           MR. CANNICK:  I can get the stipulation.  Because

8    she's --

9           THE COURT:  Go with God.

10          MS. GEDDES:  Just to be clear, I think you already

11   asked about this.  I think we're done.  We're moving on from

12   this.  I agree, I'm not going to bring in the polygraph based

13   on what you said.

14               (End of sidebar conference.)

15

16               (Continued on the next page.)

17

18

19

20

21

22

23

24

25

J. JOHNSON PACE - CROSS - CANNICK                    275

1              (In open court - jury present.)

2    BY MR. CANNICK:

3    Q    Earlier this morning before we took our break I asked you

4    when you got this autograph from Robert.  Didn't you in fact

5    stand in front of his tour bus and did not move until you were

6    granted an autograph?  You remember me asking you that?

7    A    Yes.

8    Q    I think your answer was no; is that correct?

9    A    That's correct.

10   Q    Do you also recall a meeting with the Government where

11   the Government, where you told the Government that you and

12   Keyonia stood in front of Kelly's bus until they agreed to

13   give you an autograph?

14   A    I don't recall.

15              MR. CANNICK:  May I approach?

16              THE COURT:  Sure.

17   Q    I'm directing your attention to the second highlighted

18   portion in yellow.

19              Isn't it a fact that you and Keyonia stood in front

20   of Kelly's bus until they granted you an autograph?

21   A    We did not stand in front of his tour bus.

22   Q    If the Government has that written in their notes in

23   someplace, that's an error?

24   A    If it says tour bus, that's an error.

25   Q    Well, did you stand in front of any type of vehicle to

J. JOHNSON PACE - CROSS - CANNICK                276

1    get an autograph?

2    A    In front of a car, yes.

3    Q    In front of a car?

4    A    Yes.

5    Q    What kind of car?

6    A    I don't recall the exact car, but he was in the back of a

7    car.

8    Q    You saw the car with him in the back of the car, am I

9    correct?

10   A    Yes.

11   Q    Had you seen him in that car before?

12   A    Yes.

13   Q    Where did you see him in that car before?

14   A    Coming to court.

15   Q    He didn't come to court in a tour bus?

16   A    Yes, he came to court in a tour bus, and he would get in

17   the car or in an SUV and be dropped off at the courthouse.

18   Q    You stood in front of that car, am I correct?

19   A    Yes.

20   Q    You refused move, am I correct?

21   A    We did not refuse to move; we waived the car down.

22   Q    If the Government wrote in their reports that you and

23   Keyonia stood in front of this vehicle until he agreed to give

24   you and autograph, that would be wrong by the Government to

25   put that in the report, correct?

J. JOHNSON PACE - CROSS - CANNICK                277

1   A    It would not be wrong.

2   Q    Because that was -- it wouldn't be wrong because that's

3   what in fact happened, am I correct?

4   A    That is incorrect.

5   Q    Now, the day that -- the first day that you went to

6   Robert's home, did you have intercourse with him?

7   A    No.

8   Q    What happened that day sexually between the two of you?

9   A    Nothing.

10  Q    The first day, that's because of the party, correct?

11  A    The first day is the party.

12  Q    The second time, did you have intercourse with him?

13  A    Yes, I did.

14  Q    After you had intercourse with him, according to you, he

15  prepared you a drink?

16  A    Yes.

17  Q    And you described that drink yesterday as being

18  delicious, am I correct?

19  A    Yes.

20  Q    After a while you felt a little funny after having the

21  drink, am I correct?

22  A    Yes.

23  Q    You told Robert that?

24  A    Yes, I did.

25  Q    And then he, according to you, escorted you to the room

J. JOHNSON PACE - CROSS - CANNICK                278

1   with the mirror, am I correct?

2   A     Yes.

3   Q     You laid down, according to you, in that room until you

4   felt better, am I correct?

5   A     No.

6   Q     Did you eventually leave the room?

7   A     Yes.

8   Q     When you left the room, where did you go to?

9   A     Down to the studio.

10  Q     Now, this was only the second time you were at his home,

11  am I correct?

12  A     Yes.

13  Q     And the first time you were at his home, you were there

14  for only about, less than 30 minutes, am I correct?

15  A     Yes.

16  Q     You went to a party, and that party was where?

17  A     It was at his home in the game room.

18  Q     And no one during that time gave you a tour of his home,

19  am I correct?

20  A     That's correct.

21  Q     And when you went there the second time you were

22  escorted, according to you, by Anthony to the pool area, am I

23  correct?

24  A     Correct.

25  Q     Prior to going to the pool area, Anthony did not give you

J. JOHNSON PACE - CROSS - CANNICK                279

1  a tour of the house, am I correct?

2  A    That's correct.

3  Q    This room that, the mirror room, according to you, is on

4  the first floor?

5  A    Incorrect.

6  Q    Where is the mirror room?

7  A    First level of the home.

8  Q    First level of the home?

9  A    Yes.

10 Q    How many levels?

11 A    Basement, first level then upstairs.

12 Q    So you when you said first level of the home, is that the

13 first floor?

14 A    No.

15 Q    What is the first floor?

16 A    The first floor would be the basement.

17 Q    Uh-huh.  Before this day you never had any type of tour

18 or orientation of Robert's home, am I correct?

19 A    That's correct.

20 Q    After you were lying in the mirror room for a period of

21 time, you got up and went where?

22 A    I was taken down to the studio.

23 Q    You were taken down to the studio?

24 A    I was escorted down to the studio.

25 Q    Who escorted you?

1  A     Robert.

2  Q     Robert escorted you?

3  A     Yes.

4  Q     Wasn't Robert preparing for a party downstairs?

5  A     No.

6  Q     Weren't you in that room by yourself sleeping trying to

7  feel better?

8  A     No.

9  Q     So Robert was in the room with you as you slept in the

10 mirror room?

11 A     He wasn't in the room the entire time.

12 Q     Do you recall testifying and telling the jury yesterday

13 under oath.

14        Question:  Did you drink the drink?

15        Answer:  I did drink it.

16        Question:  How did it make you feel?

17        Answer:  It was delicious.  I just started feeling a

18 bit ill and I told the defendant I wasn't feeling well.

19        Question:  What happened once you told the defendant

20 you weren't feeling well?

21        Answer:  He opened a door to the mirror room and he

22 told me I can lay down in the mirror room.

23        Question:  Can you describe the mirror room?

24        Answer:  A room where the entire room is just

25 mirror.  There is a huge mirror above the bed.

J. JOHNSON PACE - CROSS - CANNICK                  281

1          Question:  What happened once you were inside the
2    mirror room?
3          Answer:  I just laid down.
4          Question:  And where, if anywhere, did the defendant
5    go once you were in the mirror room?
6          Answer:  He told me -- well, he was preparing for a
7    party that he was going to have later, so he ended up leaving
8    the room.
9          Question:  Where did you go?
10         Answer:  About, I want to say ten minutes later, I
11   went downstairs.
12         When you testified under oath to this jury
13   yesterday, you didn't tell them that Robert took you
14   downstairs, am I correct?
15   A    That is correct.
16   Q    You told them that you laid there for about ten minutes
17   then you went downstairs, am I correct?
18   A    That's correct.
19   Q    So when you testified just a short while ago that Robert
20   took you downstairs you lied, didn't you?
21         MS. GEDDES:  Objection.
22         THE COURT:  Sustained as to form.
23   Q    Were you telling the truth when you told the jury just a
24   short while ago that it was Robert who took you downstairs?
25   A    Yes.

J. JOHNSON PACE - CROSS - CANNICK                282

1    Q    Do you know what the truth is?

2              THE COURT:  Mr. Cannick, sustained.

3    Q    Let's go back to this mirror room.  There is a bathroom

4    inside that room, am I correct?

5    A    Yes.

6    Q    And the mirror room has a lock on the outside of the

7    door, am I correct?

8    A    I don't recall.

9    Q    It's your testimony that you could just walk up to the

10   door in the mirror room after that ten minutes elapsed and

11   just open the door and walk downstairs?

12   A    You can repeat?

13             THE COURT:  Rephrase.  I don't understand it either,

14   rephrase.

15   Q    It's your testimony -- withdrawn.

16             So correct me if I'm wrong.  You just got up after

17   about ten minutes, opened the door of the mirror room, and you

18   walked downstairs?

19   A    That's incorrect.

20   Q    Tell me what happened?

21   A    Robert came to the mirror room and he escorted me down

22   the stairs.

23   Q    Did there come a point in time that you left Robert's

24   home to go back to your home that day?

25   A    The next day I did.

J. JOHNSON PACE - CROSS - CANNICK                283

1  Q    What time was it that you left the next day?

2  A    I'm unsure of the time, but I do remember saying I wanted

3  to go home at 6:00 a.m., but I'm not sure what time I actually

4  left his home.

5  Q    What time did you arrive at his home?

6  A    I don't recall the time I arrived.

7  Q    So you were, according to you, 16, and you stayed

8  overnight at his home?

9  A    Yes.

10 Q    You testified and told us at one point you eventually

11 left.  Did you alert him that you wanted to leave?

12 A    Yes.

13 Q    And how did you do that?

14 A    Through text message and a phone call.

15 Q    What happened?

16 A    I was able to leave.

17 Q    You were able to leave?

18 A    Yes.

19 Q    No one held you there, right?

20 A    I had to wait to be escorted, but I was able to leave.

21 Q    Well, were you given money to take the train?

22 A    Yes, I was given money to take the train back home.

23 Q    How much money were you given?

24 A    It was $50 in an envelope.

25 Q    And you decided to take the train as opposed to taking a

J. JOHNSON PACE - CROSS - CANNICK                284

1   cab?

2   A    Yes.

3   Q    Who was it that came down to give you the envelope?

4   A    One of the runners came down to give me the envelope.

5   Q    Do you know the runner's name?

6   A    Tom.

7   Q    What did Tom tell you?

8   A    That he was going to take me to the train station.  And

9   he handed me the envelope and said that it was from Rob.

10  Q    Now, you testified and told us about Dominique being your

11  friend from a fan club of Rob's?

12  A    Yes.

13  Q    This fan club, how long before this date had you been a

14  member?

15  A    Since about 2007.

16  Q    Would you describe yourself as a super fan?

17  A    At the time, yes.

18  Q    And what made you a super fan?

19  A    Well, what makes a super fan is somebody that is just

20  like a really big fan of a person's music or whatever they do

21  and you're just very supportive of it.

22  Q    And that's when you went to the court proceeding in 2008?

23  A    Yes.

24  Q    Would you categorize yourself as being a groupie?

25  A    No, I would not.

J. JOHNSON PACE - CROSS - CANNICK                285

1   Q    Had you ever considered yourself as being a groupie of
2   Roberts?
3              MS. GEDDES:  Objection.
4              MR. CANNICK:  Of Roberts.
5              THE COURT:  I'm not sure the distinction.
6              Do you consider yourself a groupie?
7              THE WITNESS:  No.
8              THE COURT:  Go ahead.
9   BY MR. CANNICK:
10  Q    You testified and told us that you eventually introduced
11  Dominique to Robert?
12  A    Yes.
13  Q    You have a tattoo of Dominique on your body, am I
14  correct?
15  A    Yes.
16  Q    Where is that tattoo?
17  A    It's on my leg.
18  Q    What is that tattoo?
19  A    It's a tattoo of a heart that says her full name.  And I
20  have a cup cake tattoo.  And also a tattoo with me and
21  Dominique's anniversary date.
22  Q    When you say you and Dominique's anniversary date?
23             MS. GEDDES:  Objection.
24             THE COURT:  Overruled.
25  A    Me and Dominique used to date.

1  Q    When was that?

2  A    It started March 17 of 2010.

3  Q    You testified and told us yesterday that there came a

4  point in time that Robert took your, I think you said, your

5  pink Palm Centro phone.  Do you remember telling us that?

6  A    Yes.

7  Q    And you told us that the reason why he did it is that he

8  didn't want you to be in contact with anyone.  Remember

9  telling us that?

10 A    Yes.

11 Q    But you also told us that he, according to you, took the

12 phone and gave you the memory card, am I correct?

13 A    That's correct.

14 Q    And I think you testified and told us that he eventually

15 replaced that phone by giving you money to buy another one?

16 A    That's correct.

17 Q    How much money did he give you there?

18 A    $250.

19 Q    You bought another phone, a prepaid phone?

20 A    Yes.

21 Q    How much was that prepaid phone?

22 A    I don't recall the price of it.

23 Q    Not $250 though, right?

24 A    That's right.

25 Q    On that other phone, you use it to contact the very same

J. JOHNSON PACE - CROSS - CANNICK                287

1  people, am I correct, that you were contacting before?

2  A    Not all of them.

3  Q    But you contacted Dominique?

4  A    Yes.

5  Q    Keyonia?

6  A    Yes.

7  Q    Your friend Danika?

8  A    Yes.

9  Q    And other family members?

10 A    Yes.

11 Q    Those are some of the same people that you said Rob said

12 he didn't want you to contact; is that correct?

13 A    That's correct.

14       MR. CANNICK:  Your Honor, the Government has agreed

15 to --

16       THE COURT:  Are you offering some things into

17 evidence?

18       MR. CANNICK:  Yes.

19       MS. GEDDES:  No objection.

20       THE COURT:  How are they going to be identified?

21       MR. CANNICK:  Defense 1, 2, 3.

22       THE COURT:  Okay.  One, two, three?

23       MR. CANNICK:  Yes.

24       THE COURT:  Why don't you mark them afterwards.  Do

25 you have exhibit stickers, Mr. Cannick?

J. JOHNSON PACE - CROSS - CANNICK          288

1       MR. CANNICK:  Okay.  Your Honor, I'm going to ask

2  that Robert 1 for identification be published.

3       THE COURT:  Defendant's 1.

4       MR. CANNICK:  Yes.

5       THE COURT:  Defendant's Exhibit 1, okay.

6  BY MR. CANNICK:

7  Q   You're looking at Defendant's Exhibit 1 for

8  identification.  Do you recognize that?

9  A   Yes.

10 Q   That's a color photograph, a color version, of the

11 photograph that was offered by the Government earlier in this

12 trial, am I correct?

13 A   Yes.

14 Q   Now, that is you on the bed, am I correct?

15 A   Yes.

16 Q   And where is this where are you?

17 A   In the mirror room.

18 Q   In the mirror room.  Okay.

19      And you testified and told us earlier -- withdrawn.

20      Do you remember the date this was taken?

21 A   I do not.

22 Q   Do you remember what you were doing there that day?

23 A   Yes, I was visiting Rob.

24 Q   You were visiting Rob.

25      Now, I want you to describe the outfit that you're

J. JOHNSON PACE - CROSS - CANNICK                289

1   wearing?

2   A    I'm wearing some tan capris and a red shirt.

3   Q    You're not wearing baggie sweats, am I correct?

4   A    That's correct.

5   Q    The shirt, describe the shirt.

6   A    It's a red, fitted shirt.

7   Q    Red, fitted shirt.  That's fitted, not baggie?

8   A    That's correct.

9   Q    What do you have on your feet?

10  A    I have heels on.

11  Q    You have heels on?

12  A    Yes.

13  Q    You're lying on the bed with heels on, am I correct?

14  A    Yes.

15           MR. CANNICK:  Your Honor, I'm going to --

16           THE COURT:  Are these additional photographs?

17           MR. CANNICK:  Yes.

18           THE COURT:  You already marked Defendant's

19  Exhibit 1, 2, 3 -- wait.  You should be A, B, C.

20           MR. CANNICK:  Yes.

21           THE COURT:  Those first things will be A, B and C.

22  Now you're on D and E.  All right.

23           MR. CANNICK:  Your Honor, I'm going to ask the

24  witness be shown what is marked for identification as

25  Defendant's Exhibit D and E.

J. JOHNSON PACE - CROSS - CANNICK        290

1          May I approach?

2          THE COURT:  Yes.  So these are not in evidence.

3          MR. CANNICK:  Not yet.

4    BY MR. CANNICK:

5    Q    Take a look at these.  Do you recognize what is marked as

6    Defendant's Exhibit D for identification?

7    A    Yes.

8    Q    What do you recognize it to be?

9    A    That's a photo of me, Rob, June, and another R. Kelly

10   fan.

11   Q    Do you have a sense of when this photograph is taken?

12   A    I believe that was taken in April of 2008.

13   Q    And does this seem to be a fair and accurate depiction of

14   what you recall the situation would be back at that time?

15   A    Yes.

16          MR. CANNICK:  Your Honor, I offer this into evidence

17   as Defendant's Exhibit D.

18          MS. GEDDES:  No objection.

19          THE COURT:  Okay.

20          (Defendant's Exhibit D, was received in evidence.)

21   BY MR. CANNICK:

22   Q    I'm going to show you what is previously marked

23   Defendant's Exhibit E for identification.  Do you recognize

24   that?

25   A    Yes.

J. JOHNSON PACE - CROSS - CANNICK          291

1  Q    What do you recognize it to be?

2  A    That is me.

3            MR. CANNICK:  Your Honor, I'm going to offer this as

4  Defendant's Exhibit E.

5            MS. GEDDES:  No objection.

6            THE COURT:  Okay, that's in evidence.

7            (Defendant's Exhibit E, was received in evidence.)

8            MR. CANNICK:  I ask that Defendant's Exhibit D be

9  published.

10           THE COURT:  Okay.

11           (Exhibit published.)

12 BY MR. CANNICK:

13 Q    You're looking at Defendant's Exhibit D.  Do you

14 recognize yourself in the photograph?

15 A    I do.

16 Q    Where do you recognize -- what are you wearing?

17 A    I'm wearing a black coat with white pants and brown

18 heels.

19           MR. CANNICK:  I'm going to ask that Defendant's

20 Exhibit E be published.

21           THE COURT:  Okay.

22 Q    Do you recognize yourself in that one?

23 A    Yes.

24 Q    What do you recognize yourself -- withdrawn.  In this

25 photograph you're holding a news article or something with

1  Robert's picture on it?

2  A    Yes, that's correct.

3  Q    What is it?

4  A    This was me outside of the trial holding a newspaper

5  article with him.

6  Q    You're 14 at this time, am I correct?

7  A    I'm not sure if this was taken when I was 14 or a few

8  weeks later when I turned 15.

9  Q    Do you recall whether or not this was a school day?

10  A    Yes, it was a school day.

11  Q    Incidentally, you're wearing a wig here, am I correct?

12  A    Yes, I am.

13  Q    And you're wearing a wig because you wanted to project

14  yourself as being older, am I correct?

15  A    No, that's not correct.

16  Q    It's just a style thing?

17  A    Yes.

18  Q    You testified and told us yesterday that there came a

19  point in time that you and Dominique went to Rob's home in

20  Olympia Fields, am I correct?

21  A    That's correct.

22  Q    And you testified and told us you got through the gate,

23  am I correct?

24  A    That's correct.

25  Q    And you testified and told us that you were stopped by

J. JOHNSON PACE - CROSS - CANNICK                 293

1   Bubba, am I correct?

2   A    That's correct.

3   Q    What were you doing at his home?

4   A    We just ran through the gate.  We had no plan.

5   Q    You had no plan?

6   A    No.

7   Q    You live two hours away, am I correct?

8   A    That's correct.

9   Q    So you had no plans but you drove -- withdrawn.

10          How did you get there?

11  A    Dominique drove her mom's car.

12  Q    So how far did Dominique live from there?

13  A    She lives about 15 minutes away from him.

14  Q    How did you get to Dominique?

15  A    I took the Metro train to go out to her house.

16  Q    With no plans, you left your home, went met up with

17  Dominique, and you decided to go to Rob's home?

18  A    I planned to meet up with Dominique and we had no plans

19  as far as going to his home, it just happened.

20  Q    You testified and showed us, you testified about a huge

21  gate yesterday to this property, am I correct?

22  A    That's correct.

23  Q    You climbed across that gate?

24  A    No, we did not climb the gate.

25  Q    How did you get through the gate?

1  A    We waited for a car to go through, and when the car went

2  in we ran in behind in.

3  Q    Rob was on tour, am I correct?

4  A    I'm not sure.

5  Q    How long had you waited for a car to come and go through

6  the gate?

7  A    We drove up, it was probably about two minutes; and then

8  we saw a car going in and we ran in.

9  Q    So you were waiting outside of Dominique's car?

10  A    We were getting out of her car.

11  Q    Can you describe the car that went in the gate?

12  A    It was a black car.  I'm not sure of the make or model.

13  Q    It was Bubba who caught you, right?

14  A    That's correct.

15  Q    What did you tell Bubba your reason for being there?

16  A    I just told him that I was getting my heels, I wanted to

17  get my heels that I left.

18  Q    That was not your purpose though, right?

19  A    It originally wasn't my purpose.

20  Q    When did it become your purpose?

21  A    When we got caught.

22  Q    So it wasn't your purpose.  After you told Bubba that,

23  what, if anything, did Bubba do, according to you?

24  A    Can you repeat the question?

25  Q    After you told Bubba that you were there to get your

J. JOHNSON PACE - CROSS - CANNICK                 295

1   heels what, if anything, did Bubba do according to you?

2   A    He went back and he went to the house and he got my heels

3   for me.

4              MR. CANNICK:  May I have a second please, your

5   Honor?

6              THE COURT:  Sure.

7   Q    Isn't it a fact, ma'am, that the day that you went to

8   Robert's home, he was not home?

9              MS. GEDDES:  Objection.

10             THE COURT:  Overruled.

11  A    That's incorrect -- I'm sorry, which date are you

12  speaking of?

13  Q    The date you and Dominique went to his home, isn't it a

14  fact that he was not home that day?

15  A    That's correct.

16  Q    Isn't it a fact that you did in fact get into his home

17  that day?

18  A    That's -- I got into his gate.  I did not get into his

19  home.

20  Q    Isn't it a fact that you got into his home and you went

21  inside of his home and you took pictures of his home while he

22  was not at his home?

23  A    That is not true.

24  Q    Isn't it a fact that the picture that you're taking while

25  in his bed was taken on that date that you and Dominique

*RIVKA TEICH, RPR, RMR, CRR*
*Official Court Reporter*
A 278

J. JOHNSON PACE - CROSS - CANNICK                    296

1   burglarized his home?

2         THE COURT:  Objection.  Sustained as to form.

3   Q    Isn't it a fact that you took this picture in his bed the

4   date that you and Dominique actually went there?

5   A    That's incorrect.

6   Q    Your shoes are on, am I correct?

7   A    Yes.

8   Q    You're dressed in tight-fitting clothes, am I correct?

9   A    That's correct.

10  Q    And you're testifying that you told the jury yesterday

11  that Robert's rules were that you could not wear tight-fitting

12  clothes.  That's what you told the jury yesterday, am I

13  correct?

14  A    That's correct.

15  Q    You testified and told the jury that Robert said that you

16  were to wear baggie clothes, sweatpants, am I correct?

17  A    That's correct.

18  Q    And loose-fitting blouse, am I correct?

19  A    A loose-fitting shirt.

20  Q    Shirt.  You would agree with me that the pants that

21  you're wearing are not baggie, am I correct?

22  A    That's correct.

23  Q    You would agree with me that the shirt you're wearing is

24  not loose fitting?

25  A    That's correct.

J. JOHNSON PACE - CROSS - CANNICK                 297

1  Q    Now, this photograph that you said you took when Robert

2  was home, how long had you been in his home that day?

3  A    I'm not sure.

4  Q    Do you recall what time you got there?

5  A    I do not.

6  Q    When you would go to Robert's home, would you lie in his

7  bed with your shoes on?

8  A    You can repeat that?

9  Q    When you would go to Robert's home, would you lie in his

10 bed with your shoes on?

11 A    Not all the time.

12 Q    Not all the time.  When did you do it?

13 A    I would randomly do it at times.

14 Q    This just happened to be one of the days, right?

15 A    Yes.

16 Q    Now, you and Bubba had a relationship, am I correct?

17          MS. GEDDES:  Objection.

18          THE COURT:  Overruled.

19 A    What kind of relationship?

20 Q    Come on, a sexual relationship.

21          MS. GEDDES:  Objection.

22          THE COURT:  Sustained.

23 Q    You and Bubba had a sexual relationship?

24          MS. GEDDES:  Objection.

25          THE COURT:  Can I see the parties at the side?

Sidebar                                                    298

1          (The following sidebar conference was held outside

2     the hearing of the jury.)

3          THE COURT:  I made a pretrial ruling that the

4     witness's prior sexual conduct was not relevant and I

5     precluded inquiry of this.  This is the second question that

6     you put to this witness about her relationships with other

7     people.  And if there is some reason for an exception to my

8     ruling, I would expect that you would apply to me first before

9     asking the witness.

10         I'm sustaining the objection.  I do not see the

11     relevance of it, unless you can explain it.

12         I'm very disappointed with this line of questioning.

13         MR. CANNICK:  Your Honor, this witness testified

14     that she gave my client large sums of money after she got the

15     settlement from him.  Based on the records we received from

16     the Government, she gave Bubba monies from the settlement

17     money.  Bubba was the person, according to her, that stopped

18     her from actually burglarizing my client's home.  And Bubba

19     was the one who is supposed to call my client and alert my

20     client and did nothing about it.

21         There is a theory here that she and Bubba were

22     basically in cahoots in terms of what was going on to get

23     money from my client.

24         THE COURT:  I mentioned when I made this ruling, the

25     rules require that you have to make a specific and articulate

*RIVKA TEICH, RPR, RMR, CRR*
*Official Court Reporter*
A 281

Sidebar                                                   299

1  reason to question a witness along these lines.  You are among

2  the best lawyers that I have worked with, so I know you know

3  this, and you did not do that.  You just asked her the

4  question.  And I'm precluding.

5          You had to make an application to me.  You didn't do

6  it.  If this was your theory, that's what you should have

7  done.

8          It's beyond inappropriate to ask a witness in this

9  situation a question like that.

10         MR. CANNICK:  Well, then am I allowed to ask the

11 witness about their relationship leaving out the sexual part?

12         THE COURT:  First of all, if the theory is she

13 conspired with him, I'm not sure the sex part of it matters.

14         MR. CANNICK:  It shows the closeness and the trust.

15         THE COURT:  I don't know what evidence you have that

16 they had any kind of relationship, but it doesn't matter

17 because I precluded it.  I precluded you from bringing out

18 this evidence.

19         And if there is some reason for you to do it you

20 should have made the application.  You can't do it.

21         This talking about herpes has zero to do with this

22 questioning.

23         MR. CANNICK:  Look how broad this question is.

24         THE COURT:  So the record is clear, Mr. Cannick's

25 co-counsel has come with a portion of the transcript during

Sidebar                                                    300

1  which the Government was asking the witness questions about

2  herpes.  The questions were confined specifically to this

3  period of time.

4          I'm not going to discuss this any more because I

5  don't see that there is a foundation for this question, and

6  it's in direct contradiction to what I told you.  So please

7  don't ask the question, move on to something else.

8          MR. CANNICK:  Can I get some water?

9          THE COURT:  Yes.

10         (End of sidebar conference.)

11

12         (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Pace - cross - Cannick                    301

1   EXAMINATION CONTINUES

2   BY MR. CANNICK:

3   Q    Now, yesterday you testified and told the jury about a

4   settlement that you got from Robert, am I correct?

5   A    Yes.

6   Q    And you testified about your giving him monies back?

7   A    Yes.

8   Q    Now, you also gave Bubba some of that money, am I

9   correct?

10  A    Yes.

11  Q    How much money did you give Bubba?

12  A    $4,000.

13  Q    Now, do you remember when it was that you started giving

14  Bubba money?

15  A    It was only once, and I don't recall.

16  Q    Now, yesterday you testified and told the jury that Rob

17  settled the case with you and gave you money for your silence.

18        Do you remember telling us that?

19  A    That's correct.

20  Q    Now, I want you to --

21        MR. CANNICK:  Your Honor, may I approach the

22  witness?

23        THE COURT:  Yes.

24  Q    I am going to ask you to look at Government Exhibit 928.

25  A    (Witness complies.)

SAM    OCR    RMR    CRR    RPR

A 284

Pace - cross - Cannick                                302

1    Q    That's the settlement agreement, am I correct, between

2    you and Robert?

3    A    This is the second one, yes.

4    Q    It's the second one?

5    A    Yes.

6    Q    Okay.

7              Now, may I have that back for a second?

8    A    Yes.

9              MS. GEDDES:  And just for the record, can you make

10   clear that you previously showed 3500-JP29, not 928?

11             MR. CANNICK:  Yes.

12   BY MR. CANNICK:

13   Q    I am now showing you Government Exhibit 928.

14             That is the agreement that you signed, am I correct?

15   A    That's correct.

16   Q    And who was your attorneys at that time?

17   A    Susan Loggans and Patrick Condron.

18   Q    And you testified, you told us yesterday, that basically,

19   the settlement agreement came about for Rob's purchase for

20   your silence.

21             Do you remember telling us that?

22   A    Yes.

23   Q    I want you to read that agreement and when you get to the

24   part where it says it's for the purchase of your silence, I

25   want you to let me know.  Okay?

1          MS. GEDDES:  Objection.

2          THE COURT:  Well, overruled.  Actually, sustained as

3    to form.

4          Why don't you just put the question to the witness

5    and then if you have a question you want to ask her, you can

6    do that.

7    BY MR. CANNICK:

8    Q    Look at that document.

9          Does it say anyplace in there that Rob is signing

10   this agreement to purchase your silence?

11         THE COURT:  This is a completely ministerial

12   question for you.

13         (Sidebar held with the Court and counsel only,

14   outside of the hearing of the jury and the court reporter.)

15   A    Now, what's your question?

16         MR. CANNICK:  May it be read back?

17         THE COURT:  Sure.

18         (Question read.)

19   A    No, it does not.

20   Q    Read paragraph 1 to the jury.

21   A    Kelly enters into this confidential Settlement Agreement

22   and Release without any admission of liability or wrongdoing,

23   and Kelly expressly denies engaging in any inapprop --

24   improper or wrongful conduct of any type of -- or manner.

25   Johnson acknowledges, confirms and represents that at one time

1  she told Kelly that she was 19 years of age.  Kelly asserts

2  that Johnson showed him an identification card stating that

3  she was 19 years of age, that she never told him that she was

4  under 19 years of age, and never showed him any identification

5  indicating that she was under 19 years of age.  Johnson

6  has agreed to substantially reduce her original settlement

7  demand in light of assertions of Kelly.  Kelly has agreed to

8  pay the settlement proceeds solely to avoid the cost of

9  litigation.

10 Q    And you signed that, am I correct?

11 A    I did sign this.

12 Q    May I have it back?

13       And you signed this after consulting with your

14 attorneys, am I correct?

15 A    I didn't see the agreement before I signed it, but I

16 signed the last page of it.

17 Q    So, you signed something that you didn't see?

18 A    That's correct.

19 Q    Are you telling this jury that you never read it?

20 A    I read it after I got -- after I obtained my file from my

21 attorney, but I never knew what was in the original settlement

22 because my attorneys never let me get it.

23 Q    So, it's your testimony that you went to the office --

24 you did go to their office?

25 A    That's correct.

Pace - cross - Cannick                    305

1   Q    And how long were you at the office?

2   A    On which day?

3   Q    On the date that you signed this agreement.

4   A    I was there less than an hour.

5   Q    And before that date, had you been to that office before?

6   A    Yes.

7   Q    How many times?

8   A    I was there probably twice before having to sign papers.

9   Q    And during the times that you were there, those two

10  occasions, did you discuss settlement?

11  A    We talked about the settlement the day that I had to sign

12  the paper.

13  Q    And before that, you never discussed settlement?

14  A    I didn't know anything about it.

15  Q    But you did learn about it the day that you were there

16  for the settlement, am I correct?

17  A    Yes.  A lot of things wasn't discussed with me --

18  Q    I didn't ask you that.

19        I said that you did learn about it on the date that

20  you went for the settlement?

21  A    Yes.

22  Q    Okay.  And before signing it, your attorneys explained it

23  to you?

24  A    Yes.

25  Q    Okay.  And you were how old at that time?

1   A    At the time, I was 16.

2   Q    And your mother was there?

3   A    Yes, she was.

4   Q    And your mother signed it, am I correct?

5   A    Yes, she did.

6   Q    And your mother had been involved with this procedure at

7   the outset, am I correct?

8   A    I don't understand your question.

9   Q    Wasn't your mother involved with this litigation and

10  helping you -- well, with this process and helping you with

11  this process?

12  A    She was present, yes.

13  Q    Now, after you signed this, you got another lawyer, am I

14  correct?

15  A    That's correct.

16  Q    How much longer after that did you retain another lawyer?

17  A    It was a few months after.

18  Q    So, a few months after you retained another lawyer?

19  A    Yes.

20  Q    And you retained that other lawyer to sue Rob?

21  A    Yes.

22  Q    And then you retained a third lawyer?

23  A    Yes.

24  Q    And you retained that lawyer, as well, to sue Rob?

25  A    Yes.

Pace - cross - Cannick                                    307

1   Q    Now, there was another settlement, am I correct, a

2   settlement agreement?

3   A    That's correct.

4   Q    And that one was signed by you, as well; am I correct?

5   A    Yes.

6   Q    And that one was read before you signed it?

7   A    Yes, I was allowed to read that one.

8   Q    And was it explained to you before you signed it?

9   A    Yes, it was.

10  Q    And your mother was with you in the process as well?

11  A    No, she wasn't.

12  Q    So, you did this one by yourself?

13  A    Yes, I did.

14  Q    How old were you at that time?

15  A    I'm not sure.

16  Q    Do you remember what year you signed it?

17  A    I don't recall the year I signed it.

18          MR. CANNICK:  Well, may I approach the witness?

19          THE COURT:  Yes.

20  BY MR. CANNICK:

21  Q    Look at this document and see if it refreshes your

22  recollection as to the date you signed it, the second

23  agreement.

24  A    (Witness complies.)

25          MS. GEDDES:  Can you note for the record what

1    document you just showed her?

2              MR. CANNICK:  3500-JP29.

3    A    So, this is familiar.

4    Q    You've had an opportunity to review the document?

5    A    Yes.

6    Q    Does it refresh your recollection as to the date --

7    A    Yes.

8    Q    -- that it was signed by you?

9    A    Yes.

10   Q    What was the date?

11   A    August of 2013.

12   Q    And how old were you at that time?

13   A    I was 20.

14   Q    Now, when you would stay at, according to you, Rob's

15   house, you testified that there were times that you had to ask

16   permission to go to the bathroom?

17   A    That's correct.

18   Q    Now, what rooms were you in, generally, when you were

19   there?

20   A    I was mainly in the mirror room and Music 1.

21   Q    So, the mirror room has a bathroom, am I correct?

22   A    Yes, it does.

23   Q    And it's your testimony that you had to ask permission to

24   go to the bathroom in the mirror room?

25   A    Yes.

1  Q    And how long, generally, would you have to wait in there

2  before you could get permission?

3  A    Generally, it would be fast if I was on his good side,

4  and he'll get back to me within about five minutes.

5  Q    And what if you were on his bad side?

6  A    If I was on his bad side, then I'd have to wait until he

7  would give me permission.

8  Q    What I'm asking you, approximately how long?

9  A    The longest period was three days.

10 Q    So, you're in a room, you don't see the man for three

11 days, you need to go to the bathroom, and you don't relieve

12 yourself?

13 A    That's incorrect.

14 Q    You just testified and told us that the longest you had

15 to wait was three days, am I correct?

16 A    That's correct.

17 Q    You're in the mirror room?

18 A    Yes.

19 Q    The bathroom is right there?

20 A    Yes.

21 Q    Okay.

22       Now, you testified and told us yesterday about an

23 occasion where you were called to the tour bus by Rob?

24 A    What's your question?

25 Q    You testified and told the jury yesterday that there came

1    a point in time when you were actually in his home and he was

2    in the tour bus and he called you to the tour bus?

3    A    Yes.

4    Q    And when you got to the tour bus, you testified and told

5    us about two people being on the bus, am I correct?

6    A    Yes.

7    Q    Rob and another woman, correct?

8    A    That's correct.

9    Q    And before that, had you ever been on the tour bus?

10   A    No.

11   Q    Describe the tour bus.

12   A    His tour bus was a big black travel bus, and it had red

13   and tan lines on the outside of it.

14   Q    Now, you had seen that bus on a number of occasions, am I

15   correct?

16   A    That's correct.

17   Q    So, it was no problems with you recognizing that bus, am

18   I correct?

19   A    That's correct.

20   Q    Now, describe the interior of the bus.

21   A    The interior of the bus was tan, and there's a table in

22   there and he has, like, long --

23   Q    Where's the table?

24   A    The table is to the left side of the bus when you get on

25   it.

Pace - cross - Cannick                    311

1   Q    And go ahead, finish responding.

2   A    And then there's seating and there's a bathroom on the

3   bus.

4   Q    What about bunkbeds?

5   A    I don't recall seeing bunkbeds on the bus.

6   Q    How many bathrooms on the bus?

7   A    I only saw one.

8   Q    Where was that one?

9   A    It was towards, like, the -- after the table, like

10  towards the middle of the bus.

11  Q    And then you testified and told us that there came a

12  point in time when you got herpes?

13  A    Yes.

14  Q    And you testified that before that, Rob had never

15  mentioned anything to you about herpes, am I correct?

16  A    That -- about him having herpes?

17  Q    Yes.

18  A    That's correct.

19        (Pause.)

20        MR. CANNICK:  Well, until I find it, I'll move to

21  another area.

22  Q    Now, let's go to the blue T-shirt.

23        You testified and told us yesterday that,

24  essentially, that Robert assaulted you on the last time you

25  met with him and had a sexual encounter with him?

Pace - cross - Cannick                    312

1   A    That's correct.

2   Q    And you testified and told us that he slapped you with an

3   open hand in your face, am I correct?

4   A    That's correct.

5   Q    And you testified that he also choked you out, am I

6   correct?

7   A    That's correct.

8   Q    That you literally passed out?

9   A    That's correct.

10  Q    And you testified that he also spat in your face?

11  A    That's correct.

12  Q    And then you went on and told us that after all of this,

13  you had a sexual encounter with him; am I correct?

14  A    That's correct.

15  Q    Now, when he slapped you, did you fall?

16  A    No, I did not.

17  Q    He slapped you with a lot of force, though; am I correct?

18  A    Yes.

19  Q    Okay.  And did you have any marks on your body, on your

20  face?

21  A    I don't recall.

22  Q    But he slapped you real hard, am I correct?

23  A    Hard to me, yes.

24  Q    And he's much bigger than you are, correct?

25  A    That's correct.

Pace - cross - Cannick                          313

1   Q   And where specifically on your face were you hit?

2   A   I was hit on my right side.

3   Q   Okay.

4       On your jaw or across your lips or --

5   A   I was hit across my cheek.

6   Q   Across your cheek.

7       Did it catch any part of your -- of your -- your

8   lip?

9   A   The side of it.

10  Q   The side of your lip.

11      Now, with that force, your lips were swollen, am I

12  correct?

13  A   My lips were not swollen.

14  Q   Cheeks were swollen?

15  A   My cheek was stinging, but I'm not sure if it was

16  swollen.

17  Q   And any blood coming from the lip?

18  A   No.

19  Q   And then what happened first, did he slap you first or

20  choke you first?

21  A   He slapped me first.

22  Q   And then he choked you?

23  A   That's correct.

24  Q   And when he choked you out, where were you?

25  A   I don't understand that question.

SAM      OCR      RMR      CRR      RPR

Pace - cross - Cannick                    314

1   Q    Well, when he choked you, were you standing?

2   A    Yes, I was.

3   Q    And you were right in front of him?

4   A    Yes, I was.

5   Q    And you said he choked you out till you passed out, is

6   that correct?

7   A    Yes, against the wall.

8   Q    So, when you woke up, you were on the floor; am I

9   correct?

10  A    That's correct.

11  Q    And had he spat on you before that?

12  A    Had he did what?

13  Q    You said he spit on you, right?

14  A    Yes.

15  Q    Was that before the slap?

16  A    That was after I got up and I was on the floor.

17  Q    You were on the floor, so he reached down and -- looked

18  down and spat on you?

19  A    That's correct.

20  Q    And it was in your face?

21  A    That's correct.

22  Q    And then after that, you got up and you had sex with him?

23  A    That's correct.

24  Q    And then you went home?

25  A    That's correct.

Pace - cross - Cannick                    315

1  Q    And it was on that ride home -- you took the train?

2  A    Yes, I did.

3  Q    It's a two-hour ride?

4  A    Yes.

5  Q    And on that ride on the train you started thinking about

6  how humiliating that was?

7  A    Yes.

8  Q    And you start thinking about, you know what, I'm not

9  gonna take this anymore?

10 A    Yes.

11 Q    You start thinking about, I'm gonna go to a lawyer?

12 A    Not at the time.

13 Q    Well, when did you start thinking about going to a

14 lawyer?

15 A    I wanted to go to the lawyer, like, when I got home.  I

16 didn't think about it on the train ride.

17 Q    Okay.  But when you got home, you thought about going to

18 a lawyer, right?  Am I correct?

19 A    That's correct.

20 Q    And you started gathering your evidence, is that correct?

21 A    That's incorrect.

22 Q    You didn't start thinking about, okay, what am I going to

23 tell this lawyer what evidence I have?

24 A    That's in -- no, I did not.

25 Q    Well, after you were taking the ride home and he'd

Pace - cross - Cannick                    316

1  smacked your face, did you take any photographs of your face?

2  A    I did not.

3  Q    Did you tell your mom?

4  A    Once I got home, yes, I did.

5  Q    Did you call the cops?

6  A    No, we did not.

7  Q    But you called a civil lawyer?

8  A    Yes.

9  Q    A civil lawyer would try to get you money, am I correct?

10 A    That's correct.

11 Q    And a criminal lawyer bring you here?

12 A    That's --

13         THE COURT:  I'm sorry, I don't understand the

14 question.

15         MR. CANNICK:  I'm sorry.

16 BY MR. CANNICK:

17 Q    The criminal lawyer -- criminal case brings you here.

18         THE COURT:  I see.

19 A    That's correct.

20 Q    Now, I want to go to that shirt, the blue T-shirt that

21 you testified about.

22         You said as of that day, the last day you saw Rob,

23 you used that T-shirt, which was yours, am I correct?

24 A    That's correct.

25 Q    You wore that T-shirt over there?

Pace - cross - Cannick                            317

1   A    Yes, I did -- wait, can you -- can you clarify to where

2   is the destination, over where?

3   Q    Well, you said you were at Rob's house, am I correct?

4   A    Yes.

5   Q    And you said that there came a point in time that you

6   used the T-shirt to wipe the spit off your face and the semen

7   off your face, am I correct?

8   A    Yes.

9   Q    And that was the T-shirt that you wore over there, am I

10  correct?

11  A    Yes.

12  Q    What did you wear home?

13  A    My T-shirt.

14  Q    The same T-shirt?

15  A    Yes.

16  Q    So, you'd been in that, in control of that T-shirt from

17  that date until you took it to your lawyer, am I correct?

18  A    That's correct.

19  Q    Now, do you know whether or not anyone ever took, ran a

20  test to see if your DNA was on that T-shirt to see if that

21  shirt belongs to you?

22  A    Not that I know of.

23  Q    So, the only information that we have that this T-shirt

24  belongs to you is your word, am I correct?

25       MS. GEDDES:  Objection.