# 22-1481
## 22-1982 (con)

# UNITED STATES COURT OF APPEALS
*for the*
## SECOND CIRCUIT

➤◄

**UNITED STATES OF AMERICA,**

*Appellee,*

-v.-

**ROBERT SYLVESTER KELLY
AKA R. KELLY**

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**DEFENDANT-APPELLANT'S APPENDIX
VOLUME 2 OF 5
(Pages A 301 to A 545)**

JENNIFER BONJEAN
ASHLEY COHEN
BONJEAN LAW GROUP, PLLC
750 Lexington Avenue, 9th Floor
New York, NY 10022
(718) 875-1850

## TABLE OF CONTENTS

Electronic Index to Record on Appeal in *USA v. Kelly*, 19-cr-00286…. A 1

Voir dire of Juror 3 (Prospective Juror 25)……………………………. A 45

Voir dire of Juror 4 (Prospective Juror 52)……………………………. A 53

Voir dire of Juror 5 (Prospective Juror 87)……………………………. A 59

Voir dire of Juror 7 (Prospective Juror 145)………………………….... A 66

Voir dire of Juror 8 (Prospective Juror 147)………………………….... A 70

Voir dire of Juror 9 (Prospective Juror 156)………………………….... A 74

Voir dire of Juror 11 (Prospective Juror 153)…………………………. A 80

Voir dire of Juror 12 (Prospective Juror 163)…………………………. A 85

Voir dire of Alternate Juror 4 (Prospective Juror 206)……………….... A 93

Trial Testimony of Jerhonda Johnson Pace from August 18, 2021 and August 19, 202…………………………………………………………. A 97

Trial Testimony of Kris McGrath, MD from August 19, 2021………... A 352

Trial Testimony of Anthony Navarro from August 20, 2021………….. A 433

Trial Testimony of Demetrius Smith from August 20, 2021………… A 546

Trial Testimony of Thomas Arnold from August 26, 2021……………. A 624

Trial Testimony of Faith from September 1, 2021…………………….. A 759

Trial Testimony of Anna from September 10, 2021…………………… A 911

Trial Testimony of Iffath Hoskins from September 10, 2021…………. A 951

Trial Testimony of Diana Copeland from September 10, 2021 and September 13, 2021……………………………………………………... A 1036

Trial Testimony of Angela from September 13, 2021………………….. A 1156

Trial Testimony of Alex from September 13, 2021…………………….. A 3322

Trial Testimony of Alesiette Mayweather from September 13, 2021 and September 14, 2021……………………………………………….. A 1268

Trial Testimony of Nicholas Williams from September 14, 2021……... A 1383

Declaration of Robert S. Kelly dated April 4, 2022…………………… A 1438

Notice of Appeal dated July 11, 2022………………………………….. A 1440

Notice of Appeal dated September 9, 2022……………………………. A 1441

Notice of Appeal dated November 22, 2022…………………………... A 1442

1          THE COURT:  Sustained.

2          Mr. Cannick, if you can find a convenient place.

3          MR. CANNICK:  This is it.

4          THE COURT:  Ladies and gentlemen, your lunches are

5     here, so I am going to excuse you for lunch.

6          Please, again, I know I say it all the time, but I

7     still mean it, do not talk about the case at all.  Do not look

8     anything up about the case.

9          We'll see you back here at 2:15, and have a good

10    lunch.

11         THE COURTROOM DEPUTY:  All rise.

12         (Jury exits.)

13         THE COURT:  Okay, everybody can have a seat.

14         MS. GEDDES:  Can we let the witness leave, Your

15    Honor?

16         THE COURT:  Yes.  I keep forgetting.  Go ahead.

17         (Witness steps down and exits courtroom.)

18         THE COURT:  All right, just in terms of scheduling,

19    how much longer do you have?

20         MR. CANNICK:  I thought it would be faster, but it's

21    about an hour.

22         THE COURT:  Another hour?

23         MR. CANNICK:  Yes.

24         THE COURT:  You told me when we broke before that

25    you had an hour-and-a-half.

Proceedings                                    319

1          MR. CANNICK:  You know, I'm horrible at this, Your

2     Honor.

3          THE COURT:  All right, but we have a witness who is

4     ready to deliver a baby at any moment, and so I am going to

5     ask you to be economical or more economical in your

6     examination of the witness.

7          MR. CANNICK:  Will do, Your Honor.

8          THE COURT:  I think it's in everybody's interest to

9     get this witness finished.  And to the extent there is any

10    redirect, I expect the same thing.

11         So, I know you can't determine how much redirect you

12    have, but think about it.

13         Another question that I just have for you all

14    generally is there seem to be a number of exhibits that you

15    seem to agree can go into evidence.  If you can agree on them

16    in advance without the need to lay a foundation, that will

17    also move things along.  As interesting as it is to hear

18    foundation questions, if there is no dispute about particular

19    pieces of evidence, let's just agree on them.

20         All right, we will return at 2:15.

21         MS. GEDDES:  Your Honor, can we raise some of the

22    housekeeping matters or do you want to wait?

23         THE COURT:  Yes, go ahead.

24         MS. GEDDES:  It has come to our attention that

25    Mr. Farinella issued a tweet, I don't know if that's the

Proceedings                                                      320

1   proper use, on Tuesday of this week that, in our opinion, is a

2   violation of Local Rule 23.1 and in direct --

3          THE COURT:  What does the tweet say?

4          MS. GEDDES:  Excuse me?

5          THE COURT:  What does it say?

6          MS. GEDDES:  The tweet says:  After all, the RICO

7   enterprise is based on a series of independent relationships

8   and events that the Government is trying to patch together,

9   like different types of fabric and trying to pass it off as

10  silk.

11         And the rule provides --

12         THE COURT:  I am familiar with the rule.

13         Did you tweet, Mr. Farinella?

14         MR. FARINELLA:  Yes, Your Honor.

15         THE COURT:  Why did you do that?

16         Didn't I specifically instruct you not to make

17  remarks to the media?

18         And in keeping with that rule, are you familiar with

19  the rule, that local rule?

20         MR. FARINELLA:  Yes, Your Honor.

21         THE COURT:  Why did you do that then?

22         MR. FARINELLA:  I did not think that that tweet was

23  violative of the rule, Your Honor.

24         THE COURT:  It violates the rule.  Do not do it

25  again.

Proceedings                                                    321

1              MR. FARINELLA:  Yes, Your Honor.

2              THE COURT:  Anything else?

3              MS. GEDDES:  Yes, Your Honor.  It's two quick

4      matters.

5              The Government wishes to call one witness by video

6      conference, such that she will testify from a courthouse in

7      Chicago.  The defense has no objection.

8              And if we can set it up, does Your Honor have any

9      problem with that?

10             THE COURT:  I don't, as long as everybody agrees to

11     it.

12             MS. GEDDES:  And then the last matter is there have

13     been requests by the media for several pieces of evidence that

14     were entered into evidence yesterday to include the

15     defendant's Government Exhibit 1, which is a photograph of the

16     defendant.

17             THE COURT:  I am just going to cut you off just to

18     say, the evidence, the items that have been admitted into

19     evidence, can, obviously, be shared with media outlets, except

20     to the extent there is non-public information in them.

21             So, as long as they are admitted into evidence, I

22     understand someone from your office took it upon himself to

23     make those arrangements.  As I said to you before, that is

24     going a little out of his lane.  These are court exhibits, but

25     if there is something set up for you to do that, you can use

Proceedings                                322

1    it.

2           MS. GEDDES:  Okay, but just to be clear, we haven't

3    shared anything.

4           THE COURT:  No, that's fine.

5           MS. GEDDES:  Yes.

6           THE COURT:  But if there's a request, you know, in

7    the olden days we would lay out the exhibits and the media

8    could come and look at them.

9           Whatever form it is that you want to share it with

10   them, is fine.

11          MS. GEDDES:  And just lastly, there will be some

12   exhibits that the Government will enter into evidence that we

13   will object to sharing more publicly, but we can address those

14   as they come.

15          THE COURT:  I think that's fine.

16          All right, have a good lunch.

17          (Judge ANN M. DONNELLY exited the courtroom.)

18          (Luncheon recess now taken.)

19

20          (Continued on the following page.)

21

22

23

24

25

323

1                    AFTERNOON SESSION

2

3              (In open court.)

4              (Parties present.)

5              COURTROOM DEPUTY:  All rise.

6              THE COURT:  While we're getting Mr. Kelly.  I'd

7    like to see counsel at sidebar.

8              (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                        324
```

1           (Sidebar conference held on the record in the

2    presence of the Court and Ms. Geddes and Mr. Cannick.)

3           THE COURT:  This really didn't involve you, I don't

4    think, and co-counsel here.  I just want to sort of -- I'm

5    curious.  It's come to my attention that he brought in three

6    people that he -- yesterday that he said were paralegals,

7    three women, and the marshals wouldn't let them in.

8           MR. CANNICK:  Okay.

9           THE COURT:  And apparently, they are people that

10   have been on the 6th floor viewing rooms.

11          MR. CANNICK:  I don't know who they are.

12          THE COURT:  I'm not going to -- off the record.

13          (Discussion held off the record.)

14          (Defendant enters the courtroom at 2:25 p.m.)

15          (Mr. Farinella and Ms. Blank Becker present.)

16          THE COURT:  So I've been told that you had three

17   women that you told the marshals were paralegals yesterday

18   and the marshals wouldn't let them in, or the CSOs wouldn't

19   let them in, and are they really paralegals.

20          MR. FARINELLA:  There were two that are assisting

21   me.

22          THE COURT:  Are they paralegals that work for you.

23          MR. FARINELLA:  Yes, in this case.

24          THE COURT:  Two of them or three of them?

25          MR. FARINELLA:  Two.

```
                          Sidebar                        325
```

1          MS. BLANK BECKER:  There was one that I was using

2     helping me.

3          THE COURT:  But you didn't want to give credentials

4     to them for the marshals.

5          MR. FARINELLA:  Nobody asked me.

6          THE COURT:  That's not what I was told.  I want to

7     be clear that we have enough going on in here without making

8     their jobs harder.  And so, as long as we're clear, I just

9     want to -- people -- well, I think I've made myself clear.

10    They are paralegals?

11         MR. FARINELLA:  Yes.

12         THE COURT:  They work for your firms?

13         MR. FARINELLA:  Yes.

14         THE COURT:  They don't?

15         MS. BLANK BECKER:  Mine doesn't work for my firm,

16    she's just been helping me through this whole thing.

17         MR. FARINELLA:  The two have been brought on to

18    assist me in the defense and they are working with the

19    understanding that they're in the overflow room.  And so, the

20    permission that I had asked for.  I sent a letter with the

21    Court with regard to my other paralegal who is here with me

22    in court.

23         THE COURT:  This is the third paralegal?

24         MR. FARINELLA:  Yes.

25         THE COURT:  Fourth paralegal?

```
                          Sidebar                        326
```

1          MR. FARINELLA:  Well --

2          THE COURT:  Three people.  One of them is

3   Ms. Blank Becker's and two are yours?

4          MR. FARINELLA:  Yes.

5          THE COURT:  They all work at your -- three of them

6   work with your firm?

7          MR. FARINELLA:  Yes, your Honor.

8          THE COURT:  Okay.  How long have they worked there?

9          MR. FARINELLA:  They've come on to assist me in the

10  case.

11         THE COURT:  When did they start.

12         MR. FARINELLA:  Mr. Nordmeyer has been with my firm

13  since 2013 and he has appeared with me before Judge Pauly in

14  the Southern District and other district court cases.

15         THE COURT:  It's fine.  It's just the marshals have

16  yeoman's work to do in this case and I don't want to make

17  their jobs harder.  And I don't want people who are not

18  authorized to be in this courtroom in here.  So I think

19  that's all we have to say about this.

20         MR. FARINELLA:  I am not intending on having them

21  in the courtroom, your Honor.  The only person I asked

22  permission for is Mr. Nordmeyer.

23         THE COURT:  We're not going to release this.

24         MR. CANNICK:  The break was useful.  I think I've

25  cut back from an hour to, hour plus, to hopefully 20 minutes

Sidebar                                                  327

1  | or so.

2  |         THE COURT:  That's the kind of news I like to hear

3  | and I'm sure you've cut down yours.

4  |         MS. GEDDES:  I have, Judge.  I was saying in

5  | order --

6  |         THE COURT:  No, you haven't.

7  |         MS. GEDDES:  Yes, I have.  I don't want maybe more

8  | than anything is for the witness to go into labor.  But it

9  | makes this more efficient.  I thought that perhaps your Honor

10 | could direct her before the jury comes back that she will --

11 | that she understands that the Government has instructed her

12 | not to mention that the nature of the proceeding, but on

13 | redirect she will be permitted to answer those questions.  Is

14 | that okay so that we don't take a break?

15 |         THE COURT:  It is.  You agree that ship has sailed?

16 |         MR. CANNICK:  I mean, that's been out of the bag

17 | from day one, Judge, frankly as far as I'm concerned.

18 |         THE COURT:  All right.  Yes, I'll tell her, but she

19 | can answer.  There's no need to lead her, in other words.

20 |         MS. GEDDES:  That's correct.

21 |         THE COURT:  Thanks.

22 |         (Sidebar discussion concludes.)

23 |         (Continued on the next page.)

24 |

25 |

Sidebar                                                    328

1           (Sidebar conference held on the record in the

2      presence of the Court and counsel.)

3           THE COURT:  Okay.  So let's I think everybody

4      agrees that some inquiry based on the cross-examination and

5      actually based on, yeah, based on the cross-examination of a

6      witness the issue of Mr. Kelly's is it 2008.

7           MS. GEDDES:  Trial.

8           MR. CANNICK:  Yes.

9           THE COURT:  Trial which I had precluded inquiry in.

10     I limited inquiry in to have it referred to as a "court

11     proceeding" I think is what I said.  But cross-examination

12     has opened the door to some further discussion about the

13     nature of that proceeding.  And, as I understand it, the two

14     areas and you can correct me if I'm wrong.  The first area is

15     that she told him she was 16 because she was concerned about

16     him based on the nature of the charges in that trial.

17     Correct so far.

18          MS. GEDDES:  That's correct.  That on cross,

19     Counsel asked him why she was uncomfortable.  And I think her

20     response will be because she was aware that the defendant had

21     previously been charged with sexual exploitation of a minor

22     and here she was a minor.

23          THE COURT:  So I think -- I don't think there's any

24     disagreement about that as we discussed this before.  The

25     part that I'm less comfortable with, although you explain to

Sidebar                    329

1  me, is that she went to a civil lawyer rather than reporting

2  it to the police because.

3         MS. GEDDES:  Because she went to a civil lawyer and

4  the lawyer -- she went to a civil lawyer because she was

5  apprehensive about going to the police after what had

6  happened in the 2002 case where charges were brought in 2002.

7         THE COURT:  And he got acquitted?

8         MS. GEDDES:  And he was acquitted, yes.

9         THE COURT:  You're going to bring out the fact that

10 he got acquitted anyway.  So as long as there's nothing about

11 the -- it's not an accusation but the --

12        MR. CANNICK:  The underlying facts.

13        THE COURT:  Whatever the explanation is that he

14 paid somebody off or I think it was a witness.

15        MS. GEDDES:  Oh, no, we're not going to talk about

16 that at all.

17        THE COURT:  Then we're all fine.

18        MR. CANNICK:  You're not going to talk about any of

19 the underlying facts of the 2002 case?  That's my can came

20 rash to I don't want to see that but okay.

21        MS. GEDDES:  No, I was because I think the fact

22 that -- not the facts of the case, but the fact that he was

23 charged with sexual exploitation of a minor and that

24 contributed to why she --

25        MR. CANNICK:  And he was acquitted.

Sidebar                                                    330

1          MS. GEDDES:  You can say he was acquitted.  I

2     always thought you wanted to to be honest.

3          THE COURT:  Yes.  I think we're fine.

4          (Sidebar discussion concludes.)

5          (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                          331

1            (In open court.)

2            THE COURT:  Okay.  Let's get the witness.  Do you

3   want -- when do you want me to give her that instruction?

4   Now?

5            MS. GEDDES:  I think so.  So that we don't have to

6   take a break between when he finishes.

7            THE COURT:  That's fine.

8            (Witness takes the witness stand.)

9            THE COURT:  Before we bring in the jury, I want to

10  tell the witness Mr. Cannick has a few more questions for

11  you, then the Government is going to ask you some questions.

12  I know they gave you some instruction not to talk about

13  certain things including the nature of the trial that took

14  place in 2008, but you may answer any questions that the

15  lawyers ask you, okay?

16           THE WITNESS:  Okay.

17           THE COURT:  That's lifted.  I mean, unless I

18  sustain an objection during the course of the questioning,

19  but it's okay for you to answer questions on that subject.

20  Okay?

21           COURTROOM DEPUTY:  Okay.

22           THE COURT:  Okay.  Great.  Let's get the jury.

23           (A brief pause in the proceedings was held.)

24           COURTROOM DEPUTY:  All rise.

25           (Jury enters courtroom at 2:33 p.m.)

J. Pace - Cross/Mr. Cannick                    332

1          THE COURT:  You may be seated.

2          All right.  Well back, ladies and gentlemen, we're

3   ready to resume.

4          Mr. Cannick, whenever you're ready.

5          MR. CANNICK:  Thank you, your Honor.

6          COURTROOM DEPUTY:  The witness is reminded she's

7   still under oath.

8          THE WITNESS:  Yes.

9   CROSS-EXAMINATION

10  BY MR. CANNICK:

11  (Continuing.)

12  Q    Good afternoon, ma'am.

13  A    Good morning.

14  Q    I want to visit that party, the first party you went to,

15  for the less than 30 minutes one last time.

16              Now, at that party, there was a DJ, am I

17  correct?

18  A    I don't recall a DJ being there.

19  Q    Okay.  Now, you were asked earlier by the Government

20  what, if anything, that Mr. Kelly told you about herpes.  Do

21  you remember that?

22  A    Yes.

23  Q    Okay.  And your response is that he told you nothing

24  about herpes, am I correct?

25  A    He told me nothing about him having herpes.

J. Pace - Cross/Mr. Cannick                333

1    Q    Now, you testified and told us earlier that you had
2    several meetings with the Government, am I correct?
3    A    That's correct.
4    Q    And when you had these meetings, there were agents and
5    Assistant United States Attorneys, am I correct?
6    A    Yes.
7    Q    Now, prior to the briefing and asking you questions,
8    they advised you that making a false statement or telling a
9    lie to a federal official is a crime, am I correct?
10   A    That's correct.
11   Q    And they told you that on numerous indications, am I
12   correct?
13   A    That's correct.
14   Q    And you swore here earlier today to tell the truth?
15   A    That's correct.
16   Q    And you swore yesterday to tell the truth?
17   A    That's correct.
18   Q    And then you recall being interviewed by the agents on
19   February 27, 2019?
20   A    I'm not sure of the exact date.
21        MR. CANNICK:  May I approach the witness, your
22   Honor.
23        THE COURT:  Sure.
24        MR. CANNICK:  JP-2.
25        (Approaching the witness.)

J. Pace - Cross/Mr. Cannick                    334

1  Q    I direct your attention to the top left-hand portion

2  under "Details of Investigation" and see if that refreshes

3  your recollection as to whether or not you had an interview

4  with the Government on that particular day?

5  A    Yes.

6  Q    When you say, "Yes," after having reviewed the document,

7  does that refresh your recollection that you had an interview

8  with the Government on February 27, 2019?

9  A    Yes.

10 Q    And on that date, they gave you the admonition that

11 making a false statement to the -- is a federal offense, am I

12 correct?

13 A    Yes.

14 Q    Now, when they asked you about herpes and my client on

15 that date, you told them one day, Kelly confided in me and

16 informed her, Daddy's not doing too good.  Have you ever

17 heard of herpes?

18         That he further informed you that a few people

19 close to him have it and it has been traveling around since

20 the late '90s.

21         He went on to explain that herpes was a virus,

22 even though it was curable, you cannot get rid of it.  And

23 then, according to you, he instructed you to look down there

24 to make sure it wasn't traveling.  And that he opened -- you

25 stated to the Government that he opened -- only opened up to

J. Pace - Cross/Mr. Cannick                    335

1   people about herpes that he really trusts.  And that you

2   recall that conversation took place around July 2009.

3              And that he further, according to you,

4   instructed you to lay down.  He visibly and physically

5   inspected your vagina with his finger and that he informed

6   you that you could tell anyone that she contracted genital

7   herpes from him.

8              Do you remember telling the Government that on

9   February 27, 2019?

10  A    Most of it, yes.

11  Q    But you just testified under oath that he told you

12  nothing about herpes?

13  A    This was during my outbreak when I had found out I had

14  it.

15  Q    No, that's not my question.  My question is you came in

16  here yesterday, took an oath to tell this jury the truth, and

17  when you were asked by the Government what did my client tell

18  you about herpes you said he told you nothing.  Do you

19  remember telling us that?

20  A    Yes.

21  Q    But now what I just read to you, you told the Government

22  a total different story, am I correct?

23  A    What you read I don't recall.

24  Q    Oh, I see.  Now, you did testify and told us earlier

25  that prior to coming in and giving testimony to this jury,

J. Pace - Cross/Mr. Cannick                    336

1   you and the Government went over these questions that they

2   put to you at least three times?

3          MS. GEDDES:  Objection.

4          THE COURT:  Sustained as to form.

5   Q    You and the Government went over the questions they put

6   to you, am I correct?

7   A    Yes.

8   Q    More than once?

9   A    Yes.

10  Q    More than twice?

11  A    I'm not sure it was more than twice.

12  Q    Now, I think you testified yesterday as well that there

13  came a point in time that you started after you sued Robert

14  and got a settlement that you gave monies back.  Do you

15  remember telling us that?

16  A    Yes.

17  Q    And I think you told us that you did that because you

18  felt bad about what was happening, what you guys have been

19  going through?

20  A    Yes.

21  Q    Okay.  But you sued him three other times, am I correct?

22  A    That's incorrect.

23  Q    Two other times?

24  A    That's correct.

25  Q    And after the first lawsuit, how long -- how much time

J. Pace - Cross/Mr. Cannick                337

1   elapsed before you sued him a second time?

2   A    A few months.

3   Q    And that was the only other time you sued him?

4   A    No, it wasn't.

5   Q    There was another time, am I correct?

6   A    Yes.

7   Q    Okay.  And how much time elapsed from the second to the

8   next time?

9   A    Three years.

10  Q    But you felt bad about what you were going through, am I

11  correct?

12  A    That's correct.

13  Q    And now, you also testified and told the jury that even

14  after the lawsuits you wanted to continue to be his friend?

15  A    That's correct.

16  Q    In fact, you wanted to get back with him according to

17  you?

18  A    That's correct.

19  Q    In fact, according to you, you wanted to just get the

20  relationship back in gear again?

21  A    That's correct.

22  Q    Now, when you were hoping to get the relationship back

23  in gear again was that after the first lawsuit but before the

24  second?

25  A    Yes.

J. Pace - Cross/Mr. Cannick                    338

1   Q    And when you sued him the second time, did you

2   try -- were you still hopeful after the second time to get

3   the relationship jump started again?

4   A    Yes.

5   Q    In fact, as you sit here today, you're still hopeful of

6   getting a relationship with him, am I correct?

7   A    That's incorrect.

8   Q    When did you stop hoping and wanting to get a

9   relationship with him?

10  A    I'm not sure of the date.

11  Q    Was it in 2017?

12  A    It was before then.

13  Q    2016?

14  A    It was before then.  I'm just not sure of the year.

15  Q    Okay.  So I asked you this morning about the time that

16  you went to Mr. Kelly's house for a party and whether or not

17  you encountered security.  Do you remember me asking you

18  that?

19  A    Yes.

20  Q    And you told us that, basically, what you did is that

21  you called Bubba, he met you, and just escorted you through,

22  am I correct?

23  A    That's correct.

24  Q    Well, again, you had interviews with the Government

25  where you discussed these details, am I correct?

J. Pace - Cross/Mr. Cannick                    339

1    A    Yes.

2    Q    And do you recall, or isn't it a fact, that you told the

3    Government on February 27, 2009, in that same interview that

4    was just referenced that when you arrived at Kelly's front

5    gate, security asked for your names.  That's what you told

6    the Government on that date, am I correct?

7    A    Yes.

8    Q    So you didn't tell them that when you got to the gate

9    you had already called Bubba and Bubba came and met you, you

10   didn't tell him that; right?

11   A    I don't recall.

12   Q    But you now admit that you were encountered by security.

13   They stopped you, am I correct?

14   A    It wasn't, like, actual security that stopped us.

15            THE COURT:  I'm just confused.  Is Bubba security?

16            MR. CANNICK:  No.

17            THE COURT:  Oh, this is somebody else?

18            MR. CANNICK:  Yes.

19            THE WITNESS:  Bubba, he plays the security role.

20            THE COURT:  I'm sorry.  I'm just trying to clarify.

21   Q    Bubba owns a tattoo parlor, am I correct?

22   A    That's correct.

23   Q    Bubba is a friend of Robert Kelly; is that correct?

24   A    That's correct.

25   Q    You are telling this jury under oath that Bubba was part

J. Pace - Cross/Mr. Cannick                    340

1    of the security?

2    A    Yes, Bubba is part of his security team.

3    Q    Okay.  Now, so when you told the jury earlier this

4    morning that you had no encounter with security, what you are

5    telling us is that because Bubba who, according to you, is

6    part of security but you don't view him as security.  So it

7    was fair for you to say that you had no encounter with

8    security?

9              MS. GEDDES:  Objection.

10             THE COURT:  Sustained.

11   Q    I confused myself with that one, Judge.

12             Now, when you told the jury this morning that

13   you did not have any encounter with security you meant that

14   because you had Bubba, who was part of security, come to get

15   you?

16   A    That's correct.

17   Q    Now, tell the jury why when you were interviewed by the

18   Government you told them that security came, that security

19   stopped you and asked you for your name?

20   A    I don't recall.

21   Q    Now, I'm not asking you if you recall anything, I'm

22   asking you to explain something.  Why, if Bubba was part of

23   the security and you did not view him as security, why would

24   you tell the Government in that meeting that when you arrived

25   at the front gate, security asked you for your name?

J. Pace - Cross/Mr. Cannick                    341

1          MS. GEDDES:  Objection.

2          THE COURT:  Do you remember why you told the

3    Government that?

4          THE WITNESS:  I don't recall.

5    Q    But you would agree with me that Bubba knew your name,

6    right?

7    A    Yes, Bubba knew my name.

8    Q    So you got --

9          THE COURT:  Let the witness finish.

10   A    Bubba knew my name.

11   Q    So Bubba would not have asked you for your name, am I

12   correct?

13   A    That's correct.

14         THE COURT:  I'm sorry to interrupt.  Were you by

15   yourself at this time?

16         THE WITNESS:  No, I was with Keyonia.

17         THE COURT:  I see.  Go ahead.

18   Q    According to you, what you told us the other day, is

19   that Bubba invited you and Keyonia, am I correct?

20   A    Bubba invited me and I was with Keyonia.

21   Q    Bubba did not invite you and Keyonia?

22   A    Me and Keyonia was together.

23   Q    When Bubba extended the invitation, he did not invite

24   you and Keyonia?

25   A    That's correct.  He invited me and I was with Keyonia.

J. Pace - Cross/Mr. Cannick                    342

1  Q    So, during your interview with the Government, isn't it
2  a fact that you told the Government -- isn't it a fact that
3  you told the Government in and around May 2009 that you
4  formally met Kelly through one of his friends identified as
5  Jermaine at the time you were approximately 16 years old and
6  you identified Jermaine as Jermaine Maxey also known as Bubba
7  and you stated that --
8           MS. GEDDES:  Objection.
9           THE COURT:  Well, do you have a question to put to
10 the witness.
11          MR. CANNICK:  Yes.
12          THE COURT:  Rather than just reading the whole
13 thing.
14 Q    Isn't it a fact that you told the Government that you
15 stated that you first met Maxey through MySpace, and after
16 communicating with Maxey, he invited you and your friend to
17 personally meet up.
18          Do you remember telling the Government that?
19 A    Yes.
20 Q    And then you made plans to meet at the tattoo shop?
21 A    That's correct.
22 Q    And after making arrangements at the tattoo shop, Maxey
23 contacted you and invited you and your friend to attend one
24 of Kelly's parties instead?
25 A    That's correct.

J. Pace - Cross/Mr. Cannick                    343

1  Q    So he invited you and your friend?

2  A    He invited me and I was with my friend.  So, in speaking

3  terms, he invited us.  I'm saying it's the person I'm with,

4  so if I'm invited I'm bringing them with me.

5  Q    Isn't it a fact that you told the Government during that

6  meeting of February 27, 2019, that Maxey contacted you and

7  invited you --

8         MS. GEDDES:  Objection.

9  Q    -- and your friend to attend one of Kelly's parties

10 instead?

11        THE COURT:  Overruled.  That means you can answer.

12        THE WITNESS:  Okay.

13        THE COURT:  That's okay.

14 A    That's correct.

15 Q    When you gave testimony here under oath, you testified

16 to the question what led you to go into the defendant's house

17 in May of 2009 and your answer was, We were supposed to be

18 going to a tattoo parlor and ended up getting invited to his

19 home by Bubba.  He invited to us a party.  That's what you

20 testified to under oath?

21 A    That's correct.

22 Q    Now, you testified earlier and told us that about this

23 assault according to you that Robert inflicted upon you the

24 last time you two got together for a sexual encounter.  Do

25 you remember telling us about that?

J. Pace - Cross/Mr. Cannick                    344

1    A    Yes, I do.

2    Q    You told us that after the assault, according to you,

3    that he asked you to engage in sex then as well, am I

4    correct?

5    A    That's correct.

6    Q    And after you had some initial sex, he told you to put

7    on some heels, so you can have intercourse.  Am I correct?

8    A    That's incorrect.

9    Q    That's incorrect.  What did he tell you about the heels?

10   A    Those -- the heels are the heels that we usually -- that

11   he wanted me to wear whenever we had sex.

12   Q    And he didn't ask you according to you?

13   A    He asked me about the heels and that's when I told him

14   that I left them at my uncle's house.

15   Q    And he asked you about the heels for the purpose of

16   having intercourse, am I correct?

17   A    I'm assuming that's what he wanted.

18   Q    Right.  But when you spoke to the Government in one of

19   those interviews you had, you told them that on that same

20   day, Robert was having a party and you told him, Robert, that

21   you needed to grab the heels for the party.  Do you remember

22   telling the Government that?

23   A    Yes.

24   Q    And you told the Government that you left and never

25   returned?

J. Pace - Cross/Mr. Cannick                    345

1    A    That's correct.

2    Q    So when you told the Government about this during that

3    interview, you told them that you grabbed the heels for the

4    party and not for sex, am I correct?

5    A    That's correct.

6    Q    Incidentally, do you remember telling someone that in

7    connection with this case, or with this incident, that you

8    drove, you drove by Rob's house over 30 times?

9    A    No.  I do not recall that.

10            MR. CANNICK:  May I approach.

11            THE COURT:  Yes.

12            (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

J. JOHNSON PACE - CROSS - MR. CANNICK                346

1   BY MR. CANNICK:

2   Q    I'm going to direct your attention to the highlighted

3   portion, see if that refreshes your recollection that you

4   told someone of the fact that you drove by Rob's home?

5            MS. GEDDES:  What document are you showing her?

6            MR. SCHOLAR:  JP15.

7   Q    Yes or no, does that refresh your recollection that you

8   told someone that you drove past Rob's studio to see if his

9   tour bus was there over 30 occasions?

10           THE COURT:  When did this happen?

11           MR. CANNICK:  The document or the 30 occasions?

12           THE COURT:  The 30 occasions.

13           MR. CANNICK:  About --

14           THE COURT:  Go ahead.  Does that refresh your

15   memory.

16           THE WITNESS:  It does not.

17   BY MR. CANNICK:

18   Q    When you say -- withdrawn.

19           Now, yes or no, are you familiar --

20           May we have a brief sidebar?

21           THE COURT:  Sure.

22           (Sidebar conference held.)

23

24           (Continued on the next page.)

25

Sidebar                                                        347

1          (The following conference was held outside of the

2     hearing of the jury.)

3          MR. CANNICK:  I'm almost done.  So in this interview

4     this post interview of the polygraph because I -- I don't want

5     it to be an argument that by asking of the name of polygrapher

6     that I'm opening the door to the polygraph.

7          THE COURT:  I think you asked her if this refreshes

8     her memory about whether she said this.  And then she said it

9     doesn't.  I don't think it matters to whom she said it.

10         MR. CANNICK:  Okay.

11         THE COURT:  I think that's probably -- is this

12    before any of this happened?

13         MR. CANNICK:  After.

14         MS. GEDDES:  This is after the lawsuit is settled

15    and referring to --

16         THE COURT:  I see.

17         MR. CANNICK:  She's still stalking, that's the point

18    I'm trying to make.

19         THE COURT:  I'm not accepting that characterization,

20    but I understand what you're saying.

21         (End of sidebar conference.)

22

23         (Continued on the next page.)

24

25

J. JOHNSON PACE - CROSS - MR. CANNICK          348

1                    (In open court - jury present.)

2    BY MR. CANNICK:

3    Q    Do you remember having a video recording done as you

4    waited out by Robert's home?

5    A    I do.

6    Q    Do you remember when it was that you were waiting outside

7    of his home?

8    A    I do not.

9    Q    Were you waiting alone?

10   A    I'm not sure.

11   Q    What were you waiting in?  Were you just standing around

12   waiting or were you in a car?

13   A    A car.

14   Q    How old were you?

15   A    I don't recall.

16   Q    Was this before January 10 -- January 2010?

17   A    I'm not sure.

18   Q    Let me show you a document and see if it refreshes your

19   recollection.

20              MR. CANNICK:  May I approach the witness?

21              THE COURT:  Yes.

22   BY MR. CANNICK:

23   Q    If you look at the bottom portion underlined in red, see

24   if it refreshes your recollection as to whether or not this

25   was before or after your initial lawsuit?

*RIVKA TEICH, RPR, RMR, CRR*
*Official Court Reporter*
A 331

1   A    I'm not sure.

2           MS. GEDDES:  What page are you showing her?

3           MR. CANNICK:  Fifty-four.

4           THE WITNESS:  Reading that doesn't look familiar.

5   Q    When you were waiting out by Rob's house, you were in a

6   vehicle, were you not?

7           MS. GEDDES:  Objection.

8           THE COURT:  I think you have to refer her to -- my

9   recollection is the witness said she didn't recall that.

10          MR. CANNICK:  I'm going to get to that.

11          THE COURT:  Let's do it with a proper question.

12  BY MR. CANNICK:

13  Q    You testified earlier that you recall making a video

14  recording as you sat in front of Rob's house; is that correct?

15  A    That's correct.

16  Q    When you sat in front of Rob's house, how long was it

17  that you sat there?

18  A    I'm not sure.

19  Q    Was it hours?

20  A    I'm not sure how long it was.

21  Q    Was it more than five minutes?

22  A    I'm not sure.

23  Q    What were you waiting for?

24  A    I don't know.

25  Q    You drove from somewhere to go to his home, am I correct?

J. JOHNSON PACE - CROSS - MR. CANNICK          350

1   A    That's correct.

2   Q    You park your car in front of his home, am I correct?

3   A    That's correct.

4   Q    And you wait there, am I correct?

5   A    That's correct.

6   Q    And you're telling this jury that you did that, you took

7   these steps, but you don't know why?

8   A    It was -- yes, that's what I'm telling you.

9   Q    Did you have an occasion where you would leave your home

10  and go and park in front of anyone else's house and sit there?

11            MS. GEDDES:  Objection.

12  A    Yes.

13            THE COURT:  I haven't ruled on the objection.

14            Sustained.

15  Q    Now, when you sat there, you were concerned as to whether

16  or not Rob had moved, am I correct?

17  A    I don't recall.

18  Q    You don't recall as you sat there telling the other

19  person that you wondered whether or not he had moved?

20  A    I do not recall.

21  Q    You don't recall telling the other person that you had

22  been sitting there for a while and hadn't seen him?

23  A    I don't recall.

24  Q    You don't recall telling the other person --

25            MS. GEDDES:  Objection.

J. JOHNSON PACE - CROSS - MR. CANNICK                351

1      THE COURT:  Overruled.

2  Q    -- I should just walk up to him, you're Rob, you're

3  Robert Kelly.  I'm hoping his manager is not around.  His

4  manager will get in the way --

5      THE COURT:  Did you show her this already and asked

6  her if she recollected it rather than reading it?  Do you want

7  to refresh her recollection, see if it refreshes her

8  recollection?

9      MR. CANNICK:  Sure.

10 Q    To the bottom portion.

11 A    I don't recall this.

12     MR. CANNICK:  Just one second, your Honor.  I'm

13 looking to see if there is anything further.

14     THE COURT:  Sure.

15 Q    You testified us earlier you do in fact recall driving

16 from someplace and sitting in front of his home.  Do you

17 remember how many times you actually did that?

18 A    I do not recall.

19 Q    But you do recall doing it?

20 A    I recall at least once, yes.

21     MR. CANNICK:  Nothing further, your Honor.

22     THE COURT:  Okay.  Are you ready to redirect?

23     MS. GEDDES:  Yes, your Honor.

24     MR. CANNICK:  Just two questions, your Honor.

25     THE COURT:  You already said you're done.

J. JOHNSON PACE - CROSS - MR. CANNICK          352

1          Just kidding.  Go ahead.

2    BY MR. CANNICK:

3    Q    In your book you testified you didn't embellish anything

4    when you wrote the book about your experiences in connection

5    with these facts that you told us about.

6          MS. GEDDES:  Objection.

7          THE COURT:  Did you testify that you didn't make

8    anything up in the book that you wrote?

9          THE WITNESS:  Yes.

10         THE COURT:  Go ahead.

11   Q    In the book you wrote that during that trial that you sat

12   through in 2008, that Rob blew kisses at you, correct?

13   A    That's correct.

14   Q    Did that happen?

15   A    Yes, that did.

16   Q    It happened.  He didn't know you, right?

17   A    He did not know me.

18         MR. CANNICK:  Thank you.  Nothing further.

19         THE COURT:  Go ahead, Ms. Geddes.

20         Can I see the lawyers on the side, without the court

21   reporter.

22         (Sidebar held with the Court and counsel only,

23   outside of the hearing of the jury and the court reporter.)

24         (Continued on the following page.)

25                        ///

*RIVKA TEICH, RPR, RMR, CRR*
*Official Court Reporter*
A 335

J. JOHNSON PACE - REDIRECT - MS. GEDDES          353

1   REDIRECT EXAMINATION

2   BY MS. GEDDES:

3   Q    On cross-examination I believe earlier today defense

4   counsel asked you about certain telephone calls that were

5   stored in your telephone in Government's Exhibit 210 and are

6   reflected on 210 U, T, S, and R.  Do you recall those

7   questions?

8   A    Yes.

9   Q    And one of the questions that defense counsel asked was

10  whether or not the date of these telephone calls, January 23,

11  was after the last time that you saw the defendant at his

12  house.  Do you recall that question?

13  A    Yes.

14  Q    As you sit here today, do you know the date that you last

15  saw the defendant at his residence?

16  A    I do not.

17  Q    You testified, however, that shortly after you last saw

18  the defendant, you retained a lawyer, correct?

19  A    That is correct.

20  Q    And you said that happened in January 2010, right?

21  A    That's correct.

22  Q    As part of that, you prepared this journal that was

23  reflected in 3500JP9, which I'm showing you.

24           MR. CANNICK:  Objection, your Honor.

25           THE COURT:  Overruled.

J. JOHNSON PACE - REDIRECT - MS. GEDDES          354

1   A      That's correct.

2   Q      I'm going to turn to --

3             THE COURT:  I don't think this is in evidence, is

4   it?

5             MS. GEDDES:  It's not in evidence yet.

6             THE COURT:  Can I see the parties on the side for a

7   minute.

8             (Sidebar conference held.)

9

10            (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                                    355

1          (The following sidebar conference was held outside

2     the hearing of the jury.)

3          THE COURT:  Are you planning to admit it?

4          MS. GEDDES:  I'm planning to show her this to, one,

5     see if it refreshes her recollection as to the date on which

6     she last saw him.  Then I do want to have her read this as a

7     prior consistent statement.  I think her credibility has been

8     significantly attacked both in opening and on

9     cross-examination.  She said the exact same thing four days

10    after when she retained a lawyer as to what happened on

11    January 23.  I think she should be permitted to say that she

12    said the same thing four days after it happened.

13         THE COURT:  Do you object to that?

14         MR. CANNICK:  I don't see what is the prior

15    consistent statement?

16         MS. GEDDES:  Prior consistent or inconsistent?

17         MR. CANNICK:  You're offering it as prior consistent

18    statement?

19         MS. GEDDES:  Yes, to rebut the claim of -- and to

20    rehabilitate the witness, both.

21         MR. CANNICK:  What is the prior consistent

22    statement?

23         MS. GEDDES:  January 23, 2010, she went to Rob's

24    house, Rob slapped me three times said I lied to him, it's not

25    going to be an open hand next time.

Sidebar                                               356

1          MR. CANNICK:  I'm not going to object.  Let it in.

2

3          (End of sidebar conference.)

4

5          (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J. JOHNSON PACE - REDIRECT - MS. GEDDES                357

1      (In open court - jury present.)

2   BY MS. GEDDES:

3   Q    I'm showing you the last page -- I'll show the witness

4   only -- the last page of 3500JP9 -- the second to last page.

5   Do you see what is shown on JP9?

6   A    Yes, I do.

7   Q    I'm going to direct your attention to the last entry.

8   You can read those two lines then I'll turn it over to the

9   next page.

10          (Witness reviewing document.)

11          Can I turn it over?

12  A    Yes.

13          (Witness reviewing document.)

14          Yes.

15  Q    Does looking at those last two pages of 3500JP9 refresh

16  your recollection as to the last date that you saw the

17  defendant at his residence?

18  A    Yes.

19  Q    When was it?

20  A    January 23.

21  Q    Of 2010?

22  A    Yes.

23  Q    Can you please read to the jury your entry for January 23

24  of 2010.  Take a moment.

25  A    It says:  I went to Rob's house and Rob called me a

J. JOHNSON PACE - REDIRECT - MS. GEDDES          358

1  silly, a silly bitch.  Rob slapped me three times.  He said if

2  I lie to him again it's not going to be an open hand next

3  time.  He spit in my face and in my mouth.  And he slapped me

4  in my face again for the fourth time.  He choked me during an

5  argument.  I had sex with him.  I had oral sex with him.  And

6  I became fed up with him and went home and confessed.

7           Can I have a bathroom break?

8           THE COURT:  Yes.  Let's take our afternoon break,

9  ladies and gentlemen.

10          Let's take the witness out first.

11          (Whereupon, the witness steps down.)

12          THE COURT:  We'll be in recess for 15 minutes.

13          Don't talk about the case at all.  We'll see you in

14 a few minutes.

15          (Jury exits the courtroom.)

16          THE COURT:  One thing I want everyone to keep on

17 their radar -- Ms. Greene will correct me if I'm wrong --

18 alternate number three, let me see if I have this, alternate

19 number three can't start a new job until -- she doesn't start

20 until the 23 but -- she's supposed to start orientation on the

21 23 and won't get paid if she doesn't do the orientation.  And

22 if she doesn't get that, she also won't have any benefits.

23 Apparently her husband doesn't have benefits.

24          There are many layers.  I think I told you before,

25 there were some issues about picking kids up from school also.

1  But you can -- we don't have to decide this right now -- but

2  talk amongst yourselves see if you'll agree to excuse or --

3  what day is the 23rd?

4          THE DEPUTY CLERK:  Monday.

5          THE COURT:  We'll talk about it at the end of the

6  day.

7          (Brief recess.)

8          (Whereupon, the witness resumes the stand.)

9          (Jury enters the courtroom.)

10          THE DEPUTY CLERK:  You may be seated.

11          MS. GEDDES:  May I proceed, your Honor?

12          THE COURT:  Yes.  Go ahead.

13          THE DEPUTY CLERK:  The witness is reminded she's

14  still under oath.

15  BY MS. GEDDES:

16  Q     On cross-examination do you recall being asked a question

17  about where in Government's Exhibit 928 it said that your

18  silence was being purchased.  Do you recall those questions?

19  A     Yes.

20  Q     Did you draft Government's Exhibit 928?

21          MR. CANNICK:  Objection.

22          THE COURT:  Overruled.

23  A     No.

24  Q     And how old you were when Government's Exhibit 928 --

25          MR. CANNICK:  Objection.

1            THE COURT:  Overruled.

2   Q    -- was drafted?

3   A    I was 16.

4   Q    And because you were 16, was your mother also required to

5   sign this agreement?

6   A    Yes, she was.

7   Q    Is that her signature?

8   A    Yes, it is.

9            MS. GEDDES:  I'm showing one of the pages of 928.

10  This is in evidence, may I publish that to the jury?

11           THE COURT:  Yes.

12  BY MS. GEDDES:

13  Q    Where my finger is pointing, is that your mother's

14  signature?

15  A    Yes, it is.

16  Q    Again, what was your understanding of your obligations

17  under this agreement?

18  A    That I wasn't supposed to talk about it with anyone.  I

19  was supposed to remain silent and keep everything

20  confidential.

21  Q    And in exchange for that obligation, what did you get?

22  A    I was supposed to get $1.5 million settlement.

23  Q    I'd like to direct your attention to paragraph three, do

24  you see paragraph three?

25  A    It's a bit blurry, but I can see it.

1  Q   Can you see that now?

2  A   Yes, I can.

3  Q   Can you read paragraph three for the jury, please?

4  A   Johnson and Kelly, Susan E. Loggans, Susan E. Loggans and

5  Associates PC, and Loggans' firm expressly acknowledge and

6  agree that the following are of highly confidential nature,

7  and that Johnson and Kelly, Susan E. Loggans, Susan E. Loggans

8  and Associates PC, and Loggans' firm and anyone acting on

9  their behalf under the control or in their employ will not

10  disclose nor discuss in any fashion with anyone the following

11  items.

12  Q   Can you continue and read the items which were not to be

13  discussed.  Just before you do that, that first name up there

14  says Johnson, who is Johnson?

15  A   Johnson is me.

16  Q   That was your maiden name?

17  A   Yes.

18  Q   Can you now please read to the jury the items that you

19  were not to discuss as provided in paragraph three that you

20  just read?

21  A   A:  The existence of a relationship, if any, between

22  Johnson and Kelly.

23        B:  The fact that there was a dispute between

24  Johnson and Kelly.

25        C:  The allegations underlying the dispute between

J. JOHNSON PACE - REDIRECT - MS. GEDDES       362

1   Johnson and Kelly.

2          D:  The fact that the dispute has been terminated.

3          And E:  Any term of this agreement provided however

4   that this provision does not prohibit any disclosure of the

5   proceeds to the proper taxing authorities or the allegations

6   underlying the dispute when ordered by a court competent

7   jurisdiction, or as otherwise required by law.

8   Q    On cross-examination you were also asked about how you

9   were able to advance two years from April of 2008 until May of

10  2009.  Do you recall those questions?

11  A    Yes, I do.

12  Q    When was the first day that you encountered the

13  defendant?

14  A    April Fool's day of 2008.

15  Q    How old were you then?

16  A    I was 14.

17  Q    When was your birthday?

18  A    April 19.

19  Q    When did you turn 15?

20  A    April 19, 2008.

21  Q    Eighteen days after you met the defendant?

22  A    That's correct.

23  Q    When did you turn 16?

24  A    April 19, 2009.

25  Q    When did you meet the defendant?  When did you first go

J. JOHNSON PACE - RECROSS - MR. CANNICK          363

1   to the defendant's house.

2   A    It was May of 2009.

3   Q    So fair to say there were about 13 months that passed

4   between April 1st of 2008 and May of 2009 when you met the

5   defendant?

6   A    That's correct.

7           MS. GEDDES:  Nothing further.

8           THE COURT:  Any recross?  It's limited to what came

9   out on redirect.

10          MR. CANNICK:  Yes.

11  RECROSS-EXAMINATION

12  BY MR. CANNICK:

13  Q    The journal that you just testified to on redirect, your

14  lawyers asked you to prepare that journal, am I correct?

15  A    That's correct.

16  Q    They asked you after you had gone to their office to

17  consult with them, am I correct?

18          THE COURT:  Mr. Cannick, you can take your mask off.

19          MR. CANNICK:  Thank you.

20  Q    And when you were putting the entries into the journal,

21  you were not doing it contemporaneous, am I correct, with the

22  incidents that you put in there?

23  A    Rephrase your question.

24  Q    When you made the entries in the journal, you made those

25  entries well after the items that you placed in the journal,

J. JOHNSON PACE - RECROSS - MR. CANNICK          364

1    am I correct?

2    A    I don't understand your question.

3    Q    May I have the journal?  What was the date that you

4    prepared this journal?

5    A    I'm not sure of the date I prepared the journal.

6    Q    You have an entry from May 30, 2009.

7              MS. GEDDES:  Objection.

8              THE COURT:  Overruled.

9    Q    You have an entry from May 30, 2009.  You didn't prepare

10   the journal on May 30, 2009, am I correct?

11   A    I don't recall exactly when I prepared the journal.

12   Q    Well, had you seen the lawyer before May 30, 2009?

13   A    No, I did not.

14   Q    But there is an entry in the journal, am I correct?

15   A    I didn't see the journal.

16   Q    You testified and told the jury a short time ago --

17   A    I didn't see what the page you're talking about.

18             THE COURT:  I think what Mr. Cannick is asking you

19   is, did you prepare that journal after you met the lawyers?

20             THE WITNESS:  Yes, I did.

21             THE COURT:  So that was after all of the things that

22   you told us about that happened in 2009, correct?

23             THE WITNESS:  That's correct.

24             THE COURT:  You didn't prepare the journal right

25   after it happened, correct?

J. JOHNSON PACE - RECROSS - MR. CANNICK          365

1          THE WITNESS:  That's correct.

2          THE COURT:  Sorry about that.

3          MR. CANNICK:  Thank you, your Honor.

4   BY MR. CANNICK:

5   Q    When you were asked to prepare this journal by your

6   attorneys, they told you to be accurate with the information,

7   am I correct?

8   A    That's correct.

9   Q    In the journal you told the attorneys that Robert slapped

10  you three times, am I correct?

11  A    That's correct.

12  Q    And an eventual fourth time.

13  A    That's correct.

14  Q    You told the lawyers, at least you put in the journal,

15  that he choked you?

16  A    That's correct.

17  Q    You didn't put in there that he choked you out?

18  A    That's correct.

19  Q    You put absolutely nothing in the journal about the

20  supposed T-shirt that you found -- withdrawn -- about the

21  supposed T-shirt that you had that you used to wipe off semen

22  and spit from your face?

23  A    That's correct.

24  Q    Nothing.

25          MR. CANNICK:  I think that's it, your Honor.

J. JOHNSON PACE - REDIRECT - MS. GEDDES          366

1          THE COURT:  Anything else?

2          MS. GEDDES:  Very briefly.

3    REDIRECT EXAMINATION

4    BY MS. GEDDES:

5    Q    On recross-examination you were asked about your meeting

6    with a lawyer.  Why did you go to a civil lawyer rather than

7    seek another avenue?

8          MR. CANNICK:  Objection.

9          THE COURT:  Sustained.

10   Q    On recross you were also asked about the T-shirt that you

11   testified earlier about that you used to wipe off the

12   defendant's semen from your face.  Do you recall that?

13   A    Yes.

14   Q    What did you do with that T-shirt?

15   A    I gave that T-shirt to my attorney.

16

17          (Continued on next page.)

18

19

20

21

22

23

24

25

Pace - recross - Cannick                              367

1    EXAMINATION CONTINUES

2    BY MS. GEDDES:

3    Q    And that was your attorneys at the Loggans law firm?

4    A    Yes.

5            MS. GEDDES:  Nothing further.

6            THE COURT:  Anything else?

7            MR. CANNICK:  Yes, one.

8            THE COURT:  You're kidding, right?

9            All right, one.

10   RECROSS-EXAMINATION

11   BY MR. CANNICK:

12   Q    When, when did you give that T-shirt to your attorneys?

13   A    I don't recall the exact date.

14           MR. CANNICK:  Thank you.

15           THE COURT:  All right, the witness can step down.

16           (Witness excused.)

17           THE COURT:  Are you ready to call your next witness?

18           MS. GEDDES:  Yes, the Government calls Garrick

19   Amschl.

20           (Pause.)

21           THE COURT:  Can you tell me the witness' last name

22   again?

23           MS. GEDDES:  Yes, it's Amschl, A-M-S-C-H-L.

24           (Witness enters the courtroom and takes the stand.)

25           THE COURTROOM DEPUTY:  Raise your right hand for me,

1   please.

2          Do you solemnly swear or affirm that the testimony

3   you are about to give will be the truth, the whole truth and

4   nothing but the truth?

5          THE WITNESS:  I do.

6          (Witness sworn.)

7          THE COURTROOM DEPUTY:  Please have a seat and state

8   your name for the record.

9          THE WITNESS:  Garrick Amschl.

10

11          (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **KRIS McGRATH, MD**,

2         called as a witness by the Government, having been

3         duly sworn/affirmed by the Courtroom Deputy, was examined

4         and testified as follows:

5    DIRECT EXAMINATION

6    BY MS. SHIHATA:

7    Q    Good afternoon.

8    A    Good afternoon.

9    Q    Did you receive a subpoena to testify here today?

10   A    Yes, I did.

11        THE COURT:  I am going to ask you to keep your voice

12   up, too, and use the microphone.

13        MS. SHIHATA:  I'm sorry.

14   Q    Did you receive a subpoena to testify here today?

15   A    Yes, I did.

16   Q    Are you currently employed?

17   A    Yes, I am.

18   Q    What do you do for a living?

19   A    I'm a physician.

20   Q    What kind of physician are you?

21   A    Internal medicine and allergy and immunology.

22   Q    Where do you practice?

23   A    Chicago, Illinois.

24   Q    I am showing you what's in evidence as Government

25   Exhibit 1.

McGrath - direct - Shihata                    384

1              (Exhibit published.)

2     Q    Do you recognize the person in this photograph?

3     A    Yes, I do.

4     Q    Who is that?

5     A    Robert Kelly.

6     Q    Do you personally know Robert Kelly?

7     A    Yes, I do.

8     Q    In what capacity?

9     A    As his physician.

10    Q    Do you know him in any other ways as well?

11    A    Socially.

12    Q    Do you see Robert Kelly in the courtroom here today?

13    A    Yes, I do.

14    Q    Can you point him out and indicate and identify him by an

15    item of clothing that he's wearing?

16    A    The man over there in the blue suit and blue tie.

17             THE COURT:  Indicating the defendant.

18    BY MS. SHIHATA:

19    Q    Now, you indicated you were his primary care physician,

20    correct?

21    A    Correct.

22    Q    Can you briefly describe your medical training to the

23    jury?

24    A    I'm trained in internal medicine, which is a three-year

25    program after medical school; internal medicine residency,

McGrath - direct - Shihata                    385

1   that was followed by a two-year allergy/immunology fellowship.

2   Both were at Northwestern University.  Preceded by medical

3   school at the University of Iowa.

4   Q    And do you practice in both internal medicine and allergy

5   and immunology?

6   A    Yes, I do.

7   Q    And are you board certified?

8   A    Yes, I am.

9   Q    In both of those specialties?

10  A    Yes, I am, both specialties.

11  Q    Generally speaking, what is internal medicine?

12  A    It's primary care, with the knowledge studied also in the

13  subspecialties of internal medicine such as allergy,

14  immunology, infectious disease, endocrinology,

15  gastroenterology, cardiology, and others.

16  Q    And does that include diagnosing sexually-transmitted

17  diseases?

18  A    Yes, it does.

19  Q    Including herpes?

20  A    Yes, it does.

21  Q    Now, following your medical training, did you open a

22  practice or did you buy a practice?

23  A    Yes, I bought a practice.

24  Q    And around when was that?

25  A    1984, June.

McGrath - direct - Shihata                    386

1   Q    And where was that practice located?

2   A    The practice was originally at 100 East Ohio from 1984 to

3   1988; and then in 1988, I moved the practice about four blocks

4   away to 500 North Michigan Avenue.

5   Q    And is that all in Chicago, Illinois?

6   A    Yes.

7   Q    And do you still practice at 500 North Michigan Avenue?

8   A    Yes, I do.

9   Q    Aside from your medical practice, do you hold any other

10  positions?

11  A    Yes.  I also have a teaching faculty position at

12  Northwestern University Medical School, that's professor of

13  medicine where I work with allergy/immunology fellows,

14  residents and medical students at the Northwestern Medical

15  School.

16          MS. SHIHATA:  I am showing the witness only what's

17  been marked for identification as Government Exhibit 48.

18  BY MS. SHIHATA:

19  Q    Is this just a photo of you, Dr. McGrath?

20  A    Yes, it is.

21          MS. SHIHATA:  I move to admit Government Exhibit 48.

22          THE COURT:  Any objection?

23          MS. BLANK BECKER:  No objection, Judge.

24          THE COURT:  All right, that's in evidence.

25          (Government's Exhibit 48 was received in evidence.)

McGrath - direct - Shihata                387

1  BY MS. SHIHATA:

2  Q    Now, for how long were you the defendant's primary care

3  physician?

4  A    Approximately 25 years.

5  Q    And approximately when did you first meet the defendant?

6  A    1994.

7  Q    And how did you meet him?

8  A    I was asked to see him by his accountant, Derrel McDavid,

9  as a favor.

10 Q    And how did you know Derrel McDavid at the time?

11 A    He was an internal medicine patient.

12 Q    I am showing you what's in evidence --

13       MS. SHIHATA:  I am showing the witness only what's

14 been marked for identification as Government Exhibit 12.

15 Q    Do you recognize the person in this photograph?

16 A    Yes, I do.

17 Q    Who do you recognize it to be?

18 A    Derrel McDavid.

19       MS. SHIHATA:  I move to admit Government Exhibit 12.

20       MS. BLANK BECKER:  No objection, Judge.

21       THE COURT:  Okay, that's in evidence.

22       (Government's Exhibit 12 was received in evidence.)

23       MS. SHIHATA:  May we publish it?

24       THE COURT:  Yes.

25       MS. SHIHATA:  To the jury, please.  Thank you.

McGrath - direct - Shihata                    388

1          (Exhibit published.)

2    BY MS. SHIHATA:

3    Q    Now, at some point did you receive a subpoena from the

4    Government for the defendant's medical records?

5    A    Yes, I did.

6    Q    And what, if anything, did you do after receiving that

7    subpoena?

8    A    I called an attorney and had them copied and numbered.

9          THE COURT:  You had the records copied and numbered?

10         THE WITNESS:  Yes, I had the records copied and

11   numbered.

12   Q    And were those records then provided to the Government?

13   A    Yes, they were.

14   Q    And what kinds of records did you provide the Government

15   with?

16   A    The original paper records, pre-electronic records.  So,

17   from about 1994 to 2011 was paper records.  And then the rest

18   are electronic-generated records from 2011 to -- to present.

19   Q    So, fair to say a copy of both your paper file with

20   respect to the defendant, as well as electronic records?

21   A    That's correct.

22   Q    And how were those files maintained at your office?

23   A    In a -- secure medical files -- drawers.

24   Q    For the paper records you mean?

25   A    For the paper records, and the rest are through

McGrath - direct - Shihata                    389

1  e-clinical work, so electronic health records.

2  Q    And were those records kept in the regular course of your

3  business?

4  A    Yes, they were.

5  Q    And as a regular practice of your business?

6  A    Yes, as a regular practice of my business.

7         MS. SHIHATA:  I am showing the witness only what's

8  been marked for identification as Government Exhibit 237.

9  BY MS. SHIHATA:

10  Q    Prior to your testimony here today, did you have an

11  opportunity to review Government Exhibit 237?

12  A    Yes, I did.

13  Q    And does it consist of portions of the medical records

14  for the defendant that you provided to the Government?

15  A    Yes, it does.

16         MS. SHIHATA:  I move to admit Government

17  Exhibit 237.

18         THE COURT:  Any objection?

19         MS. BLANK BECKER:  No, Judge, thank you.

20         THE COURT:  Okay.

21         (Government's Exhibit 237 was received in evidence.)

22         (Exhibit published.)

23  BY MS. SHIHATA:

24  Q    Now, based on your prior review of Government

25  Exhibit 237, does it include records from both your hard copy

McGrath - direct - Shihata                    390

1  file, as well as electronic records, that your office

2  maintained in printout format?

3  A    Yes, it does.

4  Q    Now, approximately when did your office begin using

5  electronic record keeping?

6  A    In March of 2011.

7  Q    And once you switched to electronic records, did you use

8  that recordkeeping system exclusively for patient records?

9  A    Yes.

10 Q    All right, now, I'd like to focus on the time period

11 before March 2011, before the switch to electronic

12 recordkeeping.

13       In that time period, what were the methods you used

14 to issue prescriptions for your patients?

15 A    Handwritten prescriptions or telephone call-in

16 prescriptions.

17 Q    And when you say telephone call-in prescriptions, who

18 would you be calling?

19 A    The pharmacy.

20 Q    And in those circumstances where you would call the

21 pharmacy, what information did you have to provide to the

22 pharmacy?

23 A    The patient's name, date of birth, medications, quantity,

24 dose of the medication, refills, and a signature if it was

25 written; otherwise, just a verbal over the phone.

1  Q    Now, in your paper records did you keep a record of each

2  time you called in a prescription for a patient?

3  A    No, I did not.

4  Q    Why not?

5  A    It was just the standard of practice at the time that you

6  wouldn't write a note every time you called in a prescription.

7  Q    Now, in your medical practice do you sometimes receive

8  phone calls from patients?

9  A    Yes.

10 Q    And prior to moving to your electronic system in 2011,

11 did you always create a paper record of such phone calls?

12 A    Not every time, sometimes.

13 Q    Now, turning to when you switched to electronic

14 recordkeeping in March 2011, what, if any, ways were you able

15 to issue prescriptions to your patients at that time -- after

16 that time?

17 A    After that time they would be done electronically through

18 opening a telephone encounter, and then you put in the name of

19 the medicine, the dose, all the specifics, and then you would

20 hit send and it would go to the pharmacy.

21 Q    And could you also still at that time, in addition to

22 that, do call-in prescriptions?

23 A    You could also -- yes, call-in prescriptions, also.

24 Q    And did you, in fact, do both in your practice?

25 A    Yes, I did both.

1  Q    All right, now going back to Government Exhibit 237, do

2  you see the first page of the exhibit on your screen?

3  A    Yes, I do.

4  Q    And can you explain to the jury what type of record this

5  first page is?

6  A    It's a written medical record of an encounter or progress

7  note on patient Robert Kelly, dated September 12th, 1994.

8  Q    And is this your handwriting on the page?

9  A    Yes, that's my handwriting.

10 Q    Now, directing your attention to that first entry on the

11 page, had you met the defendant before that date?

12 A    No, I had not.

13 Q    So, was this your first meeting with him?

14 A    Yes, it was.

15 Q    And when you, in your practice when you meet a patient

16 for the first time, what is your practice as to that first

17 meeting, what do you do?

18 A    The first meeting you take a history first while they're

19 there.  That's the history of present illness, preceded by the

20 chief concern or chief complaint.  Followed by past medical

21 history, past surgical history, family medical history, review

22 of systems, assessment and plan, plus or minus some laboratory

23 or imaging or testing results.

24 Q    Now, I want to direct your attention to the first line on

25 the page.  What is indicated there?

McGrath - direct - Shihata                    393

1  A     Twenty-seven, black male, singer.

2  Q     And was the defendant 27 years old when he first came to

3  see you?

4  A     Yes.

5  Q     Now, I want to go down to the fourth line.  What is

6  indicated there?

7  A     Concerned about chlamydia.  No genital urinary symptoms.

8  Q     All right, I'd like to direct your attention to the

9  middle of the page where there is some numbers written.

10            What does that refer to?

11  A     That's his weight, 193 pounds; height, 6-foot-1-inch.

12  Q     And does this record reflect whether you conducted a

13  physical exam during this office visit with the defendant?

14  A     Yes, it does.

15  Q     And what does it reflect in that regard, did you do a

16  physical exam?

17  A     Yes, it's under those two numbers.  The skin exam,

18  normal; skeletal, lymphatic, head, ears, eyes, nose and

19  throat, lungs, heart, abdomen, extremities, neurological and

20  genital urinary.

21  Q     And did you order any tests related to

22  sexually-transmitted diseases following your physical exam?

23  A     Yes, I did.

24  Q     And what tests did you order?

25  A     The tests I ordered were a chemistry, which is generally

McGrath - direct - Shihata                    394

1   kidney and liver; a blood count to screen for, like, anemia

2   and leukemia; and then a chlamydia test and syphilis test.

3   Q     So, those last two are related to STDs?

4   A     Yes, they are.

5   Q     Now, I'm turning to page 8 of the exhibit.

6          Do you recognize what type of document this is?

7          (Exhibit published.)

8   A     This is a lab result.

9   Q     And do you see where it says "drawn date and time"?

10  A     Yes.

11  Q     What date is listed there?

12  A     September 13th, 1994.

13  Q     All right.

14         Now, going back to the first page, you had indicated

15  this date here (indicating), is that September 12th or 13th of

16  1994, now having looked at the lab report?

17  A     I'd say it's September 13th, 1994.

18

19         (Continued on the following page.)

20

21

22

23

24

25

K. McGrath - Direct/Ms. Shihata                    395

1  EXAMINATION

2  BY MS. SHIHATA:

3  Q    And according to this document, what were the results of

4  those two STD tests that you ordered on September 13, 1994?

5  A    The two tests, chlamydia and syphilis tests, were

6  negative.

7  Q    All right.  I'd like to now turn to Page 2 of Government

8  Exhibit 237.

9              Is there an entry on this page for an

10 encounter with the defendant on January 23, 1995?

11 A    Yes, there is.

12 Q    And what kind of encounter was this?

13 A    It's a progress note with the chief concern,

14 examination, assessment, and plan.

15 Q    And what was the chief concern on that visit?

16 A    Penile stinging, one and a half days, no discharge.  No

17 partners, illness, no known drug allergies.

18 Q    And can you tell from this record whether you examined

19 the defendant that day?

20 A    It says "Exam," and then, "Decline rectal exam, penis."

21 There was no discharge.

22 Q    What, if any, tests did you order fooling following this

23 exam?

24 A    I ordered a gonorrhea culture and a chlamydia test.

25 Q    I'm going to direct your attention to Page 11 of

K. McGrath - Direct/Ms. Shihata               396

1   Government Exhibit 237.

2                  Does this indicate the results of those tests?

3   A    Yes, it is t does.

4   Q    And what does it indicate?

5   A    Positive growth of Neisseria gonorrhea, negative test

6   for chlamydia and syphilis.

7   Q    And so, what does that test result mean with respect to

8   gonorrhea?

9   A    That he had gonorrhea explaining his chief concern at

10  that visit.

11  Q    What is gonorrhea?

12  A    It's a sexually transmitted bacterial disease.

13  Q    Is it curable?

14  A    It's curable.

15  Q    Now, as we see in this exhibit the lab issued this

16  report on January 28, 1995, correct?

17  A    Correct.

18  Q    I want to turn back to Page 2 of Government Exhibit 237.

19                  Is there an encounter on this page from

20  February 7, 1995?

21  A    Yes, there is.

22  Q    And what kind of encounter was that?

23  A    Progress note.

24  Q    And what, if anything, happened during that encounter?

25  Was that an in-person visit?

K. McGrath - Direct/Ms. Shihata                397

1   A    It was an in-person visit.

2   Q    And what happened during that?

3   A    After talking to somebody, I can't make out that name, a

4   patient came today and I treated him because of that result

5   with an Z-Pak and a shot of Ceftriaxone, 250 milligrams,

6   intramuscularly and educated the patient to tell partners and

7   to practice safe sex.

8   Q    And is that indicated over here?

9   A    Yes.

10  Q    And what does that mean, "Advised the patient to tell

11  partner and recommend safe sex"?

12  A    With sexually transmitted diseases, you have to educate

13  the patient, make sure you treat the patient, and have the

14  patient inform any sexual contacts that they should be seen

15  and treated.

16  Q    Meaning, sexual partners?

17  A    Yeah, sexual partners.

18  Q    And why did you advise the defendant in that manner?

19  A    Because I just diagnosed him with gonorrhea.

20  Q    Is that your regular practice when you tell a patient

21  that he or she has an STD?

22  A    Yes, that's my regular practice.

23  Q    And by STD, you mean sexually transmitted disease?

24  A    Sexually transmitted diseases, correct.

25  Q    Has it always been your regular practice?

K. McGrath - Direct/Ms. Shihata                398

1   A    It always has been and is my regular practice.

2   Q    I'd like to direct your attention to Page 3 of the

3   exhibit.

4                    What's reflected for the encounter on May 1,

5   1996?

6   A    It's a progress note.  Visit.  Do you want me to

7   proceed?

8   Q    Sure.

9   A    Chief concern is penile purulent drip, two days.

10  Declines cultures, et cetera, for privacy.

11  Q    And what cultures did you want to run at that point?

12  A    I would only have to take an educated or retrospective

13  guess, chlamydia.

14              MS. BLANK BECKER:  I would object.

15              THE COURT:  Make sure you have the microphone on

16  and you can take your mask off, otherwise I can't hear you.

17              Are you objecting?

18              MS. BLANK BECKER:  Yes.

19              THE COURT:  When you say you have an educated

20  guess, are you talking about your usual practice or do you

21  know what happened next?

22              THE WITNESS:  It would be my usual practice to

23  repeat what I just did in the previous visits.

24              THE COURT:  Okay.

25

K. McGrath - Direct/Ms. Shihata                    399

1      MS. BLANK BECKER:  Thank you.

2  EXAMINATION

3  BY MS. SHIHATA:

4  Q    Would those be testing for STDs?

5  A    Yes, it would.

6  Q    And that involves cultures; is that correct?

7  A    Gonorrhea culture, chlamydia, and whatever else I would

8  have thought of at that time.

9  Q    And your notes indicate that the patient, the defendant,

10 declined for privacy reasons; correct?

11 A    That's correct.

12 Q    Now, is there another entry on this page for

13 October 29th, well, what date is that entry for?

14 A    October 29, 1988.

15 Q    '88 or '98?

16 A    I'm sorry '98.

17 Q    And what does that indicate?

18 A    Chief concern was sore tip of the penis within 24 hours,

19 episodic.  No discharge.  Exam negative.  Impression:

20 Urethritis.  And I drew the arrow pointing to the treatment

21 above which is I think was a treatment I gave on May 1, 1996.

22 Q    So the same treatment?

23 A    I think the treatments for both those visits.

24 Q    What was that treatment for?

25 A    Most causes of urethritis, most likely, treat chlamydia

K. McGrath - Direct/Ms. Shihata                400

1  and gonorrhea.

2  Q    Now, I'm going to direct your attention to Page 162 of

3  Government Exhibit 237.  Was there an office visit by the

4  defendant on this date?

5  A    Yes, there was.

6  Q    And what is the date indicated?

7  A    June 5, 2000.

8  Q    And what was the complaint on that date?

9  A    The complaint was irritated penis, Saturday evening.

10  Progressed into swelling of the head of penis and red bumps.

11  Itched.  Preceded by several hours before wore leather pants.

12  They were black, tight around the waist without underwear for

13  a photo shoot.  No dysuria, that's burning on urination.  No

14  hematuria, that's blood in the urine.  No frequency of

15  urination.  Otherwise, feels well.

16  Q    I'm just going to stop you for a moment.  That portion

17  that you read, is that what the patient, the defendant,

18  Mr. Kelly, reported to you on that visit?

19  A    And, right, it's what he reported and then what I asked

20  for pertinent positives or negatives.

21  Q    And did you conduct any examination during that visit?

22  A    Yes, there was an examination.

23  Q    And what do your notes reflect regarding that?

24  A    It says, "Exam glans penis," that's the head of penis.

25  Very small vesicles, those are very small blisters.

K. McGrath - Direct/Ms. Shihata                    401

1   Q    And what else is reflected on your notes for that visit?

2   A    My impression and plan.

3   Q    And what was that?

4   A    My impression was either contact dermatitis from the

5   black dye in the leather or leather components or herpes

6   simplex virus.

7   Q    Is that what's known as a differential diagnosis?

8   A    That is correct, a differential diagnosis for this

9   visit.

10  Q    And what does that mean?

11  A    That means the possibilities based on the history and

12  the exam.

13  Q    And you mentioned contact dermatitis.  What is that?

14  A    That's a skin reaction most common in the community

15  would be like poison ivy.  I was wondering if it was from the

16  dyes in the leather pants or the leather tanning agents

17  causing it.

18  Q    And what was the other possible diagnosis?

19  A    Herpes simplex virus or genital herpes.

20  Q    And, to be clear, was genital herpes the type of herpes

21  you suspected the defendant had at that point based on your

22  examination?

23  A    Correct.

24  Q    And why did you suspect genital herpes as, well?  Why

25  did you indicate genital herpes as one of the two diagnoses

K. McGrath - Direct/Ms. Shihata                402

1    in your differential diagnosis?

2    A    They both were causes of vesicles or blisters or bumps.

3    Q    And what is genital herpes?

4    A    A sexually transmitted disease caused by the herpes

5    simplex virus, usually Type 1 or it could be Type 2.

6    Q    And so genital herpes, I'm sorry, genital herpes is

7    which type generally?

8    A    It's a viral illness caused by the herpes simplex virus.

9    There's more than with your serotype.  Most common is

10   Serotype 1.  It could also be, most commonly, it's Type 2 and

11   could also be Type 1.

12   Q    Okay.  So, just to be clear, most commonly it's Type 2;

13   is that correct?

14   A    I believe it's Type 2, I could be wrong on that at this

15   moment.

16   Q    All right.  Now, what, if any, tests did you order at

17   this visit?

18   A    The herpes simplex virus culture.

19   Q    And why did you do that?

20   A    Because I suspected herpes simplex causing the irritated

21   penis that progressed into swelling of the head of the penis

22   with red bumps and a physical exam of small vesicles.

23   Q    And, as we just went over, prior to that date, you had

24   previously diagnosed the defendant with an STD, correct?

25   A    Correct.

K. McGrath - Direct/Ms. Shihata                403

1    Q    Gonorrhea, specifically, correct?

2    A    Correct, gonorrhea.

3    Q    Now, is genital herpes curable?

4    A    It is not curable.  It can go in remission but generally

5    not curable.

6    Q    Now, you indicated that you ordered -- or that you

7    conducted a herpes culture; is that right?

8    A    That's right.

9    Q    And can you explain to the jury what that is, what that

10   means?

11   A    It's where you swab, take, like, a cotton tip swab, swab

12   the lesions on the penis and then put it into a culture

13   media.  The results can vary.  If you don't get it at the

14   right time you can get a false negative.  I like to catch it

15   early so you get a positive culture.

16   Q    So just to explain a little bit more about what that

17   means.  Is timing very important for a herpes virus culture?

18   A    Timing is very important for a herpes virus culture.

19   Q    Can you explain why that is?

20   A    Because it goes through its changes of the skin from the

21   watery blisters with a red base to the drying blisters and

22   the flaking of the blisters.  They're not shedding the virus,

23   the virus is absent by then.  The viruses are usually present

24   at the beginning of lesions and even then you might get a

25   negative culture.

K. McGrath - Direct/Ms. Shihata                404

1   Q    And does a negative herpes culture mean you don't have

2   herpes?

3   A    No, it doesn't mean you don't have herpes.  You may not

4   have captured it.  It's a total clinical presentation of the

5   history, the exam, and then in the future response to

6   treatment which helps you confirm the diagnosis.  You don't

7   always get a positive culture.

8   Q    And so, how is it that you, as a doctor, diagnose

9   herpes?  I think you were just alluding to it.  What factors

10  do you look at?

11  A    Over time, if a patient has recurrent skin lesions or

12  penis lesions of the same nature, and then it responds to

13  treatment, then it's genital herpes.

14  Q    Now, I'm going to show you Page 20 of Government

15  Exhibit 237.

16               What is this record?

17  A    It's a lab result from June 5, 2000, herpes simplex

18  culture.  The result was negative.

19  Q    And did this result come in on June 7, 2000?

20  A    Yes, it did.  It came in on June 7, 2000.

21  Q    And what, if anything, did you conclude from that

22  negative result of the herpes culture?

23  A    That it was not conclusive and that we had to follow the

24  clinical course to see if he called or reported any more

25  future bumps or penis lesions and then try treatment and see

K. McGrath - Direct/Ms. Shihata                    405

1  if it responds to treatment either intermittently or long

2  term.

3  Q    So, fair to say, you did not conclude that the defendant

4  did not have herpes based on this test?

5  A    I did not conclude that he did not have herpes, he still

6  could have herpes.

7  Q    Now, given the uncertainty of the negative culture

8  result that you just testified about, as a doctor, what, if

9  any, practice do you have regarding advising your patients

10  regarding such results if they exhibit herpes symptoms?

11  A    Well, if it's pretty possibly herpes or could be herpes,

12  I, once again, advise the patient to seek medical help when

13  the lesions occur or advise.  Inform sexual partners of

14  potential herpes, safe sex, use a condom.  Inform your sexual

15  partners so they could make a decision whether or not to have

16  sex with you or not.

17  Q    And is that something you did with the defendant?

18  A    Eventually, I came to the conclusion he had herpes

19  simplex with recurrent calls or complaints about bumps and he

20  did respond to herpes treatment when they became more common.

21  I recommend regular treatment instead of intermittent

22  treatment.

23  Q    So after this initial office visit in 2000, did you, in

24  fact, hear from the defendant again regarding the same types

25  of symptoms?

1   A    At some point, because I began prescribing valacyclovir,

2   the treatment for herpes, I do recall him making a comment

3   once when I educated him on safe sex:  "Then I should not put

4   it in raw, I should put a hood on it."

5   Q    That's what the defendant said to you?

6   A    At one point.  And I said, yes, you should use a condom.

7   Q    What did you understand him to mean, "I should not put

8   it in raw"?

9   A    That he should have protection on his penis, shouldn't

10  be just uncovered.

11  Q    And what did you understand him to be referring when he

12  used the term a hood?

13  A    A condom.

14  Q    And this was after you diagnosed the defendant with

15  herpes?

16  A    At some point over the years from June 5, 2000.

17        MS. SHIHATA:  One moment, your Honor.

18        THE COURT:  Okay.

19        (A brief pause in the proceedings was held.)

20  Q    And, Doctor, just to be clear, when you advised the

21  defendant to put on a condom that was during for purposes of

22  engaging in sexual activity, correct?

23  A    I don't know what other reason you put a condom on for.

24  I'm sorry.

25  Q    Just so we're clear.

K. McGrath - Direct/Ms. Shihata          407

1    A    I guess we're clear.

2    Q    Now, you testified that you began treating the defendant

3    in 1994 and continued to treat him for, approximately,

4    25 years; correct?

5    A    Correct.

6    Q    And I believe you also testified that, at some point,

7    you concluded the defendant had contracted genital herpes; is

8    that correct?

9    A    That's correct.

10   Q    And how did you come to that conclusion?

11   A    Over time, complaints that the patient had concerns

12   about the bumps and that, at times, the medicine would help

13   so he would call and request a prescription for what he

14   called "the blue pill."

15   Q    And what did you understand the defendant to mean when

16   he asked you for "the blue pill"?

17   A    To treat him for genital herpes.

18   Q    What, if any -- well, how did you, in your practice,

19   treat the defendant's genital herpes?

20   A    Well, initially, as I recall, intermittently until, in

21   general, the rule is if it occurs more than three times in a

22   year, you should be taking medicine every day, a pill a day,

23   to reduce shedding and reduce the risk, but not eliminate the

24   risk of spreading it to someone else.  But you can reduce the

25   risk by taking medicine every day instead of as needed.

K. McGrath - Direct/Ms. Shihata                    408

1   Q    And when you say, "As needed," what are you referring
2   to?
3   A    As needed for outbreaks.  Like, if you just have one
4   outbreak a year, or two outbreaks a year, that would be
5   appropriate.  But if it's more than three, the rule is, in
6   general, to start them on a daily pill to perhaps not have
7   any more outbreaks, reduce the viral shedding.
8   Q    And, in your time as the defendant's doctor, did there
9   come a time where the defendant had more than three outbreaks
10  in a year?
11  A    Well, I can only assume based on me insisting on taking
12  it once a day and prescribing him at a month at a time with a
13  year of refills to reduce phone calls and to encourage
14  regular treatment.
15  Q    And so, you did, in fact, prescribe the defendant with a
16  medication to treat genital herpes for a 12-month supply?
17  A    Yeah, the phone calls seemed to be frequent for the blue
18  pill, so I would encourage one a day, 30 pills, instead of a
19  five-day treatment course or ten-day treatment course.
20  Q    Now, I think you mentioned the medication Valtrex?
21  A    It's an antiviral agent valacyclovir.
22  Q    Is valacyclovir the generic name of the drug?
23  A    Yes, it is the generic name.
24  Q    Is Valtrex the brand name?
25  A    That's correct.

K. McGrath - Direct/Ms. Shihata          409

1   Q    After you first prescribed Valtrex or valacyclovir to
2   the defendant, how did he respond to the treatment?
3   A    It would make the bumps go away.
4   Q    Okay.  It would help with the outbreak?
5   A    Yes, it would.
6   Q    Did you prescribe Valtrex or its generic version to the
7   defendant multiple times?
8   A    Yes, I did.
9   Q    After you first prescribed Valtrex or its generic
10  version to him, did the defendant continue to ask you to
11  prescribe to for him?
12  A    Yes, he did.
13  Q    And how did he do so?
14  A    It was a phone call, usually, from one of his employees.
15  Most commonly, from a man named June Brown.
16  Q    And did he also sometimes call you himself?
17  A    He would call himself, yes.
18  Q    Now, you mentioned --
19            Well, I'm going to show the witness only
20  what's been marked for identification as Government Exhibit
21  3.
22            Do you recognize this person?
23  A    Yes, I do.
24  Q    Who do you recognize it to be?
25  A    June Brown.

K. McGrath - Direct/Ms. Shihata                410

1   Q    And have you met June Brown personally?

2   A    Yes.

3   Q    Is that a fair and accurate photo of him?

4   A    It's a fair and accurate photo of him.

5           MS. SHIHATA:  I move to admit Government Exhibit 3.

6           MS. BLANK BECKER:  No objection.

7           THE COURT:  That's in evidence.

8           (Government's Exhibit 3 was received in evidence as

9   of this date.)

10          MS. SHIHATA:  And may we publish it?

11          THE COURT:  Yes.

12          (The above-referred to exhibit was published to the

13  jury.)

14  Q    And who did you understand June Brown to be with respect

15  to the defendant?

16  A    An employee of Mr. Kelly.

17  Q    Now, sitting here today, do you recall the exact date

18  that you came to the conclusion that the defendant had

19  genital herpes?

20  A    No, I cannot come to the conclusion about the exact

21  date.

22  Q    Based on your review of Government Exhibit 237 prior to

23  your testimony here today, is it fair to say that Government

24  Exhibit 237 includes multiple records indicating that you had

25  reached such a conclusion in the past medical history

K. McGrath - Direct/Ms. Shihata          411

1   portions of various progress notes?

2   A    Yes, in the electronic medical records.

3   Q    And, again, you made that switch to electronic records

4   in March 2011?

5   A    Correct.

6   Q    I want to show you Page 124 of Government Exhibit 237.

7   What is the date of this record?

8   A    The date is December 9, 2011.

9   Q    And what, if anything, does this record reference

10  regarding herpes?

11  A    Herpes is in the past medical history as also along with

12  the current assessments.

13  Q    And what, if any, treatment plan is indicated here?

14  A    Continue Valtrex 500 milligram, one tablet orally once a

15  day.

16  Q    And does it also indicate that at this time -- or what,

17  if anything, does it indicate about what medications the

18  defendant was currently taking at that time?

19  A    The current medication was Valtrex 500 milligram, one

20  tablet once a day.

21  Q    And, again, the Valtrex was prescribed to treat his

22  genital herpes?

23  A    That is correct.

24  Q    And what is indicated under "History of Present

25  Illness"?

K. McGrath - Direct/Ms. Shihata                412

1    A    The reason why he was at the office.  I had asked him to

2    come in to register since the office changed to electronic

3    medical records.  At the time, I also asked him to have a

4    well adult exam, review of systems, examinations, screening

5    labs, and a flu shot and he declined.

6    Q    All right.  So EMR that's that switch?

7    A    Electronic Medical Record.

8    Q    Just for the court reporter, let's make sure we're not

9    talking at the same time, okay?

10                Now, you indicated that at a certain point you

11   changed the way you were prescribing Valtrex to the

12   defendant, correct?

13   A    Yes, that's true.

14   Q    And did you explain why you were doing so to the

15   defendant?

16   A    I don't think I explained it to him, but it was a

17   transition from less phone-ins and more electronic

18   prescriptions.

19   Q    So explain what you mean by that?

20   A    Well, before electronic records, prescriptions were

21   called in, not always recorded.  Electronic Medical Records

22   allow you to record more prescriptions unless it's at night

23   or on a weekend or something where you don't have access to

24   the system.

25   Q    Did you indicate to the defendant that you were

K. McGrath - Direct/Ms. Shihata                413

1  prescribing 11 refills at a time?

2  A    I frequently encouraged him to take it daily instead of

3  as needed.  So I frequently would prescribe 30 pills to

4  encourage one a day with a year of refills to reduce requests

5  for the pill and encourage him to stay on it long term.

6  Q    And what, if any, based on your treatment of the

7  defendant what, if any, conclusions did you reach about

8  whether he was, in fact, taking it every day, 12 months a

9  year?

10 A    My conclusion from this one visit gives me the

11 impression he was taking it once a day.

12 Q    Did you ever reach a different conclusion?

13 A    Not that I can recall.

14 Q    All right.  I'm going to show you another page, okay?

15 Before I get to that, going back to how you issued

16 prescriptions for the defendant.

17              Would you both call the pharmacy and issue

18 electronic prescriptions for him?

19 A    Yes, that would occur.

20 Q    And what was the main pharmacy that you called to issue

21 the defendant's prescriptions?

22 A    Walgreens at 641 North Clark in Chicago.

23 Q    And was there a name commonly used to refer to that

24 Walgreens?

25 A    It was referred to the Rock N Roll McDonalds Walgreens.

K. McGrath - Direct/Ms. Shihata                414

1   Q    Why was it referred to that way?

2   A    It was a rock and roll theme to the McDonalds.  And

3   there was also a Hard Rock Café across the street.  The

4   Walgreens was across the street from those two rock and roll

5   places.

6   Q    Showing the witness only what's been marked for

7   identification, it's Government Exhibit 520.

8              Do you recognize this photograph?

9   A    Yes, I do.

10  Q    And what is depicted in this photograph?

11  A    It's a McDonalds which was referred to as the

12  Rock N Roll McDonalds in Chicago.

13  Q    And that is what the Rock N Roll McDonalds in Chicago

14  looked like in the past?

15  A    That's how it looked like in the past, correct.

16             MS. SHIHATA:  I move to admit Government

17  Exhibit 520.

18             THE COURT:  Any objection?

19             MS. BLANK BECKER:  Judge, I simply ask for a date

20  if we could, please.

21             THE COURT:  Well, it's really a question is it the

22  McDonalds, did it change or something?

23             THE WITNESS:  It's since been torn down and

24  rebuilt.

25             THE COURT:  This is what it looked like when?  I

K. McGrath - Direct/Ms. Shihata          415

1   guess before it was torn down and rebuilt.

2           THE WITNESS:  Yes.

3           THE COURT:  All right.

4           MS. SHIHATA:  I move to admit it, your Honor.

5           THE COURT:  It's admitted.

6           (Government's Exhibit 520 was received in evidence

7   as of this date.)

8           MS. SHIHATA:  Thank you, your Honor.  May we

9   publish it?

10          THE COURT:  Yes.

11          (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MS. SHIHATA:

2  Q    Where was the Walgreens at 641 N. Clark in relation to

3  this Rock 'N Roll McDonald's?

4  A    To the left and behind across the street, kitty corner.

5  I believe there is another restaurant across, directly across,

6  kitty corner.

7  Q    Did that Walgreens have any special feature?

8  A    A drive-thru was available at that Walgreens.

9  Q    Among the prescriptions that you issued to the defendant

10  at that Walgreens, was Valtrex included as one of those?

11  A    Yes, that was one frequently.

12  Q    Over the years how often did you issue Valtrex

13  prescriptions to the defendant at that Walgreens?

14  A    It was so often that I had memorized the phone number at

15  that Walgreens since then.

16  Q    Do you remember it now?

17  A    (312)587-1416.

18  Q    After you made the switch to electronic records in

19  March 2011, did you also issue prescriptions electronically

20  for the defendant to that Walgreens?

21  A    Yes, I did.

22  Q    Did you also issue prescriptions to the defendant at

23  other pharmacies?

24  A    Yes, other pharmacies.

25  Q    Is there a record in the medical records that you

K. McGRATH - DIRECT - MS. SHIHATA                417

1  provided to the Government, Government's Exhibit 237, of the

2  first time you issued a prescription for Valtrex to the

3  defendant to treat his genital herpes?

4  A    I'm not sure of the exact first prescription, I think the

5  earliest --

6  Q    The question I asked is, is there a record in

7  Government's Exhibit 237 of the first time you did so?

8  A    I can't be sure if it's a yes or no.

9            MS. SHIHATA:  May I approach, your Honor?

10           THE WITNESS:  Yes, sure.

11           THE COURT:  It's okay with you, okay.  Go ahead.

12  BY MS. SHIHATA:

13  Q    Can you please take a look through Government's Exhibit

14  237?

15  A    Yes.

16  Q    And let me know when you've had a chance to do so.

17           (Witness reviewing document.)

18  A    Okay.

19  Q    Does that refresh your recollection as to whether there

20  is any record in Government's Exhibit 237 of the first time

21  you issued a Valtrex prescription for the defendant?

22  A    Yes.

23  Q    What is the answer?

24  A    The earliest date I can see is December 8, 2011.

25  Q    That's an electronic record, correct?

K. McGRATH - DIRECT - MS. SHIHATA                418

1   A    That's electronic, correct.

2   Q    As you testified previously, you called-in Valtrex

3   prescriptions for the defendant prior to switching to

4   electronic records, correct?

5   A    Right.

6   Q    So does that mean -- does that refresh your

7   recollection -- withdrawn.

8        Are those called-in prescriptions prior to the

9   switch to electronic recordings included in the medical

10  records that you provided to the Government regarding the

11  defendant?

12  A    No, they are not.

13  Q    Why is that?

14  A    In general, in the written days called-in prescriptions

15  weren't recorded all the time.

16       MS. SHIHATA:  May I approach, your Honor?

17       THE COURT:  Yes.

18  Q    I want to direct your attention to page 221 of

19  Government's Exhibit 237.  What is this document?

20  A    Telephone encounter dated August 15, 2012.

21  Q    What does it indicate?

22  A    Refill, continue Valtrex 500-milligram once a day, number

23  30 with 11 refills.

24  Q    Is that what are you referring to earlier about

25  prescribing a years' worth of Valtrex at a time?

K. McGRATH - DIRECT - MS. SHIHATA                419

1   A    To encourage regular treatment instead of episodic

2   treatment.

3   Q    That's from August 15, 2012?

4   A    Yes.

5   Q    Again, this was to treat genital herpes?

6   A    That's correct.

7   Q    I want to direct your attention to page 219 of the same

8   exhibit.  What is the date of this record?

9   A    December 26, 2012.

10  Q    So a little over four months later?

11  A    Yes.

12  Q    What is indicated in this record?

13  A    Another refill for 30 days with 11 refills.

14  Q    So another year-long prescription?

15  A    Yes.

16  Q    Just four months later?

17  A    Just four months later.

18  Q    You indicated earlier that the defendant would sometimes

19  contact you and indicate the bumps are back.  Do you recall

20  that testimony?

21  A    Yes.

22  Q    What did you understand him to be referring to when he

23  said the bumps are back?

24  A    That his genital herpes had acted up.

25  Q    So bumps on his genitals?

K. McGRATH - DIRECT - MS. SHIHATA                    420

1  A    Yes, bumps on the genitals.

2  Q    Having just looked through each page of this Exhibit 237,

3  does it also include indications of prescribing Valtrex in

4  2015?

5  A    Yes.

6  Q    2016?

7  A    Yes.

8  Q    2017?

9  A    Yes.

10 Q    2019?

11 A    Yes.

12 Q    I'm showing the witness only what is marked for

13 identification as Government's Exhibit 402.  Do you see this

14 exhibit?

15 A    Yes, I do.

16 Q    What is it?

17 A    It's a prescription for Robert Kelly dated March 19, 2007

18 for Valtrex, 500-milligram tablets, quantity 60, with three

19 refills before March 1st, 2008.

20 Q    Does it indicate who prescribed this medication to the

21 defendant?

22 A    I prescribed the medication for the defendant.

23        MS. SHIHATA:  I move to admit Government's Exhibit

24 402.

25        MS. BLANK BECKER:  No objection.

K. McGRATH - DIRECT - MS. SHIHATA                421

1    THE COURT:  That's in evidence.

2         (Government Exhibit 402, was received in evidence.)

3    MS. SHIHATA:  May we publish it?

4    THE COURT:  Yes.

5  BY MS. SHIHATA:

6  Q    You indicated this is a prescription for Valtrex

7  500-milligram tablets, correct?

8  A    That's correct.

9  Q    I think I'm going to zoom in, the three refills is before

10  3/18/08, correct?

11  A    Correct.

12  Q    And the date of the prescription is March 19, 2007,

13  correct?

14  A    Correct.

15  Q    And based on this record, is it your conclusion that you

16  were already treating the defendant for genital herpes by

17  March 19, 2007?

18  A    Yes, that's my conclusion, that I was treating him by

19  March 19, 2007 for genital herpes.

20  Q    In the course of your doctor/patient relationship with

21  the defendant, where did you conduct your examinations of the

22  defendant or where did you treat him?

23  A    Most of the time at the office, occasionally at his house

24  or studio.

25  Q    Do you have any other offices or addresses associated

1   with your medical practice?

2   A    Not with my private practice.

3   Q    Is there another part of your practice?

4   A    I practice at Northwestern Clinic at a different address

5   on Tuesdays.

6   Q    What address is associated with that clinic that you

7   practice at?

8   A    675 North Saint Clair Street in Chicago, Illinois.

9   Q    Are you familiar with the address 251 East Huron Street,

10  Chicago, Illinois?

11  A    Same building around the corner, yes.

12  Q    The same building as your clinic?

13  A    Same building as the clinic.

14  Q    You mentioned you sometimes treated the defendant at his

15  home or studio; is that right?

16  A    That's correct.

17  Q    I'm showing you what is in evidence as Government's

18  Exhibit 502A, do you recognize this?

19  A    Yes, I do.

20  Q    What is this?

21  A    The defendant's house that the defendant lived in at one

22  time.

23  Q    Is have you been to this house?

24  A    Yes, I have.

25  Q    Where is it located?

K. McGRATH - DIRECT - MS. SHIHATA          423

1   A    Olympia Fields Illinois.

2   Q    Is that a suburb of Chicago?

3   A    Yes, it is.

4   Q    What part of this residence have you been in inside?

5   A    The entry way, the living room, the den, kitchen, side

6   room, game room, the hallway and the basement.

7   Q    What, if anything, is located in the basement?

8   A    Studio.

9   Q    You mentioned that sometimes you treated the defendant at

10  his studio, was that the studio at Olympia Fields?

11  A    Yes.

12  Q    Any other studios?

13  A    There is one on, in the earlier days, Larrabee; another

14  one on Ohio Street; then one on Justine.

15  Q    Showing the witness only what is marked for

16  identification as Government's Exhibit 525(q).  Do you

17  recognize this?

18  A    Yes, I do.

19  Q    What is this a photograph of?

20  A    Entrance to the studio on Larrabee.

21  Q    That was a studio the defendant used?

22  A    Yes.

23  Q    Did you personally go to this studio?

24  A    Yes.

25  Q    Is this a fair and accurate photograph of what the studio

K. McGRATH - DIRECT - MS. SHIHATA                424

1    looked like at the time you went to it?

2    A    Yes.

3         MS. SHIHATA:  I move to admit Government's Exhibit

4    525(q).

5         MS. BLANK BECKER:  No objection.

6         THE COURT:  All right.  You can publish it.

7         (Government Exhibit 525(q), was received in

8    evidence.)

9    BY MS. SHIHATA:

10   Q    I'm going to show the witness only what is marked for

11   identification as Government's Exhibit 505(a).  Do you

12   recognize this?

13   A    Yes.

14   Q    What do you recognize this to be?

15   A    Studio on Ohio Street.

16   Q    Is that a studio you personally visited the defendant in?

17   A    Yes.

18        MS. SHIHATA:  I move to admit Government's Exhibit

19   505(a).

20        MS. BLANK BECKER:  No objection.

21        THE COURT:  It's in.  You can publish it.

22        MS. SHIHATA:  Thank you, your Honor.

23        (Government Exhibit 505(a), was received in

24   evidence.)

25   BY MS. SHIHATA:

1   Q    On the occasions when you treated the defendant outside
2   of your office, what led you to do so?
3   A    I would get a call from usually one of his employees that
4   Robert would need to be seen, occasionally from Robert
5   himself.
6   Q    And did you in fact go when you received these calls?
7   A    Majority of the times, yes.
8   Q    What time of day would you go?
9   A    Usually evening, 7:00 p.m. or later.
10  Q    During the course of your 25-year doctor/patient
11  relationship with the defendant, did he have health insurance?
12  A    Yes, he did.
13  Q    Did he pay for your medical services using health
14  insurance?
15  A    No, he did not.
16  Q    Did he pay for your medical services at all?
17  A    No, he did not.
18  Q    Over the course of your 25-year relationship with the
19  defendant, did you learn that he was a successful singer?
20  A    Yes, I did.
21  Q    In addition to your relationship with the defendant as
22  his doctor, what if any, other relationship did you have with
23  the defendant?
24  A    Social relationship.
25  Q    Can you describe that relationship to the jury?

K. McGRATH - DIRECT - MS. SHIHATA                    426

1   A    My wife and I at times would go to his house for dinner,

2   children's birthday party, or special parties at the house.

3   Q    Did you also see the defendant socially at other

4   locations?

5   A    Occasionally at a restaurant or one of his concerts.

6   Q    How about at his studios?

7   A    We'd be invited to listen to music at his studio, that's

8   correct.

9   Q    You mentioned parties you attended, where did those take

10  place?

11  A    The parties I recall were at the Olympia Fields house.

12  Q    Did you attend the defendant's 52nd birthday party?

13  A    That was attended.

14  Q    Where did that take place?

15  A    Justine studio.

16  Q    When you say the Justine studio, are you referring to the

17  street the studio was on?

18  A    Yes, the studio that is on Justine Street.

19  Q    When did that 52nd birthday party take place?

20  A    January 8, 2019.

21  Q    You and your wife attended that?

22  A    Yes.

23  Q    Showing the witness only what is marked for

24  identification as Government's Exhibit 503(a).  Do you

25  recognize what is depicted in this photo?

K. McGRATH - DIRECT - MS. SHIHATA                427

1  A    That's the building studio on Justine Street.

2  Q    Is this a fair and accurate photo of that building?

3  A    Yes, it is.

4       MS. SHIHATA:  I move to admit Government's Exhibit

5  503(a).

6       MS. BLANK BECKER:  No objection.

7       THE COURT:  It's in evidence.  You can publish it.

8       (Government Exhibit 503(a), was received in

9  evidence.)

10  BY MS. SHIHATA:

11  Q    Is this the studio where you attended the defendant's

12  52nd birthday?

13  A    Yes.

14  Q    You mentioned you also attended some the defendant's

15  concerts; is that right?

16  A    That is right.

17  Q    Approximately how many of the defendant's concerts have

18  you attended over the years?

19  A    At least ten, perhaps 12.

20  Q    So ten to 12?

21  A    Yes.

22  Q    Approximately?

23  A    Yes.

24  Q    Did you attend those concerts alone or with someone else?

25  A    With my wife.

K. McGRATH - DIRECT - MS. SHIHATA          428

1  Q    What, if any, relationship did your wife have with the
2  defendant?
3  A    I'd call it a friendship, or a mother-like friendship, or
4  a caring relationship.
5  Q    Where did most of those concerts that you and your wife
6  take place?
7  A    The majority were in the Chicago.
8  Q    Did you ever travel to attend any of the defendant's
9  concerts?
10 A    Yes.
11 Q    Where did those take place?
12 A    New York, just outside of St. Louis in St. Charles,
13 Missouri, Las Vegas, Los Angeles, Atlanta.
14 Q    Did you attend a concert in Nashville?
15 A    In Nashville, yes.
16 Q    Were the tickets to those concerts provided to you by the
17 defendant for free?
18 A    Yes.
19 Q    Who paid for your travel to those destinations?
20 A    He paid for it; and sometimes I paid for it.
21 Q    When you paid for it, what were the circumstances of
22 that?
23 A    The St. Charles concert I just paid for it on my own.
24 Two other times I went to check out at the desk and his
25 employees hasn't made arrangements, so I just paid for it.

K. McGRATH - DIRECT - MS. SHIHATA          429

1  Q    Had you been expecting it to be paid for?

2  A    I had been expecting it to be paid for, but it wasn't.

3            MS. SHIHATA:  One moment, your Honor.

4            I want to show the witness only what is marked for

5  identification as Government's Exhibit 336(a).

6            THE COURT:  I'm going to ask, after this to find a

7  convenient time to break.

8            MS. SHIHATA:  I'm about to be done, your Honor.

9            THE COURT:  Great.

10 BY MS. SHIHATA:

11 Q    Do you recognize this photo?

12 A    Yes, I do.

13 Q    What do you recognize it to be?

14 A    Picture of myself and Mr. Kelly.

15           MS. SHIHATA:  I move to admit Government's Exhibit

16 336(a).

17           MS. BLANK BECKER:  No objection.

18           THE COURT:  Okay.  That's in evidence.

19           MS. SHIHATA:  May we publish it?

20           THE COURT:  Yes.

21           (Government Exhibit 336(a), was received in

22 evidence.)

23           THE COURT:  When I say it's in evidence --

24           MS. SHIHATA:  Sorry.

25 BY MS. SHIHATA:

K. McGRATH - DIRECT - MS. SHIHATA                    430

1  Q    Is that you depicted where I'm pointing on the right
2  side?
3  A    Yes, that is me.
4  Q    And is this the defendant?
5  A    Yes.
6  Q    Looking at this photograph, can you tell where it was
7  taken?
8  A    I think a cigar bar.
9  Q    When is the last time you were at a cigar bar with the
10 defendant?
11 A    Sometime in 2019, I don't recall the exact date.
12 Q    How was it that you ended up at a cigar bar with the
13 defendant?
14 A    I got a phone call from my wife to meet at a cigar bar.
15 Q    What is your wife's name?
16 A    Jean.
17 Q    Same last name as you?
18 A    Yes, Jean McGrath.
19 Q    Fair to say this was a social event?
20 A    Yes, fair to say.
21 Q    When, if at all, did you stop being the defendant's
22 primary care physician?
23 A    In early 2019.
24 Q    After the cigar bar or before?
25 A    Whenever his apprehension occurred.

1   Q    Sometime in 2019?

2   A    Sometime in 2019.

3   Q    When was the last time you had spoken to the defendant?

4   A    To the best of my recollection, that would have been at

5   this gathering, social event.

6   Q    At the cigar bar?

7   A    Yes.

8        MS. SHIHATA:  No further questions.

9        THE COURT:  Do you have a lot or do you want to go

10  tomorrow?

11       MS. BLANK BECKER:  Half hour, Judge.

12       THE COURT:  I think we'll wait until tomorrow then.

13       MS. SHIHATA:  Can I just mention one thing at

14  sidebar?

15       (Sidebar conference held.)

16

17       (Continued on the next page.)

Sidebar                                                        432

1              (The following sidebar conference was held outside

2       the hearing of the jury.)

3              MS. SHIHATA:  I just thought I'd mention this, I

4       don't know if anything can be done, he is scheduled to be

5       flying back at 7:00 a.m. tomorrow to get back to his medical

6       practice.  I don't know if it's possible if the jury is

7       willing to stay longer.

8              THE COURT:  Can you stay longer?

9              THE COURT REPORTER:  Yes.

10             THE COURT:  You only have half hour?

11             MS. BLANK BECKER:  Can we strike the apprehension

12      part that he said.

13             THE COURT:  I guess we can.  I think they figured

14      out that he got apprehended, he's here.

15             MS. BLANK BECKER:  I agree.

16             THE COURT:  It's up to you.  If you decide you want

17      to highlight it, let me know.  Let's let it go for now.

18             (End of sidebar conference.)

19

20             (Continued on the next page.)

21

22

23

24

25

1            (In open court - jury present.)

2            THE COURT:  Ladies and gentlemen, I'm going to ask

3     your indulgence.  Apparently the witness has got to be out of

4     town.  I'm told that the cross-examination isn't very long

5     so.  So if you'll bear with me, we'll finish the witness

6     today.

7            Anybody have a problem with that?

8            All right.  Go ahead, MS. BLANK BECKER.

9            MS. BLANK BECKER:  Thank you, Judge.

10    CROSS-EXAMINATION

11    BY MS. BLANK BECKER:

12    Q    Good afternoon.

13    A    Good afternoon.

14    Q    Dr. McGrath, my name is attorney Nicole Blank Becker --

15            THE COURT:  You can take your mask off.

16    Q    My name is Nicole Blank Becker.  I'll be asking you a

17    bunch of questions about the stuff that you had just spoken

18    about.  Okay?

19    A    Okay.

20    Q    Dr. McGrath, you indicated that you had been treating

21    Mr. Kelly for about 25 years; is that fair to say?

22    A    Yes.

23    Q    You think you also indicated you started seeing him

24    somewhere around 1994; is that correct?

25    A    That's correct.

McGRATH - CROSS - MS. BLANK BECKER                434

1    Q    When the Government was just going over with you when was
2    the first time that you were able to make some type of -- the
3    first time you had impression that Mr. Kelly had potentially
4    had herpes, I believe you indicated that that must have been
5    sometime between starting December 8 of 2011, does that sound
6    right?
7    A    That sounds right; until the other prescription was shown
8    to me, which is 2007.
9
10                   (Continued on next page.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    EXAMINATION CONTINUES

2    BY MS. BLANK BECKER:

3    Q    Yes.  I apologize, right.  And then there was one in

4    2007.

5             Prior to 2007, so we're talking, and I'm not that

6    good at math, from 1994 to 2007, the medical records that were

7    turned over, they had -- there was no notes or past history or

8    anything in there that had anything to do with herpes,

9    correct?

10   A    Correct.

11            MS. SHIHATA:  Objection, misstates the evidence.

12            THE COURT:  Well, you can ask, clear it up on

13   redirect.

14            MS. SHIHATA:  Yes, Your Honor.

15   BY MS. BLANK BECKER:

16   Q    Okay, so maybe there was the word herpes, because maybe

17   you would have to test for it.

18            THE COURT:  You know, it is really much easier if

19   you just put a question to the witness.  Don't make a long

20   statement, just ask him a question.

21   BY MS. BLANK BECKER:

22   Q    So, when it comes to herpes and, obviously, that's the

23   hot topic, there's herpes and you started to talk about

24   there's different ways to diagnosis -- there's two different

25   kinds of, let's call it, strains of herpes, correct?

1  A    There's different strains of herpes, correct.

2  Q    And when you were talking earlier about trying to figure

3  out which strain someone would have, you have to actually do a

4  blood test, is that correct?

5  A    At this time.  Contemporaneously in 1994, we did not do a

6  blood test.

7  Q    And what did you do?

8  A    A culture.

9  Q    And that's what you were describing earlier, correct?

10 A    Correct.

11 Q    Thank you.

12        Now, in the medical records that we have, there's

13 actually no positive cultures, correct --

14 A    Correct.

15 Q    -- for herpes, correct?

16 A    Correct.

17 Q    And that covers the genital herpes and/or oral herpes,

18 correct?

19 A    Correct.

20 Q    And there were some discussions also about testing done

21 for other venereal diseases, correct?

22 A    Correct.

23 Q    And the -- there was a discussion -- well, gonorrhea was

24 one of the things that was tested for, correct?

25 A    Yes.

McGrath - cross - Blank Becker                    437

1   Q    And syphilis, as well?

2   A    Yes.

3   Q    Now, are those bacteria infections?

4   A    Gonorrhea is a bacteria; syphilis is not.

5   Q    And how about herpes?

6   A    Herpes is a virus.

7   Q    Not bacteria infection then, correct?

8   A    Correct.

9   Q    Do you remember what year the testing for herpes changed

10  from the cultural to the blood-taking?

11  A    No, I do not know the exact year.

12  Q    Sure, okay.

13       Was it just a couple years ago or was it a long time

14  ago?  Could you give us that?

15  A    I said I wasn't -- I'm not sure.

16  Q    No idea?

17  A    No idea.

18  Q    Okay, got it.

19       You mentioned earlier that you actually knew

20  Walgreens's phone number by heart, correct?

21  A    That is correct.

22  Q    And you have plenty of other patients that would get

23  prescriptions from there as well, is that correct?

24  A    Some patients would use that pharmacy.

25  Q    Now, the words that you used in your medical notes

McGrath - cross - Blank Becker                    438

1  regarding herpes was that it was your impression, is that fair

2  to say?

3  A    Assessment, that would be more -- that would be more fair

4  to say.

5  Q    Okay.  So, in one of the records that the Government had

6  shown you, it actually says it's your impression.

7           That doesn't ring a bell?

8  A    No, but the letter "A" in my notes is for assessment.

9  I'll go along with the word impression also.

10          MS. SHIHATA:  Objection.

11          THE COURT:  Overruled.

12          I mean to you does it mean the same thing?

13          THE WITNESS:  I would need more time to think,

14  they're pretty close.

15          THE COURT:  All right.

16          THE WITNESS:  I'll go along with either one.

17          THE COURT:  All right.

18          MS. BLANK BECKER:  Thank you.

19  BY MS. BLANK BECKER:

20  Q    Now, there's a difference between an impression and a

21  final diagnosis, is that correct?

22  A    They sometimes can be the same.

23  Q    Sure, they could end up being the same, correct?

24  A    Hopefully, they'd be close to the same at the initial.

25  Q    So, how do you get from your impression to the final

McGrath - cross - Blank Becker                    439

1  diagnosis typically?

2  A    A combination of the history, the exam and the response

3  to therapy.

4  Q    Specifically, when we're talking about something like

5  herpes, how -- and I understand you've indicated that there's

6  some things you could visually see, but with regards to

7  testing, how do you get from the impression to the final

8  diagnosis?

9  A    A combination of all those things I just mentioned:  The

10  history, the exam and the laboratory supportive data,

11  sometimes imaging and response to therapy.

12  Q    Is it fair to say, Dr. McGrath, that from your experience

13  in treating Mr. Kelly, sitting here in court today you cannot

14  say that 100 percent he has herpes?

15  A    I feel that 100 percent he has herpes.

16  Q    Okay.

17        Are you saying you feel as in, you know, I feel like

18  it's freezing in here --

19        MS. SHIHATA:  Objection.

20  BY MS. BLANK BECKER:

21  Q    -- but someone else might not feel that way?

22  A    Is that a question?

23        MS. BLANK BECKER:  We have to wait for the judge.

24        THE COURT:  Oh, you were asking me.

25        MS. SHIHATA:  There's an objection.

McGrath - cross - Blank Becker                    440

1           THE COURT:  Oh, I didn't hear it.  You guys have to
2  use the microphone.
3           MS. SHIHATA:  I apologize.
4           THE COURT:  The objection is sustained as to form.
5  BY MS. BLANK BECKER:
6  Q    When someone is diagnosed in your experience, let's say,
7  with, God forbid, AIDS, usually there's testing done; correct,
8  in order to determine if they have AIDS?
9  A    Regarding AIDS, yes.
10  Q    Okay.  And the testing is done to confirm whether or not
11  medically they have it, correct?
12  A    With AIDS --
13  Q    Yes.
14  A    -- it helps support the diagnosis, it helps confirm the
15  diagnosis of AIDS.
16  Q    Confirm the diagnosis, yes.
17           All right, so if you got -- excuse me, if a patient
18  had a test come back and the results were negative, you could
19  say you know a hundred percent this person does not have AIDS;
20  correct?
21  A    I'm not sure about the false negatives with AIDS, so I
22  can't answer that on the base of my knowledge.  I can't answer
23  that question regarding AIDS on the base of my knowledge.
24  Q    So, there's always the possibility of false negatives, is
25  that what you're saying?

McGrath - cross - Blank Becker                441

1        THE COURT:  I think he said he doesn't know.

2    A    You could repeat the question for me and I could

3    re-answer it.

4    Q    Sure.

5            My understanding was that you're saying even though

6    a test can come back negative for AIDS, there's still this

7    possibility of a false negative, so you wouldn't say a hundred

8    percent that someone had AIDS?

9    A    Well, there's other tests for AIDS.  There's viral

10   counts.  And it's not that simple, so I can't answer that.  I

11   don't have the knowledge of AIDS.

12   Q    Dr. McGrath, I understand that you earlier said that you

13   think that that's what he has.

14           MS. SHIHATA:  Objection.

15   BY MS. BLANK BECKER:

16   Q    Is that a common --

17           THE COURT:  Well, sustained as to form, but you can

18   rephrase the question.

19           MS. BLANK BECKER:  Thank you, Judge.

20   Q    That you believe a hundred percent that he has or --

21   yeah, has herpes, correct?

22   A    I believe that 100 percent based on his concern, the one

23   exam I had, the recurrence of the description of the lesions,

24   and the response to therapy.

25   Q    Okay, Doctor.

McGrath - cross - Blank Becker                    442

1        You never told him to come in and come see you,

2   perhaps, during an outbreak or the shedding that you talked

3   about earlier, so that he could get tested and you could

4   officially, say, stamp those medical records and say, yes, he

5   actually has this?

6   A    I don't recall if I ever asked him to come in during an

7   outbreak.

8   Q    Nor did he ever come to see you when he was claiming he

9   had an outbreak, correct?

10  A    I feel he didn't need to, if he responded so quickly to

11  the treatment.

12  Q    Well, the treatment, I think what you're referring to is

13  Valtrex, right?

14  A    The treatment is Valtrex.

15  Q    Yes.

16       Well, Valtrex can be used to treat other things,

17  besides herpes?

18  A    Such as?

19  Q    You don't get to ask me the questions.

20  A    I know, but --

21       THE COURT:  Well --

22       THE WITNESS:  Sorry.

23       THE COURT:  That's okay.

24       Can it be used to treat things other than herpes?

25  Have you prescribed it for other things other than herpes?

McGrath - cross - Blank Becker                    443

1              THE WITNESS:  I prescribed it for herpes simplex,

2      cold sores; herpes genitally, genital herpes, and herpes

3      zoster.  Herpes, herpes, herpes.

4      Q    Okay, herpes, herpes, herpes, but, Doctor, there's --

5      there's different types.

6              We just discussed that, right, there's different

7      kinds of strands of herpes, correct?

8      A    Different serotypes.  Herpes, herpes, herpes, 1, 2, I

9      think there's up to 6 or 7 or 8.

10     Q    Okay, and I'm not a medical doctor, but, Dr. McGrath, are

11     you saying that someone who has herpes, Person A, and then

12     we've got Person B over here who has herpes, they

13     automatically have the same kind of herpes?

14     A    Is that a question or --

15     Q    That is a question.  I can ask it again, if you like.

16     A    Yes, ask me again, please.

17

18              (Continued on the following page.)

19

20

21

22

23

24

25

K. McGrath - Cross/Ms. Blank Becker                444

1   EXAMINATION BY

2   MS. BLANK BECKER:

3   (Continuing.)

4   Q    This is a question I can ask to again if you like?

5   A    Ask me again please.

6   Q    Person A has herpes, person B has herpes.  Are you

7   telling this jury that that means they have the same herpes,

8   the same type herpes, 1, 2?

9           MS. SHIHATA:  Objection.

10          THE COURT:  Well, overruled.  Can you answer the

11  question?

12          THE WITNESS:  They may have the same kind of

13  herpes, they may not.

14  Q    Right.  50/50, right?

15          THE COURT:  Well, I'll sustain the objection to

16  that.

17          Put another question to the witness.

18  Q    You're saying, yes, they might have the same type and

19  they might not, is that fair to say, is that what you just

20  said?

21  A    That's correct.

22          THE COURT:  Who are we talking about?  Three

23  different patients?

24          Is that what you understand the question to be?

25          THE WITNESS:  I'm confused with the question.

K. McGrath - Cross/Ms. Blank Becker            445

1          THE COURT:  Let's just clarify what the testimony
2   is.
3          Is your question that -- why don't you rephrase a
4   question so the doctor can answer it.
5          MS. BLANK BECKER:  Sure.
6   Q    There is genital herpes, right?
7   A    Yes.
8   Q    And how would you say it is a subcategory, it's a type
9   of herpes -- what is the proper?
10  A    It's when the herpes virus is present on the genitals.
11  It doesn't matter which of the herpes serotypes it is.  It
12  would be genital herpes no matter which one it was.
13  Q    Got it.  There's other kinds of herpes, right, than just
14  genital?
15  A    Right.
16  Q    So there's oral, right?
17  A    Usually on the lips, not the mouth.
18  Q    I apologize, I should have said on the lips.  And those
19  are two different strains; is that correct?
20  A    They may or may not be.  It can be the same strain.
21  Q    Okay.  They could be the same strain or they cannot be.
22  Is that what you said, right?
23  A    Yes.
24  Q    Additionally, would -- when a patient comes in, and
25  ultimately, you determine that you believe they have herpes,

K. McGrath - Cross/Ms. Blank Becker          446

1  you do your testing, are you able to tell -- you can't

2  actually tell them who gave it to them, is that fair to say?

3  A    That's fair to say, yes.

4  Q    Herpes could lie dormant, I think you even indicated

5  that earlier, for a long period of time; is that correct?

6  A    Yes.

7  Q    And then someone might not have an outbreak and we're

8  talking it could be years; is that fair to say?

9  A    Yes.

10 Q    All right.  And so, if someone came into your office,

11 they ultimately they had herpes and they told you that they

12 were intimate with one person, that would help you try to

13 figure out the who is, right?

14          MS. SHIHATA:  Objection.

15          THE COURT:  Well, is it part of your job as a

16 doctor to figure out who transmitted the herpes to your

17 patient?

18          THE WITNESS:  No, it is not.  Part of my job is to

19 instruct the patient to call their sexual contacts and inform

20 them of the diagnosis.  It's not my job to call the patients

21 who he had sex with and transfer he or she or whoever went to

22 from who to who.

23 Q    So you don't ask him questions and try to ascertain if

24 he's having slept with multiple people that you want to make

25 sure he protect?

K. McGrath - Cross/Ms. Blank Becker                447

1   A    What's the question?

2   Q    In discussing with your patients, and obviously,

3   specifically, Mr. Kelly, you never discussed with him about

4   who is this other person, maybe I should give them medication

5   as well?

6           MS. SHIHATA:  Objection.

7           THE COURT:  Overruled.  Did you ever have that

8   conversation with Mr. Kelly?

9           THE WITNESS:  I had the conversation to inform his

10  partners.

11          THE COURT:  You told him to inform his partners?

12          THE WITNESS:  That was in the medical record.

13  "Inform partners."

14  Q    Got it.  So the answer to my question is no?

15  A    Repeat the question.

16  Q    I'm going to move on because I can't even remember that

17  one at this point.

18              Dr. McGrath, when it comes to genital herpes,

19  that is or is not a bacterial disease?

20  A    It's not a bacterial disease.  It's a viral disease.

21  Q    I'm sorry, I didn't hear you?

22  A    It's a viral disease.

23  Q    You indicated that you also had a friendship with

24  Mr. Kelly is that fair to say?

25  A    Yes.

K. McGrath - Cross/Ms. Blank Becker                    448

1  Q    Socially as well?

2  A    Yes.

3  Q    Correct.  All right.  And, in fact, you'd been to a

4  number of his different studios to treat him; is that fair to

5  say, or to see him if he's not feeling well?

6  A    Yes.

7  Q    Okay.  And how often would you say, often that you've

8  been to these studios, or just once or twice?

9  A    In 25 years, not often.

10  Q    Okay.  And I think you said so you've been to three

11  different locations; is that right, studios?

12  A    I'll have to read that.  I'd have to re-add the studios.

13  Larabee, The House Studio, Ohio Street and Justine.  That

14  adds up to four.

15  Q    I apologize.  You've been to four.  Thank you.

16         And when you've gone to those studios, there's

17  been, there have been other people there?

18  A    Yes.

19  Q    Men, women, one or other both?

20  A    Yes, as I recall.

21  Q    Ever see any underage girls there?

22  A    Not that I recall.  I didn't check their ages.

23  Q    You didn't ask them for their license?

24  A    No.

25  Q    Not your job when you go there, huh?  All right.  I

K. McGrath - Cross/Ms. Blank Becker          449

1  apologize.

2          Doctor, did you notice -- were there bedrooms

3  at any of these studios that you would go to that you

4  noticed?

5  A    I don't recall seeing any bedrooms.

6  Q    And was there any activities -- there were -- when you

7  were there, I believe the testimony was that sometimes you'd

8  go later at night, is that fair to say?

9  A    Yes.

10 Q    And sometimes, you'd have to kind of wait there for a

11 while, is that fair to say?

12 A    Yes.

13 Q    And when you were waiting, Mr. Kelly was working on his

14 music, is that fair to say?

15 A    I don't know what he was always doing while I was

16 waiting.

17 Q    Not always.  So you never went into the studio and

18 listened to him while you were waiting to get, you know, to

19 get a chance to speak with him?

20 A    I would wait and wait until he wanted to see me.  And

21 then sometimes it was just to listen to some music that he

22 was proud of or wanted me to hear it.

23 Q    Okay.  Thank you.  Timing wise, are we talking

24 10:00 o'clock at night sometimes you'd go there?

25 A    I would unlikely get there at 10:00.  I may be there

K. McGrath - Cross/Ms. Blank Becker          450

1  until 10:00.  If it was much longer, I would leave because I

2  go to bed at 9:00 p.m. usually.

3  Q    Okay.  When you would be there in the evening hours,

4  were you aware of any --

5             MS. BLANK BECKER:  Strike that.

6  Q    There are people that were working there with Mr. Kelly

7  at the same time when you were there, is that fair to say?

8  A    Yes.

9  Q    Okay.  He wasn't usually just there by himself, true?

10 A    Yes.

11 Q    Okay.  He had engineers and so forth that were there,

12 correct?

13 A    Yes.

14 Q    And you've met some of them; is that correct?

15 A    Yes.

16 Q    All right.  And when you had the chance to finally speak

17 with Mr. Kelly, it wasn't like -- he continued to work after

18 you left, is that fair to say?

19            MS. SHIHATA:  Objection.

20            THE COURT:  Sustained.

21 Q    When you would go, oftentimes I think you said there's

22 different times where you'd go to his house, is that true?

23 A    Yes.

24 Q    And, in fact, you'd go, I believe you indicated

25 sometimes for parties, is that true?

K. McGrath - Cross/Ms. Blank Becker          451

1    A    Yes.

2    Q    You also went for -- there was the time where

3    Mr. Kelly's daughter's dog passed away and he had a funeral

4    for the dog.  Do you remember being there for that?

5    A    I remember being there for a dog funeral.

6    Q    And there was a lot of people there for that; is that

7    correct?

8    A    How do you define a lot?

9    Q    Okay.  The house that he lived in there, was it -- how

10   many square feet, and just a guesstimate, would you say it

11   is?

12   A    I would not know how many square feet in the house.

13   Q    Okay.

14   A    I'm not familiar with square feet in homes at all.  I

15   couldn't tell you the square feet here.

16   Q    Well, if we pretend that this is a house, the courtroom

17   that we're in right now, would you say that Mr. Kelly's home

18   was about this size?

19            MS. SHIHATA:  Objection, your Honor.

20            THE COURT:  I don't understand the relevance.

21   Let's move on to something else.

22   Q    When you would go to parties at Mr. Kelly's house, there

23   was music playing, I assume, right?

24   A    There was often music playing.

25   Q    Okay.  DJ a lot of times as well?

K. McGrath - Cross/Ms. Blank Becker          452

1   A    Occasionally, yes, DJ.

2   Q    Loud music?

3   A    I don't know the volume or the decibels.  I'm sorry, I

4   can't be sure of that.

5              (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K. McGRATH - CROSS - MS. BLANK BECKER                453

1  BY MS. BLANK BECKER:

2  Q    Okay.  So you never had to leave because you were like,

3  this music is too loud, I got to get out of here?

4          MS. SHIHATA:  Objection.

5          THE COURT:  Sustained.

6  BY MS. BLANK BECKER:

7  Q    When you went to his house for whatever reason it was,

8  either for work medically, or social gatherings, do you

9  remember ever seeing any under-age girls?

10         MS. SHIHATA:  Objection.

11         THE COURT:  I feel like we went over this already.

12         Do you remember seeing anybody?

13         THE WITNESS:  No, I don't remember seeing what I

14 would consider under-age girls.

15 BY MS. BLANK BECKER:

16 Q    This is at the house, correct?

17 A    At the house.

18 Q    Yes, thank you.

19         When you would go, whether at the house or to the

20 studio, did you go and like in your doctor's coat that often

21 times we see or we envision a doctor wearing when they treat

22 their patients?

23 A    No.

24 Q    No.  You never would go to his home and treat other

25 people at his house, correct?

1   A    No.

2   Q    Okay.  And you certainly wouldn't do, you wouldn't have

3   one of his guests sitting there and you wouldn't be doing a

4   gynecological exam at his home of one of his female guests; is

5   that correct?

6   A    That's correct.

7   Q    That sounds preposterous, correct?

8           MS. SHIHATA:  Objection.

9           THE COURT:  Sustained.

10  Q    You indicated earlier that the who part is not your job,

11  right; who else he was having sex with, correct?

12  A    Clarify the question for me.

13  Q    I'm sorry?

14  A    What is the specific question for me?

15  Q    You said earlier that the who -- we can't determine the

16  who based on whatever information you have with Mr. Kelly, you

17  have no idea who gave that to him, correct?

18  A    Correct.

19  Q    You spoke -- this isn't the first time you had to testify

20  about this; is that correct?

21  A    How do you define testify?

22  Q    Well, you --

23          THE COURT:  If you want to ask about a statement he

24  made at a prior time, you can do that.

25          MS. BLANK BECKER:  Thank you.

K. McGRATH - CROSS - MS. BLANK BECKER            455

1    Q    You had to take an oath before, correct, and you were

2    asked questions, there was a stenographer taking it all down

3    and you had to answer the questions?

4    A    Yes.

5            MS. SHIHATA:  Objection as to form.

6            THE COURT:  Did you testify at another proceeding?

7            THE WITNESS:  Yes.

8            THE COURT:  Next question.

9    Q    That proceeding occurred on April 17 -- I'm making sure I

10   got the right date.

11           THE COURT:  April of 2020?

12           MS. BLANK BECKER:  2019.

13           THE COURT:  2019, all right.

14   Q    Do you remember when you were asked some questions that

15   you specifically -- and I'll get that.

16           THE COURT:  Let's do the form correctly:  Were you

17   asked the following question and did you give the following

18   answer.

19           MS. BLANK BECKER:  Thank you, Judge.

20   Q    Were you asked several questions similar to what you're

21   being asked about today?

22   A    Yes.

23   Q    And that was a result of you being at work one day and

24   Secret Agents --

25           MS. SHIHATA:  Objection.

K. McGRATH - CROSS - MS. BLANK BECKER                456

1           THE COURT:  Sustained.

2    Q    Special Agents --

3           THE COURT:  Sustained.

4           If you want to direct him to a question and answer,

5    you may do so.

6           MS. BLANK BECKER:  Thank you.

7    Q    You ended up turning over all the medical records that

8    you had to the Government, correct?

9    A    Yes.

10   Q    In fact, to the United States Government you gave them --

11   obviously we can't count -- but whatever you had, correct?

12   A    Yes.

13   Q    And that was a result of a Special Agent coming to --

14          THE COURT:  Can I see counsel at the side?

15          (Sidebar conference held.)

16

17          (Continued on the next page.)

18

19

20

21

22

23

24

25

Sidebar                                            457

1              (The following sidebar conference was held outside

2      the hearing of the jury.)

3              THE COURT:  They were subpoenaed.

4              MS. SHIHATA:  He was served with a subpoena.

5              THE COURT:  He testified to that on direct.

6              MS. BLANK BECKER:  I heard you say that when you

7      read the report it says that --

8              MS. SHIHATA:  They came there and served him with a

9      subpoena, and he thereafter complied with it.

10             MS. BLANK BECKER:  Yes.

11             THE COURT:  There is nothing nefarious about that.

12     It's a properly served subpoena.

13             MS. BLANK BECKER:  I'm not saying --

14             THE COURT:  It's been a long day.  He had to answer

15     the subpoena.  You can't suggest to the jury that it was

16     improper.  It's not a jury question.

17             I don't understand the point.

18             MS. BLANK BECKER:  Judge, the point is my

19     information that I have is that he was -- again, this is just

20     information I'm told -- that he was forced to turnover -- he

21     wanted to -- he wanted to get Mr. Kelly's signature first.

22             THE COURT:  But the thing is, you can't litigate the

23     proprietary of the subpoena in front of the jury.

24             MS. BLANK BECKER:  I wasn't going to say it's a bad

25     subpoena.

Sidebar                                                              458

1          THE COURT:  Let me finish.  It could be that the

2     subpoena wasn't properly served, but there is another form to

3     do that; and it isn't here.  I don't want to have any more

4     questioning about that.

5          Is there something else you want to say?

6          MS. SHIHATA:  Just that it was properly served.  He

7     complied with it.  Under the law, a patient signature is not

8     required for Grand Jury subpoena.

9          MS. BLANK BECKER:  I agree with you.

10         THE COURT:  I don't think there is any point.  Just

11    because somebody feels that way.  Move on to something else.

12

13         (End of sidebar conference.)

14         (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

K. McGRATH - CROSS - MS. BLANK BECKER          459

1          (In open court - jury present.)

2          THE COURT:  Next question, please.

3          MS. BLANK BECKER:  Thank you, Judge.

4   BY MS. BLANK BECKER:

5   Q    Dr. McGrath, is it fair to say -- did you ever have a

6   goatee?

7   A    No.

8   Q    Dr. McGrath, did you ever have a beard?

9   A    No.

10  Q    Dr. McGrath, you indicated that there were times that you

11  went to concerts and Mr. Kelly paid for the airfare; is that

12  correct?

13  A    That's correct.

14  Q    And he would also leave tickets for the show so you could

15  go there at Will Call, correct?

16  A    Yes.

17  Q    And he would pay for those too obviously, right?

18  A    Yes.

19  Q    So that was common; is that correct?

20  A    Not that common; no, that's not correct.

21  Q    Okay.  So you had to pay for your own tickets to go to

22  the concerts?

23  A    I thought you meant common like frequently.

24  Q    No, sorry.  You would come -- you would go, other than I

25  believe you indicated a few times you had to pay for your own

K. McGRATH - CROSS - MS. BLANK BECKER          460

1  airline ticket?

2  A    Room, yes.  Not airline, ticket hotel room.

3  Q    Okay, so the airline ticket was --

4  A    I paid for that once or twice, yes.

5  Q    Okay.  The times when you didn't pay for that, you dealt

6  with an assistant of Mr. Kelly's who set it up for you; is

7  that correct?

8  A    Yes.

9              (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  EXAMINATION CONTINUING

2  BY MS. BLANK BECKER:

3  Q    And the assistant would ask you questions about what day

4  works for you, hours, and, ultimately, you guys would figure

5  out your schedule, is that fair to say?

6  A    Yes.

7  Q    And if there was an issue with you not being able to get

8  the tickets at Will Call or so forth, you had a number or

9  someone you could call, is it that same person to try to

10  figure out?

11  A    There was never an issue at Will Call, so --

12  Q    Okay.

13  A    -- I didn't have to call anybody.

14  Q    Okay.

15         Did you have a number of anybody you could call if

16  you needed to?

17  A    I'm sure I had a phone number at the time.  I don't

18  remember who or what number.

19  Q    Okay, how about Diana Copeland, do you know her name?

20  A    I've heard that name, yes.

21  Q    You've seen her at your doctor's office, correct?

22  A    Not as a patient.

23  Q    No, not as a patient.  My question was you've seen her,

24  correct?

25  A    I've seen her.

McGrath - redirect - Shihata                    462

1   Q    And you're aware that she was an assistant of Mr. Kelly,
2   correct?
3   A    I'm aware of that.
4             MS. BLANK BECKER:  Judge, may I just have a moment?
5             THE COURT:  Sure.
6             MS. BLANK BECKER:  Thank you.
7             (Pause.)
8             MS. BLANK BECKER:  Thank you, Judge.
9             Thank you, Dr. McGrath, I don't have any further
10  questions.
11            THE COURT:  Any redirect?
12            MS. SHIHATA:  Very briefly, Your Honor, I promise.
13            THE COURT:  When I shake my head and go like this
14  (indicating.)
15  REDIRECT EXAMINATION
16  BY MS. SHIHATA:
17  Q    Dr. McGrath, did you diagnose the defendant with genital
18  herpes?
19  A    Yes.
20  Q    Is there any doubt in your mind that the defendant had
21  genital herpes?
22  A    No.
23  Q    After you diagnosed the defendant with genital herpes,
24  did you prescribe him Valtrex?
25  A    Yes.

1    Q    Was that to treat genital herpes?

2    A    Yes.

3    Q    Did you prescribe him Valtrex to treat anything else?

4    A    No.

5    Q    After you diagnosed the defendant with herpes, did you

6    inform him that he had herpes?

7    A    Yes.

8    Q    And did you advise him to let his sexual partners know of

9    his diagnosis and to practice safer sex?

10   A    Yes.

11   Q    Is there any doubt in your mind about that?

12   A    No.

13                MS. SHIHATA:  No further questions.

14                THE COURT:  Any recross?

15                MS. BLANK BECKER:  No, Judge, thank you.

16                THE COURT:  Thank you so much, Doctor.  You can step

17   down.

18                (Witness excused.)

19                THE COURT:  Thank you, ladies and gentlemen, for

20   staying late.

21                I am just going to give you the usual instructions.

22   Please don't look anything up about the case.  Don't read any

23   news reports.  Don't do any research on your own.  Report to

24   me any effort by anyone to influence you improperly or to

25   influence another juror improperly.

1   **ANTHONY NAVARRO**,

2          called as a witness by the Government, having been duly

3          sworn/affirmed by the Courtroom Deputy, was examined and

4          testified as follows:

5   DIRECT EXAMINATION

6   BY MS. GEDDES:

7   Q     Good morning.

8   A     Hi.

9   Q     Did you receive a subpoena to testify here today?

10  A     I did.

11  Q     Do you want to be here?

12  A     In New York, yes; but not here.

13  Q     How old are you?

14  A     Thirty-six.

15  Q     Are you currently employed?

16  A     I am.

17  Q     What do you do?

18  A     I own two businesses.  I have a music production studio

19  called Motus Flow, and a smoothie shop called --

20          THE COURT:  Keep your voice up.

21          THE WITNESS:  Okay.

22  A     -- Proper Nutrition.

23          THE COURT:  Much better.

24  Q     How far did you go in school?

25  A     Five years' worth.

Navarro - direct - Geddes                    476

1  Q    Where did you go to school?

2  A    Pensacola State College in Florida, and Full Sail

3  University.

4  Q    What is Full Sail University or what did you do at Full

5  Sail University?

6  A    I studied audio engineering and recording arts.

7  Q    How long were you there?

8  A    It was for an Associate's program, so about two years.

9  Q    When did you -- did you graduate from Full Sail?

10 A    Yes.

11 Q    When did you graduate?

12 A    2006.

13 Q    Where is Full Sail University located?

14 A    It's in Winter Park, Florida, which is right outside of

15 Orlando.

16 Q    Where, if anywhere, did you move after you finished at

17 Full Sail?

18 A    So, right after I graduated, I moved to the Los Angeles

19 area in California.

20 Q    And when you graduated, did you get a job in or near the

21 field of audio engineering?

22 A    Yes, I did.

23 Q    Where did you get a job?

24 A    It was R. Kelly's recording studio called The Chocolate

25 Factory.

1  Q    In what city was The Chocolate Factory?

2  A    Olympia Fields, which is like a suburb of Chicago.

3  Q    When did you begin?

4  A    I started in the summer of 2007, like July-ish.

5  Q    Do you see the individual you knew as R. Kelly in the

6  courtroom today?

7  A    Yes.

8  Q    Can you please point to him and describe an article of

9  his clothing?

10 A    Gray suit, brown shirt.

11        THE COURT:  Indicating the defendant.

12        MS. GEDDES:  Thank you.

13 BY MS. GEDDES:

14 Q    How long did you work for the defendant?

15 A    It was about two-and-a-half years.

16 Q    When you stopped working for the defendant, where was he,

17 what was he doing?

18 A    He was on tour.

19 Q    Did you go on tour, on that particular tour with the

20 defendant?

21 A    No, I did not.

22 Q    Do you recall to whom you gave your notice that you were

23 stopping working for the defendant?

24 A    Yes.

25 Q    Who did you give your notice to?

Navarro - direct - Geddes                478

1  A    His manager, Tom Arnold.

2         MS. GEDDES:  I'm showing the witness what's been

3  marked for identification as Government Exhibit 31.  This is

4  for the witness only, please.

5  Q    Do you recognize the individuals shown in Government

6  Exhibit 31?

7  A    Yes.

8  Q    Who is that?

9  A    That's Tom Arnold.

10 Q    Is that a fair and accurate photo of Tom Arnold?

11 A    It is.

12        MS. GEDDES:  The Government offers Government

13 Exhibit 31.

14        MS. BLANK BECKER:  No objection, Judge.

15        THE COURT:  That's in, and you can publish it.

16        MS. GEDDES:  Thank you.

17        (Government's Exhibit 31 was received in evidence.)

18        (Exhibit published.)

19 BY MS. GEDDES:

20 Q    You testified that you gave notice to Tom Arnold.

21        Do you recall where it was that you gave notice to

22 him?

23 A    Yeah, it was at one of the shows, and I believe it was --

24 we were -- it was in Chicago.

25 Q    And when you say "one of the shows," whose shows are you

Navarro - direct - Geddes                    479

1  referring to?

2  A    Rob's.

3  Q    Do you remember approximately what year that was?

4  A    It was 2009.

5  Q    And as you sit here today do you know the show that it

6  was in connection with?

7  A    I believe it was the Ladies Make Some Noise tour.

8  Q    And where, again, did you say the show was where you gave

9  notice to Tom Arnold, in what city?

10 A    It was in Chicago.

11 Q    During the time that you worked for the defendant, where

12 did you work?

13 A    It was at the recording studio, which was in his house.

14 Q    In the defendant's house?

15 A    Yes.

16       MS. GEDDES:  I am showing what's in evidence as

17 Government Exhibit 502(a).

18       (Exhibit published.)

19 Q    Do you recognize 502(a)?

20 A    Yes.

21 Q    What is that?

22 A    That's the security gate to the -- to the property, to

23 the house.

24 Q    Where the defendant lived and where you worked?

25 A    Yes.

Navarro - direct - Geddes                    480

1            MS. GEDDES:  And I am showing the witness only

2    what's been marked for identification as Government

3    Exhibit 502(c).

4    BY MS. GEDDES:

5    Q    Do you recognize what's shown in 502(c)?

6    A    Yes.

7    Q    What is that?

8    A    That is -- that's Rob's house.

9    Q    And can you tell from what vantage point that photograph

10   was taken?

11   A    Yeah, so that's the front, as soon as you get into the --

12   past the security gates, that's facing the front of the house.

13   Q    And is that a fair and accurate photograph of the

14   location where the defendant lived and where you worked?

15   A    Yep, there's -- it looks like there's more trees than I

16   remember, but that's it.

17            MS. GEDDES:  The Government offers 502(c).

18            THE COURT:  Any objection?

19            MS. BLANK BECKER:  No, objection, Judge.

20            THE COURT:  All right, that's in and you can publish

21   it.

22            (Government's Exhibit 502(c) was received in

23   evidence.)

24            (Exhibit published.)

25   BY MS. GEDDES:

Navarro - direct - Geddes                    481

1  Q    Now, you testified that you worked at of the defendant's

2  home.

3              Where specifically did you work?

4  A    In the -- in the recording studio that was inside the

5  house.

6  Q    And was there a name for the recording studio where you

7  worked?

8  A    Yeah, it was called The Chocolate Factory.

9  Q    Now, when you pull up to the defendant's residence where

10 you were working, what do you see, what's the first thing that

11 you see?

12 A    Like, are you saying when you're driving into the -- it's

13 the security gate.

14 Q    And once you go through the gate, can you describe the

15 structures that are on that property?

16 A    Yes.

17              (Pause.)

18 A    Oh, are you asking me to describe?

19 Q    Oh, yes.

20 A    So, as soon as you -- as soon as you go in --

21              THE COURT:  I think we lost our mic.

22              THE WITNESS:  The battery's dead.

23              (Pause.)

24 A    Okay, so, structures.  As soon as you go in there's, you

25 know, you can see the house and then there's a few different

Navarro - direct - Geddes                    482

1    structures.  There's a -- there's -- to the right there's a

2    basketball court, tennis court type of thing.  There's a log

3    cabin, like a miniature log cabin in the yard.

4    Q    Where is the log cabin?

5    A    It's in the front -- front yard of the house.  There's a

6    garage.  There's a few tents.

7    Q    You mentioned a garage.

8             What type of garage was it, was it an attached

9    garage or a detached garage?

10   A    It was detached from the house.

11   Q    And you also mentioned some tents.

12            Where were the tents situated?

13   A    So, they're -- the tents were, like, next to the garage.

14   It was like tents to park cars.  And then there's also a --

15   like a gazebo tent for just -- that was on the side of the

16   house, which they had, like, a patio out there.

17   Q    You testified that there was The Chocolate Factory at

18   that location, correct?

19   A    Yeah.

20   Q    Where was The Chocolate Factory located?

21   A    The Chocolate Factory was in the basement of Rob's house.

22   Q    And how would someone access The Chocolate Factory, the

23   studio?

24   A    To get into the studio, you had to -- there was a side

25   entrance towards the back of the house, and you had to go down

Navarro - direct - Geddes                    483

1   these stairs to access it.

2   Q   Fair to say you spent some time in that studio as part of

3   your employment with the defendant?

4   A   Yes.

5   Q   Can you describe what is inside the studio, the layout of

6   the studio?

7   A   Yeah.  So, as soon as you walk in there's a front desk

8   reception area with a computer, a couch, sitting area, and

9   then it's -- you walk in, there's a long hallway, a bunch of

10  platinum plaques on the wall; and to the right -- at the end

11  of the hallway there's a recording studio, a storage room.

12  And then you go past that, there's another door, there's a

13  stairwell to the -- to get to the main part of the house.  And

14  then you go down another hallway, there's another recording

15  studio, with a machine room that has, like, equipment.

16          And then when you go past that, there's like another

17  hallway with a movie theater, more storage rooms, a bathroom.

18  Q   Now, you just mentioned, I think, that there was a

19  stairway to get to the other part of the house.

20          Is that another way to get into the studio?

21  A   Yes.

22  Q   So, you could get to the studio, in addition to the side

23  entrance which you previously testified, you could also get

24  there from inside of the defendant's residence?

25  A   Yes.

Navarro - direct - Geddes                    484

1  Q    You mentioned two different recording studios in that

2  basement area.

3         Were there any names for those recording studios?

4  A    Yeah, the first -- Music 1 was -- Music 1 or Studio 1 was

5  the name of one of the studios, and then The Cabin was the

6  name of another one.

7  Q    Any reason why that other recording studio was called The

8  Cabin?

9  A    Like, the decor of the studio was designed to look like

10 the inside of a log cabin.  So, there was like logs on the

11 wall.

12 Q    Was there a kitchen area in that basement part of the

13 studio or in the basement part where The Chocolate Factory was

14 located?

15 A    Yes.

16 Q    Where was that?

17 A    The kitchenette was in the -- as soon as -- if you're

18 coming in from the side entrance of the house, there's the

19 reception at the front desk, and then the kitchen was right

20 there.

21 Q    Now, as part of your employment with the defendant, did

22 you have an opportunity to also spend time inside the main

23 house, so apart from the basement area where The Chocolate

24 Factory was located?

25 A    Yes.

Navarro - direct - Geddes                485

1   Q    How many floors do you recall in the main house?

2   A    The main house had three floors.

3   Q    Had you been on each of those floors?

4   A    Yes.

5   Q    Can you describe what's on the first floor?

6   A    Yes.  So, the first floor was a kitchen.  There's a

7   poolroom.

8   Q    And when you say "poolroom," what are you referring to?

9   A    Like an indoor swimming pool.  So, the kitchen, the

10  living room.  There is a -- a giant, like, stage built for

11  performances.  There was a sun room.  There was another room

12  that was set up to be like a bar, cigar -- and cigar room.  A

13  couple of bathrooms.

14  Q    How about on the second floor, what's there?

15  A    So, the second floor was more bedrooms, and then also

16  there's like a game room, which was like a room for -- that

17  had a pool table and things like that, TVs.

18  Q    And how about the on third floor?

19  A    The third floor was where -- more rooms.  The master

20  bedroom was there.

21  Q    And when you say "more rooms," are you referring to

22  bedrooms?

23  A    Bedrooms, yeah.

24  Q    By the way, when you described the two studios in the

25  basement, does The Chocolate Factory refer to that entire area

1   or just one particular studio there?

2   A    The Chocolate Factory was the whole studio.

3   Q    You also testified that there was a garage, a detached

4   garage on the property.

5         Have you been inside?

6   A    Yes.

7   Q    What was inside the garage?

8   A    Inside the garage was, like, workout equipment.  There

9   was a boxing -- a boxing ring.  There was a bed.  A shower,

10  bathroom.

11  Q    What, if anything, do you recall being parked at the

12  defendant's residence?

13  A    So, there's quite a few vehicles there.  Do you need me

14  to like describe the vehicles?

15  Q    Sure; yes, please.

16  A    All right, so there's a handful of SUVs.  A Denali

17  Expedition, a couple of jeeps, jeep Cherokees.  There was a

18  Maybach, a Lamborghini.

19            THE COURT:  A what?

20            THE WITNESS:  A Lamborghini.

21            THE COURT:  But what did you say before that?

22            THE WITNESS:  A Maybach.

23            THE COURT:  Okay.  What is that, a kind of car?

24            THE WITNESS:  It's like a super luxury sedan type of

25  Mercedes.

Navarro - direct - Geddes                    487

1    THE COURT:  Okay, keep your voice up.

2    THE WITNESS:  Okay.

3    THE COURT:  Thanks.

4  BY MS. GEDDES:

5  Q    Do you recall any other vehicles that were there when you

6  were there?

7  A    Yeah, there's usually a couple of tour buses.

8  Q    Where were the tour buses kept when you were there?

9  A    The tour buses were kept in the driveway.

10  Q    Before you moved from Los Angeles to Chicago -- let me

11  back up.

12    Did you move to Chicago because of the job that you

13  got with the defendant?

14  A    Yes.

15  Q    So, before you moved, what did you understand your job

16  was going to be when you first started?

17  A    So, it was -- what I understood was it's like an entry-

18  level job into the recording studio business.  So, like a

19  general assistant, which does everything for the studio and

20  everything from like setting up sessions, cleaning, doing food

21  runs, and like helping out the staff.

22  Q    Did you understand it was going to be a paid or unpaid

23  position?

24  A    Initially, they got me on as like an intern, which was an

25  unpaid position.  And then eventually I got hired on as a paid

1    position.

2    Q    How long were you in that unpaid position?

3    A    Like two to three weeks.

4    Q    And then you eventually were transferred over to be a

5    paid employee?

6    A    Correct, yes.

7    Q    What, if any, paper work were you given when you first

8    started working at The Chocolate Factory for the defendant?

9    A    Just the standard W-2 forms, and then there was a

10   non-disclosure agreement as well.

11   Q    What did you understand were your obligations -- did you

12   sign the non-disclosure agreement?

13   A    Yes.

14   Q    What did you understand were your obligations as part of

15   that non-disclosure agreement?

16   A    It's along the lines of, like, privacy.  So -- so, I

17   wasn't supposed to share any kind of, like, information of

18   what happens there, no -- I couldn't take pictures and things

19   like that.

20   Q    Once you arrived at The Chocolate Factory, what were your

21   responsibilities, first as an intern, and then later as a paid

22   assistant?

23   A    Well, the first thing that I did when I worked my first

24   shift was I had to move this -- move a giant trampoline from

25   the front of the house to the back of the house; and then

Navarro - direct - Geddes                    489

1   cleaning duties, food runs, stocking up the studio with

2   groceries and things.  So, that -- that was like the initial

3   duties.

4   Q    Did those duties change over time or did you get

5   additional duties over time?

6   A    Yeah, there was more responsibilities.  So, then it was

7   more picking people up from the airport, driving around,

8   delivering packages and things.  More studio time.  So, I

9   would be in the studio more helping with -- helping the

10  engineers and things like that.

11  Q    What -- you mentioned that one of your responsibilities

12  were cleaning duties.

13        What areas were you responsible for cleaning or what

14  did you end up cleaning?

15  A    Pretty much the whole place, but most of it was down in

16  the basement in the studios.  So, all those rooms, like the

17  theater, the studios.  Sometimes I would clean the buses, the

18  garage, poolroom.

19  Q    What, if any, camera equipment did you ever see inside

20  the defendant's residence at Olympia Fields?

21  A    Yeah, so there's -- you know, it's a recording studio, so

22  there's usually -- there was always camera equipment

23  somewhere.  I've seen handheld cameras.  There's cameras in --

24  you know, like professional cameras, video cameras.

25  Q    Did you -- you testified about the fact that it was a

Navarro - direct - Geddes                    490

1    recording studio and you saw cameras in that capacity.

2              Did you ever see any camera equipment up on the

3    third floor of the residence?

4    A    Yes.

5    Q    What did you see?

6    A    In the master bedroom there was a -- there was one time I

7    had to go in there to get something, and there was cameras set

8    up in there.

9    Q    Can you describe the cameras that you saw?

10   A    Yeah.  It was just on a tripod, and there was like a

11   medium-sized camera.

12   Q    Were you able to determine whether the camera took still

13   photographs or a video camera that would take video?

14   A    This was a video camera.

15   Q    When you were an assistant for the defendant, where would

16   you spend most of your time when you were inside of the studio

17   and not running errands?

18   A    Most of the time I would spend -- so, either in the

19   studio or there was also like an area for us, like the front

20   reception area.  So, there's the desk and the chair and the

21   couch and stuff right there.

22   Q    What would you do when you were stationed in the

23   reception area?

24   A    So, there was a computer, a security camera that -- with

25   a TV screen so you could see the front gate and other security

Navarro - direct - Geddes                491

1  cameras.  Like from there, you could let people into the gate.

2  And there's also the phone stations.  The phones were

3  stationed there and you'd answer the phone, take messages,

4  things like that.

5  Q    Generally speaking, who were the individuals who called

6  the phones in the reception area where you were answering

7  phones?

8  A    So, there's a lot of people that called.  There was --

9  you know, Rob would call the studio.  Any of the managers,

10  staff.  And then there would be, like, business associates.

11  And then there would be the -- Rob's, like, girlfriends and

12  guests, and people inside the house.

13  Q    Now, as you sit here today, do you recall the telephone

14  numbers that were in the reception area?

15  A    No.

16  Q    Do you remember the defendant's telephone number?

17  A    No.

18        MS. GEDDES:  I am showing the witness only what's

19  been marked for identification as 3500-AN3.  I am going to

20  start with showing the second page.

21  BY MS. GEDDES:

22  Q    Do you recognize what I'm showing you?

23  A    Yes.

24  Q    Generally speaking, what is it?

25  A    That's the phone number to one of the -- one of the lines

Navarro - direct - Geddes                     492

1  at The Chocolate Factory studio.

2  Q    And do you know where this phone number came from?

3  A    That's my -- that's -- I put that in there.

4  Q    Is that a screenshot from your telephone?

5  A    Yeah.

6  Q    Does that refresh your recollection as to the phone

7  number for the studio?

8  A    Yes, it does.

9  Q    What is the phone number, what was the phone number for

10  the studio back then?

11  A    So, it's 708-747-6569.

12  Q    And I'm showing you the first page again.

13       MS. GEDDES:  The witness only.

14  Q    Generally speaking, what is shown there?

15  A    All right, so that's the -- the office number for the

16  business office in downtown.

17  Q    And when you say the business office downtown, what are

18  you referring to?

19  A    Like, so for The Chocolate Factory.

20  Q    And where was the business office located?

21  A    In Chicago.

22  Q    Downtown Chicago?

23  A    Yeah.

24  Q    So, not at Olympia Fields, is that correct?

25  A    Right, this was a separate -- separate place.

Navarro - direct - Geddes                                    493

1   Q    Do you recall who worked at that business office?

2   A    Yeah, so it was Rob's business manager and, like,

3   accountant, Derrel McDavid.

4            MS. GEDDES:  I'm showing the witness what's in

5   evidence, I'm showing everyone what's in evidence as

6   Government Exhibit 12.

7            (Exhibit published.)

8   BY MS. GEDDES:

9   Q    Do you recognize Government Exhibit 12?

10  A    Yes.

11  Q    Who is that?

12  A    That's Derrel McDavid.

13  Q    That's the defendant's -- that was the defendant's

14  business manager at the time that you worked for him?

15  A    Yes.

16           MS. GEDDES:  And going back to showing the witness

17  only.

18  Q    Do you recall the telephone number for that office?

19  A    Yes.

20  Q    What is it?

21  A    708-848-2115.

22  Q    And I also asked you about the defendant's telephone

23  number.

24           Did you speak with the defendant over the telephone

25  when you were working for him?

Navarro - direct - Geddes                    494

1   A    Yes.

2          MS. GEDDES:  I am showing the witness only the third

3   page of Government Exhibit 3500-AN3.

4   BY MS. GEDDES:

5   Q    Does that refresh your recollection as to what the

6   defendant's phone number was when you were working for him?

7   A    Yes.

8   Q    What is it?

9   A    630-220-1166.

10  Q    Now, you testified that you would answer phones in the

11  reception area, is that right?

12  A    Yes.

13  Q    What was the procedure for answering phone calls at The

14  Chocolate Factory?

15  A    So, you answer the phone.  You'd do the greeting:

16  Chocolate Factory.  How can I help you?"

17          And then, you know, whoever -- you find out who the

18  call is for.  If it's for Rob, then you would find out who's

19  calling.  And then you would just write a message down for him

20  and then give it to him, to give it to Rob for -- yeah, so he

21  could answer it.

22  Q    You testified that you would write a message.

23          Do you recall how you would write those messages or

24  on what you would write those messages?

25  A    Yeah, it was just on a piece of paper with -- you would

Navarro - direct - Geddes                    495

1  just write down, like, who the caller is, the name, and then

2  you would write down which line it was.  So it's either line 1

3  or line 2.

4  Q    When you were working as an assistant for the defendant,

5  did you have a regular schedule that you worked?

6  A    Yes.

7  Q    What was that?

8  A    I worked five days a week, and either the night shift or

9  the morning -- or the day shift.  And those shifts were from

10 like 8:00 p.m. to 8:00 a.m., or 8:00 a.m. to 8:00 p.m.

11 Q    And do you recall when in your time with the defendant

12 you worked the day shift and when you worked the evening

13 shift?

14 A    Yeah.  So, it -- when I first started it was the evening

15 shifts.  And then towards the later half of my time there, it

16 was the -- the day shift.

17 Q    Can you describe for the jury or can you give some

18 examples of some of the tasks or errands you were asked to

19 complete when you were an assistant?

20 A    Yeah.  So, there was a lot of food runs.

21 Q    Who were you making food runs for?

22 A    A lot of food runs for -- for Rob, and a lot of food runs

23 for the people at the house.

24 Q    Who was at the house?

25 A    The girls.

1  Q    And when you're referring to the house, what house are

2  you referring to?

3  A    Rob's house.

4  Q    And can you tell me what you mean by a food run?

5  A    People would call and request that we order food for them

6  and bring it back.

7  Q    And when you say "people would call," who would call?

8  A    Rob would call or the girls in the house would call.

9  Q    What would you do when you received a telephone call from

10 one of the women in the house who called?

11 A    So, you -- if it's a food run, you would write down the

12 order, and then you would get permission to go get it.

13 Q    Who would you get permission from?

14 A    So, it's either Rob or any of the managers; Tom, Tom

15 Arnold, or who else?  June Bug.

16 Q    Anyone else you recall?

17 A    It could be Donnie.

18 Q    Do you know Donnie's last name?

19 A    Donnie Lyle.

20       MS. GEDDES:  I am showing the witness only what's

21 been marked for identification as Government Exhibit 4.

22 Q    Do you recognize who's shown in Government Exhibit 4?

23 A    Yes.

24 Q    Who is that?

25 A    That's June Bug.

Navarro - direct - Geddes                    497

1   Q    And is June Bug a nickname or a true name?

2   A    That's a nickname.

3   Q    Do you know June Bug's true name?

4   A    I can't remember it, but --

5   Q    Okay.

6           MS. GEDDES:  Oh, the Government offers Government

7   Exhibit 4.

8           THE COURT:  Any objection?

9           MS. BLANK BECKER:  No objection.

10          THE COURT:  That's in evidence, and you can publish

11  it.

12          (Government's Exhibit 4 was received in evidence.)

13          (Exhibit published.)

14          MS. GEDDES:  I am showing the witness only what's

15  been marked for identification as Government Exhibit 32.

16  BY MS. GEDDES:

17  Q    Do you recognize what's shown in Government Exhibit 32?

18  A    Yes.

19  Q    What is shown there?

20  A    Donnie Lyle.

21  Q    And is that the Donnie you were just talking about?

22  A    Yes.

23  Q    Is that a fair and accurate photo of Donnie Lyle?

24  A    Yes, it is.

25          MS. GEDDES:  The Government offers Government

Navarro - direct - Geddes                498

1    Exhibit 32.

2            THE COURT:  Any objection?

3            MS. BLANK BECKER:  No objection.

4            THE COURT:  Let me just ask, do you have any

5    objection to any of these photos coming in?

6            If you'd rather do them photo by photo, that's

7    completely fine, but it seems like you're in a fair amount of

8    agreement here, so if it will move things along.

9            MS. BLANK BECKER:  Completely understood, Judge.

10            THE COURT:  Why don't we figure it out at a break,

11   okay?

12            I just think if there's a way that you're not

13   disagreeing about it, there's no reason to go through this,

14   but go ahead.

15            MS. BLANK BECKER:  Thank you.

16            MS. GEDDES:  May we publish 32?

17            (Government's Exhibit 32 was received in evidence.)

18            (Exhibit published.)

19   BY MS. GEDDES:

20   Q    Now, you said that you would get permission from, I think

21   you said the defendant or Tom or June Bug and on occasion

22   Donnie.

23            What would you do once you received permission to

24   get the food?

25   A    So, you would -- you would call the food order in and

Navarro - direct - Geddes                    499

1   then go get it.  Sometimes you'd have to get money if there

2   wasn't any money from -- in the petty cash drawer.

3   Q    And what would you do once you picked up the food?

4   A    You bring it back and -- so, you bring the food back to

5   the studio and then you would let Rob know that the food has

6   arrived or one of the managers know, or you would just go

7   deliver it to the person.

8   Q    And where would the person be?

9   A    The person could be anywhere in the house, so....

10  Q    When you said that you would let one of the managers

11  know, who were you referring to when you said one of the

12  managers?

13  A    So, like, it's whoever was on shift usually, but so Tom

14  Arnold or June Bug or Donnie Lyle.

15  Q    Were those considered some of the managers who worked for

16  the defendant?

17  A    Yes.

18  Q    All right, I had asked you some examples of the some of

19  the errands or tasks that you were asked to complete, and you

20  just described that one of them would be to go on food runs.

21       What are some other examples of errands or tasks

22  that you were asked to do while you were an assistant for the

23  defendant?

24  A    There was a lot of driving around people and a lot of

25  picking things up, like -- excuse me, yeah, you might have to

Navarro - direct - Geddes                    500

1   go to the office to pick something up or pick something up

2   from somebody or drop -- drop stuff off.

3   Q    So, let's start with there was a lot of driving people

4   around.

5              What do you mean by that, who were you driving

6   around?

7   A    Mainly, it was girls that were coming to the studio.

8   Q    And where would you be driving some of these girls who

9   came to the studio?

10  A    Like, where were they when I picked them up?

11  Q    Yes, from where to where would you be driving them?

12  A    Okay, so, airport was -- they could be at the airport

13  from flying in from a different place or they could be

14  somewhere in Chicago.

15  Q    And where would you take these individuals after you

16  picked them up from either the airport or somewhere in

17  Chicago?

18  A    The place where I took them was always different.  So,

19  it -- it could be the studio, the house, or it could be

20  anywhere.  Like, it could be at the mall or a hotel, or

21  oftentimes, like, the tour bus was parked somewhere and I

22  would take them to the tour bus.

23  Q    And what would you do upon taking someone to the tour

24  bus?

25  A    I would let somebody know, either Rob or one of the

Navarro - direct - Geddes                    501

1    managers, that the person has arrived.

2    Q    And would the individual then spend time on the tour bus?

3    A    Yeah.

4    Q    What, if any, rules or guidelines or protocols did you

5    understand you were to follow while you were in The Chocolate

6    Factory working for the defendant?

7    A    I mean some of the rules were just, obviously, do your

8    job.  Also, like, I wasn't supposed to be talking to any of

9    the girls or the guests that were in the house.

10            THE COURT:  Can you just speak up just a little bit

11   more?

12            Whether it's talking louder or into the microphone,

13   I just want to make sure everybody can hear you.

14            I'm sorry, go ahead.  You can continue with your

15   answer.

16   A    I forgot the question, sorry.  Can you --

17   Q    That's okay, I'll stop and then we can go back.

18            You testified that you weren't supposed to speak

19   with any of the girls or the other guests, is that correct?

20   A    Yes.

21   Q    Who did you learn that particular rule from?

22   A    Rob, that's one of Rob's rules that -- for us.  And then

23   also, Tom told me that when I started.

24   Q    You're referring to Tom Arnold?

25   A    Yes.

Navarro - direct - Geddes                    502

1    Q    And what, if anything, were you supposed to do when the

2    guests were in your presence?

3    A    Like, if -- so, if I'm transporting them somewhere and I

4    was just not supposed to talk to them.

5    Q    You testified that you would transport some of these

6    guests.

7              Who gave you instructions about who to pick up?

8    A    Usually, it was one of the managers; Tom, June Bug,

9    Donnie Lyle or Rob.

10   Q    And once -- when you were bringing one of these guests to

11   the house, to the defendant's house, where would you bring

12   them?

13             You testified that on occasion you brought them to

14   the tour bus.

15             Were there other locations within the house that you

16   would bring these guests on occasion?

17   A    Yeah, so, I would bring them all over, all over the

18   property.  So, it could be into the studios.  It could be

19   upstairs in one of the rooms.  Yeah, pretty much anywhere

20   on -- anywhere on the property.

21   Q    How would you know where to bring a particular person?

22   A    I was given instructions to -- on where they were

23   supposed to go.

24   Q    Who would give you those instructions?

25   A    One of the managers or -- or Rob.

Navarro - direct - Geddes                503

1  Q    Were there particular places in the residence where you

2  would more often bring these guests to?

3  A    I mean I don't -- I can't remember.  They would go

4  everywhere.

5  Q    When you say "everywhere," could you explain some of the

6  places specifically where you would bring them, other than the

7  tour bus which you've already identified?

8  A    Yeah, so they could go to the garage, the tent, the log

9  cabin outside, Music 1, log -- or The Cabin studio, the

10 reception area, the game room, the theater, living room,

11 kitchen, any of the -- pretty much any of the rooms in the

12 house.

13 Q    What car would you use when you were picking up and

14 transporting the defendant's guests?

15 A    So, at one point we had like a minivan, but then the

16 minivan broke down so we used -- it could have been one of the

17 SUVs.  But usually we were instructed on which car to take

18 during that particular pickup.

19 Q    And whose cars would you use, would you use your own car

20 or somebody else's?

21 A    Usually, we used Rob's, one of Rob's vehicles.  Every

22 once in a while I would use my personal vehicle, but not that

23 often.

24 Q    Did you ever drive a Chrysler 300?

25 A    Yes.

Navarro - direct - Geddes                    504

1  Q    Whose car was that?

2  A    That was Rob's.

3  Q    That was another car used by Rob that you would drive?

4  A    Yes.

5  Q    Once a guest had been -- and let me back up a moment.

6        The guests who you described that you picked up and

7  brought to a particular location within the defendant's

8  residence, generally, who were they?

9  A    Who -- who were the guests who came?

10 Q    I don't mean the particular names, but who were they,

11 what was their relationship, what did you understand the

12 relationship to be with the defendant?

13 A    They were girlfriends of Rob.

14 Q    Once one of the defendant's guests was in a particular

15 room or on a tour bus, what, if any, communications would you

16 have with that guest?

17 A    So, they would call, the guests that were staying on the

18 property would call down to the studio lines.

19 Q    What would be some of the reasons, what would be some of

20 the reasons they would call?

21 A    Oftentimes, it was to talk to Rob or they wanted to order

22 food or they needed stuff, like whatever they needed.

23 Q    Were there other reasons that a defendant might call --

24 excuse me.

25        Were there other reasons that a guest might call?

Navarro - direct - Geddes                    505

1  A    So, they would call for food.  They would call to talk to

2  Rob.  Oh, they would request, like, rides sometimes.

3  Q    Rides where?

4  A    Some of them went, like, home to their house, and then

5  some of them wanted rides to -- they would request rides to go

6  meet with Rob wherever he was.

7  Q    What, if anything, would you do when you received a

8  request for a ride from one of the defendant's female guests?

9  A    So, any of the like, requests from any of the guests,

10 we'd have to -- we'd have to run it by one of the managers or

11 run it by Rob.

12 Q    And when you say "run it by" one of the managers or Rob,

13 what do you mean?

14 A    So, to get permission to do it, and then receive -- also

15 receive instructions on what to do with them.

16 Q    What, if anything, do you recall about the manner in

17 which the defendant's female guests were dressed?

18 A    So, you know, if they were going out or going somewhere,

19 like going to the mall to go shopping or going out, they would

20 have, like, I guess just normal clothes.  But then most of the

21 time they -- they were just like lounging in the house

22 somewhere, so they would be in, like, pajamas type of

23 clothing.

24

25             (Continued on the following page.)

A. Navarro - Direct/Ms. Geddes                506

1   EXAMINATION BY

2   MS. GEDDES:

3   (Continuing.)

4   Q    What was your understanding based on your interactions

5   with these guests in the time that you spent at

6   Olympia Fields working for the defendant?

7              What was your understanding of the rules that

8   some of the defendant's female guests were to follow?

9              MS. BLANK BECKER:  Objection.

10             THE COURT:  Overruled.

11  A    So the question was what were the -- my understanding of

12  the guests' rules?

13  Q    Yes.

14  A    They had to get permission to do most things.  Like,

15  they'd have to call either down to the studio or get ahold of

16  Rob if they wanted anything, like, food or things like that.

17             THE COURT:  How did you know that?  How did you

18  know those were the rules?

19             THE WITNESS:  I was told that.

20  Q    By whom?

21  A    By Rob and by managers.  If anyone called, the rule was,

22  like, if anybody calls for anything, run it by -- ask us

23  first and we'll tell you what to do.

24  Q    What, if anything, did you understand that you should do

25  if a -- if you encountered a female guest outside of the

A. Navarro - Direct/Ms. Geddes                    507

1  location or room where that guest had been escorted to?

2  A    I would pretty much just ask them if they needed help or

3  if they were looking for something and then just -- you would

4  also let somebody know.  One of the managers know that the

5  person's out and about.

6  Q    And what, if any, conversations did you have with the

7  defendant about an individual leaving her assigned room?

8  A    The general rule was if they're not where they're

9  supposed to be, then you'd have to call and tell either Rob

10 or whoever is managing at the time.

11 Q    And when you say, if they're not where they're supposed

12 to be, where did you understand they were supposed to be?

13         MS. BLANK BECKER:  Objection.

14         THE COURT:  Overruled.

15 A    So the instructions whenever they were to go to where

16 they were supposed to be, like, for instance, if they're

17 supposed to be in The Cabin recording studio, they weren't

18 supposed to be wandering around.  They weren't supposed to

19 leave that room.  And if they did, then we were instructed to

20 let somebody know.

21         MS. GEDDES:  I'm showing the witness only what's

22 been marked for identification as Government Exhibit 70.

23 Q    Do you recognize the individual shown in Government

24 Exhibit 70?

25 A    Yes.

A. Navarro - Direct/Ms. Geddes          508

1  Q    How do you recognize that individual?

2  A    She was one of the guests that were at the house, the

3  studio.

4  Q    And is that a fair and accurate photograph of one of the

5  guests that was at the studio?

6  A    Yes.

7  Q    Do you recall this particular individual's name?

8  A    It's something with a J.

9         MS. GEDDES:  The Government offers Government

10 Exhibit 70.

11        THE COURT:  Any objection?

12        MS. BLANK BECKER:  No objection.

13        THE COURT:  All right.  That's in evidence.  You

14 can publish it.

15        (Government's Exhibit 70 was received in evidence

16 as of this date.)

17        (The above-referred to exhibit was published to the

18 jury.)

19 Q    Where do you recall seeing the individual shown in

20 Government Exhibit 70?

21 A    Inside the.  House, so she was just there.

22 Q    What, if anything, do you recall about this particular

23 individual?

24 A    I just remember, like, giving her rides.  I think I've

25 picked her up.  I've given her -- picked up food for her as

A. Navarro - Direct/Ms. Geddes                    509

1  well and brought it to the house.

2  Q    I think you testified earlier, but tell me if I'm wrong,

3  that you would also bring guests to other locations, bring

4  guests home; is that correct?

5  A    Yes.

6  Q    And how, again, would you know that it was time to bring

7  a particular guest home?

8  A    So if they're at the house, then if they wanted to go

9  somewhere they would call down to the studio to get

10 permission.  So either they would directly talk to Rob to

11 request a ride home, or they would ask us and then we would

12 relay the message to Rob.

13 Q    And what, if anything, do you recall giving to an

14 individual as they were leaving?

15 A    Sometimes, they would get, like, envelopes of money.

16 Q    How would you know to give an envelope of money to a

17 particular individual?

18 A    So either the manager, one of the managers, would

19 instruct -- would give it to me and instruct us to give it to

20 them or Rob would.

21 Q    As part of your -- as part of your job as an assistant,

22 were you ever asked to pick up any medication?

23 A    Yes.

24 Q    Where were you asked to pick up medication from?

25 A    A pharmacy, I think it was Walgreens.  Also, like, I

A. Navarro - Direct/Ms. Geddes                510

1   picked it up from the doctor downtown.

2   Q    Who is the doctor?

3   A    I can't remember his name.

4   Q    Okay.  Who did you understand the medication was for?

5   A    It was for Rob.

6   Q    What kinds of -- did you ever see the types of

7   medications that you picked up?

8   A    Yes.

9   Q    What type of medication do you recall picking up?

10  A    The medication is called Valtrex.

11  Q    You testified earlier about a gate that was outside of

12  the defendant's residence.  What, if any, security did the

13  defendant have in place in addition to that gate?

14  A    There is usually a security guard or a couple of

15  security guards out there in a truck.

16  Q    So where were the security guards stationed?

17  A    At the front of the gate.  They had a vehicle that they

18  would sit in.

19  Q    And what were the security guards -- what did you

20  understand the security guards were responsible for doing?

21  A    They greeted people that would come into the gate and

22  they also would escort people around.  Yeah.  So whenever Rob

23  would go out, there would also be, like, body guards,

24  security people.

25  Q    And I think you testified they would also escort people

A. Navarro - Direct/Ms. Geddes                    511

1   from the gate.  How is the gate opened?

2   A    So they had -- the security guards had a gate clicker

3   that would -- they could click it to open the gate.  And then

4   sometimes they would call down to the studio to open the

5   gate.

6   Q    Was there a mechanism from within the studio to open up

7   the gate?

8   A    So it's from the inside of the studio, we had -- we also

9   had another clicker, so we would have to walk outside, go up

10  the stairs, and walk out to the side of the house to click it

11  so the -- it would reach, yeah.

12  Q    So the clicker would have to be within a certain

13  distance from the gate in order for it to be activated?

14  A    Yeah.  So one of the clickers you'd have to go outside

15  to do it, but then there is another one where you could do it

16  from the inside of The Cabin studios so you could point it

17  and it would reach from inside there.

18  Q    While you were at The Chocolate Factory, do you recall a

19  time when someone tried to get through the gates without a

20  guard opening the gate?

21  A    I'm sorry.  Can you repeat the question, please.

22  Q    Yes.  While you were working, at The Chocolate Factory,

23  do you recall an instance where someone was able to get

24  through the gate without the security guards opening the

25  gate?

A. Navarro - Direct/Ms. Geddes                512

1   A    So people -- the gate was usually closed.  Yeah, so

2   people couldn't get in unless they hopped a fence.

3   Q    Did that ever happen?

4   A    Yes, I've seen that happen before.

5   Q    How did you see that happen?  From what vantage point

6   did you see it?

7   A    I saw it from the security camera from the reception

8   desk.

9   Q    And do you recall that happening on one occasion or more

10  than one occasion?

11  A    I've only see that happen once.

12  Q    What do you recall from that particular occasion that

13  you saw that happening?

14  A    So it was two girls that had climbed over the fence and

15  I could see them running across the lawn, the front lawn, and

16  they ran.  I don't know where they ran but they disappeared

17  off the camera.  I guess they hid somewhere.

18  Q    What, if anything, did you do when you saw that happen?

19  A    I called.  At the time, I called one of the managers to

20  let them know what had happened.

21  Q    And can you describe the quality of the footage that you

22  saw?

23  A    It was like black and white footage, security camera.

24  And it was pretty clear, you could see.

25  Q    Did you recognize either of the individuals?

A. Navarro - Direct/Ms. Geddes                513

1  A    Yes.

2  Q    Who did you recognize either of the individuals to be?

3  A    So one of the girls was someone that had been to the

4  house before.

5  Q    What, if anything, do you recall about the ages of those

6  girls?

7             MS. BLANK BECKER:  Objection.

8             THE COURT:  Overruled.  Did you form an impression

9  about how old they were or did you know?

10             THE WITNESS:  Yeah, they looked really young.  The

11  one girl in particular that had been there before just looked

12  pretty young, younger than me.

13  Q    At the time you were working there, how old were you?

14  A    I was in my early 20s.  Like, 21, 22.  Around then.

15  Q    And when you say, "Looked really young," and "Younger

16  than you"?

17             MR. CANNICK:  Objection.

18             THE COURT:  I'm sorry.  Only the lawyer who is

19  doing the cross can make the objection.

20             MR. CANNICK:  I'm sorry.

21             THE COURT:  That's all right.  I take it

22  Ms. Blank Becker is making the objection.

23             MR. CANNICK:  Yes.

24             THE COURT:  The objection is overruled.

25

A. Navarro - Direct/Ms. Geddes                514

1          Go ahead.

2   EXAMINATION BY

3   MS. GEDDES:

4   (Continuing.)

5   Q    When you say that you thought that they looked really

6   young and younger than you, can you be more specific and how

7   old if you formed an impression you believed them to be?

8   A    Back then, I mean, I thought they were like mid-aged

9   teenagers.  Pretty young.

10  Q    And I'm now showing the witness only what's been marked

11  for identification as Government Exhibit 34.

12              Do you recognize 34?

13  A    Yeah.

14  Q    Who is shown in 34?

15  A    That's a picture of me.

16  Q    Is that a fair and accurate photo of you?

17  A    Yeah.

18          MS. GEDDES:  The government offers 34.

19          MS. BLANK BECKER:  No objection.

20          THE COURT:  Okay.  That's in evidence and you can

21  publish it.

22          (Government's Exhibit 34 was previously received in

23  evidence.)

24          (The above-referred to exhibit was published to the

25  jury.)

A. Navarro - Direct/Ms. Geddes                515

1           THE COURT:  How old were you when that picture was

2     taken?

3           THE WITNESS:  Is this my driver's license?  I feel

4     like that's my driver's license.

5     Q    Do you recall how old you were?

6     A    So that was my Illinois driver's license photo, but I

7     had to have been 22 at the time or 23.

8     Q    Is that approximately the time when you were at The

9     Chocolate Factory?

10    A    Yes.

11    Q    Are you aware of parties that were held at the

12    defendant's residence in Olympia Fields?

13    A    Yes.

14    Q    And did you attend those parties?

15    A    I did, yes.

16    Q    What was your role at those parties?  Were you there as

17    a guest or as an employee?

18    A    I was there as an employee.

19    Q    What did you do?

20    A    So there is different types of parties, but a lot of the

21    stuff I did was like stocking the bar because they would, you

22    know, they would have alcohol.  Sometimes, I would bar tend.

23    I would clean, take trash out.  I would, you know, go

24    shopping for the parties, pick stuff up, pick people up as

25    well.

A. Navarro - Direct/Ms. Geddes                    516

1   Q    Did you learn where the guests would park who were

2   attending parties at Olympia Fields?

3   A    What was the question again.

4   Q    Did you learn where guests would park who were tending

5   parties at Olympia Fields?

6   A    Yeah.  So they either would park on the actual property,

7   or if they ran out of space, they could park, excuse me,

8   there is a hotel down the street.  They could park there.

9   Q    Approximately how far away was the hotel?

10  A    It was really close.  It was like a five-minute drive.

11  Not far at all.

12  Q    How would individuals, how would the guests get from the

13  hotel to the party in Olympia Fields?

14  A    There is different ways.  A tour bus would taxi them

15  back and forth, or they would use any of the vehicles that

16  Rob owned to taxi them back and forth.

17  Q    I'm showing the witness only what's been marked for

18  identification as Government Exhibit 521.

19           Do you recognize 521?

20  A    Yes.

21  Q    What is 521?  What is shown there?

22  A    So that's the Holiday Inn hotel that was down the street

23  from the studio.

24  Q    And what, if anything, happened at the Holiday Inn

25  hotel?

A. Navarro - Direct/Ms. Geddes                517

1   A    That's just where people would park.  Sometimes guests
2   would stay there.
3   Q    Is that one of the -- is that a location where guests at
4   a party would park and then be transported to the defendant's
5   residence?
6   A    Yes.
7           MS. GEDDES:  Government offers 521.
8           MS. BLANK BECKER:  No objection, your Honor.
9           THE COURT:  That's in evidence.  You can publish
10  it.
11          (Government's Exhibit 521 was received in evidence
12  as of this date.)
13          (The above-referred to exhibit was published to the
14  jury.)
15  Q    When you were working, were you working for the
16  defendant while the defendant had a court proceeding in
17  Chicago?
18  A    Yes.
19  Q    What was your role?
20  A    So my role while I was with Rob during that was just,
21  like, an assistant.  So I would have to deliver things or
22  pick up food or pick up people.  Yeah, that's pretty much it.
23  Q    What, if anything, would you do with respect to getting
24  to the court proceeding?
25  A    I don't understand the question.

A. Navarro - Direct/Ms. Geddes                518

1   Q    Did you have any role in transporting anybody to the

2   court proceeding?

3              MS. BLANK BECKER:  Objection.

4              THE COURT:  Overruled.

5   A    Yes.

6   Q    What was your role.  What did you do?

7   A    Like, I would drive people either guests or the crew.

8   Q    In what vehicles would you drive people?

9   A    It would be one of Rob's vehicles.  So it could be any

10  of the SUVs or the Chrysler, whichever vehicle was available.

11  Q    And where would you drive people to?

12  A    We would usually meet at -- we would park at a -- there

13  was a park nearby the courthouse.

14  Q    And what, if anything, else was parked in that park?

15             You said you would drive some of the

16  defendant's vehicles.  What, if anything, else would be in

17  that park?

18  A    So there would be a few of his vehicles and his staff.

19  And then the sometimes the tour bus, one of them or two of

20  them, would be there.

21  Q    Did you ever travel with the defendant?

22  A    Yes.

23  Q    For what reason?

24  A    I traveled with him during one of the concert tours that

25  he did.

A. Navarro - Direct/Ms. Geddes                519

1  Q    Do you recall which tour you traveled with the defendant
2  for?
3  A    I do.  It's called the Double Up Tour.
4  Q    Do you remember when that was?
5  A    2008.
6  Q    What was your role when you traveled with the defendant
7  on the Double Up Tour?
8  A    My role is pretty much the same types of job things that
9  I would do at the studio in Chicago.  So whatever, whatever
10 Rob needed, if he needed food or if he needed things picked
11 up or people picked up, that's what I would do.
12 Q    Were you often in the same location as the defendant?
13 A    During the tour?
14 Q    Yes.
15 A    Yeah.  It's the same place that the tour cities that we
16 were in.
17 Q    What, if anything, did you see being distributed while
18 you were with the defendant on tour?
19 A    Can you say it again.
20 Q    Did you ever see anything being given out to other
21 people while you were on tour?
22 A    Yeah.  There is, there is, like, I guess people would
23 get invites and things to go to after parties.
24 Q    And what are you referring to when you say "invites."
25 What was it that was distributed?

A. Navarro - Direct/Ms. Geddes                520

1  A    It was, like, Rob's phone number.

2  Q    And how was Rob's phone number distributed?

3  A    Usually, just on a piece of paper that was just handed

4  to the person.

5  Q    And did you have an opportunity to see those pieces of

6  paper?

7  A    Yes.

8  Q    What, if anything, was written on the pieces of paper?

9  A    Just his phone number.

10  Q    Was it a handwritten or typewritten as you recall?

11  A    These were handwritten.

12  Q    And who did you see giving out the defendant's phone

13  number?

14  A    So Tom has done, I've seen Tom Arnold distribute that.

15  Who else?  There was people that was on the tour with us.

16  Yeah, so any of the crew that was with us at the time would

17  do it.

18  Q    And where would you see the defendant's phone number

19  being distributed.  Where would this happen?

20  A    Usually, it was in the crowds at the shows.  So the

21  audience of the show.  Sometimes it was out when we would go

22  out places.  Yeah, they would give it out.

23  Q    In what other places outside of the shows do you recall

24  seeing people give out the defendant's --

25  A    The mall, restaurants.

A. Navarro - Direct/Ms. Geddes          521

1  Q    I want to finish my question for the record.

2              Is that where you would see individuals giving

3  out the defendant's phone number in those locations that you

4  just testified?

5  A    Yes.

6  Q    You testified that you would transport some of the

7  defendant's guests in and around Chicago.  Would you also

8  transport guests while you were working for the defendant on

9  tour outside of Chicago?

10  A    Yes.

11  Q    And did you ever transport guests on longer trips?

12  A    Yes.

13  Q    What do you recall?  Where do you recall transporting a

14  guest on a longer trip?

15  A    So from one of the shows, it was in Alabama.  I can't

16  remember the city, but I think it was Birmingham.  I took

17  someone from, well, I had to stay overnight at that tour

18  stop.  The rest of the crew had left it go to the next city.

19  Q    And where was the next city?

20  A    The next city was in Atlanta.

21  Q    What did you do the following day after you stayed

22  overnight?

23  A    So I was instructed to take a guest and take her from

24  that stop -- from that city in Alabama to Atlanta.

25  Q    And you said you were instructed to take her.  Was it a

A. Navarro - Direct/Ms. Geddes                522

1  female guest?

2  A    Yes.

3  Q    What did you understand the female guest relationship to

4  be to the defendant?

5  A    Just one of Rob's, like, girlfriends that was going to

6  visit him.

7  Q    What, if any, conversation did you have with --

8        MS. GEDDES:  Well, let me withdraw that question.

9  Q    How long is the drive from where you were in Alabama to

10 where you brought this female guest in Atlanta?

11 A    It was long.  I don't know.  I don't remember, like.

12 Q    More than a few hours?

13 A    Yeah.

14 Q    What, if any, conversation did you have with the female

15 guest during that trip?

16 A    There was no conversations.

17 Q    Why not?

18        MR. CANNICK:  Objection.

19        THE COURT:  Is there a reason why you didn't speak

20 to the woman you were -- the girl -- whatever, the female

21 that you were driving.

22        THE WITNESS:  Yeah, we were instructed to not talk

23 to anybody, any of the females.

24        THE COURT:  Okay.

25 Q    How were you paid while you were working for the

A. Navarro - Direct/Ms. Geddes                523

1  defendant?

2  A    Like, check.

3  Q    How regularly did you receive a paycheck?  Was it on a

4  regular basis?

5  A    Yeah, it was like weekly or biweekly.  I can't remember

6  how.  But it was, like, weekly.

7  Q    Do you recall whose name was listed on the paycheck as

8  the payor?

9  A    Yeah, it was Bass Productions.

10 Q    And what did you understand Bass Productions to be?

11 A    That was the company, like, the -- I guess, the

12 corporate entity of the recording studio, the business.

13 Q    Was there ever a time when you were, in fact, working

14 for the defendant when you were not paid for the time that

15 you worked for the defendant?

16 A    Yeah.  So when I first started as an intern there, I

17 wasn't paid.

18 Q    Aside from the time when you went on as an intern, was

19 there a time when you believed that you were going to get

20 paid but, ultimately, you were not paid for the time that you

21 worked?

22 A    Yes.

23 Q    Why did you understand that you were not paid?

24 A    So it was an overtime.

25 Q    So aside from the overtime, was there another time when

A. Navarro - Direct/Ms. Geddes                524

1  you expected to be paid but your Honor not paid?

2  A    Yeah.  Yeah.

3  Q    What happened?

4  A    I was fined.

5  Q    By whom?

6  A    By Rob.

7  Q    And when you say fined what do you mean?

8  A    So you know when, like, an NBA player gets fined for, I

9  guess, breaking a rule and they, like, deduct their pay as a

10 penalty, that's what it was.

11 Q    And do you recall why you were fined and not paid for

12 time that you worked?

13 A    I can't remember why.  It was something trivial that, I

14 don't know.

15 Q    When you say "trivial," what are you referring to?

16 A    Just.

17           MS. BLANK BECKER:  Objection.  He said he doesn't

18 remember.

19           THE COURT:  Overruled.

20           THE WITNESS:  Yeah.

21           THE COURT:  Why did you call it trivial?

22           THE WITNESS:  Well, it was just something stupid

23 that didn't make any sense.  That's what I meant.  Didn't

24 seem like a valid reason to be penalized your pay for doing

25 this.  I just don't remember what I did.

A. Navarro - Direct/Ms. Geddes          525

1    THE COURT:  When you say you got fined, did that

2    mean that you didn't get paid at all, or that a portion of

3    your pay was -- that you didn't get a portion of the pay.

4         THE WITNESS:  At the time, I remember the fine -- I

5    can't remember if it was my whole check or if it was partial

6    of the check.

7         THE COURT:  Okay.  Go ahead.

8    Q    You testified earlier that you received checks from Bass

9    Productions.  Who did you understand it be in charge of Bass

10   Productions?

11   A    So Derrel McDavid and then the lady that was, like, the

12   manager of the office that we would talk to her, her name was

13   Shirley.

14   Q    Now, you also mentioned that there was an issue with

15   receiving overtime; is that correct?

16   A    Yes.

17   Q    Did you file a lawsuit against the defendant?

18   A    Yes.

19   Q    And how was that lawsuit resolved?

20   A    I was just compensated.

21   Q    When, in relation to the time that you were working for

22   the defendant was at that lawsuit filed?

23   A    That was after my time.  I wasn't working at the time

24   for the defendant.

25   Q    And the lawsuit that you filed against the defendant,

A. Navarro - Direct/Ms. Geddes                526

1  what was the nature of that lawsuit, just very generally

2  speaking, was it related to the overtime dispute?

3  A    Yeah.  So it was just a request to get compensated for

4  some overtime that I did and, you know, I had asked the

5  office for it and they said they didn't want to did it, so I

6  brought a lawsuit.

7  Q    And when you say you had asked the office for it, what

8  office are you referring to?

9  A    Bass Productions.

10  Q    What, if any, contact have you had with the defendant

11  since you filed and resolved that lawsuit?

12  A    There hasn't been any contact.

13          MS. GEDDES:  One moment.

14          (A brief pause in the proceedings was held.)

15          MS. GEDDES:  No further questions.

16          THE COURT:  Okay.  Cross-examination.

17          MS. BLANK BECKER:  Thank you, Judge.

18          THE COURT:  Okay.

19  CROSS-EXAMINATION

20  BY MS. BLANK BECKER:

21  Q    Good morning, Mr. Navarro.  How are you?

22  A    I'm fine.  How are you?

23  Q    I'm good, thank you.

24          Mr. Navarro, my name is Nicole Blank Becker

25  and I'm going to be asking you a bunch of questions.  If one

A. Navarro - Direct/Ms. Geddes                    527

1   of them doesn't make sense, or you need me to repeat it, just

2   let me know.  Okay?

3   A    Sure.

4   Q    All right.  Mr. Navarro, my understanding is that you

5   worked for quite some time with Mr. Kelly; is that correct?

6   A    Yes.

7   Q    And you were pretty familiar with Olympia Fields, fair

8   enough?

9   A    Yes.

10  Q    All right.  That's basically -- that was your home base

11  for lack of better words, is that fair to say?

12  A    Yes.

13  Q    All right.  And you were talking about, you were kind of

14  giving us a map, if you would, of the home earlier; is that

15  correct?

16  A    Yes.

17  Q    Okay.  This house would, in your estimation, would you

18  say this is a small house, a huge house, what would you say?

19  A    It was huge.

20  Q    Did you have any, and I know some people aren't good

21  with square feet and so forth, did you have any concept or

22  any idea of how many square feet this house could be?

23  A    No.

24  Q    Huge is the best description, is that fair?

25  A    Yeah, it was a mansion.

A. Navarro - Direct/Ms. Geddes                528

1    Q    Okay.  Mansion.  Thank you.

2                  And the mansion, it was on a main road; is

3    that fair to say?

4    A    The man -- no, it was in, like, a subdivision.

5    Q    Okay.  You know what, I shouldn't have used that type of

6    verbiage.

7                  It was in a subdivision but there wasn't,

8    like, neighbors right next door, they were spread out; is

9    that fair to say?

10   A    There was, yes.  The other houses were, like, because

11   the property was pretty large.  So the neighbors were,

12   like -- they weren't really anywhere nearby, like, you

13   couldn't see the neighbors from the property.

14   Q    Thank you.  And with regards to parking cars when guests

15   would come or individuals who were employees and working at

16   the studio, would they park on the street in the front?

17   A    They would park on the street but like the driveway of

18   the house.

19   Q    Okay.  So you saw the picture of the gate earlier, is

20   that -- do you remember that; is that correct?

21   A    Yes.

22   Q    So when you were saying they would park on the driveway,

23   you're talking past the gate that they could park on that

24   driveway, that part of the driveway to the house; is that

25   correct?

A. Navarro - Direct/Ms. Geddes                529

1  A    Yeah.  You'd have to -- they would park on the inside of

2  the gate.

3  Q    They weren't typically parking on the outside of the

4  gate, is that true?

5  A    Are you asking me if the staff did that?

6  Q    The guests who were coming and, you know, employees that

7  were parking working in the studio?

8  A    Usually, the guests would be, like, people would park on

9  the inside, yeah.

10 Q    And then when there were big, large parties at Olympia

11 Fields.  That's when it was necessary to sort of, I believe

12 you indicated, there was a tour bus at another location,

13 right?

14 A    Yes.

15 Q    Okay.  And you used the word "tour bus," and I apologize

16 I'm just going to be a little specific.  It wasn't actually a

17 tour bus, it was sort of like a charter bus; is that fair to

18 say?

19 A    No, these are tour buses.  These were the buses they

20 used on tours.

21 Q    Okay.  And, again --

22 A    But I guess that's the actual name of it is a charter

23 bus but I don't know.

24 Q    Okay.  And I apologize.  Let me try and clear that up

25 for you.

A. Navarro - Direct/Ms. Geddes          530

1          The buses that were used to bring the guests
2    over, those were different buses than the tour buses that
3    were used for a long journey for a tour; is that correct?
4    A    No, these were the actual tour buses that you used for
5    tour.
6    Q    That Mr. Kelly would use for the tour?
7    A    Yeah.
8    Q    Got it.  So you've been in those buses; correct?
9    A    Yes.
10   Q    Okay.  And when you're in those buses, did you notice
11   that there were any bedrooms?
12   A    So there is a bedroom, like, in the back of the bus had
13   a room with a bed in it.
14   Q    All right.  And then how about prior to getting to the
15   back of the bus.  Do you remember the bunk beds?
16   A    I don't remember.  I don't know.
17   Q    Did you ever sleep on any of the tour buses?
18   A    Yes.
19   Q    And when you slept on the tour bus, where would you
20   sleep?
21   A    I would sleep in the bunks that were on the bus.
22   Q    The bunks that you didn't remember out.  So there were
23   bunks on in the bus?
24   A    The bunk.  So the bus when we went on tour there was a
25   different bus.  The staff had separate buses than Rob's

A. Navarro - Direct/Ms. Geddes          531

1  buses.

2  Q    Okay.  So there were different buses that were used

3  during the tour, isn't that what you just said?

4  A    Yeah there was additional buses that were booked.

5  Q    Okay.  And so you're saying, yes, you would sleep on

6  some of the tour buses.  There were different tour buses than

7  were shuttling the guests; correct?

8  A    I didn't sleep on the -- I didn't sleep on Rob's buses,

9  no.

10 Q    Okay.  You had been on Rob's buses, I'm pretty sure what

11 you just said, right?  You've been on the tour buses?

12 A    Yeah.

13 Q    Which are different -- okay.

14              And that's where, when you were on tour with

15 Mr. Kelly you, too, would sleep in one of the bunk beds on

16 that tour bus, is that correct?

17              MS. GEDDES:  Objection.

18              THE COURT:  It's a little bit confusing.

19              Are you saying that Mr. Kelly's bus did not have

20 bunk beds, correct so far, as far as you recall.

21              THE WITNESS:  I just can't remember if his buses

22 had bunk beds.

23              THE COURT:  But when you were talking about where

24 you and other employees slept, you were talking about a

25 separate bus; is that correct?

A. Navarro - Direct/Ms. Geddes        532

1        THE WITNESS:  Yeah, there were different buses that
2   they had got and different drivers that came in for that.
3        THE COURT:  For the employees?
4        THE WITNESS:  Right.
5        THE COURT:  Okay.  Next question.
6   EXAMINATION BY
7   MS. BLANK BECKER:
8   (Continuing.)
9   Q    Thank you.  You were aware that there was always a lot
10  of people, for lack of better words, on Mr. Kelly's tour bus;
11  is that fair to say?
12  A    Can you repeat the question.
13  Q    Sure.  When you would go on tour, it sounds as if what
14  you're saying there was different tour buses for different
15  people who were going along with you on the tour, is that
16  true?
17  A    Yeah.
18  Q    And with regards to specifically, Mr. Kelly's tour bus.
19  You'd see people get in and out of the that tour bus; is that
20  fair to say?
21  A    Yes.
22  Q    It wasn't always -- it wasn't just Mr. Kelly getting in
23  and out of the tour bus, is that true?
24  A    On his bus, yes.
25  Q    Okay.  There would be women that would go in and out of

A. Navarro - Direct/Ms. Geddes          533

1   the tour bus, is that true?

2   A    Yes.

3   Q    And maybe men, his friends that were coming along?

4   A    Yes.

5   Q    And ultimately, was there a name for the tour bus that

6   you were on, was there a name for the bus?

7   A    No.

8            (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Navarro - cross - Blank Becker                    534

1   CROSS EXAMINATION

2   BY MS. BLANK BECKER:   (Continuing)

3   Q    Who else was on the tour bus with you when you would go

4   on the tour?

5   A    So it would be the different people, but like the band,

6   or not the band but like the other employees that were on the

7   tour.

8   Q    Okay.  And were there ever women that were getting on

9   your bus and staying on the bus perhaps overnight going from

10  tour to tour?  Excuse me, going from concert to concert?

11  A    Yes.

12  Q    And that was a regular thing; is that true?

13  A    There was a time on the tour where there was a guest on

14  our bus staying in the bedroom, in the back room of the bus.

15  Q    So your bus too -- that you would go on with the other

16  employees, that also had a bedroom in the back; is that

17  correct?

18  A    Yes.

19  Q    So, in other words, to get to that bedroom you had to

20  pass by the bunks where you had slept and perhaps some of the

21  other employees; correct?

22  A    Yes.

23  Q    Got it.

24       And the -- you indicated at one point there may have

25  been a woman that was on the bus; is that correct?

Navarro - cross - Blank Becker                        535

1    A    Yes.

2    Q    Okay.  And is that -- that wasn't someone that was on the

3    bus the whole time; is that correct?

4    A    Yes.

5    Q    Okay.  And so is it fair to say that maybe at one of the

6    concerts, one of the cities you were in that woman came on to

7    the bus?

8    A    No, it...can you repeat the question?

9    Q    Sure.  Where did the woman come from that was on the bus,

10   do you remember?

11   A    She was one of the dancers of the tour, so...yeah.  I

12   don't remember like where she got on to the bus.

13   Q    Understood.

14          Dancers, they had another tour bus, is that fair to

15   say?

16   A    Yes.

17   Q    And that tour bus for the dancers, they were all females;

18   is that correct?

19   A    The bus for the dancers?

20   Q    Yeah.

21   A    All the dancers were females, yes.

22   Q    Thank you.

23          And on your bus, they were all males; is that

24   correct?

25   A    Yes.

1  Q    Now, these tour buses, they had bathrooms; correct?

2  A    Yes, they did.

3  Q    Locks on the doors on the bathroom?

4  A    Yes.

5  Q    From the inside, the lock was on the inside or on the

6  outside?

7           I know it sounds like a silly question, but I have

8  to ask.

9           In other words, you go into the restroom, you lock

10 it on the inside when you go in?

11 A    Yeah, I think so.  I don't remember that, but -- I don't

12 know.

13 Q    You don't remember thinking, you're going to go in the

14 bathroom someone might walk in?

15 A    Yeah.  The lock was on the inside.

16 Q    Got it.  Thank you.

17          And were there any rules about when you could or

18 couldn't use the bathroom on the tour buses?

19 A    The only rule was like you couldn't take a number two

20 because like it -- you know -- travel with you, and the

21 drivers all get mad.

22 Q    All right.  So maybe, for lack of a better word, it would

23 stink up the place?

24 A    Yeah.  Yeah.

25 Q    And everyone would smell it and there was an issue?

1  A    Yeah, you would smell it the whole time.

2  Q    In order to relieve yourself in that manner, were there

3  stops taken if that was necessary?

4  A    Yeah.

5  Q    Okay.  Now, I'd like to move on to Olympia Fields

6  specifically.  And you indicated that you were responsible

7  sometimes to coordinate guests there; correct?

8  A    Yes.

9  Q    Okay.  I would like to go through the process of what

10 would happen when you would bring a guest there.  I believe

11 initially you indicated that once you arrived at Olympia

12 Fields and you had a guest with you, you first obviously had

13 to stop at the gate; is that correct?

14 A    Yes.

15 Q    Okay.  And that's where the security would come to talk

16 to you or you guys did it on the phone?

17        How did that work?

18 A    The -- both ways.  So you could -- the security guard

19 would come out or you would just call.

20 Q    Okay.  And the purpose of having to go through security

21 is to make sure nobody's coming in that's not supposed to be,

22 fair enough?

23 A    Yes.

24 Q    At the time when you were there, Mr. Kelly, for lack of a

25 better word, was a celebrity; is that correct?

1   A    Yes.

2   Q    He had security guards; correct?

3   A    Yes.

4   Q    And he -- part of the role and the -- strike that.

5        Part of the reason that individuals were stopped was

6   to make sure he was safe in his own home, is that fair?

7   A    Yes.

8   Q    When you would get and see security and/or by the phone

9   or in person, the security had another role, which was they

10  check IDs, is that fair to say?

11  A    Yes.

12  Q    So, specifically, they would check and make sure it's the

13  person's name that's supposed to be there; is that correct?

14  A    I don't know.

15  Q    Okay.  So you have no idea why the guests that you would

16  bring to Olympia Fields had to give their ID to the security?

17            MS. GEDDES:  Objection.

18            THE COURT:  Why don't you rephrase the question.

19            MS. BLANK BECKER:  Sure.

20  Q    You saw the guests that were in the vehicle that you were

21  bringing -- you saw those guests hand over an ID; is that

22  correct?

23  A    When I brought people over, no, they -- the only time

24  I've seen them check IDs were at parties.

25  Q    Okay.  You never saw the security check an ID at the

1    front gate?

2    A    Well, actually, yes.  Never mind.  I have.  I have seen

3    that.

4    Q    Thank you.

5         And after they would do a check of the person's ID,

6    do you also remember then they would have those individuals

7    sign nondisclosures?

8    A    Yes.

9    Q    And the nondisclosure would be handed over and then the

10   guest would choose to sign it or not sign it; is that correct?

11   A    Yes.

12   Q    All right.  And then after that part, that's when

13   security and/or yourself would escort the person to the home?

14   A    Yes.

15   Q    And then eventually bring the person into the home, is

16   that true?

17   A    Yeah.  So, security check point and then they were given

18   instructions on where to take them.

19   Q    Great.

20        Now, you indicated well -- strike that.

21        The first thing that they would do is you indicated

22   there was sort of like a separate entrance instead of the

23   front entrance to get in to go to the studio, is that fair to

24   say?

25   A    Yes.

Navarro - cross - Blank Becker                    540

1  Q    Okay.  And when you would enter through that second

2  entrance and go to the studio, you didn't have to walk through

3  the home; is that correct?

4  A    No, this was -- that second entrance, no, that was not

5  through the home.

6  Q    And take us through when you open the door, you come in

7  and take us from that point then to the front desk?  What

8  happened?

9         Is it immediately there you're at the front desk?

10        Tell us about that.

11 A    So when you're going into the basement to get into the

12 studio, as soon as you walk in, the front desk is the first

13 thing on your left.

14 Q    Got it.

15        Now, oftentimes you would be seated at the

16 receptionist desk?

17 A    Yes.

18 Q    All right.  So if a guest came and you were not the one

19 who picked up the guest, is it fair to say sometimes they came

20 themselves to the studio and you didn't have to pick them up?

21 A    Yes.

22 Q    Okay.  In fact, were Ubers often used, and, you know,

23 obviously you didn't have to drive anyone anywhere?

24 A    Hmm.

25 Q    And I said Uber.  Maybe it was a cab back at that time.

1    A    Yeah, I don't think Uber was around then.

2    Q    Yes.  Sorry.

3    A    Taxicabs would.  Sometimes people had their own cars as

4    well.

5    Q    In their own cars.  Got it.

6         So I take it it's fair to say they're driving their

7    own car, they're catching a cab?  No one is directing them to

8    the house?

9         In other words, you didn't have -- I believe earlier

10   you were saying that you had directions of what to do once you

11   picked up a guest; correct?

12   A    Yep.

13   Q    Okay.  I'm going to move forward.  All right.

14        So, someone comes into Olympia Fields.  They come

15   down stairs and the first thing is the desk to the left;

16   correct?

17   A    Yes.

18   Q    The front desk, I believe you referred to it, or I

19   referred to it as; right?

20   A    Yes.

21   Q    All right.  What else was in that area?  Were there some

22   couches and so forth?

23   A    In the front area of the reception?

24   Q    Yes.  Yes.

25   A    So there's a couch.  There's a TV.  There was a like a

1    kitchen.  There's a kitchen.

2    Q    Okay.  Now, not to sound silly, but the kitchen, did that

3    have food in it?  Was there food in there?

4    A    There is a fridge, but there was usually not food in

5    there.  There was usually drinks.  Sometimes we would have

6    our, like, lunch, we would store it in there, but there wasn't

7    like stuff to eat.  I mean, sometimes there was groceries in

8    there, but -- I guess yeah,  there was food in there.

9    Q    Thank you.

10          And when guests would come to the studio there, was

11   it like immediately they'd go see whomever there were there

12   for or sometimes you would have them actually hang out there

13   at the couch and wait?

14   A    Yes, sometimes they would wait.

15   Q    When I use the word wait, maybe that's why you hesitated.

16          THE COURT:  Could you just put a question to the

17   witness, please.

18          MS. BLANK BECKER:  Of course, Judge.

19          THE COURT:  Thanks.

20   Q    Sometimes they would wait not just for a couple of

21   minutes, but maybe hours, is that fair to say?

22   A    Sometimes, yes.

23   Q    And when they were waiting there for hours, they could

24   get up and leave if they wanted to; right?  Go back out the

25   door they came in?

Navarro - cross - Blank Becker                    543

1  A    Yes.

2  Q    All right.  Sometimes guests would wait for days, is that

3  true?  Like stay overnight waiting; is that true?

4  A    Yes.

5  Q    Again, they could have left if they wanted to?

6  A    Yes.

7  Q    Now, the next thing that happened when someone came to

8  the studio is soon as someone was there you would call the

9  office and/or call Mr. Kelly or Mr. Arnold or whomever and let

10 them know that a guest had arrived, is that fair to say?

11 A    Yes.

12 Q    Did you -- strike that.

13      You didn't know where the guest was supposed to be

14 hanging out or if they were coming to sing for Mr. Kelly?  You

15 didn't know those details, is that fair to say?

16 A    The details of why they're visiting, is that what you're

17 asking?

18 Q    Yes.  Sorry.  Yes.

19 A    No.

20 Q    Because you said to us earlier you weren't even allowed

21 to speak to them; correct?

22 A    Yes.

23 Q    Obviously you could -- pleasantries, so forth, but their

24 actual purpose for being at the house, at the studio, that

25 wasn't for your -- that wasn't conversation for you; is that

Navarro - cross - Blank Becker                    544

1   correct?

2   A    I was only instructed on what to do with that person, so

3   they didn't tell me why they were here.

4   Q    Okay.

5   A    Sometimes.  Sometimes, I mean, if there would be someone

6   that's recording and they would tell me to bring them to the

7   studio or something like that.

8   Q    Okay.  So, basically, you did your job, is that fair to

9   say, with regards to you would find out when a guest gets

10  there where the guest was supposed to go?

11  A    Yeah.

12  Q    And, ultimately, I believe you indicated that wherever

13  you were told the guest should go, you would then take the

14  guest to that place; is that correct?

15  A    Yes.

16  Q    And I believe you also said it was oftentimes throughout

17  the entire house, it wasn't one specific place; is that

18  correct?

19  A    Yes.

20  Q    In fact, you took them -- you would take them on that

21  level, which is the basement level, maybe to different

22  studios, is that fair to say?

23  A    Yes.

24  Q    And then on the main floor, you indicated there was a

25  game room and such, sometimes you took them there; is that

Navarro - cross - Blank Becker                    545

1   right?

2   A    Yes.

3   Q    And the top floor of the house where there were bedrooms,

4   sometimes you went up there; correct?

5   A    Yes.

6   Q    Okay.  Now, I'm going to start at the top floor.

7        You indicated there was a number of bedrooms, plus

8   there was a master bedroom; is that correct?

9   A    Yes.

10  Q    All right.  The number of bedrooms, do you remember that

11  each one of those bedrooms had a bathroom?

12  A    I know the master bedroom had a bathroom, but I don't

13  remember if the other bedrooms had bathrooms in it.

14  Q    Fair enough.  If you don't remember, I want you to say I

15  don't remember.

16       This is a mansion that we are talking about; right?

17  A    Yes.

18  Q    The Olympia Fields mansion?

19  A    Yes.

20       MS. GEDDES:  Objection.

21       THE COURT:  Objection?  Overruled.

22  Q    Now, you indicated something about the fact that you

23  recall in the master bedroom seeing a camera with a tripod;

24  correct?

25  A    Yes.

Navarro - cross - Blank Becker                    546

1    Q    Prior to coming into court today, you spoke with the
2    Government; correct?
3    A    Yes.
4    Q    And you kind of went over everything that you might
5    testify about; correct?
6    A    Yes.
7    Q    And there was certain things that you probably didn't
8    remember because it's so long ago, is that fair to say?
9    A    Yes.
10   Q    And they helped you remember those things, is that fair
11   to say?
12   A    Yes.  Going -- just talking over it several times kind
13   of.
14   Q    Talking it over several times?
15   A    Yeah.
16   Q    Okay.  And then the more you talked the more things would
17   be discussed about specific facts; correct?
18   A    Yes.
19   Q    And they even showed you pictures in that meeting; is
20   that correct?
21   A    Yes.
22   Q    Most recently, they even showed you the picture that you
23   identified today as someone with the name J, they showed you
24   that picture; right?
25   A    Yes.

Proceedings                                              547

1          THE COURT:  I'm going to -- we are going to have to

2     take a break at this point.

3          MS. BLANK BECKER:  Okay.

4          THE COURT:  It's time for a morning break.  I also

5     have another matter to handle.

6          Ladies and gentlemen, I am going to excuse you.  It

7     will probably take about 15 minutes.  Please don't talk about

8     the case.

9          We will see you in a few minutes.  All right.  Thank

10    you so much.

11         THE COURTROOM DEPUTY:  All rise.

12         (Jury exits the courtroom.)

13         THE COURT:  Okay, the witness can step down and we

14    will be back here, let's say, 11:40.

15         MR. CANNICK:  Your Honor, do we have to clear our

16    stuff?

17         THE COURT:  No, it's a telephone conference.

18         (Recess taken.)

19         (In open court - jury not present.)

20         THE COURTROOM DEPUTY:  All rise.

21         THE COURT:  You could all have a seat.

22         MS. GEDDES:  Your Honor, should we bring in the

23    witness.

24         THE COURT:  I'm sorry?

25         MS. GEDDES:  Your Honor, should we bring in the

1  witness.

2          (Witness takes stand.)

3          THE COURT:  All right.  Are we ready for the jurors?

4          MS. GEDDES:  Yes, Judge.

5          THE COURT:  The other witness is going to be after

6  lunch; correct?

7          MS. GEDDES:  Definitely.

8          THE COURTROOM DEPUTY:  All rise.

9          (The jury enters the courtroom.)

10         THE COURT:  You may be seated.

11         Okay, folks, I apologize.  That took a little

12  longer.  This other matter that I had that people were just

13  too chatty.  But we are ready to continue with the

14  cross-examination of the witness.

15         THE COURTROOM DEPUTY:  The witness is reminded he is

16  still under oath.

17         THE WITNESS:  Yes.

18         THE COURT:  Go ahead, counsel.

19         MS. BLANK BECKER:  Thank you, Judge.

20  CROSS-EXAMINATION (Continuing)

21  BY MS. BLANK BECKER:

22  Q    Mr. Navarro, we left off discussing a number of things

23  with the studio and what would happen when the guests arrived.

24         Do you recall that?

25  A    Yes.

1   Q    Okay.  Another thing that would happen when the guests

2   arrived at the front desk is you were responsible, or whomever

3   was at the front desk, to scan or copy their ID; correct?

4   A    That usually wasn't my responsibility, no.

5   Q    Okay.  So that was someone else's responsibility to do?

6   A    Yes.

7   Q    At the front desk?

8   A    Yes.

9   Q    Whenever a new guest would arrive?

10  A    Yes.

11  Q    So that would be -- if my math is correct, that would be

12  two checks of their IDs, once from security and then once when

13  they are actually inside the house, the studio, is that fair

14  to say?

15  A    Are you asking about security checks?

16  Q    You know what, I'm going to move forward because we

17  already went through that and I don't want to belabor.  Thank

18  you.

19          Let's talk about some of your duties, some of your

20  role -- your job description, okay.

21          My understanding is one of the things -- you

22  indicated that you were an intern initially; correct?

23  A    Yes.

24  Q    And then you were paid?

25  A    Yes.

1   Q    All right.  Part of your job, though, is you kind of had

2   to do the things that maybe nobody else wanted to do, so to

3   speak, is that fair to say?

4   A    Yes.

5   Q    And that included, I think you said earlier, cleaning;

6   correct?

7   A    Yes.

8   Q    And when you would have to clean, is it fair to say that

9   times when you would clean some of these rooms the odor would

10  be pretty bad?

11  A    Yes.

12  Q    And is that the kind of smell that you have told the

13  Government that is like sort of resonated in your head, that

14  you can't forget it?

15  A    Yes.

16  Q    You never saw any buckets of urine anywhere in the house

17  when you were cleaning, did you?

18  A    No.

19  Q    You never saw any buckets with feces, did you?

20  A    No.

21  Q    You never picked up a bucket and thought it smelled so

22  awful and the smell that you remembered was that of urine;

23  correct?

24  A    No.

25  Q    Now, when you would have to clean, another thing you

1 would often see is condoms or boxes of condoms, is that fair

2 to say?

3 A    Whenever I cleaned, I don't remember seeing stuff like

4 that.

5 Q    Okay.  Let me change that then.

6        You remember that you would see boxes of condoms all

7 over the studio?

8 A    No.

9 Q    So you remember that earlier we talked a little bit about

10 how you had spoke to the Government prior to today; correct?

11 A    Yes.

12 Q    And you actually had spoke to him -- excuse me, spoke to

13 them for the first time back in February 2nd of 2020; is that

14 correct?

15 A    Yeah, I think so.

16 Q    Okay.  You talked to them -- you for sure talked to them

17 once; right?

18 A    Yes.

19 Q    You for sure talked to them twice; right?

20 A    Yes.

21 Q    Do you remember talking to them a third time?

22 A    Last -- the other day.

23 Q    I'm sorry, the other day, you remember?

24 A    Yes.

25 Q    I'm sorry.  I'm not trying to trip up.  I'm just trying

1  to understand.  The other day.

2          Now, is it possible in one of those conversations

3  that you had with them that you told them that you remember

4  seeing boxes of condoms?

5  A    It's possible, yes, it's possible.

6  Q    All right.  And when you would go -- and I believe -- I'm

7  going to move on to another duty, so to speak.

8          You indicated that you would go and you would get

9  food sometimes.  That was happening, what?  Daily?

10  A    Yes.

11  Q    And the food that you would get, that food would be for

12  staff members, is that true?

13  A    Yeah.  Yep.

14  Q    Okay.  There was no Uber Eats or anything like that at

15  the time; is that correct?

16  A    No, not at the time, pizza delivery.

17  Q    I'm sorry?

18  A    Well, there was pizza delivery.  I think that was the

19  only thing that delivered.

20  Q    Who delivered often to the studio, is that fair to say

21  too?

22  A    There was -- yeah, we had a lot of pizza come in.

23  Q    Isn't it fair to say as well that food was around a lot

24  there at the studio?  That was a common thing for Mr. Kelly

25  and/or any of the staff to ask you to get food?

1    A    Yeah, it was daily thing.

2    Q    Now, not only did you get food -- and I believe you

3    indicated this a little bit earlier, not only did you get food

4    for staff and Mr. Kelly, but for any of the guests that were

5    there as well, that was part of your role?

6    A    Yes.

7    Q    And the way you would know what those guests wanted is

8    they'd call and tell you; correct?

9    A    Yes.

10   Q    All right.  And then -- strike that.

11        When they would call you and tell you they're hungry

12   and they wanted food, you didn't just hang up on them and say,

13   no, you can't have food, did you?

14   A    No.

15   Q    Okay.  And then, I believe you indicated that in order

16   for them to get the food, you had -- you had asked someone,

17   you know, is this okay, this is what they're requesting, is

18   that fair to say?

19   A    Yes.

20   Q    All right.  So you weren't allowed to just go get someone

21   lobster and steak every day, is that true?

22   A    Correct.

23   Q    There was like a budget, is that fair to say?

24   A    Yeah.  I mean, yeah.

25   Q    Not that you were in charge of the budget, but the

Navarro - cross - Blank Becker                    554

1   purpose -- one of the purposes for calling someone else is you

2   needed money to pay for it, is that fair to say?

3   A    Yes.

4   Q    And you always got like a receipt from whatever food you

5   went and picked up, is that fair to say?  For the most part, I

6   should say.

7   A    I don't remember needing receipts, no.

8   Q    Okay.  So how was it that you would sort of report back

9   as to how much money was actually spent for the times you

10  would go get food?

11  A    I didn't.

12  Q    You never wrote that down?

13  A    I don't remember writing that down.  I know -- so there

14  is a petty cash drawer that had like a till, but I don't

15  remember if we had to write it down there.

16  Q    Okay.  But ultimately you could use the petty cash that

17  was supplied obviously by someone, not you, is that fair to

18  say?

19  A    Yes.

20  Q    All right.  Now, another one of your duties is you would

21  run errands for either the staff, Mr. Kelly, or any guest; is

22  that true?

23  A    Yes.

24  Q    And one of the things I believe you indicated that you

25  did is you would go to Walgreens and pick up prescriptions,

1   you said; right?

2   A    Yes.

3   Q    Okay.  But that's not the only thing you would pick up at

4   Walgreens; right?

5   A    I -- I think -- yeah, I picked up other things from

6   there.

7   Q    Like tampons?

8   A    Yes.

9   Q    Pads, maxi pads for women?

10  A    Yep, yep.

11  Q    In fact, sometimes you had lists from the guests of

12  things that they needed and you would go to the drugstore and

13  grab them for them?

14  A    Yeah.  There was always a list of things to get that came

15  from -- not specifically the guests but from Diana -- Diane,

16  which was somebody in the house.

17  Q    So let me just understand that a little bit more.

18         You said the list would come from Diana.  Diana,

19  that was one of the assistants for Mr. Kelly; correct?

20  A    Yes.  Diana.

21  Q    And Mr. Kelly -- excuse me, Diana, for lack of a better

22  word, she was the go-between for guests sometimes with you and

23  other employees, is that true?

24  A    She was just like I guess the assistant to R. Kelly,

25  so...she was like a house manager, did things, yeah.

1  Q    Okay.  So as the assistant, are you saying that sometimes

2  she would give you the list of things that the girls had --

3  excuse me, that the women had asked for?  Is that what you're

4  saying?

5  A    I didn't specifically know who the list was for, but

6  there was always a shopping list of things to get.

7  Q    Okay.  So this -- and I'm not trying to bog you down on

8  the details of that, but the shopping list that you're talking

9  about, this is something that you'd received and then you'd go

10 and get what you would had to get and you'd bring it back,

11 true?

12 A    True.

13 Q    Got it.  Thank you.

14        Now, when your job title changed a little bit from

15 intern to -- and I apologize, were you like assistant

16 engineer?  Is that what you said?  What was the name?

17 A    Like a general assistant.

18 Q    General assistant.

19 A    Runner is what they called it.

20 Q    Sorry?

21 A    The title is runner --

22 Q    Runner.

23 A    -- which is a general assistant.

24 Q    Okay.  And that title runner, is that the only time

25 you've heard that word used in the music industry or is that a

1  pretty common thing that's -- word that's used for --

2  A    It's a common thing in the music industry.

3  Q    Okay.  And speaking of common words, when you would be at

4  the studio or around Mr. Kelly or around the guests, they --

5  they being the guests, would refer to Mr. Kelly as Mr. Kelly,

6  is that fair to say?

7  A    Yes.

8  Q    You never heard them refer to him as daddy; correct?

9  A    I've heard of that, yes.

10  Q    So you've heard that coming from whom?

11  A    Guests.

12  Q    Guests.  Okay.

13        And when you heard that word coming from guests, the

14  context of it, were they telling you -- strike that.

15        What was the context of them using that word?

16  A    In conversation, so....

17  Q    With you?

18  A    No, with -- with Rob.

19  Q    So you would be present for conversations between Mr.

20  Kelly and his guests?

21  A    Sometimes, yeah.

22  Q    And, so, the context -- strike that.

23        Would you describe when the guest would use the word

24  daddy as a negative connotation or a positive connotation, if

25  you know?

Navarro - cross - Blank Becker                    558

1    MS. GEDDES:  Objection.

2    THE COURT:  Sustained as to form.

3  Q    So remember when you talked to the Government on at least

4  three other occasions that we've established?  Remember that?

5  You said at least three other times; right?

6  A    Yes.

7  Q    You never told them anything about the word daddy, did

8  you?

9  A    I don't remember, no.

10  Q    And the word daddy, fair enough to say it's often used as

11  a term of endearment?

12    MS. GEDDES:  Objection.

13    THE COURT:  Overruled.

14    You can answer.  Do you have an answer for that?

15    THE WITNESS:  I don't know what that means,

16  "endearment."

17  Q    Sorry.  In a somewhat positive way as opposed to in a

18  nasty, negative way.

19    THE COURT:  Okay, that I will sustain.

20  Q    You tell us what -- how -- when you would hear the word

21  daddy, how did that make you feel?  What were you seeing?

22  A    It was I guess more --

23  Q    The demeanor.  Sorry.  That's the word I'm looking for.

24  A    Okay.

25    THE COURT:  I do not understand the question.  I'm

Navarro - cross - Blank Becker                    559

1   sorry.

2          Would you repeat the question to the witness?

3          MS. BLANK BECKER:  Judge, I'm just going to move on.

4   Thank you.

5          THE COURT:  Okay.

6   Q    All right.  So when you were working at the studio, I

7   believe you indicated, or I'm not sure it was even discussed,

8   but you yourself had a -- oh, yeah,  it was -- a

9   non-disclosure; correct?

10  A    Yes.

11  Q    You signed that right at the beginning when you started

12  working there; correct?

13  A    Yes.

14  Q    Not a big deal, common thing to do in the musician world,

15  is that fair?

16  A    Yes.

17  Q    And at some point I believe you indicated that you were

18  working throughout the night, like 9:00 to 9:00, is that true?

19  A    Yes.

20  Q    And then there were times you started to work even during

21  the day; correct?

22  A    Yes.

23  Q    You were working a lot of hours, fair to say?

24  A    Yes.

25  Q    All right.  In fact, there was always things that needed

1  to be done there at the studio, is that fair to say?

2  A    Yes.

3  Q    And you didn't have all the burden of doing everything on

4  your shoulders, you guys sort of worked as a team, is that

5  fair to say?

6  A    Yes.

7  Q    Okay.  And if there was something that needed to be done

8  and someone else would who normally be in that role, you would

9  help out or vice versa, is that fair to say?

10  A    Yes.

11  Q    Okay.  And in all the hours that you were at the studio,

12  Mr. Kelly, for the most part, was working, is that true?

13  A    Yes.  Is that fair to say.

14  Q    Mr. Kelly was also known to work throughout the evening

15  hours; is that correct?

16  A    Yes.

17  Q    And he had the engineers in the studios oftentimes

18  working with him doing that as well, fair to say?

19  A    Yes.

20  Q    And that was also going on sometimes through the entire

21  day; true?

22  A    Yes.

23  Q    Now, you're aware that Mr. Kelly couldn't read or write;

24  is that correct?

25  A    I was aware that he -- I was told that he couldn't read,

Navarro - cross - Blank Becker                    561

1   but I'm not sure about the writing thing.

2   Q    Okay.  He never wrote any letters to you or anything like

3   that, is that true?

4   A    I did not receive any letters, no, from him.

5   Q    Thank you.

6          So there -- when Mr. Kelly was working in the

7   studio, you've been in the studio when he's been working, fair

8   to say?

9   A    Yes.

10  Q    Okay.  And one of the ways that Mr. Kelly does his work

11  is by getting melodies or songs and he would tape it?  And,

12  again, I apologize, I'm probably not using the right verbiage,

13  but make a recording there in the studio, is that true?

14          MS. GEDDES:  Objection.

15          THE COURT:  Sustained.

16  Q    Did you ever see Mr. Kelly make a recording of a song in

17  the studio?

18          MS. GEDDES:  Objection.

19          THE COURT:  Sustained.

20  Q    Was there ever singing going on when you were in the

21  studio?

22          MS. GEDDES:  Objection.

23          THE COURT:  Overruled.

24  A    Yes.

25  Q    And were there engineers actively working in concert with

1 | Mr. Kelly when that was happening?

2 | A    Yes.

3 | Q    How many engineers would you say there was given at one

4 | time?

5 | A    Are you asking about the sessions with Rob?

6 | Q    Yes.  Thank you.

7 | A    Usually it's one engineer and then one assistant.

8 | Q    And one assistant?

9 | A    And then there might be the musical director would be

10 | there or musicians or other producers.

11 | Q    I'm sorry, I didn't hear the last thing you just said.

12 | A    There could be other musicians or producers there as

13 | well.

14 | Q    And sometimes those individuals would be there for hours

15 | and hours and hours too; is that correct?

16 | A    Yes.

17 | Q    And speaking of other musicians, Mr. Navarro, is it fair

18 | to say that there was some larger than life musicians that

19 | showed up at the studio sometimes?

20 | A    Yes.

21 | Q    Okay.  Whitney Houston?

22 |         MS. GEDDES:  Objection.

23 |         THE COURT:  Sustained.

24 | Q    So when the larger than life celebrities would show up at

25 | the studio, they would come with their own security; is that

Navarro - cross - Blank Becker                    563

1   correct?  Sometimes?

2           THE COURT:  Do you know?

3           THE WITNESS:  I don't remember.

4   Q    Okay.  When celebrities would come to the studio, is it

5   fair to say that oftentimes guests or whomever was at the

6   location they had to sort of stay where they were and not

7   interact with the celebrities and whoever else they brought

8   with them?

9   A    The guests --

10  Q    Yes.

11  A    -- in the house?

12          I don't remember them being around in the sessions,

13  but -- well, yeah, I guess they were around in the studios

14  sometimes, but I don't remember any kind of interaction

15  between the guests and the people that came in.

16  Q    Okay.  So at this point I'm just asking about the

17  celebrities, when they would come there.

18  A    Okay.

19          THE COURT:  You should really only answer the

20  question if you know the answer to it, okay?  If you don't

21  know, say you don't know.

22          THE WITNESS:  Okay.

23  A    I don't know.

24  Q    Okay.  So let's now discuss -- we're going to...you

25  talked about different cars that you've had to drive when you

1   would go pick up any guest; correct?

2   A    Yes.

3   Q    And you listed a couple different vehicles.  You never

4   drove a black Range Rover, did you?

5   A    No.

6   Q    Do you remember even seeing a black Range Rover as a

7   vehicle that Mr. Kelly had?

8   A    No.

9   Q    And you drove a bunch of the different cars that were

10  there; right?

11  A    Yes.

12  Q    Including a Maybach?

13  A    Yes.

14  Q    All right.  So if there was a black Range Rover there,

15  you would know about it?

16  A    Yes.

17  Q    Now, you indicated there was a number of different guests

18  that you would pick up, maybe you would have to pick them up

19  at a train station ever?

20  A    Yes.

21  Q    Airport?

22  A    Yes.

23  Q    Hotels?

24  A    Yes.

25  Q    And when you would pick up these guests, none of them

1  appeared to be under age to you; is that correct?

2  A    Yes.

3  Q    So if you picked up someone at the train station and

4  brought them to the house, that person seemed to be sort of

5  maybe around your age at the time, 21, 22; is that fair to

6  say?

7        THE COURT:  Who are we talking about being picked

8  up?  Just anyone?

9        I just want to understand the question.

10       MS. BLANK BECKER:  Okay.

11       THE COURT:  Is there a particular person to whom

12  you're referring?

13       MS. BLANK BECKER:  Sure.  Thank you, Judge.

14       THE COURT:  Yes.

15  Q    When you would pick up the female guests, did they appear

16  to be around the same age as you at the time, 21, 22?

17  A    Yes.

18  Q    And when you -- you indicated you would pick up guests at

19  the train; correct?

20  A    Yes.

21  Q    Okay.  And you remember having to pick up the girl that

22  was in the picture and you said you thought her name started

23  with a J.  Do you remember picking her up at the train?

24  A    I don't, no.

25  Q    You don't remember that; right?

Navarro - cross - Blank Becker                    566

1    A    No.

2    Q    Because if you did remember that, you told us earlier --

3    strike that.

4          You've told us about a camera that caught two

5    younger girls on the property; correct?

6    A    Yes.

7    Q    Okay.  And you indicated those girls looked really young,

8    is that true?

9    A    Yes.

10   Q    You can tell -- I believe you said the camera was pretty

11   clear, right?

12   A    Yes.

13   Q    So you could tell from the camera that those two girls

14   looked super young; right?

15   A    Yes.

16   Q    And you also said that when you watched, you could see

17   them running, I believe you said across the property.  Is that

18   what you said?

19   A    Yes.

20   Q    Okay.  And then you thought maybe that's when -- after

21   that, that's when they maybe hid.  That was your word;

22   correct?

23   A    Yes.

24   Q    Okay.  You don't know if instead of hiding they actually

25   went into the house, is that true?

Navarro - cross - Blank Becker                    567

1          THE COURT:  Do you know where they went?  That's the

2    question.

3          MS. BLANK BECKER:  Thank you, Judge.

4    A    I don't know where they went.

5    Q    Okay.  Well, let me ask you this.  You were at the house

6    looking at the security cameras.  That's what you said; right?

7    A    Yes.

8    Q    Okay.  And the security cameras were in the basement?

9    A    Yes.

10   Q    And the security cameras in the basement, you weren't by

11   yourself when the girls -- excuse me -- these two women,

12   girls, jumped over the fence; right?

13   A    No.

14   Q    Bubba, someone by the name of Bubba was there too; right?

15   A    I don't remember if Bubba was there.

16   Q    You don't remember that when you saw these two

17   individuals come into Mr. Kelly's property or come on Mr.

18   Kelly's property, you don't recall seeing -- excuse me, having

19   a conversation with Bubba about what you just saw?

20   A    I don't remember.

21   Q    Okay.  Someone called Mr. Kelly and told him about what

22   you had just seen; correct?

23          MS. GEDDES:  Objection.

24          THE COURT:  Sustained.

25          Unless it was you.  Did you call him?

1          THE WITNESS:  I called somebody.  I don't remember.

2     I don't think it was Rob that I called.  I think it was one --

3     maybe Tom.  Yeah.

4               (Continued on following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  EXAMINATION CONTINUES

2  BY MS. BLANK BECKER:

3  Q    Okay.

4  A    I called somebody, though, and told them what was going

5  on.

6  Q    You don't remember Bubba being the one who called someone

7  to figure out what was going on?

8          MS. GEDDES:  Objection.

9          THE COURT:  I'll sustain it as to form.

10          You called someone, you don't remember whom you

11 called, correct?

12          THE WITNESS:  Yeah, just to -- yeah, to tell them

13 that someone had ran onto the property.

14          THE COURT:  Okay.

15          MS. BLANK BECKER:  Judge, may I just have one

16 moment, please?

17          THE COURT:  Sure.

18          (Pause.)

19          MS. BLANK BECKER:  Thank you, Judge.

20 BY MS. BLANK BECKER:

21 Q    You indicated that when you would pick up different

22 guests, oftentimes you were picking up the same guest, like a

23 repeat guest.

24          Is that fair to say?

25 A    Yeah, there was -- yes, there was regulars that came.

1  Q    You never received any calls at the front desk that said

2  that they wanted to leave and they weren't allowed to,

3  correct?

4  A    There's been times where there's people that wanted to

5  leave and they -- they couldn't 'cause either they couldn't

6  get a ride or we couldn't get ahold of Rob.

7  Q    Okay.  These -- these -- these people, they had cell

8  phones as well, correct?

9  A    I don't know.

10 Q    So, are you saying, Mr. Navarro, that if a guest wanted

11 to leave, they couldn't walk out the door?

12 A    No, they -- they could walk out the door.

13 Q    Okay, thank you.

14        MS. BLANK BECKER:  Sorry, Judge, I'm thinking.

15        THE COURT:  That's all right.

16 BY MS. BLANK BECKER:

17 Q    When you saw the different bedrooms -- strike that.

18        Were there bedrooms in the basement level?

19 A    No.

20 Q    Were there bedrooms on the main level?

21 A    Yes.

22 Q    And then upstairs, correct?

23 A    Yes.

24 Q    Okay.  And I believe you indicated for some of the

25 guests, you were the one responsible for sort of taking them

1   to go to different rooms; true?

2   A    Yes.

3   Q    And when you would take them to those rooms, did you need

4   a key to get into the room to open it up for them?

5   A    No.

6   Q    Did you have to unlock something on the outside to allow

7   them to get into the rooms?

8   A    No.

9   Q    For lack of better words, it was a normal kind of

10  doorknob, nothing special about it?

11  A    Yeah, it was just regular doorknobs.

12  Q    Thank you.

13       At some point earlier you were talking about the

14  fact that there was a long hallway, correct, that you had to

15  sort of take guests through?

16  A    Yes.

17  Q    And you said something about platinum plaques?

18  A    Yes.

19  Q    What is that?

20  A    A platinum plaque is, like, a certificate that shows --

21       MS. GEDDES:  Objection.

22       THE COURT:  Overruled.

23       MS. BLANK BECKER:  Thank you.

24       THE COURT:  Overruled.  It's not particularly

25  relevant, but you can answer.

Navarro - cross - Blank Becker                     572

1          THE WITNESS:  Okay.

2    A    It's like a certificate that says you've achieved a

3    certain amount of record sales.  So, like -- kinda like a

4    trophy.

5    Q    Got it, thank you.

6          Now, briefly there was some conversations about the

7    garage of the home, do you remember that, there were some

8    questions and answers about that?

9    A    Yes.

10   Q    All right.  There was -- and you mentioned something

11   about boxing, correct?

12   A    Yes.

13   Q    There was an actual, like, full-sized boxing ring in

14   there, is that correct?

15   A    Yes.

16   Q    Okay.  There wasn't -- you said something about that you

17   remember there was a bed in there, correct?

18   A    Yes.

19   Q    Okay.  What did that bed look like?

20   A    Just like -- just a bed with blankets on it.  It might

21   have been queen sized.

22   Q    Had you ever seen anyone in it?

23   A    I have never seen anyone in it, no.

24   Q    Thank you.

25          In fact, have you ever seen Mr. Kelly in his home or

Navarro - cross - Blank Becker                573

1   in the studio engaging in sexual activities?

2   A    No.

3           MS. BLANK BECKER:  Again, Judge, I apologize.

4           THE COURT:  That's all right.

5           MS. BLANK BECKER:  Thank you.

6           (Pause.)

7           MS. BLANK BECKER:  Again, Judge, I apologize, I'm

8   trying to speed it up.

9           THE COURT:  It's all right, take your time.

10          MS. BLANK BECKER:  Thank you.

11  BY MS. BLANK BECKER:

12  Q    There were -- there was things that you talked about with

13  regards to getting fined, is that true?

14  A    Yes.

15  Q    And you equated it to, like, a basketball team when

16  individuals get fined on a team, correct?

17  A    Yes.

18  Q    All right.  And typically, the purpose of a fine is

19  because you did something wrong?

20  A    Yes.

21  Q    Okay.  And it didn't have to be the worst penalty in the

22  world, correct, that's what you were saying?

23          MS. GEDDES:  Objection.

24          THE COURT:  I will sustain it as to form.

25          MS. BLANK BECKER:  Sure.

1   BY MS. BLANK BECKER:

2   Q    You indicated that sometimes you thought the fines were

3   for, like, I don't know if this was your exact words, but

4   little things, is that fair to say?

5   A    No.

6   Q    Okay.

7        You thought sometimes you got fined and you

8   shouldn't have, true?

9   A    Yes.

10  Q    All right.  Now, fines are typically, in basketball, if

11  someone breaks the rules they get a fine, right?

12           THE COURT:  Please, just ask the question.  Let's

13  keep the prelude out of it.  Just put a question to the

14  witness.

15  Q    Sometimes basketball players get fined because they did

16  not follow a rule, correct?

17           MS. GEDDES:  Objection.

18           THE COURT:  Sustained.

19  Q    Sometimes employees working with and for Mr. Kelly, they

20  would get fined for not following their job duties, correct?

21  A    Yes.

22  Q    All right.

23       In other words, if someone didn't show up when they

24  were supposed to, fine; true?

25  A    Yes.

1   Q    If someone was late, they'd get fined; true?

2   A    No, I don't -- I don't remember that.

3   Q    Were you ever late?

4   A    Probably, yeah.

5   Q    And you don't remember getting fined?

6   A    No.

7   Q    And this was between the evening hours and the day hours?

8   A    Correct.

9   Q    And the fine didn't come directly from the -- I shouldn't

10  say that.

11         The -- the breaking of a -- you know, not doing your

12  job correctly, if there was going to be a fine, I believe you

13  indicated that was Mr. Arnold sort of followed through on

14  that, is that correct?

15  A    The fine did not come from Mr. Arnold, no.

16  Q    And that was probably a bad question on my part, and I

17  apologize.

18  A    That's okay.

19  Q    Mr. Arnold was someone that would talk to you if there

20  was a fine -- excuse me, if there was something that was done

21  that wasn't supposed to be done, is that true?

22  A    Yeah.

23  Q    Thank you.

24         Had you ever seen the security for Mr. Kelly armed?

25  A    No.

Navarro - cross - Blank Becker                576

1  Q    You never saw Mr. Kelly armed either, correct?

2  A    Correct.

3  Q    You never saw any physical abuse while you were at the

4  studio, correct?

5  A    No.

6  Q    You never saw any what you would consider verbal abuse

7  while you were at the studio, correct?

8  A    Yes.

9  Q    And yes, you saw verbal abuse?

10        I'm sorry, that probably is a bad question.

11        How about this:  Did you see any verbal abuse when

12  you were there?

13  A    To --

14  Q    Guests?

15  A    -- anybody?

16  Q    Yes, guests?  Did you -- okay, sorry.

17  A    Yeah, yeah, I would see it.

18  Q    You would, you would see verbal abuse?

19  A    Yes.

20  Q    Okay.  So, when you talked to the Government back in

21  February 2nd of 2020, do you remember telling them that you

22  didn't see any physical or verbal abuse at the studio?

23  A    Yes, I remember now, but I guess I just had a memory just

24  now.

25  Q    Oh, so just now you're saying you remembered something

1    about that?

2    A    Yes.

3              THE COURT:  Wait, I am just unclear.

4              You say you remember verbal abuse now, is that what

5    you're saying?

6              THE WITNESS:  Yes.

7              THE COURT:  Okay.

8    BY MS. BLANK BECKER:

9    Q    And when you say you remember verbal abuse, there was

10   times where employees got reprimanded for things that they

11   would do, is that true?

12   A    Yes.

13   Q    Now, you said something, and I'm just about done, you

14   said something about touring, that you would go on some tours

15   with Mr. Kelly, fair enough?

16   A    Yes.

17   Q    More than one or just one?

18   A    I've only been on one.

19   Q    And that tour lasted about how long?

20   A    Three months.

21   Q    As part of that tour, you remember after the concerts

22   there was usually a backstage, everyone would get together

23   backstage afterwards, is that true?

24   A    Yeah, there is a -- yeah, there was a backstage area for

25   the -- for the artists.

Navarro - cross - Blank Becker                    578

1   Q    Okay, for lack of better words, like a green room, is

2   that fair to say?

3   A    Yeah, yeah.

4   Q    Okay.  A common thing with musicians or artists?

5   A    Correct, yes.

6   Q    Okay, got it.

7        And in the green room after the concert that was

8   typically for, like, autographs, true, that was one thing?

9   A    Yeah, that -- they would do meet-and-greets for the fans.

10  Q    Okay, thank you.

11       And fans, sometimes would there be kids with their

12  parents?

13  A    Yeah.

14  Q    And sometimes were there just a lot of women?

15  A    Yes.

16  Q    And there was food back there, is that right?

17  A    Yeah, there is a -- there is food in the backstage areas.

18  Q    Drinks?

19  A    Yes.

20  Q    And did you happen to -- strike that.

21       Were there any -- there was no underage girls back

22  there at the time, correct?

23  A    Yes.

24  Q    In fact, there is an announcement that is made prior to

25  the green room gathering that unless you're over 21, you

Navarro - cross - Blank Becker                579

1   couldn't come backstage unless you had a parent with you; is

2   that true?

3   A    I don't remember.

4   Q    You don't remember, okay.

5        Well, are you familiar, there's a very -- strike

6   that.

7        Are you familiar with the music of Mr. Kelly?

8        MS. GEDDES:  Objection.

9        THE COURT:  Sustained.

10  BY MS. BLANK BECKER:

11  Q    When Mr. Kelly would perform at a concert on stage, were

12  you there?

13  A    Was I at the concert, is that the question?

14  Q    Yes.

15  A    Yes.

16  Q    Thank you.  And at the concert when you would be there,

17  is there a time in his concerts that he would allow for

18  individuals from the audience to come up on the stage?

19  A    I don't remember.

20  Q    How about do you recall whether or not there was -- there

21  was a certain song that he would sing and there would be a

22  sign that someone from --

23       MS. GEDDES:  Objection.

24       THE COURT:  Yes, just put a question to the witness,

25  if you could, not compound.  If you have to do it in more than

1   one, you can do that, but just put a single question to the

2   witness.

3          MS. BLANK BECKER:  Thank you, Judge.

4   BY MS. BLANK BECKER:

5   Q    Do you remember a sign that was sometimes held -- excuse

6   me, that was held by someone on stage?

7   A    No, I don't remember that.

8   Q    So, you don't remember the sign that was paraded sort of

9   back and forth on the stage that said you had to be --

10          MS. GEDDES:  Objection.

11  Q    -- over 21?

12  A    No.

13          THE COURT:  I'll sustain it as to form.

14          Do you remember any signs?

15          THE WITNESS:  No.

16          THE COURT:  Okay, next question.

17          MS. BLANK BECKER:  Got it.  Thank you, Judge.

18  BY MS. BLANK BECKER:

19  Q    Was it your understanding that in order to be backstage,

20  you had to be 21, or over, sorry?

21  A    I don't know what the -- the age thing was for that.

22  Q    Okay.  So, it could have been --

23  A    I wasn't told.

24  Q    -- 18, it could have been 21, you just don't know?

25          MS. GEDDES:  Objection.

Navarro - redirect - Geddes                    581

1              THE COURT:  Sustained as to form.

2    BY MS. BLANK BECKER:

3    Q    Were you the one responsible for checking IDs prior to

4    individuals coming backstage?

5    A    No.

6    Q    That was someone else's job?

7    A    Yes.

8              MS. BLANK BECKER:  Thank you.

9              Judge, may I have one moment?

10             THE COURT:  Sure.

11             MS. BLANK BECKER:  Thanks.

12             (Pause.)

13             MS. BLANK BECKER:  Thank you, Judge.  Thank you.  I

14   don't have any additional questions.

15             THE COURT:  Okay, any redirect?

16             MS. GEDDES:  Briefly, Your Honor.

17             THE COURT:  Okay.

18   REDIRECT EXAMINATION

19   BY MS. GEDDES:

20   Q    A few minutes ago you were asked whether or not you

21   recalled hearing any verbal abuse, and you indicated that you

22   had.

23             What do you remember?

24   A    The employees getting, like, verbally abused.

25   Q    By whom?

Navarro - redirect - Geddes                    582

1  A    Rob.

2  Q    And by the way, when you were initially interviewed by

3  agents in February of 2020, how were you feeling?

4  A    I think I had Coronavirus, I was pretty sick.

5       MS. BLANK BECKER:  I didn't hear the answer, I'm

6  sorry, Judge.

7       THE COURT:  Can you just?

8       THE WITNESS:  Yes.  I was very sick with

9  Coronavirus.

10 BY MS. GEDDES:

11 Q    You were asked on cross-examination about the procedures

12 when a -- when individuals came to Olympia Fields and you were

13 asked about identifications that were checked.

14      Were guests' identifications always checked at the

15 security gate?

16 A    Not always.

17 Q    And what was the purpose of -- did you understand what

18 the purpose was of those ID checks?

19 A    No.

20 Q    And the same question, when guests would enter the studio

21 area at the reception area, were IDs always copied then?

22 A    When -- whenever security would check IDs, they did, yes,

23 they usually made a copy of it.

24 Q    But did they always check?

25 A    They didn't always, no.

Navarro - redirect - Geddes                    583

1   Q    And I think on cross-examination you were also asked

2   about copies of IDs that were made in the studio, itself.

3            Do you recall those questions?

4   A    Yeah.

5   Q    Were guests -- were IDs always checked when they entered

6   the studio at that time?

7   A    Not always.  There was a time when IDs weren't being

8   checked and people were in and out.

9   Q    I'm sorry, can you say that again?

10  A    They weren't always checked for people that came in.

11  Q    You were also asked about whether certain practices were

12  common in your experience interacting in sort of the music

13  industry, and I think one of the things that on cross you were

14  asked about was whether it was common to sign an NDA, for an

15  employee to sign an NDA.

16           Do you recall those questions?

17  A    Yes.

18  Q    And you were also asked about, you know, common terms

19  that -- that were used in the music industry.

20           Do you remember that?

21  A    Yes.

22  Q    Was working for the defendant common based on your

23  experience?

24           MS. BLANK BECKER:  Objection, Judge.

25           THE COURT:  Overruled.

Navarro - redirect - Geddes                    584

1   A    Was my -- can you repeat the question again, please?

2   Q    Yes.

3        Was your experience working for the defendant

4   similar to the way in which other -- your other experiences in

5   the music industry?

6   A    No.

7            MS. BLANK BECKER:  Objection.

8            THE COURT:  Overruled.

9   BY MS. GEDDES:

10  Q    How would you --

11           THE WITNESS:  No.

12  Q    -- describe your experience working --

13           MS. GEDDES:  Oh, I'm sorry.

14  A    The answer to the previous question was no.

15  Q    How would you describe your experience working for the

16  defendant?

17  A    It was a weird time for me, but just the things that you

18  had to do was just a bit uncomfortable.  The music part, the

19  production and all that was really good, but all the other

20  stuff that was going on was just kind of strange.

21       It was almost like the twilight zone when you went

22  into the gate, like you're in this different world that was

23  just a strange place.

24           MS. GEDDES:  Nothing further.

25           THE COURT:  Any recross?

Navarro - recross - Blank Becker                    585

1            MS. BLANK BECKER:  Yes, briefly.  Thank you, Judge.
2    RECROSS-EXAMINATION
3    BY MS. BLANK BECKER:
4    Q    When you say the twilight zone, Mr. Navarro, have you
5    ever worked for any celebrities that were known as nationally
6    and internationally as Mr. Kelly before?
7    A    No.
8    Q    In fact, you don't have anything to really compare your
9    relationship to or, excuse me, your employment to at that
10   time, correct?
11   A    At that time, no, it was my first job.
12           THE COURT:  Do you have something now to compare it
13   to?
14           THE WITNESS:  I've done gigs with Taylor Swift,
15   Jay Z, Kanye.  Yeah, it was just normal kind of -- who else?
16           Yeah, most of the work is just professional,
17   professional work.  There's not a lot of extra personal stuff
18   you had to do.
19   BY MS. BLANK BECKER:
20   Q    Sure, and when you say you've done gigs, you've worked in
21   sound in different capacities than what we're talking about in
22   how you worked for and with Mr. Kelly, correct?
23   A    Yes.
24   Q    And, Mr. Navarro, you had indicated, and the Government
25   had asked you about the fact, you know, how were you feeling

SAM    OCR    RMR    CRR    RPR

A 543

Navarro - recross - Blank Becker                586

1   when you gave the interview initially when they spoke with you

2   in February 21st of 2000 [sic] and you indicated something

3   about the fact that you had the Coronavirus and you weren't

4   feeling great.  Correct?

5   A    Yes.

6   Q    Mr. Navarro, did you also have the Coronavirus the second

7   time you talked with them?

8   A    No.

9           MS. GEDDES:  Objection.

10          THE COURT:  Overruled.

11          I think you meant 2020, is that right?

12          MS. BLANK BECKER:  I did.  I apologize, 2020.

13  BY MS. BLANK BECKER:

14  Q    Was that when you had Corona?

15  A    So, the first time that I talked to them, is that what

16  you're asking me?

17  Q    Yes, if the first time was on February 21st,

18  2000 [sic] --

19          MS. GEDDES:  And 20.

20          MS. BLANK BECKER:  Oh, geez, I keep saying that.

21          THE WITNESS:  2020.

22          MS. BLANK BECKER:  I'm so sorry.

23          THE COURT:  You had Corona then, correct?

24          What the lawyer is asking you is did you have Corona

25  the second time you spoke to the Government?

Case 22-1481, Document 79, 04/18/2023, 3501143, Page248 of 248

1          THE WITNESS:  The second time I spoke, no.

2    BY MS. BLANK BECKER:

3    Q    And how about the other day when you spoke with them?

4    A    No.

5    Q    You didn't have Corona then either?

6    A    No.

7          MS. BLANK BECKER:  Okay, thank you.  I don't have

8    any additional questions.

9          Thank you, Judge.

10          THE COURT:  Any redirect?

11          MS. GEDDES:  No, Your Honor.

12          THE COURT:  All right, you can step down.

13          (Witness excused.)

14          THE COURT:  I think it probably makes sense to take

15    our lunch break now.  So, let me just check to make sure your

16    lunches are here.  I assume they are.

17          Is that right?

18          THE COURTROOM DEPUTY:  I didn't hear anything.

19          MS. GEDDES:  Your Honor, our next witness is

20    relatively short.

21          THE COURT:  Okay, so why don't we press ahead.

22    Let's make the best use of our time.

23          Call the next witness, please.

24          MS. GEDDES:  The Government calls Courtnay Wilson.

25          (Witness enters and takes the stand.)