# 22-1481 22-1982 (con)

## UNITED STATES COURT OF APPEALS

*for the*

## SECOND CIRCUIT

▶◀

**UNITED STATES OF AMERICA,**

*Appellee,*

-v.-

**ROBERT SYLVESTER KELLY
AKA R. KELLY**

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**DEFENDANT-APPELLANT'S APPENDIX
VOLUME 4 OF 5
(Pages A 846 to A 1145)**

JENNIFER BONJEAN
ASHLEY COHEN
BONJEAN LAW GROUP, PLLC
750 Lexington Avenue, 9th Floor
New York, NY 10022
(718) 875-1850

# **TABLE OF CONTENTS**

Electronic Index to Record on Appeal in *USA v. Kelly*, 19-cr-00286…. A 1

Voir dire of Juror 3 (Prospective Juror 25)……………………………. A 45

Voir dire of Juror 4 (Prospective Juror 52)……………………………. A 53

Voir dire of Juror 5 (Prospective Juror 87)……………………………. A 59

Voir dire of Juror 7 (Prospective Juror 145)…………………………... A 66

Voir dire of Juror 8 (Prospective Juror 147)…………………………... A 70

Voir dire of Juror 9 (Prospective Juror 156)…………………………... A 74

Voir dire of Juror 11 (Prospective Juror 153)…………………………. A 80

Voir dire of Juror 12 (Prospective Juror 163)…………………………. A 85

Voir dire of Alternate Juror 4 (Prospective Juror 206)……………….... A 93

Trial Testimony of Jerhonda Johnson Pace from August 18, 2021 and August 19, 202………………………………………………………….. A 97

Trial Testimony of Kris McGrath, MD from August 19, 2021………... A 352

Trial Testimony of Anthony Navarro from August 20, 2021………….. A 433

Trial Testimony of Demetrius Smith from August 20, 2021…………. A 546

Trial Testimony of Thomas Arnold from August 26, 2021……………. A 624

Trial Testimony of Faith from September 1, 2021…………………….. A 759

Trial Testimony of Anna from September 10, 2021…………………… A 911

Trial Testimony of Iffath Hoskins from September 10, 2021…………. A 951

Trial Testimony of Diana Copeland from September 10, 2021 and September 13, 2021…………………………………………………………….   A 1036

Trial Testimony of Angela from September 13, 2021…………………   A 1156

Trial Testimony of Alex from September 13, 2021……………………   A 3322

Trial Testimony of Alesiette Mayweather from September 13, 2021 and September 14, 2021……………………………………………………..   A 1268

Trial Testimony of Nicholas Williams from September 14, 2021……...   A 1383

Declaration of Robert S. Kelly dated April 4, 2022……………………   A 1438

Notice of Appeal dated July 11, 2022………………………………….   A 1440

Notice of Appeal dated September 9, 2022…………………………….   A 1441

Notice of Appeal dated November 22, 2022…………………………...   A 1442

Faith - Cross - Cannick                2329

1   Q   It was a female, am I correct?

2   A   Correct.

3   Q   An African-American female, am I correct?

4   A   Correct.

5   Q   And you sat opposite her and you had a conversation for

6   well over an hour, am I correct?

7   A   Correct.

8   Q   And in that podcast, you discussed what were going --

9   some of the things that were happening for you since *Surviving*

10  *R. Kelly*, am I correct?

11  A   Correct.

12  Q   And you told her that you had opportunities that came

13  about, opportunities -- not an opportunity, but opportunities

14  -- that came about for acting, am I correct?

15  A   I don't remember saying that with her.

16  Q   You know that was televised?

17         Well, it was recorded and there is a video up?

18  A   Correct.

19  Q   Now, after *Surviving R.* -- well, withdrawn.

20         Before your participation in *Surviving R. Kelly*, did

21  you have an attorney?

22  A   Can you ask your question again?

23  Q   Before your participation in *Surviving R. Kelly*, did you

24  have an attorney?

25  A   Yes.

Faith - Cross - Cannick                    2330

1   Q    Who was that attorney?

2   A    Lee Merrick.

3   Q    And Lee Merrick is an attorney out of San Antonio?

4   A    Incorrect.

5   Q    I'm asking you a question.  I'm not -- is Lee Merrick an

6   attorney out of San Antonio?

7   A    He's an attorney out of Dallas, Texas.

8   Q    So the answer to my question is that he's not from

9   San Antonio?

10  A    No.

11  Q    Now, after, did you at some point retain another

12  attorney?

13  A    Yes.

14  Q    And who was that attorney?

15  A    Gloria Allred.

16  Q    And Gloria Allred is in the courtroom with you today,

17  correct?

18  A    Yes.

19  Q    And do you have any pending lawsuits?

20  A    Yes.

21  Q    And is Ms. Allred involved in those lawsuits?

22  A    She is not.

23  Q    Another lawyer is?

24  A    Lee Merrick.

25  Q    Now, when was it that you retained Ms. Allred?

Faith - Cross - Cannick    2331

1       MS. SHIHATA:  Objection, Your Honor, as to

2  relevance.

3       THE COURT:  Overruled.

4  A   Once the whole trial and everything came about, the

5  criminal process started, I got legal advising from Ms.

6  Allred.

7  Q   So my question, ma'am, is when was it that you retained

8  Ms. Allred?

9  A   I'm not sure of the exact date.

10  Q   Do you remember the year?

11  A   Around 2019, I believe.

12  Q   And do you remember the month?

13  A   No.

14  Q   That show, that podcast that I spoke to you about is

15  called *The Paper Route*, am I correct?

16       THE COURT:  It is called the what?

17       MR. CANNICK:  *The Paper Route.*

18       THE COURT:  *The Paper Route*?

19       MR. CANNICK:  Yes.

20       THE COURT:  Yes.

21  A   Correct.

22  Q   And what's the name of the hostess?

23  A   I don't remember her name.  That was my first time

24  meeting her.

25  Q   My question was, what was her name?

Faith - Cross - Cannick                                    2332

1          THE COURT:  She said she did not remember.

2          Next question.

3    Q    Your appearance there was about a year ago?

4    A    Give or take, yes.

5    Q    On that podcast, you also discussed the choices you've

6    made in connection with this, with Mr. Kelly, correct?

7    A    Correct.

8    Q    We'll get to it.

9          THE COURT:  I did not hear what you said.

10          MR. CANNICK:  I said we'll get to it.

11          THE COURT:  Oh.

12    Q    Now, before you brought any lawsuit here, you and

13    Mr. Merrick had a demand letter sent to Mr. Kelly for money,

14    am I correct?

15    A    That is incorrect.

16    Q    Didn't you and Mr. Merrick send a demand letter to

17    Mr. Kelly for $3 million?

18    A    That is incorrect.  I wasn't aware of that.

19    Q    Mr. Merrick was your attorney, am I correct?

20    A    Correct.

21    Q    You retained him, am I correct?

22    A    Correct.

23    Q    And you're telling this jury that he sent out -- that he

24    sent out a demand letter for $3 million you were not aware of?

25    A    I did not read over the demand letter.  I was not aware

Faith - Cross - Cannick                    2333

1  he was asking for $3 million or money.

2  Q    What did you hire him for?

3         MS. SHIHATA:  Objection.

4         THE COURT:  Sustained as to form.

5  Q    Well, you hired him to sue Mr. Kelly, am I correct?

6  A    Incorrect.

7  Q    You didn't hire Mr. -- this attorney to sue Mr. Kelly,

8  claiming that he gave you herpes?

9         THE WITNESS:  May I answer?

10        THE COURT:  You can answer.

11 A    I hired Mr. Merrick prior, before even looking at a

12 lawsuit, to help me pursue criminal charges against Mr. Kelly,

13 which I got no help from, so then came the lawsuit next.

14 Q    Okay.  It became a lawsuit next.

15        When was the first time you attempted to bring

16 criminal charges against Mr. Kelly?

17 A    In Dallas, Texas.

18 Q    My question is when.

19 A    I don't remember the exact date.

20        MR. CANNICK:  May I approach the witness?

21        THE COURT:  Yes.

22 Q    I'm going to direct your attention to this highlighted

23 area.

24        You looked at the document?

25 A    Correct.

Faith - Cross - Cannick                    2334

1   Q    Did it refresh your recollection that you went to the
2   Dallas Police Department on April 9, 2018?
3   A    Correct.
4   Q    And you had Mr. Merrick file a lawsuit on April 17, 2018,
5   am I correct?
6   A    Can you repeat those dates again?
7   Q    Dallas Police Department, April 9th, 2018, lawsuit --
8   well, demand letter dated April 17, 2018.
9   A    Are you asking me a question?
10  Q    I did.  And you asked me to give you the dates again.
11        MR. CANNICK:  Can I have the question read back to
12  her?
13        THE COURT:  Sure.
14        MR. CANNICK:  Where she asked for the dates.
15        (The record was read.)
16  A    Correct.
17  Q    Now, before making an effort to file a complaint with the
18  Dallas Police Department, had you made an attempt to file a
19  criminal complaint anywhere else?
20  A    In New York.
21  Q    What was the date of that?
22  A    I'm not sure of the exact date.
23  Q    And when you say that you filed one in New York, where
24  specifically?
25  A    I don't remember where specifically.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

A 851

Faith - Cross - Cannick                    2335

1   Q    Did you go to these places to file these lawsuit -- these

2   criminal --

3   A    Correct.

4   Q    And as you sit here today, you don't have a recollection

5   as to where you went?

6   A    I do not know the exact location and city name.

7   Q    Was one in New York City?

8   A    Correct.

9   Q    And was one in Westbury, Long Island?

10            THE COURT:  I think I am having a little trouble

11  hearing you.  I do not know if your microphone...

12            Better, better.  Okay.

13  Q    You said one was in New York City.  Do you remember the

14  date of that?

15  A    I don't remember the date.

16  Q    Wasn't that in January 14, 2019?

17  A    I don't remember the date.

18  Q    Well, let's see if this refreshes your recollection, the

19  top portion.

20            No, down.

21  A    Right here?

22  Q    Right there.

23            Does that refresh your recollection?

24  A    Yes.

25  Q    What's the date?

Faith - Cross - Cannick                          2336

1                 THE COURT:  Again, your microphone is not...

2   Q    You said that refreshes your recollection?

3   A    Yes.

4   Q    What's the date?

5   A    January -- may I see it again?

6   Q    Beg your pardon?

7   A    Can I see it again?

8                 January 14th.

9   Q    What year?

10  A    2019.

11  Q    And you filed another lawsuit, criminal case in Suffolk

12  County?

13                THE COURT:  She filed a criminal case or did she

14  make a complaint?

15                MR. CANNICK:  She made a complaint to file a

16  criminal case.

17                THE COURT:  Well, that is still --

18                MS. SHIHATA:  Objection.

19                THE COURT:  It is still sustained as to form.

20                First, you cannot file a criminal case.

21                She made a complaint to detectives in Suffolk

22  County; is that what you are asking her?

23                MR. CANNICK:  That's exactly what I'm asking her.

24                THE COURT:  Okay.  Or police officer.

25  Q    Now, you made this complaint in June 21, 2018, Suffolk

Faith - Cross - Cannick                    2337

1    County?

2    A    I don't remember.

3              THE COURT:  You don't remember the date?

4              You want to show her the --

5              MR. CANNICK:  Yes.

6              THE WITNESS:  I'm sorry, I'm getting confused.

7              THE COURT:  That is all right.  He is going to show

8    you the date.  All he wants to know is whether you remember

9    the date you spoke to the police in Suffolk County here in

10   New York.

11             THE WITNESS:  Correct.

12             THE COURT:  Does that refresh your recollection of

13   when that happened?

14             THE WITNESS:  Correct.

15             THE COURT:  When was it?

16             THE WITNESS:  In 2018.

17             THE COURT:  But do you know the specific --

18             THE WITNESS:  June 2018.

19             THE COURT:  Okay.  Next question.

20   BY MR. CANNICK:

21   Q    Now, before coming in and speaking to us, you and I had

22   never spoken, am I correct?

23   A    Correct.

24   Q    Now, you testified and told us that there came a point in

25   time that you went to a concert with your sister and at some

Faith - Cross - Cannick                                    2338

1  point that evening you met Mr. Kelly.  Do you remember telling
2  us about that?
3  A    Correct.
4  Q    And you testified and told us that you exchanged numbers?
5  A    I did not testify and say we exchanged numbers.  I said
6  he gave me his number.
7  Q    And you did not give him your number?
8  A    We texted.
9  Q    And at some point, there came a point where you had
10 conversations afterwards?
11 A    Correct.
12 Q    And there was an agreement or an understanding that you
13 could visit him on, some point, the road or wherever?
14 A    Correct.
15 Q    In fact, he told you that whenever you wanted to, that
16 you could visit him?
17 A    Correct.
18 Q    So after he told you that, you made a decision that you
19 would go and visit him?
20 A    Correct.
21 Q    You made a choice, am I correct?
22 A    Correct.
23 Q    In fact, you met him at the show and you said that you
24 were invited to an afterparty, along with your sister, and he
25 made certain overtures to you at that meeting, am I correct?

Faith - Cross - Cannick                    2339

1    A    Correct.

2    Q    And after he made those overtures to you, you started

3    texting?

4    A    Correct.

5    Q    And eventually started speaking?

6    A    Correct.

7    Q    And then eventually start FaceTiming?

8    A    Correct.

9    Q    And in those communications, he flirted with you, am I

10   correct?

11   A    Correct.

12   Q    And you returned the flirt, am I correct?

13   A    Correct.

14   Q    And then it came, as said earlier, that he invited you,

15   that if you want to come and visit, contact someone from his

16   office, correct?

17   A    Correct.

18   Q    And you made that contact, right?

19   A    Correct.

20   Q    Not your sister; you made that contact, right?

21   A    Correct.

22   Q    And then you got -- you texted and you told Diana?

23   A    Correct.

24   Q    You told her Mr. Kelly says to get me a ticket?

25   A    I didn't say give me a ticket.

Faith - Cross - Cannick                                    2340

1  Q    What did you say?

2  A    I gave her the days I would like to come and she checked

3  with him to make sure that was okay, and then the flight was

4  booked.

5  Q    Flight was booked.

6             And eventually you got a return from Diana with

7  respect to your interest in going to visit him, am I correct?

8  A    Can you say that again, please?

9  Q    Eventually you got a response that Mr. Kelly said it was

10 okay and a flight was booked?

11 A    Correct.

12 Q    And then eventually you received a ticket?

13 A    Correct.

14 Q    And the ticket was not in your name?

15 A    Correct.

16 Q    The ticket was in another person's name?

17 A    Correct.

18 Q    Another female?

19 A    Correct.

20 Q    And after you got that ticket, you made the choice in

21 saying I ain't going?

22             THE COURT:  I did not hear what you said, I am

23 sorry.  Did you say "I ain't going"?

24             MR. CANNICK:  Yes, "I ain't going."

25             THE COURT:  That is all right.  I just could not

Faith - Cross - Cannick                    2341

1    hear it.
2            MR. CANNICK:  Okay.
3    Q    Am I correct, ma'am?
4    A    You're correct.
5    Q    And you made that choice, right?
6    A    Correct.
7    Q    So after you got this ticket in someone else's name, you
8    realized, came to the conclusion that you know what, that
9    offends my dignity, I'm not going, right?
10   A    I never said that it offended my dignity.
11   Q    Okay.  Why you chose not to go?
12   A    I just felt like for the first time, that was improper.
13   Q    Okay.  Let's talk about the second time.
14           After you felt still that that was not the proper
15   thing, you eventually continued to communicate with Mr. Kelly,
16   am I correct?
17   A    Correct.
18   Q    And there were text messages?
19   A    Correct.
20   Q    Telephone calls?
21   A    Correct.
22   Q    FaceTimes?
23   A    Correct.
24   Q    And you participated of your own will, am I correct?
25   A    Correct.

Faith - Cross - Cannick                    2342

1    Q    You answered the phone when he called?

2    A    Correct.

3    Q    You sent text messages?

4    A    Correct.

5    Q    And you got involved into FaceTiming?

6    A    Correct.

7    Q    And then eventually you decided I'm going, I want to take

8    another trip?

9              THE COURT:  Take another trip?

10             MR. CANNICK:  Yes, to visit Mr. Kelly.

11             THE COURT:  Had she been yet?

12             MR. CANNICK:  Well, "give it another shot."

13             THE COURT:  All right.

14   Q    You gave it another shot?

15   A    Can you ask me the question all over again?

16   Q    After exchanging communications, continuing to flirt, you

17   decided that you would give it another shot to visit

18   Mr. Kelly?

19   A    Correct.

20   Q    Now, again, you made that decision?

21   A    Correct.

22   Q    And you decided that you would then contact Diana, am I

23   correct?

24   A    Correct.

25   Q    And you asked for another ticket, am I correct?

Faith - Cross - Cannick                                    2343

1   A     Correct.

2          MR. CANNICK:  Your Honor, would this be a good time?

3          THE COURT:  Sure.

4          All right, ladies and gentlemen, we are going to

5   break for lunch.  We are going to take a slightly longer lunch

6   today.  I have another matter to attend to, so we will be back

7   at 2:30.  Please don't talk about the case or look anything up

8   or anything like that, but enjoy your lunches.

9          THE CLERK:  All rise.

10         (Jury exits the courtroom.)

11         THE COURT:  All right.  Everybody can sit down.

12         The witness can step out.  We will see you after

13  lunch.

14         Anything from either side before we break for lunch?

15         MS. SHIHATA:  Not from the government.

16         MR. SCHOLAR:  No, Your Honor.

17         THE COURT:  Okay.  And, Mr. Cannick, I am going to

18  ask my same fruitless question that I ask all the time.  Do

19  you have a sense of how long you are going to be?  I am just

20  trying to figure out what we can accomplish today.

21         MR. CANNICK:  I'm sure that we'll be finished with

22  her before the end of the day.  We may be finished with her

23  probably around 4:00, maybe.

24         THE COURT:  Okay.  All right.  All right.  So --

25         MR. CANNICK:  If that long.

Faith - Cross - Cannick                                    2344

1          THE COURT:  Okay.

2          All right.  Everybody enjoy their lunches.

3          (Luncheon recess taken.)

4          (Continuing on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Faith - Cross - Cannick                                    2345

1                          AFTERNOON SESSION

2                  (In open court; jury not present.)

3                  (Parties present.)

4          THE CLERK:  All rise.

5          THE COURT:  Everybody can sit down.

6          All right.  Let's get the witness, please.

7                  (Discussion held off the record.)

8                  (Witness enters the courtroom.)

9          THE CLERK:  All rise.

10                 (Jury enters the courtroom.)

11         THE CLERK:  You may be seated.

12         THE COURT:  All right, everybody, does it feel any

13   warmer in here today?

14                 THE JURY:  Yes.

15         THE COURT:  Glad to hear it.  Wish I could say I had

16   something to do with it.

17         All right.  We are ready to resume the

18   cross-examination of the witness.

19         Go ahead, Mr. Cannick.

20         MR. CANNICK:  Thank you.

21         THE CLERK:  The witness is reminded she is still

22   under oath.

23                 THE WITNESS:  Yes.

24   CROSS-EXAMINATION

25   BY MR. CANNICK:  (Continuing.)

Faith - Cross - Cannick                    2346

1  Q    Before going out to meet Mr. Kelly -- well, let me

2  withdraw that.

3        After your initial meeting with Mr. Kelly at the

4  afterparty, did you Google him?

5  A    Yes.

6  Q    And why did you Google him?

7  A    To find out who he was, because I wasn't a fan.

8  Q    And you did, in fact, read up about who he was?

9  A    Can you ask your question again?

10  Q    You read -- after you Googled him, you read what was

11  returned, am I correct?

12  A    I'm sorry, can you ask that question again?

13  Q    You Googled him?

14  A    Yes.

15  Q    You read what you saw on the computer, am I correct?

16  A    Yes.

17  Q    Okay.  Now, do you recall an instance where in your

18  earlier communications with Mr. Kelly he responded to you

19  "Come on, I am who I am.  I see a few people, but I'm not

20  married, laugh out loud."

21  A    Yes.

22  Q    And your response was "Laugh out loud.  I understand."

23  A    Correct.

24  Q    Now, what were you -- what did you take that

25  communication to mean?

Faith - Cross - Cannick                          2347

1  A    I understood that he wasn't married, he dates multiple
2  people.
3  Q    And he told you that in the initial part of the
4  communication between the two of you, am I correct?
5  A    Correct.
6  Q    Now, you told us about a situation when you were dating
7  your first boyfriend, that you were assaulted by his other
8  girlfriend.  Do you remember telling us about that?
9  A    The mother of his child, not his other girlfriend.  Yes,
10 I remember saying that.
11 Q    There's a distinction?
12 A    The mother of your child and a girlfriend, yes, there's a
13 distinction.
14 Q    Okay.
15 A    That's like a wife and a girlfriend.  Two different
16 things.
17 Q    If I ask a question, please just respond to the question
18 that I ask.  Okay?
19        Now, you testified as a result of that you developed
20 a problem, epilepsy?
21 A    Correct.
22 Q    And you testified that as a result, you have to be
23 careful with drinking alcohol because alcohol may trigger a
24 seizure?
25 A    Correct.

Faith - Cross - Cannick                                    2348

1  Q    Now, you testified and told us as well that when you went
2  to Mr. Kelly's afterparty, you had some alcohol?
3  A    That is incorrect.  I never said that.
4  Q    You didn't have any alcohol?
5  A    I did not have any alcohol.
6  Q    There was an occasion where you did have alcohol with
7  Mr. Kelly, am I correct?
8  A    Yes.
9  Q    And you did a -- you consumed the alcohol of your own
10 choosing, am I correct?
11 A    Can you ask that question again?
12        THE COURT:  I think he is asking, nobody made you
13 drink alcohol; is that right?
14        THE WITNESS:  Correct.
15        THE COURT:  Okay.  Next question.
16 Q    So that wasn't just one time, it was multiple times that
17 you consumed alcohol of your own choosing?
18 A    Correct.
19 Q    Now, you testified and told us that you were asked by
20 Mr. Kelly to call him Daddy.  Do you remember telling us about
21 that?
22 A    Correct.
23 Q    And you did call him Daddy, am I correct?
24 A    Yes.
25 Q    And in your conversations with him, you called him Daddy?

Faith - Cross - Cannick                         2349

1  A     Yes.

2  Q     And in your text messages you called him Daddy, am I

3  correct?

4  A     Yes.

5  Q     Now, that was of your choosing, am I correct?

6  A     Yes.

7  Q     He asked you to and you decided yes, I can call you

8  Daddy?

9  A     I respected what he asked to be called, yes.

10 Q     Well, you didn't have to call him Daddy, right?

11 A     No.

12 Q     In fact, if I recall your testimony correctly, you said

13 that there was a time that he called you on the phone and you

14 answered the phone, and basically he was not satisfied with

15 you not calling him Daddy and he hung up.  Do you remember

16 telling us about that?

17 A     Yes.

18 Q     And then, according to you, he called back again and this

19 time you called him Daddy, am I correct?

20 A     Correct.

21 Q     Now, you had the option of not answering the phone, am I

22 correct?

23 A     Correct.

24 Q     You knew it was him that was calling, am I correct?

25 A     Correct.

Faith - Cross - Cannick                    2350

1  Q    And you answered the phone and you called him Daddy?

2  A    Correct.

3  Q    When you sent those text messages, you called him Daddy?

4  A    Yes, sir.

5  Q    So he asked you to call him Daddy and you started calling

6  him Daddy?

7  A    Yes, sir.

8  Q    Now, let's talk about the first trip to New York.  You

9  testified and told us that there came a point in time that he

10  invited you -- well, you asked for a trip to New York.  Do you

11  remember telling us about that?

12  A    Yes.

13  Q    And you text Diana?

14  A    Yes.

15  Q    And you asked for the accommodation to be arranged, am I

16  correct?

17  A    Yes.

18  Q    You did all that, correct?

19  A    Yes.

20  Q    And after you asked for the accommodation to be arranged,

21  you got on the plane?

22  A    Yes.

23  Q    And you took the plane to New York?

24  A    Yes.

25  Q    In fact, wasn't this a connecting flight?

Faith - Cross - Cannick                    2351

1   A    Yes.

2             THE COURT:  I could not hear you.

3             THE WITNESS:  Yes.

4   Q    So you had an opportunity in Nashville, where you made

5   the connecting flight, to change your mind, right?

6   A    Yes.

7   Q    But instead you boarded the next flight from Nashville to

8   Long Island, right?

9   A    Yes.

10  Q    And then you came there and you went to a hotel?

11  A    Yes.

12  Q    What time you got to the hotel?

13  A    I don't remember.

14  Q    Was it in the afternoon?

15  A    I don't remember.

16  Q    Was it in the morning?

17  A    I don't remember.

18  Q    Was it in the evening?

19            MS. SHIHATA:  Objection.

20            THE COURT:  Overruled.

21            Do you remember what time of day?

22            THE WITNESS:  I don't remember.

23  Q    Now, you, at some point, contacted Diana after you

24  arrived at the hotel?

25  A    Correct.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

A 868

Faith - Cross - Cannick                                      2352

1  Q    And you wanted to know what you should be doing, what's

2  going to happen next, am I correct?

3  A    Yes.

4  Q    And could you speak a little louder?

5  A    Yes.

6  Q    And basically, you had that option, right?  You didn't

7  have to go out; you contacted Diana to ask what are we going

8  to do next, right?

9  A    Yes.

10 Q    Okay.  And then Diana told you nothing was going to

11 happen until 8:00, do you remember that?

12 A    Yes.

13 Q    And then at 8:00, sometime around that, you went to the

14 concert?

15 A    Yes.

16 Q    Okay.  And you testified and told us that you didn't sit

17 in the first row, but you were someplace very close to the

18 front?

19 A    Yes.

20 Q    Now, this was at Westbury Coliseum?

21 A    Correct.

22 Q    And you testified and told the jury that Mr. Kelly

23 actually performed to you, he was making eye contact with you

24 and singing to you, am I correct?

25 A    Correct.

Faith - Cross - Cannick                    2353

1  Q    And you stared back at him, am I correct?

2  A    Yes.

3  Q    Now, was the stage a rotating stage?

4  A    I don't remember.

5  Q    How many acts you saw that night?

6  A    Just him.

7  Q    And when you were watching Mr. Kelly, did you notice that

8  the stage would rotate around and come back around?

9  A    I don't remember if the stage was rotating.

10 Q    Well, according to you, during that show he was singing

11 to you?

12 A    I stated he interacted with me during the show, yes, I

13 said that.

14 Q    Okay.  Now, you testified that after the show you went --

15 you were asked if you were going to go to the afterparty?

16 A    Incorrect.

17 Q    Were you asked if you were going to go to the afterparty?

18 A    Are you referring to the show in New York?

19 Q    Well, that's what we're talking about.

20 A    That's incorrect.  I wasn't asked if I was going to go

21 anywhere.  Diana told me where I was going and where he was

22 going.

23         (Continuing on the next page.)

24

25

Andronikh M. Barna, Official Court Reporter, RPR, CRR

A 870

Faith - cross - Cannick                    2354

1   EXAMINATION CONTINUES

2   BY MR. CANNICK:

3   Q    Did you go to the after-party?

4   A    No.

5   Q    Now, you got an Uber back to the hotel?

6   A    Yes.

7   Q    And you were not told about the after-party?

8   A    I was told he was going to the after-party and I was

9   going back to my hotel.

10  Q    And you were told that and then you did, right?

11  A    Yes.

12  Q    Okay.  And then you testified and told the jury at some

13  point in the early morning hours, around 6:00, Mr. Kelly came

14  to your room?

15  A    Correct.

16  Q    And according to you, there was a sexual encounter

17  that -- that really humiliated you?

18  A    I said it was awkward, yes.

19  Q    Awkward.  You didn't want that to happen you told the

20  jury, right?

21  A    Correct.

22  Q    In fact, you -- you felt -- you felt a kind of way about

23  it that you even called your sister, correct?

24  A    Incorrect.

25  Q    You called your friend?

SAM    OCR    RMR    CRR    RPR

A 871

Faith - cross - Cannick                    2355

1    A    My best friend.

2    Q    Yes.  And, basically, you called your best friend because

3    you said that you wanted to find out if you were off?

4    A    Incorrect.

5    Q    Why did you call your best friend?

6    A    I said I wanted to see what she had to say about the

7    situation.

8    Q    Okay.  And she -- she had something to say about the

9    situation, and you felt as though that whatever Mr. Kelly said

10   to you as he was leaving the room was constructive criticism

11   according to you?

12   A    Incorrect, I stated that's what he told me.  I did not

13   say that's what it was.

14   Q    So, he told you that it was constructive criticism?

15   A    Yes.

16   Q    Now, after he gave you that constructive criticism and

17   after you went through that degrading experience with him, you

18   flew back to San Antonio, am I correct?

19   A    Correct.

20   Q    And then there came a point in time, according to you, he

21   contacted you again?

22   A    Correct.

23   Q    And after he contacted you, you and he exchanged text

24   messages?

25   A    We were already exchanging text messages.

Faith - cross - Cannick                    2356

1  Q    Did you continue to exchange text messages?

2  A    Correct.

3  Q    Did you continue to talk on the phone?

4  A    Correct.

5  Q    Did you continue to Facetime?

6  A    Correct.

7  Q    And after this experience that you had in New York that

8  you felt degraded about, you asked for another trip; am I

9  correct?

10 A    We talked about another trip, me coming again, yes.

11 Q    You asked for another trip, am I correct?

12 A    He said he wanted to see me and I gave Diana the dates I

13 was available.

14 Q    And you did that?

15 A    Correct.

16 Q    Even after that experience that you supposedly had in

17 New York?

18 A    Correct.

19 Q    You decided, you know what, I want to see him again?

20 A    Correct.

21 Q    Forget the fact that he constructively criticized me, I

22 want to go back again?

23 A    Correct.

24 Q    Forget the fact that he -- he degraded me, I want to see

25 him again?

Faith - cross - Cannick                                    2357

1    A    Correct.

2    Q    And after you made that decision to contact Diana, you

3    got a ticket, am I correct?

4    A    Correct.

5    Q    You got yourself prepared, am I correct?

6    A    Correct.

7    Q    And you went to the airport?

8    A    Correct.

9    Q    And you took the flight to where he was, am I correct?

10   A    Correct.

11   Q    And then after you got to that place -- where was that

12   place, anyhow?

13   A    Which place are you referring to?

14   Q    The trip after New York.

15   A    I went back home.

16   Q    Come on.

17   A    You're very --

18   Q    I know what I'm talking about, you know what I'm talking

19   about?

20           THE WITNESS:  He's not being clear, I'm sorry, Your

21   Honor.

22           THE COURT:  All right, everybody stop.  You stop and

23   you stop.

24           The question is what is the -- I think the question

25   is what is the next place that you went to, to see Mr. Kelly?

Faith - cross - Cannick                          2358

1          Do I have that right, Mr. Cannick?

2          MR. CANNICK:  Absolutely, Your Honor.

3          THE COURT:  All right, so that's the question.

4          What city did you go to next?

5          THE WITNESS:  The city I went to next after New York

6   was Chicago.

7          THE COURT:  All right, next question.

8   BY MR. CANNICK:

9   Q    So, in Chicago you had another sexual encounter with him,

10  am I correct?

11  A    Correct.

12  Q    An unwanted sexual encounter?

13  A    Correct.

14  Q    And after you had this unwanted sexual encounter, you

15  went back to San Antonio, am I correct?

16  A    Correct.

17  Q    And then you continued to text -- exchange text messages

18  with him?

19  A    Correct.

20  Q    And you continued to have telephone calls with him?

21  A    Correct.

22  Q    And you continued to Facetime with him?

23  A    Correct.

24  Q    And then you asked for another trip?

25  A    We discussed me coming next time, yes.

Faith - cross - Cannick                    2359

1  Q    And you discussed it after that degrading experience --
2           MS. SHIHATA:  Objection.
3           THE COURT:  Overruled.
4  BY MR. CANNICK:
5  Q    You discussed it and you decided that you're going to
6  take another trip to see him?
7  A    Correct.
8  Q    And you went through the same process, you contacted
9  Diana?
10 A    Correct.
11 Q    And you got out to the airport?
12 A    Yes.
13 Q    And then you went to meet him again?
14 A    Yes.
15 Q    When you met him again, where was that city?
16 A    After Chicago, I went to Dallas.
17 Q    Okay.  And Dallas was a similar experience, another
18 degrading sexual encounter, am I correct?
19 A    I never said that.
20 Q    You didn't like what was going on with him sexually, am I
21 correct?
22 A    I didn't say that about the Dallas trip either.
23 Q    In the Dallas trip you testified and told us that you --
24 you consumed a lot of alcohol?
25 A    Correct.

Faith - cross - Cannick                    2360

1  Q    In fact, you told us that it was Cîroc?

2  A    Correct.

3  Q    And this was -- now, you had been diagnosed with this

4  condition that would cause you to have a seizure before you

5  went to Dallas, am I correct?

6  A    Correct.

7  Q    And you knew that the alcohol would cause or could

8  trigger a seizure, am I correct?

9  A    Too much alcohol can cause you to have a seizure, yes.

10 Q    And you made that decision to consume the alcohol again,

11 am I correct?

12 A    Correct.

13 Q    And after some point, I think you alluded to the fact

14 that because of the alcohol you had sexual encounters with

15 Mr. Kelly, am I correct?

16 A    I never said because of the alcohol that's why I had sex

17 with him.  I never said that.

18 Q    Okay.  Now, you also indicated that you were left in the

19 Sprinter for long periods of time?

20 A    I didn't indicate.  I said I was left in the Sprinter for

21 a long period of time.

22 Q    Yes.  So, you indicated that you were left there while

23 they were in the cigar bar?

24 A    Incorrect.

25 Q    So, you were left in the Sprinter?

Faith - cross - Cannick                    2361

1   A    Correct.

2   Q    And how long were you left in the Sprinter?

3   A    For a number of hours.

4   Q    When you say "a number of hours," more than two?

5   A    Correct.

6   Q    More than four?

7   A    It might have been about four hours.

8   Q    You didn't like that?

9   A    Correct.

10  Q    In fact, you felt a little humiliated?

11  A    I never said I felt humiliated.

12  Q    I'm asking you, did you feel humiliated?

13  A    Humiliated, no; left behind, yes.

14  Q    And you didn't want to be left behind, right?

15  A    Correct.

16  Q    You wanted to be with him, right?

17  A    Correct.

18  Q    Okay.  And so -- and you felt as though he was not

19  sensitive to the fact that you wanted to be with him?

20  A    Incorrect, I never said that.

21  Q    I didn't ask you if you said that, I'm asking you if

22  that's how you felt?

23  A    No.

24  Q    So, when you said a short while ago that you felt left

25  behind, it didn't bother you that you were left behind for

Faith - cross - Cannick                    2362

1   about four hours?

2   A    It bothered me for the amount of time that I was left

3   behind.  If he had something to do, that's his job, he's an

4   entertainer; it was just being there.

5   Q    But weren't you -- weren't you -- weren't you upset that

6   you couldn't leave on your own will?

7   A    Correct.

8   Q    Weren't you upset that you didn't have food to eat?

9   A    I was upset about not being able to use the bathroom.  I

10  wasn't hungry in the Sprinter.

11  Q    Okay.  But you were upset about not being able to use the

12  bathroom, am I correct?

13  A    Correct.

14  Q    And anything else about the trip upset you?

15  A    No.

16  Q    So, then eventually you went back to San Antonio?

17  A    Yes.

18  Q    Okay.  And then after being left in the Sprinter in this

19  occasion for an excessive amount of hours and feeling left

20  behind, you decided to visit him again at another destination,

21  am I correct?

22  A    Correct.

23  Q    And, again, of your own will?

24  A    Correct.

25  Q    You contacted Diana to make those arrangements for you?

Faith - cross - Cannick                                    2363

1   A    Correct.

2   Q    And what city did you go to next?

3   A    Los Angeles.

4   Q    And it was in Los Angeles that you testified and told the

5   jury that he was stern?

6   A    Correct.

7   Q    And you testified and told the jury that he had a gun

8   next to him as he spoke to you?

9   A    The gun was beside him, yes.

10  Q    And frightened you, right?

11  A    Made me uncomfortable, yes.

12  Q    Very uncomfortable, scared?

13  A    Yes.

14  Q    And then he had unwanted sex with you?

15  A    Oral sex.

16  Q    Oral sex, yes.  You didn't want that?

17  A    Correct.

18  Q    So he had a gun, that frightened you, right?

19  A    Correct.

20  Q    He performed oral sex on you that you didn't want, am I

21  correct?

22  A    Incorrect, I never said that happened in LA.

23  Q    What?

24       (Pause.)

25  BY MR. CANNICK:

Faith - cross - Cannick                                    2364

1   Q    So, he made you perform oral sex on him?

2   A    Correct.

3   Q    And you definitely didn't want to do that, right?

4   A    Correct.

5   Q    And then he left you for long periods of time?

6   A    Correct.

7   Q    So, gun, perform oral sex on him, left you, and then

8   eventually you went back to San Antonio?

9   A    Correct.

10  Q    Did there come -- did there come a point in time that you

11  went to visit him again?

12  A    Yes.

13  Q    So, after all that, after being forced to perform oral

14  sex on him, after being intimidated by him because he had a

15  gun next to him as he spoke to you, and leaving you behind,

16  you went to visit him again?

17  A    Correct.

18  Q    Your choice, right?

19  A    Yes.

20  Q    What city did you go to this time?

21  A    New York.

22  Q    So, New York.  Now, I want to go back to something we

23  started discussing before the lunch recess.

24       Now, when you spoke to the New York police when you

25  filed a complaint against Mr. Kelly, you told them that

Faith - cross - Cannick                              2365

1   Mr. Kelly penetrated your vagina and your anus, right?

2   A    I never said that.

3              MR. CANNICK:  May I approach, Your Honor?

4              THE COURT:  Sure.

5   BY MR. CANNICK:

6   Q    Read the second paragraph.

7   A    (Witness complies.)

8   Q    You read it?

9   A    Correct, I read it.

10  Q    Isn't it a fact that you told the police officers --

11  A    What's on that paper is incorrect.

12  Q    I didn't ask you --

13             THE COURT:  Just let -- okay.

14             First of all, let him finish the questions before

15  you start to answer.  He is going to ask you questions.

16             And let the witness respond.

17             MR. CANNICK:  Thank you.

18             THE COURT:  So, what is the question you want to put

19  to the witness?

20  BY MR. CANNICK:

21  Q    Isn't it a fact that when you were interviewed by the

22  police officers who took this complaint, you told them that he

23  inserted his penis in your anus and your vagina?

24  A    That is not a fact.

25  Q    So, you didn't tell them that?

SAM    OCR    RMR    CRR    RPR

A 882

Faith - cross - Cannick                2366

1    A    No.

2    Q    And if it's here, they made it up?

3    A    Well -- that is not a fact.

4         THE COURT:  Well, sustained as to whether they made

5    it up.

6         You're saying you didn't tell them that; is that

7    right?

8         THE WITNESS:  Yes.

9    BY MR. CANNICK:

10   Q    And when you were speaking with them, were they taking

11   notes?

12   A    Yes.

13   Q    And you were the only one who were giving them details of

14   this account that you were complaining that happened, am I

15   correct?

16   A    Correct.

17   Q    Now, isn't it a fact that you also told them in that

18   interview that Mr. Kelly told you that if you didn't allow --

19   well, that you pushed -- that he pushed you and said that he

20   would not allow you to eat during the meeting?

21   A    That's incorrect.

22   Q    And if it's in here, that's an error?

23   A    Absolutely an error.

24   Q    Okay.  And isn't it a fact that you told the detectives,

25   or whomever interviewed you, that you were tested and found to

Faith - cross - Cannick                    2367

1   be positive for herpes in December 2017?

2   A    Incorrect, I never said that.

3   Q    Okay, you never said it.  And if it's in here, then it's

4   an error?

5   A    A hundred percent a error.

6   Q    Now --

7         MR. CANNICK:  May I have a second, Your Honor,

8   please?

9         (Pause.)

10  BY MR. CANNICK:

11  Q    Now, after this experience that you had in LA where you

12  said that Mr. Kelly had a gun near him as he spoke to you and

13  that he violated you sexually and had you wait around, you

14  flew back to San Antonio?

15  A    Yes.

16  Q    And did there come a time that you decided to visit him

17  again?

18  A    Yes.

19  Q    Where was that?

20  A    New York.

21  Q    And now, the experiences that you had in those other

22  visits, none of them were to your liking, am I correct?

23  A    Correct.

24  Q    And you felt as though he violated you in some fashion on

25  each and every one of those trips, am I correct?

Faith - cross - Cannick                              2368

1  A    Correct.

2  Q    And those violations were sexual violations?

3  A    Correct.

4  Q    And you said that you felt as though that you couldn't go

5  and use a bathroom when you wanted to use a bathroom?

6  A    Correct.

7  Q    And you felt as though that you were not given food?

8  A    I never said that.

9  Q    You were given food?

10  A    I never said that.

11  Q    What do you say -- withdrawn.

12          Now, after you had that experience in LA, you

13  decided that you were going to contact Diana and arrange for

14  another trip?

15  A    Correct.

16  Q    And the same process, you contacted her and she sent a

17  trip, and then you got to the airport and eventually got to

18  the -- what hotel was it?

19  A    You're asking me about which trip?

20          THE COURT:  He asked what hotel you went to.

21          THE WITNESS:  Yes.

22  A    Which trip again?  I'm sorry.

23  Q    New York.

24          THE COURT:  Well, you went to New York twice, right?

25          So, I think you're talking about the last time --

SAM    OCR    RMR    CRR    RPR

A 885

Faith - cross - Cannick                    2369

1        MR. CANNICK:  The last trip.

2        THE COURT:  -- the last trip?

3        MR. CANNICK:  Yes.

4        THE COURT:  Was it the Mondrian or something?

5        THE WITNESS:  Yes, the Mondrian.

6        THE COURT:  Okay, go ahead.

7   BY MR. CANNICK:

8   Q    And you got to that hotel by Uber?

9   A    Yes.

10  Q    And, again, this was your own volition, you decided, you

11  had asked for this trip and you got the trip and you made the

12  trip, am I correct?

13  A    Yes, sir.

14  Q    And I think you testified -- withdrawn.

15       At some point you said you met someone by the name

16  of Joy or Joycelyn?

17  A    Correct.

18  Q    And what city was it that you met this person?

19  A    Dallas.

20  Q    I'm sorry, I can't hear you?

21  A    Dallas.

22  Q    And you testified and you told us that she appeared to be

23  unkempt to you, am I correct?

24  A    Correct.

25  Q    And you told us that you and her were in the Sprinter for

Faith - cross - Cannick                    2370

1   a prolonged period of time?

2   A    Correct.

3   Q    And this trip that you met Joy, you, basically, did not

4   have a good experience in that trip either?

5   A    I didn't say that the whole trip was terrible, but

6   meeting her, it was a weird experience.

7   Q    And notwithstanding that, you made another trip, am I

8   correct?

9   A    Correct.

10  Q    Now, you testified and told us about an occasion where

11  you needed to go to the bathroom and Diana followed you from

12  the Sprinter to the bathroom.

13       Do you remember telling us that?

14  A    She didn't follow me, she led me to the bathroom.

15  Q    She led you?

16  A    I didn't know where it was.

17  Q    Oh, okay.  So, she escorted you to the bathroom and she

18  stayed there while you used the bathroom?

19  A    Correct.

20  Q    And you didn't think that she was trying to restrain you

21  in any way, am I correct?

22  A    No.

23  Q    And you eventually went back to the Sprinter?

24  A    Yes.

25  Q    And you walked back to the Sprinter?

Faith - cross - Cannick                                    2371

1   A    I followed her back to the Sprinter, yes.

2   Q    Right.  She never put her hands on you, am I correct?

3   A    No.

4   Q    Now, you testified and told us that there -- while she --

5   when she escorted you to the bathroom, that, basically, she

6   stood outside of the stall?

7   A    Correct.

8   Q    Right outside of the stall you said?

9   A    Correct.

10  Q    So, you could -- and that somehow caused you to be

11  unnerved?

12  A    Can you ask your question again?

13  Q    Were you -- did that bother you in any way that she stood

14  outside the stall?

15  A    It was different.  I didn't understand it.

16  Q    Okay, but did it bother you?

17  A    It was different.

18  Q    How so?

19  A    Nobody has ever waited for me outside of the stall, maybe

20  outside the bathroom, but not directly outside the stall.

21  Q    Oh, okay, okay.  You were a guest of Mr. Kelly's, am I

22  correct?

23  A    Correct.

24  Q    And you knew that she worked for Mr. Kelly, am I correct?

25  A    Correct.

Faith - cross - Cannick                    2372

1  Q    And were you aware that she had responsibilities to

2  Mr. Kelly and his guests?

3  A    She was his assistant, yes.

4  Q    And you knew that she was pretty much escorting you and

5  whomever else was with you, Joy or whomever, wherever you

6  went, am I correct?

7  A    I didn't know she was an escort and supposed to escort us

8  everywhere we went, no.  At the time, I wasn't aware.

9  Q    Did you become aware of that?

10 A    Later on.

11 Q    Now, there were times that -- well, withdrawn.

12       You were asked on direct examination about certain

13 text messages that you sent to Mr. Kelly about the outfits

14 that you were wearing?

15 A    Yes.

16 Q    Okay.  You -- he asked you and you sent them, am I

17 correct?

18 A    Yes.

19 Q    You were in San Antonio when you were sending those

20 photographs, am I correct?

21 A    Correct.

22 Q    And he was definitely not in San Antonio?

23 A    Correct.

24 Q    And there was an occasion where you told him that you

25 were going someplace.

Faith - cross - Cannick                    2373

1          You sent that, am I correct?

2    A    Correct.

3    Q    And you sent that because you said that he'd asked you or

4    said to you that he wanted to know where you're going to be?

5    A    You're asking, like, what did I send exactly?

6          I'm not understanding your question.  It's not

7    clear.

8    Q    He asked you at some point to keep him in informed as to

9    where you're going to be, according to you, am I correct?

10   A    Correct.

11   Q    And that's why you sent the photo to him, am I correct?

12   A    Sent a photograph?

13   Q    A text message.

14   A    Of what?

15   Q    You and your friend at the Olive Garden.

16   A    Me and my family at Olive Garden, yes, I sent him a

17   picture.

18   Q    Right.  And you sent that because he had asked you or

19   said to you, let me know where you're going to be?

20   A    He asked me where I was, clear as day, in the text.

21   Q    So, might the answer to my question be yes then?

22          MS. SHIHATA:  Objection.

23          THE COURT:  Well, overruled.

24          I mean he asked you where you were and you sent him

25   a picture of where you were, right?

Faith - cross - Cannick                    2374

1        THE WITNESS:  He asked me like two questions in one,
2   Your Honor, I'm sorry.
3        THE COURT:  That's okay.  All right, but the
4   question was where are you and you sent the picture, right, or
5   one of the questions.
6        All right, next question.
7   BY MR. CANNICK:
8   Q   And then there was a time where you sent him a picture of
9   your outfit and asked him if that was okay?
10  A   Yes, sir.
11  Q   And you did that because at some point he asked you to do
12  so?
13  A   Yes, sir.
14  Q   And you were in San Antonio when you'd sent that photo,
15  am I correct?
16  A   Yes, sir.
17  Q   And of your volition you sent it -- him an outfit -- a
18  picture of your outfit and asked him if that outfit was okay?
19  A   Can you start over?
20  Q   At some point you sent him a picture of the outfit and
21  asked him if the outfit was okay?
22  A   Yes, sir.
23  Q   Now, you testified and told us about a situation where
24  Mr. Kelly, I think this was in the LA trip in the studio, that
25  he, it appeared, to be jogging into where you were, grabbed

Faith - cross - Cannick                                    2375

1   something and jogged back out?

2   A    Correct.

3   Q    Now, you knew before going out on any of these trips that

4   Mr. Kelly was a very busy man, am I correct?

5   A    Correct.

6   Q    And you knew that he -- he and his talents were in high

7   demand, am I correct?

8   A    No, not at the time.

9   Q    But you learned that, am I correct?

10  A    I wasn't aware.

11  Q    You never learned it?

12          MS. SHIHATA:  Objection.

13          THE COURT:  Well, I am a little unclear.

14          Are you saying, are you asking her was his talent

15  was in high demand?

16          MR. CANNICK:  High demand, yes.

17          THE COURT:  All right.  And did you know whether

18  that was true or not?

19          THE WITNESS:  No, ma'am, I would not know that.

20          THE COURT:  All right, next question.

21  BY MR. CANNICK:

22  Q    You Googled him, right?

23          MS. SHIHATA:  Objection, Your Honor.

24          THE COURT:  Overruled.

25  Q    You Googled him, right?

Faith - cross - Cannick                          2376

1        THE WITNESS:  Your Honor, may I --

2        THE COURT:  No.  He's entitled to ask you questions.

3   Just do your best to answer them.  If you don't understand

4   them, just let me know.

5   BY MR. CANNICK:

6   Q    You Googled him, am I correct?

7   A    Yes.

8   Q    And the purpose of your Googling him was to find out

9   about him, am I correct?

10  A    Yes.

11  Q    And when you Googled him, you learned of all the Number 1

12  hits that he had, am I correct?

13  A    No.

14  Q    You overlooked that part?

15       MS. SHIHATA:  Objection.

16       THE COURT:  Overruled.

17       How much time did you spend Googling him?

18       THE WITNESS:  It literally was a Google, and then

19  that's it.  I'm not -- Your Honor, I'm not looking to see

20  every Number 1 hit, latest album.  It's not --

21       THE COURT:  If you didn't know that, that's fine.

22       THE WITNESS:  He's asking specific questions.

23       THE COURT:  Well, do your best to answer them.

24  BY MR. CANNICK:

25  Q    In fact, you spoke to one of your friends about Mr. Kelly

Faith - cross - Cannick                    2377

1  after you initially met him, am I correct?

2  A     Incorrect.

3  Q     Didn't you tell us -- well, didn't you tell us -- didn't

4  you say in your interview with the Government that you

5  contacted your -- well, after the after-party, the first time

6  you ever met Mr. Kelly, your sister was very excited and she

7  said to you:  You gotta talk to Mr. Kelly?

8  A     Yes, sir.  You asked me if I talked to my friend, I did

9  not.  I had a conversation with my sister.

10         MR. CANNICK:  Your Honor, I am going to ask you to

11  instruct the witness to listen to the question and answer the

12  question.

13         THE COURT:  She did.  She said she didn't ask her

14  friend, she asked her sister.

15         Let's not argue, please.  Put your question to the

16  witness.  Don't argue with counsel, just answer his question.

17  If you don't understand, say you don't understand and he'll

18  rephrase it.

19         Go ahead, Mr. Cannick.

20         MR. CANNICK:  Okay.

21  BY MR. CANNICK:

22  Q     So, isn't it a fact -- so, you don't remember telling the

23  Government that you spoke to your friend about Mr. Kelly and

24  having met him, and your friend said:  You better talk to

25  Mr. Kelly, he's a grown-ass man?

Faith - cross - Cannick                    2378

1    A    You said right after the concert, sir, and that's not the
2    conversation that was had.
3              THE COURT:  Okay, the question is --
4              MS. SHIHATA:  Your Honor --
5              THE COURT:  -- he's asking you -- I'm sorry?
6              MS. SHIHATA:  May we just have a sidebar?
7              THE COURT:  No, we don't have to have a sidebar.
8              Just the question is you're saying that you spoke to
9    your friend at a separate time, is that right?
10             THE WITNESS:  Yes.  These questions are very, like,
11   general.  Like, I'm not understanding.  The questions are not
12   clear, Your Honor, at all.
13             THE COURT:  Well, I think they are.  If you have
14   difficulty answering them, you let me know.
15             Mr. Cannick, can you put another question to the
16   witness?
17   BY MR. CANNICK:
18   Q    After you had met Mr. Kelly initially, you contacted your
19   friend, am I correct?
20   A    Sure.
21   Q    And you told your friend that you just met R. Kelly, am I
22   correct?
23   A    Incorrect.
24   Q    You didn't tell your friend that you met R. Kelly?
25   A    I did not initially after the concert; no, I didn't.

Faith - cross - Cannick                    2379

1          THE COURT:  Sometime later did you tell your friend

2    that?

3          THE WITNESS:  Yes.

4          THE COURT:  All right, next question.

5    BY MR. CANNICK:

6    Q    And your friend said to you that you better talk to him,

7    he's a grown-ass man?

8    A    Correct.

9    Q    And your friend was excited, am I correct?

10   A    Encouraging.

11   Q    Encouraging?

12   A    Yes, sir.

13   Q    And encouraging of you to speak with him, develop a

14   relationship with him?

15   A    Yes.

16   Q    Now, you followed that advice, am I correct?

17   A    Yes.

18   Q    And your sister was equally encouraging, am I correct?

19   A    Yes.

20   Q    And you followed her advice as well, am I correct?

21   A    Yes.

22   Q    Now, when you were in LA and you were waiting in the

23   Sprinter, you felt uncomfortable because you were waiting in

24   there for such a long time?

25   A    Are you asking me if I felt uncomfortable?

Faith - cross - Cannick                    2380

1   Q    That's my question.

2   A    Yes.

3   Q    And did you open the door?

4   A    In LA, no, sir.

5   Q    And you text Diana?

6   A    Yes.

7   Q    And she came?

8   A    Yes.

9   Q    And she opened the door?

10  A    Yes.

11  Q    And you and Diana went somewhere?

12  A    Diana showed me where the bathroom was.

13  Q    Okay.  And then you eventually came back to the bathroom,

14  right?

15  A    I think you said back to the bathroom, no, we didn't come

16  back to the bathroom.

17  Q    Back to the Sprinter?

18  A    Correct.

19  Q    Now, how many times did you have to text Diana in order

20  to get her to come to take you to the bathroom?

21  A    Are you asking me that night or just then?

22  Q    We're talking about that night.

23  A    I had to text her twice about the bathroom.

24  Q    And there was the first text, and then about 15 minutes

25  later you sent a second text?

Faith - cross - Cannick                    2381

1   A    I don't know.

2   Q    And then she eventually came?

3   A    Yes.

4   Q    You don't know what she was doing when you sent the text,

5   am I correct?

6   A    At the time in LA, yes, I did know what she was doing the

7   first time I sent the text.

8   Q    What was she doing?

9   A    Waiting in the Sprinter with me in the passenger seat.

10  Q    And so, she's in the passenger seat and you text her?

11  A    Yes.

12  Q    Didn't call out to her?

13  A    She wouldn't be able to hear me.

14  Q    That's not my question, my question is you didn't call

15  out to her?

16  A    No.

17  Q    Now, and then you eventually text her a second time and

18  she got out of the passenger seat and --

19  A    I texted her to use the bathroom the first time in that

20  setting and she said, okay, stand by, and she came back.

21  Q    Okay.  Now, you testified earlier today about Mr. Kelly

22  being asleep and your picking up his phone and answering his

23  phone.

24       Do you remember telling us that?

25  A    Incorrect, I never said I answered his phone.

Faith - cross - Cannick                              2382

1  Q     You looked at the messages coming on his phone, am I

2  correct?

3  A     I looked at the screen, his phone is locked.

4  Q     Okay.  And you looked at all of the phones, am I correct,

5  that he had?

6  A     The two, yes.

7  Q     Was it two or three?

8  A     There was two by me.

9  Q     And you had no fear doing that, right?

10  A     No.

11  Q     And he didn't say anything to you about it, am I correct?

12  A     He didn't know, he was asleep.

13  Q     So, he didn't know.

14        So, when you picked up the phone and you looked at

15  the messages, you said to us this morning that it was a group

16  text and all of them were from women.

17        Do you remember telling us that?

18  A     No.

19

20        (Continued on the following page.)

21

22

23

24

25

SAM     OCR     RMR     CRR     RPR

A 899

Faith - Cross - Cannick                    2383

1   BY MR. CANNICK:

2   Q    You don't remember saying that before lunch?

3   A    I said a group text of women.

4   Q    Of women, okay.  There were names associated with the

5   text messages?

6   A    Correct.

7   Q    Basically you discerned that all of those people were

8   women?

9   A    I went off of the female names I saw on the screen.

10  Q    You saw some numbers on the screen too, right?

11  A    Correct.

12  Q    Basically you saw those calls, those messages, and you

13  said you tried to wake him up?

14  A    I tried to wake him up while his phone was going off

15  before I looked at the phone.

16  Q    At some point Diana came to the room?

17  A    Yes.

18  Q    And got him up to go to a meeting?

19  A    Yes, sir.

20  Q    I asked you earlier this morning about the shows that

21  you've appeared on to talk about this.  You appeared on at

22  least seven shows, am I correct?

23  A    I don't know the exact number.

24  Q    Do you recall appearing on something called Corein

25  Carter?

Faith - Cross - Cannick                    2384

1   A    Can you say that again?

2   Q    C-O-R-E-I-N?

3   A    That's a show?

4   Q    I'm asking you.

5   A    I never heard of a show called that.

6   Q    What about CBS This Morning?

7   A    Yes.

8   Q    And on that show, you appeared with your attorney

9   Ms. Allred?

10  A    Correct.

11  Q    Then you appeared on something called She Talk L.A.?

12  A    Correct.

13  Q    And Dr. Oz?

14  A    Correct.

15  Q    And on Dr. Oz, again, you had Ms. Allred with you?

16  A    Correct.

17  Q    In fact, she participated in the interview, am I correct?

18  A    Correct.

19  Q    And then you went on something called Chelsea Grayson?

20  A    That's a person.

21  Q    Yes.  Did you have an interview with this person Chelsea

22  Grayson?

23  A    Yes.

24  Q    Then you went on Channel Five?

25  A    Channel Five, that's a channel.  I don't know.

Faith - Cross - Cannick                          2385

1  Q    Okay, but fair to say you appeared on at least five to

2  seven television shows?

3  A    Correct.

4  Q    And podcasts as well?

5  A    Correct.

6  Q    In one of the podcasts we spoke about this morning, the

7  Paper Route.  On that show you said during that interview:  I

8  don't like the word victim because I don't feel like I'm a

9  victim.  I'm a young woman.  And let's be clear, let's be

10 clear, I made a choice to be involved with that person.  Do I

11 feel like everything he did was right?  Hell, no.  But I had a

12 choice.  And that's why I walked away.  I did not move in with

13 him.  I did not live with him.  I did not take any money from

14 him.  There is a choice that you have to make.

15          You said that?

16 A    Correct.

17 Q    You made a choice.

18 A    Correct.

19 Q    And you're not a victim.

20 A    Correct.

21          MR. CANNICK:  Thank you.

22          THE COURT:  Any redirect?

23          MS. SHIHATA:  Yes, your Honor.

24          THE COURT:  Do you think it's long?  It might be not

25 a bad time to take a break.

Faith - Redirect - Shihata                    2386

1        MS. SHIHATA:  I don't think it's very long.

2        THE COURT:  Okay good.

3   REDIRECT EXAMINATION

4   BY MS. SHIHATA:

5   Q    Good afternoon.

6   A    Good afternoon.

7   Q    During cross-examination before the lunch break you were

8   asked some questions about how you remembered all these

9   details from three years ago.  Do you remember those

10  questions?

11  A    Correct.

12  Q    You provided the Government with a screen recording of

13  all your chats with Diana Copeland, correct?

14        MR. CANNICK:  Objection.

15        THE COURT:  Overruled.

16  A    Correct.

17  Q    That spanned the time that you began traveling and seeing

18  the defendant, correct?

19  A    Correct.

20  Q    As you testified, the defendant told you to keep Diana

21  apprised as things were happening on your trip, correct?

22  A    Correct.

23  Q    And to ask for permission to do certain things, correct?

24  A    Correct.

25  Q    Is it fair to say that having text messages from that

Faith - Redirect - Shihata                    2387

1   time period is a way you've been able to refresh your

2   recollection about certain details?

3   A    Correct.

4   Q    You were also asked some questions before lunch on

5   cross-examination about your having been in college then

6   leaving college.  Do you remember those questions?

7   A    Yes.

8   Q    Had your parents supported you financially?

9   A    Yes.

10  Q    And did that include while you were seeing the defendant?

11  A    Yes.

12  Q    And do they continue to support you financially?

13  A    Yes.

14  Q    Are your parents successful?

15  A    Yes.

16  Q    Have you ever wanted for anything on a financial aspect?

17  A    No.

18  Q    Did you ask the defendant to support you?

19  A    No.

20  Q    You were asked some questions on cross-examination before

21  the lunch break about certain dates about when you went to a

22  lawyer and when you went to the Dallas Police Department and

23  so forth.  Do you remember those questions?

24  A    Yes.

25       MS. SHIHATA:  One moment, your Honor.

Faith - Redirect - Shihata                2388

1      THE COURT:  Sure.

2  Q    You testified that you went to the Dallas Police

3  Department on April 9, 2018.  Do you remember that?

4  A    Yes.

5  Q    Mr. Cannick, the defense attorney, showed you a document

6  that indicated something about a demand letter being sent on

7  April 17, 2018.  Do you remember those questions?

8  A    Yes.

9  Q    April 9, 2018, that's before April 17, 2018, correct?

10 A    Correct.

11 Q    So you went to the Dallas Police Department first,

12 correct?

13 A    Correct.

14 Q    You were asked some questions on cross-examination about

15 various things that happened in your travels to see Mr. Kelly.

16 Do you remember those questions?

17 A    Correct.

18 Q    And I think you testified on cross-examination that

19 certain things happened on those trips that you were

20 uncomfortable with or that you didn't want to happen; is that

21 correct?

22 A    Correct.

23 Q    You also testified yesterday that there were two sides to

24 the defendant, correct?

25 A    Correct.

Faith - Redirect - Shihata                    2389

1  Q    In fact, you testified that at the very beginning of your
2  testimony, correct?
3  A    Yes.
4  Q    That it wasn't all bad, correct?
5  A    Correct.
6  Q    Just before you finished, Mr. Cannick asked you some
7  questions about a podcast where you indicated you didn't like
8  the term victim, right?
9  A    Correct.
10 Q    In that same podcast did you also say you didn't like the
11 term survivor?
12 A    Correct.
13 Q    Mr. Cannick asked you a lot of questions about choices
14 you made.  Do you remember those questions?
15 A    Correct.
16 Q    And pretty much all of the questions asked you about
17 choices to get on flights and choices to contact Diana.  Those
18 were all things you had talked about and testified about on
19 direct examination, correct?
20 A    Correct.
21 Q    In your time seeing the defendant, the defendant also
22 made some choices, correct?
23 A    Correct.
24         MR. CANNICK:  Objection.
25         THE COURT:  Overruled.

Faith - Recross - Cannick                    2390

1  Q    The defendant chose not to tell you he had herpes,

2  correct?

3  A    Correct.

4  Q    The defendant chose to ignore you when you said you

5  weren't comfortable with sex, correct?

6  A    Correct.

7  Q    In Los Angeles the defendant chose to grab the back of

8  your head, put his penis in your mouth, keep his hand pushing

9  your head towards his penis with a gun next to him, correct?

10 A    Correct.

11       MS. SHIHATA:  No further questions.

12       THE COURT:  Any recross?

13       MR. CANNICK:  Yes.

14 RE-CROSS EXAMINATION

15 BY MR. CANNICK:

16 Q    And you made the choice to go back to see him, right?

17 A    Correct.

18 Q    After he had done all those things to you --

19 A    Correct.

20 Q    -- according to you, right?

21 A    Correct.

22 Q    In fact, you didn't make the choice to go to another

23 city, you went to several other cities, am I correct, to visit

24 him after that?

25 A    After what?

Faith - Recross - Cannick                    2391

1   Q    You don't know what I'm talking about?

2   A    I don't.

3        THE COURT:  I don't actually either.

4   Q    We're talking about the fact the Government just asked

5   her on redirect about --

6        THE COURT:  The easiest thing to do is put the

7   question again, if you don't mind.

8   BY MR. CANNICK:

9   Q    After you saw -- it was in L.A. that, according to you,

10  he grabbed your head put it on his penis?

11  A    Correct.

12  Q    And according to you, it was in L.A. that he had the gun

13  next to him when he did this?

14  A    Correct.

15  Q    And after that, you went to see him in another city, am I

16  correct?

17  A    Correct, one last time.

18  Q    But you went to see him in another city after that, am I

19  correct?

20  A    Yes.

21  Q    What city was that?

22  A    New York.

23  Q    You went through making the choice of contacting him for

24  another trip, am I correct?

25  A    Correct.

Faith - Recross - Cannick                    2392

1   Q    The Government asked you a short while ago about, you

2   were told to ask Diana to give you permission to do things?

3   A    I'm sorry.  Can you ask that question again?

4   Q    You testified a short while ago in a question put to you

5   that you were told to ask Diana for permission to do things?

6   A    That's incorrect.  That's not what I said.

7   Q    My question was, was that asked of you a short while ago

8   by the Government?

9   A    No.

10  Q    You didn't ask her say you had to ask Diana for

11  permission?

12  A    No.

13  Q    You didn't have to ask anyone for permission?

14  A    I had to ask your client, R. Kelly.

15  Q    Beg your pardon?

16  A    R. Kelly.

17  Q    R. Kelly is who you had to ask for permission?

18  A    Correct.

19  Q    The permission that you were asking is what R. Kelly told

20  you, to check in with Diana to make sure that she knows where

21  you are and make sure that you're okay.  Isn't that a fact?

22  A    Correct.

23            MR. CANNICK:  Thank you.

24            THE COURT:  Anything else?

25            MS. SHIHATA:  No, your Honor.

Proceedings                                    2393

1           THE COURT:  The witness can step down.

2           (Whereupon, the witness was excused.)

3           THE COURT:  I think this is a good time to take our

4    afternoon break.  It will be about ten minutes.  Don't talk

5    about the case.  We'll see you soon.

6           THE COURTROOM DEPUTY:  All rise.

7           (Jury exits the courtroom.)

8           THE COURT:  I trust there is nothing anybody has to

9    bring up before the break?

10          MS. SHIHATA:  No, your Honor.

11          MR. CANNICK:  No, your Honor.

12          THE COURT:  Who is the next witness.

13          MS. SHIHATA:  Kelly.

14          THE COURT:  We'll see you after the break.

15          MS. GEDDES:  One small matter, our witness I believe

16   after this next witness is going to be testifying by video.  I

17   think we'll just need like a few minutes to set up the video.

18          THE COURT:  That's fine.

19          (Brief recess.)

20          THE COURT:  Just before we call the next witness, I

21   need to see Ms. Shihata and Mr. Cannick at sidebar.  We don't

22   need the reporter.

23          (Discussion held off the record at sidebar.)

24          THE COURT:  Do you want to get the witness, unless

25   there is anything somebody wants to raise?  All right.

Anna - cross - Cannick                    2986

1   **ANNA**,

2       having been previously duly sworn, was examined and

3       testified as follows:

4   CROSS EXAMINATION

5   BY MR. CANNICK:

6   Q   Now, did you meet with the Government last night after we

7   recessed?

8   A   No.

9   Q   After we left last night at 5:30, you didn't meet --

10  A   No, I did not, I left.

11  Q   Did you see them last night?

12  A   No.

13          MR. CANNICK:  Now, I'm going to ask that these be

14  marked as defense GG, HH, II, and JJ.

15          May I show them to the witness?

16          THE COURT:  Sure.

17  Q   Would you look through them, please?

18          Do you recognize them?

19  A   Yes.

20  Q   What do you recognize them to be?

21  A   Pictures of me and Rob.

22          MR. CANNICK:  Your Honor, I offer them into

23  evidence.

24          THE COURT:  Any objection?

25          MS. CRUZ MELENDEZ:  No objection.

Anna - cross - Cannick                    2987

1        THE COURT:  All right.  Those are in evidence.

2            (Defendant's Exhibits GG, HH, II, and JJ received in

3    evidence.)

4            MR. CANNICK:  Your Honor, I would ask that they be

5    published.

6        THE COURT:  Okay.

7            (Exhibit published.)

8        THE COURT:  Do they get published?

9        MR. CANNICK:  Your Honor, we are just trying to --

10       THE COURT:  Sticking?

11       MR. CANNICK:  Yes.

12   Q    This photo that we are looking at now, you're in that

13   photograph?

14   A    Correct.

15   Q    And Robert Kelly is as well?

16   A    Correct.

17   Q    Do you know where this photograph was taken?

18   A    The house in Johns Creek that had the pool.

19   Q    And this was a party?

20   A    My birthday party; correct?

21   Q    I'm sorry, I didn't hear you.

22   A    My birthday party.

23   Q    Your birthday party?

24   A    Yes.

25   Q    And this is a party that he flew in his band that he had

Anna - cross - Cannick                2988

1  to perform internationally?

2  A    Correct.

3  Q    Basically, when he flew that band in for your birthday

4  party, he basically performed a two-hour concert just to you,

5  am I correct?

6  A    Correct.

7  Q    What's in the next one?  That's you in the photograph?

8  A    Correct.

9  Q    You are wearing a t-shirt?

10  A    Yes.

11  Q    And that t-shirt has Mr. Kelly's face on it?

12  A    Correct.

13  Q    When was that photograph taken?

14  A    When or where?

15  Q    When.

16  A    I'm not sure when.  I don't remember when.

17  Q    Do you remember where?

18  A    I believe we were at the shops at Buckhead.

19  Q    The shops at Buckhead?

20  A    Yes.

21  Q    In Atlanta?

22  A    Yes.

23        MR. CANNICK:  Next photograph, please.

24  Q    Is this a photograph, another photograph of you and Mr.

25  Kelly?

Anna - cross - Cannick                    2989

1   A    Correct.

2   Q    Do you recall where that photograph was taken?

3   A    A club called Gold Room in Buckhead in Georgia.

4   Q    Do you remember what time?

5   A    It was in the evening, so maybe like 12:00, 1:00 a.m.

6   Q    About what year?  Do you recall what year?

7   A    I don't recall what year.

8            MR. CANNICK:  Next.

9   Q    These are photographs of yourself at your party?

10  A    Correct.

11  Q    And this was a stage that you were on or was this a pool

12  area?

13  A    That was just the pool area.

14  Q    And the concert that he performed, he had a concert

15  setting?

16  A    It was in the living room.  Basically, everything was

17  rearranged for that, so, yes.

18  Q    In fact, he hired an event planner, am I correct?

19  A    I believe so, yes.

20  Q    And the event planner staged the entire evening?

21  A    I'm not really sure who did, but....

22  Q    It was staged?

23  A    Yes.

24  Q    You enjoyed yourself; right?

25  A    Yes.

Anna - cross - Cannick                    2990

1   Q   Your parents did?

2   A   My mom did, yes.

3   Q   Your mom did.

4           You had family and friends there?

5   A   Yes.

6   Q   They all had a good time; right?

7   A   Yes.

8           MR. CANNICK:  The next one, please.

9   Q   The same scenario here, your birthday party?

10  A   Correct.

11          MR. CANNICK:  Next one, please.

12          Can you tighten it up some.

13  Q   Do you see yourself there?

14  A   Yes.

15  Q   Are you to the right?

16  A   To the -- in the sparkly dress to the right, yes.

17  Q   The sparkly dress?

18  A   Uh-hum.

19  Q   And that's Mr. Kelly's left arm around your neck?

20  A   Correct.

21  Q   In a hugging fashion, am I correct?

22  A   Correct.

23  Q   The person who's on his right, who's that person?

24  A   Joy.

25  Q   Joy.  Okay.  Do you remember when that was taken?

Anna - cross - Cannick                         2991

1   A    This was in L.A., Snoop Dogg's wife's birthday or

2   something like that.

3   Q    And he took you and Joy to that party?

4   A    Correct.

5   Q    Do you remember how you got there?

6   A    I believe we all rode in the Sprinter.

7   Q    So went cross country in the Sprinter?

8   A    No.  We were already there, I believe.  We could have

9   been there.  I don't remember what we were there for already,

10  but we were already in L.A.

11  Q    Okay.  And do you recall how long you stayed there, in

12  L.A.?

13  A    Might be a week or two.  I don't really remember.

14  Q    You did a lot of traveling with Mr. Kelly, did you not?

15  A    Traveling, yes.

16  Q    And I think you -- you told us yesterday that you did a

17  lot of shopping with him as well?

18  A    Correct.

19  Q    And a lot of restaurants and cigar bars?

20  A    Yes.

21  Q    Now, I asked you yesterday about the time that this

22  incident -- I think it was in Mobile where Mr. Kelly and you

23  had an argument.

24        Do you remember you telling us that?

25  A    Correct.

Anna - cross - Cannick                    2992

1  Q    Now, you thought that Mr. Kelly -- well, withdrawn.

2          You were of the mind that Mr. Kelly thought you were

3  texting another guy, correct?

4  A    Correct.

5  Q    And you told that to the Government, correct?

6  A    Correct.

7  Q    And essentially, in that interview, you basically told

8  them that notwithstanding the arguments that you and Mr. Kelly

9  had you weren't afraid of him?

10 A    I could have said that.  I don't remember.

11 Q    Okay.  Let's see if this refreshes your recollection.

12 A    So where I say I speak my mind?  Okay.

13 Q    So after reading this and having your -- did it refresh

14 your recollection that you told the Government in your

15 interview with them, one of the interviews, that despite the

16 arguments, you weren't afraid of Mr. Kelly?

17 A    Correct.

18 Q    And you also told them that you still speak your mind?

19 A    Correct.

20 Q    And you also told them that you'd always stand up for

21 yourself?

22 A    Most of the time.  I said that, but most of the time.

23 Q    Right.  But what you told them is that you would always

24 stand up for yourself?

25 A    Correct.

Anna - cross - Cannick                                2993

1   Q    Now, when you left Mr. Kelly after that incident and you
2   went to the airport, eventually Mr. Kelly paid for a room for
3   you because he didn't want you to be out there alone, am I
4   correct?
5   A    Correct.
6   Q    And then he eventually paid for your flight to leave, am
7   I correct?
8   A    Correct.
9   Q    Now -- and we talked about this text he asked you to
10  write -- we talked about this yesterday, a text that he asked
11  you to write.  Do you remember telling us about that?
12  A    Which text?
13  Q    Well, you told the jury that it was a letter that he had
14  wanted you to write, but it was a text, was it not?
15  A    Depending on which time, which text?
16  Q    That -- it was you who attacked him.
17          THE COURT:  I'm not clear either.  Are you talking
18  about a text message or a handwritten letter?
19          MR. CANNICK:  Well, her testimony was, Your Honor,
20  that --
21          THE COURT:  Was it a text?
22          MR. CANNICK:  -- a written letter.
23          THE WITNESS:  I don't remember a text.  I do
24  remember writing the letter.
25  Q    I will show you this and see if it refreshes your

Anna - cross - Cannick                                    2994

1  recollection that it was a text.

2  A    Okay.

3          MR. CANNICK:  Let's find it.

4  Q    Again, right where my finger is, my thumb.

5          You've read it?

6  A    Yes.

7  Q    Does it refresh your recollection that Mr. Kelly asked

8  you to send him a text indicating that the situation was not

9  his fault, that you attacked him?

10 A    The events that I just read were correct, but I don't

11 recall sending a text message.

12 Q    Okay.  But that's what's in here, am I correct, in this

13 document?

14 A    Correct.  About the incident that happened, correct?

15 Q    Yes.

16 A    Yes.

17 Q    And him asking you to send a text?

18         MS. CRUZ MELENDEZ:  Objection.

19 A    I don't remember the text part.

20 Q    Okay.  Now -- and that night after you went back to the

21 airport so that you could leave, there were no flights, am I

22 correct, that evening?

23 A    Correct.

24 Q    And then it was that time that he paid for you to get a

25 hotel so you wouldn't have to be alone?

Anna - cross - Cannick                              2995

1   A    Correct.

2   Q    Now, there came a point in time that the Savages started

3   making public comments about Mr. Kelly, am I correct?

4   A    Correct.

5   Q    And you told -- and after they started doing that, Mr.

6   Kelly, according to you, didn't trust anyone anymore, am I

7   correct?

8   A    That he didn't trust anyone?

9   Q    Yes.

10  A    Correct.

11  Q    And that was -- that distrust came before your mother

12  visited, am I correct?

13  A    Correct.

14       MS. CRUZ MELENDEZ:  Objection.

15       THE COURT:  Overruled.

16  Q    Now, when you were with Mr. Kelly, you never had an issue

17  where you didn't have food, am I correct?

18  A    No.

19  Q    I'm not correct?

20  A    I mean you're correct.  I never had an issue with food,

21  yeah.

22  Q    And you never had a situation where you didn't have

23  water, am I correct?

24  A    Correct.

25  Q    And you never had to, when you were with Mr. Kelly, spend

Anna - cross - Cannick                    2996

1   money on anything, am I correct?

2   A    Correct.

3   Q    In fact, he would give you money, am I correct?

4   A    Correct.

5   Q    Substantial sums, am I correct?

6   A    Correct.

7   Q    Now, Jane was jealous of you and your relationship with

8   Mr. Kelly?

9            MS. CRUZ MELENDEZ:  Objection.

10           THE COURT:  Sustained.

11  Q    Now, what was your relationship with Jane?

12           THE COURT:  Didn't we have this testimony yesterday

13  that they didn't get along?  I'm quite certain I remember

14  hearing it.  I don't want to do the same thing over again.

15           MR. CANNICK:  Okay.  I'm sure your recollection is

16  better than mind.

17           THE COURT:  Well, I don't know about that.

18  Q    Now, you testified yesterday about spanking?

19  A    Correct.

20  Q    Now, you were of the mind that Mr. Kelly viewed spanking

21  as a punishment?

22  A    Correct.

23  Q    And but you also were of a mind that it was a sexual turn

24  on for him, am I correct?

25  A    Correct.

Anna - cross - Cannick                    2997

1   Q    And the spanking, light spanking as well, am I correct?

2             THE COURT:  I didn't hear what you said.

3             MR. CANNICK:  Light spanking.

4             THE COURT:  Who did?

5             MR. CANNICK:  I'm saying this punishment was light

6   spanking as well.

7             THE COURT:  Light.  I see.

8   A    I would not say light.

9             MR. CANNICK:  Just one second.

10  Q    I'm going to she if this refreshes your recollection.

11  Well, withdrawn.

12            When you met with the Government and you were

13  interviewed by the Government, you told them that sometimes

14  the spankings were light; right?

15  A    I don't ever recall saying that.

16  Q    Again, where my thumb is.

17  A    I don't recall saying light.

18  Q    But it's in there, am I correct?

19  A    It's in there.

20  Q    What's in there, in fact, is that sometimes --

21            MS. CRUZ MELENDEZ:  Objection, Your Honor.

22  Q    -- there were light spankings?

23            THE COURT:  Well, sustained as to form.

24  Q    What you told them is that sometimes they were light

25  spankings, am I correct?

Anna - cross - Cannick                              2998

1   A    I don't recall telling them that.

2   Q    But it's in the document you just read?

3   A    It's in the document.

4   Q    Okay.  Now, you testified and told us about an occasion

5   or occasions where you urinated in a cup on the Sprinter?

6   A    Correct.

7   Q    Now, Mr. Kelly, according to you, his assistants also

8   urinated in the cups of the Sprinter, am I correct?

9   A    Yeah, I mean, everybody kind of did.

10  Q    Everybody.

11        Now, if you really didn't want to do something, an

12  activity that Mr. Kelly suggested, you wouldn't do it, am I

13  correct?

14  A    No, that's not correct.

15  Q    That's not correct.

16        Isn't it fact that you told the Government that if

17  you vehemently did not want to engage in some activity, you

18  wouldn't do it?

19  A    I wouldn't say all the time, but sometimes, yes.

20  Q    Okay.  That's what you told the Government, am I correct?

21  A    Could have.  I don't remember.

22  Q    Let's see if this refreshes your recollection.

23  A    Okay.

24  Q    The portion where my thumb is.

25        Finished reading it?

Anna - cross - Cannick                           2999

1      Thank you.

2           Isn't it a fact that you told the Government during

3  one of those interview sessions that if you vehemently did not

4  want to engage in some activity, you wouldn't do it?

5  A    I would say sometimes.  It does say that on there, but

6  sometimes.

7  Q    But on this document that you read --

8  A    Correct.

9  Q    -- it says that, am I correct?

10 A    Correct.

11 Q    Now --

12          MR. CANNICK:  Your Honor, may that question and

13 answer be read back, please.

14          (Record read.)

15          THE COURT:  I don't know which question.

16          MR. CANNICK:  The last.

17          THE COURT:  But on this document, is that the one?

18          MR. CANNICK:  Yes.

19          THE COURT:  All right.  Do you mind?

20          (Record read.)

21 Q    Now, these punishments that you told us about, none of

22 them would happen, according to you, for not doing something,

23 am I correct?  Not doing something that was asked of you by

24 Mr. Kelly?

25 A    I can't recall.

Anna - cross - Cannick                    3000

1  Q    You can't recall what?

2  A    That whatever you just said, that it was....

3  Q    Well, let's see if this refreshes your recollection.

4        Where my thumb is located at.

5        Having read the document, does it refresh your

6  recollection that you told the Government that none of the

7  punishment you suffered were because you said you didn't want

8  to do something?

9  A    It's there on the document.  I don't recall fully saying

10 that.

11 Q    It's on the document?

12 A    It's on the document.

13 Q    Okay.  And you were the person that was being interviewed

14 when this was being drafted?

15 A    Correct.

16 Q    Now, you -- isn't it fact that you told the Government

17 that punishments were more for things that Kelly thought that

18 you were doing behind his back, like lies?

19        MS. CRUZ MELENDEZ:  Objection.

20        THE COURT:  Overruled.

21        Did you make that statement?

22 A    I don't recall making that statement.

23 Q    Picking up where you left --

24 A    Right.  I see that.  I just don't recall saying that.

25 Q    Okay.  But it's on the document?

Anna - cross - Cannick                          3001

1   A    Correct.

2   Q    Now, you testified yesterday and told us about when you

3   and Mr. Kelly finally terminated the relationship.  Do you

4   remember telling us about that?

5   A    I was what?

6   Q    When you told us about the time that you and Mr. Kelly,

7   the relationship terminated.  Do you recall telling us that?

8   A    Correct.

9   Q    Now, this happened as a result of your having gone away

10  home and then you returned, am I correct?

11  A    You're saying the ending of our relationship?

12  Q    Yes.

13  A    I'm not understanding the other question.

14  Q    You testified yesterday and told us that there came a

15  point in time that you and Mr. Kelly's relationship

16  terminated.  Do you remember telling us about that?

17  A    Correct.

18  Q    And I think you testified and told us that this happened

19  after you had returned to Mr. Kelly from, I think it was a

20  Christmas trip, am I correct?

21  A    Correct.

22  Q    Okay.  And if -- this, according to you, happened because

23  when you returned you realized that Mr. Kelly had had women at

24  the apartment, am I correct?

25  A    In the hotel, correct.

Anna - cross - Cannick                    3002

1   Q   At the hotel.

2   A   Yes.

3   Q   And you saw evidence of that, am I correct?

4   A   Correct.  In the hotel room we were staying in.  Correct.

5   Q   And then you spoke to him about it?

6   A   Yes.

7   Q   And you were under the impression that Jane had been

8   there, am I correct?

9   A   I think all of them.

10  Q   You thought all of his girlfriends?

11  A   Yeah.  Uh-hum.

12  Q   And then you had words about it and you left him, am I

13  correct?

14  A   I think we got into an argument, and then, yeah, I left

15  the hotel and went outside.

16  Q   Okay.  And there came a point in time a couple of weeks

17  later, you sent Mr. Kelly a text; right?

18  A   I don't recall.

19  Q   You don't recall sending him a text where you were

20  holding a baby?

21  A   Where I was holding a baby?

22  Q   Yeah.

23  A   I don't remember.

24  Q   Okay.  And whatever your recollection is, Mr. Kelly never

25  text you again, am I correct?

Anna - redirect - Shihata                    3003

1   A    I wouldn't say that, no.

2   Q    You're saying he texted you again?

3   A    Not like recently, but we communicated down the line.

4   Q    After -- after the relationship was terminated?

5   A    Correct.

6   Q    And he didn't ask you to come back to him, did he?

7   A    No.

8   Q    And you didn't ask him --

9   A    No.

10  Q    -- to go back, am I correct?

11  A    Correct.

12  Q    Okay.

13        MR. CANNICK:  Just a second, please, Your Honor.

14        THE COURT:  Yes.

15        MR. CANNICK:  That's it.  Thank you.

16        THE COURT:  Okay.  Any redirect?

17        MS. CRUZ MELENDEZ:  Yes, Your Honor.

18  REDIRECT EXAMINATION

19  BY MS. CRUZ MELENDEZ:

20  Q    During cross-examination yesterday, defense counsel asked

21  you about a radio program that you gave some statements about?

22  A    Correct.

23  Q    And in response to his question, you stated that that was

24  different, a different situation from where we are here, when

25  you say where we are here, do you mean your testimony here

Anna - redirect - Shihata                    3004

1  today?

2  A    Correct.  I felt like obviously it's different with you

3  guys telling, you know, everything.

4           MR. CANNICK:  Objection.

5           THE COURT:  Overruled.

6  Q    You can continue.

7  A    So, yeah, that's why I didn't feel the need to tell the

8  radio everything.  I was actually trying to make him not sound

9  like everything that people were saying.

10  Q    Now, you were subpoenaed to testify here today; correct?

11  A    Correct.

12  Q    Is it fair to say that you don't want to be testifying

13  about some of the private things that happened with respect to

14  your relationship with the defendant; correct?

15  A    Correct.  I definitely didn't want to come do this, but

16  I'm having to.

17  Q    And you are here under oath; correct?

18  A    Correct.

19  Q    Now, when you were talking on that radio program, you

20  weren't under oath there; correct?

21  A    Correct.

22  Q    And isn't it fair to say that when you went on that radio

23  program, you weren't there to talk about the defendant;

24  correct?

25  A    Correct.

Anna - redirect - Shihata                    3005

1   Q    Okay.  You were there to talk about other issues having

2   to do with yourself and your career; right?

3   A    Correct.

4   Q    Isn't it also fair to say that you said that there were

5   ups and downs in your relationship with the defendant;

6   correct?

7   A    Correct.

8   Q    And that you didn't want to fully go into everything or

9   go fully into depth with respect to your relationship with the

10  defendant; right?

11  A    Correct.

12  Q    Now, defense counsel also asked you about your appearing

13  on the second part of *Surviving R. Kelly*.  Do you remember

14  testifying to that?

15  A    Correct.

16  Q    I think you testified that you couldn't remember the

17  exact month that that appeared, but that it happened sometime

18  in 2020?

19  A    Correct.

20  Q    Were you still with the defendant in 2020?

21  A    No.

22  Q    When you -- do you know when the first portion of

23  *Surviving R. Kelly*, that docu series aired?

24  A    I can't fully remember.

25  Q    Do you remember whether you were with the defendant when

Anna - redirect - Shihata                    3006

1   that aired?

2   A    I think it was being talked about when I was with him,

3   but I don't think it was aired yet.  I think they were film --

4   or I don't know, but I did hear about it.

5   Q    You didn't participate in that first portion of *Surviving*

6   *R. Kelly*, did you?

7   A    No.

8   Q    I think you testified yesterday that you ended the

9   relationship with the defendant somewhere around New Year's

10  going into 2018; correct?

11  A    Correct.

12  Q    And defense counsel also asked you questions on

13  cross-examination with respect to the altercation that

14  happened between you and the defendant where your necklace was

15  broken.  Do you remember that?

16  A    Correct.

17  Q    That incident started because the defendant believed that

18  you were texting someone; correct?

19  A    Correct.

20  Q    During his concert; right?

21  A    Correct.

22  Q    That you were using your phone in a way that you weren't

23  supposed to be?

24  A    Correct.

25  Q    When that incident started, was the defendant upset?

Anna - redirect - Shihata                    3007

1   A    Correct.

2   Q    Defense counsel questioned you on cross-examining with

3   respect to that, about you having initiated physical contact

4   with the defendant; right?

5   A    Correct.

6   Q    What was he doing right before you pushed him away?

7   A    Yelling, raising his voice.

8   Q    And after you pushed him, what did the defendant do?

9   A    He grabbed me.

10  Q    Grabbed you up near your neck?

11  A    Up near my neck.

12  Q    How tall are you?

13  A    5'4".

14  Q    How much do you weigh?

15  A    125.

16  Q    Did you weigh about the same amount back when this

17  incident occurred?

18  A    Probably -- yeah, close to the same.

19  Q    And how tall approximately is the defendant?

20  A    He is 6'2", maybe.

21  Q    Now, with respect to that incident, defense counsel also

22  asked you questions about whether or not -- about whether or

23  not the defendant then paid for your airfare to go home after

24  that; correct?

25  A    Correct.

Anna - redirect - Shihata                              3008

1   Q    Prior to him doing that, you had gone to the airport;
2   correct?
3   A    Correct.
4   Q    And you testified that you couldn't get on the plane
5   because you didn't have money for a ticket home; correct?
6   A    Correct.
7   Q    When you went to the airport, did you even bring all of
8   your belongings with you?
9   A    I believe I did have my suitcase with me.
10  Q    Were there other things that you didn't have with you
11  that you had brought with you on the trip?
12  A    Yes.  I believe I left like my makeup bag, and my -- when
13  my necklace broke, it was left behind, but I ended up getting
14  it.
15  Q    So it's fair to say you were in a rush to the airport;
16  correct?
17  A    Correct.
18  Q    And going back for a moment to the incident inside of the
19  hotel when the defendant grabbed you and you said that he was
20  yelling at you?
21  A    It was inside the arena but, yes.
22  Q    I'm sorry.  Inside the arena.  I apologize.  How was he
23  yelling at you?
24  A    Just in an aggressive tone, you know, upset.
25  Q    Where was he in relationship to you?

1   A    Where was he?

2   Q    Yes.

3   A    In front of me.

4   Q    So when you pushed him away, was he close to your face?

5   A    Yes.

6   Q    Now, when you went to the airport and you didn't have a

7   ticket and couldn't afford a ticket and you came back, defense

8   counsel asked you whether the defendant ultimately paid for

9   your ticket.  Do you remember those questions?

10  A    Correct.

11  Q    Before he paid for your ticket, the defense counsel asked

12  you to write something; correct?

13  A    Correct.

14  Q    I'm sorry.  Not defense counsel.  I think I said defense

15  counsel.  The defendant asked you to write something?

16  A    Correct.

17  Q    He asked you to write a letter, a note; correct?

18  A    Correct.

19  Q    Now, defense counsel, on cross-examination, asked you

20  questions as to whether or not you indicated to the Government

21  that that was -- that you had written a text, right, instead

22  of a letter.  Do you remember him asking you about that?

23  A    I just don't remember -- I do remember writing the

24  letter.  I don't remember a text.  It could have been, but I

25  don't remember.

1  Q    He showed you a document that was prepared by someone

2  other than you; correct?

3       Defense counsel, when he asked you about the text,

4  showed you a document?

5  A    Oh, yes.

6  Q    You didn't prepare that document; right?

7  A    What it said sounded right, but I don't remember saying

8  or --

9       THE COURT:  I think the question is did you write

10 that report that he showed you?

11      THE WITNESS:  I don't recall writing that, no.

12      THE COURT:  All right.  Go ahead.

13 Q    And I'll show it to you again, but you've never seen this

14 before; correct?

15 A    No.

16 Q    I'm going to show you what defense counsel showed you for

17 a moment and I will direct your attention, but you also

18 referred to this -- to the Government as a letter?

19      MR. CANNICK:  Objection as to form.

20      THE COURT:  Overruled.

21 A    She wrote the --

22 Q    Don't read it out loud?

23      THE COURT:  You don't have to read it.

24 Q    But did you refer to it as a letter?

25 A    Yes.  Yes.

Anna - redirect - Shihata                        3011

1  Q    And in that letter, the note that the defendant asked you

2  to write, you testified that he asked you to write information

3  in there to protect himself; correct?

4  A    Correct.

5  Q    Now, defense counsel, on cross-examination, asked you

6  whether or not everything in that letter was true; correct?

7  A    Correct.

8  Q    Okay.  And I believe you testified that you weren't sure

9  whether or not everything in the letter was true; correct?

10 A    Correct.

11 Q    Is it fair to say that there were instances where the

12 defendant asked you to write a letter and that created

13 falsehoods; correct?

14 A    Correct.

15 Q    In fact, during direct examination we went through some

16 of those letters; correct?

17 A    Correct.

18 Q    Is it also fair to say that there were instances, might

19 be sentences in there that may have been true, for example,

20 you testified about having told the defendant your age being

21 something different than what it actually was?

22 A    Correct.  Some things were true, some things weren't.

23 Q    And it's fair to say that in those types of letters the

24 defendant directed you to include falsehood; right?

25 A    Correct.

Anna - redirect - Shihata                    3012

1  Q    Referring again to that incident with respect to where

2  the defendant broke your necklace when he grabbed you around

3  your neck --

4           MR. CANNICK:  Objection.  It's not the testimony.

5  Q    Near the area of your neck.

6           THE COURT:  I will sustain it as to form.

7  Q    I think you testified that he grabbed you in your upper

8  chest, near the area of your neck?

9  A    Correct.

10 Q    Other instances in which the defendant hit you for having

11 -- withdrawn.

12           You testified about other instances in which the

13 defendant hit you; correct?

14 A    Correct.

15 Q    For example, you testified about the time where you were

16 walking in a hotel and he smacked you in your face; correct?

17 A    Correct.

18 Q    Did you initiate any physical contact with the defendant

19 before he smacked you?

20 A    No.

21 Q    Isn't it fair to say he smacked you because he thought

22 you were looking at other men?

23           MR. CANNICK:  Objection, Your Honor.

24 A    Correct.

25           THE COURT:  Overruled.

Anna - redirect - Shihata                    3013

1  Q    You also testified about a time where the defendant hit

2  you because he believed you were texting with your

3  ex-boyfriend.

4  A    Correct.

5  Q    Do you recall testifying about that?

6  A    Correct.

7  Q    And the defendant hit you then?

8  A    Correct.

9  Q    Did you initiate physical contact with the defendant

10 before he hit you?

11 A    No.

12 Q    Defense counsel, on cross-examination, asked you about

13 reasons you might receive punishments from the defendant.  Do

14 you recall those questions?

15 A    Yes.

16 Q    What were some of the reasons that you received

17 punishments?

18 A    Let me get my thoughts together really quick.

19         Say it I went shopping and didn't wear something

20 that was loose enough or had a little bit of makeup on, maybe

21 talking to one of the assistants about something I shouldn't

22 have been.

23 Q    What were some of the things you shouldn't have been

24 talking to the assistants about?

25 A    Could have been about the situation I was in, about the

Anna - redirect - Shihata                    3014

1    other girls.

2    Q    And were you not supposed to be talking about these

3    things because it was one of the defendant's rules?

4    A    Correct.

5    Q    You also talked about situations with respect to some of

6    the other girls.  Are you referring to the defendant's other

7    girlfriends?

8    A    Correct.

9    Q    Okay.  Were there rules regarding the types of

10   conversations that you could have with his other girlfriends?

11   A    Correct.

12   Q    Were you allowed to have private conversations with them?

13   A    No.

14   Q    And that's because that was one of the defendant's rules?

15   A    Correct.

16   Q    Fair to say that during the punishments that occurred --

17   let's focus in right now with the spankings -- that you didn't

18   initiate physical contact with the defendant before the

19   spankings?

20   A    No.

21   Q    Defense counsel asked you questions regarding the

22   spankings and I think he described them to you as having been

23   light.  Is that how you would describe them?

24   A    No.

25   Q    When you spoke to the Government, did you tell them that

Anna - redirect - Shihata                        3015

1   the spankings got harder?

2   A    I don't remember saying between the two which it was.  I

3   just --

4   Q    How would you describe -- sitting here today, how would

5   you describe the spankings?

6   A    You mean, some of the time they would leave marks, that

7   would kind of....

8   Q    Were they painful?

9   A    Yes.

10  Q    Is it fair to say that you told the Government that you

11  would cry?

12  A    Yes.

13  Q    So much know that snot would be coming out of your nose?

14  A    Correct.

15  Q    When the defendant spanked you, did he spank you multiple

16  times in one session?

17  A    Correct.

18  Q    Now, defense counsel showed you photographs of some

19  events that you attended with the defendant.  Do you recall

20  that?

21  A    Yes.

22  Q    And one of the events you said was a birthday party for

23  yourself; correct?

24  A    Correct.

25  Q    And you were dressed up for that birthday party; correct?

Anna - redirect - Shihata                    3016

1   A    Yes.

2   Q    You testified previously that there were times where the

3   defendant would tell you to get cute; correct?

4   A    Correct.

5   Q    But that other times, and you just testified, that for

6   the most part the defendant wanted you to wear baggy clothing,

7   no makeup and a baseball cap?

8   A    Correct.

9   Q    And that you would get in trouble if you didn't do that?

10  A    Correct.

11  Q    Defense counsel also asked you questions about your

12  having left the defendant during the course of your

13  relationship and then come back again.

14       Do you recall those questions?

15  A    Correct.  Yes.

16  Q    Why would you go back to the defendant?

17  A    It was, you know, in a relationship, habit and, you know,

18  like I said, feelings too, even though sometimes -- times were

19  hard, it was still hard to leave because at the time it's --

20  you know, you're -- I love him, so -- I loved him, so it was,

21  you know, feelings, and that would bring you back.

22       You know, just like people today, there are still

23  people out there that have similar issues like that and they

24  go back.  They leave.  They come back.

25       MR. CANNICK:  Your Honor, I'm objecting.

Anna - redirect - Shihata                    3017

1   A    -- it's how it is.

2           THE COURT:  Overruled.

3           MR. CANNICK:  It is about her testimony, her

4   experience.

5           THE COURT:  Overruled.

6   Q    What, if any, expectations did you have -- withdrawn.

7           You had testified on cross-examination that

8   sometimes you left and came back even after the defendant was

9   physically abusive towards you.  What expectations or hopes,

10  if any, did you have about whether or not that would change

11  when you came back?

12          MR. CANNICK:  Objection.

13          THE COURT:  Sustained as to form.

14          The question is did you hope that things would

15  change if you went back?

16          THE WITNESS:  Yeah, because when I would come back,

17  things would be great, you know.  He would be a little more

18  lenient, cool and laid back, you know, just like in the

19  beginning, you know, and then eventually, the longer time goes

20  on, the rules and stuff kicked back in.  So, yeah.

21  Q    And when you say the rules, the rules that we have talked

22  about and you have testified about --

23  A    Right.

24  Q    -- that the defendant instituted?

25  A    Correct.

Anna - redirect - Shihata                          3018

1   Q    Defense counsel asked you on cross-examination whether or

2   not the defendant would take you shopping.  Do you recall

3   that?

4   A    Yes.

5   Q    Did the defendant also physically abuse you?

6   A    Yes.

7   Q    Defense counsel asked you about whether or not the

8   defendant would take you out to dinner.  Do you recall those

9   questions?

10  A    Yes.

11  Q    Did the defense counsel -- did the defendant also make

12  you write letters with false information, embarrassing

13  information in it?

14  A    Correct.

15  Q    Defense counsel asked you whether or not the defendant

16  bought you gifts.  Do you recall those questions?

17  A    Yes.

18  Q    Did the defendant also make you record yourself doing

19  embarrassing and demeaning acts as punishment?

20  A    Yes.

21  Q    Defense counsel talked about the fact that the defendant

22  gave you money.

23       Do you recall those questions?

24  A    Yes.

25  Q    Did the defendant also make you walk back and forth and

Anna - redirect - Shihata                    3019

1    call yourself a slut and a bitch?

2    A    Correct.

3             (Continued on following page.)

Anna - recross - Cannick                    3020

1          MS. CRUZ MELENDEZ:  One moment, Your Honor

2          THE COURT:  Sure.

3          (Pause.)

4          MS. CRUZ MELENDEZ:  Nothing further.

5          THE COURT:  Any recross?

6          MR. CANNICK:  Yes.

7   RECROSS-EXAMINATION

8   BY MR. CANNICK:

9   Q    What ultimately caused you to leave the relationship was

10  other women and my client, am I correct?

11  A    Yes.

12          THE COURT:  Can you turn on your microphone?

13  Thanks.  Sorry about that.

14  Q    What caused you to leave the relationship, however, is my

15  client and other women, am I correct?

16  A    I would say it was more than just the other women.

17  Q    Well, you testified just a short while ago --

18  A    I did.

19  Q    -- 15 minutes ago, you testified and told this jury under

20  oath that what caused you to leave my client was the fact that

21  when you returned from a vacation, you found evidence of

22  another, of other women being with him in the hotel suite, am

23  I correct?

24  A    I would say that but that's just not the only reason.

25  It's everything.

CMH      OCR      RMR      CRR      FCRR

A 945

Anna - recross - Cannick                    3021

1   Q    That's what you told the government, am I correct?

2   A    Yes, but there's some more to it.

3   Q    But you didn't tell the government the other things that

4   were to it that you're trying to suggest now; you told them

5   the reason you left is because when you returned, you saw

6   evidence of other women with him, am I correct?

7          MS. CRUZ MELENDEZ:  Objection.

8          THE COURT:  Overruled.

9   A    Correct.

10  Q    Now, you don't need to be put under oath to tell the

11  truth then, right?

12         MS. CRUZ MELENDEZ:  Objection.

13         THE COURT:  Sustained.

14         Just put a question to the witness.

15  Q    You testified and told us that when, I think the

16  government asked you this question, that when you were with

17  the radio station giving this interview, you were not under

18  oath.  Do you remember them asking you that question?

19  A    Correct.

20  Q    Now, are you suggesting that you need to be under oath in

21  order to tell the truth?

22         MS. CRUZ MELENDEZ:  Objection.

23         THE COURT:  Overruled.

24  A    I didn't feel like I had to tell them that.  I mean, this

25  is a different situation so it's different.

Anna - recross - Cannick                                    3022

1   Q    My question is do you have to be under oath to tell the
2   truth?
3   A    No, you don't but it's choice as well.
4   Q    You had a choice?
5   A    Then, yes.
6   Q    Now, so you testified and told us that you would get in
7   trouble for speaking to an assistant, one of Mr. Kelly's
8   assistants, for discussing certain items with them.  Do you
9   remember telling us that?
10  A    Discussing certain items?
11  Q    Yes, you would have conversations with an assistant.  You
12  were asked that just a short while ago?
13  A    Correct.
14  Q    Okay.  Who was the assistant you got in trouble for
15  talking to?
16  A    It can be not just one individual.
17  Q    Well --
18  A    I talked to all of them.
19  Q    Well, who did you get in trouble --
20  A    I would say all of them because they would talk to me
21  too.
22  Q    Diana Copeland, did you get in trouble for talking to
23  her?
24  A    Yes.
25  Q    Okay.

CMH      OCR      RMR      CRR      FCRR
A 947

Anna - redirect - Cruz Melendez                    3023

1        MR. CANNICK:  Just going over a few things,

2   Your Honor.

3        THE COURT:  It's okay.

4   Q    You testified on redirect that after abuse, having been

5   abused, you would go back to Mr. Kelly?

6   A    Correct.

7   Q    And you went back several times, am I correct?

8   A    Correct.

9   Q    More than a dozen, am I correct?

10  A    I wouldn't say more than a dozen but --

11  Q    Many times?

12  A    Many times.

13  Q    And it was your decision to go back, am I correct?

14       THE DEFENDANT:  Correct.

15  Q    You missed those shopping sprees?

16       MS. CRUZ MELENDEZ:  Objection.

17       THE COURT:  Sustained.

18       MS. CRUZ MELENDEZ:  Just very briefly, Your Honor.

19       THE COURT:  Okay.

20  REDIRECT EXAMINATION

21  BY MS. CRUZ MELENDEZ:

22  Q    Defense counsel asked you on cross-examination about the

23  defendant's assistants?

24  A    Correct.

25  Q    Who paid for those assistants?

Anna - recross - Cannick                                    3024

1  A    Robert.

2  Q    And defense counsel asked you about the reason that you

3  ultimately left the defendant, correct?

4  A    Correct.

5  Q    My question to you is what were the reasons that you left

6  the defendant?

7  A    I feel like it was everything built up over time.  That

8  just happened to be that incident that happened that really

9  caused me to just be, like, okay, I can't do this anymore but

10 it was not just that.  I feel like it was everything built up

11 over time and I finally was, like, okay, I don't want this

12 life for myself and I found the strength to just move on.

13         MS. CRUZ MELENDEZ:  Nothing further.

14 RECROSS-EXAMINATION

15 BY MR. CANNICK:

16 Q    You didn't tell that to the government during your

17 interview, right?

18 A    I don't recall.  I don't know if that question was fully

19 asked like that so no.

20 Q    No, you didn't tell them that, but you did tell them that

21 it was his other women?

22         MS. CRUZ MELENDEZ:  Nothing further.

23         THE COURT:  Is that a question?

24         MR. CANNICK:  It's a question.

25         THE COURT:  Okay.

Anna - recross - Cannick                    3025

1    A    What kind, what question was it really?

2    Q    You didn't hear?

3              THE COURT:  Well, you don't have your microphone on

4    to be fair.

5              MR. CANNICK:  My mic is on.

6              THE COURT:  And I couldn't hear it.

7              MR. CANNICK:  You know what?  I withdraw it.

8              THE COURT:  All right.  Nothing else from the

9    government?

10             MS. CRUZ MELENDEZ:  No.

11             THE COURT:  The witness can step down.  Thank you

12   very much.

13             (Witness excused.)

14             THE COURT:  Are you ready to call your next witness?

15             MS. SHIHATA:  Yes.  The government calls Dr. Iffath

16   Hoskins.

17             THE CLERK:  Please stand and raise your right hand.

18             (The witness, IFFATH HOSKINS, was duly

19   sworn/affirmed by clerk.)

20             THE WITNESS:  Thank you.  You may be seated.

21             THE COURT:  You can remove your mask.

22             THE WITNESS:  Thank you.

23             THE COURT:  And let's make sure, first of all, your

24   microphone is on and move it a little closer to you.

25             So just a few things before we begin.  I just want

Hoskins - direct - Shihata                    3026

1   to make sure that everybody can hear you.

2           THE WITNESS:  Yes, ma'am.

3           THE COURT:  So I'm going to ask you to make sure

4   you're speaking into the microphone and speak slowly.  Our

5   court reporter takes down everything you say.  It makes it

6   easier if you take your time.  For the same reason, try not to

7   talk over whichever lawyer is asking you questions.  If there

8   is a question that isn't clear or you'd like to have repeated,

9   let me know and I'll have the lawyer do that and just do your

10  best to answer only the question this you're being asked.

11          Okay?

12          THE WITNESS:  Yes, ma'am.

13          THE COURT:  All right.  Go ahead.

14          MS. SHIHATA:  Thank you, Your Honor.

15  DIRECT EXAMINATION

16  BY MS. SHIHATA:

17  Q    Good morning.  What is your profession?

18  A    Good morning.  My profession is obstetrics, gynecologist,

19  women's health care.

20  Q    Are you currently employed somewhere?

21  A    Yes, ma'am.

22  Q    Where are you employed?

23  A    At New York University.

24  Q    And is it a particular part of New York University?

25  A    Yes, the medical aspect.  New York University School of

Hoskins - direct - Shihata                           3027

1   Medicine.

2   Q    And do you have any other employment as well outside of

3   New York University?

4   A    Yes, I do.  I also work at Bellevue Hospital which is the

5   public health system hospital.

6   Q    That's the public health system here in New York?

7   A    Yes, ma'am.  It's called Health and Hospitals and

8   Bellevue Hospital is the flagship hospital of that public

9   health system.

10  Q    And what is your position at NYU?

11  A    At NYU, I have an academic position which is professor.

12  I also have a clinical position which is director of patient

13  safety.

14  Q    And what is that, being director of patient safety?

15  A    So director of patient safety is a concept whereby -- NYU

16  is a private hospital so every patient is brought in by a

17  private attending and the idea is that this individual, this

18  patient safety person, myself or others in my own division,

19  would be the ones during any window of time to be helping to

20  ensure that all the safety protocols are being followed and/or

21  if there's emergencies and/or if there's complications and/or

22  if there's any question that needs to be addressed, to help

23  out with any and all of those.

24  Q    And are you the -- do you hold this position in the

25  Department of Obstetrics and Gynecology?

Hoskins - direct - Shihata                          3028

1    A    Yes, ma'am.

2    Q    And how long have you held that position at NYU?

3    A    In the current situation, since 2013.

4    Q    And you mentioned you are also employed at Bellevue.

5    What is your position there?

6    A    At Bellevue, I'm also an OB/GYN doctor and I do a lot of

7    the high risk ultrasounds, I take care of women's health

8    issues, both in the clinic and also with ultrasounds.

9    Q    And so is it fair to say you practice as an OB/GYN in the

10   clinical setting apart from your positions as director of

11   safety and so forth?

12   A    Yes, ma'am, day and night.

13   Q    And are you board certified in any specialties?

14   A    Yes, ma'am.

15   Q    What specialties?

16   A    Obstetrics and gynecology and then the higher level of

17   subspecialization.

18   Q    All right.  And, generally, what is obstetrics?

19   A    Obstetrics is the medical care of women who interestingly

20   are either planning to get pregnant, through the pregnancy and

21   then up to a year after the pregnancy is over.

22   Q    And how about gynecology, what's that?

23   A    Gynecology is the health care of women outside of what

24   I've just described in relation to the pregnancy.  So any

25   aspect of women's health care, from an adolescent all the way

Hoskins - direct - Shihata                3029

1    to grave, et cetera, older age.

2    Q    And you also said you had a subspecialty, is that right?

3    A    Yes, ma'am.

4    Q    And what is that?

5    A    My subspecialty is in high risk obstetrics where I do a

6    lot of the surgical aspects.

7    Q    And are you board certified in that as well?

8    A    I'm board certified in that in the sense that it's a

9    higher level above obstetrics and gynecology.

10   Q    And in your work in gynecology, does that include

11   diagnosing and treating patients with sexually transmitted

12   diseases?

13   A    Yes, ma'am.

14   Q    And does that include herpes?

15   A    Yes.

16   Q    Now, are you also what's known as a board examiner?

17   A    Yes, I used to be.

18   Q    Used to be?  Okay.  And what is a board examiner?

19   A    A board examiner is, it's a body of people who help

20   address anybody practicing in the field which, in my case,

21   would be OB/GYN, anybody practicing in that field is, has

22   fulfilled the competence categories.  So in other words, the

23   board examiner, during the situation of the exam, will be

24   making an assessment in a window of time to say that that

25   individual has, knows how to practice within the scope and

Hoskins - direct - Shihata                    3030

1   breadth of the field of women's health, knows how to formulate

2   a treatment plan, knows how to handle complications, knows how

3   to guide a patient through whatever clinical situation it may

4   be.  So it's just overall addressing how women's health care

5   is delivered and the board examiner is the individual who,

6   with his or her colleagues, will decide that that person, the

7   candidate, has fulfilled those requirements and those

8   obligations.

9   Q    So is it fair to say that the board examiner with their

10  colleagues are the ones that determine whether someone is

11  board certified in a specialty?

12  A    Yes, that is the person who would say yes, I have

13  addressed this, I have assessed it, I've analyzed it, this

14  individual is deemed clinically competent to practice the

15  scope and breadth of the field.  So there's people who would

16  succeed and then there's others where we would say this one is

17  not ready yet.

18  Q    And when you served as a board examiner, what specialties

19  were you a board examiner for?

20  A    Again, both general women's health which is obstetrics

21  and gynecology and also in the field of high risk obstetrics.

22  Q    Now, can you please describe for the jury your

23  educational background beginning with medical school?

24  A    So my medical school was in Karachi in Pakistan, Dow

25  Medical College, after which, it wasn't educational but it was

Hoskins - direct - Shihata                    3031

1    considered a supervised clinical work after my medical school

2    degree.  I worked in the Middle East in Doha, Qatar for two

3    years under supervision so it's a way of training.  Then two

4    and a half years subsequent to that, I worked in women's

5    health in Muscat, Oman, both in the Middle East.

6           Subsequent to that, I came to the United States and

7    worked in internal medicine and psychiatry combined training.

8    I didn't practice in that field and switched over to training

9    in women's health obstetrics and gynecology.  After the

10   women's health -- after the obstetrics and gynecology

11   training, I got higher training in the field of high risk

12   obstetrics from the surgical and clinical aspect.

13   Q    And where did you do your residency in obstetrics and

14   gynecology?

15   A    My residency in obstetrics and gynecology was at the

16   National Naval Medical Center in Bethesda, Maryland.  It's

17   under the umbrella of the Uniformed Services University of the

18   Health Sciences.

19   Q    And are you or were you a member of the United States

20   Armed Forces?

21   A    Yes, I was.

22   Q    For how long?

23   A    Twenty-seven years.

24   Q    And did you practice medicine in that context?

25   A    Yes, I did.  I practiced while, in obstetrics and

Hoskins - direct - Shihata                    3032

1    gynecology while on active duty which was 11 years.  The

2    remaining was in the Reserves and that was the United States

3    Navy.  Also at Walter Reed Army Medical Center and at NIH.

4    And then one small explanation, also with the United States

5    Marine Corps.  Because the Marine Corps doesn't have medical

6    assets, the Navy provides the medical assets.  So, overtly, it

7    looks as though it was also the Marine Corps but it was as a

8    medical person in the Navy towards the Marine Corps.

9    Q    And when you left the United States Armed Forces, what

10   rank did you hold?

11   A    Bird Colonel 0-6.

12   Q    Now, you testified that you're currently employed at both

13   NYU and Bellevue.  Have you also previously worked in various

14   capacities at these and other hospitals?

15   A    Yes, I have.

16   Q    And does that include as the Chief and Residency Program

17   Director of the Department of Obstetrics and Gynecology at

18   NYU?

19   A    Yes, it does.

20   Q    And as an Attending of Obstetrics and Gynecology at NYU?

21   A    Yes, ma'am.

22   Q    As the Chair and Residency Director of the Department of

23   Obstetrics and Gynecology at Lutheran Medical Center?

24   A    Yes, ma'am.

25   Q    An as the Executive Director of the Women's Health

1   Institute at the Memorial Health University Medical Center in

2   Savannah, Georgia?

3   A    Yes, ma'am.

4   Q    And, finally, as the Director of Research and Infectious

5   Diseases at the Division of Maternal-Fetal Medicine at the NYU

6   Medical Center?

7   A    Yes, ma'am.

8   Q    You also testified that you also currently hold an

9   academic position at NYU, is that right?

10  A    Yes, ma'am.

11  Q    And how long have you been a professor at the NYU School

12  of Medicine approximately?

13  A    Ten plus years.

14  Q    And in that capacity, who do you train?

15  A    A multitude of individuals get trained.  The overt most

16  common example is training fellows at the highest level of

17  residency, so medical students, residents, fellows within the

18  field.  We also help train young attendings as they need to

19  learn additional or more things.  I also am involved in the

20  training of what we call allied health professionals.  So they

21  could be nurse practitioners, midwives, physician assistants,

22  nurses.  They would be unique components who want to do extra

23  within women's health.

24  Q    And the area you focused on is women's health, obstetrics

25  and gynecology for the training as well?

Hoskins - direct - Shihata                    3034

1   A    Yes, ma'am.

2        THE COURT:  Do you have an application with regard

3   to this witness?

4        MS. SHIHATA:  I do.  I can move on to it.

5        THE COURT:  All right.

6        MS. SHIHATA:  Your Honor, pursuant to Federal Rule

7   of Evidence 702, I'd like to offer Dr. Hoskins as an expert in

8   the field of medicine with a specialization in obstetrics and

9   gynecology including the diagnosis, treatment and effects of

10  sexually transmitted diseases.

11       THE COURT:  Any objection?

12       MS. BLANK BECKER:  No objection, Judge.

13       THE COURT:  I gave you an instruction about expert

14  witnesses.  As I said before, I'll give you a little bit more

15  instruction on that in my final charge.

16       Go ahead, Counsel.

17       MS. SHIHATA:  Thank you.

18  Q    Now, you're testifying here as an expert witness, is that

19  correct?

20  A    That's correct.

21       THE COURT:  Is the microphone working?

22       THE WITNESS:  Yes.  I had just tilted it a little

23  bit.

24       THE COURT:  It may need another battery.

25       THE WITNESS:  So it wasn't me.

1        THE COURT:  Not you.

2        (Pause.)

3        THE WITNESS:  It's on, ma'am.

4        THE COURT:  Now it's good.  Go ahead.

5        MS. SHIHATA:  Thank you.

6   Q    Are you being compensated for your time here testifying

7   as an expert?

8   A    Yes, ma'am.

9   Q    Now, Dr. Hoskins, what is a sexually transmitted disease?

10  A    Exactly what the term says.  Illness or infection or

11  disease that has been obtained or has occurred in the, during

12  the interaction of sexual intercourse.

13  Q    And is it -- sexually transmitted diseases also known as

14  STDs?

15  A    Yes, ma'am.

16  Q    And are these diseases also known as venereal diseases?

17  A    Yes, ma'am.

18  Q    Now, what are some examples of STDs?

19  A    Well, there are several examples.  They can come in the

20  categories of bacteria, viruses, fungus infections.  Some

21  examples are chlamydia, gonorrhea, syphilis, HIV.

22  Q    And how about herpes?

23  A    Herpes also.

24  Q    Now, are some STDs curable?

25  A    Yes, ma'am.

Hoskins - direct - Shihata                              3036

1  Q    And what are some of the ones that are curable?

2  A    The once that are curable are chlamydia, syphilis,

3  gonorrhea, and we know that because we can do a test of cure

4  to verify that they are cured.

5  Q    And are some STDs not curable?

6  A    Correct.  Correct.  Some are not curable.

7  Q    Is herpes curable?

8  A    No, ma'am.

9  Q    So once you contract herpes, do you have it for the rest

10 of your life?

11 A    Yes.

12 Q    Now, generally speaking, what is the herpes simplex

13 virus?

14 A    Well, generally speaking, it's a body of viruses.  That's

15 the name, herpes simplex.  There's two types.  It's a very

16 contagious, transmissible virus that can, that lives in the

17 human body, in various tissues in the human body.

18 Q    And now focusing specifically on genital herpes, what

19 does that term mean?

20 A    Well, genital herpes means that it is herpes virus

21 infection in the genital area of the human body.

22 Q    How does genital herpes, how does that enter the body?

23 A    The herpes virus would enter, in the aspect of genital,

24 it would be contact with the genital, with some area of the

25 genital tract.  It has to have a direct contact between an

Hoskins - direct - Shihata                    3037

1   area on an individual or an item that is containing or

2   carrying the virus and then direct contact with any aspect of

3   the human body in the genital area but it has to be a direct

4   contact.

5   Q    And can that direct contact be through sexual

6   intercourse?

7   A    Yes, ma'am.

8   Q    Now, once the herpes virus enters the body, where does it

9   go?

10  A    Well, once the virus enters the body, it's going to stay

11  in that local general area where it entered, create a response

12  from the body in that general area and then, ultimately, over

13  a window of time, it will go into where its preferred location

14  and place is which is the central nervous system.

15         MS. SHIHATA:  All right.  I'd like to show the

16  witness only what's been marked for identification as

17  Government Exhibit 962.

18         THE COURT:  Do you have any objection to this going

19  into evidence?

20         MS. BLANK BECKER:  I do not, Judge.

21         THE COURT:  So this is in evidence.

22         (Government Exhibit 962 so marked.)

23         MS. SHIHATA:  If we can publish it, please.

24  Q    You just mentioned the central nervous system.  What is

25  the central nervous system?

Hoskins - direct - Shihata                    3038

1  A    Well, the central nervous system is the combination of

2  the brain as can be seen over there and then whole rest of the

3  nerves which is the spinal cord and the rest of the nerves for

4  the entire body.

5  Q    And is that represented in this diagram, Government

6  Exhibit 962?

7  A    Yes, ma'am.

8  Q    And can you describe how it's represented here?

9  A    Well, it's showing a human body.  Theoretically, it's

10 showing, I'm assuming, the back of the person.  It's showing

11 at the top, the brain, the long narrow yellowish tubular

12 structure is the spinal cord, and it's showing different

13 colors like a bluish color and a greenish color of like fibril

14 or tendril-like things which are various nerves that are being

15 depicted as they're going through various aspects of the body

16 and you can see it's going throughout the entire body.

17 Q    And after the herpes virus goes to the central nervous

18 system, what happens then?

19 A    Well, once the herpes virus goes to the central nervous

20 system, it's going to stay there.  That's it's preferred area

21 of location so it can be in the central tube that you can see,

22 that long yellow narrow tube.  It stays there in a specific

23 unique portion of the central nervous system.

24 Q    And how, if at all, is entry of the herpes virus into the

25 central nervous system dangerous?

Hoskins - direct - Shihata                    3039

1  A    Well, it's dangerous because once it's within the,

2  technically the area within the central nervous system which

3  are called the dorsal roots but it's just a component of the

4  central nervous system, it will remain there.  It's dangerous

5  because once it's there, it's always there so it can

6  reactivate and when it reactivates, it can cause a result or

7  an effect based on its reactivation and then other parts of

8  the body, any place that what we call are innervated or where

9  the nerves are going, any part or many parts can then be

10 affected.

11 Q    And how can those other parts of the body be affected?

12 A    By how, you mean what can happen or the pathway?

13 Q    What can happen.

14 A    What can happen.  So what can happen is when it goes,

15 when there's reactivation, there can be a resurgence of a

16 pattern that was similar to the initial attack.  For example,

17 so the person would show evidence of a new herpes event or a

18 situation or an outbreak, and that would be in various stages

19 of quantity in terms of the width and the extent of where the

20 outbreak is in terms of the severity of the symptoms in

21 relation to the outbreak and in terms of the depth of that

22 outbreak, in terms of how deep into the tissue.

23 Q    Now, you've used the term "outbreak" a few times.  What

24 is a herpes outbreak?

25 A    Well, herpes outbreak is just a way of saying that there

Hoskins - direct - Shihata                     3040

1   is an area in the body where the herpes is causing its effect

2   and the reason we call it outbreak is it's sort of like a

3   generalized area.  So an outbreak can be in one area like the

4   genital area or in some other part of the human body and not

5   in the whole body even though the nervous system is in the

6   whole body.

7   Q     And focusing specifically on an outbreak in the genital

8   area, how does that manifest itself?

9   A     Well, the outbreak in the genital area, again, first

10  clarifying would it be a primary outbreak or a secondary

11  outbreak, but having said that, it would manifest itself by

12  what are the classic findings of the infection of herpes which

13  would be blisters, ulcers, pustules, vesicles.  These are

14  technical terms but they basically mean raised areas filled

15  with fluid.  If the blister breaks open, then it's red

16  appearing because it's a denuded or raw area within that

17  blister.

18        So those are the ways that the herpes infection can

19  show itself and then there will be like wherever the blister

20  was, it's usually a small area which has a lining, it's got a

21  raw area within the base of it and then some weepiness of the

22  fluid coming out.

23  Q     You mentioned primary and secondary infections or, sorry,

24  outbreaks.  What do you mean by primary outbreak?

25  A     What we call primary outbreak in herpes means that that

Hoskins - direct - Shihata                    3041

1   human body has never seen the attack by the herpes virus so

2   it's going to be the first time and we're talking about herpes

3   simplex type 2 for example.  So the primary outbreak would be

4   that the body is going to mount a very strong response to this

5   attack or this insult of the herpes virus.  So that's a

6   primary outbreak.  There are various aspects of the human body

7   that get involved and react to this infection.

8           Then a secondary outbreak means the herpes was

9   already within the body.  The body defense cells and

10  mechanisms had already got a prior memory of having been

11  exposed to that, living in the central nervous system like we

12  see and now it's a secondary outbreak where it got

13  reactivated.  Similar findings can occur like with the primary

14  outbreak but now that the body has defense cells that have

15  already been exposed to that, have a practice and a memory of

16  having attacked it or tried to tamp it down, the secondary

17  outbreak would be a situation where it's less extensive, less

18  severe, less intense, similar findings.

19  Q    And when you say similar findings, are you referring to

20  the same blisters and pustules, fluid filled, that you were

21  talking about before?

22  A    Yes.  Similar findings means those which you've

23  described, the blisters, the vesicles, the pustules, the

24  broken areas, the scabs, the denuded areas.  In addition to

25  that, it's also a bunch of symptoms both in the primary

Hoskins - direct - Shihata                    3042

1   outbreak and the secondary outbreak, burning, tingling, pain,

2   a sensation of numbness sometimes.  Severe pain is probably at

3   the top of the list.

4   Q    And with respect to genital herpes, how does that severe

5   pain manifest itself?

6   A    Well, with genital herpes, once the vesicles, pustules,

7   blisters appear, there is pain in that general area.  It could

8   be before the actual blister has been seen but the pain is

9   there.  It can be during the time when the blister is present,

10  when the blister breaks open and the fluid weeps out and then

11  subsequent to that, when it's crusting over.

12            So the pain manifests itself -- if it's a primary

13  outbreak, the pain is very, very intense because you recall

14  that herpes is preferentially wanting to be with the nerves.

15  So the nerves gets overactivated, overstimulated, so the

16  intensity of the response of that nerve is very high and,

17  therefore, the pain is very intense.  The burning is very

18  intense.  Then that pain causes the individual to then have

19  secondary complications or problems due to the actual

20  existence of the pain.

21  Q    What are some of those secondary complications or

22  problems?

23  A    So the secondary complications or problems would

24  obviously depend on where the blisters were, where the pain

25  was but, in general, if it's in the general area and there's

Hoskins - direct - Shihata                    3043

1    all these blisters in the genital area with the severe pain

2    and burning and that sensation, then the individual might have

3    severe pain just because that tissue is very, in deep pain

4    and, therefore, the person may not be able to have even

5    anything touching like a sheet or clothes, may not be able to

6    walk, may not be able to lie down.  Anything touching that

7    area or even air sort of being exposed to that area might

8    cause pain.  It can also be when the individual needs to

9    urinate, for example, because the area might be extra

10   responsive and sensitive.  So there may be a stinging, burning

11   sensation actually during the act of, you know, urinating,

12   therefore, the individual, the body tends to like avoid trying

13   to do that.

14          So because of the pain, because of the burning,

15   there can be secondary situations such as the person won't

16   move, the person may not urinate, the person may then retain

17   the urine, the person may need to have a burning sensation

18   which may mean that they cannot wear their clothes at that

19   time because nothing can touch it.  So that's what I'm trying

20   to describe as the secondary.  And it's all because it's a

21   very severe, high level of intense pain and burning that

22   occurs with the primary outbreak.

23          THE COURT:  I'm just going to ask you if you can

24   slow down just a little, just a little bit just so our court

25   reporter can get everything that you're saying.

Hoskins - direct - Shihata                    3044

1    THE WITNESS:  I'll try.

2    THE COURT:  Thank you so much.

3    Go ahead.

4  Q    All right.  So now, these secondary outbreaks that you

5  mentioned, what, if anything, causes a secondary outbreak?

6  A    So the answer to what causes a secondary outbreak is a

7  range and it starts from unknown, unpredictable, to known

8  factors that might trigger a secondary outbreak.

9         So in the unknown and unpredictable, it could be

10  everything was going along fine in the individual's life and

11  suddenly there was an outbreak, an overt identifiable trigger.

12         The other end of the spectrum could be known

13  triggers such as just the person living their lives.  You

14  know, in a woman, it would be her menstruation is starting.

15  It could be if a person happens to get a common cold or cough

16  where they are getting another infection and another attack on

17  their immunity and now this also will get reactivated in

18  addition.  It can be sunlight.  Ultraviolent light is a very

19  common trigger for herpes reactivation.  So people going out

20  into the sunlight in the daytime, some have described that

21  that is a trigger.  It can also be people who have already got

22  other illnesses, asthma, cancer, hypertension, diabetes.

23  Anything which is already giving a burden to your immune

24  system can also be a trigger for the herpes to get

25  reactivated.

Hoskins - direct - Shihata                3045

1          So like I said, it goes from unknown, unpredictable

2     all the way to known triggers where the individual may know.

3     When I get a cold, when I get my periods, when I'm out in the

4     sunlight, et cetera, et cetera, those are the kinds of things

5     that are triggers.

6     Q    And is it fair to say based on what you just said, from

7     unpredictable to known triggers, that the known triggers are

8     often very common, everyday things?

9     A    Yes, ma'am.  It's just generally living their lives.

10    Q    And so does that make it relatively unpredictable for a

11    person with herpes about when they're, they might get a

12    secondary outbreak?

13    A    Yes, it is unpredictable.  It's known to be unpredictable

14    but on the other hand, they can then say I'll never have my

15    menses, I'll never be out in the sunlight, I'll never get

16    another cold.  So it is unpredictable because they have to

17    live their lives or they would just have to stop living their

18    lives.

19    Q    So fair to say it's difficult for a women to stop having

20    menses or getting colds or any of those lists of things?

21    A    Correct.

22    Q    Okay.  Now, are you familiar with the, in the context of

23    herpes, are you familiar with the term "shedding"?

24    A    Yes, I am.

25    Q    And what is that?

1  A    Shedding means, in the context of herpes, shedding means

2  that the virus is being excreted.  It's coming from the tissue

3  where it is at that moment present to the outside, whether

4  it's contact with something else or outside into the air.

5  Q    And does a person have to be -- well, withdrawn.

6          Are you familiar with the term, in the context of

7  herpes, are you familiar with the term "asymptomatic

8  shedding"?

9  A    Yes, ma'am.

10  Q    And what is that?

11  A    Asymptomatic shedding, again, means that the virus is

12  being excreted but it is coming at a time in the individual's

13  life when he or she does not have evidence of the herpes

14  itself.  In other words, they don't have a blister, they don't

15  have the symptoms of the tingling, the numbness, the burning,

16  the pain so they might be thinking I'm, my herpes is at rest

17  right now but, in reality, it has reactivated because there's

18  no evidence that it has reactivated but the shedding is

19  occurring in the absence of any overt evidence of

20  reactivation.

21  Q    And does that mean a person can still be shedding the

22  virus even when they're not having an outbreak?

23  A    Yes.

24  Q    Now, does every individual who is exposed to genital

25  herpes, does that mean they a hundred percent will get genital

Hoskins - direct - Shihata                    3047

1  herpes?

2  A    In my personal, clinical opinion, nothing in medicine is

3  a hundred percent or zero percent, but as close to a

4  hundred percent as possible.  It's a very contagious, very

5  transmissible virus.  I personally am not aware that if

6  somebody is exposed to herpes and then they wouldn't get it.

7  Q    All right.  But there are times when a person can be

8  exposed and perhaps -- well, withdrawn.

9         Are there certain precautions that can be taken to

10  reduce the likelihood of herpes infection, of a person with

11  herpes infecting somebody else?

12  A    Yes, there are precautions which would mean that they

13  didn't get exposed to it.

14  Q    Okay.  And, well, starting -- why don't you tell me what

15  you're thinking of.

16  A    So what I mean by that is when I talk about being exposed

17  to it, I mean that there has to be the opportunity for a

18  contact, a direct contact, and that's what I was trying to

19  explain, that when there is direct contact from an area of

20  body tissue, utensil, an item that is carrying the herpes

21  virus and it has direct contact with the skin or mucous

22  membrane of the human body, there will definitely be the

23  infection with the herpes.

24         If there is no contact such as decreasing the

25  exposure by doing protection for one's self, either the person

Hoskins - direct - Shihata                3048

1   with the herpes or the person who is not yet infected, either

2   one of them is protecting themselves, then, yes, the

3   likelihood of getting the herpes would be decreased.

4   Q    And when you say protecting themselves, does that include

5   using a condom?

6   A    That includes using a condom.

7   Q    Now, are you familiar with treatments for herpes?

8   A    Yes, ma'am.

9   Q    And is one treatment a drug known as Valtrex?

10  A    Yes, ma'am.

11  Q    Now, we'll talk a bit more about that later, but can

12  Valtrex also be taken prophylactically?

13  A    Yes, ma'am.

14  Q    And what does that mean?

15  A    Well, basically Valtrex is an antiviral so it's going to

16  attack virus cells.  And when Valtrex is taken

17  prophylactically, it means that even if there is herpes

18  available or present, the Valtrex is going to keep it tamped

19  down or prevented and that's the word, prophylaxis.  That

20  means that even though its presence is there, it won't be

21  enough either in quantity or duration to be able to transmit

22  it to somebody else.

23  Q    So is that also a case where notwithstanding that the

24  person has herpes, it might reduce the risk of transmitting it

25  to somebody else if they're taking Valtrex prophylactically?

Hoskins - direct - Shihata                    3049

1    A     Yes.

2    Q     Okay.  So fair to say then that that's a situation where

3    someone might have sex with somebody and not necessarily a

4    hundred percent give it to the other person?

5    A     Yes.

6    Q     Okay.  Now, now, can you explain -- well, actually prior

7    to that, you talked about outbreaks, primary and secondary

8    outbreaks from herpes.  Are there also other medical

9    complications that can result from having the herpes simplex

10   virus in your, in one's body?

11   A     I'm -- by other medical complications, what I would take

12   from that is when there is an outbreak, be it primary or

13   secondary, that there can be a further spread, a further

14   complication, a further event.

15         So if there is an outbreak, whether it's primary or

16   secondary, there can be an infection in that area.  If there's

17   an outbreak and there's an infection, that infection can go

18   into the bloodstream to the fullest extent where it may be

19   only in the bloodstream and then to a higher level where we

20   may call it sepsis.  The infection can go into the central

21   nervous system where we may call it just an infection in that

22   nerve area directly or it may go all the way to the brain or

23   the rest of the central nervous system or even the layers that

24   cover the brain and the central nervous system.  Technically

25   that's called meninges.

Hoskins - direct - Shihata                3050

1          So when we look at what are the other outcomes with

2     the primary or a secondary outbreak, it can be a local area of

3     everything we've talked about.  That area can get infected an

4     then there can be blood infections, there can be brain and

5     central nervous infections.  There can be secondary problems

6     like urine retention.  We've talked about that.  There can be

7     secondary problems such as the person is in such severe pain,

8     they don't move around at all, therefore, they are at a little

9     bit higher risk of having maybe blood clots because they're

10    not moving around so much.  They're lying still because of the

11    pain.  So it can go on and on like a ripple effect.

12    Q     Okay.  And fair to say that some of these secondary

13    effects that you've talked about, going into the brain and

14    sepsis, that those are rarer than the outbreaks, is that fair

15    to say?

16    A     They are rarer, yes, they are less common but during the

17    outbreak is when they can occur meaning as a result of the

18    outbreak.

19    Q     I see.  So notwithstanding that they are rarer, they

20    remain a risk when someone has herpes, is that fair to say?

21    A     Always.

22              (Continued on next page.)

23

24

25

Hoskins - direct - Shihata                    3051

1   DIRECT EXAMINATION (Continued.)

2   BY MS. SHIHATA:

3   Q    And just so the jury understands, what are some of the

4   terms -- some of the terms you mentioned, what is sepsis?

5   A    Sepsis means that there is an infection in the

6   bloodstream.  In general, sepsis we mean by bacterial

7   infection, but they can be viral infection in the bloodstream

8   as well.  Sepsis is overarching term that just means that the

9   infection is so intense that it is affecting the bloodstream

10  and therefore the heart and the lungs and the brain.  Sepsis

11  is a very serious, heavy term that denotes that the infection

12  in the bloodstream is heavy enough that it is now beginning to

13  have effects on the rest of the human body.

14  Q    And I think you used the term meninges, is that --

15  A    Yes, ma'am.

16  Q    What is that?

17  A    Yes.  So meningitis is when the infection, in this case

18  herpes, has gone into the central nervous system and has,

19  whether it's a primary or reactivation, it's now caused an

20  inflammation in the tissues of the brain.  The brain itself,

21  the tissue of the brain when we use the technical term we call

22  it encephalitis, it's a different technical term.  If we use

23  the term where the infection is the layers or the covering of

24  the brain, those are what's called the meninges and that term

25  would be called meningitis.

Hoskins - direct - Shihata                 3052

1  Q    Now, can you explain to the jury what a medical diagnosis

2  is?

3  A    A medical diagnosis in my opinion basically means that

4  the clinician has used his or her medical knowledge, expertise

5  to come up with an answer of a particular condition that this

6  is what the condition is, name the illness, name the clinical

7  situation, identify it.

8  Q    And what methods do doctors use to diagnose genital

9  herpes?

10 A    For genital herpes specifically the most common and very

11 reliable, accurate method would be physical exam.  Where we

12 would take the history from the patient, but basically

13 physically examining the area where the outbreak has been

14 identified and can be seen and that would be the most common

15 way.  There are additional ways to clinch the diagnosis, to

16 reconfirm higher level and they could be using laboratory

17 tests.

18 Q    And what does a doctor look for in the clinical exam with

19 respect to herpes?

20 A    In the clinical exam, you know, in general the patient

21 would say, I have certain symptoms, and we described those

22 before, and then when the doctor or whoever the clinician is

23 is examining that specific area, they would look for redness,

24 a sensation of numbness.  You can take a Q-tip or some other

25 object and feel around in the area the patient would say this

Hoskins - direct - Shihata                    3053

1   feels numb.  There can be -- similarly, there can be a finding

2   of intense pain and burning in that area either with the

3   patient having touched it or some other object touched it or

4   the clinician examining the patient, and then visual is the

5   biggest category where you would see a blister.  You could see

6   the blister, the area is weeping and wet because there is

7   fluid seeping out, you could see the redness, the rawness in

8   the base of the blister, you could see a crusting over because

9   different blisters will be in different stages, some have

10  popped open, some are starting out, some have already opened

11  and are raw and the final side would be that they've crusted

12  over already.  So all those put together, looking at the area

13  visually in the setting of what the patient has described, is

14  the most accurate way of doing it.

15  Q    Now you mentioned other testing that's available.  Are

16  you familiar with the term herpes simplex culture?

17  A    Yes, I am.  That is one of the other tests.

18  Q    And what is that?

19  A    Well, any time you're talking about a culture, and in

20  this setting herpes simplex culture, the idea is to take a

21  sample, be it a sample from the fluid, the edge of the

22  blister, a portion of that tissue and grow it in a special

23  growth medium in the laboratory under specific conditions so

24  that more of that virus can grow with the assumption being

25  that the virus was in the sample that was collected, with the

1    benefit of the growth medium it will grow and multiple and the

2    culture will be positive, because it will be -- it will grow

3    enough to be identified and looked at under the microscope.

4    Q    Is timing of when a culture is taken for the herpes

5    simplex virus, is that important to the accuracy of the

6    result?

7    A    It is important in the sense that it is -- you know, when

8    there is an active lesion there's the highest likelihood of

9    identifying the virus, so from that point of view the timing

10   is important.

11   Q    And can an outbreak last anywhere from several days to

12   several weeks?

13   A    Yes, ma'am, it usually does.

14   Q    And does the manner in which the blisters or the -- does

15   it change throughout that time, the manner in how whether they

16   are more fluid or less fluid or dried up, does that change

17   over the course of the outbreak?

18   A    Yes, it does.  The initial part of the outbreak will have

19   more of the blister, more of the liquid, more of the

20   weepiness, seeping and then as it opens up and then dries to

21   air or with some other way then there will be -- that will

22   change, the appearance will change and the amount of the virus

23   coming out will also change.

24   Q    So is it fair to say that even within the outbreak time

25   period it can matter where within the time period the culture

Hoskins - direct - Shihata                    3055

1  is taken?

2  A    In general, yes.

3  Q    And as a result, does herpes -- the results of herpes

4  simplex cultures sometimes provide false negatives?

5  A    Yes.

6  Q    Now, are there any other tests other than the culture

7  that can be used to test for herpes?

8  A    There are two other categories of tests.  One would be to

9  look for the actual genetic material of the herpes virus.  So

10 there can be a certain chemical reaction and a laboratory test

11 that looks for that and that would come out as positive if the

12 DNA, for example, the genetic material of the virus is found.

13 And then there is another category of test which is blood

14 tests in the person looking for the presence of defense cells

15 that have been exposed to herpes so they can be -- a certain

16 type of cell within the human body that would be positive for

17 having been exposed to herpes.

18 Q    And you testified earlier that the -- notwithstanding the

19 existence of these different types of testing, the most common

20 method that doctors use is the history and physical exam?

21 A    Yes, ma'am, it is the most common and very, very

22 reliable.

23 Q    Now I want to turn now to treatment for herpes.  What

24 medications are used to treat herpes?

25 A    The medications used to treat herpes would be in two big

1    categories.  One would be to treat the symptoms.  So there's a

2    herpes outbreak and then there could be treatment for the pain

3    and et cetera, et cetera, and preventing a secondary

4    infection, but the targeted medication for treating the herpes

5    are what's called antivirals.  They are going to attack the

6    virus.

7    Q    And what are some of the medications, these antiviral

8    medications?

9    A    Regarding herpes simplex specifically there is Valtrex,

10   Famvir, there's a third one that I'm blocking on, Acyclovir.

11   Q    Is Valtrex a brand name?

12   A    Valtrex is a brand name.  The generic name is valtra -- I

13   can't remember.

14   Q    Does Valaciclovir, is that the generic name?

15   A    That's the one.

16   Q    And what does Valtrex do?

17   A    Valtrex is going to help suppress the herpes infection.

18   It will attack the component of the herpes virus that's what's

19   called an antiviral and what it will end up doing is it will

20   decrease the overall duration of that particular herpes

21   outbreak.  It will decrease the overall depth and severity of

22   that particular herpes outbreak.  So, in other words, it tries

23   to prevent the infection and additionally tamps it down so

24   that the severity and the duration and the depth is tamped

25   down.

1  Q    Now we talked earlier about the prophylactic use of

2  Valtrex, do you recall that?

3  A    Yes.

4  Q    Now I think you just testified it's -- well, withdrawn.

5  Does taking Valtrex, can it eliminate herpes from your body?

6  A    I don't think that it can eliminate it specifically for

7  it to ever be completely gone.

8  Q    Okay.  So all I'm getting at here is, it's not a cure for

9  herpes; is that right?

10  A    Yes, ma'am, there is no cure for herpes.

11  Q    Now when you diagnose a patient with herpes, what, if

12  anything, do you advise that patient?

13  A    Well, again in diagnosing the patient there will be the

14  component that's the more urgent, the more acute of how to

15  manage the current outbreak for her -- his or her, in this

16  case, her own comfort and safety, not to get it secondary

17  infected, take care of -- how to handle the pain, the burning,

18  et cetera.

19          In addition to that, we do tell the patients, you

20  know, this is a serious situation right now, the person is

21  highly infectious, can transmit and therefore that individual

22  has to take certain precautions to avoid that risk.

23  Q    And what precautions are those?

24  A    Well, basically the person has to take the precaution to

25  avoid contact with any other part of her own body per se, but

1  specifically sexual intercourse, transmitting it to another

2  individual because she is, at that point, highly infectious

3  and is, you know, able to transmit this very contagious virus.

4  Q    Do you advise patients about the use of condoms?

5  A    Yes, we do.

6  Q    What, if anything, do you tell patients regarding

7  informing sexual partners of the diagnosis?

8  A    Well, we do tell them that because they are very

9  contagious, because herpes is chronic, it's permanent, that

10 they should ideally be communicating to, you know, the

11 individual that they are planning to have a sexual

12 relationship with, that they would be likely to transmit it

13 and therefore they should avoid having that contact, avoid

14 intercourse.  If they wish to, they should share the knowledge

15 that there is herpes present, either it's a chronic or acute

16 outbreak and therefore that vulnerable has a right to then

17 make a choice, but also that both can have a choice to protect

18 themselves.  The person infected has a -- I would say, an

19 obligation to use a condom or some other protection and then

20 the person who is -- the other person who is not infected, but

21 is likely to get exposed, would have a choice to do some

22 preventive measure for himself or herself.

23 Q    I think earlier in your testimony you mentioned that

24 there are two types of the herpes simplex virus; is that

25 correct?

Hoskins - direct - Shihata                    3059

1  A    Yes, ma'am.

2  Q    And are those known as type 1 and type 2?

3  A    Yes.

4  Q    And -- well, can you explain to the jury what that means.

5  A    So herpes simplex virus type 1, we call it type 1, type

6  2, part -- and also partly because of the generic location

7  where it stays.

8           So herpes simplex type 1 can be more in the oral

9  area around the lips, in the mouth, on the tongue.  Fever

10 blisters, cold sores, in that general category.  So type 1 is,

11 again, highly contagious, highly infectious, but it stays

12 localized in that general area, does not cause such is a big

13 all encompassing effect as type 2, which is more intense.

14 Q    And is type 2, generally speaking, in the genital area?

15 A    Generally in the genital area, yes.

16 Q    Can a person have both type 1 and type 2 herpes?

17 A    Yes.

18 Q    You testified earlier that herpes can be transmitted

19 through sexual intercourse, correct?

20 A    Yes.

21 Q    And can it also be transmitted through oral sex?

22 A    Yes.

23 Q    And with respect to the prophylactic use of Valtrex, I

24 think you testified that that helps to lower the risk of

25 spreading; is that right?

1    A    Yes.

2    Q    Is there anything in the medical literature and studies

3    regarding what the risk remains even when someone is using

4    Valtrex prophylactically as directed by their doctor?

5    A    Again, herpes is chronic, it remains.  There is the

6    possibility of shedding even in the absence of any symptoms,

7    et cetera, so it's always there.

8              Having said that, using something like Valtrex is

9    going to try to decrease that.  That's the intention of giving

10   the Valtrex or taking the Valtrex, but there will never be a

11   situation where there's a hundred percent protection knowing

12   or not knowing there is an actual lesion or an ulcer or an

13   outbreak.  So in general, we tell the patients that you will

14   never be hundred percent protected even if you took the

15   Valtrex all the time or whatever window of time, because there

16   is a subset, and it varies in the range of 10 to 20 percent,

17   usually, there is a subset of situations and people where

18   there will still be the possibility of you transmitting it or

19   shedding it because the Valtrex's usefulness is not anywhere

20   close to a hundred percent.

21   Q    And the percentages you mentioned there, that's based on

22   a person who is actually following the directions of their

23   doctor and taking the Valtrex as prescribed, is that fair to

24   say?

25   A    Correct.  Whenever the medication is given, the

Hoskins - direct - Shihata                3061

1   assumption between the clinician and the patient, the covenant

2   is you will follow the instructions.  Human life, human nature

3   comes in, there may be a missed dose, there may be a missed

4   window of time and therefore again that also adds to that 10

5   to 20 percent concern that there will never be a

6   hundred percent protection.

7           MS. SHIHATA:  One moment, your Honor.  No further

8   questions.

9           THE COURT:  All right.  How is everybody doing?

10  Does anybody need a break?  Yes.  Okay, we'll take 10 minutes.

11          Please don't talk about the case.  See you in a few

12  minutes.

13          THE COURTROOM DEPUTY:  All rise.

14          (Jury exits courtroom.)

15          THE COURT:  Everybody can have a seat.  The witness

16  can step out.

17          (Whereupon the witness stepped down.)

18          THE COURT:  Anything before we break?

19          MS. SHIHATA:  No, your Honor.

20          (Recess.)

21          THE COURTROOM DEPUTY:  All rise.

22          THE COURT:  Everybody can have a seat.

23          Are we ready for the witness?

24          Let's get the witness then we'll get the jury.

25          (Whereupon the witness resumed the stand.)

Hoskins - direct - Shihata                3062

1              THE COURTROOM DEPUTY:  All rise.

2              (Jury enters courtroom.)

3              THE COURTROOM DEPUTY:  You may be seated.

4              THE COURT:  We are ready to resume with the witness.

5    Cross-examination.

6              THE COURTROOM DEPUTY:  The witness is reminded she's

7    still under oath.

8              THE WITNESS:  Yes, ma'am.

9              MS. BLANK BECKER:  May I, Judge?

10             THE COURT:  Yes.

11             MS. BLANK BECKER:  My name is attorney Blank

12   Becker --

13             THE COURT:  I think we need to fix your microphone.

14   I wonder if it's better to use the standing one.  It might be

15   better.  Turn that one off.

16             MS. BLANK BECKER:  Sorry, Judge.  This one is

17   better, it doesn't reach up here.

18             Can I ask the questions from the seat?

19             THE COURT:  Whatever is most convenient.  It really

20   doesn't reach?

21             MS. BLANK BECKER:  No, we tried.

22             THE COURT:  Let's move the -- yes.  Does that work.

23             MS. BLANK BECKER:  I believe so, Judge.  Perfect.

24             THE COURT:  Go ahead.

25             MS. BLANK BECKER:  Thank you.

Hoskins - cross - Blank Becker                    3063

1    CROSS-EXAMINATION

2    BY MS. BLANK BECKER:

3    Q    I going to ask you a number of questions.  If you don't

4    understand something I ask you or you need it repeated, just

5    let me know, okay?

6    A    Yes.

7    Q    Is that a yes?

8    A    Yes.

9    Q    Thank you.

10             Doctor, it's my understanding, and I want to ask

11   you, isn't it true that you don't need to have sexual

12   intercourse in order to get herpes?

13   A    Yes.

14   Q    And in fact, if a person's not having an outbreak the

15   likelihood of transmitting is significantly less, correct?

16   A    Could you explain what you mean by significantly less?

17   Q    Sure.

18             Well, if a person isn't currently having the

19   outbreak, isn't it true that there is really only about four

20   to 10 percent chance that they're going to be transmitting the

21   disease to someone else?

22   A    That is correct.  I wouldn't call it "only," that's a big

23   number.

24   Q    Okay.  But that's four to 10 percent out of a hundred --

25             Is that correct?

Hoskins - cross - Blank Becker                    3064

1    A    Yes.

2    Q    -- percent?

3    A    Yes.

4    Q    Now you discussed earlier HSV-1, HSV-2, correct?

5    A    Correct.

6    Q    Now HSV-1, the oral herpes, that can be passed from

7    person to person just by kissing; isn't that correct?

8    A    Correct.

9    Q    And --

10            THE COURT:  I'm so, sorry is your microphone on?

11            THE WITNESS:  Hello?

12            THE COURT:  Better.  Go ahead.

13            MS. BLANK BECKER:  Thank you.

14            THE WITNESS:  I brought it closer, it might work.

15            THE COURT:  That's fine.

16   BY MS. BLANK BECKER:

17   Q    And not only can it be transmitted by kissing, but it

18   could also be transmitted through sharing objects such as like

19   lip balm; isn't that correct?

20   A    Yes, that's HSV-1, yes.

21   Q    Yes.  Okay.  Then HSV-2, that is most commonly -- which

22   is the genital herpes we talked about earlier -- it's most

23   commonly passed by vaginal sex or anal sex, correct?

24   A    Most commonly because it's genital, yes, but that's not

25   the only route.

Hoskins - cross - Blank Becker                3065

1   Q    Okay.  Yes, I just wanted to know most commonly.  Thank
2   you.
3        Genital herpes is very common in the United States
4   in general, correct?
5        MS. SHIHATA:  Objection.
6        THE COURT:  Well, I don't know, can you answer that
7   question?  Can you answer that question?
8   A    I don't know what you mean by very common, because in
9   terms of percentages, common may mean something higher percent
10  or lower percent.
11  Q    Okay.  Well, isn't it true that more than one out of six
12  individuals have genital herpes?
13  A    Yes.
14  Q    And isn't it also true that most people who have herpes,
15  they don't even know they have herpes?
16  A    I disagree with that.
17  Q    Okay.  Isn't it next to impossible to pinpoint when a
18  person has contracted herpes?
19  A    I disagree with that.
20  Q    So you believe that it is very easy to determine when
21  someone has -- when someone has contracted herpes?
22  A    Yes.  Because that's when they find out that -- the way
23  they think about it is after they have developed the problems
24  and that's when they know that they have contracted herpes.
25  It's a specific point in time.

Hoskins - cross - Blank Becker                     3066

1  Q    Well, you indicated earlier that herpes can lie dormant,

2  correct?

3  A    Correct.

4  Q    It can lie dormant for days, correct?

5  A    Correct.

6  Q    Months, correct?

7  A    Correct.

8  Q    Years, correct?

9  A    Correct.

10 Q    Okay.  So, if it could lie dormant for years and someone

11 contracts the disease let's say in 1980, but doesn't show any

12 type of symptoms, as you just indicated, which helps a person

13 know that they have it, isn't it possible that years could go

14 by before they even think to go to a doctor to see if they

15 have herpes?

16 A    No.  I think it's apples and oranges.  When they contract

17 the herpes there will be a specific point in time when they

18 first got the illness.  The lying dormant is after they got

19 the illness that can be years and up to years.  So when they

20 contract it initially, it will always be able to be pinpointed

21 in time.

22 Q    So an individual has sex with their partner on Monday and

23 partner X, then they have sex with someone on Tuesday, partner

24 Y, and then they have sex with somebody on Wednesday, partner

25 Z, if that person goes to get tested on Friday, are you saying

1   that they could pinpoint when they contracted herpes?

2   A    No, they cannot.

3   Q    Time has passed, right?

4   A    It's not so much the time has passed, it's the exposures.

5   Q    So time has passed from Monday to Friday, correct?

6   A    Oh, yes.

7   Q    Okay.  And there's been a number of different potential

8   exposures, correct?

9   A    Yes.

10  Q    Okay.  And so you can't tell us today whether the person

11  who had sexual intercourse with X, Y and Z, which one of them

12  could have given them the disease if they came positive on

13  Friday for -- with a test, correct?

14  A    That is correct.

15  Q    No way to tell who gave it to that person?

16  A    That is correct.

17  Q    Now you also, I believe, talked a little bit about ways

18  to know who gave you herpes and you had indicated that if you

19  were with that partner and then you came in, you had some

20  outbreak, then you could do a physical exam, correct?

21  A    Yes.

22  Q    Now if you aren't diagnosed immediately after you're

23  having sex with that partner, isn't it true that the only way

24  to determine that that person received or contracted herpes

25  from that person they had sex with, is if that person never

Hoskins - cross - Blank Becker                    3068

1  had sex before.  Let me -- you know what?  Even that was a

2  confusing question how I said it.  Let me say that better.

3  A    Thank you.

4  Q    Person A has sex with person B, and person A has symptoms

5  of herpes and they come in to see you as the doctor.  Now,

6  isn't it true that the only way to determine if person A got

7  this herpes simplex from person B and be definitive that

8  person B gave it to person A, is the fact that person A would

9  have to have had no partners prior to being with person B.

10 A    I don't think it is no partners prior to person B.  I

11 think it is if it's in the window of time.  If the person had

12 partners a year earlier, that's not relevant.  It's inside the

13 incubation window.

14 Q    So it's not relevant if person A had sex with another

15 individual a year before having sex with person B?

16 A    Not for the first attack.

17 Q    Okay.  So you're saying that if person A had sex with

18 person C -- let's call it X, so we can differentiate.

19         Person A has sex with person X a year prior and they

20 have a relationship and they have sex, I don't know a couple

21 of times through the year, they then have sex on Monday with

22 person B, you're saying that the fact that they had a previous

23 partner who may have given them herpes, contracted herpes from

24 has no significance to the current case?

25 A    Again it's apples and oranges.  If person X had a prior

Hoskins - cross - Blank Becker                3069

1    relationship with person A, and person A did not, from person

2    X, get herpes, because the first outbreak would show, there's

3    nothing hidden about the initial contact with herpes, it would

4    show.  Then when person A has sex with person B and they get

5    herpes, then it came from the person they had sex with, the

6    prior person did not give it to them.  They never showed the

7    evidence.  You can't have contact with herpes for the first

8    time and it never show up.

9    Q    Okay.  How about if the person doesn't go to get tested

10   during that year and they don't end up getting tested -- after

11   they had sex with person Z, there is no test during that year,

12   they wait until they have at some point they have sex with

13   person B and then sometime after that, not right after but

14   maybe six months later, they go to get tested.  Does that make

15   a difference?

16   A    Well, it always makes a difference if they don't go to

17   get tested, but again the testing is a tertiary aspect.

18            Person X, if they had herpes and if person X gave it

19   to person A for the first time, it would show up.  Whether

20   they get the testing or not is a tertiary aspect, because the

21   individual might be able to manage himself or herself and

22   never show up for any clinical care --

23   Q    Correct.

24   A    -- but the fact that if the person X had first time

25   infected person A, that would show up for person A.

Hoskins - cross - Blank Becker                    3070

1        What person A does with that information is his or
2    her own situation.  That's all I'm trying to clarify, that the
3    past exposure is different from a past acute primary exposure.
4    Q    Okay.  When you do the tests, whatever tests you choose,
5    the tests don't give you the DNA of the other person who gave
6    your patient herpes, correct?
7    A    Correct.
8    Q    Yes.  So when you're asking questions and/or informing
9    your patients about herpes, is it important -- isn't it
10   important that you talk about whether or not they have one
11   partner or multiple partners?
12   A    Yes, we do.  Yes, we do.
13   Q    And that's important because you're trying to figure out
14   and trying to sort of narrow down where this person could have
15   contracted the disease from, correct?
16   A    Yes.  That's usually the model for sexually transmitted
17   diseases.
18   Q    Now isn't it true that a blood test certainly can tell
19   you if you have herpes or not?
20   A    Correct.
21   Q    And a blood test is a pretty sure way of determining
22   whether this person, your patient, has herpes or not, correct?
23   A    Correct.
24   Q    Now --
25   A    Had, not has, had.

Hoskins - cross - Blank Becker                    3071

1   Q    Okay.  Had --

2   A    In the past.

3   Q    Had been -- I'm sorry, say that again.

4   A    Had in the past.

5   Q    Yes.  Had in the past, okay, got it.

6            Now the blood test, they can't tell you the person

7   who gave your patient herpes, correct?

8   A    No.

9   Q    And they also can't determine how long the person has

10  been infected, correct?

11  A    They can to a small extent.

12  Q    A blood test?

13  A    Yes, ma'am.

14  Q    Tell me about that.

15  A    So in the blood test you're looking for what type of a

16  cell, that's call the antibody.  If you find an antibody of a

17  certain type, which is called M, as in Mary, that is an acute,

18  recent current exposure.  If you find the antibody which is

19  named G, as in God, that denotes past exposure.

20           So if I draw a blood test on a patient and I'm doing

21  what's called an antibody test, I will get an answer that says

22  IGM, as in Mary, positive or negative.  I will get an answer

23  IGG, as in God, positive or negative.  And that will allow me

24  to tell the duration, is it acute, recent now, which would be

25  M as Mary, or is it past, in the past of her life, which would

Hoskins - cross - Blank Becker                    3072

1   be the G.

2   Q    Okay.  So what's recent?  What timeline, what does that

3   mean?

4   A    In general, about two weeks on average.  It can be up to

5   a month.

6   Q    So if the test is done after two weeks or up to a month,

7   then you're saying that is considered G, as in God.  Excuse

8   me, that's considered past exposure, past the two weeks or the

9   month?

10  A    Correct.  The lab will tell me which immunoglobulin it

11  is, IGM or IGG.  The lab will say positive, and then it will

12  tell me which type of antibody cell.

13  Q    So is it fair to say then that the blood test is a pretty

14  accurate way to determine whether or not someone has herpes?

15  A    Well, in fact it's a very inaccurate way.

16  Q    Tell me then what you mean by that.

17  A    Well, it means, in general when someone is trying to

18  diagnose herpes, the last thing we look for is a blood test.

19  It is part of the armamentarium of trying to diagnose herpes.

20  The first thing is, as I had mentioned earlier, the physical

21  exam, highly reliable, and many, many clinicians will not

22  bother to do any additional lab testing of any kind.  However,

23  if somebody wishes to do lab testing a preferred way is to get

24  the genetic material of herpes virus.  If for some reason that

25  is not available or what we call equivocal, non-diagnostic and

1  for whatever additional reason, that I can't think of right

2  now, somebody says I wish to do the antibody test which will

3  tell me if this body mounted a defense mechanism against

4  exposure to the herpes virus, that's the antibody test, the M

5  and the G.  So that's the least chosen is that blood test.

6  Q    So it requires the patient to ask to get a blood test in

7  order for you to do a blood test on someone who may have

8  symptoms or outbreaks of herpes?

9  A    Well, the patient would be offered, after her physical

10 exam and the clinician says you have herpes, primary outbreak

11 or secondary outbreak, the patient may accept that and they

12 move on with the management plan and the counseling and

13 precautions.  The patient or the clinician may say, both may

14 say or one may say, I want further diagnosis, I want to clinch

15 this.  I'm almost certain, but I want more certainty.  Then

16 they would do the blood test or the culture.

17        In the setting of the blood test, which we are

18 discussing, we could do -- draw a sample of a blood and look

19 for the genetic material of the virus, or we could draw a

20 sample of blood and say I'm looking for the antibody, which is

21 the IGG, IGM.

22 Q    Thank you.

23        You're familiar with the CDC, correct?

24 A    Yes.

25 Q    What does that stands for?

Hoskins - cross - Blank Becker                    3074

1   A    Centers for Disease Control.

2   Q    And the Center for Disease Control, they come out with

3   way they believe are appropriate standards and guidelines; is

4   that correct?

5   A    Guidelines.

6   Q    Guidelines, thank you.

7        So you're familiar with the fact that the CDC's

8   guidelines indicate that the only way to know for certain if a

9   person has herpes is by a blood test you're aware of that?

10  A    Yes, because you have to define what certain means.

11  Q    Okay.  So when you -- strike that.  So a blood test is

12  the best way to determine if a person has herpes?

13  A    If you're talking about as close to a hundred percent

14  certainty, yes, blood test.

15  Q    Isn't it true that herpes is one of the most common STDs

16  in the world?

17  A    I don't know what you mean by most common in the world.

18  Q    Well, herpes type 1, the oral infection, that's a very

19  common infection, correct?

20  A    It is very common, yes.

21  Q    And isn't it true that according to the World Health

22  Organization -- you're familiar with them?

23  A    Yes, I am.

24  Q    Who are they, I guess I should ask.

25  A    Well, they are a group of medical personnel or medical

Hoskins - cross - Blank Becker                    3075

1   affiliated personnel who have opinions and managements on the

2   public health, on the overall health of geographically various

3   communities.

4   Q    Do you rely on their information at times?

5   A    Almost never to be very honest.

6   Q    Okay.  And how come?

7   A    Because of many reasons.  The top reasons are that the

8   World Health Organization will not -- will -- will be very

9   particular about not being specific because they're talking

10  global.  So they will give opinions and guidelines that would

11  apply to a global concept which would then be defined or

12  controlled by what are resources available there, what

13  abilities of clinicians and their expertise available there,

14  et cetera, et cetera.  So that's just one example of why World

15  Health Organization information are suggestions, they are

16  guidelines and they are not really used to hone in and to hang

17  your hat on in terms of diagnosis and clinical management.

18  Q    So you would be surprised if doctors in the United States

19  relied on their suggestions and guidelines?

20           MS. SHIHATA:  Objection.

21           THE COURT:  Well, overruled.  Can you answer that

22  question?

23           THE WITNESS:  Yes.  I wouldn't be surprised.  A

24  clinician once he or she is a competent, qualified clinician

25  can do whatever they want to do.  I personally wouldn't use

Hoskins - cross - Blank Becker                    3076

1    it.

2    Q    Thank you.

3         Now, isn't it true, doctor, someone with oral type 1

4    herpes can unsuspectingly -- sorry, I always get that word

5    wrong -- unsuspectingly self-inoculate a herpes infection from

6    oral to genital area simply by touching the sores and then

7    touching the genital area?

8    A    It's rare, but it is possible.

9    Q    Can you tell me a few of the diagnosis that are possible

10   when a patient shows up with genital ulcers?

11   A    Oh, okay.  So the diagnoses with genital ulcers are, they

12   are in the categories of infections, sexually transmitted

13   infections.  They can be in the category of allergies, contact

14   issues, et cetera.  They can be in the category of a

15   medication reaction, et cetera.  So it's different columns.

16   Q    And just so we can make sure we're all on the same page,

17   what is a genital ulcer, what does that mean?

18   A    A genital ulcer you're basically talking the ulcer means

19   it's a blister that opened or broke open and it's raw and

20   exposed to the outside.

21   Q    So fair to say there's things other than herpes that

22   appear as genital ulcers?

23   A    But they each have a unique appearance.

24   Q    Yes.  And the most common of the causes of genital ulcers

25   is not herpes, but it is an infectious disease.

Hoskins - cross - Blank Becker                    3077

1   A    The most common, again you have to clarify what you mean

2   by most common --

3   Q    Well --

4   A    -- you have to look at the clinical setting of where that

5   occurred.

6   Q    Okay.  So when determining -- looking at genital ulcers

7   and trying to determine what they are in the patient, isn't it

8   true that herpes is not typically the number one diagnosis

9   when seeing genital ulcers?

10  A    I disagree.

11  Q    How about syphilis, that can cause genital ulcers, right?

12  A    You're using genital ulcer like saying there's a cover

13  when it's raining.  The cover can be a hat, it can be an

14  umbrella, it can be whatever else, a cape or anything.

15       Genital ulcer is a bucket of things that can -- it's

16  a term that a lot of things can go into that bucket.

17       So a syphilis ulcer is going to physically look

18  different, its behavior, its appearance, historically when it

19  appeared in the context, that's why I was talking about the

20  clinical context of how when you see what you're calling a

21  genital ulcer, you're not going to look at a patient and say,

22  oh, this a genital ulcer, I have a checklist the most common

23  is whatever item and then herpes is somewhere on that list.

24  You're going to take the whole clinical context, look at that

25  genital ulcer and say the most likely underlying cause is X,

Hoskins - cross - Blank Becker                3078

1  Y, Z, based on clinical context which includes the appearance

2  of that particular ulcer.

3  Q    Well, could you tell us about a Lipschutz ulcers?

4  A    Well, Lipschutz ulcers are those which due to a more of

5  an irritation from a prior infection, you know, underlying, et

6  cetera, and they would not look anything close to a herpes

7  ulcer.

8  Q    So your opinion or your testimony states that those sores

9  don't look anything like herpes?

10  A    Not in my clinical opinion they don't.

11  Q    And those sores aren't usually -- strike that.  Those

12  type of sores typically are found after a flu or maybe someone

13  has mono; is that correct?

14  A    Yeah.

15  Q    Okay.  That's called a Lipschutz ulcer not herpes,

16  correct?

17  A    Yeah.

18  Q    Chlamydia, that can cause ulcers, correct?

19  A    Sometimes.

20  Q    Syphilis, that can cause ulcer sometimes?

21  A    Sometimes.  Very different appearances.

22           (Continued on the next page.)

23

24

25

1    CROSS EXAMINATION

2    BY MS. BLANK BECKER:   (Continuing)

3    Q    And there's other STDs that can cause ulcers as well;

4    correct?

5    A    Correct.

6    Q    So it's quite possible that one of the -- if someone has

7    a genital ulcer, it could be any one of these different

8    ulcers?

9    A    The possibility would only be in the realm of the

10   clinical context.

11   Q    You have said -- you know, you have qualified, sort of, a

12   number of these questions in the clinical context; correct?

13   A    Correct.

14   Q    How do you explain then if someone comes to see you and

15   they have no symptoms when they come to see you, how is the

16   clinical context relevant?

17   A    The clinical context -- well, that information would be

18   part of the clinical context.  And no symptoms of what?  What

19   is it that I'm looking for?  What is it that I am concerned

20   for?

21        If I see a patient and there is no history, there is

22   no complaint of any kind and the patient has no physical exam

23   and evidence of any ulcers and no history and no symptoms or

24   signs, then that's a clinical context.

25        If a patient has a particular finding, physical

Hoskins - cross - Blank Becker                    3080

1    finding, like an ulcer somewhere, I have to put it into the

2    context of other aspects of her personal life and her clinical

3    life:  Medications, infections, what she was doing about her

4    partners, about her sexual history, her personal medical

5    history, illnesses, et cetera.  So that's what I mean by

6    clinical context.

7              No symptoms, again, matters in relation to other

8    symptoms you're talking about towards the ulcer or the finding

9    or are you talking about no symptoms in her physiologic -- in

10   the rest of her body?

11   Q    Well, it could be both; correct?

12   A    It can.

13   Q    Okay.  Now, you also discussed earlier about the use of

14   cultures to determine if someone has herpes; correct?

15   A    Correct.

16   Q    And are cultures used -- let's say within the past ten

17   years, have cultures been used to do such a thing?

18   A    Well, I can't comment on that because I don't know what a

19   clinician might want to order.

20   Q    Okay.  Fair enough.  So a culture is always an option for

21   a clinician to order?

22   A    Yes.

23   Q    Okay.  And would you say, in your practice, a culture

24   would come before a blood test?  Would that be something you

25   would do prior to a blood test or either/or?

1  A    It can be neither.  It can be either.  It can be or, or

2  all of them.  It depends on the clinical context, what I'm

3  trying to find out and what is in front of me in terms of the

4  patient's symptoms and signs.

5  Q    Okay.  So, doctor, let me give you an example.  If a

6  patient had ulcers and they had a swab done to culture, and

7  test the sores and it was negative, does that prove that the

8  person doesn't have herpes?

9  A    No, it does not.

10  Q    So these tests, including cultures, they are not

11  100 percent; right?

12  A    Nothing in medicine is 100 percent.

13  Q    So I believe you indicated earlier that there could be a

14  false negative; is that correct?  Or not?

15  A    What was I speaking about?  I don't recall.

16  Q    With regards to cultures and testing.

17  A    Yes.

18  Q    You're saying there would be a false negative?

19  A    Yes, did he tell.

20  Q    And you're also saying that these tests are not

21  100 percent accurate; correct?

22  A    Correct.

23  Q    All right.  So based on the testimony you just indicated

24  with regard to a visit with a patient and getting all their

25  background and so forth, if you examine that patient, can you

Hoskins - cross - Blank Becker                3082

1   always tell from the examination whether the person has herpes

2   or not?

3   A    I think it's a very open-ended question.  If you could

4   help narrow it down a little bit.

5   Q    Sure.

6           Is it an exam by itself 100 percent sensitive for

7   diagnosis of herpes?

8   A    Nothing in medicine is 100 percent.

9   Q    Okay.

10  A    Having said that, the physical exam is highly reliable

11  and the most common, most chosen, most frequent model of how

12  we diagnose herpes.  It's more of all these, preferable,

13  reliable, likely, if it's a primary outbreak because it's so

14  particular, so unique, the finding, the location, the whole

15  appearance of the ulcer and the whole genital area, the

16  lesions, et cetera.

17          If it's a secondary outbreak, we take into context

18  the patient telling us her history, what her symptoms were,

19  what we call -- it's a technical term, but we call it

20  prodromal, meaning before the physical, actual ulcer, they

21  were other sensations:  Burning, tingling, pain, et cetera.

22  So then we put into context of that.

23          So when we do a physical exam, it's very highly

24  reliable.  When we have the clinical context both ways, its

25  primary, so clear, so specific.  It's secondary, we can get it

Hoskins - cross - Blank Becker                    3083

1   in the context of what she's describing to us.

2   Q    So if you examine a patient, are you suggesting that you

3   can always tell if they have herpes or not?

4   A    I think we are going a little circular.

5         If the patient has the classic presentation on exam,

6   we can break it down into primary or secondary.  The primary

7   is the most easy to identify.  It's very unique.  It's very

8   specific.  It's highly likely to be that just by us clinicians

9   seeing it, knowing the location, the appearance, the timing

10  and what the patient is describing.  So it's very likely.

11  Nothing is 100 percent.  It can be clinched with additional

12  tests.

13        With the secondary, the appearance of the ulcer in

14  the context of what the patient is describing by history and

15  by the current symptoms, it would again be also very likely

16  but not as high of a likelihood as with the primary.

17  Q    Okay.  I'm going to move on.

18  A    Thank you.

19  Q    Doctor, can a baby acquire herpes --

20  A    Yes.

21  Q    -- from their mother?  I'm sorry?

22  A    Yes.

23  Q    And can children even acquire herpes over time from their

24  parents, growing up with their parents, especially if their

25  parents have the Type 1 herpes?

Hoskins - cross - Blank Becker                    3084

1   A    Yes.

2   Q    Doctor, isn't it also true that the rates for herpes are

3   higher in African-Americans?

4   A    I think some studies have shown that but not all studies

5   have shown that because there are many other factors that

6   affect the rate of herpes.

7           MS. BLANK BECKER:  Sorry, Judge.

8           THE COURT:  It's all right.

9           MS. BLANK BECKER:  I am trying to move forward

10  through this.

11          May I have one moment, Judge?

12          THE COURT:  Sure.

13          (Pause.)

14          MS. BLANK BECKER:  Thank you, Judge.

15          THE COURT:  Sure.

16          MS. BLANK BECKER:  Judge, may I approach?

17          THE COURT:  Sure.

18          MS. BLANK BECKER:  Thank you.

19  Q    I am going to hand you --

20          THE COURT:  You want to talk to the witness?

21          MS. BLANK BECKER:  Yes.

22          THE COURT:  I see.

23  Q    I'm going to hand you a document and just ask that you

24  look at it and then I can ask you some additional questions.

25  Okay?

1    A    Yes.

2    Q    Okay.

3              MS. BLANK BECKER:  May I, Judge?

4              THE COURT:  Yes.

5              THE WITNESS:  Do you want me to put my mask on?

6              THE COURT:  No.  It's all right.

7              MS. BLANK BECKER:  May I approach, Judge?

8              THE COURT:  Yes.

9    Q    I am going to ask...

10             MS. BLANK BECKER:  Judge, I ask that this be marked

11   as Exhibit KK, please.

12             THE COURT:  All right.  You know, we are coming

13   right up to the lunch break.  Do you have a lot more for this

14   witness?

15             MS. BLANK BECKER:  I have some more questions, but

16   I'm almost done.

17             THE COURT:  That's okay.  If you have ten minutes or

18   so, we can finish the cross.  But, anyway, so you are marking

19   this for identification.

20             Are you offering it into evidence?

21             MS. BLANK BECKER:  Yes, Judge, and only for the

22   jury.

23             THE COURT:  Do you have any objection to this?

24             MS. SHIHATA:  No, as long as it is jury only.

25             THE COURT:  It's in evidence, then.

1          (Defendant's Exhibit KK received in evidence.)

2          MS. BLANK BECKER:  Judge, do you wish for me to

3   continue or do you want to take a break?

4          THE COURT:  Go ahead.

5          MS. BLANK BECKER:  Thank you.

6          Judge, this is to be published to the jury only.

7          THE COURT:  Yes.  If you are trying to -- just take

8   it off the screen.  You are showing it to everybody.  If there

9   is something that you have to take out of it.

10          MS. BLANK BECKER:  No, I don't have to take it out.

11          MS. SHIHATA:  As long as it is jury only.

12          THE COURT:  All right.

13          MS. BLANK BECKER:  Judge, may I approach to just let

14   her know something?

15          THE COURT:  Sure.

16          You're going to have to have some kind of way to

17   project your voice.

18          MS. BLANK BECKER:  Sorry, Judge.  Is it okay if I

19   could possibly sit so the jury can hear me?

20          THE COURT:  That's fine.

21          MS. BLANK BECKER:  I appreciate it.

22   BY MS. BLANK BECKER:

23   Q    Doctor, I apologize for the brief break there.

24   A    No worries.

25   Q    Doctor, I have handed you Defense Exhibit KK.  What does

Hoskins - cross - Blank Becker                    3087

1   that appear to be?

2   A    It looks like a medical summary visit.

3   Q    Okay.  Is that a common thing to do as a gynecologist

4   when someone comes to write a report?

5   A    Any clinician, sure.

6   Q    Okay.  Thank you.

7          And specifically, in this particular report that you

8   are looking at, there are several questions that appears that

9   were asked of this individual with regards to their

10  gynecological history; correct?

11  A    Correct.

12  Q    And specifically there is a question that was asked about

13  her -- in this case, this is a female; is that correct?

14  A    Correct.  I assume.

15  Q    Yes.  And she was asked, in regards to her gynecological

16  history, sexual history, sexually active; correct?

17  A    Correct.

18  Q    Do you see that?

19  A    Yes.

20  Q    Okay.  And she indicated -- it appears that she

21  indicated, per this piece of paper, that -- she indicated that

22  she had a partner since April 2015; correct?

23  A    Correct.

24  Q    And the date of this particular report is dated

25  8/14/2015; correct?

Hoskins - cross - Blank Becker                     3088

1   A    Correct.

2   Q    All right.  So April 2015, we're talking what?  Four

3   months prior to when she was there; correct?

4   A    Correct.

5   Q    Okay.  And it also indicates on here that she had -- her

6   sexual history and whether she was sexually active, that's a

7   question; correct?

8   A    Correct.

9   Q    And she -- that's where she indicated that she had only

10  been sexually active or sexual history since April 2015;

11  correct?

12  A    No.  That's not what it means.

13           THE COURT:  Could I see the parties at the side

14  please for a minute with the court reporter.

15           (Sidebar held outside of the hearing of the jury.)

16           (Continued on next page.)

17

18

19

20

21

22

23

24

25

Sidebar                                                    3089

1          (The following sidebar took place outside the

2   hearing of the jury.)

3          THE COURT:  Are we getting into sexual history

4   questions again?

5          MS. SHIHATA:  I don't think we are because the

6   sexual partner she had there was the friend.

7          MS. BLANK BECKER:  Yeah.

8          THE COURT:  It sounds like the witness is about to

9   answer something different.

10          MS. SHIHATA:  I have no idea what the witness is

11   about to say.

12          MS. BLANK BECKER:  Yes.

13          MS. SHIHATA:  I don't have an issue with partner

14   since 4/2015.

15          THE COURT:  All right.

16          (Sidebar concluded.)

17          (Continued on the following page.)

18

19

20

21

22

23

24

25

1           MS. BLANK BECKER:  May I, Judge?

2           THE COURT:  Yes, go ahead.

3           MS. BLANK BECKER:  Thank you.

4    BY MS. BLANK BECKER:

5    Q    And, Doctor, the date of birth is listed on this sheet;

6    correct?

7    A    Correct.

8    Q    And what is that?

9    A    12/30/1997.

10   Q    Okay.  So -- and I'm not very good at math.  Maybe you're

11   better.  1997 until 2015, when this test was done, how old

12   would that make that individual?

13   A    Well, I could do the math or I could just read it, which

14   says 17 years.

15   Q    There you go.

16          So this test was done when the individual was 17

17   years old?

18   A    Correct.  According to this paper, yes.

19   Q    And this particular paper that we are looking at, I'm

20   going to switch now to the second part of this piece of paper.

21          Are you able to see that?

22   A    Yes, ma'am.

23   Q    Okay.  And ultimately it was determined, or this

24   particular paperwork indicates that the plan was for treating

25   herpes; is that correct?

Hoskins - cross - Blank Becker                    3091

1   A    Correct.

2   Q    Thank you.

3        Because there is such a lapse in time from the time

4   where this individual indicated she had sexual intercourse

5   with her partner from April 2015 until four months later, in

6   August 2015, can you tell by looking only at what you have

7   here whether or not you can determine who she got that from?

8   A    I'm not interpreting it the way you are.

9   Q    Well, I'm not here to interpret.  I'm asking questions.

10  So you can tell us your interpretation.

11  A    No.  The reason I say what I do is because you said

12  because there was a lapse of time and when I read this medical

13  report, I look at the words that says she has a partner since

14  April 2015.  It says she is sexually active.

15       When we ask patients that, what we're trying to

16  identify is are they currently sexually active, were they past

17  sexually active, are they virginal, et cetera.  So I am

18  interpreting it from a textbook medical point of view.

19  Q    Thank you.

20       MS. BLANK BECKER:  Judge, I believe this would be a

21  good point to take a lunch break.

22       THE COURT:  Okay.

23       MS. BLANK BECKER:  Thank you.

24       THE COURT:  Ladies and gentlemen, we are going to

25  break for lunch.  Please have a good lunch.  Don't talk about

Hoskins - cross - Blank Becker                    3092

1    the case.  Let's see you at, let's make it 2:25.

2              THE COURTROOM DEPUTY:  All rise.

3              (Jury exits the courtroom.)

4              THE COURT:  All right.  Everybody can have a seat.

5              Doctor, you are excused.  We will see you after

6    lunch.

7              THE WITNESS:  Thank you.

8              (Witness exits.)

9              THE COURT:  Anything before we break for lunch?

10             MS. BLANK BECKER:  No.

11             MS. GEDDES:  Yes.

12             THE COURT:  Before you do this, I want to figure out

13   how much longer we have with this witness.

14             MS. BLANK BECKER:  Honestly, Judge, that took longer

15   than I thought.  I have a couple more things and that's it.

16             THE COURT:  That's fine.

17             And you are not going to have a lot redirect

18   examination.

19             MS. SHIHATA:  Not a lot.

20             MS. GEDDES:  On Monday, since we are not going to

21   start until 12 clock, we proposed to defense counsel that we

22   have the jurors eat an early lunch and maybe take two

23   afternoon breaks to make the most out of our time.

24             THE COURT:  I think we might be ahead of you on

25   that.

Hoskins - cross - Blank Becker                3093

1          MS. GEDDES:  Thank you.

2          THE COURT:  Ms. Greene is the person in control.

3     She has it covered.

4          Anything else?  All right.

5          See you after lunch.

6

7          (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Hoskins - cross - Blank Becker                3094

1

2                          AFTERNOON SESSION

3            (In open court; outside the presence of the jury.)

4            THE COURTROOM DEPUTY:  All rise.

5            THE COURT:  Everybody can have a seat.

6            All right.  Let's get the witness and then we will

7   get the jury.

8            THE COURTROOM DEPUTY:  All rise.

9            (The jury enters the courtroom.)

10           THE COURTROOM DEPUTY:  You may be seated.

11           THE COURT:  All right.  I hope everybody enjoyed

12  their lunch.  We are ready to continue.

13           Go ahead, Ms. Becker.

14           MS. BLANK BECKER:  Thank you.

15           THE COURTROOM DEPUTY:  The witness is reminded she

16  is still under oath.

17           THE WITNESS:  Yes.  Thank you.

18  CROSS EXAMINATION

19  BY MS. BLANK BECKER:  (Continuing)

20  Q    Good afternoon, Doctor.

21           Doctor, you testified that the most common method of

22  diagnosing herpes is through history and physical exam; is

23  that fair to say?

24  A    Yes, ma'am.

25  Q    All right.  And then you also agreed with the CDC that

Hoskins - cross - Blank Becker                    3095

1   the most accurate way to verify herpes, a herpes diagnosis is

2   through a blood test; correct?

3   A    If one choses to go on a higher level, yes.

4   Q    Okay.  With regards to herpes, we've talked about how

5   there is a herpes simplex 1 and a 2; correct?

6   A    Correct.

7   Q    All right.  And isn't it a fact that it wasn't until

8   around the 1960s that the scientists were able to determine

9   that there were two different strands?

10  A    I wouldn't know which year, but, yes, it was considered

11  relatively recent if you talk about history of medicine,

12  correct.

13  Q    Thank you.

14        And that's when the classification of genital herpes

15  came out; is that correct?

16  A    I don't recall it by the year.

17  Q    Not the year, but that was when they separated it?

18  A    A separation.  Correct.

19  Q    I got it.  Thank you.

20        You also testified earlier that syphilis and

21  chlamydia, those are bacterial infections; correct?

22  A    Correct.

23  Q    But with regards to herpes, that's not a bacterial?

24  A    No.

25  Q    -- infection?  It's a virus?

1  A     Correct.

2  Q     Got it.

3         MS. BLANK BECKER:  And I don't have any additional

4  questions.  Thank you, Doctor.  Thank you, Judge.

5         THE COURT:  Thank you.

6         Any redirect?

7         MS. SHIHATA:  Yes, Judge.

8  REDIRECT EXAMINATION

9  BY MS. SHIHATA:

10 Q     Good afternoon.

11 A     Good afternoon.

12 Q     Now, during cross-examination you were asked some

13 questions, or a question or two about whether a mother can

14 transmit herpes to her baby; is that right?

15 A     Yes, ma'am.

16 Q     And what are some of the effects that herpes can have on

17 a pregnant woman?

18 A     Well, whenever we look at a pregnant woman, we're always

19 looking at two patients, because it's the mother and the baby.

20 So like you pointed out, when you say what are the effects on

21 the pregnant woman, on the woman itself would be if it's a

22 primary outbreak, it would be a flu-like thing with fever,

23 sniffles, runny nose, malaise, aches and pains, it would be

24 the lesions in the genital area that are extremely painful.

25 We've been through all of that, with the weeping ulcers, et

Hoskins - redirect - Shihata                3097

1    cetera.  And that would be in the mother.

2          But the fact that the mother in pregnancy -- this is

3    going to be a little bit of a long-ish answer.  During

4    pregnancy, every single mother is -- her immunity is down.

5    And the reason her immunity is down is that's how she is

6    accepting that other person inside her, the fetus who's

7    growing.  And the best way to explain that, to show what I am

8    talking about, later on in life, if that same mother and that

9    same child were to give each other -- to donate an organ or

10   share blood or tissue, they would have to be tested to see if

11   there is a match.  Yet every single mother, 100 percent of the

12   time, carries a baby where the organ, the blood and

13   everything, it's inside her, it's a completely different

14   person, so her immunity has to be suppressed in order for her

15   to accept that for the duration of the pregnancy.

16         Because her immunity is suppressed, she's going to

17   be at increased risk for, A, getting an infection, and, B, if

18   she gets an infection, it would be on a higher plane, higher

19   degree, worse:  Depth of the illness, longer duration of the

20   illness, more serious possibility of complications.  That's

21   the back story.

22         Going to your question about herpes effect on the

23   mother, because her immunity inherently is less because it is

24   suppressed because of carrying the pregnancy, the herpes is

25   going to have a bigger effect.

Hoskins - redirect - Shihata                    3098

1          If it's a primary infection, then all these things

2    that I have described are going to be on a higher degree,

3    higher amount, higher quantity.

4          If it's a secondary infection, there are studies in

5    the literature where she is more likely to have an outbreak

6    because her immunity is suppressed, it was lying in her

7    central nervous system, now it's going to reinfect her.

8          So there are the concerns in a mother:  Flu-like

9    problems, additional problems in terms of secondary

10   infections, and then the fact that everything is going to be

11   of a higher degree.

12   Q    And what kind of complications can it have on the fetus

13   or baby that's being carried?

14   A    So for the fetus it's very much more serious because the

15   fetus does not have any inherent immunity.  So the fetus has

16   only got a little bit of protection through the mother.  The

17   herpes virus, even though the mother maybe now, as a secondary

18   infected person, she had it before, assume, and now she's

19   carrying the virus, and if it gets transmitted to the fetus

20   through the placenta, the fetus's body has never seen this

21   virus before, it doesn't have very good efficient immunity, so

22   the fetus can get very sick even inside the uterus.

23         If the baby has been delivered, the concern is if

24   there was a direct contact between wherever the virus is

25   shedding to the baby, either through the nares -- that's the

Hoskins - redirect - Shihata                    3099

1   nasal passages -- in the eyes, through the ears, mouth, any

2   skin.

3           When there is direct contact, if the mother is

4   shedding and now there's contact to this newborn that just

5   came out or is in the passage, in the birth canal, that fetus

6   or newborn can get very sick very quickly and has a higher

7   likelihood that it would go to the brain and the infection in

8   the brain would cause serious long-term damage.

9   Q    Like what?

10  A    So the infection in the brain for a newborn, if it's

11  coming from a herpes virus infection is a condition that would

12  be an inflammation in the brain.  The technical term is

13  encephalitis or -- and the implication is that there would be

14  a cerebral palsy like picture.  Cerebral palsy is just an

15  umbrella for lots of conditions that are resulting from damage

16  to the brain.  Herpes is one of them.

17  Q    So fair to say that a woman of child bearing age

18  diagnosed with herpes, this is yet another serious

19  complication that they have to be concerned with?

20  A    Correct.  We do tell our patients that this is a burden

21  you carry if you have herpes and you are now pregnant or

22  planning to get pregnant, this is a risk that could occur to

23  you because of your immune suppression, but also the definite

24  very serious risk to your baby if you get an activation at

25  that time and the reactivation at that time is an

Hoskins - redirect - Shihata                    3100

1   unpredictable point in time.

2   Q    Now, you were asked a lot of questions on

3   cross-examination about testing for herpes and various methods

4   and whether someone can have herpes and not know it and so

5   forth.  Fair to -- certainly someone whose doctor tells them

6   they have herpes knows they have herpes; correct?

7   A    They have herpes, yes.

8   Q    Now, you were asked a lot of questions about person X, Y,

9   Z and person A, B.  I want to make a simpler version of that

10  question, okay.

11        So if person X has a doctor who has told them they

12  have herpes and they go out and sleep and have sexual

13  intercourse with multiple partners, they are exposing each of

14  those partners to herpes; correct?

15  A    Yes.

16  Q    You were also asked questions about different types of

17  ulcers in the genital area on cross-examination and I think

18  you were asked about ulcers related to syphilis and chlamydia.

19  Do you take Valtrex to treat syphilis?

20  A    No.  It's a bacterial infection.

21  Q    And do you take Valtrex to treat chlamydia?

22  A    No.

23  Q    Those are both bacterial infections?

24  A    Yes.

25  Q    And Valtrex is an anti-viral; correct?

Hoskins - redirect - Shihata                3101

1   A    Correct.

2   Q    Now, you also talked about diagnosing herpes in a

3   clinical setting, and when you do that, does that include

4   taking the history of the patient?

5   A    Yes.

6   Q    Including their sexual history?

7   A    Yes.

8   Q    Whether they're having sex with multiple partners?

9   A    Yes.

10  Q    Whether they have had sexually transmitted diseases in

11  the past?

12  A    Yes.

13  Q    All of that is part of it; right?

14  A    Yes.

15  Q    Now, you were shown a medical record, I believe it was

16  Defense EE -- I'm sorry, KK.  I'm going to show you, jury

17  only, please, the record here.  This one is marked Government

18  Exhibit 909, but it is the same record.

19         Now, the date of this exam is August 14, 2015;

20  correct?

21  A    Yes, ma'am.

22  Q    The age of the patient 17 years old?

23  A    Yes, ma'am.

24  Q    And it indicates they have a partner, singular, since

25  April 2015?

Hoskins - redirect - Shihata                3102

1   A     Yes.

2   Q     And if you look under examination, it says external

3   genitalia, multiple ulcerated weeping lesions, exquisitely

4   tender?

5   A     Correct.

6   Q     Now we will look under assessment on the second page,

7   assessment herpes; correct?

8   A     Correct.

9   Q     And then plan, there's a plan to start Valtrex.  That's

10  the treatment we talked about earlier; correct?

11  A     Correct.

12  Q     Under notes, it says, "Discussed clinical appearance of

13  primary herpes outbreak, discussed culture for confirmation

14  and typing.  Patient refuses culture due to discomfort.

15  Discussed additional STD testing.  Patient declines due to

16  discomfort but will consider once current outbreak is less

17  painful."

18        MS. BLANK BECKER:  Excuse me one second.  We are

19  supposed to get rid of the --

20        THE COURT:  Is there an objection?

21        MS. SHIHATA:  It's jury only.

22        MS. BLANK BECKER:  My understanding is that the last

23  name, we were still getting rid of.  Thank you.

24        MS. SHIHATA:  The jury is aware of the name.

25        THE COURT:  All right.

Hoskins - recross - Blank Becker                3103

1  BY MS. SHIHATA:

2  Q    Now, this is a situation where the doctor diagnosed

3  herpes based on the physical exam and history?

4  A    Correct.  And that is the most common way of doing it,

5  yeah.

6  Q    And here it appears the doctor discussed doing a culture

7  but the patient refused because it was so painful at the time;

8  correct?

9  A    Correct.

10       MS. SHIHATA:  Nothing further.

11       THE COURT:  Any recross?

12       MS. BLANK BECKER:  Thank you, Judge, just briefly.

13       THE COURT:  Sure.

14       MS. BLANK BECKER:  Could I do it from here, is that

15  all right?

16       THE COURT:  Sure.

17       MS. BLANK BECKER:  Thank you.

18  RECROSS EXAMINATION

19  BY MS. BLANK BECKER:

20  Q    Doctor, there is no indications in those reports that

21  there were any blood tests done; correct?

22  A    I would have to look at it again.

23  Q    Certainly.

24       MS. BLANK BECKER:  May I approach, Judge?

25       THE COURT:  Sure.

Hoskins - recross - Blank Becker                3104

1   A     Thank you.

2           No blood tests were ordered.

3           MS. BLANK BECKER:  May I approach?

4           THE COURT:  That's it.

5           MS. BLANK BECKER:  May I approach and get the forms,

6   please?

7           THE COURT:  Sure.

8           (Continued on following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Hoskins - Recross - Blank Becker                3105

1   RECROSS-EXAMINATION

2   BY MS. BLANK BECKER (Continuing):

3   Q    There were some questions just now, and I initiated some

4   questions regarding the pregnant woman transferring to the

5   child, correct?

6   A    Correct.

7   Q    Isn't it a fact that a pregnant woman could actually

8   knowingly expose their child or newborn to herpes?

9   A    Could you clarify "knowingly"?

10  Q    Sure.

11       The adult -- sometimes the adult, the mother, is

12  going to know that they have herpes, correct?

13  A    Correct.

14  Q    Sometimes when they -- strike that.

15       And when they know that they have herpes and they

16  have a baby, they are, I think you believe -- I believe you

17  said it's like they understand the risk that they might be

18  taking by having a child?

19  A    Well, I would hope they do, but I can't give you a

20  guarantee that every mother understands the risk she's taking

21  by having a child because she has a chronic infection.

22  Q    Understood.  I'm not suggesting you know what they're

23  thinking.

24       But if the individual knows that they have herpes,

25  the mother knows she has herpes, we'll just leave it at that,

1  isn't it true that she is or she can knowingly expose the

2  newborn baby?

3          MS. SHIHATA:  Objection.

4          THE COURT:  Can I see counsel at sidebar for a

5  minute, please?

6

7          (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                                                3107

1         (The following occurred at sidebar.)

2         THE COURT:  Is there some dispute that -- is there

3   a dispute about whether all the people had herpes or not?

4         I'm confused, what's the purpose of this?

5         MS. BLANK BECKER:  The issue is knowingly, because

6   the public health code is knowingly.

7         THE COURT:  Right, but what does that have to do

8   with whether somebody -- is there a pregnant woman here?

9         MS. BLANK BECKER:  No, it's just showing that there

10  are ways that people knowingly know that they can transmit

11  herpes.

12        THE COURT:  Right.

13        MS. BLANK BECKER:  And they're not -- there's no

14  public health code against that, the --

15        THE COURT:  That's a legal question and the jury is

16  not going to be able to decide -- there's not going to be any

17  instruction to the jury about that.

18        The question is with this individual Defendant.  So,

19  the fact that the there may be other people -- I don't know if

20  it's a violation of that code or not, but it might be reckless

21  endangerment, very well may be, but I don't really see the

22  significance of it.  I would like to move things along --

23        MS. BLANK BECKER:  That's my last question.

24        MS. SHIHATA:  The question -- whether some other

25  hypothetical human being could be subject to the legal

Sidebar                                                    3108

1   prohibition is completely irrelevant to this trial and the

2   charges in this trial.

3          THE COURT:  I just don't see the relevance of it.

4   So, if you can, explain it.

5          MS. BLANK BECKER:  Sorry.  One of the elements for

6   the transmission is knowingly transmitting.

7          THE COURT:  Right.  I don't think it's "transmit."

8          MS. SHIHATA:  No, it's the risk.  I've said it a

9   million times.

10         THE COURT:  I know.

11         MS. SHIHATA:  And by the way, unless he is a

12   pregnant man I don't know how this is relevant.

13         MS. BLANK BECKER:  I certainly could laugh with you

14   guys because I understand what you're saying, but the point is

15   not that he's a pregnant man or she is pregnant.  The point is

16   the "knowingly" part.

17         When someone has herpes, a female who is having a

18   baby has herpes and they have the baby, they know they're

19   having a baby who could have this horrible result that she

20   said, right?

21         THE COURT:  But I'm going to stop you here.  I get

22   where you're going here, sort of, except it doesn't -- it

23   doesn't have any relevance.

24         The question for the jury is going to be under these

25   facts whether this Defendant had herpes, which there seems to

Sidebar                                                    3109

1   be serious dispute about that, and whether he subjected

2   someone else to it without informing them.  And the fact that

3   some other hypothetical person could be or not be prosecuted

4   is just irrelevant.  It's not an argument I'd permit anybody

5   to make in summation anyway.

6           MS. BLANK BECKER:  That's my understanding, is that

7   the summation --

8           THE COURT:  Let her finish.

9           MS. SHIHATA:  I'm just shaking my head.  I

10  apologize.

11          MS. BLANK BECKER:  A summation comparison of some

12  sort that we want to make --

13          THE COURT:  I see what you're saying.  But that

14  would be if you're making an argument for selective

15  prosecution.  But you can't do that, at least -- if there's

16  some law that you want to submit that says you can do that,

17  you're welcome to do it.  But I'm pretty sure you can't.

18          It would be like arguing, look, they didn't

19  prosecute this other person for robbing a bank and they're

20  prosecuting my guy.  That's not going to be a permissible

21  argument.  So, if that's the way that we're going, I just

22  think we should move on to something else.

23          MS. BLANK BECKER:  I'm not arguing.

24          THE COURT:  Okay, great.

25          (Continued on the following page.)

LAM        OCR        RPR

A 1034

Proceedings                                          3110

1          (Sidebar ends; in open court.)

2          MS. BLANK BECKER:  Thank you, Judge.

3          Doctor, I don't have any additional questions.

4          Thank you, Judge.

5          THE COURT:  Thank you.

6          Any redirect?

7          MS. SHIHATA:  No, your Honor.

8          THE COURT:  Doctor, thank you so much.  You can step

9    down.

10          (Witness excused.)

11          THE COURT:  Are you ready to call your next witness?

12          MS. GEDDES:  Yes, Judge.  The Government calls

13   Phillip Fanara.

14          THE COURTROOM DEPUTY:  Please raise your right hand

15   for me.

16          Do you solemnly swear or affirm that the testimony

17   you're about to give will be the truth, the whole truth, and

18   nothing but the truth?

19          THE WITNESS:  I do.

20          THE COURTROOM DEPUTY:  Thank you.  You may be

21   seated.

22          THE COURT:  You can also take off your mask.

23          THE WITNESS:  Thank you.

24          THE COURT:  Just a couple of things before we start.

25          Please make sure that you're speaking into the

Copeland - Direct - Geddes                    3131

1  **DIANA COPELAND**,

2              called by the Government, having been

3              first duly sworn, was examined and testified

4              as follows:

5  DIRECT EXAMINATION

6  BY MS. GEDDES:

7  Q    Are you currently employed?

8  A    Yes.

9              THE COURT:  Is the microphone on?

10              THE COURTROOM DEPUTY:  I think it's just not close

11  enough.

12              (Pause in proceedings.)

13  Q    What do you do?

14  A    I am not employed, I am actually -- I'm a writer and a

15  filmmaker.

16  Q    And were you previously employed?

17  A    Yes.

18  Q    And just to be clear, when you said you were employed, do

19  you have a business right now?

20  A    Yes, I have a film company.

21              THE COURT:  I'm having trouble hearing you, which

22  may be my problem, but I'll ask you just to speak up just a

23  little bit into the microphone.

24              THE WITNESS:  Okay.

25  Q    How were you previously employed?

Copeland - Direct - Geddes                    3132

1  A    I was previously employed as executive assistant to
2  R. Kelly.
3  Q    And do you see him in the courtroom today?
4  A    Yes, I do.
5  Q    Can you point to him and describe an article of his
6  clothing?
7  A    He's right there and he has a gray suit jacket on.
8            THE COURT:  Indicating the Defendant.
9  Q    Now, when did you start working for the Defendant?
10 A    Around 2004, 2005.
11 Q    And how long did you work for him?
12 A    About 15 years on and off.
13 Q    Fifteen years, is that correct?
14 A    Yes, on and off.
15 Q    And you testified that you worked "on and off" during
16 that 15 year period.
17          As you sit here today, do you remember the
18 particular dates of your stints working for the Defendant?
19 A    Just a little.
20 Q    Do you remember the exact dates of when you worked for
21 the Defendant?
22 A    Not the exact dates, no.
23 Q    When was the last stint or period of time that you worked
24 continuously for the Defendant?
25 A    That would be the end of 2016 to 2018.

Copeland - Direct - Geddes                3133

1   Q    Okay.  And do you remember when in 2018 you stopped

2   working for him?

3   A    It was around April.

4   Q    Of 2018?

5   A    Correct.

6

7              (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Copeland - direct - Geddes                    3134

1    DIRECT EXAMINATION (Continued.)
2    BY MS. GEDDES:
3    Q    Of 2018?
4    A    Correct.
5    Q    Now you testified that you were his executive assistant,
6    was that your title for him?
7    A    Yes.
8    Q    And were you always -- did you always have the title
9    executive assistant during the 15 years that you worked for
10   the defendant?
11   A    No.  It was personal assistant and then it changed.
12   Q    To an executive assistant?
13   A    Yes.
14   Q    When you first started working for the defendant, in what
15   state did you live?
16   A    Michigan.
17   Q    And where in -- what state did the defendant live?
18   A    Illinois.
19   Q    How were you able to work for the defendant living in a
20   different city?
21   A    So I would commute from Michigan to Chicago every week.
22   Q    And during the time period that you were in Chicago
23   working for the defendant in a particular week, where were you
24   staying?
25   A    I'm sorry, can you repeat.

Copeland - direct - Geddes                3135

1      THE COURT:  Just where did you stay when you came to

2  Chicago to work?

3      THE WITNESS:  Oh, I would stay at the estate.

4  Q    And where was that estate?

5  A    At Robert's estate.

6  Q    Where was it?

7  A    It was in Olympia Fields.

8  Q    Is that in Chicago?

9  A    Correct.

10  Q   When you first started to work for the defendant as his

11  personal assistant, what were your responsibilities?

12  A   Um, my responsibilities were more so household

13  responsibilities.  Making sure that, you know, the maids,

14  housekeepers and nannies were scheduled correctly and that

15  they were paid.

16  Q   And you mentioned a nanny, was there a period of time

17  that you worked for the defendant where there were children

18  living at the estate?

19  A   Yes.

20  Q   And how long was that for?

21  A   That probably was about two years into my employment.

22  Q   And was that the first two years that you worked for the

23  defendant?

24  A   Correct.

25  Q   Then after that two-year period, were there no longer

Copeland - direct - Geddes                    3136

1  children living in a permanent basis in the defendant's

2  estate?

3  A    Correct.

4  Q    What other responsibilities did you have over the course

5  of your 15-year employment for the defendant?

6  A    Later responsibilities would include just, you know,

7  answering calls when someone was trying to reach him, making

8  sure that he, you know, made certain meetings on time or

9  was -- woke up in time to do like radio drops or something

10 like that.

11 Q    And did you also handle aspects of the defendant's

12 personal life?

13 A    Absolutely.

14 Q    Like what?

15 A    If there were guests I made sure that they felt

16 comfortable.

17 Q    When you refer to guests, what type of guests are you

18 referring to?

19 A    It could be anybody from a record label executive to a

20 personal guest.

21 Q    And who are the individuals who were personal guests of

22 the defendant, just generally speaking who are we referring

23 to?

24 A    Well, we're referring to -- well, he had male guests and

25 female guests.

Copeland - direct - Geddes                    3137

1   Q    Were these girlfriends of the defendant's?

2   A    The female guests, yes.

3   Q    And now you testified that you worked as a personal

4   assistant and an executive assistant for the defendant, did

5   the defendant employ other people in other capacities?

6   A    Yes.

7   Q    And I'm going to show you what's in evidence as

8   Government Exhibit 12.  Do you recognize that individual?

9   A    Yes, I do.

10  Q    What, if anything, did he do for the defendant?

11  A    He was an accountant and also seemed to serve as a

12  manager.

13  Q    I should have asked you initially, who is that?

14  A    Derrel McDavid.

15  Q    And over what period of time did Derrel McDavid serve as

16  the defendant's accountant and partially his manager as well?

17  A    I'm not sure when he left, but my best guess is 2013.

18  Q    And was Mr. McDavid working for the defendant when you

19  started to work for him in 2004 or 2005?

20  A    Correct.

21  Q    I'm showing what's in evidence as Government Exhibit 3,

22  do you recognize who that is?

23  A    Yes, I do.

24  Q    Who is that?

25  A    June Brown.

Copeland - direct - Geddes                3138

1   Q    And what did, if anything, did June Brown do for the
2   defendant?
3   A    June Brown was a personal assistant.
4   Q    And over what period of time?
5   A    At least the entire period of time that I worked there.
6   Q    So he was there when you started and when you left?
7   A    Correct.
8   Q    I'm showing Government Exhibit 4, which is in evidence.
9   A    This is --
10  Q    Who is that?
11  A    June Bug.  I'm sorry, George Kelly.
12  Q    Does George Kelly have a nickname?
13  A    June Bug.
14  Q    What, if anything, did George Kelly, also known as June
15  Bug, do for the defendant?
16  A    He was also a personal assistant.
17  Q    Over what period of time?
18  A    On and off the entire time that I worked there as well.
19  Q    But like you he worked on during some of that time and
20  did not work for the defendant at other parts of that time; is
21  that correct?
22  A    Correct.
23  Q    I'm showing what's in evidence as Government Exhibit 5 do
24  you recognize who that is?
25  A    I do.

Copeland - direct - Geddes                    3139

1   Q    Who is that?

2   A    Van Pullen.

3   Q    What, if anything, did he do for the defendant?

4   A    He was also a personal assistant.

5             THE COURT:  I'm going to ask again, I hate to be a

6   nag, I'm having a little trouble hearing you.  Sometimes that

7   works if you just actually hold the microphone.

8             THE WITNESS:  Okay.

9             THE COURT:  Take it out of that and just hold it in

10  your hand.  This might be better, then I don't have to keep

11  annoying you.  Go ahead.

12  BY MS. GEDDES:

13  Q    I'm sorry, did you say who this individual was?

14  A    Van Pullen.

15  Q    What, if anything, did Van Pullen do for the defendant?

16  A    He was a personal assistant.

17  Q    Over what period of time?

18  A    I believe he came later, like sometime in, I really don't

19  know just a few years.  I remember seeing him just maybe a

20  couple of years or...

21  Q    Do you remember whether that was in the beginning, the

22  middle, or the end period of when you worked for the

23  defendant?

24  A    The end period.

25  Q    Was he still there when you left in April of 2018?

Copeland - direct - Geddes                    3140

1   A    I can't say one way or another, I don't know.

2   Q    Was he there for at least a portion of your last stint

3   that you worked for the defendant?

4   A    I'm not sure if he was there at that period of time,

5   sorry.

6   Q    Okay.  Government Exhibit 22, which is in evidence, do

7   you recognize that individual?

8   A    I do.

9   Q    Who is that?

10  A    This is Candy.

11  Q    And what, if anything, did Candy do for the defendant?

12  A    She was a security.

13  Q    Over what period of time?

14  A    Well, she worked in and out the entire time that I worked

15  there, on and off.

16  Q    And do you know Candy's full name?

17  A    I think it is Cynthia Oliphant.

18  Q    Is Candy a nickname?

19  A    Yes, it is.

20  Q    I'm showing what's in evidence as Government Exhibit 16.

21  Let me make sure it's in evidence.  It is.

22         I'm showing what's in evidence as Government

23  Exhibit 16, do you recognize that individual?

24  A    I do.

25  Q    Who is that?

Copeland - direct - Geddes                    3141

1   A    This is the bus driver.

2   Q    Do you know his name?

3   A    I can't remember his name.

4   Q    And over what period of time was this individual a bus

5   driver for the defendant?

6   A    I don't remember the period of time either.

7   Q    Okay.  I'm showing Government Exhibit 15 which is also in

8   evidence.  Do you recognize that individual?

9   A    This is a bus driver as well.

10  Q    And do you know his name?

11  A    His name is Terry.

12  Q    And over what period of time did Terry work for the

13  defendant?

14  A    I don't recall the time period.

15  Q    Okay.  I'm showing Government Exhibit 19, which is in

16  evidence.  Do you recognize that individual?

17  A    This is Ronald Hardy.

18  Q    And what, if anything, did he do for the defendant?

19  A    He was security.

20  Q    Over what period of time?

21  A    On and off the entire time I was there, yeah.

22  Q    And Government Exhibit 17, which is also in evidence, do

23  you recognize that individual?

24  A    I only know him by his nickname.

25  Q    Which is?

Copeland - direct - Geddes                    3142

1   A    Top Gun.

2   Q    What, if anything, did Top Gun do for the defendant?

3   A    He was a bus driver.

4   Q    Do you know over what period of time he served as a bus

5   driver for the defendant?

6   A    I do not.

7   Q    And I'm showing you the witness only what's been marked

8   for identification as Government Exhibit 13.

9            Do you recognize Government Exhibit 13?

10  A    I do.

11  Q    Who is that?

12  A    James Mason.

13  Q    What, if anything, did James Mason do for the defendant?

14  A    He was his manager.

15           MS. GEDDES:  The government offers Government

16  Exhibit 13.

17           MR. CANNICK:  No objection.

18           THE COURT:  It's in evidence.

19           (Government Exhibit 13, was received in evidence.)

20  Q    Over what period of time did James Mason serve as the

21  defendant's manager?

22  A    The last stint of my employment, that would have been

23  like 2016 to 2018.

24  Q    And was James Mason still working for the defendant when

25  you stopped working for him in April of 2018?

Copeland - direct - Geddes                     3143

1   A    Yes.

2   Q    Now when you started to work for the defendant, where did

3   the defendant live?

4   A    Olympia Fields.

5   Q    At the estate you testified you stayed at?

6   A    Correct.

7   Q    Did he stay at Olympia Fields through the time period

8   that you worked for him?

9   A    Yes, he did.

10  Q    Did he continue to stay there or did there come a time

11  when the defendant moved out of Olympia Fields?

12  A    There came a time when he moved out.

13  Q    Where did he live after that?

14  A    Trump Towers.

15  Q    In Chicago?

16  A    In Chicago.

17  Q    Are there any other locations where the defendant at

18  times lived while you were working for him?

19  A    There were two homes in Johns Creek, Georgia.

20  Q    Is that a suburb of Atlanta?

21  A    Correct.

22  Q    Do you remember what time period the defendant was using

23  those two homes in Johns Creek?

24  A    Somewhere around 2000 -- at least 2016 to 2018.  I am not

25  sure when he initially moved in there.

Copeland - direct - Geddes                    3144

1   Q    Now where was the defendant's recording studio when you

2   first started to work for him?

3   A    In the basement -- oh, no, it was Trax, so it was in

4   Chicago.

5   Q    And you started to talk about a different recording

6   studio, what recording studio did the defendant use after the

7   recording studio at Trax?

8   A    That would have been the one that's in the basement --

9   was in the basement of the Olympia Fields home.

10  Q    What other recording studios, if any, did the defendant

11  use after he moved out of his residence at Olympia Fields?

12  A    There was a studio on Ohio Street in Chicago and then

13  there was another one on Justine in Chicago.

14  Q    And which one did the defendant use first, which studio?

15  A    The one on Ohio.

16  Q    And are both of those located in downtown Chicago?

17  A    Correct.

18  Q    While you were working for the defendant and when the

19  defendant was not on tour, what was your schedule?

20  A    My schedule was like Sunday to Thursday.  It was just

21  really just four days a week and it didn't matter which four,

22  but mostly Sunday to Thursday.

23  Q    And during that four-day period when you were scheduled

24  to work for the defendant, what hours did you work?

25  A    They were like 24-hour shifts.

Copeland - direct - Geddes                                    3145

1  Q    So fair to say you were on call for that entire four-day
2  period?
3  A    Yes, just on call.
4  Q    When you were staying at Olympia Fields while you were on
5  call for that four-day period and after the defendant's
6  children moved out of Olympia Fields, who, if anyone, else
7  stayed at that residence?
8  A    Various women.
9  Q    And where did those females stay, where within Olympia
10 Fields?
11 A    Um, in the office maybe, the studio, maybe on the tour
12 bus, the theater downstairs.
13 Q    Fair to say they stayed in a number of locations within
14 Olympia Fields?
15 A    Correct.
16 Q    And were those individuals effectively living there?
17 A    Sometimes.
18 Q    Now were there also female guests who visited the
19 defendant at Olympia Fields but didn't stay there on a longer
20 term basis?
21 A    Correct.
22 Q    What, if anything, did you notice about the defendant's
23 female guests and his live-in girlfriends' movement around the
24 residence in Olympia Fields?
25 A    They were not free to roam the house.

Copeland - direct - Geddes                          3146

1   Q    Now did you roam Olympia Fields while you were working

2   there?

3   A    I did.

4   Q    And what, if anything, would you do when you walked

5   through the residence at Olympia Fields to announce your

6   presence?

7   A    I would knock.

8   Q    And what do you mean?

9   A    If I was going from one room to another, I might knock on

10  the wall.

11  Q    To announce your presence?

12  A    Correct.

13  Q    Now while you were living or staying, I should say, while

14  you were staying at Olympia Fields, what, if anything, did you

15  notice about the way in which the defendant's live-in

16  girlfriends dressed around the house?

17  A    They dressed casually like, you know, loose-fitting

18  clothing.

19  Q    Just backing up one moment.  You testified that you would

20  knock on a wall before entering a room; is that correct?

21  A    That is correct.

22  Q    Why would you do that?

23  A    To make sure that I announced my presence.

24  Q    So the defendant knew that you were entering the room?

25  A    Correct.

Copeland - direct - Geddes                                    3147

1   Q    You just mentioned -- you just testified that the
2   defendant's live-in girlfriends dressed in, I think
3   loose-fitting clothing while they were in Olympia Fields; is
4   that correct?
5   A    Correct.
6   Q    How about when those same live-in girlfriends went out in
7   public, what, if anything, did you notice about the way in
8   which they dressed when out in public?
9   A    When out in public?  They would sometimes wear the same
10  clothing.
11  Q    The same loose-fitting clothing?
12  A    Correct.
13  Q    When the defendant moved out of his residence at Olympia
14  Fields, where did those females who were effectively living
15  with the defendant, where did they go at that time?
16  A    Can you repeat that please.
17  Q    Sure.  When the defendant moved out of his residence in
18  Olympia Fields, and I think you testified that at least at one
19  point he moved into the Trump Towers, where, if anywhere, were
20  his live-in girlfriends staying at that time?
21  A    When he moved to the Trump?
22  Q    Yes.
23  A    Live-in girlfriends might be at the Trump, they might be
24  at the studio.
25  Q    And when you referring to the studio, you're referring to

Copeland - direct - Geddes                                    3148

1  the studio on Ohio Street?

2  A    Correct.

3  Q    And when the defendant was no longer using the studio on

4  Ohio Street were there also some females who stayed at the

5  studio on Justine Street?

6  A    Correct.

7  Q    What, if anything, did you notice about those females'

8  movements around those two studios when you were there?

9  A    It was pretty much the same, they didn't roam.

10 Q    They did not roam throughout the studio?

11 A    They did not roam.

12 Q    Where would they stay?

13 A    Depending on which studio, the one on Ohio, I think they

14 would either be in the actual control room with him, or they

15 would be in like another room, it's kind of like a lobby.

16 Q    Where they would stay?

17 A    Correct.

18 Q    Now as part of your working for the defendant, did you on

19 occasions arrange for local transportation for the defendant's

20 female guests or live-in girlfriends?

21 A    Correct.

22 Q    What, if anything, did the defendant or his guests

23 request regarding the transportation?

24 A    Female drivers.

25 Q    And when you were arranging local transportation, how

Copeland - direct - Geddes                          3149

1    would you arrange that transportation?

2    A    I would -- well, it would be Ubers, so --

3    Q    And was there a mechanism in arranging an Uber to ensure

4    that there was a female driver?

5    A    No, there wasn't.

6    Q    What, if anything, did the defendant -- did you advise

7    the defendant of that?

8    A    I -- I don't know if I advised him, but I think he

9    noticed that the male drivers would show up.

10   Q    And were you -- did you learn what, if anything, the

11   defendant did when a male driver showed up in an Uber that you

12   had arranged?

13   A    I would have to call another one.

14   Q    And how did you know you needed to call another one?

15   A    He would ask me to.

16   Q    And on occasion did you call multiple Ubers in order to

17   obtain a female driver?

18   A    I did.  He did eventually realize that you can't pick the

19   gender of the driver, so he didn't ask any more.

20   Q    And earlier I asked you about the defendant's female

21   guests and live-in girlfriends' movements around the studios

22   where they later stayed.  I want to focus on when those

23   individuals were staying at Justine Street --

24   A    Okay.

25   Q    -- the studio on Justine Street.

Copeland - direct - Geddes                    3150

1    Where, if anywhere, would those individuals stay

2    when the defendant had the studio on Justine Street?

3    A    For the most part there were bedrooms upstairs, so they

4    would be up there, and there was also on the main floor like a

5    kitchen, lounge area, or they might be in the control room in

6    the studio with him.

7    Q    And as you testified earlier, was it the case that they

8    would stay in one of those particular locations?

9    A    Like in their room.

10   Q    They would remain in their room, correct?

11   A    Right.

12   Q    Would you on occasion accompany some of the defendant's

13   female guests or live-in girlfriends on public outings?

14   A    Yes.

15   Q    Can you give some examples of where you might accompany

16   these individuals.

17   A    Sure.  I accompanied them to shopping, to get massages,

18   to get their nails done, things of that nature.

19   Q    And before I ask my next question I want to show you

20   what's in evidence as Government Exhibit 75C.

21        Now, without saying the first or last name of this

22   individual, do you recognize her?

23   A    I do.

24   Q    And again, without saying it, do you know her first and

25   last name?

Copeland - direct - Geddes                    3151

1   A    I do.

2   Q    For today's purpose we're just going to refer to her as

3   Jane, okay?

4   A    Okay.

5   Q    Now was Jane one of the defendant's live-in girlfriends

6   for a period of time?

7   A    Yes, she was.

8   Q    And I'm showing you what's in evidence as Government

9   Exhibit 78.  Again, without saying her first and last name, do

10  you recognize this individual?

11  A    I do.

12  Q    And what is her first name?

13  A    Joycelyn.

14  Q    And was Joycelyn one of the individuals who lived with

15  the defendant for a period of time?

16  A    Correct.

17              (Continued on the next page.)

18

19

20

21

22

23

24

25

Copeland - direct - Geddes                    3152

1   DIRECT EXAMINATION
2   BY MS. GEDDES:  (Continuing)
3   Q    I'm showing you -- I am going to show you what's in
4   evidence as Government Exhibit 69 B, and again, without saying
5   her first and last name, do you recognize the individual shown
6   in Government Exhibit 69 B?
7   A    I do.
8   Q    And what is her first name?
9   A    Dominique.
10  Q    And was she also one of the defendant's live-in
11  girlfriends for a period of time?
12  A    Yes, she was.
13  Q    And I am going to show you what's in evidence as
14  Government Exhibit 52.  Again, without saying her first and
15  last name, do you recognize this individual?
16  A    I do.
17       MS. GEDDES:  I'm sorry, well, the Government offers
18  Government Exhibit 52.
19       MR. CANNICK:  No objection.
20       MS. GEDDES:  I apologize.
21       THE COURT:  That's all right.  That's in evidence.
22       (Government's Exhibit 52 received in evidence.)
23  Q    What is this individual's nickname?
24  A    Juice.
25  Q    And was Juice one of the defendant's live-in girlfriends

Copeland - direct - Geddes                3153

1  for a period of time?

2  A    Yes, she was.

3  Q    And referring to Jane, Joycelyn, Dominique and Juice,

4  were they spending time with the defendant during your last

5  stint working for him between 2016 and 2018?

6  A    Yes.

7  Q    All right.  I want to go back to my question earlier

8  about when you would accompany those individuals and I want to

9  refer specifically to those four individuals that I just

10 mentioned:  Jane, Joycelyn, Dominique and Juice.

11        What, if anything, did you notice about the manner

12 in which they interacted with men other than the defendant?

13 A    They did not want to interact with the men.

14 Q    And what, if anything, did you observe when you

15 accompanied some of those individuals on public outings?

16 A    They would not interact with men.

17 Q    Can you describe an example?

18 A    An example is if we walked in a shoe store and the

19 salesman was a male, they would ask, can I help you directly

20 to that individual?  And they would turn away.

21 Q    And just to be clear, the person asking can I help you,

22 was that the male salesperson?

23 A    Correct.

24 Q    And the "they" in your sentence who turned away, are you

25 referring to some of the defendant's live-in girlfriends?

Copeland - direct - Geddes                    3154

1   A    Yes.

2   Q    What, if anything, might they ask you in that particular

3   instance?  Or what would you do in that instance?

4   A    Oh, they would ask me to interact with that salesperson

5   and I would do that.

6   Q    And were you also present with some of the defendant's

7   live-in girlfriends where a female salesperson walked over and

8   offered to help them?

9   A    Yes.

10  Q    How, if at all, did they respond in that scenario?

11  A    They would interact with that person.

12  Q    Without any intervention by you?

13  A    No.

14  Q    Meaning you didn't do anything, they just interacted on

15  their own; correct?

16  A    Correct.

17  Q    Did you have occasion to ride elevators in public spaces

18  with some of the defendant's live-in girlfriends?

19  A    I did.

20  Q    What, if anything, did you notice about the way in which

21  some of his live-in girlfriends rode on elevators?

22  A    I did notice one particular time when I was in the

23  elevator with Joycelyn.  She turned away and I stepped off the

24  elevator, and she did not see me step off because she was

25  turned away.  I think she was turned away because a gentleman

Copeland - direct - Geddes                    3155

1  had gotten on the elevator.  So she ended up being left on the

2  elevator because she didn't see me get off.

3  Q    And do you remember where you were when that happened?

4  A    We were at a hotel, but I don't know which one.

5  Q    And why were you on the elevator with Joycelyn in the

6  first place?

7  A    I was walking her to her room.

8  Q    What did you hear the defendant's female guests or

9  live-in girlfriends call the defendant in the defendant's

10 presence?

11 A    Daddy.

12 Q    How did they refer to the defendant to you when the

13 defendant was not around?

14 A    Mr. Kelly.

15 Q    What, if anything, did you observe about what, if

16 anything, the women would do when the defendant walked into a

17 room where the defendant's live-in girlfriends were?

18 A    I'm sorry, can you repeat that?

19 Q    It was a terrible question.

20       Did you have occasion to see what, if anything, the

21 defendant's live-in girlfriends did when the defendant entered

22 a room where they were?

23 A    Yes.

24 Q    What --

25 A    They would jump up and give him a big kiss.

Copeland - direct - Geddes                    3156

1  Q    And would all of them do that?

2  A    Yes.

3  Q    Did you spend time with the defendant's female guests or

4  live-in girlfriends on the Sprinter van?

5  A    I have, yes.

6  Q    Under what circumstances would you spend time with those

7  individuals on the Sprinter van?

8  A    We may ride with him to an important meeting and if this

9  was not a meeting that I was going into, I would sit in the

10 Sprinter with his guest and we would be there.

11 Q    And just to be clear, the "him" in that sentence, is that

12 referring to the defendant?

13 A    Yes.

14 Q    Now, in that scenario that you just described, what, if

15 anything -- what would you do if you needed to use a restroom

16 and were on the Sprinter van waiting?

17 A    I would get off the Sprinter and use it.

18 Q    Find a bathroom and use it?

19 A    Yes.

20 Q    What, if anything, did you observe the defendant's female

21 guests or live-in girlfriends do in that scenario if they

22 needed to use a bathroom?

23 A    They would ask me to get ahold of him.

24 Q    And what, if anything, would you do when you received

25 those requests?

Copeland - direct - Geddes                    3157

1   A    I would get ahold of him.

2   Q    And were there -- and what would you do once you got

3   ahold of them?

4   A    Just let him know that his guests needed to use the

5   restroom.

6   Q    What would happen after that?

7   A    He would just say okay and I'd take them to the restroom,

8   I'd accompany them.

9   Q    And, again, just to be clear, the "him" is referring to

10  the defendant?

11  A    Yes.

12  Q    Were there times in which you were not able to

13  immediately get ahold of the defendant?

14  A    Yeah, there have been times.

15  Q    And what would happen in those circumstances?

16  A    Well, the one that comes to mind --

17  Q    And please don't use any names.

18  A    Okay, I will not.

19       She was insistent on me getting ahold of him before

20  she went.  She ended up just having to hold it for maybe like

21  30 minutes.  He was working out in Lifetime Fitness and he

22  didn't have his phones on him, so.

23  Q    Was the Sprinter van parked outside the Lifetime Fitness?

24  A    Yes.

25  Q    I am going to show you what's in evidence as Government

Copeland - direct - Geddes                    3158

1   Exhibit 76.  And, again, without identifying this individual,

2   do you recognize who that is?

3   A    I do.

4   Q    And was that the individual you were just referring to

5   who needed to use the restroom and didn't use it, waited

6   instead?

7   A    Correct.

8   Q    And during the period of time when that individual was

9   waiting to use or you were trying to get in contact with the

10  defendant, did it appear like she needed to use the bathroom

11  badly?

12            MR. CANNICK:  Objection.

13            THE COURT:  Sustained.

14  Q    During that time period when you were trying to get ahold

15  of the defendant to let him know that that particular

16  individual needed to use the restroom, what, if anything, did

17  you notice about her actions?

18  A    She really had to go.

19  Q    To the bathroom?

20  A    Yes.

21  Q    Was one of your responsibilities as the defendant's

22  personal assistant or executive assistant to arrange travel

23  for some of the defendant's female guests?

24  A    Correct.

25  Q    By the way, going back to what I was just asking you

1  about that particular scenario where one of -- someone needed

2  to use the restroom, you said that it took about 30 minutes.

3  What happened after that 30 minutes?

4  A    He came to the Sprinter.

5  Q    And what happened at that point?

6  A    And she went to the restroom.

7  Q    Over what period of time did you make travel arrangements

8  for the defendant's female guests?

9  A    That started in about 2016.  So the last stint, maybe a

10 little bit before that, I can't remember.

11 Q    And what, if any, instructions did the defendant give you

12 regarding making travel reservations?

13 A    I -- can you clarify?

14 Q    Sure.  How would you know to make travel arrangements for

15 a particular individual?

16 A    Oh, he would let me know that someone was going to be

17 calling me, or I'm sorry, texting me about visiting.

18 Q    And what would you do upon receiving those text messages?

19 A    I would, you know, get the information, and make the

20 travel arrangements and send the travel arrangements to the

21 guest.

22 Q    And were there times where you received text messages

23 from individuals that you hadn't previously discussed with the

24 defendant?

25 A    Didn't happen often, but rarely.  And when it did, I

Copeland - direct - Geddes                                    3160

1    would just make sure I confirmed it with him.

2    Q    And who were you making these travel arrangements for?

3    A    Well, I made travel arrangements for everybody from

4    record executives to just personal guests.

5    Q    Okay.  And did those personal guests include his female

6    guests?

7    A    Correct.

8    Q    When you made travel reservations, did that also include

9    hotel reservations?

10   A    Sometimes.

11   Q    Whose name would you book hotel reservations under when

12   you were making arrangements for one of his female guests?

13   A    Sometimes my name, sometimes their name.

14   Q    And did you also arrange for hotel reservations for the

15   defendant?

16   A    Yes.

17   Q    And under whose name would you make hotel reservations

18   when you were making arrangements for the defendant?

19   A    Sometimes my name.  Sometimes a fictitious name because

20   he's a celebrity.

21   Q    Do you remember the particular fictitious name that you

22   used?

23   A    I do not.

24   Q    Okay.  Did you sometimes make reservations for a George

25   Kelly?

Copeland - direct - Geddes                    3161

1   A    Yes.

2   Q    Who is George Kelly?

3   A    The personal assistant.

4   Q    And does he have a nickname?

5   A    June Bug.

6   Q    Did you sometimes use the name George Kelly for the

7   defendant's reservations?

8   A    Yes.

9   Q    I want to go back to the individual shown in Government

10  Exhibit 76.

11         MS. GEDDES:  I'm putting Government Exhibit 76,

12  which is in evidence, on the screen.

13         (Exhibit published.)

14  Q    I should have asked you and I did not.  Without saying

15  it, do you know this individual's first and last name?

16  A    I do.

17  Q    For today's purpose, let's call her Anna.

18  A    Okay.

19  Q    What was Anna's relationship with the defendant?

20  A    She was his girlfriend.

21  Q    Over what time period do you recall this individual being

22  one of the defendant's girlfriends?

23  A    Before I came back, I believe that's when they started

24  the relationship.  So it had to have been like maybe 2016 to

25  2018.

Copeland - direct - Geddes                3162

1   Q    So when you say before you came back, when you started

2   working that last stint for the defendant, was she already one

3   of the defendant's girlfriends at that time?

4   A    Correct.

5   Q    Now, did there come a time when Anna left the defendant

6   while you were working for the defendant?

7   A    Yes.

8   Q    Where were you at that time?

9   A    She left many times.

10  Q    Was there a particular time when you were in the same

11  location at the time that she physically left?

12  A    Yes.

13  Q    Where were you at that particular time?

14  A    Atlanta.

15  Q    Where was the defendant at that time?

16  A    He had left to go to a -- perform at a concert.

17  Q    And do you remember where that concert was?

18  A    I do not.

19  Q    All right.  But you were with Anna and not -- you were

20  physically with Anna and not with the defendant at that time;

21  is that correct?

22  A    That is correct.

23  Q    What happened -- what do you recall happening on that

24  particular occasion when Anna left?

25  A    I remember her being really angry.  I think they had just

Copeland - direct - Geddes                                3163

1   had like an argument before he left, and she was really angry.

2   She was packing her things and she left.

3   Q   And who, if anyone else, was present when she left?

4   A   I think I was the only one actually present, but in the

5   home was also LeLe.

6   Q   And what home was it where you were when she left that

7   day?

8   A   It was the smaller home.  There was two homes in Atlanta

9   -- in Johns Creek, Georgia and this was the smaller home.

10  Q   All right.  And you mentioned that LeLe was also at the

11  house that day; is that correct?

12  A   Correct.

13  Q   Do you know LeLe's full name?

14  A   Alicia Evan.

15  Q   And I'm going to show you what's in evidence as

16  Government Exhibit 42.  Do you recognize what's in evidence as

17  Government Exhibit 42 two?

18  A   I do.

19  Q   What is that?

20  A   LeLe.

21  Q   That was the individual who was present that day?

22  A   Correct.

23  Q   Did there come a time when you spoke with the defendant

24  about Anna leaving that day?

25  A   Yes.

Copeland - direct - Geddes                    3164

1  Q    Where did that conversation take place?

2  A    It took place at a park near the studio.

3  Q    In what city?

4  A    In Chicago.

5  Q    And approximately how long after Anna's leaving did that

6  conversation occur?

7  A    Maybe a few days.

8  Q    What, if anything, did the defendant say to you?

9  A    Well, someone had contacted him, another coworker

10  contacted him and said that I let Anna escape, and, so, he

11  asked me about that.

12  Q    What did the defendant ask you?

13  A    He just told me that this person told him that I let Anna

14  escape.

15  Q    How did you respond?

16  A    I was really upset because there were like these rumors

17  swirling in the media and, you know, I didn't like the words

18  that that person had used to tell him that.

19  Q    Now, who used the term "escape" during your conversation

20  with the defendant?

21  A    The defendant.

22  Q    And how did you respond when he -- how did he -- what was

23  his demeanor when he was having this conversation with you?

24  A    He was disappointed in me.

25  Q    And what did he say?

Copeland - direct - Geddes                    3165

1    A    Well, he said that if I -- that I should just let LeLe

2    handle it.

3    Q    Referring to Alicia Evan?

4    A    Correct.

5    Q    Who was also in the house that day?

6    A    Correct.

7    Q    What did you understand him to mean when he said you

8    should have left LeLe handle it?

9    A    Probably just that I am a little bit more --

10            MR. CANNICK:  Your Honor, I'm going to object to the

11   "probably."

12            THE COURT:  I will sustain it as to that.

13   Q    What did you understand -- if you know, what did you

14   understand the defendant to mean when he said that he should

15   have let LeLe handle it?

16   A    I really would be just guessing on that.  I don't know.

17   Q    Okay.  Well, what had you done?

18   A    Nothing.

19   Q    You had let Anna leave?

20   A    Yes.

21            MR. CANNICK:  Objection.

22            THE COURT:  Well, overruled.

23            Is that what happened?  Is that what happened, that

24   she left?

25            THE WITNESS:  Anna.

Copeland - direct - Geddes                    3166

1        THE COURT:  And you didn't keep her from going;
2   correct?
3        THE WITNESS:  Correct.
4        THE COURT:  All right.  Next question.
5   Q    What, if anything --  well, withdrawn.
6        Switching gears, what, if anything, did you see the
7   defendant carrying on a regular basis?
8   A    A backpack.
9   Q    Did he carry it or did others carry it on his behalf?
10  A    Sometimes he carried it, sometimes other people carried
11  it.
12  Q    Can you describe -- well, let me -- during the 15 years
13  that you worked for the defendant, did the defendant have one
14  backpack or multiple backpacks?
15  A    Multiple.
16  Q    And what, if anything -- can you describe the different
17  backpacks?  I don't mean one by one, but what characteristics
18  did you observe about the backpacks?
19  A    They were always designer backpacks, Gucci, Louis
20  Vuitton.
21  Q    Who, if anyone, other than the defendant, would carry the
22  defendant's backpack?
23  A    Any of his male personal assistants would carry the
24  backpack.
25  Q    And did you ever have an occasion to see what was inside

Copeland - direct - Geddes                    3167

1  the defendant's backpack?

2  A    I never went through his backpack, but I did see like an

3  iPad one time.

4  Q    How did you see the iPad?

5  A    It was kind of like just sticking out.

6  Q    Of the backpack?

7  A    Correct.

8  Q    Fair to say there might have been other things in the

9  backpack at that same time that you just didn't see?

10  A    Yes.

11  Q    Now, during the 15 years on and off that you worked for

12  the defendant, how were you paid?  Were you a salary -- did

13  you have a salary or were you paid on an hourly basis?

14  A    Salary.

15  Q    As an employee of the defendant, were you always paid for

16  the work that you performed?

17  A    No.

18  Q    When were you not paid?

19  A    When I was fined.

20  Q    What do you mean by fined?

21  A    A fine is basically like if you don't do your job

22  correctly, you get fined.

23  Q    Who used the term fine?

24  A    Robert.

25  Q    And approximately how many times were you fined while you

Copeland - direct - Geddes                    3168

1    were working for the defendant?

2    A    I do not know.  Several times.

3    Q    Can you recall some of the reasons for which you were

4    told that you had been fined?

5    A    Well, one time would have been when I was trying to

6    search for this really rare puppy and I could not find this

7    puppy.

8    Q    Did you tell the defendant that?

9    A    Well, it took a really long time, so he did notice, and

10   yeah.  So that was one time.

11   Q    And what happened?

12   A    I was fined.

13   Q    Prior to being fined, did you inform the defendant that

14   you were having trouble finding this puppy?

15   A    Yes.

16   Q    Are there other occasions that you recall -- by the way,

17   who were you finding a puppy for?

18   A    Robert.

19   Q    Were there other occasions that you were fined that you

20   recall the purported reasons for being fined?

21   A    Another time was when I made a nail appointment and there

22   was a male at the nail salon.

23   Q    Who did you make a nail appointment for?

24   A    One of his guests.

25   Q    One of his female guests?

Copeland - direct - Geddes                    3169

1   A    Well, actually three of his guests.

2   Q    And referring -- using the names that we previously used,

3   can you -- do you remember which guest it was that you made a

4   nail appointment for?

5   A    Yes.

6   Q    Who was it?

7   A    Jane, Joycelyn, and Dominique.

8   Q    And now, were you present for --

9   A    I think it was just Jane and Joycelyn.  I don't think

10  Dominique.

11  Q    Okay.  Were you present for when Jane and Joycelyn

12  arrived at the nail salon?

13  A    I was not.

14  Q    How did you hear that you had been fined as a result of a

15  male being there?

16  A    When I got fined, that's how I found out.

17  Q    What were you told?

18  A    That I was fined because the appointment that I made that

19  was -- that should have been a female only did have a male

20  working there.

21  Q    And when you say that there had been -- what did you

22  understand the defendant wanted you to do in making nail

23  appointments?

24  A    Just to make sure that there were -- it was all-female

25  establishment.

Copeland - direct - Geddes                          3170

1  Q    And when you say all female, does that mean there

2  couldn't even be like a male janitor in the location?

3  A    Correct.  Correct.

4  Q    Who told you that you had been fined?

5  A    I believe it was the accounting person.

6  Q    Who was the accounting person at that time?

7  A    Joan Sullivan.

8         MS. GEDDES:  I am going to show the witness only

9  what has been marked for identification as 37.

10 Q    Do you recognize that individual?

11 A    I do.

12 Q    Who is that?

13 A    Joan Sullivan.

14        MS. GEDDES:  The Government offers Government

15 Exhibit 37.

16        MR. CANNICK:  No objection.

17        THE COURT:  That's in evidence.

18        (Government's Exhibit 37 received in evidence.)

19 Q    You testified earlier that Derrell McDavid served as the

20 defendant's accountant and sometimes manager until

21 approximately 2013; is that correct?

22 A    Right.

23 Q    Over what period of time did Joan Sullivan serve as the

24 defendant's accountant?

25 A    She was -- she would take his place somewhere around

Copeland - direct - Geddes                    3171

1   2014, 2015.

2   Q    So she served as the defendant's accountant after Derrel

3   McDavid no longer served as his accountant?

4   A    Right.

5   Q    Now, you testified that Derrel McDavid also served in a

6   managerial role.  Did Sullivan also serve in a managerial

7   role?

8   A    I don't believe so.

9   Q    Just as an accountant?

10  A    Correct.

11  Q    Have you ever seen the defendant with a weapon?

12  A    No.

13  Q    Have you ever been in one of the defendant's studios or

14  residences where you saw a weapon?

15  A    Yes.

16  Q    What kind of weapon did you see?

17  A    I saw a gun.

18  Q    Can you describe the gun that you saw?

19  A    It was small handgun.

20  Q    And where did you see it?  Did you say it was a studio?

21  Where did you see it?

22  A    The studio on Justine.

23  Q    Where specifically in the studio on Justine Street did

24  you see the gun?

25  A    It was behind the bar.

Copeland - direct - Geddes                    3172

1   Q    And I am going to show you what's in evidence as
2   Government Exhibit 926, page 23.  Do you recognize what's
3   shown there?
4   A    I do.
5   Q    What is that?
6   A    That is the lounge area of the studio.
7   Q    On Justine Street?
8   A    Yes.
9   Q    And do you see where my pen is pointing?
10  A    Yes.
11  Q    What is that?
12  A    That's the bar.
13  Q    And is that the bar area where you saw a gun?
14  A    It looks different.
15  Q    Is that the location of the bar area where you saw the
16  gun?
17  A    I believe so, yes.
18  Q    And where in the bar area did you see it?
19  A    It was on the shelf behind the bar.
20  Q    Like where liquor in a bar might be stored?
21  A    Yes.
22  Q    Approximately when did you see a gun in that bar area of
23  the defendant's recording studio?
24  A    That was approximately either March or April of 2018.
25  Q    Shortly before you stopped working for the defendant?

Copeland - direct - Geddes                    3173

1   A    Correct.

2   Q    Did you ever have any discussions with anyone about the

3   defendant having a firearm?

4   A    I did.

5   Q    Who did you have that discussion with?

6   A    I'm sorry, what was the question?

7   Q    Did you ever have any -- my first question was did you

8   ever have any discussions with anyone about the defendant

9   having a firearm or a gun?

10           MR. CANNICK:  Objection to that, Your Honor.  It's

11  not the testimony.

12           THE COURT:  Sustained as to form.

13           Did you say did you ever have any discussions with

14  anyone about the gun?

15           MS. GEDDES:  Yes, and then I asked her who she had a

16  discussion with.

17           THE COURT:  You're not asking for the substance of

18  the conversation?

19           MS. GEDDES:  I'm about to, at which point can we

20  have a brief sidebar on it?

21           THE COURT:  Yes, but we don't have too much time, so

22  let's do a quick one.

23           MS. GEDDES:  We could break.  I still have a little

24  bit --

25           THE COURT:  I am going to squeeze every minute out

Copeland - direct - Geddes                    3174

1    of you.  So let's not have a sidebar.  Let's ask another

2    question and we will deal with that later.

3              MS. GEDDES:  All right.

4    Q    I'm showing the witness page 37 of Government Exhibit

5    926.  Do you recognize what's shown there?

6    A    I do.

7    Q    What is shown there?

8    A    This is the bar area of the studio.

9    Q    And is that the bar area where you saw the gun?

10   A    Yes.

11   Q    And I'm putting my pen on that shelf area underneath,

12   where those two lamps are.  Is that the location where you saw

13   it or where on this diagram?

14   A    Correct.

15   Q    That shelf underneath where the two lamps are set?

16   A    Yes.

17   Q    And without saying the nature of the conversation, who

18   was the individual that you had a discussion with about the

19   defendant having a gun?

20             MR. CANNICK:  Objection.

21             THE COURT:  I think the objection is to the fact

22   that the defendant had the gun.  The testimony was that she

23   saw a gun in the studio.

24             Do I have that right, Mr. Cannick?

25             MR. CANNICK:  Yes, Your Honor.

Copeland - direct - Geddes                    3175

1              THE COURT:  So did you have a conversation with

2      somebody about the fact that you saw a gun in the studio?

3              THE WITNESS:  No.

4              MS. GEDDES:  My question was actually about

5      something other than that.  I can address it afterwards.

6              THE COURT:  All right.

7      BY MS. GEDDES:

8      Q    I want to direct your attention to January of 2018.  Did

9      you have a computer that you used in connection with your work

10     for the defendant?

11     A    I did.

12     Q    What type of computer did you have?

13     A    It was a MacBook Air.

14     Q    When did you get that computer approximately?

15     A    Approximately January of 2018.

16     Q    And who purchased the computer?

17     A    I did.

18     Q    What did you use it for?

19     A    I took notes in meetings.

20     Q    Meetings for the defendant or meetings with the

21     defendant?

22     A    Correct.

23     Q    But was it your own personal computer?

24     A    Correct.

25     Q    Do you still have that computer?

Copeland - direct - Geddes                    3176

1   A    I do not.

2   Q    What happened?

3   A    It went missing one day when we were having -- when there

4   were guests in the studio.

5   Q    Which studio were you in?

6   A    On Justine.

7   Q    And where were you when you last saw your computer?

8   A    I was sitting on the couch in the lounge area of the

9   studio.

10  Q    And was that the same lounge area that was just shown in

11  Government Exhibit 926?

12  A    Correct.

13  Q    Who, if anyone, was present while you were there?

14  A    There were guests.  There was Robert and Alicia Evan was

15  there.

16  Q    And where was your computer?

17  A    On the coffee table.

18  Q    And do you recall -- I think you said that you were on

19  one of the couches around the coffee table; is that correct?

20  A    Correct.

21  Q    And do you recall what you were doing at that time?

22  A    Just working.

23  Q    And do you remember where the defendant was?

24  A    He was adjacent to us, I think maybe playing cards at

25  another table.

1          THE COURT:  Okay.  Let's get the witness unless

2   anybody has something to bring up.

3          Okay, let's get the witness.

4          (Witness takes the stand.)

5          (Jury enters.)

6          THE COURTROOM DEPUTY:  You may be seated.

7          THE COURT:  All right, everybody, welcome back.  I

8   hope everybody had a good weekend.  We are ready to resume

9   with, I don't remember where we were, direct?

10          MS. GEDDES:  That's correct.

11          THE COURTROOM DEPUTY:  The witness is reminded she

12   is still under oath.

13   **DIANA COPELAND**, having been previously duly sworn/affirmed,

14       testified as follows:

15   CONTINUED DIRECT EXAMINATION

16   BY MS. GEDDES:

17   Q    Good morning.

18   A    Good morning.

19   Q    On Friday before we ended for the day, you testified

20   about certain fines that the defendant imposed while you were

21   working for him.

22   A    Right.

23   Q    Do you recall the amount of the fine that were imposed by

24   the defendant?

25   A    I do not.

Copeland - direct - Geddes                    3188

1  Q    Were they always the same amount or did it differ?

2  A    It differed.

3  Q    And were there times when you did not receive any part of

4  your paycheck in a particular week as a result of a fine?

5  A    Correct.

6  Q    When we ended on Friday, you were testifying about a

7  computer that you had purchased.  Can you remind the jury when

8  you purchased that computer?

9  A    Somewhere around January 2018.

10 Q    And what type of computer was it?

11 A    It was a Macbook Air.

12 Q    And what did you use the computer for in connection with

13 your employment with the defendant?

14 A    In connection with the employment, it would have been

15 just to take notes in the meetings.

16 Q    And I think you might have testified to this on Friday

17 but it's been a while since then, what happened to the

18 computer?  When did you last see the computer?

19 A    I last saw it in April 2018 in the lounge area of the

20 studio.

21 Q    And who was present when you last saw the computer?

22 A    There were people there and Robert was there as well.

23 Q    Did you have any conversations with the defendant about

24 your computer?

25 A    I did.

Copeland - direct - Geddes                    3189

1  Q    What happened during those conversations?

2  A    Well, it wasn't exactly a conversation.  I just asked him

3  about it.

4  Q    And when did you ask the defendant about your computer?

5  A    When I first noticed it being missing.

6  Q    That day at the studio in April of 2018?

7  A    Correct.

8  Q    And how did the defendant respond when you asked him

9  about your computer going missing?

10  A    He didn't really respond.  He didn't know where it was.

11  Q    What did he say?

12  A    He was kind of -- he looked and didn't really know where

13  it was.

14  Q    What, if any, steps did the defendant take to try to

15  locate your computer?

16  A    None.

17  Q    And what, if any -- did you hear the defendant ask anyone

18  else in the room about what had happened to your computer?

19  A    No.

20  Q    Did you ever receive your computer back?

21  A    No, I did not.

22  Q    Did you take any steps to try to recover -- or find out

23  where your computer was located?

24  A    I did.  I did a search on the computer -- on the -- on

25  another computer.  It was -- it's called, like, Find Your

Copeland - direct - Geddes                    3190

1   Device and it located it.

2   Q    And when did you do that -- when did you conduct that

3   search?

4   A    Just a little bit after I noticed that it was missing.

5   Q    Was it that same day?

6   A    Yes.

7   Q    And based on that search where did it indicate your

8   computer was?

9   A    That it was still in the studio.

10  Q    Did you subsequently learn that your computer had been

11  used for something?

12            MR. CANNICK:  Objection.

13            THE COURT:  First of all, overruled.

14            Did you learn that; that your computer had been used

15  even though you didn't have it?

16            THE WITNESS:  Yes.

17            THE COURT:  Next question.

18  BY MS. GEDDES:

19  Q    What did you learn, what happened?

20  A    The Apple sends you a notification if the computer is

21  opened.

22  Q    And approximately when did you -- is that what you mean

23  that you received a notification from Apple that the computer

24  had been opened?

25  A    Correct.

Copeland - direct - Geddes          3191

1  Q    And when did you receive that notification in connection
2  or relative to when you last saw your computer at the studio?
3  A    About a couple of months later.
4  Q    What, if anything, did you do upon receiving that
5  communication from Apple?
6  A    I sent a text to his then-manager.
7  Q    Who was his then-manager?
8  A    James Mason.
9  Q    And at the time that you received the notification from
10 Apple that your computer had been opened, what if any
11 information did you learn about its then-location?
12 A    I'm sorry, can you repeat that?
13 Q    Yes.  When you received that notification from Apple that
14 your computer had been opened, did you receive any information
15 about the location of your computer at that time?
16 A    I did not.
17 Q    And just to be clear, I'm referring to the notification
18 from Apple about where your computer was located?
19 A    Initially, but I don't think the second time it indicated
20 the location.
21 Q    When you contacted contacted the manager that you just
22 referenced, James Mason, whose manager was that?
23 A    Robert's.
24 Q    The defendant's?
25 A    Correct.

Copeland - direct - Geddes                    3192

1  Q    And you testified earlier or last week, that you stopped

2  working for the defendant in approximately April of 2018; is

3  that correct?

4  A    Correct.

5  Q    And was that the same month that your computer went

6  missing?

7  A    Correct.

8  Q    Why did you stop working for the defendant at that time?

9  A    A number of reasons.

10 Q    Was one of them --

11       THE COURT:  Well let's --

12       What were the reasons?

13       THE WITNESS:  Well, there was a lot going on.  Wow.

14 It was just we weren't seeing eye-to-eye.  There was, you

15 know, new management.  I kind of felt like things should have

16 been handled differently because we had had people in that we

17 didn't trust and so we weren't seeing eye-to-eye in terms of

18 that.

19 BY MS. GEDDES:

20 Q    In terms of "we" who are you referring to?

21 A    Myself and Robert.

22 Q    Now did you see the defendant after you stopped working

23 for him?

24 A    I did, yes.

25 Q    When was the last time that you saw the defendant prior

Copeland - direct - Geddes                    3193

1  to the beginning of your testimony last week?

2  A    The last time?

3  Q    That you saw him.

4  A    That would have been probably in 2019.

5  Q    And do you recall during what part of 2019 you last saw

6  the defendant?

7  A    I can't recall.

8  Q    Okay.  Where did you first see the defendant on that last

9  occasion when you saw him?

10  A    Well, we met at a park.

11  Q    Where was the park located?

12  A    Across from the water tower.

13  Q    Is that in Chicago?

14  A    Yes.

15  Q    And what happened when you showed up at the park?

16  A    When I showed up at the park, he was -- I was sitting on

17  the bench.  He called me and he said, Don't you see this big

18  giant van sitting here jokingly.  And so I eventually went to

19  the van.  We ended up going to the Trump Towers from there.

20  Q    And just to be clear, for the record when you say "he,"

21  are you referring to the defendant?

22  A    Yes.

23  Q    Who went to the Trump Towers that day?

24  A    I believe it was Robert, *Jane and myself.

25  Q    And what happened when you arrived at the Trump Towers?

Copeland - direct - Geddes                3194

1  A    When I arrived at the Trump Towers, Jane gave me a robe

2  to put on.

3  Q    What, if anything, did she say?

4  A    She said that Mr. Kelly would like me to -- she asked me

5  was I wired.

6  Q    What did you understand her to mean when she asked you if

7  you were wired?

8  A    If I had some kind of device that would record or --

9  Q    Now, at the time that you last saw the defendant and went

10 to the Trump Towers, had you met with law enforcement at that

11 time?

12 A    I'm not sure if that was before or after.

13 Q    How did you respond when Jane asked you whether you were

14 wired?

15 A    I was shocked and I said no.

16 Q    What, if anything, did you do with the robe that Jane

17 provided to you?

18 A    Well, I took off my sweatshirt and I left on my tank top

19 and my pants and I put the robe on.

20 Q    And who did you understand wanted you to be putting on

21 that robe?

22 A    Robert.

23 Q    And what did you understand the defendant wanted you to

24 have other than the robe on?  What was the purpose --

25        What did you understand was the purpose of having

Copeland - direct - Geddes                    3195

1   been provided with this robe?

2   A    To disrobe and to put the robe on.

3   Q    For what reason?

4   A    To make sure I wasn't wired.

5   Q    And just to be clear, were you wearing a wire?

6   A    No.

7   Q    Or did you have a recording device at any point?

8   A    Absolutely not.

9   Q    After you put on the robe and advised Jane that you were

10  not -- did not have a wire on, did you interact with the

11  defendant?

12  A    I did.

13  Q    What happened when you saw the defendant?

14  A    He was very upset at what was going on in the media.

15  Q    What, if anything, did he ask you to do?

16  A    At a certain point he just told me to write something

17  truthful about how I feel about him.

18  Q    And what, if anything, did he provide you in order to do

19  that?

20  A    I think it was a notebook and pen.

21  Q    And did you then write a letter?

22  A    I did.

23           MS. GEDDES:  I'm showing the witness only what's

24  been marked for identification as Government Exhibit 301.

25           THE COURT:  Any objection to this going into

Copeland - direct - Geddes                    3196

1    evidence?

2              MR. CANNICK:  None.

3              THE COURT:  Okay.  This will be in evidence as 301?

4              MS. GEDDES:  Yes.

5              THE COURT:  Admitted.

6              (Government Exhibit 301 received in evidence.)

7    BY MS. GEDDES:

8    Q    Do you recognize what's shown in 301?

9              (Exhibit published.)

10   A    Yes.

11   Q    What is that?

12   A    This is my handwriting and this is the letter.

13   Q    And I want to -- you testified earlier that the defendant

14   asked you to write a letter that was truthful; is that

15   correct?

16   A    That is correct.

17   Q    Have you had an opportunity to review this letter prior

18   to your testimony today?

19   A    Yes, I have.

20   Q    And having reviewed the letter, was everything that you

21   wrote in this letter truthful?

22   A    Everything, yes.

23   Q    I want to direct your attention to the second page where

24   it indicates, he has never verbally, physically or mentally

25   abused anybody.

1          Based on what -- having worked for the defendant for

2    the lengthy period of time that you worked for him, was that

3    an accurate statement when you wrote that?

4    A    It probably should say I have never seen him verbally,

5    physically or mentally abuse anyone.

6    Q    Well, during the course of your employment with the

7    defendant, was there ever a time when the defendant verbally

8    abused you?

9    A    I don't know that I would call it verbally abuse --

10   verbal abuse.

11   Q    Did you and the defendant get into verbal altercations?

12   A    Yes.

13   Q    And what were the nature of those altercations?

14   A    Usually it would be over a fine.

15   Q    And what was the defendant's demeanor during some of

16   these discussions?

17   A    He could get pretty heated, yes.

18   Q    Could you describe what you mean by him getting pretty

19   heated?

20   A    He could get angry.  He could curse.  He could -- yeah.

21   Q    And what, if anything, would you do after you had some of

22   those verbal disputes with the defendant?

23   A    Sometimes cry.

24   Q    And did you always continue to work for the defendant

25   after those verbal disputes?

Copeland - direct - Geddes                    3198

1   A    Yes.  Well, sometimes I would leave.

2   Q    And when you say sometimes you would leave, what do you

3   mean?

4   A    It means sometimes I would quit.

5   Q    As a result of those verbal disputes?

6   A    Correct.

7   Q    Would the defendant raise his voice during some of those

8   disputes?

9   A    Correct.

10  Q    And would the defendant criticize you during some of

11  those disputes?

12  A    Correct.

13  Q    Now, you testified that you wrote this letter shown in

14  Government Exhibit 301 in 2019 at some time.

15       Was that the only time that you wrote a letter at

16  the defendant's direction?

17  A    No.

18  Q    When if -- what other time had the defendant asked you to

19  write a letter?

20  A    Years ago initially, I think the staff wrote letters

21  basically saying that they stole something and this was just

22  to make sure that no one was going to do something against

23  him.

24  Q    What did the defendant ask you to do?

25  A    Write a letter.

Copeland - direct - Geddes                              3199

1   Q    Did the defendant explain why he wanted you to write a
2   letter?
3   A    Yeah, I believe his attorneys had told him to have us do
4   that.
5   Q    And what did you understand the defendant wanted you to
6   write in the letter that he asked you to write?
7   A    That I stole something.
8   Q    At the time that you wrote the letter had you, in fact,
9   stolen anything from the defendant?
10  A    No.
11            MS. GEDDES:  I am showing the witness what's been
12  marked for identification as Plaintiff's Exhibit 3500-DC2-8.
13            THE COURT:  Any objection to this Mr. Cannick?
14            MR. CANNICK:  No.
15            MS. GEDDES:  The Government Plaintiff's Exhibit
16  3500-DC2-8.
17            THE COURT:  It's in evidence.
18            (Government Exhibit 3500-DC2-8 received in
19  evidence.)
20            (Exhibit published.)
21  BY MS. GEDDES:
22  Q    Do you recognize the letter that is in Plaintiff's
23  Exhibit 3500-DC2-8?
24  A    Yes.
25  Q    And at the top whose signature is that?

1   A    Mine.

2   Q    And it reads:  This is the hardest letter that I have

3   ever written.  I wanted to write it in the most honest and

4   humble way possible, but there is no perfect or easy way to

5   tell someone you love that you have betrayed them.  I have

6   stolen money from you and I am very sorry.  It took me two

7   years to admit it to myself and to you because I would rather

8   leave than have you look at me differently.  I am so thankful

9   that you are a forgiving person.  We have always been like

10  family and I would not be the same if I lost our relationship

11  over this.  I will never, ever betray in any way ever again.

12  I am truly disappointed in myself and I am ashamed.  There is

13  no pain greater than the one in my heart right now.  There is

14  no excuse for what I did and no way to make it look better.

15          I took something from you that didn't belong to me.

16  I stole money.  What makes it worse is that I know in my heart

17  that if I had asked you for some money, you would have no

18  problem with it.  You are a very giving and loving person and

19  there is no excuse for anyone you love to steal from you.

20  Right now I don't feel deserving of your love or your trust

21  and it's killing me inside.  It's the very feeling that I ran

22  away from for two years, but right now all I can do is

23  apologize and hope time heals the pain, trust and our

24  friendship.  Please feel my spirit when I say that I am truly

25  sorry and I will never betray you ever again.  I love you.

Copeland - direct - Geddes                    3201

1        And then there are two signatures there.  Are those
2  both your signature as well?
3  A    Yes.
4  Q    And at the top of this -- of this third page, is that
5  also your signature there at the top right-hand corner?
6  A    Yes.
7  Q    And at the top of the second page, there is also a
8  signature, is that also your signature?
9  A    Yes.
10 Q    And just to be clear, did you ever steal anything from
11 the defendant?
12 A    No.
13 Q    I am showing the witness only what's been marked for
14 identification as Government Exhibit 970?
15        (Exhibit published for witness only.)
16 BY MS. GEDDES:
17 Q    Do you recognize what's shown in Exhibit 970?
18 A    Yes.
19 Q    What that?
20 A    My phone number.
21 Q    Is it still your phone number today?
22 A    Yes, it is.
23 Q    How long have you used that phone number?
24 A    For many years.  I don't know how many.
25 Q    And did you use that telephone number while you were

Copeland - direct - Geddes                3202

1  working with the defendant?

2  A    Yes.

3           MS. GEDDES:  The Government offers 970.

4           MR. CANNICK:  No objection.

5           THE COURT:  That is in evidence.

6           (Government Exhibit 970 received in evidence.)

7           THE COURT:  Jury only?

8           MS. GEDDES:  Jury only, please.

9           (Exhibit published to jury only.)

10          MS. GEDDES:  Nothing further.

11          THE COURT:  Cross-examination?

12          MR. CANNICK:  Yes, Your Honor, thank you.

13 CROSS-EXAMINATION

14 BY MR. CANNICK:

15 Q    I just want to go over your testimony a bit here.  The

16 letter that was just read to you by the Government, DC-8, in

17 that letter you said that Rob is a giving and loving person.

18 Did you find that to be true?

19 A    Yes, I did.

20 Q    Did you find him to be a generous person?

21 A    Yes.

22 Q    And you testified that that letter did not pertain to you

23 actually stealing anything from him.  There was a reference

24 that you stole something from him but that was not true;

25 correct?

Copeland - direct - Geddes                    3203

1   A    Correct.

2   Q    But what was true was that there was a dispute that you

3   and he had about something that was a misunderstanding; am I

4   correct?

5   A    Yes.

6   Q    And that misunderstanding caused you to decide, you know

7   what, given the misunderstanding I'm going to leave and you

8   wrote that letter on your way back to work with him, am I

9   correct?

10  A    That is correct.

11  Q    You left him for two years after that and on coming back,

12  you wrote that letter?

13  A    That's correct.

14  Q    And the misunderstanding was never resolved, right, you

15  just moved on from it?

16  A    That is correct.

17  Q    Now, the Government asked you about whether or not Robert

18  had ever verbally abused, do you remember them asking you

19  that?

20  A    Yes.

21  Q    And you testified that there were times that you and he

22  would have disagreements and sometimes you would cry, am I

23  correct?

24  A    Right.

25  Q    You met with the Government before coming her to give

Copeland - direct - Geddes                3204

1   your testimony here?

2   A    Yes.

3   Q    And you met with them a number of times, am I correct?

4   A    That's correct.

5   Q    And during the prepaaration to come here, they asked you

6   questions, am I correct?

7   A    That is correct.

8   Q    And during their asking you those questions, you cried

9   then; am I correct?

10  A    That is correct.

11  Q    They didn't like how you were answering the questions and

12  you eventually cried; am I correct?

13          MS. GEDDES:  Objection.

14          THE COURT:  Sustained.

15  BY MR. CANNICK:

16  Q    But you cried?

17  A    Yes, I did.

18  Q    Now, you mentioned that there were times that Rob would

19  exact fines on you and his other employees; am I correct?

20  A    That is correct.

21  Q    Now, fines in the music industry is pretty commonplace;

22  am I correct?

23          MS. GEDDES:  Objection.

24          THE COURT:  Do you have any basis for having an

25  opinion about whether fines are common in the music industry?

1          THE WITNESS:  I do, Your Honor.

2          THE COURT:  What is the basis for your --

3          THE WITNESS:  I have friends that are in the

4    industry.

5          THE COURT:  Well, I guess the jury can take the

6    answer for what it is worth.

7          Go  ahead.

8    BY MR. CANNICK:

9    Q    And your friends in the industry, you find that they were

10   fined by their bosses; is that correct?

11   A    That is correct.

12   Q    And I'm sure being in the industry for the amount of time

13   you have been in there, you heard about how James Brown used

14   to fine --

15          MS. GEDDES:  Objection.

16          THE COURT:  Sustained.

17   BY MR. CANNICK:

18   Q    Now, you testified that there was a time that you left

19   your employment with Robert because you guys weren't seeing

20   eye-to-eye.  Do you remember that?

21   A    Right.

22   Q    Now, that was only because of business direction, am I

23   correct?

24   A    That is correct.

25   Q    In fact, there was new management and you weren't in

Copeland - direct - Geddes                3206

1    synch with the new management; am I correct?

2    A    Correct.

3    Q    Now during your final stint -- withdrawn.

4         Do you recall how many times you left your

5    employment with Robert and returning?

6    A    Many.

7    Q    Many; right?

8    A    Yes.

9    Q    And you would come back because you found it to be an

10   exciting job?

11   A    I came back sometimes because I felt he didn't have

12   trustworthy people around him.

13   Q    And when you say that, you knew that some of his

14   employees had stolen from him; am I correct?

15            MS. GEDDES:  Objection.

16            THE COURT:  Sustained.

17   BY MR. CANNICK:

18   Q    Well, wasn't your responsibility when you came back in

19   the final months of your job was to help him find his monies?

20   A    Yes.

21   Q    Okay.  Because there were large sums of monies that just

22   disappeared?

23            MS. GEDDES:  Objection.

24            THE COURT:  Sustained as to form.

25   BY MR. CANNICK:

1  Q    Why did you have that responsibility?

2  A    Robert did not have any control over his bank account.

3  He didn't even know even know his Social Security number.  He

4  had no control over over whether things were being paid, the

5  urgent things that needed to be paid.  He had no control over

6  that and he had no idea where his royalties were going.  Who

7  was getting that check and so that was a huge problem.

8  Q    Okay, thank you.  Given your employment with Mr. Kelly

9  you came to understand that he had a problem with reading and

10 writing?

11 A    Correct.

12 Q    Now, I want to go back and discuss some aspects of your

13 employment with Mr. Kelly.  You were employed with him at a

14 point in time as his executive assistant?

15 A    Correct.

16 Q    What was your responsibilities as his executive

17 assistant?

18 A    The focus was to make sure that he had everything

19 required to make music, to tour, to live comfortably, to make

20 sure that the bills were paid, that his home was running

21 smoothly, that his kids were taken care of.

22 Q    And you were pretty much his go-to person in terms of

23 making sure that those things were to his standard?

24 A    Correct.

25 Q    Now, you also testified that you worked as his assistant.

Copeland - direct - Geddes                    3208

1   Was that a personal assistant?

2   A    Correct.

3   Q    And what were the responsibilities -- what were your

4   responsibilities as his personal assistant?

5   A    So, at that time it was more so to manage the estate when

6   he was living in Olympia Fields.  The children were there at

7   the time and there were nannies and housekeepers and people

8   who took care of the grounds and things of that nature that

9   needed to be scheduled and paid.

10  Q    And did you have any direct involvement with his children

11  and wife?

12  A    Yes.

13  Q    What were those involvements?

14  A    That was another part of making sure that the household

15  ran smoothly.  You know, I was told when I first was hired

16  that I was an extension of him because he was really busy.

17  And he would be in the studio for hours so I had to make sure

18  that the kids had something to do.  He would have me schedule

19  trips to the museum and things like that with their teacher

20  and things of that nature.

21  Q    Now you mentioned that he was a very busy person.  Could

22  you give us an idea as to his daily routine?

23  A    That varied every day.  He would be in the studio from

24  nighttime until the sun came up many days.

25  Q    Let me stop you there.  In terms of being in the studio

Copeland - direct - Geddes                    3209

1  did he have an engineer staff with him?

2  A    At what period?

3  Q    At the time that you worked with him --

4  A    Actually he had engineers the entire time I was working

5  there.

6  Q    Do you know the shifts of those engineers?

7  A    I do not know their shifts.

8  Q    Okay.  But do you recall them working pretty much 24

9  hours a day?

10  A    24 hours, yeah.  There was always somebody there, but --

11  Q    And they would be there because oftentimes he would have

12  an inspiration or decide to go to the studio and he would

13  either work -- need to work on his music; am I correct?

14  A    Correct.

15        THE COURT:  I do not see the relevance, but let's

16  move on to something else.

17  BY MR. CANNICK:

18  Q    Now his band was there 24 hours?

19        THE COURT:  His band?

20        MR. CANNICK:  His band.

21        THE COURT:  I really don't see the relevance.

22        MR. CANNICK:  Your Honor --

23        THE COURT:  Go ahead.

24  BY MR. CANNICK:

25  Q    His band would be there to be ready to perform if he was

Copeland - direct - Geddes                    3210

1   deciding to go to the studio; right?

2   A    Sometimes, yes.

3   Q    And did he play basketball during his daily routine?

4   A    Yes.

5   Q    Do you know what his his basketball schedule?

6   A    Typically he would play somewhere around 11 p.m. or

7   midnight.

8   Q    So he would play in the -- closer to midnight for about

9   how many hours?

10  A    Maybe three.

11  Q    And then after that would he go back to the studio, to

12  your knowledge?

13  A    Yes.

14  Q    And when would he get to bed?

15       MS. GEDDES:  Objection.

16  A    Morning.

17       THE COURT:  Was this every day?

18       THE WITNESS:  It was a routine.

19       THE COURT:  Okay.

20  BY MR. CANNICK:

21  Q    Did he have any involvement during his daily routine with

22  other artists?  Did he work with other artists?

23  A    Absolutely.

24  Q    Other producers?

25  A    Yes.

1  Q    Record label?

2  A    Yes.

3  Q    Did he during his day have to plan concerts and tours?

4  A    That is correct.

5  Q    And do you know whether or not he would write music for

6  himself and for other artists?

7  A    Yes, he did.

8  Q    And these artists that he would write and produce for,

9  they were considered A-list musicians?

10        MS. GEDDES:  Objection.

11        THE COURT:  I think we're going quite far afield

12  here.  Let's move on to something else.

13  BY MR. CANNICK:

14  Q    What time would he begin his day?

15  A    Somewhere around maybe 4 p.m., 5 p.m.

16  Q    And you had total access of the properties that you

17  worked for when you worked with Mr. Kelly?

18  A    Yes.

19  Q    And what properties were they?

20  A    Olympia Fields, the Trump Towers, the estate in John's

21  Creek.

22  Q    And of all of those properties, did you note that any of

23  the bedrooms or rooms had locks on the outside of the door?

24  A    No, they did not.

25  Q    Do you know whether or not any of his phones were ever

Copeland - direct - Geddes                    3212

1  rigged so that they could only call certain numbers?

2            THE COURT:  Any of his personal telephone?

3            MR. CANNICK:  The phones within the studio and in

4  the home.

5            THE COURT:  Like a landline?

6            MR. CANNICK:  Yes.

7            THE COURT:  Okay.

8  A    No.

9  Q    Have you ever heard that?

10 A    I have not heard of that.

11 Q    Now, did you have responsibility as relates to

12 Mr. Kelly's guests?

13 A    Yes.

14 Q    And what type of guests would he have?

15 A    It could range from record label executives, you know,

16 A-list stars like Whitney Houston, God bless her soul.

17 Q    What about his personal friends?

18 A    People he played basketball with or female friends.

19 Q    The female friends, some of them you learned that they

20 were his girlfriends; am I correct?

21 A    That is correct.

22 Q    And some of those girlfriends lived with him; am I

23 correct?

24 A    That is correct.

25 Q    Now, when you mentioned that you have involvement with

Copeland - direct - Geddes                    3213

1   his record label and other entertainers, would those

2   individuals bring their entourage with them when they would

3   visit?

4   A    Sometimes.

5   Q    Now, does Robert have certain policies or procedures to

6   maintain decorum in his home and his business?

7   A    Yes.

8   Q    What were they?

9   A    The decorum in the home was that you could not roam his

10  home.  You could not -- you should knock if you come out of

11  one room and you go into another.  Those were the biggest

12  rules.

13  Q    And his wife was the one who put --

14            MS. GEDDES:  Objection.

15            THE COURT:  Overruled.

16  BY MR. CANNICK:

17  Q    His wife was the one who put the rules in place about

18  knocking on doors in the home and the business; am I correct?

19  A    That is correct.

20  Q    Now, this rule applied to everyone who came into his

21  home; am I correct?

22  A    That is correct.

23  Q    It wasn't just a rule for girlfriends; am I correct?

24  A    No, it wasn't just -- it was for everybody.

25  Q    Now, I asked you earlier if you ever -- if you had

Copeland - direct - Geddes                                    3214

1    meetings with the Government.  Do you remember me asking you

2    that?

3    A    Yes.

4    Q    Now, when you went to visit the Government for these

5    sessions, you couldn't just roll out of the house; correct?

6    A    No.

7    Q    A marshal had to escort you; correct?

8    A    That is correct.

9    Q    You couldn't just get up and go to the bathroom; correct?

10            MS. GEDDES:  Objection.

11            THE COURT:  Overruled.

12            Did someone have to walk you to the bathroom?

13            THE WITNESS:  Yes.

14            THE COURT:  Inside?

15            THE WITNESS:  Yes.

16

17            (Continued on the following page.)

18

19

20

21

22

23

24

25

1   CROSS-EXAMINATION (CONTINUED)

2   BY MR. CANNICK:

3   Q    And if you wanted to go get some lunch, they had to

4   walk you out; am I correct?

5   A    I wasn't allowed.

6   Q    You weren't allowed lunch?

7   A    I wasn't allowed to go for lunch.  I'm sorry.

8   Q    Okay.  Now, I asked you about Mr. Kelly having live-in

9   girlfriends.  Did those live-in girlfriends lived there for

10  substantial periods; am I correct?

11  A    Yes.

12  Q    Okay.  Some lived there three, four, five years and

13  beyond; am I correct?

14  A    Correct.

15  Q    And some of them came and went; am I correct?

16  A    That is correct.

17  Q    In fact -- what's the name -- Anna was one who came and

18  left; am I correct?

19  A    Oh, yes.

20  Q    Many times, am I correct?

21  A    That's correct.

22  Q    And she also had an apartment in Atlanta; am I correct?

23  A    That is correct.

24  Q    And Robert paid for that apartment; am I correct?

25  A    I'm not aware who paid for it.

Copeland - Cross - Cannick                    3216

1    Q    Okay.  But you know she came and left?

2    A    Yes.

3    Q    And do you know someone that they called "Juice"?

4    A    I do.

5    Q    Now, "Juice" stayed for long periods of time; am I

6    correct?

7    A    That's correct.

8    Q    But she also left, as well; am I correct?

9    A    That's correct.

10   Q    Came and left, right?

11   A    Yes, sure.

12   Q    She also had a car?

13   A    Yes.

14   Q    And she had a job?

15   A    She did.

16   Q    And what about someone by the name of Dominique, that

17   person stayed for a period of time?

18   A    That is correct.

19   Q    And then left; am I correct?

20   A    That's correct.

21   Q    And others did, Sara?

22   A    Yeah.

23   Q    Okay.

24   A    I remember Sara, yeah.

25   Q    She never stayed in-house; am I correct?

1    A    No, she never stayed.

2    Q    She stayed in a hotel?

3    A    Yes, that's correct.

4    Q    And she'd come and go; am I correct?

5    A    Yes.

6    Q    And there were a number of individuals who were of that

7    status of coming and leaving; am I correct?

8    A    That's correct.

9    Q    Now, you testified about taking Mr. Kelly's girlfriend

10   shopping.  That was part of your responsibility; am I

11   correct?

12   A    I don't know if it was a responsibility, but it was

13   part of what I did.

14   Q    Part of what you did?

15   A    Yeah.

16   Q    And Mr. Kelly would splurge on these on these young

17   ladies; am I correct?

18   A    Yes.

19   Q    He would have you -- have them go to high-end stores?

20   A    That's correct.

21   Q    He would pay for their cosmetic procedures?

22   A    That's correct.

23   Q    He would lavish them with gifts?

24   A    Correct.

25   Q    Parties?

Copeland - Cross - Cannick                    3218

1   A    Correct.

2   Q    Picnics?

3   A    Correct.

4   Q    Rental getaways?

5   A    Correct.

6        THE COURT:  What did -- I didn't hear what you

7   said.

8   Q    Rental getaway, a house in the mountains?

9        THE COURT:  I see.

10  A    That is correct.

11  Q    Exotic pets?

12  A    That's correct.

13  Q    Extravagant parties?

14  A    That is correct.

15  Q    Trips abroad?

16  A    That's correct.

17  Q    He afforded them an exotic lifestyle, did he not?

18  A    Yes.

19  Q    Now, Mr. Kelly, you mentioned that he -- his

20  girlfriends would call his daddy.  Do you remember telling

21  us that?

22  A    That's correct.

23  Q    Now daddy is a term of endearment; am I correct?

24       THE COURT:  Sustained.

25  Q    I have something to say and I don't remember -- I

Copeland - Cross - Cannick                    3219

1    don't.

2              THE COURT:  I said sustained.

3              MR. CANNICK:  Sustained.

4              THE COURT:  Yes.

5    Q    Have you ever heard --

6              THE COURT:  I'm going sustain this, too, I think,

7    beginning, have you ever heard.

8              MR. CANNICK:  No, no, not have you ever heard.

9              Your Honor, I think we need a sidebar.

10             (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar Conference                    3220

1              (The following occurred at sidebar.)

2              MR. CANNICK:  Your Honor --

3              THE COURT:  Her opinion, how can you defend --

4              MR. CANNICK:  How can I defend -- if the

5     Government's saying that he made her call him daddy, right,

6     I think that I have a right to show how the context was

7     used.

8              THE COURT:  First, the Government didn't say --

9     and don't you think, that haven't you ever heard that using

10    daddy in this way is whatever supports their opinion?

11    That's all.  I'm not letting you do -- you can certainly

12    argue that --

13             MR. CANNICK:  Yeah, I will.

14             THE COURT:  But this lady's opinion --

15             MR. CANNICK:  Okay.

16             THE COURT:  -- about when people called them daddy

17    is not really relevant.

18             Do you know how much longer you have with her?

19             MR. CANNICK:  Maybe 30 or 40 minutes.

20             THE COURT:  Okay.

21             MR. CANNICK:  I'm going a lot faster than I

22    thought.

23             THE COURT:  The only thing I was thinking about

24    was, right after in the next break, I would like to just

25    follow-up with that juror, with the alternate juror.

Sidebar Conference                                    3221

1          MR. CANNICK:  Sure, okay.

2          THE COURT:  All right?  Because we're going until

3    6:00 tonight.

4          MR. CANNICK:  Right.

5          THE COURT:  So I think what we'll do is maybe if

6    anybody needs five minutes.

7          MR. CANNICK:  Okay.

8          THE COURT:  And then we're going to convene.  I'll

9    have Donna work out the details.

10          MR. CANNICK:  Okay.  We're going to take a break

11    now?

12          THE COURT:  No, no, no.

13          MR. CANNICK:  Oh, okay.

14          THE COURT:  That's why I wanted to figure out when

15    you're done.

16          MR. CANNICK:  Okay.

17          THE COURT:  And then we'll do it in Judge Chen's

18    jury room.

19          MR. CANNICK:  Do you have a set time in mind when

20    you want to take it?

21          THE COURT:  I'm think around 2:00ish.

22          MR. CANNICK:  2:00ish?  Okay.

23          THE COURT:  Yes.  That's 45 minutes.

24          If you're not done, that's also fine.

25          MR. CANNICK:  Yeah, okay.

Case 22-1481, Document 81, 04/18/2023, 3501150, Page275 of 303

1          (Continued on the next page.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Copeland - Cross - Cannick                    3223

1            (Sidebar ends; in open court.)
2            THE COURT:  All right.  Go ahead.
3   Q    Now, are you familiar with the lyrics of Mr. Kelly's
4   songs?
5            MS. GEDDES:  Objection.
6            THE COURT:  If you can answer the question.
7            Do you know the words to his song?
8   Q    Well, let me be specific.  To Chocolate Factory?
9            MS. GEDDES:  Objection.
10           THE COURT:  A few questions.
11           MR. CANNICK:  Okay.
12           THE COURT:  I don't really think this is --
13  Q    In this song he called himself daddy; am I correct?
14           MS. GEDDES:  Objection.
15           THE COURT:  Overruled.  She doesn't -- do you know
16  the words?
17           THE WITNESS:  To be totally honest.
18           THE COURT:  Let's move on to something else.
19           MR. CANNICK:  I will see if I can refresh her
20  recollection.
21           THE COURT:  No, no, no, no, no.  Next question.
22  Q    Well, in that song did he say --
23           MR. CANNICK:  I know I'm slow, Your Honor, but --
24           THE COURT:  Mr. Cannick, it does not matter what
25  the lyrics of his song were, that's all I'm saying.  Let's

1  put some other questions to the witness.  She said she's not

2  familiar with the lyrics.

3         MR. CANNICK:  That's why I was trying to refresh

4  her recollection, Your Honor.

5         THE COURT:  The objection is sustained.

6         MR. CANNICK:  Thank you.

7  Q    Be you do know that he had a song called Chocolate

8  Factory?

9  A    I've heard that, yes.

10 Q    But you don't recall the lyrics of the song?

11 A    I don't.

12 Q    And you don't recall whether or not he called himself

13 daddy in that song?

14 A    I don't know.

15 Q    Now, Mr. Kelly, you mentioned earlier that -- in your

16 testimony that when he would come into the room -- I'm not

17 sure if this was your testimony or not -- but when he came

18 into the room his girlfriends kiss him?

19 A    They did, yes.

20 Q    Okay.  But when his girlfriends came into the room he

21 stood up; am I correct?

22 A    That's correct.

23 Q    In fact, when you came into the room he stood up; am I

24 correct?

25 A    That's correct.

Copeland - Cross - Cannick                    3225

1   Q     And, in fact, he would stand up anytime a female came

2   into the room; am I correct?

3   A     That's correct.

4   Q     And he would open the door for any female; am I

5   correct?

6   A     That's correct.

7   Q     It wasn't just his girlfriends; am I correct?

8   A     That's correct.

9   Q     Now, and he hired personal assistants to make sure that

10  the needs and the wants of his girlfriends were attended to;

11  am I correct?

12  A     That is correct.

13  Q     And the rules that -- the policies that we spoke about

14  earlier, knocking and to make sure that before you, leaving

15  and going into a room, that applied to staff as well as

16  girlfriends?

17              MS. GEDDES:  Objection.

18  A     Overruled.

19  Q     Now, have you ever been or have you ever traveled on

20  the tour bus?

21  A     I have, yes.

22  Q     Now, was there a rule in place as it relates to

23  knocking on a door before coming out of the bathroom?

24  A     Oh, yes.

25  Q     And why was that such a rule?

1   A    Well, the door was directly across from the microwave.

2   And so should you be warming something up or boiling water

3   for tea or coffee you could get pretty burned.

4   Q    Okay.

5   A    So...

6   Q    If you came out without letting folks know that you're

7   coming out by opening the door?

8   A    Yes.

9   Q    Now that rule applied to everyone; am I correct?

10  A    Oh, yes.

11  Q    It just didn't apply to Jane, do you know who Jane is?

12  A    I do.

13  Q    That rule just didn't apply to Jane, did it?

14  A    Oh, no.

15  Q    It applied to everybody?

16  A    Me included.

17  Q    Okay.  Now, you would take the tour bus and the

18  Sprinter sometimes on cross-country trips; am I correct?

19  A    That's correct.

20  Q    And these weren't pleasure trips, these are trips where

21  Mr. Kelly was going to perform; am I correct?

22  A    That's correct.

23  Q    And sometimes you would be out in the middle of

24  nowhere; am I correct?

25  A    Correct.

Copeland - Cross - Cannick                    3227

1    Q    There would be no bathrooms in sight for miles; am I
2    correct?
3    A    That's correct.
4    Q    And, in fact, there would be no cell phone service
5    because you're so far out; is that correct?
6    A    That is correct.
7    Q    And there was a time when you didn't have rest room
8    coming up anytime soon, some people would urinate in large
9    cups; am I correct?
10   A    I'm not aware of that.
11   Q    You're not aware of the big gulp cups?
12   A    I -- I know about it, but I -- at the time, I didn't
13   know people were doing that.
14   Q    Oh, you didn't know people were doing that?
15   A    No.
16   Q    Okay.
17         All right.  Now, have you ever rented a car with
18   one of Mr. Kelly's runners driving you from Point A to Point
19   B?
20   A    Can you repeat the question.
21   Q    Mr. Kelly had runners; am I correct?
22   A    Yes, that's correct.
23   Q    And these runners would do whatever task that he would
24   want or what the staff would ask him; am I correct?
25   A    That's correct.

Copeland - Cross - Cannick                3228

1    Q    And sometimes it required them driving you someplace;
2    am I correct?
3    A    That's correct.
4    Q    And have you ever ridden with one of them?
5    A    Yes.
6    Q    And they would flip the mirror up; am I correct?
7    A    Yes.
8    Q    And you would want that; am I correct?
9              MS. GEDDES:  Objection.
10             THE COURT:  She would want the mirror up?
11             MR. CANNICK:  She would want the mirror up.
12             THE COURT:  Did you want the mirror up?
13             THE WITNESS:  I didn't necessarily want it, but it
14   was okay.
15   Q    Did you find it to be offensive?
16   A    No.
17   Q    What was the benefit?
18             MS. GEDDES:  Objection.
19             THE COURT:  Overruled.
20   A    Well, just not having to have conversation or --
21   Q    So --
22   A    -- to have eye contact with someone.
23   Q    So you appreciated the fact that you didn't have to
24   have conversation or eye contact with the driver?
25   A    That's correct.

Copeland - Cross - Cannick                    3229

1  Q    Okay.  Now, there were occasions when you told us that
2  you escorted Mr. Kelly's girlfriends on shopping trips.  Do
3  you remember telling us that?

4  A    That's correct.

5  Q    And they would wear sweat clothes; am I correct?

6  A    That's correct.

7  Q    You would wear sweat clothes, too; am I correct?

8  A    That's correct.

9  Q    And they would be warmup suits and you did it for the
10 comfort; am I correct?

11 A    Oh, yeah.

12 Q    And there were times that you would escort them to rest
13 rooms?

14 A    That's correct.

15 Q    Okay.  Why would you escort them the rest room?

16 A    It would only be when we are at a venue that we weren't
17 familiar with.  One of the first things that my job required
18 was for me to find a bathroom, the rest rooms, were -- for
19 guests or even for him.

20 Q    So the first thing that you would do is find the
21 location of those rest rooms?

22 A    That's correct.

23 Q    And because you knew the location you would escort the
24 guests?

25 A    That is correct.

1   Q    And, in fact, you would escort Mr. Kelly as well; am I
2   correct?
3   A    That is correct.
4   Q    Now, have you ever gone in the stall with them --
5   withdrawn.
6         Have you stood right outside of the stall with
7   them and -- with them being a girlfriend when they were
8   using the facility?
9   A    No.
10  Q    And lets be more specific.  Have you ever stood outside
11  the stall -- do you know someone by the fame of Faith?
12  A    I do.
13  Q    Okay.  Did you ever stand outside the stall when she
14  was using the facility?
15  A    No.  I escorted her one time and the bathroom did not
16  have a stall, it was one individual bathroom.
17  Q    Okay.  And where did you position yourself?
18  A    Outside the door of the rest room.
19  Q    Now, did you ever give her, serve her alcohol?
20  A    No.
21  Q    You're smiling.  Why are you smiling?
22  A    Because I don't drink and I would be the last person
23  that somebody would ask for that.
24  Q    Now, you testified and told us yesterday about
25  escorting Mr. Kelly's girlfriends shopping and you would

Copeland - Cross - Cannick                    3231

1    interact with the salespeople?

2    A    Correct.

3    Q    Well, you would interact with salespeople -- well,

4    withdrawn.

5         You would go sopping with Mr. Kelly from time to

6    time; am I correct?

7    A    Yes, that's correct.

8    Q    And you would interact with the salespeople for him; am

9    I correct?

10   A    That is correct.

11   Q    Now when you were honing your duties as personal

12   assistant and executive assistant, Mr. Kelly's female guests

13   were not free to move around his business at home?

14   A    That's correct.

15   Q    But none of his guests were; am I correct?

16   A    That's correct.

17   Q    Now when you met with the Government, your attorney

18   with was you; am I correct?

19   A    That's correct.

20   Q    Ms. Rodriguez?

21   A    Yes.

22   Q    And she is here with you this mornings?

23   A    Yes, she is.

24   Q    This afternoon.

25        About how many hours you met with the Government

Copeland - Cross - Cannick                    3232

1   in connection with this case?

2   A    Several.

3   Q    When you say several, more than ten?

4   A    Yes.

5   Q    More than 20?

6   A    Hard to say.  Probably.

7   Q    Okay.  Do you know, more than 30?

8   A    I don't think so.

9   Q    Okay.  And during those meetings, they would suggest

10  certain verbiage to you in terms of answering questions for

11  you; am I correct?

12  A    No, they did not.

13  Q    They didn't suggest to you how to answer certain

14  questions?

15  A    No.

16  Q    They didn't express a preference on terms of certain

17  language or verbs to use?

18  A    On some of the language, if they used it, I would in

19  turn use it.

20  Q    So they used words like directed, Mr. Kelly directed?

21  A    Correct.

22  Q    And Mr. Kelly instructed?

23  A    Right.

24  Q    Mr. Kelly commanded?

25  A    I don't know if I've heard that one.

Copeland - Cross - Cannick          3233

1  Q    Okay.  But before your meeting with the Government you

2  never in a conversation about Mr. Kelly said that he

3  directed someone to do something; am I correct?

4  A    No.

5  Q    Or he instructed someone to do something; am I correct?

6  A    No.

7  Q    Okay.  That language came from the Government?

8  A    I don't know.

9  Q    You can answer.

10        THE COURT:  You can answer the question if it's

11  correct you can say it is correct.  If it's not, say it's

12  not.

13        Did the Government suggest that you use that kind

14  of language?

15        THE WITNESS:  They did not suggest.  But if they

16  would say something in a certain way, I may repeat it that

17  way, if that makes sense.

18        THE COURT:  Okay.  Well, next question.

19        MR. CANNICK:  Okay.

20  Q    And now, and you testified on direct exam that

21  Mr. Kelly would require a female Uber driver when we were

22  driving guests; am I correct?

23  A    That's correct.

24  Q    And basically it was a safety concern with Mr. Kelly;

25  am I correct?

1      MS. GEDDES:  Objection.

2      THE COURT:  Well, I don't know.  Do you know, was

3  it for safety?

4      THE WITNESS:  I believe so, yeah.

5  Q    And Uber drivers --

6      THE COURT:  Give it a try.

7      MR. CANNICK:  Give it a try?

8      THE COURT:  Yeah.

9  Q    Uber drivers have been known to rape --

10     MS. GEDDES:  Objection.

11     THE COURT:  Sustained.

12     MR. CANNICK:  I gave it a shot.

13     THE COURT:  You gave it a shot.

14  Q    Okay.  Now, they kill passengers, too?

15     MS. GEDDES:  Objection.

16     THE COURT:  Mr. Cannick, come on.

17     Sustained, if I didn't.

18     MR. CANNICK:  I'll went with, "Come on."

19  Q    You -- part of your job is that you arrange flights for

20  Mr. Kelly's guests?

21  A    That's correct.

22  Q    And hotel accommodations?

23  A    That's correct.

24  Q    And those would be for his girlfriends?

25  A    That's correct.

Copeland - Cross - Cannick                3235

1   Q    And also for his friends?

2   A    Friends, record label executives, business associates.

3   Q    Anyone who he asked you to bring to into town, you

4   would make the arrangements for?

5   A    That's correct.

6   Q    Did you have any instructions for them when they

7   arrived?

8   A    It would depend on if it was a hotel room most of the

9   time, yes.

10  Q    Okay.  Now, you testified and told us about a situation

11  you were in an elevator with one of Mr. Kelly's girlfriends,

12  Joycelyn.

13           Do you remember telling us about that?

14  A    Yes.

15  Q    And you testified that she was looking at the rear of

16  the elevator?

17  A    Yes.

18  Q    Did they're still together; am I correct?

19  A    I don't know.

20  Q    You don't know?

21  A    (Witness shakes head negatively.)

22  Q    Okay.  Now, would you also have responsibility for

23  Mr. Kelly's security concerns; am I correct?

24  A    I'm sorry, can you repeat that.

25  Q    You had some responsibility in making sure that

Copeland - Cross - Cannick        3236

1   Mr. Kelly was secure; am I correct?

2   A    Absolutely, yes.

3   Q    And you took that in consideration every time you were

4   dealing with him, you want to make sure that he was safe; am

5   I correct?

6   A    Yes.

7   Q    And the van -- withdrawn.

8        The Sprinter having its blind pulled up so that no

9   one could see in or see out, that was a security measure; am

10  I correct?

11  A    Yes.

12  Q    And how many security personnel did he have?

13  A    At any given time, at least three or four.

14  Q    And basically they worked to make sure that he was

15  secure; am I correct?

16  A    Correct.

17  Q    And did he have security for his girlfriends?

18  A    There was one female security guard.

19  Q    Okay.  And that person was named Candy?

20  A    Yes.

21  Q    And Candy pretty much made sure that the girls were

22  safe, the young ladies were safe?

23  A    Yes.

24  Q    Okay.

25       And basically protecting and securing Mr. Kelly

Copeland - Cross - Cannick                3237

1    was paramount; am I correct?

2    A    Correct.

3    Q    He was the meal ticket; am I correct?

4             MS. GEDDES:  Objection.

5             THE COURT:  Overruled.

6    A    Yes.

7    Q    And it was important to him that he was kept safe as

8    well as his girlfriends; am I correct?

9             MS. GEDDES:  Objection.

10            THE COURT:  Sustained.

11   Q    When he had security for his girlfriends; am I correct?

12   A    Correct.

13   Q    Now, you testified and told us about a situation where

14   you were by the Lifetime Fitness Center with Anna --

15   A    Yes.

16   Q    -- in the Sprinter.

17            And you testified that she really needed to use

18   the facility?

19   A    Yes.

20   Q    The rest room.

21            And basically Mr. Kelly was inside the facility

22   and he was working out?

23   A    Correct.

24   Q    And didn't have his cell phone with him?

25   A    Correct.

1    Q    And she could not reach him?

2    A    Correct.

3    Q    And instead of going, she decided she would wait and

4    continue to try to reach him?

5    A    Yes.

6    Q    Now, you didn't prevent her from going to the rest

7    room; am I correct?

8    A    No.

9    Q    In fact, you wanted her and encouraged her to go to the

10   rest room; am I correct?

11   A    I did.

12   Q    And Mr. Kelly never told you to deny her to use the

13   facility; am I correct?

14   A    No.  In that particular situation he got mad because I

15   didn't really press her to go --

16   Q    Okay.

17   A    -- on her own.

18   Q    So he was angry at you for not letting her --

19   A    Yes.

20   Q    -- for not encouraging her to go?

21   A    Yes.

22   Q    Now you also testified and told us on direct that there

23   were times that you would make reservations at a hotel for

24   Mr. Kelly and he would use a fictitious name for him; am I

25   correct?

Copeland - Cross - Cannick                3239

1    A    That's correct.

2    Q    Now that was a security concern; am I correct?

3    A    Yes.

4    Q    And, in fact, it's commonplace for artists,

5    entertainers, celebrities to use fictitious names to ensure

6    their security when they go to these places; am I correct?

7              MS. GEDDES:  Objection.

8              THE COURT:  Overruled.

9    A    That is correct.

10   Q    Now, you testified and told us about a time that Anna

11   was smoking marijuana on the property?

12   A    I --

13             MS. GEDDES:  Objection.  I don't think that's the

14   testimony.

15             MR. CANNICK:  Okay.  Well, we'll see.

16   Q    Do you recall a time when Anna was smoking marijuana on

17   one of Mr. Kelly's properties in Atlanta?

18   A    I do recall it.

19   Q    Okay.  And do you recall calling Mr. Kelly and letting

20   him know that?

21   A    I do.

22   Q    Okay.  And Mr. Kelly was not pleased to hear that; am I

23   correct?

24   A    No, he was not.

25   Q    And he and Anna had an exchange about it?

Copeland - Cross - Cannick                    3240

1   A    I believe so, yes.

2   Q    And Anna was very angry?

3   A    I -- I believe so.

4   Q    Right.

5         And as a result of this exchange, Mr. Kelly did

6   not take Anna on a cruise that he was about to go on; am I

7   correct?

8   A    I did not now that was the reason.

9   Q    Okay.  But she didn't go on the cruise, right?

10  A    That's correct.

11  Q    And, in fact, she left -- she left Mr. Kelly; am I

12  correct?

13  A    That's correct.

14  Q    And at some point she ultimately returned?

15  A    Correct.

16        MR. CANNICK:  Excuse me, Your Honor, I can't

17  remember what time you said we were taking a break.

18        THE COURT:  We've got some time.

19        MR. CANNICK:  I just need some water.

20        THE COURT:  Oh, go ahead.

21        MR. CANNICK:  I don't have any.

22        THE COURT:  Okay.

23        (Pause in proceedings.)

24        MR. CANNICK:  Thanks.

25  Q    Okay.  Now, there was part of your testimony last week

Copeland - Cross - Cannick                    3241

1  when you spoke about Mr. Kelly and you having a conversation

2  and he told you that someone said, this person said that you

3  let Anna escape.

4          Do you remember saying that?

5  A    Correct.

6  Q    Now, those were -- Mr. Kelly never used the word

7  "escape"; am I correct, other than repeating what someone

8  said?

9  A    Yes.

10 Q    And when the Government said here who used that word

11 "escape" and your answer was Mr. Kelly, you were talking

12 about Mr. Kelly repeating what someone else said; am I

13 correct?

14 A    That is correct.

15 Q    You weren't suggesting that Mr. Kelly told you that you

16 let someone escape, right?

17 A    That is correct.

18 Q    Okay.  In fact, did you in you 15 years with Mr. Kelly,

19 ever try to prevent someone from leaving?

20 A    Never.

21 Q    And women left him many times; am I correct?

22 A    Many times.

23 Q    And have you ever heard of Mr. Kelly or -- well, let me

24 back up.

25          Have you ever seen Mr. Kelly physically try to

Copeland - Cross - Cannick                    3242

1   stop someone from leaving him?

2   A    Never.

3   Q    Have you heard of him suggesting to someone else to

4   prevent someone from leaving him?

5   A    Never.

6   Q    In fact, when they left Mr. Kelly was the one who paid

7   for their airfare; am I correct?

8   A    That's correct.

9   Q    What Mr. Kelly's issue was --

10            MS. GEDDES:  Objection.

11            THE COURT:  Sustained as to form.

12  Q    Mr. Kelly did not want them to take any of the items he

13  purchased for them, correct?

14            MS. GEDDES:  Objection.

15            THE COURT:  Sustained.

16  Q    Did you ever try to stop someone from leaving

17  Mr. Kelly?

18  A    No.

19  Q    Now you testified and told us about seeing a gun behind

20  the bar.  Do you remember telling us about that?

21  A    That is correct.

22  Q    Okay.  Now how close did you get to that gun?

23  A    Maybe about 12 inches away.

24  Q    Okay.  And you didn't examine the gun, did you?

25  A    No.

1  Q    Okay.  Now, you worked with Mr. Kelly for over 15 years
2  in both his house and his business.  Did you ever see him in
3  possession of a gun?
4  A    Never.
5  Q    When you saw the gun that day, do you recall what time
6  of day it was?
7  A    I believe it was nighttime.
8  Q    And do you recall who, if anyone else, was in the bar
9  at that time?
10  A    I believe it was -- besides the engineers, that I was
11  the only ere person there.
12  Q    And you don't know who was in the bar before you got
13  there; am I correct?
14  A    I'm sorry?
15  Q    You don't know who was in the bar before you got there?
16  A    I do not.
17  Q    All right.  You didn't like some of the rules
18  Mr. Kelly -- rules or policies that Mr. Kelly had; am I
19  correct?
20  A    Correct.
21  Q    But notwithstanding, you would still return and work
22  for him?
23  A    That is correct.
24  Q    Even times that you quit?
25  A    That is correct.

Copeland - Cross - Cannick                    3244

1  Q    Those policies and procedures were still in place when
2  you returned?
3  A    That is correct.
4  Q    And that letter of -- withdrawn.
5        At any point in time that you were working for
6  Mr. Kelly, did he ever instruct you to recruit women for
7  him?
8  A    No.
9  Q    Did you ever hear him ask others to recruit women for
10 him?
11 A    No, I did not.
12 Q    Did you ever see Mr. Kelly take rooftop dinners with
13 his girlfriends?
14 A    Yes.
15 Q    To expensive restaurants?
16 A    Yes.
17       MR. CANNICK:  I'm almost there, Your Honor.
18       THE COURT:  Okay.
19 Q    Now, the computer that you spoke of early that went
20 missing, that computer basically had Mr. Kelly's information
21 on it; am I correct?
22 A    Correct.
23 Q    You basically used that computer to perform his job
24 responsibilities -- withdrawn.
25       You basically used that computer to help you, and

Copeland - Cross - Cannick                    3245

1  assist you in doing your job as it related to him; am I

2  correct?

3  A    That's correct.

4  Q    So the information on that computer was his

5  information; am I correct?

6  A    That's correct.

7  Q    Now, when you said that Mr. Kelly, your -- withdrawn.

8        That your responsibilities in your last stint was

9  to help try to track down and trace his monies, Mr. Kelly

10 generated very large sums of revenue; am I correct?

11        MS. GEDDES:  Objection.

12        THE COURT:  Sustained as to form.

13 Q    Mr. Kelly's -- you were aware of his earning

14 capacity -- withdrawn.

15        You had some involvement with his -- familiarity

16 with his contracts?

17 A    Correct.

18 Q    And he collected -- he was generated revenues from

19 royalties?

20 A    Correct.

21 Q    Record sales?

22 A    Correct.

23 Q    Record production?

24 A    Correct.

25 Q    Song writing?

Copeland - Cross - Cannick                    3246

1   A    Correct.

2   Q    Mr. Kelly generated hundreds of millions of dollars; am

3   I correct?

4   A    That is correct.

5   Q    Now, in the 15 years that you worked with Mr. Kelly,

6   did you ever see him try to stop or prevent any one of his

7   girlfriends from leaving him?

8   A    No.

9   Q    Have you ever saw him lock any of his girlfriends in a

10  room?

11  A    Never.

12  Q    Has he ever asked you to do such a thing?

13  A    Never.

14  Q    Have you ever heard him ask any of his staff to do such

15  a thing?

16  A    Never.

17  Q    Did you ever see Mr. Kelly deny any of his girlfriends

18  water?

19  A    Never.

20  Q    Did you ever hear him ask anyone else to deny them

21  water?

22  A    No.

23  Q    Did he ever ask you to deny the water?

24  A    No.

25  Q    What about food, have you ever seen him deny them food?

Copeland - Cross - Cannick                    3247

1    A    No.

2    Q    In fact, they had Uber accounts for the girlfriends?

3    A    They did.

4    Q    They had menus all across the place to order food; am I

5    correct?

6    A    Yes.

7    Q    And they had runners available to them to go and get

8    food; am I correct?

9    A    That's correct.

10   Q    And they had personal assistants to also assist them

11   with getting food, water, drinks, shopping, anything of

12   those things; am I correct?

13   A    That is correct.

14   Q    You did not see anyone in Mr. Kelly's employment do any

15   of those things in terms of denying women food, water,

16   drinks?

17   A    No.

18   Q    Never saw anyone locked in a room?

19   A    Never.

20   Q    And you'd come to work, just do your job to the best of

21   your abilities; am I correct?

22   A    That's correct.

23        MR. CANNICK:  Your Honor, I have nothing further.

24        THE COURT:  All right.  Any redirect?

25        MS. GEDDES:  Yes, Your Honor.

Copeland - Redirect - Geddes                    3248

1   REDIRECT EXAMINATION
2   BY MS. GEDDES:
3   Q    Is it fair to say that testifying here today is hard
4   for you?
5   A    That is correct.
6   Q    And when you stopped working for the defendant, was
7   part of that because your name had been out there in the
8   media?
9   A    That's not correct.
10  Q    Were you concerned about how your name was portrayed in
11  media at some point?
12  A    Yes, that's correct.
13  Q    And does that still concern you here today?
14  A    No, it does not.
15  Q    You're not concerned about how the media will react to
16  your testimony here today?
17  A    No, I'm not.
18  Q    On cross-examination you were asked about that letter
19  that I showed you which admitted -- or claimed to admit to
20  stealing from the defendant.  Do you recall those questions?
21  A    I do.
22  Q    Were you the only person who was working for the
23  defendant who wrote that letter?
24           MR. CANNICK:  Objection.
25           THE COURT:  Overruled.

Copeland - Redirect - Geddes                3249

1          To your knowledge, did you ever see other people
2    write those letters?
3          THE WITNESS:  I did not.
4    Q    Did you hear about -- I think in your direct
5    examination you testified about he asked others to write
6    that letter; is that correct?
7    A    That's that I was told, yes.
8    Q    And the misunderstanding that you had, that had nothing
9    to do with stealing from him, correct?
10   A    I don't believe I remember what the misunderstanding
11   was about.
12   Q    I just want to be clear:  Did you ever steal from the
13   defendant?
14   A    No, I did not.
15   Q    So when you wrote that you stole from the defendant,
16   that was not true, correct?
17   A    That's correct.
18   Q    And you wrote that because the defendant wanted you to
19   write that, correct?
20   A    That is correct.
21   Q    And the defendant told you that it was his attorney's
22   idea to write that letter, correct?
23   A    That is correct.
24   Q    On cross-examination you were asked about how you would
25   dress when you were working for the defendant.  Do you

Copeland - Redirect - Geddes          3250

1  recall that?

2  A    Yes.

3  Q    Whose choice was it for you to wear the clothing that

4  you wore on a day-to-day basis while you worked for the

5  defendant?

6  A    It was my choice.

7  Q    The defendant never told how to dress, correct?

8  A    Never.

9  Q    And you remember also being asked about whether people

10 could roam within -- well, first off think about

11 Olympia Fields where the defendant was living.  And you

12 testified that people were not allowed to roam; is that

13 correct?

14 A    That is correct.

15 Q    But you were allowed to freely roam around

16 Olympia Fields, weren't you?

17 A    That is correct.

18 Q    And you were also asked about who put in place the rule

19 that individuals not roam around Olympia Fields, and I

20 believe you testified that it was his wife; is that correct?

21 A    That is correct.

22 Q    Was his wife there after the first two years that you

23 worked for the defendant?

24 A    No, she was not.

25 Q    And did the rule stay in place after you worked for the