# 22-1481 22-1982 (con)

## UNITED STATES COURT OF APPEALS

*for the*

## SECOND CIRCUIT



**UNITED STATES OF AMERICA,**

*Appellee,*

-v.-

**ROBERT SYLVESTER KELLY**
**AKA R. KELLY**

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**BRIEF FOR DEFENDANT-APPELLANT ROBERT SYLVESTER KELLY**

JENNIFER BONJEAN
ASHLEY COHEN
BONJEAN LAW GROUP, PLLC
750 Lexington Avenue, 9th Floor
New York, NY 10022
(718) 875-1850

Chicago Office:
Bonjean Law Group, PLLC
53 W. Jackson, Blvd., Ste. 315
Chicago, Illinois 60604

# <u>TABLE OF CONTENTS</u>

STATEMENT OF JURISDICTION…………………………………………...  1

ISSUES PRESENTED FOR REVIEW…………………………………...  2

STATEMENT OF THE CASE…………………………………………...  3

SUMMARY OF ARGUMENT…………………………………………..  21

ARGUMENT…………………………………………………………..  26

I.   THE GOVERNMENT FAILED TO PROVE DEFENDANT
     GUILTY OF RACKETEERING WHERE THE RECORD IS
     DEVOID OF EVIDENCE OF AN ENTERPRISE COMPRISED OF
     MEMBERS WHO SHARED A COMMON ILLEGAL OR
     FRADULENT PURPOSE AND WHERE THE DEFENDANT AND
     THE ALLEGED ENTERPRISE WERE INDISTINCT……………..  26

     A.   General Legal Principles…………………………………  27

     B.   No Common Purpose to Engage in a Fraudulent or Illegal
          Course of Action…………………………………………..  28

     C.   Defendant and the Enterprise Are Not Distinct……………..  37

II.  THE GOVERNMENT'S EVIDENCE WAS INSUFFICIENT TO
     PROVE DEFENDANT GUILTY OF VIOLATING THE MANN
     ACT AS TO JANE…………………………………………..  42

     A.   Insufficient Evidence of Intent…………………………  43

     B.   Insufficient Evidence of Coercion or Enticement……………  47

          1. April/May 2015 Trip to California………………………  48

          2. September/October 2015 Trip to California……………  52

i

III.     THE GOVERNMENT'S EVIDENCE WAS INSUFFICIENT TO
         PROVE DEFENDANT GUILTY OF VIOLATING THE MANN
         ACT AS TO FAITH…………………………………………….     54

         A.     Insufficient Evidence of Intent…………………………….     54

         B.     Insufficient Evidence of Coercion or Enticement……………     56

         C.     New York Penal Law 120.20 (reckless endangerment) ……….     58

         D.     New York Public Health Law § 2307…………………………     61

IV.      BECAUSE NEW YORK PUBLIC HEALTH LAW § 2307 IS
         UNCONSTITUTIONALLY VAGUE, DEFENDANT'S MANN
         ACT CONVICTIONS PREDICATED ON THAT LAW MUST BE
         VACATED……………………………………………………….     63

V.       DEFENDANT'S MANN ACT CONVICTIONS PREDICATED ON
         A VIOLATION OF CALIFORNIA HEALTH AND SAFETY
         CODE § 120290 MUST BE VACATED BECAUSE THE
         GOVERNMENT CHARGED DEFENDANT WITH A REPEALED
         VERSION OF THE STATUTE THAT WAS
         UNCONSTITUTIONALLY VAGUE………………………………     66

VI.      THE GOVERNMENT FAILED TO PROVE DEFENDANT
         GUILTY OF FORCED LABOR OF JERHONDA AND FAITH
         BASED ON AN ISOLATED SEX ACT THAT NEITHER VICTIM
         ALLEGED WAS FORCED…………………………………………     70

VII.     DEFENDANT WAS DENIED A FAIR AND IMPARTIAL JURY
         WHERE SEVERAL OF THE SEATED JURORS ADMITTED
         THAT THEY PREJUDGED THE DEFENDANT'S GUILT AND
         TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF
         COUNSEL WHEN HE FAILED TO MOVE TO DISQUALIFY
         PATENTLY UNQUALIFIED JURORS…………………………..     75

VIII.    DEFENDANT WAS DENIED A FAIR TRIAL WHERE THE
         GOVERNMENT SWAMPED THE JURY WITH EXCESSIVE
         BAD ACT EVIDENCE INCLUDING TESTIMONY FROM
         SEVEN ADDITIONAL WITNESSES WHO DETAILED

DEFENDANT'S UNUSUAL AND GRAPHIC SEXUAL ACTIVITIES, HIS HISTORY OF TRANSMITTING HERPES TO HIS SEX PARTNERS, HIS ABUSIVE CONDUCT TOWARDS HIS GIRLFRIENDS, AND EVEN AUDIO AND VIDEO RECORDINGS OF THIS CONDUCT WITH WOMEN AND MEN, SOME OF WHOM NEVER TESTIFIED……………………………    86

    A.    Excessive STD Evidence……………………………………    89

    B.    Evidence Concerning Sexual Relations with Aaliyah…………..    91

    C.    Testimony from Addie, Alexis, Kate, Anna, Angela, Louis, and Alex……………………………………………………………..    93

    D.    Admission of Graphic Videos and Audio Recordings………….    96

IX.    THE DISTRICT COURT'S RESTITUTION AWARD FOR JANE AND STEPHANIE'S HERPES TREATMENT WAS UNSUPPORTED BY THE GOVERNMENT'S EVIDENCE……….    97

    A.    Jane………………………………………………………………    97

    B.    Stephanie………………………………………………………    102

X.    THE DISTRICT COURT LACKED AUTHORITY TO ORDER THE BOP TO TURNOVER MONIES SEIZED FROM DEFENDANT'S TRUST FUND TO THE CLERK OF COURT FOR FUTURE RESTITUTION PAYMENTS……………………….    104

CONCLUSION…………………………………………………………...    106

## TABLE OF AUTHORITIES

### CASES

*Anctil v. Ally Fin., Inc.,* 998 F. Supp. 2d 127 (S.D.N.Y. 2014) .............................33

*Atkinson v. Anadarko Bank & Trust Co.,* 808 F. 2d 438 (5th Cir. 1987)...............41

*Babb v. Capitalsource., Inc.,* 588 F. App'x 66 (2d Cir. 2015)................................33

*Bangl. Bank v. Rizal Commer. Banking Corp.,*
2020 U.S. Dist. LEXIS 49246 (S.D.N.Y. Mar. 20, 2020).......................................32

*Bennett v. U.S. Trust Co. of New York*, 770 F. 2d 308 (2d Cir. 1985) ...................37

*Boyle v. United States,* 556 U.S. 938 (2009)........................................................27

*Brannon v. Boatmen's First Nat'l Bank of Oklahoma,*
*T.B.A.,* 153 F. 3d 1144 (10th Cir. 1998)................................................................37

*Brittingham v. Mobil Corp.,* 943 F. 2d 297 (3d Cir. 1991) ....................................40

*Caminetti v. United States,* 242 U.S. 470 (1917) ..................................................45

*Cedric v. Kushner Promotions, Ltd. v. King,* 533 U.S. 158 (2001) .......................37

*Cisneros v. Petland, Inc.,* 972 F. 3d 1204 (11th Cir. 2020) ..................................35

*Connors v. United States*, 158 U.S. 408 (1895) ....................................................83

*Crab House of Douglaston v. Newsday,* 801
F. Supp. 2d 61 (E.D.N.Y 2011).............................................................................28

*Cruz v. FXDirectDealer, LLC.,* 720 F. 3d 115 (2d Cir. 2013) ...............................33

*Cullen v. Margiotta,* 811 F. 2d 698 (1987) ...........................................................39

*Dickerson v. Napolitano,* 604 F. 3d 732 (2d Cir. 2010).........................................64

*Discon, Inc. v. NYNEX Corp.,* 93 F. 3d 1055 (2d Cir. 1996) ................................40

*Expressions Hair Design v. Schneiderman,*
803 F. 3d 94 (2d Cir. 2015). ..................................................................62

*First Capital Asset Mgmt., Inc.. v. Satinwood, Inc.,*
385 F. 3d 159 (2d Cir. 2004) ....................................................27, 31, 37

*First Nationwide Bank v. Gelt Funding, Corp.,*
 820 F. Supp. 89 (S.D.N.Y. 1993) *aff'd* 27 F. 3d 763 (2d Cir. 1994) ...................33

*Fitzgerald v. Chrysler Corp.,* 116 F. 3d 225 (7th Cir. 1997) ................................21

*Gomez v. United States,* 490 U.S. 858 (1989).........................................................85

*Hansen v. Haff,* 291 U.S. 559 (1934) ......................................................................47

*Hirsch v. Enright,* 751 F. 2d 628 (3d Cir. 1984) .....................................................38

*In re Michael,* 326 U.S. 224 (1945) ........................................................................75

*Irwin v. Dowd,* 366 U.S. 717 (1961) .......................................................................76

*Johnson v. United States,* 576 U.S. 591 (2015).......................................................63

*Kaul v. Intercontinental Exch.,* 2022 U.S. Dist. LEXIS 164414
(S.D.N.Y. Sep. 12, 2022) ........................................................................32

*McCullough v. Suter,* 757 F. 2d 142 (7th Cir. 1985)...............................................38

*Michelson v. United States,* 335 U.S. 469 (1948) ...................................................88

*Mortenson v. United States,* 322 U.S. 369 (1944)............................................44, 45

*Moss v. BMO Harris Bank, N.A.,* 258 F. Supp. 3d 289 (E.D.N.Y. 2017)..............32

*Muchira v. Al-Rawaf,* 850 F. 3d 605(4th Cir. 2007) ..............................................71

*New York v. United Parcel Serv., Inc.,* No. 15-CV-1136 (KBF),
2016 U.S. Dist. LEXIS 105038 (S.D.N.Y. Aug. 9, 2016) ......................33

*Old Chief v. United States,* 519 U.S. 172 (1997) ....................................................88

*Ray v. Spirit Airlines, Inc.,* 836 F. 3d 1340 (11th Cir. 2016) ...................................35

*Reves v. Ernst & Young,* 492 U.S. 229 (1989) .........................................................26

*Riverwoods Chappaqua Corp. v. Marine Midland Bank,*
*N.A.,* 30 F. 3d 339 (2d Cir. 1994)........................................................................37, 38

*Rosales-Lopez v. United States*, 451 U.S. 182 (1981)..............................................83

*Sairam v. Mercy Ret. & Care Ctr.,* 2022 U.S. Dist. LEXIS 9462
(N.D.Cal. Jan. 19, 2022)............................................................................................35

*See Toviave,* 761 F. 3d 623 (5th Cir. 2014)..............................................................74

*Smith v. Phillips,* 455 U.S. 209 (1982)....................................................................76

*Stein v. World-Wide Plumbing Supply Inc.,* 71 Supp. 3d 320
(E.D.N.Y. 2014) ........................................................................................................27

*Strickland v. Washington,* 466 U.S. 668 (1984)......................................................77

*United States v Marcus,* 487 F. Supp. 387 (E.D.N.Y. 2007) ..................................71

*United States v. An Soon Kim,* 471 F.App'x 82 (2d Cir. 2012) ...............................44

*United States v. Basciano,* 599 F. 3d 184 (2d Cir. 2010)........................................27

*United States v. Blount*, 479 F. 2d 650 (6th Cir. 1973)............................................83

*United States v. Chambers,* 291 U.S. 217 (1934) ....................................................66

*United States v. Gagliardi,* 506 F. 3d 140 (2d Cir. 2007)..................................52, 58

*United States v. Goodrich,* 12 F. 4th 219 (2021) .....................................................98

*United States v. Griffith,* 2000 U.S. Dist. LEXIS 12655 (S.D.N.Y. 2000) .............45

*United States v. Haslage,* 853 F. 3d 331 (7th Cir. 2017) .........................................45

*United States v. Hayward,* 359 F. 3d 631 (3d Cir. 2004).........................................44

*United States v. Hickman,* 330 F. Supp. 3d 921 (W.D.N.Y. 2018).......................105

*United States v. Indelicato,* 865 F. 2d 1370 (2d Cir. 1989) .................................28

*United States v. Lopez,* 514 U.S. 549 (1995) ...........................................................46

*United States v. Maynard,* 743 F.3d 374 (2d Cir. 2014) .....................................100

*United States v. Mejia,* 545 F. 3d 179 (2d Cir. 2008) .............................................27

*United States v. Miller,* 148 F. 3d 207 (2d Cir. 1998).............................................44

*United States v. Torres,* 128 F. 3d 38 (2d Cir. 1997) ..............................................77

*United States v. Turkette,* 452 U.S. 576 (1981)...............................................27, 35

*United States v. Vilar,* 729 F. 3d 62 (2d Cir. 2013) ................................................99

*United States v. Waqar,* 997 F. 3d 481 (2d Cir. 2021).......................................52, 58

*United States v. Woodard,* 2016 U.S. Dist. LEXIS 1195118
(W.D. Mich. Jun, 24, 2016).....................................................................................105

*US Dominion, Inc. v. MyPillow, Inc.,* 2022 U.S. Dist. LEXIS 90530
(D.C. Cir. May 19, 2022) ..........................................................................................35

*Weaver v. Siegel,* 2020 U.S. Dist. LEXIS 228258
(E.D.N.Y. Sep. 22, 2020) ..........................................................................................32

## **STATUTES**

18 U.S.C. § 1961(4) ...................................................................................................27

18 U.S.C. § 1962(c)..............................................................................................26, 39

18 U.S.C. § 2421(a)........................................................................................... passim

18 U.S.C. § 2422(a)........................................................................passim

18 U.S.C. § 2429 ......................................................................96, 98

18 U.S.C. § 3572(i) ........................................................................104

18 U.S.C. § 3613(A)........................................................................104

18 U.S.C. § 3663 ..............................................................................98

18 U.S.C. §1589 ..............................................................................71

18 U.S.C. 2422(b) ......................................................................52, 98

18 U.S.C. 2423(a) ............................................................................98

## OTHER AUTHORITIES

California Penal Law Sections 261.5(a)........................................43, 46, 52

California Penal Law Sections 261.5(b) ..........................................43, 46

New York Penal Law Section §120.20 ............................................54, 56

## CODES

California Health and Safety Code § 120290.................................2, 22, 43

## STATEMENT OF JURISDICTION

A jury returned a verdict, finding Defendant guilty of all charges in the government's third superseding indictment on September 27, 2021. [DE238][1] Defendant was sentenced to a term of 30 years' imprisonment on June 29, 2022. Judgment was entered on June 30, 2022. [DE319] A timely notice of appeal was filed on July 22, 2022. [DE321] After a subsequent restitution hearing held on September 28, 2022, the district court entered a restitution order on November 8, 2022. [DE344] Defendant filed an amended notice of appeal on November 22, 2022. [DE354] An amended judgment was entered on December 7, 2022. [DE357]

On September 9, 2022, the district court judge entered an order directing the Bureau of Prisons to turnover monies it seized from defendant's inmate trust account to the Clerk of the Court. [DE330] Defendant filed a notice of appeal from that order on September 9, 2022. [DE332]

The United States Court of Appeals for the Second Circuit has jurisdiction over these matters pursuant to 28 U.S.C. §1291.

---

[1] Cites to the district court docket will be as follows: [DE#]; Cites to the Special Appendix will be as follows: (SpA#); Cites to the Appendix will be as follows: (Vol.# of # (A#)); Cites to the Sealed Appendix will be as follows: (Vol.# of # (SA#)); Cites to the trial transcripts not contained in an appendix are as follows: ("R#"); Cites to Government Exhibits are as follow (GX#).

## ISSUES PRESENTED FOR REVIEW

1.    Whether the government failed to prove defendant guilty of racketeering where the record is devoid of evidence of an enterprise comprised of members who shared a common illegal or fraudulent purpose and where the defendant and the alleged enterprise were indistinct.

2.    Whether the government failed to prove defendant guilty of violating the Mann Act as to Jane.

3.    Whether the government failed to prove defendant guilty of violating the Mann Act as to Faith.

4.    Whether New York Public Health Law § 2307 is unconstitutionally vague such that defendant's Mann Act convictions predicated on that law must be vacated.

5.    Whether defendant's Mann Act convictions predicated on a violation of California Health and Safety Code § 120290 must be vacated, because the government charged defendant with a repealed version of the statute that was unconstitutionally vague.

6.    Whether the government failed to prove defendant guilty of forced labor of Jerhonda and Faith based on an isolated sex act that did not constitute "labor or service" and that neither victim alleged was forced.

7.      Whether defendant was denied a fair and impartial jury where four of the seated jurors admitted that they prejudged the defendant's guilt, and trial counsel provided ineffective assistance of counsel when he failed to move to disqualify the patently unqualified jurors or otherwise conduct a meaningful *voir dire* of prospective jurors.

8.      Whether defendant was denied a fair trial where the government swamped the jury with excessive other bad act evidence including testimony from seven additional witnesses who detailed defendant's unusual and graphic sexual activities, his history of transmitting herpes to his sex partners, his abusive behavior toward his girlfriends, and both audio and video-recordings of this conduct with women and men, some of whom never testified.

9.      Whether the district court's restitution award for Jane and Stephanie's herpes treatment was unsupported by the government's evidence.

10.      Whether the district court lacked authority to order the BOP to turnover monies seized from defendant's trust fund account to the Clerk of Court for future restitution payments.

## STATEMENT OF CASE

The Defendant, an internationally renowned recording artist, was charged with leading a Racketeer Influenced and Corrupt Organization ("RICO") enterprise between 1994 and 2018, comprised of individuals whose objective was to promote

Defendant's music and to "recruit women and girls in illegal sexual activity with [Defendant] and to produce pornography and child pornography." [DE43 at ¶¶1-2] Defendant was separately charged with various Mann Act violations stemming from conduct in 2015 (related to Jane) and 2018 (related to Faith). [*Id.* at ¶¶22-29; 32-46] After a six-week jury trial, Defendant was convicted of all counts of the third superseding indictment; he was later sentenced to 30 years' imprisonment.[2] [DE319]; (SpA190)

Through new counsel, Defendant filed extensive post-trial motions pursuant to Fed R. Crim. P. 29 and 33 [DE270, 273, 276] that were denied by the district court in a 103-page Memorandum Decision and Order ("Order") [DE318]; (SpA 54-156) Defendant includes a concise statement of the case setting out the facts relevant to the issues raised in this brief and also refers this Court to the district court's detailed factual background presented in the light most favorable to the government contained in its Order. (SpA 55-86)

**A.    Pre-Trial Motions**

---

[2] On September 14, 2022, Defendant was convicted in the Northern District of Illinois with three counts of production of child pornography and three enticement counts. He was acquitted of obstruction of justice, receiving child pornography, and two enticement counts. *See United States v. Kelly, et al.,* No. 19 CR 567 (N.D. Ill.) Defendant was sentenced to 20 years' imprisonment ordered to run concurrent to the sentence in the instant case (with the exception of one year which was ordered to run consecutive). All charges brought by the state of Illinois were subsequently dismissed. Defendant still has one pending criminal case in the state of Minnesota.

Defendant unsuccessfully moved to dismiss the RICO count pre-trial, arguing that the government failed to sufficiently plead a RICO enterprise. [DE41]; (SpA1-18) Defendant also moved to dismiss as unconstitutional those Mann Act charges premised on a violation of New York Public Health Law Section 2307. [DE42] The district court denied the motion in a written order. [DE69]; (SpA19-30)

On July 23, 2021, the government filed a 55-page motion seeking to admit extensive prior bad act evidence. [DE133] On July 30, 2021, defense counsel filed a written objection to the government's motion and filed a supplemental response on August 6, 2021. [DE145; 156] The district court issued a ruling from the bench followed by a written order largely granting the government's motion. [DE255] Throughout trial, defense counsel asked the court to reconsider some of its rulings regarding the admission of other bad act evidence, mostly unsuccessfully. (SpA52-53; Vol. 1 of 5 (A1-3))

**B.    Jury Selection**

Because of extraordinary pre-trial publicity, the district court directed the parties to submit a joint proposed jury questionnaire to be completed by prospective jurors. [DE54; 115] The parties reviewed the questionnaires to determine whether they could agree to the dismissal of some jurors for cause. [DE152; 157] The district court conducted an oral *voir dire* as to the remaining

5

prospective jurors, affording the parties the opportunity to submit additional

questions to probe their qualifications to serve as jurors. (R26-451)

Numerous seated jurors were either familiar with accusations that Defendant

had a history of sexually abusing underage girls, had previously faced legal

problems, and/or had seen the highly unflattering docuseries, *Surviving R. Kelly,*[3]

in which several government witnesses had appeared. (Vol. 1 of 5 (A45-97); Vol. 1

of 7 (SA178 – 402)) Defense counsel did not move to disqualify jurors who

admitted they had prejudged Defendant's guilt or had gathered knowledge about

the case from other sources. (Vol. 1 of 5 (A46-93); Vol. 1 of 7 (SA178 – 402))

Defendant was largely excluded from the *voir dire* process. (Vol. 1 of 5 (1438))

### C.   Complainants' Testimony

The third superseding indictment charged Defendant with various

racketeering acts related to sexual misconduct committed against six women, *inter*

*alia,* Jerhonda (Jane Doe #4). Jane (Jane Doe #5) and Faith (Jane Doe #6). [DE43]

### 1.   Jerhonda

In 2008, Jerhonda was a "superfan" of the Defendant and "met" him as she

walked alongside him as he left court; she told him she was a fan. (Vol. 1 of 5

---

[3] *Surviving R. Kelly* is a Lifetime docuseries that details sexual abuse allegations
against the Defendant. It aired over three nights from January 3 to January 5, 2019.
In its premiere episode, it was Lifetime's highest-rated program in more than two
years, with two million total viewers.
https://www.vanityfair.com/hollywood/2019/01/surviving-r-kelly-ratings-lifetime

(A106)) In May 2009, Jerhonda and her friend received an invitation to a party at Defendant's home by one of Defendant's employees. (*Id.* A107) Jerhonda spoke with Defendant at the party and exchanged phone numbers. She falsely told him she was 19. (*Id.* A111-112)

A few days later, the Defendant invited Jerhonda back to his house where they engaged in sexual contact. (*Id.* A115-116) According to Jerhonda, she felt uncomfortable and privately confessed to the Defendant that she was actually 16 years old. (*Id.*) Defendant told her "to continue to tell everyone that [she] was 19." (*Id.* A117) Jerhonda did not testify that she told anyone other than the Defendant that she was 16.

Jerhonda continued visiting Defendant and having sex with him for approximately eight months. On January 23, 2010, Jerhonda testified that Defendant slapped her and choked her for disrespecting him. (*Id.* A168-169) Defendant went into the VIP room with Jerhonda where he instructed her to perform oral sex on him which she did. (*Id.* A170) Jerhonda left Defendant's studio after this incident and did not return. Thereafter, she sued the Defendant. (*Id.* A173)

### 2. Jane

Jane and her parents attended one of Defendant's concerts in Orlando, Florida in April 2015. Jane was 17 years old. (Vol. 2 of 7 (SA434-435)) Jane

claimed that she made eye-contact and connected with Defendant while he was performing and danced on the stage during the performance. Someone provided Jane with Defendant's phone number after the show. (Vol. 2 of 7 (SA438); Vol. 4 of 7 (SA991 – 995) Jane attempted to call the number but could not reach the Defendant. (*Id.*) Jane's mother began texting the Defendant pretending to be Jane over the course of two days. (Vol. 4 of 7 (SA996 – 998)) Jane eventually spoke to Defendant and falsely told him she was 18 years of age. (Vol. 2 of 7 (SA446))

Jane met the Defendant at his hotel room in Orlando where they engaged in sexual contact. (Vol. 2 of 7 (SA443-457)) At one point, the police arrived and Jane reassured the Defendant that she was 18. After checking Jane's identification and confirming that she was 18, the police left. (*Id.* SA458 – 460) Thereafter, Defendant invited Jane to meet him in Los Angeles where he was performing. (*Id.* SA454-464)

With her mother's consent and encouragement, Jane met Defendant in California and traveled with him while he was touring. After his final performance in Stockton, they had sexual intercourse for the first time. (*Id.* SA483- 484)

Jane moved to Chicago the summer of 2015 to stay with the Defendant but when Defendant learned she was only 17 years old,[4] he sent her home to Florida.

---

[4] The age of consent in Illinois is 17 years old.
https://www.ilga.gov/legislation/ilcs4.asp?ActID=1876&ChapterID=53&SeqStart=13300000&SeqEnd=17200000

(*Id.* SA4502 – 503;535-526) With the consent of her parents, Jane returned to Chicago to live with the Defendant. (*Id.* SA528-529) In September and October 2015, she toured with him again in the state of California. Jane turned 18 in December 2015. (*Id.* SA435)

Jane and Defendant continued a relationship for five years. Defendant had other live-in girlfriends. (R969) Jane characterized the relationship as abusive at times and detailed that Defendant had many rules and would punish her (and his other girlfriends) with spankings if they broke the rules. (Vol. 2 of 7 (SA521-522;575) (R970-976))

### 3. Faith

Faith met the Defendant in March 2017 at a concert in San Antonio, Texas when she was 19 years old. (Vol. 6 of 7 (SA1644-1645) She and her sister were invited to an after-party where she met the Defendant and he gave her his phone number. (*Id.* SA1652 – 1653) Faith and Defendant began texting regularly. (*Id.* SA1660 – 1663)

Defendant and Faith met each other in person five times and had sexual encounters during those occasions. Defendant arranged for Faith to travel to New York on two occasions, in May and February 2018, where they engaged in sexual activity. (*Id.* SA1671 – 1677; 1682-1685) Faith also traveled to Los Angeles on

one occasion in January 2018 where according to Faith, she saw a gun in his studio that unnerved her. (*Id.* SA1739; Vol. 3 of 5 (A766 – 767)) At the Defendant's direction, the Defendant performed oral sex on the Defendant. (*Id.* A769-771)

### D.    Defendant's Former Employees

The government presented testimony from roughly eight former employees of the Defendant; none of these individuals were charged as members of the enterprise.

### 1.    Demetrius Smith (Friend and Personal Assistant from 1984-1994)

Smith met Defendant as a teenager when he was still attending high school and singing in subways in the mid-1980s. Smith was first a friend and mentor to the Defendant and then began working as his personal assistant when Defendant received his first record deal in 1988 or 1989. (Vol. 3 of 5 (A565)) Smith worked off and on for Defendant as a personal assistant until around 1994. (*Id.* A559-561) Smith's responsibilities included assisting the Defendant "in things he needed" and with scheduling. (*Id.* A562)

Smith testified that Defendant met Aaliyah through his manager Barry Hankerson who was Aaliyah's uncle. Smith testified that from his perspective their relationship was strictly about music and that he never saw Defendant take Aaliyah out by herself. (*Id.* A578) Smith did concede there were short periods of time when Defendant might be alone with Aaliyah (*Id.* A582) There were times when he

thought Defendant and Aaliyah were "overly playful" or "too friendly" and he asked Defendant if he was "messin" with Aaliyah to which Defendant always responded "no." (*Id.* A583-584) Smith raised those concerns a few times but only learned that the relationship was more than platonic in 1994 when it was believed that Aaliyah might be pregnant. (*Id.*)

### 2. Anthony Navarro (Runner and Sound Engineer from 2007-2009)

Anthony Navarro worked as a sound engineer in Defendant's studio for two-and-a-half years. (Vol. 2 of 5 (A433 – 435)) Navarro understood it was an entry level position and would include such duties as cleaning, doing food runs, and driving guests around. (*Id.* A445-447) Navarro testified that numerous people came through the studio, including different girlfriends of the Defendant. (*Id.* A458) One of his responsibilities was to drive the girlfriends where they needed to go; he was instructed not to speak with Defendant's guests. (*Id.* A459) Navarro explained that Defendant's guests were generally required to ask permission if they wanted things or wanted to order food and they were not permitted to wander the studio or Defendant's home unaccompanied. (*Id.* A464-465) Sometimes these guests would stay at the studio for an extended time but could leave if they wanted to. (*Id.* A500-501;528) Navarro did not know the details of why any female guests visited Defendant. (*Id.* A501)

Navarro never picked up female guests who appeared to be underage; they appeared to be around his age, in their early 20s. (*Id.* A523) Navarro never saw Defendant engaging in sexual activity in his home or in his studio. (*Id.* A530-531)

Navarro went on tour with the Defendant and observed that invites would be distributed to attendees for after parties. (*Id.* A477) Sometimes Defendant's phone number would be on the invites. (*Id.* A478) At times, he would see Defendant's phone number distributed to people at the mall or at a restaurant. (*Id.*) Navarro never saw underage girls backstage. (*Id.* A536) Navarro recalled that identifications were checked before people could go backstage but he could not recall whether people had to be 18 or 21. (*Id.* A538-539)

### 3. Tom Arnold (Runner/Studio Manager from 1998 to 2011)

Tom Arnold worked for Defendant from 1998 to 2011; he started as a runner and eventually became his studio manager and road manager. (Vol. 5 of 7 (SA1242 – 1245) One of Arnold's responsibilities working for Defendant was to provide transportation to his guests which could include men with whom Defendant played basketball, a musician, and his "female guests." (*Id.* SA1247) If Defendant wanted Arnold to transport a guest somewhere, Defendant would tell him directly, or someone with Defendant would make the request. (*Id.* SA1249)

Arnold testified that the protocol for driving guests from one location to another was to open the door for them, turn the rearview mirror up, and turn the

radio on to a reasonable volume. (*Id.* SA1250) Arnold understood that turning the rearview mirror up was to avoid eye-contact with Defendant's "female guests" and to ensure their privacy (*Id.* SA1251) (Vol. 3 of 5 (A722)). Guests at the studio were required to sign confidentiality agreements that prohibited guests from recording or taking photographs. Staff would either take Polaroid photos of guests or copy their identifications to confirm the identity of the person signing the confidentiality agreement. (Vol. 5 of 7 (SA1253-1254)); (Vol. 3 of 5 (A639-640;728)). The policy of having studio guests sign confidentiality agreements originated with Defendant's business manager and lawyer. (Vol. 3 of 5 (A720-721).

Arnold generally had no interactions with the Defendant's "female guests." (Vol. 5 of 7 (SA1256)). If a guest in the studio was hungry, they would call the front desk and Arnold would arrange to get them food with petty cash that was at the reception area. (*Id.* SA1257) If a guest wanted to move from one location in the studio to another, Arnold would get permission to escort the guest. (Vol. 3 of 5 (A643). If a guest wanted to speak with the Defendant, Arnold would relay the message to the Defendant. (Vol. 5 of 7 (SA1257)) Arnold explained that generally, guests would not be able to roam Defendant's studio and home freely but would ask for permission to go from one part of the studio to another. (Vol. 3 of 5 (A646))

Arnold testified that there were instances when he would provide Defendant's phone number to a woman, not normally in a concert setting but an after-party or at a club or possibly at a mall. (Vol. 3 of 5 (A650-651)) There were also other members of the entourage who would give women Defendant's phone number. (Vol. 3 of 5 (A652). Underage people were not permitted backstage and identifications were checked to ensure that. (Vol. 3 of 5 (A723-724)) Arnold did not testify that he provided Defendant's phone number to any underage women. Arnold testified that he sometimes arranged travel for Defendant's female guests until they began using a professional travel company. (Vol. 3 of 5 (A675)) Arnold would obtain the guest's identifications to arrange their travel. (Vol. 3 of 5 (A666)) Arnold did not testify that he ever booked travel for an underage female guest.

### 4. Suzette and Alesiette Mayweather (Personal Assistants in 2016)

Suzette and Alesiette worked as personal assistants for the Defendant. Suzette worked for Defendant between October 2015 and February 2017. (Vol. 5 of 7 (SA1476)); Alesiette worked for the Defendant between late 2015 to June 2016. (Vol. 5 of 5 (A1269)) Their job responsibilities were to tend to anything he needed, running errands, grocery shopping, taking care of laundry, arranging accommodations for guests (female and male) coming into town, and booking airfare. (Vol. 5 of 7 (SA1478)); Suzette and Alesiette testified that Defendant had several live-in girlfriends during this period of time. (Vol. 6 of 7 (SA1522-1526))

They testified that Defendant was controlling of his girlfriends, expected them to follow certain rules, dress-down in baggy clothes, and suspected he slapped or spanked them previously. (*Id.* SA1520;1528-1529). On a couple of occasions, the sisters expressed concern amongst themselves about Defendant's mistreatment of Jane. The sisters denied that they took any action at any time to assist Defendant in procuring girls or women. (Vol. 5 of 5 A1366)

### 5. Diana Copeland (Personal Assistant/Executive Assistant Intermittently from 2005-2018)

Copeland began working for the Defendant in 2004 or 2005 as a personal assistant and worked off and on for him until 2018. (Vol. 4 of 5 (A1037)). Her responsibilities were largely household in the beginning, tending to housekeepers and nannies and making sure they were paid. (*Id.* A1040) Later on, Copeland would do administrative jobs, like answering phones, maintaining Defendant's schedule, and tending to Defendant's guests which could be anyone from a record label executive to a personal guest. (*Id.* A1041). Copeland would make hotel and travel arrangements for the Defendant, his entourage, and his girlfriends. (*Id.* A1065-1066). Copeland would sometimes carry Defendant's backpack but she never went through it; she did see an iPad in one of his backpacks once. (*Id.* A1071-1072). During her last stint of employment with the Defendant, one of Copelands responsibilities was to help him get control of his finances. (*Id.* A1102) Defendant had difficulties reading and writing; he had no control over his bank

accounts; did not even know his social security number; and did not know where his royalties were going. (*Id.*)

Defendant instituted rules for guests on his property namely to knock before entering a room and not to roam around the property unsupervised. (*Id.* A1051) (R3146; 3213) These rules applied to everyone and were actually initiated by his wife when she lived on the property. (R3213)

Copeland acknowledged that Defendant's girlfriends also followed Defendant's rules to wear baggy clothing and not to interact with other men in public. (*Id.* A1051-1052; A1110). Defendant had girlfriends who stayed at his properties, sometimes for extended periods of time. (*Id.* A1050-1051; A1110) Some girlfriends lived in Defendant's home while others did not. (*Id.* A1110-1111) They were free to leave if they wanted to. (*Id.* A1111-1112) Copeland never attempted to stop any of Defendant's girlfriends from leaving his property. (*Id.* A1137) Defendant never asked Copeland to recruit women for him nor did she ever hear him ask any other employee to recruit women for him. (*Id.* A1139) Copeland never saw Defendant attempt to prevent any woman from leaving his home; she never saw Defendant lock any of his girlfriends in a room; and he never asked her to confine any of his girlfriends. (*Id.* A1141) Defendant's girlfriends had constant access to food and assistants to help them with anything they wanted. (*Id.* A1142).

### 6.    Nicholas Williams (Intern/Runner in 2003)

Williams worked for the Defendant for a year in 2003 when he was 19 years old (Vol. 5 of 5 (A1384-1385)). He described the environment as a "hostile work environment" and was disappointed that was not able to use the audio equipment. (*Id.* A1389)).

Different types of people visited Defendant at the studio, ranging from professional artists, musicians, actors with whom he was doing projects, personal trainer, some of his entourage, and female guests. (*Id.* A1404) Williams noticed that Defendant's female guests at the studio were young. (*Id.* A1407) Williams was instructed not to interact with the female guests. (*Id.* A1408)

### 7.    Cheryl Mack (Executive Assistant from 2014 - 2015)

Mack met Defendant in 2005 when she was working as a talent manager in the industry. (Vol. 7 of 7 (SA1929)) She reconnected with Defendant in 2013 through another record executive and began working as Defendant's executive assistant in in 2014. (*Id.* SA1966; SA2001) Mack managed Defendant's calendar and worked on projects with him; she also arranged travel for his guests and entourage. (*Id.* SA1946; SA1967) Mack would arrange travel as requested by the Defendant and used the company credit card to book necessary reservations. (*Id.* SA1967-1968) She used a company known as Preferred Travel to make most

reservations. (*Id.* SA1969) Mack was prohibited from socializing with Defendant's guests. (*Id.* SA1982)

Mack received a text message from Jane in April 2015 asking her to book travel arrangements to California for Jane which Mack did. (*Id.* SA1971-1972) Mack later met Jane in the lobby of Mandalay Bay hotel in Las Vegas where she was checking into her hotel room. (*Id.* SA1973) Mack also saw Jane in Kelly's dressing room at a venue in Connecticut where he was performing. She was there with several other individuals but eventually she left when Kelly began massaging Jane's leg because it made her feel uncomfortable. (*Id.* SA1978-1985) Mack quit the following day. (*Id.* SA1986)

### E.    Other Bad Act Evidence

Over the Defendant's objections, the district court permitted the government to admit testimony about Defendant's uncharged sexual misbehavior with at least eight other individuals including testimony from Angela, Addie, Kate, Alexis, Louis, Alex, and Anna. [DE255]; (SpA31-53) The district court's order details the testimony of these other bad act witnesses. (SpA54-156)

The district court further permitted testimony from numerous witnesses and through medical documents about Defendant's history contracting sexually transmitted diseases, including herpes and his alleged transmission of herpes to women (other than the complainants). The district court allowed the introduction

of evidence related to Defendant's alleged mistreatment of employees, including docking their pay for violating his policies and rules. The district court permitted the jury to hear audio recordings of the Defendant's alleged verbal and physical assaults of his girlfriends unrelated to the charged offenses. The district court further permitted several video recordings of graphic sexual encounters including: (1) sexual conduct between Alex, Dominique, and the Defendant (GX341, 342, 343); (2) Defendant spanking a naked Anna while she called herself insulting names (GX328(a)); and (3) Anna spreading feces on her own naked body. (GX 329(a)).

Defendant filed a motion for a new trial based, *inter alia,* on the court's admission of excessive, cumulative, and highly prejudicial other bad act evidence. [DE276] The district court denied the motion. [DE318 at pgs. 92-102]; (SpA54-156)

## F.    Verdict and Sentencing

The jury returned a verdict finding Defendant guilty on all counts of the indictment. The jury acquitted the Defendant of racketeering acts in connection to claims made by Sonya. On June 29, 2022, the district court sentenced Defendant to a term of 30 years' imprisonment and imposed court fines and costs. [DE319] The court deferred a ruling on restitution.

### G.    Seizure of Defendant's Trust Fund Account Monies

On August 4, 22, at the government's direction, the Bureau of Prison ("BOP") confiscated $27,824.24 of money from the Defendant's trust account. The government then filed a motion with the district court for an order directing the BOP to deposit the funds with the Clerk of Court. [DE323] Defendant objected to the seizure and any turnover order on the grounds that the BOP impermissibly seized the funds, and the government lacked authority to restrain the money where no default was entered, no restraining order was in place, and restitution had not even been ordered in the case. [DE325] The district court allowed the government's motion. [DE330]; (SpA157-165)

### H.    Restitution

The district court conducted a restitution hearing and awarded Jane $281,168.18 for medication (Valtrex) to treat genital herpes for the rest of her life. [DE344]; (SpA166 – 197) The district court also ordered Defendant to pay Stephanie $78,981.72 in restitution primarily to compensate her for medication to treat genital herpes that Stephanie claimed was transmitted to her by the Defendant. (*Id.* SpA166 – 197)

Defendant objected to the court's calculation of these amounts where the government offered no evidence that Jane and Stephanie were infected with herpes as a result of the charged conduct or were receiving suppressive treatment with

Valtrex. Further, the government failed to explain why compensation should include the monthly cost of Valtrex, which was nearly 40X more expensive than valacyclovir, the generic version of drug. Defendant's objections were overruled.

## SUMMARY OF ARGUMENT

In *Fitzgerald v. Chrysler Corp.,* 116 F. 3d 225, 226-27 (7th Cir. 1997), Chief Judge Posner cautioned that where a "statute is broadly worded in order to prevent loopholes from being drilled in it by ingenious lawyers, there is a danger of it being applied to situations absurdly remote from the concerns of the statute's framers." Such is the case here, where the Government (mis)used both the Racketeer Influenced and Corrupt Organizations statute ("RICO") and the Mann Act in a manner never previously conceived or carried out.

Galvanized by an influential social movement determined to punish centuries of male misbehavior through symbolic prosecutions of high-profile men, the government brought a RICO prosecution against the Defendant that was "absurdly remote" from the drafters' intent. Stretching the "liberal construction" clause well beyond the intent of Congress, the government constructed a RICO theory designed, not to "effectuate the purpose" of the RICO statute, but to prosecute the Defendant for alleged misdeeds going back decades without pesky statutes of limitations obstacles. In the end, the government failed to prove the offense of racketeering where evidence of a RICO enterprise was non-existent. The

government's evidence failed to show a collective of individuals who shared any common purpose other than to promote Defendant's music. At best, the government demonstrated that the Defendant used unwitting, low-level employees to carry out anodyne tasks that arguably facilitated his sexual needs but who had no knowledge, intent, or objective to promote his "illegal" sexual activities.

Adding to its long history of celebrity Mann Act prosecutions, the government charged Defendant with violating federal law by arranging Jane and Faith's travel to other states (California and New York) to attend his concerts with the purpose of violating public health laws, namely by exposing them to herpes during sexual intercourse. Neither Jane nor Faith were actually infected with herpes during these travels. Because the government could not, as a matter of law, prove that a "significant and motivating" factor for Defendant's transportation of Jane and Faith was to expose them to herpes in violation of state public health laws, the convictions cannot be sustained.

There are more problems with the government's creative charging approach. For one, the California public health code that the government contends Defendant violated, Cal. Health Safety Code § 120290, was repealed by the California Legislature and was inoperative at the time of Defendant's prosecution. Further, both Cal. Health Safety Code § 120290 (as charged) and New York Public Health Law § 2307 which intend to criminalize "exposure" to communicable diseases are

22

unconstitutionally vague where a person of ordinary intelligence would have no notice of what the statutes prohibit. And, as this case so aptly demonstrates, these statutes encourage arbitrary and discriminatory enforcement. Defendant may be the only person in history who has been charged with violating the federal Mann Act based on alleged misdemeanor infractions of state public health laws. He is decidedly the only person who has been charged with violating these laws without having actually infected the alleged victims with an infectious disease.

The government's proof problems extend to its forced labor charges. Evincing a clear intent to make federal law coextensive with state law, the government charged Defendant with violating the forced labor statute because on isolated occasions, he "instructed" or "directed" Jerhonda and Faith to perform an act of oral sex on him. Where an isolated sex act is neither a "labor or service" and neither women testified that Defendant forced the sex act, the government failed to prove violations of federal forced labor laws.

Sufficiency of the evidence aside, Defendant is entitled to a new trial where the record shows that *at a minimum,* four of the seated jurors (Jurors 3, 4, 5, & 12) were not qualified to serve. Two of then had watched the inflammatory, tabloid docuseries *Surviving R. Kelly.* Trial counsel's performance was objectively unreasonable when he failed to move to disqualify patently unqualified jurors and failed to conduct any meaningful *voir dire* of prospective jurors who expressed

their prejudgment of the case. Defendant was prejudiced by his counsel's sub-standard performance where it resulted in the seating of *at least* four jurors who were actually biased and could not act with impartiality.

There is more. Defendant's trial was engulfed by irrelevant and excessive bad character evidence that added little to the jury's assessment of whether Defendant committed the charged offenses. Indeed, the six-week trial was comprised overwhelmingly of uncharged bad act evidence that served no legitimate evidentiary purpose. With the court's blessing, the government smuggled in a mass of repugnant conduct under the guise that the evidence demonstrated the "means and method" of a non-existent enterprise. This case was not about an enterprise; it was about the conduct of one man who the government sought to punish for his alleged history of mistreating women. As such, the mountain of bad act evidence offered in this prosecution was nothing more than inadmissible and unduly prejudicial propensity evidence. Because Defendant was forced to defend against dozens of uncharged claims of abusive and sexual misbehavior – much of it lawful albeit unpalatable for some – Defendant was stripped of the presumption of innocence and denied a fair trial.

Lastly, the district court abused its discretion in granting Jane nearly $300,000 in restitution (and Stephanie $50,000) for a lifetime supply of Valtrex for herpes treatment. Where the government failed to establish that the women were

infected with herpes as a result of any of the charged conduct; that either of them are treated with a suppressive regimen of Valtrex; and/or actually treat with Valtrex rather than valacyclovir (the generic version of Valtrex) which is a fraction of the cost of Valtrex, the government failed to offer sufficient evidence to justify the exceptional restitution award. In short, the district court abused the purpose of restitution statute and granted Jane a windfall reward for costs she has never incurred or will incur, seemingly to punish the Defendant.

In its final push to punish the Defendant, the district court abused its discretion when it ordered the Bureau of Prisons to turnover $27,000 of seized monies from Defendant's inmate trust account for use against a *future* restitution award without any showing that Defendant had defaulted or failed to live up to his payment obligations.

Defendant's convictions must be reversed, or in the alternative, a new trial must be granted. Separately, this Court must vacate the district court's restitution order as to Jane and Stephanie and return Defendant's property to his trust account.

# ARGUMENT

**I.**   **The Government Failed To Prove Defendant Guilty Of Racketeering Where The Record Is Devoid Of Evidence Of an Enterprise Comprised of Members Who Shared A Common Illegal or Fraudulent Purpose and Where the Defendant and the Alleged Enterprise Were Indistinct.**

Ignoring the distinctly economic legislative history of the RICO statute, the government brought a RICO prosecution against Defendant, not to remedy widespread criminal activity of an enterprise, but to punish one man whose alleged crimes could no longer be prosecuted by state and local agencies. Under the guise of the "liberal construction clause," the government manufactured an ill-fitting RICO theory that was unsupported by the evidence. To be sure, prosecutors have used RICO in a wide variety of circumstances, but the liberal construction clause is "not an invitation to apply RICO to new purposes that Congress never intended." *Reves v. Ernst & Young,* 492 U.S. 229, 248-49 (1989). In its rush to indict public enemy number 1 of the #MeToo movement, the government stretched the statute beyond its limits, applying it under circumstances leagues removed from the statute's purpose. Accordingly, when the time came to prove its RICO charge, the government failed at the fundamental task of establishing an enterprise.

To convict a defendant of racketeering, the government must prove, at a minimum, the existence of an enterprise and a related pattern of racketeering activity. 18 U.S.C. § 1962(c); *United States v. Basciano,* 599 F. 3d 184, 199 (2d Cir. 2010) *citing United States v. Turkette,* 452 U.S. 576, 582 (1981). Viewing the evidence in the light most favorable to the government and drawing all inferences in its favor, this Court must vacate Defendant's conviction for racketeering where the government's evidence of a RICO enterprise was insufficient. *United States v. Mejia,* 545 F. 3d 179, 202 (2d Cir. 2008).

### A.    General Legal Principles

An enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The United States Supreme Court has defined a RICO enterprise as "a group of persons associated together for a common purpose of engaging in a course of conduct." *Turkette,* 452 U.S. at 583. *See also Boyle v. United States,* 556 U.S. 938, 950 (2009). An enterprise is demonstrated "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F. 3d 159, 173 (2d Cir. 2004). For an association of individuals to constitute an enterprise, "the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work

27

together to achieve such purposes." *Id.* at 174*.* The enterprise's purpose must be common to all of its members. *Stein v. World-Wide Plumbing Supply Inc.,* 71 Supp. 3d 320, 325 (E.D.N.Y. 2014). *See also Crab House of Douglaston v. Newsday,* 801 F. Supp. 2d 61, 77 (E.D.N.Y 2011) *citing Satinwood,* 385 F. 3d at 174. The "enterprise" is neither the individual defendant nor the "pattern of racketeering activity;" rather it is "an entity separate and apart from the pattern of activity in which it engaged," and must be alleged and proved separately. However, there must be a nexus between the enterprise and the racketeering activity that is being conducted. *United States v. Indelicato,* 865 F. 2d 1370, 1384 (2d Cir. 1989).

Against this legal backdrop and taking the evidence in the light most favorable to the government, the government failed to prove a RICO enterprise. Assuming arguendo, the government's evidence was sufficient to establish that the Defendant committed various sex offenses between 1994 and 2018, its evidence did not show that those offenses were committed as part of an enterprise. Specifically, the government's failure to demonstrate a fraudulent or illegal common purpose of the enterprise distinct from the Defendant [or his racketeering activities] was fatal to its RICO theory notwithstanding the jury's verdict.

**B.** **No Common Purpose to Engage in a Fraudulent or Illegal Course of Action**

In its third superseding indictment, the government alleged, *inter alia,* that the Defendant, individuals he employed, and members of his entourage constituted a group of individuals associated in fact who functioned as a continuing unit for the common purpose of promoting Defendant's music and brand and to "recruit women and girls in illegal sexual activity with [Defendant] and to produce pornography and child pornography." [DE43 at ¶¶1-2]

Defendant does not dispute that during his 25-year recording career he maintained a production company that employed dozens of people. Defendant's business was no different than other businesses both in the music industry and elsewhere. Typical of a "hugely famous" recording artist, Defendant employed managers, accountants, engineers, security personnel, drivers, runners, and personal assistants. (Vol. 2 of 5 A514-15; Vol. 3 of 5 A693) Defendant concedes that people on his payroll or in his so-called entourage generally shared a common purpose of promoting his music. But the evidence failed to show that his employees shared a common purpose to "recruit" women and girls to engage in "illegal sexual activity" with the Defendant or in the "production of child pornography."

Out of the gate, this RICO prosecution was suspect where the only person named in the indictment was Defendant. While the government is under no obligation to indict every member of a RICO enterprise, if the government lacks

29

evidence to indict *any* other member of an alleged enterprise, it is a good sign that no RICO enterprise exists. The government bandied about the buzzwords of a legitimate RICO prosecution, quick to label everyone and anyone in Defendant's orbit as part of his "inner circle" but came up short on actual evidence of an "inner circle" of people who carried out the purpose of the so-called enterprise. Of the 45 government witnesses, only eight former employees testified; none offered testimony establishing personal knowledge of Defendant's purported "illegal sexual conduct" let alone knowing facilitation of it.

Despite repeated references to Defendant's "inner circle" which connotes a small group of individuals close to the leader of a group, the government's enterprise evidence came largely from a handful of low-level employees. These employees were consistent in their account of working for Defendant; they largely just followed rules, some arguably strange but not inherently illegal. They were not privy to Defendant's sex life or the details of his relationships. Most importantly, they never agreed to assist or help the Defendant engage in illegal sexual conduct of any kind. Quite the opposite, for example personal assistants Suzette and Alliesette expressed concern about how Defendant treated some of his live-in girlfriends, and both women worked for Defendant for short periods of time. Cheryl Mack quit her job the very next day after meeting Jane and observing her interactions with the Defendant.

The district court makes much of testimony that employees would sometimes pass Defendant's phone number along to *women.* Not a single employee testified that they ever knowingly provided Defendant's phone number to a minor or were asked to. The record fails to show that there was an expectation to "recruit" underage girls or that any employee received a benefit for doing so. Indeed, both Anthony Navarro and Tom Arnold denied ever providing Defendant's phone number to underage girls or driving any women who appeared to be minors. In fact, the government's evidence reveals that employees were prohibited from interacting with Defendant's girlfriends or talking about his relationship with them. Jerhonda testified that Defendant instructed her to continue to tell people that she was 19 after he learned she was 16. In short, the record is devoid of evidence that the members of the enterprise acted with the common objective of ensuring that Defendant engaged in *illegal* sexual activity. Rather, the evidence showed that whatever "illegal sexual activity" in which the Defendant engaged was *concealed* from his employees, and he took measures to keep his personal sexual life secret. That some employees witnessed concerning or odd conduct by the Defendant is not the same as sharing a common purpose to promote his illegal sexual conduct.

Almost conceding that evidence of an enterprise was insufficient, the district court held that the government was not required to show a common purpose of illegal or fraudulent activity so long as the persons associated-in-fact share *any*

common purpose, including the entirely legal purpose of promoting Defendant's music and brand. Not so. As held in *Satinwood,* for an association of individuals to constitute an enterprise, "the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *Satinwood, Inc.,* 385 F. 3d at 174; *see also, Kaul v. Intercontinental Exch.,* 2022 U.S. Dist. LEXIS 164414,*20 (S.D.N.Y. Sep. 12, 2022); *Bangl. Bank v. Rizal Commer. Banking Corp.,* 2020 U.S. Dist. LEXIS 49246, *24 (S.D.N.Y. Mar. 20, 2020); *Weaver v. Siegel,* 2020 U.S. Dist. LEXIS 228258, *25 (E.D.N.Y. Sep. 22, 2020) (all generally holding that to constitute an enterprise, the association of individuals must share a common purpose to engage in a fraudulent or illegal course of conduct). Thus, for the government to prove an enterprise here, it was required to prove that Defendant, and all members of the so-called association-in-fact enterprise, came together with the common purpose of recruiting women and girls to engage in "illegal sexual activity" – not merely the broader purpose of promoting Defendant's music or brand.

In an instructive case, *Moss v. BMO Harris Bank, N.A.,* 258 F. Supp. 3d 289 (E.D.N.Y. 2017), the plaintiff brought a putative class action against First Premier Bank ("FPB") alleging RICO violations. *Id* at 293. The plaintiff charged that FPB, a formal legal entity, belonged to the Automated Clearing House ("ACH") Network, a payment processing system, that processed unlawful ACH transactions

on behalf of payday lenders. *Id.* at 295. The plaintiff argued, *inter alia,* that the ACH Network constituted an enterprise consisting of "originators," various depository financial institutions that received ACH transaction instructions, ACH operators, and third-party service providers – all of which shared the common lawful purpose of facilitating batch processing of electronic payments for and between participating depository financial institutions. *Id.* at 299.

The court concluded that the ACH Network described by plaintiff did *not* constitute an enterprise for RICO purposes because it did not "share a common purpose to engage in a particular *fraudulent* course of conduct and work together to achieve such purposes" which was fatal to its claim. (emphasis in the original) *Id. citing New York v. United Parcel Serv., Inc.,* No. 15-CV-1136 (KBF), 2016 U.S. Dist. LEXIS 105038 (S.D.N.Y. Aug. 9, 2016) *quoting First Capital Mgmt.,* 385 F. 3d at. 174. *See also, Cruz v. FXDirectDealer, LLC.,* 720 F. 3d 115, 121 (2d Cir. 2013) (affirming dismissal of association-in-fact RICO claim where the amended complaint admitted that certain participants in the purported enterprise were not aware of deceptive practices at issue); *First Nationwide Bank v. Gelt Funding, Corp.,* 820 F. Supp. 89, 90 (S.D.N.Y. 1993) *aff'd* 27 F. 3d 763 (2d Cir. 1994). Critically, the *Moss* court expressly rejected the plaintiff's "enterprise" theory, finding it implausible that all of the institutions that allegedly made up the enterprise "possess[ed] the unlawful intent required to transform that cooperative

into an association-in-fact enterprise for RICO purposes." *Id.* at 300. *See also, Anctil v. Ally Fin., Inc.,* 998 F. Supp. 2d 127 (S.D.N.Y. 2014), *aff'd in part, rev'd in part on other grounds sub nom. Babb v. Capitalsource., Inc.,* 588 F. App'x 66, (2d Cir. 2015) (dismissing RICO claims that alleged that defendants used the Mortgage Electronic Registration System ("MERS") to conceal unlawful mortgage transfers because plaintiff failed to show "coordinated activity to jointly achieve a *common fraudulent purpose.*") (emphasis in the original). The *Moss* court observed that at best, the defendant used a legitimate network to advance its own illegitimate business interests and that the alleged illicit ACH transactions did not render the ACH Network a RICO enterprise absent a common purpose among the other network participants to violate RICO. *Id.*

The *Moss* court's logic applies with full force here. The government's evidence showed, at best, that Defendant used his role within his legitimate music-driven collective to participate in private sexual misconduct. As in *Moss,* Defendant's use of his otherwise legitimate music business to advance his allegedly illegitimate sexual needs does not render Defendant's business organization a RICO enterprise *absent* a common purpose among his associates to violate RICO.

That Defendant's employees shared an abstract purpose of "promoting Defendant's music and brand" does not satisfy the "common purpose" requirement

since there still must exist a nexus between the objective of the enterprise and the racketeering activity. *Indelicato,* 865 F. 2d at 1384 ("it is plain that for establishment of a RICO violation there must also be some kind of relationship between the acts and the enterprise, for each of the substantive RICO subsections prohibits a specific type of interplay between a pattern of racketeering activity and the enterprise." *See also, Cisneros v. Petland, Inc.,* 972 F. 3d 1204, 1211 (11th Cir. 2020) (holding that "an abstract common purpose, such as a generally shared interest in making money, will not suffice [to establish an enterprise]. Rather, where the participants' ultimate purpose is to make money for themselves, a RICO plaintiff must plausibly allege that the participants shared the purpose of enriching themselves through a particular *criminal* course of conduct.") *see also, Ray v. Spirit Airlines, Inc.,* 836 F. 3d 1340, 1352, n.3 (11th Cir. 2016) (observing that the "common purpose of making money" would not be sufficient to find an association-in-fact enterprise between Spirit Airlines and outside vendors who merely provided "anodyne services."); *Sairam v. Mercy Ret. & Care Ctr.,* 2022 U.S. Dist. LEXIS 9462, *10 (N.D.Cal. Jan. 19, 2022); *US Dominion, Inc. v. MyPillow, Inc.,* 2022 U.S. Dist. LEXIS 90530, *15 (D.C. Cir. May 19, 2022).

In its Order, the district court claims that *Satinwood* is at odds with *Turkette,* because *Turkette* mentioned nothing about a "fraudulent" course of conduct, holding only that the individuals in an enterprise must share a common purpose to

engage in a "course of conduct." [DE318 at 36] (SpA89) A closer look at *Turkette* strongly suggests that the Supreme Court presumed illegality in the "course of conduct" to which it referred. The question presented to the Court in *Turkette* did not involve a deep dive into the "course of conduct" language but addressed whether an "enterprise" encompasses both legitimate and illegitimate enterprises or is limited in application to the former. *Turkette,* 452 U.S. at 577. The Court rejected the argument that an entirely illegal organization was outside the purview of the RICO statute or inconsistent with the statute's purpose. *Id.* at 591. The Court wrote, "[o]n the contrary, these statements [of purpose] are in full accord with the proposition that RICO is equally applicable to a criminal enterprise that has no legitimate dimension or has yet to acquire one." *Id.*

During its discussion, the *Turkette* assumed a RICO enterprise would have *some* criminal objective. The Court compared those associations-in-fact that were entirely criminal in nature with those that were a mixed bag of criminality and legitimacy. *Turkette* never suggested that an enterprise could be established by individuals engaging in a "course of conduct" with an entirely legal purpose that was unrelated to the alleged racketeering acts of one person in the enterprise.

The RICO statute was never intended to remedy criminal conduct of *individuals* who carried out their misdeeds through the use of routine services by their unwitting personal assistants. Under the government and the district court's

logic, an entirely rogue actor working in an otherwise entirely legal organization could be prosecuted under RICO for merely duping his assistants or associates into facilitating his misdeeds with mundane tasks. One could think of countless duties asked of an unwitting personal assistant, such as making hotel reservations, calling an Uber, throwing out a bag of garbage, or delivering a message, that could facilitate a crime perpetrated by an individual working in the context of a business. That does not a RICO enterprise make.

### B.    Defendant and the Enterprise Are Not Distinct

Relatedly, the government's evidence of a RICO enterprise was insufficient because Defendant is indistinct from the enterprise. For §1962(c) purposes, the "person" charged with a RICO violation and the alleged "enterprise" must be separate and distinct from one another. *Cedric v. Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 168 (2001) ("holding that "one must and prove the existence of two distinct entities: (1) a 'person;' and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Id.* This requirement flows from the statutory mandate that a *person* who engaged in a pattern of racketeering activity must be "employed by or associated with" the enterprise. *Satinwood,* 385 F. 3d 159 (2d Cir. 20014); *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F. 3d 339, 344 (2d Cir. 1994); *Bennett v. U.S. Trust Co. of New York*, 770 F. 2d 308, 315 (2d Cir. 1985); *Brannon v. Boatmen's First Nat'l Bank of Oklahoma,*

*T.B.A.,* 153 F. 3d 1144, 1146 (10th Cir. 1998). An entity cannot simultaneously be the enterprise and the person who conducts its affairs, permitting that would be tantamount to permitting an entity to associate with itself. *Bennett,* 770 F. 2d at 315; *Hirsch v. Enright,* 751 F. 2d 628, 633 (3d Cir. 1984)*; McCullough v. Suter,* 757 F. 2d 142, 144 (7th Cir. 1985).

If, as the government claims, the objective of the enterprise was to promote the Defendant and meet his personal needs, including his sexual activities (legal or not), the enterprise had no function unrelated to the Defendant. They are one in the same. That the government did not, and seemingly could not, indict a single other member of this enterprise under a RICO theory, reflects the absence of an enterprise distinct from Defendant. Since this RICO prosecution is the first of its kind (and likely the last of its kind), this Court must look to civil RICO cases for guidance.

In *Riverwoods, supra,* the plaintiff claimed that through acts of extortion and mail fraud, the defendant Marine Midland Bank coerced Riverwoods to "restructure" loan agreements between Riverwoods and Westchester Federal Savings, later acquired by Marine Midland. *Riverwoods,* 30 F. 3d at 341. Riverwoods purchased a property in New Castle, New York to develop residential condominiums and obtained a loan from Westchester Federal Savings for that purpose. *Id.* at 341-42. Marine Midland later acquired Westchester Federal Savings

and inherited the loan agreement. According to Riverwoods, shortly after the acquisition, Marine Midland officers communicated an intent to dishonor the loan agreement and engaged in "extortive" behavior to force Riverwoods to enter into a new loan agreement with terms more favorable to Marine Midland. *Id.* at 342.

In its complaint, Riverwoods alleged, *inter alia,* that through a pattern of racketeering activity, Marine Midland and two of its loan officers participated in the affairs of an association-in-fact enterprise known as the "Restructuring Group," in violation of 18 U.S.C. § 1962(c). This Court reiterated that under the plain language of the statute the RICO "person" must conduct the affairs of the RICO "enterprise" through a pattern of racketeering and that "the person and the enterprise referred to must be distinct." *Id*. at 344. The court emphasized that "a corporate entity may not be both the RICO person and the RICO enterprise, acknowledging that the distinctness requirement could be satisfied where there is partial overlap between the RICO person and the RICO enterprise, and that a defendant may be a "RICO 'person' and one of a number of members of the RICO 'enterprise." *Id*. *citing Cullen v. Margiotta,* 811 F. 2d 698, 730 (1987). However, by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant, the distinctness requirement may not be circumvented. *Id.* The *Riverwoods* court observed that because a corporation can only function through its

employees and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is in reality no more than the defendant itself. *Id;* *see also Brittingham v. Mobil Corp.,* 943 F. 2d 297, 301 (3d Cir. 1991). Where employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in association with the corporation do not form an enterprise distinct from the corporation. *Id*.

This Court reached a similar conclusion in *Discon, Inc. v. NYNEX Corp.,* 93 F. 3d 1055 (2d Cir. 1996). There, Discon, Inc., was a New York corporation whose primary business was to provide "removal services" to telephone companies. *Id.* at 1057. Discon argued that the defendant NYNEX, a holding company, that controlled subsidiaries MECo and NYTel (collectively, the "NYNEX Defendants") conspired with AT&T technologies to eliminate Discon from the market removal services by defrauding the public. *Id.* at 1058.

Discon sued the NYNEX defendants for civil RICO, alleging that the NYNEX group which consisted of NYNEX, MECo, and NYTel were three separate corporate "persons" that conducted the affairs of the NYNEX group "enterprise" through a number of illegal predicate acts. *Id.* at 1063. The Second Circuit observed that the distinctiveness requirement could not be circumvented "by alleging a RICO enterprise that consists merely of a corporate defendant

associated with its own employees or agents carrying on the regular affairs of the defendant." *Id*. Relying on *Riverwoods,* the Second Circuit stated that "[w]here employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in association with the corporation do not form an enterprise distinct from the corporation." *Id*. The court observed that like the defendants in *Riverwoods,* NYNEX, MECo and NYTel operated within a unified corporate structure, and even though they were legally separate entities, the relationship between NYNEX, MECo, and NYTel was not substantially different from that between the loan officers in *Riverwoods* in comparison to the bank. *Id*. at 1064. In both cases, the individual defendants were acting within the scope of a single corporate structure, guided by a "single corporate consciousness." *Id. See also, Atkinson v. Anadarko Bank & Trust Co.,* 808 F. 2d 438, 440-41 (5th Cir. 1987) (finding no enterprise distinct from the person where the defendant bank, its holding company, and three employees were not associated in any manner apart from the activities of the bank).

Applying the rules of the foregoing cases, the government failed to prove an enterprise distinct from the Defendant. By alleging a RICO enterprise that consists of Defendant and his own employees/agents carrying on his affairs, namely promoting his brand, his music, and even assuming arguendo, his sexual needs, the

government fails to satisfy the distinctness requirement. Put differently, because the government alleged that Defendant's employees associated together for no purpose other than to carry out Defendant's needs, including his personal sexual activities, the employees did not form an enterprise distinct from Defendant. Defendant and the alleged enterprise were one in the same.

In sum, the government's theory of a RICO enterprise was flawed from the start. The government's evidence, taken in its best light, showed only that Defendant employed a collective of people over his 25+ year career who promoted his career and his music; they did not share an objective to commit sex crimes against women and girls. Accordingly, the government failed to prove an enterprise, and Defendant's racketeering conviction must be vacated.

## II. The Government's Evidence Was Insufficient to Prove Defendant Guilty Of Violating The Mann Act as to Jane.

Defendant was convicted of violating the Mann Act in connection with his sexual contact with Jane during two separate trips to California in 2015. In its superseding indictment, the government charged that Defendant violated the Mann Act pursuant to 18 U.S.C. § 2421(a) when he arranged travel for Jane to California first in around April/May 2015 and again in September/October 2015, with the intent of exposing her to herpes (Racketeering Acts 8A, 9A and Count Two). Alternatively, the government charged that Defendant violated the Mann Act

pursuant to 18 U.S.C. § 2422(a) when he induced Jane to travel to California for the purpose of exposing her to herpes.(Racketeering Acts 8B). The government also charged that Defendant violated the Mann Act when he enticed Jane, a minor, to travel to California in September and October 2015 for the purpose of violating California Penal Law Sections 261.5(a) and 261.5(b) (Racketeering Acts 9A and 9D and Counts Three and Four).

### A.   Insufficient Evidence of Intent

Because Defendant's motivating purpose in arranging travel for Jane to accompany him on tour in California on both occasions had absolutely nothing to do with exposing her to herpes, the government failed to prove § 2421(a) violations of the Mann Act. Similarly, Defendant had no intent to induce or coerce Jane to travel to California to expose her to herpes as required by § 2422(a). Thus, racketeering acts 8A, 8B, 9A and Count Two must be vacated.

Section 2421(a) provides that "[w]hoever knowingly transports any individual in interstate or foreign commerce, or in any Territory or Possession of the United States, with intent that such individual engages in prostitution, or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 10 years, or both." The government's superseding indictment (Racketeering Acts 8A and 9A and Count Two) charged that the "sexual activity" for which Defendant

could be charged was a violation of Cal. Health and Safety Code § 120290 which prohibits a defendant from willfully exposing someone to a "contagious, infectious, or communicable disease."

Seemingly in this Circuit, like others, to establish "intent" for §2421(a) purposes, the government must prove that a "significant or motivating purpose" behind the travel was to engage the individual in the charged illegal sexual activity. *See United States v. Miller,* 148 F. 3d 207, 212 (2d Cir. 1998); *United States v. An Soon Kim,* 471 F.App'x 82, 84 (2d Cir. 2012); *see also, United States v. Hayward,* 359 F. 3d 631 (3d Cir. 2004). *But see, Mortenson v. United States,* 322 U.S. 369, 372 (1944) (holding that an intent must be the dominant motive of such interstate movement). The "illegal sexual activity must have not been merely incidental to the trip." *Hayward,* 359 F. 3d at 637.

Under the "significant or motivating purpose" standard, the government's evidence of intent was insufficient, because the record fails to show that Defendant intended to transport Jane to California at any time for the purpose of exposing her to herpes - the prohibited sexual activity charged. The government, and the district court, agree that the purpose of the travel was *not* to expose Jane to herpes but argue that the motivating purpose in bringing Jane to California was to have sex and that because those sexual activities could have resulted in Defendant being

charged for violating the California health code for failing to disclose his herpes diagnosis, the government's proofs were adequate.

This logic is gravely flawed as it reads the intent element entirely out of the statute. A § 2421(a) violation of The Mann Act punishes travel plus *intent* to commit a prohibited sexual activity. In this case, that prohibited sexual activity is a violation of the California public health laws. The act is not so broad as to punish travel plus a violation of a state law that results after the fact. Indeed, the United States Supreme Court held long ago in *Mortenson v. United States,* 322 U.S. 369, 372 (1944), that the *intent* must be found to exist "*before* the conclusion of the interstate journey." *See also, United States v. Haslage,* 853 F. 3d 331, 334 (7th Cir. 2017) ("the crime begins in the state where the defendant set out with the *intent* to cross the state line and commit the crime"); *United States v. Griffith,* 2000 U.S. Dist. LEXIS 12655, *11 (S.D.N.Y. 2000) *quoting Caminetti v. United States,* 242 U.S. 470, 491 (1917) (the purpose of the Mann Act was to "punish the movement in interstate commerce of women and girls with a view to the accomplishment of the unlawful purposes prohibited.")

The district court is simply wrong when it suggests that to satisfy the *intent* element, a general intent to engage in legal sex that ultimately could be criminally charged for reasons entirely unrelated to the original intent of the travel satisfies the elements of a § 2421(a) violation. Consider the hypothetical where a man

arranges to have his adult paramour travel to another state for sexual purposes, but once there, she declines his sexual advances and he sexually assaults her. Under the district court's logic, this would constitute a Mann Act violation which it decidedly is not. It surely would constitute a crime under California law, but not a Mann Act violation. The Mann Act was never intended to be a tool to punish violations of state law, particularly violations of public health laws. The United States Supreme Court has warned courts to refrain from attributing to Congress an exercise of power to displace states in their traditional role of enforcing state criminal laws. *United States v. Lopez,* 514 U.S. 549, 564 (1995).

With that established, the government simply did not prove that when Defendant arranged for Jane to travel to California in either April 2015 or September 2015, he did so with a motivating purpose to expose her to herpes in violation of a California health code. Similarly, Defendant did not, as a matter of law, violate § 2422(a) where, even if he induced Jane to travel to California in April 2015 (he didn't as argued, *infra*), it was not with the intent or purpose to expose her to herpes.

The government's proofs as to Racketeering Act 9D (Count Four) suffer from the same illogic, although admittedly, at first blush it appears to be a closer call. The government alleged that Defendant transported Jane to California in September and October 2015 to engage in prohibited sexual activity, namely

46

violations of California Penal Law Section 261.5(a) and 261.5(b) (unlawful sexual intercourse with a person under 18 years old). While Defendant's sexual activities with Jane in California arguably could have been charged under California law, the fact remains that Defendant's motivating purpose in bringing Jane to California on tour was *not* to violate the California penal code prohibiting sexual activity with individuals under the age of 18. Defendant and Jane had a consensual and legal sexual relationship in Illinois. Defendant's purpose in traveling to California was to perform, and he arranged for his girlfriend to go with him. Jane herself admitted that the reason for their travel was for him to perform at his shows. (Vol. 2 of 7 SA553) That Defendant had his girlfriend, with whom he was engaged in a consensual sexual relationship in Chicago, accompany him does not reflect an intent to violate the prohibited sexual activity defined by California state law. If Defendant had sexual relations with Jane in California in September and October, it was purely incidental to the purpose of the trip. *See Hansen v. Haff,* 291 U.S. 559, 562-63 (1934) ("[p]eople not of good moral character, like others, travel from place to place and change their residence. But to say that, because they indulge in illegal or immoral acts, they travel for that purpose, is to emphasize that which is incident and ignore what is of primary significance)

Of consideration, if Defendant had not brought Jane with him, he likely (and perhaps did) bring one of his other live-in girlfriends on the trip as his companion.

47

Sex was likely assumed irrespective of who Defendant brought on his travels which underscores that it was merely incidental to his travels rather a "motivating and significant" purpose of it. At bottom, no nexus exists between the transportation of Jane and the alleged illegal sexual activity charged as to any of the charged Mann Act violations.

### B.     Insufficient Evidence of Coercion or Enticement

Separately, the government failed to prove a Mann Act Violation pursuant to 18 U.S.C. § 2422(a) where insufficient evidence exists to show that Defendant knowingly "persuaded, induced, enticed, or coerced" Jane to travel to California in April 2015 or September 2015.

### 1.     April/May 2015 Trip to California

The government's evidence showed that Defendant *invited* Jane to come see him perform in California after they commenced an intimate relationship in Florida. There was no inducement or enticement on the part of the Defendant. Indeed, Jane's testimony and contemporaneous text messages between Jane and her mother reflect that at the direction of her mother, Jane deceived Defendant about her age and carried out a plan to meet him and engage him in a relationship - not the other way around. (GX233a)(Vol. 1 of 7 SA4-177) To be clear, Defendant concedes that neither Jane nor her mother's conduct, no matter how troubling, would be a defense to this charge if Defendant did, *in fact,* induce or entice Jane to

travel to California for illegal sexual activity, but the evidence shows only that Defendant invited Jane to travel to California to attend a concert, reasonably believing her to be 18 years of age, and she accepted.

After attending one of Defendant's performances with her parents in Orlando on April 11, 2015, Jane's mother obtained Defendant's phone number and began communicating with Defendant, posing as her daughter. (Vol. 2 of 7 SA443-444) Jane eventually communicated directly with the Defendant via Facetime and told him she was 18 years of age. (*Id.* at SA446) Jane did not reveal her true age until months later. (*Id.* at SA525)

On April 20, 2015, Jane's mother, still pretending to be Jane, arranged for Jane to meet Defendant ostensibly to audition for the Defendant. However, Jane and her mother were aware that Defendant, believing Jane to be 18, was also interested in Jane sexually. In one text, Jane's mother texted her daughter stating, "[t]his man trying to screw but I'm trying to make it business; He knows you're a singer but he ain't playing he want to ft (fuck tonight)" (Vol. 1 of 7 SA6) Despite that Jane and her mother were on notice that Defendant was interested in Jane sexually, Jane's mother encouraged Jane to "entice" the Defendant:

> Be prepared to sing 3 songs he said he will meet you and listen to your song…please have your glasses off hair to side…mama knows best pretty hurts and third your choice don't yell…put on a show..dance grab his hand shimmy wiggle sit on his lap *entice* him…while singing its all bout performance…this your chance and

opportunity don't blow it.  Jane's mother even told Jane not to look "grown." (emphasis added) (*Id.* at SA8)

After their first encounter, Jane and Defendant continued to text at the encouragement of Jane's mother and Defendant eventually invited Jane if she wanted to attend his concert in California. Jane reported back to her mother.

Jane:  And I talked to r Kelly

Mom: Yeah bout what

Jane:  **Lmao bout flying me out**

Mom: Oh really, when

Jane:  **Yeah, whenever I tell him he can. Tomorrow if I choose**

Mom: Oh yeah (*Id.* at SA19)

On April 28, 2015, Jane traveled to Los Angeles to meet Defendant with the knowledge and consent of her parents. (Vol. 2 of 7 SA464; 479) At no point did Jane express any apprehensions about being with Defendant or ask her mother to arrange for her to come home. When Jane excitedly told her mother that she was riding Defendant's tour bus to Stockton to attend his concert, Jane's mother responded, "Omg exciting you riding on the tour bus." (Vol. 1 of 7 SA33)

On May 1, 2015, Jane's mother urged Jane to take advantage of Defendant, texting her "It won't be star lifestyle if you don't get serious bout your music and show this man you want to be famous like him..once he tired of you you'll be like everybody else. You better use this as your opportunity while you got him in

spell." (*Id.* at SA35) Jane's mother then said, "You should text him and be like you know you gonna be my boo and see what he say." To which Jane responded, "Lmaooo." (*Id.*) Jane traveled with Defendant from Los Angeles to Stockton, California, telling her mother: "he asked me did I wanna come to his show I said of course and he said okay then. let's pack this stuff up. he was even putting his stuff in my bag." (*Id.* at SA38) (Vol. 2 of 7 SA483)

Jane and her mother remained in constant communication before Defendant's show. Jane's mother instructed her about what to wear and made suggestions about how she should behave at Defendant's show: "I would blow him lil kisses and wink at him and bite the tip of my finger mess with him real good. Do something seductive then make a silly face . . .lol." (*Id.* at SA39) Jane and her mother continued to text throughout Defendant's performance. At one point, Jane's mother suggested that Jane would marry the Defendant and that her son-in-law would be older than her (Jane's mother). (*Id.* at 43) According to Jane, she and Defendant had sexual intercourse for the first time after the concert. (Vol. 2 of 7 SA484)

No rational juror could conclude that Defendant "enticed, persuaded, induced, or coerced" Jane to travel to California. Jane's testimony along with contemporaneous conversations with her mother show that Defendant invited Jane to join him and she accepted. The government suggested that Defendant's mere act

of arranging for Jane's travel is sufficient to demonstrate that he "induced" her to travel to California, because he "caused" her to travel. The law says otherwise. The Second Circuit has made clear that the terms "persuade, induce, entice [and] coerce" are words of common usage that have plan ordinary meanings." *United States v. Waqar,* 997 F. 3d 481, 483 (2d Cir. 2021); *United States v. Gagliardi,* 506 F. 3d 140, 147 (2d Cir. 2007). The Court distinguishes this conduct from merely *asking* which is not sufficient to demonstrate criminality. *Id.* (recognizing that "there might be some uncertainty as to the precise demarcation between "persuading," which is criminalized, and "asking," which is not.")

Where the government concedes that Defendant was operating under a reasonable belief that Jane was 18; Jane and her mother knew that Defendant was interested in Jane sexually from jump street; and Defendant merely invited Jane to meet him in California to attend his concerts, the government failed to prove coercion or enticement. An invitation, even from a famous recording-artist, is not presumptively enticing or coercing. The government's evidence failed to show that Jane was "persuaded, induced, enticed, or coerced" into traveling to California. Jane had a mission to meet the Defendant; she succeeded at getting an invitation to join him on tour, and she accepted the invitation with the green light from her mother. Both knew that Defendant had a sexual interest in Jane who he believed to be of legally consenting age.

## 2. September/October 2015 Trip to California

The government charged Defendant with Mann Act violations pursuant to §
2422(a) and (b) under the separate theory that Defendant "did knowingly and
intentionally persuade, induce, entice, and coerce" Jane to engage in prohibited
sexual activity under California Penal Law Sections 261.5(a) and 261.5(b),
unlawful sexual intercourse with a person under 18 in September 2015 and
October 2015. As already discussed, *supra,* the government failed to prove an
intent to travel for the purpose of violating California statutory rape laws where he
was engaged in a legal sexual relationship with Jane in the state of Illinois.

Furthermore, the government simply failed to prove that Defendant took any
action to induce, persuade, entice, or coerce Jane into traveling to California. Jane
did not testify that Defendant took any actions to persuade, induce, entice, or
coerce her to engage in prohibited sexual activity while the two were in California
as a result of his in September/October 2015. Defendant and Jane were in sexual
relationship based primarily in Illinois where Defendant and Jane resided at that
point. Although Jane testified that Defendant was controlling and had slapped her
once, she did not testify that he coerced or enticed her to accompany him on tour.
Jane traveled with Defendant to numerous states as one of his partners. She went
consensually and voluntarily and remained Defendant's partner until 2019.
Defendant did not have to induce, persuade, entice, or coerce Jane to travel to

California for prohibited sexual activity, even *if* Jane later characterized the relationship as abusive.

The government's Mann Act theories were defective from the start where the government distorted the purpose of the Act and stretched its commerce power beyond all limits, making it difficult to imagine a scenario where the federal government could *not* exert its control into traditional areas of state control. The government's proofs, as a matter of law, were insufficient and this Court must vacate Defendant's convictions for Racketeering Acts 8 and 9 (Counts Two through Five)

## III. The Government's Evidence Was Insufficient to Prove Defendant Guilty Of Violating The Mann Act as to Faith.

The government's Mann Act theories related to Faith are equally, if not more, defective where Faith was an adult woman who expressly testified that she made her own "choices" and was not a "victim" of the Defendant even if she believed he was "wrong" in how he treated her.

### A. Insufficient Evidence of Intent

Racketeering Acts 12A and 14A (Counts Six and Eight) charged that Defendant violated § 2421(a) and § 2422(a) when he transported Faith to New York on two separate occasions (May 18, 2017 and February 2, 2018) with the intent to engage her in sexual activity that would expose her to herpes in violation

of New York Penal Law Section ("NYPL §120.20") (reckless endangerment) and Public Health Law Section 2307 ("NYPHL § 2307") (knowing exposure of infectious venereal disease).

Because there is no link connecting Defendant's transportation of Faith with an intent to expose her to herpes, Defendant cannot as a matter of law be guilty of the charged § 2421(a) violations. As discussed at length, *supra,* the government must prove that the charged illegal sexual activity is a "significant, or motivating purpose" behind the transportation. *Miller,* 148 F. 3d 2 at 212. Because the Defendant's purported violation of a New York Public Health Law prohibiting him from exposing a partner to herpes and reckless endangerment was *incidental* to Faith's trip rather than a motivating purpose in transporting Faith to New York, the intent requirement of the statute cannot be sustained. As previously discussed, Defendant must possess an *intent* to carry out the prohibited sexual conduct *prior* to the travel.

The government misled the jury concerning the law (which would explain why the jury returned guilty verdicts on these counts) when it argued that Defendant transported Faith to New York "for the purpose of sex, the only remaining issue is whether the sexual activity that he brought her here for was illegal, and it was." (R433) This argument erroneously suggested that the government only needed to show a general intent to transport Faith to New York

55

for sex, irrespective of whether he possessed an intent to engage in *illegal* sexual activity. As addressed *supra,* the government proves a section § 2421(a) by showing transportation plus intent to commit *unlawful* sexual activity - not intent to commit lawful sexual behavior that may result in illegal conduct. Thus, the government *was* required to show the the motivating purpose behind Defendant's transportation of Faith was to expose her to a venereal disease in violation of the specific offense charged. The same is true in connection with the §2422(a) offense where even *if* the government showed that Defendant persuaded, induced, enticed, or coerced Faith to travel to New York, his motivating purpose in doing so was not an intent to expose her to herpes.

## B. Insufficient Evidence of Coercion or Enticement

Racketeering Acts 12B (Count Seven) and 14B (Count Nine) similarly charged that Defendant did knowingly and intentionally "persuade, induce, entice, and coerce" Faith to travel in interstate commerce to engage in sexual activity that would expose her herpes in violation of NYPL §120.20 and New York Public Health Law Section 2307.

The government failed to prove that Defendant took *any* action to induce, persuade, entice, or coerce Faith into traveling to New York on May 18, 2017 and again on February 2, 2018. Defendant's mere status as a famous recording artist cannot satisfy the government's burden to prove enticement or coercion. Rather,

the undisputed evidence shows only that Defendant invited an adult woman to meet him in New York, and she accepted.

In March 2017, Faith attended one of Defendant's concerts in San Antonio, Texas with her sister. (Vol. 6 of 7 SA1649) Faith had an opportunity to meet Defendant at an after-party backstage along with other individuals. (*Id.* at SA1650) Defendant and Faith had a conversation during the after-party and Defendant provided her with his phone number. (*Id.* at SA1653; 1657) After that encounter, Faith and Defendant kept in touch via text and FaceTime. The conversations were normal, appropriate, and pleasant. Defendant complimented her appearance. (*Id.* at SA1662-1663) Faith testified that Defendant referred to himself as "Daddy" during those conversations. (*Id.*) According to Faith, Defendant asked to be called by Daddy and she agreed. Faith did *not* testify that Defendant forced her to call him Daddy. Indeed, Defendant and Faith had met exactly one time when Faith began calling him "Daddy." (*Id.* at 1663)

On the issue of travel, Faith had this to say:

Q.     In your communications with the defendant, how, if at all, did the topic of traveling to see him come up?

A.     He had informed me that he was on tour right now – or excuse me, at the time, he was on tour, so he was just saying his schedule was kind of crazy, but whenever I wanted to come see him, I could, and he just said that he could arrange the days or just let him know when I wanted to come hang out, but that it would be fun; I would get to see, you know, how – how it is, how he is on tour, things like that. (*Id.* at SA1664)

Defendant told Faith that if she wanted to come to his shows, she could contact his assistant and he would arrange it for her. (*Id.* at SA1665) Faith then contacted Defendant's assistant who made travel arrangements for her. (*Id.* at SA1666) Originally, Faith was going to travel to Chicago but ultimately traveled to New York for one of Defendant's performances. According to Faith, Defendant informed her "that he was having a show in New York and that he would like for me to come, hang out, it was going to be fun, so I said yes." (*Id.* at SA1670) Defendant's assistant arranged her travel and Faith traveled to New York to attend Defendant's performance and "hang out." (*Id.* at SA1671)

The Second Circuit has made clear that the terms "persuade, induce, entice [and] coerce" are words of common usage that have plan ordinary meanings." *United States v. Waqar,* 997 F. 3d 481, 483 (2d Cir. 2021); *United States v. Gagliardi,* 506 F. 3d 140, 147 (2d Cir. 2007). The Court distinguishes this conduct from merely *asking* which is not sufficient to demonstrate criminality. *Id.* (recognizing that "there might be some uncertainty as to the precise demarcation between "persuading," which is criminalized, and "asking," which is not.")

No rational juror could conclude from Faith's testimony that Defendant coerced or enticed her to travel to New York (for the purpose of giving her herpes no less). By Faith's account, Defendant was polite, generous, and appropriate,

leaving it entirely at her discretion to come to New York to attend a concert. Defendant's invitation does not equate to inducement or persuasion.

### C.    New York Penal Law §120.20 (reckless endangerment)

To the extent Defendant's Mann Act convictions rest on violations of NYPL §120.20, the government failed to sustain its burden, because unprotected sex with a person who carries the herpes virus does not establish a "substantial risk of physical injury." No New York court has ever found as such. Indeed, as best as Defendant can tell, no one has *ever* been prosecuted in the state of New York for reckless endangerment for exposing a sexual partner to herpes who was not infected with herpes. Needless to say, the law on this issue is lacking.

At the outset, Faith did not contract genital herpes. Faith claimed that at some point in time after she visited New York, she was diagnosed with herpes type 1 after getting a cold sore on her mouth. (Vol. 3 of 5 A796-797) She did not testify that she contracted genital herpes and there is no evidence that she did. Presumably, even the government would concede that cold sores caused by herpes type 1 (and carried by 50% of the population)[5] does not cause a substantial risk of serious physical injury.

Furthermore, as a matter of law, unprotected sex with someone who has genital herpes does not establish a "substantial risk of serious physical injury."

---

[5] https://www.webmd.com/genital-herpes/pain-management-herpes#1

According to the City Health Department, one in four New Yorkers has genital herpes.[6] If sexual intercourse with individuals who merely carry the genital herpes virus carries the "substantial risk of serious physical injury" New York City would have astronomical hospitalization and death rates from the transmission of herpes. Although Dr. Hoskin, the government's expert witness, identified some serious, but unusual, health risks associated with the contraction of genital herpes, the offense of reckless endangerment requires a showing of a "substantial risk" of "serious physical injury."

To be clear, Defendant accepts that in rare circumstances someone afflicted with herpes could suffer "serious physical injury," but here, the government did not prove that Faith faced "substantial risk" of being infected with herpes or that a "substantial risk" that would suffer the rare complications that would satisfy the "serious physical injury" element. Dr. Hoskins estimated that there exists a 10% to 20% chance of a risk of transmission when someone is managing their infections with Valtrex as Defendant was. (R3059-61) Assuming the accuracy of this statistic, it does not establish a high risk of both transmitting the disease and that the newly afflicted will suffer the rare complications that could qualify as "serious physical injury." Herpes is not deadly; it is treatable (if not curable), and rarely causes any

---

[6] https://www.nydailynews.com/new-york/one-fourth-city-residents-herpes-article-1.294915

serious, protracted health impairments.[7] Complications associated with herpes carry a low, rather than "substantial" risk of serious physical injury. As defined by the statute, the government cannot, as a matter of law, sustain this claim. In short, merely having unprotected sex with someone who carries the virus cannot as a matter of law create a substantial risk of: (1) being infected with the disease; and (2) suffering the rare complications that qualify as a serious physical injury. The government cannot point to a single case that supports the prosecution's expansive reading of this statute.

### D.    New York Public Health Law § 2307

To the extent Defendant's Mann Act convictions rest on violations of NYPHL § 2307, the government failed to sustain its burden, because there was *no* evidence presented at trial demonstrating that Defendant was "infected" with a venereal disease during his sexual interactions with Faith which explains why she never contracted genital herpes from the Defendant. New York Public Health Law § 2307 reads:

> Sec. 2307 Venereal Disease; Person knowing Himself to Be Infected; Any person who, knowing himself or herself to be infected with an infectious venereal disease, has sexual intercourse with another shall be guilty of a misdemeanor. (SpA 203)

---

[7] https://slate.com/technology/2019/12/genital-herpes-stigma-history-explained.html

By the plain terms of this antiquated provision, a Defendant must know himself to be infected with an "infectious venereal disease" to violate the provision. The government and the district court interpreted "infected" to mean merely carrying an infectious disease rather than having a herpes-related infection. The statue is silent as to the definition of "infected."

The word "infected" in the statute must be interpreted to mean active infection to avoid constitutional concerns. It is axiomatic that most courts, state and federal, will generally interpret statutes so as to avoid constitutional difficulties. *Expressions Hair Design v. Schneiderman,* 803 F. 3d 94, 114 (2d Cir. 2015). As the evidence at trial showed, herpes is a *virus* that may constitute a venereal disease but it does not follow that having the virus equates to having an infection. That said, an active outbreak of herpes where someone experiences blistering and open sores that would give them notice that they are contagious would qualify as an "infection."

The only logical (and constitutional) reading of the statue requires the government to show that Defendant was experiencing a herpes *infection* at the time of his sexual encounter with Faith which would have put the Defendant on notice of the possibility of transmitting the disease to a sexual partner. If this is not the case than New Yorkers are violating this public health law every minute of every day without any consequence.

The government presented no evidence that Defendant was experiencing a herpes-related infection during his sexual encounters with Faith, and Faith admitted that she did not contract genital herpes from the Defendant. Accordingly, the government failed to prove a violation of NYPHL § 2307.

## IV. Because New York Public Health Law § 2307 Is Unconstitutionally Vague, Defendant's Mann Act Convictions Predicated on That Law Must Be Vacated.

The government's Mann Act convictions as to Faith are predicated, in part, on his alleged violation of NYPHL § 2307 (SpA203) discussed above. Prior to his trial, Defendant unsuccessfully challenged the constitutionality of the law on Due Process grounds. [DE69] (SpA1)

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property without due process of law." *Johnson v. United States,* 576 U.S. 591, 595 (2015). In *Johnson,* the Supreme Court observed that "our cases establish that the Government violates the guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Id.* The prohibition of vagueness in criminal statute "is a well-recognized requirement, consonant alike with ordinary notions of fair play

63

and the settled rules of law," and a statute that flouts it "violates the first essential of due process." *Id.*

These Fifth Amendment principles apply to state laws through the Fourteenth Amendment. The Due Process Clause of the Fourteenth Amendment requires that every criminal statute: "(1) give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, and (2) provide explicit standards for those who apply the statute." *Dickerson v. Napolitano,* 604 F. 3d 732, 741 (2d Cir. 2010). "A plaintiff making an as-applied challenge must show that the statute in question provided insufficient notice that his or her behavior at issue was prohibited." *Id.* at 745. "Even if a person of ordinary intelligence has notice of what a statute prohibits, the statute nonetheless may be unconstitutionally vague "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Id.* at 747.

New York Public Health Law § 2307 fails both prongs of the *Dickerson* test. By failing to define "infection" or including a mental state other than "knowledge," the statute fails to put people of ordinary intelligence on notice of what conduct is prohibited. Furthermore, this Court need look no further than this case to see that the statute authorizes or encourages arbitrary or discriminatory enforcement. As best as Defendant can tell, he is the *only* person in New York history who has been

prosecuted for violating this statute where the victim was not infected with the "venereal disease."

One in six Americans (one in four New Yorkers) suffer from genital herpes (herpes simplex 2).[8] As discussed previously, although herpes in not curable, there are highly effective treatments for herpes that prevent infection. Under the plain reading of this statute, even a person who carries the virus but who has been asymptomatic for decades would commit a crime by having sexual intercourse with another - irrespective of whether he disclosed his status to his/her partner. In the absence of a definition of "infected," the statute is unconstitutionally vague.

The government and the district court's interpretation of the statute is highly stigmatizing to the millions of individuals who have been diagnosed with herpes simplex two. The disease is easily treated with a suppressive drug regimen and people often experience complete remission from infection. While the district court assumed that "infected" meant having the virus rather than having the ability to transmit it, no authority supports this application and such an interpretation not only fails to appreciate how many people carry the virus but would also lead to arbitrary and discriminatory enforcement. Indeed, under the government's interpretation of the statute, it seems likely that every sexually active person in the statute of New York is routinely violating the statute. Human Papillomavirus

---

[8] https://www.webmd.com/sex/how-common-genital-herpes

(HPV) is a sexually transmitted disease that according to the Centers for Disease Control and Prevention ("CDC") "is so common that nearly all sexually active men and women get the virus at some point in their lives.[9]" A person of ordinary intelligence would have no idea that they are prohibited from having sex in the state of New York if they have HPV - which would probably constitute 90% of the sexually active population.

In sum, NYPHL §2307 is unconstitutionally vague, and this Court must vacate Defendant's Mann Act convictions to the extent that they rely on this unconstitutionally vague statute.

**V.    Defendant's Mann Act Convictions Predicated on a Violation of California Health and Safety Code § 120290 Must Be Vacated Because the Government Charged Defendant With a Repealed Version of the Statute That Was Unconstitutionally Vague.**

The government charged Defendant with several Mann Act violations predicated on Defendants alleged violation of Cal. Health Safety Code § 120290. However, the government  charged Defendant under a repealed version of the statute no longer in effect. (SpA198) Prior to the jury charge in this case, Defendant notified the court that the jury instructions did not reflect the elements of Cal. Health and Safety Code § 120290. [DE219] The government acknowledged

---

[9] https://www.cdc.gov/std/hpv/stats.htm

as much but argued that it charged Defendant under the statute that was in effect in 2015, not the current statute.

The government had no authority to charge Defendant with a statute that was repealed or inoperative at the time of prosecution. *United States v. Chambers,* 291 U.S. 217, 223 (1934) ("In case a statute is repealed or rendered inoperative, no further proceedings can be had to enforce it in pending prosecutions unless competent authority has kept the statute alive for that purpose.")

In 2015, § 120290 of the California Health and Safety Code provided:

> Except in provided in Section 120291 or in the case of the removal of an afflicted person in a manner the least dangerous to the public health, any person afflicted with any contagious, infectious, or communicable disease who willfully exposes himself or herself to another person, and any person who willfully exposes another person afflicted with the disease to someone else, is guilty of a misdemeanor. (SpA 198)

The statute was overhauled entirely in 2018 after the California Legislature determined that it was antiquated, having been passed during an era of discrimination toward those afflicted with HIV.[10] The current statue bears little to no resemblance to the repealed 2015 version, least of all because it now requires a showing of a specific intent to transmit the disease. (SpA199)

---

[10] The Bill Analysis for the 2018 Enactment sets forth the legislative history and rationale for repealing the version under which Defendant was prosecuted. https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201720180SB239

Although repealed, the government proposed a jury instruction that reflected the elements of the statute in effect in 2015. Apparently recognizing that the 2015 statute was unconstitutionally vague, the government included elements in its jury instruction that were not included in the statute as written by the California Legislature. Thus, the government not only charged Defendant with a repealed statute but rewrote to its liking.

Even if the government had the authority to charge Defendant under the 2015 version of § 120290 of the California Health and Safety Code, the statute did not pass constitutional muster. Most obviously, the statute is void for vagueness both on its face and as applied to the Defendant because it simply did not give a person of ordinary intelligence a reasonable opportunity to know what is prohibited nor did it provide explicit standards to those who apply the statute. *Dickerson,* 604 F. 3d at 741. The statute also lends itself to arbitrary and discriminatory application. Again, Defendant appears to be the first person in California's history to be charged under this statute where the alleged victim was not actually infected with the disease during the conduct that occurred in California.

As written, the 2015 law failed to provide adequate definitions about what diseases the statute meant to address when it criminalized "willful exposure" of *all* allegedly communicable diseases, including those not sexually transmitted. The statute is silent on what is meant by "willful exposure" and makes no mention of

68

whether the Defendant could willfully expose someone to a disease without possessing the knowledge of his ability transmit the disease or without even knowing he/she has the disease. Indeed, it seems likely that the California Legislature repealed this statute, in part, because of its constitutional vagueness.

Just by way of example, this statute would criminalize passing along cold sores. Nearly 50% of the population has herpes type 1 – a communicable disease. Under the 2015 statute, anyone with herpes type 1 (also known as cold sores) who kisses another person would be guilty of a misdemeanor, even if the afflicted person had no active infection, outbreak, and did not pass the disease along to the recipient of the kiss. Under this statute, parents with herpes simplex 1 (again 50% of the population) would be prohibited from kissing their own children. One cannot imagine how many arbitrary prosecutions could take place in this current era of a pandemic if this law was in effect today. The examples of how this statute could be misused for arbitrary and discriminatory purposes abound.

In its Order [DE318 at pg. 60-61] (SpA 113-114), the government faults Defendant through his trial counsel for failing to challenge the indictment or the constitutionality of the statute earlier. The reason is simple. Trial counsel had no idea that the government intended to charge the Defendant pursuant to a repealed and inoperative statute. Although the

indictment cites to the statute and notes "effective 1998" this language did put Defendant on notice that the government intended to charge him pursuant to the repealed version of the statute. [DE, ¶23] Indeed, the first time trial counsel recognized the issue was prior to the finalization of jury instructions when he objected to the government's proposed instruction that did not track the language of the current statute. [DE219 at 5-6] Contrary to the district court's view, the government's cite to the California statute with the words "effective 1998" did not alert the defense of an intent to charge a repealed statute. Indeed, it was entirely reasonable to assume that the government would *not* be charging a repealed statute that was clearly unconstitutional as the California Legislature understands, but EDNY does not. Defendant has shown "good cause" for failing to raise the issue earlier. In sum, the racketeering act premised on a violation of this repealed, and otherwise unconstitutional statute, cannot stand.

**VI.     The Government Failed To Prove Defendant Guilty Of Forced Labor Of Jerhonda And Faith Based On An Isolated Sex Act That Neither Victim Alleged Was Forced.**

The government alleged that Defendant committed the crimes of forced labor when he directed Jerhonda and Faith to perform an act of oral sex on him on January 23, 2010 and January 13, 2018 respectively. Where neither Jerhonda nor

70

Faith characterized the isolated sex act as forced, no rational juror could conclude that Defendant knowingly obtained, or agreed to obtain, any labor or services from them. These charges are yet another example of the government's transparent effort to stretch a statute far beyond its intended purpose to reach conduct that can no longer be reached by state authorities.

A conviction of forced labor under 18 U.S.C. §1589 requires the government to prove beyond a reasonable doubt that: (1) the defendant obtained the labor or services of another person; (2) through, *inter alia,* threats of serious harm; and (3) the defendant acted knowingly. *United States v Marcus,* 487 F. Supp. 387, 310 (E.D.N.Y. 2007). The statute does not define "labor or services" but is given its ordinary meaning, *i.e.,* "labor" means the "expenditure of physical or mental effort especially when fatiguing, difficult, or compulsory" while "service" is defined as "the performance of work commanded or paid for by another." *United States v. Marcus,* 628 F. 3d 36, 44, n. 10 (2d Cir. 2010). Additionally, the government must establish a causal link between the labor and services provided by the person and the threat of "serious harm." *Id.*

Section 1589 is "intended to address *serious* trafficking, or cases where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence." *Muchira v. Al-Rawaf,* 850 F. 3d 605, 618 (4th Cir. 2007). The harm or

threat of harm, "considered from the vantage point of a reasonable person in the place of the victim, must be 'sufficiently serious' to *compel* that person to *remain"* in her condition of servitude when she otherwise would have left. *Id.* The statute was not intended to address isolated acts of assault that are squarely within the police powers of the state. The implication of characterizing this conduct as a violation of forced labor makes it "it difficult to perceive any limitation on federal power . . . in areas of criminal law enforcement . . . where states have historically been sovereign." *Lopez,* 514 U.S. at 564.

According to the government, on January 2010, Defendant violated the forced labor statute by using threats of violence to obtain labor, an act of oral sex, from Jerhonda. Accepting the government's evidence in its best light, Jerhonda described an isolated incident in which the Defendant assaulted her because he was angry that she disrespected him. (Vol. 1 of 5 A169) Jerhonda testified that after the assault, she sat down with Defendant in the VIP room and he "instructed" her to perform oral sex on him. (*Id.* at A169-170) Jerhonda complied. Jerhonda did not testify that Defendant threatened her, forced her, or even demanded that she give him oral sex. Jerhonda did not claim that she feared Defendant would assault her again if she declined the request. Jerhonda did not even testify that she did not want to provide Defendant oral sex. After the incident, Jerhonda left Defendant's home of her own free will.

Accepting Jerhonda's account as true, it simply does not establish an act of forced labor. An isolated act of oral sex does not qualify as "labor or services," where there is no commercial aspect to the incident and the victims never testified that they expected any type of benefit from the act. Moreover, the record does not show that Jerhonda gave oral sex to the Defendant out of fear or threats of violence, notwithstanding the prior assaultive behavior. It would not have taken much for Jerhonda to make the causal link between the act of oral sex and her fear of physical assault by the Defendant; but she simply didn't. The jury was not free to jump to such a conclusion in the absence of Jerhonda's testimony, particularly where this event was an isolated one.

Similarly, no rational juror could conclude based on the evidence adduced at trial that Defendant knowingly obtained, or agreed to obtain, any labor or services from Faith on January 13, 2018 who testified that that she traveled to Los Angeles to see Defendant with whom she had been having a romantic relationship. She described an incident where she and Defendant were in a small room in his studio. Faith claimed there was a gun in the room that made her intimidated, but conceded that Defendant never threatened her with it, or made any gestures that he intended to use it. Faith was simply uncomfortable by its presence. After an intense conversation during which Faith described Defendant as being "serious" but not threatening, Defendant directed her to give him in oral sex and grabbed her neck

before placing his penis inside her mouth. Without objection, Faith provided oral

sex to Defendant although she testified that she did not want to.

Faith herself refuses to identify as someone who was forced to do

anything. On cross-examination, Faith admitted that she was not a victim

and had made a *choice* to be with Defendant. (Vol. 4 of 5 A902)

> Q.     In one of the podcasts we spoke about this morning, the Paper
>        Route. On that show you said during that interview: **I don't
>        like the word victim because I don't feel like I'm a victim.
>        I'm a young woman. And let's be clear, let's be clear, I
>        made a choice to be involved with that person. Do I feel like
>        everything he did was right? Hell, no. But I had a choice.
>        And that's why I walked away. I did not move in with him. I
>        did not live with him. I did not take any money from him.
>        There is a choice that you have to make.** You said that?

> A.     Correct.

> Q.     You made a choice.

> A.     Correct.

> Q.     And you're not a victim.

> A.     Correct. (*Id.*)

The forced labor statute was not enacted to remedy isolated occurrences like

the one described by Faith. Indeed, it is not even clear from Faith's testimony that

she communicated to Defendant that she did not want to give him oral sex; she

certainly did not end her relationship with Defendant after this episode. The record

fails to reflect a causal link between the isolated act of oral sex and any threat of

physical violence. Absent "clear expression of Congressional intent," courts should resist the urge to transform the forced labor statute to cover the circumstances alleged in Racketeering Act Six which bear virtually no resemblance to those paradigmatic forced labor cases and their victims. *See United States v. Toviave,* 761 F. 3d 623, 626 (5th Cir. 2014) (describing prostitution, forced sweatshop work, and forced domestic service as "paradigmatic forced labor cases.")

Jerhonda and Faith each described an isolated sex act with the Defendant that they now view as assaultive. The district court contends that the jury was free to see these specific incidences as "forced labor" in light of other evidence it heard about Defendant's conduct toward other women, but the government was not free to bootstrap testimony from other alleged victims to bolster their forced labor theories as to very specific acts charged in the indictment. Jerhonda and Faith were not living in a condition of servitude through threats of physical force. They each described a discrete act that at best, might have been charged as some type of sexual assault (and even that seems unlikely). To construe these events as acts of forced labor would render the purpose of the statute meaningless and afford the *federal* government free reign to charge *any* sex act accompanied by harsh or unkind words as forced labor.

**VII.   Defendant Was Denied A Fair And Impartial Jury Where Several Of The Seated Jurors Admitted That They Prejudged The Defendant's Guilt and Trial Counsel Provided Ineffective Assistance of Counsel When He Failed to Move To Disqualify Patently Unqualified Jurors.**

As United States Supreme Court Justice Black stated in *In re Michael,* 326 U.S. 224, 228 (1945):  "[I]t is difficult to conceive of a more effective obstruction to the judicial process than a juror who has prejudged the case." That is, because "Due Process means a jury capable and willing to decide the case solely on the evidence before it, and a trial court ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips,* 455 U.S. 209, 217 (1982). In *Irwin v. Dowd,* 366 U.S. 717, 722 (1961), the United States Supreme Court observed, "the right to a jury trial guarantees to the criminal accused a fair trial by a panel of impartial and 'indifferent' jurors . . . This is true, regardless of the heinousness of the crime charged, the apparent guilty of the offender or the station in life which he occupied . . . a juror who has formed an opinion cannot be impartial." (internal citations omitted).

In this case, the record shows that *at a minimum,* four of the seated jurors (Jurors 3, 4, 5, & 12) were not qualified to serve. There were several other seated jurors who likely should have been struck for cause, but trial counsel failed to

conduct any meaningful *voir dire* of these jurors to determine whether they could put aside their expressed biases and prejudices. Trial counsel's performance was objectively unreasonable when he failed to move to disqualify patently unqualified jurors and failed to conduct *any* meaningful *voir dire* of prospective jurors who expressed their prejudgment of the case. Defendant was prejudiced by his counsel's sub-standard performance where it resulted in the seating of *at least* four seated jurors who were actually biased and could not act with impartiality. *Strickland v. Washington,* 466 U.S. 668, 692-93 (1984). *see also United States v. Torres,* 128 F. 3d 38, 43 (2d Cir. 1997).

Because of extraordinary pretrial publicity, the district court directed the parties to jointly prepare a juror questionnaire to probe, *inter alia,* prospective jurors' exposure to pretrial publicity. [DE115] The court invited the parties to review the questionnaires in advance of jury selection and determine whether they could agree that certain individuals should be excluded for "cause." After completing that process, the parties were left with a set of potential jurors for oral *voir dire* procedures. The court gave both sides the opportunity to pose additional questions to prospective jurors. Inexplicably, Defendant's counsel failed to challenge several jurors who ultimately sat on Defendant's jury who were plainly incapable of serving as fair and impartial jurors.

Juror No. 4 revealed in the questionnaire:

Question 39:     The charge in this case involves allegations regarding exposure
                 to one or more sexually transmitted diseases. Is there anything
                 about such an allegations that you believe would affect your
                 ability to serve as a fair and impartial juror?

Answer:          **Yes. I find transmission of STDs in a nonconsensual act to
                 be particularly repulsive.** (Vol. 1 of 7 SA213)

Question 79:     Which publicly known person do you least admire?

Answer:          **Jeffrey Epstein** (*Id.* at SA222)

The court generally asked this juror whether anything he/she read would affect

his/her ability to be fair and impartial in the case, and the juror replied, "not that I

know of." (Vol. 1 of 5 A57) However, defense counsel failed to ask the court to

question the juror whether his feelings of "repulsion" about the transmission of

STDs in a nonconsensual scenario would interfere with his/her ability to serve as

fair and impartial juror.

A juror who expressly admitted that his/her feelings about the

nonconsensual transmission of STDs *would* affect his ability to fair and impartial

should have been struck for cause out of the gate. Inexplicably, the juror was not

challenged or even questioned about his "repulsion" for the precise act for which

Defendant was charged. That this same juror named Jeffrey Epstein, an accused

pedophile, as the person he *least* admires, is yet further support that Juror No. 4

was not a juror who could serve with impartiality.

Juror No. 5 disclosed the following in his/her questionnaire:

78

| | |
|---|---|
| Question 31: | Have you watched or heard any interviews of Robert Kelly or any TV shows featuring him or any specials or documentaries about him? |
| Answer: | **Yes.** |
| Question: | What were your general impressions? |
| Answer: | **He loves underage girls** |
| Question 32: | From what you have seen, or heard, do you have a general impression of defendant? |
| Answer: | Somewhat negative. |
| Question | Why do you feel that way? |
| Answer: | **The allegation that related he was sleeping with underage girls (minors)** (Vol. 1 of 7 SA239-340) |

Although the court asked the prospective juror general questions about her ability to "put aside other things she might have heard," when asked if she could be fair, the juror indicated that she would "give it a shot." (*Id.* A63) The court reminded the juror that she had to be certain that she would consider only evidence offered at trial, and the juror begrudgingly acquiesced. Even the district court expressed concern about Juror No. 5's ability to serve, observing "[s]o I don't know about you, but when someone says they think they can do something in this context, I don't think that's an unqualified assurance. And I don't know what the parties' position is on that. I think I pushed her pretty hard on it, and we still ended up with "I think so." Let me hear from the government, if you have a position on that." (*Id.* A65) A Not surprisingly, the government was confident that the juror

could be fair. The court still expressed doubts. Inexplicably, trial counsel agreed with the government and the juror was seated. (*Id.* A65)

Trial counsel's performance was objectively unreasonable where he agreed to the seating of a Juror No. 5 who not only watched *Surviving R. Kelly* but concluded that Defendant "loves underage girls." There can be no trial strategy for failing to excuse this juror for cause. Had trial counsel challenged this juror, the court would have undeniably struck her for cause. Trial counsel not only failed to move to disqualify the juror, he did not even ask the court to probe more deeply into the juror's statements on the questionnaire that Defendant "loves underage girls" or her statement that she had "negative" feelings about the Defendant because of allegations that he engaged in sex with minors.

Juror No. 3 provided the following information in the questionnaire

| Question 29: | The case for which you are summoned involved the defendant Robert Sylvester Kelly, also known as "R.Kelly," Have you read, seen or heard anything about the case, alleged crimes, or people involved? |
|---|---|
| Answer: | **I watched the documentary, but I forgot the name of it**. |
| Question 30: | Have you read, seen, or heard about Robert Kelly, also known as R. Kelly? |
| Answer: | Yes. Entertainer, **I heard that he has been sleeping with underage girls**. |
| Question 31: | Have you watched or heard any interviews of Robert Kelly or any TV shows featuring him or any specials or documentaries about him? |

Answer:              **Yes.**

Question:            What were your general impressions?

Answer:              **I saw a documentary about him and his legal troubles**. I
                     don't know the full story so I have no feelings and remain
                     impartial. (Vol. 1 of 7 SA183)

Trial counsel did not ask the court to question the juror further about his

responses to these questions or to determine whether the juror could truly serve as

an impartial and unbiased juror in light of having watched the salacious and highly

prejudicial docuseries. Not a single question was asked of the juror about his

impressions of the documentary, nor did counsel ask the court to inquire about

what information he learned about Defendant's prior legal issues or his reputation

for "sleeping with underage girls." (*Id.* A45-52)

Juror No. 12 offered several alarming answers in response to the

questionnaire that justified disqualification:

Question 29:         Have you read, seen or heard anything about the case, the
                     alleged crimes or people involved?

Answer:              **Yes.**

Question:            Describe in detail what you recall reading, seeing or hearing
                     about, etc…

Answer:              **Sex with minors, specific details do not come to mind,
                     parodies on TV regarding details of defendant's personal
                     life (SNL, Dave Chapelle); Was in jail prior then released.**
                     (Vol. 2 of 7 SA379)

81

Question 32:     From what you have seen, read, or heard, do you have a general impression of the defendant?

Answer     Somewhat negative

Question     Why?

Answer     I really never cared one way or the other regarding the defendant. **The somewhat negative impression is an emotional one impacted by the nature of the charges against him.** (*Id.* at 380)

The juror was asked about his/her ability to be fair and the court obtained assurances from the juror that he/she could. But trial counsel did not bother to ask the court to inquire about the juror's reference to Defendant's "personal life" "sex with minors" or Dave Chapelle's SNL skit which referenced prior allegations against Defendant of videotaping a sexual encounter that depicted him urinating on a minor, a crime for which he was prosecuted. (*Id.* A85-92) It is beyond comprehension that counsel would not have moved to strike this juror who had seen damning pretrial publicity; knew (or thought) Defendant had already been in jail for these offenses; and felt "emotional" "by nature of the charges against him."

The record reveals that these jurors 3, 4, 5, and 12 were not capable of deciding the case solely on the evidence before it or acting with impartiality. Beyond these four jurors, at least, four other jurors likely were incapable of acting as indifferent, far, and impartial triers of the fact. However, defense counsel did virtually *nothing* to probe the attitudes of these prospective jurors.

Jurors No. 7, 8, 9, and 11 all revealed that they had heard about the case and the alleged crimes and expressed knowledge about Defendant's prior "issues with the law." Without exception, trial counsel failed to probe what precisely the prospective jurors had heard or conduct a meaningful inquiry into whether they could be fair given what they had heard or seen. (*Id.* A72) An attorney cannot make an intelligent decision about whether to challenge a potential juror for cause or whether to exercise the Defendant's peremptory challenges without properly questioning potential jurors to learn of potential biases. *See Connors v. United States*, 158 U.S. 408, 413 (1895) (holding that an adequate *voir dire* is essential to ensure that prospective jurors will be free of bias or prejudice and will perform their duties impartially); *Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981) (holding that *voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored); *United States v. Blount*, 479 F. 2d 650, 651 (6th Cir. 1973) (holding the primary purpose of the *voir dire* is to make possible the empaneling of an impartial jury through questions that permit the intelligent exercise of challenges by counsel).

Under the standard promulgated by *Strickland, supra,* trial counsel failed to provide effective assistance of counsel to Defendant when he failed to move to strike unqualified jurors 3, 4, 5, and 12 and overall failed to conduct a reasonable *voir dire* to probe the stated biases of several other seated jurors. To prove a

successful claim for ineffective assistance of counsel, Defendant must demonstrate that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of proceeding would have been different. *Strickland,* 466 U.S. at 694. In this context, the prejudice prong of *Strickland* is satisfied by a showing that the juror was actually biased. *Torres,* 128 F. 3d at 43. (defining actual bias as "bias-in-fact" or "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality")

Defendant has satisfied both prongs of the *Strickland* analysis. As set out above, juror 3, 4, 5, 12 expressed views that lead to the inference, indeed the certainty, that they would not and could not act with entire impartiality. Trial counsel's failure to move to disqualify them was substandard. Apart from their own admissions, two of those seated jurors had seen *Surviving R.Kelly* which is evidence of bias-in-fact where no human being could act as a fair and impartial juror after seeing a docuseries that painted Defendant as a serial predator.[11] The docuseries was eleven episodes and consisted mostly of interviews with alleged victims who graphically detailed their claims of sexual abuse.[12] Some of the

---

[11] https://www.rollingstone.com/tv/tv-features/surviving-r-kelly-lifetime-docuseries-review-774317/

[12] In his Rule 33 motion [DE283], Defendant referred the district court to the *Surviving R. Kelly* series which can be live streamed on several platforms, including Netflix and Amazon Prime. Defendant also embedded the following

information communicated in the docuseries was presented at Defendant's trial, but much of it was not - meaning that at least two jurors had highly prejudicial information untested by the adversarial process to consider in addition to what was presented at trial. The docuseries highlighted the stories of scores of women who claim to have been victims of sexual abuse and offered no countervailing viewpoint. A significant portion of the documentary detailed allegations against Defendant of sexual abuse of a 14-year-old, including claims he videorecorded himself urinating on the 14-year-old (for which Defendant was convicted in his NDIL prosecution). It is nothing short of mind-blowing that defense counsel acquiesced to the seating of jurors who came to the case with this highly prejudicial information that no human being could have put aside.

For his part, Defendant explains that he was effectively absent throughout the *voir dire* process even though jury selection is a critical stage of trial at which Defendant had every right to participate. *Gomez v. United States,* 490 U.S. 858, 873 (1989). In a sworn declaration attached to post-trial motions, Defendant explained that he played no role in picking his jury. He had no access to the

---

links in his reply which are excerpts from *Surviving R. Kelly* that any juror who had seen the documentary would have seen prior to serving on his jury.
https://www.youtube.com/watch?v=zVqHs8O3wGU
https://www.youtube.com/watch?v=8FaA-1Aipjc
https://www.youtube.com/watch?v=yREP5i3Jhtg

questionnaires which he could not read in any event; he did not participate at any side bars where prospective jurors were questioned; and did not consent to any juror who had seen the inflammatory docuseries. [DE283-1] Defendant had the constitutional right to be present and participate throughout his *voir dire* process. His declaration demonstrates that he was a spectator as his attorneys picked a jury without his input, including individuals that should have been struck for cause.

Because Defendant's jury was comprised of several jurors who could not discharge their constitutional duty to be fair and impartial, Defendant did not have a chance at defending against the charges. Defendant was denied his constitutional guarantee of a fair and impartial jury and his Sixth Amendment guarantee of effective assistance of counsel when his attorney failed to move to strike jurors 3, 4, 5, and 12 or otherwise conduct any meaningful *voir dire* of the remaining jurors.

**VIII. Defendant Was Denied A Fair Trial Where The Government Swamped The Jury With Excessive Other Bad Act Evidence Including Testimony from Seven Additional Witnesses Who Detailed Defendant's Unusual and Graphic Sexual Activities, His History of Transmitting Herpes to his Sex Partners, His Abusive Conduct Toward his Girlfriends, and Even Audio and Video Recordings of This Conduct With Women and Men, Some of Whom Never Testified.**

With virtually no limitation, the district court permitted the prosecution to inundate the jury with excessive bad act evidence, mostly under the theory that the evidence was relevant to the "means and method" of the enterprise. [DE255; SpA31] The "means and method" justification for the introduction of copious amounts of bad act evidence is gravely flawed because the government's theory of an enterprise is flawed. Where the enterprise consisted of nothing more than the purported sexual misbehavior of the Defendant, unconnected to the activities of a discrete enterprise, the "means and methods" of an enterprise cannot justify the admission of copious amounts of bad act evidence.

As argued, *supra,* the government failed to prove a RICO enterprise. No matter how much repellent evidence of sexual indiscretions or abusive behavior the government accumulated against the Defendant, the fact remains that it was the Defendant, and the Defendant alone, who engaged in those affairs wholly disconnected to the affairs of a distinct enterprise. Unwitting assistance of underlings who carried bags, picked up Defendant's prescriptions, and drove Defendant's female guests from location to another is not proof of an enterprise. By characterizing Defendant's purported decades-long history of abusive conduct toward women as an enterprise, the government not only avoided statutes of limitations but was free to introduce *any* unkind or abusive act (of a sexual or non-

sexual nature) as evidence of the enterprise, conveniently avoiding the rule against the admission of propensity evidence.

Notwithstanding, the district court was still obligated to conduct a meaningful Rule 403 analysis which it failed to do. Rule 403 authorizes the exclusion of relevant evidence when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issue, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. The United States Supreme Court held in *Old Chief* that "unfair prejudice," as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offenses charged. *Old Chief v. United States,* 519 U.S. 172, 180 (1997). The Committee Notes to Rule 403 explain, "'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Committee's Notes on Fed. R. Evid. 403. As *Old Chief* observed:

> Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. Not that the law invests the defendant with a presumption of good character, but it simply closes the whole matter of character, disposition, and reputation on the prosecution's case-in-chief. The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character

is irrelevant; on the contrary, it is said to weigh too much crime with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that is disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice. *Michelson v. United States,* 335 U.S. 469, 475-76 (1948).

Probative value is also informed by the availability of alternative means to present similar evidence. Specifically, the Supreme Court has advised that the "Rule 403 'probative value' of an item of evidence . . . may be calculated by comparing evidentiary alternatives." *Old Chief,* 519 U.S. at 184.

The district court is afforded wide discretion to exclude evidence that is, on balance, unduly prejudicial. *Taveras,* 424 F. Supp. 446 (E.D.N.Y. 2006). "So long as the district court has conscientiously balanced the proffered evidence's probative value with the risk for prejudice, its conclusion will be disturbed only if it is arbitrary or irrational. *Id.*

As set out below, this Court did not conscientiously balance the probative value of certain proffered government evidence that carried an extraordinary risk of prejudice.

### A.    Excessive STD Evidence

The government charged the Defendant with committing several racketeering acts based on his transportation of Jane and Faith to California and New York with an intent to expose them to herpes in violation of local public

health laws. The district court repeatedly noted that under its interpretation of the statutes, the government was not required to show that Defendant transmitted herpes to Jane and Faith; mere exposure was sufficient.

Even if the district court was correct, there was little justification for allowing massive amounts of evidence that Defendant purportedly spent decades receiving and transmitting sexually transmitted diseases. Through Defendant's personal physician, Dr. McGrath, the government presented evidence of Defendant's entire medical history concerning the contraction of sexually transmitted diseases dating back to the 1990s, including his prior diagnoses with such sexually transmitted diseases as gonorrhea and chlamydia. (Vol. 2 of 5 A365; A367) Dr. McGrath further testified at length about this treatment of Defendant for herpes.

In addition to Dr. McGrath's testimony, the prosecution elicited testimony from every person who testified about sexual contact with Defendant about whether Defendant disclosed his herpes diagnosis with them. The prosecution also presented testimony from three additional witnesses, Jerhonda, Kate, and Anna that Defendant infected the women with herpes eliciting descriptions of herpes infection symptoms. And if that was not enough, the prosecution offered extensive documentary evidence regarding Defendant herpes treatment and elicited graphic

details from multiple witnesses about the symptoms of herpes. The prosecutors

uttered the word herpes hundreds of times throughout this trial.

There was no legitimate basis to bombard the jury with excessive evidence

about Defendant's herpes diagnosis or the fact that he had allegedly transmitted the

disease to a number of different women. The only issue in dispute related to

Defendant's herpes diagnosis was: (1) whether he had herpes in 2015 and 2018

when he had sexual relations with Jane and Faith; (2) whether he knew he had

herpes; and (3) whether he disclosed it to the women before they had intercourse.

Dr. McGrath testified unequivocally that as of 2015, Defendant was

diagnosed with herpes and was being treated for herpes. Both women testified that

they had unprotected sex with Defendant and that Defendant did not disclose that

he suffered from herpes. This evidence went unrefuted. Accordingly, any

additional evidence related to Defendant's herpes diagnosis and transmission of

herpes to other women was unnecessary, cumulative, and unduly prejudicial.

## B. Evidence Concerning Sexual Relations With Aaliyah

The prosecution charged Defendant with one racketeering act of bribery for

the sole purpose of getting evidence before the jury about his marriage and

relationship with Aaliyah. Over defense counsel's objection, this Court permitted

the prosecution to introduce testimony from Angela (Jane Doe No. 7) that she

allegedly observed sexual interactions between Defendant and Aaliyah in 1992 on

Defendant's tour bus. This Court erred by allowing this highly prejudicial testimony into evidence after initially denying the government's request.

Angela's testimony was not relevant under the "means and methods" theory since it purportedly occurred pre-enterprise which the district court concedes in its Order. [DE318 at 94-95] (SpA1447-148) Instead, the district court defended the ruling on the grounds that the evidence was necessary to show Defendant's motive for bribery, particularly since Defendant would not confess to having sex with Aaliyah. Whether the Defendant had a motive for committing bribery did not justify putting this inflammatory evidence before the jury.

Even if the government believed that it needed to present some evidence of motive, it did through the testimony of Demetrius Smith. Smith, who assisted in obtaining a false identification card for Aaliyah so she could marry the Defendant, testified that in 1994 Defendant told him that Aaliyah was "in trouble" and "thought she was pregnant" (Vol. 3 of 5 A596) Smith further testified that the decision to marry was Aaliyah was made so that Defendant could avoid legal issues. The government had plenty of motive evidence to present and had no need for the wildly prejudicial testimony of Angela that was not corroborated by anyone. As such, it was error to allow Angela to testify about her alleged observations on the tour bus in 1992.

### C.    Testimony from Addie, Alexis, Kate, Anna, Angela, Louis, and Alex

This Court permitted the government to present a whopping seven additional witnesses to testify about graphic uncharged bad act evidence concerning dozens of sexual encounters with the Defendant. In its Order [DE318; SpA54] the district court set out a detailed accounting of the testimony of Addie, Alexis, Kate, Anna, Angela, Louis, and Alex. Apart from Angela's testimony which concerned sexual conduct pre-enterprise, the prosecution defended the introduction of this evidence under the catch-all "means and methods" of the enterprise theory.

As argued above, where the Defendant, and the Defendant alone, was the enterprise, the "means and methods" justification for the introduction of copious amounts of bad act evidence is simply a free pass at introducing unlimited bad act evidence related to Defendant's alleged sexual misdeeds and abusive conduct. This circular logic returns us to the overarching defect in this prosecution, namely that it was a prosecution of Defendant's bad character and unpunished sexual misdeeds; it had nothing to with punishing or preventing the conduct of an enterprise.

The district court suggests that Addie's testimony about her sexual acts with the Defendant was probative of the enterprise but fails to explain how or why. Addie testified that when she was 17 years, she went one of Defendant's concerts. Defendant announced from the stage that only women over 18 could go backstage and she did not go backstage because she had no identification. According to

Addie, two "bouncers" asked them if they wanted to get Defendant's autograph but did not ask their age before bringing them backstage to Defendant's dressing room. According to Addie, Defendant provided her autograph and engaged her and her friend in sexual activity. Indeed, the way Addie tells it, Defendant forcefully assaulted her in the dressing room. (Vol. 5 of 7 SA1307-1308) No one was present for the sexual activity other than Defendant and her friend.

This testimony added nothing to the government's theory of an enterprise, particularly where it is unclear that the mysterious "bouncers" even worked for the Defendant, and Addie admitted that they would have had no idea she was 17 years old rather than 18. Indeed, all of the other bad act testimony that came from Alexis, Angela, Louis, and Alex was designed to put before the jury evidence of Defendant's *propensity* to engage in prohibited sexual activity with minors. It shed no light on the existence of an enterprise. While there was some vague testimony that nameless "bouncers" or "associates" invited young women backstage or passed along Defendant's phone number, there was no testimony that these nameless individuals had any knowledge that these young people were minors rather than 18 years old. If an enterprise is formed simply because members of a rock star or rapper's entourage invite teenagers backstage to meet an artist, the government should be overloaded with RICO prosecutions against recordings artists. That a

"bouncer" allows a 17 year-old backstage after a R & B concert is not evidence, he/she is recruiting minors for the Defendant's *illegal* sexual conduct.

Through these other bad act witnesses, the jury was inundated with one jarring story after the next of unconventional graphic sex acts, including sexual conduct that many, perhaps most, would consider deviant (*e.g.,* group sex, elements of BDSM[13], and coprophilia[14]) The government presented detailed testimony about Defendant's sexual activities with men, group sex, and even elicited testimony from Anna about Defendant's penchant for sex involving coprophilia which she described and demeaning and humiliating.

When considering this mass of prior bad act evidence cumulatively, its probative value is diminished exponentially as compared to its prejudicial effect. There can be little doubt that Defendant's jury was inclined to rectify past injustices by punishing Defendant even if it harbored doubt about his guilt on the charged offenses. The risk of prejudice and confusion was particularly acute where the trial devolved into a live rendition of the *Surviving R. Kelly* docuseries replete with viewings of sexually explicit videos.

---

[13] Merriam – Webster Definition of BDSM: sexual activity involving such practices as the use of physical restraint, the granting or relinquishing of control, and the infliction of pain.
[14] Merriam – Webster Definition of coprophilia: marked interest in excrement; the use of feces or filth for sexual excitement

### D.     Admission of Graphic Videos and Audio Recordings

If days upon days of testimony of other bad act witnesses was not enough, the government was further permitted to introduce private videos of graphic sex acts, some of which have BDSM elements. Government Exhibits 341 through 343 were group sex acts between Alex. Dominique and the Defendant which reflected nothing but group sex, involving two men and one woman who did not even testify. The district court barely defends the introduction of these videos for a legitimate non-propensity purpose.

Government Exhibit 328(a) is a lengthy video of Defendant spanking Anna who was naked and crying, walking back and forth, calling herself a "slut" and "stupid" while Defendant looked on. This video was offered for no other purpose than to show Defendant's sexual perversion and mistreatment of Anna. It shed no light on whether an enterprise existed and had no bearing on the charged offenses. Lastly, and most problematic, the government admitted a video of Anna spreading feces on her naked body and calling the Defendant "daddy" although Defendant was not depicted in the video. (GX329(a)) This video, like the others, added nothing to the equation as it relates to proving an enterprise and did not thing but breed contempt for the Defendant. Defendant was entitled to a fair trial on the charged offenses. Instead, with the district court's blessing, the prosecution put him on trial for a lifetime of bad behavior. With a jury already biased against him (*see*

Argument VII) and the admission of a mountain of uncharged bad conduct, Defendant was denied his guarantee of a fair trial.

## IX. The District Court's Restitution Award for Jane and Stephanie's Herpes Treatment Was Unsupported by the Government's Evidence.

After a hearing conducted on September 28, 2022, the district court ruled that Jane was entitled to restitution pursuant to 18 U.S.C. § 2429 for the cost of herpes treatment, namely the cost of Valtrex[15] for the remainder of her life in an amount of $281,168.18. The court further ruled that Stephanie was entitled to $45,587.20 for the cost of herpes treatment, namely the cost of Valtrex and valacyclovir for the remainder of her life.

### A. Jane

The district court abused its discretion in granting Jane nearly $300,000 in restitution for a lifetime supply of Valtrex where the government failed to establish that: (1) Jane was infected with herpes as a result of any of the charged conduct; (2) Jane has been or will be treated with a suppressive regimen of Valtrex; and (3) Jane will actually treat with Valtrex rather than valacyclovir (the generic version of Valtrex) which is a fraction of the cost of Valtrex. In short, the district court abused the purpose of restitution statute and granted Jane a windfall for costs she has

---

[15] Valtrex is the brand name for the drug valacyclovir. https://www.goodrx.com/valacyclovir/what-is

97

never incurred or will incur, seemingly to punish the Defendant and compensate Jane for emotional distress.

Preliminarily, the restitution sought for genital herpes treatment is *not* mandatory pursuant to 18 U.S.C. § 2429 since Jane's contraction of herpes cannot be causally linked to any Mann Act violations. The Defendant was charged with a Mann Act violation stemming from a trip that Defendant and Jane took to California between April 28, 2015, and May 1, 2015 (Racketeering Act Eight) and further charged with Mann Act violations related to the trip that the duo took to California in September or October 2015 (Racketeering Act Nine and Counts Two through Five). Because Jane did not, and cannot, connect her contraction of herpes with either of those trips, she is not a "victim" for the purpose of 18 U.S.C. § 2429. Under the statute, "victim" is defined as the individual harmed "as a result of the crime under this chapter [117]," namely crimes prohibited by 18 U.S.C. 2421(a), 18 U.S.C. 2422(a) and (b) and 18 U.S.C. 2423(a) ("Mann Act violations"). By its own terms, mandatory restitution is required pursuant to 18 U.S.C. § 2429 only when the harm suffered by the individual is shown to be *as a result of* the specific Mann Act offense. *See United States v. Goodrich,* 12 F. 4th 219, 228 (2021).

The government ignores that Jane and the Defendant commenced a relationship in April 2015. Jane moved into the Defendant's home shortly thereafter where they engaged in a consensual and legal relationship in the state of

Illinois for five years. But for two isolated trips to California, Defendant would never have been convicted of a Mann Act violation related to Jane. The government simply cannot show that Jane's affliction with herpes had any connection to those specific trips.

The analysis is the same pursuant to 18 U.S.C. § 3663 where there is no nexus between the offenses for which Defendant was convicted and Jane's contraction of herpes. The Mandatory Victims Restitution Act ("MVRA") defines "victim" as "a person directly and proximately harmed as a result of an offense for which restitution may be ordered . . ." *Goodrich,* 12 F. 4th at 228. Thus, in determining to whom a defendant owes restitution, the statute requires the court (1) to identify the "offense" of conviction and (2) to ascertain whether the putative "victim" was "directly and proximately harmed" by the defendant's commission of *that* "offense." *Id.* (emphasis added) The Second Circuit explained in *United States v. Vilar,* 729 F. 3d 62 (2d Cir. 2013), restitution may be imposed only for losses arising from "the specific conduct that is the basis of the offense of conviction." The government has not and cannot demonstrate that Jane's contraction of herpes arose from "the specific conduct" alleged in the charged Mann Act violations, or the forced labor count related to Jane.

Separately, the Second Circuit has held repeatedly that the MVRA requires that the "offense" of conviction "directly and proximately harmed" the victim

entitled to restitution. *Goodrich,* 12 F. 4th at 229. Courts have interpreted this language to impose cause-in-fact and proximate cause requirements, respectively. *Id*. Again, the harm suffered by Jane, namely her contraction of herpes, must be directly and proximately caused by the specific Mann Act violations and/or forced labor offense. It is not sufficient to state that Defendant and Jane were in an abusive relationship in which he transmitted herpes to her at some point. Jane and Defendant were in a relationship for over four years. Regardless of how abusive Jane now claims the relationship was, she is not entitled to a quarter-million-dollars for herpes treatment medication where she cannot directly or proximately link her herpes diagnosis to the specific offenses for which Defendant was convicted.

Assuming arguendo the government demonstrated a sufficient causal connection between Jane's herpes diagnosis and the charged offenses, the government dramatically inflated the cost of Valtrex - even for an uninsured individual. *United States v. Maynard,* 743 F.3d 374, 378 (2d Cir. 2014) (the government bears the burden for proving actual losses, not losses that are hypothetical or speculative).

First and foremost, the government assumes without providing any supporting evidence that Jane has and will continue to take Valtrex as suppressive treatment, rather than intermittent treatment. The government offered no affidavit,

medical records, or even a letter from Jane's physician confirming that she is

following (and will continue to follow for the remainder of her life) a daily

suppressive regimen of Valtrex. Dr. McGrath testified that only people who suffer

three outbreaks a year typically are placed on a suppressive regimen rather than

treat the infections on an as-needed basis. (Vol. 2 of 5 A376-377)  A simple google

search or a review of CDC guidelines shows that treatment of herpes does not take

one form and not everyone is directed to follow a suppressive regimen.[16] It is mere

conjecture on the part of the government that Jane has or will remain on a

suppressive regimen of Valtrex for the remainder of her life.

Even *if* the government showed that Jane was following a suppressive

regimen, the government has inflated the cost of the suppressive treatment. Relying

on www.drugs.com, the governments contends that a 30-day supply of Valtrex is

$421.29. However, a 30-day supply of the valacyclovir (the generic version of

Valtrex) is $15.31.[17] Accordingly, even assuming the government satisfied its

burden and demonstrated that Jane will be on a suppressive regimen of

valacyclovir for the remainder of her life, the actual total cost is $9829.02

($15.31/12 months = $183.72 x 53.5 = $9829.02), not an outrageous sum of

$270,466.18. The government offered no rationale for why Jane would need to

---

[16] https://www.cdc.gov/std/treatment-guidelines/herpes.htm
[17] https://www.drugs.com/price-guide/valacyclovir

take the brand name drug of valacyclovir rather than the generic version,

particularly where the government does not make the same request for Stephanie.

In sum, the government cannot satisfy the causal connection between the offenses

for which Defendant was convicted and Jane's contraction of herpes. But even if it

could, the government brazenly attempts to punish Defendant and enrich Jane by

forcing him to pay a quarter-million dollars to Jane even though there is *no*

evidence that she follows and will continue to follow a suppressive regimen of

Valtrex, or that she cannot treat her herpes symptoms with a non-brand version of

valacyclovir.

### B.    Stephanie

The government seeks restitution on behalf of Stephanie for herpes

treatment dating back to 1999. At the outset, the record does not substantiate that

Defendant transmitted herpes to Stephanie. Stephanie did not even testify that

Defendant infected her with herpes. Indeed, Defendant's medical records show that

he testified negative for herpes in June of 2000. (GX237) Dr. McGrath began

treating Defendant for herpes on some date thereafter in the year 2000. (Vol. 2 of 5

A375) Thus, Stephanie's claim that she was infected with herpes by Defendant in

1999 is simply unsupported by the evidence and her own testimony. The

government continually overlooks that 1 in 6 people have genital herpes.

Defendant is not the source of every person on the planet with herpes. Stephanie's claim that Defendant infected her with herpes is contradicted by known facts.

That aside, the government fails to show that Stephanie's purported affliction with herpes occurred between May 1999 and October 15, 1999 during the conduct alleged in Racketeering Act Two. As discussed *supra,* the government must show that Stephanie is a "a person directly and proximately harmed as a result of an offense for which restitution may be ordered . . ." *Goodrich,* 12 F. 4th at 228. Defendant was convicted for an act of sexual exploitation because he allegedly filmed a single sex act with Stephanie between May 1999 and October 15, 1999, when she was still 17 years of age. Restitution may only be imposed for losses arising from the "specific conduct" alleged in Racketeering Act Two. Because Stephanie cannot show that she contracted herpes from Defendant during the conduct alleged in this charge, or at all, she is not entitled to restitution for herpes treatment. Furthermore, the government's exhibit shows that Stephanie is prescribed valacyclovir (the generic version of Valtrex) which should cost only $15.31 per month *without insurance*. Even if Stephanie was taking valacyclovir daily for the rest of her life as the government argues, the total future costs would not exceed $643.02.

In sum, Stephanie's belated claim that she contracted herpes from Defendant is supported by no evidence whatsoever, including her own sworn testimony.

Defendant did not present with symptoms or begin treating for herpes until 2000. Even if this Court were to blindly accept Stephanie's claim 23 years after the fact, the government cannot demonstrate that herpes was a direct and proximate cause of the conduct specifically alleged in Racketeering Act Two. Accordingly, Stephanie, like Jane, is not entitled to no restitution for past or future herpes treatment.

## X.     The District Court Lacked Authority To Order The BOP to Turnover Monies Seized From Defendant's Trust Fund To The Clerk Of Court for Future Restitution Payments.

Final judgment was entered against the Defendant on June 30, 2022. [DE319] As part of that judgment, the district court entered an assessment of $900, a $40,000 JVTA assessment, and a fine of $100,000. [*Id.*] The district court deferred a restitution finding.

On or around August 4, 2022, the Bureau of Prisons ("BOP") seized roughly $27,0000 from Defendant's inmate trust account without a court order, without notice, without filing a lien on the property, without filing a notice of default, and without providing Defendant with a receipt for the funds. [DE323 at 2] In a pleading filed over a month later, the government admitted that it directed the BOP to seize Defendant's trust fund account monies and sought an order from the district court directing the BOP to turn over the seized money to the Clerk of Court

for deposit in an interest-bearing account pending a determination as to restitution. [*Id*.] The district court granted the order. [DE330] (SpA 157)

The district court lacked authority to direct the BOP to turn over $27,000 seized from Defendant's trust account. Because Defendant was not in default and was not provided with any default notice, there was simply no authority for the government to order the BOP to seize Defendant's monies. 18 U.S.C. § 3613(A); 18 U.S.C. § 3572(i). Likewise, the district court lacked authority to direct the BOP to place the seized funds with the Clerk of Court for use against a future potential restitution judgment. Neither the government nor the district court cited any authority for the proposition that the government may restrain Defendant's property preemptively for use against a future restitution award that has yet to be entered.

Case law on this issue is slim. But two district court cases provide some insights. In *United States v. Hickman,* 330 F. Supp. 3d 921 (W.D.N.Y. 2018), the government moved the district court to authorize payment from the defendant's trust account in order to satisfy the criminal monetary obligation imposed by the judgment against the defendant. *Id.* at 922. The district court denied the request because the government failed to present evidence of default in his payment obligations. *See also, United States v. Woodard,* 2016 U.S. Dist. LEXIS 1195118 (W.D. Mich. Jun, 24, 2016) (denying the government's motion for an order

authorizing the BOP to turn over the defendant's trust account funds to pay a court-ordered fine absent any evidence that the fine is "unpaid" or in "default")

What occurred in the instant cases is even more problematic where the government ordered the BOP to seize Defendant's money without *first* seeking leave of court. The government acted prematurely and without legal authority when it ordered the BOP to seize Defendant's monies from his trust account absent any showing that Defendant defaulted or had shirked his payment obligations. The district court abused its discretion when it directed the BOP to turn over the funds to the Clerk of Court for payment against a restitution award that had yet to be entered.

## **CONCLUSION**

For the foregoing reasons, Defendants convictions must be reversed. Alternatively, Defendant is entitled to a new trial. Separately, the restitution award must be vacated and Defendant's property seized from his inmate trust must be promptly returned.

/s/ Jennifer Bonjean
/s/ Ashley Cohen
Bonjean Law Group PLLC
750 Lexington Avenue, 9th Fl.
New York, NY 10022
Tel: 718.875.1850

Chicago Office:
53 W. Jackson, Blvd., Ste. 315
Chicago, Illinois 60604

<u>CERTIFICATE OF COMPLIANCE</u>

I certify pursuant to FRAP 32 and Local Rule 32.1 (a)(4)(A) that the foregoing brief was prepared on a computer using Microsoft Word. The proportionally spaced typeface, font size and spacing used was the following:

Name of Typeface: Times New Roman
Point Size: 14
Line Spacing: Double

The total number of words in the brief, based upon Microsoft word count, exclusive of the cover, table of contents, table of authorities and signature is 24,830 words.

Dated: April 19, 2023            <u>/s/ Jennifer Bonjean</u>
                                      <u>/s/ Ashley Cohen</u>

                                 Bonjean Law Group PLLC
                                 750 Lexington Avenue, 9th Fl.
                                 New York, NY 10022
                                 Tel: 718.875.1850

                                 **Chicago Office:**
                                 Bonjean Law Group, PLLC
                                 53 W. Jackson, Blvd., Ste. 315
                                 Chicago, Illinois 60604