# 22-1481(L)

## 22-1982(CON)

*To Be Argued By*:
KAYLA C. BENSING

# United States Court of Appeals

## For the Second Circuit

❖

UNITED STATES OF AMERICA,

*Appellee,*

—against—

ROBERT SYLVESTER KELLY, AKA R. KELLY,

*Defendant-Appellant.*

**On Appeal From The United States District Court
For The Eastern District of New York**

## BRIEF FOR THE UNITED STATES

BREON PEACE,
*United States Attorney,*
*Eastern District of New York*
*271-A Cadman Plaza East*
*Brooklyn, New York 11201*
*(718) 254-7000*

NICHOLAS J. MOSCOW,
LAUREN H. ELBERT,
KAYLA C. BENSING,
  *Assistant United States Attorneys,*
    *Of Counsel.*

<u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................vii

PRELIMINARY STATEMENT ........................................................ 1

STATEMENT OF FACTS ................................................................ 3

I.      The Superseding Indictment and Trial
        Conviction................................................................................ 3

II.     Trial ......................................................................................... 4

        A.      The Racketeering Enterprise and
                Overview............................................................................ 4

        B.      Kelly's Genital Herpes Diagnosis ......................................... 9

        C.      Bribery to Obtain a Fraudulent
                Identification Document for Aaliyah
                Haughton (RA1) ........................................................ 9

        D.      Sexual Exploitation of Stephanie
                (RA2).......................................................................... 11

        E.      Mann Act Violation, Forced Labor
                and Sexual Exploitation of Jerhonda
                (RA5, RA6, RA7)...................................................... 13

        F.      Mann Act Violations, Sexual
                Exploitation and Forced Labor of
                Jane (Counts 2, 3, 4 and 5 and RA8,
                RA9, RA10, RA11).................................................. 15

        G.      Mann Act Violations and Forced
                Labor of Faith (Counts 6, 7, 8, 9 and
                RA12, RA13, RA14)................................................ 19

H. Other Witnesses ................................................................23

    1. Angela................................................................23

    2. Addie..................................................................25

    3. Kate ..................................................................26

    4. Sonja.................................................................27

    5. Alexis ...............................................................28

    6. Louis and Alex ................................................28

    7. Anna .................................................................30

III. Posttrial Motions........................................................33

IV. Sentencing .................................................................34

ARGUMENT .................................................................36

POINT ONE - THE GOVERNMENT ADDUCED
SUFFICIENT EVIDENCE OF
AN ENTERPRISE .......................................36

I. Applicable Law ...........................................................36

  A. Standard of Review .............................................36

  B. Waiver and Forfeiture..........................................38

  C. RICO's Enterprise Requirements ........................38

II. Kelly Waived Any Argument that the
Court's Instructions Were Legally
Erroneous .......................................................... 40

III. It Was Not Plain Error to Permit the Jury
to Find That Individuals Shared a Common
Purpose that Was Not Illegal...........................42

IV.  The Evidence of the Charged Common
     Purposes Was Overwhelming ....................................... 50

V.   The Enterprise Was Distinct from Kelly ..................... 56

POINT TWO - THE GOVERNMENT ADDUCED
          SUFFICIENT EVIDENCE TO SUPPORT
          THE JURY'S VERDICT AS TO THE
          REMAINING COUNTS ................................. 59

I.   Applicable Law ...................................................... 59

II.  Discussion ............................................................. 59

     A.  Counts 6 and 8 and Racketeering
         Acts 8A, 12A and 14A—Transport
         with Intent to Engage in Illegal
         Sexual Activity ..................................................... 59

     B.  Counts 7 and 9 and Racketeering
         Acts 8B, 12B and 14B—Persuasion,
         Inducement, Enticement or Coercion ......................... 64

     C.  Racketeering Acts 9(B)-(D)—
         Unlawful Sexual Intercourse with a
         Minor ................................................................ 67

     D.  Counts 6, 7, 8 and 9 and
         Racketeering Acts 12 and 14—New
         York Penal Law Section 120.20 ............................ 68

     E.  Racketeering Acts 6 and 13—Forced
         Labor ............................................................... 72

POINT THREE - THE STATE LAWS UNDERLYING
KELLY'S CONVICTIONS DO NOT
SUFFER FROM ANY VAGUENESS
INFIRMITIES ........................................................... 77

I.  Relevant Procedural History .................................... 77

    A.  Pretrial Motions to Dismiss – Section
        2307 ................................................................ 77

    B.  Posttrial Motions – Sections 2307
        and 120290 ..................................................... 77

II.  Applicable Law ..................................................... 79

    A.  Vagueness Challenges ...................................... 79

    B.  Standard of Review .......................................... 80

    C.  Untimeliness .................................................... 81

III.  Discussion ............................................................ 82

    A.  Counts 6 Through 9 and
        Racketeering Acts 12 and 14—New
        York Public Health Law Section 2307 ............. 82

        1.  Kelly Was "Infected" Under
            Section 2307 ............................................ 82

        2.  Section 2307 Is Not
            Unconstitutionally Vague ......................... 84

    B.  Racketeering Act 8—California
        Health and Safety Code Section
        120920 ............................................................ 87

        1.  Waiver .................................................... 87

2.     The Indictment Properly
       Charged Kelly with the Law in
       Effect at the Time of the
       Charged Conduct ........................................ 90

3.     Section 120290 Is Not
       Unconstitutionally Vague ........................... 92

POINT FOUR - KELLY WAS NOT DENIED A FAIR TRIAL
            NOR EFFECTIVE ASSISTANCE OF
            COUNSEL DURING VOIR DIRE ............................... 95

I.     Relevant Facts ........................................................ 95

II.    Applicable Law ...................................................... 97

       A.    Voir Dire ....................................................... 97

       B.    Ineffective Assistance ................................. 98

III.   Argument ................................................................ 99

POINT FIVE - THE DISTRICT COURT PROPERLY
            ADMITTED EVIDENCE OF SEXUAL ACTS
            AND KELLY'S EXPOSURE OF OTHERS
            TO GENITAL HERPES ............................... 105

I.     Relevant Facts ...................................................... 105

II.    Applicable Law .................................................... 107

       A.    Evidentiary Rulings .................................. 107

       B.    Uncharged Acts ......................................... 107

       C.    Federal Rule of Evidence 403 ................ 108

III.   Argument .............................................................. 109

       A.    Angela's Testimony Regarding
             Aaliyah ...................................................... 109

B. Evidence of Kelly's Exposure of Others to Herpes ................................................ 110

C. Testimony of Addie, Alexis, Anna, Louis and Alex ................................................ 112

D. Video Exhibits 328(a), 329(a), 341(a), 342(a) and 343(a) ...................................... 115

POINT SIX - THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ORDERING RESTITUTION AND AUTHORIZING SEIZURE OF KELLY'S BOP FUNDS ................................................................ 119

I. Applicable Law .................................................................. 119

A. Standard of Review ............................................................ 119

B. Restitution Law ................................................................ 119

II. Analysis ............................................................................. 122

A. The District Court's Imposition of Restitution Was Within its Discretion .............................. 122

B. The District Court's Order Authorizing Seizure of Funds from Kelly's BOP Account Was Within its Discretion ...................................................... 126

CONCLUSION ............................................................................ 128

# TABLE OF AUTHORITIES

Page

## CASES

Boyle v. United States,
   556 U.S. 938 (2009).........................................................................passim

Cedric Kushner Promotions, Ltd. v. King,
   533 U.S. 158 (2001).........................................................49, 50 n.10, 58

Ciminelli v. United States,
   143 S. Ct. 1121 (2023)..............................................................................41

Counterman v. Colorado,
   143 S. Ct. 2106 (2023).....................................................................85 n.20

Cruz v. FXDirectDealer, LLC,
   720 F.3d 115 (2d Cir. 2013) ..............................................................45-46

D. Penguin Bros. Ltd. v. City Nat. Bank,
   587 F. App'x 663 (2d Cir. 2014) ...........................................................46

D'Addario v. D'Addario,
   901 F.3d 80 (2d Cir. 2018) ....................................................................47

Davis v. United States,
   411 U.S. 233 (1973)................................................................................81

Discon, Inc. v. NYNEX Corp.,
   93 F.3d 1055 (2d Cir. 1996) ............................................................57-58

Doe v. Roe,
   No. 12-CV-01644, 2013 WL 1787175
   (D. Nev. Apr. 25, 2013) .........................................................................93

Einaugler v. Supreme Ct. of State of N.Y. for Cnty. of Kings,
   918 F. Supp. 619 (E.D.N.Y. 1996) .......................................................70

First Capital Asset Mgmt. v. Satinwood, Inc.,
   385 F.3d 159 (2d Cir. 2004) ............................................... 43-46

First Nationwide Bank v. Gelt Funding, Corp.,
   820 F. Supp. 89 (S.D.N.Y. 1993)....................................... 44-45

H.J. Inc. v. Northwestern Bell Tel. Co.,
   492 U.S. 229 (1989) .............................................................. 49

Henry v. Poole,
   409 F.3d 48 (2d Cir.2005) .................................................... 98

Hickman v. United States,
   330 F. Supp. 3d 921 (W.D.N.Y. 2018)......................... 127 n.31

Holder v. Humanitarian Law Project,
   561 U.S. 1 (2010)................................................................ 79

JSC Foreign Econ. Ass'n Technostroyexport v. Weiss,
   No. 06-CV-6095, 2007 WL 1159637
   (S.D.N.Y. Apr. 18, 2007) ............................................... 46 n.8

LeFlore v. Pollard,
   295 F. App'x 95 (7th Cir. 2008)....................................... 98-99

McCullough v. Suter,
   757 F.2d 142 (7th Cir. 1985)............................................... 58

Moll v. US Life Title Ins. Co. of New York,
   654 F. Supp. 1012 (S.D.N.Y. 1987)................................. 44-45

Murphy v. Florida,
   421 U.S. 794 (1975)........................................................... 102

Myrick v. Anglin,
   496 F. App'x 670 (7th Cir. 2012)........................................ 71

Nat'l Org. for Women, Inc. v. Scheidler,
   510 U.S. 249 (1994).................................................... 50 n.10

Nwozuzu v. Holder,
    726 F.3d 323 (2d Cir. 2013) ................................................................ 82

Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,
    30 F.3d 339 (2d Cir. 1994) ................................................................ 57

Rosales-Lopez v. United States,
    451 U.S. 182 (1981) ................................................................ 97

Skilling v. United States,
    561 U.S. 358 (2010) ................................................................ 79-80

Smith v. Goguen,
    415 U.S. 566 (1974) ................................................................ 80

Strickland v. Washington,
    466 U.S. 668 (1984) ................................................................ 98-99, 103

Thibodeau v. Portuondo,
    486 F.3d 61 (2d Cir. 2007) ................................................................ 79

U1it4less, Inc. v. Fedex Corp.,
    871 F.3d 199 (2d Cir. 2017) ................................................................ 49

United States v. Amer,
    110 F.3d 873 (2d Cir. 1997) ................................................................ 80, 84-85

United States v. Baird,
    70 F.4th 390 (7th Cir. 2023) ................................................................ 65-66

United States v. Barret,
    848 F.3d 524 (2d Cir. 2017) ................................................................ 107

United States v. Basciano,
    599 F.3d 184 (2d Cir. 2010) ................................................................ 124

United States v. Bastian,
    770 F.3d 212 (2d Cir. 2014) ................................................................ 80-81

United States v. Binday,
    804 F.3d 558 (2d Cir. 2015) ................................................................ 41

United States v. Boccagna,
    450 F.3d 107 (2d Cir. 2006) .............................................................. 120

United States v. Bonanno Organized Crime Family of La Cosa Nostra,
    695 F. Supp. 1426 (E.D.N.Y. 1988)...................................................... 90

United States v. Capers,
    20 F.4th 105 (2d Cir. 2021)............................................................. 36-37

United States v. Carboni,
    204 F.3d 39 (2d Cir. 2000) ............................................................... 108

United States v. Catoggio,
    326 F.3d 323 (2d Cir. 2003) ..................................................... 120, 124

United States v. Cianci,
    378 F.3d 71 (1st Cir. 2004) ............................................................. 47-48

United States v. Coplan,
    703 F.3d 46 (2d Cir. 2012) ................................................................. 36

United States v. Coppola,
    671 F.3d 220 (2d Cir. 2012) ............................................................. 109

United States v. Coriaty,
    300 F.3d 244 (2d Cir. 2002) ............................................................. 125

United States v. Crowley,
    236 F.3d 104 (2d Cir. 2000) ............................................................... 89

United States v. Davis,
    576 F.2d 1065 (3d Cir. 1978) ............................................................. 90

United States v. Donaghy,
    570 F. Supp. 2d 411 (E.D.N.Y. 2008)........................................ 119-120

United States v. Elwood,
    757 F. App'x 731 (10th Cir. 2018).................................................... 126

United States v. Feldman,
    853 F.2d 648 (9th Cir. 1988) .............................................................. 48

United States v. Frumento,
    563 F.2d 1083 (3d Cir. 1977) ............................................................ 91

United States v. Glenn,
    312 F.3d 58 (2d Cir. 2002) ................................................................. 37

United States v. Greer,
    285 F.3d 158 (2d Cir. 2002) ............................................................... 41

United States v. Guadagna,
    183 F.3d 122 (2d Cir. 1999) ............................................................... 37

United States v. Gushlak,
    728 F.3d 184 (2d Cir. 2013) ........................................ 120, 122, 124-25

United States v. Herrera,
    584 F.2d 1137 (2d Cir. 1978) ............................................................. 84

United States v. Hester,
    708 F. App'x 441 (9th Cir. 2018) ...................................................... 126

United States v. Houtar,
    980 F.3d 268 (2d Cir. 2020) ...................................................... 79, 85-86

United States v. Huber,
    603 F.2d 387 (2d Cir. 1979) ............................................................... 43

United States v. Irving,
    452 F.3d 110 (2d Cir. 2006) ............................................................. 126

United States v. James,
    957 F.2d 679 (9th Cir. 1992) ............................................................... 71

United States v. Kelley,
    551 F.3d 171 (2d Cir. 2009) ............................................................. 107

United States v. Kimber,
    777 F.3d 553 (2d Cir. 2015) ............................................................... 99

United States v. King,
    861 F. App'x 490 (2d Cir. 2021) ........................................................ 81

*United States v. Kukushkin,*
61 F.4th 327 (2d Cir. 2023) .................................................. 37

*United States v. Lawes,*
292 F.3d 123 (2d Cir. 2002) ......................................... 97, 100

*United States v. Lemberger,*
673 F. App'x 579 (7th Cir. 2017) ...................................... 126

*United States v. Licavoli,*
725 F.2d 1040 (6th Cir. 1984) ............................................ 91

*United States v. Marcus,*
628 F.3d 36 (2d Cir. 2010) ................................................. 73

*United States v. Matera,*
489 F.3d 115 (2d Cir. 2007) ............................... 107-08, 113

*United States v. McCain,*
No. 21-2982, 2023 WL 2335332
(2d Cir. Mar. 3, 2023) ..................................................... 108

*United States v. Miller,*
954 F.3d 551 (2d Cir. 2020) ............................... 37, 54 n.11

*United States v. Minicone,*
960 F.2d 1099 (2d Cir. 1992) ....................................... 51-53

*United States v. Mitchell,*
811 F. App'x 50 (2d Cir. 2020) .......................................... 38

*United States v. Nieves,*
58 F.4th 623 (2d Cir. 2023) ................................... 98, 102-03

*United States v. O'Brien,*
926 F.3d 57 (2d Cir. 2019) .......................................... 81, 89

*United States v. Olano,*
507 U.S. 725 (1993) ........................................................... 38

United States v. Parse,
   789 F.3d 83 (2d Cir. 2015) ........................................................ 103 n.23

United States v. Pearson,
   570 F.3d 480 (2d Cir. 2009) ............................................................. 125

United States v. Pelton,
   578 F.2d 701 (8th Cir. 1978) .............................................................. 66

United States v. Perkins,
   948 F.3d 936 (8th Cir. 2020) .......................................................... 60-61

United States v. Pierce,
   785 F.3d 832 (2d Cir. 2015) ............................................................ 39-40

United States v. Pizzonia,
   577 F.3d 455 (2d Cir. 2009) ............................................................. 112

United States v. Polouizzi,
   564 F.3d 142 (2d Cir. 2009) .............................................................. 38

United States v. Price,
   443 F. App'x 576 (2d Cir. 2011) ........................................................ 98

United States v. Ragonese,
   47 F.4th 106 (2d Cir. 2022) ............................................................... 84

United States v. Raniere,
   No. 20-3520, 2022 WL 17544087
   (2d Cir. Dec. 9, 2022) ..................................................................... 73

United States v. Rashkovski,
   301 F.3d 1133 (9th Cir. 2002) ........................................................... 66

United States v. Reifler,
   446 F.3d 65 (2d Cir. 2006) ............................................................... 119

United States v. Roldan-Zapata,
   916 F.2d 795 (2d Cir. 1990) .......................................................... 108-09

United States v. Rybicki,
  354 F.3d 124 (2d Cir. 2003) ......................................................80, 86-87

United States v. Sabhnani,
  539 F. Supp. 2d 617 (E.D.N.Y. 2008)............................................72-73

United States v. Sampson,
  No. 13-CR-269 (DLI), 2016 WL 756565
  (E.D.N.Y. Feb. 26, 2016) .......................................................89

United States v. Scott,
  677 F.3d 72 (2d Cir. 2012) ...............................................107

United States v. Scott,
  979 F.3d 986 (2d Cir. 2020) ...............................................93

United States v. Tarbell,
  728 F.3d 122 (2d Cir. 2013) ...............................................99

United States v. Thomas,
  887 F.2d 1341 (9th Cir. 1989)...............................................91

United States v. Tropeano,
  252 F.3d 653 (2d Cir. 2001) ...............................................107

United States v. Turkette,
  452 U.S. 576 (1981)................................................... passim

United States v. Vilar,
  729 F.3d 62 (2d Cir. 2013) ...............................................50

United States v. Waqar,
  997 F.3d 481 (2d Cir. 2021) ...............................................64-65

United States v. Whab,
  355 F.3d 155 (2d Cir. 2004) ...............................................80-81

United States v. Williams,
  553 U.S. 285 (2008)...............................................79, 80

*United States v. Yalincak,*
   30 F.4th 115 (2d Cir. 2022)................................................................119

*United States v. Zangari,*
   677 F.3d 86 (2d Cir. 2012) ...............................................................119

*United States v. Zemlyansky,*
   908 F.3d 1 (2d Cir. 2018) ...............................................................38-39

*World Wrestling Ent., Inc. v. Jakks Pac., Inc.,*
   425 F. Supp. 2d 484 (S.D.N.Y. 2006)............................................46 n.8

*Zamora v. FIT Int'l Grp. Corp.,*
   834 F. App'x 622 (2d Cir. 2020) .........................................................46

## STATE CASES

*Fan v. Sabin,*
   49 Misc. 3d 1201(A) (N.Y. Sup. Ct. 2015)...........................................83

*Maharam v. Maharam,*
   123 A.D.2d 165 (1st Dep't 1986) ........................................................83

*Matter of Grattan v. People,*
   65 N.Y.2d 243 (1985) ........................................................................86

*People v. Galatro,*
   84 N.Y.2d 160 (1994) ...................................................................72 n.18

*People v. Williams,*
   24 N.Y.3d 1129 (2015) ......................................................................71

## STATUTES

18 U.S.C. § 1589 ..........................................72, 74 n.19, 75-76

18 U.S.C. § 1961 .......................................38-39, 42-43. 90-91

18 U.S.C. § 1962 ........................................................3, 38, 42

18 U.S.C. § 2241 ...........................................................60-61

18 U.S.C. § 2421 ............................................................. 3, 59-60. 63 n.13

18 U.S.C. § 2422 ...................................................................... 64, 66

18 U.S.C. § 2429 ............................................................... 119, 121-22

18 U.S.C. § 3613 ...................................................................... 126-27

18 U.S.C. § 3663 ............................................................. 119, 121, 124

18 U.S.C. § 3664 ................................................................. 119, 126

28 U.S.C. § 2255 ...................................................................... 95, 99

## STATE STATUTES

California Health and Safety Code § 120261 ........................................ 93

California Health and Safety Code § 120290 ................................. passim

California Penal Code § 7 ............................................................. 93

New York Penal Law § 120.20 ...................................................... passim

New York Public Health Law § 2307 ............................................ passim

## FEDERAL RULES

Fed. R. Crim. P. 12 ............................................................ 78, 81, 88

Fed. R. Crim. P. 29 ........................................................... 33, 36, 77-78

Fed. R. Crim. P. 33 ......................................................... 33, 34, 97, 102

Fed. R. Crim. P. 52 ..................................................................... 103 n.23

Fed. R. Evid. 403 ..................................................................... 108-09

Fed. R. Evid. 404 ........................................................... 105, 108, 109

Fed. R. Evid. 413 ..................................................................... 105

## OTHER AUTHORITIES

Gerard E. Lynch, <u>RICO: The Crime of Being a Criminal, Parts I & II</u>, 87 Colum. L. Rev. 661 (1987) ............................................................... 49

<u>Infect</u>,
    Black's Law Dictionary (11th ed. 2019) ........................................ 82-83

<u>Sexually Transmitted Disease</u>,
    Black's Law Dictionary (11th ed. 2019) ............................................ 83

<u>Venereal Disease</u>,
    Black's Law Dictionary (11th ed. 2019) ............................................ 83

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 22-1481 (L)

UNITED STATES OF AMERICA,

<u>Appellee,</u>

-against-

ROBERT SYLVESTER KELLY,

<u>Defendant-Appellant.</u>

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

<u>PRELIMINARY STATEMENT</u>

Defendant-appellant Robert Sylvester Kelly, also known as "R. Kelly," appeals from an amended judgment entered in December 2022, in the United States District Court for the Eastern District of New York (Donnelly, J.), convicting him, after a six-week jury trial, of racketeering, three counts each of Mann Act transportation to engage in illegal sexual activity and Mann Act coercion and enticement to engage

in illegal sexual activity, and one count each of Mann Act coercion of a minor to engage in illegal sexual activity and Mann Act transportation of a minor with intent to engage in illegal sexual activity. The district court sentenced Kelly principally to a sentence of 360 months' imprisonment to be followed by five years of supervised release, as well as a $100,000 fine and approximately $379,649.90 in restitution.

On appeal, Kelly challenges (1) the proof of a legally cognizable enterprise within the meaning of RICO; (2) the evidence supporting the jury's verdict on various of the Mann Act violations and forced labor racketeering acts; (3) the constitutionality of certain state laws on which the Mann Act convictions were predicated; (4) the constitutional adequacy of trial counsel during <u>voir</u> <u>dire</u>; (5) the district court's admission of certain evidence; and (6) the district court's determinations in ordering restitution and in authorizing the seizure of certain funds.

These arguments are without merit and the Court should affirm Kelly's conviction and sentence.

## STATEMENT OF FACTS

Robert Sylvester Kelly, also known as "R. Kelly," an award-winning musician and performer, used his fame and network of people closest to him—who profited from his successful career and who were compensated because of their willingness to enable and perpetuate his activities—to target, groom and exploit young men and women, including minors, for his sexual gratification.

## I.    The Superseding Indictment and Trial Conviction

In March 2020, a grand jury in the Eastern District of New York returned a third superseding indictment (the "Indictment") charging Kelly with racketeering, in violation of 18 U.S.C. § 1962(c), and various violations of the Mann Act, 18 U.S.C. §§ 2421-24, relating to illegal sexual activity with "Jane"[1] and "Faith."  (GA19-41).[2]

---

[1]    Because many of the government's victim witnesses testified using a pseudonym or their first name only, the government refers to the victims by their pseudonym or their first name even where, as with Aaliyah and Jerhonda, their full names were disclosed at trial.

[2]    Parenthetical references to "A," "SPA," "SA," and "GA" are to Kelly's appendix, his special appendix, his sealed appendix and the government's appendix, respectively.  "Br" refers to Kelly's brief and "PSR" refers to Kelly's Presentence Investigation Report, a copy of which is being sent to the court under seal.

4

In September 2021, a jury convicted Kelly, after a six-week trial, of all counts.  (GA908-17).

II.   Trial

The evidence adduced at trial consisted of testimony from 50 witnesses, including 45 witnesses called by the government and five called by Kelly, and hundreds of exhibits.

A.   The Racketeering Enterprise and Overview

Since the 1990s, Kelly led an organization comprised of an inner circle of employees and associates, including a business manager, an accountant, recording engineers, personal assistants, runners, drivers, security personnel and members of his entourage, who promoted his music and brand, but who also enabled Kelly's use of his fame and organization to engage in abusive and illegal sexual relationships with a number of victims, often minors—including sexual activity without disclosing a sexually transmitted disease ("STD") that Kelly had contracted, production of child pornography, bribery and coercion, among other crimes.  (PSR¶¶ 13-22).

Kelly and his inner circle assisted Kelly in his professional and personal life, which included managing studios and tour buses and

serving as receptionists, but also recruiting and maintaining Kelly's female victims.  (See, e.g., A447-49, 649, 673; SA1244, 1257; GA1041). Kelly's inner circle in the 1990s included his personal assistant and tour manager Demetrius Smith, his manager Barry Hankerson, as well as Larry Hood, Bruce Kelly and Tyree Jameson.  (A560-67, 570).  After Hankerson, Derrel McDavid served as Kelly's manager and accountant. (A600, 1042).  At various times between 2003 and 2011, Tom Arnold served as Kelly's studio manager, road manager and personal assistant. (SA1242-44).  Diana Copeland served as Kelly's personal assistant, and later, executive assistant, beginning in approximately 2004 and staying for approximately 15 years.  (A1037, 1039).  Kelly's enterprise also included many runners, including witnesses Nicholas Williams and Anthony Navarro (A514, 1386); close associate Jermaine Maxey, also known as "Bubba" (A107, 661; SA1483, 1850); and during the later years, personal assistants including Milton "June" Brown, George "June Bug" Kelly, Cheryl Mack, Suzette Mayweather ("Suzette") and Alesiette Mayweather ("Alesiette").  (SA624, 1476, 1480-81, 1484, 1956; A1043, 1269, 1272).

At times, Kelly's runners required visitors to sign non-disclosure agreements and made copies of their identification documents. They also escorted and provided food to female guests and providing them with food.  (A507, SA1253-57).  They distributed slips of paper with Kelly's telephone number and selected women and girls to join him backstage and at afterparties.  (SA436, 1649, 1759, 1852; A650-53; GA1038).  His runners picked up his female guests from their homes, nearby train stations and airports, and his inner circle accompanied female guests to various locations, including the mall and the salon.  (SA1247-48; A457-58, 1055, 1289-90; GA938).  One of Kelly's drivers drove one of Kelly's female guests—a 16-year-old girl—from a mall in Jacksonville to meet Kelly in Miami, a five-and-a-half-hour trip.  (A677; SA1766-67; GA875).  His inner circle carried Kelly's backpack, which contained, among other items, iPads that he used to record sexual activity.  (SA457, 510, 1684, 1920-21; GA936-37, 871, 1063).

Kelly's inner circle also assisted Kelly's female guests in arranging their air travel and hotel rooms, allowing them to visit Kelly across the United States.  (A649, 1063, 1282).  They picked up medication to treat Kelly's genital herpes.  (A468).  Kelly also expected them to make

sure that his female guests and girlfriends abided by Kelly's rules, including keeping them controlled and confined. They stood guard when Kelly required his victims to stay in a particular place as punishment for breaking one of Kelly's "rules." (A1294-1311; GA1030-37). They had to report any female guest who left a room without permission. (A464-65). When one girlfriend, "Anna," left Kelly on one occasion, Kelly confronted Copeland, then his personal assistant, about how she had "let Anna escape." (A1069). Another time, Kelly directed Copeland to "pay close attention" to his female guests' use of their cellular telephones. (GA1047-48 (text message forwarded by Kelly to Copeland directing, "You should pay close attention to the girls['] phones I would say ESPECIALLY [Jane] and what exactly they do on them")).

Members of Kelly's inner circle also had to enforce the punishments Kelly pronounced on his victims. (SA1739-51). On one occasion, Kelly confronted assistant Suzette after he learned that she had let a girlfriend, "Dominique," off the tour bus without first obtaining Kelly's permission. (SA1557-59). When Kelly learned that, on another occasion, Dominique had shared personal information about herself with Suzette, Kelly confronted Suzette about the rule violation, leading

8

Suzette to lie to Kelly because Suzette feared what Kelly might do to Dominique otherwise.  (SA1560-62).

Kelly relied on his inner circle and required them to abide by several rules, including signing non-disclosure agreements and obtaining Kelly's approval before carrying out even the most mundane of tasks, such as allowing a guest to go to the bathroom.  (A737, 1108, 1282; SA1439).  He also required his inner circle to carry out his demands without question and to be fiercely loyal.  For example, Kelly told Cheryl Mack about a lawsuit filed against him by a 17-year-old aspiring female singer, and instructed Mack that she must "pick a team"; Kelly threatened Mack that "in these types of situations people come up missing."  (SA1935-36, 1944-46).  Kelly also "fined" members of his inner circle by withholding funds owed to them if they disobeyed his orders. (A482, 680-82, 1072-74; SA1270-71, 1565-66).  In addition, Kelly required several members of his inner circle to write letters falsely confessing to bad conduct and provide those letters to Kelly so that Kelly could use them for his protection.  (A1093-96, SA1987-90).

B.     Kelly's Genital Herpes Diagnosis

Dr. Kris McGrath was Kelly's primary care physician for over 25 years, beginning in September 1994 until sometime in 2019.  (A353, 356, 361, 399-400).  At some point after June 2000 and before March 19, 2007, Dr. McGrath concluded that Kelly had contracted genital herpes, an STD.  (A376, 379-80, 390, 431).  Dr. McGrath told Kelly that Kelly had genital herpes and advised him to inform his sexual partners of this fact "so they could make a decision whether or not to have sex with you or not," and Kelly confirmed he understood and that he should use a condom when having sex.  (A374-75, 432).

C.     Bribery to Obtain a Fraudulent Identification
          Document for Aaliyah Haughton (RA1)

In approximately 1992 or 1993, Kelly began sexually abusing Aaliyah Haughton ("Aaliyah"), an aspiring musical artist, when she was 13 or 14.  (A570-71, 579-85, 1174-78, 1188-89, 1192).  In 1994, while on tour, Kelly approached Smith, told him that "Aaliyah was in trouble," and instructed him to make flight reservations immediately to Chicago. (A585-90).  On the plane ride back to Chicago, Kelly, who was concerned and "crying a lot," explained to Smith that Aaliyah believed she was

pregnant. (A596-97, 600-01). Kelly also told Smith that, after speaking with McDavid, he had devised a plan to marry Aaliyah so that he could avoid jail. (A597, 599-600).

Kelly and members of his inner circle gathered and discussed Kelly's plan to marry Aaliyah. (A604-05). Aaliyah, who was a minor, was not old enough to get a marriage license. (GA804-05; A606-07). Smith proposed to the group getting a fraudulent identification card for Aaliyah showing she was of age from a local welfare office by bribing an employee with cash. (A605-07, SA1219-20). McDavid gave Smith $500 in cash, and the group obtained the identification after Smith bribed a public aid office employee. (A608-15; GA876-85). Kelly, Smith, Aaliyah and others then went to obtain another fake identification card for Aaliyah and then to the Clerk's Office to obtain a marriage license, where they had to present identification. (GA804-07; A614-20). Based on the information provided, including the marriage application falsely listing Aaliyah's date of birth, the Clerk's Office issued Kelly and Aaliyah a marriage license. (GA809-10). Aaliyah and Kelly were married, and the marriage license was filed with the Clerk's Office. (A620; GA811-13, 868-

69). A few minutes after the ceremony, Kelly, Smith and Jameson flew back to the concert venue to continue Kelly's tour. (SA1223).

    D.    <u>Sexual Exploitation of Stephanie (RA2)</u>

During the summer of 1998, a 16-year-old girl ("Stephanie") was at a McDonald's restaurant in Chicago when a man asked her age. (GA815-18). When Stephanie responded that she was 16, the man gestured over to Kelly, seated nearby, and told Stephanie that Kelly wanted her to call him and gave Stephanie Kelly's phone number. (GA816-17). Stephanie did not call Kelly at that time. (GA817).

Approximately one year later, when Stephanie was 17, she sought Kelly out at a store to ask him if he would listen to her friend Katherine sing and potentially help Katherine with her career. (GA817-19, 822-23). Kelly used his introduction to Stephanie to arrange to have sexual intercourse with her, including when he knew she was a minor. (GA823-36, 1019-20). While Stephanie was still 17, Kelly videotaped Stephanie engaging in sexual contact with him. (GA836-40). Stephanie saw Kelly, and had recurring sexual intercourse with him, for approximately six months. (GA827-31). At various times, Kelly's employees transported her. (GA828-29). Stephanie described Kelly as

"controlling, intimidating," and her sexual interactions with him (including being instructed to have oral sex in front of others) as "humiliating." (GA830-32, 844-45, 852). Kelly taught Stephanie his rules. (GA841). Stephanie was not allowed to speak to men, and heard Kelly tell guests at a dinner "that he likes young girls and that people make such a big deal of it but it really isn't a big deal because even, look at Jerry Lee Lewis, he's a genius and I'm a genius and we should be allowed to do whatever we want because of what we give to this world." (GA841-42).

In approximately October 1999, one of Kelly's employees arranged for Stephanie to travel to Florida to see Kelly. (GA845-50, 1021-22). On that trip, Kelly recorded Stephanie giving him oral sex in a humiliating manner and, following the trip, Stephanie did not want to see Kelly anymore. (GA849-50). Stephanie nonetheless continued to see Kelly because she wanted Kelly to give her the sex tapes he had made of her. (GA850-51). She asked Kelly to destroy or give her the videotapes on multiple occasions, but Kelly did not do so. (GA852). Stephanie ultimately stopped speaking with Kelly. (GA851).

E.   Mann Act Violation, Forced Labor and Sexual
     Exploitation of Jerhonda (RA5, RA6, RA7)

In May 2009, shortly after Jerhonda turned 16, Kelly's employee Maxey ("Bubba") invited Jerhonda to attend a party at Kelly's residence.  (A107).  At the party, Jerhonda told Kelly that she was 19.  (A111-12).  Kelly and Jerhonda exchanged telephone numbers, and thereafter, Kelly invited Jerhonda over and one of Kelly's runners, Navarro, picked up Jerhonda and drove her to Kelly's residence.  (A111-14, 148-49).  There, Kelly had oral sexual intercourse with Jerhonda, after which Jerhonda told Kelly that she was in fact 16.  (A115-16).  Kelly told Jerhonda to tell others that she was 19, and then had vaginal intercourse with her.  (A116-18).  He did not use any protection and never disclosed to her that he had contracted an STD.  (A118-19).  Kelly arranged for a runner to bring Jerhonda an envelope with $50 and take her to a nearby train station when done.  (A121-23).

During the ensuing approximately six months that Jerhonda spent with Kelly, Kelly continued to engage in unprotected sexual intercourse with her and Jerhonda contracted genital herpes.  (A161-62, 166-68).  Jerhonda told Kelly and he arranged for a doctor to examine her

and give her medication. (A166-67). While they were together, Kelly regularly recorded Jerhonda engaging in sexually explicit activity. (A161-62). While she was with Kelly, Jerhonda also learned about certain of Kelly's "rules." (A125-26). When Jerhonda broke one of Kelly's rules or otherwise failed to meet his desires, Kelly physically assaulted her and told her that she was "on punishment." (A141-42, 159-61). Kelly also had Jerhonda sign a non-disclosure agreement and write false letters that would discredit any claims she made against Kelly, for example claiming that Jerhonda had stolen from Kelly, and that her sister had arranged for her to falsely claim that Kelly gave her genital herpes. (A142-45).

In January 2010, when she was still 16, Jerhonda broke one of Kelly's rules, angering Kelly. (A169). Kelly slapped her, choked her until she briefly passed out, spit on her and told her to "put [her] head down in shame." (A169-70). Kelly then "instructed [her] to perform oral sex on him." (A170). Jerhonda complied with Kelly's instruction, and when she finished, Kelly ejaculated on Jerhonda's face. (Id.). Jerhonda used her T-shirt to wipe off Kelly's semen. (Id.). Biological testing on the

T-shirt later revealed the presence of sperm, and a DNA profile from the sperm matched Kelly's DNA profile. (GA950-51, 961).

In 2009, while Jerhonda was inside Kelly's residence, Jerhonda learned that police officers arrived at the residence looking for a 17-year-old friend of Jerhonda's. (A132-33, 138-39). An officer testified at trial that he responded to Kelly's residence and spoke with McDavid in his search for a "missing juvenile." (GA798-801).

F.    Mann Act Violations, Sexual Exploitation and Forced Labor of Jane (Counts 2, 3, 4 and 5 and RA8, RA9, RA10, RA11)

Jane was 17 when she first encountered Kelly at a concert in April 2015. (SA434-35). Kelly had one of his associates provide Jane with his phone number, which Jane later called. (SA438, 444). Jane told Kelly that she was an aspiring singer, and Kelly invited Jane to audition for him at his hotel. (SA446-47). Jane also falsely told Kelly that she was 18. (SA446). When Jane arrived, Kelly would only listen to Jane audition after she engaged in oral sex with him. (SA452-62).

Thereafter, Kelly arranged for Jane to travel across the country to meet him while he was on tour, including in California. (SA461, 463-64). Mack, aware of Jane's true birthdate, arranged for

Jane's travel, paid for by Kelly. (SA465-67). Kelly had sexual contact with Jane while they were in California (SA469-70), and there, Kelly began to teach his "rules" to Jane. (See, e.g., SA475-76; GA1028). Around this time, Jane and Kelly first had vaginal sexual intercourse; Kelly did not use a condom or other protection and did not tell Jane that he had genital herpes. (SA484-85).

Jane spent the summer of 2015 with Kelly, traveling to shows and staying with him in Chicago. In August 2015, Jane was diagnosed with genital herpes, leaving her so she could not walk. (SA516-18). With the assistance of "Juice," whom Jane described as one of Kelly's "friends" and his "assistant," Jane saw a doctor in downtown Chicago and was prescribed medication. (SA516-17; GA929-31). Jane told Kelly about her diagnosis. (SA517-18). When she subsequently had outbreaks of herpes, Kelly disparaged her. (SA520).

At the end of the summer, when Jane was scheduled to return home for her senior year of high school, Jane told Kelly that she was 17. (SA525-26). Kelly arranged for Juice's mother to serve as Jane's legal guardian until she turned 18 and for Jane's parents to enroll her in remote schooling. (SA527-28). Jane then resumed traveling with Kelly.

(SA533-35). During this time, Jane explained in text messages to her friend that if she were to become pregnant, Kelly would want her to have an abortion because she was not yet 18. (SA547-48). While Jane was still 17, Kelly recorded Jane engaged in sexual activity with him. (SA537-38).

Jane continued to live with Kelly until his arrest in July 2019, as did other women. (SA567, 572-73, 659). Jane learned through Kelly and others that Kelly required Jane (and the other women who lived with Kelly) to abide by rules he set. For example, Jane had to seek permission before she left areas where she was staying. (SA520-21). When Jane was in Kelly's Sprinter van and needed to use a restroom, she would urinate into a cup when she was not permitted to get off the van. (GA939-40). Jane was not permitted to look at or otherwise interact with other men and was discouraged from communicating with friends or using social media. (SA521, 765, 1189; GA936). Jane drafted letters containing false and embarrassing statements, a process often overseen by Juice. (SA490-91, 520; GA 942-45). At Kelly's direction, Jane also created videos containing false and embarrassing statements and doing humiliating things, including a video of her eating feces, as punishment. (GA945-47).

Jane was required to report to Kelly when she saw anyone violating Kelly's rules. (GA940-41).

Kelly punished Jane when she did not follow his rules. Punishments inflicted by Kelly included spankings, physical assaults and confining Jane to a room or a bus for prolonged periods of time. (SA566, 574-90, 596-603, 3418-35). Jane also saw Kelly spanking and otherwise physically assaulting the other women who lived with Kelly, when Kelly determined that one had broken his rules. (SA590). Kelly also required Jane to have sexual contact with other men and women at Kelly's direction, often recorded, including the women living with Kelly, his assistants, and "Alex," a man she had never seen before Kelly directed her to have sex with him. (SA620-26, 653-58; GA932-35).

When Kelly subjected Jane to confinement, his assistants typically stood nearby. (See, e.g., GA1033-37). One of Kelly's employees saw Kelly's female guests and girlfriends urinate in cups on the Sprinter rather than finding a restroom. (A1289). Another employee understood that Kelly required his female guests and girlfriends to obtain permission before moving around, including to use the restroom. (SA1528-32). Suzette and Alesiette Mayweather exchanged text messages in which

they discussed punishments towards women, including that Kelly was holding Jane "all day," and that Jane had been held in a van for a lengthy time without food. (SA1542-47, 1579-83; GA1029). Suzette knew Kelly met Jane when she was 17 and heard Kelly hit her on at least one occasion. (SA1513, 1520, 1634).

G.     Mann Act Violations and Forced Labor of Faith
        (Counts 6, 7, 8, 9 and RA12, RA13, RA14)

"Faith" met Kelly in March 2017, when she was 19. (SA1644-45, 1647). Two women wearing T-shirts with Kelly's face and the word "Staff" approached Faith and her sister and invited them backstage. (SA1649-50). No one checked Faith's ID before entry. (SA1651). Kelly gave Faith his phone number, and the two later began communicating by phone. (SA1652-63). Kelly invited Faith to come see him on tour and told her that his assistant, Copeland, would make travel arrangements, which she subsequently did, paid for by Kelly. (SA1662-64).

Faith travelled from Texas to New York to see Kelly in May 2017. (SA1671-75; GA1025-27). Kelly had sexual intercourse with Faith in her hotel room while filming using his iPad. (SA1682-97). Kelly did not use a condom and did not inform Faith that he had genital herpes

prior to engaging in sexual intercourse with her. (Id.). Afterward, Kelly indicated that if Faith was "really like 16, [she] can tell daddy." (SA1692-93). At Kelly's direction, Faith stayed in her hotel room for the duration of her trip. (SA1698-1702).

In the months that followed the first New York trip, through Copeland, Kelly arranged for Faith to travel to see him in various cities, including Chicago, Los Angeles and New York. (SA1703-15, 1739-51; A759, 762-66). In each of those locations, Kelly either engaged in sexual intercourse with Faith or had Faith give him oral sex when Faith told him she had her period. (SA1706-15, 1739-51; A759, 762-66). Kelly did not use a condom or tell Faith he had contracted genital herpes prior to sexual contact on any of these occasions, including in New York in February 2018. (SA1645-46).

Throughout this period, Faith learned more of Kelly's rules, and Kelly told Faith that to "protect" him an attorney would bring some papers for Faith to sign, though ultimately the lawyer did not show up. Kelly also said he needed Faith to write down something embarrassing about her family that she did not want anyone else to know. (SA1716-18). During the conversation, Kelly told her he had a group of girlfriends

that he "raised." (SA1715; A759). Thereafter, he told Faith to send a text message to his various phone numbers, stating, "Daddy I want to be with you and the girls," though Faith had told him she did not want that. (SA1717-19). On one occasion, when Faith was in the back of Kelly's Sprinter van for hours with one of Kelly's girlfriends, "Joy," Faith had to use the bathroom but could not get out of the van because it was locked. (SA1720-28; A761). After Joy told Faith that she "had to ask" first, Faith contacted both Copeland and Kelly. (SA1728-29; A761). After Faith texted Copeland that she was "about to pass out," Copeland and Kelly finally came back to the Sprinter and drove Faith to use the bathroom. (SA1729). Copeland followed her there, though Copeland did not use the bathroom herself, and Copeland stood outside the bathroom stall. (SA1729-30).

Kelly became increasingly controlling in his communications with Faith, who tried to follow his "rules." (SA1733-39). During a trip in Los Angeles, Copeland directed Faith to visit a recording studio, where she waited outside in Kelly's Sprinter van for hours. (SA1741-44). Copeland eventually took Faith inside the studio and left her in a room. (SA1745-48). Kelly briefly entered, but Faith did not stand up and greet

Kelly when he came into the room, and he left. (SA1749). Several more hours went by before Kelly returned. (SA1748-49). When Kelly returned to the room, he told Faith that he would have returned sooner if she had greeted him properly the first time. (A765). Kelly then directed Faith to take off her clothes and walk back and forth. (Id.). Faith falsely told Kelly that she had her period, because she did not want to have sex with him. (Id.). Kelly sighed and said, "Well, why did you come?" (A766).

Kelly directed Faith to a smaller room, and when she entered she saw a gun lying on an ottoman. (A767). Kelly moved the gun near him, sat down in a chair and told Faith to stand across from him. (A767-68). He then told Faith to pose and took photos of her with his iPad, while becoming irritated and complaining that she was not being "sexy enough." (A768). Kelly then asked Faith a series of intimate questions and told Faith there would be consequences if she did not answer truthfully. (A768-70).

Kelly then pulled out his penis, grabbed the back of Faith's neck, told her to "suck [his] dick" and pushed her forward so her mouth contacted his penis. (A769). Kelly's gun remained nearby when this occurred. (Id.). Faith was "intimidated" and did not want to give Kelly

oral sex, but she did. (A769-70). Throughout, Kelly's hand remained on the back of her neck guiding her. (A770). Faith did not feel like she could leave the room because she was "under [Kelly's] rules and he had a weapon, so [she] wasn't even going to step out of line." (A771).

Following her final trip to New York in February 2018, Faith stopped seeing Kelly and eventually sued him. (A802-03). Afterward, Kelly arranged for compromising photos he had taken of Faith to be sent to her lawyer with a letter threatening, among other things, to release the photos publicly if she did not abandon her lawsuit and stop speaking publicly about Kelly. (A803-14, 816-17; GA965-85). Faith did not withdraw her lawsuit. Thereafter, Kelly's associate, Donnell Russell, sent threatening texts to Faith and her mother and created a Facebook page called "Surviving Lies," where he ultimately followed through on those threats and publicly posted graphic photos of Faith. (A832-38; GA858-67).

H. Other Witnesses

1. Angela

"Angela" first met Kelly through her friend "Tiffany" in 1991, when Angela was 14 or 15 and aspired to sing and dance. (A1160-61).

Tiffany brought Angela to Kelly's apartment in Chicago with two other high school girls. (A1161-63). Bruce Kelly, Demetrius Smith and Larry Hood were at the apartment with Kelly when they arrived. (A1164-66). The girls, including Angela, then followed Kelly into a room and Angela and Kelly had sexual intercourse, as did at least one other high school girl. (A1167-70). When Angela and the others left the room, Smith, Bruce Kelly and Hood were still present. (A1170-71).

For the next few years, Angela saw Kelly almost every day. (A1171). At some point in 1991, Angela stopped attending high school, after Kelly gave her the option to either "go to school" or "sing." (A1172-73). Kelly continued to have sexual intercourse with Angela while she was between the ages of approximately 15 through 17 on multiple occasions at his apartment, the recording studio, and while they were "on the road." (A1173-74). Angela did not want to have sexual intercourse with Kelly but did so because he told her and other girls that they had to "pay [their] dues." (A1174-75).

Angela also met Aaliyah and saw her regularly. (A1178-80, 1182). In 1992 or 1993, Aaliyah joined Kelly on tour and, during a stop

in Washington, D.C., Angela saw Kelly perform oral sex on Aaliyah in the tour bus.  (A1184-85, 1192).

    2.   <u>Addie</u>

On September 2, 1994, "Addie," a 17-year-old girl, attended a concert in Miami with a friend.  (SA1293-96; 1014).  At the end of the concert, Kelly announced that women over the age of 18 could go backstage.  (SA1298-1301).  Addie, under 18, did not intend to go backstage until two "bouncers" approached Addie and her friend and asked them if they wanted to go backstage to get Kelly's autograph.  (SA1298-99, 1330).  Addie was not asked her age at any point but was led to Kelly's dressing room.  (SA1301).

While there, Addie mentioned to Kelly that she was an aspiring artist, in response to which Kelly invited Addie to his hotel room for an "audition."  (SA1303-04).  Addie told Kelly that she was only 17.  (SA1303, 1305).  Kelly then spoke to two of his bouncers, and the bouncers escorted everyone from the dressing room except Addie and her friend.  (SA1305).  Once alone in the room, Kelly played a song for the girls and then kissed them.  (SA1306-07).  When Addie tried to pull away, Kelly became more aggressive, holding Addie's wrists, and unzipped

her shorts and penetrated her vagina with his penis. (SA1307-09). After Kelly finished having intercourse with Addie, she was in a state of shock; she opened the door, which she had to unlock, and ran out of the room. (SA1309-10).

        3.   <u>Kate</u>

"Kate" met Kelly in 2001 when she was 27 and living in Chicago. (SA1811-12). Kate had a sexual relationship with Kelly. (SA1816-20). Kate expressed to Kelly that she was concerned that she might contract an STD and asked him whether he would use protection, but he said he would not. (SA1820-21). Kelly did not disclose to Kate that he had any STDs. (SA1821). While she was still in a sexual relationship with Kelly and not in a sexual relationship with anyone else, Kate contracted genital herpes. (SA1822). Kate told Kelly that she believed that he had transmitted an STD to her. (SA1823).

4.  Sonja[3]

In 2003, 21-year-old Sonja met Kelly at a mall.  (GA987, 991).
Sonja, hoping to get an interview with Kelly to kickstart her career at a
radio station, contacted Kelly after Kelly or a member of his entourage
gave Sonja a paper with Kelly's telephone number.  (GA990-95).  Kelly
invited Sonja to travel to his studio, purportedly to conduct an interview
of him, with travel arranged by one of Kelly's associates.  (GA995-99).

When Sonja arrived, one of Kelly's associates asked Sonja if
she needed "protection," which he explained meant condoms.  (GA1001-
02).  Another associate took Sonja to a room, where she remained for
approximately three to four days.  (GA1005, 1011, 1018).  At some point,
one of Kelly's associates brought her a beverage in a cup; she consumed
it and became extremely tired.  (GA1011-13).  She awoke thereafter to
find that her underwear had been removed and felt a "wetness" in her
vaginal area and on her thighs; she saw Kelly in the corner of the room
"doing up" his pants and belt.  (GA1013-15).  After Kelly left, one of

---

[3]     While the jury ultimately found Racketeering Acts Three and
Four—which alleged certain crimes related to Sonja—not proven, the
evidence presented at trial concerning Sonja also constituted evidence of
the existence of the enterprise and its means and methods.

Kelly's associates entered the room, told Sonja not to tell anyone about her time at the studio, made her sign a confidentiality agreement and said "don't fuck with Mr. Kelly," which she took as a threat. (GA1016-17).

     5.  <u>Alexis</u>

In 2006, 15-year-old Alexis met Kelly after one of Kelly's concerts, after a man told Alexis that Kelly wanted to meet her backstage. (SA1796, 1759). Alexis signed a non-disclosure agreement. (SA1761-63). Thereafter, Kelly arranged for his bus driver to transport Alexis by bus from Jacksonville to Miami to meet Kelly in Miami; his runners also arranged for airplane travel for Alexis to meet Kelly, including when she was 16 and 17. (SA1765-67; GA963-64). Alexis had sexual contact with Kelly in her "teens" but could not recall whether their sexual relationship began before she was 18. (SA1764-65). Kelly did not use protection and never told her that he had contracted an STD. (SA1765-66).

     6.  <u>Louis and Alex</u>

In 2006, when "Louis" was 17, Kelly gave Louis his telephone number after meeting him in a McDonald's. (SA1340-42, 1345-46).

Louis's mother later called that number and told Kelly that Louis was an aspiring musician; Louis and his family thereafter attended a party hosted by Kelly. (SA1342-45). Kelly invited Louis to meet him in his studio, ostensibly so that Kelly could help Louis as a musician. (SA1348-50). Instead, Kelly gave Louis, still just 17, oral sex, and recorded their sexual encounters. (SA1362-63, 1843-44). Prior to their initial sexual encounter, Kelly asked Louis what he was "willing to do for the music." (SA1362). On another occasion, Kelly directed another person to give Louis oral sex. (SA1378-79).

Louis introduced Kelly to his friend "Alex," who was a year younger than Louis, and Kelly began to communicate by phone with Alex when he was 17, eventually beginning a sexual relationship with Alex. (SA1371; A1214, 1218, 1226-27, 1230). At Kelly's direction, Alex also engaged in sexual activity, including intercourse, with women, including Jane, in Kelly's presence. (A1228-45; SA1916-17). Kelly regularly recorded Alex's sexual encounters with Kelly and with women. (A1228-41). Government Exhibits 341(a), 342(a) and 343(a) depicted one such example where Kelly, naked from the waist down, directed Alex and another woman to engage in oral and vaginal sex. Throughout, Alex and

the woman do not smile and appear wholly unengaged, and Kelly directs every action, including by positioning the woman and Alex into various sexual positions. Copeland arranged for Alex to travel and made hotel arrangements so that Alex could engage in sex acts with Kelly. (A1243-44).

In 2019, Kelly directed both Louis and Alex to handwrite statements falsely denying that they ever had sexual contact with Kelly. (SA1409-13).

7. <u>Anna</u>

In 2016, 20-year-old Anna met Kelly backstage at one of his concerts after Bubba approached her and told her that Kelly wanted to meet her. (SA1851-52). Kelly and Anna began to communicate by phone and thereafter started a sexual relationship, during which time Anna regularly visited Kelly in Georgia, Chicago and at various concert venues throughout the country, and ultimately moved in with him. (SA1853-58). Kelly's assistants typically arranged for Anna's travel and hotel accommodations, which Kelly paid for. (SA1855).

Kelly became increasingly controlling and promulgated rules that he expected Anna to follow. (SA1862-70, 1873, 1922; A938). For

example, Anna could not act without Kelly's permission—on occasions when Kelly did not provide permission to use the restroom, Anna was forced to urinate in a cup. (SA1863-66). On one occasion, when Kelly discovered Anna still had a social media application on her cellular telephone (against his rules), Kelly had his assistant watch Anna to make sure she deactivated the account. (SA1871-73).

Kelly also violently punished Anna in various ways when she violated his rules, including through physical altercations, of which Kelly's assistants were aware. (SA1869, 1888-92, 1908; A931-39, 943-44; GA955-56, 1023-24). Kelly recorded himself exacting punishments, including violently spanking Anna. (SA1873-77, A940; GA1063). As additional punishment, Kelly ordered Anna to walk back and forth while nude in high heels, instructing her to call herself denigrating names. (SA1878-79, 1885-87; A943-44; GA1063). During these punishments, Kelly would sometimes masturbate or direct Anna to engage in non-consensual sex acts with him. (SA1888). Kelly also instructed Anna to video record herself doing demeaning acts, which sometimes involved bodily fluids, and which caused her "humiliation." (SA1909-10, 1913; GA1064).

In addition, at Kelly's direction, Anna signed documents provided by Kelly's assistants that were "for his protection" that appeared to be non-disclosure agreements. (SA1895-96). Kelly also instructed Anna to write letters, dictated by him, in which she wrote embarrassing falsehoods and falsely admitted to blackmail schemes against Kelly (SA1896-97, 1900-09; GA1042-46); Kelly safeguarded the letters in his storage facility (GA874) "for him to hold against or down the line if something were to happen or come about" (SA2865).[4] Kelly also instructed Anna to have her mother relinquish her cellular telephone, remove her clothing, enter his sauna and write a similar type of false letter claiming to have blackmailed Kelly in case Anna's mother "were to come against him in any type of way" and as a condition of her visiting Anna. (SA1912-14). After her mother finished writing the letter, which she did so that she could see her daughter, Anna gave it to Copeland. (SA1913).

Kelly directed Anna to have sex with Kelly and others, including on multiple occasions with Jane, and two occasions with Alex,

---

[4] Anna witnessed Kelly instruct others to write similar types of letters, including Jane. (SA1910-12).

which Anna did not want to do and which Kelly recorded on an iPad. (SA1914-20). During these encounters, Kelly admonished Anna when she did not appear enthusiastic. (SA1915-16). Kelly never used a condom. (SA1919). At one point, Anna obtained a test for STDs; however, she never received her results because the doctor provided them directly to Copeland. (SA1858-59). Anna ended the relationship with Kelly in approximately December 2018. (SA1854; A949).

The jury convicted Kelly of all counts following the lengthy trial.

III. <u>Posttrial Motions</u>

Following the guilty verdict, Kelly moved for a judgment of acquittal and for a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33 ("Rule 29" and "Rule 33," respectfully). (GA211-307). In his Rule 29 motion, Kelly argued, as relevant to this appeal, that his RICO conviction should be vacated because the government did not establish the elements of an enterprise by failing to establish that the associated-in-fact members of the enterprise shared a common purpose of ensuring Kelly's illegal sexual activities and by failing to demonstrate that the enterprise was distinct from the defendant; that the Mann Act

violations were unsupported by sufficient proof; and that certain of the state law statutes underlying the Mann Act violations—namely, California Health and Safety Code § 120290 ("Section 120290") and New York Public Health Law § 2307 ("Section 2307")—were unconstitutionally vague. (GA211-73). In his Rule 33 motion, as relevant here, Kelly asserted that he was denied constitutionally effective counsel where counsel failed to adequately challenge certain jurors and potential jurors during <u>voir</u> <u>dire</u>. (GA274-95). In a supplemental Rule 33 motion, Kelly challenged, as relevant here, the district court's admission of evidence of certain uncharged acts. (GA296-307).

The district court, in a thorough opinion, denied each of the motions. (SPA54-156).

## IV. <u>Sentencing</u>

The district court sentenced Kelly to 360 months' imprisonment as to Count One, 10 years as to Counts Two, Six and Eight, and 20 years as to Counts Three, Four, Five, Seven and Nine, all to run concurrently. The Court also imposed a $100,000 fine, a $40,000 assessment under the Justice for Trafficking Victims Act and a $900 special assessment.

In advance of sentencing, the government moved the district court for entry of restitution. In September 2022 the district court held a restitution hearing and, in November 2022, issued an order of restitution in the amount of $300,668.18 to Jane and $78,981.72 to Stephanie. On December 7, 2022, the Court issued an amended judgment reflecting the restitution order.

In August 2022, the government moved for an order directing the Bureau of Prisons ("BOP") to turn over money held in the appellant's inmate trust account so that it could be applied to the appellant's then-outstanding financial penalties. The district court granted that motion prior to the restitution hearing.

## ARGUMENT

## POINT ONE

### THE GOVERNMENT ADDUCED SUFFICIENT EVIDENCE OF AN ENTERPRISE

Kelly argues that the government failed to prove a racketeering enterprise because (1) the enterprise proved by the government lacked an illegal common purpose, and (2) the enterprise was not distinct from Kelly alone. These arguments are without merit, as the district court held in response to pretrial motions (SPA8) and posttrial motions styled under Federal Rule of Criminal Procedure 29 (SPA89).

I.   Applicable Law

A.   Standard of Review

"A defendant challenging the sufficiency of the evidence . . . at trial bears a heavy burden, as the standard of review is exceedingly deferential." United States v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012). This Court will "sustain the jury's verdict if, crediting every inference that could have been drawn in the government's favor and viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Capers, 20 F.4th 105, 113 (2d Cir.

2021).[5] This Court must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others." United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999). Moreover, "it is well-settled" that this Court will "defer to the jury's assessment of witness credibility." United States v. Glenn, 312 F.3d 58, 64 (2d Cir. 2002).

Objections to jury instructions, conversely, are reviewed "de novo, reversing only where, viewing the charge as a whole, there was a prejudicial error." United States v. Kukushkin, 61 F.4th 327, 332 (2d Cir. 2023)). But when a defendant does not timely object to jury instructions, a challenge to the instructions is reviewed "for plain error, considering whether (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." United States v. Miller, 954 F.3d 551, 557-58 (2d Cir. 2020).

---

[5]  When quoting cases, unless otherwise noted, citations, internal quotation marks and footnotes are omitted, and all alterations are adopted.

B.    Waiver and Forfeiture

This Court has distinguished between "'forfeiture' of a claim, which results from a failure to assert the claim in a timely fashion, and which does not prevent an appellate court from reviewing the claim for plain error, from 'waiver,' which is the 'intentional relinquishment or abandonment of a known right,' and which permanently extinguishes the right to raise the claim." United States v. Polouizzi, 564 F.3d 142, 153 (2d Cir. 2009) (quoting United States v. Olano, 507 U.S. 725, 733 (1993)). In the context of jury instructions, when a party proposes an instruction or agrees that the instruction is acceptable, that party waives the right to object. Id.; see also United States v. Mitchell, 811 F. App'x 50, 52 (2d Cir. 2020) (defendant "waived her right to challenge the jury instructions on appeal" because "defense counsel confirmed they were 'fine'").

C.    RICO's Enterprise Requirements

To sustain a substantive racketeering conviction, the government must prove that a defendant participated in the affairs of the charged enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(c); United States v. Zemlyansky, 908 F.3d 1, 11 (2d Cir. 2018). Under the RICO statute, an "enterprise" may include "any . . . union or

group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

"[T]he RICO statute provides that its terms are to be 'liberally construed to effectuate its remedial purposes,'" specifically holding that "the very concept of an association in fact is expansive." Boyle v. United States, 556 U.S. 938, 944 (2009) (quoting § 904(a), 84 Stat. 947, note following 18 U.S.C. § 1961). To sustain a RICO conviction, an association-in-fact enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle, 556 U.S. at 946; see also id. at 944 (the statutory definition of "enterprise" in 18 U.S.C. § 1961(4) "does not specifically define the outer boundaries of the 'enterprise' concept," and is "obviously broad" and has a "wide reach"). As to the "purpose" structural feature, the Supreme Court held that such requirement was "apparent from the meaning of the term in ordinary usage, i.e., a 'venture,' 'undertaking,' or 'project.'" Id. An association-in-fact enterprise "'is simply a continuing unit that functions with a common

purpose.'" <u>United States v. Pierce</u>, 785 F.3d 832, 838 (2d Cir. 2015) (quoting <u>Boyle</u>, 556 U.S. at 948).

## II. Kelly Waived Any Argument that the <u>Court's Instructions Were Legally Erroneous</u>

Kelly did not object to the district court's jury instruction, which recognized that "[t]he term enterprise includes legitimate and illegitimate enterprises," and which required proof, for an association-in-fact, that individuals "have associated together for a common purpose of engaging in a course of conduct," without specifying whether that conduct or common purpose must be unlawful. (GA903). Indeed, that same language was included in the parties' joint proposed jury instructions, styled as a government proposal with enumerated defense objections—but with no defense objection or request to insert "illegal" or "fraudulent" in the definition of the "common purpose" requirement. (GA65-66, 131-34).[6]

---

[6] Kelly objected to additional language proposed by the government on the enterprise element of Count One (GA887-96), but he did not object to the district court's language as to the enterprise's common purpose—much less propose language that such purpose need be fraudulent or otherwise illegal.

Nevertheless, after trial, Kelly argued that the evidence was insufficient to meet what he describes as a requirement of the statute—a fraudulent or illegal common purpose shared by members of the enterprise—a purported requirement never submitted to the jury nor even proposed by the defense before trial. To the contrary, the parties' joint proposed instructions, adopted by the district court, set a benchmark for the government to meet; the government met the mark; and Kelly now objects that the government did not introduce sufficient evidence for the jury to find that another, previously unspecified requirement was met. But that is not how a sufficiency challenge works. A claim that there was insufficient evidence to support a jury's verdict, as opposed to a claim of deficiency in instructing a jury, assumes the validity of the instructions. Kelly has "waived any right to appellate review, . . . by agreeing to the language of the instruction." United States v. Binday, 804 F.3d 558, 582 (2d Cir. 2015), abrogated on other grounds by Ciminelli v. United States, 143 S. Ct. 1121 (2023). Nor has Kelly raised any argument specific to the jury instructions on appeal. United States v. Greer, 285 F.3d 158, 170 (2d Cir. 2002) (failure to include argument in appellate brief waives argument on appeal).

III.  It Was Not Plain Error to Permit the Jury to Find That
      <u>Individuals Shared a Common Purpose that Was Not Illegal</u>

Even if Kelly's brief challenging the sufficiency of the evidence

were interpreted to challenge the jury instructions—and to seek a new

trial, at which the government would be introducing evidence to meet the

elements the defendant now claims are required—this challenge would

fail.  Kelly's statement of the law is wrong, and the district court's

instructions and rulings—reviewed for plain error, because he did not

object to (and indeed jointly proposed) the relevant language in the

instructions—did not contain an error that was "plain."  Moreover, any

error would have been harmless.

First, the instructions were not error at all, because RICO

does not require that members of an enterprise share an <u>illegal</u> common

purpose.  This Court, in determining the scope of a statute, begins with

its language.  "If the statutory language is unambiguous, in the absence

of a clearly expressed legislative intent to the contrary, that language

must ordinarily be regarded as conclusive."  <u>United States v. Turkette</u>,

452 U.S. 576, 580 (1981).  The term "enterprise" as used in § 1962(c)

includes "any union or group of individuals associated in fact although

not a legal entity." 18 U.S.C. § 1961(4). As the Supreme Court ruled in <u>Turkette</u>, "the definition appears to include both legitimate and illegitimate enterprises within its scope; it no more excludes criminal enterprises than it does legitimate ones." 452 U.S. at 580-81; <u>see also</u> <u>United States v. Huber</u>, 603 F.2d 387, 394 (2d Cir. 1979) (RICO's use of the word "includes" in defining "enterprise" "indicates that the list is not exhaustive but merely illustrative" and Congress intended that "all such harmful infiltration, regardless of form, should be eradicated").[7] Thus, <u>Turkette</u> held that "[t]he enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct." <u>Id.</u> at 583.

In support of his argument, Kelly cites to language in <u>First Capital Asset Mgmt. v. Satinwood, Inc.</u>, 385 F.3d 159 (2d Cir. 2004) ("<u>Satinwood</u>"), that "the individuals [comprising an association-in-fact enterprise] must share a common purpose to engage in a particular

---

[7] Kelly's assertion in his brief that "<u>Turkette</u> assumed a RICO enterprise would have <u>some</u> criminal objective" specific to the enterprise's "common purpose" or other structural requirements (Br36) is nowhere found in the text or spirit of that decision, nor does Kelly explain where that so-called assumption is grounded.

44

<u>fraudulent</u> course of conduct and work together to achieve such purposes." <u>Id.</u> (emphasis added). Kelly asserts that, contrary to <u>Turkette</u>'s clear language, a new element of "fraud" must also be present to prove an association-in-fact enterprise. But Kelly uses this language out of context. In <u>Satinwood</u>, the alleged common purpose was one grounded in fraud—"to conceal . . . assets from [] creditors[] [and] the bankruptcy court"—and, thus, this Court necessarily analyzed whether such a common purpose had been adequately alleged. <u>Id.</u> at 174.

The same is true of the two district court cases on which <u>Satinwood</u> relied when speaking of a "common purpose to engage in a particular fraudulent course of conduct." <u>Id.</u> (quoting <u>First Nationwide Bank v. Gelt Funding, Corp.</u>, 820 F. Supp. 89 (S.D.N.Y. 1993), and citing <u>Moll v. US Life Title Ins. Co. of New York</u>, 654 F. Supp. 1012 (S.D.N.Y. 1987)). In <u>First Nationwide</u>, the alleged common purpose was to "defraud[]," which the district court determined was insufficient because the plaintiff had "not specified" any "join[ing] together as a group to perpetrate the frauds alleged" but, instead, had asserted only a "series of discontinuous independent frauds." 820 F. Supp. at 97-98. And in <u>Moll</u>, the defendant argued that the plaintiff had not sufficiently proved that

"an amorphous group of real estate attorneys and other individuals 'engaged in the real estate settlement industry in . . . New York'" constituted an enterprise where the alleged common purpose was "providing real estate settlement services to purchasers of residential real estate and maximizing illegal kickbacks." 654 F. Supp. at 1032. Each of these cases (and Satinwood) preceded the Supreme Court's 2009 decision in Boyle, which held that to prove an association-in-fact enterprise, the enterprise need only have "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." 556 U.S. at 946.

Moll and First Nationwide cited Turkette's standard that the group must have "a common purpose of engaging in a course of conduct." That is the standard for an enterprise, and the statute does not require that the enterprise be grounded in criminality. But in the civil RICO cases cited by Kelly and the Satinwood court, the common purpose alleged was the alleged course of fraud, leading those courts to use the language cited by Kelly. The same is true for the published and non-published cases in this Circuit that cite that portion of Satinwood. See,

e.g., Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 120 (2d Cir. 2013)

(upholding dismissal of civil RICO claim where complaint alleged that

company was the RICO "person" and other entities were unaware of the

"common purpose of employing the multiple deceptive, abusive and

fraudulent acts described in" the amended complaint); D. Penguin Bros.

Ltd. v. City Nat'l Bank, 587 F. App'x 663, 667 (2d Cir. 2014) (same);

Zamora v. FIT Int'l Grp. Corp., 834 F. App'x 622 (2d Cir. 2020) (same).[8]

Notwithstanding the language used in Satinwood and cited by

Kelly, it is well established that an enterprise may have a common

---

[8]     In any event, as the district court carefully recounted, several
other district courts in this Circuit have held that insofar as Satinwood
announces a more stringent rule as to the illegitimate nature or purpose
of an association-in-fact enterprise, such a rule would conflict with other
binding Second Circuit and Supreme Court precedent that make clear
that RICO covers both legitimate and illegitimate enterprises—whether
legal entities or association-in-fact enterprises.  (SPA88-89 (citing World
Wrestling Ent., Inc. v. Jakks Pac., Inc., 425 F. Supp. 2d 484, 499
(S.D.N.Y. 2006), aff'd, 328 F. App'x 695 (2d Cir. 2009); JSC Foreign Econ.
Ass'n Technostroyexport v. Weiss, No. 06-CV-6095, 2007 WL 1159637, at
*9 (S.D.N.Y. Apr. 18, 2007))).  As those cases note, this Court's analysis
of RICO's enterprise requirements in Satinwood was dicta, as "none of
the three district court decisions that were on appeal in [Satinwood]
dismissed the complaint on the ground that the plaintiffs failed to
properly allege that the enterprise was distinct from the racketeering
acts," and "the parties on appeal did not brief the adequacy of the
allegations regarding the enterprises."  World Wrestling Ent., Inc., 425
F. Supp. 2d at 500.

purpose of engaging in a wholly legitimate course of conduct and there is

no requirement whatsoever that the enterprise members have a common

purpose of fraud or any other criminality. Indeed, Turkette made clear

that the "enterprise" as defined in RICO is distinct from "racketeering

acts":

> The enterprise is . . . a group of persons associated together
> for a common purpose of engaging in a course of conduct. The
> pattern of racketeering activity is, on the other hand, a series
> of criminal acts as defined by the statute. The former is
> proved by . . . evidence that the various associates function
> as a continuing unit. The latter is proved by evidence of the
> requisite number of acts of racketeering committed by the
> participants in the enterprise.

Turkette, 452 U.S. at 583. And in D'Addario v. D'Addario, 901 F.3d 80

(2d Cir. 2018), this Court, in reinstating RICO claims dismissed by the

district court, determined that an association-in-fact enterprise existed

where the shared purpose was "one prescribed by law: settling the Estate

by paying off its debts and distributing its assets among the heirs." Id.

at 103; see also United States v. Cianci, 378 F.3d 71, 82-83 (1st Cir. 2004)

(municipal entities were part of association-in-fact enterprise despite

that "municipalities cannot be found to have acted with unlawful intent"

for common purpose because "neither the indictment nor the jury

instructions compel the conclusion that the City itself had to have formed an unlawful intent," and citing Turkette); United States v. Feldman, 853 F.2d 648, 657 (9th Cir. 1988) (RICO "does not require intentional or 'purposeful' behavior by corporations charged as members of an association-in-fact" because they "may be entirely legitimate and need not benefit from the racketeering; in fact, the criminal activity charged may harm each individual corporation by looting it, or a corporation may be used by the defendant to line his or her pockets").[9]

To read a requirement into an association-in-fact enterprise that the group must have some sort of illicit—much less fraudulent—common purpose would run contrary to substantial Supreme Court and Second Circuit precedent that explicitly do not require as much, and would be directly contrary to RICO's purpose in "undermining organized crime's influence upon legitimate businesses" and "the need to protect the

---

[9] Insofar as Kelly asserts that the RICO claims against him are contrary to RICO's "distinctly economic legislative history" (Br26), the Supreme Court has directly rejected that "the definition of a RICO enterprise [be] limited to businesslike entities," recognizing that it saw "no basis to impose such an extratextual requirement." Boyle, 556 U.S. at 945. In any event, as demonstrated by the trial evidence, Kelly used his business in the music industry to carry out the means and methods of the enterprise.

public from those who would run 'organization[s] in a manner detrimental to the public interest,'" as Kelly did here for decades. Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 165 (2001) (quoting S. Rep. No. 91-617, at 82); see also H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 248 (1989) (RICO "responds to a new situation in which persons engaged in long-term criminal activity often operate wholly within legitimate enterprises."); U1it4less, Inc. v. Fedex Corp., 871 F.3d 199, 205 (2d Cir. 2017) ("the plain language and purpose of the statute contemplate that a person violates the statute by conducting an enterprise through a pattern of criminality"); Gerard E. Lynch, RICO: The Crime of Being a Criminal, Parts I & II, 87 COLUM. L. REV. 661, 678 (1987) (recounting legislative history that "the purpose of RICO is the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce").

At a minimum, Kelly has failed to establish that the district court's error was plain. The Supreme Court's jurisprudence, and Second Circuit caselaw in the criminal RICO context, all supports Judge Donnelly's thoughtful position on the requirements for the "common purpose" among members of an association-in-fact, SPA87-91, and any

error in her rulings was far from plain.[10]  Finally, for the same reasons

discussed infra, any error would have been harmless.  Cf. United States

v. Vilar, 729 F.3d 62, 78-79 (2d Cir. 2013).  Kelly has not established plain

error in the jury instructions.

## IV. The Evidence of the Charged Common Purposes Was Overwhelming

The evidence at trial established that Kelly and his inner

circle shared the common purposes alleged in the Indictment:

"promot[ing] R. Kelly's music and the R. Kelly brand, [and] recruit[ing]

women and girls to engage in illegal sexual activity with KELLY and to

---

[10]    Kelly's throwaway claim that his being the only individual indicted "is a good sign that no RICO enterprise exists" (Br30) is similarly unavailing.  The Supreme Court has held that RICO's purposes include "seek[ing] to prevent a person from victimizing, say, a small business, S. Rep. No. 91-617, p. 77 (1969), or to prevent a person from using a corporation for criminal purposes, Nat'l Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 259 (1994), [as long as] the person and the victim, or the person and the tool, are different entities, not the same." Cedric Kushner, 533 U.S. at 162.  The statute was intended to prohibit a person from infiltrating an enterprise—even a legitimate one associated for lawful purposes—and using that organization to commit a pattern of racketeering activity.  That is precisely what happened here.  See also id. at 164-65 (RICO "protects a legitimate 'enterprise' from those who would use unlawful acts to victimize it, and also protects the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which 'unlawful . . . activity is committed.").

produce pornography, including child pornography." (GA20). The evidence proved that Kelly used his fame and popularity in the music business, combined with a network of individuals at his disposal, to target, groom and exploit numerous victims for his own sexual gratification.

First, Kelly concedes that his inner circle "generally shared a common purpose of promoting his music." (Br29). As detailed above, that concededly proven purpose, combined with the other structural features of an association-in-fact enterprise, namely, "relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose," Boyle, 556 U.S. at 946, is sufficient under the law and the instructions given by the district court.

Kelly nonetheless urges that his enterprise's "common purpose" of "promot[ing] R. Kelly's music and the R. Kelly brand" was insufficient because there was no "nexus between the objective of the enterprise and the racketeering activity." (Br35). But as the district court determined, the insufficiency argument fails on the facts. (SPA91-92). "[N]exus between the RICO enterprise and the predicate racketeering acts may be established by evidence that the defendant was

enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise, or that the predicate offenses are related to the activities of that enterprise." United States v. Minicone, 960 F.2d 1099, 1106 (2d Cir. 1992).

The trial included lengthy testimony from Kelly's victims and members of his inner circle about how his employees and entourage managed not only his professional life, but also the recruitment and maintenance of Kelly's victims. See supra at 4-8. They provided Kelly's number to or otherwise recruited women and girls for him, distributed non-disclosure agreements, escorted female guests and tended to their needs, made travel and hotel arrangements for victims, shuttled his recording equipment around and picked up his herpes medication. Kelly funded a machinery of individuals tending to his every personal need, including grooming, maintaining and even acting as Kelly's guards over the women and girls with whom he was engaged in illegal sexual activity. This machinery "enabled [him] to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise." Minicone, 960 F.2d at 1106.

Nor can there be any dispute that the "predicate offenses are related to the activities of the enterprise," id., where the evidence established that almost every single victim was recruited or coerced into sexual activity with Kelly because of his position in the music industry—a position promoted by Kelly's inner circle. See, e.g., supra at 9 (Aaliyah was an aspiring musical artist); 15 (Kelly demanded oral sex before auditioning Jane); 19 (Kelly's associates recruited Faith at a concert by inviting her backstage); 27 (Sonja met Kelly to kickstart her career at a radio station); see also, e.g., id. at 11 (Kelly used Stephanie's desire to introduce a friend to sing for Kelly to arrange to have sexual intercourse with Stephanie); 23-24 (Angela aspired to sing and had sexual intercourse with Kelly as a minor because he told her she had to "pay [her] dues"); 25 (Kelly's associates recruited Addie and ensured that he was able to pursue intercourse with her); 29 (Louis met Kelly because his mother believed Kelly could help Louis as an aspiring musician, and Kelly asked Louis what he was "willing to do for music" before a sexual encounter).

Second, this same conduct also proved the second common purpose alleged in the indictment: that members of the enterprise

recruited women and girls to engage in illegal sexual activity.[11]  Some,
like Smith and McDavid, actively assisted with a predicate act—
bribery—so that Kelly would not face the repercussions of his illegal
sexual activity with Aaliyah.  See supra at 9-11.  Others enabled his
exploitative, coercive and force-related conduct by enforcing his
punishments, such as by standing guard over Kelly's female guests.  See
supra at 6-7, 18-19.  Kelly confronted Copeland about how she "let Anna
escape" and enlisted her to monitor "what exactly" Jane and others did
on their phones.  Id. at 7; see also id. at 21 (describing how Copeland
directed Faith's whereabouts, including her ability to use the restroom).
He employed the Mayweather assistants in ensuring women did not
break his rules—even docking pay when they failed to comply with
enforcing rules pertaining to his girlfriends.  Id. at 7-8.

Others helped manage Kelly's exposure of herpes to other
women.  Supra at 16 (Juice helped Jane obtain herpes medication); 33
(Anna's STD results went to Copeland).  Kelly's inner circle also

---

[11]    The government did not need to prove any illicit common
purpose.  Nonetheless, it did, and thus any error would not "seriously
affect[] the fairness, integrity or public reputation of judicial
proceedings."  Miller, 954 F.3d at 557-58.

maintained discipline over Kelly's victims—thus helping to ensure his demands were met. See supra at 17 (Juice oversaw process of drafting Jane's false letters); 23 (Russell sent threatening texts to Faith and her mother and posted graphic photos of Faith after she proceeded with her lawsuit against Kelly); 27-28 (one of Kelly's associates made Sonja sign a confidentiality agreement and instructed her not to "fuck with Mr. Kelly"); 32 (Kelly's associates provided Anna with non-disclosure agreements to sign, and Anna provided collateral to Copeland); see also GA1049-62 (transcript of recording in which Kelly indicates his engineers were monitoring and downloading video surveillance).

And there was ample evidence for the jury to conclude that Kelly's inner circle knew or turned a blind eye to the fact that at least some of Kelly's "girlfriends" were minors. (A472 (Navarro, one of Kelly's runners, describing girls he helped transport as looking "[p]retty young," "like mid-aged teenagers")); (GA798-801 (officer describing how he responded to Kelly's residence and spoke with McDavid, looking for a "missing juvenile")); (SA465-67 (Mack arranging for Jane's travel, aware of Jane's birthdate indicating she was a minor)); (SA1983-85 (Mack describing observing sexual act between Kelly and Jane)); (SA1513, 1520,

1634 (Suzette describing that she knew Jane was a minor and had heard Kelly physically abuse Jane)); (A1161-71 (describing how Smith, Bruce Kelly and Hood were in apartment while Kelly engaged in sexual acts with minor high school students)).

The enterprise alleged by the government and found proven by the jury was one comprised of an inner circle who shared a common purpose of engaging in a course of conduct. The inner circle worked together to promote Kelly's music and his brand and to meet his personal needs, which included recruiting women and girls, including for illegal sexual activity. Viewing the evidence in the light most favorable to the government, as this Court must, the evidence of an enterprise was more than sufficient.

## V. The Enterprise Was Distinct from Kelly

Kelly also asserts that the government's proof of an enterprise failed because it did not demonstrate that Kelly was "distinct" from the enterprise. (Br37-42). Again, he is wrong. At trial, the government offered evidence that Kelly surrounded himself with his inner circle, and Kelly and his inner circle together worked to promote his brand and to

meet his personal needs.  Because the enterprise was comprised of Kelly

and his inner circle, it is sufficiently distinct from Kelly.

Kelly's reliance on a series of cases where the defendant was

a corporate entity is inapposite.  For example, in <u>Riverwoods Chappaqua</u>

<u>Corp. v. Marine Midland Bank, N.A.</u>, 30 F.3d 339, 344 (2d Cir. 1994), the

defendant was a corporation, Marine Midland Bank, and the enterprise

consisted of bank employees acting in the course of their employment and

on behalf of the corporation.  This Court explained that "where employees

of a corporation associate together to commit a pattern of predicate acts

in the course of their employment and on behalf of the corporation, the

employees in association with the corporation do not form an enterprise

distinct from the corporation."  <u>Id.</u>  As this Court reasoned, "[b]ecause a

corporation can only function through its employees and agents, any act

of the corporation can be viewed as an act of such an enterprise, and the

enterprise is in reality no more than the defendant itself."  <u>Id.</u>  The same

is true of the other case on which Kelly relies.  <u>See</u> <u>Discon, Inc. v. NYNEX</u>

<u>Corp.</u>, 93 F.3d 1055, 1057-58, 1064 (2d Cir. 1996) (finding distinctness

requirement  unsatisfied  where  holding  company  and  two  of  its

subsidiaries were named as both RICO defendants and RICO enterprise

because entities were part of unified corporate structure and "guided by a single corporate consciousness"), vacated on other grounds, 525 U.S. 128 (1998).

This is not a case where a corporate entity was both the RICO defendant and the RICO enterprise or where Kelly was simply associating with himself. Rather, as in Cedric Kushner, the enterprise—which consisted of Kelly's inner circle—was distinct from Kelly. See 533 U.S. at 163 (holding that "corporate employee" who "conduct[ed] the corporation's affairs in a RICO-forbidden way" satisfied distinctness requirement because a "corporate owner/employee, a natural person, is distinct from the corporation itself"); see also id. (holding distinctness requirement satisfied where "either formal or practical separateness" exists); McCullough v. Suter, 757 F.2d 142, 144 (7th Cir. 1985) (holding that where defendant "had several people working for him[,] this made his company an enterprise, and not just a one-man band").

POINT TWO

THE GOVERNMENT ADDUCED
SUFFICIENT EVIDENCE TO SUPPORT THE
JURY'S VERDICT AS TO THE REMAINING COUNTS

I.    Applicable Law

      See POINT ONE, Part II.A, supra.

II.   Discussion

    A.    Counts 6 and 8 and Racketeering Acts 8A, 12A and 14A—
        Transport with Intent to Engage in Illegal Sexual Activity

      There was overwhelming evidence that Kelly transported

Jane and Faith with the intent of exposing them to herpes, in violation

of 18 U.S.C. § 2421(a), as charged in Racketeering Act 8A (charging an

underlying violation of Section 120290 as to Jane); and Racketeering Acts

12A and 14A and Counts 6 and 8 (charging underlying violations of

Section 2307 and New York Penal Law § 120.20 ("Section 120.20") as to

Faith).[12] (GA28, 32, 34, 37-38). As the district court correctly instructed

---

      [12] Kelly asserts that Racketeering Act 9A and Count 2 must be
vacated for the same reason. (Br42-43). However, those charges pertain
to Kelly's transport of Jane to engage in illegal sexual activity with her
based on her status as a minor—not his transmission of herpes to her—
which the government addresses infra at 67-68.

the jury, to establish the necessary intent for a violation of Section 2421(a),

> The Government must prove beyond a reasonable doubt . . . that a significant or motivating purpose of the travel across a state line was that the defendant would engage in illegal sexual activity with [the victim]. In other words, that illegal activity . . . can't have been merely incidental to the trip.

(GA904).

Kelly does not challenge the jury instruction on appeal but argues that the illegal nature of the sexual activity (though not the sexual activity itself) was "incidental" to the trips—in other words, he intended to have unprotected sex with Jane and Faith but did not intend to expose them to herpes. (Br43-46, 55-56). However, the plain text of Section 2421(a), which prohibits the "knowing[] transport[] [of] any individual . . . with intent that such individual engage in . . . any sexual activity for which any person can be charged with a criminal offense," required the jury to determine, as it did, that "the defendant transported Jane and Faith with the intent of engaging in sexual activity with them, and that the intended sexual activity was illegal." (SPA105); cf. United States v. Perkins, 948 F.3d 936, 938 and n.2 (8th Cir. 2020) (as to 18 U.S.C. § 2241(c), which prohibits "cross[ing] a state line with intent to

engage in a sexual act with a person who has not attained the age of 12 years," proof of two elements must be met: "cross[ing] a state line with the intent to engage in a sexual act with a person, and second, the person must not have attained the age of twelve").

One of Kelly's motivating purposes in transporting Jane to California was to engage in unprotected sex in his usual manner, without first informing her that he had contracted herpes and obtaining her consent to sexual intercourse in those circumstances. Kelly's argument on appeal that the jury's verdict in this case was based on "travel plus a violation of a state law that result[ed] after the fact" simply ignores the factual record in this case. (Br45). Medical records and testimony established that Kelly had contracted genital herpes at some point before March 2007, and Kelly knew of this diagnosis and that he should inform his sexual partners that he had herpes and to use a condom during intercourse. (A374-76, 379-80, 390, 431-32; GA1039-40). Failure to do so made his unprotected sex a state crime, and his travel with intent to commit that crime was itself a federal crime.

There was also overwhelming evidence showing that Kelly's motivating purpose in spending time with Jane was to engage in sexual

activity with her.  The relationship began as a sexual relationship, when Kelly told Jane she could not audition for him until he ejaculated (SA454-60), and thereafter arranged and paid for Jane to travel to see him on tour for sex—"he wanted to teach [Jane] a few [musical] techniques, however, he needed to ejaculate again before doing anything."  (SA469-70).  Each of the following trips and encounters involved sex; in the summer of 2015, Jane and Kelly "had sex almost every day."  (SA481-84, 503-09).  Kelly did not use a condom and "never" told Jane that he had previously been diagnosed with herpes.  (SA484-85, 518, 547).

The jury could reasonably conclude that one of Kelly's motivating reasons for arranging for Jane to travel to see him in California in April and May 2015 was to have sexual intercourse with Jane in the manner he always did with Jane and his other sexual partners who testified at trial: without a condom and without first informing her that he had contracted herpes.[13]

---

[13]    Thus, this case is distinguishable from Kelly's hypothetical, in which one individual "arranges to have his adult paramour travel to another state for sexual purposes" and, once there, decides without premeditation to sexually assault her.  (Br45-46).  Under that scenario, if the jury determined that such a criminal sexual assault was truly

The same is true for Faith.  Faith testified that after meeting Kelly, he arranged for her to travel to see him on various occasions to engage in sexual activities.  (SA1644-45, 1682-83, 1706-08, 1712-14, 1733; A780-794).  On one trip to see Kelly in California, when Faith told Kelly she was on her period, Kelly asked her, "Well, why did you come?" (A765-66).  At no point did Kelly tell Faith that he had herpes or wear a condom, including during sexual intercourse.  (SA1645-46; A786).  A reasonable jury could certainly have concluded that a motivating purpose of having Faith travel to see him was to have sexual intercourse with her in the manner he always did, without a condom and without first informing her that he had herpes.[14]

---

incidental to the travel, no violation of § 2421(a) would have occurred. That is not this case.

[14]     Kelly's argument that the government lowered its burden in summation (Br55-56), by not explicitly stating that his intent in transporting Faith to New York had to be having <u>unprotected</u> sex, rather than simply having sex, is untrue.  <u>See</u> GA898-900 (describing the "only remaining issue [a]s whether the sexual activity that he brought her here for was illegal," and arguing that Kelly did not wear a condom and "never told" Faith that he had herpes).

B.   Counts 7 and 9 and Racketeering Acts 8B, 12B and
     14B—Persuasion, Inducement, Enticement or Coercion

Kelly next argues there was insufficient evidence to prove
that he "persuaded, induced, enticed, or coerced" Jane and Faith to travel
to engage in sexual activity that exposed them to herpes, as charged in
Racketeering Act 8B (charging an underlying violation of Section 120290
as to Jane); and Racketeering Acts 12B and 14B and Counts 7 and 9
(charging underlying violations of Sections 120.20 and 2307 as to Faith).
(GA28-29, 33-35, 37-39).  Kelly argues that he did not "persuade, induce,
entice or coerce" Jane to travel to California in April and May 2015 but,
rather, that Jane, a minor, "deceived" Kelly, citing to various text
messages between Jane and her mother.  (Br48-52).  He also argues that
Faith was an "adult woman" who accepted his invitation to New York,
which did "not equate to inducement or persuasion."  (Br56-59).

The verbs persuade, induce, entice and coerce as used in 18
U.S.C. § 2422 "do not include, as a necessary element, the overbearing or
transformation of another's will."  United States v. Waqar, 997 F.3d 481,
483 (2d Cir. 2021).  Rather, a person may be persuaded "to take an action
to which she is already predisposed or neutral" because, otherwise, the

focus would "move[] the locus of the offense conduct from the intent and actions of the would-be persuader to the effect of his words and deeds on his would-be victim"—a view of the statute this Court has specifically rejected. Id. at 486-87.

Although Kelly attempts to flip the focus of the evidence to Jane and Faith, Kelly's own actions reflect attempts to persuade, induce and/or entice Jane and Faith to engage in illegal sexual activity with him. At Kelly's first meeting with Jane, "he persuaded her to engage in sexual contact with him, telling her he needed to ejaculate before she could 'audition' for him." (SPA106 (citing SA454-60)). He then told Jane, an aspiring professional singer, that he wanted her to travel to see him on tour, promising to teach her singing techniques and arranging for trips to California paid for—flights and hotels included—by Kelly. A jury could thus readily conclude that Kelly persuaded, induced and enticed Jane to travel to California with (false) promises of assisting her with her singing and by arranging and paying for her travel, "regardless of whether she expressed (or felt) reluctance, indifference, or, for that matter, enthusiasm at the prospect of doing so." Waqar, 997 F.3d at 487; United States v. Baird, 70 F.4th 390, 391-92 (7th Cir. 2023) (defendant's

plan to bring candy to anticipated sexual encounter with a child was sufficient to sustain conviction of attempted enticement of a minor in violation of § 2422(b)).

Kelly's argument as to Faith fails for the same reasons. Based on the evidence set forth above, including that Kelly told Faith he "loved" her, invited Faith to see him, assured her that the trip would be "fun" and she could see "how he is on tour," and arranged and paid for her travel, the jury could reasonably conclude that Kelly induced her to travel to New York so that they could engage in sexual intercourse. See United States v. Rashkovski, 301 F.3d 1133, 1137 (9th Cir. 2002) (defendant's offer to make and pay for necessary travel arrangements and victims thereafter traveled with his assistance was "sufficient evidence from which a rational jury could conclude that [the defendant] persuaded, induced or enticed them to travel"); United States v. Pelton, 578 F.2d 701, 713 (8th Cir. 1978) (concluding the defendant induced a woman to travel by making her travel arrangements, even though the woman had been willing to travel to work as a prostitute). And, as discussed, the jury had a strong basis to infer that Kelly's intent, consistent with his standard

practice, was to have unprotected sex without first informing Faith that he had contracted herpes.

C.   Racketeering Acts 9(B)-(D)—Unlawful
     Sexual Intercourse with a Minor

Kelly's transportation of Jane to California was done for the purpose of engaging in sexual activity with a minor, notwithstanding his implausible claims that the sex he had with a teenager 30 years his junior was "purely incidental" to her transportation there. (Br46-48).[15]  Kelly's argument is premised on the claim that he went to California to perform, rather than to have sex. (Br47-48).  But the evidence showed that Kelly had sex with Jane while she was a minor "almost every day" in the summer of 2015, including while he was on tour. (SA509, 537).[16] Jane had no role in planning the tour or Kelly's performances, nor does Kelly

---

[15]   As detailed above, Kelly appears to challenge Racketeering Act 9A alongside his challenge to those racketeering acts pertaining to herpes exposure rather than alongside his challenge to Racketeering Act 9D.  Insofar as Kelly maintains a challenge to Racketeering Act 9A, it fails for the same reasons as do his arguments to Racketeering Act 9D.

[16]   Jerhonda, Faith and other victims buttressed this evidence by testifying consistently regarding the frequency and manner of Kelly's sexual activity.

claim as much. The jury was free to infer that Kelly took Jane on those trips to engage in sexual activity with her—and that activity was illegal.

Finally, Kelly's arguments as to Racketeering Acts 9B and 9C (Br53-54) fail for similar reasons. (See SPA124-25). The jury properly inferred that Kelly induced, persuaded, enticed or coerced Jane to travel with him from New York to California (and beyond), when he (i) arranged for her parents to enroll her in a virtual high school, (ii) authorized Juice's mother to serve as her guardian, and (iii) arranged and paid for her travel. As detailed above, the case law forecloses Kelly's suggestion that he did not induce, persuade, entice or coerce her because she may have agreed to travel with Kelly.

D.    Counts 6, 7, 8 and 9 and Racketeering Acts 12 and 14—New York Penal Law Section 120.20

Kelly's argument regarding Racketeering Acts 12 and 14 and Counts 6 through 9 relies on his conclusory assertion that "unprotected sex with someone who carries the herpes virus does not establish a substantial risk of serious physical injury" as required by Section 120.20. (Br59). As the Court properly instructed the jury, "a substantial risk of serious physical injury" occurs:

> when [a person] engages in conduct which creates a
> substantial and unjustifiable risk of serious physical injury to
> another person, when he is aware of and consciously
> disregards that risk, and when that risk is of such nature and
> degree that disregard of it constitutes a gross deviation from
> the standard of conduct that a reasonable person would
> observe in the situation. . . .
>
> Serious physical injury means impairment of a person's
> physical condition that creates a substantial risk of death, or
> that causes death, or serious and protracted disfigurement or
> protracted impairment of health or protracted loss or
> impairment of the function of any bodily organ.

(GA905-06).

Kelly asserts that unprotected sex with a person carrying

genital herpes does not establish a substantial risk of serious bodily

injury because not every sexual encounter means that herpes will be

passed on, or that if passed on, it will result in "serious physical injury."

(Br59-60). But the evidence showed that (1) herpes is a "very contagious,

transmissible virus," (A961); (2) it can be spread even while the carrier is

"asymptomatic," i.e., does not have blistering or other overt symptoms

(A971), and even if he is on an anti-viral medication like Valtrex—"it

varies in the range of 10 to 20 percent . . . where there will still be the

possibility of you transmitting it"—and even that percentage range

depends on a carrier faithfully abiding by their medication regime

(A985);[17] and (3) Kate and Jane contracted herpes prior to Kelly's exposure of Faith to the same (SA516-19, 1820-23).  Further, Dr. McGrath informed Kelly that he needed to tell his sexual partners that he had genital herpes to obtain their consent and to use a condom.  Cf. Einaugler v. Supreme Ct. of State of N.Y. for Cnty. of Kings, 918 F. Supp. 619, 626 (E.D.N.Y. 1996) (for New York State reckless endangerment, it was sufficient that defendant "consciously failed to do what every physician testified he should have done," in that case, immediately transport a distressed patient to a hospital), aff'd 109 F.3d 836, 840 (2d Cir. 1997) (Section 120.20 required "reckless[ness]," i.e., "gross[] deviat[ion] from a reasonable person's standard of conduct and consciously disregard[ing] a substantial and unjustifiable risk").

Kelly also recycles his unsuccessful argument that "[h]erpes is not deadly," and "rarely causes any serious, protracted health impairments," and, according to him, thus cannot cause a "substantial"

---

[17]    A reasonable jury could conclude from Dr. McGrath's testimony and the medical and prescription records that Kelly did not take Valtrex as prescribed given that Dr. McGrath often had to reissue prescriptions for Kelly despite having already prescribed months-worth of Valtrex to him at a time.  (A387-88).

risk of serious physical injury. (Br60-61). But as the district court outlined, the trial evidence permitted a rational jury to find that herpes constituted, at minimum, a "protracted impairment of health," including that herpes was permanent and incurable, with recurring outbreaks that cause "sever[ly] pain[ful]" physical and psychological side effects, and risks causing other medical complications. (SPA109-110 (citations omitted)); cf. People v. Williams, 24 N.Y.3d 1129, 1130 (2015) (defendant's engaging in unprotected sex with victim knowing he was HIV positive and without informing victim of HIV positive status constituted second degree reckless endangerment); United States v. James, 957 F.2d 679, 680 (9th Cir. 1992) (transmission of genital herpes constituted a "permanent or life threatening injury" under the United States Sentencing Guidelines); Myrick v. Anglin, 496 F. App'x 670, 674 (7th Cir. 2012) (reversing district court's determination that genital herpes was not "a serious medical condition" under the Eighth Amendment).

From all these facts, a reasonable jury could find, as the trial jury did, that Kelly's conduct created "a substantial risk of . . . protracted impairment of health." N.Y. Penal L. § 10.10.[18]

E.    Racketeering Acts 6 and 13—Forced Labor

Kelly's challenges to the sufficiency of the evidence proving the predicate racketeering acts alleging forced labor, in violation of 18 U.S.C. § 1589 (Racketeering Acts 6 and 13, as to Jerhonda and Faith), similarly fail. "To convict the defendant of forced labor, the government must prove: '(1) the defendant obtained the labor or services of another person; (2) the defendant did so . . . (a) through threats of serious harm to, or physical restraint against that person or any other person; or (b) through a scheme, plan or pattern intended to cause the person to believe that non-performance would result in serious harm to, or physical restraint against, that person or any other person; . . . and (3) that the defendant acted knowingly.'" (SPA126 (quoting United States v.

---

[18]    Kelly's argument that Faith did not in fact contract genital herpes is irrelevant. The statute does not require it. "[T]he risk of injury alone will sustain prosecution" under Section 120.20. People v. Galatro, 84 N.Y.2d 160, 164 (1994).

Sabhnani, 539 F. Supp. 2d 617, 629 (E.D.N.Y. 2008), aff'd, 599 F.3d 215 (2d Cir. 2010))).

There is no legal support for Kelly's claim that a sex act—whether one or many—"does not qualify as 'labor or services'" unless there is a "commercial aspect to the incident" or the victim expected to receive a "benefit from the act." (Br73). That ignores the text and purpose of the statute, which prohibits obtaining labor and services through force, restraint and intimidation, rather than remuneration.

This Court recently rejected a similar claim, determining that the "ordinary meaning" of "labor" encompassed "the expenditure of physical or mental effort especially when fatiguing, difficult, or compulsory." United States v. Raniere, No. 20-3520, 2022 WL 17544087, at *2 (2d Cir. Dec. 9, 2022). Further, "service" means "the performance of work commanded or paid for by another." United States v. Marcus, 628 F.3d 36, 44 n.10 (2d Cir. 2010). These definitions require no "commercial aspect" as Kelly suggests is required—nor does it make any

sense, as Kelly claims, that the victims of "forced labor" would expect "any type of benefit from the act."[19]

Kelly's conduct as to Jerhonda and Faith falls squarely within the plain language of the forced labor statute. After grooming Jerhonda over approximately six months and punishing her when she violated Kelly's rules, and after obtaining false statements from Faith to use as collateral and threatening her with a firearm, Kelly obtained services, i.e., oral and vaginal sex, from Jerhonda and Faith by implicitly threatening physical harm if they did not comply. Kelly's arguments to the contrary are contradictory. He asserts, without support, that the "statute was not intended to address isolated acts of assault that are squarely within the police powers of the state," but then claims that the sex acts were not the product of assault, asserting that they were not given "out of fear or threats of violence, notwithstanding the prior assaultive behavior." (Br72-73). In any event, as the district court

---

[19]    Furthermore, to insist that only "commercial sex acts," as opposed to non-commercial sex acts, could form the basis of a forced-labor conviction would yield absurd results: obtaining free sex from a prostitute through force or threats of serious harm or restraint would be a violation, 18 U.S.C. § 1589, yet the exact same conduct perpetrated against a person who did not work as a prostitute would be lawful.

determined, Kelly's "conduct—physical and psychological coercion intended to make [his victims] submit—is not traditionally addressed by state law." (SPA129). Kelly used a variety of tactics over time designed to cause his victims to serve him—conduct that falls squarely within 18 U.S.C. § 1589's proscriptions and does not interfere with the enforcement of criminal activity traditionally reserved for the states.

Finally, contrary to Kelly's arguments (Br72-75), the evidence was sufficient to permit a jury to find that Kelly obtained sex acts from Jerhonda and Faith through threats of serious harm to them or through a scheme, plan or pattern intended to cause them to believe that non-performance would result in serious harm or physical restraint. As the district court recounted, Kelly punished Jerhonda when she failed to follow rules, including through physical violence and writing false letters, and in January 2010, Kelly "slapped" Jerhonda, "choked her into unconsciousness, 'spit' on her face and told her to 'put [her] head down in shame'" before "forc[ing] her to perform oral sex on him." (SPA128 (citing A169-70)). Kelly similarly monitored Faith (SA1709, 1716, 1729, 1736-38), punished Faith for violating his rules (GA854-57, 957-59), and, ultimately, brought Faith into a small room with a gun, moved the gun

next to him, and directed her to perform oral sex on him, which Faith did because she felt "intimidated" and not free to leave because she "was under his rules and he had a weapon" (A764-71). The jury thus had ample support for its conclusion that Kelly obtained sex from Jerhonda and Faith as result of his "scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a)(4).

<u>POINT THREE</u>

THE STATE LAWS UNDERLYING
KELLY'S CONVICTIONS DO NOT
<u>SUFFER FROM ANY VAGUENESS INFIRMITIES</u>

I.   <u>Relevant Procedural History</u>

A.   <u>Pretrial Motions to Dismiss – Section 2307</u>

In March 2020, Kelly moved to strike those counts and racketeering acts (Counts Six through Nine and Racketeering Acts 12 and 14) that incorporated Section 2307 as unconstitutionally overbroad and vague.  (GA12-18).  The morning of jury selection, Kelly filed an (untimely) additional motion to dismiss, asserting that, as relevant here, the same counts and racketeering acts should be dismissed because herpes was not an "infectious venereal disease" as used in Section 2307. The district court denied both motions.  (SPA12, 17, 24-26).  Kelly did not assert that Section 2307 was impermissibly vague by authorizing or encouraging discriminatory enforcement.

B.   <u>Posttrial Motions – Sections 2307 and 120290</u>

In moving for Rule 29 relief, Kelly asserted that the government had failed to prove Racketeering Act 8, alleging violations of the Mann Act premised on Section 120290, "because the government

charged [Kelly] with a repealed version of the statute no longer in effect" and because, according to Kelly, Section 120290 was vague. (GA248-51). He also argued, for the first time, and without explanation, that "[i]n the absence of a definition of 'infected,'" Section 2307 was unconstitutionally vague, and interpreting "infected" to "mean[] having the virus rather than having the ability to transmit it . . . would lead to arbitrary and discriminatory enforcement." (GA269).

The district court determined Kelly's constitutional claims were "not properly the subject of a Rule 29 motion" and referred to its pretrial order denying them. (SPA111). It also determined as to Section 120290 that (1) Kelly failed to timely move to dismiss the claims incorporating Section 120290 pursuant to Federal Rule of Criminal Procedure 12 and thus had waived the arguments; (2) he was appropriately charged with the version of Section 120290 in effect at the time of the charged conduct; and (3) Section 120290 was not unconstitutionally vague. (SPA116-19).

II.   Applicable Law

    A.   Vagueness Challenges

"The void-for-vagueness doctrine springs from the Fifth Amendment's due process clause."  United States v. Houtar, 980 F.3d 268, 273 (2d Cir. 2020).  A statute can be impermissibly vague if it either (1) "fails to provide a person of ordinary intelligence fair notice of what is prohibited," or (2) "is so standardless that it authorizes or encourages seriously discriminatory enforcement."  Holder v. Humanitarian Law Project, 561 U.S. 1, 18 (2010).  That said, courts apply a "presum[ption] that acts of Congress are not unconstitutionally vague."  Houtar, 980 F.3d at 273 (citing Skilling v. United States, 561 U.S. 358, 403 (2010)).

"When a vagueness challenge alleges lack of notice, the relevant inquiry is whether the statute 'presents an ordinary person with sufficient notice of . . . what conduct is prohibited.'"  Houtar, 980 F.3d at 273 (quoting Thibodeau v. Portuondo, 486 F.3d 61, 67 (2d Cir. 2007)). A statute is not void for vagueness, however, just because its applicability is unclear at the margins, see United States v. Williams, 553 U.S. 285, 306 (2008), or if a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances,

see Skilling, 561 U.S. at 403.  Rather, a statute is void for vagueness only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application.  Williams, 553 U.S. at 306; see Smith v. Goguen, 415 U.S. 566, 578 (1974) (vague statute lacks "any ascertainable standard for inclusion and exclusion" of conduct within its scope).

Where, as here, the interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness "as applied."  United States v. Rybicki, 354 F.3d 124, 129 (2d Cir. 2003) (en banc).  A challenger "who engages in some conduct that is clearly proscribed [by the challenged statute] cannot complain of the vagueness of the law as applied to the conduct of others."  United States v. Amer, 110 F.3d 873, 878 (2d Cir. 1997).

B.  Standard of Review

Where a vagueness challenge was not raised before the district court, this Court reviews it for plain error.  Rybicki, 354 F.3d at 129; see supra at 37-38.  This Court "typically do[es] not find plain error 'where the operative legal question is unsettled, including where there is no binding precedent from the Supreme Court or this Court.'"  United

States v. Bastian, 770 F.3d 212, 220 (2d Cir. 2014) (quoting United States

v. Whab, 355 F.3d 155, 158 (2d Cir. 2004)).

C. Untimeliness

Motions based on a defect in the indictment must be raised by

pretrial motion "if the basis for the motion is then reasonably available

and the motion can be determined without a trial on the merits." Fed. R.

Crim. P. 12(b)(3)(B). If such a motion is not made prior to trial, it is

untimely and should be denied unless the "party shows good cause."

Fed. R. Crim. P. 12(c)(3); accord United States v. King, 861 F. App'x 490,

493 (2d Cir. 2021). "This requirement . . . spar[es] the court, the

witnesses, and the parties 'the burden and expense of a trial,'" and

ensures that indictments are not dismissed after the jury has been sworn.

United States v. O'Brien, 926 F.3d 57, 82-84 (2d Cir. 2019) (quoting Davis

v. United States, 411 U.S. 233, 241 (1973)). Where "the facts on which [a

defendant's] motion was premised had been available to him throughout

his pretrial period," no good cause will be deemed shown. Id. at 84.

III.  Discussion

 A. Counts 6 Through 9 and Racketeering Acts 12 and
   14—New York Public Health Law Section 2307

   Kelly asserts that the evidence was insufficient to prove violations of Section 2307 because "there was <u>no</u> evidence presented at trial demonstrating that defendant was 'infected' with a venereal disease during his sexual interactions with Faith," and that, in any event, the statute is "unconstitutionally vague."  (Br61-66).

   1. Kelly Was "Infected" Under Section 2307

   Kelly asserts that, as a statutory matter, he could not be "infected with an infectious venereal disease" under Section 2307 unless he had overt symptoms of herpes, <u>i.e.</u>, "blistering and open sores that would give [one] notice that [one is] contagious," despite that genital herpes is transmissible even when it does not cause visible symptoms. (Br61-63).  The argument, which hinges on a tortured version of the meaning of "infected," merits little discussion.

   The term "infected" is unambiguous and has a plain and ordinary meaning.  See <u>Nwozuzu v. Holder</u>, 726 F.3d 323, 327 (2d Cir. 2013) (statutory terms are construed according to their "plain meaning" where "unambiguous").  "Infect" means "[t]o contaminate."  <u>Infect</u>,

Black's Law Dictionary (11th ed. 2019). Further, Section 2307 applies the term "infected" in conjunction with a person who knows "himself . . . to be infected <u>with an infectious venereal disease</u>." <u>Cf.</u> <u>Venereal Disease</u>, <u>Sexually Transmitted Disease</u>, Black's Law Dictionary (11th ed. 2019) (defining "venereal disease" as a "sexually transmitted disease," which, in turn, is defined as a "disease transmitted only or chiefly by engaging in sexual acts with an infected person"). As proven at trial, genital herpes is an STD transmissible by engaging in sexual acts with an infected person. (A961-62 (defining herpes as an infectious STD), 1030 (same)). New York courts agree. <u>See</u> <u>Maharam v. Maharam</u>, 123 A.D.2d 165, 170-71 (1st Dep't 1986) (finding a duty to disclose genital herpes based on Section 2307); <u>Fan v. Sabin</u>, 49 Misc. 3d 1201(A) (N.Y. Sup. Ct. 2015) (same).

Kelly's argument that the only "logical" reading of Section 2307 is to require the word "infected" to mean that Kelly have "blistering and open sores" does not comport with the statute's plain language. (Br62). The statute requires only that the person with the STD know of the infection; "blistering and open sores" is not the only way to prove knowledge. Here, as detailed above, Kelly had been aware that he had

genital herpes long before he had intercourse with Faith and knew that he should inform her and obtain her consent and use a condom.  Not doing so constituted a violation of Section 2307.

### 2.    Section 2307 Is Not Unconstitutionally Vague

Kelly asserts that Section 2307 "[b]y failing to define 'infection' . . .  fails to put people of ordinary intelligence on notice of what conduct is prohibited." (Br64).  As detailed above, "infected" is unambiguous and carries its plain and ordinary meaning, and its language did not leave Kelly with "no reason even to suspect that his conduct might be within its scope." United States v. Herrera, 584 F.2d 1137, 1149 (2d Cir. 1978).  Insofar as Kelly challenges the statute as applied to individuals with Human Papillomavirus—not genital herpes— or in situations where an individual may have previously disclosed a herpes infection to a partner and obtained consent (Br65-66), Kelly's arguments miss the mark because "vagueness challenges to statutes not threatening First Amendment interests" are evaluated "on an as-applied basis." United States v. Ragonese, 47 F.4th 106, 113-14 (2d Cir. 2022).  Kelly, who knew he was infected with genital herpes and who had been told so by his doctor and by multiple women, nonetheless "engage[d]

in . . . conduct that [wa]s clearly proscribed" by Section 2307, <u>see</u> <u>Amer</u>, 110 F.3d at 878, that is, having sex with Faith without informing her he had herpes. This Court should thus affirm the district court's denial of his as-applied vagueness challenge alleging lack of notice.[20]

Kelly, for the first time on appeal, also alleges that Section 2307 is unconstitutionally vague because it "authorizes or encourages arbitrary or discriminatory enforcement" as proven, according to Kelly, by the fact that "he is the <u>only</u> person in New York history who has been prosecuted for violating this statute where the victim was not infected with the 'venereal disease.'" (Br64-65). Courts uphold statutes where they "as a general matter provide[] sufficiently clear standards to eliminate the risk of arbitrary enforcement" or where, "even in the

---

[20] Kelly's argument that Section 2307 is unconstitutionally vague because it includes no other "mental state" than "knowledge" is unexplained and unsupported by any case law. (Br64). To the contrary, dozens of statutes use "knowledge" as the requisite mens rea. <u>Cf.</u> <u>Counterman v. Colorado</u>, 143 S. Ct. 2106, 2117, --- U.S. --- (2023) (applying a "recklessness" requirement and explaining the "three basic choices" of culpable mental states," "[p]urpose," "knowledge" and "recklessness," which "is morally culpable conduct, involving a "deliberate decision to endanger another").

absence of such standards, the conduct at issue falls within the core of the statute's prohibition."  Houtar, 980 F.3d at 277.

Under its plain terms, Section 2307 does not require that the victim be infected with the venereal disease; it prohibits exposure.  Thus, Kelly's argument as to arbitrary enforcement based on circumstances beyond the reach of the statute makes little sense, and Kelly does not explain how the statute otherwise fails to set forth unclear standards.  In any event, as the district court determined, the risk that Kelly would infect victims with genital herpes, without informing them or obtaining their consent in such circumstances, "falls within the 'core concern' of the statute—to protect the public from the spread of infectious diseases." (SPA17); see also Matter of Grattan v. People, 65 N.Y.2d 243, 245 (1985) ("Article 23 of the Public Health Law ('Control of Sexually Transmissible Diseases') was enacted . . . [t]o promote the detection and eradication of sexually communicable diseases").  Finally, Kelly did not raise this argument below and, thus, this Court reviews it for plain error.[21]

---

[21]     As noted supra at 78, although Kelly asserted that Section 2307 was unconstitutionally vague in his Rule 29 motion (the wrong avenue for such a claim), and in doing so used the words "arbitrary and

Rybicki, 354 F.3d at 129.  Accordingly, because Kelly's conduct falls squarely within Section 2307's prohibition, he cannot show that that the district court erred in denying his motions to strike and dismiss, let alone that any error seriously affected the fairness, integrity, or public reputation of judicial proceedings in his case.

B.    Racketeering Act 8—California Health and Safety Code Section 120920

Kelly next asserts that Racketeering Act Eight should be vacated because "the government charged [Kelly] with a repealed version of" Section 120290 "that was unconstitutionally vague."  (Br66).  The argument fails because it was untimely and wrong as a matter of law.

1.    Waiver

The operative Indictment, returned approximately a year and a half before the trial in this case, charged Kelly with violations of the Mann Act incorporating violations of Section 120290 as it existed at the time of Kelly's conduct——between April 28 and May 1, 2015—for his

---

discriminatory enforcement," he offered no argument or explanation for the challenge—nor did he make such an argument in his pretrial motions to dismiss and strike (SPA17 n.6)—and, thus, plain error review should apply.

unprotected sexual intercourse without prior disclosure of his infected status. (GA28-29). The parties' proposed jury instructions—filed before the commencement of trial—also referenced the version of Section 120290 in effect in 2015. (GA98-102 (filed July 2, 2021)). A different version of the statute went into effect on January 1, 2018. See Cal. Health and Safety Code § 120290 (effective 2018). After the jury had been sworn in and several weeks after trial had commenced, Kelly, for the first time, requested that the district court amend certain portions of the proposed jury instructions to comport with the 2018 version of Section 120290. (GA203-10 (filed Sept. 18, 2021)).

Kelly's arguments on appeal regarding Section 120290 are untimely under Rule 12(c)(3) of the Federal Rules of Criminal Procedure. Specifically, "the basis for the motion"—a complaint about the version of the statute charged—was "reasonably available" and could have been "determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(B). Kelly was on notice as early as March 2020 when the Indictment was filed—and certainly by July 2021, when the parties filed the proposed jury instructions—that he was being charged with the version of Section 120290 in effect in 2015. In asserting that his claims are not waived,

Kelly maintains that he "had no idea" the statute with which he was being charged, despite acknowledging that the Indictment made the effective date clear and declining to address the proposed jury instructions, which also made the effective date clear. (Br69-70). Because "the facts on which his motion was premised [were] available to him throughout his pretrial period," he has not shown good cause. O'Brien, 926 F.3d at 84.

The same is true for Kelly's vagueness challenge to Section 120290, given that "[t]he [] Indictment currently at issue is the same document Defendant reviewed before trial; so if that document is vague now, then it was vague then, which is when Defendant should have voiced his concerns." United States v. Sampson, No. 13-CR-269 (DLI), 2016 WL 756565, at *10 (E.D.N.Y. Feb. 26, 2016) (citing United States v. Crowley, 236 F.3d 104, 108 (2d Cir. 2000)). Indeed, Kelly raised a vagueness challenge to Section 2307 before trial but declined to challenge Section 120290. Kelly's claims as to Section 120290 were untimely brought and, thus, waived. (SPA116).

### 2. The Indictment Properly Charged Kelly with the Law in Effect at the Time of the Charged Conduct

Even if timely made, Kelly's argument lacks merit. Kelly's conduct was criminal under the law in effect at the time he committed the crime. (SPA119-20). That is dispositive in the racketeering context, where the relevant consideration is whether the predicate racketeering act was a violation of the relevant state or federal law at the time that the underlying conduct was committed. Specifically, Congress defined "racketeering activity" to include certain acts "chargeable" under state law and "indictable" under federal law. See 18 U.S.C. § 1961(1). In United States v. Davis, 576 F.2d 1065 (3d Cir. 1978), the Third Circuit determined that "the words 'chargeable under State law' in [18 U.S.C.] § 1961(1)(A) mean 'chargeable under State law at the time the offense was committed.'" Id. at 1067; cf. United States v. Bonanno Organized Crime Family of La Cosa Nostra, 695 F. Supp. 1426 (E.D.N.Y. 1988) (RICO predicate alleging acts indictable under 18 U.S.C. § 1512 dismissed because defendant's alleged conduct occurred before enactment of § 1512).

Moreover, as other circuits have determined, state law references in the federal RICO statute "simply define[] wrongful conduct," United States v. Thomas, 887 F.2d 1341, 1349 (9th Cir. 1989), which is why, "in the context of state statutes of limitations, . . . regardless of the running of the state statute the defendant is still 'chargeable' with the state offense within the meaning of" § 1961(1)(A), United States v. Licavoli, 725 F.2d 1040, 1046-47 (6th Cir. 1984). "Section 1961 requires . . . only that the conduct on which the federal charge is based be typical of the serious crime dealt with by the statute, not that the particular defendant be 'chargeable under State law' at the time of the federal indictment." Id. at 1047 (quoting United States v. Frumento, 563 F.2d 1083, 1087 n.8A (3d Cir. 1977)).

Here, the government appropriately charged Kelly with the version of Section 120290 in effect at the time he committed his crime. (SPA119-120).

### 3. Section 120290 Is Not Unconstitutionally Vague

In 2015, the operative version of Section 120290 (titled "willful exposure of a communicable disease") provided, in relevant part, as follows:

> [A]ny person afflicted with any contagious, infectious, or communicable disease who willfully exposes himself or herself to another person, and any person who willfully exposes another person afflicted with the disease to someone else, is guilty of a misdemeanor.

Cal. Health & Safety Code § 120290 (effective 1998).

Kelly's claims on appeal that the charged version of Section 120290 was unconstitutionally vague fail for the same reasons as his challenge to Section 2307. Specifically, Kelly's claim that he was "the first person in California's history to be charged under this statute where the alleged victim was not actually infected with the disease during the conduct that occurred in California" (Br68) both misstates the statute's requirements—it does not prohibit transmission, but exposure—and fails to recognize that Kelly did give Jane genital herpes. (SA516-18). Further, Kelly's scattershot claim that "willful exposure" and "communicable diseases" as used in the statute were somehow vague—claims unsupported by any case law or even explanation—also fails. The

California legislature defined "communicable disease" as "any disease that was transferable through the exposure incident, as determined by the certifying physician," Cal. Health and Safety Code § 120261(d), and "willfully" as "a purpose or willingness to commit the act, or make the omission referred to," Cal. Penal Code § 7(1). "[I]t is clear to an ordinary person that [Section 120290] would prohibit the defendant's conduct—having unprotected sex knowing he had herpes and without informing his partner." (SPA117).

Moreover, Kelly's "conduct falls within § 120290's clear core—protecting the public from the spread of infectious diseases." (Id. (citing Doe v. Roe, No. 12-CV-01644, 2013 WL 1787175, at *5 (D. Nev. Apr. 25, 2013) (observing that "transmission of an infectious disease" is the type of injury Section 120290 "was designed to prevent"))). Finally, Kelly's arguments as to herpes type 1 (not genital herpes) and Section 120290's possible application to those who (unlike Kelly) did not know they had the disease have no bearing on his as-applied vagueness challenge. See United States v. Scott, 979 F.3d 986 (2d Cir. 2020). Because Kelly exposed Jane to a contagious, infectious, communicable disease—herpes—by engaging in unprotected sexual activity with her, knowing at

94

the time that he was infected but not disclosing that to her, he committed

a violation of Section 120290 as charged in the Indictment, instructed by

the district court to the jury, and proved by the evidence.

<u>POINT FOUR</u>

<u>KELLY WAS NOT DENIED A FAIR TRIAL NOR
EFFECTIVE ASSISTANCE OF COUNSEL DURING VOIR DIRE</u>

Kelly argues that he was denied a fair and impartial trial because four of the seated jurors were unqualified to serve, and because he was denied effective assistance to counsel by counsel's failure to "conduct any meaningful <u>voir dire</u>" of these and other jurors. (Br76-77). Although this Court need not address on direct appeal Kelly's claim that his counsel was ineffective, the record is sufficient to reject this argument on the merits. In the alternative, Kelly's claim should be dismissed without prejudice to Kelly's filing of a petition pursuant to 28 U.S.C. § 2255.

I.   <u>Relevant Facts</u>

Approximately 575 prospective jurors completed a comprehensive questionnaire comprised of 108 questions. The parties thereafter submitted a joint list of prospective jurors they agreed should be stricken for cause. (GA918-27). In addition, the government submitted a list of additional prospective jurors it challenged for cause and Kelly submitted a list of additional prospective jurors he challenged

for cause.    (Id.).    The district court then directed the remaining prospective jurors to appear for an in-person voir dire.

During the first phase of voir dire, the district court addressed the prospective jurors in a group setting, advising them of multiple principles of law, including the burden of proof, the defendant's presumption of innocence and the need to follow the court's instructions. (GA344-45, 348, 516, 524-25, 527-28).   During the second phase, the district court spoke with the remaining prospective jurors individually, including posing additional follow-up questions submitted by the parties, and excluded additional prospective jurors for cause for various reasons. (See generally GA349-758).   After voir dire was complete, the parties exercised their peremptory challenges from the pool of qualified prospective jurors and the district court subsequently seated and swore 12 jurors and five alternate jurors to hear the case.    (GA761-86). Following the close of evidence, the 12 jurors deliberated, ultimately finding Kelly guilty on all nine counts and, with respect to Count One, that all racketeering acts, except Racketeering Acts Three and Four, had been proven.  No alternate juror was asked to deliberate.

Following the conviction, Kelly moved pursuant to Federal Rule of Criminal Procedure 33 for a new trial. (GA274-95). The district court denied the motion. (SPA54-156).

II. <u>Applicable Law</u>

    A. <u>Voir Dire</u>

The district court must, during <u>voir dire</u>, "remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence." <u>Rosales-Lopez v. United States</u>, 451 U.S. 182, 188 (1981) (plurality opinion). This Court is "reluctant to reverse a conviction solely because a particular question(s) was not asked on voir dire." <u>United States v. Lawes</u>, 292 F.3d 123, 128 (2d Cir. 2002). <u>Voir dire</u> is "so insufficient as to call for a reversal" where the record as a whole showed that it was "so demonstrably brief and lacking in substance as to afford counsel too little information even to draw any conclusions about a potential juror's general outlook, experience, communication skills, intelligence, or life-style," there was a failure to inquire about "systematic or pervasive bias," or "a jury misunderstood its duty to weigh certain evidence fairly that would have been clarified by asking a requested voir

dire question." Id. at 129; see also United States v. Nieves, 58 F.4th 623, 633 (2d Cir. 2023).

B.    Ineffective Assistance

To prevail on a claim of ineffective assistance of counsel, a defendant "must show that counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." Strickland v. Washington, 466 U.S. 668, 687-88 (1984). "Judicial scrutiny of counsel's performance must be highly deferential," id. at 689, and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" Id. at 690; accord Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005) ("Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance.").

The defendant must also show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In the context of jury selection, courts recognize the strategy-bound determinations related to which prospective jurors to strike. Cf. United States v. Price, 443 F. App'x 576, 578-79 (2d Cir. 2011); LeFlore v.

Pollard, 295 F. App'x 95, 97-98 (7th Cir. 2008) ("the strategic decision not to strike [a] juror . . . is, under Strickland, 'virtually unchallengeable'").

"When faced with a claim for ineffective assistance of counsel on direct appeal, [this Court] may: (1) decline to hear the claim, permitting the appellant to raise the issue as part of a subsequent petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255; (2) remand the claim to the district court for necessary factfinding; or (3) decide the claim on the record before us." United States v. Tarbell, 728 F.3d 122, 128 (2d Cir. 2013). "Among these options, the Supreme Court has instructed that in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance." Id. at 128-29. "However, we may decide ineffective assistance claims on direct appeal when their resolution is beyond any doubt or to do so would be in the interest of justice." United States v. Kimber, 777 F.3d 553, 562 (2d Cir. 2015).

III.   Argument

Kelly challenges the suitability of four of the seated jurors, Jurors 3, 4, 5 and 12. He also challenges his counsel's performance. His claims fail because both parties had sufficient information to draw

conclusions about the potential jurors and there is no evidence that the jurors misunderstood their duty to weigh the evidence presented in the case fairly.  See Lawes, 292 F.3d at 128.

As to the challenged jurors:

- Juror 3 (prospective juror 25) indicated that he had seen a "documentary" about Kelly but had "forgot the name of it," and had "heard that [Kelly] has been sleeping with underage girls." (SA183). However, Juror 3 also indicated that he did not "know the full story, so I have no feelings about it.  I remain impartial," and "[t]he media tends to demonize people.  I deal with facts." (SA183-84).  Juror 3 confirmed his ability to decide the case fairly and impartially and apply the district court's instructions on the law. (SA184-85, 191, 195-96; GA390 (Juror 3 describing himself during voir dire as "a stickler for the law" and a "rule guy.")).

- Juror 4 (prospective juror 52) wrote that he found "transmission of STDs in a nonconsensual act to be particularly repulsive," and had a close friend who was a victim of sexual assault and was infected with HIV "from the police in a foreign country."  (SA213, 217, 222). However, Juror 4 confirmed that he would base his decision on "[t]he evidence, testimony and your instructions on the law."  (A57). Although the questionnaire had included a description of the case (SA207), including that the charges in the case involved allegations regarding exposure to one or more STDs, the juror confirmed that he could be a fair and impartial juror after listening to the district court's preliminary instructions.  (A57-58).

- Juror 5 (prospective juror 87) wrote that she had heard interviews with Kelly and was left with the general impression that he "love[s] underage girls," and had a "somewhat negative" impression of him due

to the same.  (SA239-40).[22]  Far from "begrudging[] acquiesce[nce]" (Br79), Juror 5 unequivocally confirmed during <u>voir dire</u> that she was "able to put aside anything that [she had] heard about the case and just judge it on the evidence that [she] hear[d] in the courtroom." (A61).  She also confirmed she could follow the district court's instructions on the law and give both sides a fair trial (A63-65).

- Juror 12 (prospective juror 163) wrote that he had heard of Kelly and the alleged crimes, including that they involved "sex with minors, specific details do not come to mind."  (SA379-80).  He had heard of Kelly's "various instances of achievement in [his] musical career." (<u>Id.</u>).  During <u>voir dire</u>, Juror 12 confirmed that he had only heard "minor things" about the allegations in the press, could not "recall any specific details," and stated that he would base his decision "only on the evidence" heard in the courtroom and the district court's instructions on the law.  (A87-92).  Juror 12 was also a friend of a member of Bill Cosby's family; as to that case he indicated that he would wait until the jury's verdict, and that "[t]rial by media is scarier to me than a jury."  (SA386; GA555; A87-88).

Contrary to Kelly's assertion on appeal that "trial counsel failed to conduct any meaningful <u>voir dire</u> of these jurors to determine whether they could put aside their expressed biases and prejudices" (Br76-77), and far from actual bias, the <u>voir dire</u> transcript shows that any potential concerns that may have arisen from the jurors' questionnaire responses were alleviated by other clear responses from

---

[22]    On appeal, Kelly appears to assume this was a reference to the "Surviving R. Kelly" documentary, but there is no indication in the record to support that.  (Br80).  The same is true of Juror 3.  (Br80-81).

the questionnaire and questioning in court establishing that each juror could remain fair and impartial and decide the case according to the district court's instructions. Because of this, as the district court determined in denying Kelly's Rule 33 motion, "none of the challenges the defendant asserts on appeal would have warranted granting a challenge for cause." (SPA136); see Murphy v. Florida, 421 U.S. 794, 799-800 (1975) (qualified jurors "need not . . . be totally ignorant of the facts and issues involved" in a case; rather, "it is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court").

Moreover, although Kelly, in hindsight, complains that yet more questions could have been posed to these jurors, that is far short of the standard in this Circuit for showing error had Kelly objected during trial. Cf. Nieves, 58 F.4th at 639-40 (voir dire requires "sufficiently detailed questioning to allow defendants to indirectly ferret out more subtle biases through peremptory challenges based on circumstantial indicators of bias"). Here, the district court amply provided "opportunity for prospective jurors to be meaningfully screened for biases relevant to

a particular defendant or the charges against that defendant." Id. at 638.[23]

Because his counsel did not err, Kelly has not shown that his counsel's representation "fell below an objective standard of reasonableness" or any probability that "the result of the proceeding would have been different" should this Court decide the ineffective assistance claim on direct appeal. Strickland, 466 U.S. at 687-88, 694. Kelly's generalized assertions that his attorneys could have done more during voir dire are wholly belied by the record, which shows that trial counsel actively participated throughout the process. In addition to written for-cause challenges, Kelly requested that the district court make further inquiries of numerous prospective jurors, including additional questions related to the prospective jurors' opinions on the "Me Too" movement and related topics and their knowledge of Kelly and the nature of the charges, including making successful challenges for cause over the

---

[23] Moreover, because Kelly advised the district court that he had no further questions for the challenged jurors, and did not try to strike them for cause, his challenge is reviewed for plain error. Cf. Fed. R. Crim. P. 52(b); United States v. Parse, 789 F.3d 83, 112-13 (2d Cir. 2015) (applying plain error standard to voir dire).

government's objections.  (See, e.g., GA368, 373, 382-84, 455-61, 495, 507, 542, 550, 569, 588, 597, 609-10, 623, 627-28, 636, 642-45, 654, 724, 751-52, 756-57).  Finally, Kelly neither asserts nor produces any information supporting a claim of actual bias on the totality of the record; his claims to the contrary are mere speculation.[24]

---

[24]    Kelly's argument as to Jurors 7, 8, 9 and 11 fails for the same reasons explained herein and in the district court's sound opinion. (SPA139-140).  None of these jurors had anything but a neutral opinion about Kelly, and all confirmed they could be fair and impartial.  There was no basis to seek their exclusion.

<u>POINT FIVE</u>

THE DISTRICT COURT PROPERLY
ADMITTED EVIDENCE OF SEXUAL ACTS AND
<u>KELLY'S EXPOSURE OF OTHERS TO GENITAL HERPES</u>

Kelly challenges evidence admitted as direct evidence of the RICO enterprise and pursuant to Rule 404(b). Judge Donnelly did not abuse her discretion in admitting this evidence.

I.   <u>Relevant Facts</u>

Prior to trial, the government moved <u>in</u> <u>limine</u> to admit certain evidence as direct evidence of the enterprise and its means and methods, as inextricably intertwined with the charged crimes and under Federal Rules of Evidence 404(b) and 413; Kelly opposed. (GA135-202). The district court ruled, as relevant here, that:[25]

- Evidence of Kelly's sexual abuse of Aaliyah when she was a minor was admissible as motive evidence of, and inextricably intertwined with evidence of, Racketeering Act 1 (bribery to wed Aaliyah), and no more inflammatory than the charged offenses. (GA310, 312; SPA35). The district court made this determination only after confirming that Kelly intended to challenge that he had a sexual relationship with Aaliyah prior to their marriage. (<u>Id.</u> at 13-14).

---

[25]   The district court denied several of the government's requests to admit "other act" evidence, including threats made to a witness, a separate scheme to bribe a Cook County, Illinois clerk; Kelly's attempt to influence the jury in a state court case; and Kelly's efforts to obtain child pornography in 2019 as either irrelevant, needlessly cumulative or unduly prejudicial. (GA324-25).

- Evidence of Kelly's exposure of Jerhonda, Kate and Anna to genital herpes, and testimony regarding his herpes diagnosis, was "relevant to show [Kelly's] knowledge of the condition," which in turn tended to prove the charges that Kelly knowingly exposed Jane and Faith to herpes. (GA316-17, 794-95; SPA39).

- Evidence of Kelly's sexual abuse of Addie, a minor (beginning in 1994), Alexis, a minor (beginning in 2006), Louis, a minor (beginning in 2006) and Anna (beginning in 2016) was admissible as direct evidence of the enterprise and its means and methods, including to recruit women and children to engage in illegal sexual activity with Kelly, to produce child pornography, and to exert control over victims, as well as the existence of a common scheme, including promising to help young people in the music industry in order to lure them to engage in sexual acts. (GA315-16, 319-23). Although the district court initially precluded evidence of Kelly's sexual abuse of Angela (beginning in 1991 when she was a minor), during the trial, the district court determined such evidence was "relevant to the existence of the enterprise, particularly that [Kelly's] employees were aware of his activities and didn't do anything to stop it." (SA1882-83). The district court further concluded that it gave necessary "context" and was "inextricably intertwined" with Angela's testimony as to her relationship with Kelly. (SA1882-93; SPA36).

- Audio recordings of physical abuse of and threats made to various women were admissible as direct evidence of the charged offenses and relevant to demonstrate Kelly's control over victims and corroborate victim testimony, and was no more inflammatory than the charged offenses. (GA327; SPA44-45).

The district court, in denying Kelly's post-trial motions complaining about the admission of this evidence, reiterated its pretrial determinations. (SPA147-56).

II.    <u>Applicable Law</u>

    A.    <u>Evidentiary Rulings</u>

This Court reviews a district court's evidentiary rulings "for abuse of discretion, recognizing that district courts enjoy broad discretion over the admission of evidence." United States v. Barret, 848 F.3d 524, 531 (2d Cir. 2017). Abuse of discretion is found "only where the trial judge ruled in an arbitrary or irrational fashion." United States v. Kelley, 551 F.3d 171, 175 (2d Cir. 2009). Moreover, "harmless error analysis applies to evidentiary errors." United States v. Tropeano, 252 F.3d 653, 659 (2d Cir. 2001).

    B.    <u>Uncharged Acts</u>

In determining whether evidence of "other acts" was properly admitted, this Court considers "whether (1) it was offered for a proper purpose; (2) it was relevant to a material issue in dispute; (3) its probative value is substantially outweighed by its prejudicial effect; and (4) the trial court gave an appropriate limiting instruction to the jury if so requested by the defendant." United States v. Scott, 677 F.3d 72, 79 (2d Cir. 2012). Such evidence is admissible "to prove an essential element of [] RICO crimes charged," including "the existence of a criminal enterprise

in which the defendant[] participated."  United States v. Matera, 489 F.3d 115, 120 (2d Cir. 2007).  Further, "other acts" evidence is admissible as relevant direct evidence of the crimes charged—and not considered Rule 404(b) evidence—if it (i) "arose out of the same transaction or series of transactions as the charged offense," (ii) "is inextricably intertwined with the evidence regarding the charged offense," or (iii) "is necessary to complete the story of the crime on trial."  United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000).  "This Court is particularly deferential to the district court's Rule 404(b) rulings because a district court is in the best position to evaluate the evidence and its effect on the jury."  United States v. McCain, No. 21-2982, 2023 WL 2335332, *3 (2d Cir. Mar. 3, 2023).

C.   Federal Rule of Evidence 403

A district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Evidence of uncharged acts is not unfairly prejudicial where it is not "any more sensational or disturbing than the crimes" with which the defendant was charged.  United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir.

1990).  This Court's review of a Rule 403 decision is "highly deferential" to the district court.  United States v. Coppola, 671 F.3d 220, 244 (2d Cir. 2012).

III.  Argument

A.  Angela's Testimony Regarding Aaliyah

The district court did not abuse its discretion in admitting Angela's testimony that she saw Kelly engaged in a sexual act with Aaliyah, a minor.  Angela's testimony was direct evidence of Kelly's motive to commit Racketeering Act One.  As the district court determined, because the bribery was intended "to keep secret [Kelly's] sexual relationship with a young teenager . . . testimony from a witness who actually saw them having sex was relevant."  (SPA147).  Kelly's argument on appeal that evidence of motive does "not justify" admissibility (Br92) ignores the language of Rule 404(b).  Nor is Kelly's argument that Angela's testimony was duplicative of Smith's testimony persuasive because, as the district determined, "Smith, unlike Angela, did not see [Kelly] having sexual contact with Aaliyah when she was a minor"—and at trial, Kelly denied that such contact occurred.  (SPA148).  Finally, although Kelly asserts that Angela's testimony was "wildly

prejudicial" (Br92), in fact, the evidence was not substantially outweighed by any risk of unfair prejudice given that the conduct was not more inflammatory than the charged offenses.[26]

B.    Evidence of Kelly's Exposure of Others to Herpes

The district court did not abuse its discretion in admitting evidence of Kelly's herpes diagnosis and exposure and transmission of herpes to others.  Dr. McGrath's testimony regarding when he observed Kelly's herpes, how he diagnosed it and his treatment of it was patently relevant in a case in which Kelly's knowledge of his diagnosis was an element of Racketeering Acts 8 (Jane), 12 (Faith) and 14 (Faith), as well as Counts 6 through 9 of the Indictment.  Kelly did not concede "that he had genital herpes, knew he had the disease or knowingly exposed others to the disease."  (SPA149; see also A1034 (acknowledging "serious dispute" between parties about whether Kelly had herpes)).  Indeed, Kelly suggested in examining Dr. McGrath that because Kelly had not

---

[26]    Kelly argues that this testimony was "not relevant" to the means and methods of the Enterprise.  (Br92).  The government never made such an argument, nor was the district court's opinion based on such reasoning.

received a blood test, Dr. McGrath could not be certain that Kelly had herpes—though Dr. McGrath dispelled that argument. (A408).

Kelly also asserts that the district court erred in admitting testimony from Jerhonda, Kate and Anna that Kelly "infected the women with herpes." (Br90). First, Anna did not testify that Kelly infected Anna with herpes; rather, she was tested for STDs and her results were sent to Copeland. (SA1858-59, 1919). Second, Jerhonda and Kate's testimony that Kelly infected them with herpes and they informed Kelly of that "was probative of the defendant's knowledge that he had herpes, which the government was required to establish beyond a reasonable doubt" for the charges pertaining to Jane and Faith, as well as admissible corroboration of "other victims' testimony that the defendant's practice was to have unprotected sex without disclosing" his STD—a charged means and method of the Enterprise. (SPA149-150). Moreover, their testimony was admissible as direct evidence of Kelly's reckless intent, as required to establish a violation of Section 120.20.

Insofar as Kelly asserts that there were additional "massive amounts" of evidence pertaining to his herpes diagnosis, including from unspecified "multiple witnesses," the only other witnesses to testify about

herpes were Jane and Faith—the victims whose infection and risk-of-infection constitute some of the charged conduct in this case, and whose credibility the defendant attacked at trial—and one expert witness, Dr. Hoskins, who testified that herpes was a serious and incurable disease (another element of the charged offenses).[27]

C.    Testimony of Addie, Alexis, Anna, Louis and Alex

Kelly urges error in the admission of the testimony of five witnesses regarding other sexual encounters with Kelly. (Br93-95).[28] The district court did not abuse its discretion in admitting this testimony as direct evidence of the means and methods of the enterprise. "[T]o demonstrate a pattern of racketeering, . . . it is not the number of predicates proved but, rather, the relationship that they bear to each other or to some external organizing principle that indicates whether they manifest the continuity required to prove a pattern[.]" United States v. Pizzonia, 577 F.3d 455, 465 (2d Cir. 2009). Thus, evidence of

---

[27]    One agent witness also testified about Kelly's Valtrex prescription, used to treat herpes, which was introduced as a government exhibit. (GA873).

[28]    Angela and Kate's testimony was properly admitted for the reasons discussed supra.

crimes not charged as RICO predicates is still admissible to establish the existence of the enterprise and its means and methods.  See, e.g., Matera, 489 F.3d at 120.

Such is the case here.  Kelly's abuse of Addie, Alexis, Louis and Alex—all minors at the time the abuse began—is evidence that Kelly's abuse of Stephanie, Jerhonda and Jane, also minors, were not isolated events but were part of a pattern.  Similarly, Kelly's psychological abuse of Anna was consistent with the abuse of Jerhonda, Jane and Faith; it was part of an overarching pattern employed by Kelly and the enterprise.  Kelly's abuse of Anna was also evidence of the means and methods of the enterprise, that is, the use of physical assaults and threats of physical, psychological and reputational harm—including coercion, extortion, and blackmail—in an attempt to obtain total control over both victims and employees, to ensure their strict adherence to Kelly's demands and to maintain and promote Kelly's stature in the music industry.

On appeal, Kelly takes particular issue with Addie's testimony.  (Br93-94).  However, Addie's testimony helped establish one of the purposes of the enterprise—"to recruit women and girls to engage

in illegal sexual activity" at concert venues, including by "invit[ing] women and girls backstage . . . following KELLY's live performances" and by using Enterprise members "to manage the flow of women and girls who were directly interacting with KELLY." (GA20).  As detailed above, enterprise members recruited 17-year-old Addie and secured Kelly's access to her, ultimately enabling Kelly to sexually assault her.  (SA 1298-1310).[29]

The same is true of the other witness testimony of which Kelly complains, which pertained to other purposes or means and methods of the Enterprise, including recruiting, grooming and facilitating travel for victims, enforcement of various rules for victims, isolating women and girls from friends and family, and creating embarrassing and degrading videos of sexual partners to maintain control over them.  (GA22); see supra at 28 (Alexis's testimony that she was recruited by associates to

---

[29]   Kelly argues that individuals whom Addie described as "bouncers" and "part of [Kelly's] entourage," who were working at Kelly's concert, who authorized access to Kelly's backstage and dressing room, who "escorted" Addie "straight to [Kelly]" and who were communicating with Kelly, including by clearing his dressing room on his request, did not, in fact, work for Kelly. (SA1321; GA953).  However, the district court did not abuse its discretion in permitting the jury to make its own determination.

meet Kelly backstage; was transported by Kelly's associates; had travel booked and arranged by Kelly's runners so she could meet Kelly across the country, including for sexual activity; and was never informed by Kelly that he had an STD); id. at 30-33 (Anna's testimony that she was recruited by Bubba during a concert, and thereafter began an abusive sexual relationship with Kelly); id. at 28-29 (Louis's testimony that Kelly recruited him when he was a minor purportedly to help him with music, but thereafter engaged in recorded sex acts); id. at 29-30 (Alex's testimony that Kelly used an iPad to record Kelly performing sex acts on Alex as well as to record women, including Jane, performing sex acts on Alex while Kelly masturbated).

Kelly's arguments to the contrary do not engage with this Court's RICO precedents and, instead, simply repeat Kelly's assertions, ungrounded in the evidence presented at trial, that a "rock star or rapper's entourage" does not equate to an enterprise. For the reasons discussed supra at 42-58, these arguments fail.

### D. Video Exhibits 328(a), 329(a), 341(a), 342(a) and 343(a)

Finally, Kelly contests the admission of five video exhibits at trial, three of which depicted sexual encounters between Alex, Dominique

116

and Kelly (GA1065-67), and two of which depicted punishment or evidence of Kelly's control of Anna (GX328(a) and 329(a) (GA1063-64), (the latter of which the jury observed only for a few minutes)).

Though Kelly does not urge any particular error with the admission of GX 341(a)-343(a) (GA1065-67) on appeal (Br96-97), they were properly admitted as direct evidence of Kelly's recruitment of women and girls to engage in sexual activity and to produce pornography—purposes of the charged enterprise. (GA20). They also corroborated testimony from Alex, Jane and Louis that Kelly directed victims to have sexual contact with one another, which he filmed. The videos also were not unduly prejudicial considering the trial testimony and charged conduct. (Cf. SPA153-54).

The same is true of GX 328(a) and 329(a).[30] First, they proved the means and methods of the enterprise, including providing examples

---

[30]    Government Exhibit 328(a) depicts Kelly forcing Anna to repetitively walk in the nude and denigrate herself as punishment. Kelly spanks her multiple times, causing her pain. At one point, Kelly begins to masturbate as Anna, still visibly upset, continues to walk back and forth, following Kelly's demands. (GA1063). Government Exhibit 329(a) depicts Anna, nude, on the floor of a bathroom speaking to the camera, referring to Kelly as "Daddy" and spreading bodily fluids, specifically urine and feces, on her body. (GA1064).

of rules Kelly implemented and the punishments he exacted if his victims broke them—corroborating testimony in that regard and demonstrating Kelly's creation of embarrassing video recordings used to control his victims. The exhibits are clear examples of embarrassing and degrading videos created and kept by Kelly, and their content unambiguously depicts several of the physical and psychological means and methods he used to assert dominance and control over his victims. They corroborated Anna's, Jane's and Jerhonda's testimony regarding forms of punishment Kelly inflicted, as well as multiple witnesses' testimony that Kelly was often seen carrying a backpack in which he kept recording devices, such as iPads, that he frequently used to record sexual encounters and punishments. (SA455 (Jane), SA510 (Jane), GA936-37 (Jane), SA1684 (Faith), SA1909-10 (Anna), SA1920-21 (Anna), GA871 (Chabot)). Government Exhibit 329(a) also corroborated Jane's trial testimony that Kelly instructed her to use an iPad to record herself eating feces and smearing it on her body as a punishment and directing her to act like she enjoyed it. (GA946-47). Jane, who did not want to engage in this type of conduct and only did so because it was one of Kelly's punishments, filmed

herself as instructed (as did Anna), and then gave the iPad to Kelly. (GA946-48).

Finally, given the nature of the charges, including sexual exploitation of minors; forced labor—proof of which included evidence of the violent choking and physical assault of Jerhonda (A169) and Kelly's display of a firearm to Faith (A766-67); kidnapping; and aggravated criminal sexual abuse; the content depicted in these exhibits was also no more inflammatory than the charges against Kelly. Thus, the district court did not abuse its discretion in admitting them, nor did Kelly demonstrate plain error in their admission. (SPA153-155).

POINT SIX

THE DISTRICT COURT DID NOT ABUSE ITS
DISCRETION IN ORDERING RESTITUTION AND
AUTHORIZING SEIZURE OF KELLY'S BOP FUNDS

## I.    Applicable Law

### A.    Standard of Review

Restitution orders are reviewed for abuse of discretion.
United States v. Zangari, 677 F.3d 86, 91 (2d Cir. 2012); United States v.
Yalincak, 30 F.4th 115, 122 (2d Cir. 2022) ("Congress has vested the
district court with considerable discretion in fashioning restitution
orders.").

### B.    Restitution Law

Federal law authorizes courts to award restitution in cases
involving racketeering offenses, 18 U.S.C. § 3663, and violations of the
Mann Act, 18 U.S.C. § 2429.  Under both statutes, the government bears
the burden of proving the amount of loss sustained by the victim by a
preponderance of the evidence.  18 U.S.C. § 3664(e); United States v.
Reifler, 446 F.3d 65, 122 (2d Cir. 2006).

"A restitution award need only to be a reasonable estimate of
the victim's actual losses."  United States v. Donaghy, 570 F. Supp. 2d

411, 423 (E.D.N.Y. 2008) (collecting cases); see also United States v. Gushlak, 728 F.3d 184, 203 (2d Cir. 2013) (no error in district court's approval of "inevitably approximate estimate of the restitution amount" because the "potential imprecisions in what is by its nature an imprecise process would not render the restitution amount unreasonable"). "Although estimates are appropriate, a court must base its restitution award on more than mere speculation about a victim's actual losses." Donaghy, 570 F. Supp. 2d at 423 (citing United States v. Catoggio, 326 F.3d 323, 329 (2d Cir. 2003)). "Uncertainties with respect to the amount in question should be resolved in favor of the victim in accord with the statutory focus on making the victim whole." Donaghy, 570 F. Supp. 2d at 423 (citing United States v. Boccagna, 450 F.3d 107, 119 (2d Cir. 2006) ("[R]estitution attempts to compensate for loss by restoring the victim to a position he occupied before the injurious event.")).

Victims of racketeering offenses are entitled to reimbursement of certain expenses if the offense resulted in bodily injury and other expenses if the offense resulted in damages to or loss or destruction of property. Here, certain of the victims of the racketeering

sustained bodily injuries, and therefore the court was entitled to award

restitution for losses, including:

> (2) . . . (A) . . . an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;
>
> (B) . . . an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and
>
> (C) . . . income lost by such victim as a result of such offense; . . .
>
> (4) . . . lost income and necessary child care, transportation, and other expenses related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense[.]

18 U.S.C. § 3663(b). Victims of Mann Act violations are entitled to

mandatory restitution pursuant to 18 U.S.C. § 2429(a). Courts must

award Mann Act victims restitution in the "full amount of the victim's

losses . . . ." 18 U.S.C. § 2429(b)(1). The term "full amount of the victim's

losses" includes any costs incurred, or that are reasonably projected to be

incurred in the future, by the victim, as a proximate result of the offenses

involving the victim, including—(A) medical services relating to physical,

psychiatric, or psychological care; (B) physical and occupational therapy or rehabilitation; (C) necessary transportation, temporary housing, and child care expenses; (D) lost income; (E) reasonable attorneys' fees, as well as other costs incurred; and (F) any other relevant losses incurred by the victim. 18 U.S.C. §§ 2429(b)(3), 2259(c)(2).

II.   Analysis

A.   The District Court's Imposition of
Restitution Was Within its Discretion

Kelly first argues that the government failed to prove that Jane or Stephanie contracted herpes from him during the specific interactions that formed the basis of his Mann Act conviction or specifically charged racketeering acts; second, the government failed to prove that Jane or Stephanie required a suppressive rather than occasional regimen for herpes treatment; and finally, the government failed to prove that Jane or Stephanie required a name-brand form of herpes medication. None of these arguments has merit.

First, while (absent exceptions not met here) restitution can be awarded only for losses incurred because of "the specific conduct forming the basis for the offense of conviction," Gushlak, 728 F.3d at 195 n.7, Kelly's proposed interpretation of causation is far too narrow.

(Br100). Kelly "willfully exposed Jane to herpes during the sexual activity giving rise to the Mann Act violations." (SPA173 (citing SA509-18)). His transporting her interstate to have unprotected sex with her, knowing that he had herpes, is the crime itself; it is also what led to her injury.

As to Stephanie, Kelly argues that because he was not diagnosed with herpes until 2000, the evidence does not support that he gave herpes to Stephanie in 1999. (Br102). But his doctor also testified that "[y]ou don't always get a positive culture," even where there is a herpes infection. (A373-74). Given Stephanie's testimony that she first had sex with Kelly when she was 17 and engaged in a sexual relationship with him for approximately six months, and that she was diagnosed with herpes shortly after that period, the evidence supports the district court's conclusion that Kelly infected Stephanie with herpes and therefore caused her to incur expenses in treating it.

Moreover, even assuming, _arguendo_, that Kelly did not infect Jane and Stephanie with herpes during the specific sexual crimes that occurred during the individually charged interstate trips but instead on some other occasion, Kelly was convicted, in Count One, of racketeering,

which encompassed a pattern of criminal conduct that victimized a number of individuals, including, but not limited to, the individuals as to whom the government seeks restitution. A racketeering conviction punishes "the pattern of activity, not the predicates." United States v. Basciano, 599 F.3d 184, 205 (2d Cir. 2010). As the district court correctly found, Jane and Stephanie are victims of both Kelly's pattern of racketeering and several specific racketeering acts, and they are entitled to restitution for their losses by statute. 18 U.S.C. § 3663(a)(2) ("For the purposes of this section, the term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."); see Catoggio, 326 F.3d at 327-29 (restitution was owed to all victims of defendant's racketeering activity).

The district court's decision to award Jane and Stephanie restitution for a suppressive, rather than occasional, herpes treatment regimen was well within its discretion, and the total restitution order

amounts to a reasonable estimate of their loss. Gushlak, 728 F.3d at 195-96. The law requires that victims be awarded the full amount of their loss, which can fairly be interpreted to require compensation for a full treatment regime. United States v. Coriaty, 300 F.3d 244, 253 (2d Cir. 2002) (observing "the statutory focus on the victim's loss and upon making victims whole"). While there may be some uncertainty as to whether Jane and Stephanie will indefinitely require suppressive treatment, this Court has upheld "restitution for estimated future medical expenses." United States v. Pearson, 570 F.3d 480, 486 (2d Cir. 2009). Moreover, given that Jane and Stephanie would have no herpes outbreaks at all absent Kelly's conduct, they should be maintained in an outbreak-free state to the extent possible, which is more likely to be achieved with a suppressive regime.

Kelly's argument that his victims should be awarded only the cost of generic medication rather than the name-brand similarly fails. There is no requirement that a crime victim bargain-hunt to identify the cheapest treatment for the injuries they incurred. On the contrary, the law seeks to make victims whole. The court's estimate of the treatment

expense using the name-brand medication was reasonable and within its discretion.

B.    The District Court's Order Authorizing Seizure of
      Funds from Kelly's BOP Account Was Within its Discretion

Federal law provides the government and district courts with ample authority to seize property to apply toward payment of a fine, and Kelly has identified no basis to exclude his BOP commissary account from that general rule.   "[A] judgment imposing a fine may be enforced against all property or rights to property of the person fined."  18 U.S.C. § 3613(a). The only exemption to this authority is property "which the government could not reach for the payment of federal income taxes."  United States v. Irving, 452 F.3d 110, 126 (2d Cir. 2006).  Moreover, a person who accumulates substantial resources while incarcerated "shall be required to apply the value of such resources to any restitution or fine still owed." 18 U.S.C. § 3664(n).  Courts have repeatedly authorized turnover orders to be applied to outstanding criminal penalties, including restitution. United States v. Hester, 708 F. App'x 441, 443 (9th Cir. 2018); United States v. Elwood, 757 F. App'x 731, 736 (10th Cir. 2018); United States v. Lemberger, 673 F. App'x 579, 580 (7th Cir. 2017).

The funds in Kelly's inmate trust account were not exempt from seizure under 18 U.S.C. § 3613(a), and therefore were subject to seizure to pay the imposed financial penalties. Kelly's assertion that the seizure was somehow unlawful because there was no lien filed is factually wrong—a judgment imposing a fine or restitution is a lien on all property and rights to property of the person fined. 18 U.S.C. § 3613(c) ("A fine imposed . . . or an order of restitution . . . is a lien in favor of the United States . . . ."). The district court was authorized by law to order the seizure of these funds.[31]

---

[31] The prudential logic behind not ordering seizure of funds from a defendant who is timely paying his fine, see Hickman v. United States, 330 F. Supp. 3d 921, 922 (W.D.N.Y. 2018), has no bearing in this case. Kelly had made no payment toward his criminal fine following his sentencing (despite holding over $27,000 in his inmate trust account). (SPA163 n.4).

CONCLUSION

For the reasons stated above, this Court should affirm the

judgment.


Dated:     Brooklyn, New York
           July 19, 2023

Respectfully submitted,

BREON PEACE,
United States Attorney,
Eastern District of New York.

By:    _____/s/_____
       KAYLA C. BENSING
       Assistant U.S. Attorney


NICHOLAS J. MOSCOW,
LAUREN H. ELBERT,
KAYLA C. BENSING,
Assistant United States Attorneys,
     (Of Counsel).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4) because the brief contains 24,640 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated:  Brooklyn, New York
          July 19, 2023

/s/ NICHOLAS J. MOSCOW
NICHOLAS J. MOSCOW
Assistant U.S. Attorney