# 22-1481(L)

## 22-1982(CON)

# United States Court of Appeals

### For the Second Circuit

———— ◆ ————

UNITED STATES OF AMERICA,

*Appellee,*

—against—

ROBERT SYLVESTER KELLY, AKA R. KELLY,

*Defendant-Appellant.*

——————

**On Appeal From The United States District Court
For The Eastern District of New York**

**THE GOVERNMENT'S APPENDIX
VOLUME I OF V
(Pages GA1 to GA273)**

BREON PEACE,
*United States Attorney,
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000*

NICHOLAS J. MOSCOW,
LAUREN H. ELBERT,
KAYLA C. BENSING,
  *Assistant United States Attorneys,
    Of Counsel.*

# TABLE OF CONTENTS

Page

Defendant's Motion to Dismiss (DE 41),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated February 28, 2020...............................................................GA 1

Defendant's Motion to Dismiss, Motion to Strike (DE 42),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated March 2, 2020 ..................................................................GA 12

Superseding Indictment (DE 43),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated March 12, 2020 ................................................................GA 19

Joint Request to Charge (DE 117-1),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated July 7, 2021.....................................................................GA 42

Defendant's Objections to Request to Charge (DE 117-3),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated July 7, 2021...................................................................GA 131

Government Memorandum in Support of Motion in Limine (DE 133),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated July 23, 2021.................................................................GA 135

Defendant's Memorandum in Opposition to Motion in Limine (DE 146),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated July 31, 2021.................................................................GA 190

Defendant's Letter Motion Regarding Jury Instructions (DE 219),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 18, 2021 .......................................................GA 203

Defendant's Memorandum in Support of Motion for Acquittal
(DE 269-1),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated February 17, 2022.........................................................GA 211

Defendant's Memorandum in Support of Motion for a New Trial
(DE 270-1),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated February 17, 2022............................................................GA 274

Defendant's Memorandum in Support of Supplemental Motion for a
New Trial (DE 276-1),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated March 21, 2022 ..............................................................GA 296

Pretrial Conference Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 3, 2021 ...............................................................GA 308

Jury Selection Transcript,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 9 through 11, 2021 ............................................GA 328

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 18, 2021 .............................................................GA 792

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 19, 2021 .............................................................GA 796

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 20, 2021 .............................................................GA 803

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 26, 2021 .............................................................GA 814

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 1, 2021 ..........................................................GA 853

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 14, 2021 ........................................................GA 870

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 15, 2021 .......................................................GA 872

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 22, 2021 .......................................................GA 886

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 23, 2021 .......................................................GA 897

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 24, 2021 .......................................................GA 901

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 27, 2021 .......................................................GA 907

Government Letter Regarding "For Cause" Challenges (DE 152),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 4, 2021 ..............................................................GA 918

Government Letter Regarding "For Cause" Challenges (DE 157),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 6, 2021 ..............................................................GA 924

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 23, 2021 .............................................................GA 928

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 25, 2021 .............................................................GA 949

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 30, 2021 .............................................................GA 952

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 31, 2021 ............................................................GA 954

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 2, 2021 ........................................................GA 960

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 3, 2021 ........................................................GA 962

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 9, 2021 ........................................................GA 986

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 9, 2021 ........................................................GA 986

Government Exhibit 208(a),
  United States v. Kelly, 19-CR-286 (AMD)..................................GA 1025

Government Exhibit 233(d),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated April 29, 2015............................................................GA 1028

Government Exhibit 240(b),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated December 10, 2015......................................................GA 1029

Government Exhibit 240(c),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated December 28, 2015......................................................GA 1030

Government Exhibit 240(f),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated May 10, 2016..............................................................GA 1031

Government Exhibit 240(g),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated May 16 through 17, 2015.............................................GA 1033

Government Exhibit 401,
  United States v. Kelly, 19-CR-286 (AMD)..................................GA 1038

Government Exhibit 402,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated March 19, 2007 ...........................................................GA 1039

Government Exhibit 417(a),
  United States v. Kelly, 19-CR-286 (AMD)..................................GA 1041

Government Exhibit 449,
  United States v. Kelly, 19-CR-286 (AMD)..................................GA 1042

Government Exhibit 497(a),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated December 6, 2017........................................................GA 1047

Government Exhibit 485(b)-T,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated December 6, 2017........................................................GA 1049

Submitted Separately on Disc

Government Exhibit 328(a)
  United States v. Kelly, 19-CR-286 (AMD)..................................GA 1063

Government Exhibit 329(a)
  United States v. Kelly, 19-CR-286 (AMD)..................................GA 1064

Government Exhibit 341(a)
  United States v. Kelly, 19-CR-286 (AMD)..................................GA 1065

Government Exhibit 342(a)
  United States v. Kelly, 19-CR-286 (AMD)..................................GA 1066

Government Exhibit 343(a)
  United States v. Kelly, 19-CR-286 (AMD)..................................GA 1067

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19 CR 286 – AMD |
| | ) | |
| ROBERT KELLY | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION TO DISMISS COUNT ONE OF THE SUPERSEDING INDICTMENT

Defendant, Robert Kelly, by and through his attorneys, respectfully moves this Court, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(iii) and (v), to Dismiss Count One of the Superseding Indictment. In support of this Motion, Defendant, shows the Court the following:

## I.    Summary of the Charges

Defendant is charged with one count of violating section 1962(c) of the federal RICO statute, relating to six victims (Jane Does Nos. 1-6), and four substantive counts of violating the Mann Act, all of which involve only Jane Doe No. 6.

With respect to the RICO count, which was clearly alleged as an end run around the applicable statute of limitations for the underlying predicate acts, the Superseding Indictment alleges that the purported RICO "enterprise" was

an "association in fact" that was comprised of Defendant Kelly and unnamed members of his entourage, including managers, bodyguards, and personal assistants. The Superseding Indictment reads:

<u>The Enterprise</u>

1.     The defendant ROBERT SYLVESTER KELLY, also known as

"R. Kelly," and individuals who served as managers, bodyguards, drivers, personal assistants and runners for KELLY, as well as members of KELLY's entourage, comprised an enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4), that is, the Enterprise constituted a group of individuals associated in fact that was engaged in, and the activities of which affected, interstate and foreign commerce. The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.'

Superseding Indictment at ¶1. The alleged purpose of this RICO enterprise was to "promote Kelly's music and the R. Kelly brand (which is not a crime)," and "to recruit women and girls to engage in illegal sexual activity with Kelly." *Id.* at ¶2. The alleged predicate acts purportedly occurred sporadically between 1994 and 2017, the majority of which bear little connection to the Eastern District of New York:[1]

---

[1] Given the extremely liberal venue standards in criminal prosecutions (18 U.S.C. § 3237(a)) and given that some minimal part of the criminal activity is alleged to have occurred in the Eastern District, venue may be proper in this District. *See, e.g., United States v. Long*, 697 F. Supp. 651, 655-56 (S.D.N.Y. 1988). That said, the Defendant is from Chicago; the majority of the alleged wrongs occurred in the Northern District of Illinois; and pending charges exist in the Northern District of Illinois. Charging Defendant in a separate Indictment in an out- of-state District,

(1) 1994, Northern District of Illinois (Jane Doe No. 1);

(2) 1999, Northern District of Illinois (Jane Doe No. 2);

(3)-(4) 2003-2004, Northern District of Illinois (Jane Doe No. 3);

(5)-(7) 2009-2010, Northern District of Illinois, (Jane Doe No. 4);

(8)-(9) 2015, District of Connecticut and Northern District of California (Jane Doe No. 5); and,

(10)-(12) (and Counts 2-4) 2017, Eastern District of New York and Central District of California (Jane Doe No. 6).

Predicate acts two through 12 all relate to Defendant allegedly coercing women and girls to engage in sexual activity with him. Act One is an outlier and accuses Mr. Kelly of bribing a government official to produce a piece of fake identification for Jane Doe No. 1. No other charges relate to Jane Doe No. 1 and the Superseding Indictment is silent on how that predicate act fits into the overall purpose of the enterprise.

## II.    Applicable Legal Standard

"In deciding a motion to dismiss an indictment for failure to state a criminal offense, a court must assume the truth of the allegations in the indictment and determine whether the indictment is valid on its face." *United*

---

rather than superseding the existing Illinois Indictment is unfair, inconsistent with the norm, and seemingly calculated to make it more difficult to defend against because, *inter alia*, as the government is aware, Mr. Kelly has very limited resources.

3

*States v. Pirk*, 267 F.Supp.3d 406, 415 (W.D.N.Y. 2017) (quotation marks and citations omitted). In deciding a motion to dismiss for failure to state an offense, a court may generally not "look beyond the face of the indictment," nor may it "dr[a]w inferences as to the proof that would be introduced by the government at trial." *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998). Finally, and importantly, when reviewing an indictment for sufficiency, "common sense must control." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992); *see also United States v. Torres*, 191 F.3d 799, 805 (7th Cir. 1999) (noting that a court must review an indictment "as a whole, rather than in a hypertechnical manner") (quotation marks omitted).

That said, "[a]n indictment, or a portion thereof, may be dismissed if it is otherwise defective or subject to a defense that may be decided solely on issues of law." *United States v. Labs of Virginia, Inc.*, 272 F.Supp.2d 764, 768 N.D. Ill. 2003. An indictment does not pass muster simply because it parrots the language of the statute "where the definition of an offense . . . includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species [and] must descend to particulars." *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000) (*quoting Russell v. United States*, 369 U.S. 749, 765 (1962)). In other words, the allegations in an indictment must "allow [a] court to evaluate whether [the] facts alleged could support conviction." *Id*. at 92.

4

The arguments for dismissal urged in this Motion present pure questions of law that the Court can – and should – resolve before trial. No argument implicates any dispute of fact or requires the Court to draw any inference about the truth of the Government's allegations. The allegations regarding the "enterprise" on the face of the Indictment are simply inadequate to meet the legal requirements of a cognizable RICO enterprise-in-fact, or the Government's ability to prove them at trial. Accepting those facts as true, and based on the arguments that follow, the Court may, and should, dismiss Counts One.

## III. Analysis and Argument

### A. The Indictment Fails to Properly Allege a Legally Cognizable RICO Enterprise, So Count One Must Be Dismissed

The Government would like this Court to believe that an individual, namely Mr. Kelly, and unnamed, unidentified associates somehow formed a legally cognizable RICO enterprise for the purposes of federal criminal prosecution in this case. Notably, the Superseding Indictment is completely silent regarding any acts taken by any other individual aside from Mr. Kelly. As alleged in the Indictment, a single person acting in the manner that Mr. Kelly allegedly did does not form a legally cognizable RICO enterprise under the law. As such, Count One of the Superseding Indictment is flawed on its face and must be dismissed.

5

The federal RICO statute was designed to prevent the illicit infiltration of legitimate enterprises. S. Rep. No. 91-617, at 76 (1969) (stating that RICO's purpose was "the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce"). This explains why the conduct prohibited in §1962 is unlawful only if it occurs in connection with the investment in, acquisition of, or operation of an "enterprise" affecting interstate commerce. In other words, RICO generally does not target the enterprise, but the bad actors who misuse or wrongfully acquire or invest in a legitimate enterprise. *United States v. Turkette*, 452 U.S. 576, 591 (1981).

Section 1961(4) defines an enterprise as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Any group of entities or individuals that is "associated in fact" may be a RICO enterprise. *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1111 (D.C. Cir. 2009). However, many courts required the association-in-fact enterprise to have some structure or hierarchy and an ongoing legitimate purpose that was different from a group that is joined solely to violate RICO. *See e.g.*, *United States v. Bledsoe*, 674 F.2d 647, 664-65 (8th Cir. 1982) ("We are satisfied that RICO was not designed to serve as a recidivist statute, imposing heavier sentences for crimes which are already punishable under other statutes. The Act was not

intended to be a catchall reaching all concerted action of two or more criminals involving two or more of the designated crimes.").

In 2009, the Supreme Court further addressed whether an association-in-fact enterprise must possess an "ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engages." *Boyle v. United States*, 556 U.S. 938, 941 (2009). The Supreme Court held that an association-in-fact enterprise under RICO must have some structure but, relying on both *United States v. Turkette* and the plain language of the RICO statute, identified only three required structural features: (1) "a purpose"; (2) "relationships among those associated with the enterprise"; and, (3) "longevity sufficient to permit those associates to pursue the enterprise's purpose."

Here, the Superseding Indictment fails to meet any of these requirements. First, the common purpose alleged – "to promote Kelly's music and the R. Kelly brand," and "to recruit women and girls to engage in illegal sexual activity with Kelly" – fails to pass muster. It clearly is not unlawful to promote music or a brand, and the Superseding Indictment is silent on how any other individual benefited from Mr. Kelly alleging engaging in sexual activity. If no others benefited, then the only member of the enterprise is Mr. Kelly.

Second, the Superseding Indictment fails to allege the relationship amongst any of the members of the enterprise. Indeed, with the exception of

7

Mr. Kelly, the Superseding Indictment is silent as to the identity of any of alleged members. This lack of specificity blatantly fails to satisfy the requirements of Federal Rule of Criminal Procedure 12(b)(3)(B)(iii).

Third, given that the Indictment names only one individual, there is no way for this Court to evaluate the enterprise's longevity. It is inconceivable that the same members existed in both 1994 (the first predicate act) and 2017 (the last predicate act), and without alleging who the other members are or how they formed the alleged enterprise, neither Defendant nor this Court can adequately asses the nature of the enterprise or appropriately defend against these charges.

More importantly, in this case, Mr. Kelly is charged specifically with a violation of section 1962(c). *See* Superseding Indictment, at pg. 14. Section 1962(c) prohibits any person "employed by or associated with any enterprise" from conducting the affairs of that enterprise through a pattern of racketeering. All Courts of Appeals have concluded that this language means that in a §1962(c) case**,** <u>a party cannot be both the defendant "person" and the enterprise</u>. *See Doyle v. Hasbro, Inc.*, 103 F.3d 186, 191 (1st Cir. 1996) (affirming dismissal of RICO claim where plaintiff failed to identify an enterprise distinct from defendant); *Odishelidze v. Aetna Life & Cas. Co.*, 853 F.2d 21, 23 (1st Cir. 1988); *Official Publ'ns, Inc. v. Kable News Co.*, 884 F.2d 664, 668 (2d Cir. 1989); *Bennett v. U.S. Trust Co. of New York*, 770 F.2d 308,

315 (2d Cir. 1985); *New Beckley Mining Corp. v. Int'l Union, United Mine Workers of Am.*, 18 F.3d 1161, 1163-1164 (4th Cir. 1994); *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 840 (4th Cir. 1990); *In re Burzynski*, 989 F.2d 733, 743 (5th Cir. 1993); *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 583 (5th Cir. 1992); *Davis v. Mut. Life Ins. Co. of New York*, 6 F.3d 367, 377 (6th Cir. 1993); *Palmer v. Nationwide Mut. Ins. Co.*, 945 F.2d 1371, 1373 (6th Cir. 1991); *Preferred Mut. Ins. Co. v. Dumas*, 943 F.2d 52 (6th Cir. 1991) (unpublished table decision); *Bennett v. Berg*, 685 F.2d 1053, 1061 (8th Cir. 1982); *Schreiber Distrib. Co. v. ServWell Furniture Co.*, 806 F.2d 1393, 1396 (9th Cir. 1986); *Garbade v. Great Divide Mining & Milling Corp.*, 831 F.2d 212, 213 (10th Cir. 1987); *Yellow Bus Lines, Inc. v. Drivers Local Union*, 639, 883 F.2d 132, 139 (D.C. Cir. 1989); *United States v. Goldin Indus., Inc.*, 219 F.3d 1268, 1271 (11th Cir. 2000).

Courts generally recognize that the defendant may be a member of a larger association-in-fact enterprise without violating the person/enterprise distinction, but all have held that the defendant must conduct the enterprise's affairs, not merely his own affairs. *United Food & Commercial Workers Unions v. Walgreen Co.*, 719 F.3d 849, 853-56 (7th Cir. 2013); *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339 (2d Cir. 1994). A defendant can only be liable under 1962(c) if he exercises a managerial role in the enterprises affairs. *Reves v. Ernst & Young*, 507 U.S. 170, 178-79 (1993).

9

Here, the Government has failed to plausibly allege that Mr. Kelly directed or managed the affairs of an enterprise that is distinct from himself as a person. The Superseding Indictment does not identify a single person that worked with Mr. Kelly, either by name or pseudonym. Nor does it allege that a single action taken in furtherance of the conspiracy was performed by anyone other than Mr. Kelly. Without a difference between the defendant and the "enterprise," there can be no violation of RICO. *Baker v. IBP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004) (dismissing where the enterprise was not adequately specified).

Even if the Superseding Indictment did properly allege these facts, it is clear from the face of the Superseding Indictment that any alleged enterprise members were Mr. Kelly's employees. *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 121 (2d Cir. 2013) (noting that the required person/enterprise distinction "cannot be evaded by alleging that a [defendant] has violated the statute by conducting the enterprise that consists of itself plus all or some of its officers or employees").

This Indictment simply fails to adequately identify an unlawful RICO enterprise. Reading the facts in the light most favorable to the Government, it is impossible to distinguish between the Defendant and the enterprise itself, so this Court must dismiss Count One of the Indictment.

10

**IV.    Conclusion**

RICO was not designed as a means to punish a single individual for his own wrongful actions. As this Court can see, substantive offenses were only charged relating to one of the six Jane Does. RICO is only being used in this case in an effort to subvert various statutes of limitations. Robert Kelly is not an enterprise. The Superseding Indictment seems to think otherwise, but the law does not. Accordingly, Count One must be dismissed.

Respectfully submitted,

*/s/* Steven A. Greenberg
*One of Defendant's Attorneys*

Steven A. Greenberg-Greenberg Trial Lawyers
53 W. Jackson Blvd., Ste. 1260
Chicago, IL 60604
(312) 879-9500
*Steve@GreenbergCD.com*

Mike Leonard-Leonard Meyer LLP
120 N. LaSalle Street
Suite 2000
Chicago, Illinois 60601
(312) 380-6559 (direct)
mleonard@leonardmeyerllp.com

Thomas A. Farinella, Esq.
Law Office of Thomas A. Farinella, P.C.
260 Madison Avenue, 8th Floor
New York, NY 10016
tf@lawtaf.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19 CR 286 – AMD |
| | ) | |
| ROBERT KELLY | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO STRIKE ALLEGATIONS FROM COUNT ONE OF
THE SUPERSEDING INDICTMENT AND DISMISS THE REMAINING COUNTS**

Defendant, Robert Kelly, by and through his attorneys, respectfully moves

this Court, pursuant to Federal Rule of Criminal Procedure 12(b)(v) and

constitutional principles, to strike from Count One of the Superseding Indictment

statutory allegations, and to dismiss the remaining counts which rely upon an

unconstitutional statute.  In support of this Motion, Defendant states as follows:

I.      **Summary of the Charges**

Defendant is charged with one count of violating section 1962(c) of the RICO

statute, relating to six victims (Jane Does Nos. 1-6), and four substantive counts of

violating the Mann Act, all of which involve only Jane Doe No. 6.  The racketeering

is alleged in Count I, and the violations of the Mann Act in Counts II through V.

The predicate acts alleged in Count I, numbers 10 and 12, as well as the Mann Act

violations alleged in Counts II-V, rely upon two New York statutes, namely New

York Public Health Law section 2307 and New York Penal Law section 120.20. The

Public Health Law provides as follows:

Sec.  2307 Venereal Disease; Person Knowing Himself to Be Infected: Any person who, knowing himself or herself to be infected with an infectious venereal disease, has sexual intercourse with another shall be guilty of a misdemeanor.

This statute is facially unconstitutional. It prohibits sexual intercourse by anybody who has an STD. The definition is vast, ranging from HIV to yeast infections. 10 CRR-NY 23.1.[1]  It includes HPV and "scabbies".[2]

The _only_ requirement is that the individual knows that they have the venereal disease. In other words, it prohibits two consenting adults from having sexual intercourse if either, or both, know that they have an infectious venereal disease. It does not require that the disease be passed on, nor does it allow the consenting adults to have sexual intercourse if the venereal disease is disclosed beforehand. It does not permit the use of a condom, or account for modern day suppression drugs.[3]

The New York Penal Code defines the relevant sexual terms:

---

[1] https://govt.westlaw.com/nycrr/Document/I37c6f5a8c22411dd80c2c6f42ff0193c?viewType=FullText&originationContext=documenttoc&transitionType=CategoryPageItem&contextData=(sc.Default).

[2] HPV is the most common sexually transmitted infection (STI). HPV is a different virus than HIV and HSV (herpes). 79 million Americans, most in their late teens and early 20s, are infected with HPV.  https://www.cdc.gov/std/hpv/stdfact-hpv.htm

[3] Steps to have safe sex if you have an STD are detailed at https://www.cdc.gov/std/hiv/stdfact-std-hiv-detailed.htm.

Suppression of HIV makes the use of a condom avoidable. _See_ https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5761829/-Suppression/; see also https://www.biktarvy.com/about-biktarvy (allowing for unprotected sex with HIV).

1. "Sexual intercourse" has its ordinary meaning and occurs upon any penetration, however slight.

2. (a) "Oral sexual conduct" means conduct between persons consisting of contact between the mouth and the penis, the mouth and the anus, or the mouth and the vulva or vagina.

> (b) "Anal sexual conduct" means conduct between persons consisting of contact between the penis and anus.

N.Y. Penal Law § 130.00.

This law has a definition of sexual intercourse. Traditionally, that term has been advanced as contact between the male's penis and a woman's vagina.  More to the point, because the law separately identifies and defines other forms of sexual contact, it is presumed that the legislature meant for sexual intercourse to mean one thing and to exclude these other forms of contact:

> A court cannot by implication supply in a statute a provision which it is reasonable to suppose the Legislature intended intentionally to omit; and the failure of the Legislature to include a matter within the scope of an act may be construed as an indication that its exclusion was intended. (McKinney's Cons Laws of NY, Book 1, Statutes §74.)

> The maxim *expressio unius est exclusio alterius* is applied in the construction of the statutes, so that where a law expressly describes a particular act, thing or person to which it shall apply, an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded (McKinney's Cons Laws of NY, Book 1, Statutes § 240).

*Dennis Lane Apartments, Inc. v. Green*, 2008 NY Slip Op 28328, ¶ 3, 21 Misc. 3d 480, 483-84, 864 N.Y.S.2d 247, 249 (Civ. Ct.)

The law does not appear to address or prohibit other forms of sexual contact, such as oral sex or anal sex. Rather, it imposes a complete ban on one form of sexual

interaction whenever someone has an infectious venereal disease. It is written as an absolute, with the elements being: 1) that if an individual knows they have an  STD, 2) they are then prohibited from having sexual intercourse.  As written, it is an improper invasion of the right to privacy because it makes it illegal to have private, consensual, sexual intercourse.

Substantive Due Process prohibits the government from limiting the right to engage in private, consensual, sexual intercourse without fear of criminal liability. Private sexual contact between consenting adults involves a fundamental liberty interest that triggers a non-deferential review whenever the government seeks to proscribe such contact. The principle, in its modern form, was first expressed by Justice Stevens in his dissent in the now infamous *Bowers v. Hardwick* decision, where a majority of the United States Supreme Court upheld a Georgia statute that criminalized any act of oral sex, even between consenting, married adults in the privacy of their homes:

> Our prior cases make two propositions abundantly clear. First, the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice; neither history nor tradition could save a law prohibiting miscegenation from constitutional attack. Second, individual decisions by married persons, concerning the intimacies of their physical relationship, even when not intended to produce offspring, are a form of 'iberty' protected by the Due Process Clause of the Fourteenth Amendment. Moreover, this protection extends to intimate choices by unmarried as well as married persons.

*Bowers v. Hardwick*, 478 U.S. 186, 216 (1986) (Stevens, J., dissenting).

In 2003, Justice Stevens' dissent became the view of the majority, when the Court ruled a similar law was unconstitutional in Lawrence *v. Texas*, "Justice Stevens' analysis, in our view, should have been controlling in *Bowers* and should control here. *Bowers* was not correct when it was decided, and it is not correct today." *Lawrence*, 539 U.S. 558, 578.

*Lawrence* concerned a Texas law that specifically criminalized homosexual anal intercourse. *Lawrence's* invalidation of the statute was not predicated upon any *per se* constitutional right to engage in the specific acts themselves (or any particular sexual act), but rather, from application of the basic constitutional privacy jurisprudence that has its origin in *Griswold v. Connecticut*, 381 U.S. 479 (1965), and which has since been continuously reaffirmed, most recently in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015).  Collectively, the cases stand for the proposition that private sexual decisions made by consenting adults invariably involve a fundamental liberty interest protected by the Due Process Clause of the Fourteenth Amendment, one that absolutely shields private sexual conduct from the reach of government intervention. This includes intercourse because it is "a promise of the Constitution that there is a realm of personal liberty which the government may not enter." *Lawrence*, 539 U.S. at 578.

*Lawrence* is now regarded as the bedrock case establishing the right to sexual privacy. *See, e.g.,* Erwin Chemerinsky, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES 846 (3d ed. 2006) ("*Lawrence*, more than any other case in American history, recognizes that sexual activity is a fundamental aspect of

personhood and that it is entitled to constitutional protection."). *Lawrence*, however, did not stand alone –as the Court noted, it merely recognized and articulated a decades-old "emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex." *Lawrence*, 539 U.S. at 572.

The New York statute fails to recognize the right to privacy by imposing a wholesale prohibition on intercourse. Pursuant to the terms of that statute, one's disclosure that he/she has an STD is not enough, consent by one's partner is not enough, and well-recognized protective steps are not enough. The law, as written, requires that one who has an STD engage in complete abstinence.  That is not and cannot be constitutional. Indeed, "*Lawrence* confirmed a dimension of freedom that allows individuals to engage in intimate association without criminal liability." *Obergefell v. Hodges*, 135 S. Ct. 2584, at 2600.

The statue cannot be read in any manner other than to prescribe a wholesale prohibition. It does not have any qualifiers, it does not have any contingency, it only prohibits. Nor can it be saved by judicial construction or interpretation. The law does not permit us to take a common sense look at the statute and read into it things that are not there, such as a requirement that there be disclosure for knowing consent, or even that there be consent. On its face the law is invalid and cannot be the footing for a state law violation RICO predicate.

## IV.   Conclusion

Accordingly, any allegations that are dependent upon this law in Count One must be stricken, and the remaining counts that rely upon this allegation must be dismissed.

Respectfully submitted,

*/s/*Steven A. Greenberg
*Defendant's Attorneys*

Steven A. Greenberg-Greenberg Trial Lawyers
53 W. Jackson Blvd., Ste. 1260
Chicago, IL 60604
(312) 879-9500
*Steve@GreenbergCD.com*

Mike Leonard-Leonard Meyer LLP
120 N. LaSalle Street
Suite 2000
Chicago, Illinois 60601
(312) 380-6559 (direct)
*mleonard@leonardmeyerllp.com*

Thomas A. Farinella, Esq.
Law Office of Thomas A. Farinella, P.C.
260 Madison Avenue, 8th Floor
New York, NY 10016
tf@lawtaf.com

RD 3/13 J.H.

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAR 13 2020 ★
Mar 12 2020
BROOKLYN OFFICE

3-13-2020
J.M.

EAG/NS/MCM
F. #2019R00029

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

ROBERT SYLVESTER KELLY,
    also known as "R. Kelly,"

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - X

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 19-286 (S-3) (AMD)
(T. 18, U.S.C., §§ 1962(c), 1963,
1963(a), 1963(m), 2421(a), 2422(a),
2422(b), 2423(a), 2 and 3551 et seq.)

THE GRAND JURY CHARGES:

<u>INTRODUCTION</u>

      At all times relevant to this Superseding Indictment, unless otherwise indicated:

<u>The Enterprise</u>

      1.    The defendant ROBERT SYLVESTER KELLY, also known as "R. Kelly," and individuals who served as managers, bodyguards, drivers, personal assistants and runners for KELLY, as well as members of KELLY's entourage, comprised an enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4), that is, the Enterprise constituted a group of individuals associated in fact that was engaged in, and the activities of which affected, interstate and foreign commerce.   The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.

43

2.      The purposes of the Enterprise were to promote R. Kelly's music and the R. Kelly brand, to recruit women and girls to engage in illegal sexual activity with KELLY and to produce pornography, including child pornography.   By promoting R. Kelly's music and the R. Kelly brand, the members of the Enterprise expected to receive financial opportunities and personal benefits, including increased power and status within the Enterprise.

3.      In connection with the Enterprise, KELLY and other members of the Enterprise traveled throughout the United States and abroad to perform at concert venues, to promote the R. Kelly brand and to recruit women and girls to engage in illegal sexual activity with KELLY.

4.      When KELLY attended and performed at concerts and other events, KELLY and/or members of the Enterprise on KELLY's behalf invited women and girls backstage and to other events following KELLY's live performances.   These women and girls were often offered wristbands that signified that they were authorized to attend an event.   There, KELLY relied upon members of the Enterprise to ensure that only those authorized to attend were allowed at the event and to manage the flow of women and girls who were directly interacting with KELLY.

5.      When KELLY identified a woman or girl who he wished to see again, he either gave his contact information to the woman or girl or obtained her contact information or relied upon members of the Enterprise to do so.   Following these events, KELLY communicated with certain of these women and girls by telephone, including through the use of traditional telephone calls, text messages, iMessages and FaceTime.   As

3

part of this communication, KELLY often requested that the women and girls provide him with photographs of themselves.

6.      KELLY and other members of the Enterprise also arranged for the women and girls to travel to see KELLY on occasion, including at concerts throughout the United States and related events.   To facilitate their travel, KELLY directed the women and girls to contact a member of the Enterprise, who then arranged travel for the women and girls.   When the women and girls arrived at the lodging, which was typically selected by a member of the Enterprise, a member of the Enterprise usually provided them with instructions.   In addition, members of the Enterprise took steps to ensure that the women and girls did not interact with other women and girls whom KELLY planned to see.   Members of the Enterprise then arranged for the women and girls to attend his concerts and positioned them such that KELLY could see them during his concerts.

7.      KELLY promulgated numerous rules that many of his sexual partners were required to follow, including the following:

(a)      The women and girls were not permitted to leave their room without receiving permission from KELLY, including to eat or go to the bathroom;

(b)      The women and girls were required to wear baggy clothing when they were not accompanying KELLY to an event or unless otherwise instructed by KELLY;

(c)      The women and girls were not permitted to look at other men and instead were told to keep their heads down; and

(d)      The women and girls were required to call KELLY "Daddy."

8.      The Enterprise operated within the Eastern District of New York and elsewhere, including overseas.

<u>Methods and Means of the Enterprise</u>

9.      Among the means and methods by which KELLY and his associates participated in the conduct of the affairs of the Enterprise were the following:

(a)      Committing, attempting and aiding and abetting the commission of crimes and conspiring to commit crimes, including but not limited to engaging in sexual activity with girls under 18 years old, engaging in and facilitating sexual activity without disclosing a sexually transmitted disease KELLY had contracted, producing child pornography, bribery, extortion, coercion and blackmail;

(b)      Demanding absolute commitment to KELLY and not tolerating dissent;

(c)      Obtaining sensitive information about sexual partners and members and associates of the Enterprise to maintain control over them;

(d)      Creating embarrassing and degrading videos of sexual partners to maintain control over them;

(e)      Recruiting and grooming sexual partners for KELLY; and

(f)      Isolating women and girls from friends and family and making them dependent on KELLY for their financial wellbeing.

<u>The Defendant</u>

10.      The defendant ROBERT SYLVESTER KELLY, also known as "R. Kelly," was the leader of the Enterprise.

5

<div align="center">

COUNT ONE
(Racketeering)

</div>

11.     The allegations contained in paragraphs one through 10 are realleged

and incorporated as if fully set forth in this paragraph.

12.     In or about and between January 1994 and the present, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendant ROBERT SYLVESTER KELLY, also known as "R. Kelly," together with others,

being a person employed by and associated with the Enterprise, an enterprise that engaged in,

and the activities of which affected, interstate and foreign commerce, did knowingly and

intentionally conduct and participate, directly and indirectly, in the conduct of the affairs of

the Enterprise through a pattern of racketeering activity, as defined in Title 18, United States

Code, Sections 1961(1) and 1961(5), consisting of the racketeering acts set forth below.

<div align="center">

Racketeering Act One
(Bribery)

</div>

13.     On or about August 30, 1994, within the Northern District of Illinois,

the defendant ROBERT SYLVESTER KELLY, together with others, did knowingly and

intentionally cause another individual to promise and tender to a public officer and public

employee property, to wit: Unites States currency, that such public officer and public

employee was not authorized by law to accept, with the intent to influence the performance

of an act related to the employment and function of a public officer and public employee, to

wit: the creation of a fraudulent identification document for Jane Doe #1, an individual

whose identity is known to the Grand Jury, in violation of Illinois Criminal Code Sections

5/33-1(a) and 5/5-1.

### Racketeering Act Two
#### (Sexual Exploitation of a Child – Jane Doe #2)

14.    In or about and between May 1999 and October 15, 1999, both dates

being approximate and inclusive, within the Northern District of Illinois, the defendant

ROBERT SYLVESTER KELLY, together with others, did knowingly and intentionally

employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #2, an individual

whose identity is known to the Grand Jury, to engage in sexually explicit conduct for the

purpose of producing one or more visual depictions of such conduct, which visual depictions

were produced using materials that had been mailed, shipped and transported in interstate

and foreign commerce, in violation of Title 18, United States Code, Sections 2251(a),

2251(d) (effective 1998) and 2.

### Racketeering Act Three
#### (Kidnapping – Jane Doe #3)

15.    In or about and between 2003 and 2004, both dates being approximate

and inclusive, within the Northern District of Illinois and elsewhere, the defendant ROBERT

SYLVESTER KELLY, together with others, did knowingly and intentionally secretly

confine an individual, to wit: Jane Doe #3, an individual whose identity is known to the

Grand Jury, against her will, and induce Jane Doe #3 by deceit and enticement to go from

one place to another with intent secretly to confine her against her will, in violation of

Illinois Criminal Code Sections 5/10-1 and 5/5-1.

### Racketeering Act Four
#### (Mann Act Violation – Jane Doe #3)

16.    The defendant ROBERT SYLVESTER KELLY committed the

following acts, either one of which alone constitutes Racketeering Act Four:

7

    A.    <u>Transportation</u>

       17.    In or about and between 2003 and 2004, both dates being approximate and inclusive, within the Northern District of Illinois and elsewhere, the defendant ROBERT SYLVESTER KELLY, together with others, did knowingly and intentionally transport an individual, to wit: Jane Doe #3, in interstate commerce, with intent that such individual engage in sexual activity for which a person can be charged with a criminal offense, to wit: violations of Illinois Criminal Code Sections 5/12-16(a)(6) (effective 2002) (aggravated criminal sexual abuse), 5/12-16(a)(7) (effective 2002) (aggravated criminal sexual abuse) and 5/12-15(a)(2) (effective 2000) (criminal sexual abuse), in that KELLY engaged in sexual conduct with Jane Doe #3, to wit: directly touching and fondling Jane Doe #3's sex organs for the purpose of his sexual gratification, (i) during the commission of a kidnapping of Jane Doe #3, knowing that Jane Doe #3 was unable to give knowing consent; (ii) as part of the same course of conduct as delivery of a controlled substance to Jane Doe #3, knowing that Jane Doe #3 was unable to give knowing consent; and (iii) knowing that Jane Doe #3 was unable to give knowing consent, in violation of Title 18, United States Code, Sections 2421 (effective 1998) and 2.

    B.    <u>Coercion and Enticement</u>

       18.    In or about and between 2003 and 2004, both dates being approximate and inclusive, within the Northern District of Illinois and elsewhere, the defendant ROBERT SYLVESTER KELLY, together with others, did knowingly and intentionally persuade, induce, entice and coerce an individual, to wit: Jane Doe #3, to travel in interstate commerce, to engage in sexual activity for which a person can be charged with a criminal offense, to wit: violations of Illinois Criminal Code Sections 5/12-16(a)(6) (effective 2002) (aggravated

8

criminal sexual abuse) 5/12-16(a)(7) (effective 2002) (aggravated criminal sexual abuse) and

5/12-15(a)(2) (effective 2000) (criminal sexual abuse), in that KELLY engaged in sexual

conduct with Jane Doe #3, to wit: directly touching and fondling Jane Doe #3's sex organs

for the purpose of his sexual gratification, (i) during the commission of a kidnapping of Jane

Doe #3, knowing that Jane Doe #3 was unable to give knowing consent; (ii) as part of the

same course of conduct as delivery of a controlled substance to Jane Doe #3, knowing that

Jane Doe #3 was unable to give knowing consent; and (iii) knowing that Jane Doe #3 was

unable to give knowing consent, in violation of Title 18, United States Code, Sections

2422(a) and 2.

<div align="center">

Racketeering Act Five
(Mann Act – Jane Doe #4)

</div>

19.    In or about and between May 2009 and January 2010, both dates being

approximate and inclusive, within the Northern District of Illinois and elsewhere, the

defendant ROBERT SYLVESTER KELLY, together with others, did knowingly and

intentionally persuade, induce, entice and coerce an individual who had not attained the age

of 18 years, to wit: Jane Doe #4, an individual whose identity is known to the Grand Jury, to

engage in sexual activity for which a person can be charged with a criminal offense, to wit:

violations of Illinois Criminal Code Section 5/12-16(d) (effective 2002) (aggravated criminal

sexual abuse), in that KELLY engaged in sexual penetration of Jane Doe #4 who was under

17 years of age, while he was more than five years older than Jane Doe #4, using one or

more facilities and means of interstate commerce, in violation of Title 18, United States

Code, Sections 2422(b) and 2.

### Racketeering Act Six
(Forced Labor – Jane Doe #4)

20.     In or about and between May 2009 and January 2010, both dates being approximate and inclusive, within the Northern District of Illinois and elsewhere, the defendant ROBERT SYLVESTER KELLY, together with others, did knowingly and intentionally obtain the labor and services of a person, to wit: Jane Doe #4, by means of force, threats of force, physical restraint and threats of physical restraint to that person or another person; by means of serious harm and threats of serious harm to that person or another person; and by means of a scheme, plan and pattern intended to cause such person to believe that, if that person did not perform such labor and services, such person would suffer serious harm and physical restraint, and a combination of such means, in violation of Title 18, United States Code, Sections 1589(a) and 2.

### Racketeering Act Seven
(Sexual Exploitation of a Child – Jane Doe #4)

21.     In or about and between May 2009 and January 2010, both dates being approximate and inclusive, within the Northern District of Illinois and elsewhere, the defendant ROBERT SYLVESTER KELLY, together with others, did knowingly and intentionally employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #4, to engage in sexually explicit conduct for the purpose of producing one or more visual depictions of such conduct, which visual depictions were produced using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce, in violation of Title 18, United States Code, Sections 2251(a), 2251(e) and 2.

10

### Racketeering Act Eight
(Mann Act – Jane Doe #5)

22.     The defendant ROBERT SYLVESTER KELLY committed the

following acts, either one of which alone constitutes Racketeering Act Eight:

A.     <u>Transportation</u>

23.     On or about and between April 28, 2015 and May 1, 2015, both dates

being approximate and inclusive, within the Central District of California, the Northern

District of California and elsewhere, the defendant ROBERT SYLVESTER KELLY,

together with others, did knowingly and intentionally transport an individual, to wit: Jane

Doe #5, an individual whose identity is known to the Grand Jury, in interstate commerce,

with intent that such individual engage in sexual activity for which a person can be charged

with a criminal offense, to wit: violations of Cal. Health and Safety Code § 120290 (effective

1998) (willful exposure of a communicable disease), in that KELLY engaged in unprotected

sexual intercourse with Jane Doe #5 without first informing Jane Doe #5 that he had

contracted herpes and obtaining her consent to sexual intercourse in these circumstances, in

violation of Title 18, United States Code, Sections 2421(a) and 2.

B.     <u>Coercion and Enticement</u>

24.     On or about and between April 28, 2015 and May 1, 2015, both dates

being approximate and inclusive, within the Central District of California, the Northern

District of California and elsewhere, the defendant ROBERT SYLVESTER KELLY,

together with others, did knowingly and intentionally persuade, induce, entice and coerce an

individual, to wit: Jane Doe #5, to travel in interstate commerce, to engage in sexual activity

for which a person can be charged with a criminal offense, to wit: violations of Cal. Health

and Safety Code § 120290 (effective 1998) (willful exposure of a communicable disease), in

that KELLY engaged in unprotected sexual intercourse with Jane Doe #5 without first

informing Jane Doe #5 that he had contracted herpes and obtaining her consent to sexual

intercourse in these circumstances, in violation of Title 18, United States Code, Sections

2422(a) and 2.

<div align="center">Racketeering Act Nine<br>(Mann Act – Jane Doe #5)</div>

25.    The defendant ROBERT SYLVESTER KELLY committed the

following acts, any one of which alone constitutes Racketeering Act Nine:

A.    Transportation

26.    In or about and between September 2015 and October 2015, both dates

being approximate and inclusive, within the Eastern District of New York, the Northern

District of California and elsewhere, the defendant ROBERT SYLVESTER KELLY,

together with others, did knowingly and intentionally transport an individual, to wit: Jane

Doe #5, in interstate commerce, with intent that such individual engage in sexual activity for

which a person can be charged with a criminal offense, to wit: violations of California Penal

Law Sections 261.5(a) and 261.5(b) (unlawful sexual intercourse with a person under 18

years old), in that KELLY engaged in sexual intercourse with Jane Doe #5 who was under 18

years old, while he was more than three years older than Jane Doe #5, in violation of Title

18, United States Code, Sections 2421(a) and 2.

B.    Coercion and Enticement

27.    In or about and between September 2015 and October 2015, within the

Eastern District of New York, the Northern District of California and elsewhere, the

defendant ROBERT SYLVESTER KELLY, together with others, did knowingly and

intentionally persuade, induce, entice and coerce an individual, to wit: Jane Doe #5, to travel

in interstate commerce, to engage in sexual activity for which a person can be charged with a

criminal offense, to wit: violations of California Penal Law Sections 261.5(a) and 261.5(b)

(unlawful sexual intercourse with a person under 18 years old), in that KELLY engaged in

sexual intercourse with Jane Doe #5 who was under 18 years old, while he was more than

three years older than Jane Doe #5, in violation of Title 18, United States Code, Sections

2422(a) and 2.

      C.    <u>Coercion of Minor</u>

        28.     In or about and between September 2015 and October 2015, within the

Eastern District of New York, the Northern District of California and elsewhere, the

defendant ROBERT SYLVESTER KELLY, together with others, did knowingly and

intentionally persuade, induce, entice and coerce an individual who had not attained the age

of 18 years, to wit: Jane Doe #5, to engage in sexual activity for which a person can be

charged with a criminal offense, to wit: violations of California Penal Law Sections 261.5(a)

and 261.5(b) (unlawful sexual intercourse with a person under 18 years old), in that KELLY

engaged in sexual intercourse with Jane Doe #5 who was under 18 years old, while he was

more than three years older than Jane Doe #5, using one or more facilities and means of

interstate commerce, in violation of Title 18, United States Code, Sections 2422(b) and 2.

      D.    <u>Transportation of Minors</u>

        29.     In or about and between September 2015 and October 2015, within the

Eastern District of New York, the Northern District of California and elsewhere, the

defendant ROBERT SYLVESTER KELLY, together with others, did knowingly and

Case 22-1481, Document 124, 07/19/2023, 3544138, Page37 of 279
GA0031
Case 1:19-cr-00286-AMD   Document 43   Filed 03/12/20   Page 13 of 23 PageID #: 362

13

intentionally transport an individual who had not attained the age of 18 years, to wit: Jane

Doe #5, in interstate commerce, with intent that such individual engage in sexual activity for

which a person can be charged with a criminal offense, to wit: violations of California Penal

Law Sections 261.5(a) and 261.5(b) (unlawful sexual intercourse with a person under 18

years old), in that KELLY engaged in sexual intercourse with Jane Doe #5 who was under 18

years old, while he was more than three years older than Jane Doe #5, in violation of Title

18, United States Code, Sections 2423(a) and 2.

<div align="center">

Racketeering Act Ten
(Sexual Exploitation of a Child – Jane Doe #5)

</div>

30.     In or about and between September 2015 and December 30, 2015, both

dates being approximate and inclusive, within the Northern District of California, the

Northern District of Illinois and elsewhere, the defendant ROBERT SYLVESTER KELLY,

together with others, did knowingly and intentionally employ, use, persuade, induce, entice

and coerce a minor, to wit: Jane Doe #5, to engage in sexually explicit conduct for the

purpose of producing one or more visual depictions of such conduct, which visual depictions

were produced using materials that had been mailed, shipped and transported in and affecting

interstate and foreign commerce, in violation of Title 18, United States Code, Sections

2251(a), 2251(e) and 2.

<div align="center">

Racketeering Act Eleven
(Forced Labor – Jane Doe #5)

</div>

31.     In or about and between April 2015 and December 2018, both dates

being approximate and inclusive, within the Northern District of Georgia, the Northern

District of Illinois and elsewhere, the defendant ROBERT SYLVESTER KELLY, together

with others, did knowingly and intentionally obtain the labor and services of a person, to wit:

Case 22-1481, Document 124, 07/19/2023, 3544138, Page38 of 279
GA0032
Case 1:19-cr-00286-AMD   Document 43   Filed 03/12/20   Page 14 of 23 PageID #: 363

14

Jane Doe #5, by means of force, threats of force, physical restraint and threats of physical restraint to that person or another person; by means of serious harm and threats of serious harm to that person or another person; and by means of a scheme, plan and pattern intended to cause such person to believe that, if that person did not perform such labor and services, such person would suffer serious harm and physical restraint, and a combination of such means, in violation of Title 18, United States Code, Sections 1589(a) and 2.

<div align="center">Racketeering Act Twelve<br>(Mann Act – Jane Doe #6)</div>

32.    The defendant ROBERT SYLVESTER KELLY committed the following acts, either one of which alone constitutes Racketeering Act Twelve:

A.    <u>Transportation</u>

33.    On or about May 18, 2017, within the Eastern District of New York and elsewhere, the defendant ROBERT SYLVESTER KELLY, together with others, did knowingly and intentionally transport an individual, to wit: Jane Doe #6, an individual whose identity is known to the Grand Jury, in interstate commerce, with intent that such individual engage in sexual activity for which a person can be charged with a criminal offense, to wit: violations of New York Penal Law Section 120.20 (reckless endangerment) and New York Public Health Law Section 2307 (knowing exposure of infectious venereal disease), in that KELLY engaged in unprotected sexual intercourse with Jane Doe #6 without first informing Jane Doe #6 that he had contracted herpes and obtaining her consent to sexual intercourse in these circumstances, in violation of Title 18, United States Code, Sections 2421(a) and 2.

B.   Coercion and Enticement

34.     On or about May 18, 2017, within the Eastern District of New York

and elsewhere, the defendant ROBERT SYLVESTER KELLY, together with others, did

knowingly and intentionally persuade, induce, entice and coerce an individual, to wit: Jane

Doe #6, to travel in interstate commerce, to engage in sexual activity for which a person can

be charged with a criminal offense, to wit: violations of New York Penal Law Section 120.20

(reckless endangerment) and New York Public Health Law Section 2307 (knowing exposure

of infectious venereal disease), in that KELLY engaged in unprotected sexual intercourse

with Jane Doe #6 without first informing Jane Doe #6 that he had contracted herpes and

obtaining her consent to sexual intercourse in these circumstances, in violation of Title 18,

United States Code, Sections 2422(a) and 2.

<div align="center">

Racketeering Act Thirteen
(Forced Labor – Jane Doe #6)

</div>

35.     On or about January 13, 2018, within the Central District of California

and elsewhere, the defendant ROBERT SYLVESTER KELLY, together with others, did

knowingly and intentionally obtain the labor and services of a person, to wit: Jane Doe #6, by

means of force, threats of force, physical restraint and threats of physical restraint to that

person or another person; by means of serious harm and threats of serious harm to that

person or another person; and by means of a scheme, plan and pattern intended to cause such

person to believe that, if that person did not perform such labor and services, such person

would suffer serious harm and physical restraint, and a combination of such means, in

violation of Title 18, United States Code, Sections 1589(a) and 2.

Case 22-1481, Document 124, 07/19/2023, 3544138, Page40 of 279
GA0034
Case 1:19-cr-00286-AMD   Document 43   Filed 03/12/20   Page 16 of 23 PageID #: 365

16

<u>Racketeering Act Fourteen</u>
(Mann Act – Jane Doe #6)

36.     The defendant ROBERT SYLVESTER KELLY committed the

following acts, either one of which alone constitutes Racketeering Act Fourteen:

A.     <u>Transportation</u>

37.     On or about February 2, 2018, within the Eastern District of New York

and elsewhere, the defendant ROBERT SYLVESTER KELLY, together with others, did

knowingly and intentionally transport an individual, to wit: Jane Doe #6, in interstate

commerce, with intent that such individual engage in sexual activity for which a person can

be charged with a criminal offense, to wit: violations of New York Penal Law Section 120.20

(reckless endangerment) and New York Public Health Law Section 2307 (knowing exposure

of infectious venereal disease), in that KELLY engaged in unprotected sexual intercourse

with Jane Doe #6 without first informing Jane Doe #6 that he had contracted herpes and

obtaining her consent to sexual intercourse in these circumstances, in violation of Title 18,

United States Code, Sections 2421(a) and 2.

B.     <u>Coercion and Enticement</u>

38.     On or about February 2, 2018, within the Eastern District of New York

and elsewhere, the defendant ROBERT SYLVESTER KELLY, together with others, did

knowingly and intentionally persuade, induce, entice and coerce an individual, to wit: Jane

Doe #6, to travel in interstate commerce, to engage in sexual activity for which a person can

be charged with a criminal offense, to wit: violations of New York Penal Law Section 120.20

(reckless endangerment) and New York Public Health Law Section 2307 (knowing exposure

of infectious venereal disease), in that KELLY engaged in unprotected sexual intercourse

with Jane Doe #6 without first informing Jane Doe #6 that he had contracted herpes and

obtaining her consent to sexual intercourse in these circumstances, in violation of Title 18,

United States Code, Sections 2422(a) and 2.

(Title 18, United States Code, Sections 1962(c), 1963 and 3551 et seq.)

<div align="center">

## COUNT TWO
(Mann Act Transportation – Jane Doe #5)

</div>

39.    In or about and between September 2015 and October 2015, both dates

being approximate and inclusive, within the Eastern District of New York, the Northern

District of California and elsewhere, the defendant ROBERT SYLVESTER KELLY,

together with others, did knowingly and intentionally transport an individual, to wit: Jane

Doe #5, in interstate commerce, with intent that such individual engage in sexual activity for

which a person can be charged with a criminal offense, to wit: violations of California Penal

Law Sections 261.5(a) and 261.5(b) (unlawful sexual intercourse with a person under 18

years old), in that KELLY engaged in sexual intercourse with Jane Doe #5 who was under 18

years old, while he was more than three years older than Jane Doe #5.

(Title 18, United States Code, Sections 2421(a), 2 and 3551 et seq.)

<div align="center">

## COUNT THREE
(Mann Act Coercion and Enticement – Jane Doe #5)

</div>

40.    In or about and between September 2015 and October 2015, within the

Eastern District of New York, the Northern District of California and elsewhere, the

defendant ROBERT SYLVESTER KELLY, together with others, did knowingly and

intentionally persuade, induce, entice and coerce an individual, to wit: Jane Doe #5, to travel

in interstate commerce, to engage in sexual activity for which a person can be charged with a

criminal offense, to wit: violations of California Penal Law Sections 261.5(a) and 261.5(b)

(unlawful sexual intercourse with a person under 18 years old), in that KELLY engaged in

sexual intercourse with Jane Doe #5 who was under 18 years old, while he was more than

three years older than Jane Doe #5.

(Title 18, United States Code, Sections 2422(a), 2 and 3551 et seq.).

## COUNT FOUR
### (Mann Act Coercion of Minor – Jane Doe #5)

41.    In or about and between September 2015 and October 2015, within the

Eastern District of New York, the Northern District of California and elsewhere, the

defendant ROBERT SYLVESTER KELLY, together with others, did knowingly and

intentionally persuade, induce, entice and coerce an individual who had not attained the age

of 18 years, to wit: Jane Doe #5, to engage in sexual activity for which a person can be

charged with a criminal offense, to wit: violations of California Penal Law Sections 261.5(a)

and 261.5(b) (unlawful sexual intercourse with a person under 18 years old), in that KELLY

engaged in sexual intercourse with Jane Doe #5 who was under 18 years old, while he was

more than three years older than Jane Doe #5, using one or more facilities and means of

interstate commerce.

(Title 18, United States Code, Sections 2422(b), 2 and 3551 et seq.)

## COUNT FIVE
### (Mann Act Transportation of Minor – Jane Doe #5)

42.    In or about and between September 2015 and October 2015, within the

Eastern District of New York, the Northern District of California and elsewhere, the

defendant ROBERT SYLVESTER KELLY, together with others, did knowingly and

intentionally transport an individual who had not attained the age of 18 years, to wit: Jane

Doe #5, in interstate commerce, with intent that such individual engage in sexual activity for

which a person can be charged with a criminal offense, to wit: violations of California Penal Law Sections 261.5(a) and 261.5(b) (unlawful sexual intercourse with a person under 18 years old), in that KELLY engaged in sexual intercourse with Jane Doe #5 who was under 18 years old, while he was more than three years older than Jane Doe #5.

(Title 18, United States Code, Sections 2423(a), 2 and 3551 et seq.)

COUNT SIX
(Mann Act Transportation – Jane Doe #6)

43.     On or about May 18, 2017, within the Eastern District of New York and elsewhere, the defendant ROBERT SYLVESTER KELLY, also known as "R. Kelly," together with others, did knowingly and intentionally transport an individual, to wit: Jane Doe #6, in interstate commerce, with intent that such individual engage in sexual activity for which a person can be charged with a criminal offense, to wit: violations of New York Penal Law Section 120.20 (reckless endangerment) and New York Public Health Law Section 2307 (knowing exposure of infectious venereal disease), in that KELLY engaged in unprotected sexual intercourse with Jane Doe #6 without first informing Jane Doe #6 that he had contracted herpes and obtaining her consent to sexual intercourse in these circumstances.

(Title 18, United States Code, Sections 2421(a), 2 and 3551 et seq.)

COUNT SEVEN
(Mann Act Coercion and Enticement – Jane Doe #6)

44.     On or about May 18, 2017, within the Eastern District of New York and elsewhere, the defendant ROBERT SYLVESTER KELLY, also known as "R. Kelly," together with others, did knowingly and intentionally persuade, induce, entice and coerce an individual, to wit: Jane Doe #6, to travel in interstate commerce, to engage in sexual activity for which a person can be charged with a criminal offense, to wit: violations of New York

Penal Law Section 120.20 (reckless endangerment) and New York Public Health Law

Section 2307 (knowing exposure of infectious venereal disease), in that KELLY engaged in

unprotected sexual intercourse with Jane Doe #6 without first informing Jane Doe #6 that he

had contracted herpes and obtaining her consent to sexual intercourse in these circumstances.

(Title 18, United States Code, Sections 2422(a), 2 and 3551 et seq.)

<u>COUNT EIGHT</u>
(Mann Act Transportation – Jane Doe #6)

45.     On or about February 2, 2018, within the Eastern District of New York

and elsewhere, the defendant ROBERT SYLVESTER KELLY, also known as "R. Kelly,"

together with others, did knowingly and intentionally transport an individual, to wit: Jane

Doe #6, in interstate commerce, with intent that such individual engage in sexual activity for

which a person can be charged with a criminal offense, to wit: violations of New York Penal

Law Section 120.20 (reckless endangerment) and New York Public Health Law Section

2307 (knowing exposure of infectious venereal disease), in that KELLY engaged in

unprotected sexual intercourse with Jane Doe #6 without first informing Jane Doe #6 that he

had contracted herpes and obtaining her consent to sexual intercourse in these circumstances.

(Title 18, United States Code, Sections 2421(a), 2 and 3551 et seq.)

<u>COUNT NINE</u>
(Mann Act Coercion and Enticement – Jane Doe #6)

46.     On or about February 2, 2018, within the Eastern District of New York

and elsewhere, the defendant ROBERT SYLVESTER KELLY, also known as "R. Kelly,"

together with others, did knowingly and intentionally persuade, induce, entice and coerce an

individual, to wit: Jane Doe #6, to travel in interstate commerce, to engage in sexual activity

for which a person can be charged with a criminal offense, to wit: violations of New York

Penal Law Section 120.20 (reckless endangerment) and New York Public Health Law

Section 2307 (knowing exposure of infectious venereal disease), in that KELLY engaged in

unprotected sexual intercourse with Jane Doe #6 without first informing Jane Doe #6 that he

had contracted herpes and obtaining her consent to sexual intercourse in these circumstances.

(Title 18, United States Code, Sections 2422(a), 2 and 3551 et seq.)

<u>CRIMINAL FORFEITURE ALLEGATION AS TO COUNT ONE</u>

47.     The United States hereby gives notice to the defendant that, upon his

conviction of the offense charged in Count One, the government will seek forfeiture in

accordance with Title 18, United States Code, Section 1963(a), which requires any person

convicted of such offense to forfeit: (a) any interest the person acquired or maintained in

violation of Title 18, United States Code, Section 1962; (b) any interest in, security of, claim

against or property or contractual right of any kind affording a source of influence over any

enterprise which the person has established, operated, controlled, conducted or participated

in the conduct of, in violation of Title 18, United States Code, Section 1962; and (c) any

property constituting, or derived from, any proceeds which the person obtained, directly or

indirectly, from racketeering activity in violation of Title 18, United States Code, Section

1962.

48.     If any of the above-described forfeitable property, as a result of any act

or omission of the defendant:

   (a)     cannot be located upon the exercise of due diligence;

   (b)     has been transferred or sold to, or deposited with, a third party;

   (c)     has been placed beyond the jurisdiction of the court;

   (d)     has been substantially diminished in value; or

(e)      has been commingled with other property which cannot be

divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section

1963(m), to seek forfeiture of any other property of the defendant up to the value of the

forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 1963(a) and 1963(m))


A TRUE BILL

FOREPERSON


RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

BY: _____
ACTING UNITED STATES ATTORNEY
PURSUANT TO 28 C.F.R. O.136

F.#: 2019R00029
FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

ROBERT SYLVESTER KELLY,

Defendant.

# SUPERSEDING INDICTMENT

(T. 18, U.S.C., §§ 1962(c), 1963, 1963(a), 1963(m), 2421(a), 2422(a), 2
and 3551 et seq.)

*A true bill.*

_____
                                                                Foreperson

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
                                                                      Clerk

*Bail, $* _____

***Elizabeth Geddes, Assistant U.S. Attorney (718) 254-6430***

EAG/NS/MCM
F. #2019R00029

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

   - against -                     19 CR 286 (S-3) (AMD)

ROBERT SYLVESTER KELLY,

          Defendant.

– – – – – – – – – – – – – – – – – X

## THE GOVERNMENT'S REQUESTS TO CHARGE

JACQUELYN M. KASULIS
Acting United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Elizabeth A. Geddes
Nadia I. Shihata
Maria Cruz Melendez
Assistant U.S. Attorneys
    (Of Counsel)

PRELIMINARY STATEMENT

Pursuant to Rule 30 of the Federal Rules of Criminal Procedure, the government respectfully requests that the Court include the following instructions in its charge to the jury.  In addition, the government requests leave to offer additional instructions as they become necessary during the course of the trial.

The government respectfully requests that copies of the third superseding indictment (the "Indictment") and the jury instructions be provided to the jurors during their deliberations.

REQUEST NO. 1
General Requests

The government respectfully requests that the Court charge the jury in its usual manner on the following subjects:

a.     The Role of the Court and the Duties of the Jury;

b.     Equality of the Parties Before the Court;

c.     Jury Communications with Lawyers and the Court;

d.     Presumption of Innocence;

e.     Burden of Proof and Reasonable Doubt;

f.     Circumstantial Evidence and Direct Evidence;

g.     Function of the Indictment and What Is Not Evidence;

h.     Permissible Inferences Drawn from the Evidence;

i.     Stipulations and Objections;

j.     Charts and Summaries;

k.     Testimony of Law Enforcement Witnesses;

l.     Discrepancies in Testimony;

m.     No Inference to Be Drawn from Defendant's Failure to Testify (if applicable);

n.     Testimony of the Defendant (if applicable);

o.     Dates Approximate;

p.     Deliberations;

q.     "And" means "Or" in Indictment;

r.     Right to See Exhibits and Have Testimony Read During Deliberations;

3

s.      Questioning Wisdom of Law and Basing Verdict on Sympathy or Prejudice

Prohibited; and

s.      Verdict must be unanimous.

REQUEST NO. 2
Indictment

The defendant is formally charged in an indictment.  As I instructed you at the outset of this case, an indictment is a charge or accusation.  The Indictment in this case contains nine separate counts, on each of which you will be called upon to render a separate verdict.

REQUEST NO. 3
Knowingly and Intentionally

All of the charges implicate the concepts of knowledge and intent.  As a general rule, the law holds individuals accountable only for conduct in which they intentionally engage.  Thus, before you can find the defendant guilty of the crimes charged, you must be satisfied he was acting knowingly or intentionally.

A person acts knowingly if he acts voluntarily and intentionally, not because of ignorance, mistake, or accident.  A person acts intentionally if he acts with the specific intent to do something the law forbids.  The person need not be aware of the specific law or rule that his conduct may be violating.  But he must act with the specific intent to do whatever it is the law forbids.

These issues of knowledge and intent require you to make a determination about a defendant's state of mind, something that rarely can be proved directly.  A wise and careful consideration of all the circumstances before you, however, may permit you to make a determination as to a defendant's state of mind.  Indeed, in your everyday affairs, you are frequently called upon to determine a person's state of mind from his words and actions in given circumstances.  You are asked to do the same here.

Authority

Charge of the Hon. Sterling Johnson, United States v. Scalisi, 10 CR 46
(SJ); charge of the Hon. Nicholas G. Garaufis, United States v. Price,
05 CR 492 (NGG).

6

REQUEST NO. 4
Aiding and Abetting and Willful Causation

Many of the racketeering acts in Count One and certain of the other counts charge the defendant with aiding and abetting or willfully causing certain crimes.  It is not necessary to find that the defendant personally committed those crimes as long as the government proves that he "aided and abetted" or "willfully caused" another person to do so.  This is so because, under the law, a person who aids or abets or willfully causes another to commit an offense is just as guilty of that offense as if he committed it himself.

With regard to aiding and abetting under federal law, the aiding and abetting statute is Title 18 of the United States Code, Section 2(a), which provides that:

> Whoever commits an offense against the United States or aids or abets or counsels, commands or induces, or procures its commission, is punishable as a principal.

Therefore, you may find the defendant guilty of an offense charged if you find beyond a reasonable doubt that the government has proven that another person actually committed the offense with which the defendant is charged, and that the defendant aided or abetted that person in the commission of the offense.

In order to find the defendant guilty of aiding and abetting a crime, you must first find that some person did actually commit the crime charged.  Obviously, no one can be convicted of aiding or abetting the criminal acts of another if no crime was committed by the other person in the first place.  But if you do find that a crime was committed, then you must consider whether the defendant aided or abetted the commission of that crime.

In order to aid or abet another to commit a crime, it is necessary that the defendant knowingly associate himself in some way with the crime, and that he participate in

7

the crime by doing some act to help make the crime succeed.  To establish that the defendant

knowingly associated himself with the crime, the government must establish that the

defendant knew and intended that the crime charged would be committed.  To establish that

the defendant participated in the commission of the crime, the government must prove that

the defendant engaged in some affirmative conduct or overt act for the specific purpose of

bringing about that crime.

　　　　　The mere presence of the defendant where a crime is being committed, even

coupled with knowledge by the defendant that a crime is being committed, or merely

associating with others who were committing a crime is not sufficient to establish aiding and

abetting.  One who has no knowledge that a crime is being committed or is about to be

committed but inadvertently does something that aids in the commission of that crime is not

an aider and abettor.  An aider and abettor must know that the crime is being committed and

act in a way that is intended to bring about the success of the criminal venture.

　　　　　To determine whether the defendant aided and abetted the commission of

particular crimes or caused the commission of them, ask yourselves these questions:

> <u>First</u>: Did he participate in the crime charged as something he
> wished to bring about?

> <u>Second</u>: Did he associate himself with the criminal venture
> knowingly and willfully?

> <u>Third</u>: Did he seek by his actions to make the criminal venture
> succeed?

If the defendant did all of these things, then he is an aider and abettor, and is therefore guilty

of the offense.  If, on the other hand, your answer to any of these questions is "no," then the

defendant is not an aider and abettor, and you must not find him guilty.

With regard to willful causation under federal law, Section 2(b) of Title 18 of the United States Code provides that:

> Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

In order to find a defendant guilty of an offense charged under this statute, you must <u>first</u> find that another person has committed the acts constituting the offense charged. <u>Second</u>, you must find that the defendant had the mental state required to violate the offense charged. <u>Third</u>, you must find that the defendant intentionally caused another to commit the requisite act.

I further instruct you that to convict a defendant of aiding and abetting or willfully causing an offense under federal law, you must unanimously agree that the government has proven, beyond a reasonable doubt, either that the defendant aided and abetted the commission of the offense or that the defendant willfully caused the commission of the offense. In other words, all twelve of you must agree on either aiding and abetting or willfully causing. It is not sufficient that some of you find that a defendant aided and abetted the commission of the offense while others find that a defendant willfully caused the commission of the offense.

<u>Authority</u>

Adapted from the charge of the Hon. Sterling Johnson, <u>United States v. Scalisi</u>, 10 CR 46 (SJ); Sand, Modern Federal Jury Instructions, Instr. 1-11; <u>see</u> <u>also</u> <u>Nye & Nissen v. United States</u>, 336 U.S. 613, 618-19 (1949) (discussing the standard for aiding and abetting culpability); <u>United States v. Hamilton</u>, 334 F.3d 170, 180 (2d Cir. 2003) (discussing the standard for aiding and abetting under 18 U.S.C. § 2).

REQUEST NO. 5
All Available Evidence Need Not Be Produced

The law does not require any party to call as witnesses all persons who may

have been present at any time or place involved in the case, or who may appear to have some

knowledge of the matter in issue at this trial.  Nor does the law require any party to produce

as exhibits all papers and things mentioned during the course of the trial.

Authority

Adapted from E. Devitt & C. Blackmar, Federal Jury
Practice and Instructions, Instruction No. 72.11 (3d ed. 1977).

REQUEST NO. 6
Interviews of Witnesses

There was testimony at trial that attorneys for the government and the

defendant interviewed witnesses when preparing for trial.  You should not draw any

unfavorable inference from that testimony.  To the contrary, the attorneys were obligated to

prepare this case as thoroughly as possible and might have been derelict in the performance

of their duties if they failed to interview witnesses before this trial began and as necessary

throughout the course of the trial.


Authority

Adapted from the charge of the Hon. Sterling Johnson, United States v.
Scalisi, 10 CR 46 (SJ); charge of the Hon. Kiyo A. Matsumoto, United
States v. Barret, et al., 10 CR 806 (KAM).

11

REQUEST NO. 7
Uncalled Witness Equally Available to Both Sides

Both the government and the defense have the same power to subpoena witnesses to testify on their behalf.  If a potential witness could have been called by the government or by the defendant and neither called the witness, then you may draw the conclusion that the testimony of the absent witness might have been unfavorable to the government or to the defendant or to both.

On the other hand, it is equally within your province to draw no inference at all from the failure of either side to call a witness.

You should remember that there is no duty on either side to call a witness whose testimony would be merely cumulative of testimony already in evidence, or who would merely provide additional testimony to facts already in evidence.

Authority

Adapted from L. Sand, et al., Modern Federal Jury Instructions, Instruction 6-7; see generally United States v. Erb, 543 F.2d 438, 444-45 (2d Cir.) (discussing propriety of missing witness charges), cert. denied, 429 U.S. 981 (1976).

12

<u>REQUEST NO. 8</u>
<u>Opinion of Defendant's Character</u>
(If Applicable)

The defendant has called witnesses who have given their opinion of his good character.  This testimony is not to be taken by you as the witness's opinion as to whether the defendant is guilty or not guilty.  That question is for you alone to determine.

You should, however, consider this character evidence together with all the other facts and all the other evidence in the case in determining whether the defendant is guilty or not guilty of the charges.

Accordingly, if after considering all the evidence including testimony about the defendant's good character, you find a reasonable doubt has been created, you must acquit him of the charges.

On the other hand, if after considering all the evidence, including that of defendant's character, you are satisfied beyond a reasonable doubt that the defendant is guilty, you should not acquit the defendant merely because you believe him to be a person of good character.


<u>Authority</u>

Adapted from L. Sand, <u>et al.</u>, <u>Modern Federal Jury Instructions</u>,
Instruction No. 5-15.

13

REQUEST NO. 9
Uncharged Acts Considered for a Limited Purpose
(If Applicable)

You have heard evidence that the defendant engaged in conduct, including

crimes, other than the crimes charged in the Indictment.  The defendant is not on trial for

committing any acts not charged in the Indictment or for acts committed outside the time

periods charged in each count of the Indictment.  Consequently, you may not consider

evidence of those other acts as a substitute for evidence that the defendant committed the

crimes charged in this case.  Nor may you consider evidence of those other acts as proof that

the defendant has a criminal propensity; that is, you may not conclude that he likely

committed the crimes charged in the Indictment because he was predisposed to criminal

conduct.

Instead, you may consider evidence of uncharged conduct by the defendant for

limited purposes, and you may consider it only for the following limited purposes, which I

will now describe. You may only consider evidence of uncharged conduct:

- As evidence of the existence of the charged enterprise and as evidence that the
  enterprise engaged in racketeering activity;

- As evidence of the Defendant's position or role within the enterprise;

- As evidence of the development of relationships of mutual trust between the
  defendant and others with whom he is charged with carrying out the charged crimes;

- As evidence of conduct that is inextricably intertwined with evidence of the charged
  crimes;

- As evidence enabling you to understand the complete story of the charged crimes;

- As evidence of a modus operandi formed by the defendant and his accomplices to commit the charged crimes; and

- As evidence corroborating the testimony of other government witnesses.

Evidence of uncharged conduct by the defendant may not be considered by you for any purpose other than the ones I have just listed.


<u>Authority</u>

Adapted from the charge of the Hon. Kiyo A. Matsumoto, <u>United States v. Rivera, et al.</u>, 13 CR 149 (KAM); Hon. Nicholas G. Garaufis, <u>United States v. Raniere</u>, 18 CR 204 (NGG).

REQUEST NO. 10
Impeachment by Prior Inconsistent Statement
(If Applicable)

You have heard evidence that a witness made a statement on an earlier occasion which counsel argues is inconsistent with the witness's trial testimony. Evidence of the prior inconsistent statement was placed before you for the limited purpose of helping you decide whether to believe the trial testimony of the witness who contradicted himself or herself. If you find that the witness made an earlier statement that conflicts with his/her trial testimony, you may consider that fact in deciding how much of his/her trial testimony, if any, to believe.

In making this determination, you may consider whether the witness purposely made a false statement or whether it was an innocent mistake; whether the inconsistency concerns an important fact, or whether it had to do with a small detail; whether the witness had an explanation for the inconsistency, and whether that explanation appealed to your common sense.

It is exclusively your duty, based upon all the evidence and your own good judgment, to determine whether the prior statement was inconsistent, and if so how much, if any weight should be given to the inconsistent statement in determining whether to believe all, part, or none of the witness's testimony.

16

REQUEST NO. 11
Jury to Consider Only Defendant on Trial

You have heard evidence about the involvement of certain other people in the crimes charged.  You may not draw any inference, favorable or unfavorable, towards the government or the defendant from the fact that certain persons are not on trial before you. That these other individuals are not on trial before you is not your concern.  You should neither speculate as to the reason these other people are not on trial before you nor allow their absence as parties to influence in any way your deliberations in this case.  Nor should you draw any inference from the fact that any other person is not present at this trial.  Your concern is solely the defendant on trial before you.

Authority

Adapted from the charge of the Hon. Kiyo A. Matsumoto, United States v. Rivera, et al., 13 CR 149 (E.D.N.Y.); L. Sand, et al., Modern Federal Jury Instructions, Instruction 2-18.

REQUEST NO. 12
Expert Testimony

You have heard the testimony of what we call expert witnesses in this case. Ordinarily, witnesses are restricted to testifying concerning matters of fact. There are occasions, however, when there is some technical or other specialized area of knowledge that will assist the jury in deciding a disputed fact. On those occasions, a witness who is specially qualified by training, knowledge, experience, or education may be called to testify about some evidence or facts in issue in the form of an opinion.

In weighing expert testimony, you may consider the expert's qualifications, the opinion given, the witness's reasons for testifying, as well as all the other considerations that ordinarily apply when you are deciding whether or not to believe a witness. You may give expert testimony whatever weight, if any, you find it deserves in light of all the other evidence before you. You should not, however, accept a witness's testimony merely because he or she is an expert in a field. Nor should you substitute it for your own reason, judgment and common sense. The determination of the facts in this case rests solely with you.

In short, the opinion of an expert witness is in all respects the same as the testimony of any other witness. Give it such weight as you think it deserves.

Authority

Adapted from the charge of the Hon. David G. Trager, United States v. McKenzie, 94 CR 469 (E.D.N.Y.); L. Sand, et al., Modern Federal Jury Instructions, Instruction 7-21.

18

REQUEST NO. 13
Particular Investigative Techniques Not Required

You have heard reference, in the arguments of defense counsel in this case, to the fact that certain investigative techniques were not used by the government.  There is no legal requirement, however, that the government prove its case through any particular means.  While you are to carefully consider the evidence adduced by the government, you are not to speculate as to why they used the techniques they did or why they did not use other techniques.  The government is not on trial.  Law enforcement techniques are not your concern.

Your concern is to determine whether or not, on the evidence or lack of evidence, the defendant's guilt has been proved beyond a reasonable doubt.

Authority

Adapted from charge of Hon. Joseph Bianco, United States v. Kwame Richardson, 09 CR 874 (E.D.N.Y.).

REQUEST NO. 14
Venue

Venue refers to the location of the charged crimes.  Each count of the

indictment alleges that the crime charged occurred in whole or in part in this judicial district,

which is the Eastern District of New York.  This district includes Brooklyn, Queens, Staten

Island, Nassau and Suffolk counties on Long Island, and the waters surrounding Manhattan.

To establish a venue for a crime in this district, the government must prove that some act in

furtherance of the crime happened in the Eastern District of New York.  With respect to

Count One, the racketeering count, the government need only prove that some act in

furtherance of the racketeering offense happened in the Eastern District of New York, and

need not prove that any or all of the alleged racketeering acts happened in the Eastern

District of New York.

Unlike the other elements, the government must prove venue only by a

preponderance of the evidence, that is, it is more likely than not that some act in furtherance

of the crimes occurred in Brooklyn, Queens, Staten Island, Long Island, or the waters

surrounding Manhattan.

<u>REQUEST NO. 15</u>
<u>Count One: Racketeering</u>

Count One of the Indictment charges the defendant with violating the

Racketeer Influenced and Corrupt Organizations Act.  Count One reads as follows:

> In or about and between January 1994 and the present, both
> dates being approximate and inclusive, within the Eastern
> District of New York and elsewhere, the defendant ROBERT
> SYLVESTER KELLY, also known as "R. Kelly," together with
> others, being a person employed by and associated with the
> Enterprise, an enterprise that engaged in, and the activities of
> which affected, interstate and foreign commerce, did knowingly
> and intentionally conduct and participate, directly and indirectly,
> in the conduct of the affairs of the Enterprise through a pattern
> of racketeering activity, as defined in Title 18, United States
> Code, Sections 1961(1) and 1961(5), consisting of the
> racketeering acts set forth below.

The relevant provision of the racketeering statute reads as follows:

> It shall be unlawful for any person employed by or associated
> with any enterprise engaged in, or the activities of which affect,
> interstate or foreign commerce, to conduct or participate,
> directly or indirectly, in the conduct of such enterprise's affairs
> through a pattern of racketeering activity . . . .

To prove this crime, the government must prove five elements beyond a

reasonable doubt.

<u>First,</u>    An enterprise, as described in the Indictment, existed
on or about the time alleged in the Indictment;

<u>Second,</u>    The enterprise engaged in, or its activities affected,
interstate or foreign commerce;

<u>Third,</u>    The defendant was employed by or was associated
with the enterprise;

<u>Fourth,</u>    The defendant knowingly conducted or participated,
either directly or indirectly, in the conduct of the
affairs of the enterprise; and

<u>Fifth</u>,      The defendant knowingly participated in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as described in the Indictment; that is, through the commission of at least two of the charged racketeering acts, the last of which must have occurred within ten years after the commission of a prior racketeering act, or through causing or aiding and abetting the commission of two such racketeering acts.

I will now explain each of these elements in greater detail.

I.     <u>First Element: The Existence of the Enterprise</u>

The first element the government must prove beyond a reasonable doubt is that an enterprise existed.  The Indictment alleges the existence of the following enterprise:

<u>The Enterprise</u>

1.     The defendant ROBERT SYLVESTER KELLY, also known as "R. Kelly," and individuals who served as managers, bodyguards, drivers, personal assistants and runners for KELLY, as well as members of KELLY's entourage, comprised an enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4), that is, the Enterprise constituted a group of individuals associated in fact that was engaged in, and the activities of which affected, interstate and foreign commerce.  The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.

2.     The purposes of the Enterprise were to promote R. Kelly's music and the R. Kelly brand, to recruit women and girls to engage in illegal sexual activity with KELLY and to produce pornography, including child pornography.  By promoting R. Kelly's music and the R. Kelly brand, the members of the Enterprise expected to receive financial opportunities and personal benefits, including increased power and status within the Enterprise.

3.     In connection with the Enterprise, KELLY and other members of the Enterprise traveled throughout the United States and abroad to perform at concert venues, to promote the R. Kelly brand and to recruit women and girls to engage in illegal sexual activity with KELLY.

4.     When KELLY attended and performed at concerts and other events, KELLY and/or members of the Enterprise on KELLY's behalf invited women and girls backstage and to other events following KELLY's live

performances.  These women and girls were often offered wristbands that signified that they were authorized to attend an event.  There, KELLY relied upon members of the Enterprise to ensure that only those authorized to attend were allowed at the event and to manage the flow of women and girls who were directly interacting with KELLY.

5.      When KELLY identified a woman or girl who he wished to see again, he either gave his contact information to the woman or girl or obtained her contact information or relied upon members of the Enterprise to do so.  Following these events, KELLY communicated with certain of these women and girls by telephone, including through the use of traditional telephone calls, text messages, iMessages and FaceTime.  As part of this communication, KELLY often requested that the women and girls provide him with photographs of themselves.

6.      KELLY and other members of the Enterprise also arranged for the women and girls to travel to see KELLY on occasion, including at concerts throughout the United States and related events.  To facilitate their travel, KELLY directed the women and girls to contact a member of the Enterprise, who then arranged travel for the women and girls.  When the women and girls arrived at the lodging, which was typically selected by a member of the Enterprise, a member of the Enterprise usually provided them with instructions.  In addition, members of the Enterprise took steps to ensure that the women and girls did not interact with other women and girls whom KELLY planned to see.  Members of the Enterprise then arranged for the women and girls to attend his concerts and positioned them such that KELLY could see them during his concerts.

7.      KELLY promulgated numerous rules that many of his sexual partners were required to follow, including the following:

(a)      The women and girls were not permitted to leave their room without receiving permission from KELLY, including to eat or go to the bathroom;

(b)      The women and girls were required to wear baggy clothing when they were not accompanying KELLY to an event or unless otherwise instructed by KELLY;

(c)      The women and girls were not permitted to look at other men and instead were told to keep their heads down; and

(d)      The women and girls were required to call KELLY "Daddy."

8.      The Enterprise operated within the Eastern District of New York and elsewhere, including overseas.

<u>Methods and Means of the Enterprise</u>

9.      Among the means and methods by which KELLY and his associates participated in the conduct of the affairs of the Enterprise were the following:

(a)      Committing, attempting and aiding and abetting the commission of crimes and conspiring to commit crimes, including but not limited to engaging in sexual activity with girls under 18 years old, engaging in and facilitating sexual activity without disclosing a sexually transmitted disease KELLY had contracted, producing child pornography, bribery, extortion, coercion and blackmail;

(b)      Demanding absolute commitment to KELLY and not tolerating dissent;

(c)      Obtaining sensitive information about sexual partners and members and associates of the Enterprise to maintain control over them;

(d)      Creating embarrassing and degrading videos of sexual partners to maintain control over them;

(e)      Recruiting and grooming sexual partners for KELLY; and

(f)      Isolating women and girls from friends and family and making them dependent on KELLY for their financial wellbeing.


The term "enterprise" as used in these instructions may include any group of

people associated in fact, even though this association is not recognized as a legal entity.

Thus, an enterprise need not be a formal business entity such as a corporation, but may be

merely an informal association of individuals.  The term enterprise includes legitimate and

illegitimate enterprises.[1]  An enterprise can be a vehicle used by a defendant to commit

crimes.[2]

The "enterprise" does not have to have a particular name, or, for that matter,

any name at all.  Nor must it be registered or licensed as an enterprise, or be a commonly

---

[1]      <u>United  States v. Turkette</u>, 452 U.S. 576, 585 (1981).

[2]      <u>Nat'l Org. for Women, Inc. v. Scheidler</u>, 510 U.S. 249, 259 (1994).

recognized legal entity such as a corporation, a partnership, a business, or the like.  A group

or association of people can be an "enterprise" if these individuals have "associated together

for a common purpose of engaging in a course of conduct."[3]  Mere similarity of conduct or

the fact that individuals may have assembled together and discussed common aims and

interests does not necessarily establish proof of the existence of an enterprise, though you

may consider such factors.   Such an association of persons may be established by evidence

showing an ongoing organization, formal or informal, and by evidence that the people

making up the association functioned as a continuing unit.

The government must prove an association-in-fact enterprise existed by

evidence of an ongoing organization, formal or informal, and by evidence that the various

associates functioned as a continuing unit.  The enterprise must have the three following

structural features: (1) a purpose; (2) relationships among those associated with the

enterprise; and (3) longevity sufficient to permit these associates to pursue the enterprise's

purpose.[4]

It is not necessary that the enterprise have any particular or formal structure,

but it must have sufficient organization that its members functioned and operated in a

coordinated manner in order to carry out the alleged common purpose or purposes of the

enterprise.  Such a group need not have a hierarchical structure or a "chain of command";

decisions may be made on an *ad hoc* basis and by any number of methods – by majority

vote, consensus, a show of strength, etc.  Members of the group need not have fixed roles;

---

[3]      Turkette, 452 U.S. at 583.

[4]      Boyle v. United States, 556 U.S. 938, 945-46 (2009).

25

different members may perform different roles at different times.  The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or initiation procedures.[5]

While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, you may nonetheless find that the enterprise element is satisfied by finding the existence of a group whose associates engage in spurts of activity punctuated by periods of inactivity.[6]

Thus, an enterprise need not have role differentiation, a unique *modus operandi*, a chain of command, sophistication of organization, diversity and complexity of crimes, uncharged or additional crimes aside from the alleged racketeering activity, or an enterprise name.  Moreover, an enterprise is not required to be "business-like" in its form or function, and it may, but need not, have an economic or profit-seeking motive.  Indeed, RICO is not limited to groups whose crimes are sophisticated, diverse, complex, or unique.[7]

Such an association of individuals may retain its status as an "enterprise" even though the membership of the association changes over time by adding or losing individuals during the course of its existence.  The existence of the enterprise continues even if there is a gap or interruption of the enterprise's racketeering activities.[8]

---

[5]    See id. at 945-46.

[6]    Id. at 948.

[7]    Id.

[8]    United States v. Payne, 591 F.3d 46, 60 (2d Cir. 2010); see also United States v. Olson, 450 F.3d 655, 668 (7th Cir. 2006); United States v. Perholtz, 842 F.2d 343, 362-63 (D.C. Cir. 1988).

Although whether an enterprise existed is a distinct element that must be proved by the government, common sense dictates that the existence of an enterprise is oftentimes more readily proven by what it does rather than by an abstract analysis of its structure.  Thus, the evidence used to prove the pattern of racketeering and the enterprise may coalesce.  Therefore, you may consider proof of the racketeering acts to determine whether the evidence establishes the existence of an enterprise, and further, you may infer the existence of an enterprise from evidence of the pattern of racketeering activity.[9]

The government is not required to prove each and every allegation about the enterprise or the manner in which the enterprise operated.  The enterprise proved, however, must be essentially the one alleged in the Indictment.

## II.   The Second Element: Effect on Interstate or Foreign Commerce

The second element that the government must prove beyond a reasonable doubt is that the enterprise was engaged in or had an effect on interstate or foreign commerce, even if it was only a minimal effect.

Interstate commerce means trade or conducting business or travel between one state and another state or the District of Columbia; and foreign commerce means such trade, business or travel between the United States and another country.  Therefore, interstate and foreign commerce may include the movement of money, goods, services or persons from one state to another state or the District of Columbia or between the United States and another country.  This may include, among other matters, the purchase or sale of goods or supplies from outside the United States, the use of interstate or international mail or wire facilities, or

---

[9]      Boyle, 556 U.S. at 951; Turkette, 452 U.S. at 583.

the causing of any of those things.  The government need not prove that the acts of the defendant affected interstate commerce or that the defendant knew he was affecting interstate commerce.

Regarding that alternative method of satisfying this element, to establish the requisite effect on interstate or foreign commerce, the government is not required to prove a significant or substantial effect on interstate or foreign commerce.  This element, which simply ensures federal jurisdiction over the conduct, is satisfied if even a minimal effect on interstate or foreign commerce is shown.  The effect need not be direct.  Any effect, even if it is postponed, indirect, or slight, is sufficient to satisfy the interstate commerce element.  It does not matter whether the effect is harmful or beneficial to interstate commerce.  Moreover, it is not necessary for the government to prove that the defendant knew that the enterprise would affect interstate or foreign commerce, that the defendant intended to affect interstate or foreign commerce, or that the defendant engaged in, or his activities affected, interstate or foreign commerce.

I instruct you that it makes no difference whether the type of interstate commerce affected is legal or illegal.

It is not necessary for the government to prove that the individual racketeering acts themselves affected interstate or foreign commerce; rather, it is the enterprise and its activities considered in their entirety that must be shown to have had that effect.  On the other hand, this effect on interstate or foreign commerce may be established through the effect caused by the individual racketeering acts.

III.    Third Element: Association with or Employment by the Enterprise

         The third element that the government must prove beyond a reasonable doubt

is that the defendant was associated with or employed by the enterprise at some time during

the period charged in the Indictment.  "Associated with" should be given its plain meaning.

"Associate" means "to join, often in a loose relationship as a partner, fellow worker,

colleague, friend, companion or ally . . . to join or connect with one another."  Therefore, a

person is "associated with" an enterprise when, for example, he joins with other members of

the enterprise and he knowingly aids or furthers the activities of the enterprise, or he

conducts business with or through the enterprise.  The defendant need not have been a

member of or associated with the enterprise for the entire period of its existence, but the

defendant must have been associated with the enterprise at the time he allegedly committed

the crimes charged.  That is, the government must prove that the defendant was connected to

the enterprise in some meaningful way and that he knew of the existence of the enterprise

and of the general nature of its activities.  A person cannot be associated or employed by an

enterprise if he does not know of the enterprise's existence or the nature of its activities.

IV.    Fourth Element: Participation in Enterprise through Pattern of Racketeering

         The fourth element that the government must prove is that the defendant

knowingly conducted or participated, either directly or indirectly, in the conduct of the

affairs of the enterprise.

         This means that the defendant must have played some part in the operation or

management in the enterprise and that the defendant intentionally performed acts, functions

or duties that are necessary to, or helpful in, the operation of the enterprise.  Thus, if the

defendant participated in the operation or management of the enterprise itself or he had some

29

part in directing the enterprise's affairs, that would satisfy this element.  In other words, all who participate in the conduct of the enterprise, whether they are generals or foot soldiers, are responsible for the affairs of the enterprise.

V.    Fifth Element: Pattern of Racketeering Activity

The fifth element the government must prove beyond a reasonable doubt is that the defendant engaged in a pattern of racketeering activity.  The term "racketeering activity" is defined to mean the commission of certain crimes.  A "pattern of racketeering activity" generally means the following:

First, the defendant intentionally committed, or caused, or aided and abetted the commission of, two or more of the racketeering acts alleged in the Indictment, the last of which must have occurred within ten years after the commission of a prior racketeering act. Your verdict must be unanimous as to which specific racketeering acts you find that the defendant committed, caused, or aided and abetted.  Shortly, I will instruct you on the elements regarding each of the alleged racketeering acts.

Second, the racketeering acts must have a "nexus" to the enterprise and the racketeering acts must be "related."  A racketeering act has a "nexus" to the enterprise if it has a meaningful connection to the enterprise.  To be "related," the racketeering acts must have the same or similar purposes, results, participants, victim, or methods of commission, or be otherwise interrelated by distinguishing characteristics and not be merely isolated events. Two racketeering acts may be "related" even though they are dissimilar or not directly related to each other, provided that the racketeering acts are related to the same enterprise. For example, for both "nexus" and "relatedness" purposes, the requisite relationship between the RICO enterprise and a predicate racketeering act may be established by evidence that the

defendant was enabled to commit the racketeering act solely by virtue of his position in the

enterprise or involvement in or control over its affairs, or by evidence that the defendant's

position in the enterprise facilitated his commission of the racketeering act, or by evidence

that the racketeering act benefitted the enterprise, or by evidence that the racketeering act

was authorized by the enterprise or by evidence the racketeering act promoted or furthered

the purposes of the enterprise.

Third, the racketeering acts themselves either extended over a substantial

period of time or posed a threat of continued criminal activity.  The government need not

prove such a threat of continuity by any mathematical formula or by any particular method of

proof, but rather may prove it in a variety of ways.  For example, the threat of continued

unlawful activity may be established when the evidence shows that the racketeering acts are

part of a long-term association that exists for criminal purposes or when the racketeering acts

are shown to be the regular way of conducting the affairs of the enterprise.

Moreover, in determining whether the government has proven the threat of

continued unlawful activity, you are not limited to consideration of the specific racketeering

acts charged against the defendant; rather, in addition to considering such acts you also may

consider the nature of the enterprise, and other unlawful activities of the enterprise and its

members viewed in their entirety, including both charged and uncharged unlawful activities.

I will now explain the law governing the eleven racketeering acts that the government has alleged.  As a reminder, you must render separate verdicts of proven or not proven with regard to each of these alleged racketeering acts on the verdict sheet under Count One.

<u>Authority</u>

Adapted from the charges in <u>United States v. Herron</u>, 10-CR-615 (NGG) (E.D.N.Y.); <u>United States v. Napout</u>, 15-CR-252 (PKC) (E.D.N.Y.); and <u>United States v. Coppola</u>, 08-CR-763 (JG) (E.D.N.Y.); <u>Boyle v. United States</u>, 556 U.S. 938, 945-46 (2009); <u>Nat'l Org. for Women, Inc. v. Scheidler</u>, 510 U.S. 249, 259 (1994); <u>United  States v. Turkette</u>, 452 U.S. 576, 585 (1981); <u>see also United States v. Payne</u>, 591 F.3d 46, 60 (2d Cir. 2010); <u>see also</u> <u>United States v. Olson</u>, 450 F.3d 655, 668 (7th Cir. 2006); <u>United States v. Perholtz</u>, 842 F.2d 343, 362-63 (D.C. Cir. 1988).

<u>REQUEST NO. 16</u>
<u>Racketeering Act One</u>

Racketeering Act One charges defendant with bribery.  It reads:

On or about August 30, 1994, within the Northern District of Illinois,
the defendant ROBERT SYLVESTER KELLY, together with others,
did knowingly and intentionally cause another individual to promise
and tender to a public officer and public employee property, to wit:
Unites States currency, that such public officer and public employee
was not authorized by law to accept, with the intent to influence the
performance of an act related to the employment and function of a
public officer and public employee, to wit: the creation of a fraudulent
identification document for Jane Doe #1, an individual whose identity
is known to the Grand Jury, in violation of Illinois Criminal Code
Sections 5/33-1(a) and 5/5-1.

Illinois Criminal Code Section 5/33-1(a) provides, in pertinent part, that:

A person commits bribery when . . . with intent to influence the
performance of any act related to the employment and function
of any public officer [or] public employee . . . , he promises or
tenders to that person any property which he is not authorized
by law to accept.

The government must prove beyond a reasonable doubt each of the following

elements:

> <u>First</u>,      That the person the defendant sought to influence
>             was a public officer or public employee;

> <u>Second</u>,    That the defendant caused another person to promise
>             or tender property to the person the defendant sought
>             to influence; and

> <u>Third</u>,      That the defendant did so with the intent to influence
>             the performance of any act related to that person's
>             employment or function as a public officer or public
>             employee.

The term "public officer" means a person who is appointed to an office which is established,

and the qualifications and duties of which are prescribed by statute, to discharge a public

duty for any political subdivision of the State of Illinois.  The term "public employee" is a

person who is authorized to perform an official function on behalf of, and is paid by the State

of Illinois or any political subdivision thereof.  The term "tender" means any delivery or

proffer made with the requisite intent.  A mere offer or promise with the requisite intent is

sufficient to constitute bribery under Illinois law.  I instruct you that United States currency

constitutes property under Illinois law.


<u>Authority</u>

Illinois Pattern Jury Instructions – Criminal 21.11 and 21.12;
<u>United States v. Genova</u>, 167 F. Supp. 2d 1021, 1040-41 (N.D.
Il. 2001) ("A mere offer or promise with requisite intent is
sufficient to constitute bribery under Illinois law.").

REQUEST NO. 17
Racketeering Act Two

Racketeering Act Two charges defendant with sexual exploitation of a child.

It reads:

> In or about and between May 1999 and October 15, 1999, both dates being approximate and inclusive, within the Northern District of Illinois, the defendant ROBERT SYLVESTER KELLY, together with others, did knowingly and intentionally employ, use, persuade, induce, entice and coerce a minor, to wit: Jane Doe #2, an individual whose identity is known to the Grand Jury, to engage in sexually explicit conduct for the purpose of producing one or more visual depictions of such conduct, which visual depictions were produced using materials that had been mailed, shipped and transported in interstate and foreign commerce, in violation of Title 18, United States Code, Sections 2251(a) … and 2.

Title 18, United States Code, Section 2251 provides, in pertinent part, that:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, shall be punished . . . , if such person knows or has reason to know that such visual depiction will be transported in interstate or foreign commerce or mailed, if that visual depiction was produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported in interstate or foreign commerce or mailed.

To prove the defendant committed this racketeering act, the government must prove the following three elements beyond a reasonable doubt:

First,    that Jane Doe #2 was under the age of 18 at the time of the acts alleged in the Indictment;

Second,   that the defendant used, employed, persuaded, induced, or enticed Jane Doe #2 to take part in sexually explicit conduct for the purpose of producing or transmitting a visual depiction of that conduct; and

35

<u>Third</u>,    that the visual depiction was to be mailed or
transported or transmitted in or affecting interstate or
foreign commerce or using a facility of interstate and
foreign commerce or produced using materials that
had been mailed, shipped, or transported in and
affecting interstate and foreign commerce.

As to the first element, the government must prove beyond a reasonable doubt
that Jane Doe #2 was less than 18 years old at the time of the acts alleged in the Indictment.
The government does not need to prove that the defendant knew that Jane Doe #2 was less
than 18 years old.

As to the second element, I instruct you that the words "used," "employed,"
"persuaded," "induced," and "enticed" are words of common usage, and I instruct you to
interpret these words by using your own common sense.  The words "persuade," "induce"
and "entice" are, in effect, synonyms that convey the idea of leading or moving another
person by persuasion as to some action, state of mind, etc., or to bring about, produce or
cause.

A "visual depiction" includes any photograph, film, video or picture, including
undeveloped film and videotape, data stored on computer disc or by electronic means which
is capable of conversion into a visual image or data that is capable of conversion into a visual
image that has been transmitted by any means.  A visual depiction includes a digitally
recorded photograph or video.

"Sexually explicit conduct" means, among other things, actual or simulated
sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether
between persons of the same or opposite sex; masturbation; or lascivious exhibition of the
genitals or pubic area of any person.

36

The term "lascivious exhibition" means a depiction that displays the genitals or pubic area of a child in order to excite lustfulness or sexual stimulation in the viewer.  Not every exposure of the genitals or pubic area constitutes lascivious exhibition.  In deciding whether a particular visual depiction constitutes a lascivious exhibition, you should consider the following questions:

- whether the focal point of the visual depiction is of the child's genitals or pubic area or whether there is some other focal area;

- whether the setting of the visual depictions makes it appear to be sexually suggestive, for example, in a place or pose generally associated with sexual activity;

- whether the child is displayed in an unnatural pose or in inappropriate attire, considering the age of the child;

- whether the child is fully or partially clothed or nude, although nudity is not in and of itself lascivious;

- whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;

- and whether the visual depiction was intended or designed to elicit a sexual response from the viewer.

It is not required that a particular visual depiction involve all of the factors that I have just listed for you.  The importance you give to any one factor is up to you to decide.

While the government must prove that the defendant acted with the purpose of producing a sexually explicit visual depiction, the government does not need to prove that a visual depiction of sexually explicit conduct was actually produced.  In deciding whether the government has proven that the defendant acted for the purpose of producing or transmitting a visual depiction of sexually explicit conduct, you may consider all of the evidence concerning the defendant's conduct.

37

Whether or not a minor consented to engage in sexually-explicit conduct is irrelevant, as the consent or voluntary participation of a minor is not a defense to the charge.

As to the third element of the underlying crime, I will further define what it means for a depiction to be transported or transmitted in or affecting interstate or foreign commerce or using a facility of interstate and foreign commerce or produced using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce.  If a visual depiction of sexually explicit conduct, as I have defined that term, is recorded or stored on a device that was made either outside the state where the visual depiction was made or in a foreign country, then that is sufficient to satisfy the interstate commerce element.  It is not necessary for the government to prove that the defendant knew that that the device had been made outside of the state where the visual depiction was made or in a foreign country.

<div align="center">Authority</div>

Adapted from the charges in United States v. Price, 17-CR-301 (NGG) (E.D.N.Y.); United States v. Pattee, 820 F.3d 496, 511 (2d Cir. 2016) (holding that the interstate commerce nexus of § 2251(a) is met when the pornography is produced with equipment manufactured outside of the state of the production of the pornography).

<u>REQUEST NO. 18</u>
<u>Racketeering Act Three: Kidnapping</u>

Racketeering Act Three charges defendant with kidnapping.  It reads:

In or about and between 2003 and 2004, both dates being
approximate and inclusive, within the Northern District of
Illinois and elsewhere, the defendant ROBERT SYLVESTER
KELLY, together with others, did knowingly and intentionally
secretly confine an individual, to wit: Jane Doe #3, an individual
whose identity is known to the Grand Jury, against her will, and
induce Jane Doe #3 by deceit and enticement to go from one
place to another with intent secretly to confine her against her
will, in violation of Illinois Criminal Code Sections 5/10-1….

Illinois Criminal Code Section 5/10-1 provides, in pertinent part, that:

Kidnap[p]ing occurs when a person knowingly: (1) [a]nd
secretly confines another against his will, or . . . (3) [b]y deceit
or enticement induces another to go from one place to another
with intent secretly to confine h[er] against h[er] will.

The government must prove beyond a reasonable doubt each of the following

elements:

<u>First</u>,    That the defendant acted knowingly; and

<u>Second</u>, That the defendant (i) secretly confined, or caused
another to secretly confine, Jane Doe #3 against her
will, or (ii) by deceit or enticement, induced
Jane Doe #3 to go from one place to another place, and
that when the defendant did so, he intended secretly to
confine Jane Doe #3 against her will.

Confinement is established where the victim has been clearly enclosed within something,

most commonly, a house or a car.  The secret confinement element of kidnapping may be

shown by proof of the secrecy of either the confinement or the place of confinement.  Put

another way, confinement is secret where it serves to isolate or insulate the victim from

meaningful contact or communication with the public, that is, when the confinement is in a

place or in a manner which makes it unlikely that members of the public will know or learn

of the victim's unwilling confinement within a reasonable period of time.

<u>Authority</u>

Illinois Pattern Jury Instructions – Criminal 8.02; <u>People v. Gonzalez</u>, 239 Ill. 2d 471, 479 (2011) ("Although the statute does not define secret confinement, this court has defined the term 'secret' as concealed, hidden, or not made public.  In turn, the term "confinement" is defined as the act of imprisoning or restraining someone.  It is settled that the secret confinement element of kidnapping may be shown by evidence of the secrecy of the confinement or the secrecy of the location of the confinement."); <u>People v. Quintana</u>, 332 Ill. App. 3d 96, 104 (1st Dist. 2002) ("'Secret' denotes concealed, hidden, or not made public.  Confinement is established where the victim has been clearly enclosed within something, most commonly, a house or a car."); 3 Wayne R. LaFave, Substantive Criminal Law § 18.1(c), at 17 (2d ed. 2003) (confinement is "secret where it serves to isolate or insulate the victim from meaningful contact or communication with the public, that is, when the confinement is in a place or in a manner which makes it unlikely that members of the public will know or learn of the victim's unwilling confinement within a reasonable period of time").

40

<u>REQUEST NO. 19</u>
<u>Racketeering Act Four: Mann Act</u>

Racketeering Act Four alleges that the defendant committed two separate

violations of the Mann Act, one related to transportation and the other involving coercion or

enticement.  Thus, Racketeering Act Four has two parts, and you will render separate

verdicts on each part.  If you find that the defendant committed either or both of these two

crimes, you must find that the government has proven Racketeering Act Four.

A.    <u>Racketeering Act 4A</u>

The first part, which is referred to on the verdict sheet as Racketeering Act 4A,

alleges that the defendant transported Jane Doe #3 for the purpose of engaging in illegal

sexual activity.  With respect to Racketeering Act 4A, the Indictment reads as follows:

> In or about and between 2003 and 2004, both dates being
> approximate and inclusive, within the Northern District of
> Illinois and elsewhere, the defendant ROBERT SYLVESTER
> KELLY, together with others, did knowingly and intentionally
> transport an individual, to wit: Jane Doe #3, in interstate
> commerce, with intent that such individual engage in sexual
> activity for which a person can be charged with a criminal
> offense, to wit: violations of Illinois Criminal Code Sections
> 5/12-16(a)(6) (effective 2002) (aggravated criminal sexual
> abuse), 5/12-16(a)(7) (effective 2002) (aggravated criminal
> sexual abuse) and 5/12-15(a)(2) (effective 2000) (criminal
> sexual abuse), in that KELLY engaged in sexual conduct with
> Jane Doe #3, to wit: directly touching and fondling Jane Doe
> #3's sex organs for the purpose of his sexual gratification, (i)
> during the commission of a kidnapping of Jane Doe #3,
> knowing that Jane Doe #3 was unable to give knowing consent;
> (ii) as part of the same course of conduct as delivery of a
> controlled substance to Jane Doe #3, knowing that Jane Doe #3
> was unable to give knowing consent; and (iii) knowing that Jane
> Doe #3 was unable to give knowing consent, in violation of
> Title 18, United States Code, Sections 2421 (effective 1998) and
> 2.

The Indictment charges the defendant with violating section 2421 of Title 18 of the United States Code.  That section provides in relevant part:

> Whoever knowingly transports any individual in interstate . . . commerce . . . with intent that such individual engage … in any sexual activity for which any person can be charged with a criminal offense . . . shall be [guilty of a crime].

In order to prove the defendant guilty of transporting an individual for the purpose of engaging in illegal sexual activity, the government must prove each of the following elements beyond a reasonable doubt:

First,   That the defendant knowingly transported, or caused the transportation of, Jane Doe #3 in interstate commerce as alleged in the Indictment; and

Second,   That the defendant transported Jane Doe #3 with the intent that he would engage in sexual activity with Jane Doe #3 and that for that sexual activity, a person can be charged with a criminal offense.

The first element that the government must prove beyond a reasonable doubt is that the defendant knowingly transported, or caused the transportation of, Jane Doe #3 in interstate commerce, as alleged in the Indictment.  This means that the government must prove that the defendant knew both (i) that he was transporting, or causing the transportation of, Jane Doe #3 and (ii) that he was transporting Jane Doe #3, or causing the transportation of, in interstate commerce.  To act knowingly means to act voluntarily and intentionally and not because of accident, mistake or other innocent reason.

"Interstate commerce" means simply movement between one state and another.  The government does not have to prove that the defendant personally transported Jane Doe #3 across a state line.  It is sufficient to satisfy this element that defendant was

42

actively engaged in or caused the making of the travel arrangements, such as by purchasing, or causing the purchase of, the ticket necessary for the individual to travel as planned.[10]

The second element that the government must prove beyond a reasonable doubt is that defendant transported, or caused the transportation of, Jane Doe #3 with the intent that he would engage in sexual activity with Jane Doe #3 and that a person could be charged with a criminal offense for that sexual activity.  Direct proof of a person's intent is almost never available.  It would be a rare case where it could be shown that a person wrote or stated that as of a given time he committed an act with a particular intent.  Such direct proof is not required.  The ultimate fact of intent, though subjective, may be established by circumstantial evidence, based upon the defendant's outward manifestations, his words, his conduct, his acts and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn from them.

In order to establish this element, it is not necessary for the government to prove that engaging in illegal sexual activity was the sole purpose for crossing the state line.  A person may have several different purposes or motives for such travel, and each may prompt in varying degrees the act of making the journey.  The government must prove beyond a reasonable doubt, however, that a significant or motivating purpose of the travel across a state line was that the defendant would engage in illegal sexual activity with Jane Doe #3.  In other words, that illegal activity must not have been merely incidental to the trip.

---

[10] United States v. Holland, 381 F.3d 80, 86-87 (2d Cir. 2004) ("We cannot agree with the proposition that an operator of a prostitution ring may escape liability by accepting a bus company's offer to "Leave the Driving to Us."  Inviting travel, purchasing tickets, and accompanying individuals on trips is more than sufficient to establish that a defendant 'transport[ed]' the individuals within the meaning of Section 2421.").

The Indictment alleges that "KELLY engaged in sexual conduct with Jane Doe #3, to wit: directly touching and fondling Jane Doe #3's sex organs for the purpose of his sexual gratification, (i) during the commission of a kidnapping of Jane Doe #3, knowing that Jane Doe #3 was unable to give knowing consent; (ii) as part of the same course of conduct as delivery of a controlled substance to Jane Doe #3, knowing that Jane Doe #3 was unable to give knowing consent; and (iii) knowing that Jane Doe #3 was unable to give knowing consent" and that this conduct violated Illinois Criminal Code Sections 5/12-16(a)(6) (effective 2002) (aggravated criminal sexual abuse), 5/12-16(a)(7) (effective 2002) (aggravated criminal sexual abuse) and 5/12-15(a)(2) (effective 2000) (criminal sexual abuse).  The Indictment alleges that the defendant violated three different state laws.  If you find that the conduct for which the defendant transported, or caused the transportation of, Jane Doe #3 violated <u>any</u> of these three laws, then you must find that this element is satisfied, but you must be unanimous as to which law was violated.

Illinois Criminal Code Section 5/12-15(a)(2) provides that a person commits criminal sexual abuse, a crime, if he "commits an act of sexual conduct and the accused knew that the victim was unable to understand the nature of the act or was unable to give knowing consent."  To provide a violation of Section 5/12/-15(a)(2), the government must prove the following two elements beyond a reasonable doubt.

<u>First</u>,   That the defendant committed an act of sexual conduct upon Jane Doe #3; and

<u>Second</u>,   That the defendant knew that Jane Doe #3 was unable to understand the nature of the act or give knowing consent to the act.

44

"'Sexual conduct' means any intentional or knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus or breast of the victim or the accused, . . . or any transfer or transmission of semen by the accused upon any part of the clothed or unclothed body of the victim, for the purpose of sexual gratification or arousal of the victim or the accused."  (ILCS 5/12-12(e)).

Illinois Criminal Code Section 5/12-16(a)(6) provides that a person commits aggravated sexual abuse, also a crime, if he commits criminal sexual abuse, as I just explained to you, and "the criminal sexual abuse was perpetrated during the course of the commission or attempted commission of any other felony by the accused."  I instruct you that kidnapping is a felony and you should apply those instructions here.

Illinois Criminal Code Section 5/12-16(a)(7) provides that a person commits aggravated sexual abuse, also a crime, if he commits criminal sexual abuse, as I just explained to you, and "the accused delivered (by injection, inhalation, ingestion, transfer of possession, or any other means) to the victim without his or her consent, or by threat or deception, and for other than medical purposes, any controlled substance."

B.    Racketeering Act 4B

The second part, which is referred to on the verdict sheet as Racketeering Act 4B, alleges that the defendant enticed or coerced Jane Doe #3 for the purpose of engaging in illegal sexual activity.  With respect to Racketeering Act 4B, the Indictment reads as follows:

> In or about and between 2003 and 2004, both dates being approximate and inclusive, within the Northern District of Illinois and elsewhere, the defendant ROBERT SYLVESTER KELLY, together with others, did knowingly and intentionally persuade, induce, entice and coerce an individual, to wit: Jane Doe #3, to travel in interstate commerce, to engage in sexual activity for which a person can be charged with a criminal

45

offense, to wit: violations of Illinois Criminal Code Sections 5/12-16(a)(6) (effective 2002) (aggravated criminal sexual abuse) 5/12-16(a)(7) (effective 2002) (aggravated criminal sexual abuse) and 5/12-15(a)(2) (effective 2000) (criminal sexual abuse), in that KELLY engaged in sexual conduct with Jane Doe #3, to wit: directly touching and fondling Jane Doe #3's sex organs for the purpose of his sexual gratification, (i) during the commission of a kidnapping of Jane Doe #3, knowing that Jane Doe #3 was unable to give knowing consent; (ii) as part of the same course of conduct as delivery of a controlled substance to Jane Doe #3, knowing that Jane Doe #3 was unable to give knowing consent; and (iii) knowing that Jane Doe #3 was unable to give knowing consent, in violation of Title 18, United States Code, Sections 2422(a) and 2.

Section 2422(a) of Title 18 of the United States Code provides in relevant part:

Whoever knowingly persuades, induces, entices, or coerces any individual to travel in interstate . . . commerce . . . to engage . . . in any sexual activity for which any person can be charged with a criminal offense . . . shall be [guilty of a crime].

In order to prove the defendant guilty of persuading or inducing or enticing or coercing an individual to travel for the purpose of engaging in illegal sexual activity, the government must prove each of the following elements beyond a reasonable doubt:

First,   That the defendant knowingly persuaded, induced, enticed or coerced Jane Doe #3 to travel in interstate commerce, as alleged in the Indictment;

Second,   That Jane Doe #3 traveled in interstate commerce; and

Third,   That the defendant acted with the intent that the defendant would engage in illegal sexual activity with Jane Doe #3.

With respect to the third element, the Indictment alleges that the defendant acted with the intent to engage in illegal sexual activity in violation of three different state laws. I have already instructed you regarding the provisions of Illinois Criminal Code Sections 5/12-15(a)(2), 5/12-16(a)(6), and 5/12-16(a)(7). You are to apply those instructions

46

here.  If you find the defendant acted with the intent that he would engage in conduct that violated <u>any</u> of these three laws, then you must find that this element is satisfied, but you must be unanimous as to which law he acted with the intent to violate.

REQUEST NO. 20
Racketeering Act Five: Mann Act

Racketeering Act Five alleges that the defendant, using an interstate facility,

enticed or coerced Jane Doe #4 to engage in illegal sexual activity, in violation of the Mann

Act.  The Indictment reads as follows:

> In or about and between May 2009 and January 2010, both dates
> being approximate and inclusive, within the Northern District of
> Illinois and elsewhere, the defendant ROBERT SYLVESTER
> KELLY, together with others, did knowingly and intentionally
> persuade, induce, entice and coerce an individual who had not
> attained the age of 18 years, to wit: Jane Doe #4, an individual
> whose identity is known to the Grand Jury, to engage in sexual
> activity for which a person can be charged with a criminal
> offense, to wit: violations of Illinois Criminal Code Section
> 5/12-16(d) (effective 2002) (aggravated criminal sexual abuse),
> in that KELLY engaged in sexual penetration of Jane Doe #4
> who was under 17 years of age, while he was more than five
> years older than Jane Doe #4, using one or more facilities and
> means of interstate commerce, in violation of Title 18, United
> States Code, Sections 2422(b) and 2.

The Indictment charges the defendant with violating section 2422(b) of Title

18 of the United States Code.  That section provides in relevant part:

> Whoever, using . . . any facility or means of interstate . . .
> commerce, … knowingly persuades, induces, entices, or coerces
> any individual who has not attained the age of 18 years, to
> engage in . . . any sexual activity for which any person can be
> charged with a criminal offense . . . shall be [guilty of a crime].

In order to prove the defendant guilty of using a facility of interstate

commerce to persuade or induce or entice or coerce an individual to engage in illegal sexual

activity, the government must prove each of the following elements beyond a reasonable

doubt:

First,     The defendant used a facility of interstate commerce;

48

Second,    That the defendant knowingly persuaded or induced or enticed or coerced Jane Doe #4 to engage in sexual activity;

Third,    That this sexual activity would violate Illinois law; and

Fourth,    That Jane Doe #4 was less than eighteen years old at the time of the acts alleged in the Indictment.

The first element that the government must prove beyond a reasonable doubt is that the defendant used a facility of interstate commerce.  Transmission of communications by means of the telephone constitutes the use of a facility of interstate commerce regardless of whether the communication actually crossed a state line.  However, you must find beyond a reasonable doubt that the specific communication in question was actually transmitted by means of the telephone.

The second element that the government must prove beyond a reasonable doubt is that the defendant knowingly persuaded or induced or enticed or coerced Jane Doe #4 to engage in sexual activity.  The words persuade or induce or entice or coerce should be given their ordinary meanings.

The third element that the government must prove beyond a reasonable doubt is that this sexual activity would violate Illinois law.  The Indictment alleges that defendant persuaded Jane Doe #4 to engage in sexual activity, which constitutes Aggravated Criminal Sexual Abuse, in violation of Illinois law.  To sustain the charge of Aggravated Criminal Sexual Abuse, the government must prove the following three elements beyond a reasonable doubt:

First,    That the defendant committed an act of sexual penetration with Jane Doe #4;

49

Second,   That Jane Doe #4 was at least 13 years of age but under 17 years of age when the act was committed; and

Third,   That the defendant was at least 5 years older than Jane Doe #4.

The term "sexual penetration" means any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio or anal penetration.  Evidence of emission of semen is not required to prove sexual penetration.[11]

The fourth element that the government must prove beyond a reasonable doubt is that Jane Doe #4 was less than eighteen years old at the time of the acts alleged in the Indictment.   The government does not need to prove that the defendant knew that Jane Doe #4 was less than 18 years old.

<div align="center">Authority</div>

L. Sand, et al., Modern Federal Jury Instructions, Instruction 64-03; Illinois Pattern Jury Instructions – Criminal 11.61 and 11.62A; People v. Chromik, 408 Ill. App. 3d 1028 (App. Ct. Il 3rd Dist. 2011)

---

[11]    IL ST CH 720 § 5/12-12(f).

REQUEST NO. 21
Racketeering Act Six: Forced Labor

Racketeering Act Six alleges that the defendant committed forced labor of

Jane Doe #4.  The Indictment reads as follows:

> In or about and between May 2009 and January 2010, both dates
> being approximate and inclusive, within the Northern District of
> Illinois and elsewhere, the defendant ROBERT SYLVESTER
> KELLY, together with others, did knowingly and intentionally
> obtain the labor and services of a person, to wit: Jane Doe #4, by
> means of force, threats of force, physical restraint and threats of
> physical restraint to that person or another person; by means of
> serious harm and threats of serious harm to that person or
> another person; and by means of a scheme, plan and pattern
> intended to cause such person to believe that, if that person did
> not perform such labor and services, such person would suffer
> serious harm and physical restraint, and a combination of such
> means, in violation of Title 18, United States Code, Sections
> 1589(a) and 2.

The relevant statute reads as follows:

> Whoever knowingly obtains the labor or services of another
> person— (1) by means of force, threats of force, physical
> restraint, or threats of physical restraint to that person or another
> person (2) by means of serious harm or threats of serious harm
> to that person or another person; [or] (3) by means of any
> scheme, plan, or pattern intended to cause the person to believe
> that, if the person did not perform such labor or services, that
> person or another person would suffer serious harm or physical
> restraint [shall be guilty of a crime.]

To prove that the defendant committed this racketeering act, the government

must prove three elements beyond a reasonable doubt:

First,   The defendant obtained the labor or services of Jane
         Doe #4;

Second,  The defendant did so through one of the following
         prohibited means: (a) through threats of serious harm
         to, or physical restraint against, Jane Doe #4 or any
         other person; or (b) through a scheme, plan or pattern

51

intended to cause Jane Doe #4 to believe that non-
performance would result in serious harm to, or
physical restraint against, Jane Doe #4 or any other
person; and

<u>Third</u>,    The defendant acted knowingly.

The first element the government must prove is that the defendant obtained the

labor or services of another person, in this case, Jane Doe #4.  To "obtain" means to acquire,

control, or possess, even if only for a short period.  "Labor" means the expenditure of

physical or mental effort.  "Services" means conduct or performance that assists or benefits

someone.  The government does not have to prove that Jane Doe #4 performed "work" for

the defendant in the economic sense, although that would satisfy this element.  Labor or

services can include, but is not limited to, sexual services.  All the government must prove is

that Jane Doe #4 provided labor or services as I just defined them.

As to the second element, if you find that the defendant obtained the labor or

services of Jane Doe #4, then you must determine whether the defendant did so through one

of the two prohibited means, that is, either through threats of serious harm to, or physical

restraint against, a person, or through a scheme, plan or pattern intended to cause the person

to believe that serious harm would result if she did not perform the labor or services required

of her.  In order to find that the second element has been satisfied, you must find beyond a

reasonable doubt that at least one of the prohibited means I just mentioned was used to obtain

Jane Doe #4's labor or services.

I now want to define for you some of the terms you will be considering in

determining whether this second element of Racketeering Act Six has been satisfied.  The

term "serious harm" includes both physical and non-physical types of harm, including

psychological, financial, or reputational harm.  A threat of serious harm, therefore, need not involve any threat of physical violence.  It includes improper threats of consequences, whether physical or nonphysical, that are sufficient, under all the surrounding circumstances, to compel or coerce a reasonable person of the same background and in the same circumstances as Jane Doe #4 to provide, or to continue providing, labor or services, in order to avoid that harm.  In considering whether a threat of harm would be sufficient to compel or coerce an alleged victim's services, you may also consider the defendant's conduct as well as Jane Doe #4's special vulnerabilities, if any.  In this regard, you may find that not all persons are of the same courage or firmness.  You may consider, for example, Jane Doe #4's age, background, physical and mental condition, experience, education, socioeconomic status and any inequalities between Jane Doe #4 and the defendant with respect to these considerations, including their relative stations in life, among other things.  Simply put, you may ask whether Jane Doe #4 was vulnerable in some way so that the actions of the defendant, even if not sufficient to compel another person to provide labor or services, were enough to compel Jane Doe #4 to provide labor or services.

The words "scheme," "plan," and "pattern" are to be given their ordinary meanings.  The scheme, plan or pattern need not involve actual threats of serious harm, but may involve any other means, including deception or psychological coercion, used to cause the victim to reasonably believe that she, her family, or any other person would suffer serious harm if she refused to continue providing labor or services.

If you find that any of the two prohibited means I mentioned earlier was used, you must then determine whether such use was sufficient to cause Jane Doe #4 reasonably to believe that she had no choice but to provide labor or services to the defendant.  In making

that determination, you may consider the cumulative effect on Jane Doe #4 of the defendant's conduct.

A few final things about this second element of the offense of forced labor: To prove forced labor, the government does not need to link each of the threats allegedly made or actions allegedly taken against Jane Doe #4 to particular labor or service tasks performed by her.  If Jane Doe #4 was threatened with or suffered certain consequences in connection with the services she rendered, either as punishment or as part of a climate of fear that overcame her will and compelled her service, that is sufficient to establish the second element of the offense of forced labor.

The government also need not prove physical restraint, such as the use of chains, barbed wire or locked doors, in order to establish the offense of forced labor.  The fact that Jane Doe #4 may have had an opportunity to escape is irrelevant if the defendant placed Jane Doe #4 in such fear or circumstances that she did not reasonably believe she could leave.  A victim who has been placed in such fear or circumstances is under no affirmative duty to try to escape.

Finally, in considering whether service performed by someone was involuntary, you are instructed that it is not a defense to the crime of forced labor that the person may have initially agreed, voluntarily, to render the service or perform the labor.  If a person willingly begins service or labor, but later desires to withdraw, and is then forced to remain and perform the labor or services against her will by threats of serious harm, or by a scheme, plan or pattern, intended to cause her to believe that non-performance will result in serious harm to her or another person, then her service becomes involuntary.  Also, whether a person is paid a salary or a wage is not determinative of the question of whether that person

54

has been held in forced labor.  In other words, if a person is compelled to labor against her

will by any one of the means prohibited by the forced labor statute, such service is

involuntary even if she is paid or compensated for the labor or services.

With regard to the third element, the government must prove that a defendant

acted knowingly, a concept that I have already explained to you.

<u>Authority</u>

Adapted from the charges in <u>United States v. Marcus</u>, 05-CR-457 (ARR) (E.D.N.Y.);<u>United States v. Raniere,</u> 18-CR-204 (NGG) (E.D.N.Y.); L. Sand, <u>et al.</u>, <u>Modern Federal Jury Instructions</u>, Instruction 47A-02; <u>See also</u> <u>United States v. Kaufman</u>, 546 U.S. 1242, 1261-62 (10th Cir. 2008) (forced labor statute applies to coerced acts other than "work in an economic sense").

<u>REQUEST NO. 22</u>
<u>Racketeering Act Seven: Sexual Exploitation</u>

Racketeering Act Seven alleges that the defendant sexually exploited Jane Doe

#4.  The Indictment reads as follows:

> In or about and between May 2009 and January 2010, both dates
> being approximate and inclusive, within the Northern District of
> Illinois and elsewhere, the defendant ROBERT SYLVESTER
> KELLY, together with others, did knowingly and intentionally
> employ, use, persuade, induce, entice and coerce a minor, to wit:
> Jane Doe #4, to engage in sexually explicit conduct for the
> purpose of producing one or more visual depictions of such
> conduct, which visual depictions were produced using materials
> that had been mailed, shipped and transported in and affecting
> interstate and foreign commerce, in violation of Title 18, United
> States Code, Sections 2251(a), 2251(e) and 2.

I have already instructed you on the law that applies to sexual exploitation and

you should apply that here.

<u>REQUEST NO. 23</u>
<u>Racketeering Act Eight: Mann Act Violations – Jane Doe #5</u>

Racketeering Act Eight alleges that the defendant committed two separate violations of the Mann Act, one related to transportation and the other involving coercion or enticement.  Thus, Racketeering Act Eight has two parts, and you will render separate verdicts on each part.  If you find that the defendant committed either or both of these two crimes, you must find that the government has proven Racketeering Act Eight.

A.    <u>Racketeering Act 8A: Transportation</u>

The first part, which is referred to on the verdict sheet as Racketeering Act 8A, alleges that the defendant transported Jane Doe #5 for the purpose of engaging in illegal sexual activity.  With respect to Racketeering Act 8A, the Indictment reads as follows:

> On or about and between April 28, 2015 and May 1, 2015, both dates being approximate and inclusive, within the Central District of California, the Northern District of California and elsewhere, the defendant ROBERT SYLVESTER KELLY, together with others, did knowingly and intentionally transport an individual, to wit: Jane Doe #5, an individual whose identity is known to the Grand Jury, in interstate commerce, with intent that such individual engage in sexual activity for which a person can be charged with a criminal offense, to wit: violations of Cal. Health and Safety Code § 120290 (effective 1998) (willful exposure of a communicable disease), in that KELLY engaged in unprotected sexual intercourse with Jane Doe #5 without first informing Jane Doe #5 that he had contracted herpes and obtaining her consent to sexual intercourse in these circumstances, in violation of Title 18, United States Code, Sections 2421(a) and 2

The Indictment charges the defendant with violating section 2421 of Title 18 of the United States Code.  That section provides in relevant part:

> Whoever knowingly transports any individual in interstate . . . commerce . . . with intent that such individual engage . . . in any

57

sexual activity for which any person can be charged with a
criminal offense . . . shall be [guilty of a crime].

In order to prove the defendant guilty of transporting an individual for the

purpose of engaging in illegal sexual activity, the government must prove each of the

following elements beyond a reasonable doubt:

> First,    That the defendant knowingly transported, or caused
>           the transportation of, Jane Doe #5 in interstate
>           commerce as alleged in the Indictment; and
>
> Second,   That the defendant transported, or caused the
>           transportation of, Jane Doe #5 with the intent that he
>           would engage in illegal sexual activity with Jane Doe
>           #5.

The first element that the government must prove beyond a reasonable doubt is

that the defendant knowingly transported, or caused the transportation of, Jane Doe #5 in

interstate commerce, as alleged in the Indictment.  "Interstate commerce" means simply

movement between one state and another.  The government does not have to prove that the

defendant personally transported Jane Doe #5 across a state line.  It is sufficient to satisfy

this element that defendant was actively engaged in or caused the making of the travel

arrangements, such as by purchasing, or causing the purchase of, the tickets necessary for the

individuals to travel as planned.[12]

The defendant must have knowingly transported, or caused the transportation

of, Jane Doe #5 in interstate commerce.  This means that the government must prove that

---

[12]    Holland, 381 F.3d at 86-87 ("We cannot agree with the proposition that an operator of
a prostitution ring may escape liability by accepting a bus company's offer to "Leave the
Driving to Us."  Inviting travel, purchasing tickets, and accompanying individuals on trips is
more than sufficient to establish that a defendant 'transport[ed]' the individuals within the
meaning of Section 2421.").

defendant knew both that he was transporting Jane Doe #5 as I just defined that term, and that he was transporting Jane Doe #5 in interstate commerce.  To act knowingly means to act voluntarily and intentionally and not because of accident, mistake or other innocent reason.

The second element that the government must prove beyond a reasonable doubt is that the defendant transported, or caused the transportation of, Jane Doe #5 with the intent that he would engage in illegal sexual activity with Jane Doe #5.  Direct proof of a person's intent is almost never available.  It would be a rare case where it could be shown that a person wrote or stated that as of a given time he committed an act with a particular intent.  Such direct proof is not required.  The ultimate fact of intent, though subjective, may be established by circumstantial evidence, based upon the defendant's outward manifestations, his words, his conduct, his acts and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn from them.

In order to establish this element, it is not necessary for the government to prove that engaging in illegal sexual activity was the sole purpose for crossing the state line. A person may have several different purposes or motives for such travel, and each may prompt in varying degrees the act of making the journey.  The government must prove beyond a reasonable doubt, however, that a significant or motivating purpose of the travel across a state line was that Jane Doe #5 would engage in illegal sexual activity.  In other words, that illegal activity must not have been merely incidental to the trip.

Under California law, specifically Cal. Health and Safety Code § 120290 (effective 1998), "any person afflicted with any contagious, infectious, or communicable

disease who willfully exposes himself or herself to another person . . . [shall be punished.]"

The government must prove beyond a reasonable doubt:

> First,    That the defendant knew that he was afflicted with any contagious, infectious, or communicable disease;
>
> Second,   That the defendant exposed himself to Jane Doe #5 by engaging in unprotected sexual activity with Jane Doe #5;
>
> Third,    That the defendant acted willfully; and.
>
> Fourth,   That the defendant did not inform Jane Doe #5 that he had a contagious, infectious, or communicable disease and obtain her consent to expose himself in these circumstances prior to engaging in the exposure.

With respect to the first element, "communicable disease" means any disease that was transferable through the exposure incident.[13]  With respect to the third element, the term willfully means with knowledge of the consequences or purposefully.[14]  It does not require that the defendant intended to expose another to a contagious, infectious, or communicable disease.

### B.    Racketeering Act 8B: Coercion or Enticement

The second part, which is referred to on the verdict sheet as Racketeering Act 8B, alleges that the defendant enticed or coerced Jane Doe #5 for the purpose of engaging in illegal sexual activity.  With respect to Racketeering Act 8B, the Indictment reads as follows:

---

[13]    CA HLTH & S § 120261(c) ("'Communicable disease' means any disease that was transferable through the exposure incident, as determined by the certifying physician.").

[14]    Cal. Penal Law 7(1) (effective until 2016) ("The word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, or make the omission referred to.  It does not require any intent to violate law, or to injure another, or to acquire any advantage.").  See People v. Valdez, 27 Cal. 4th 778, 787-788 (2002); cf. People v. Atkins, 25 Cal. 4th 76, 85 (2000) ("willfully" implies no evil intent).

On or about and between April 28, 2015 and May 1, 2015, both dates being approximate and inclusive, within the Central District of California, the Northern District of California and elsewhere, the defendant ROBERT SYLVESTER KELLY, together with others, did knowingly and intentionally persuade, induce, entice and coerce an individual, to wit: Jane Doe #5, to travel in interstate commerce, to engage in sexual activity for which a person can be charged with a criminal offense, to wit: violations of Cal. Health and Safety Code § 120290 (effective 1998) (willful exposure of a communicable disease), in that KELLY engaged in unprotected sexual intercourse with Jane Doe #5 without first informing Jane Doe #5 that he had contracted herpes and obtaining her consent to sexual intercourse in these circumstances, in violation of Title 18, United States Code, Sections 2422(a) and 2.

Section 2422(a) of Title 18 of the United States Code provides in relevant part:

Whoever knowingly persuades, induces, entices, or coerces any individual to travel in interstate . . . commerce . . . to engage … in any sexual activity for which any person can be charged with a criminal offense . . . shall be [guilty of a crime].

In order to prove the defendant guilty of persuading or inducing or enticing or coercing an individual to travel for the purpose of engaging in illegal sexual activity, the government must prove each of the following elements beyond a reasonable doubt:

First,    That the defendant knowingly persuaded, induced, enticed or coerced Jane Doe #5 to travel in interstate commerce, as alleged in the Indictment;

Second,   That Jane Doe #5 traveled in interstate commerce; and

Third,    That the defendant acted with the intent that Jane Doe #5 would engage in illegal sexual activity.

I have already instructed you regarding the elements of a violation of Cal. Health and Safety Code § 120290 (effective 1998).  You should apply those instructions here.

REQUEST NO. 24
Racketeering Act Nine: Mann Act Violations – Jane Doe #5

Racketeering Act Nine alleges that the defendant committed four separate

violations of the Mann Act, two related to transportation and the other two involving

coercion or enticement.  Thus, Racketeering Act Nine has four parts, and you will render

separate verdicts on each part.  If you find that the defendant committed any one or all of

these four crimes, you must find that the government has proven Racketeering Act Nine.

A.    Racketeering Act 9A: Transportation

The first part, which is referred to on the verdict sheet as Racketeering Act 9A,

alleges that the defendant transported Jane Doe #5 for the purpose of engaging in illegal

sexual activity.  With respect to Racketeering Act 9A, the Indictment reads as follows:

> In or about and between September 2015 and October 2015,
> both dates being approximate and inclusive, within the Eastern
> District of New York, the Northern District of California and
> elsewhere, the defendant ROBERT SYLVESTER KELLY,
> together with others, did knowingly and intentionally transport
> an individual, to wit: Jane Doe #5, in interstate commerce, with
> intent that such individual engage in sexual activity for which a
> person can be charged with a criminal offense, to wit: violations
> of California Penal Law Sections 261.5(a) and 261.5(b)
> (unlawful sexual intercourse with a person under 18 years old),
> in that KELLY engaged in sexual intercourse with Jane Doe #5
> who was under 18 years old, while he was more than three years
> older than Jane Doe #5, in violation of Title 18, United States
> Code, Sections 2421(a) and 2.

I have already instructed you on the elements of transportation in violation of the Mann Act

and you should apply those instructions here.

The Indictment provides that the defendant violated California Law by

engaging in sexual intercourse with Jane Doe #5 who was under 18 years old, while he was

more than three years older than Jane Doe #5.  California law provides that "[a]ny person

who engages in an act of unlawful sexual intercourse with a minor who is not more than

three years older or three years younger than the perpetrator, is guilty of [a crime]."

"Unlawful sexual intercourse is an act of sexual intercourse accomplished with a person who

is not the spouse of the perpetrator, if the person is a minor."  For the purposes of this

section, a "minor" is a person under the age of 18 years and an "adult" is a person who is at

least 18 years of age.

      B.    <u>Racketeering Act 9B: Coercion or Enticement</u>

      The second part, which is referred to on the verdict sheet as Racketeering Act

9B, alleges that the defendant coerced and enticed Jane Doe #5 to travel for the purpose of

engaging in illegal sexual activity.  With respect to Racketeering Act 9B, the Indictment

reads as follows:

> In or about and between September 2015 and October 2015,
> within the Eastern District of New York, the Northern District
> of California and elsewhere, the defendant ROBERT
> SYLVESTER KELLY, together with others, did knowingly and
> intentionally persuade, induce, entice and coerce an individual,
> to wit: Jane Doe #5, to travel in interstate commerce, to engage
> in sexual activity for which a person can be charged with a
> criminal offense, to wit: violations of California Penal Law
> Sections 261.5(a) and 261.5(b) (unlawful sexual intercourse
> with a person under 18 years old), in that KELLY engaged in
> sexual intercourse with Jane Doe #5 who was under 18 years
> old, while he was more than three years older than Jane Doe #5,
> in violation of Title 18, United States Code, Sections 2422(a)
> and 2.

I have already instructed you on the elements of coercion or enticement in violation of the

Mann Act and you should apply those instructions here.

C.     <u>Racketeering Act 9C: Coercion of a Minor</u>

The third part, which is referred to on the verdict sheet as Racketeering Act

9C, alleges that the defendant, using an interstate facility, coerced or enticed Jane Doe #5 to

engage in illegal sexual activity.  With respect to Racketeering Act 9C, the Indictment reads

as follows:

> In or about and between September 2015 and October 2015,
> within the Eastern District of New York, the Northern District
> of California and elsewhere, the defendant ROBERT
> SYLVESTER KELLY, together with others, did knowingly and
> intentionally persuade, induce, entice and coerce an individual
> who had not attained the age of 18 years, to wit: Jane Doe #5, to
> engage in sexual activity for which a person can be charged with
> a criminal offense, to wit: violations of California Penal Law
> Sections 261.5(a) and 261.5(b) (unlawful sexual intercourse
> with a person under 18 years old), in that KELLY engaged in
> sexual intercourse with Jane Doe #5 who was under 18 years
> old, while he was more than three years older than Jane Doe #5,
> using one or more facilities and means of interstate commerce,
> in violation of Title 18, United States Code, Sections 2422(b)
> and 2.

The Indictment charges the defendant with violating section 2422(b) of Title

18 of the United States Code.  That section provides in relevant part:

> Whoever, using . . . any facility or means of interstate . . .
> commerce, … knowingly persuades, induces, entices, or coerces
> any individual who has not attained the age of 18 years, to
> engage in . . . any sexual activity for which any person can be
> charged with a criminal offense . . . shall be [guilty of a crime].

In order to prove the defendant guilty of using a facility of interstate

commerce to persuade or induce or entice or coerce an individual to engage in illegal sexual

activity, the government must prove each of the following elements beyond a reasonable

doubt:

<u>First</u>,     The defendant used a facility of interstate commerce;

Second,   That the defendant knowingly persuaded or induced or enticed or coerced Jane Doe #5 to engage in sexual activity;

Third,    That this sexual activity would violate California law; and

Fourth,   That Jane Doe #5 was less than eighteen years old at the time of the acts alleged in the Indictment.

The first element that the government must prove beyond a reasonable doubt is that the defendant used a facility of interstate commerce.  Transmission of communications by means of the telephone constitutes the use of a facility of interstate commerce regardless of whether the communication actually crossed a state line.  However, you must find beyond a reasonable doubt that the specific communication in question was actually transmitted by means of the telephone.

The second element that the government must prove beyond a reasonable doubt is that the defendant knowingly persuaded or induced or enticed or coerced Jane Doe #5 to engage in sexual activity.  The words persuade or induce or entice or coerce should be given their ordinary meanings.

The third element that the government must prove beyond a reasonable doubt is that this sexual activity would violate California law.  And I instructed you about the relevant California law as to Racketeering Act 9A and you should apply that here.

The fourth element that the government must prove beyond a reasonable doubt is that Jane Doe #4 was less than eighteen years old at the time of the acts alleged in the Indictment.   The government does not need to prove that the defendant knew that Jane Doe #4 was less than 18 years old.

D.    Racketeering Act 9D: Transportation of a Minor

The fourth part, which is referred to on the verdict sheet as Racketeering Act 9D, alleges that the defendant transported a minor, Jane Doe #5, for the purpose of engaging in illegal sexual activity.  With respect to Racketeering Act 9D, the Indictment reads as follows:

> In or about and between September 2015 and October 2015, within the Eastern District of New York, the Northern District of California and elsewhere, the defendant ROBERT SYLVESTER KELLY, together with others, did knowingly and intentionally transport an individual who had not attained the age of 18 years, to wit: Jane Doe #5, in interstate commerce, with intent that such individual engage in sexual activity for which a person can be charged with a criminal offense, to wit: violations of California Penal Law Sections 261.5(a) and 261.5(b) (unlawful sexual intercourse with a person under 18 years old), in that KELLY engaged in sexual intercourse with Jane Doe #5 who was under 18 years old, while he was more than three years older than Jane Doe #5, in violation of Title 18, United States Code, Sections 2423(a) and 2.

> Section 2423(a) of Title 18 of the United States Code provides in relevant part:

> A person who knowingly transports an individual who has not attained the age of 18 years in interstate or foreign commerce . . . with intent that the individual engage in . . . any sexual activity for which any person can be charged with a criminal offense, shall be [guilty of a crime].

The elements of this crime are as follows:

First,    That the defendant knowingly transported, or caused the transportation of, a minor in interstate or foreign commerce;

Second,    That the defendant transported, or caused the transportation of, the minor with the intent that she would engage in any sexual activity for which a person can be charged with a criminal offense; and

       <u>Third</u>,     That the defendant was less than eighteen years old at the time of the acts alleged in the Indictment.

The first element requires that the defendant knowingly transported, or caused the transportation of, a minor in interstate and foreign commerce.  I have previously defined the term "knowingly," and you should follow that instruction here.  "Interstate or foreign commerce" means simply movement between one state and another or between the United States and a foreign country.  The government does not have to prove that the defendant personally transported Jane Doe #5 across a state line.  It is sufficient to satisfy this element that defendant was actively engaged in or caused the making of the travel arrangements, such as by purchasing, or causing the purchase of, the ticket necessary for the individual to travel as planned.[15]

       The second element requires that the defendant transported, or caused the transportation of, the minor with the intent that she would engage in sexual activity for which a person can be charged with a criminal offense.  In order to establish this element, it is not necessary for the government to prove that engaging in criminal sexual activity was the sole purpose for crossing the state line or foreign border.  A person may have several different purposes or motives for such travel, and each may prompt in varying degrees the act of making the journey.  The government must prove beyond a reasonable doubt, however, that a significant or motivating purpose of the travel across a state line was that the minor would

---

[15]    <u>Holland</u>, 381 F.3d at 86-87 "We cannot agree with the proposition that an operator of a prostitution ring may escape liability by accepting a bus company's offer to "Leave the Driving to Us."  Inviting travel, purchasing tickets, and accompanying individuals on trips is more than sufficient to establish that a defendant 'transport[ed]' the individuals within the meaning of Section 2421.").

engage in criminal sexual activity.  In other words, that illegal activity must not have been merely incidental to the trip.

Now, direct proof of a person's intent is almost never available.  It would be a rare case where it could be shown that a person wrote or stated that as of a given time he committed an act with a particular intent.  Such direct proof is not required.  The ultimate fact of intent, though subjective, may be established by circumstantial evidence, based upon a defendant's outward manifestations, his words, his conduct, his acts and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn from them.

The third and last element that the government must prove beyond a reasonable doubt is that the minor was less than eighteen years old at the time of the acts alleged in the Indictment.  The government need not prove that the defendant knew the minor was less than eighteen years old.

<u>Authority</u>

L. Sand, <u>et al.</u>, <u>Modern Federal Jury Instructions</u>, Instructions 64-15, 64-16, 64-17, 64-18, 63-19.

<u>REQUEST NO. 25</u>
<u>Racketeering Act Ten: Sexual Exploitation</u>

Racketeering Act Ten alleges that the defendant committed sexual exploitation

of Jane Doe #5.  The Indictment reads as follows:

> In or about and between September 2015 and December 30,
> 2015, both dates being approximate and inclusive, within the
> Northern District of California, the Northern District of Illinois
> and elsewhere, the defendant ROBERT SYLVESTER KELLY,
> together with others, did knowingly and intentionally employ,
> use, persuade, induce, entice and coerce a minor, to wit: Jane
> Doe #5, to engage in sexually explicit conduct for the purpose
> of producing one or more visual depictions of such conduct,
> which visual depictions were produced using materials that had
> been mailed, shipped and transported in and affecting interstate
> and foreign commerce, in violation of Title 18, United States
> Code, Sections 2251(a), 2251(e) and 2.

I have already instructed you on the law that applies to sexual exploitation and you should

apply that here.

<u>REQUEST NO. 26</u>
<u>Racketeering Act Eleven: Forced Labor</u>

Racketeering Act Eleven alleges that the defendant committed forced labor of

Jane Doe #5.  The Indictment reads as follows:

> In or about and between April 2015 and December 2018, both
> dates being approximate and inclusive, within the Northern
> District of Georgia, the Northern District of Illinois and
> elsewhere, the defendant ROBERT SYLVESTER KELLY,
> together with others, did knowingly and intentionally obtain the
> labor and services of a person, to wit: Jane Doe #5, by means of
> force, threats of force, physical restraint and threats of physical
> restraint to that person or another person; by means of serious
> harm and threats of serious harm to that person or another
> person; and by means of a scheme, plan and pattern intended to
> cause such person to believe that, if that person did not perform
> such labor and services, such person would suffer serious harm
> and physical restraint, and a combination of such means, in
> violation of Title 18, United States Code, Sections 1589(a) and
> 2.

I have already instructed you on the law that applies to forced labor and you should apply

that here.

REQUEST NO. 27
Racketeering Act Twelve: Mann Act Violations

Racketeering Act Twelve alleges that the defendant committed two separate violations of the Mann Act, one related to transportation and the other involving coercion or enticement.  Thus, Racketeering Act Twelve has two parts, and you will render separate verdicts on each part.  If you find that the defendant committed either or both of these two crimes, you must find that the government has proven Racketeering Act Twelve.

A.    Racketeering Act 12A: Transportation

The first part, which is referred to on the verdict sheet as Racketeering Act 12A, alleges that the defendant transported Jane Doe #6 for the purpose of engaging in illegal sexual activity.  With respect to Racketeering Act 12A, the Indictment reads as follows:

> On or about May 18, 2017, within the Eastern District of New York and elsewhere, the defendant ROBERT SYLVESTER KELLY, together with others, did knowingly and intentionally transport an individual, to wit: Jane Doe #6, an individual whose identity is known to the Grand Jury, in interstate commerce, with intent that such individual engage in sexual activity for which a person can be charged with a criminal offense, to wit: violations of New York Penal Law Section 120.20 (reckless endangerment) and New York Public Health Law Section 2307 (knowing exposure of infectious venereal disease), in that KELLY engaged in unprotected sexual intercourse with Jane Doe #6 without first informing Jane Doe #6 that he had contracted herpes and obtaining her consent to sexual intercourse in these circumstances, in violation of Title 18, United States Code, Sections 2421(a) and 2.

I have already instructed you on the elements of transportation in violation of the Mann Act and you should apply those instructions here.

71

B.     Racketeering Act 12B: Coercion or Enticement

The second part, which is referred to on the verdict sheet as Racketeering Act

12B, alleges that the defendant coerced or enticed Jane Doe #6 for the purpose of engaging

in illegal sexual activity.  With respect to Racketeering Act 12B, the Indictment reads as

follows:

> On or about May 18, 2017, within the Eastern District of New
> York and elsewhere, the defendant ROBERT SYLVESTER
> KELLY, together with others, did knowingly and intentionally
> persuade, induce, entice and coerce an individual, to wit: Jane
> Doe #6, to travel in interstate commerce, to engage in sexual
> activity for which a person can be charged with a criminal
> offense, to wit: violations of New York Penal Law Section
> 120.20 (reckless endangerment) and New York Public Health
> Law Section 2307 (knowing exposure of infectious venereal
> disease), in that KELLY engaged in unprotected sexual
> intercourse with Jane Doe #6 without first informing Jane Doe
> #6 that he had contracted herpes and obtaining her consent to
> sexual intercourse in these circumstances, in violation of Title
> 18, United States Code, Sections 2422(a) and 2.

I have already instructed you on the elements of coercion or enticement in violation of the

Mann Act and you should apply those instructions here.

The Indictment provides that the defendant violated two different state laws.

Either or both is sufficient to find that his conduct amounted to illegal sexual activity, but

you must be unanimous as to which law was violated.  Specifically, the Indictment alleges

that "KELLY engaged in unprotected sexual intercourse with Jane Doe #6 without first

informing Jane Doe #6 that he had contracted herpes and obtaining her consent to sexual

intercourse in these circumstances," in violation of New York Penal Law 120.20 and New

Your Public Health Law 2307.  I'll explain each of those.  To prove a violation of New York

Penal Law Section 120.20, the government must prove the following elements beyond a reasonable doubt.

> First,   The defendant recklessly engaged in conduct; and

> Second,  The reckless conduct must create a substantial risk of "serious physical injury".

A person recklessly engages in conduct which creates a substantial risk of serious physical injury to another person: (i) when he engages in conduct which creates a substantial and unjustifiable risk of serious physical injury to another person, (ii) when he is aware of and consciously disregards that risk, and (iii) when that risk is of such nature and degree that disregard of it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.[16]   The defendant's subjective intent is irrelevant.

Serious physical injury means impairment of a person's physical condition that creates a substantial risk of death, or which causes death, or serious and protracted disfigurement, or protracted impairment of health or protracted loss or impairment of the function of any bodily organ.[17]

---

[16]    See N.Y. Penal Law § 15.05(3).
[17]    See N.Y. Penal Law § 10.00(10).

Under New York Public Health Law Section 2307, "[a]ny person who, knowing himself or herself to be infected with an infectious venereal disease, has sexual intercourse with another shall be [punished]."  To prove a violation of Section 2307, the government must prove the following elements beyond a reasonable doubt:

First,     that the defendant engaged in unprotected sexual intercourse with Jane Doe #6;

Second,    that the defendant knew himself to be infected with an infectious venereal disease, here herpes, at the time he had sexual intercourse with Jane Doe #6; and

Third,     that the defendant did not inform Jane Doe #6 that he had herpes and obtain her consent to engage in sexual intercourse with him in these circumstances prior to engaging in sexual intercourse with her.

<u>Authority</u>

New York Pattern Jury Instructions, available at http://www.nycourts.gov/judges/cji/2-PenalLaw/120/120-20.pdf. See People v. Bryant, 445 N.Y.S.2d 711, 713 (1st Dep't 1981) ("Reckless endangerment in the second degree requires proof of (1) reckless conduct which (2) creates a substantial risk of 'serious physical injury.'"); In re Kysean D.S., 728 N.Y.S.2d 323 (4th Dep't 2001) ("subjective intent is irrelevant"); Winn v. McQuillan, 390 F. Supp. 385, 390 (S.D.N.Y. 2005) ("The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation."); ECF Docket No. 69 (Court's Order dated May 22, 2020 denying defendant Robert Kelly's Motions to Dismiss and Strike) at 13-17; Maharam v. Maharam, 510 N.Y.S.2d 104, 104 (1st Dep't 1986) (Section 2307 provides basis for valid civil claim where husband failed to disclose to his wife that he had herpes before sexual intercourse); Fan v. Sabin, 2015 WL 5547775, at *6 (N.Y. Sup. Ct. Sep. 21, 2015) (in civil case where plaintiff alleged that defendant who was plaintiff's ex-boyfriend had unprotected sexual intercourse with plaintiff knowing he had herpes and without first informing her of same, Section 2307 "imposes a duty to disclose").

74

REQUEST NO. 28
Racketeering Act Thirteen: Forced Labor

Racketeering Act Thirteen alleges that the defendant committed forced labor

of Jane Doe #6.  The Indictment reads as follows:

> On or about January 13, 2018, within the Central District of
> California and elsewhere, the defendant ROBERT
> SYLVESTER KELLY, together with others, did knowingly and
> intentionally obtain the labor and services of a person, to wit:
> Jane Doe #6, by means of force, threats of force, physical
> restraint and threats of physical restraint to that person or
> another person; by means of serious harm and threats of serious
> harm to that person or another person; and by means of a
> scheme, plan and pattern intended to cause such person to
> believe that, if that person did not perform such labor and
> services, such person would suffer serious harm and physical
> restraint, and a combination of such means, in violation of Title
> 18, United States Code, Sections 1589(a) and 2.

I have already instructed you on the law that applies to forced labor and you should apply

that here.

REQUEST NO. 29
Racketeering Act Fourteen: Mann Act Violations

Racketeering Act Fourteen alleges that the defendant committed two separate violations of the Mann Act, one related to transportation and the other involving coercion or enticement.  Thus, Racketeering Act Fourteen has two parts, and you will render separate verdicts on each part.  If you find that the defendant committed either or both of these two crimes, you must find that the government has proven Racketeering Act Fourteen.

A.      Racketeering Act 14A: Transportation

The first part, which is referred to on the verdict sheet as Racketeering Act 14A, alleges that the defendant transported Jane Doe #6 for the purpose of engaging in illegal sexual activity.  With respect to Racketeering Act 12A, the Indictment reads as follows:

> On or about February 2, 2018, within the Eastern District of New York and elsewhere, the defendant ROBERT SYLVESTER KELLY, together with others, did knowingly and intentionally transport an individual, to wit: Jane Doe #6, in interstate commerce, with intent that such individual engage in sexual activity for which a person can be charged with a criminal offense, to wit: violations of New York Penal Law Section 120.20 (reckless endangerment) and New York Public Health Law Section 2307 (knowing exposure of infectious venereal disease), in that KELLY engaged in unprotected sexual intercourse with Jane Doe #6 without first informing Jane Doe #6 that he had contracted herpes and obtaining her consent to sexual intercourse in these circumstances, in violation of Title 18, United States Code, Sections 2421(a) and 2.

I have already instructed you on the elements of transportation in violation of the Mann Act, as well as the elements of violations of New York Penal Law Section 120.20 (reckless endangerment) and New York Public Health Law Section 2307 (knowing exposure of infectious venereal disease), and you should apply those instructions here.

The Indictment provides that the defendant violated two different state laws. Either or both is sufficient to find that his conduct amounted to illegal sexual activity, but you must be unanimous as to which law was violated.

B.      Racketeering Act 14B: Coercion or Enticement

The second part, which is referred to on the verdict sheet as Racketeering Act 14B, alleges that the defendant coerced or enticed Jane Doe #6 for the purpose of engaging in illegal sexual activity.  With respect to Racketeering Act 14B, the Indictment reads as follows:

> On or about February 2, 2018, within the Eastern District of New York and elsewhere, the defendant ROBERT SYLVESTER KELLY, together with others, did knowingly and intentionally persuade, induce, entice and coerce an individual, to wit: Jane Doe #6, to travel in interstate commerce, to engage in sexual activity for which a person can be charged with a criminal offense, to wit: violations of New York Penal Law Section 120.20 (reckless endangerment) and New York Public Health Law Section 2307 (knowing exposure of infectious venereal disease), in that KELLY engaged in unprotected sexual intercourse with Jane Doe #6 without first informing Jane Doe #6 that he had contracted herpes and obtaining her consent to sexual intercourse in these circumstances, in violation of Title 18, United States Code, Sections 2422(a) and 2.

I have already instructed you on the elements of coercion or enticement in violation of the Mann Act, as well as the elements of violations of New York Penal Law Section 120.20 (reckless endangerment) and New York Public Health Law Section 2307 (knowing exposure of infectious venereal disease), and you should apply those instructions here.

The Indictment provides that the defendant violated two different state laws.  Either or both is sufficient to find that his conduct amounted to illegal sexual activity, but you must be unanimous as to which law was violated.

<u>REQUEST NO. 30</u>
<u>Count Two: Mann Act Transportation of Jane Doe #5</u>

Count Two alleges that the defendant transported Jane Doe #5 in violation of

the Mann Act.

The Indictment reads as follows:

In or about and between September 2015 and October 2015,
both dates being approximate and inclusive, within the Eastern
District of New York, the Northern District of California and
elsewhere, the defendant ROBERT SYLVESTER KELLY,
together with others, did knowingly and intentionally transport
an individual, to wit: Jane Doe #5, in interstate commerce, with
intent that such individual engage in sexual activity for which a
person can be charged with a criminal offense, to wit: violations
of California Penal Law Sections 261.5(a) and 261.5(b)
(unlawful sexual intercourse with a person under 18 years old),
in that KELLY engaged in sexual intercourse with Jane Doe #5
who was under 18 years old, while he was more than three years
older than Jane Doe #5.

I have already instructed you on the elements of transportation in violation of the Mann Act

and you should apply those instructions here.

79

REQUEST NO. 31
Count Three: Mann Act Coercion or Enticement of Jane Doe #5

Count Three alleges that the defendant coerced or enticed Jane Doe #5 in

violation of the Mann Act.

The Indictment reads as follows:

In or about and between September 2015 and October 2015,
within the Eastern District of New York, the Northern District
of California and elsewhere, the defendant ROBERT
SYLVESTER KELLY, together with others, did knowingly and
intentionally persuade, induce, entice and coerce an individual,
to wit: Jane Doe #5, to travel in interstate commerce, to engage
in sexual activity for which a person can be charged with a
criminal offense, to wit: violations of California Penal Law
Sections 261.5(a) and 261.5(b) (unlawful sexual intercourse
with a person under 18 years old), in that KELLY engaged in
sexual intercourse with Jane Doe #5 who was under 18 years
old, while he was more than three years older than Jane Doe #5.

I have already instructed you on the elements of coercion or enticement in violation of the

Mann Act and you should apply those instructions here.

<u>REQUEST NO. 32</u>
<u>Count Four: Mann Act Coercion or Enticement of Jane Doe #5</u>

Count Four alleges that the defendant coerced a minor, Jane Doe #5, in

violation of the Mann Act.  The Indictment reads as follows:

> In or about and between September 2015 and October 2015,
> within the Eastern District of New York, the Northern District
> of California and elsewhere, the defendant ROBERT
> SYLVESTER KELLY, together with others, did knowingly and
> intentionally persuade, induce, entice and coerce an individual
> who had not attained the age of 18 years, to wit: Jane Doe #5, to
> engage in sexual activity for which a person can be charged with
> a criminal offense, to wit: violations of California Penal Law
> Sections 261.5(a) and 261.5(b) (unlawful sexual intercourse
> with a person under 18 years old), in that KELLY engaged in
> sexual intercourse with Jane Doe #5 who was under 18 years
> old, while he was more than three years older than Jane Doe #5,
> using one or more facilities and means of interstate commerce.

I have already instructed you on the elements of coercion of a minor in violation of the Mann

Act and you should apply those instructions here.

<u>REQUEST NO. 33</u>
<u>Count Five: Mann Act Transportation of A Minor - Jane Doe #5</u>

Count Five alleges that the defendant transported a minor, Jane Doe #5, in

violation of the Mann Act.

The Indictment reads as follows:

In or about and between September 2015 and October 2015,
within the Eastern District of New York, the Northern District
of California and elsewhere, the defendant ROBERT
SYLVESTER KELLY, together with others, did knowingly and
intentionally transport an individual who had not attained the
age of 18 years, to wit: Jane Doe #5, in interstate commerce,
with intent that such individual engage in sexual activity for
which a person can be charged with a criminal offense, to wit:
violations of California Penal Law Sections 261.5(a) and
261.5(b) (unlawful sexual intercourse with a person under 18
years old), in that KELLY engaged in sexual intercourse with
Jane Doe #5 who was under 18 years old, while he was more
than three years older than Jane Doe #5.

I have already instructed you on the elements of transportation of a minor in violation of the

Mann Act and you should apply those instructions here.

82

REQUEST NO. 34
Count Five: Mann Act Transportation - Jane Doe #6

Count Five alleges that the defendant transported Jane Doe #6, in violation of

the Mann Act.

The Indictment reads as follows:

On or about May 18, 2017, within the Eastern District of New
York and elsewhere, the defendant ROBERT SYLVESTER
KELLY, also known as "R. Kelly," together with others, did
knowingly and intentionally transport an individual, to wit: Jane
Doe #6, in interstate commerce, with intent that such individual
engage in sexual activity for which a person can be charged with
a criminal offense, to wit: violations of New York Penal Law
Section 120.20 (reckless endangerment) and New York Public
Health Law Section 2307 (knowing exposure of infectious
venereal disease), in that KELLY engaged in unprotected sexual
intercourse with Jane Doe #6 without first informing Jane Doe
#6 that he had contracted herpes and obtaining her consent to
sexual intercourse in these circumstances.

I have already instructed you on the elements of transportation in violation of the Mann Act,

as well as the elements of violations of New York Penal Law Section 120.20 (reckless

endangerment) and New York Public Health Law Section 2307 (knowing exposure of

infectious venereal disease), and you should apply those instructions here.

The Indictment provides that the defendant violated two different state laws.

Either or both is sufficient to find that his conduct amounted to illegal sexual activity, but

you must be unanimous as to which law was violated.

<u>REQUEST NO. 35</u>
<u>Count Seven: Mann Act Transportation - Jane Doe #6</u>

Count Seven alleges that the defendant transported Jane Doe #6, in violation

of the Mann Act.

The Indictment reads as follows:

On or about May 18, 2017, within the Eastern District of New
York and elsewhere, the defendant ROBERT SYLVESTER
KELLY, also known as "R. Kelly," together with others, did
knowingly and intentionally persuade, induce, entice and coerce
an individual, to wit: Jane Doe #6, to travel in interstate
commerce, to engage in sexual activity for which a person can
be charged with a criminal offense, to wit: violations of New
York Penal Law Section 120.20 (reckless endangerment) and
New York Public Health Law Section 2307 (knowing exposure
of infectious venereal disease), in that KELLY engaged in
unprotected sexual intercourse with Jane Doe #6 without first
informing Jane Doe #6 that he had contracted herpes and
obtaining her consent to sexual intercourse in these
circumstances.

I have already instructed you on the elements of coercion or enticement of Jane Doe #6 in

violation of the Mann Act, as well as the elements of violations of New York Penal Law

Section 120.20 (reckless endangerment) and New York Public Health Law Section 2307

(knowing exposure of infectious venereal disease), and you should apply those instructions

here.

The Indictment provides that the defendant violated two different state laws.

Either or both is sufficient to find that his conduct amounted to illegal sexual activity, but

you must be unanimous as to which law was violated.

<u>REQUEST NO. 36</u>
<u>Count Eight: Mann Act Transportation - Jane Doe #6</u>

Count Eight alleges that the defendant transported Jane Doe #6, in violation of

the Mann Act.

The Indictment reads as follows:

> On or about February 2, 2018, within the Eastern District of
> New York and elsewhere, the defendant ROBERT
> SYLVESTER KELLY, also known as "R. Kelly," together with
> others, did knowingly and intentionally transport an individual,
> to wit: Jane Doe #6, in interstate commerce, with intent that
> such individual engage in sexual activity for which a person can
> be charged with a criminal offense, to wit: violations of New
> York Penal Law Section 120.20 (reckless endangerment) and
> New York Public Health Law Section 2307 (knowing exposure
> of infectious venereal disease), in that KELLY engaged in
> unprotected sexual intercourse with Jane Doe #6 without first
> informing Jane Doe #6 that he had contracted herpes and
> obtaining her consent to sexual intercourse in these
> circumstances.

I have already instructed you on the elements of transportation of Jane Doe #6 in violation of

the Mann Act, as well as the elements of violations of New York Penal Law Section 120.20

(reckless endangerment) and New York Public Health Law Section 2307 (knowing exposure

of infectious venereal disease), and you should apply those instructions here.

The Indictment provides that the defendant violated two different state laws.

Either or both is sufficient to find that his conduct amounted to illegal sexual activity, but

you must be unanimous as to which law was violated.

REQUEST NO. 37
Count Nine: Mann Act Coercion or Enticement - Jane Doe #6

Count Nine alleges that the defendant coerced or enticed Jane Doe #6, in violation of the Mann Act.

The Indictment reads as follows:

On or about February 2, 2018, within the Eastern District of New York and elsewhere, the defendant ROBERT SYLVESTER KELLY, also known as "R. Kelly," together with others, did knowingly and intentionally persuade, induce, entice and coerce an individual, to wit: Jane Doe #6, to travel in interstate commerce, to engage in sexual activity for which a person can be charged with a criminal offense, to wit: violations of New York Penal Law Section 120.20 (reckless endangerment) and New York Public Health Law Section 2307 (knowing exposure of infectious venereal disease), in that KELLY engaged in unprotected sexual intercourse with Jane Doe #6 without first informing Jane Doe #6 that he had contracted herpes and obtaining her consent to sexual intercourse in these circumstances.

I have already instructed you on the elements of coercion or enticement of Jane Doe #6 in violation of the Mann Act, as well as the elements of violations of New York Penal Law Section 120.20 (reckless endangerment) and New York Public Health Law Section 2307 (knowing exposure of infectious venereal disease), and you should apply those instructions here.

The Indictment provides that the defendant violated two different state laws. Either or both is sufficient to find that his conduct amounted to illegal sexual activity, but you must be unanimous as to which law was violated.

REQUEST NO. 38
Punishment

The question of possible punishment of the defendant is of no concern to the

jury and should not, in any sense, enter into or influence your deliberations.  The duty of

imposing a sentence rests exclusively upon the court.  Your function is to weigh the evidence

in the case and to determine whether or not the defendant is guilty beyond a reasonable

doubt, solely upon the basis of such evidence.  Under your oath as jurors, you cannot allow a

consideration of the punishment which may be imposed upon the defendant, if he is

convicted, to influence your verdict, in any way, or, in any sense, enter into your

deliberations.

Authority

Adapted from L. Sand, et al., Modern Federal Jury Instructions,
Instruction 9-1.

<u>REQUEST NO. 39</u>
<u>Verdict Form</u>

I have prepared a verdict form that includes the counts as listed in the

Indictment.  Beneath each count is a space marked guilty or not guilty.  Your verdict as to

each count must be recorded on the foreperson's verdict form.

If you find a defendant guilty of Count One, you must also answer the fourteen

questions listed directly below that Count.

I remind you that the verdict form must reflect your unanimous verdict as to

each count and each of the questions listed beneath Count One.

<u>CONCLUSION</u>

The government respectfully requests that the Court include the foregoing in

its instructions to the jury.  In addition, the government requests the opportunity to submit

further instructions or amend those submitted as appropriate.


Dated: Brooklyn, New York
       _____, 2021

<div style="margin-left:45%">

Respectfully submitted,

JACQUELYN M. KASULIS
Acting United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By:    _____/s/_____
       Elizabeth A. Geddes
       Nadia I. Shihata
       Maria Cruz Melendez
       Assistant U.S. Attorneys
       (718) 254-6430/6295/6408

</div>

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------x


**UNITED STATES OF AMERICA,**


-   **against**   -                                              **19 CR 286 (S-3) (AMD)**


**ROBERT SYLVESTER KELLY,**




**DEFENSE REQUESTS TO CHARGE**







Deveraux L. Cannick, Esq.
AIELLO & CANNICK
69-06 Grand Avenue
Maspeth, NY 11378

The following are our requests/changes to the Request to Charge:

1.  (n).    ***Defendant's Right Not To Testify***

Under our Constitution, a defendant has no obligation to testify or to present any evidence, because it is the Government's burden to prove the defendant guilty beyond a reasonable doubt. That burden remains with the Government throughout the entire trial and never shifts to any defendant. A defendant never is required to prove that he is innocent. The right of the defendant not to testify is an important part of our Constitution.

As the Supreme Court has said, and I am quoting:

> *It is not everyone who can safely venture on the witness stand, though entirely innocent of the charge against him. Excessive timidity, nervousness when facing other and attempting to explain transactions of suspicious character, and offenses charged against him, will often confuse and embarrass to such a degree as to increase rather than remove prejudices against him. It is not everyone, however honest, who would therefore willingly be placed on the witness stand.*

It is for this reason that you may not attach any significance to the fact that the defendant did not testify. No adverse inference may be drawn against the defendant because he did not take the witness stand. You may not consider this against the defendant in any way in your deliberations.

Adapted from *Carter v. Kentucky,* 450 U.S. 288, 300 n. 15 (1981).

**27.    Request Number 27 on page 74.**

This should be included:

The law shall "apply where someone "knowingly exposed [another] person to a venereal infection." Legislative Memorandum, 1946 New York State Legislative Annual, p. 191. Thus, to the extent that this section of law is enforceable, NYSDOH interprets it as inapplicable to individuals who have sexual intercourse where they either (1) do not know they are infected, or (2) do know they are infected and reveal that information to their consenting partners. Further, the Department interprets the law as only applying to individuals who knowingly expose another individual to an acute, bacterial venereal disease such as syphilis or gonorrhea. No changes have been made to the regulations in response to these comments.

Dated:  Maspeth, New York
      July 2, 2021

                          Respectfully submitted,

                          /s/_____
                          Deveraux L. Cannick, Esq.
                          Aiello & Cannick
                          69-06 Grand Avenue
                          Maspeth, NY 11378
                          718-426-0444

GA0134

Case 1:19-cr-00286-AMD   Document 117-3   Filed 07/02/21   Page 4 of 4 PageID #: 985

EAG/NS/MCM
F. # 2019R00029

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                                   Docket No. <u>19–CR-286 (S-3)</u>

ROBERT SYLVESTER KELLY,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

<u>MEMORANDUM OF LAW IN SUPPORT OF
THE GOVERNMENT'S MOTION IN LIMINE TO
ADMIT CERTAIN UNCHARGED ACTS</u>

JACQUELYN M. KASULIS
ACTING UNITED STATES ATTORNEY
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201

Elizabeth Geddes
Nadia Shihata
Maria Cruz Melendez
Assistant U.S. Attorneys
    (Of Counsel)

<u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ....................................................................................... 1

I.   ALLEGED RACKTEERING ACTS ............................................................... 5

    A.  Bribery related to Jane Doe #1 ............................................................... 5

    B.  Jane Doe #2 ........................................................................................ 5

    C.  Jane Doe #3 ........................................................................................ 6

    D.  Jane Doe #4 ........................................................................................ 6

    E.  Jane Doe #5 ........................................................................................ 7

    F.  Jane Doe #6 ........................................................................................ 8

II.  Overview of the Government's Evidence of the Defendants' Other Acts........................ 10

    A.  Sexual Abuse of Jane Doe #1, a Minor ................................................... 10

    B.  Sexual Abuse of Jane Doe #7, a Minor ................................................... 11

    C.  Sexual Abuse of Jane Doe #8, a Minor ................................................... 11

    D.  Sexual Abuse of Jane Doe #9, a Minor ................................................... 12

    E.  Sexual Abuse of Jane Doe #10, a Minor ................................................. 12

    F.  Exposure of Jane Does #11 and #12 to A Sexually Transmitted Disease ................. 14

    G.  Sexual Abuse of Jane Doe #13, a Minor ................................................. 15

    H.  Sexual Abuse of John Doe #1, a Minor ................................................... 15

    I.  Unlawful Imprisonment of Jane Doe #14 ................................................ 16

    J.  Threats toward Employee #1 and Hush Payments towards Jane Doe #15 ................. 16

    K.  Physical and Psychological Abuse of Jane Doe #16 and Jane Doe #17 ................... 18

    L.  Physical and Psychological Abuse of Jane Doe #18................................... 18

    M.  Threats toward Jane Doe #6 and Others ................................................. 20

    N.  Threats to Jane Doe #19 ................................................................... 25

O.  Bribery of Cook County Clerk ...................................................................... 25

P.  The Existence of Kelly's Prior Criminal Case in Cook County, Illinois ................... 26

Q.  Kelly's Efforts to Obtain Child Pornography .............................................. 27

R.  Audio Recordings of Physical Abuse and Threats....................................... 28

ARGUMENT ....................................................................................................... 30

I.  Evidence of Other Acts Is Admissible to Establish the Racketeering Enterprise and Its Means and Methods ............................................................................. 30

A. Legal Standard.......................................................................................... 30

B. Analysis .................................................................................................... 32

II. Certain Evidence of Other Acts is Directly Relevant to and Inextricably Intertwined with the Evidence of the Charged Crimes ................................................... 34

A. Legal Standard.......................................................................................... 34

B. Analysis .................................................................................................... 36

III. Evidence of the Defendants' Other Acts Is Also Admissible Pursuant to Federal Rule of Evidence 404(b) .......................................................................... 38

A. Legal Standard.......................................................................................... 39

B. Analysis .................................................................................................... 41

C.  The Probative Value of the "Other Crimes" Evidence Far Outweighs Any Prejudicial Effect ....................................................................................... 42

IV. Evidence of the Defendant's Sexual Assault of  other victims Is also Admissible under Rule 413 ............................................................................................... 43

1.  The Defendant is Charged with Sexual Assault ................................... 48

2.  Evidence of Other Sexual Assaults Are Admissible Under Rule 413 ................. 49

V.  THE VICTIMS IDENTIFIED IN THE OTHER ACTS EVIDENCE DESCRIBED ABOVE SHOULD BE PERMITTED TO TESTIFY USING, AND BE REFERRED TO BY, THEIR FIRST NAME ONLY OR PSEUDONYMS at trial .................................... 50

CONCLUSION.................................................................................................... 52

PRELIMINARY STATEMENT

The government respectfully submits this memorandum in support of its

motion in limine to admit at trial evidence of certain acts by the defendant Robert Kelly.

Specifically, the government seeks to admit evidence of uncharged (i) sexual abuse of

minors; (ii) unlawful imprisonment; (iii) hush payments; (iv) use of physical and

psychological harm to obtain sexual and other services; (v) threatening conduct; (vi) physical

abuse; and (vii) bribery.  As demonstrated below, the evidence of these acts is admissible as

evidence of the charged racketeering offense.  In addition, certain of the evidence of these

other acts is directly relevant to and inextricably intertwined with the evidence of the charged

crimes.  In the alternative, evidence of these other acts is also admissible under Rules 404(b)

and 413 of the Federal Rules of Evidence.

STATEMENT OF FACTS

On June 20, 2019, a grand jury in the Eastern District of New York (the

"EDNY grand jury") returned a five-count indictment charging the defendant Robert

Sylvester Kelly with racketeering, in violation of Title 18, United States Code,

Section 1962(c), among other crimes.  On July 10, 2019, the EDNY grand jury returned a

superseding indictment, adding a forfeiture allegation.  On December 5, 2019, the EDNY

grand jury returned a superseding indictment, adding an additional predicate racketeering act

to the racketeering offense.  On March 12, 2020, the EDNY grand jury returned a third

superseding indictment (the "Indictment"), removing one predicate racketeering act (former

racketeering act eight), adding three other racketeering acts, and adding four substantive

counts.

Count One of the Indictment, charging racketeering, alleges an enterprise consisting of the defendant Robert Sylvester Kelly, also known as "R. Kelly," and individuals who served as managers, bodyguards, drivers, personal assistants and runners for Kelly, as well as members of Kelly's entourage (the "Enterprise"). (Ind. ¶ 1). The Indictment further alleges that the Enterprise "constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the [E]nterprise," and that the Enterprise engaged in, and its activities affected, interstate and foreign commerce. (Id.). The purposes of the Enterprise were to promote R. Kelly's music and the R. Kelly brand, to recruit women and girls to engage in illegal sexual activity with Kelly and to produce pornography, including child pornography. (Id. ¶ 2). By promoting R. Kelly's music and the R. Kelly brand, the members of the Enterprise expected to receive financial opportunities and personal benefits, including increased power and status within the Enterprise. (Id.).

In connection with the Enterprise, Kelly and other members of the Enterprise traveled throughout the United States and abroad to perform at concert venues, to promote the R. Kelly brand and to recruit women and girls to engage in illegal sexual activity with Kelly. (Id. ¶ 3). When Kelly attended and performed at concerts and other events, Kelly and/or members of the Enterprise on Kelly's behalf invited women and girls backstage and to other events following Kelly's live performances. (Id. ¶ 4). These women and girls were often offered wristbands that signified that they were authorized to attend an event. (Id.). There, Kelly relied upon members of the Enterprise to ensure that only those authorized to attend were allowed at the event and to manage the flow of women and girls who were directly interacting with Kelly. (Id.). When Kelly identified a woman or girl who he wished

to see again, he either gave his contact information to the woman or girl or obtained her contact information or relied upon members of the Enterprise to do so.  (Id. ¶ 5).  Following these events, Kelly communicated with certain of these women and girls by telephone, including through the use of traditional telephone calls, text messages, iMessages and FaceTime.  (Id.).  As part of this communication, Kelly often requested that the women and girls provide him with photographs of themselves.  (Id.).

Kelly and other members of the Enterprise also arranged for the women and girls to travel to see Kelly on occasion, including at concerts throughout the United States and related events.  (Id. ¶ 6).  To facilitate their travel, Kelly directed the women and girls to contact a member of the Enterprise, who then arranged travel for the women and girls.  (Id.).  When the women and girls arrived at the lodging, which was typically selected by a member of the Enterprise, a member of the Enterprise usually provided them with instructions.  (Id.).  In addition, members of the Enterprise took steps to ensure that the women and girls did not interact with other women and girls whom Kelly planned to see.  Members of the Enterprise then arranged for the women and girls to attend his concerts and positioned them such that Kelly could see them during his concerts.  (Id.).

Kelly promulgated numerous rules that many of his sexual partners were required to follow, including the following:

- The women and girls were not permitted to leave their room without receiving permission from Kelly, including to eat or go to the bathroom;

- The women and girls were required to wear baggy clothing when they were not accompanying Kelly to an event or unless otherwise instructed by Kelly;

- The women and girls were not permitted to look at other men and instead were told to keep their heads down; and

- The women and girls were required to call Kelly "Daddy."

(Id. ¶ 7).

Among the means and methods by which Kelly and his associates participated in the conduct of the affairs of the Enterprise were the following:

- Committing, attempting and aiding and abetting the commission of crimes and conspiring to commit crimes, including but not limited to engaging in sexual activity with girls under 18 years old, engaging in and facilitating sexual activity without disclosing a sexually transmitted disease Kelly had contracted, producing child pornography, bribery, extortion, coercion and blackmail;

- Demanding absolute commitment to Kelly and not tolerating dissent;

- Obtaining sensitive information about sexual partners and members and associates of the Enterprise to maintain control over them;

- Creating embarrassing and degrading videos of sexual partners to maintain control over them;

- Recruiting and grooming sexual partners for Kelly; and

- Isolating women and girls from friends and family and making them dependent on Kelly for their financial wellbeing.

(Id. ¶ 9).

I.    ALLEGED RACKTEERING ACTS

The indictment alleges racketeering acts related to six women identified as Jane Doe #1 through Jane Doe #6 in the Indictment.  The alleged conduct is described below.

A.    Bribery related to Jane Doe #1

Racketeering Act One alleges that Kelly, together with others, engaged in bribery in violation of Illinois law.  In or about 1994, Kelly caused an enterprise member to pay $500 to get a state employee to create a state identification card for Jane Doe #1, then 15 years old, so that Kelly and Jane Doe #1 could get married and Jane Doe #1 could not be forced to testify against him (given the spousal privilege).  Records from Cook County in Illinois show that on August 30, 1994, an application was granted for Kelly and Jane Doe #1 to be married and that they were in fact married on August 31, 1994.  The marriage application and record, marriage license, and certification of marriage all state that Jane Doe #1 was 18 at the time, when in fact she was 15 years old.

B.    Jane Doe #2

Racketeering Act Two alleges that Kelly, together with others, enticed and coerced Jane Doe #2, a minor, to engage in sexually explicit conduct and then visually recorded such conduct.  The defendant met Jane Doe #2 in or about 1999, when she was 16 years old, after another member of the Enterprise approached her at a fast-food restaurant and informed her the defendant wished to speak with her.  Thereafter, while Jane Doe #2 was a minor under 18 years old, the defendant filmed their sexual intercourse on multiple occasions, thereby creating child pornography, using materials that had been mailed, shipped and transported in interstate and foreign commerce.

C.    Jane Doe #3

Racketeering Acts Three and Four allege that Kelly, together with others, unlawfully imprisoned and sexually assaulted Jane Doe #3 without her consent.  In or about and between 2003 and 2004, Jane Doe #3 met Kelly at a mall outside the state of Illinois when she was in her early 20s and working as a radio station intern.  The defendant thereafter invited Jane Doe #3 to travel to Chicago, Illinois, purportedly to conduct an interview of him. Following her arrival in Chicago, Jane Doe #3 was directed to a recording studio.  Once there, she was escorted to a room within the studio by one of the defendant's associates, who also took and searched her suitcase.  Later, while in the room, another associate made a copy of Jane Doe #3's driver's license, directed her to sign what she believed to be a nondisclosure agreement, and advised her not to talk to anyone and to keep her head down. Jane Doe #3 ultimately spent approximately three days in the room, which was locked, without sustenance.  After a member of the Enterprise provided her with food and a drink, she became tired and dizzy.  She woke up some time thereafter to the defendant with her in the bedroom in circumstances made it apparent that he had sexually assaulted her while she was unconscious.

D.    Jane Doe #4

Racketeering Acts Five through Seven allege that Kelly, together with others, enticed Jane Doe #4, a minor, to engage in illegal sexual activity, made a visual recording of such sexual activity and used force and threats of force to obtain sexual services from the minor.  In or about May 2009, when Jane Doe #4 was 16 years old and the defendant was in his early 40s, the defendant began a sexual relationship with Jane Doe #4 in violation of Illinois law, which ultimately lasted for a period of months.  During this time period, on

multiple occasions, the defendant produced sexually explicit photographs and videos of Jane Doe #4 engaging in sexual intercourse and sexual contact with the defendant and others at his direction.

In the course of their relationship, the defendant also engaged in a scheme, plan and pattern intended to cause Jane Doe #4 to believe that, if she did not perform certain sexual acts on him and others at his direction, she or her family members would suffer serious harm. The defendant engaged in a pattern of both physical and psychological abuse when Jane Doe #4 disobeyed his sexual directives, including slapping, choking, and isolating her in rooms for days at a time with no access to food, which caused Jane Doe #4 to believe such punishments would occur if she did not acquiesce and perform sexual acts she did not want to perform. In addition, the defendant caused Jane Doe #4 to write and sign letters and other documents containing false information that, if released, could cause reputational harm to both her and her close family members as an additional means to exert control over her.

In January 2010, Jane Doe #4 left Kelly and retained Lawyer #1, an individual whose identity is known to the government, to represent her. On behalf of Jane Doe #4, Lawyer #1 thereafter negotiated a financial settlement with Kelly, in exchange for which Jane Doe #4 agreed to not further discuss her relationship with Kelly.

E.   <u>Jane Doe #5</u>

Racketeering Acts Eight through Eleven allege that Kelly, together with others, enticed Jane Doe #5, a minor, to engage in illegal sexual activity, made a visual recording of such sexual activity and used force and threats of force to obtain sexual services from the minor. (Counts Two through Five charge the defendant with standalone crimes involving certain of that conduct as to Jane Doe #5.) In or about 2015, Jane Doe #5, a minor

and aspiring music artist, met the defendant after attending one of his concerts. Thereafter, at the defendant's suggestion, Jane Doe #5 began traveling on a consistent basis with the defendant while he was on tour, at the defendant's direction, purportedly to learn about the music business, including to various locations in California while Jane Doe #5 was under 18 years old.

In or about April and May 2015, while in California, the defendant engaged in sexual activity with Jane Doe #5, without divulging to her that he had contracted an infectious venereal disease, namely herpes, in violation of California law. In October 2015, while Jane Doe #5 was a minor, he persuaded, induced and coerced Jane Doe #5 to travel to California to engage in sexual activity with the defendant, in violation of California law.

As with Jane Doe #4, the defendant engaged in a pattern of both physical and psychological abuse when Jane Doe #5 disobeyed his directives, including spanking and isolating her in rooms for days at a time with no access to food, which caused Jane Doe #5 to believe such punishments would occur if she did not acquiesce and perform sexual acts she did not want to perform. As a result of Kelly's course of coercive conduct, the defendant was able to successfully coerce Jane Doe #5 into engaging in sexual activity with numerous other women at Kelly's direction and on occasion with another man, identified below as John Doe #2. In addition, the defendant caused Jane Doe #5 to write and sign letters and other documents containing false information that, if released, could cause reputational harm to both her and her close family members as an additional means to exert control over her.

F.    Jane Doe #6

Racketeering Acts Twelve through Fourteen allege that Kelly, together with others, enticed Jane Doe #6 to engage in illegal sexual activity and used force and threats of

8

force to obtain sexual services from Jane Doe #6.  (Counts Six through Nine charge the

defendant with standalone crimes involving certain of that conduct as to Jane Doe #6.)  Jane

Doe #6 met the defendant following an R. Kelly concert that she attended when she was 19

years old, at which time the defendant provided Jane Doe #6 with his telephone number.

Thereafter the two communicated by telephone.  In May 2017, at the defendant's direction,

Jane Doe #6 contacted another member of the Enterprise, one of the defendant's assistants, to

arrange travel to and accommodations in New York to attend an R. Kelly concert in Long

Island, New York.  Following the concert, Jane Doe #6 returned to her hotel room.  In the

early morning hours, the defendant unexpectedly arrived at Jane Doe #6's room and loudly

announced his presence.  Ultimately, at the defendant's direction, the encounter became

sexual in nature and the two engaged in intercourse.  The defendant did not use a condom.

Prior to the intercourse, the defendant did not divulge to Jane Doe #6 that he had contracted

herpes, an infectious venereal disease, in violation of New York law.  Notably, during the

encounter in the hotel room, the defendant told Jane Doe #6, in sum and substance, that if she

was really 15 or 16 years old, she could tell him, suggesting he would have preferred for Jane

Doe #6 to be younger.

Thereafter, the defendant arranged and paid for Jane Doe #6 to travel to

various locations throughout the United States to see him, including in January 2018 to Los

Angeles, California.  During this trip, Jane Doe #6 went to a recording studio in Los Angeles

to see the defendant.  Once at the studio, Jane Doe #6 waited for many hours in a room,

without sustenance, for the defendant to arrive.  After briefly seeing him, the defendant did

not show up again until the following day.  After he arrived the following day, the defendant

took Jane Doe #6 into a smaller area/room and instructed Jane Doe #6 to take off her

9

clothing.  Jane Doe #6 noticed a gun in the room, which the defendant moved to a piece of furniture nearby.  He then proceeded to ask Jane Doe #6 a series of questions, warning her there would be consequences if she lied.  Given the surrounding circumstances, Jane Doe #6 believed she was not free to leave the room.  Thereafter, the defendant directed Jane Doe #6 to give him oral sex in the room.  (When agents executed a search warrant at the defendant's residence on July 11, 2019, they found a holster and ammunition.)

The defendant arranged for Jane Doe #6 to travel a final time to see him in February 2018 in New York City.  While in New York, the defendant engaged in sexual activity with Jane Doe #6, again without divulging to her that he had contracted an infectious venereal disease, in violation of New York law.  Jane Doe #6 stopped seeing the defendant following this trip and ultimately learned that she had contracted an infectious venereal disease during the course of her relationship with the defendant.  Medical records confirm that the defendant had an infectious venereal disease during the course of his sexual activity with Jane Doe #6.

II.    OVERVIEW OF THE GOVERNMENT'S EVIDENCE OF THE DEFENDANTS' OTHER ACTS

A.    Sexual Abuse of Jane Doe #1, a Minor

As described above, Kelly is charged in Racketeering Act One with bribery of a state employee to create a state identification card for Jane Doe #1, then 15 years old, so that Kelly and Jane Doe #1 could get married and Jane Doe #1 could not be forced to testify against him (given the spousal privilege).  The government seeks to introduce evidence regarding Kelly's sexual abuse of Jane Doe #1 to prove his motive for engaging in this racketeering act.

When Kelly met Jane Doe #1, she was a minor and the niece of his manager at the time.  At the time, Jane Doe #1 was a promising young singer and Kelly thereafter began to write and produce music for Jane Doe #1.  While Jane Doe #1 was still a minor, Kelly began a sexual relationship with her and, in August 1994, when Jane Doe #1 was 15 years old, Kelly believed Jane Doe #1 had become pregnant.  As a result, in an effort to shield himself from criminal charges related to his illegal sexual relationship with Jane Doe #1, Kelly arranged to secretly marry her to prevent her from being compelled to testify against him in the future.  Given Jane Doe #1's age, the bribery charged in Racketeering Act One was necessary to effectuate the marriage.

B.    <u>Sexual Abuse of Jane Doe #7, a Minor</u>

In or about 1991, when she was approximately 15 years old, Jane Doe #7, an individual whose identity is known to the government, met Kelly at his apartment in Chicago, Illinois.  Jane Doe #7 had been invited by a female acquaintance, who was also a minor, to come to Kelly's apartment with her.  Two other minor females also came to the apartment with them.  While at the apartment, Kelly initiated and engaged in sexual intercourse with Jane Doe #7.  Jane Doe #7 also saw Kelly engaged in sexual encounters with other minors she went to Kelly's apartment with.

Jane Doe #7 later became employed by Kelly as, among other things, a back-up dancer.  During the course of her time with Kelly, Jane Doe #7 observed Kelly engaged in sexual contact with Jane Doe #1, a minor.

C.    <u>Sexual Abuse of Jane Doe #8, a Minor</u>

In or about September 1994, Jane Doe #8, a 17-year-old girl and an individual whose identity is known to the government, attended a concert in Florida where Kelly

performed.  After the concert, members of the Enterprise directed Jane Doe #8 and a friend

of hers to go backstage to meet Kelly and Jane Doe #8 obtained Kelly's autograph.  While

Jane Doe #8 was backstage, Kelly, who was not wearing a condom, vaginally penetrated her

with his penis, in violation of Florida law.  A pamphlet signed by Kelly containing a

reference to Jane Doe #8 and a room number corroborates Jane Doe #8's encounter with

Kelly.

  D. <u>Sexual Abuse of Jane Doe #9, a Minor</u>

   In or about 1995, Kelly met Jane Doe #9, a 17-year-old girl and an individual

whose identity is known to the government, at a Florida mall and thereafter commenced a

sexual relationship with her, in violation of Florida law.  On one occasion, Jane Doe #9

laughed at a joke by one of Kelly's associates and Kelly immediately summoned her outside

and slapped her across the face for having done so.  During their relationship, Jane Doe #9

contracted herpes and disclosed her diagnosis to Kelly, who did not admit to having herpes.

At the time of her diagnosis, Jane Doe #9 was only sexually active with Kelly.

  E. <u>Sexual Abuse of Jane Doe #10, a Minor</u>

   In or about July 2001, Jane Doe #10, an individual whose identity is known to

the government who was then 16 years old, attended an R. Kelly concert.  Prior to the

concert, a member of the Enterprise gave Jane Doe #10 and her friend backstage passes so

they could meet Kelly following the concert.  After the concert, Jane Doe #10 and her friend

met Kelly backstage and took a photo with him.  As they were leaving, another member of

the Enterprise told Jane Doe #10 that Kelly wanted to see her again and provided her with a

piece of paper with Kelly's cell phone number and his hotel room number on it, and advised

Jane Doe #10 to call the phone number in an hour.  Thereafter, Jane Doe #10 called the

number and Kelly invited her to come to his hotel room.  Jane Doe #10 subsequently went to

the hotel room with her friend.  When they arrived, Kelly was there with multiple other

people.  Kelly subsequently took Jane Doe #10 to the bathroom, closed the door and

immediately exposed himself, signaling that he wanted Jane Doe #10 to give him oral sex,

which she did.  Jane Doe #10 and her friend subsequently left.  The next morning, Jane Doe

#10 returned to Kelly's hotel room and the two engaged in sexual contact.

Thereafter, Jane Doe #10 communicated with Kelly by phone and, through

another member of the Enterprise, Kelly made arrangements and paid for Jane Doe #10 to

travel to Chicago to see him.  In or about December 2001, while Jane Doe #10 was 16 years

old, Jane Doe #10 travelled to Chicago to Kelly's recording studio.  Upon her arrival, an

employee directed Jane Doe #10 to an office where Kelly was.  Kelly immediately told Jane

Doe #10 to pull down her pants and turn around.  Jane Doe #10 did not initially comply with

Kelly's direction.  In response, Kelly became angry and yelled at her.  Jane Doe #10 felt

intimidated and did as Kelly directed.  Thereafter, Kelly asked Jane Doe #10 for her ID and

she showed it to him.  Kelly thereafter directed Jane Doe #10 to give him oral sex, which she

did.  In April 2003, when Jane Doe #10 was no longer a minor, Jane Doe #10 saw Kelly

again and engaged in sexual intercourse with him.

In or about 2004, based on information she received from another individual,

Jane Doe #10 became concerned that Kelly may have videotaped their sexual encounter in

his hotel room when she was 16 years old and that such a videotape had been disseminated.

In an effort to learn whether such a videotape existed, Jane Doe #10 contacted Lawyer #1,

who had represented individuals who had sued Kelly previously.  Thereafter, Jane Doe #10

engaged the services of Lawyer #1.  Kelly ultimately reached a financial settlement with Jane

Doe #10 in which he paid a substantial sum to Jane Doe #10 and Lawyer #1.  The settlement

agreement included a nondisclosure provision, which purportedly would prevent Jane Doe

#10 from reporting Kelly's conduct to law enforcement.[1]

     F.    <u>Exposure of Jane Does #11 and #12 to A Sexually Transmitted Disease</u>

        Jane Doe #11, an individual whose identity is known to the government, met

Kelly when she was an adult and had a consensual sexual relationship with Kelly beginning

in 2001.  Prior to engaging in sexual activity with Kelly, Jane Doe #11 tried to ask Kelly

whether he had any sexually transmitted diseases and he demurred; Kelly did not wear a

condom while engaging in sexual activity with Jane Doe #11.  Jane Doe #11 later learned

that she had contracted herpes and believed she had contracted it from Kelly.  In or about

2003, Jane Doe #11 retained Lawyer #1 and reached a $250,000 settlement with Kelly.  Jane

Doe #11 advised that her friend, Jane Doe #12 - who is now deceased - also reached a

$250,000 settlement with Kelly based on a similar claim.  As part of the settlement, Jane Doe

---

[1]    <u>But see</u> <u>Quinio v. Alaa</u>, 344 F. Supp. 3d 464, 476 (E.D.N.Y. 2018) ("Courts throughout the country have found that the public policy interest at stake[,] the reporting of possible crimes to the authorities[,] is one of the highest order and is indisputably well defined and dominant in the jurisprudence of contract law.") (internal quotation marks omitted); <u>see also</u> <u>Branzburg v. Hayes</u>, 408 U.S. 665, 696–97 (1972) (stating that "it is obvious that agreements to conceal information relevant to commission of crime have very little to recommend them from the standpoint of public policy" and concluding that "[i]t is apparent ... that concealment of crime and agreements to do so are not looked upon with favor"); <u>Lachman v. Sperry–Sun Well Surveying Co.</u>, 457 F.2d 850, 853 (10th Cir. 1972) ("It is public policy in Oklahoma and everywhere to encourage the disclosure of criminal activity"); <u>Cosby v. American Media, Inc.</u>, 197 F. Supp. 3d 735, 742 (E.D. Pa. 2016) (settlement agreement unenforceable as being against public policy "to the extent that [it] purports to prevent its signatories [alleged victims of sexual assault] from voluntarily disclosing information about crimes to law enforcement authorities").

#11 believed that she was not permitted to disclose to anyone, including law enforcement, her claims about Kelly.

G.    <u>Sexual Abuse of Jane Doe #13, a Minor</u>

In March 2006, Kelly met Jane Doe #13, a 15-year-old girl and an individual whose identity is known to the government, at a concert and arranged to meet her the following day. Upon meeting her, Kelly asked her whether she was a "virgin" and thereafter commenced a sexual relationship with her. Kelly arranged for a member of the Enterprise – one of his bus drivers – to drive Jane Doe #13 several hours within Florida and otherwise arranged for her air travel to Kelly's residence in Chicago, Illinois. Telephone records, emails and bank records corroborate Kelly's relationship with Jane Doe #13 beginning when she was 15 years old.

H.    <u>Sexual Abuse of John Doe #1, a Minor</u>

In or about December 2006, Kelly met John Doe #1, a 17-year-old boy and an individual whose identity is known to the government, at a local McDonalds and invited him to attend a party at his residence in Chicago, Illinois. John Doe #1, along with his mother and stepfather, attended the party. When Kelly saw John Doe #1 with his family members, Kelly advised him to come without them to the next gathering. Thereafter, Kelly invited John Doe #1 into his studio under the guise of helping and mentoring John Doe #1 with his musical aspirations. Kelly also asked John Doe #1 what he was willing to do to succeed in the music business and clarified that he wanted John Doe #1 to engage in sexual contact with Kelly. With that backdrop, Kelly then engaged in sexual contact with John Doe #1, in violation of Illinois law. John Doe #1 thereafter introduced Kelly to, among others, John Doe #2, a close male friend who was then 16 or 17 years old and whose identity is known to

15

the government, and Kelly sought to establish a sexual relationship with John Doe #2. (Several years later, Kelly started a sexual relationship with John Doe #2 and required his girlfriends, including Jane Doe #5, to have sex with John Doe #2 upon his command and often filmed those encounters.  Kelly sometimes paid John Doe #2 after sexual encounters with him.)  Kelly also directed John Doe #1 and others to engage in sexual contact with each other and filmed those encounters.  Telephone records corroborate Kelly's relationship with John Doe #1 and John Doe #2, beginning when both were 17 years old.   John Doe #1 also introduced Kelly to girlfriends of John Doe #1.

> I.   Unlawful Imprisonment of Jane Doe #14

In 2008, Kelly met Jane Doe #14, a woman in her 20s whose identity is known to the government, and arranged for her to travel to Kelly's residence in Chicago, Illinois, where they began a sexual relationship.  During her last trip to Chicago to see Kelly, she was left in a room for a long period of time and she became worried.  She told a member of the Enterprise – an individual on Kelly's "security" team – that she wanted to leave and that individual said they would figure it out (but did not allow her to leave just then).  The following morning, she overheard Kelly yelling and sounds of a physical assault.  Jane Doe #14 again contacted Kelly's security team, but this time said that she was going to call the police if not permitted to leave.  Only then did a member of Kelly's security team come to the room where she was staying, escort her out of the room and take her to the airport.

> J.   Threats toward Employee #1 and Hush Payments towards Jane Doe #15

In 2009, Kelly met Jane Doe #15, an aspiring singer who was 17 years old and whose identity is known to the government, through a talent manager who – years later – became an employee of Kelly, identified herein as Employee #1.  Kelly paid for Jane Doe

16

#15's lodging at a hotel nearby his residence in Olympia Fields, Illinois, purportedly so that Kelly could mentor and assist her with her music career and Jane Doe #15 could use the studio at his residence to record music.  Jane Doe #15 ceased her relationship with Kelly when she was 18 years old, went to the hospital where she confided to a nurse that Kelly had sexually abused her, filed a police report and retained an attorney, Lawyer #1, to represent her in a possible lawsuit against Kelly.  Kelly thereafter told Employee #1, in sum and substance, that Jane Doe #15 was attempting to sue Kelly for engaging in a sexual relationship with her, that Employee #1 needed to decide whether she was on "Team Kelly" or "Team [Jane Doe #15]" and that Employee #1, who was based in Atlanta at the time, needed to travel to Chicago immediately.  At Kelly's direction, Employee #1 traveled to Chicago, where Kelly told Employee #1, in substance, "you have to be careful in these situations because people end up going missing," a comment Employee #1 construed as a threat to her and her family.  Shortly thereafter, a member of the Enterprise – one of Kelly's employees – told Employee #1 that she had to go to downtown Chicago with him but did not provide any information regarding precisely where they were going or for what purpose. Upon their arrival in downtown Chicago, Employee #1 was dropped off at Kelly's lawyer's office, where the lawyer presented her with a prepared typewritten affidavit to sign. Employee #1 did not read the affidavit in full but saw that it said, inter alia and in substance, that she did not see Kelly have sex with Jane Doe #15, provide Jane Doe #15 with alcohol or slap Jane Doe #15.  Employee #1 reported that she signed the affidavit without carefully reading it because she feared that harm would come to her or her family if she did not.  Bank records show that Kelly paid Lawyer #1 and that Lawyer #1 then paid nearly $400,000 to Jane Doe #15.  Jane Doe #15 has repeatedly declined to meet with law enforcement.

K.      Physical and Psychological Abuse of Jane Doe #16 and Jane Doe #17

In or about 2001, Kelly met Jane Doe #16, who was then 16 or 17 years old and whose identity is known to the government, and commenced a multi-year sexual relationship with Jane Doe #16.  In or about May 2009, Kelly met Jane Doe #17, who was then 17 years old and whose identity is known to the government, and commenced a multi-year sexual relationship with Kelly.  Both women remained with Kelly until at least in or about 2017.  Kelly regularly spanked Jane Doe #16 and Jane Doe #17 when he perceived that they had violated one of his rules.  He also directed Jane Doe #16 and Jane Doe #17 to write numerous letters containing falsehoods and embarrassing allegations for Kelly to use at his discretion if and when the need arose.  In addition, witnesses saw Kelly subject Jane Doe #17 to particularly extreme punishment, which included loss of her cellular telephone, violent assaults and deprivation of food and the ability to leave her room.  Jane Doe #16 and Jane Doe #17 also engaged in sex with Kelly and John Doe #2, an individual otherwise unknown to either of them, at Kelly's direction, which interactions were often filmed.  The government recovered various letters written by Jane Doe #16 and Jane Doe #17, including certain ones that appear to contain falsehoods.

L.      Physical and Psychological Abuse of Jane Doe #18

In or about 2016, Jane Doe #18, whose identity is known to the government, met Kelly at one of his concerts when she was approximately 20 years old after one of Kelly's associates approached her and told Jane Doe #18 that Kelly wanted to meet her.  In or about 2016, Jane Doe #18, started a sexual relationship with Kelly.  Kelly regularly punished Jane Doe #18 in various ways when she violated his rules.  For example, Kelly violently spanked, hit and kicked Jane Doe #18 on multiple occasions.  At times, Kelly also

18

instructed Jane Doe #18 to text Kelly that she liked being spanked after administering the spankings as punishment.  In addition to the spankings, Kelly ordered Jane Doe #18 to walk back and forth in high heels for long stretches of time, repeating as she walked what he deemed she had done wrong, as a punishment.  At a concert in November 2017, Kelly became enraged with Jane Doe #18 because he suspected she had been communicating with another man and grabbed Jane Doe #18 and broke her necklace, cutting her neck.  Kelly then made her go back to the hotel where she was staying and write a note stating that she had attacked Kelly.  Kelly dictated to her what he wanted her to write in the note.  When she finished the note, Kelly directed Jane Doe #18 to give him the note for his future use.

On other occasions, Kelly slapped Jane Doe #18 because he believed she was looking at or talking to other men in violation of his rules.  In addition, during their relationship, Jane Doe #18 signed a non-disclosure agreement and, at Kelly's direction, wrote letters in which she wrote embarrassing falsehoods, and witnessed others write similar letters.  The government recovered various letters written by Jane Doe #18, including certain ones that contain falsehoods, which were dictated to her by Kelly so that he could use the letters against her at a later date.  Kelly also directed Jane Doe #18 to make recordings of herself engaged in compromising and disparaging acts and making certain statements at his instruction, and to provide those recordings to him.  The contents of those recordings, which would cause Jane Doe #18 embarrassment and reputational harm if disseminated to others, were thus available for Kelly's use at a time of his choosing.  At Kelly's direction, Jane Doe #18 also engaged in sex with Kelly and others, including Jane Doe #5 and John Doe #2, an individual otherwise unknown to her, which Kelly regularly recorded.

19

M.     Threats toward Jane Doe #6 and Others

In or about the fall of 2018 continuing through January 2020, Kelly and other

members of the Enterprise, including Donnell Russell, Russell's mother, and an individual

working on Kelly's behalf, used coercive tactics to attempt to convince Jane Doe #6 to

abandon a civil lawsuit she had filed against Kelly and to stop speaking publicly about Kelly.

They did so by conveying to Jane Doe #6 that they had maintained compromising

photographs of her, which could be released at any time, and then releasing certain such

photographs publicly via a Facebook page called "Surviving Lies" and during interviews

Russell conducted on YouTube.[2]  Specifically, following the filing of a civil lawsuit on

behalf of Jane Doe #6 against Kelly, in November 2018, the lawyer who filed the lawsuit for

Jane Doe #6 received a typewritten letter signed by Kelly.  Enclosed with the letter were

portions of the civil complaint filed on behalf of Jane Doe #6 with the following stamp

affixed: "I DO NOT ACCEPT THIS OFFER TO CONTRACT AND I DO NOT CONSENT

TO THESE PROCEEDINGS," with Kelly's handwritten signature and a State of Illinois

Notary stamp and signature for Russell's mother, an individual whose identity is known to

the government, and two pieces of paper that contained images and typewritten text.  Among

the images were text message exchanges between Kelly and Jane Doe #6, as well as

photographs of Jane Doe #6 that were apparently cropped to not disclose certain body parts,

but which nonetheless included portions of Jane Doe #6's exposed buttocks and breast.

---

[2]     On or about August 13, 2020, Donnell Russell was arraigned on a complaint charging him with stalking of Jane Doe #6 and an immediate family member of Jane Doe #6, in violation of 18 U.S.C. 2261A(2)(B), for this conduct.  On October 8, 2020, a grand jury in the Eastern District of New York returned an indictment charging Russell with the same offense.

Beneath those photographs was text including "I assure you this would not be considered a Sunday go-to-meeting dress.  The next two pictures have been cropped for the sake of not exposing her extremities to the world, yet!!!"  As described further below, in recorded statements live-streamed over YouTube in late January 2019, Donnell Russell stated that he wrote the commentary that accompanied the photographs, that Kelly had signed the letter, and that he had participated in sending these documents "to the lawyer."

Notably, a judicially-authorized search of Kelly's Apple iPhone seized at the time of his federal arrest revealed that, on the morning of October 26, 2018, Kelly sent the photographs of Jane Doe #6 and text message exchanges between Jane Doe #6 and Kelly that were included in the November 2018 mailing to Donnell Russell's mother via MMS messages.  Later that same day, Russell's mother sent a text message to Kelly that said, "Question: Do you have a way of sending me one more picture showing her phone number at the top? I'm going to print it and include it, along with the other 3 and include them in the letter to her attorney. Do you agree that she should really know her client??? ☺"  Kelly thereafter responded with a text message stating, inter alia, "I'm going to get you more."

United States Postal Service ("USPS") records indicate that the mailing described above was sent by certified mail from Chicago, Illinois, on November 20, 2018, and received at the lawyer's address in Brooklyn, New York on November 26, 2018.  USPS records for the certified mail return receipt associated with the mailing indicate that the destination address for the return receipt was 219 N. Justine Street, Chicago, Illinois 60607-1403 – the address of a warehouse rented and used as, inter alia, a recording studio by Kelly at the time.

In November and December 2018, Donnell Russell was in telephone and email communication with an individual, whose identity is known to the government, who offered to work on Kelly's behalf including as a behind-the-scenes publicist for Kelly (the "Publicist"). Among other things, in early December 2018, Russell sent emails to the Publicist including, among other things, the same photographs of Jane Doe #6 described above. On December 4, 2018, using the alias "Colon Dunn," and the email address colondunn@yahoo.com, Russell sent an email with the subject line "The Survivors Exposed" to various individuals employed by A&E Networks, which owns Lifetime Entertainment Services. Lifetime produced a documentary series featuring various of Kelly's accusers entitled "Surviving R. Kelly," which aired on the Lifetime TV network in early January 2019. On the evening of December 4, 2018, Lifetime was to hold a private screening of a portion of the documentary at a theater in Manhattan, however, the screening was interrupted by a gun threat that was communicated by telephone to the theater. The December 4, 2018 email from "Colon Dunn" attached a PDF (the "Survivors PDF") that included photographs and purported derogatory information related to various of Kelly's accusers who appear in the Surviving R. Kelly documentary series, including Jane Doe #4 and Jane Doe #6, including the same photographs of Jane Doe #6's partially exposed breast and buttocks that were sent to Jane Doe #6's lawyer in November 2018. That same day, Russell forwarded this email to the Publicist.

Jane Doe #6 and her mother traveled to New York City to attend the December 4, 2018 "Surviving R. Kelly" premiere. The premiere was interrupted and police arrived and evacuated the theater where it was being held. Jane Doe #6 later learned that a threat had been made to the theater, which resulted in the evacuation. Thereafter, Jane Doe

22

#6 returned to her hotel and encountered the Publicist.  The Publicist told Jane Doe #6 that she worked for Kelly and they needed to talk.  Ultimately, Jane Doe #6 and her mother agreed to meet with the Publicist at a nearby restaurant.  At the meeting, the Publicist was accompanied by a male individual with a gun on his person that Jane Doe #6 believed to be the Publicist's "bodyguard."[3]  During the meeting, the Publicist showed Jane Doe #6 nude photographs of Jane Doe #6 and suggested that Kelly would release the photographs publicly if Jane Doe #6 continued to speak about Kelly.  Jane Doe #6 recognized the photographs as photographs that had been taken by Kelly during her relationship with him.

On December 21, 2018, Russell sent a series of text messages to Jane Doe #6 and her mother, which included the text "Just a sample.  We will seek criminal charges.  You've been warned," followed by photographs of portions of the Survivors PDF, including the same photographs of Jane Doe #6 included in the November 2018 mailing to Jane Doe #6's lawyer.  Thereafter, inter alia, Russell sent Jane Doe #6 and her mother text messages stating, "Publishing soon" and "[T]his is Colon.  My investigation will be done soon enough."  On January 3, 2019, Russell sent another text message stating, "Pull the plug or you will be exposed."

---

[3]     Records from Spirit Airlines indicate that the Publicist traveled from Florida to LaGuardia airport with her cousin, Michael Williams, on the morning of December 4, 2018. Notably, on August 11, 2020, Williams was arrested on a complaint charging him with witness intimidation and arson for setting fire to a car parked in the driveway of Jane Doe #5's residence at the time.  Williams was subsequently indicted by a grand jury in the Eastern District of New York on the same charges and thereafter pleaded guilty to arson. During a search of the hotel room Williams was staying in at the time of his arrest, law enforcement agents recovered a loaded 9mm Hi-Point handgun with an obliterated serial number in a black holster.

On January 7, 2019, at 02:42:01 UTC,[4] Russell – using the "Colon Dunn" alias – created a Facebook page called "Surviving Lies." Facebook deactivated the Surviving Lies Facebook page on January 7, 2019, at 20:44:17 UTC after posts targeting Jane Doe #6 and another of Kelly's accusers were posted on the page by Russell. Those postings included photographs of text message exchanges between Jane Doe #6 and Kelly and photographs of Jane Doe #6 included in the November 2018 mailing to Jane Doe #6's lawyer. Following Facebook's deactivation of the page, Facebook issued a statement indicating that the page violated Facebook's Community Standards and had been removed, adding "We do not tolerate bullying or sharing other's private contact information and take action on content that violates our policies as soon as we're aware."

On January 25, 2020, Russell appeared in a video interview live-streamed on YouTube. During the interview, Russell introduced himself as Kelly's "advisor, consultant [and] friend" and indicated that he had known Kelly for "going on 30 years now." Thereafter, during the interview, Russell discussed Jane Doe #6 and the lawsuit she had filed, holding up copies of items that had been sent to Jane Doe #6's lawyer, including the photographs of Jane Doe #6 described above. While holding up one of the pages with photographs of Jane Doe #6 to the camera, Russell stated "That's my commentary at the bottom." On January 26, 2020, Russell appeared in another video interview live-streamed on YouTube. During the interview, Russell again held up copies of items that had been sent to Jane Doe #6's lawyer, including the photographs of Jane Doe #6 described above. While

---

[4]   In January 2019, UTC time was five hours ahead of Eastern Time and six hours ahead of Central time.

holding up these items, Russell stated: "we sent" these documents "to the lawyer."  Russell

further stated "these are the pictures of her [Jane Doe #6] that we sent.  These are the texts

messages of her that we sent."  Referring to a document in the mailing, Russell stated that

Kelly "signed it."[5]

N.      Threats to Jane Doe #19

In or about November 2018, Kelly summoned Jane Doe #19, a former

girlfriend of Kelly and whose identity is known to the government, to travel interstate to

Chicago, Illinois.  Once in Chicago, Kelly made Jane Doe #19 provide her driver's license to

an assistant to photocopy and sign a non-disclosure agreement.  Kelly also told Jane Doe #19

that she needed to decide which team she was on, "Team Kellz" or the other one, and that

she had a beautiful family and she did not want to be "handled," a comment that Jane Doe

#19 construed as a threat.  Finally, during that encounter, Kelly had Jane Doe #19 write a text

message to Kelly containing falsehoods.

O.      Bribery of Cook County Clerk

In February 2019, following the release of the Surviving R. Kelly docuseries,

the commencement of multiple investigations by law enforcement authorities, and the filing

of criminal charges earlier that month in Cook County, Illinois, one then member of Kelly's

---

[5]      Russell's statements during these YouTube interviews are admissible at trial
because they constitute a portion of the very conduct constituting the ongoing interstate
stalking of Jane Doe #6 and her mother.   In addition, the statements are admissible as
statements against Russell's penal interest under Fed. R. Evid. 804(b)(3) and as statements in
furtherance of the racketeering conspiracy and a conspiracy to commit interstate stalking of
Jane Doe #6 and her mother, in violation of 18 U.S.C. §§ 371 and 2261A(2), under Fed. R.
Evid. 801(d)(2)(E).  The statements are clearly relevant and the danger of unfair prejudice
does not outweigh their probative value.

inner circle, who billed himself as Kelly's crisis manager (the "Crisis Manager"), told Kelly

that he had "two people" who "know a lot" and told Kelly to "figure out what you can do for

them," suggesting these individuals were open to being bribed.  In response, Kelly stated,

"What you do, man, is write something on a piece of paper and give me what I should tip the

bailiff.  What I should tip the, uh, the valet.  Like when my uncle come up here and say 'Rob,

the valet guy, he parked the car over there.'  I say, 'So what should I give him?'  He say,

'Well, 20, 30, 30 dollars.'  I gave him 30 dollars.  So what I'm saying is I don't know that

number."  Later in the same conversation, the Crisis Manager told Kelly that he had paid a

clerk in Cook County $2,500 and procured a "burner" telephone for the clerk in order to

obtain information about Kelly's legal trouble, stating "That's done . . . You don't know

nothing."  Kelly responded, "Exactly."  A recording of this conversation was recovered

pursuant to a judicially-authorized search of Kelly's phone.

> P.     The Existence of Kelly's Prior Criminal Case in Cook County, Illinois

The government seeks to introduce limited evidence regarding the existence of

Kelly's prior criminal case in Cook County, Illinois, and an attempt to influence the jury in

that case.  Specifically, in June 2002, Kelly was charged in Cook County, Illinois, with child

pornography offenses related to a videotape of a female engaged in sexual activity.  After

multiple delays, jury selection began in or about May 2008.  In or about May 2008, John Doe

#1 alerted Kelly that he had access to a juror and Kelly told John Doe #1 to come to his

residence.  When John Doe #1 came to his residence, he advised Kelly – in front of Kelly's

attorneys – about the juror and Kelly's attorneys advised against contacting the juror.

Shortly thereafter, Kelly, outside the presence of his attorneys, specifically requested that

John Doe #1 make contact with the juror and tell the juror that Kelly was a "good guy." The case ultimately went to trial in June of 2008 and Kelly was acquitted on all charges.

The government seeks to introduce evidence of the existence and general nature of the case – including the nature of the charge, its duration and Kelly's acquittal – through a certified (and redacted) copy of the case summary/docket sheet for the case and limited testimony from witnesses to explain, provide context for, and situate testimony regarding other events and matters, including the information from John Doe #1 described above, as well as Kelly and the Enterprise's use of certain protocols, including the timing of the collection of identification documents from victims and others (in some circumstances) and the use of nondisclosure and settlement agreements.

Q.   Kelly's Efforts to Obtain Child Pornography

Jane Doe #5 is expected to testify that, during the course of her relationship with Kelly, Kelly directed her to obtain child pornography involving boys for him. At Kelly's direction, Jane Doe #5 searched the internet for pornography involving younger-looking males and screen-recorded such pornography for Kelly's use. Jane Doe #5 believed the pornography that she found on the internet and downloaded for Kelly actually involved individuals who were 18 or older given the websites on which she found the videos. A judicially-authorized search of digital media recovered from Kelly's residence corroborates Jane Doe #5's account. The following videos were recovered from the device:

- IMG_0002.MP4: Video from "TwinksBare.com" titled "Amateur Bareback Twinks Fucking Raw," which shows two young males initially wearing children's underwear and kissing. They then expose their genitalia and perform oral sex on each other and engage in anal sex and masturbation, including on and against a child's bunk bed. During the video, a scrolling graphic on top indicates that the video was uploaded to WWW.XVIDEOS.COM. The video is approximately 10 minutes long

and appears to have been captured on a "screen recording" on the device using the app "RECGO" on May 26, 2019. File information for the video on the device also indicates that the file was created on the device on May 26, 2019.

- IMG_0096.MP4: Video from "Asian-Slave-Boy.com" showing a young Asian male tied to a bed with underwear on, while a man caresses his body. In the video, the man exposes and thereafter touches the male's genitalia. According to the file information for the video on the device, the file appears to have been created on the device on June 22, 2019.

- IMG_0042.MP4: Video from "FAMDICK.com" showing man on a sofa with a young male. Initially, the young male is fully clothed in what appear to be pajamas while the man is in underwear and an undershirt. Eventually, the man exposes the male's buttocks, has the male give him oral sex, and engages in anal sex with the male. The file information for the video on the device indicates that the file was created on the device on June 12, 2019.

The government has been unable to confirm the identity or ages of the individuals appearing in these videos.

R.    Audio Recordings of Physical Abuse and Threats

Finally, the government seeks to introduce excerpts of two audio recordings recovered pursuant to a search warrant, both of which show the physical and psychological abuse Kelly employed to maintain control over women and girls with whom he was engaged in sexual relationships and Kelly's regular use of audio and video recordings to maintain control.

One video recording shows two women in a room laying in a bed and engaging in casual conversation. At some point in the recording, Kelly enters the room, accuses one of the women of lying and begins to physically assault the woman. Notably, the video appears to have been taken by a stationary camera mounted somewhere in the room.

28

In the other recording, Kelly berates, threatens and physically assaults Jane

Doe #20, a woman whose identity is known to the government who commenced a sexual

relationship with Kelly when she was 18 years old and who Kelly believed stole from him:

> There's only one way you're gonna get rid of this. For me to trust your ass again. You're gonna do the fuck I tell you to do. When you made the fuckin tape for me and I looked at that shit, you was hiding your fucking face all over that shit because you didn't want to be seen. I told you to fucking trust me. And here it is I can't fucking trust you. You're the one who's fucking untrustworthy. I'm a loyal man. Shut the fuck up. You're gonna do that shit for me for fuckin' free. And you ain't gonna hide your fucking face on me. You're gonna do what the fuck I tell you to do and you're gonna do it fuckin right. Then I'm gonna gain my fuckin trust back with your ass. If I even detect you trying to hide on that shit, I'm gonna blow this shit the fuck up. Do you hear this shit I'm telling you. I fucking raised your ass. I raised you. … [UI] fucking murdered for doing shit like this. Shut up. Shut the fuck up. You're gonna do this shit fucking right. You're gonna gain my fucking trust because you fucking owe me that, you hear me. You fucking understand me? …. You gonna do what the fuck I tell you to do to gain my moth]er fucking trust. You better not ever in my mother fucking life take from me again or I will be in Florida and something will happen to you. You understand what I'm telling you. …
>
> Now you go to that fucking garage. You chill there until you hear from me. You understand me. You take your fuckin phone. You don't call no mother fucking body. And I will know if you did. You can go in the closet. You can go wherever you gonna go, but I'm gonna know if you did. You come over here for something to eat. Or you call to me. And that's the fuck it. Until I tell you can go back in that room. Okay? Do you hear me? … Go to the garage right the fuck now. When I come and get you this time, you better be fucking like you're supposed to fuckin' be. And you know you held back on that tape, now don't you? … You're not going to do that no more. You bet the fuck not. Go to the fucking garage. Hear me? … You're not gonna tape until I tell you. When I tell you, I don't give a fuck if you're coming out of your sleep. You better be fucking ready. Do you

> understand?  I better feel like you asked me to do. … You make
> no fucking calls except the studio or me.

During the recording transcribed in part above, Kelly is overheard physically assaulting Jane

Doe #20, who Kelly claims he "raised" after he accuses her and she admits stealing from

him.  Also on the recording, he expressly threatened her that he would "be in Florida and

something [would] happen to her" if she stole from him again and commented that people

get "murdered" for doing what she did.  Finally, Kelly is overheard directing the woman to

"go in the closet" and to go to the "garage" and stay there until he gives her further

instructions and instructing her that she would need to re-record something at his direction.

<u>ARGUMENT</u>

The government moves <u>in limine</u> for the admission of evidence pertaining to

the acts set forth above.  First, the evidence of these acts is admissible as direct evidence of

the charged racketeering offense.  Second, evidence of many of these other acts is directly

relevant to and inextricably intertwined with the evidence of the charged crimes.  In the

alternative, evidence of the defendants' bad acts is also admissible under Rules 404(b) and

413 of the Federal Rules of Evidence.

I.  <u>EVIDENCE OF OTHER ACTS IS ADMISSIBLE TO ESTABLISH THE
    RACKETEERING ENTERPRISE AND ITS MEANS AND METHODS</u>

A.  <u>Legal Standard</u>

A racketeering offense is not simply the commission of two or more predicate

acts, because, as the Second Circuit has explained, "it is neither the enterprise standing alone

nor the pattern of racketeering activity by itself which RICO criminalizes, but [r]ather, the

combination of these two elements[.]"  <u>United States v. Pizzonia</u>, 577 F.3d 455, 463 (2d Cir.

2009) (citation and internal quotation marks omitted).  In addition, it is well-settled that, "to

30

demonstrate a pattern of racketeering, in the end, it is not the number of predicates proved

but, rather, the relationship that they bear to each other or to some external organizing

principle that indicates whether they manifest the continuity required to prove a pattern[.]"

Id. at 465 (emphasis added; citation and internal quotation marks omitted).  Put another way,

"a RICO pattern may not be established without some showing that the racketeering acts are

interrelated and that there is continuity or a threat of continuity; . . . racketeering acts that are

not widely separated in time or space may nonetheless, given other evidence of the threat of

continuity, constitute a RICO pattern."  United States v. Indelicato, 865 F.2d 1370, 1381 (2d.

Cir. 1989).

> As a result, the Second Circuit has repeatedly held that evidence of "other" or

"uncharged" crimes is admissible to establish the existence of the enterprise and its means

and methods.  For example, in United States v. Baez, 349 F.3d 90, 93 (2d Cir. 2003), the

Second Circuit held: "It is well settled that in prosecutions for racketeering offenses, the

government may introduce evidence of uncharged offenses to establish the existence of the

criminal enterprise."  Id. (upholding district court's admission of sixteen uncharged

robberies).  Moreover, crimes committed in furtherance of the racketeering enterprise – even

where not alleged as racketeering acts – do not fall within the ambit of Rule 404(b).  See

United States v. Coiro, 922 F.2d 1008, 1017 (2d Cir. 1991) (continuity established where a

corrupt attorney's bribery of public officials and money laundering spanning approximately

four months was part of a long term drug enterprise that engaged in other unlawful activities

that was likely to continue "absent outside intervention"); United States v. DiNome, 954 F.2d

839, 843 (2d Cir. 1992) (evidence of uncharged murders admissible to prove relationship and

continuity of RICO enterprise's illegal activities); United States v. Diaz, 176 F.3d 52, 79 (2d

Cir. 1999) (admission of evidence that members of the Latin Kings Street gang, the RICO

enterprise, committed uncharged drug trafficking and crimes of violence on behalf of the

Latin Kings "to prove the existence, organization and nature of the RICO enterprise, and a

pattern of racketeering by each defendant-appellant").

      B.    <u>Analysis</u>

      First, as described below, each of the above-described uncharged acts are

integral to proving the existence and nature of the Enterprise charged in this case.

Specifically, such evidence is admissible as proof of, <u>inter alia</u>, the activities, purpose and

means of the Enterprise; the defendant's role in the Enterprise; and proof that the alleged

predicate racketeering acts constitute a "pattern of racketeering activity."

      The other acts evidence the government seeks to admit – Kelly's sexual abuse

of minors, Kelly's use of physical harm and threats of physical harm on his victims, the

unlawful imprisonment of women, the use of extortionate and coercive tactics to exert and

maintain control over his victims and employees and bribery – all are evidence of the

existence of the Enterprise, its purposes, means and methods, the pattern of racketeering and

specifically the relatedness of the racketeering acts and the threat of their continuity.  For

example, Kelly's abuse of Jane Doe #1, Jane Doe #7, Jane Doe #8, Jane Doe #9, Jane Doe

#10, Jane Doe #13 and John Doe #1, all minors at the time the abuse and attempted abuse

began, is evidence that his abuse of Jane Doe #2, Jane Doe #4 and Jane Doe #5, also minors,

were not isolated events and were part of a larger pattern.  Kelly's direction to Jane Doe #5

to obtain child pornography for his use also demonstrates Kelly's motive and intent with

respect to the charged minor victims, Jane Doe #1, Jane Doe #7, Jane Doe #8, Jane Doe #9,

Jane Doe #10, Jane Doe #13 and John Doe #1 (as well as his control over Jane Doe #5).

Tactics to unlawfully imprison women and girls to ensure their availability for Kelly at Kelly's demand (such as the uncharged act involving Jane Doe #14 and the alleged racketeering act involving Jane Doe #3) are evidence of the Enterprise itself and its means and methods.

Similarly, Kelly's physical and psychological abuse of Jane Doe #16, Jane Doe #17, Jane Doe #18 and Jane Doe #20  and threats toward Employee #1, Jane Doe #19 and Jane Doe #20 all tend to show that the similar abuse of Jane Doe #4, Jane Doe #5 and Jane Doe #6 was part of an overarching pattern employed by Kelly and members of the Enterprise.  Along with the threats to expose embarrassing photographs of Jane Doe #6, it is also evidence of the means and methods of the Enterprise, that is, the use of physical assaults and threats of physical, psychological and reputational harm – including coercion, extortion, and blackmail – in an attempt to obtain total control over both victims and employees and ensure their strict adherence to Kelly's demands and to maintain and promote Kelly's stature in the music industry, and the continued operation of the Enterprise.  The threats against Jane Doe #6 are also an example of the Enterprise's use of the pornography facilitated and created by the Enterprise (the creation of which is one of the charged purposes of the Enterprise) to coerce and blackmail victims and others, and not simply for Kelly's sexual gratification. Given that multiple witnesses will testify regarding Kelly's filming of them in the nude and while engaged in sexual encounters (as well as other compromising and embarrassing situations) at his direction, the existence of such videos within the defendant's possession and under his control resulted in an ever-present fear and threat that such compromising material could be disseminated to others or more broadly released.  Like the notes and letters containing embarrassing information, including falsehoods, that the defendant directed many

33

of his victims to write, the defendant's creation and retention of such material allowed for its use to control, coerce, extort, and blackmail victims, including as a means to ensure their silence.  Similarly, payments to women and girls in exchange for their silence was also part of the means and methods of the Enterprise; as described above, Kelly and members of his inner circle negotiated financial settlements with multiple women and girls, including Jane Doe #4, Jane Doe #10, Jane Doe #11, Jane Doe #12 and Jane Doe #15, in exchange for their silence, thereby helping to ensure the continued existence of the Enterprise.  Finally, evidence of the discussion between the defendant and the Crisis Manager regarding bribery is probative of the required continuity component and tends to show the horizontal relatedness of the bribery charged in Racketeering Act One.  See United States v. Alkins, 925 F.2d 541, 551-53 (2d Cir. 1991) (the requisite continuity may be established against a defendant through evidence of uncharged crimes by other members of the enterprise not charged in the indictment).

II.    CERTAIN EVIDENCE OF OTHER ACTS IS DIRECTLY RELEVANT TO AND INEXTRICABLY INTERTWINED WITH THE EVIDENCE OF THE CHARGED CRIMES

For the following reasons, certain evidence of other acts is also direct evidence of, and inextricably intertwined with, the evidence of the charged offenses and thus admissible to complete the story of the charged crimes.

A.    Legal Standard

It is well settled that "'evidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of

the crime on trial.'"  United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (quoting

United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997)); see also United States v.

Towne, 870 F.2d 880, 886 (2d. Cir. 1989) (same).

           The Second Circuit has repeatedly upheld the admission of uncharged act

evidence as direct evidence of the charged crimes where such evidence provides necessary

background or context for the charged crimes.  See United States v. Gonzalez, 110 F.3d 936,

941-42 (2d Cir. 1997) (uncharged burglary admissible in trial for felon in possession of a

firearm because, inter alia, it provided "crucial background evidence that gave coherence to

the basic sequence of events that occurred on the night" of defendants' arrest); United States

v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) (noting that evidence of other "bad acts" may be

admitted "to provide the jury with the complete story of the crimes charged by demonstrating

the context of certain events relevant to the charged offense"); United States v. Langford,

990 F.2d 65 (2d Cir. 1993) ("It is within the court's discretion to admit evidence of acts

committed prior to the time charged in the indictment to prove the existence of the alleged

conspiracy as well as to show its background and history."); United States v. Pitre, 960 F.2d

1112, 1119 (2d Cir. 1992) ("Prior act evidence may be admitted to inform the jury of the

background of the conspiracy charged, to complete the story of the crimes charged, and to

help explain to the jury how the illegal relationship between participants in the crime

developed.").  In this respect, "trial court[s] may admit evidence that does not directly

establish an element of the offense charged, in order to provide background for the events

alleged in the indictment.  Background evidence may be admitted to show, for example, the

circumstances surrounding the events or to furnish an explanation of the understanding or

intent with which certain acts were performed." United States v. Coonan, 938 F.2d 1553,

1561 (2d Cir. 1991) (quoting United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988)).

B.    Analysis

Evidence of certain of the other acts described above are so intricately

intertwined that they are "necessary to complete the story of the crime on trial[.]" Carboni,

204 F.3d 44.  First, evidence regarding Kelly's illegal sexual relationship with Jane Doe #1, a

minor he believed he had impregnated, is necessary to establish his motive, intent and plan,

among other things, for engaging in the bribery conduct charged in Racketeering Act One.

Jane Doe #9's testimony that she advised Kelly that she had contracted herpes

from Kelly and Jane Doe #11 and Jane Doe #12's lawsuits against Kelly as a result of their

contention that he exposed them to herpes, all constitute evidence of Kelly's knowledge that

he had herpes, an incurable sexually transmitted disease, and could transmit it to others, both

elements that the government will need to prove at trial to establish Racketeering Acts Eight,

Twelve and Fourteen and Counts Six through Eight.  Additionally, Jane Doe #5 heard and

saw Kelly inflict physical assaults on Jane Doe #16, Jane Doe #17 and Jane Doe #18 and

evidence of such assaults therefore helps to explain, in part, how the defendant maintained

control over Jane Doe #5.  Similarly, Kelly's and other Enterprise members' efforts to

threaten Jane Doe #6 and her mother with the exposure of embarrassing photographs of her

is evidence of Kelly's regular recording of his interactions with Jane Doe #6 (as she will

testify) and is part of Kelly's attempts at maintaining control over Jane Doe #6, as well as the

existence of the Enterprise and the lengths to which Kelly and other Enterprise members

went to protect the Enterprise.  Kelly's threats toward Employee #1 also help to explain her

evolving relationship with Kelly and how Kelly maintained control over Enterprise members.

36

Limited evidence regarding the existence of Kelly's prior Cook County criminal case, the nature of the charged crimes (sexual exploitation of a minor), the case's duration (approximately six years), and his ultimate acquittal after trial is also inextricably intertwined with evidence of the charges crimes and evidence regarding the existence, and evolving means and methods of, the Enterprise.  For example, the government expects that certain witnesses will testify about changes in the protocols used by certain employees in an effort to protect the Enterprise following the initiation of the prior criminal case and during its lengthy pendency.  It is also inextricably intertwined with Kelly and other members of the Enterprise's use of certain methods, including the collection of identification documents and the use of nondisclosure agreements and settlement agreements, as well as threats, coercion and extortion, to prevent women and girls from reporting his conduct to law enforcement authorities.  Additionally, evidence related to the facts underlying the charge, including the fact that a video of the defendant engaging in sexual activity with a minor was widely and publicly disseminated, is relevant to the defendant's knowledge and intent with respect to the charged crimes to show that the defendant understood the consequences of his actions when he filmed underage girls, including Jane Doe #4 and Jane Doe #5 (i.e., that such videos could be disseminated) and that his purpose of having sex with these minor victims was, at least in part, for the purpose of producing such a visual depiction and not by accident or mistake.

In addition, the nature of the charges is relevant background to explaining why the defendant told many of his victims that he would be giving certain items, including some of the letters containing falsehoods, to his lawyers for safe-keeping.  The fact of the charges is also relevant background to explain why John Doe #1 told the defendant that he had access to a juror, a fact that the government should be permitted to front by eliciting on direct

examination, rather than waiting for the defendant to elicit as impeachment material on cross examination.

The nature of the charges and the fact of the defendant's acquittal are also necessary background to explain why many victims of his abuse initially failed to report to law enforcement the abuse.  A failure to report is a common theme among victims of sexual and domestic abuse, and particularly so in scenarios as here where the abuser - the defendant - is a prominent public figure with an active fan base.  Indeed, a victim's failure to report will likely be raised by the defendant during cross-examination in support of an argument that the victims' testimony with respect to Kelly's conduct is fabricated.  But the failure to report - and instead seek a civil settlement or simply to remain silent - is readily explained by the fact that the defendant was once charged with sexually exploiting a minor, there was a video widely believed to feature the defendant with a minor and the jury acquitted him.  Thus the 2008 charges and the acquittal are necessary background to help explain why some of his victims long opted against reporting his conduct.  Nor is the probative value substantially outweighed by the risk of unfair prejudice, given that he is charged with the same type of charges here and the fact of his acquittal in the prior Cook County case will be introduced at trial.  See Fed. R. Evid. 403.

III.   EVIDENCE OF THE DEFENDANTS' OTHER ACTS IS ALSO ADMISSIBLE PURSUANT TO FEDERAL RULE OF EVIDENCE 404(B)

In the alternative, the government seeks to admit evidence of the other acts described above pursuant to Federal Rule of Evidence 404(b).

A.     Legal Standard

Evidence of uncharged crimes or "other acts" may also be admitted pursuant to Rule 404(b) for permissible purposes, including to prove motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.  Fed. R. Evid. 404(b)(2); see United States v. Ortiz, 857 F.2d 900, 903 (2d Cir. 1988).  Rule 404(b) evidence is only admissible if, under Rule 403, the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice or by considerations of judicial economy such as the needless presentation of cumulative evidence.  Id.

The Second Circuit has established a three-prong test for the admission of "other crimes" evidence under Rule 404(b).  First, a trial court must determine that the evidence is offered for a purpose other than to prove the defendant's bad character or criminal propensity.  See United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992); United States v. Mickens, 926 F.2d 1323, 1328 (2d Cir. 1991).  Second, the trial court must determine that the evidence is relevant under Rules 401 and 402 of the Federal Rules of Evidence and that its probative value is substantially outweighed by the danger of unfair prejudice.  See Pitre, 960 F.2d at 1119; Mickens, 926 F.2d at 1328.  Third, the court must provide an appropriate limiting instruction to the jury, if one is requested.  See Pitre, 960 F.2d at 1119.

While the government "must explain in detail the purposes for which the evidence is sought to be admitted," United States v. Levy,731 F.2d 997, 1002 (2d Cir. 1984) (internal citation omitted), the Second Circuit has emphasized that Federal Rule of Evidence 404(b) is a rule of broad reach and liberal application.  Id. ("We have adopted the inclusionary or positive approach to [404(b)]; as long as the evidence is not offered to prove

propensity, it is admissible.").  To the extent that evidence of an uncharged crime is offered to prove knowledge or intent (i.e., state of mind), the law requires that the other act and the charged conduct be "sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the knowledge [or intent] inference advocated by the proponent of the evidence," else it would not be relevant.  United States v. Aminy, 15 F.3d 258, 260 (2d Cir. 1994) (quoting United States v. Peterson, 808 F.2d 969, 974 (2d Cir. 1987) (internal quotation marks omitted)); see also United States v. Paulino, 445 F.3d 211, 223 (2d Cir. 2006) (prior arrest for small amount of cocaine base street-level distribution sufficiently similar to prove knowledge and intent for charged crime of possession of large amount of powder cocaine in residence); United States v. Araujo, 79 F.3d 7, 8 (2d Cir. 1996) (explaining similarity rule for knowledge and intent proof is "simply a rule of relevance").

Finally, additional bases for admitting other acts evidence under Rule 404(b) include "corroborat[ing] crucial prosecution testimony" if the corroboration is "direct and the matter corroborated is significant," United States v. Everett, 825 F.2d 658, 660 (2d Cir. 1987) (internal quotation marks omitted), and, where cross-examination into a government witness's bad acts for impeachment purposes is anticipated, allowing the government to elicit the witness's testimony about such acts on direct examination so as to avoid the appearance that the government is concealing such purported impeachment evidence from the jury, see, e.g., United States v. Guerrero, 882 F. Supp. 2d 463, 492 (S.D.N.Y. 2011).

Here, the government offers evidence of the defendant's participation in uncharged acts not to show propensity but rather, as explained below, as evidence of the defendant's knowledge, intent and common scheme or plan, as well as his modus operandi.

B.    Analysis

Evidence of the defendant's sexual abuse of Jane Doe #1, Jane Doe #7, Jane Doe #8, Jane Doe #9, Jane Doe #10, Jane Doe #13 and John Doe #1, all minors, should be admitted for the proper purpose of establishing a common scheme or plan used by the defendant, as well as his modus operandi.  In United States v. Larson, 112 F.3d 600, 603 (2d Cir. 1997), the Second Circuit affirmed the defendant's conviction for sexual molestation of a minor, in which the district court permitted the introduction of testimony related to uncharged sexual conduct where the defendant had used similar methods of enticing his victims with, among other methods, sporting equipment and alcohol because such evidence demonstrated a common scheme or plan.  Similarly, here, the defendant used two separate common schemes to recruit his victims.  Sometimes, he relied upon a member of his inner circle to select the victim (upon Kelly's direction) such as how he identified Jane Doe #9 and Jane Doe #13, and Jane Doe #5 and Jane Doe #6.  Other times, the defendant lured minors to his orbit by promising to mentor them in the music world, such as how he lured John Doe #1 and Jane Doe #5, or – in the case of Jane Doe #1 – by in fact writing and producing music for her.  See United States v. Baker, 82 F.3d 273, 276 (8th Cir. 1996) (finding district court properly admitted 404(b) evidence of a "remarkably similar series of prior actions" showing the defendant's common plan or scheme).  This evidence, along with the evidence regarding Kelly's direction to Jane Doe #5 to obtain child pornography for his use and the nature of his prior criminal case in Cook County, Illinois (as described above), is also admissible to prove the defendant's motive to carry out the alleged crimes, and his knowledge and intent (i.e., state of mind) in doing so, all permissible uses of other acts evidence.

C.    <u>The Probative Value of the "Other Crimes" Evidence Far Outweighs Any
Prejudicial Effect</u>

Finally, the probative value of the other acts evidence is not substantially

outweighed by its prejudicial effect.  Evidence of other crimes is admissible when offered for

a proper purpose through various types of evidence, including witness testimony, so long as

the evidence "'[does] not involve conduct any more sensational or disturbing than the

crime[] with which [the defendant has been] charged.'"  <u>Pitre</u>, 960 F.2d at 1120 (quoting

<u>United States v. Roldan-Zapata</u>, 916 F.2d 795, 804 (2d Cir. 1990)).  Where the uncharged

crimes are similar in nature to the charged crimes, Rule 404(b) evidence is admissible under

the Rule 403 balancing test.  <u>See</u> <u>United States v. Livoti</u>, 196 F.3d 322, 326 (2d Cir. 1999)

(upholding admissibility of evidence that the defendant, a police officer charged with

engaging in excessive use of force with an arrestee, choked another arrestee on the basis that

"the evidence did not involve conduct more inflammatory than the charged crime, and the

district court gave a careful limiting instruction"); <u>Paulino</u>, 445 F.3d at 223 (prior cocaine

convictions admissible as proof that the defendant was aware that substance in his closet was

cocaine; observing that evidence admissible pursuant to Rule 404(b) should not be excluded

on grounds of unfair prejudice where the evidence does not "involve conduct more

inflammatory than the charged crime[s]").

As noted above, the evidence relating to the other criminal acts listed above

will come primarily from the testimony of victim witnesses and, with respect to the threats

against Jane Doe #6, documentary evidence.  Accordingly, the quality of the evidence is no

more prejudicial than that offered with regard to the other charged crimes. More importantly,

the uncharged criminal acts are either similar in nature or less sensational than the charged

crimes.  In any event, any potential prejudice to the defendant can be effectively mitigated by

a cautionary instruction limiting the jury's consideration of the evidence to the purposes for

which it is offered.  See, e.g., United States v. Mickens, 926 F.2d 1323, 1328-29 (2d Cir.

1991); United States v. Snype, 441 F.3d 119, 129 (2d Cir. 2006) (the law presumes that

juries follow limiting instructions).

IV.   EVIDENCE OF THE DEFENDANT'S SEXUAL ASSAULT OF
      OTHER VICTIMS IS ALSO ADMISSIBLE UNDER RULE 413

   A.   Legal Standard

        In a sexual assault case, the admissibility of evidence of a prior sexual assault

offense is governed by Rule 413.[6]  The rule provides that in "a criminal case in which a

defendant is accused of a sexual assault, the court may admit evidence that the defendant

committed any other sexual assault.  The evidence may be considered on any matter to which

it is relevant."  Fed. R. Evid. 413(a).  Rule 413(d) defines "sexual assault" as:

> a crime under federal law or under state law (as "state" is
> defined in 18 U.S.C. § 513) involving: (1) any conduct
> prohibited by 18 U.S.C. chapter 109A; (2) contact, without
> consent, between any part of the defendant's body — or an
> object — and another person's genitals or anus; (3) contact,
> without consent, between the defendant's genitals or anus and
> any part of another person's body; (4) deriving sexual pleasure
> or gratification from inflicting death, bodily injury, or physical

---

[6]    Rule 413's sister-rule, Rule 414, allows evidence of a defendant's commission
of a prior offense of child molestation in a criminal case where the defendant is accused of
child molestation.  Rule 415 provides that the evidence covered by Rules 413 and 414 is
admissible in civil cases.  The principles governing admission of evidence under these rules
is the same.  See, e.g., United States v. Barnason, No. 10 Civ. 3335, 2012 WL 426438, at *8
(S.D.N.Y. Feb. 10, 2012) (noting that "[t]here is a dearth of case law in this Circuit
concerning how district courts should apply Fed. R. Evid. 415," and relying on cases
interpreting Rule 413 to admit under Rule 415 uncharged acts of sexual assault in a civil
case).

pain on another person; (5) an attempt or conspiracy to engage
in conduct described in subparagraphs (1)–(4).

Fed. R. Evid. 413(d).

Rule 413 stands as an exception to the general rule barring "the admission of

evidence for the purpose of showing a defendant's propensity to commit bad acts."  Fed. R.

Evid. 404(a).  Put differently, Rule 413 permits other acts evidence precisely for the purpose

of showing a defendant's propensity to engage in the kinds of acts with which he is charged.

"Congress enacted [Rules 413-415] because these types of cases [referring to sexual assault

cases] often raise questions regarding the victim's credibility and a defendant's prior conduct

can be especially probative," and the rules are "'based on the premise that evidence of other

sexual assaults is highly relevant to prove propensity to commit like crimes.'"  United States

v. Batton, 602 F.3d 1191, 1196 (10th Cir. 2010) (quoting United States v. Enjady, 134 F.3d

1427, 1431 (10th Cir. 1998)); (emphasis added); see also United States v. Davis, 624 F.3d

508, 512 (2d Cir. 2010) (Rules 413 and 414 are an express "exception to the usual

proscription against admission of prior crimes to prove the character of a person in order to

show action in conformity therewith."); United States v. Seymour, 468 F.3d 378, 384-85 (6th

Cir. 2006) ("Rules 413 and 414, enacted in 1995, were designed to 'protect the public from

crimes of sexual violence' by permitting 'in sexual assault and child molestation cases . . .

evidence that the defendant has committed offenses of the same type on other occasions.'"

(quoting 140 Cong. Rec. H8968, H8991 (daily ed. Aug. 21, 1994) (statement of Rep.

Molinari)).  These rules apply not just to prior convictions, but even to evidence of

uncharged offenses.  See Johnson v. Elk Lake Sch. Dist. ("Elk Lake"), 283 F.3d 138, 151-52

(3d Cir. 2002).

Rule 413 was designed to "supersede in sex offense cases the restrictive aspects of Federal Rule of Evidence 404(b)" and to create a presumption that "evidence admissible pursuant to the proposed rules is typically relevant and probative, and that its probative value is normally not outweighed by any risk of prejudice or other adverse effects." 140 Cong. Rec. H968, H8991-92 (1994) (remarks of principal House sponsor, Rep. Molinari); see also 140 Cong. Rec. S12990; David J. Karp, Evidence of Propensity and Probability in Sex Offense Cases and Other Cases, 70 Chi. Kent. L. Rev. 15, 19 (1994). Furthermore, Congress recognized and intended that this approach would make the admission of similar crimes evidence in federal sex offense cases the norm, and its exclusion the exception, even in instances where there is a substantial lapse in time between the charged conduct and the prior acts. The legislative sponsors noted:

> The practical effect of the new rules is to put evidence of uncharged offenses in sexual assault and child molestation cases on the same footing as other types of relevant evidence that are not subject to a special exclusionary rule. The presumption is in favor of admission. The underlying legislative judgment is that the evidence admissible pursuant to the proposed rules is typically relevant and probative, and that its probative value is normally not outweighed by any risk of prejudice or other adverse effects.
>
> In line with this judgment, the rules do not impose arbitrary or artificial restrictions on the admissibility of evidence. Evidence of offenses for which the defendant has not previously been prosecuted or convicted will be admissible, as well as evidence of prior convictions. No time limit is imposed on the uncharged offenses ... as a practical matter, evidence of other sex offenses by the defendant is often probative and properly admitted, notwithstanding substantial lapses of time in relation to the charged offense or offenses.

140 Cong. Rec. H8992 (1994) (Statements of Rep. Molinari and Senator Dole) (emphasis added); see also 137 Cong. Rec. S3212, S338-3242 (1991); Karp, 70 Chi. Kent L. Rev. at 19.

Evidence of a defendant's prior sexual assault is admissible under Rule 413 where "(1) the defendant is currently accused of an offense of sexual assault; (2) the proffered prior acts evidence is 'of the defendant's commission of another offense . . . of sexual assault,' Fed. R. Evid. 413(a); and (3) the proffered evidence is relevant." Batton, 602 F.3d at 1196 (citing United States v. Guardia, 135 F.3d 1326, 1328 (10th Cir. 1998)); see also Elk Lake, 283 F.3d at 144-56; United States v. Prawdzik, 2008 U.S. Dist. LEXIS 65499, *3-5 (E.D. Pa. Aug. 25, 2008). With respect to the last prong, it is generally accepted that a defendant with a propensity to commit sexual acts similar to those charged is more likely to have committed the charged act and therefore such evidence is relevant and in conformity with the standards set out in Rules 401 and 402. Doe v. Glanzer, 232 F.3d 1258, 1268 (9th Cir. 2000); see also Fed. R. Evid. 401 (stating that evidence is relevant if it has a tendency to "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"); Fed. R. Evid. 402 (stating that only relevant evidence is admissible at trial).

Even where the evidence is determined to be relevant, however, a Rule 403 balancing is appropriate when deciding whether to admit such evidence. United States v. Awadallah, 436 F.3d 125, 131 (2d Cir. 2006) ("so long as the district court has conscientiously balanced the proffered evidence's probative value with the risk for prejudice," a Rule 403 determination "will be disturbed only if it is arbitrary or irrational"); United States v. Davis, 624 F.3d 508, 512 (2d Cir. 2010); United States v. Schaffer, 851 F.3d 166, 180 (2d Cir. 2017). See also United States v. Vickers, 708 Fed. Appx. 732, 736 (2d Cir. 2017). The Third Circuit's decision in Elk Lake is particularly instructive with regard to the Rule 403 analysis that must take place in this context. The court instructed as follows:

Having concluded that Rule 403 is applicable to Rules 413-15, we now turn to the manner in which the balancing inquiry ought to be performed.  Relying on the legislative history, a number of courts and commentators have concluded that Rule 403 should be applied to Rules 413-15 with a thumb on the scale in favor of admissibility.  See United States v. Larson, 112 F.3d 600, 604 (2d Cir. 1997) ("With respect to the Rule 403 balancing . . . the sponsors [of Rules 413-15] stated that 'the presumption is that the evidence admissible pursuant to these rules is typically relevant and probative, and that its probative value is not outweighed by any risk of prejudice.'") (quoting 140 Cong. Rec. S12,990 (daily ed. Sept. 20,  1994) (Statement of Sen. Dole)); see also United States v. LeCompte, 131 F.3d 767, 769 (8th Cir. 1997) (noting the "strong legislative judgment that evidence of prior sexual offenses should ordinarily be admissible").  Indeed, in his speech that is referenced as part of the "authoritative" legislative history of Rules 413-15, David Karp observed that there is "an underlying legislative judgment . . . that the sort of evidence that is admissible pursuant to proposed Rules 413-15 is typically relevant and probative, and that its probative value is normally not outweighed by any risk of prejudice or other adverse considerations."  Evidence of Propensity, 70 Chi.-Kent L. Rev. at 19.

In our view, this characterization of the role of Rule 403 is overly simplified.  It makes sense when the past act sought to be introduced under Rules 413-15 is demonstrated with specificity, see Enjady, 134 F.3d at 1433 (identifying "how clearly the prior act has been proved" as a factor to be considered in assessing the probative value of evidence of past sexual assaults), and is sufficiently similar to the type of sexual assault allegedly committed by the defendant.  See United States v. Guardia, 135 F.3d 1326, 1331 (10th Cir. 1998) (noting that "the similarity of the prior acts" to the acts at issue in the case is a factor to be considered in determining their probative value).  In these archetypal cases, where the propensity inference that can be drawn from the past act evidence is greatest, Congress surely intended for the probative value of the evidence to outweigh its prejudicial effect, and, conversely, did not want Rule 403 factors such as undue delay, waste of time, confusion of the issues, etc., to justify exclusion.  See, e.g., 140 C.R. 15,209 (1994) (Statement of Rep. Kyl) (recognizing as the archetypal case one in which "there is a clear pattern of conduct by an accused who has been convicted of similar conduct").

47

> In other cases, however, where the past act is not substantially similar to the act for which the defendant is being tried, and/or where the past act cannot be demonstrated with sufficient specificity, the propensity inference provided by the past act is weaker, and no presumption in favor of admissibility is warranted.  Where a past act cannot be shown with reasonable certainty, its probative value is reduced and it may prejudice the defendant unfairly, confuse the issues, mislead the jury, and result in undue delay and wasted time -- all reasons for excluding evidence under Rule 403.  The same can be said of evidence of past acts that are dissimilar to the act for which the defendant is being tried; in particular, the introduction of dissimilar past acts runs the risk of confusing the issues in the trial and wasting valuable time.  Also relevant to the Rule 403 balancing analysis are the additional factors recognized by the Tenth Circuit in Guardia: "the closeness in time of the prior acts to the charged acts, the frequency of the prior acts, the presence or lack of intervening events, and the need for evidence beyond the testimony of the defendant and alleged victim."  135 F.3d at 1330 (internal citations omitted).

Elk Lake, 283 F.3d at 155-56.

> B.   Analysis

> 1.   The Defendant is Charged with Sexual Assault

Kelly is currently charged with multiple types of sexual assault.  First,

Racketeering Act Four in Count One of the Indictment alleges that Kelly sexually assaulted

Jane Doe #3 by engaging in sexual contact without her consent.  See Fed. R. Evid. 413(d)(2)

(definition of "sexual assault" includes state law violations involving "contact, without

consent, between any part of the defendant's body — or an object — and another person's

genitals or anus").  Second, Racketeering Acts Six, Eleven and Thirteen – involving Jane

Doe #4, Jane Doe #5 and Jane Doe #6 – allege that the defendant caused them to engage in

sexual contact with them by placing them in fear of, inter alia, physical injury, conduct that

qualifies as "sexual assault."  See Fed. R. Evid. 413(d)(1) (defining sexual assault to include

48

state and federal law violations involving "any conduct prohibited by 18 U.S.C. chapter

109A"); 18 U.S.C. 2241 (Chapter 109A includes "caus[ing] another person to engage in a

sexual act . . . by placing that other person in fear that any person will be subjected to death,

serious bodily injury"); 2242(1) (Chapter 109A includes "caus[ing] another person to engage

in a sexual act by threatening or placing that other person in fear (other than by threatening

or placing that other person in fear that any person will be subjected to death, serious bodily

injury, or kidnapping)")

> 2.    Evidence of Other Sexual Assaults Are Admissible Under Rule 413

Because Kelly has been accused of sexual assaults, evidence of other sexual

assaults is plainly admissible under Rule 413.  Specifically, the government intends to

introduce evidence of Kelly's use of physical and psychological coercion as to Jane Doe #17,

Jane Doe #18 and Jane Doe #20 to show Kelly's propensity to carry out such conduct and

therefore as evidence supporting the charged sexual assaults of Jane Doe #4, Jane Doe #5

and Jane Doe #6.

Nor is evidence of the prior sexual assaults barred by Rule 403.  While the

evidence of the defendant's sexual assaults of Jane Doe #17, Jane Doe #18 and Jane Doe #20

is prejudicial in the sense that it tends to support the government's case, Rule 403 excludes

only evidence where threatened prejudice is both "unfair" and it "substantially" outweighs

the probative nature of the evidence.  See Davis, 624 F.3d at 512 (noting that even "highly

prejudicial" is not necessarily "unfairly prejudicial").  Indeed, the Second Circuit has

instructed courts to apply Rule 403 "less stringently" to evidence proffered under Rule 413.

Barnason, 2012 WL 426438, at *3 (citing Larson, 112 F.3d at 604).  Specifically, the Second

Circuit has noted, "[w]ith respect to the Rule 403 balancing[,] . . . the sponsors [of Rules

413-415] stated that '[t]he presumption is that the evidence admissible pursuant to these rules is typically relevant and probative, and that its probative value is not outweighed by any risk of prejudice.'"  Larson, 112 F.3d at 604 (quoting 140 Cong. Rec. S12,990 (daily ed. Sept. 20, 1994) (Statement of Sen. Dole)).

Consequently, where, as here, evidence is offered under Rule 413, courts apply Rule 403 with a "thumb on the scale in favor of admissibility."  Johnson, 283 F.3d at 155; see also Davis, 624 F.3d at 512 (noting that sexual propensity evidence may be "highly prejudicial" but not necessarily "unfairly prejudicial" and affirming admission of such evidence under Rule 414); Barnason, 2012 WL 426438, at *5 (applying presumption that the probative value of evidence of past sexual assaults is not outweighed by the risk of unfair prejudice).  Moreover, it is insufficient for the defendant to allege that the evidence may lead jurors to find the defendant liable not for his abuse of Jane Doe #4, Jane Doe #5 or Jane Doe #6, but of Jane Doe #17, Jane Doe #18 or Jane Doe #20.  Such a danger is one that all propensity evidence presents and yet Congress expressly overruled the prior rule that previously excluded it.  See United States v. LeCompte, 131 F.3d 767, 769 (8th Cir. 1997) (noting the "strong legislative judgment that evidence of prior sexual offenses should ordinarily be admissible" and holding that the district court abused its discretion in excluding under Rule 403 evidence of defendant's prior uncharged sex offenses).

V.   THE VICTIMS IDENTIFIED IN THE OTHER ACTS EVIDENCE DESCRIBED
     ABOVE SHOULD BE PERMITTED TO TESTIFY USING, AND BE REFERRED
     TO BY, THEIR FIRST NAME ONLY OR PSEUDONYMS AT TRIAL

For the reasons stated in its first motion in limine filed on July 10, 2021, see ECF No. 121 (which is incorporated herein by reference), the government respectfully submits that the victim-witnesses identified above, namely Jane Doe #8, Jane Doe #10, Jane

50

Doe #11, Jane Doe #13, Jane Doe #15, Jane Doe #16, Jane Doe #17, Jane Doe #18 and Jane

Doe #20 and John Doe #1 and John Doe #2 (the "Victim-Witnesses"), should be permitted to

testify using their first names only or pseudonyms and/or should be referred to in this manner

by other witnesses and the parties at trial.  As described above, testimony related to these

witnesses will consist of highly sensitive and personal testimony concerning their medical

history and illegal sexual abuse and contact by the defendant, some of which occurred while

most of them were minors.  The limited protections requested by the government for the

Victim-Witnesses' personal identifiers are reasonable, necessary and appropriate to protect

their safety and well-being, avoid harassment of the Victim-Witnesses by the press and

others, and prevent undue embarrassment and other adverse consequences, such as retaliation

by the defendant's supporters, need for relocation, or loss of employment.

<u>CONCLUSION</u>

For the reasons set forth above, the government's motion <u>in</u> <u>limine</u> should be

granted.

Dated:     Brooklyn, New York
           July 23, 2021

                              Respectfully submitted,

                              JACQUELYN M. KASULIS
                              ACTING UNITED STATES ATTORNEY
                              Eastern District of New York
                              271-A Cadman Plaza East
                              Brooklyn, New York 11201

                    By:     __/s/_____
                              Elizabeth Geddes
                              Nadia Shihata
                              Maria Cruz Melendez
                              Assistant United States Attorneys
                              (718) 254-7000

cc:     Clerk of Court (AMD) (by ECF)
        All defense counsel of record (by ECF)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
========================================X
UNITED STATES OF AMERICA,                          19-CR-286 (S-3)


           -against-


ROBERT SYLVESTER KELLY,
      Also known as "R. Kelly,"


                 Defendant.
========================================X



**<u>MEMORANDUM OF LAW IN OPPOSITION OF
THE GOVERNMENT'S MOTION IN LIMINE TO
ADMIT CERTAIN UNCHARGED ACTS</u>**




                          Thomas A. Farinella
                          Nicole Blank Becker
                          Attorneys for the Defendant
                          Robert S. Kelly
                          260 Madison Avenue, 8th Floor
                          New York, New York 10016

## PRELIMINARY STATEMENT

Mr. Kelly respectfully submits this memorandum in opposition to the government's motion *in limine* to admit at trial evidence of certain acts by Mr. Kelly.  This evidence of certain acts offered in the government's motion are unequivocally inadmissible under the Federal Rules of Evidence because the government's request is untimely, not relevant and if permitted will cause severe prejudice to Mr. Kelly of which such prejudice outweighs the probative value.  Therefore, if the Court does not deny the government's motion Mr. Kelly's constitutional rights will be violated as well as his right to a fair trial.

## I.    LACK OF TIMELINESS BY THE GOVERNMENT IN PRODUCING THE OTHER ACTS WITNESSES

### A.    Timeliness of the "other acts" evidence

Understanding that the government in many federal criminal cases request permission of the court for the use of 404(b) evidence of an accused's extrinsic acts, of which is viewed as an important asset in the government's case against an accused. This fact comes with the understanding that certain time limits will be adhered to, so as to not prejudice the defense. The 2020 amendments to Rule 404(b) contains additional notice requirements placed on the government in a criminal case.

Rule 404(b), Federal Rules of Evidence, requires the prosecution to provide reasonable notice of any other-crimes evidence the prosecutor intends to offer at trial. The notice is to be in advance of trial. *See* Rule 404(b)(3). Additionally, per Rule 404(b), the government must not only identify the evidence that it intends to offer pursuant to the rule but also articulate a non-propensity purpose for which the evidence is offered and the basis for concluding that the evidence is relevant in light of this purpose.

Effective December 1, 2020, Rule 404(b)'s notice requirement was moved to the new Rule 404(b)(3) and made mandatory. *See Authors' Comments* 404(b)(4) and 4040(b)(11). The amendment to Rule 404(b) makes clear what notice is required. The pretrial notice must be in writing—which this requirement is satisfied by notice in electronic form. *See* Rule 101(b)(6). Requiring the notice to be in writing provides certainty and reduces arguments about whether notice was actually provided. The government did provide notice in writing per Rule 404(b).

The part of the 404(b) rule that was not followed by the government is the fact that notice must be provided before trial in such time as to allow the defendant a fair opportunity to meet the evidence, unless the court excuses that requirement upon a showing of good cause. *See* Rules 609(b), 807, and 902(11). Advance notice of Rule 404(b) evidence is important so that the parties and the court have adequate opportunity to assess the evidence, the purpose for which it is offered, and whether the requirements of Rule 403 have been satisfied—even in cases in which a final determination as to the admissibility of the evidence must await trial. The good cause exception applies not only to the timing of the notice as a whole but also to the timing of the obligations. See Rule 404(b).

The government must articulate a non-propensity purpose for requesting Jane Doe's and John Doe's testimony in order to be properly admitted and the reasoning supporting that purpose. Oftentimes, the gathering of such information and the formulation of such theories takes a lengthy period of time. The defense should be granted an equal amount of time as the government when it comes to formulating arguments against their requests. Under the current schedule before the Court, the defense is prejudiced by the timing of notice given by the government.

The government filed their notice with the Court to *Admit Certain Uncharged Acts* on July 23, 2021. July 23, 2021 is only 16 days prior to jury selection which is considered the start of jury

trial. Mr. Kelly was afforded a mere 7 days to respond to the "other-acts" motion of which the government has not revealed any of the Jane Doe's or John Doe's identities. Not only is the defense responsible for answering the government's "other acts" motion filed on July 20, 2021, but the government also filed an additional lengthy Motion in limine *to admit certain evidence and preclude certain evidence,* also with short notice. On the exact same day, the government supplied additional 3500 material to the defense, all of which require a thorough analysis prior to trial.

It is impossible for the defense to properly defend Mr. Kelly when the filing of the government's notice has not been provided in such time as to allow the defendant a fair opportunity to meet the evidence. Given the nearness of trial, the defense is not given ample amount of time to ensure an adequate opportunity to assess the evidence, the purpose for which the evidence is offered, and whether the requirements of Rule 403 have been satisfied are not. Therefore, the defense believes it is appropriate for the Court to dismiss the government's motion in its entirety.

Assuming arguendo, the Court is not willing to deny the government's motion to *Admit Certain Uncharged Acts* based on a lack of advanced notice to the defense, the defense requests each of the requested "other acts" by the government be denied by the Court.

**B. Jury Questionnaire**

The final jury questionnaires were due in June of 2021. The jury questionnaires were approved by both the government and the defense. On July 26, 2021, the distribution of the jury questionnaires took place. Post the jury questionnaire having been sent out, the government filed their "other acts" motion. The "other acts" motion references two John Does that the government requests to call as 404(b) witnesses. The two John Does alledge to have had a same-sex relationship with Mr. Kelly.

3

The questionnaires sent to the potential jurors on Mr. Kelly's case are void of a single question about their opinions or feelings on same-sex relationships. The topic of sexual orientation has become as controversial as politics. This topic would have been ripe for questioning in the jury questionnaire. Thus, failure to include such questions violates Mr. Kelly's constitutional right to a fair trial.

Because the government has had access to all of the evidence in Mr. Kelly's case for over two years, there is no question that they were aware of the John Doe's allegations long before the Jury Questionnaires were finalized. Despite possessing this information, there was never any mention by the government that this controversial topic would potentially be part of Mr. Kelly's trial. The defense was blindsided. Therefore, given the serious nature of the government's proposed allegations by the John Doe's and a lack of transparency in an effort to address the jury pool on this issue alone, should bar the government's request to introduce any evidence concerning the John Doe's.

A written jury questionnaire should propound questions that are balanced to aid in the selection of a fair and impartial jury. *United States v. Wilson*, 493 F. Supp. 2d 397, 403 (E.D.N.Y. 2006))[Q]uestions may be proper [and] indeed necessary[] if they deal with subject matter that would demonstrate impermissible bias on the part of a juror." *Id.* at 404-05 (citing *United States v. Fell*, 372 F. Supp. 2d 766, 770 (D. Vt. 2005)). There is no question that the only purpose for which  government seeks to introduce evidence from the John Doe's is purely salacious and sensational reasons.

It is indisputable that the allegations of the alleged same-sex relationships is a subject matter that would demonstrate impermissible bias on the part of a juror.  The failure to include any questions about this specific and unique subject matter for the potential jurors to respond to makes

4

the selection of a fair and impartial jury impossible.  Therefore, Mr. Kelly respectfully requests

that the Court deny the government's motion in its entirety.  The failure to do so would result in

his constitutional right to a fair trial and an impartial jury will be violated.

## II.      ARGUMENT

The Federal Rules of Evidence governs the admissibility of evidence of prior or subsequent

"bad acts" evidence of "crimes, wrongs, or acts" other than those charged in the indictment. *See*

Fed. R. Evid. 404(b). The Federal Rules of Evidence further prohibit admission of evidence of

other crimes, wrongs, or acts to prove the character of a person in order to show action in

conformity therewith. *Id.* Additionally, Rule 404(b) prohibits the admission of such evidence if it

proves the character of a person to show his propensity to commit the charged act, but permits its

admission for other purposes. *Id.* "Other act" evidence serves a proper purpose so long as it is not

offered to show the defendant's propensity to commit the offense. *United States v. Curley*, 639

F.3d 50, 2011 U.S. App. LEXIS 8442, 85 Fed. R. Evid. Serv. (Callaghan) 233. The Federal District

Court of New York  follows the "inclusionary" approach, which admits all "other act" evidence

that does not serve the sole purpose of showing the defendant's bad character and that is neither

overly prejudicial under Rule 403 nor irrelevant under Rule 402. *United States v. Pascarella,* 84

F.3d 61, 69 (2d Cir. 1996). Even under this approach, however, district courts should not presume

that such evidence is relevant or admissible. *United States v. Halper,* 590 F.2d 422, 432 (2d Cir.

1978).

To satisfy the relevance inquiry, the evidence must be "sufficiently similar to the conduct

at issue to permit the jury reasonably to draw from that act the [state of mind] inference advocated

by the proponent of the evidence." *United States v. Peterson*, 808 F.2d 969, 974 (2d Cir. 1987).

The district court must consider all the evidence presented to the jury and determine whether a

reasonable jury could find the advocated inference. *Huddleston*, 485 U.S. at 690; *United States v. Ramirez*, 894 F.2d 565, 569 (2d Cir. 1990). The court abuses its discretion if the evidence is "not sufficiently similar" to the charged conduct or if "the chain of inferences necessary to connect [the] evidence with the ultimate fact to be proved [is] unduly long." *Peterson*, 808 F.2d at 974 (internal quotation marks omitted).

If the evidence is relevant, the district court must determine if its potential for unfair prejudice substantially outweighs its probative value. *See* Fed. R. Evid. 403. The evidence's probative value "depends largely on whether or not there is a close parallel between the crime charged and the acts shown." *United States v. Gordon*, 987 F.2d 902, 908 (2d Cir. 1993) (internal quotation marks omitted).

Evidence is unfairly prejudicial when "it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Massino*, 546 F.3d 123, 132 (2d Cir. 2008) (internal quotation marks omitted)). If the other acts tend to prove a fact not in issue or "to excite emotions against the defendant," they create a prejudicial effect. *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). The district court abuses its discretion when it admits "other act" evidence with a high possibility of jury misuse but with only slightly more probative value than other evidence on the same issue. *See McCallum*, 584 F.3d at 477.

Permitting the introduction of "other crimes" evidence (particularly in a criminal case) poses the danger that the jury will view it as reflecting on the party's character and reach a verdict because it has concluded that the party is a bad person deserving of punishment. *United States v. Linares*, 367 F.3d 941, 945–46 (D.C. Cir. 2004). Protection against such a danger comes from four sources: (1) from adherence to the command of Rule 404(b) that such evidence may be admitted

only for a non-character purpose; (2) from the relevancy requirement embraced in Rule 402; (3) from Rule 403; and (4) from the use of limiting instructions. *Huddleston v. United States,* 485 U.S. 681, 691–92, 108 S.Ct. 1496, 1502 (1988). *See United States v. Gomez,* 763 F.3d 845, 860–61 (7th Cir. 2014) (discussing proper instruction). The requirement that other crimes evidence may be admitted only for a non-character purpose means that proponents of such evidence "must do more than conjure up a proper purpose—they must also establish a chain of inferences no link of which is based on a propensity inference." *United States v. Smith,* 725 F.3d 340, 345 (3d Cir. 2013); *United States v. Gomez,* 763 F.3d 845, 856, 860 (7th Cir. 2014)

If the Court is so inclined to add an appropriate limiting instruction the following must be considered. Although the law presumes that juries follow limiting instructions, *United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006), these instructions only minimize the evidence's prejudicial effect, *United States v. Figueroa,* 618 F.2d 934, 943 (2d Cir. 1980). A limiting instruction "does not invariably eliminate the risk of prejudice notwithstanding the instruction." *Id*.

Case law in this circuit is clear, Judge William Pauley, who has been lauded for his fairness as jurist in the *U.S. v. Daugerdas*, held, "Fed.R.Evid. 404(b) requires the Government to provide Defendants with "reasonable notice" of any extrinsic "acts" evidence it intends to offer at trial. While Defendants requested Rule 404(b) disclosure on February 5, 2010, the Government did not disclose its intent to offer evidence on the MLD transaction until it produced its exhibit list on January 17, 2011. This Court has cautioned the Government repeatedly about the need to cabin its proof and provide advance disclosure of the transactions to be offered at trial. *Given the magnitude of this case, Defendants cannot adequately prepare to rebut evidence related to the MLD transaction with approximately one month remaining before trial. See* Fed.R.Evid. 404(b)

advisory committee's note, 1991 Amendment ("The amendment to Rule 404(b) adds a pretrial notice requirement in criminal cases and is intended to reduce surprise and promote early resolution on the issue of admissibility."). Accordingly, the Government is precluded from introducing any evidence relating to the MLD transaction." *U.S. v. Daugerdas* 2011 WL 573587. This Court should mirror the ruling, "pgiven the magnitude" of this case, which is indisputable, and conclude that Mr. Kelly would suffer irreparable prejudice if the government's motion is granted with less than "one month remaining before trial."

Similar to the case at bar, the defense was not given "reasonable notice" of any extrinsic "acts" evidence until *less than* 30 days before trial. Given the magnitude of this case, just like in *Daugerdas,* Mr. Kelly cannot adequately prepare to rebut the evidence of additional allegations made by 13 Jane Does and 2 John Does. Accordingly, the defense requests the Court preclude the government from introducing any "other acts" evidence and deny the government's motion in its entirety.

### III. OPPOSITION TO THE GOVERNMENT'S REQUEST TO ENTER EVIDENCE OF THE DEFENDANT'S OTHER ACTS

There are thirteen Jane Does and two John Does, whose identities are still confidential. The Court must determine admissibility of their proposed testimony by the government. None of the names of the Jane Does or John Does have been disclosed to the defense. Without disclosure of their names it is merely impossible to adequately respond to the government's motion, especially given the fact that Mr. Kelly and defense have had a mere 7 days to respond. The standard for pretrial disclosure of witnesses is "whether a specific showing of need for disclosure by the defendant outweighs a specific showing of need for concealment by the government." *See United States v. Goldman,* 439 F. Supp. 337, 350 (S.D.N.Y. 1977); *United States v. Cannone*, 528 F.2d 296, 302 (2d Cir. 1975).

The Jane Does in the government's "other acts" motion are no less important than the Jane Does and John Does in the superseding indictment. A single Jane Doe or John Doe that is allowed to testify against the defendant must be met with the same rigorous cross-examination throughout the trial as Jane Does #1-6. Therefore, without the knowledge of the identity of the Jane and John Doe's with whom the defense is entitled to thoroughly cross-examine, the defense is at a disadvantage when it comes to adequately preparing and effectively defending Mr. Kelly at trial. More importantly, it is impossible for the defense to make effective arguments necessary to combat the introduction of each 404(b)-witness proposed by the government when the defense is in the dark as to the identities of the Jane and John Doe's.

## A.     Jane Doe #1, a Minor

The government seeks to introduce evidence regarding Mr. Kelly's alleged sexual abuse of Jane Doe #1 to prove his motive for engaging in Racketeering Act One, bribery. The defense believes the evidence the government seeks to admit lack's reliability, eviscerates Mr. Kelly's Sixth Amendment right to confront his accusers and should be excluded for prejudice and/or confusion under Rule 403.

Mr. Kelly has a right to confront his accusers, this right is a right which is guaranteed in the Confrontation Clause of the Sixth Amendment of the United States Constitution. *Crawford v. Washington*, 541 U.S. 36, 43, 124 S. Ct. 1354, 1359, 158 L. Ed. 2d 177, 187, 2004 U.S. LEXIS 1838, 72 U.S.L.W. 4229, 63 Fed. R. Evid. Serv. (Callaghan) 1077, 17 Fla. L. Weekly Fed. S 181. Testimonial statements of witnesses absent from trial are admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine. *Id.* Per Rule 804, hearsay exceptions, a declarant is unavailable if he or she is "unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity."

In the government's motion, representations are made that "sexual abuse" of Jane Doe #1 occurred at the hands of Mr. Kelly. The government asserts that, "While Jane Doe #1 was still a minor, Kelly began a sexual relationship with her and, in August 1994, when Jane Doe #1 was 15 years old, Kelly believed Jane Doe #1 had become pregnant." There is absolutely no physical proof, nor circumstantial proof, that any of these allegations put forth by the government are true. Jane Doe #1 is unable to testify that any of the above allegations are true, they are merely accusations that assist in forming the government's narrative. First, due to the unfortunate passing away of Jane Doe #1 on August 25, 2001, she is legally unavailable. Second, the defendant has never had a prior opportunity to cross-examine Jane Doe #1 prior to her passing away. Therefore, the additional information the government seeks to introduce regarding Jane Doe #1 is nothing more than conjecture and an effort to further shape their narrative.

In the government's last attempt to be granted permission to get their narrative in regarding Jane Doe #1, the government wrote, "Given Jane Doe #1's age, the bribery charged in Racketeering Act One was necessary to effectuate the marriage." This sentence alone, may be appropriate for jurors to hear when attempting to prove the bribery charge, the rest is an effort to support their narrative with no actual evidence to support such prejudicial allegations.

Lastly, Rule 403 does not support the evidence coming in. Rule 403 Stands for the premise that the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

If the government somehow proves the evidence they wish to admit is relevant, the allegations made regarding Jane Doe #1 and Mr. Kelly still should not be allowed in because their

probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues and misleading the jury. *See* Rule 403.

### B. Sexual Abuse Allegations of Jane Doe 7 through Jane Doe 20

In the event this Court is prepared to allow Jane Doe 7 through Jane Doe 20 to testify, the defense vehemently objects. It is the defense's position that without knowing the names of Jane Doe 7 through Jane Doe 20, the defense cannot effectively show the Court why each and every Jane Doe should be stricken. If the names of the Jane Does are revealed to the defense, the defense would certainly be able to promulgate the proper response for objecting to their introduction under the law.  However, given the time restraints in the trial schedule and with only 10 days left until the trial begins the government should be rewarded for its untimely and late disclosure.More importantly, the Court should consider all of the reasons stated above in denying the government's motion as to Jane Doe 7 through Jane Doe 20.

### C. Sexual Abuse Allegations of John Doe 1 and John Doe 2

The argument for striking John Doe 1 and John Doe is first executed under the "Timeliness of the other acts evidence" at the beginning of this motion. The second argument for why the John Doe 1 and John Doe 2 should be stricken as 404(b) witnesses is the same argument as stated regarding the Jane Does. Without knowledge of the names of John Doe 1 and John Doe 2, the defense cannot effectively show the Court why each of the John Does should be stricken. If the names of the John Does are revealed to the defense, the defense would certainly be able to promulgate the proper response for objecting to their introduction under the law. However, given the time restraints in the trial schedule and with only 10 days left until the trial begins the government should be rewarded for its untimely and late disclosure.  More importantly, the Court

should consider all of the reasons stated above in denying the government's motion as to John Doe 1 and John 2.

## IV.    CONCLUSION

For the reasons set forth above, the government's motion in limine should be denied.

Dated: New York, New York
        July 30, 2021

                              Respectfully submitted,

                               /s/Thomas A. Farinella
                              Thomas A. Farinella
                              Nicole Blank Becker
                              Attorneys for the Defendant
                              Robert S. Kelly
                              260 Madison Avenue, 8th Floor
                              New York, New York 10016
                              Tel:  (917) 319-8579



225 BROADWAY
SUITE 715
NEW YORK, NY 10007
T: 212 323 6922
F: 212 323 6923

September 18, 2021

The Honorable Ann M. Donnelly
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

RE:     United States v. Robert Kelly
        Criminal Docket No.: 19-286 (AMD)

Dear Judge Donnelly:

        The defense submits this letter motion seeking an amendment of the proposed jury instructions.  The defense recognizes that the Court directed the parties to submit joint proposed instructions.  However, after a review of the testimony elicited at trial, the defense submits that the proposed amendments are required.

Request No: 16/ Racketeering Act One
        With respect to the Illinois statute for bribery, the proposed instruction currently reads:

> Illinois Criminal Code Section 5/33-1(a) provides, in pertinent part, that:
>
> A person commits bribery when . . . with intent to influence the performance of any act related to the employment and function of any public officer [or] public employee . . . , he promises or tenders to that person any property which he is not authorized by law to accept.
>
> The government must prove beyond a reasonable doubt each of the following

elements:

|        |        |
|--------|--------|
| First, | That the person the defendant sought to influence was a public officer or public employee; |
| Second, | That the defendant caused another person to promise or tender property to the person the defendant sought to influence; and |
| Third, | That the defendant did so with the intent to influence the performance of any act related to that person's employment or function as a public officer or public employee. |

However, the pattern jury instructions given by Illinois Courts provide:

**Ill. Pattern Jury Instr.-Criminal 21.11**

Illinois Pattern Jury Instructions-Criminal | Database updated April 2021
Illinois Supreme Court Committee On Pattern Jury Instructions In Criminal Cases

21.00. Bribery

# 21.11 Definition Of Bribery—Official

A person commits the offense of bribery when he [1] promises or tenders any [(property) (personal advantage)] to a [(public officer) (public employee) (juror) (witness)] with intent to influence the performance of any act related to the [(officer's) (employee's) (juror's) (witness')] employment or function.

[or]

[2] promises or tenders any [(property) (personal advantage)] to one whom he believes to be a [(public officer) (public employee) (juror) (witness)] with intent to influence the performance of any act related to the employment or function of a [(public officer) (public employee) (juror) (witness)].

[or]

[3] promises or tenders any [(property) (personal advantage)] to another person with intent to cause the other person to influence the performance of any act related to the employment or function of a [(public officer) (public employee) (juror) (witness)].

[or]

[4] [(receives) (retains) (agrees to accept)] any [(property) (personal advantage)] knowing that the [(property) (personal advantage)] [(was tendered) (promised)] with intent to cause him to influence the performance of any act related to the employment or function of a [(public officer) (public employee) (juror) (witness)].

[or]

[5] [(solicits) (receives) (retains) (agrees to accept)] any [(property) (personal advantage)] pursuant to an understanding that he shall [(improperly influence) (attempt to influence)] the performance of any act related to the employment or function of a [(public officer) (public employee) (juror) (witness)].
[The term "public officer" means a person who is elected to office pursuant to statute to discharge a public duty for [any political subdivision of] the State.]

[The term "public officer" means a person who is appointed to an office which is established, and the qualifications and duties of which are prescribed by statute, to discharge a public duty for [any political subdivision of] the State.]

[The term "public employee" is a person who is authorized to perform an official function on behalf of, and is paid by [any political subdivision of] the State.]

[The term "tender" means any delivery or proffer made with the requisite intent.]

**Committee Note**

*Instruction and Note Approved January 26, 2018*

720 ILCS 5/33-1, 2-17, and 2-18 (West 2017), as amended by P.A. 97-1108, effective January 1, 2013.

When paragraph [1] is used, give Instruction 21.12. When paragraph [2] is used, give Instruction 21.12A. When paragraph [3] is used, give Instruction 21.12B. When paragraph [4] is used, give Instruction 21.12C. When paragraph [5] is used, give Instruction 21.12D.

2

Therefore, according to the Illinois pattern jury instructions, the person charged pursuant to the statute has to either promise or tender property or **promise or tender property to another person** with the intent to cause the other person to influence the performance of official act.

This is further illustrated by additional guidance provided by the Illinois pattern jury instructions.  For example,

**Ill. Pattern Jury Instr.-Criminal 21.12**

**Illinois Pattern Jury Instructions-Criminal**   Database updated April 2021
Illinois Supreme Court Committee On Pattern Jury Instructions In Criminal Cases

**21.00. Bribery**

# 21.12 Issues In Bribery—Official

To sustain the charge of bribery, the State must prove the following propositions:

*First Proposition:* That ___ was a [(public officer) (public employee) (juror) (witness)]; and

*Second Proposition:* That the defendant promised or tendered to _____[(property) (a personal advantage)]; and

*Third Proposition:* That the defendant did so with the intent to influence the performance of any act related to _____'s [(employment) (function)] as a [(public officer) (public employee) (juror) (witness)].

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty.

**Committee Note**

*Instruction and Note Approved January 26, 2018*

At the instant trial, the Government called Demetrius Smith regarding the bribery charge.  On direct, Mr. Smith testified that he alone offered money to another person; that Mr. Kelly was not present when he discussed anything about money; and that he received the money from another person and not Mr. Kelly.  Tr. 714-719.  On cross-examination, Mr. Smith was asked: "Q: Okay.  Now, Robert never had anything to do with you bribing anyone to get a marriage license, am I correct?  A. No, he didn't."  Tr. 750-51.

The count related to bribery should be dismissed.  If the Court, however, decides to submit the charge to the jury, it is clear that the Government's theory is that the bribery was conducted through an intermediary.

3

Ill. Pattern Jury Instr.-Criminal 21.12B

Illinois Pattern Jury Instructions-Criminal | Database updated April 2021
Illinois Supreme Court Committee On Pattern Jury Instructions In Criminal Cases

21.00. Bribery

# 21.12B Issues In Bribery—Official—Through An Intermediary

To sustain the charge of bribery, the State must prove the following propositions:

*First Proposition*: That the defendant promised or tendered [(property) (a personal advantage)] to ___; and

*Second Proposition*: That the defendant did so with the intent to cause ___ to influence the performance of any act related to the [(employment) (function)] of a [(public officer) (public employee) (juror) (witness)].

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty.

**Committee Note**

*Instruction and Note Approved January 26, 2018*

 720 ILCS 5/33-1 (West 2017).

As illustrated by the Illinois pattern jury instruction, there are only 2 propositions. The proposed instruction would improperly provide 3 propositions. However, as demonstrated above in any scenario, the defendant would have to tender property directly to the person bribed (21.12) or tender property to the person a third person with the intent to cause the third person to influence the official act.

The second part of the proposed instruction in this case currently reads:

> Second, That the defendant caused another person to promise or tender property to the person the defendant sought to influence; and

However, that is not a proper reading of the statute nor would it appear to be an instruction that would be given pursuant to the pattern instruction. The defense submits that the jury instructions in the instant case regarding the Illinois statute should be guided by the what the Illinois State legislature intended and what is properly given by Illinois state courts. The defense respectfully requests that the instruction be amended so that it reads that the defendant either promised or tendered property to the official actor or promised or tendered property to a person so that he or she could influence the official actor.

4

California Health and Safety Code § 120290

With respect to California Health and Safety Code § 120290, the proposed instruction currently reads:

The government must prove beyond a reasonable doubt:

First,   That the defendant knew that he was afflicted with any contagious, infectious, or communicable disease;

Second,   That the defendant exposed himself to Jane Doe #5 by engaging in unprotected sexual activity with Jane Doe #5;

Third,   That the defendant acted willfully; and.

Fourth,   That the defendant did not inform Jane Doe #5 that he had a contagious, infectious, or communicable disease and obtain her consent to expose himself in these circumstances prior to engaging in the exposure.

However, the text of the statute actually provides:

(a)(1)  A defendant is guilty of intentional transmission of an infectious or communicable disease if all of the following apply:

(A)  The defendant knows that he or she or a third party is afflicted with an infectious or communicable disease.

(B)  The defendant acts with the specific intent to transmit or cause an afflicted third party to transmit that disease to another person.

(C)  The defendant or the afflicted third party engages in conduct that poses a substantial risk of transmission to that person.

(D)  The defendant or the third party transmits the infectious or communicable disease to the other person.

(E)  If exposure occurs through interaction with the defendant and not a third party, the person exposed to the disease during voluntary interaction with the defendant did not know that the defendant was afflicted with the disease.   A person's interaction with the defendant is not involuntary solely on the basis of his or her lack of knowledge that the defendant was afflicted with the disease.

(2)  A defendant is guilty of willful exposure to an infectious or communicable disease if a health officer, or the health officer's designee, acting under circumstances that make securing a quarantine or health officer order infeasible, has instructed the defendant not to engage in particularized conduct that poses a substantial risk of transmission of an infectious or communicable disease, and the defendant engages in that conduct within 96 hours

of the instruction.   A health officer, or the health officer's designee, may issue a maximum of two instructions to a defendant that may result in a violation of this paragraph.

(b)  The defendant does not act with the intent required pursuant to subparagraph (B) of paragraph (1) of subdivision (a) if the defendant takes, or attempts to take, practical means to prevent transmission.

(c)  Failure to take practical means to prevent transmission alone is insufficient to prove the intent required pursuant to subparagraph (B) of paragraph (1) of subdivision (a).

(d)  Becoming pregnant while infected with an infectious or communicable disease, continuing a pregnancy while infected with an infectious or communicable disease, or declining treatment for an infectious or communicable disease during pregnancy does not constitute a crime for purposes of this section.

(e)  For purposes of this section, the following definitions shall apply:

 (1)  "Conduct that poses a substantial risk of transmission" means an activity that has a reasonable probability of disease transmission as proven by competent medical or epidemiological evidence.   Conduct posing a low or negligible risk of transmission as proven by competent medical or epidemiological evidence does not meet the definition of conduct posing a substantial risk of transmission.

 (2)  "Infectious or communicable disease" means a disease that spreads from person to person, directly or indirectly, that has significant public health implications.

 (3)  "Practical means to prevent transmission" means a method, device, behavior, or activity demonstrated scientifically to measurably limit or reduce the risk of transmission of an infectious or communicable disease, including, but not limited to, the use of a condom, barrier protection or prophylactic device, or good faith compliance with a medical treatment regimen for the infectious or communicable disease prescribed by a health officer or physician.

(f)  This section does not preclude a defendant from asserting any common law defense.

The statute also provides:

 (2)  A defendant's medical records, medications, prescriptions, or medical devices shall not be used as the sole basis of establishing the specific intent required pursuant to subparagraph (B) of paragraph (1) of subdivision (a).

Initially, the defense respectfully requests that the Court require the Government to indicate whether the claim is that Mr. Kelly intentionally exposed others or that he willfully exposed others.

Further, the defense respectfully requests that the Court provide an instruction that the defendant does not act with the intent required pursuant to the statute if the defendant takes, or attempts to take, practical means to prevent transmission.  The defense also respectfully requests that the Court provide an instruction that failure to take practical means to prevent transmission alone is insufficient to prove the intent to transmit a communicable disease.

6

California Penal Law Sections 261.5(a) and 261.5(b)

The statute provides: Statute:

> 261.5 (a):  Unlawful sexual intercourse is an act of sexual intercourse accomplished with a person who is not the spouse of the perpetrator, if the person is a minor. For the purposes of this section, a "minor" is a person under the age of 18 years and an "adult" is a person who is at least 18 years of age.

> (b) Any person who engages in an act of unlawful sexual intercourse with a minor who is not more than three years older or three years younger than the perpetrator, is guilty of a misdemeanor.

The defense respectfully requests that the Court provide the following instruction:

Mistake of Fact:  Reasonable mistake by the defendant as to the age of the minor is a defense. This defense applies if the defendant held a reasonable belief that the minor was at least eighteen years old at the time of the sexual intercourse.[1]

Authority:     *People v. Hernandez*, 61 Cal.2d 529, 534, 39 Cal.Rptr. 361, 393 P.2d 673 (Sup. Ct. Cal. 1964) ("There can be no dispute that a criminal intent exists when the perpetrator proceeds with utter disregard of, or in the lack of grounds for, a belief that the female has reached the age of consent. But if he participates in a mutual act of sexual intercourse, believing his partner to be beyond the age of consent, with reasonable grounds for such belief, where is his criminal intent? In such circumstances he has not consciously taken any risk.  Instead he has subjectively eliminated the risk by satisfying himself on reasonable evidence that the crime cannot be committed. If it occurs that he has been misled, we cannot realistically conclude that for such reason alone the intent with which he undertook the act suddenly becomes more heinous").[2]   The Court in *Hernandez*, reversed a conviction for statutory rape wherein the complainant was 17 years and 9 months and the accused had a good faith belief that the complainant was over the age of consent.

---

[1] Judge Sterling Johnson, Jr. provided a jury instruction on a good faith defense in *United States v. Mensah*, 19 Cr. 60 (SJ).

[2] *Hernandez* was superseded by statute 261.5 (d) only regarding sex with a minor under the age of 14 and that is not applicable to the instant case.

7

**Verdict Sheet**

       The defense respectfully requests that the Court amend the verdict sheet so that the choices read:

Not Guilty_____          Guilty_____          and

Not Proven_____          Proven_____.

The rationale for such an amendment is obvious.  The defendant is presumed innocent.  To require the jury to surrender that presumption to first consider guilt in order to go back to a consideration of whether the defendant is not guilty is confusing, may shift the burden of proof, and denies the defendant the true presumption of innocence.[3]

                       Respectfully submitted,

                            /s/

                       Calvin H. Scholar

CHS/jb

cc:     All Counsel,   by E-MAIL

---

[3] Judge Sidney Stein made such an amendment in *United States v. Bryan Duncan, et al.*, 18 Cr. 289 (SHS) Trial Transcript dated May 20, 2019 at p. 1601-02.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
                                           :

UNITED STATES OF AMERICA,         :

                                           :          19 Cr 286 (AMD)

                                           :

-vs-                                     :

                                           :

                                           :

ROBERT SYLVESTER KELLY,      :
      also known as "R. Kelly,"     :

                                           :

               Defendant.      :
-----------------------------------------------------X

## DEFENDANT ROBERT KELLY'S MEMORANDUM OF LAW IN SUPPORT OF <u>A JUDGMENT OF ACQUITTAL</u>

JENNIFER BONJEAN
Bonjean Law Group, PLLC
750 Lexington Ave., 9th Fl.
New York, NY  10022
718-875-1850

*Attorney for Robert Kelly*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**…………………………………………………...  iii

**INTRODUCTION**……………………………………………………………  1

**ARGUMENT**

I.   **THE GOVERNMENT FAILED TO PROVE DEFENDANT GUILTY OF
     THE OFFENSE OF RACKETEERING (COUNT ONE)**………………………  3

   A.  The Government's Proof Did Not Establish an Enterprise…………………  5

   B.  Common Purpose…………………………………………………………...  6

   C.  Enterprise Distinct from Racketeering Activities…………………………  9

   D.  Person-Enterprise Rule…………………………………………………….  10

   E.  The Government Failed to Prove that the So-Called Enterprise's Activities
       Affected Interstate Commerce……………………………………………  13

   F.  The Government's Proof Did not Establish a Pattern of Racketeering…......  16

       1.  Racketeering Act One: (Bribery)…………………………………….  18

       2.  Racketeering Act Two (Sexual Exploitation of a Child –
           Stephanie)…………………………………………………………...  20

       3.  Racketeering Act Five (Mann Act Violation – Jerhonda)………......  22

       4.  Racketeering Act Six (Forced Labor – Jerhonda)………………….  24

       5.  Racketeering Act Seven: (Sexual Exploitation of a Child –
           Jerhonda)……………………………………………………………  27

       6.  Racketeering Act Eight (Mann Act Violations – Jane)…………….  28

           a.  Racketeering 8A – Transportation………………………….....  29

               i.   Intent………………………………………………………  29

               ii.  Violation of Cal. Health Safety Code § 120290……......  31

           b.  Racketeering Act 8B – Coercion or Enticement……………  34

i

7.  Racketeering Act Nine: (Mann Act Violations – Jane)…………… 41

    a.  Racketeering Acts 9A – Transportation………………….... 41

    b.  Racketeering Acts 9B – Coercion or Enticement………….. 41

    c.  Racketeering Act 9C – Coercion or Enticement………….. 42

    d.  Racketeering Act 9D – Transportation……………………. 43

8.  Racketeering Act 10: (Sexual Exploitation of Jane)………………. 44

9.  Racketeering Act Eleven - Forced Labor of Jane…………………. 45

10. Racketeering Act Twelve: (Mann Act Violations – Faith)………… 46

    a.  Intent……………………………………………………... 47

    b.  Coercion or Enticement…………………………………... 48

    c.  New York Public Health Law Section 2307 and Penal Law 120.20……………………………………….............. 50

11. Racketeering Act Thirteen: (Forced Labor – Faith)……………….. 52

12. Racketeering Act Fourteen – (Mann Act Violations – Faith)……… 54

II.    **THE GOVERNMENT FAILED TO PROVE COUNTS TWO THROUH NINE OF THE INDICTMENT**……………………………………….... 55

**CONCLUSION**………………………………………………………… 56

## TABLE OF AUTHORITIES

### CASES

*Atkinson v. Anadarko Bank & Trust Co.,* 808 F. 2d 438 (5th Cir. 1987) ..................................... 13

*Bennett v. U.S. Trust Co. of New York*, 770 F. 2d 308 (2d Cir. 1985)..................................... 6, 10

*Boyle v. United States,* 556 U.S. 938 (2009) ............................................................................... 5

*Brannon v. Boatmen's First Nat'l Bank of Oklahoma, T.B.A.,* 153 F. 3d 1144 (10th Cir. 1998) .. 6

*Brittingham v. Mobil Corp.,* 943 F. 2d 297 (3d Cir. 1991)......................................................... 11

*Burner Corp. v. R.A. Bruner Co.,* 133 F. 3d 491 (7th Cir. 1998) ................................................ 8

*Callan v. State Chemical Mfg. Co.,* 584 F. Supp. 619 (E.D. Pa 1984)........................................ 4

*Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158 (2001)................................................. 10

*Crab House of Douglaston v. Newsday,* 801 F. Supp. 2d 61 (E.D.N.Y 2011).............................. 5

*Cullen v. Margiotta,* 811 F. 2d 698 (1987) ................................................................................ 11

*Discon, Inc. v. NYNEX Corp.,* 93 F. 3d 1055 (2d Cir. 1996)....................................................... 12

*First Capital Asset Mgmt., Inc.. v. Satinwood, Inc.,* 385 F. 3d 159 (2d Cir. 2004) ............... 5, 6, 7

*Fitzgerald v. Chrysler Corp.,* 116 F. 3d 225 (7th Cir. 1997)........................................................ 1

*Gonzalez v. Raich,* 545 U.S. 1 (2005)....................................................................................... 22

*H.J., Inc. v. Northwestern Bell tel. Co.,* 492 U.S. 229 (1989) ........................................... 4, 16, 17

*Hirsch v. Enright,* 751 F. 2d 628 (3d Cir. 1984)......................................................................... 6

*McCullough v. Suter,* 757 F. 2d 142 (7th Cir. 1985) ................................................................... 6

*Muchira v. Al-Rawaf,* 850 F. 3d 605 (4th Cir. 2017)........................................................... 25, 53

*Reich v. Lopez,* 858 F. 3d 55 (2d Cir. 2017) ......................................................................... 16, 17

*Reves v. Ernest & Young,* 507 U.S. 170 (1993) ........................................................................... 4

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,*

30 F. 3d 339 (2d Cir. 1994)..............................................................................6, 10, 12

*Sessions v. Dimaya,* 138 S. Ct. 1204 (2017) ..........................................................33, 52

*Stein v. World-Wide Plumbing Supply Inc.,* 71 Supp. 3d 320 (E.D.N.Y. 2014)............5

*United States v Marcus,* 487 F. Supp. 387 (E.D.N.Y. 2007)......................................25

*United States v. Brand,* 467 F. 3d 179 (2d Cir. 2006) ................................................22

*United States v. Burden,* 600 F. 3d 204 (2d Cir. 2010)..............................................17

*United States v. Campbell,* 49 F. 3d 1079 (5th Cir. 1995)..........................................30

*United States v. Chambers,* 291 U.S. 217 (1934) ......................................................31

*United States v. Cryar,* 232 F. 3d 1318 (10th Cir. 2000)............................................30

*United States v. Daidone,* 471 F. 3d 371 (2d Cir. 2005)............................................17

*United States v. Giordano,* 442 F. 3d 31 (2d Cir. 2006)............................................22

*United States v. Hayward,* 359 F. 3d 631 (3d Cir. 2004) ..........................................30

*United States v. Indelicato,* 865 F. 2d 1370 (2d  Cir. 1989) ..............................6, 7, 17

*United States v. Jackson,* 368 F. 3d 59 (2d Cir. 2004) ................................................3

*United States v. Keltner,* 147 F. 3d 662 (8th Cir. 1998) ..............................................9

*United States v. Kinslow,* 860 F. 2d 963 (9th Cir. 1988) ............................................30

*United States v. Lopez,* 514 U.S. 549 (1995) ............................................................22

*United States v. Lukashov,* 694 F. 3d 1107 (9th Cir. 2012) ..................................30, 47

*United States v. Marcus,* 487 Supp. 387 (E.D.N.Y. 2007)……………………………52

*United States v. Perkins,* 948 F. 3d 936 (8th Cir. 2020) ............................................30

*United States v. Pizzonia,* 577 F. 3d 455 (2d Cir. 2009) ............................................16

*United States v. Reyes,* 302 F. 3d 48 (2d Cir. 2002) ..................................................2

*United States v. Robertson,* 514 U.S. 669 (1995) ......................................................14

*United States v. Smith,* 413 F. 3d 1253 (10th Cir. 2005) ........................................................... 9

*United States v. Toviave,* 761 F. 3d 623 (6th Cir. 2014) ........................................................ 25, 27

*United States v. Turkette,* 452 U.S. 576 (1981) ....................................................................... 5, 6

*United States v. Vang,* 128 F. 3d 1065 (7th Cir. 1997) ............................................................. 30

## STATUTES

18 U.S.C. § 1961(4) ...................................................................................................................... 5

18 U.S.C. § 1961(5) .................................................................................................................... 16

18 U.S.C. § 1962(a) .................................................................................................................... 13

18 U.S.C. § 1962(c) ................................................................................................... 5, 10, 11, 13

18 U.S.C. § 2421(a) .................................................................................................... 29, 30, 46, 47

18 U.S.C. § 2422(b) .................................................................................................... 22, 23, 43

18 U.S.C. § 2423(a) .................................................................................................................... 30

18 U.S.C. § 2425 ........................................................................................................................ 22

18 U.S.C. §1589 ............................................................................................................. 24, 25, 52

18 U.S.C. 2251(a) ........................................................................................................... 20, 27, 44

18 U.S.C. 2256(3) ........................................................................................................... 21, 28, 45

18 U.S.C.§ 2422(a) ..................................................................................................................... 46

## OTHER AUTHORITIES

California Penal Law Section 261.5(b) ........................................................................................ 42

California Penal Law Sections 261.5(a) ...................................................................................... 42

D'Angelo, Frank, NOTE:  Turf Wars: Street Gangs and the Outer Limits of RICO's "Affecting Commerce" Requirement, 76 Fordham L. Rev. 2075, 2084 (March 2008) ............................ 16

Gerald E. Lynch, RICO:  The Crime of Being a Criminal, 87 Colum. L. Rev. 661,

666, n. 22 (1987 ............................................................................................... 15

New York Penal Law Section 120.20 ............................................................ 46

New York Public Health Law Section 2307 ........................................... 47, 52

**RULES**

Federal Rule of Criminal Procedure 29(c) ....................................................... 2

**CODES**

Cal. Health and Safety Code § 120290 ................................................ 29, 31, 32, 41

## INTRODUCTION

In *Fitzgerald v. Chrysler Corp.,* 116 F. 3d 225, 226-27 (7th Cir. 1997), Chief Judge Posner cautioned that where a "statute is broadly worded in order to prevent loopholes from being drilled in it by ingenious lawyers, there is a danger of it being applied to situations absurdly remote from the concerns of the statute's framers." Such is the case here, where the Government (mis)used both the Racketeer Influenced and Corrupt Organizations statute ("RICO") and the Mann Act in a manner never previously conceived or carried out.

Invigorated by an influential social movement determined to punish centuries of male misbehavior through symbolic prosecutions of high-profile men, the government brought a RICO prosecution against the Defendant that was "absurdly remote" from the drafters' intent. Stretching the "liberal construction" clause well beyond the intent of Congress, the government constructed a RICO theory of prosecution designed, not to "effectuate the purpose" of the RICO statute, but to prosecute the Defendant for alleged misdeeds going back decades without pesky statutes of limitations obstacles.

Adding to its history of celebrity Mann Act prosecutions, the government extended the broad language of the Mann Act to conduct it never intended to remedy. While the Mann Act may be an effective tool for combating human trafficking, it was not designed to punish sexual misconduct like that alleged against Defendant. Where Defendant's alleged transportation of females (largely consenting adults) was incidental to his travels as a world-renown performer, he is not guilty of Mann Act violations. If the government intends to prosecute Mann Act violations in the fashion it did here, it might consider investigating the many influential, wealthy, mostly White, corporate leaders who frequently arrange travel for paramours who later conclude that the experience was less than pleasant.

A detached and unemotional review of the evidence in this case shows that the government presented an overabundance of bad character evidence to compensate for its insufficient proofs of the specific elements of RICO and the Mann Act. Accordingly, this Court must acquit Defendant of the verdicts of guilt entered against him.

## **RELEVANT FACTS**

The government charged Defendant with one count of racketeering based on fourteen predicate acts and eight stand-alone counts of violations of the Mann Act that were also charged as racketeering acts. With the exception of Racketeering Act One, alleging the offense of bribery, the charged offenses involve conduct alleged by five women, Jerhonda (Jane Doe #4), Jane (Jane Doe #5), Stephanie (Jane Doe #2), Sonja (Jane Doe #3), and Faith (Jane Doe #6). The jury returned a verdict convicting Defendant of all charged counts but acquitted him of those racketeering acts related to Sonja. Given the length of the record, Defendant will incorporate relevant facts into the argument sections as appropriate.

## **ARGUMENT**

This Court must set aside the verdict of guilt entered against the Defendant and enter a judgment of acquittal where the government presented insufficient evidence of the offense of racketeering (Count One) and all Mann Act violations (Counts Two through Nine). Federal Rule of Criminal Procedure 29(c) provides that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." A court can enter a judgment of acquittal on the grounds of insufficient evidence "only if, after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in the government's favor, it concludes no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Reyes,* 302 F. 3d 48, 52 (2d Cir. 2002). To sustain a conviction, the jury must

have been able to find each of the essential elements of the crime beyond a reasonable doubt. *United States v. Jackson,* 368 F. 3d 59, 63 (2d Cir. 2004).

As set out in detail below, Defendant's RICO conviction cannot stand where the government failed to prove the existence of an enterprise, the activities of which affected interstate commerce, and a pattern of racketeering activity. Moreover, insufficient evidence existed to prove each and every element of the charged Mann Act violations by proof beyond a reasonable doubt.

## I.      THE GOVERNMENT FAILED TO PROVE DEFENDANT GUILTY OF THE OFFENSE OF RACKETEERING (COUNT ONE)

This Court must acquit Defendant of the offense of racketeering where the government failed to prove Defendant guilty beyond a reasonable doubt of each and every element of the offense. The government effectively swamped the jury with bad character evidence that was guaranteed to produce a guilty verdict, but its proofs on the charged offenses were insufficient as a matter of law. Ignoring the distinctly economic legislative history of the RICO statute, the government brought a RICO prosecution against Defendant, not to remedy widespread criminal activity of an enterprise, but to punish one man whose alleged crimes could no longer be prosecuted by state and local agencies. The government's belated interest in protecting Defendant's alleged victims does not justify application of the RICO statute to alleged private, sexual misconduct of the Defendant (and only the Defendant), even if some of that conduct could have been timely prosecuted by local authorities long ago.

As a reminder, RICO's primary purpose was to combat organized crime, by prosecuting "the highly diversified acts of a single organized crime enterprise under a RICO's umbrella." The overarching goal of the statute was "to curb the infiltration of legitimate business

organizations by racketeers." In its Statement of Finding and Purposes accompanying the RICO

statute, Congress declared the following:

> The Congress finds that (1) organized crimes in the United States is a highly
> sophisticated, diversified, and widespread activity that annually drains billions of
> dollars from America's economy by unlawful conduct and the illegal use of force,
> fraud, and corruption; (2) organized crime derives a major portion of its power
> through money obtained from such illegal endeavors and syndicated gambling,
> loan sharking, the theft and fencing of property, the importation and distribution
> of narcotics and dangerous drugs, and other forms of social exploitation; (3) this
> money and power are increasingly used to infiltrate and corrupt legitimate
> business and labor unions and to subvert and corrupt our democratic processes;
> (4) organized crime activities in the United States weaken the stability of the
> Nation' economic system, harm innocent investors and competing organizations,
> interfere with free competition, seriously burden interstate and foreign commerce,
> threaten the domestic security, and undermine the general welfare of the Nation
> and its citizens; and (5) organized crime continues to grow because of defects in
> the evidence-gathering process of the law inhibiting the development of the
> legally admissible evidence necessary to bring criminal other sanctions or
> remedies to bear the unlawful activities of those engage in organized crime and
> because the sanctions and [sic] remedies available to the Government are
> unnecessarily limited in scope and impact. It is the purpose of this Act to seek the
> eradication of organized crime in the United States by strengthening the legal
> tools in the evidence-gathering process, by establishing new penal prohibitions,
> and by providing enhanced sanctions and new remedies to deal with the unlawful
> activities of those engaged in organized crime. Organized Crime Control Act of
> 1970, 1 of Publ.L. No 91-452. *Callan v. State Chemical Mfg. Co.,* 584 F. Supp.
> 619, 621 (E.D. Pa 1984).

Admittedly, prosecutors have used RICO in a wide variety of circumstances under the

statute's "liberal construction" clause. *H.J., Inc. v. Northwestern Bell tel. Co.,* 492 U.S. 229, 248-

49 (1989). The "liberal construction" clause notwithstanding, the Supreme Court has

acknowledged that the clause is not without limits. *Reves v. Ernest & Young,* 507 U.S. 170, 183.

(1993). As the Court held in *Reves,* the liberal construction clause was "not an invitation to apply

RICO to new purposes that Congress never intended." The government clearly exceeded those

limits with this prosecution as evidenced by its failure to prove the charged offense of

racketeering.

To sustain a conviction for RICO, the government must prove that the defendant: (1) through the commission of two or more acts constituting a pattern of racketeering activity; (2) directly or indirectly invested in, maintained an interest in, or participated in, an enterprise; (3) the activities of which affected interstate or foreign commerce. 18 U.S.C. § 1962(c). As set out below, the government offered insufficient proof of all elements of the offense of racketeering.

**A.    The Government's Proof Did Not Establish an Enterprise.**

The government's case was doomed from the start where it failed to plead and prove an enterprise. An enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The United States Supreme Court has defined a RICO enterprise as "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette,* 452 U.S. 576, 583 (1981). *See also Boyle v. United States,* 556 U.S. 938, 950 (2009). An enterprise is demonstrated "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *First Capital Asset Mgmt., Inc.. v. Satinwood, Inc.,* 385 F. 3d 159, 173 (2d Cir. 2004). For an association of individuals to constitute an enterprise, "the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *Id.* at 174. The enterprise's purpose must be common to all of its members. *Stein v. World-Wide Plumbing Supply Inc.,* 71 Supp. 3d 320, 325 (E.D.N.Y. 2014). *See also Crab House of Douglaston v. Newsday,* 801 F. Supp. 2d 61, 77 (E.D.N.Y 2011) *citing Satinwood,* 385 F. 3d at 174.

The "enterprise" is neither the individual defendant nor the "pattern of racketeering activity;" rather it is "an entity separate and apart from the pattern of activity in which is

engaged," and must be alleged and proved separately. However, there must be a nexus between the enterprise and the racketeering activity that is being conducted. *United States v. Indelicato,* 865 F. 2d 1370, 1384 (2d  Cir. 1989). Furthermore, the RICO enterprise must have an ascertainable structure separate and distinct from the pattern of racketeering activities. *Turkette,* 452 U.S. at 583.

Finally, for §1962(c) purposes, the "person" charged with a RICO violation and the alleged "enterprise" must be separate and distinct from one another. This requirement flows from the statutory mandate that a *person* who engaged in a pattern of racketeering activity must be "employed by or associated with" the enterprise. *Satinwood,* 385 F. 3d 159 (2d Cir. 20014); *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F. 3d 339, 344 (2d Cir. 1994); *Bennett v. U.S. Trust Co. of New York*, 770 F. 2d 308, 315 (2d Cir. 1985); *Brannon v. Boatmen's First Nat'l Bank of Oklahoma, T.B.A.,* 153 F. 3d 1144, 1146 (10th Cir. 1998). An entity cannot simultaneously be the enterprise and the person who conducts its affairs, permitting that would be tantamount to permitting an entity to associate with itself. *Bennett,* 770 F. 2d at 315; *Hirsch v. Enright,* 751 F. 2d 628, 633 (3d Cir. 1984)*; McCullough v. Suter,* 757 F. 2d 142, 144 (7th Cir. 1985).

## B.    Common Purpose

In its third superseding indictment, the government alleged that the Defendant, his employees (managers, bodyguards, drivers, personal assistant, and runners), and other members of his entourage constituted the enterprise for RICO purposes. According to the government, the purpose of the enterprise was to: (1) promote Defendant's music and his "brand;" (2) recruit women and girls to engage in illegal sexual activity with the Defendant; and (3) produce pornography, including child pornography. The government did not allege that the enterprise

constituted a legal entity, but rather an association of individuals. [Dkt. No. 43 – Superseding Indictment]

As held in *Satinwood, supra,* for an association of individuals to constitute an enterprise, "the individuals must share a *common purpose* to engage in a particular *fraudulent* course of conduct and work together to achieve such purposes." (emphasis added) Thus, for the government to establish an enterprise here, it was required to prove that Defendant, his employees, and entourage came together with the common purpose of recruiting women and girls to engage in "illegal sexual activity" and produce pornography – not merely the broader purpose of promoting Defendant's music or brand. Assuming the Defendant's employees and entourage *did* share a common objective of promoting Defendant's music, that objective had no nexus to the underlying racketeering activity. *Indelicato,* 865 F. 2d at 1384. Defendant did not go through all the trouble of becoming a world-famous R&B singer for the purpose of engaging in illegal sexual activity, even if his job put him in proximity to women. The government cannot end run the "common purpose" requirement by identifying a broad objective of the enterprise unrelated to any fraudulent activity with no nexus to the racketeering activity.

The government's evidence of an enterprise was insufficient because it failed to establish that Defendant's employees and entourage shared the common purpose of recruiting women to engage in "illegal sexual activity" with Defendant that included creating pornography. Notably, the government does not define "illegal sexual activity," but based on the predicate acts charged the government contends that Defendant's employees and entourage shared an objective of ensuring that Defendant had his sexual needs met by women (some but not all underage women) while at home and while traveling, was able to control these women to engage in sexual conduct the government deems abusive, was able to videotape his sexual activities with these women,

and could expose his sexual partners to herpes. To be clear, the government contends that making sure that Defendant's sexual needs were met was the objective of the enterprise (in addition to promoting his music and brand).

Concededly, the government offered evidence that Defendant's various employees carried out some tasks that related to connecting the Defendant to women with whom he had a personal, even sexual, relationship or with women whom he was interested in having a sexual relationship. These tasks included providing Defendant's phone number to women who attended his concerts, inviting women to after-parties, arranging for travel for Defendant's female guests, and ordering food for those guests while they visited his property. However, the record is devoid of evidence that the members of the enterprise acted with the common objective of ensuring that Defendant engaged in *illegal* sexual activity.

It is true that RICO does not have a *mens rea* requirement beyond what is necessary for proving the predicate crimes. *Burner Corp. v. R.A. Bruner Co.,* 133 F. 3d 491, 495 (7th Cir. 1998). But where the government's evidence of an enterprise centers on its claim that the associated-in-fact members shared a *common purpose* of ensuring Defendant's *illegal* sexual activities, the government must offer some evidence that the members of the enterprise *knew* that their actions were promoting not just legal sexual activities but *illegal* sexual activities and the production of pornography. Put in terms expressed in *Satinwood,* the government was required to show that the individuals who made up the enterprise shared a common purpose to engage in "a fraudulent course of conduct." To share a purpose requires the members to agree on what that purpose is.

Defendant is not claiming that each member of the enterprise must have possessed knowledge about every predicate act that the Defendant is alleged to have committed, but the

government cannot prove a common purpose without showing that the members of the enterprise shared an understanding of what that purpose was which according to the government was promoting "illegal sexual activity" and producing pornography. Despite its bullying tactics, the government came up short on evidence that all of Defendant's employees who made up this vague enterprise were working as a continuing unit to ensure Defendant could engage, not just in sex, but illegal sex.

No employee testified that he/she understood that their purpose in the enterprise was to recruit *underage* women nor did any member of the enterprise present any testimony that they had any knowledge about Defendant's herpes diagnosis, that he practiced unsafe sex, or that he videotaped his sexual experiences. The government can point to no evidence that any employee possessed specific information about what precisely transpired in Defendant's bedroom once he was alone with his female guests. Even if Defendant's employees knew that Defendant expected his guests to follow strict, even controlling, rules, and possessed recording devices like iPads and iPhones, it does not follow that the members of the enterprise shared a goal of promoting *illegal* sexual activity.

### C.    Enterprise Distinct from Racketeering Activities

To the extent the government argues that its evidence showed that the members of the enterprise shared a common purpose and had knowledge of promoting the Defendant's *illegal* sexual conduct, the government has failed to demonstrate that the purpose of the enterprise was distinct from the racketeering activities. *United States v. Smith,* 413 F. 3d 1253, 1267 (10th Cir. 2005). *United States v. Keltner,* 147 F. 3d 662, 668 (8th Cir. 1998).

### D. Person-Enterprise Rule

Separately, the government was required to demonstrate that Defendant was *distinct* from the enterprise. It is axiomatic that § 1962(c) "clearly envisions" that the "person" and the "enterprise" will be distinct. *Bennett,* 770 F. 2d at 315. "This requirement focuses the section on the culpable party and recognizes that the enterprise itself is often a passive instrument or victim of the racketeering activity." *Id.* The United States Supreme Court has held that a RICO defendant must have "participated in the conduct of the 'enterprises affairs,' not just his own affairs. *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 163 (2001). The government cannot plead its way around the distinctness requirement by simply alleging that the enterprise is Defendant's "inner circle" and introduce a series of headshots of all of Defendant's former employees as evidence of an enterprise. The enterprise as alleged by the government existed because of its goal to promote the Defendant in his legal and alleged illegal sexual activities; it had no function unrelated to the Defendant. Under this factual pattern, the distinctness requirement was not satisfied.

Because the government's RICO prosecution under this fact pattern is entirely unique, there is a dearth of factually analogous authority on this issue. That said, guidance offered in factually dissimilar cases leads to the clear conclusion that the government failed to prove an enterprise *distinct* from the Defendant. In *Riverwoods, supra,* the plaintiff Riverwoods Chappaqua Corporation ("Riverwoods") claimed that through acts of extortion and mail fraud, the defendant Marine Midland Bank coerced Riverwoods to "restructure" loan agreements between Riverwoods and Westchester Federal Savings, later acquired by Marine Midland. *Riverwoods,* 30 F. 3d at 341. Riverwoods purchased a property in New Castle, New York to develop residential condominiums and obtained a loan from Westchester Federal Savings made a

10

for that purpose. *Id.* at 341-42. Marine Midland later acquired Westchester Federal Savings and inherited the loan agreement. According to Riverwoods, shortly after the acquisition, Marine Midland officers made it clear that they intended to dishonor the existing agreement and that they engaged in "extortive" behavior to force Riverwoods to enter into a new loan agreement with terms more favorable to Marine Midland. *Id.* at 342.

In its complaint, Riverwoods alleged, *inter alia,* that through a pattern of racketeering activity, Marine Midland and two of its loan officers participated in the affairs of an association-in-fact enterprise known as the "Restructuring Group," in violation of 18 U.S.C. § 1962(c). The Second Circuit reiterated that under the plain language of the statute the RICO "person" must conduct the affairs of the RICO "enterprise" through a pattern of racketeering and that "the person and the enterprise referred to must be distinct." *Id.* at 344. The court emphasized that "a corporate entity may not be both the RICO person and the RICO enterprise, acknowledging that the distinctness requirement could be satisfied where there is partial overlap between the RICO person and the RICO enterprise, and that a defendant may be a "RICO 'person' and one of a number of members of the RICO 'enterprise." *Id. citing Cullen v. Margiotta,* 811 F. 2d 698, 730 (1987). However, by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant, the distinctness requirement may not be circumvented. *Id.*

Finding that the Riverwoods had failed to prove the distinctness requirement, the *Riverwoods* court observed that because a corporation can only function through its employees and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is in reality no more than the defendant itself. *Id; see also Brittingham v. Mobil Corp.,* 943 F. 2d 297, 301 (3d Cir. 1991). Where employees of a corporation associate together to

commit a pattern of predicate acts in the course of their employment and on behalf of the
corporation, the employees in association with the corporation do not form an enterprise distinct
from the corporation. *Id*.

The *Riverwoods* court scoffed at the notion that the plaintiff seriously contended that the
actions of the Restructuring Group were anything other than the activities of Marine Midland
employees carrying out the business of that bank. *Id.* The court reasoned:

> Both the allegations in the complaint and the proof at trial showed that the
> individual members of the Restructuring Group were employed by Marine
> Midland at the relevant times. Those employees were acting within the scope of
> their authority as officers of Marine Midland, and all of the actions taken by the
> Restructuring Group, such as negotiating and executing the restructured loan and
> exacting personal guarantees from Shapiro, were undertaken on behalf of Marine
> Midland and were directly related to the bank's business. *Id*. at 345.

The Second Circuit reached a similar conclusion in *Discon, Inc. v. NYNEX Corp.,* 93 F.
3d 1055 (2d Cir. 1996). There, Discon, Inc., was a New York corporation whose primary
business was to provide "removal services" to telephone companies. *Id.* at 1057. Discon argued
that the defendant NYNEX, a holding company, that controlled subsidiaries MECo and NYTel
(collectively, the "NYNEX Defendants") conspired with AT&T technologies to eliminate
Discon from the market removal services by defrauding the public. *Id.* at 1058.

Discon sued the NYNEX defendants for civil RICO, alleging that the NYNEX group
which consisted of NYNEX, MECo, and NYTel were three separate corporate "persons" that
conducted the affairs of the NYNEX group "enterprise" through a number of illegal predicate
acts. *Id.* at 1063. The Second Circuit observed that the distinctiveness requirement could not be
circumvented "by alleging a RICO enterprise that consists merely of a corporate defendant
associated with its own employees or agents carrying on the regular affairs of the defendant." *Id*.
Relying on *Riverwoods,* the Second Circuit stated that "[w]here employees of a corporation

associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in associated with the corporation do not form an enterprise distinct from the corporation." *Id*. The court observed that like the defendants in *Riverwoods,* NYNEX, MECo and NYTel operated within a unified corporate structure, and even though they were legally separate entities, the relationship between NYNEX, MECo, and NYTel was not substantially different from that between the loan officers in *Riverwoods* in comparison to the bank. *Id*. at 1064. In both cases, the individual defendants were acting within the scope of single corporate structure, guided by a "single corporate consciousness." *Id. See also, Atkinson v. Anadarko Bank & Trust Co.,* 808 F. 2d 438, 440-41 (5th Cir. 1987) (finding no enterprise distinct from the person where the defendant bank, its holding company, and three employees were not associated in any manner apart from the activities of the bank).

Applying the rules of the foregoing cases, the government failed to prove an enterprise distinct from the Defendant. By alleging a RICO enterprise that consists of Defendant and his own employees/agents carrying on his affairs, namely promoting his brand, his music, and his sexual needs, the government fails to satisfy the distinctness requirement. Put differently, because the government alleged that Defendant's employees associated together for no purpose other than to carry out Defendant's needs, including his illegal sexual activity, the employees did not form an enterprise distinct from Defendant. Defendant and the alleged enterprise were one in the same.

**E.    The Government Failed to Prove that the So-Called Enterprise's Activities Affected Interstate Commerce.**

To sustain a conviction for racketeering, the government must offer proof beyond a reasonable doubt that the alleged racketeering activity affected interstate commerce. 18 U.S.C. § 1962(a)-(c). Section 1962(c) declares that it is illegal for "any person employed by or associated

13

with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." This provision anchors the Act to Article I congressional power by incorporating an "affecting interstate commerce" requirement.

The United States Supreme Court has determined that an enterprise is "engaged in commerce" when it is "directly engaged in the production, distribution, or acquisition of goods or services in interstate commerce." *United States v. Robertson,* 514 U.S. 669, 672 (1995). However, consistent with the liberal construction clause of the RICO Act, some courts have held that the racketeering activity of the enterprise need only have a *de minimum* effect on interstate commerce. This Court instructed this jury consistent with the view that the government need only prove that beyond a reasonable doubt that the enterprise had a "minimal effect" on interstate commerce. [Dkt. No. 117-1 – Jury Charge] This Court further instructed the jury that " it is not necessary for the government to prove that the individual racketeering acts themselves affected interstate or foreign commerce; rather it is the enterprise and its activities considered in their entirety that must be shown to have had that effect." No source was provided for this specific statement of law.

Assuming the government was only required to prove that the enterprise had a *de minimus* effect on interstate commerce, the government failed to establish that element by proof beyond a reasonable doubt. Because the existence of the enterprise in this case hinges on the specific activity of promoting Defendant's illegal sexual activity (rather than promoting his music) the government *was* required to prove that those racketeering acts affected interstate commerce. Courts have held that to satisfy RICO, only the enterprise, and not the predicate acts themselves, must affect interstate commerce; however, that is only where there a nexus between

the objective of the enterprise and the charged racketeering activities. While the government may, and did, argue that Defendant's activities centered around promoting and performing his music affected interstate commerce, the charged racketeering acts are untethered to those activities. The government cannot end-run the "affecting commerce" requirement by claiming an economic purpose of the enterprise that has no connection to the charged racketeering activities.

The government's ability to prove an enterprise turns on its claim that the purpose of the enterprise was to promote Defendant's illegal sexual activities and create pornography (albeit for his own personal use). Thus, the government does have to prove that those activities affected interstate commerce. Defendant's alleged conduct of engaging in sexual activities with young women under the age of 18, exposing adult women to herpes, and/or videotaping his sexual activities with individuals under the age of 18 cannot be said to have any impact on interstate commerce.

Indeed, the *de minimus* effect approach here amounts to an unconstitutional extension of Congress's commerce power and is contrary to RICO's distinctly economic legislative history. It is beyond debate that the legislative history and the congressional findings accompanying the Act reflect Congress's prevailing concern with the negative economic impacts of criminal infiltration into legitimate businesses. Some scholars have argued that eradicating criminal infiltration of legitimate business activities was the Act's *only* purpose. Gerald E. Lynch, RICO: The Crime of Being a Criminal, 87 Colum. L. Rev. 661, 666, n. 22 (1987). Admittedly, the Supreme Court in *Turkette* sanctioned the application of RICO to non-infiltrations when it held that a RICO enterprise may be a wholly illegitimate organization.

Scholars have observed that *Turkette* marked an expansion in RICO prosecutions.

D'Angelo, Frank, NOTE:  Turf Wars: Street Gangs and the Outer Limits of RICO's "Affecting

Commerce" Requirement, 76 Fordham L. Rev. 2075, 2084 (March 2008). D'Angelo writes:

> The first wave of expansion extended RICO in the areas of government and corporate corruption. During the 1980s, federal prosecutors used RICO to prosecute corrupt corporate officers, state officials, and judges. A second wave saw prosecutors use RICO to prosecute violent gangs. Until the late 1980s, murder was rarely prosecuted in federal court, but since then federal prosecutors have used RICO to bring down murderous motorcycle gangs, white supremacist groups, and ethnic street gangs. *Id.* (citations omitted)

As D'Angelo points out, in most of these types of cases, RICO's commerce requirement was

easily satisfied. *Id.* In all of those scenarios, an economic motive was driving the racketeering

activities. In contrast, here the alleged enterprise in this case had the objective of ensuring that

Defendant's sexual desires were satisfied. There was no economic motive driving these

activities.

### F.        The Government's Proof Did not Establish a Pattern of Racketeering

The government must also demonstrate a pattern of racketeering activity by proving, at a

minimum, two predicate racketeering acts that occurred within ten years of one another. *See* 18

U.S.C. §1961(1), (5). Proof of two predicate acts is not sufficient to satisfy its burden of proof,

the government must also show that the racketeering acts are related to each other and to the

enterprise, and together pose a threat of continuing criminal activity. *H.J. Inc. v. Nw. Bell Tel.

Co.,* 492 U.S. 229, 239 (1989). *See also, Reich v. Lopez,* 858 F. 3d 55, 59 (2d Cir. 2017).[1]

Predicate acts must bear a relationship to each other that "manifest[s] the continuity required to

prove a pattern." *United States v. Pizzonia,* 577 F. 3d 455, 465 (2d Cir. 2009). RICO is

---

[1] This Court observed in *Reich* that the Supreme Court has instructed courts to interpret the pattern element the same way in civil and criminal cases. *Reich,* 858 F. 3d at 61, n.4

inapplicable to perpetrators of "isolated" or "sporadic" criminal acts; "criminal conduct only 'forms a pattern if it embraces criminal acts'" that are related. *Indelicato,* 865 F. 2d at 1383.

Focusing on the relatedness requirement, the "[p]redicate crimes must be related both to each other (termed 'horizontal relatedness') and to the enterprise as a whole (termed 'vertical relatedness'). *Reich,* 858 F. 3d at 60-61. *See also United States v. Daidone,* 471 F. 3d 371, 376 (2d Cir. 2005). Horizontal relatedness can be shown through predicate acts that "have the same or similar purpose, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.,* 492 U.S. at 240. *See also, Indelicato,* 865 F. 2d at 1382 (relatedness shown by "temporal proximity, or common goals, or similarity of methods, or repetitions"). Where the enterprise in question is not primarily in the "business of racketeering activity" predicate acts must be related to each other in kind for a RICO case to proceed." *Reich,* 858 F.3d at 60-61.

Vertical relatedness requires only "that the defendant was enabled to commit the offense solely because of his position in the enterprise of his involvement in or control over the enterprise's affairs, or because the offense related to the activities of the enterprise." *United States v. Burden,* 600 F. 3d 204, 216 (2d Cir. 2010).

With regard to the continuity requirement, the government must present evidence regarding the timing and temporal scope of the alleged racketeering acts to demonstrate either close-or open-ended continuity. *Reich,* 858 F. 3d at 60. Criminal activity that occurred over a long period of time in the past has close-ended continuity, regardless of whether it may extend not the future. Close-ended continuity is "primarily a temporal concept," that requires that the predicate crimes extend "over a substantial period of time." *Id.*

17

In contrast, criminal activity "that by its nature projects into the future with a threat of repetition" possesses open-ended continuity, and that can be established in several ways. Some crimes may be by their very nature a future threat. *Id.* When the business of an enterprise is primarily unlawful, the continuity of the enterprise itself projects criminal activity into the future. Similarly, criminal activity is continuous when "the predicate acts were the regular way of operating that business," even if the business itself is a primarily lawful. *Id.*

The government failed to demonstrate a pattern of racketeering activity because it offered insufficient evidence of most of the predicate acts and the charged acts lacked sufficient relatedness and continuity.

### 1.    Racketeering Act One: (Bribery)

The government failed to prove Racketeering Act One where insufficient evidence existed to prove that Defendant caused Demetrius Smith to pay a public aid employee $500 to secure identification for Jane Doe #1 (Aaliyah). Despite blatant strong-arming by the government, Smith's testimony was inconsistent and vague about whether Defendant was even present during any discussions about paying money to bribe someone for the fraudulent identification. Smith consistently testified that he discussed the prospect of bribing someone to obtain the fake identification with Derrel McDavid. (R. 745) Smith did not obtain any money from the Defendant and did not recall discussing it with him although he allowed that he might have. (R. 719) Whenever Smith failed to testify *precisely* as the government wanted, he was refreshed with his prior statements, *not* because he needed refreshing, but as a clear reminder that if he contradicted himself, he could be charged as a co-conspirator. That type of bullying pervaded Smith's examination and suggested that Smith's testimony may have been pressured by the government.

After the subject matter had been discussed numerous times throughout Smith's

testimony. The AUSA asked the following on re-direct:

> Q.    When you spoke to the group, as you testified on direct
> examination, when you spoke to the group about acquiring a state ID from the
> welfare office Aaliyah for money, the defendant was there, right?

> A.    I'm pretty sure. I think so but I'm not. I'm just not positive. Even if
> I said it before, I'm just not positive. I just don't see that in my head right now.
> (R. 758)

Not satisfied with that answer, the AUSA asked Smith again whether Defendant was present

when there was any discussion about a bribery. Despite his clear concern of facing legal

repercussions for his testimony, Smith declared, "I don't remember if Robert was there. If I said

he was there before, I'm not changing that story to change the story. I'm just going back and I'm

just trying – I don't see it in my head Robert next to me. . . " (R. 759)

No rational juror could conclude that this less than convincing testimony provided proof

beyond a reasonable doubt that defendant caused Smith to tender money to the public aid officer.

Even if the evidence showed that the Defendant turned to Smith for assistance in facilitating his

marriage to Aaliyah, the offense of bribery requires proof that Defendant at least *knew* of Smith's

intent to bribe a public official and facilitated in the bribery in some way. The record is devoid of

evidence that Defendant knew *how* Smith obtained the identification or facilitated Smith in

obtaining the identification. As far as Defendant knew Smith obtained the identification from a

friend who worked in the public aid office. Without Smith's unequivocal testimony that

Defendant was part of the planning process of obtaining the fraudulent identification, the

evidence was insufficient to sustain the Bribery offense.

Furthermore, Racketeering Act One, Bribery, lacks both vertical and horizontal

relatedness. It was an isolated offense having no connection to the other charged acts or to the

purpose of the enterprise itself. Indeed, as discussed, *supra,* the record simply fails to show that in 1994 any enterprise existed that had a common purpose of facilitating Defendant's sexual desire for minors. Smith testified at length that he had no idea that Defendant was involved in any type of sexual relationship with Aaliyah or any other young women. Smith was certainly part of Defendant's close circle of confidantes but the mere identification of a group of people who worked for the Defendant does not an enterprise make. Smith did not testify about any other conduct in which he engaged to advance the alleged purpose of the enterprise. Smith's conduct was nothing more than a singular event that bore no connection to the purpose of the enterprise (which did not exist in any event) and which bears no connection to the other racketeering acts.

Furthermore, because the Act did not occur within 10 years of any other predicate Act that was sufficiently proven, the Act is time-barred.

Racketeering Act One was not proved beyond a reasonable doubt.

## 2.      Racketeering Act Two (Sexual Exploitation of a Child – Stephanie)

The government failed to prove Racketeering Act Two, that is, sexual exploitation of Stephanie where it offered insufficient evidence that Defendant used, employed, persuaded, induced, or enticed Stephanie to take part in sexually explicit conduct for the purpose of producing a visual depiction. The government contends that on a single occasion prior to her 18th birthday, Defendant had sexual relations with Stephanie at his studio in Chicago, Illinois and recorded the episode on a video camera. The government cannot produce the video or the camera on which it was allegedly recorded. To be clear, the Defendant is alleged to have recorded a legal and seemingly consensual sex act under the law of the state of Illinois that was only a violation of 18 U.S.C. 2251(a) because Stephanie was not 18 years of age.

To demonstrate that Defendant committed sexual exploitation of a child pursuant to 18 U.S.C. 2251(a), it is not enough for Stephanie to simply allege that Defendant recorded sexually explicit conduct. Stephanie offered no testimony that proved that Defendant "used, persuaded, induced, enticed or coerced" her into "sexually explicit" conduct. Stephanie had an ongoing sexual relationship with Defendant before the video-recording incident and after the video-recorded incident. Although she described those sexual experiences in hindsight as "humiliating," it does not follow that Defendant did *anything* to persuade, induce, entice or coerce her into the sexual activity that was recorded. In fact, Stephanie admits that Defendant called her on the phone and told her that he was picking her up and that "he wanted to make a video of us having sex and that he would be there shortly." (R. 1643) To which Stephanie responded, "Okay." Although Stephanie clearly regrets this decision, her own testimony shows that Defendant did not thing but tell her he wanted to videotape them having sex and she agreed. The government must prove that Defendant did something more than just film the sexually explicit conduct. If the act of filming or recording alone was sufficient to sustain the charge, Congress would not have included a requirement that the Defendant "employ, persuade, indue, entire, or coerce."

Furthermore, the government failed to prove that Defendant acted with a purpose of "producing" a visual depiction of that conduct. Although the jury was erroneously charged that the government could sustain the charge by proving that the purpose was "transmitting a visual depiction." The statute requires something different. Indeed, "producing" is defined by the statute as "producing, directing, manufacturing, issuing, publishing, or advertising." 18 U.S.C. 2256(3). While the statute also prohibits the transmission of *live* visual depictions, Defendant was not charged with transmitting a live visual depiction and there is no evidence that he did.

21

Lastly, the parties' stipulation that the film used in VHS tapes was a type of film that was not produced in Illinois is insufficient to prove by a reasonable doubt that the conduct was recorded on a "device" made in a foreign country or "affected interstate" commerce. Accordingly, the government failed to prove Racketeering Act Two by proof beyond a reasonable doubt.

### 3.      Racketeering Act Five (Mann Act Violation – Jerhonda)

The government failed to prove Racketeering Act Five where there was insufficient evidence that Defendant: (1) used a facility of interstate commerce to knowingly persuade, induce, entice, or coerce Jerhonda to engage in sexual activity that violated Illinois law; and that (2) Defendant knowingly committed the prohibited sexual activity.

To obtain a conviction under §2422(b), the government must show that the defendant "(i) used a facility of interstate commerce; (ii) to knowingly persuade, induce or entice; (iii) any individual who is younger than eighteen-years old; (iv) to engage in sexual activity of a criminal nature." *United States v. Brand,* 467 F. 3d 179, 201-02 (2d Cir. 2006).

First, the government did not prove that Defendant used a facility of interstate commerce to persuade Jerhonda to engage in aggravated criminal sexual abuse between May 2009 and January 2010. Defendant contends that purely intrastate use of cell phones does not constitute use of a facility of interstate commerce. *United States v. Lopez,* 514 U.S. 549 (1995). *Gonzalez v. Raich,* 545 U.S. 1 (2005) (there are limits on Congress's power to create federal criminal prohibitions on traditionally state-regulated spheres of noneconomic activity). *But see United States v. Giordano,* 442 F. 3d 31, 40-41 (2d Cir. 2006) (finding that the jurisdictional element of § 2425 is satisfied by intrastate use of a telephone capable of transmitting communicates between states).

Even *if* purely intrastate use of cell phones constituted use of a facility of interstate commerce, the government's evidence that Defendant called Jerhonda on a telephone is not sufficient proof that he *used* the facility of interstate commerce (a cell phone according to the government) to knowingly "induce, persuade, entice, or coerce" Jerhonda to come to Olympia Fields to engage in prohibited sexual activity. The government provided no text exchanges showing that Defendant used any words to "induce, persuade, entice, or coerce" nor did Jerhonda testify that during any telephone conversation or on any text messages did Defendant use words for the purpose of inducing, persuading, entice or coercing her to come to his home or studios for prohibited sexual activities. Under the plain reading of the statute, there must be a nexus between the use of the cell phone and the words of persuasion, enticement, or coercion to satisfy a §2422(b) violation. For example, if Defendant called Jerhonda and invited her to a party at his home. And then once there, he coerced her into prohibited sexual activity – that does not constitute a Mann Act violation pursuant § 2422(b) since the Defendant did not use the facility of interstate commerce (the cell phone) to coerce or induce her into the prohibited sexual activity. Use of the cellphone for some unknown communication coupled with a subsequent prohibited sex act is not sufficient to establish a violation of § 2422(b).

Lastly, if Defendant really believed that Jerhonda was 17 when they engaged in sexual activity and that belief was reasonable, then he would not be guilty of aggravated criminal sexual abuse. (R. 4351) Taking the evidence in the light most favorable to the prosecution, no reasonable juror could conclude that Defendant knew that Jerhonda was 16 years old when they allegedly engaged in sexual activity between May 2009 and January 2010. Jerhonda turned 17 years old in April 2010. Government's Exhibit 70 which depicts a photo of Jerhonda would fail to put any reasonable person on notice that she was 16 years old rather than 17 years old.

The record reflects that Jerhonda habitually lied about her age. When she was 15 years old, she befriended a 23-year-old woman with whom she would attend Defendant's Illinois state court appearances in 2008. To gain access to those court appearances, Jerhonda had to demonstrate that she was 18 years of age, presumably by showing an identification. After using her older connections to get invited to a party at Defendant's home in Olympia Fields, she sought out the Defendant and falsely told him that she was 19 years old. To be clear, there is *no* evidence that Defendant sought out Jerhonda.

Jerhonda implausibly claims that after going through all the trouble of lying about her age to get close to Defendant and past his security team, she decided to disclose her true age of 16 immediately after their first sexual encounter. Jerhonda claims that Defendant was indifferent to her age and continued to engage in sexual relations with her until January 2010.

The government's evidence falls painfully short of proving that Defendant did not reasonably believe that Jerhonda was 17 years old at the time of their alleged sexual activities. The government allegedly recovered a copy of Jerhonda's fake ID and birth certificate in a storage facility purportedly belonging to Defendant. Rather than reach the obvious conclusion that Jerhonda provided a fake ID to Defendant's security team to gain access to the home, the government alleges that Defendant or someone in his "inner circle" went through the trouble of altering her ID and photocopying it. No rational juror could conclude that Defendant engaged in sexual activities with Jerhonda with the understanding that she was not of legal consenting age.

### 4.    Racketeering Act Six (Forced Labor – Jerhonda)

No rational juror could conclude based on the evidence adduced at trial that Defendant knowingly obtained, or agreed to obtain, any labor or services from Jerhonda on January 23, 2010.  A conviction of forced labor under 18 U.S.C. §1589 requires the government to prove

beyond a reasonable doubt that: (1) the defendant obtained the labor or services of another person; (2) through, *inter alia,* threats of serious harm; and (3) the defendant acted knowingly. *United States v Marcus,* 487 F. Supp. 387, 310 (E.D.N.Y. 2007). The language "by means of" contained in the forced labor statute, 18 U.S.C. §1589(a), requires the government to establish  a causal link between the labor and services provided by the person and the threat of "serious harm." *Id.* Serious harm, for purposes of §1589(a)(2) is defined as:

> [a]ny harm, whether physical or nonphysical, including psychological, financial or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue to performing labor or service in order to avoid incurring that harm. *Muchira v. Al-Rawaf,* 850 F. 3d 605, 618 (4th Cir. 2017).

Section 1589 is "intended to address *serious* trafficking, or cases where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence." *Id.* The harm or threat of harm, "considered from the vantage point of a reasonable person in the place of the victim, must be 'sufficiently serious' to *compel* that person to *remain"* in her condition of servitude when she otherwise would have left. *Id.*

"Part of a fair reading of statutory text is recognizing that Congress legislates against the backdrop of certain unexpressed presumptions." *United States v. Toviave,* 761 F. 3d 623, 628 (6th Cir. 2014) Section 1589, the forced labor statute, was "passed to implement the Thirteenth Amendment's [prohibition] against slavery or involuntary servitude." *United States v. Toviave,* 761 F. 3d 623, 629 (6th Cir. 2014). "Congress intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion" as well as through "physical or legal coercion." *Muchira,* 850 F. 3d at 617.

According to the government, on an isolated date in January 2010, Defendant violated the forced labor statute by using threats of violence to obtain labor, an act of oral sex, from Jerhonda. The forced labor statute was not intended to reach isolated conduct like that described by Jerhonda. Accepting the government's evidence in its best light, Jerhonda described an isolated incident in which the Defendant allegedly assaulted her because he was angry that she was on her phone and did not properly acknowledge him when he entered the room. Jerhonda claimed that Defendant slapped and choked her because, "[h]e didn't believe that I was texting a friend and he got mad about it." (R. 176) Jerhonda testified that after the purported assault, she sat down with Defendant in the VIP room and he "instructed" her to perform oral sex on him. Jerhonda complied with the "instruction." Jerhonda did not testify that Defendant threatened her, forced her, or even demanded that she give him oral sex. Jerhonda did not claim that she feared Defendant would assault her again if she declined the request. Jerhonda then left Defendant's home and never came back.

The government did not establish a causal link between the isolated act of oral sex and any threat of physical violence. Any physical violence that occurred during that episode in January 2010 preceded Jerhonda providing oral sex to Defendant. Jerhonda's testimony simply does not lead to the reasonable inference that she gave Defendant oral sex because she feared physical violence. Jerhonda did not claim that Defendant used any words suggesting she would suffer an assault if she did not provide him with oral sex nor did she claim that she feared another assault if she refused his request for oral sex. Jerhonda did not even testify that she did not want to give Defendant oral sex. As troubling as Jerhonda's story may be, the government still must prove the elements of the crime of forced labor by proof beyond a reasonable doubt. It

would not have taken much for Jerhonda to make the causal link between the act of oral sex and her fear of physical assault by the Defendant. But she simply did not provide that testimony.

Absent "clear expression of Congressional intent," courts should resist the urge to transform the forced labor statute to cover the circumstances alleged in Racketeering Act Six which bear virtually no resemblance to those paradigmatic forced labor cases and their victims. *See Toviave,* 761 F. 3d 623, 626 (5th Cir. 2014) (describing prostitution, forced sweatshop work, and forced domestic service as "paradigmatic forced labor cases.") Jerhonda came and went as she pleased, even if Defendant prohibited her from wandering his property at will. Defendant did not force Jerhonda into a condition of servitude through threats of physical force and an isolated example of oral sex with an alleged abusive act is just not forced labor.

### 5.    Racketeering Act Seven: (Sexual Exploitation of a Child – Jerhonda)

The government failed to prove Racketeering Act Seven, that is, sexual exploitation of Jerhonda. According to Jerhonda, during her six-month sexual relationship with the Defendant, he recorded her with a Canon video camera and on an iPhone. The government produced no images or meta-data corroborating this claim. Rather, the government contends that evidence that Defendant owned a Canon video camera and had an iPhone that had the ability to video is sufficient evidence to establish the elements of the offense.

The government failed to prove that Defendant used, employed, persuaded, induced, or enticed Jerhonda to take part in sexually explicit conduct for the purpose of producing a visual depiction. To demonstrate that Defendant committed sexual exploitation of a child pursuant to 18 U.S.C. 2251(a), it is not enough for Jerhonda to simply allege that Defendant recorded sexually explicit conduct. Jerhonda's testimony was insufficient to prove that Defendant "used, persuaded, induced, enticed or coerced" her into "sexually explicit" conduct. According to

Jerhonda, she had an ongoing sexual relationship with Defendant before Defendant allegedly

video-recorded here, a relationship that Defendant would have no reason to believe was

prohibited since Jerhonda misrepresented her age. Although Jerhonda describes those sexual

experiences in hindsight as "humiliating," it does not follow that Defendant did *anything* to

persuade, induce, entice or coerce her into the sexual activity that was recorded. The government

must prove that Defendant did something more than just film the sexually explicit conduct. If the

act of filming or recording alone was sufficient to sustain the charge, Congress would not have

included a requirement that the Defendant "employ, persuade, indue, entire, or coerce."

Furthermore, the government failed to prove that Defendant acted with a purpose of

"producing" a visual depiction of that conduct. Although the jury was erroneously charged that

the government could sustain the charge by proving that the purpose was "transmitting a visual

depiction." The statute requires something different. Indeed, "producing" is defined by the

statute as "producing, directing, manufacturing, issuing, publishing, or advertising." 18 U.S.C.

2256(3). While the statute also prohibits the transmission of *live* visual depictions, Defendant

was not charged with transmitting a live visual depiction and there is no evidence that he did.

Lastly, the government's "affecting interstate" commerce evidence was insufficient

where it could not establish what device, if any, was used to make these recordings.

### 6.    Racketeering Act Eight (Mann Act Violations – Jane)

The government failed to prove that Defendant committed Mann Act violations in

connection with his sexual activity with Jane on or about April 28, 2015, and May 1, 2015, in the

state of California. Jane was 17 years old in May 2015. She concedes that she misrepresented her

age to Defendant when she met him and kept her true age a secret until Fall 2015. After meeting

Defendant in Orlando, Florida in April 2015, Jane traveled to meet him in California at the end of April 2015.

The government charged Defendant with two Mann Act violations in connection with this trip, alleging first that Defendant violated 18 U.S.C. § 2421(a).

### a.      Racketeering 8A – Transportation

Preliminarily, the government's use of the Mann Act under the present set of facts is unprecedented and unjustified. 18 U.S.C. § 2421(a) provides that "[w]hoever knowingly transports any individual in interstate or foreign commerce, or in any Territory or Possession of the United States, with intent that such individual engage in prostitution, or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 10 years, or both." The government contended that Defendant arranged for Jane to travel to California with the intent of willfully exposing her to a "contagious, infectious, or communicable disease" in violation of Cal. Health and Safety Code § 120290.

The government failed to prove a Mann Act violation under § 2421(a) where it offered insufficient evidence that Defendant: (1) transported Jane with the *intent* of exposing her to herpes; and (2) committed a violation of Cal. Health and Safety Code § 120290 by proof beyond a reasonable doubt.

### i.      Intent

Because there is no link connecting Defendant's transportation of Jane with an intent to expose her to herpes, Defendant cannot be guilty of a Mann Act violation. The Ninth and Tenth Circuit Courts of Appeal have held that to establish the intent requirement of the Mann Act violation, the government must prove that the illegal sexual activity is the "dominant, significant,

or motivating purpose" behind the transportation. *see United States v. Kinslow,* 860 F. 2d 963 (9th Cir. 1988); *United States v. Lukashov,* 694 F. 3d 1107, 1110 (9th Cir. 2012); *United States v. Cryar,* 232 F. 3d 1318 (10th Cir. 2000).

Similarly, in *United States v. Hayward,* 359 F. 3d 631 (3d Cir. 2004), the Third Circuit approved the district court's jury instruction that stated:

> It is not necessary for the government to prove that the illegal sexual activity was the sole purpose for the transportation. A person may have several different purposes or motives for such travel, and each may prompt in varying degrees the act of making the journey. The government must prove beyond a reasonable doubt, however, *that a significant or motivating purpose of the travel across state or foreign boundaries was to have the individual transported to engage in the illegal sexual activity. In other words, the illegal sexual activity must have not been merely incident to the trip. Id.* at 637.

In *United States v. Campbell,* 49 F. 3d 1079 (5th Cir. 1995), the Fifth Circuit analyzed the intent requirement of 18 U.S.C. § 2421 and held that, "[i]n determining whether a dominant purpose exists, we instead ask whether the illicit behavior is one of the efficient and compelling purposes of the travel." *Id.* at 1083. *See also, United States v. Vang,* 128 F. 3d 1065 (7th Cir. 1997) (interpreting the "dominant purpose" standard to mere merely "significant" or "compelling" or efficient"); *United States v. Perkins,* 948 F. 3d 936 (8th Cir. 2020) (holding that to prove the intent elements under § 2423(a), the illicit behavior must be *one of the purposes motivating* the interstate transportation).

The Second Circuit does not seem to have answered the intent question, but whether this Court applies a true "dominant purpose" standard or merely a "significant" or "motivating" purpose standard, the result is the same. The Defendant's alleged violation of a California health law prohibiting him from exposing a partner to herpes was *incidental* to the trip. There is no proof in this record that demonstrates that Defendant's motivating purpose in transporting Jane to California was to expose her to herpes. In fact, the government cannot even show that the

motivating purpose of the trip had anything to do with Jane. As Jane herself testified when asked:

> Q.      And while you were 17, did you take additional trips to California with the defendant?

> A.      Yes, I did.

> Q.      And do you remember where you traveled to?

> A.      I do not.

> Q.      Do you remember what the purpose of your travel was for?

> A.      He had shows. (R. 888)

In short, no rational juror could find that the government proved that Defendant's intent to "transport" Jane to California was to infect with her herpes.

### ii.      Violation of Cal. Health Safety Code § 120290

Second, the government did not prove beyond a reasonable doubt that Defendant committed a violation of the Cal. Health and Safety Code § 120290, because the government charged Defendant with a repealed version of the statute no longer in effect, a version that reduced the government's burden of proof. Prior to the jury charge in this case, Defendant notified the court that the jury instructions did not reflect the elements of Cal. Health and Safety Code § 120290. The government acknowledged as much but argued that it charged Defendant under the statute that was in effect in 2015. The government had no authority to charge Defendant with a statute that was repealed or inoperative at the time of prosecution. *United States v. Chambers,* 291 U.S. 217, 223 (1934) ("In case a statute is repealed or rendered inoperative, no further proceedings can be had to enforce it in pending prosecutions unless competent authority has kept the statute alive for that purpose.")

In 2015, § 120290 of the California Health and Safety Code provided:

> Except in provided in Section 120291 or in the case of the removal of an afflicted person in a manner the least dangerous to the public health, any person afflicted with any contagious, infectious, or communicable disease who willfully exposes himself or herself to another person, and any person who willfully exposes another person afflicted with the disease to someone else, is guilty of a misdemeanor.

The statute was overhauled entirely in 2018 after the California Legislature determined that it was antiquated, having been passed during an era of discrimination toward those afflicted with HIV.[2] The current statue bears little to no resemblance to the repealed 2015 version, least of all because it now requires a showing of a specific intent to transmit the disease.

Although repealed or inoperative, the government proposed a jury instruction that attempted to reflect the elements of the 2015 statute. Apparently recognizing that the 2015 statute was unconstitutionally vague in any event, the government stepped into the shoes of the legislature and rewrote the statute to save it from a constitutional challenge. Thus, the government not only charged Defendant with a repealed statute but rewrote it in clear violation of various constitutional provisions, including the separations of power clause and principles of comity. Defendant's jury was instructed pursuant to a statute that never existed. A California court has no authority to rewrite a California statute and neither does a district court sitting in New York.

Even if the government had the authority to charge Defendant under the 2015 version of § 120290 of the California Health and Safety Code, the statute does not pass constitutional muster. Most obviously, the statute is void for vagueness both on its face and as applied to the

---

[2] The Bill Analysis for the 2018 Enactment sets forth the legislative history and rationale for repealing the version under which Defendant was prosecuted.
https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201720180SB239

Defendant. The doctrine of vagueness "guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." *Sessions v. Dimaya,* 138 S. Ct. 1204, 1212 (2017). As written, the 2015 law fails to provide adequate definitions that put individuals with *any* chronic and potentially contagious diseases on notice of what amounts to criminal conduct, including communicable diseases that are not sexually transmitted.

By way of example, nearly 50% of the population has Herpes Simplex I – a communicable disease. Under the 2015 statute, anyone with Herpes Simplex I (also known as cold sores) who kisses another person without disclosing that they have Herpes Simplex I, is guilty of a misdemeanor. Even if the afflicted person has no active infection, outbreak, and does not pass the disease along to the recipient of the kiss. Under this statute, parents with Herpes Simplex I (again 50% of the population) would be prohibited from kissing their own children. One cannot imagine how many arbitrary prosecutions could take place in this current era of a pandemic if this law was in effect today.

Even if the elements of the statute were as the government alleged, insufficient evidence existed to sustain the charge. The government did not prove that Defendant was contagious, infected, or had the capacity to transmit herpes during the sexual encounter he had with Jane in May 2015. Additionally, the government cannot show that Defendant acted willfully *with knowledge of the consequences.* Presumably, the government assumes that the consequences is transmitting the disease to the person exposed. But effective treatments exist for herpes that significantly reduce outbreaks and the likelihood of transmission. If Defendant was consistently taking Valtrex in April 2015, it cannot be

said that he willfully exposed Jane "with knowledge of the consequences," particularly since Jane was not infected with herpes in April 2015.

This racketeering act cannot be sustained where it was based on a repealed law; was rewritten and was facially unconstitutional in any event.

### b.       Racketeering Act 8B – Coercion or Enticement

The government alternatively argues that Defendant is guilty of the Mann Act stemming from his April trip to California, because Defendant knowingly "persuaded, induced, enticed, or coerced" Jane to travel to California. Insufficient evidence exists to prove that Defendant took any action to induce, persuade, entice, or coerce Jane into traveling to California in April – May 2015. Quite the opposite, the record shows that Jane's mother purposefully and strategically *enticed* Defendant with her 17-year-old daughter, comparing her to Aaliyah at various points. (GX233) The government takes great umbrage to this characterization, but the record speaks for itself.

Although defense counsel did not make much use out of it, Government's Exhibit 233 offers powerful evidence showing that Defendant had no reason to "induce, persuade, entice, or coerce" Jane into going to California with him. Text messages introduced by the government show that Jane, with the guidance of her mother, enticed Defendant, who reasonably believed Jane was 18 years old, to bring her to California. In short, when Jane traveled to meet Defendant in California in April-May, she required no enticement, persuasion, or encouragement of any kind.

On April 11, 2015, Jane attended one of Defendant's concerts in Orlando, Florida. After the show, someone provided Jane with Defendant's phone number. (R 775) Jane attempted to text the number on the phone and gave the paper to her mother. *Id.* Although

Jane did not reach Defendant, Jane's mother began texting the Defendant posing as her 17-year-old daughter. (R. 778-779) Jane eventually communicated directly with the Defendant via Facetime and told the Defendant she was 18 years of age. (R. 781)

On April 20, 2015, Jane's mother, still posing as Jane, initiated text messages with Defendant and arranged for Jane to meet the Defendant at a hotel in Orlando. Government's Exhibit 233 shows that Jane and her mother knew from the start that Defendant was interested in Jane sexually – believing that she was of legally consenting age. Before Jane's first meeting with Defendant, Jane's mother texted Jane, stating, "This man trying to screw but I'm trying to make it business; He knows you're a singer but he ain't playing he want to ft (fuck tonight)" (GX 233)

Despite that Jane and her mother were on notice that Defendant was interested in Jane sexually, Jane's mother encouraged Jane to meet Defendant. She told Jane to keep Defendant's "curiosity piqued." And advised her about what she should wear to effectively entice him. *Id.* During her in-court testimony, Jane testified that she went to meet Defendant solely to audition for him, but her contemporaneous text messages reveal that Jane was more interested in Defendant for personal and romantic reasons. Jane texted her mother, "Ahhhhhh he so fine." *Id.* When Jane's mother told her to be ready to sing something, Jane said "Igh [Ugh]" suggesting that she did not actually want to audition for Defendant.

Jane's mother encouraged Jane to tease Defendant but not to do anything sexual with him since he would then lose interest in her. Believing that he was speaking to an 18-year-old Jane, Defendant texted Jane's mother that he was staying on the tour bus but was going to get a hotel room for their privacy. Jane's mother then shared that message

with Jane, texting. "Yep he said he staying on the tour bus but he wants to get a hotel

room for just y'all so y'all can get away from security and mgrs. etc." (GX 233)

Jane's mother gave Jane some final advice before she sent daughter to meet

Defendant, who believed Jane to be 18 years old.

> Be prepared to sing 3 songs he said he will meet you and listen to your
> song…please have your glasses off hair to side…mama knows best pretty hurts
> and third your choice don't yell…put on a show..dance grab his hand shimmy
> wiggle sit on his lap *entice* him…while singing its all bout performance…this
> your chance and opportunity don't blow it.  Jane's mother even told Jane not to
> look "grown." (emphasis added)

> Take off that ugly ass lipstick I told you he don't want you to be grown I told you
> to keep hair curly that shit look a mess you need some jeans or shorts you trying
> to look grown he wanted you cuz you look young and innocent that's what he
> want not a lil girl trying to be grown you're a damn fool

Defying her mother's advice to merely tease Defendant, Jane engaged in sexual

conduct with Defendant in the hotel room. Jane stripped down to her undergarments and

walked back and forth for Defendant. (R. 791) She later acquiesced to removing her

clothes, testifying that she "got on top of him backwards and he did lick my butt." (R.

793)

After the sexual encounter, officers arrived at the hotel room and knocked on the

door. (R. 793) After arranging for Jane to meet Defendant in his hotel, Jane's parents

apparently called the police.[3] (R. 793) Jane described Defendant as nervous and anxious

asking her to confirm that she was 18 years old as she had represented. Jane testified at

trial, "[a]fter he [Defendant] looked through the peephole, he made me go into the

restroom immediately and told me to get dressed. And he said, "Are you 18?" And I said,

"Yes." And he said, "Don't lie to me." And I said, "Yes." *Id.*  Defendant opened the door

---

[3] Although defense counsel sought to present evidence that Jane's parents intended to set Defendant up and extort him, the Court precluded that testimony.

and the police checked Jane's identification to confirm her age before leaving. (R. 794) Defendant was present when police officers checked Jane's identification. Rather than calling it night, Jane again removed her clothes and got on top of Defendant to continue their sexual activities. (R. 795)

After her first encounter with Defendant, Jane told her mother that Defendant had asked whether he could fly her to meet him. Jane told her mother, "I said duuuuuh." Jane continued to communicate with the Defendant via text message and by phone and continued to spend time with Defendant in Orlando doing normal dating activities such as seeing movies and eating out. (GX233)

At one point, Jane's mother got frustrated with Jane for not prioritizing her music with Defendant. On April 23, 2015, Jane's mother texted her, "You need to let him hear your songs. Let him see your video. **You trying to date the man you need to let him see your shit** . . ." (emphasis added) Jane's mother also continued to encourage Jane's relationship with Defendant, telling her to be a little "feisty," stating "He married aliyah cuz she was feisty she didn't let him run over her. You need to be different than the rest " Later that evening, Jane's mother texted Jane, "You are silly that man ain't trying to do nothing with you musically he want to fuck period cuz he like young girls." Jane reassured her mother that Defendant was willing to look at her performances and was "patiently waiting" to look at some of her videos that her mother had emailed her.

On April 24, 2015, after Defendant had left Orlando, Jane's mother instructed Jane "you better be texting him so you will stay on his mind." Later that day, Jane texted her mother about flying out to see Defendant in California.

Jane:   And I talked to r Kelly

Mom:  Yeah bout what

Jane:  **Lmao bout flying me out**

Mom:  Oh really, when

Jane:  **Yeah, whenever I tell him he can. Tomorrow if I choose**

Mom:  Oh yeah

On April 28, 2015, Jane traveled to Los Angeles, California to meet Defendant with the knowledge and consent of her parents. (R. 799; 814; GX 233) Jane continued to text with her mother once in Los Angeles. At one point her mother told her "He going to be in your room butt naked with one of his songs playing lol." Government's Exhibit 233 reflects that Jane and her mother texted incessantly while Jane was in Los Angeles with Defendant. Jane tells her mother at one point, "Crazy this Aaliyah movie just came on and I just got off the phone with r." Mom responded, "Really crazy."

Jane testified that she had oral sex with Defendant in Los Angeles, but she did not share that information with her mother via text. (R. 804-805) At no point did Jane express any apprehensions about being with Defendant or ask her mother to arrange for her to come home. When Jane excitedly told her mother that she was riding Defendant's tour bus to Stockton to attend his concert, Jane's mother responded, "Omg exciting you riding on the tour bus." (GX233)

On May 1, 2015, Jane's mother urged Jane to take advantage of Defendant, texting her "It won't be star lifestyle if you don't get serious bout your music and show this man you want to be famous like him..once he tired of you you'll be like everybody else. You better use this as your opportunity while you got him in spell." Jane's mother

38

then said, "You should text him and be like you know you gonna be my boo and see what he say." To which Jane responded, "Lmaooo."

Jane traveled independently to meet Defendant in Stockton, California where he was performing on May 1, 2015. (R. 818) She stayed in contact with her mother the entire time. At one point, Jane explained to her mother how she ended up going to Stockton to see Defendant's performance: "I told you. **he asked me did I wanna come to his show I said of course and he said okay then. let's pack this stuff up. he was even putting his stuff in my bag."**

Jane and her mother remained in constant communication before Defendant's show. Jane's mother instructed her about what to wear and made suggestions about how she should behave at Defendant's show: "I would blow him lil kisses and wink at him and bite the tip of my finger mess with him real good. Do something seductive then make a silly face . . .lol." Jane and her mother continued to text throughout Defendant's performance. At one point, Jane and her mother exchanged the following texts:

Jane:   He singing this whole show to me

Mom:   Lol to funny

Jane:   Frrrrrrr

Jane:   Lmaooo

Jane:   This man in love

Mom:   Omg you gonna marry him and have his babies

Mom:   Lol my son in law gonna be older than me

Mom:   To dang funny

Jane:   Lmaooo

Mom:  Well you better get signed first then married 2nd.

**

Mom:  He gonna seduce you tonight

Jane:   Lol

Mom:  You have to give him a massage before he go to bed.

Jane:   Lmaooooooooo no I doubt it.

Mom:  Girl you better or he will get someone else to.

Jane's mother continued to encourage her to seduce Defendant. At one point, Jane told

her mother that she "caught feelings"[4] for the Defendant.

According to Jane, she and Defendant had sexual intercourse for the first time

after the concert. (R. 819) At no point during her travels with Defendant in California in

April and May 2015 did Jane disclose that she was 17 years of age or that she had lied to

him about her age. After the trip to California, Jane traveled to meet Defendant in Las

Vegas where he was performing. (R. 821)

No rational juror could conclude that Defendant "enticed, persuaded, induced, or

coerced" Jane to travel to California. Jane's contemporaneous conversations with her

mother show that Defendant invited Jane to join him, and she excitedly accepted. When

her mother asked her when he asked her to travel, Jane told her mother "whenever I tell

him I can. Tomorrow *if I choose*." (GX233) By her own admission, Jane *chose* to travel

with Defendant because she wanted to, and her mother encouraged her. While this court

concluded that Jane's parents' testimony was not relevant for the purpose defense counsel

sought to introduce it, Jane's text messages with her mother introduced as government's

---

[4] "Caught Feelings" is an expression that means "when you meet a girl/guy that you like and it starts to have an effect on you in an emotional way." https://www.urbandictionary.com/define.php?term=caught%20feelings

exhibit 233 were highly relevant evidence that Defendant took no action to "induce, persuade, or coerce" Jane to travel with him. Jane was eager to travel with Defendant and "caught feelings" for him as she admitted and concealed her age from Defendant so she could pursue a relationship with him. The government's evidence fails to show that Jane was "persuaded, induced, enticed, or coerced" into traveling to California.

### 7.  Racketeering Act Nine: (Mann Act Violations – Jane)

The government charged Defendant with four Mann Act violations, stemming from a trip with Jane to California between September 2015 and October 2015, two months before her 18th birthday. According to Jane, she disclosed her true age (17 years of age) prior to this trip. The government's evidence is insufficient as to these Mann Act Violations.

### a.  Racketeering Acts 9A – Transportation

For the same reasons argued in connection with Racketeering Act 8A, the government failed to prove beyond a reasonable doubt that Defendant (1) transported Jane with the *intent* of exposing her to herpes in September-October 2015; and (2) committed a violation of Cal. Health and Safety Code § 120290 by proof beyond a reasonable doubt. The arguments set forth, *supra,* are equally applicable Racketeering Act 9A.

### b.  Racketeering Acts 9B – Coercion or Enticement

Insufficient evidence exists to prove that Defendant committed Racketeering Act 9B. By all accounts, Defendant and Jane were in a serious (and legal) relationship based in Illinois where Defendant resided in fall 2015. Although Jane testified that she told Defendant her true age after the summer ended in 2015, the record does not reflect precisely when she told Defendant her true age. As such, the government failed to show that Defendant possessed the requisite *mens rea* to

sustain a charge of unlawful sexual intercourse with a person under 18 years old under the California penal code in September or October 2015.

Furthermore, the record is devoid of evidence that Defendant took any action to induce, persuade, entice, or coerce Jane into traveling to California between September and October 2015. Critically, when Defendant learned that Jane had lied about her age, he sent her home to Florida. Jane returned to Chicago with her parent's consent. Although it is true that Jane's parents did not have the authority to consent to any illegal sexual activity between Jane and the Defendant, their permission to allow her to stay with Defendant is reflective of Jane's desire to continue her relationship with Defendant. Jane offered no testimony to suggest that she was coerced or enticed into traveling to California in fall 2015. Jane's testimony about Defendant's "rules" and sexual proclivities during this time period are not sufficient evidence of coercion *to travel* even if Jane now believes with the benefit of hindsight that Defendant's conduct was controlling or constituted some type of "grooming."

### c.      Racketeering Act 9C – Coercion or Enticement

The government charged Defendant with a Mann Act violation under the separate theory that Defendant transported Jane to California in September or October 2015 with the intent to violate California Penal Law Sections 261.5(a) and 261.5(b), unlawful sexual intercourse with a person under 18. Preliminarily, for the reasons argued, *supra,* the government simply failed to prove that Defendant took any action to induce, persuade, entice, or coerce Jane into traveling to California. By late 2015, Defendant and Jane were in serious relationship based primarily in Illinois where Defendant resided. The age of consent in Illinois is 17; therefore, the Defendant and Jane's sexual relationship was not prohibited there. Jane traveled with Defendant to numerous states as one of his partners. She went consensually and voluntarily. Defendant did not

have to induce, persuade, entice, or coerce her to travel – even if the government is correct that Defendant had exerted some dominance or control in the relationship at the time.

Furthermore, as argued in connection with Racketeering Act Five, the government provided insufficient evidence that Defendant used any words to "induce, persuade, entice, or coerce" Jane to travel to California *via a facility of interstate commerce*. Under the plain reading of the statute, there must be a nexus between the use of the facility of interstate commerce (a cell phone, computer) and the words of persuasion, enticement, or coercion to satisfy a §2422(b) violation. The record is devoid of that proof. The mere fact that Defendant texted with Jane about any number of things does not satisfy the interstate commerce element of this Mann Act violation.

### d.      Racketeering Act 9D – Transportation

It is true that in the state of California the age of consent is 18. According to Jane, she had sexual relations with Defendant in California during this trip when she was still 17 years of age. However, the government failed to prove Defendant guilty of the Mann Act under this theory where Defendant's motivating purpose in traveling to California was not to have sex with Jane. Defendant and Jane had a consensual and legal sexual relationship in Illinois. Defendant's purpose in traveling to California was to perform and he arranged for his girlfriend to go with him. If Defendant had sexual relations with Jane in California in September and October, it was purely incidental to the purpose of the trip. As Jane herself testified when asked:

Q.      And while you were 17, did you take additional trips to California with the defendant?

A.      Yes, I did.

Q.      And do you remember where you traveled to?

A.      I do not.

Q.      Do you remember what the purpose of your travel was for?

A.      He had shows. (R. 888)

No rational juror could find that the government proved that Defendant's motivating purpose in "transporting" Jane to California was to have sexual intercourse with her, particularly where he had an ongoing legal and consensual sexual relationship with her in the state of Illinois where he resided. At bottom, no nexus exists between the transportation of Jane and the alleged illegal sexual activity.

### 8.      Racketeering Act 10: (Sexual Exploitation of Jane)

The government failed to prove Racketeering Act Ten, that is, sexual exploitation of Jane where it offered insufficient evidence that Defendant used, employed, persuaded, induced, or enticed Jane to take part in sexually explicit conduct for the purpose of producing a visual depiction between September 2015 and December 30. The government contends that prior to Jane's 18th birthday, Defendant recorded his sexual experiences with her in California.

To demonstrate that Defendant committed sexual exploitation of a child pursuant to 18 U.S.C. 2251(a), it is not enough for Jane to simply allege that Defendant recorded sexually explicit conduct. Jane offered no testimony that proved that Defendant "used, persuaded, induced, enticed or coerced" her into "sexually explicit" conduct during the relevant time-period. Jane had an ongoing sexual relationship with Defendant before the video-recording incident and after the video-recorded incident. Although Jane seems to regret those experiences, she did not offer sufficient evidence of enticement or coercion. The government must prove that Defendant did something more than just film the sexually explicit conduct. If the act of filming or recording

44

alone was sufficient to sustain the charge, Congress would not have included a requirement that the Defendant "employ, persuade, indue, entire, or coerce."

Furthermore, the government failed to prove that Defendant acted with a purpose of "producing" a visual depiction of that conduct. Although the jury was erroneously charged that the government could sustain the charge by proving that the purpose was "transmitting a visual depiction." The statute requires something different. Indeed, "producing" is defined by the statute as "producing, directing, manufacturing, issuing, publishing, or advertising." 18 U.S.C. 2256(3). While the statute also prohibits the transmission of *live* visual depictions, Defendant was not charged with transmitting a live visual depiction and there is no evidence that he did. Accordingly, the government failed to prove Racketeering Act Ten by proof beyond a reasonable doubt.

### 9.    Racketeering Act Eleven - Forced Labor of Jane

The government charged Defendant with forced labor of Jane under a theory that Defendant required Jane to participate in sex with other men and other women. (R. 4426) Although at trial, Jane claimed that she did not want to participate in those activities and that she did not enjoy those activities, that does not mean that Jane was *forced* to participate in those activities. If Jane refuses even now to allege that she was forced by threats of violence to engage in certain sex acts, it is unclear why the government believes she was. Again, belatedly acknowledging that one really did not want to participate in the conduct is not the equivalent of being forced. The record is devoid of any evidence that Jane was forced within the meaning of the statute to have sex with individuals other than the Defendant or that she was prohibited in any way from extricating herself from the relationship.

The government's evidence that Jane was "forced" to participate in these sexual acts consisted of Alex's ("nephew") testimony that some women he had sex with were "zombie-ish" and that Defendant had directed women, *other than Jane,* to participate in group sex. Rather than point the jury to specific evidence from Jane's testimony that reflected that she had been forced to participate in these activities through violence, restraint, or threat of violence, the government argued that Defendant had directed Dominique to have sexual intercourse with Alex. (R. 4426-4427) While the government was permitted to offer an extraordinary amount of uncharged bad act evidence for various purposes, such evidence cannot supplant the government's burden to show that Jane, herself, was forced to participate in group sex acts.

The evidence offered was insufficient proof of the offense of Forced Labor. As discussed in connection with Racketeering Act Six, the government cannot establish the offense of forced labor by simply showing that Defendant and Jane had a sexual relationship that some might consider abusive. The government was required to establish a causal link between the group sex acts and threats of physical violence. It failed to do so.

### 10.       Racketeering Act Twelve: (Mann Act Violations – Faith)

The government charged Defendant with two Mann Act violations in connection with Faith's trip to New York in May 2017, alleging that Defendant violated 18 U.S.C. § 2421(a) and § 2422(a). The government charged that Defendant either transported or "persuaded, induced, enticed, or coerced" Faith to travel to New York with the purpose of knowingly exposing her to an infectious venereal disease under New York Public Health Law Section 2307 and reckless endangerment pursuant to New York Penal Law Section 120.20. The government failed to prove Mann Act violations under § 2421(a) and § 2422(a) where it offered insufficient evidence that

Defendant: (1) transported Faith with the *intent* of exposing her to herpes; or (2) persuaded, induced, enticed, or coerced Faith to travel to New York with the intent of exposing her to herpes. Separately, the government failed to prove that Defendant committed the offense of reckless endangerment or a violation New York Public Health Law Section 2307 which is unconstitutional in any event both facially and as applied to the Defendant.

   **a.**  **Intent**

   Because there is no link connecting Defendant's transportation of Faith with an intent to expose her to herpes, Defendant cannot be guilty of a Mann Act violation. As discussed at length, *supra,* the government must prove that the illegal sexual activity is the "dominant, significant, or motivating purpose" behind the transportation. *see United States v. Kinslow,* 860 F. 2d 963 (9th Cir. 1988); *United States v. Lukashov,* 694 F. 3d 1107, 1110 (9th Cir. 2012); *United States v. Cryar,* 232 F. 3d 1318 (10th Cir. 2000); *United States v. Hayward,* 359 F. 3d 631 (3d Cir. 2004). Because the Defendant's purported violation of a New York Public Health Law prohibiting him from exposing a partner to herpes was *incidental* to Faith's trip rather than a motivating purpose in transporting Faith, the intent requirement of the statute cannot be sustained.

   The government argued to the jury that it should find Defendant guilty of a Mann Act violation by merely finding that Defendant transported Faith to New York from her hometown in Texas "for the purpose of sex, the only remaining issue is whether the sexual activity that he brought her here for was illegal, and it was." (R. 4433) This argument is legally flawed. Transporting Faith to New York to have sex would not satisfy the elements of a violation under Section § 2421(a) since the sex act *itself* was perfectly legal as Faith was a consenting adult. The activity that was allegedly illegal in New York was exposing Faith to herpes. It is *that* act that

47

must be motivating purpose behind Defendant's transportation of Faith. Because the government cannot demonstrate a nexus between Defendant's motivation for transporting Faith to New York and the *illegal* sexual activity, Defendant must be acquitted of the § 2421(a) offense.

### b.    Coercion or Enticement

The government alternatively argues that Defendant is guilty of the Mann Act stemming from Faith's trip May 18, 2017, trip to New York because Defendant knowingly "persuaded, induced, enticed, or coerced" Jane to travel to New York for the purpose of exposing her to herpes. Insufficient evidence exists to prove that Defendant took any action to induce, persuade, entice, or coerce Jane into traveling to New York on May 18, 2017. The evidence shows that Defendant invited a grown woman to meet him in New York, and she accepted.

In March 2017, Faith attended one of Defendant's concerts in San Antonio, Texas with her sister. (R. 2130) Faith had an opportunity to meet Defendant at an after-party backstage along with other individuals. (R. 2131) Defendant and Faith had a conversation during the after-party and Defendant provided her with his phone number. (R. 2134; 2138) After that encounter, Faith and Defendant kept in touch via text and FaceTime. The conversations were normal, appropriate, and pleasant. Defendant complimented her appearance. (R. 2143-2144) Faith testified that Defendant referred to himself as "Daddy" during those conversations. (R. 2143) According to Faith, Defendant asked to be called by Daddy and she complied.[5] Faith did *not* testify that Defendant forced her to call him Daddy. Indeed, Defendant and Faith had met exactly one time when Faith began calling him "Daddy." (R.2144)

On the issue of travel, Faith had this to say:

---

[5] The government makes much of the fact that Defendant asked his girlfriends to call him "Daddy," so much so that the fact was pled in the indictment. There is nothing inherently criminal or even particularly unusual about the use of the moniker "Daddy," particularly in sexual relationships. https://www.vice.com/en/article/8qwze4/why-women-like-to-call-men-daddy-during-sex

Q.     In your communications with the defendant, how, if at all, did the topic of traveling to see him come up?

A.     He had informed me that he was on tour right now – or excuse me, at the time, he was on tour, so he was just saying his schedule was kind of crazy, but whenever I wanted to come see him, I could, and he just said that he could arrange the days or just let him know when I wanted to come hang out, but that it would be fun; I would get to see, you know, how – how it is, how he is on tour, things like that. (R. 2145)

Defendant told Faith that if she wanted to come to his shows, she could contact his assistant and he would arrange it for her. (R. 2146) Faith then contacted Defendant's assistant who made travel arrangements for her. (R. 2147) Originally, Faith was going to travel to Chicago but ultimately traveled to New York for one of Defendant's performances. According to Faith, Defendant informed her "that he was having a show in New York and that he would like for me to come, hang out, it was going to be fun, so I said yes." (R. 2151) Defendant's assistant arranged her travel and Faith traveled to New York to attend Defendant's performance and "hang out." (R. 2152)

No rational juror could conclude from Faith's testimony that Defendant coerced or enticed her to travel to New York (for the purpose of giving her herpes). By Faith's account, Defendant was polite, generous, and appropriate, leaving it entirely at her discretion to come to New York to attend a concert. Defendant's alleged bad behavior with other women is not sufficient evidence of his specific conduct in connection with Faith on May 18, 2017. The government routinely asked the jury to find that it had proven elements of the charged offense simply because Defendant had, from the government's perspective, been controlling and coercive to *other* women. Faith's testimony does not establish *any* conduct on the part of Defendant that shows that he did *anything* other than invite her to come to his concert in New York, an invitation she accepted.

Frankly, if this conduct proves "coercion or enticement" by proof beyond a reasonable doubt, the government is going to be very busy prosecuting Mann Act violations. Although it seems unlikely that the government has much of an intention of using this provision to prosecute influential, wealthy White men who invite women on fancy trips for the purpose of engaging in sexual activity that those women later decide was unpleasant.

### c.     New York Public Health Law Section 2307 and Penal Law 120.20

To sustain the Mann Act violations charged in connection with Faith's travel to visit Defendant in New York on February 2, 2018, the government must prove that Defendant intended to engage in a sexual activity for which he could be charged with a criminal offense. Pushing the boundaries of its prosecutorial discretion, the government alleged that Defendant *could* have been charged with a violation of New York Public Health Law § 2307 and/or reckless endangerment because he created a "substantial risk of serious physical injury" when he had unprotected sex with Faith, knowing that he had herpes.

At the outset, Faith did not contract genital herpes from Defendant despite her misleading testimony. After returning from New York, Faith claimed she was diagnosed with herpes type 1 after getting cold sores on her mouth. (R. 2279-2280) Nearly 50 % of the population has herpes type 1, and it can be contracted in any number of ways, including kissing, sharing a toothbrush, or eating utensils.[6] Cold sores caused by herpes type 1 does not cause a substantial risk of serious physical injury. Presumably even the government would concede this point.

Furthermore, as a matter of law, unprotected sex with someone who has genital herpes does not establish a substantial risk of serious physical injury. According to the City Health

---

[6] https://www.webmd.com/genital-herpes/pain-management-herpes#1

50

Department, one in four New Yorkers has genital herpes.[7] If sexual intercourse with individuals who merely carry the genital herpes virus carries the "substantial risk of serious physical injury" New York City would have an astronomical hospitalization and death rates from the transmission of herpes. Although the government's expert witness identified some serious, but unusual, health risks associated with the contraction of genital herpes, the offense of reckless endangerment requires a showing of a "substantial risk" of "serious physical injury." Serious physical injury is defined as a person's physical conditions that creates a substantial risk of death, or serious and protracted impairment of health.

The government did not satisfy this burden. The risk of Defendant transmitting genital herpes to Faith is unknown where he did *not* transmit it her, and there is no evidence that he was contagious or had an outbreak. If the government could show that Defendant had active symptoms of herpes when he had intercourse with Faith, their proofs might be on a better footing. But merely having unprotected sex with someone who carries the virus cannot as a matter of law create a substantial risk of serious physical injury. Notably, the government cannot point to a single case that supports the prosecution expansive reading of this statute.

Even *if* Defendant had given Faith genital herpes, the government's evidence would be insufficient to sustain a charge for reckless endangerment. Herpes is not deadly and rarely causes any serious, protracted health impairments.[8] Again, the government's expert witness identified rare complications from herpes that could perhaps meet the definition under the reckless endangerment statute, but since those complications carry a low, rather than "substantial" risk of serious physical injury as defined by the statute, the government cannot, as a matter of law, sustain this claim.

---

[7] https://www.nydailynews.com/new-york/one-fourth-city-residents-herpes-article-1.294915
[8] https://slate.com/technology/2019/12/genital-herpes-stigma-history-explained.html

Separately, New York Public Health Law § 2307 is unconstitutional, facially and as applied, for the reasons previously identified by Defendant in his "Motion to Strike Allegations from Count One of the Superseding Indictment and Dismiss the Remaining Counts" (Dkt. No. 42). Additionally, the statute is void for vagueness as it fails to put the public on notice of what conduct constitutes criminal behavior and authorizes arbitrary and discriminatory enforcement. *Sessions v. Dimaya,* 138 S. Ct. 1204, 1212 (2017).

One in six Americans (one in four New Yorkers) suffer from genital herpes (herpes simplex 2). Under the plain reading of this statute, even a person who carries the virus but has been asymptomatic for decades would commit a crime by having sexual intercourse with another. In the absence of a definition of "infected," the statute in unconstitutionally vague. While this court seems to assume that "infected" means having the virus rather than having the ability to transmit it, no authority supports this application, and such an interpretation would lead to arbitrary and discriminatory enforcement.

### 11.   Racketeering Act Thirteen: (Forced Labor – Faith)

No rational juror could conclude based on the evidence adduced at trial that Defendant knowingly obtained, or agreed to obtain, any labor or services from Faith on January 13, 2018. A conviction of forced labor under 18 U.S.C. §1589 requires the government to prove beyond a reasonable doubt that: (1) the defendant obtained the labor or services of another person; (2) through, *inter alia,* threats of serious harm; and (3) the defendant acted knowingly. *United States v Marcus,* 487 F. Supp. 387, 310 (E.D.N.Y. 2007). The language "by means of" contained in the forced labor statute, 18 U.S.C. §1589(a), requires the government to establish a causal link between the labor and services provided by the person and the threat of "serious harm." *Id.* Section 1589 is "intended to address *serious* trafficking, or cases where traffickers threaten harm

52

to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence." *Muchira v. Al-Rawaf,* 850 F. 3d 605, 618 (4th Cir. 2017). The harm or threat of harm, "considered from the vantage point of a reasonable person in the place of the victim, must be 'sufficiently serious' to *compel* that person to *remain"* in her condition of servitude when she otherwise would have left. *Id.*

According to the government, on January 13, 2018, Defendant violated the forced labor statute by using threats of violence to obtain labor, an act of oral sex, from Faith. The forced labor statute was not intended to reach isolated conduct like that described by Faith. Faith testified that she traveled to Los Angeles to see Defendant, presumably to continue her romantic/sexual relationship with the Defendant. She described an incident where she and Defendant were in a small room in the Los Angeles studio where he worked. According to Faith, there was a gun in the room that made Faith intimidated, but Defendant never touched the gun, threatened her with it, or made any gestures that he intended to use it. Faith was simply uncomfortable by its presence. After an intense conversation during which Faith described Defendant as being "serious" but not threatening, Defendant directed her to give him in oral sex and grabbed her neck before placing his penis inside her mouth. Without objection, Faith provided oral sex to Defendant although she testified that she did not want to.

The forced labor statute was not enacted to remedy isolated occurrences like the one described by Faith. Indeed, it is not even clear from Faith's testimony that she gave any indication to Defendant that she did not want to give him oral sex, although she claims she did not to want to give him oral. The record fails to reflect a causal link between the isolated act of oral sex and any threat of physical violence – even if Faith felt intimidated by being in the same room where a gun was located. This event did not amount to "forced labor." Furthermore, Faith

53

traveled to visit the Defendant against, even after this alleged act of forced labor where she now claims she did not want to participate in the act of oral sex.

### 12.    Racketeering Act Fourteen – (Mann Act Violations – Faith)

The government charged Defendant with a second set of Mann Act violations in relation to Faith's second trip to New York on February 2, 2018. The government's evidence was insufficient for the same reasons argued in connection with Racketeering Act Eleven. First, the government simply fails to demonstrate that Defendant transported Faith to New York on February 2, 2018, for the purpose of exposing her to herpes. Second, the record is devoid of any testimony that Defendant coerced or enticed Faith to come to New York for the purpose of exposing her to herpes.

Faith and Defendant's so-called "relationship" was conducted almost entirely over text. After meeting at Defendant's concert in San Antonio, Faith met the Defendant face-to-fact no more than five times. Faith always returned to her home in Texas after her short excursions to visit with Defendant. This was a grown woman who made decisions to travel with Defendant, not out of fear, coercion, or any type of enticement, but because she wanted to. Faith herself refuses to identify as someone who was forced to do anything. On cross-examination, Faith admitted that she was not a victim and had made a *choice* to be with Defendant. (R. 2385)

> Q.    In one of the podcasts we spoke about this morning, the Paper Route. On that show you said during that interview: **I don't like the word victim because I don't feel like I'm a victim. I'm a young woman. And let's be clear, let's be clear, I made a choice to be involved with that person. Do I feel like everything he did was right? Hell, no. But I had a choice. And that's why I walked away. I did not move in with him. I did not live with him. I did not take any money from him. There is a choice that you have to make.** You said that?

> A.    Correct.

Q.      You made a choice.

A.      Correct.

Q.      And you're not a victim.

A.      Correct. (R. 2385)

The record is devoid of evidence that proves that Defendant coerced or enticed Faith to

travel to New York in February 2018. The government must point to *some* specific words

or conduct by the Defendant that were coercive or enticing in respect to *Faith*. An

invitation is simply not enough. Accordingly, the government failed to prove

Racketeering Act 14.

In sum, the government failed to prove the Defendant guilty of RICO.

**II.     THE GOVERNMENT FAILED TO PROVE COUNTS TWO THROUH NINE OF
THE INDICTMENT.**

The government charged Defendant with four free-standing Mann Act charges that

mirror Racketeering Acts Eight and Nine, related to Jane. For the reasons argued, *supra,* (pgs.

29-42), the government failed to prove Counts two through five of the indictment.

Similarly, the government charged Defendant with four free-standing Mann Act

violations that mirror Racketeering Acts Twelve and Fourteen. For the reasons argued,

*supra,*(pgs. 47-53; 55-56), the government failed to prove Counts six through nine of the

indictment.

**<u>CONCLUSION</u>**

For the foregoing reasons, this Court should enter an order acquitting Defendant of all offenses.

Respectfully submitted,

<u>/s/JENNIFER BONJEAN</u>

JENNIFER BONJEAN
Bonjean Law Group, PLLC
750 Lexington Ave., 9th Fl.
New York, NY  10022
718-875-1850

*Attorney for Robert Kelly*

56