# 22-1481(L)

## 22-1982(CON)

# United States Court of Appeals

### For the Second Circuit

———— ◆ ————

UNITED STATES OF AMERICA,

*Appellee,*

—against—

ROBERT SYLVESTER KELLY, AKA R. KELLY,

*Defendant-Appellant.*

—————

**On Appeal From The United States District Court
For The Eastern District of New York**

**THE GOVERNMENT'S APPENDIX
VOLUME II OF V
(Pages GA274 to GA512)**

BREON PEACE,
*United States Attorney,
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000*

NICHOLAS J. MOSCOW,
LAUREN H. ELBERT,
KAYLA C. BENSING,
*Assistant United States Attorneys,
Of Counsel.*

# TABLE OF CONTENTS

Page

Defendant's Motion to Dismiss (DE 41),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated February 28, 2020.............................................................GA 1

Defendant's Motion to Dismiss, Motion to Strike (DE 42),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated March 2, 2020 ................................................................GA 12

Superseding Indictment (DE 43),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated March 12, 2020 ..............................................................GA 19

Joint Request to Charge (DE 117-1),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated July 7, 2021...................................................................GA 42

Defendant's Objections to Request to Charge (DE 117-3),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated July 7, 2021.................................................................GA 131

Government Memorandum in Support of Motion in Limine (DE 133),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated July 23, 2021................................................................GA 135

Defendant's Memorandum in Opposition to Motion in Limine (DE 146),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated July 31, 2021................................................................GA 190

Defendant's Letter Motion Regarding Jury Instructions (DE 219),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 18, 2021 .......................................................GA 203

Defendant's Memorandum in Support of Motion for Acquittal
(DE 269-1),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated February 17, 2022.........................................................GA 211

Defendant's Memorandum in Support of Motion for a New Trial
(DE 270-1),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated February 17, 2022...........................................................GA 274

Defendant's Memorandum in Support of Supplemental Motion for a
New Trial (DE 276-1),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated March 21, 2022 .............................................................GA 296

Pretrial Conference Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 3, 2021 ...............................................................GA 308

Jury Selection Transcript,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 9 through 11, 2021 ............................................GA 328

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 18, 2021 .............................................................GA 792

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 19, 2021 .............................................................GA 796

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 20, 2021 .............................................................GA 803

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 26, 2021 .............................................................GA 814

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 1, 2021 .........................................................GA 853

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 14, 2021 .......................................................GA 870

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
      Dated September 15, 2021 .......................................................GA 872

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
      Dated September 22, 2021 .......................................................GA 886

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
      Dated September 23, 2021 .......................................................GA 897

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
      Dated September 24, 2021 .......................................................GA 901

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
      Dated September 27, 2021 .......................................................GA 907

Government Letter Regarding "For Cause" Challenges (DE 152),
  United States v. Kelly, 19-CR-286 (AMD),
      Dated August 4, 2021 ..............................................................GA 918

Government Letter Regarding "For Cause" Challenges (DE 157),
  United States v. Kelly, 19-CR-286 (AMD),
      Dated August 6, 2021 ..............................................................GA 924

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
      Dated August 23, 2021 ............................................................GA 928

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
      Dated August 25, 2021 ............................................................GA 949

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
      Dated August 30, 2021 ............................................................GA 952

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 31, 2021 ............................................................GA 954

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 2, 2021 .......................................................GA 960

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 3, 2021 .......................................................GA 962

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 9, 2021 .......................................................GA 986

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 9, 2021 .......................................................GA 986

Government Exhibit 208(a),
  United States v. Kelly, 19-CR-286 (AMD)................................GA 1025

Government Exhibit 233(d),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated April 29, 2015.............................................................GA 1028

Government Exhibit 240(b),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated December 10, 2015......................................................GA 1029

Government Exhibit 240(c),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated December 28, 2015......................................................GA 1030

Government Exhibit 240(f),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated May 10, 2016..............................................................GA 1031

Government Exhibit 240(g),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated May 16 through 17, 2015 .............................................. GA 1033

Government Exhibit 401,
  United States v. Kelly, 19-CR-286 (AMD) ................................. GA 1038

Government Exhibit 402,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated March 19, 2007 ............................................................ GA 1039

Government Exhibit 417(a),
  United States v. Kelly, 19-CR-286 (AMD) ................................. GA 1041

Government Exhibit 449,
  United States v. Kelly, 19-CR-286 (AMD) ................................. GA 1042

Government Exhibit 497(a),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated December 6, 2017 ......................................................... GA 1047

Government Exhibit 485(b)-T,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated December 6, 2017 ......................................................... GA 1049

Submitted Separately on Disc

Government Exhibit 328(a)
  United States v. Kelly, 19-CR-286 (AMD) ................................. GA 1063

Government Exhibit 329(a)
  United States v. Kelly, 19-CR-286 (AMD) ................................. GA 1064

Government Exhibit 341(a)
  United States v. Kelly, 19-CR-286 (AMD) ................................. GA 1065

Government Exhibit 342(a)
  United States v. Kelly, 19-CR-286 (AMD) ................................. GA 1066

Government Exhibit 343(a)
  United States v. Kelly, 19-CR-286 (AMD) ................................. GA 1067

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------X
                                          :

UNITED STATES OF AMERICA,        :

                                         :        19 Cr 286 (AMD)

                                         :

-vs-                               :        NOTICE OF MOTION

                                         :

                                         :

ROBERT SYLVESTER KELLY,      :
      also known as "R. Kelly,"    :

                                         :

                Defendant.      :
---------------------------------------------------X

**DEFENDANT ROBERT KELLY'S MEMORANDUM OF LAW IN SUPPORT OF HIS<br>MOTION FOR A NEW TRIAL**

JENNIFER BONJEAN
Bonjean Law Group, PLLC
750 Lexington Ave., 9th Fl.
New York, NY  10022
718-875-1850

*Attorney for Robert Kelly*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**…………………………………………………………  ii

**INTRODUCTION**………………………………………………………………..  1

**ARGUMENT**

   I.   **Defendant Was Denied Effective Assistance of Counsel Where His Trial Attorneys Failed to Conduct a Meaningful *Voir Dire* of Potential Jurors and Challenge Unqualified Jurors, Some of Whom Had Watched the Inflammatory Docuseries "Surviving R. Kelly" or Were Familiar with Prior Accusations of Sexual Abuse of Minors against Defendant. Counsel's Objectively Unreasonable Performance during *Voir Dire* Resulted in the Empaneling of a Jury that Was Neither Fair Nor Impartial.**
     ………………………………………………………………………………..  2

   II.   **Defendant Is Entitled to a New Trial Where One Of His Trial Attorneys Labored Under A Disabling Conflict Of Interest As a Result of Her Simultaneous Representation Of The Defendant and the Government's Star Witness "Jane" That Was Imputed to the Entire Defense Team**……………..  13

   **CONCLUSION**………………………………………………………………..  18

i

## **TABLE OF AUTHORITIES**

### **CASES**

*Anwar v. United States,* 648 F. Supp. 820 (N.D.N.Y. 1986) ........................................ 17

*Connors v. United States*, 158 U.S. 408 (1895) ........................................................ 10

*In re Michael,* 326 U.S. 224 (1945) ............................................................................ 2

*Irwin v. Dowd,* 366 U.S. 717 (1961) ........................................................................... 2

*Lainfesta v. Artuz,* 253 F. 3d 151 (2d Cir. 2001 ....................................................... 14

*Rosales-Lopez v. United States*, 451 U.S. 182 (1981) ............................................. 10

*Smith v. Phillips,* 455 U.S. 209 (1982) ....................................................................... 2

*Strickland v. Washington,* 666 U.S. 668 (1984) .................................................. 11, 13

*United States v. Blount*, 479 F. 2d 650 (6th Cir. 1973) ............................................ 11

*United States v. Daugerdas,* 735 F. Supp. 2d 113 (S.D.N.Y. 2010) .......................... 17

*United States v. Fulton,* 5 F. 3d 605 (2d Cir. 1993) ............................................. 14, 16

*United States v. Jiang,* 140 F. 3d 124 (2d Cir. 1998) ............................................... 17

*United States v. Laird*, 239 Fed. Appx. 971 (6th Cir. 2007) ....................................... 3

*United States v. Luciano,* 158 F. 3d 655 (2d Cir. 1998) ........................................... 14

*United States v. Sanchez,* 969 F. 2d 1409 (2d Cir. 1991) .......................................... 2

*United States v. Schwarz,* 283 F. 3d 76 (2d Cir. 2000) ............................................ 14

*United States v. Stein,* 410 F. Supp. 2d 316 (S.D.N.Y. 2006) ................................... 17

*Waldorf v. Shuta,* 3 F. 3d 705, 710 (3d Cir. 1993) ............................................... 3, 10

*Wheat v. United States,* 486 U.S. 153 (1988) .......................................................... 14

### **RULES**

Federal Rule of Criminal Procedure 24 ........................................................................ 3

Federal Rule of Criminal Procedure 29 ........................................................................................... 2

Federal Rule of Criminal Procedure 33 ........................................................................................... 2

## **CONSTITUTIONAL PROVISIONS**

U.S. Const. Amend. VI. ........................................................................................................... 1, 14

**INTRODUCTION**

It is axiomatic that a Defendant is entitled to the effective assistance of counsel. U.S. Const. Amend. VI. Incorporated in Defendant's Sixth Amendment guarantee is the right to conflict-free counsel. Defendant was denied his Sixth Amendment guarantees in a number of ways, some of which are clear from the record – some of which are not.[1] In this complex RICO prosecution, Defendant's legal team fell apart mere weeks before the commencement of trial. The docket reflects that Defendant's lawyers were unable to effectively represent Defendant as a team. Energy, resources, and time that should have been devoted to preparing for trial were expended battling each other until two of Defendant's more experienced attorneys were granted leave to withdraw. Defendant was left with a disjointed, unprepared trial team and no singular defense strategy.

This motion identifies two serious violations of Defendant's Sixth Amendment constitutional guarantees that require a new trial and are apparent from the record. Specifically, Defendant is entitled to a new trial where his trial team conducted no meaningful *voir dire* and acquiesced to the seating of jurors who were unqualified to serve on this jury. Defendant was also denied conflict-free counsel where his attorney Ms. Becker simultaneously represented one of the government's key witnesses. These violations of Defendant's Sixth Amendment rights are so serious as to demand a new trial without a showing of prejudice.

---

[1] Contemporaneous with this motion, Defendant is also filing a motion for leave to supplement this motion where undersigned counsel may raise additional claims of ineffective assistance of counsel, some of which may depend on outside the record information.

**LEGAL STANDARD**

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Unlike Rule 29, Rule 33 "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice," but such "discretion should be exercised sparingly." *United States v. Sanchez,* 969 F. 2d 1409, 1413-14 (2d Cir. 1991).

**ARGUMENT**

I.      **Defendant Was Denied Effective Assistance of Counsel Where His Trial Attorneys Failed to Conduct a Meaningful *Voir Dire* of Potential Jurors and Challenge Unqualified Jurors, Some of Whom Had Watched the Inflammatory Docuseries "Surviving R. Kelly" or Were Familiar with Prior Accusations of Sexual Abuse of Minors against Defendant. Counsel's Objectively Unreasonable Performance during *Voir Dire* Resulted in the Empaneling of a Jury that Was Neither Fair Nor Impartial.**

As United States Supreme Court Justice Black stated in *In re Michael,* 326 U.S. 224, 228 (1945): "[I]t is difficult to conceive of a more effective obstruction to the judicial process than a juror who has prejudged the case." That is, because "Due Process means a jury capable and willing to decide the case solely on the evidence before it, and a trial court ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips,* 455 U.S. 209, 217 (1982). In *Irwin v. Dowd,* 366 U.S. 717, 722 (1961), the United States Supreme Court observed, "the right to a jury trial guarantees to the criminal accused a fair trial by a panel of impartial and 'indifferent' jurors . . . This is true, regardless of the heinousness of the crime charged, the apparent guilty of the offender or the

station in life which he occupied  . . . a juror who has formed an opinion cannot be impartial."
(internal citations omitted).

Rule 24 of the Federal Rules of Criminal Procedure governs *voir dire* in criminal trials.
The rule provides that if the court examines jurors, it must permit the attorney for the parties to:
(A) ask further questions that the court considers proper; or (B) submit further question that the
court may ask if it considers them proper. Fed. R. Crim. P. 24(a). A trial judge, who under Rule
24, decides to examine prospective jurors himself "must at the very least solicit questions from
both parties' attorney . . .," *United States v. Laird*, 239 Fed. Appx. 971, 972 (6th Cir. 2007).

Naturally, the trial court's duty to ensure that each and every juror is fair and impartial is
heightened where, as here, pretrial publicity has greatly increased the odds that a potential juror
has preconceived views of the accused's guilt. *Waldorf v. Shuta*, 3 F. 3d 705, 710 (3d Cir. 1993)
(in a case of substantial pretrial publicity, jurors' subjective assessments of their own impartiality
may not adequately screen for the possibility of prejudice).

In an effort to protect Defendant's cherished guarantee of a fair and impartial jury trial,
this Court implemented a procedure whereby potential jurors were asked to complete
questionnaires that probed whether they had prior knowledge, preconceived notions, or biases
about Defendant given the unprecedent pretrial publicity he faced. (Dkt. No. 115) Indeed, the
questionnaire contained an entire section entitled "Knowledge of the Case and People" that
asked jurors to reveal whether they had "read, seen, or heard anything about the case, the alleged
crimes, or people involve" and to describe in detail any information they had previously learned
by the Defendant. The questionnaire expressly asked prospective jurors whether they had
"watched or heard any interviews of Robert Kelly, of any TV shows featuring him, or any
specials or documentaries about him."

The court invited counsel for the government and the Defendant to review the questionnaires in advance of jury selection and determine whether they could agree that certain individuals should be excluded for "cause." The parties conducted that process and identified a set of potential jurors for the *voir dire* process. Inexplicably, Defendant's counsel failed to challenge several jurors who ultimately sat on Defendant's jury who were clearly unqualified to serve on account of their preconceived beliefs about Defendant's guilt. These decisions cannot be justified by trial strategy where the record fails to reflect that trial counsel conducted a sufficient inquiry to probe these jurors' biases. Indeed, trial counsel was mostly silent throughout *voir dire*. Although the court was responsible for questioning prospective jurors, it afforded the parties the opportunity to weigh in the questioning of prospective jurors who had made representations in their questionnaires that raised red flags. These questionnaires were highly effective tools for putting the parties on notice of jurors who might not be qualified to serve. But trial counsel made no effort to drill down on troubling representations that demanded further inquiry to ensure that the juror could be fair and impartial, regardless of any general assurances he/she provided to follow the court's instructions.

Perhaps most troubling, most of Defendant's jurors were aware of prior allegations of sexual abuse against him, and *several* seated jurors had actually seen a scathing, one-sided, docuseries entitled "Surviving R.Kelly" that portrayed Defendant as a serial predator and included interviews with many of the government's witnesses – albeit outside the adversarial process.[2] Defendant's jury should *not* have included a single person who saw the documentary "Surviving R. Kelly." It defies all logic that a juror could possibly remain "indifferent" and consider only the evidence heard from the witness stand after watching this docuseries. But this

---

[2] https://www.rollingstone.com/tv/tv-features/surviving-r-kelly-lifetime-docuseries-review-774317/

Court could not make cause challenges for Defendant or do defense counsel's job for it (although it tried at points). It was defense counsel's responsibility to conduct a meaningful *voir dire,* particularly in this highly publicized case to ensure that Defendant's jury was fair and impartial. Trial counsel failed in its duty.

For example, Juror No. 3 provided the following information in the questionnaire

| | |
|---|---|
| Question 29: | The case for which you are summoned involved the defendant Robert Sylvester Kelly, also known as "R.Kelly," Have you read, seen or heard anything about the case, alleged crimes, or people involved? |
| Answer: | **I watched the documentary, but I forgot the name of it**. |

| | |
|---|---|
| Question 30: | Have you read, seen, or heard about Robert Kelly, also known as R. Kelly? |
| Answer: | Yes. Entertainer, **I heard that he has been sleeping with underage girls**. |

| | |
|---|---|
| Question 31: | Have you watched or heard any interviews of Robert Kelly or any TV shows featuring him or any specials or documentaries about him? |
| Answer: | Yes. |

| | |
|---|---|
| Question: | What were your general impressions? |
| Answer: | **I saw a documentary about him and his legal troubles**. I don't know the full story so I have no feelings and remain impartial. |

| | |
|---|---|
| Question 91: | Do you know anything about the "Me Too movement?" |
| Answer: | Yes. It's a movement that seeks justice for rape victims 25-30 years after the fact. |

Trial counsel did not ask the court to question the juror further about his responses to these questions or to determine whether the juror could truly serve as impartial and unbiased juror in light having seen the salacious and highly prejudicial docuseries. Not a single question was asked of the juror about his impressions of the documentary, nor did counsel ask the court to inquire about what information he learned about Defendant's prior legal issues or his reputation for "sleeping with underage girls." Frankly, anyone who had seen the docuseries should have been automatically removed for cause.

Juror No. 4 revealed in the questionnaire:

Question 39:   The charge in this case involves allegations regarding exposure to one or more sexually transmitted diseases. Is there anything about such an allegations that you believe would affect your ability to serve as a fair and impartial juror?

Answer:   **Yes. I find transmission of STDs in a nonconsensual act to be particularly repulsive.**

Question 55:   Have you ever known anyone, including yourself, who was the victim of a sexual assault, other assault or homicide or other act of violence that required medical treatment or counseling?

Answer:   Yes. Close friend received asylum due to sexual assault and infection with HIV from the police in a foreign country

Question 78:   Which publicly known person do you least admire?

Answer:   Jeffrey Epstein

Although the court generally asked whether anything the juror read would affect his/her ability to be fair and impartial in the case, and the juror replied, "not that I know of." But trial counsel did *not* ask the court to question the juror whether his feelings of "repulsion" about the transmission of STDs in a nonconsensual scenario would interfere with his ability to serve as fair and impartial juror. No conceivable reason exists for failing to inquire further about the juror's feelings about the transmission of STDs in nonconsensual circumstances where the government charged Defendant with precisely that act. Incredibly, this juror willingly disclosed that the publicly known person he *least* admires is Jeffrey Epstein, an accused pedophile – just like the Defendant. With no meaningful inquiry about whether this juror could truly serve as a fair and impartial juror, the juror was seated.

Juror No. 5 disclosed the following in his/her questionnaire:

Question 31:   Have you watched or heard any interviews of Robert Kelly or any TV shows featuring him or any specials or documentaries about him?

Answer:   **Yes.**

Question:   What were your general impressions?

Answer:   **He loves underage girls**

Question 32   From what you have seen, or heard, do you have a general impression of defendant?

Answer:          Somewhat negative.

Question        Why do you feel that way?
Answer:         The allegation that related he was sleeping with underage girls (minors)

      Although the court asked the prospective juror general questions about her ability to "put aside other things she might have heard," when asked if he/she could be fair, the juror indicated that he/she would "give it a shot." (R. 94) The court reminded the juror that he/she had to be certain that she would consider only evidence offered at trial, and the juror acquiesced. Incredibly, the court seemed very concerned about this juror's ability to be fair, observing "So I don't know about you, but when someone says they think they can do something in this context, I don't think that's an unqualified assurance. And I don't know what the parties' position is on that. I think I pushed her pretty hard on it, and we still ended up with "I think so." Let me hear from the government, if you have a position on that."

      Not surprisingly, the government was confident that the juror indicated she could be fair. The court still expressed doubts. Inexplicably, trial counsel agreed with the government and the juror was seated. To be blunt, defense counsel agreed to the seating of a juror who not only watched "Surviving R. Kelly" but concluded that Defendant "loves underage girls." There simply cannot be any rial strategy for failing to excuse this juror for cause. Had trial counsel challenged this clearly unqualified juror, the court seemingly would have struck him/her for cause. Trial counsel not only didn't move to disqualify the juror, he did not even ask the court to probe more deeply into the juror's statements on the questionnaire that Defendant "loves underage girls."

      Juror No. 7 also revealed in his questionnaire that that he had heard about the case and the alleged crimes. Trial counsel did not ask the court to question the juror further about *what* he

heard specifically or where he heard it. The court merely asked the juror whether he could put aside what he heard and rely on the evidence presented in the case. (R. 152-153)

Juror No. 8 also disclosed that he/she had heard about crimes Defendant is alleged to have committed, and further indicated that he/she believed that the allegations related to another case in another state. Again, trial counsel failed to probe what precisely the prospective juror had heard or conduct a meaningful inquiry into whether she could be fair given what she had heard. (R. 157)

Juror No. 9 also indicated that she knew that Defendant "had issues with the law" but could not say exact what for. She also described the "MeToo" movement as "the power structure of the male dominated move industry has been turned on its head." Again, trial counsel did not ask the court to question this juror about any details she may have heard about Defendant's "issues with the law" nor did he ask that the court inquire about the Defendant's views concerning the "Me Too" movement and role in changing power dynamics in the male-dominated movie industry.

Juror No. 11 similarly disclosed that he/she "saw the case mentioned on the news when he was first being investigated and that she had read or seen that he had "allegations of misconduct lodged against him." Shockingly, trial counsel did not ask the court to follow up on any of these important revelations to determine whether this juror was qualified.

Juror No. 12 offered several concerning answers in response to the questionnaire:

| Question 29: | Have you read, seen or heard anything about the case, the alleged crimes or people involved? |
|---|---|
| Answer: | **Yes.** |

| Question: | Describe in detail what you recall reading, seeing or hearing about, etc… |
|---|---|
| Answer: | **Sex with minors, specific details do not come to mind, parodies on TV regarding details of defendant's personal life (SNL, Dave Chapelle); Was in jail prior then released.** |

Question 30:   Have you read, seen or heard about R Kelly?
Answer:        Yes. Same as answer above. Various instances of achievement in musical career, songs on the radio, videos, entertainment news shows. Specifics are not remembered.

Question 32:   From what you have seen, read, or heard, do you have a general impression of the defendant?
Answer         Somewhat negative

Question       Why?
Answer         I really never cared one way or the other regarding the defendant. **The somewhat negative impression is an emotional one impacted by the nature of the charges against him.**

Question 91:   Do you know anything about the "Me Too" movement.
Answer         Entertainment industry led movement encouraging when to come forward and name their accusers. Associate it with accusers of Harvey Weinstein. Various news articles and TV news segments.

Trial counsel questioned the juror about his/her ability to be fair and obtained assurances from the juror that he/she could. But trial counsel did not bother to ask the court to inquire about the juror's reference to Defendant's "personal life" "sex with minors" or Dave Chapelle's SNL skit which referenced prior allegations against Defendant of videotaping a sexual encounter that depicted him urinating on a minor, a crime for which he was prosecuted although not convicted.

It is beyond comprehension that trial counsel would not have sought to inquire further of this juror about his prior knowledge about allegations against Defendant or press whether he could truly be fair given the information with which he came to the jury.

Nearly all of the alternative jurors admitted that they were aware of allegations of sexual abuse against Defendant. In fact, one of the alternative jurors stated "know there have been accusations related to this for quite some time. Think [Defendant] was married to Alliyah who was underage at the time." And further admitted that she had seen Defendant's interview with Gayle King in which "he stood up and yelled to defend himself." Although defense counsel

indicated that he intended to challenge this alternate for cause, no motion was formally made and the alternate remained on the jury.

Critically, Alternate Juror No. 4 revealed that she was aware that Defendant was married to Aaliyah when she was young but claimed that she had not really heard much about the case and assured the court she could be fair. Again, trial counsel had no follow up questions for this alternate juror. Notably, this juror apparently was familiar with well-known "MeToo" lawyer Gloria Allred who represented some of the government's witnesses and asked if she could get Allred's autograph in the middle of trial. (R. 2186; 3262-3266)

Defendant had no chance to defend himself where most of the jurors in his case were fully aware of his prior legal issues, some had watched the damning docuseries "Surviving R. Kelly," and many seemed to accept that he was known for abusing minors. Frankly, everyone in the courtroom seemed to accept that Defendant's jury would be prejudiced against him, and made virtually no effort to empanel a truly unbiased jury. Although the court generally asked jurors about their ability to be fair, it was counsel's job to elicit as much information as possible to determine whether the juror could actually be fair. As stated previously, in a case of substantial pretrial publicity, jurors' subjective assessments of their own impartiality may not adequately screen for the possibility of prejudice. *Waldorf,* 3 F. 3d at 710.

*Voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. *Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981). As early as 1895, the Supreme Court in *Connors v. United States*, 158 U.S. 408, 413, (1895) explained that an adequate *voir dire* is essential to ensure that prospective jurors will be free of bias or prejudice and will perform their duties impartially. The primary purpose of the *voir dire* is to make possible the empaneling of an impartial jury through questions that permit

the intelligent exercise of challenges by counsel. *United States v. Blount*, 479 F. 2d 650, 651 (6th Cir. 1973).

Defendant received ineffective assistance of counsel where his trial counsel failed to conduct any meaningful *voir dire* of prospective jurors to ensure they were free of bias or prejudice. Counsel also failed to challenge jurors who were clearly disqualified from serving, including those who had seen the highly prejudicial documentary "Surviving R.Kelly."
To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate both that his attorney's representation was unreasonable under the "prevailing professional norms," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Strickland v. Washington,* 666 U.S. 668 (1984).

Trial counsel's performance was unreasonable under prevailing professional norms where he failed to question clearly biased jurors about the extent of their knowledge about Defendant's prior legal issues, allegations of sexual abuse, and their feelings about the documentary "Surviving R.Kelly." An attorney cannot make an intelligent decision about whether to challenge a potential juror for cause or whether to exercise the Defendant's peremptory challenges without properly questioning potential jurors to learn of potential biases. In this case, numerous jurors divulged that they had prior biases from having learned information about Defendant through other sources prior to the jury selection process. Their own subjective assurances that they could be fair was not sufficient to ensure that they did not harbor beliefs or preconceived ideas about Defendant's guilt.

Significantly, one alternate juror saw "MeToo" lawyer Gloria Allred in the courtroom. Allred represented a few of the government's witnesses and was a common fixture on all media

11

platforms declaring Defendant "the worst" predator she has ever pursued.[3] During the middle of

trial, the juror asked a courtroom deputy if she could obtain an autograph from Allred. When

asked by the court why she wanted the autograph, the juror responded, "Because I admire her.

Just 'cause, you know, other cases. I've never heard – I didn't know she was gonna be here, I

just admire her for what she's accomplished." (R.3262) This was the same alternate juror who

admitted during the jury selection process that she knew about allegations against Defendant and

specifically that he was married to Aaliyah when she was underage.

Trial counsel belatedly sought to remove the juror, stating "I can't think of anything more

disqualifying than a juror asking for the autograph of one of the attorneys who represents one of

the witnesses. It speaks to a bias for the prosecution's witnesses, and for that reason I would ask

that she be removed." (R. 3265) The request was denied.

Trial counsel was, of course, correct that this juror clearly evinced a bias against

Defendant and in favor of his accusers. But counsel's failure to ask the court to question the juror

during *voir dire* more extensively about her factual knowledge of Defendant's marriage to

Aaliyah and her feelings concerning allegations of sexual abuse made it impossible for the

Defendant to gather an accurate impression and make an educated decision about whether she

was qualified to serve. Had counsel competently questioned this juror, he likely would have

learned information that revealed a bias consistent with her request to obtain an autograph from

Allred, a woman she admired, who called Defendant the "worst predator" she has pursued.

Defendant has demonstrated prejudice by trial counsel's failure to conduct any

meaningful *voir dire* where his jury was comprised largely of people who were seated with an

---

[3] https://www.theguardian.com/us-news/video/2021/sep/28/attorney-gloria-allred-says-r-kelly-is-the-worst-predator-she-has-ever-pursued-video

understanding that Defendant was a sexual predator. Because Defendant cannot possibly prove the likelihood of success if his case was heard by a fair and impartial jury, prejudice must be presumed. Trial counsel abdicated all responsibility to conduct a meaningful *voir dire* which resulted in a jury that was largely unqualified to serve. The United States Supreme Court has recognized that "in certain Sixth Amendment contexts, prejudice is presumed. Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. *Strickland,* 466 U.S. at 692. This case is one of those rare cases. Accordingly, this Court should vacate the verdicts of guilt and grant Defendant a new trial.

II.     **Defendant Is Entitled to a New Trial Where One Of His Trial Attorneys Labored Under A Disabling Conflict Of Interest As a Result of Her Simultaneous Representation Of The Defendant and the Government's Star Witness "Jane" That Was Imputed to the Entire Defense Team.**

Defendant is entitled to a new trial where he was denied his Sixth Amendment constitutional guarantee of conflict-free counsel. Mere weeks before the commencement of trial, it was discovered that one of Defendant's attorneys, Ms. Becker, may be suffering from a conflict of interest because of her prior representation of the government's key witnesses, Jane. Consistent with its obligations, the court conducted a *Curcio* hearing and concluded that Ms. Becker had entered into an attorney-client relationship with Jane while she was representing the Defendant. Although this conflict was an unwaivable conflict, the court permitted Defendant to waive it. Because Defendant was denied conflict-free counsel by an attorney who likely possessed information that could have been used to discredit Jane's testimony but was unable to utilize the information without revealing attorney-client communications, Defendant was prejudiced by this conflict.

13

The Sixth Amendment mandates that "in all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. Amend. VI. "This right to counsel includes a criminal defendant's right to be represented by the counsel of his choice." *Lainfesta v. Artuz,* 253 F. 3d 151, 154 (2d Cir. 2001) *citing Wheat v. United States,* 486 U.S. 153, 159 (1988). However, this qualified right is supported by, among other things, the Sixth Amendment right to effective assistance of counsel. *Id*. "A defendant's Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel." *United States v. Schwarz,* 283 F. 3d 76, 90 (2d Cir. 2000).

A *per se* conflict of interest exists: "(1) where the attorney was not licensed to practice law because he failed to satisfy the substantive requirements of admission to the bar, and (2) where the attorney was implicated in the defendant's crime." *United States v. Luciano,* 158 F. 3d 655, 661 (2d Cir. 1998). "The *per se* rule applies when an attorney is implicated in the crimes of his or her client since, in that event, the attorney cannot be free from fear that a vigorous defense should lead the prosecutor or the trial judge to discover evidence of the attorney's own wrongdoing." *United States v. Fulton,* 5 F. 3d 605, 611 (2d Cir. 1993).

"An attorney has an actual, as opposed to potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of actions." *Schwarz,* 283 F. 3d at 91. While a defendant is generally required to demonstrate prejudice to prevail on a claim of ineffective assistance of counsel, this is not so when counsel is burdened by an actual conflict of interest. *Id.* Prejudice is presumed under such circumstances. *Id.*

In the case at bar, Defendant is entitled to a new trial where his attorney labored under a *per se* and/or actual conflict of interest that could not be waived. At a *Curcio* hearing held on

14

July 15, 2021, just weeks before the commencement of trial, Jane's prior attorney, Ms.

Rodriguez disclosed to the court that she was previously retained by Jane and another possible

government witness (J. Savage) in July 2019. (R. 6) Rodriguez met Defendant's attorney, Ms.

Becker in person at a bond hearing at the Dirksen Center in July 2019. Ms. Rodriguez expressly

told Ms. Becker that she represented Jane and Savage, instructing her *not* to contact Jane. (R. 7)

Ms. Rodriguez provided a text message to the court that showed that she [Rodriguez] texted Ms.

Becker, stating "I don't want the lines blurred regarding our role and I think they are already

blurred. Please do not contact them at all without my knowledge." (R. 8)

     Rodriguez told the court that she later learned that Ms. Becker had been contacting Jane

and Savage. According to Rodriguez, Jane suggested that she was getting advice from Becker in

connection to how to handle the media. (R. 11) Rodriguez declined to divulge further

information about her conversations with Jane but stated that her representation formally ended

when she received an instruction signed by Jane telling her to provide her attorney's file to her

new attorney, Ms. Becker. (R. 12)

     Ms. Becker confirmed that she had communications with Jane. (R. 24) The government

also confirmed that Jane had told prosecutors that she had a lengthy meeting with Ms. Becker in

August 2019. (R. 23)  The government revealed that in their conversations with Jane, Jane

revealed information to the government that she received from Ms. Becker that the government

viewed as *adverse* to the Defendant. (R. 23)

     After considering statements made by Ms. Rodriguez, the court noted that Ms. Rodriguez

stated that Ms. Becker had given her clients legal advice that conflicted with the advice that

Rodriguez had given her client. This court seemingly concluded that Ms. Becker had formed an

attorney-client relationship with Jane while she was representing Defendant, evidenced not only

by Ms. Rodriguez's statements but by the fact that Jane instructed Rodriguez to send her file to Ms. Becker. (R. 27-28) The government further pointed out that Ms. Becker might suffer from a so-called *Fulton* conflict which arises when a lawyer is accused of misconduct (whether true or not). In those scenarios, the attorney may violate his/her duty of loyalty to her client by prioritizing her own interest in defending herself against accusations of misconduct. *Fulton, supra.* (R. 33)

This court acknowledged that Becker did suffer from a conflict, but that it amounted to a conflict that could be waived and mitigated by ensuring that Becker did not conduct the cross-examination of Jane. This court afforded Defendant the opportunity to consult with a third-party lawyer and admonished him before accepting his waiver of conflict-free counsel.

Defendant is entitled to a new trial where his attorney Ms. Becker labored under a *per se* or actual conflict of interest that could not be waived. First, as the government pointed out, Ms. Becker seemingly suffered from a *Fulton* conflict, a *per se* conflict, where there is no question that by communicating about the case with the government's key witness, notwithstanding that the witness had her own counsel and did not consent to the communications, she opened herself up to accusations of misconduct or even possibly an attempt to influence a government witness on behalf of her client. That is not to say that the allegation is true, but an attorney who may be perceived as having engaged in that type of misconduct suffers from a *per se* conflict since the attorney "cannot be free from fear that a vigorous defense should lead the prosecutor or the trial judge to discover evidence of the attorney's own wrongdoing." *Fulton, supra.*

Second, when Ms. Becker formed an attorney-client relationship with Jane, her interests diverged from the Defendant because she also owed a duty of loyalty to Jane, the government's key witness. Ms. Becker was placed under inconsistent duties because of her representation of

the Defendant and Jane, an adverse witness. Prejudice must be presumed where Ms. Becker had

at least one extended conversation with Jane about her relationship with Defendant and may have

obtained privileged information from the file that Jane's prior attorney sent to Becker at Jane's

request. However, Becker was prohibited by the attorney-client privilege from disclosing any

information she may have received from conversations with Jane or from her prior attorney's

file, even if that information would have been beneficial to the Defendant's defense. Similarly,

as the government suggested (although the record is unclear on this point), Jane may have

obtained privileged information from Becker that was adverse to the Defendant, information that

most certainly was passed along to the government.

Courts have recognized that where a lawyer seeks to simultaneously represent a

defendant and a cooperating witness in the same criminal proceedings, a conflict of interest

exists. *United States v. Jiang,* 140 F. 3d 124, 127 (2d Cir. 1998); *see also United States v.*

*Daugerdas,* 735 F. Supp. 2d 113, 117 (S.D.N.Y. 2010). Further, whenever a defense attorney has

previously represented an important government witness who testifies against his client, the

possibility of a conflict of interest exits. *Anwar v. United States,* 648 F. Supp. 820, 826

(N.D.N.Y. 1986).

With these principles in mind, Ms. Becker suffered from an actual conflict of interest that

could not be waived. That conflict was imputed to her trial partners. *United States v. Stein,* 410

F. Supp. 2d 316, 325 (S.D.N.Y. 2006) ("an attorney's conflicts are ordinarily imputed to his firm

based on the presumption that associated attorneys share client confidences.") If Becker had

merely interviewed or conversed with Jane, she would have had no duty of loyalty to Jane that

conflicted with her duty of loyalty to Defendant. But as this Court concluded, Becker formed an

attorney-client relationship with Jane that put her at odds with her duty of loyalty to the

17

Defendant. The risk of prejudice was made more significant by the fact that Jane was not just any witness, but the government's star witness. Defendant's Sixth Amendment guarantee of a conflict-free counsel was denied.

In light of the foregoing, Defendant's convictions must be vacated and a new trial ordered.

Dated: February 17, 2022
     New York, New York           Respectfully submitted,

           /s/JENNIFER BONJEAN
           Jennifer Bonjean
           Bonjean Law Group, PLLC
           750 Lexington Ave., 9th Fl.
           New York, NY  10022
           718-875-1850

Case 1:19-cr-00286-AMD   Document 276-1   Filed 03/21/22   Page 1 of 12 PageID #: 10968

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------X
                                 :

UNITED STATES OF AMERICA,        :

                                 :            19 Cr 286 (AMD)

                                 :

-vs-                              :

                                 :

ROBERT SYLVESTER KELLY,         :
        also known as "R. Kelly,"        :

                                 :

              Defendant.       :
----------------------------------------------------X

## DEFENDANT ROBERT KELLY'S MEMORANDUM OF LAW IN SUPPORT OF HIS SUPPLEMENTAL MOTION FOR A NEW TRIAL

JENNIFER BONJEAN
Bonjean Law Group, PLLC
750 Lexington Ave., 9th Fl.
New York, NY  10022
718-875-1850

*Attorney for Robert Kelly*

**INTRODUCTION**

Defendant's trial was engulfed by irrelevant and excessive bad character evidence that added little to the jury's assessment of whether Defendant committed the charged offenses. Indeed, the six-week trial was comprised overwhelmingly of uncharged bad act evidence that served no legitimate evidentiary purpose. With the court's blessing, the government subjected the jury to a mass of repugnant conduct for the primary purpose of depicting Defendant as contemptable, sexual deviant. The government defended the introduction of the evidence as relevant to the "means and methods of the enterprise" with nary a word of Rule 403 considerations. For reasons argued in Defendant's Rule 29 motion, the government's evidence of an "enterprise" was insufficient as a matter of law. This case was not about an enterprise; it was about the conduct of one man who the government sought to punish for his alleged history of mistreating women. As such, the mountain of bad act evidence offered in this prosecution was nothing more than inadmissible propensity evidence. Because Defendant was forced to defend against dozens of uncharged claims of abusive and sexual misbehavior – much of it lawful albeit unpalatable for some – Defendant was stripped of the presumption of innocence and denied a fair trial.

But that is not all, Defendant was denied effective assistance of counsel when his attorneys failed to file adequate pre-trial objections to the introduction of the mass of overly prejudicial propensity evidence and routinely failed to lodge timely objections to some (although not all) of the damning bad-act evidence.

In sum, Defendant's trial was little more than a re-enactment of the one-sided docuseries "Surviving R. Kelly" which several of the jurors had viewed before stepping into the courtroom. It is a wonder that the government did not simply offer the docuseries into evidence. With this

backdrop, Defendant was powerless to defend against the charged offenses – for which there were viable, even winning defenses. Defendant was denied his constitutional guarantee of a fair trial where the jury heard excessive, minimally probative, evidence of contemptible conduct that was introduced solely to inflame the passions of the jury and punish the Defendant for decades of unchecked bad behavior.

## RELEVANT FACTS

In the two months preceding the start of Defendant's trial, his defense team was focused on fighting one another and preoccupied with litigating a *Curcio* hearing on account of one his attorney's disabling conflict of interest. Not surprisingly, Defendant's trial team wasted valuable time and resources focused on this side circus rather that preparing a strategy for defending the case.

At the Defendant's request, this Court granted an extension for the filing of motions *in limine* until July 23, 2021. [Dkt. No. 131] On July 23, 2021, the government filed a whopping 55-page motion[1] seeking to admit a heap of prior bad act evidence. [Dkt. No. 133] Defense counsel filed no motions *in limine*. Incredibly, defense counsel failed to preclude *any* uncharged bad act evidence that was produced as part of the government's 3500 materials. On July 30, 2021, defense counsel filed a written objection to the government's motion *in limine* regarding the introduction of prior bad act evidence largely on "timeliness" grounds. [Dkt. No. 145] The response contained a general objection to the evidence as untimely with no meaningful relevancy objections or Rule 403 analysis. Inexplicably, defense counsel did not seek a continuance of the trial to investigate these alleged "surprise" witnesses but merely asked the court to strike them.

---

[1] This motion was in addition to a separate 39-page motion *in limine.* [Dkt. No. 135]

At a final pretrial hearing, defense counsel conceded that he did, in fact, know who the other bad act witnesses were and was familiar with their allegations. Defense counsel conceded that he was in possession of all 3500 material and had received supplemental 3500 materials from government.

On August 6, 2021, defense counsel filed a 2-page supplemental opposition to the government's motion to admit other bad act evidence. Throughout trial, defense counsel filed a handful of letters objecting to the introduction of certain bad act evidence; those objections were largely overruled. The record does not seem to reflect objections to much of the uncharged bad act evidence offered by the government.

## ARGUMENT

**Defendant Was Denied a Fair Trial When His Jury Was Swamped with a Mass of Minimally Probative, Cumulative, and Unduly Prejudicial Other Bad Act Evidence – Some of Which Was Admitted Without Objection in Violation of Defendant's Sixth Amendment Guarantee of Effective Assistance of Counsel.**

With virtually no limitation, this Court permitted the prosecution to inundate the jury with excessive bad act evidence, mostly under the theory that the evidence was relevant to the "means and method" of the enterprise. The "means and method" justification for the introduction of copious amounts of bad act evidence is gravely flawed because the government's theory of an enterprise is flawed. Where the enterprise consisted of nothing more than the purported sexual misbehavior of the Defendant, unconnected to the activities of a discrete enterprise, the "means and methods" relevancy justification is meaningless.

As argued at length in Defendant's Rule 29 motion, the government failed to prove that Defendant was distinct from the so-called enterprise. No matter how much repellent evidence of

sexual indiscretions or abusive behavior the government accumulated against the Defendant, the fact remains that it was the Defendant, and the Defendant alone, who engaged in those affairs wholly disconnected to the affairs of a distinct enterprise. By characterizing Defendant's purported decades-long history of abusive conduct toward women as an enterprise, the government not only avoided statutes of limitations but was free to introduce *any* unkind or abusive act (of a sexual or non-sexual nature) as evidence of the enterprise, conveniently avoiding the rule against the admission of propensity evidence and the limitations set out in Fed. R. Evid. 404(b).

Notwithstanding, this Court was still obligated to conduct a meaningful Rule 403 analysis which it failed to do. Rule 403 authorizes the exclusion of relevant evidence when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issue, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. The United States Supreme Court held in *Old Chief* that "unfair prejudice," as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offenses charged. *Old Chief v. United States,* 519 U.S. 172, 180 (1997). The Committee Notes to Rule 403 explain,  "'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Committee's Notes on Fed. R. Evid. 403. As *Old Chief* observed:

> Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. Not that the law invests the defendant with a presumption of good character, but it simply closes the whole matter of character, disposition, and reputation on the prosecution's case-in-chief. The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The

> inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much crime with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that is disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice. *Michelson v. United States,* 335 U.S. 469, 475-76 (1948).

Probative value is also informed by the availability of alternative means to present similar evidence. Specifically, the Supreme Court has advised that the "Rule 403 'probative value' of an item of evidence  . . . may be calculated by comparing evidentiary alternatives." *Old Chief,* 519 U.S. at 184.

The district court is afforded wide discretion to exclude evidence that is, on balance, unduly prejudicial. *Taveras,* 424 F. Supp. 446 (E.D.N.Y. 2006). "So long as the district court has conscientiously balanced the proffered evidence's probative value with the risk for prejudice, its conclusion will be disturbed only if it is arbitrary or irrational. *Id.*

 As set out below, this Court did not conscientiously balance the probative value of certain proffered government evidence that carried an extraordinary risk of prejudice. In some instances, trial counsel failed to object to the introduction of such evidence, rendering counsels' performance objectively unreasonable.

A.      **Excessive STD Evidence**

The government charged the Defendant with committing numerous racketeering acts in the states of California and New York by knowingly exposing Jane and Faith to herpes. This Court repeatedly noted that under its interpretation of the statutes, the government was not required to show that Defendant transmitted herpes to Jane and Faith; mere exposure was sufficient.

As set forth in his Rule 29 motion, Defendant quarrels with this Court's interpretation of the statute, but assuming arguendo the Court is correct, there is little justification for allowing massive amounts of evidence that Defendant purportedly spent decades transmitting herpes to numerous women. Through Defendant's physician, the government presented evidence that Defendant had herpes when he was sexually active with Jane and Faith; that he knew he had herpes during the relevant time period; and that he was treating his condition with a regimen of Valtrex. Both women testified that they had unprotected sex with Defendant and that Defendant did not disclose that he suffered from herpes. This evidence went unrefuted. Accordingly, any additional evidence related to Defendant's herpes diagnosis and transmission of herpes to other women was unnecessary, cumulative, and unduly prejudicial – regardless of relevance.

Notwithstanding, the prosecution admitted excessive evidence about Defendant's failure to practice safe sex and elicited numerous allegations that Defendant transmitted herpes to other women. Specifically, the prosecution presented testimony that Defendant: (1) suffered from other sexually transmitted diseases *prior* to his sexual relationship with Jane and Faith; (2) had infected Jerhonda with herpes; (3) had infected Kate with herpes; and (4) had infected Anna with herpes. The prosecution offered copious amounts of documentary evidence regarding Defendant and his partner's herpes treatment and elicited graphic details from multiple witnesses about the symptoms of herpes. The governments uttered the word herpes hundreds of times throughout this trial.

This evidence was rank propensity evidence. For the reasons argued in Defendant's Rule 29 motions and above, the government simply failed to show that the so-called enterprise existed so that Defendant could expose women to herpes. As such, the herpes evidence is not justified

under the catch-all "means and methods" of the enterprise. It's just propensity evidence.
Moreover, whatever probative value it had was significantly outweighed by its prejudicial effect.

Although trial counsel voiced an objection to the admission of Kate's testimony, the
record does not clearly indicate that trial counsel objected to the excessive amount of herpes
evidence from numerous other witnesses. This failure was objectively unreasonable since there is
no possible trial strategy for failing to limit this type of other bad act evidence which was
designed to breed contempt for the Defendant. Furthermore, there can be no confidence in this
verdict of guilt where it was based largely prejudicial bad act evidence, including excessive
"herpes" evidence.

**B.    Evidence Concerning Sexual Relations With Aaliyah**

The prosecution charged Defendant with one racketeering act of bribery for the sole
purpose of getting evidence before the jury about his marriage and relationship with Aaliyah.
Over defense counsel's objection, this Court permitted the prosecution to introduce testimony
from Angela (Jane Doe No. 7) that she allegedly observed sexual interactions between Defendant
and Aaliyah in 1991 on Defendant's tour bus. This Court erred by allowing this highly
prejudicial testimony into evidence.

Angela's testimony was not relevant under the "means and methods" theory since it
purportedly occurred pre-enterprise. This Court seemed to recognize this fact, but nonetheless
concluded that Angela's testimony that she witnessed sexual interactions between Defendant and
Aaliyah provided the motive for Defendant's racketeering act of bribery. Defendant respectfully
disagrees on this point.

The prosecution presented testimony about Defendant's alleged motive for marrying
Aaliyah through Demetrius Smith who expressly stated that Defendant told him that Aaliyah was

7

"in trouble" and "thought she was pregnant" (R. 703) Smith elaborated that Defendant believed that he needed to marry Aaliyah to protect himself from going to jail. (R. 706). Graphic testimony from a third-party about seeing Defendant and Aaliyah engaging in sexual relations added nothing more to the motive than Defendant's own admissions and the fact that he married Aaliyah. Whatever probative value Angela's testimony had on this point was substantially outweighed by its prejudicial effect. As such, it was error to allow Angela to testify about her alleged observations on the tour bus in 1991.

### C.   Testimony from Addie, Alexis, Kate, Anna, Angela, Louis, and Alex

This Court permitted the government to present a whopping seven additional witnesses to testify about graphic uncharged bad act evidence concerning dozens of sexual encounters with the Defendant. Apart from Angela's testimony which concerned sexual conduct pre-enterprise, the prosecution defended the introduction of this evidence under the catch-all "means and methods" of the enterprise theory. As argued above, where the Defendant, and the Defendant alone, was the enterprise, the "means and methods" justification for the introduction of copious amounts of bad act evidence is simply a free pass at introducing unlimited bad act evidence related to Defendant's alleged sexual misdeeds and abusive conduct. This circular logic returns us to the overarching defect in this prosecution, namely that it was a prosecution of Defendant's bad character and unpunished sexual misdeeds; it had nothing to with punishing or preventing the conduct of an enterprise.

Even if the evidence had some relevant purpose, the evidence was cumulative and unduly prejudicial. The jury was inundated with one jarring story after the next of unconventional graphic sex acts, including sexual conduct that many, perhaps most, would consider deviant

8

(*e.g.,* group sex, elements of BDSM[2], and coprophilia[3]) When considering this mass of prior bad act evidence cumulatively, its probative value is diminished exponentially as compared to its prejudicial effect. There can be little doubt that Defendant's jury was inclined to rectify past injustices by punishing Defendant even if it harbored doubt about his guilt on the charged offenses. The risk of prejudice and confusion was particularly acute where the trial devolved into a live rendition of the "Surviving R. Kelly" docuseries replete with viewings of sexually explicit videos.

Trial counsel objected to the introduction of testimony from Addie in a letter dated August 26, 2021, filed under seal, but the record does not seem to reflect that defense counsel specifically objected on 401 or 403 grounds to all of the aforementioned prior bad act evidence with the exception of Angela (but only as to her observations about Defendant's conduct with Aaliyah and not as to her own sexual experiences with Defendant). Trial counsel's performance was objectively substandard where it failed to adequately object to the introduction of this damning evidence. Trial counsel offered no written response to the prosecution's motion to allow this evidence and made no meaningful arguments at the final pretrial conference on these matters. Since trial counsel claimed that he was surprised by the proposed other bad act witnesses, he was in no position to make cogent and comprehensive arguments objecting to this unduly prejudicial evidence. Even when given another opportunity to file more fulsome objections, counsel failed to do so. No trial strategy justifies this objectively unreasonable performance. *Strickland v. Washington,* 466 U.S. 668, 690 (1984).

---

[2] Merriam – Webster Definition of BDSM: sexual activity involving such practices as the use of physical restraint, the granting or relinquishing of control, and the infliction of pain.
[3] Merriam – Webster Definition of coprophilia: marked interest in excrement; the use of feces or filth for sexual excitement

Inexplicably, trial counsel affirmatively introduced other prior bad act evidence. For example, trial counsel opened the door to testimony concerning Defendant's prior criminal prosecution in Illinois state court related to sexual exploitation of a child. No *sound* trial strategy justified telling the jury that Defendant had been previously prosecuted for crimes nearly identical to those charged in the instant case.

Defendant was prejudiced by his attorneys' failings where a reasonable probability exists that this Court would have excluded much of the prosecution's proposed bad act evidence if it had been challenged competently. There can be no confidence in this verdict of guilt where the jury was overwhelmed with bad character evidence.

### D.    Admission of Graphic Videos Depicting Sex Acts

Defendant was further denied a fair trial when this Court permitted the introduction of graphic pornography (and still photos) involving group sex between the Defendant, Alex, and Dominique – who did not even testify in these proceedings, and graphic videos involving Anna (including a video depicting coprophilia). Trial counsel objected to the introduction of these videos, albeit belatedly. Again, for the reasons set forth in counsel's letters to this Court, and for the reasons identified, *supra,* this evidence was not relevant to any "means and methods" of an enterprise since there was no enterprise. Whatever probative value it had, was substantially outweighed by its prejudicial effect. One cannot imagine a more prejudicial piece of evidence than these videos which added very little to the testimony the jurors heard.

## <u>CONCLUSION</u>

In light of the foregoing, Defendant's convictions must be vacated, and a new trial ordered.

10

Dated: March 21, 2022
    New York, New York             Respectfully submitted,

                               /s/JENNIFER BONJEAN
                               Jennifer Bonjean
                               Bonjean Law Group, PLLC
                               750 Lexington Ave., 9th Fl.
                               New York, NY  10022
                               718-875-1850

GA0308

1

```
1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    --------------------------------x
                                        19-CR-286(AMD)
3    UNITED STATES OF AMERICA,
                                        United States Courthouse
4             Plaintiff,               Brooklyn, New York

5             -against-                August 3, 2021
                                        11:00 a.m.
6    ROBERT SYLVESTER KELLY,

7             Defendant.

8    --------------------------------x

9         TRANSCRIPT OF CRIMINAL CAUSE FOR PRETRIAL CONFERENCE
               BEFORE THE HONORABLE ANN M. DONNELLY
10                   UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES

13   For the Government:        UNITED STATES ATTORNEY'S OFFICE
                                Eastern District of New York
14                              271 Cadman Plaza East
                                Brooklyn, New York 11201
15                              BY:  ELIZABETH GEDDES, AUSA
                                     MARIA E. CRUZ MELENDEZ, AUSA
16                                   NADIA SHIHATA, AUSA

17

     For the Defendant:         AIELLO & CANNICK
18                              69-06 Grand Avenue
                                Maspeth, New York 11378
19                              BY:  DEVEREAUX L. CANNICK, ESQ.

20                              THE LAW OFFICE OF THOMAS A. FARINELLA
                                260 Madison Avenue, 8th Floor
21                              New York, New York 10016
                                BY:  THOMAS A. FARINELLA, ESQ.
22

23   Court Reporter:            Georgette K. Betts, RPR, FCRR, CCR
                                Email:  Georgetteb25@gmail.com
24
     (Continued on next page.)
25
```

```
 1    APPEARANCES(Continued)

 2    For the Defendant:        THE C.H. SCHOLAR LAW FIRM PLLC
                                225 Broadway, Suite 225
 3                              New York, New York 10007
                                BY:  CALVIN H. SCHOLAR, ESQ.
 4
 5                              BLANK LAW, P.C.
                                444 S. Washington Avenue
 6                              Royal Oak, Michigan 48067
                                BY:  NICOLE BLANK BECKER, ESQ.
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20    Court Reporter:          Georgette K. Betts, RPR, FCRR, CCR
                                Phone:  (718)804-2777
21                              Fax:    (718)804-2795
                                Email:  Georgetteb25@gmail.com
22
23
24    Proceedings recorded by mechanical stenography.  Transcript
      produced by computer-aided transcription.
25
```

PROCEEDINGS

1    actual witnesses themselves.

2         THE COURT:  So you just didn't know the name of the

3    person that was associated with the particular allegation.

4         MR. FARINELLA:  Well --

5         THE COURT:  You know, let's do, let's go through

6    them all because that's what I'm going to do anyway and then

7    you can tell me.

8         The other thing I'll say about notice is that I'm

9    the one who set the motion schedule for motions *in limine* and

10    I don't -- the only thing I recall about that is that the

11    defense asked for extra time, which I granted.  So I don't --

12    I mean, that was what the schedule was and if there was some

13    need to have it sooner I'm sure you would have told me.

14         All right.  So what I'm going to do is just go

15    through these and if I miss one, because I did get a lot of

16    submissions, I'm sure you'll let me know.

17         So the first one has to do with the claims related

18    to Jane Doe Number One and these are allegations about conduct

19    in 1994.  The government's position is that this evidence is

20    direct evidence of the enterprise, that it provides the motive

21    for the charge in racketeering, for the conduct in

22    Racketeering Act One, and that it is inextricably intertwined

23    with that.  And so I'm -- it's clearly relevant and it clearly

24    shows a motive for Racketeering Act Number One, so that is

25    admissible.

PROCEEDINGS

1          That's not something that was a surprise to you, was

2   it, Mr. Farinella?

3          MR. FARINELLA:  No, your Honor.

4          THE COURT:  Okay.  The next one --

5          MS. BLANK BECKER:  I'm sorry.

6          THE COURT:  Sorry, Ms. Becker.  Go ahead.

7          MS. BLANK BECKER:  May I just address that one

8   briefly, if I could please?

9          THE COURT:  Sure.

10          MS. BLANK BECKER:  Judge, while I believe it states

11   something to this effect in our motion as well, while

12   understandable that clearly Jane Doe Number One is a listed

13   Jane Doe of whom we knew about no doubt, I believe what we put

14   in our motion and what we believe is that, although certain

15   parts of it are certainly relevant, there was a lot of

16   statements made and requests to come in regarding the

17   circumstances surrounding the marriage and so forth that we

18   believe are more prejudicial than probative.

19          THE COURT:  Well, let me just say this generally

20   about all of --

21          MS. BLANK BECKER:  Sure.

22          THE COURT:  -- this evidence is that, you know, I

23   think I've said this before, I don't have the 3500 material.

24   I don't know what the testimony is going to be.  I can say

25   generally that this is relevant and it is related to the

PROCEEDINGS

12

1   racketeering act.  It provides the motive and in that respect

2   it is clearly relevant, and not only does it provide the

3   motive for Racketeering Act One, it is also evidence of the

4   allegations about the enterprise and the methods and means

5   used to perpetuate the enterprise, so in that respect it is

6   clearly relevant.

7           Obviously, with all of these things I'm not going to

8   permit hearsay.  The evidence has to be in an admissible form,

9   but the point of my rulings today is to tell you what's

10  admissible and what is not.  I don't think I have to go

11  through chapter and verse with this group of experienced

12  lawyers about the form in which the evidence takes.  So let's

13  just keep that in mind.

14          MS. BLANK BECKER:  Thank you, Judge, I agree.  Thank

15  you.

16          THE COURT:  Okay.  The next act has to do with Jane

17  Doe Number Seven in 1991.  This is pre-pattern or

18  pre-racketeering enterprise evidence.  I just want to hear

19  from the government.  I know your position is that it is

20  evidence of the means and method, but it takes place before

21  the racketeering -- the organization is alleged to have begun.

22  And so my question is, why does that come in?

23          MS. GEDDES:  Your Honor, Jane Doe Number Seven is

24  prepared to testify that in light of her relationship with the

25  defendant, which included the fact that they had sexual

GA0313

PROCEEDINGS

13

```
 1  contact with each other when she was a minor, she was in a
 2  position to view the defendant engaged in sexual activity with
 3  Jane Doe Number One, so it is part of her background and I
 4  would say her history is inextricably intertwined with -- that
 5  information is inextricably intertwined with her account of
 6  how she knew the defendant, why she was with the defendant
 7  when she saw the defendant engaged in sexual activity with
 8  Jane Doe One.
 9           THE COURT:  Let me ask the defense, are you going to
10  deny that there was sexual contact with Jane Doe Number One,
11  wasn't he married to her?  Is that something the defense is
12  going to dispute?
13           MR. FARINELLA:  No.
14           THE COURT:  No.  Well, if they're not disputing it
15  then I'm going to exclude the evidence of Jane Doe Number
16  Seven.
17           MS. GEDDES:  Your Honor, just to be clear, are
18  they --
19           MR. FARINELLA:  Hold on.
20           MS. GEDDES:  -- conceding they are not going to
21  dispute that they were engaged in sexual activity prior to
22  their marriage?  Because at the time Jane Doe One was 13 to 15
23  years old.  I don't think that's something that they're
24  prepared to --
25           MR. FARINELLA:  We are not, your Honor.  So I want
```

GA0314

PROCEEDINGS

14

```
 1   to understand here, so the government's position, just so I
 2   have it clear, that Jane Doe Seven or 17?
 3                THE COURT:  Seven.
 4                MR. FARINELLA:  Okay.  That clears it up.
 5                THE COURT:  Okay.
 6                MR. FARINELLA:  But no, we do dispute -- we're not
 7   prepared to concede that at this time, your Honor, with regard
 8   to Jane Doe Number One.
 9                THE COURT:  So if Jane Doe Number One witnessed the
10   defendant --
11                MS. GEDDES:  Jane Doe Number Seven.
12                THE COURT:  Sorry.  Jane Doe Number Seven witnessed
13   the contact with Jane Doe Number One it's clearly relevant, if
14   you're going to dispute it.  You can cross examine her about
15   it, but if that's not something that you -- I mean, it's
16   directly relevant to that first racketeering act.
17                MR. FARINELLA:  And I do believe Jane Doe Number
18   Seven is one of the Jane Does that was just recently revealed,
19   I don't recall if seeing her --
20                MS. GEDDES:  That's correct.
21                MR. FARINELLA:  -- in the original 3500 material, so
22   I would ask the Court before making a ruling if we can at
23   least have just a very short window of time to review --
24                THE COURT:  Okay.
25                MR. FARINELLA:  Because there are a number of new
```

GEORGETTE K. BETTS, RPR, FCRR, CCR
*Official Court Reporter*

GA0315

PROCEEDINGS

15

1   disclosures and, again, we had a limited amount of time to

2   respond.

3           THE COURT:  That's fine.  If you want to take some

4   time to review that and just submit a letter on that, that's

5   perfectly fine.  But I think -- do you want me to give you a

6   deadline for that?

7           MR. FARINELLA:  Sure.

8           THE COURT:  Can you give it to me in -- let's see,

9   what's today, Tuesday.  Can you give it to me by the end of

10  the week, by Friday?

11          MR. FARINELLA:  Yes, your Honor, I can.

12          THE COURT:  Then can the government -- I hate to

13  ruin your weekend, but can you respond by Monday?

14          MS. GEDDES:  Yes, Judge.

15          THE COURT:  And if there's any reply that you wanted

16  to file, you can just do it the next day, okay.

17          MR. FARINELLA:  Understood, your Honor, thank you.

18          THE COURT:  Sure.  All right.

19          The next request has to do with Jane Doe Number

20  Eight in 1994.  The government proffers Jane Doe Number Eight

21  was in a concert of the defendant's and was directed to go

22  backstage by the defendant's associates and that the defendant

23  had sexual contact with her.  As the government has proffered

24  before, they represent that this is direct evidence of

25  enterprise and its means and methods.

PROCEEDINGS

16

1    This is an example, and maybe I don't have to repeat

2  it, but this is really not propensity evidence.  This is

3  evidence that is offered to show the existence of the

4  enterprise and the methods undertaken to perpetuate the

5  evidence, so it is relevant and it's not unduly prejudicial,

6  it's no more inflammatory than the charged offenses and so

7  that one is admissible.

8    The next one has to do with the Jane Doe Number Nine

9  in 1995.  This has to do with Racketeering Acts Eight, 12 and

10 14 and Counts Six, Seven and Eight.  I don't know to what

11 extent the defense has considered stipulating to some of this

12 evidence.  This is regarding the transmission of sexually --

13 of herpes.  So I think the question is, the government is

14 saying that this is relevant to show the defendant's knowledge

15 of the condition, but I think some of this, if there's a

16 stipulation about that it becomes less relevant.

17    Is that something you'd like to put in that letter

18 also?

19    MR. FARINELLA:  Your Honor, I would ask the Court to

20 consider this.  There are a number of disclosures of Jane Does

21 that were recently disclosed with 3500 material.  Perhaps in

22 an effort to try to expedite this process we can just have

23 that short window period of time to have substantive review of

24 that material and at that point we will certainly, if we can,

25 attempt to meet and confer with the government to see if we

GA0317

PROCEEDINGS

17

1    can stipulate to any of the issues that are --

2             THE COURT:  Okay.

3             MR. FARINELLA:  -- that we agree on.

4             THE COURT:  Okay, let me just say in the absence of

5    a stipulation it's relevant to one of the charges and so I'm

6    not requiring you to stipulate, sometimes people do agree to

7    this in an effort to move things along.  So it's just

8    something I'm putting out there.  So we'll put that in the

9    category of things you're going to let me know in that letter

10   on Friday, okay?

11            MR. FARINELLA:  Thank you, your Honor.

12            THE COURT:  The next item refers to Jane Doe Number

13   10 in 2001.  This is similar to the -- somewhat similar.  It's

14   related to the previous one, but it also -- I take that back,

15   I've got my -- it's not.  This has to do with Jane Doe Number

16   10 being recruited by an associate at a concert when Jane Doe

17   was 16 and at some point Jane Doe became concerned that an

18   encounter with the defendant was filmed and so that she

19   reached a settlement with the defendant on that matter.

20            Now this is not one of those things about which you

21   didn't know, is it, Mr. Farinella?

22            MR. FARINELLA:  I'm reviewing --

23            THE COURT:  Take your time.

24            MR. FARINELLA:  -- the original 3500 material names

25   and I do not believe I see --

GA0318

PROCEEDINGS

1    MS. GEDDES:  Your Honor -- excuse me.  We provided

2    evidence of this contact in Rule 16 discovery, it's not been

3    disclosed in 3500 material.

4    THE COURT:  I'm sorry, it was disclosed in Rule 16,

5    pursuant to Rule 16?

6    MS. GEDDES:  That's correct.

7    THE COURT:  Okay.

8    MS. GEDDES:  But not Rule 3500.

9    THE COURT:  Okay.

10    MS. GEDDES:  Not 3500, excuse me.

11    THE COURT:  So the question is -- I don't think

12    there's any question that it is relevant, because it, again,

13    is evidence of the enterprise and its means and methods and

14    the settlement, the fact that it was settled I think is

15    evidence of the effort to perpetuate the existence of the

16    enterprise, because were that made public it would certainly

17    have jeopardized the existence of the enterprise.

18    I do not believe -- so it is relevant.  It is not

19    unduly prejudicial, because it is, like some of this other

20    evidence, no more inflammatory than the charged offenses, so

21    that is admissible.

22    MR. CANNICK:  Your Honor, might I.  If the Court is

23    going to allow testimony or evidence that there was a

24    settlement, then we're going to ask the Court for a curative

25    instruction at that time.

PROCEEDINGS

1          THE COURT:  Definitely.

2          MR. CANNICK:  Okay.

3          THE COURT:  And I should have said that at the

4    beginning, that there may be instances that I've ruled that

5    are admissible that will require a curative instruction should

6    the parties request it.

7          MR. CANNICK:  Thank you, your Honor.

8          THE COURT:  Okay.  Jane Doe Number 11 and 12, this I

9    think we can put in the same category, Mr. Farinella, of those

10   things you're going to take a look at.

11         MR. FARINELLA:  Yes, your Honor.

12         THE COURT:  Okay.

13         The next has to do with Jane Doe 13 and this relates

14   to conduct that occurred in 2006.  The evidence is that Jane

15   Doe Number 13 was 15 years old, met the defendant at a

16   concert.  This falls in that same category of relevant

17   evidence that tends to show that the enterprise existed and is

18   consistent with the methods and means that are contained in

19   the indictment.  It is, like the other evidence, not unduly

20   prejudicial and no more inflammatory than the charged

21   offenses.  So that is admissible.

22         Now the next category of evidence has to do with

23   John Doe Number One in 2006.  Is John Doe Number One

24   testifying?  That's my question to the government.

25         MS. GEDDES:  Yes, Judge.

GA0320

PROCEEDINGS

20

1    THE COURT:  What is the general -- aside from the

2 evidence you're seeking to introduce, what is the general

3 nature of his testimony?  Is he testifying about the existence

4 of the enterprise?

5    MS. GEDDES:  He will testify about the enterprise

6 itself as well as the means that the defendant used to recruit

7 him as a minor victim and the manner in which the defendant

8 introduced him to other females and directed those females to

9 engage in sexual activity with John Doe Number One in the

10 presence of the defendant, which is very similar to some of

11 the forced labor -- to the forced labor allegation involving

12 Jane Doe Number Five, where the defendant engaged in a pattern

13 of manipulation and physical abuse to ensure that Jane Doe

14 Number Five would participate in all of the sexual activities

15 directed by the defendant to include sexual activity with

16 other men and women.

17    THE COURT:  Now I just want to -- this was

18 information that was turned over in February?

19    MS. GEDDES:  That's correct.

20    THE COURT:  And is that correct, Mr. Farinella, that

21 you received that in February?

22    MR. FARINELLA:  Certain aspects of that we received

23 in February.  We also received additional disclosures just

24 recently I believe.

25    MS. GEDDES:  I don't think with respect to --

GA0321

PROCEEDINGS

```
1    perhaps in trial prep we have had an additional meeting with

2    John Doe Number One, but all of the allegations that are

3    described in the government's motion were previously disclosed

4    in the 3500 production in February.

5              THE COURT:  All right.  You agree with that,

6    Mr. Farinella?

7              MR. FARINELLA:  Yes, your Honor.

8              THE COURT:  Okay.  Now the allegation is that John

9    Doe Number One was 17 and that the defendant promised to help

10   him with his musical aspiration and that the defendant began a

11   sexual relationship with him.  The government's basis for

12   admission is this is direct evidence of the enterprise and its

13   means and methods.  And it includes a common scheme or really

14   more of a modus operandi, which is promising to help young

15   people in the music industry in order to lure them.  The

16   evidence is certainly relevant because it demonstrates the

17   methods that were used to perpetuate the evidence.

18              I know that there's -- that the defense has

19   complained that -- or I'm sorry, has objected that it is more

20   inflammatory than the charged offenses but the charges include

21   allegations about same-sex relationships, so it's really not

22   more inflammatory than that.  One of the allegations is that

23   the defendant directed young women and girls to engage in sex

24   with one another.  And so it's not more inflammatory than the

25   charged offenses.
```

GA0322

30

PROCEEDINGS

1   means and methods, there is an alternative basis for admission

2   under Rule 413, which permits evidence of a defendant's prior

3   sexual conduct for whatever purposes relevant.  That statute

4   though, the Second Circuit has made it clear that the 403

5   rules apply in evaluating it.  And I don't think there's any

6   question that he's charged with sex crimes.

7           You're not disputing that are you, Mr. Farinella,

8   that the rule applies, the Rule 413?  The question is just how

9   the Court balances it.

10          MR. FARINELLA:  I think the Court answered its

11  question, he's charged with sex crimes, your Honor.

12          THE COURT:  I just wanted to make sure there wasn't

13  a dispute about that, because I don't know that you address it

14  in your letter.  I mean, it is different, it's a rule that's

15  sort of an anti-propensity rule, but it does require the Court

16  to engage in a balancing process, but it is an alternative

17  basis for admission.

18          My determination on the ones that I've ruled

19  admissible so far have to do with the direct evidence of the

20  enterprise.

21          Jane Doe Number 18, is she testifying?

22          MS. GEDDES:  Yes, Judge.

23          THE COURT:  Jane Doe Number 18, this is from 2016 to

24  2017.  The proffer is that she was recruited by one of the

25  defendant's associates at a concert and that she will also

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

GA0323

PROCEEDINGS

1    testify about the various rules and the consequences of

2    violating the rules, which include various forms of physical

3    abuse.  The allegation is also that she was required to, like

4    one of the other Jane Does, to write letters that contained

5    embarrassing and false statements about herself and that she

6    was required to have sex with others including Jane Doe Number

7    Five and John Doe Number Two and that those encounters were

8    recorded.

9           This falls under the same category of means and

10   methods and it is relevant for that reason.  It also

11   demonstrates at least the control that the defendant exercised

12   over victims as alleged in the indictment.  It's not more

13   inflammatory than the charged offenses and it's also

14   intertwined as the other evidence -- the other Jane Does who

15   will testify similarly, it is intertwined with Jane Doe Number

16   Five's testimony as I understand it.

17          All right.  The next has to do with conduct in 2018

18   and '19, regarding Jane Doe Number Six, that the defendant and

19   his associates used threatening tactics in order to get Jane

20   Doe Number Six to stop speaking publicly about Mr. Kelly and

21   to drop a lawsuit.  These tactics included threats in texts,

22   in text messages, in person and on Facebook to release

23   compromising photographs of Jane Doe Number Six.  And again,

24   this is not -- I know you'll tell me if this is something

25   about which you were not aware, Mr. Farinella, but you were

PROCEEDINGS

1   aware of this as well, correct?

2           MR. FARINELLA:  Yes, your Honor.

3           THE COURT:  Clearly relevant to the enterprise's

4   methods and it also demonstrates the willingness of the

5   defendant and his associates to take steps to ensure the

6   perpetuation of the enterprise.  It is not unduly prejudicial

7   and it is not more inflammatory than the charged offenses.

8           The next thing has to do with the threats to Jane

9   Doe Number 19 and the threats were in 2018.  This has to do

10  with directing her to travel to Chicago and to sign a

11  nondisclosure agreement.  I mean, this is -- this is relevant

12  evidence, it goes to the means and methods, but I think it is

13  needlessly cumulative so I'm not going to permit that to come

14  into evidence.

15          The next has to do with an allegation of bribery of

16  a Cook County clerk in 2019.  The allegation is that after

17  this television show was released and law enforcement began to

18  investigate the defendant, that the defendant and an associate

19  bribed a Cook County, Illinois clerk to get information about

20  legal action.

21          Is this a charged crime anywhere?

22          MS. GEDDES:  It is not a charged crime and just to

23  be clear, on the recording the crisis manager indicates that

24  he had bribed a clerk.  The defendant on the recording says,

25  just tell me how much, indicating his willingness to carry out

PROCEEDINGS

1   additional bribes.

2           THE COURT:  I'm not going to permit that to come in.

3   It's marginally relevant.  And this ruling could change if the

4   door is opened, which could happen in a variety of ways, but

5   it's not clear to me how this relates to the enterprise except

6   I suppose it could be argued that it is part of an effort to

7   perpetuate the enterprise, but I think under the circumstances

8   I'm not going to permit it.

9           The next has to do with the prior criminal case in

10  Illinois that -- and the allegation is the defendant attempted

11  to influence the jury -- is this through John Doe Number One

12  or number two?

13          MS. GEDDES:  It's through John Doe Number One and,

14  your Honor, the government's interest in introducing this

15  evidence is much more directed at the fact of the 2002 case

16  and the duration in which it went.

17          In addition, the government anticipates that as part

18  of John Doe Number One's direct examination, because it does

19  constitute impeachment material, we would also elicit the

20  allegation or the fact that he admits that in 2008 he had

21  access to a juror and the defendant's response to that, the

22  thing we are far more interested in introducing the fact of

23  the 2002 charge and that the defendant was on trial for -- was

24  under indictment for such a long period of time and was

25  ultimately acquitted in 2008.

GA0326

PROCEEDINGS

34

1    THE COURT:  What's the relevance of that?  I'm not

2    inclined to permit it by the way, just -- it seems he was

3    acquitted of something for whatever reason and it doesn't seem

4    relevant to the enterprise.  Instead, it seems to me that it's

5    directed to showing that he's sort of been under suspicion for

6    a long time and I don't see an admissible purpose for that.  I

7    mean, generally, you know, the fact that somebody was

8    acquitted of a crime you would not be permitted to inquire

9    into that and I don't really see a good reason to permit it

10   here.  Obviously, if something comes out during the trial

11   that, again doors can be opened all the time, but I don't

12   think that that's admissible, so I'm not going to permit that.

13   Okay.

14       The next has to do with an effort in 2019 to obtain

15   child pornography.  Is this charged anywhere?

16       MS. GEDDES:  No, your Honor.

17       THE COURT:  I'm not permitting that either.  It's

18   not clearly relevant, although it has some relevance, but it

19   is surely unduly prejudicial.  And I would also note, at least

20   as far as I can tell, the recordings, to the extent they

21   exist, it's not even been confirmed that they are child

22   pornography.  So that's unduly prejudicial and I'm not going

23   to permit that.

24       The next category of evidence has to do with audio

25   recordings that depict the defendant yelling and physically

PROCEEDINGS

1    assaulting women and those are clearly admissible as direct

2    evidence of the methods used to perpetuate the enterprise and

3    it is direct evidence of the defendant participating in it.

4    It's not more inflammatory than the charged offenses.  In

5    fact, it is evidence of the charged offenses and so that is

6    admissible.

7         The next category of evidence -- I want to make a

8    general observation about these applications to put in

9    witnesses' text messages.  They may become relevant if the

10   witness is challenged with a -- is accused of a prior

11   inconsistent statement.  Some of them seem to fall under that

12   ancient *Hillman* case from the Supreme Court from -- well,

13   let's say from a long time ago, that seem to talk about her

14   declarations of future intent.  That she's going to a concert,

15   that she's going to go to Chicago, that she's staying in a

16   particular hotel.  Those are sort of classic declarations of

17   future intent that are admissible, they are non-hearsay.

18        The texts recounting things that happened on the

19   other hand and things that she did are not declarations of

20   future intent.  They don't seem to me to be -- they are not

21   excited utterances, they are not present sense impressions.

22   So those are not admissible unless she's challenged about --

23   or if she has a failure of memory and they are still not

24   admissible, but she can surely have her recollection refreshed

25   with them or if she's challenged that she's making the whole

GA0328

1

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   ------------------------------x
                                      19-CR-286(AMD)
 3   UNITED STATES OF AMERICA,
                                      United States Courthouse
 4            Plaintiff,             Brooklyn, New York

 5            -against-              August 9, 2021
                                      9:30 a.m.
 6   ROBERT KELLY,

 7            Defendant.
     ------------------------------x
 8
                TRANSCRIPT OF CRIMINAL CAUSE FOR JURY SELECTION
 9            BEFORE THE HONORABLE ANN M. DONNELLY
                  UNITED STATES DISTRICT JUDGE
10                    BEFORE A JURY

11   APPEARANCES

12   For the Government:       UNITED STATES ATTORNEY'S OFFICE
                               Eastern District of New York
13                             271 Cadman Plaza East
                               Brooklyn, New York 11201
14                             BY:  ELIZABETH GEDDES, ESQ.
                                    MARIA CRUZ MELENDEZ, ESQ.
15                                  NADIA SHIHATA, ESQ.
                               Assistant United States Attorneys
16
     For the Defendant:        THE C.H. SCHOLAR LAW FIRM PLLC
17                             225 Broadway - Suite 225
                               New York, New York 10007
18                             BY:  CALVIN HAROLD SCHOLAR, ESQ.

19                             THE LAW OFFICE OF THOMAS A. FARINELLA
                               260 Madison Avenue - 8th Floor
20                             New York, New York 10016
                               BY:  THOMAS A. FARINELLA, ESQ.
21
                               AIELLO & CANNICK
22                             69-06 Grand Avenue
                               Maspeth, New York 11378
23                             BY:  DEVEREAUX LEON CANNICK, ESQ.

24

25
```

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

```
                                                                2

 1    APPEARANCES (CONTINUED)

 2    Attorney for:              BLANK LAW, PC
                                 444 South Washington Avenue
 3                               Royal Oak, Michigan 48067
                                 BY:  NICOLE BLANK BECKER, ESQ.
 4

 5    Court Reporter:            LINDA D. DANELCZYK, RPR, CSR, CCR
                                 Phone:  718-613-2330
 6                               Fax:    718-804-2712
                                 Email:  LindaDan226@gmail.com
 7

 8    Proceedings recorded by mechanical stenography.  Transcript
      produced by computer-aided transcription.
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PROCEEDINGS                                           3

1          THE COURTROOM DEPUTY:  All rise.

2          THE COURT:  Everybody can be seated.

3          (Defendant enters the courtroom.)

4          THE COURTROOM DEPUTY:  This is criminal cause for a

5   jury selection and trial.  Docket Number 19-CR-286.  U.S.A.

6   versus Robert Kelly.

7          Counsel, state your appearance, government first.

8          MS. GEDDES:  Elizabeth Geddes, Nadia Shihata and

9   Maria Cruz Melendez for the government.  Good morning, Your

10  Honor.

11         THE COURT:  Good morning.

12         MS. BLANK BECKER:  Good morning, Your Honor, Nicole

13  Blank Becker as well as -- well, sorry, Calvin -- sorry about

14  that -- Scholar.  Mr. Thomas Farinella and Devereaux Cannick,

15  as well as my client, Mr. Kelly, sitting at the defense table.

16         THE COURT:  Good morning.

17         Just a few things before we get started.  I don't

18  know what the status is.  We were waiting for a couple of

19  jurors.  I think somebody might have called in sick.  But

20  we're -- the last time we checked there are 40 some.

21         I think one person also got confused and is planning

22  to come this afternoon instead of this morning.  So I mean

23  that happens.

24         I will say going through the questionnaires there

25  were a few people that I'm a little puzzled are included only

PROCEEDINGS                                    4

1    because there's one person that didn't answer any questions.

2    There are a couple of other people who don't seem -- who have

3    expressed concerns about their ability to speak and understand

4    English.

5             I don't know that that's the best use of our time to

6    be questioning those people, but if that's what you all want

7    to do, that's fine, I just -- I'm just not entirely certain

8    that that's going to be proper, but anyway you can go ahead

9    and do that if you want.

10             I also just want to remind all the parties about the

11    federal rule in this district about making statements to the

12    press.  I'm not saying I've seen any, but I'm just going to

13    have you all keep that in mind.

14             All right.  Is there -- I did receive the

15    government's submission regarding additional questions to be

16    made to the panelists.

17             Is there one from the defense?

18             MR. FARINELLA:  Yes, Your Honor, the additional

19    questions on Friday.

20             THE COURT:  No, I meant with respect to the

21    individual jurors, there's nothing else?

22             I went through it myself, so there were things that

23    I thought we should ask them, but I guess when each juror

24    comes in, if there's something that -- I mean I have a list, I

25    want to ensure on an individual basis important parts of

PROCEEDINGS                                    5

1  picking a jury for service jury service, but if there's

2  something that comes to mind that you want me to ask, let me

3  know.  I would actually prefer to have something ahead of time

4  so we can do this smoothly.

5           MR. CANNICK:  Yes, the only point to that is that

6  sometimes something may need to be said and that might provoke

7  a question, so that's what I was anticipating.

8           THE COURT:  I see, which is completely fine.  That's

9  also during when we're finished, if there's something else

10 that either side wants to ask, just let me know.

11          MR. CANNICK:  Thank you.

12          THE COURT:  Okay.  I don't know -- what I plan to do

13 before we get going with the individual questioning is give

14 them some general instructions for jury selection.

15          I'm also going to talk to them, as I said I would at

16 some earlier submission -- earlier ruling, about the fact that

17 they are anonymous.  We're not giving the standard instruction

18 that is given in a case like that.

19          And then I am going to ask them a couple of general

20 questions, since it's been a little bit since some of them

21 have filled out the questionnaire all right.

22          Anything that anybody -- oh, I should also say, I

23 did get I guess the defense had filed a motion to dismiss.

24          I feel like we went over some of those topics

25 already, but is there something new in that submission?

PROCEEDINGS                                  6

1          MR. FARINELLA:  The issues that are raised in this

2     motion are separate and distinct from the prior motion, which

3     was a motion to strike.

4          THE COURT:  Was there any other time you could have

5     made this motion?

6          MR. FARINELLA:  The government had argued the

7     original motion to strike, Your Honor.  That discovery had not

8     completed yet.  We just recently received discovery as of

9     Thursday.

10          THE COURT:  Wait, why are we still talking about

11     discovery?  I thought discovery as we established it was

12     turned over in February?

13          MR. FARINELLA:  It's been ongoing, Your Honor.

14          MS. GEDDES:  Your Honor, the government does

15     continue to provide discovery as it obtains additional

16     information.  I could be wrong, but I don't believe any

17     additional discovery was provided with respect to the

18     allegations that are the subject of the dismissal motion.

19          THE COURT:  I mean I'll certainly decide on that.

20     How much time do you need to respond?

21          MS. GEDDES:  Can we have the 'til the end of this

22     week?

23          THE COURT:  Sure.  Sure.  All right.

24          And then you can have 'til Monday to reply.

25          Is there going to be anything else along those

PROCEEDINGS                                  7

1    lines?  I mean obviously if something comes up, you can -- you

2    can file a motion on that, but I feel like the time to do this

3    was some time ago.

4              So is there anything else like that that you're

5    anticipating?

6              MR. FARINELLA:  No, Your Honor.

7              THE COURT:  All right.  Anything else before we

8    bring the panel in?

9              Okay, let's bring them in.

10             MR. CANNICK:  Are you going to introduce us to the

11   prospective jury now or?

12             THE COURT:  Yes.  You know what, I know everybody's

13   names, but I'm going to write them down just in case.  All

14   right.

15             Anything else?

16             MR. CANNICK:  And the last question.  When you

17   introduce us, are we allowed to say good morning or do you

18   just want us to stand?

19             THE COURT:  You can say good morning.

20             MR. CANNICK:  Okay.

21             THE COURT:  All right.  Anything else anyone wants

22   to raise?  Okay, all right.

23             MR. CANNICK:  Thank you.

24             (Pause in the proceedings.)

25             THE COURT:  One other thing before we bring the

PROCEEDINGS                                    8

1   jurors.  Because we have to bring them into another courtroom

2   for additional questioning, we're going to dismiss the group

3   of jurors so they don't see that Mr. Kelly is in custody.

4              MR. CANNICK:  Your Honor, so the problem with not

5   reading English, we would consent that they be excused for

6   cause.

7              THE COURT:  All right.  Do we have the numbers of

8   those?

9              MR. CANNICK:  Work through them.

10             THE COURT:  I just have them.  So if you can go

11  through those jurors, maybe between this little general thing

12  and the individual questioning, you let me know who they are.

13  Most important, we'll let -- oh, can I ask you a question?

14             (Discussion was had off the record.)

15             THE COURTROOM DEPUTY:  All rise, please.

16             (Prospective Jury enters the courtroom.)

17             THE COURT:  Thank you.

18             THE COURTROOM DEPUTY:  Prospective Jurors, good

19  morning.  Could you please state your raise your right hand.

20             (Prospective Jury was sworn.)

21             THE PROSPECTIVE JURY:  Yes.

22             THE COURTROOM DEPUTY:  Thank you.  You may be

23  seated.

24             THE COURT:  Good morning, ladies and gentlemen.

25             THE PROSPECTIVE JURY:  Good morning.

PROCEEDINGS                              9

1              THE COURT:  Welcome to the Eastern District.  I'm

2      Judge Donnelly.  Our courtroom deputy is Donna Greene.  My law

3      clerk is Feyilana Lawoyin.

4              As you know from the questionnaires, we're here

5      today because we're about to select a jury to serve in a

6      criminal case.

7              The name of the case is the United States against

8      Robert Sylvester Kelly.  As you read in the questionaries,

9      Mr. Kelly is charged with racketeering for his alleged role as

10     the leader of an enterprise.

11             He's alleged to have engaged in racketeering acts

12     including bribery, sexual exploitation of a child, kidnapping,

13     transportation of minors and other individuals for the purpose

14     of engaging in illegal sexual activity, illegal coercion and

15     enticement of individuals and forced labor.

16             He's also charged with transporting individuals,

17     including a minor, for the purpose of engaging in illegal

18     sexual activity and illegal coercion and enticement of

19     individuals.

20             Mr. Kelly has pleaded not guilty to all of these

21     charges.  And they are just charges.  It's the government's

22     burden to prove Mr. Kelly guilty beyond a reasonable doubt

23     with respect to each one of those charges.

24             And what I've given you is just a summary of the

25     charges to give you some background of the case.  I'll

PROCEEDINGS                    10

1    instruct the jury as to the elements in each of those crimes

2    and as to the law that applies at the appropriate time.

3              What I'd like to do next is introduce the

4    participants.

5              Starting over with the government, we have Maria

6    Cruz Melendez.

7              MS. CRUZ MELENDEZ:  Good morning.

8              THE COURT:  Nadia Shihata.

9              MS. SHIHATA:  Good morning.

10             THE COURT:  And Elizabeth Geddes.

11             MS. GEDDES:  Good morning.

12             THE COURT:  At the defense table we have Devereaux

13   Cannick.

14             MR. CANNICK:  Good morning.

15             THE COURT:  Nicole Blank Becker.

16             MS. BLANK BECKER:  Good morning.

17             THE COURT:  Thomas Farinella.

18             MR. FARINELLA:  Good morning.

19             THE COURT:  Calvin Scholar.

20             MR. SCHOLAR:  Good morning.

21             THE COURT:  And also the defendant Robert Kelly.

22             THE DEFENDANT:  Good morning.

23             THE COURT:  All right.  Folks, first of all, thank

24   you for participating in this process.  The process of

25   selecting a jury in a criminal case is a critical part of our

PROCEEDINGS                                    11

 1   justice system.

 2           Now before we get started, I want to give you a

 3   brief overview of your role as a juror if you are selected.

 4   For any of you who have been jurors before, this is going to

 5   be a slightly, maybe significantly, different experience for a

 6   couple of reasons.

 7           First, we will be referring to you by your assigned

 8   juror numbers and we ask that you not tell us your name or any

 9   identifying information about yourself.

10           We've had the names removed from your questionnaires

11   before we looked at them.  I don't know your names.  None of

12   the lawyers know your names.  And Mr. Kelly doesn't know your

13   name.  Nobody knows what your names are.

14           And there's a reason for this.  Earlier this year I

15   decided that the jury in this case would be what we call

16   anonymous and partially sequestered.  That simply means that

17   nobody's going to know who the members of the jury are.

18           Everybody's, obviously, to the extent that there are

19   people viewing the proceeding, they'll be able to see jurors

20   sitting in the courtroom, but they won't know anything about

21   your names.

22           I did this out of respect for your privacy.  This is

23   a high-profile case that has gotten a lot of public attention,

24   including on the news and in the media.  And I don't want

25   anyone trying to talk to about the trial.  I don't want anyone

PROCEEDINGS                                    12

1   stopping you any place outside of the courthouse and asking

2   you questions about it or trying to get your take on it.  And

3   keeping jurors anonymous is a fairly standard practice in

4   high-profile cases like this one.

5          And the reason is, as I said, because people are

6   interested in the case.  And they really want to know things

7   about you and what you think about the case.  You're going to

8   have enough on your plates if you're selected as a juror in

9   this case, and I just didn't want you to have to contend with

10  this as well.

11         Another part of the order that I entered is that

12  jurors will be brought to and from the courthouse by the

13  United States Marshals every day, and the jurors will stay

14  away from the rest of the public while here in the courthouse

15  during the trial.

16         This is done for the same reason.  It's to protect

17  your privacy.  And as I said, it's not unusual in a case where

18  there is significant media attention.

19         The point is, that if you are selected as a juror,

20  your job is important.  And as I will explain to you briefly,

21  in a few minutes, your job is going to be to listen to the

22  evidence that you hear in the courtroom and not anything

23  outside of the courtroom.

24         I also apologize for this drilling.  I'm told it's

25  going to end soon.  There it is.

PROCEEDINGS                    13

1         The second difference in your jury service has to do

2    with something that's affected all of us, which is the

3    COVID-19 pandemic.  That is something that, as you know, has

4    upended everybody's lives and our institutions and the way

5    that they function.  The courts are no different.

6         Our court has consulted experts, and their advice is

7    that it is safe to resume trials in our courthouses as long as

8    we take protective measures.  We are carefully following the

9    guidance from the United States Center for Disease Control

10   Prevention, as well as the New York public health experts.

11        Here in the Eastern District, and in other New York

12   courts, judges have resumed trials.  Every precaution is being

13   taken to protect the health and safety of the public, and of

14   all people who work here in the courthouse.

15        We have reviewed and implemented the guidance of

16   health officials on the safe operation of public spaces and

17   office buildings.  We've also changed our protocols the way

18   that we do trials so jurors can feel safe when they come to

19   the courthouse to fulfill their civic duty and jury service.

20        So, for example, we take everybody's temperature

21   when they come into the courthouse.  The entire building is

22   cleaned regularly and thoroughly sanitized.  That includes

23   doorknobs and table services and chairs.  And we have hand

24   sanitizer widely available throughout the building.

25        Large rooms like this, which is our ceremonial

PROCEEDINGS                                    14

1    courtroom, is traditionally used for naturalization ceremonies

2    and larger gathers.  But this has been made available to make

3    sure there is enough room for all of you.

4                Our trial courtrooms and trial won't be conducted in

5    this, but our trial courtrooms have been refitted so that

6    jurors are no longer clustered together in the jury box, which

7    any of you who have served as a jury before probably

8    remembers.  Instead, we have jurors sitting apart from one

9    another in what is usually a non-COVID public section of the

10   courtroom.

11               We've consulted with an epidemiologist and an HVAC

12   specialist who reviewed and advised on the setup in our

13   courtrooms and if -- they've been guiding us in the way that

14   we do this.

15               If you are selected as a juror, you'll be provided

16   with lunch and snacks and water every day at no cost.

17               One thing is for sure, though, that we have to

18   continue to try cases, including jury trials.  Our system of

19   justice depends on it.

20               For over two centuries, it's been true that the

21   federal court is always open.  That's true through wars and

22   natural disasters and even pandemics in earlier times.  It's

23   true today because of the dedication of everybody who works in

24   this building; judges, the court staff, attorneys, and members

25   of the public, like you, who come to do your civic duty as

GA0342

PROCEEDINGS                                    15

1    jurors.

2              And that is the other thing.  The pandemic has not

3    changed the importance of jury service.  It's one of the most

4    important contributions that a citizen makes to keeping a fair

5    and impartial system of justice in our country.  Jury service

6    is a privilege.  It's an honor.  It is one of the great

7    benefits of living in the United States.  Obviously it can be

8    inconvenient, and we've all experienced that already, I'm

9    sure.

10             But I can tell you in my experience, that jurors

11   come away from their experience as a juror with the

12   appreciation for the process and for their fellow citizens,

13   and I'm sure it will be the same for you.  It is important you

14   make every effort to accept and perform your responsibilities

15   as citizens of this great country.

16             Now, the purpose of this process, this jury

17   selection process, is to select those jurors who can be fair

18   and impartial to both sides in this case.  Some people find

19   that they can be fair and impartial in one kind of case, but

20   for various reasons, whether it's something that has happened

21   to you or somebody you care about you can't be fair in another

22   kind of case.  The process that we use is designed to help us

23   figure out whether you can be fair and impartial to both sides

24   in this case.  This is an important task, as I'm sure you can

25   all appreciate.

PROCEEDINGS                        16

1        If during the course of this process you come to

2   believe that because of something that's happened to you or

3   because of something you've heard or read that you cannot be

4   fair and impartial, that is that you would favor either the

5   government or the defendant regardless of what the evidence

6   shows, then you must tell me that.  It's not unusual, and

7   there's no reason to be embarrassed about it.  What will

8   happen is that you will be excused from this case and possibly

9   serve on another case.

10       But the system only works if all of our citizens are

11  willing and prepared to serve as jurors when they can do so

12  fairly and impartially.  And I do not expect that with anybody

13  who would seek to avoid this important duty for any but the

14  most compelling reasons.

15       So we're going to be conducting the individual

16  selection of jurors in a different courtroom that will be the

17  questioning each of you individually.  And you'll be asked

18  questions to determine whether you can be fair and impartial

19  to both sides.

20       And the point of these questions is not to pry into

21  your personal business or ask you embarrassing questions.  As

22  I said, the purpose is to make sure that the jurors that we

23  select will be fair and impartial to both sides.

24       Now, another part of the jury selection process is

25  that the lawyers for both sides are entitled to exercise a

GA0344

PROCEEDINGS                    17

1   certain number of what's called peremptory challenges.  That

2   means that they can excuse a number of jurors without giving

3   any reason.  If you're excused, don't take it personally.  But

4   if you are selected as a juror, your job is going to be to

5   listen to the evidence and to my instructions on the law and

6   to make a determination that's based only the law.

7           So I want to speak to you just generally about some

8   things to keep in mind.  The first thing is, as Mr. Kelly sits

9   here now, he's presumed to be innocent.

10          (Interference.)

11          THE COURT:  I'm just going to wait.  Oh, there it

12  is.

13          He is presumed innocent until and only if the jury

14  finds that he is guilty beyond a reasonable doubt.

15          As I just explained to you, he's been indicted for a

16  number of crimes, but an indictment is just an accusation.  It

17  doesn't mean that Mr. Kelly is guilty of anything.  You can't

18  assume that he is guilty or more likely to be guilty just

19  because he's been charged with committing these crimes.

20          That's the reason we have trials, to determine

21  whether the government can prove a defendant's guilt beyond a

22  reasonable doubt.

23          And that is it the government's burden of proof

24  beyond a reasonable doubt.  A defendant in a criminal case

25  does not have to prove that he is not guilty.  That means a

GA0345

PROCEEDINGS                                    18

1   defendant does not have to testify, or to put on any evidence

2   and a juror can't hold that against a defendant if he makes

3   that choice.

4          The next thing is that as jurors you must follow the

5   law as I give it to you, even if you don't agree with it or if

6   you think the law should be different.

7          The next thing is that you have to base your verdict

8   on the evidence, not on something that you've read in the

9   newspapers or seen on television.  I did note from your

10  questionnaires that many of you like to watch law shows on

11  television or you've seen documentaries purporting to report

12  on cases.  You have to put those things out of your mind.

13         Obviously the law shows are entertainment and they

14  wrap everything up in an hour.  This is a little bit

15  different.  The point is, though, I want you to enjoy those

16  shows if you can, but bear in mind that this is much

17  different.

18         The same reasoning also includes news reports about

19  cases.  Those reports might be accurate, but they might not be

20  accurate.  And you can't base your decision in this case on

21  what something that you might have read about another case.

22         As I explained before, your names are being kept in

23  confidence.  So during the process, don't give any information

24  about yourselves, or your family that can be used to identify

25  you.

PROCEEDINGS                                    19

1      Also, as I said before, there is significant media

2    interest in this case.  That means there are undoubtedly news

3    articles and news stories about it.  If you are selected as a

4    juror, you will not be permitted to read any news accounts of

5    this case or watch any accounts of this case at all.  If you

6    see something in the paper, you're just going to have to turn

7    the page, you can't read it.

8      Equally important, you're not going to be permitted

9    to discuss the case with anyone else, including your fellow

10   jurors, while the case is going on.  Again, that's because

11   you're going to be focussing on the evidence that you hear in

12   the courtroom not outside of the courtroom.  And even with

13   your fellow jurors, you can't discuss the case until you've

14   heard everything and my instructions on the law.

15     You cannot post anything about your experience as a

16   juror on Facebook or on any kind of social media.  That means

17   any contact with anybody at all about your service as jurors.

18     Another instruction, I know at least one person

19   noted that this would be hard.  You can't look anything up

20   about the case on the internet.  You can't look up anything

21   about the parties or about anything having to do with this

22   case.  The reason -- let me pause for just a minute.

23          (Interference.)

24          THE COURT:  The reason for these rules is they

25   protect the integrity of the trial and assure that both sides

GA0347

PROCEEDINGS                                        20

1    receive a fair trial.

2              Jurors in criminal cases base their verdicts on the

3    evidence that they hear in the courtroom, not on something

4    that's somebody else tells you, not on something that you see

5    on TV or on social media.  So that's the reason if you're

6    selected as a juror, I'll be reminding you of these rules

7    regularly.  You can't watch news accounts, look anything up or

8    speak to anybody else about the case.  You would be violating

9    your oath as jurors if you were to do that.

10             (Interference.)

11             THE COURT:  The next thing is you must report to me

12   any effort by any person to influence you about the case or

13   speak with you about the case or to get information about the

14   case, or speak to you about anything having to do with the

15   case.

16             I'm going to remind you, which I think was in the

17   questionnaires -- sorry.

18             (Interference.)

19             THE COURT:  I just want to go over the schedule with

20   you.  The trial is going to begin with opening statements and

21   testimony on August 18th.  It's expected to last about four

22   weeks.  We will be taking Fridays off beginning the week of

23   August 23rd, unless there's a religious holiday during that

24   week.  If there are jurors who observe the various holidays,

25   we'll take that day instead of the Friday.

PROCEEDINGS                                    21

1          I just want to go over, and the answer will be the

2    hand raise to these questions.  As I said before, one of the

3    important principles of criminal law is that a defendant in a

4    criminal case is presumed to be innocent.  And Mr. Kelly is

5    presumed to be innocent until and only if the jury unanimously

6    finds that he is guilty beyond a reasonable doubt.

7          Is there anyone who cannot follow that rule?

8          Oh, there's one person in the back who cannot follow

9    that rule.  Two people?  All right.

10          You all filled out questionnaires and so I think

11   most of you said you could follow the rules.  If there's

12   something that's changed between now and then, that's fine.

13          So I see three jurors who say they cannot follow

14   that rule.  All right.

15          The next question is that when you filled out the

16   questionnaires, you were told not to research, read or watch

17   anything about the case or learn anything about the case.

18          Has anybody, even though you were instructed not to

19   do that, done that any way, looked things up on the internet,

20   even if you just Googled it.  If you have, now is the time to

21   tell me.

22          Anybody looked up things about the case on the

23   internet?

24          Okay, this gentleman here.

25          Okay.  You looked something up on the internet?

GA0349

PROCEEDINGS                                    22

```
 1              THE PROSPECTIVE JURY:  Yes.
 2              THE COURT:  And so this gentleman, are you Number
 3    90?
 4              THE PROSPECTIVE JURY:  Yes.
 5              THE COURT:  And what number are you, sir.
 6              THE PROSPECTIVE JURY:  140.
 7              THE COURT:  140, okay.  Okay.
 8              All right.  Okay, the next process -- the next part
 9    of the process I'll be questioning you each individually, and
10    we'll doing that in another courtroom.
11              And, again, don't take it personally if you don't
12    get selected, it's just part of the process.
13              I do want to thank all of you for the time you've
14    invested already in this process.  Our system cannot function
15    unless we have good people like you who are willing to give up
16    their time and to serve as jurors.
17              Okay, so let's take the jurors back to the central
18    jury room, and I'll see you to individually in the a minute.
19    Okay?
20              (Prospective Juror exits the courtroom.)
21              THE COURT:  All right, just with respect to those
22    three jurors who said they can't follow, 74, 80 and 53, those
23    I think we can agree should be excused.
24              MR. CANNICK:  Yes, Your Honor.
25              MS. GEDDES:  74, 80 and 53?
```

PROCEEDINGS                              23

1            THE COURT:  Yes.

2            And the two gentleman who looked things up, we don't

3  have to let them go, we can just ask them individual

4  questions.  That's 90 and 140.

5            MR. CANNICK:  Was there a third person?

6            THE COURT:  I don't think so.

7            Okay, anything else before we head to the other

8  room?

9            MS. GEDDES:  Your Honor, I don't know what order

10  you're going to be asking questions, but it appears that the

11  first juror, Number 6, did not respond to many of the

12  questions and indicated a difficulty in understanding English,

13  so I think we can probably skip that particular juror.

14            THE COURT:  Number 1?

15            Number 6.

16            So apparently 6 is not here.

17            MS. GEDDES:  Okay.

18            THE COURT:  So the order that we're doing them, as I

19  said in the letter, is the numerical order.

20            So it looks like just for your -- so we're all on

21  the same page, it will be 2, 7, 11, 12, 15, 16, 25, 38, 45.

22            So 29 and 39 are not here, so they're not going to

23  be questioned.

24            91 is not going to be questioned.

25            127 and 153.

PROCEEDINGS                              24

1          MS. BLANK BECKER:  Those are going to be questioned

2     or not?

3          THE COURT:  No.

4          MS. BLANK BECKER:  Are not?

5          THE COURT:  I mean I can read all of the numbers,

6     but they're the ones that submitted the questionnaire, so I'm

7     assuming you know who they are.  I don't have it in front of

8     me, but I'm just going to go through those numbers that we

9     won't be questioning.

10         6, 29, 39, 91, 115, 127, and 153.

11         And why don't you take a moment to see whether there

12    are additional ones that were people that couldn't speak

13    English.

14         One thing that occurs to me that our goal is to get

15    I think taking into account the peremptory challenges and the

16    alternate jurors, I think our magic number is 29, so but I

17    think that's right.  It's going to be picking 18 jurors, 12 as

18    alternates.

19         Is that right, Donna?

20         THE COURTROOM DEPUTY:  Forty.

21         THE COURT:  I'm told by my mathematician that it's

22    40.  I think we should get a few extra, just as a cushion.

23    But what I think the plan is, once we reach that number, we're

24    good to go, okay?  All right.

25         (Pause in the proceedings.)

PROCEEDINGS                               25

 1          THE COURT:  The other issue which also occurs to me,

 2   we can deal with the one juror, I think has prepaid tickets

 3   for a vacation starting September 15th.

 4          MS. GEDDES:  Yes.

 5          THE COURT:  And also a juror who's got some

 6   important milestone, and I think it starts on August 18th.

 7          MS. GEDDES:  Yes, Your Honor, we -- I think we noted

 8   in here that we certainly agree that both of them will need be

 9   excused for cause.  I have the numbers.

10          THE COURT:  Okay, I just am finding out the jurors,

11   but we don't have to question them, let's just pinpoint the

12   ones that are not going to be serving.  Okay.

13          MR. CANNICK:  We have no objections.

14          THE COURT:  Do me a favor, when you're all done

15   just, give us the list.

16          MR. FARINELLA:  Yes, we've consented.

17          THE COURT:  The most helpful will be instead of

18   shouting to each other, write down a list, and if defense

19   counsel does can do the same thing.

20          (Pause in the proceedings.)

21

22          (Continued on the following page.)

23

24

25

PROCEEDINGS                                    26

1          THE COURT:  Just a reminder, we're just talking

2    about the first 50 this morning.  You can do the other ones

3    later.

4          MS.  GEDDES:  We have agreed that we do not need to

5    question 65, 92, 123, 140, 321, 384.

6          THE COURT:  Okay.

7          MS.  GEDDES:  There are some others who indicated

8    trouble with English, but they completed the questionnaire.

9    We think it's worth asking them to see if they can, if they

10   might have understated their English skills.

11         THE COURT:  Okay.  Then I think we're ready to start

12   the individual questions.

13         (Following proceedings in Courtroom 2E)

14         THE DEPUTY CLERK:  All Rise.

15         THE COURT:  Just to review, we'll be starting with

16   juror number seven.  The juror is going to sit in the jury

17   box.  Sorry, we'll start with juror number two.

18         Make sure you're microphone is on.  It's very hard

19   to hear.  Make sure it's on.  Let's bring in juror number two.

20         (Prospective Juror enters.)

21         THE COURT:  Good morning, sir.

22         PROSPECTIVE JUROR:  Good morning, Judge.

23         THE COURT:  Let's make sure our juror has a

24   microphone so everybody can hear.

25         Say couple of reminders don't give us any details

PROCEEDINGS                          27

1    that might identify you.  Our court reporter is taking down

2    everything that you say so, just speak slowly.  All right?

3              PROSPECTIVE JUROR:  Yes.

4              THE COURT:  I've gone through your questionnaire.  I

5    was interested in the kind of work that you do, you said

6    you're full-time employed.  What is the kind of work you?  Do

7    don't tell me where you work, just what kind of work do you

8    do.

9              PROSPECTIVE JUROR:  Supervisor.

10             THE COURT:  A supervisor?

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  At what kind of a -- what general kind

13   of a place?

14             PROSPECTIVE JUROR:  A city job.

15             THE COURT:  How long have you had that job?

16             PROSPECTIVE JUROR:  Twenty-one years.

17             THE COURT:  One of the other questions that I was

18   interested in is, what you like to do in your spare time?

19             PROSPECTIVE JUROR:  Soccer, table tennis and net

20   ball.

21             THE COURT:  Did you watch the Olympics?

22             PROSPECTIVE JUROR:  Yes, I did.

23             THE COURT:  I think some of those sports are in the

24   Olympics, aren't they?

25             PROSPECTIVE JUROR:  Yes.

PROCEEDINGS                              28

1          THE COURT:  Are either of your two children

2    employed?

3          PROSPECTIVE JUROR:  One.

4          THE COURT:  What does that child do?

5          PROSPECTIVE JUROR:  Works in a funeral home.

6          THE COURT:  I see.  All right.  I know you saw this

7    in the questionnaire, but I want to make sure of a couple of

8    things here.  I explained to the group at large that Mr. Kelly

9    is presumed to be innocent and the Government has to prove his

10   guilt beyond a reasonable doubt.  I'll explain that in more

11   detail at the appropriate time, but if you're selected as a

12   juror do you promise to follow that rule?

13         PROSPECTIVE JUROR:  Yes, Judge.

14         THE COURT:  Okay.  The other thing is that you must

15   follow my instructions on the law even if you don't agree with

16   them.  Will you be able to do that?

17         PROSPECTIVE JUROR:  Yes, Judge.

18         THE COURT:  Is there any reason why you could not be

19   a fair and impartial juror to both sides?

20         PROSPECTIVE JUROR:  No, Judge.

21         THE COURT:  Okay.  Then another very important part

22   of the trial is that you won't be able to do any research

23   about the case or look anything up.  Do you promise not to do

24   that?

25         PROSPECTIVE JUROR:  Yes, Judge.

PROCEEDINGS                                29

1          THE COURT:  All right.  I would like to see just one

2   representative from either side to see if any of these lawyers

3   have any additional questions for you.

4          (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                                    30

1        (Sidebar conference.)

2        MS.  GEDDES:  Are you going to pose the additional

3    questions that we submitted on Friday?  The same sex

4    relationships.

5        THE COURT:  I forgot about all of that.

6        The same question?

7        MR. CANNICK:  Yes.

8        (End of sidebar conference.)

9        (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JURY SELECTION                                    31

```
 1                    (In open court.)

 2              THE COURT:  Thank you.  The other thing, I wanted to

 3      be sure about was the schedule, the trial schedule, how long

 4      it's going to take.  That's good for you?

 5              PROSPECTIVE JUROR:  Yes, Judge.

 6              THE COURT:  One other series of questions.  There

 7      may be some evidence in the case that involves testimony or

 8      exhibits that have to do with sexual activity between people

 9      of the same sex.  Anything about that evidence that would

10      affect your ability to be a fair and impartial juror?

11              PROSPECTIVE JUROR:  No, Judge.

12              THE COURT:  Okay.  And there are a couple of people

13      that I want to see if you are familiar with them or you know

14      them.  Courtenay Wilson, Michael Trimarco, and Evangeline

15      ████████████.  Do you know any of those people?

16              PROSPECTIVE JUROR:  No, Judge.

17              THE COURT:  Thank you so much.  You can step out.

18              (Prospective juror exits.)

19              MR. CANNICK:  You might have done this already and I

20      just didn't hear, could you instruct them now to still not

21      discuss anything about the case, even the fact they haven't

22      heard anything, nothing that they discussed.

23              THE COURT:  I thought I might have said that, but

24      I'll say it loudly.

25              (Prospective juror enters.)
```

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

JURY SELECTION                                            32

1          THE COURT:  Good morning.

2          PROSPECTIVE JUROR:  Good morning.

3          THE COURT:  How are you doing?

4          PROSPECTIVE JUROR:  I'm good.

5          THE COURT:  I know you filled out that very detailed

6   questionnaire, I just have a couple of additional questions

7   for you.  You're employed full-time in customer service; is

8   that right?

9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  Don't tell me the name of the place, but

11   what kind of place do you work?

12          PROSPECTIVE JUROR:  Retail.

13          THE COURT:  Okay.  What kind of things do you like

14   to do in your spare time?

15          PROSPECTIVE JUROR:  Listen to music, shopping.

16          THE COURT:  Okay.  I'm going to ask you a few names

17   see if any know any of these people, Courtenay Wilson.

18          PROSPECTIVE JUROR:  No.

19          THE COURT:  Michael Trimarco.

20          PROSPECTIVE JUROR:  No.

21          THE COURT:  Evangeline █████████.

22          PROSPECTIVE JUROR:  No.

23          THE COURT:  One other thing, there may be evidence

24   in this case that relates to either testimony or exhibits that

25   relate to sexual activity between people of the same sex.

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

JURY SELECTION                                    33

1   Anything about that evidence that would affect your ability to

2   be a fair and impartial juror in this case?

3           PROSPECTIVE JUROR:  No.

4           THE COURT:  Okay.  Some of these questions were in

5   the questionnaire, but I want to go over a couple of them with

6   you.  As I told you, as it says in the questionnaire and as I

7   told you in the big room, Mr. Kelly is presumed to be

8   innocent.  And the Government has the burden of proving his

9   guilt beyond a reasonable doubt.  I'll talk to you about that

10  in more detail at the appropriate time.

11          Is there any reason you could not follow that rule

12  of law?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  Is there any reason that you couldn't

15  follow my instructions on the law?

16          PROSPECTIVE JUROR:  No.

17          THE COURT:  And one of the things that is also

18  critical in this case is that you not look up anything on the

19  Internet, talk to anybody about the case, anything like that.

20  Do you promise that you will not do research on the case?

21          PROSPECTIVE JUROR:  Yes, I promise.

22          THE COURT:  That also means not talking to anybody

23  about the case at all, even after you walk out of here.  Okay?

24          PROSPECTIVE JUROR:  Okay.

25          THE COURT:  Let me just see if any of the parties

GA0361

JURY SELECTION                                    34

1    have any additional questions for this witness.

2              MS.  GEDDES:  Yes, your Honor.

3              (Continued on the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GA0362

1          (Sidebar conference.)

2          MS.  GEDDES:  Your Honor, we had posed four

3     additional questions in the submission that we made.

4          THE COURT:  I have it.  I forgot to look at it.

5          MS.  GEDDES:  That's all that I have.

6          MR. CANNICK:  We have no questions.

7          (End of sidebar conference.)

8          (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JURY SELECTION                                          36

1          (In open court.)

2          THE COURT:  Just a couple of other things.  Based on

3   your questionnaire, first of all, you were uncertain I think

4   in your questionnaire whether your employer would pay you

5   during jury selection.  Have you found that out?

6          PROSPECTIVE JUROR:  Yes, I did.

7          THE COURT:  And what is the answer?

8          PROSPECTIVE JUROR:  Yes, they will.

9          THE COURT:  Okay, good.  The other -- sorry to ask

10  you about this question -- you also indicated that when you

11  were younger that a family member abused you.  I'm just

12  wondering whether that would affect your ability to be fair

13  and impartial in this case?

14         PROSPECTIVE JUROR:  No.

15         THE COURT:  You indicated in the questionnaire that

16  you had heard something about the case, that you heard

17  something about the allegations.  Would you be able to put

18  aside anything that you heard before and just focus on the

19  evidence in the case that you hear in the courtroom, nothing

20  that YOU might have heard outside the courtroom.  Will you be

21  able to put all that aside?

22         PROSPECTIVE JUROR:  Yes, I would.

23         THE COURT:  Is there any reason why you wouldn't be

24  able to be fair and impartial to both sides?

25         PROSPECTIVE JUROR:  No.

JURY SELECTION                                    37

```
 1                THE COURT:  Okay.  Thank you so much.  Just as a

 2     reminder, I know I said it before, don't talk to anybody about

 3     anything about the case.

 4                PROSPECTIVE JUROR:  Okay.

 5                THE COURT:  I forgot to ask you another question

 6     here.  One of the questions asked you whether or not you know

 7     anybody who's done any kind of criminal defense work at all,

 8     and/or done any kind of advocacy group or advocacy work having

 9     to do with people's rights in connection with a trial?  Do you

10     know anybody who has done that kind of work.

11                PROSPECTIVE JUROR:  No.

12                THE COURT:  Okay, thank you so much.  Now you can

13     go.

14                (Prospective Juror exits.)

15                (Prospective juror enters.)

16                THE COURT:  Good morning.

17                PROSPECTIVE JUROR:  Hi.

18                THE COURT:  I just have a few additional questions

19     for you.  I'll first remind you not to give us any information

20     that would identify you.  Okay?

21                PROSPECTIVE JUROR:  Okay.

22                THE COURT:  One of the things that you listed in

23     your questionnaire is that you used to be in something called

24     Circle K International.  What is that?

25                PROSPECTIVE JUROR:  You might be familiar with
```

JURY SELECTION                                      38

1   Quantas International, the collegiate level of that

2   organization.  It's a community service group.

3               THE COURT:  What kind of things did you do in

4   connection with your membership?

5               PROSPECTIVE JUROR:  A lot of the work was done with

6   a local nature conservancy.  But really the club as a whole is

7   that you could pick any project, doing any kind of service

8   within that community.

9               THE COURT:  What other kind of things do you like to

10  do in your spare time?

11              PROSPECTIVE JUROR:  I like to go camping and hike,

12  get out of the city as much as possible.  And I like to

13  crafting and scrapbooking, something I use to do with my mom a

14  lot so I still do that kind of stuff.

15              THE COURT:  I want to clarify, I think I know the

16  answer but I want to be doubly sure.  In one of the questions

17  I think you misread one of the questions.  It was whether you

18  would be able to listen to other people's opinions on the

19  jury.  I think it looks to me you said yes, but I want to make

20  sure.

21              PROSPECTIVE JUROR:  I accidently hit the wrong

22  button as I was going through the questions. Yes.

23              THE COURT:  It happens.  A couple of additional

24  questions.  I'm going to ask if you are familiar with any of

25  these people, Evangeline ███████.

JURY SELECTION                                        39

1           PROSPECTIVE JUROR:  No.

2           THE COURT:  Michael Trimarco.

3           PROSPECTIVE JUROR:  No.

4           THE COURT:  And Courtenay Wilson.

5           PROSPECTIVE JUROR:  No.

6           THE COURT:  It may be during the course of the case

7    you hear testimony or see some exhibits that have to do with

8    sexual activity between people of the same sex.  Anything

9    about that evidence that would affect your ability to be fair

10   and impartial?

11          PROSPECTIVE JUROR:  No.  I have a same sex partner.

12          THE COURT:  And I did just go over some these

13   principles with you in the group, but I want to make doubly

14   sure about them.  As I explained to you in the larger group,

15   and I think it's in the questionnaire as well, Mr. Kelly is

16   presumed to be innocent.  And the Government has to prove his

17   guilt beyond a reasonable doubt.  I'll talk to you about

18   those, what that means at a more appropriate time, or at the

19   appropriate time and give you the details of what the law is.

20   But is there any reason that you couldn't follow that

21   instruction on the law?

22          PROSPECTIVE JUROR:  No, there is no reason.

23          THE COURT:  Just as a general matter, any reason why

24   you wouldn't be able to follow all of my instructions on the

25   law?

GA0367

JURY SELECTION                                    40

1              PROSPECTIVE JUROR:  No.

2              THE COURT:  The other thing is, as I explained but

3     it's just extremely important, that you can't look anything up

4     having to do with the case at all.  Any problem following that

5     directive?

6              PROSPECTIVE JUROR:  No.

7              THE COURT:  And obviously you can't talk to anybody

8     about the case, even at this stage.  Okay?

9              PROSPECTIVE JUROR:  Uh-huh.

10              THE COURT:  Anybody have any additional questions

11     for this juror?

12              MR. CANNICK:  May we?

13              (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

GA0368

SIDEBAR CONFERENCE                    41

1            (Sidebar conference.)

2            THE COURT:  What is the question?

3            MR. CANNICK:  Her response to question 91, that was

4    told to me to follow up on that.

5            THE COURT:  It has to do with the answer to the Me

6    Too movement.

7            MR. CANNICK:  Let me ask Nicole what specifically

8    she wants to ask.

9            THE COURT:  Why don't you consult with her.

10           MR. CANNICK:  If she has been a participant or a

11   follower of the Me Too movement.

12           And 101, if she's being paid by her employer.

13           (End of sidebar conference.)

14           (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

JURY SELECTION                                   42

```
 1                (In open court.)

 2                THE COURT:  A couple of additional questions.  Do

 3    you know whether or not your employer will compensate you for

 4    your jury service?

 5                PROSPECTIVE JUROR:  I double checked, I will be

 6    compensated.

 7                THE COURT:  In one of the questions asked, it asked

 8    about the Me Too movement.  Have you ever done any direct

 9    participation any advocacy for the Me Too movement?

10                PROSPECTIVE JUROR:  I have not.

11                THE COURT:  I think that is it.  This is juror

12    number 11.

13                (Prospective juror exits.)

14                THE COURT:  I think I have neglected to put the

15    numbers of the different jurors on the record.  I'm going to

16    do it now.

17                The first juror was juror number two, then we did

18    juror number seven, this was juror number 11, and our next

19    juror will be juror number 12.

20                (Prospective juror enters.)

21                THE COURT:  So this is juror number 12.  Good

22    morning.

23                PROSPECTIVE JUROR:  Good morning.

24                THE COURT:  How are you doing?

25                PROSPECTIVE JUROR:  I'm good.
```

JURY SELECTION                                    43

1          THE COURT:  I know you filled out your

2   questionnaire, I have a couple of additional questions to

3   clarify.  You said you're currently looking for work; is that

4   right?

5          PROSPECTIVE JUROR:  I'm actually waiting to hear

6   from my employer, because I work in a hotel.  And so they are

7   not at full capacity so I'm just waiting to see if, when it

8   is, or hopefully it is that they will call me and ask for me

9   to come work again.

10          THE COURT:  What kind of work -- don't tell us,

11   again in general, don't tell us anything that would identify

12   where you work or anything like that, but what kind of work do

13   you do at the hotel?

14          PROSPECTIVE JUROR:  I work as a guest service agent,

15   just helping the guests.

16          THE COURT:  Okay.  Obviously this is going to be a

17   time commitment for this trial, will your employer compensate

18   you if you're selected as a juror?

19          PROSPECTIVE JUROR:  I believe, yes.

20          THE COURT:  You don't know when you would hear one

21   way or the other?

22          PROSPECTIVE JUROR:  I was going to give them a call

23   after the trial.

24          THE COURT:  That's fine.  Then it's not a problem

25   for you; is that right?

JURY SELECTION                                      44

```
 1              PROSPECTIVE JUROR:  No.

 2              THE COURT:  Good to know.  One of your hobbies is

 3   film making.  Any particular kind of film that you like to

 4   focus on?

 5              PROSPECTIVE JUROR:  Just like, my particular genre

 6   is sci-fi, fantasy, horror.

 7              THE COURT:  Have you made any?

 8              PROSPECTIVE JUROR:  I did a few video editing, but

 9   just like from like video games; I just took footage and tried

10   to edit it.

11              THE COURT:  I see.  I'm going to ask you about a

12   couple of names to see if you know any of these people.

13   Michael Trimarco.

14              PROSPECTIVE JUROR:  No.

15              THE COURT:  Evangeline ███████.

16              PROSPECTIVE JUROR:  No.

17              THE COURT:  And Courtenay Wilson.

18              PROSPECTIVE JUROR:  No.

19              THE COURT:  One thing that may happen during the

20   course of this trial is you might hear testimony or see

21   exhibits that are related to sexual activity between people of

22   the same sex.  Anything about that kind of evidence that would

23   affect your ability to be a fair and impartial?

24              PROSPECTIVE JUROR:  No.

25              THE COURT:  Let me just check, I have a couple of
```

GA0372

JURY SELECTION                                    45

1   other things to talk to you about, I just want to check with

2   counsel to see if there is any question that they want to put

3   the juror.

4              MS.  GEDDES:  No, your Honor.

5              MR. CANNICK:  Your Honor, may we?

6              THE COURT:  Sure.

7              (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                                    46

 1              (Sidebar conference.)

 2              MR. CANNICK:  I think his response to number 64, he

 3     was involved in a prior trial as a juror.

 4              PROSPECTIVE JUROR:  Yes.

 5              MR. CANNICK:  Could you find out if that was a

 6     RICO case; and two, whether or not he'd be able to forget --

 7              THE COURT:  State court case.  There is no RICO.

 8     It's it looks like a drug trafficking, state court.

 9              MR. CANNICK:  Right.  But could he forget what he

10     was instructed by the judge in that case and accept your

11     instructions on the law here.

12              THE COURT:  I just want to make sure I understand.

13     It's a drug trafficking case.  Is there a state RICO?

14              MR. CANNICK:  Not that I'm aware of.

15              MS.  GEDDES:  There is a state RICO crime but --

16              MR. CANNICK:  It's not for drugs.

17              THE COURT:  That would be confusing.

18              MR. CANNICK:  Just as long as he doesn't bring the

19     law from the state court.

20              THE COURT:  From the drug case.

21              MR. CANNICK:  From any case any --

22              THE COURT:  I'll do that.

23              (End of sidebar conference.)

24              (Continued on the next page.)

25

JURY SELECTION                                    47

1          (In open court.)

2          THE COURT:  You had been a juror before, haven't

3     you?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  A lot different, isn't it?

6          PROSPECTIVE JUROR:  It is.

7          THE COURT:  How long ago was that?

8          PROSPECTIVE JUROR:  I can't recall, but definitely a

9     few years ago.  I would say maybe like three or four.

10          THE COURT:  I think that was in state court as well,

11     right?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Obviously, I'm sure you moved on from

14     that case.  But obviously, any instructions you heard on that

15     case wouldn't apply to this case.

16          PROSPECTIVE JUROR:  No.

17          THE COURT:  Let me go over a couple of other things.

18     These are things that we talked about in the big room but I

19     want to make sure that you can follow these rules.  The first

20     rule has to do with the presumption of innocence.  Mr. Kelly

21     is presumed to be innocent and the Government has to prove his

22     guilt beyond a reasonable doubt.  I'll explain what those

23     things mean at the appropriate time, but is there any reason

24     why you couldn't follow that instruction?

25          PROSPECTIVE JUROR:  No.

1           THE COURT:  Also instructions I give that you have

2    to follow.  Any reason you couldn't do that?

3           PROSPECTIVE JUROR:  No.

4           THE COURT:  Also you can't research anything having

5    to do with the case, which I'm sure is a temptation for

6    everybody, but you just can't do it.  Do you promise that

7    you'll follow that instruction?

8           PROSPECTIVE JUROR:  Yes.

9           THE COURT:  Is there any reason why you couldn't

10   give both sides a fair and impartial trial?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  Thank you so much.

13          (Prospective juror exits.)

14          MS.  GEDDES:  This particular juror did not answer

15   many of the questions, but also said that there is something

16   he wanted to speak to you privately about.  It might make

17   sense to start with that.

18          THE COURT:  To be clear, we're talking about juror

19   number 15.

20          MS.  GEDDES:  That's correct.

21          Your Honor, we also have printed copies of those

22   names if it would be easier to just show the jurors rather

23   than reading it.  It's up to you.

24          THE COURT:  I think it's easier for me to say it.

25          (Prospective juror enters.)

GA0376

JURY SELECTION                                    49

1

2             THE COURT:  This is juror number 15.

3             Good morning.  How are you doing?

4             PROSPECTIVE JUROR:  I'm fine.  Thank you.

5             THE COURT:  I'm going to start with in your

6    questionnaire you indicated that you wanted to discuss

7    something privately.  What is it that you wanted to say?  We

8    can also do that -- if it's something you want to discuss in

9    private, let's do it at the side.  We can do it over here.

10            (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                                    50

1              (Sidebar conference with Juror 15.)

2              THE COURT:  What did you want to talk to us about

3    privately?

4              PROSPECTIVE JUROR:  The case?

5              THE COURT:  On the questionnaire there is a question

6    that says:  Do you want to speak to the judge and the lawyers

7    privately about anything.  You said yes.  Maybe you don't want

8    to?  I don't know.

9              PROSPECTIVE JUROR:  Actually, I don't know.

10             THE COURT:  Okay.  Sometimes we fill these things

11   out by mistake.  Don't worry about it have a seat.

12             PROSPECTIVE JUROR:  I'm not a good speaker.  Is this

13   a problem?  You ask question, and I give you answer.

14             THE COURT:  Do you have trouble speaking English and

15   understanding English?

16             PROSPECTIVE JUROR:  A little bit.

17             THE COURT:  Do you think that would be a problem for

18   you sitting as a juror in this case?

19             PROSPECTIVE JUROR:  Actually I guess it's after that

20   I can understand and speak it.

21             THE COURT:  Only you can tell us, okay.  I can't

22   judge from listening to you.  If it's something that you makes

23   you uncomfortable, let me know.  What do you think?

24             PROSPECTIVE JUROR:  Maybe uncomfortable.

25             THE COURT:  Okay.  That happens a lot.  Nothing to

GA0378

SIDEBAR CONFERENCE                                        51

1    worry about.

2             Let me just see with the lawyers, are we okay to

3    excuse the juror?

4             MR. CANNICK:  Yes.

5             MS.  GEDDES:  Yes.

6             THE COURT:  Thank you for participating.

7             (Prospective juror exits.)

8             (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GA0379

JURY SELECTION                    52

```
1              (Prospective juror enters.)

2              THE COURT:  Good morning.  This is Juror No. 16.  I

3    just have a couple of additional questions for based on your

4    questionnaire.  So, you tell us that you are retired; is that

5    right?

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  What kind of work did you do before you

8    were retired?

9              PROSPECTIVE JUROR:  I was an administrator at a

10   nonprofit.

11             THE COURT:  How long did you have that job for?

12             PROSPECTIVE JUROR:  In nonprofits?

13             THE COURT:  Yes.

14             PROSPECTIVE JUROR:  Because I did change jobs.  26

15   years.

16             THE COURT:  And before that, is it correct that you

17   did administrative type work?

18             PROSPECTIVE JUROR:  It's all administrative.

19             THE COURT:  And I guess before the nonprofit it was

20   in some other capacity; is that right?

21             PROSPECTIVE JUROR:  I don't understand.

22             THE COURT:  So you said before you did the

23   nonprofit?

24             PROSPECTIVE JUROR:  I've always been an admin.

25             THE COURT:  I see, okay.  I am going to ask you a
```

SIDEBAR CONFERENCE                                          53

1    couple of additional questions that weren't on the

2    questionnaire.  The first question is whether you are familiar

3    with the following people:  Evangeline ███████?

4              PROSPECTIVE JUROR:  No.

5              THE COURT:  Michael Trimarco?

6              PROSPECTIVE JUROR:  No.

7              THE COURT:  Courtenay Wilson?

8              PROSPECTIVE JUROR:  No.

9              THE COURT:  It may be that during the course of this

10   trial you may hear testimony or see exhibits that may relate

11   to sexual activity of people of the same sex.  Anything about

12   that that would prevent you from being fair and impartial to

13   both sides?

14             PROSPECTIVE JUROR:  No.

15             THE COURT:  I have a couple of additional questions

16   but I want to ask both sides if there's anything further to

17   ask you.

18             Anything further.

19             MS. GEDDES:  No, Your Honor.

20             MR. CANNICK:  May we have a sidebar?

21                  THE COURT:  Sure.

22             (Sidebar held outside of the hearing of the jury.)

23             (Continued on the next page.)

24

25

*SN        RPR        OCR*

GA0381

SIDEBAR CONFERENCE                    54

1            (The following sidebar took place outside the

2    hearing of the jury.)

3            MR. CANNICK:  To question 32 she indicated her

4    opinion of Mr. Kelly was somewhat negative.

5            THE COURT:  So I will clear that up.

6            (Sidebar ends.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*SN        RPR        OCR*

GA0382

JURY SELECTION                                         55

1              (In open court; Jury present.)

2              THE COURT:  All right, in the questionnaire there

3    are a couple of questions about this case and your familiarity

4    with the case and you side that you had a somewhat negative

5    impression of Mr. Kelly based on the description of the

6    charges.  You also said that you understood thoroughly the

7    concept of innocent until proven guilty.  Will you be able to

8    follow that instruction that Mr. Kelly is presumed to be

9    innocent no matter what the charges are?

10             PROSPECTIVE JUROR:  Yeah.

11             THE COURT:  Okay.  And it's just an extension of

12   what I said in the larger room, that the fact that somebody is

13   charged with something is not proof of guilt.  That's the

14   reason why we have trials which I think --

15             PROSPECTIVE JUROR:  Can I expand on that a little

16   bit?

17             THE COURT:  Sure.

18             PROSPECTIVE JUROR:  The charges in general is what I

19   have a negative opinion of.

20             THE COURT:  Nobody is asking any juror to endorse

21   the conduct that's charged.  The question is whether given the

22   nature of the charges you can give both sides a fair trial.

23             PROSPECTIVE JUROR:  Yes, I can.

24             THE COURT:  Okay.  That's an instruction that I will

25   give you, the presumption of innocence; that it's the

JURY SELECTION                                           56

1    Government that has the burden of proving Mr. Kelly's guilt

2    beyond a reasonable doubt and of course if you are selected as

3    a juror in this case, I will give you an instruction on those

4    concepts at the appropriate time.  In general, a juror is

5    obligated to follow the Judge's instructions on the law even

6    if the juror doesn't agree with them.  Any problem following

7    that rule?

8              PROSPECTIVE JUROR:  No.

9              THE COURT:  Another thing is you can't look anything

10   up about the case.  You can't do any research.  You can't talk

11   to anybody about your experience as a juror.  Any difficulty

12   following those rules?

13             PROSPECTIVE JUROR:  No, I actually don't follow much

14   local news.

15             THE COURT:  Well, and you know sometimes people are

16   tempted to look things, up but you won't do that either; is

17   that right?

18             PROSPECTIVE JUROR:  No.

19             THE COURT:  Any reason why you couldn't give both

20   side a fair trial in this case?

21             PROSPECTIVE JUROR:  No.

22             THE COURT:  Thank you so much.

23             MR. CANNICK:  May we have a sidebar, Your Honor?

24             (Sidebar held outside of the hearing of the jury.)

25

GA0384

SIDEBAR CONFERENCE                                    57

1              (The following sidebar took place outside the

2      hearing of the jury.)

3              MR. CANNICK:  Did you ask her about the same sex

4      question?

5              THE COURT:  Yes, at the beginning.

6              MR. CANNICK:  And, lastly, did you find out what

7      type of work the nonprofit was involved in?

8              THE COURT:  I can ask.

9              (Sidebar ends.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    *SN        RPR        OCR*

JURY SELECTION                                              58

1          (In open court; Jury present.)

2          THE COURT:  One other question.  What is the kind of

3  work that the nonprofit do?

4          PROSPECTIVE JUROR:  It was human rights.

5          THE COURT:  In any particular area?

6          PROSPECTIVE JUROR:  I was the administrator to the

7  director.

8          THE COURT:  But when you say human right that covers

9  a fairly broad topic.  Did it have a particular focus?

10         PROSPECTIVE JUROR:  Do you want the organization?

11         THE COURT:  No, what were the goals?  Were they

12  international human rights.

13         PROSPECTIVE JUROR:  Both international and domestic

14  human right.

15         THE COURT:  All right.  Thank you so much.

16         (Prospective juror exits.)

17         (Prospective juror enters.)

18         THE COURT:  All right, this is Juror No. 25.  Good

19  morning.

20         THE DEFENDANT:  Good morning, Your Honor.

21         THE COURT:  How are you doing today?

22         PROSPECTIVE JUROR:  I'm okay.

23         THE COURT:  Good, good.  I have a couple of

24  additional questions.  I know you filled out the

25  questionnaire.  One of the questions asked whether you or

JURY SELECTION                                    59

1    anyone close to you has ever had either a positive or negative

2    experience involving the police or any law enforcement agency.

3    I know you have had -- you've had your share of experiences?

4              PROSPECTIVE JUROR:  Of course.

5              THE COURT:  Anything about those experiences that

6    had you form an opinion about law enforcement, positive or

7    negative?

8              PROSPECTIVE JUROR:  I'm not biased against law

9    enforcement if that's what you want to know.  I'm biased

10   against people in law enforcement that do these things.

11             THE COURT:  In your personal experience, did you

12   have, in your interactions, say when you were the victim of a

13   crime, did you have any negative or positive experience either

14   with the officer who interviewed you or to the extent there

15   was any prosecutor involved.

16             PROSPECTIVE JUROR:  I've had both negative and

17   positive experiences.  Good people are people.  Good people,

18   bad people.  There's bad everywhere.

19             THE COURT:  All right.  Given the things that

20   have -- you were -- even though these things happened some

21   time ago, they stick with you and despite all the things that

22   have happened to you it sound like you can judge people on

23   their own merit; is that right?

24             PROSPECTIVE JUROR:  That's correct.

25             THE COURT:  And that these past experiences won't --

GA0387

1              PROSPECTIVE JUROR:  They won't cloud my judgment if

2      that's what you're asking me, Your Honor.

3              THE COURT:  You said that much better than I did.

4      Thank you very much.  I have a couple of just sort of general

5      things to talk to you about but I do want to check with the

6      lawyers to see if they have something else that they want me

7      to put to you.  So hold on for just a moment.

8              PROSPECTIVE JUROR:  Okay.

9              THE COURT:  While we are waiting for that.  I'm

10     assuming the schedule is okay with you; is that right?

11             PROSPECTIVE JUROR:  It's fine.

12             THE COURT:  Okay.

13             (Sidebar held outside of the hearing of the jury.)

14

15

16

17

18

19

20

21

22

23

24

25

GA0388

SIDEBAR CONFERENCE                              61

1          (The following sidebar took place outside the

2    hearing of the jury.)

3          MS. GEDDES:  Your Honor, he answered the question

4    that he's not biased against law enforcement but he's biased

5    against people in law enforcement.

6          THE COURT:  He said he's biased against the people

7    who do these things.

8          MS. GEDDES:  I want to be sure that that does not

9    extend to prosecutors.

10         THE COURT:  I can ask him more questions about it if

11   you want, but he did say he judges people on their own merit.

12   I will ask again if you want to be sure.  It's completely

13   fine.

14         MS. GEDDES:  I agree that I think he was talking

15   about the people in his particular incident.

16         MR. CANNICK:  The question was left off about the

17   same sex.

18         THE COURT:  I've got too many pieces of paper.

19   Thank you for reminding me.

20         (Sidebar ends.)

21

22

23

24

25

                    *SN*      *RPR*      *OCR*

GA0389

JURY SELECTION                                    62

1          (In open court; Jury present.)

2          THE COURT:  Bear with me for just a second.

3          PROSPECTIVE JUROR:  Sure, sure.

4          THE COURT:  The evidence in this case may involve

5    testimony either by witnesses or exhibits that have to do with

6    sexual activity between people of the same sex.  Anything

7    about that evidence that would affect your ability to be a

8    fair and impartial juror in this case?

9          PROSPECTIVE JUROR:  Absolutely not.

10         THE COURT:  Are you familiar or have you heard of

11   any of the follow people:  Courtenay Wilson, Michael Trimarco

12   and Evangeline ████████?

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  And to clarify you've seen a lot in

15   terms of your interactions with law enforcement.  Do I

16   understand you correctly to say that you are judging people as

17   individuals and not on whether they work for the prosecutor's

18   office or --

19         PROSPECTIVE JUROR:  Yes, individuals.

20         THE COURT:  I just wanted to double check to make

21   sure that that was true.

22         PROSPECTIVE JUROR:  No problem.

23         THE COURT:  We talked about this in the larger room

24   but I wanted to clarify a couple of things.  The first has to

25   do with a presumption of innocence.  Mr. Kelly is presumed

JURY SELECTION                                                    63

1    innocent and it is the Government that has the burden of

2    proving his guilt beyond a reasonable doubt.  If you are

3    selected as a juror I will explain what those terms mean in

4    more detail but is there any reason you can't follow that

5    instruction?

6             PROSPECTIVE JUROR:  No reason at all.

7             THE COURT:  Just generally, a juror is required to

8    follow the Judge's instructions on the law.  Any reason why

9    you wouldn't be able to follow my instruments on the law?

10            PROSPECTIVE JUROR:  No, I'm a stickler for the law

11   on my job.  I'm the rule guy.

12            THE COURT:  I'm the rule guy here?

13            PROSPECTIVE JUROR:  Yes.

14            THE COURT:  The other thing is, as I said in the

15   larger room, that you may not look up anything about the case

16   at all, research anything, research the law, read any

17   articles, look up the people in the case.  Any reason why you

18   couldn't follow that instruction?

19            PROSPECTIVE JUROR:  There's no reason at all.

20            THE COURT:  Is there any reason at all why you

21   wouldn't be able to give both sides a fair trial?

22            PROSPECTIVE JUROR:  No.

23            THE COURT:  And just another caution; I'm just going

24   to remind you not to speak to anybody about this process

25   either, okay?

GA0391

JURY SELECTION                                    64

1           PROSPECTIVE JUROR:  Okay.

2           THE COURT:  Thank you so much?

3           PROSPECTIVE JUROR:  Thank you, Your Honor.

4           (Prospective juror exits.)

5           (Prospective juror enters.)

6           THE COURT:  Is this Juror No. 38?

7           THE COURTROOM DEPUTY:  Yes.

8           PROSPECTIVE JUROR:  Good afternoon.

9           THE COURT:  Time flies?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  How are you doing this morning?

12          PROSPECTIVE JUROR:  Good, thank God.

13          THE COURT:  All right.  One question that I have for

14   you just in terms of the trial itself, you expressed some

15   concern about serving on a case for this period of time.  Is

16   there any reason why -- jury service is obviously a burden for

17   everyone, but if you're selected as a juror in this case, you

18   know what the time commitment is, are you going to be able to

19   do that?

20          PROSPECTIVE JUROR:  Actually I'm a day trader too.

21   I do day trading and my I use margin money for my company.  So

22   if I'm in the case I think at the end of the trial I have to

23   file bankruptcy.

24          THE COURT:  I take it that would obviously be a

25   distraction for you?

GA0392

JURY SELECTION                                             65

1        PROSPECTIVE JUROR:  No.  I'm not doing the activity.

2   I'm not buying or selling anything.

3        THE COURT:  What I'm saying is if you're not doing

4   your day trading, would that make it hard for you to

5   concentrate on this case?

6        PROSPECTIVE JUROR:  If I'm here I'm not doing any

7   day trading.

8        THE COURT:  Any issue with excusing this juror?

9        MR. CANNICK:  Not from us Your Honor.

10       MS. GEDDES:  Nor from the Government.

11       THE COURT:  I am going to excuse you as a juror.  It

12  doesn't mean you won't get picked for another jury but I think

13  this is probably not the case for you.

14       PROSPECTIVE JUROR:  Sorry.

15       THE COURT:  No need to apologize.

16       PROSPECTIVE JUROR:  Thank you very much.  .

17       (Prospective juror exits.)

18       (Prospective juror enters.)

19       THE COURT:  Good afternoon.  This is Juror No. 45,

20  is that correct?

21       PROSPECTIVE JUROR:  Yes.

22       THE COURT:  All right.  I know you filled out the

23  questionnaire.  I am just going to ask you a couple of

24  additional questions based on your answers.  You wrote in the

25  questionnaire that you weren't certain if you would be paid

GA0393

JURY SELECTION                                              66

1   for jury duty.  Have you found out the answer to that

2   question?

3              PROSPECTIVE JUROR:  No, I didn't.

4              THE COURT:  You didn't?

5              PROSPECTIVE JUROR:  I didn't ask.

6              THE COURT:  You didn't ask?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  If you were to find out that your

9   employer didn't pay you, would that be a hardship for you?

10             PROSPECTIVE JUROR:  You said it's four weeks, right?

11             THE COURT:  Yes.

12             THE WITNESS:  Yes.

13             THE COURT:  You're willing to serve even if they

14  don't?

15             PROSPECTIVE JUROR:  If I have to.

16             THE COURT:  I want to make sure we can hear you.

17             PROSPECTIVE JUROR:  Sorry.

18             THE COURT:  Better, thank you.  I was curious what

19  you did in your spare time to the extent that you have

20  anything?

21             PROSPECTIVE JUROR:  Currently, I'm not doing

22  anything I'm at home because with the pandemic I don't expose

23  myself anywhere but I'm home.

24             THE COURT:  Are you working from home?

25             PROSPECTIVE JUROR:  Yes.

GA0394

JURY SELECTION                                      67

1          THE COURT:  Are you still caring for an elderly

2    relative as well.

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  Do you like to watch television or read

5    or anything like that.

6          PROSPECTIVE JUROR:  I do.

7          THE COURT:  And you said in one of the answers to

8    the questions you said that you might have heard something

9    about this case and about the allegations in the case; is that

10   correct?

11         PROSPECTIVE JUROR:  Correct.

12         THE COURT:  Would you be able to put aside whatever

13   you heard and just judge the case on its own merit?

14         PROSPECTIVE JUROR:  Sure.

15         THE COURT:  And just judge it based on what you hear

16   in the courtroom?

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  And not based on anything you heard

19   somewhere else, you can do that?

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  And then I'm going to ask you about a

22   couple of names whether you are familiar with any of these

23   three people.  The first is Evangeline █████████?

24         Do you know that person?

25         PROSPECTIVE JUROR:  No.

GA0395

JURY SELECTION                                    68

1            THE COURT:  Michael Trimarco?

2            PROSPECTIVE JUROR:  No.

3            THE COURT:  And Courtenay Wilson?

4            PROSPECTIVE JUROR:  No.

5            THE COURT:  In this case you may hear some testimony

6   or see some exhibits that have to do with sexual activity

7   between people of the same sex.  Anything about that kind of

8   evidence that would make it hard for you to be a fair and

9   impartial juror?

10           PROSPECTIVE JUROR:  No.

11           THE COURT:  I want to check with the lawyers to see

12  if they have additional questions to put to you.

13           Counsel.

14           MS. GEDDES:  Not from the Government.

15           MR. CANNICK:  Nothing here.

16           THE COURT:  All right.  And then I just want to

17  review a couple of things with you that we discussed in the

18  larger courtroom.  The first has to do with the presumption of

19  innocence.  Mr. Kelly is presumed to be innocent and it's the

20  Government that has the burden of proving he is guilty beyond

21  a reasonable doubt.  If you are selected as a juror in this

22  case I will give you detailed instructions on that law, but is

23  there any reason why you wouldn't be able to follow that

24  instruction?

25           PROSPECTIVE JUROR:  No, ma'am.

JURY SELECTION                                                 69

```
 1                THE COURT:  Okay.  And is there any reason why you
 2      wouldn't be able to follow all of my instructions on the law?
 3                PROSPECTIVE JUROR:  No, ma'am.
 4                THE COURT:  And the other thing about the case is
 5      that you can't look anything up or read any articles about it,
 6      watch anything about it on the television or anything like
 7      that.  Will you be able to follow that instruction?
 8                PROSPECTIVE JUROR:  Yes.
 9                THE COURT:  Okay.  And is there any reason that you
10      can think of why you couldn't give both sides a fair trial in
11      this case?
12                PROSPECTIVE JUROR:  No.
13                THE COURT:  Thank you so much?
14                PROSPECTIVE JUROR:  Thank you.
15                (Prospective juror exits.)
16                (Prospective juror enters.)
17                THE COURT:  And this is Juror No. 49?
18                PROSPECTIVE JUROR:  Yes, sir.
19                THE COURT:  How are you?
20                PROSPECTIVE JUROR:  Fine, thank you.
21                THE COURT:  I have a couple of questions about your
22      questionnaire and some additional questions as well.  You are
23      not currently employed; is that right?
24                PROSPECTIVE JUROR:  Yes.
25                THE COURT:  And are you -- and you're not looking
```

JURY SELECTION                                    70

```
 1   for work at the moment?

 2           PROSPECTIVE JUROR:  I'm planning to become a

 3   freelancer.  So I'm in between.

 4           THE COURT:  I see.  What kind of work are you going

 5   to do?

 6           PROSPECTIVE JUROR:  Mainly illustration.

 7           THE COURT:  Yes.  For what kinds of things, for

 8   publications?

 9           PROSPECTIVE JUROR:  No, I would say for fashion,

10   culture.

11           THE COURT:  You're a graphic artist?

12           PROSPECTIVE JUROR:  Illustrator.

13           THE COURT:  Okay.  And in your spare time you like

14   to do art-related things as well.  What else do you like to do

15   in your spare time?

16           PROSPECTIVE JUROR:  Just YouTube.  I stay mainly

17   home doing illustration these days.

18           THE COURT:  Okay, all right and in addition to what

19   was in the questionnaire I want to talk to you about a couple

20   of different things.  The first is I'm going to give you three

21   names and ask if you know them.  They're in addition to that

22   list you have on that questionnaire.  Evangeline ████████?

23           PROSPECTIVE JUROR:  No.

24           THE COURT:  Michael Trimarco?

25           PROSPECTIVE JUROR:  No.
```

*SN        RPR        OCR*

GA0398

JURY SELECTION                                          71

1              THE COURT:  Courtenay Wilson?

2              PROSPECTIVE JUROR:  No.

3              THE COURT:  Another thing about the case is that you

4     will hear some testimony or see some exhibits that relate to

5     sexual activity between people of the same sex.  Anything

6     about that kind of evidence that would make it hard for you to

7     be fair and impartial in this case?

8              PROSPECTIVE JUROR:  Sort of.  You mean homosexual?

9              THE COURT:  Yes.

10             PROSPECTIVE JUROR:  No.  I'm mainly raised as a

11    Christian when I was young so I would have some difficulty

12    accepting, but as an artist I'm kind of impartial but, you

13    know, I'm in between.

14             THE COURT:  I see.

15             Any difficulty excusing this gentleman?

16             MR. CANNICK:  No, Your Honor.

17             MS. GEDDES:  No, Your Honor.

18             THE COURT:  I think under the circumstances I'm

19    going to excuse you from this case.  Thank you for letting us

20    know.

21             PROSPECTIVE JUROR:  Sure.

22             (Prospective juror exits.)

23             (Prospective juror enters.)

24             MS. GEDDES:  Your Honor, could we address one thing

25    at the sidebar?

JURY SELECTION                                      72

1          THE COURT:  Sure, just let me talk to my law clerk

2   here.

3              (Sidebar held outside of the hearing of the jury.)

4              (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GA0400

SIDEBAR CONFERENCE                                73

1              (The following sidebar took place outside the

2     hearing of the jury.)

3              MS. GEDDES:  Is there an overflow room for this?

4              THE COURT:  Yes.

5              MS. GEDDES:  Could we show the jurors the names

6     because we were intending to keep that name Evangeline

7     ██████████?

8              THE COURT:  I did not know.

9              MS. GEDDES:  I apologize.  We filed a letter under

10    seal and then I lost track of the fact that this was an open

11    courtroom.

12             THE COURT:  Okay.

13             MS. GEDDES:  I think going forward would could --

14    could we move to seal the last name of that particular

15    individual?

16             THE COURT:  We'll black it out.

17             I have to have to find out how many more people are

18    for this morning.

19             (Sidebar ends.)

20             (Continued on the next page.)

21

22

23

24

25

*SN       RPR       OCR*

JURY SELECTION                                    74

1           (In open court; Jury present.)

2           THE COURT:  Ms. Greene, what number are we on here.

3           THE COURTROOM DEPUTY:  52.

4           THE COURT:  How are you doing?

5           PROSPECTIVE JUROR:  I'm going good.

6           THE COURT:  Good.  I have a couple of additional

7    questions and some questions that are based on your

8    questionnaire that you filled out.  The first thing I would

9    like to start with is you were uncertain about whether or not

10   any obligations that you had would interfere with your ability

11   to be a juror in this case.

12          PROSPECTIVE JUROR:  I've arranged things at work and

13   I'll be making an international trip after it's over, which I

14   will have to do at the last minute, but it's nothing

15   unworkable.

16          THE COURT:  You've rearranged your schedule for us?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  I have a couple of other questions based

19   on your questionnaire.  First, I think you had some thoughts

20   that maybe Mr. Kelly was the cartoonist?

21          PROSPECTIVE JUROR:  It was actually R. Crumb.  It's

22   a completely -- it's from 40 years ago.

23          THE COURT:  So we're clear on that.  You in your

24   spare time it sounds like you like to do a lot of traveling;

25   is that right?

GA0402

JURY SELECTION                                   75

1          PROSPECTIVE JUROR:  I have.  I have a boyfriend in

2   India so I've been there twice during the pandemic.  He will

3   be in Germany so I'm hoping to go to Europe when this is over.

4   I'm not a recreational traveler.  And I don't do it for work.

5          THE COURT:  And then you also said you had done some

6   work with American Civil Liberties Union?

7          PROSPECTIVE JUROR:  No, I just have a card.  I got

8   my card when Trump was elected.

9          THE COURT:  Is there anything else you like to do in

10  your spare time?  You say you crochet?

11         PROSPECTIVE JUROR:  A lot of things.  I do a lot of

12  sketching, I read, antiques.  I do all sorts of other things.

13         THE COURT:  I'm going to ask you a couple of other

14  questions.  I'm quite certain I know the answer to one of the

15  questions.  There's going to be testimony in this case

16  possibly or exhibits that have to do with sexual activity

17  between people of the same sex.  Any problem with evidence

18  relating to that.

19         PROSPECTIVE JUROR:  None whatsoever.

20         THE COURT:  And the other -- there are three

21  individuals whose names might be mentioned during the course

22  of the trial and I think --

23         Do you have a list of them?

24         MS. GEDDES:  I do, Your Honor.

25         THE COURT:  Give them to Ms. Greene.

GA0403

JURY SELECTION                          76

1          Look at these names and see if you recognize any of

2    them.

3          PROSPECTIVE JUROR:  I don't recognize them.

4          THE COURT:  Thank you so much.  Let me see if the

5    lawyers have additional questions that they want to put to

6    this prospective juror?

7          MR. CANNICK:  Yes.

8          (Sidebar held outside of the hearing of the jury.)

9          (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    77

1            (The following occurred at sidebar.)

2            MS. GEDDES:  As it relates to question number 32,

3    now that he knows it's not the cartoonist, does his answer

4    change.

5            THE COURT:  All right.

6            (Sidebar ends.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GA0405

1          (In open court; Jury present.)

2          THE COURT:  I am assuming that now that you know

3    we're not talking about the cartoonist, your answer doesn't

4    change does it?  Are you familiar at all with Mr. Kelly.

5          PROSPECTIVE JUROR:  I've heard the name and I've

6    seen news articles and every single time I had to remind

7    myself who it was.

8          THE COURT:  Anything that you've read that would

9    affect your ability to be fair and impartial in this case?

10         PROSPECTIVE JUROR:  Not that I know of.

11         THE COURT:  And obviously as I said in the larger

12   room, is that jurors base their decision not on something

13   they've read or heard about or read about in a news article or

14   anything like that.  You have to base your decision on the

15   evidence in this case.

16         PROSPECTIVE JUROR:  The evidence, testimony and your

17   instructions on the law.

18         THE COURT:  That's very good.  Obviously you have to

19   follow those instructions as well.  Finally, just a reminder

20   as I said in the larger room with the presumption of innocence

21   that it's the Government that has the burden of proving

22   Mr. Kelly's guilt beyond a reasonable doubt.

23         PROSPECTIVE JUROR:  Right.

24         THE COURT:  And he is presumed to be innocent.  No

25   trouble following that instruction; correct?

GA0406

JURY SELECTION                                    79

1          PROSPECTIVE JUROR:  No problem.

2          THE COURT:  Anything you could think of that would

3   affect your ability to be a fair and impartial juror?

4          PROSPECTIVE JUROR:  I'm having a little trouble

5   hearing.  I'm assuming if I had to get the volume turned up on

6   something I could do that.  I've heard everything.  It's taken

7   a little effort on a couple of occasions.

8          THE COURT:  I'm a low talker so I will keep that in

9   mind as well.

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  You've been able to hear everything; is

12   that right?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  Thank you so much.

15          PROSPECTIVE JUROR:  All right.

16          (Prospective juror exits.)

17          MS. GEDDES:  Your Honor, this is an individual who

18   failed to answer a majority of the questionnaire so there may

19   well be a language issue.

20          THE COURT:  Are we on number 53?

21          MS. GEDDES:  Sorry.

22          THE COURT:  Did you agree on this one or not?

23          MS. GEDDES:  I'm sorry, 53 I thought was not here.

24   No, no.  He was one of the ones who raised his hand and had an

25   issue.  So I think we're now on 57 if I'm following my sheet

                    *SN*      *RPR*      *OCR*

GA0407

JURY SELECTION                                    80

1  correctly and 57 is one who did not answer numerous questions

2  so there may be a language issue.

3           (Prospective juror enters.)

4           THE COURT:  Good afternoon.  How are you doing?

5           PROSPECTIVE JUROR:  Good.

6           THE COURT:  I want to make sure that that microphone

7  is on.  I'm having a little trouble hearing you.  I know we

8  have gone through your questionnaire.  I have a couple of

9  questions about some things that are in it.  The -- you are

10 working as a cashier now; is that correct.

11          PROSPECTIVE JUROR:  Yeah.

12          THE COURT:  Do you know if your employer will pay

13 you during -- if you become a juror?

14          PROSPECTIVE JUROR:  I'm not sure about that.

15          THE COURT:  Would that be a problem for you if you

16 weren't being paid?

17          PROSPECTIVE JUROR:  No.  Right now I'm on vacation.

18          THE COURT:  You're on vacation.  All right.  So the

19 trial is going to be about four weeks long.  Would you be able

20 to sit for that long?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  You don't think so?

23          PROSPECTIVE JUROR:  No, because my lower part of my

24 back, I can't sit long.

25          THE COURT:  You can't sit for a long time?

GA0408

JURY SELECTION                                    81

1              PROSPECTIVE JUROR:  No.

2              THE COURT:  I think the case is going to go on for

3    quite some time and I wouldn't want to make you uncomfortable

4    so I'm going to excuse you from this case.

5              PROSPECTIVE JUROR:  Okay.

6              THE COURT:  I hope your back feels better.

7              PROSPECTIVE JUROR:  Thank you.

8              (Prospective Juror exits.)

9              (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GA0409

JURY SELECTION                                    82

1              (Prospective Juror enters the courtroom.)

2              THE COURT:  Good afternoon.

3              THE PROSPECTIVE JUROR:  Good afternoon.

4              THE COURT:  How are you doing.

5              THE PROSPECTIVE JUROR:  I'm cold?

6              THE COURT:  Well, it's either feast or famine in

7    these courtrooms.  It's either really hot or really cold, so

8    sorry about that.

9              So I just have a couple of questions for you based

10   on your questionnaire.

11             I know you're still a student; is that right?

12             THE PROSPECTIVE JUROR:  Yes.

13             THE COURT:  But you're also working, correct?

14             THE PROSPECTIVE JUROR:  Yes.

15             THE COURT:  And you said in your questionnaire that

16   you weren't sure whether your employer would pay you while you

17   are on jury duty.

18             Do you know the answer to that question?

19             THE PROSPECTIVE JUROR:  Ah, I -- I don't think they

20   pay me, 'cause the last time I was here, they said they

21   wouldn't pay me for the Monday I missed.

22             THE COURT:  Oh, when you came here?

23             THE PROSPECTIVE JUROR:  Yeah.

24             THE COURT:  Let me ask you this.  Would that be a

25   problem for you if you didn't get paid while you were -- for

JURY SELECTION                                   83

1    the four weeks or so that you would be on jury duty?

2              THE PROSPECTIVE JUROR:  No, because I talked to them

3    about it and I think we can make a compromise later as far as

4    getting paid.  We still working it out.  But I'll fine, I'm

5    still a student.

6              THE COURT:  Okay, all right.  So that's not a

7    problem for you; is that right?

8              THE PROSPECTIVE JUROR:  Yes.

9              THE COURT:  I see.  Okay.

10             And you're studying engineering?

11             THE PROSPECTIVE JUROR:  Yes.

12             THE COURT:  What do you hope to do with your degree?

13             THE PROSPECTIVE JUROR:  I hope to be a mechanical

14   engineer, and right now I just want to work on, you know,

15   giving to the field and see some cool stuff, like, for

16   example, I heard mechanical engineers help build

17   rollercoasters.  So it's kind of interesting.

18             THE COURT:  You're still thinking about the kind of

19   work you'd like to do?

20             THE PROSPECTIVE JUROR:  Yes.

21             THE COURT:  I see.

22             Okay, there are a couple of additional questions.  I

23   think you have in front of you a list of names.

24             Do those names, any of those names look familiar to

25   you?

JURY SELECTION                                    84

1          THE PROSPECTIVE JUROR:  Not really.

2          THE COURT:  You don't know those people, that's my

3     question.

4          THE PROSPECTIVE JUROR:  No.

5          THE COURT:  Okay.  And the other thing I want to

6     speak to you about is some evidence you may hear during the

7     course of the trial.

8          There will be some evidence, whether it's testimony

9     or exhibits, that have to do with sexual actively between

10    people who are of the same sex.

11         Anything about that kind of evidence that would make

12    it hard for you to be fair and impartial in this case?

13         THE PROSPECTIVE JUROR:  Not at all.

14         THE COURT:  Okay.

15         Let me check with the lawyers to see if they have

16    any additional questions they want to put to you.

17         MS. GEDDES:  Yes, Your Honor.

18         (Continued on the next page.)

19         (Sidebar conference.)

20

21

22

23

24

25

GA0412

SIDEBAR CONFERENCE                    85

1           (The following occurred at sidebar.)

2           MS. GEDDES:  Your Honor, can you ask him when he

3    starts school and if misses being classes would that be an

4    issue for him?  That would put him too far behind?  I can't

5    totally tell if he is currently in school or.

6           THE COURT:  Okay.

7           (End of sidebar conference.)

8           (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

JURY SELECTION                                    86

1      THE COURT:  I should have asked you this before.
2  You're in school.  Are you going to -- when does school start
3  up again?
4      THE PROSPECTIVE JUROR:  The last week of August.  I
5  think that Wednesday.
6      THE COURT:  I see.  So are you going to school full
7  time?
8      THE PROSPECTIVE JUROR:  Part time.
9      THE COURT:  Okay.  Is that -- what's the schedule?
10  Is that going to interfere?
11      THE PROSPECTIVE JUROR:  I'm talking online classes.
12      THE COURT:  I see.  Can you do -- I'm old, so do
13  you -- can you do that at any time of the day?
14      THE PROSPECTIVE JUROR:  No, they have like certain
15  classes where I can meet a teacher during Zoom.
16      THE COURT:  Right.
17      THE PROSPECTIVE JUROR:  But they have like
18  recordings of the classes I can see.
19      THE COURT:  Okay.  So I just want to make sure, you
20  know, you're devoting so much of your time to being educated
21  in what sounds like a difficult field.  I don't want to set
22  you back because this is a full day here, 9:30 to 5:30 at
23  least four days a week.
24      Is that going to be a problem for you?
25      THE PROSPECTIVE JUROR:  Um -- since I have like --

JURY SELECTION                                    87

1    it's like 9:30 to 5:30, I can probably rearrange my classes,

2    because I haven't fully committed my schedule yet.

3            THE COURT:  Okay.  Well, you can let us know, too.

4    I don't want to interfere with your education, but once we get

5    started, we're starting.

6            THE PROSPECTIVE JUROR:  We're starting.

7            THE COURT:  So if you want to think about that and

8    let me know, that's fine, too.  I'm not trying to tell you

9    what to do, I just want to make sure that you -- that if

10   you're selected as a juror, we're not going to be able to go

11   back and say, you know, that you got to go to class.

12           You understand that?

13           THE PROSPECTIVE JUROR:  Okay.

14           THE COURT:  Okay.  So if you want to let me know

15   this afternoon or something like that, that's fine.

16           THE PROSPECTIVE JUROR:  Okay.

17           THE COURT:  Couple of other things I just want to

18   reaffirm with you.  We talked about this, it was in the

19   questionnaire, and it's also in the -- we talked about it in

20   the bigger room.

21           But what I want to talk to you about is the

22   preemption of innocence, and that Mr. Kelly is presumed to be

23   innocent, and that government has the burden of proving he's

24   guilty beyond a reasonable doubt.

25           If you are selected as a jury in this case, I'll

JURY SELECTION                                      88

1    give you further instructions about that at the appropriate

2    time.

3              But is there any reason you couldn't follow that

4    instruction?

5              THE PROSPECTIVE JUROR:  No.

6              THE COURT:  Okay.

7              Any reason that you wouldn't be able to follow all

8    of my instructions on the law?

9              THE PROSPECTIVE JUROR:  No.

10             THE COURT:  Okay.

11             Now the other thing is that you can't do any

12   research on the case at all.  You can't look anything up.

13   Read anything about it.  Either now or when the case starts,

14   when the case gets going.

15             Any difficulty following that instruction?

16             THE PROSPECTIVE JUROR:  Not at all.

17             THE COURT:  Okay.

18             And then I guess generally.  Is there any reason why

19   you couldn't be fair and impartial to both sides?

20             THE PROSPECTIVE JUROR:  No.

21             THE COURT:  Okay.

22             Okay, thank you so much.

23             THE PROSPECTIVE JUROR:  You're welcome.

24             (Prospective Juror exits the courtroom.)

25             (Prospective Juror enters the courtroom.)

JURY SELECTION                                89

```
 1              THE COURT:  Donna, I think we've excused this juror.

 2              THE COURTROOM DEPUTY:  65?

 3         Oh, you did sorry.

 4              THE COURT:  Sorry about that.

 5         Thank you much so have a good day.

 6         (Prospective Juror exits the courtroom.)

 7         (Potential Juror enters the courtroom.)

 8              THE COURT:  Juror 87?  Okay, great.

 9         Good afternoon.

10              THE PROSPECTIVE JUROR:  Hi.  Good afternoon.

11              THE COURT:  How are you today?

12              THE PROSPECTIVE JUROR:  I'm great.

13              THE COURT:  I'm okay.  Good.  I've gone through your

14    questionnaire, I have a couple of questions for you.

15         My first question is, are you going to be paid if

16    you're a juror in this case by your employer?

17              THE PROSPECTIVE JUROR:  I guess so.

18              THE COURT:  You guess so?

19              THE PROSPECTIVE JUROR:  Sure.

20              THE COURT:  So the reason I'm asking is that, you

21    know, it's a time about four weeks.

22              THE PROSPECTIVE JUROR:  Yes.

23              THE COURT:  Would that be a hardship for you if your

24    employer didn't pay you?

25              THE PROSPECTIVE JUROR:  It would be.
```

JURY SELECTION                                    90

```
1            THE COURT:  Is there a way you can find out?

2            THE PROSPECTIVE JUROR:  Yes, but I guess most likely

3   I would be getting paid because where I work.

4            THE COURT:  Okay.  So you think the kind of place

5   that you -- obviously, don't tell me what it is.

6            THE PROSPECTIVE JUROR:  Yes.

7            THE COURT:  I'm going to ask you a few more

8   questions, but I'm also going to ask you to confirm that

9   that's the case.

10            THE PROSPECTIVE JUROR:  Yes, I sure will.

11            THE COURT:  Okay, that's great.  Thank you so much.

12            THE PROSPECTIVE JUROR:  You're welcome.

13            THE COURT:  Now you say you like to cook in your

14   spare time.

15            THE PROSPECTIVE JUROR:  Yes.

16            THE COURT:  Anything in particular?

17            THE PROSPECTIVE JUROR:  Yes.  I love cooking curry

18   chicken, making roast beef.

19            THE COURT:  You're making me hungry.

20            THE PROSPECTIVE JUROR:  Chow mein.

21            THE COURT:  Anything else you like to do in your

22   spare time?

23            THE PROSPECTIVE JUROR:  Apart from cooking, I guess

24   I work so hard, I sleep.

25            THE COURT:  Yes, okay, all right.
```

1          And you said that you have some familiarity with

2    this case.  You've heard about it.

3          But are you able to put aside anything that you've

4    heard about the case and just judge it on the evidence that

5    you hear in the courtroom?

6          THE PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Okay.  And put aside all those other

8    things you might have heard.

9          THE PROSPECTIVE JUROR:  Yes.

10         THE COURT:  Okay.

11         Now I think -- is that piece of paper in the jury

12   box?

13         THE COURTROOM DEPUTY:  I gave it to her.

14         THE COURT:  There's some names on that piece of

15   paper.  Could you just look at those and tell me if you know

16   any of those people?

17         THE PROSPECTIVE JUROR:  None of them are familiar.

18         THE COURT:  Okay.  And the other thing is that in

19   this case they'll be either testimony and/or exhibits that

20   have to do with sexual activity between people of the same

21   sex.

22         Anything about that that would maybe it hard for you

23   to fair and impartial in this case?

24         THE PROSPECTIVE JUROR:  No.

25         THE COURT:  Okay.  Let me check with the lawyers to

JURY SELECTION                                                92

1   and see if they have any additional questions they want me to

2   ask you.

3             MS. GEDDES:  No, Your Honor.

4             MR. CANNICK:  No.

5             THE COURT:  Okay, great.  I just have a few other

6   things I want to talk to you about.

7             And we talked about some of these things in the big

8   room but I just want to go over them again.

9             The first has to do with the presumption of

10  innocence.  Mr. Kelly is presumed to be innocent, and it's the

11  government that has the burden of proving his guilt beyond a

12  reasonable doubt.

13            If you are selected as a juror in this case, I'll

14  talk to you about what that means at the appropriate time.

15            THE PROSPECTIVE JUROR:  Okay.

16            THE COURT:  But is there any reason you wouldn't be

17  able to follow that law?

18            THE PROSPECTIVE JUROR:  No.

19            THE COURT:  I'm not picking on you, but you seem

20  like you're hesitating a little bit.

21            THE PROSPECTIVE JUROR:  No, there wouldn't be no

22  reason that I wouldn't be able to.  Where I work, you have to

23  work...

24            THE COURT:  You have to?

25            THE PROSPECTIVE JUROR:  Where I work, we have to

JURY SELECTION                                          93

1    follow the order.

2                THE COURT:  Okay.  All right.  Well, that's an

3    important principle of criminal law, the presumption.

4                And you'll follow that?

5                THE PROSPECTIVE JUROR:  Yes.

6                THE COURT:  And I take it from what you said, you'll

7    also follow all of my instructions on the law?

8                THE PROSPECTIVE JUROR:  Yes.

9                THE COURT:  Okay.  The other thing is that you can't

10   look anything up about the case on the internet or --

11               THE PROSPECTIVE JUROR:  I know you made it clear.

12   Yes, nothing should be looked up.

13               THE COURT:  Can you follow that instruction?

14               THE PROSPECTIVE JUROR:  Yes.

15               THE COURT:  And is there any reason that you can

16   think of that you couldn't give both sides a fair trial in

17   this case?

18               THE PROSPECTIVE JUROR:  Well, as you mentioned,

19   according to when you listen, whatever you hear.  So I think

20   I'll give it a shot.

21               THE COURT:  All right.  So sometimes when I'm

22   instructing jurors, I tell them to think about it this way:

23   If you were flying on an airplane and you asked the pilot if

24   she could land the plain safely and she said "I think so," you

25   probably wouldn't want to be on that plane, correct?

GA0421

JURY SELECTION                                    94

1          THE PROSPECTIVE JUROR:  Right, because she's too

2   guessing.

3          THE COURT:  Yes.  This the same thing.  You have to

4   be absolutely certain that you can give both sides a fair

5   trial.

6          THE PROSPECTIVE JUROR:  Right.

7          THE COURT:  And if you can't do that, that's

8   completely fine, but we have to know about it.

9          THE PROSPECTIVE JUROR:  Yes.

10          THE COURT:  Any reason why you can't give both sides

11   a fair trial?

12          THE PROSPECTIVE JUROR:  I don't think so.

13          THE COURT:  I don't think so.

14          Okay.  But you have to be positive.

15          Can you be positive?

16          THE PROSPECTIVE JUROR:  Yes.

17          THE COURT:  You can?

18          THE PROSPECTIVE JUROR:  Yes.

19          THE COURT:  It's okay if you can't.

20          THE PROSPECTIVE JUROR:  Yes.

21          THE COURT:  You don't have to tell me that because

22   you think I want to hear it.

23          THE PROSPECTIVE JUROR:  Right.

24          THE COURT:  What I want to hear is how you actually

25   feel about it.

GA0422

JURY SELECTION                                          95

1           THE PROSPECTIVE JUROR:  Yeah, I think I can do that.

2           THE COURT:  Okay.  All right.  Thank you so much.

3    I'm going to --

4           Ms. Greene will take you...

5           THE PROSPECTIVE JUROR:  Thank you so much.

6           (Prospective Juror exits the courtroom.)

7           THE COURT:  So I don't know about you, but when

8    someone says they think they can do something in this context,

9    I don't think that's an unqualified assurance.  And I don't

10   know what the parties' position is on that.  I think I pushed

11   her pretty hard on it, and we still ended up with "I think

12   so."

13          Let me hear from the government, if you have a

14   position on that.

15          MS. GEDDES:  Your Honor, I think that she did

16   indicate that she was positive she could be fair.  It's almost

17   like a reflective at the end when she said "I think I can be

18   fair."

19          THE COURT:  Even after that wonderful speech about

20   landing the plane?

21          MS. GEDDES:  I'm not sure she totally understood.

22          THE COURT:  All right.  Well, I thought she did, but

23   it's up to you.

24          MR. SCHOLAR:  It's probably nothing is going to

25   happen, but we are going to agree with the government.

GA0423

JURY SELECTION                                    96

1          THE COURT:  Now is break for lunch.  And we still

2    have some to get through in this first group, so we'll resume

3    back in this room at 2:15.

4               (A recess was taken at 1:06 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GA0424

PROCEEDINGS 97

```
1              A F T E R N O O N   S E S S I O N

2           (Time noted:  2:25 p.m.)

3           (In open court.)

4           (Defendant enters the courtroom.)

5           THE COURTROOM DEPUTY:  All rise.

6           THE COURT:  Everybody can be seated.

7           (Prospective Juror enters the courtroom.)

8           THE COURT:  All right, this is Juror Number 88.

9           Good afternoon, sir.  How are you doing?

10          THE PROSPECTIVE JUROR:  Good.

11          THE COURT:  Good.  You know, I've been through your

12  questionnaires and there's one page that came at the very end

13  and think you missed it, so I just want to go over that with

14  you, if that's okay?

15          THE PROSPECTIVE JUROR:  Sure.  No problem.

16          THE COURT:  The first question is 98, but it asks

17  whether you would have any difficulty reading or speaking

18  English.

19          THE PROSPECTIVE JUROR:  No problem.

20          THE COURT:  Okay.  And do you wish to apply to the

21  court to be excused on the grounds that being a juror would be

22  a hardship?

23          THE PROSPECTIVE JUROR:  No.

24          THE COURT:  And do you have any obligations, whether

25  they're personal, professional, or family, that would
```

GA0425

1   seriously interfere with your ability to concentrate on the

2   case if you're selected as a juror?

3           THE PROSPECTIVE JUROR:  No.

4           THE COURT:  Does your employer pay you for the time

5   that you miss work as a result of jury service?

6           THE PROSPECTIVE JUROR:  Yeah.

7           THE COURT:  Okay.  And do you have any other

8   condition or need or anything that requires special

9   accommodation while you're in court?

10          THE PROSPECTIVE JUROR:  No.

11          THE COURT:  Do you have any difficulties hearing

12  that aren't corrected by a hearing aide?

13          THE PROSPECTIVE JUROR:  No.

14          THE COURT:  And any trouble seeing even if you have

15  your glasses on?

16          THE PROSPECTIVE JUROR:  I see fine with my glasses

17  on.

18          THE COURT:  Okay.  And are taking any kind of

19  medication that would affect your ability to remember things

20  or concentrate?

21          THE PROSPECTIVE JUROR:  No.

22          THE COURT:  Any reason why you wouldn't be able to

23  comply with our rules about -- in connection with COVID,

24  social distancing, masking, and things like that?

25          THE PROSPECTIVE JUROR:  That's fine.

PROCEEDINGS                                    99

1              THE COURT:  Okay.  And -- well, I'll go through the

2    rest of the questionnaire, but I take it in addition to what

3    you filled out, there's nothing additional that you want to

4    alert us to; is that correct?

5              THE PROSPECTIVE JUROR:  Yeah, nothing else.

6              THE COURT:  Okay.  So one of your hobbies or

7    interests is learning new languages.

8              What else do you do in your spare time?

9              THE PROSPECTIVE JUROR:  I just kind of go out a

10   little with friends, and I guess watch TV, you know.  I guess

11   play games and stuff like that.

12             THE COURT:  Okay.  There are a couple of other --

13   there's a paper -- yes.  It has three names on it.

14             Any of those familiar to you?

15             THE PROSPECTIVE JUROR:  No.

16             THE COURT:  Okay.  During the course of the trial,

17   you may hear testimony or see exhibits having to do with

18   sexual activity between people who are the same sex.

19             Anything about that kind of evidence that would

20   affect your ability to be fair and impartial to both sides?

21             THE PROSPECTIVE JUROR:  No.

22             THE COURT:  Okay.  I want to see if either parties

23   have any questions for this juror?

24             None from the government.

25             Any from?  Okay.

GA0427

PROCEEDINGS                                    100

1            Okay, let me just -- be repeating a little bit, but

2    I want to go over some of the things that were in the

3    questionnaire.  Some of the concepts and that we talked about

4    this morning in the larger room.

5            First is that Mr. Kelly's presumed to be innocent

6    and the government has the burden of proving his guilt beyond

7    a reasonable doubt.

8            If you're selected as a juror, I'll define all that

9    for you.  But any reason why you couldn't follow that rule?

10           THE PROSPECTIVE JUROR:  No.

11           THE COURT:  And is there any reason why you wouldn't

12   be able to follow all of my instructions on the law?

13           THE PROSPECTIVE JUROR:  No.

14           THE COURT:  I told everybody this morning about the

15   importance of not doing research on the case or looking

16   anything up.

17           Do you promise that you're going to follow that

18   directive?

19           THE PROSPECTIVE JUROR:  Yes.

20           THE COURT:  And obviously don't talk to anybody

21   about this process either.

22           Any reason that you can think of why you couldn't

23   give both sides a fair trial?

24           THE PROSPECTIVE JUROR:  No reasons.

25           THE COURT:  Okay.  Thank you so much.  You'll be

GA0428

PROCEEDINGS                                    101

1    directed where you're supposed to go next.

2              THE PROSPECTIVE JURY:  Thank you.

3              (Prospective Juror exits the courtroom.)

4              THE COURT:  The next juror is Juror Number 90.

5              That juror is one of the ones who said that he did a

6    little bit of looking up about the case on the internet.  So

7    I'll ask him a few of questions about that.

8              Thanks, Donna.

9              This is also just a juror that indicated some

10   concern about his ability to understand English.

11             So maybe we'll start with that one.

12             (Pause in the proceedings.)

13             (Prospective Juror enters the courtroom.)

14             THE COURT:  All right, this is Juror Number 90.

15             Good afternoon, sir.

16             THE PROSPECTIVE JUROR:  How are you?

17             THE COURT:  Good.

18             On your questionnaire you said that you have some

19   difficulty understanding and reading and speaking English.

20             MR. SCHOLAR:  Little bit.  Especially the special

21   word.

22             THE COURT:  Okay.  Are you uncomfortable about the

23   prospect of being a juror and --

24             THE PROSPECTIVE JUROR:  If it's going to be some

25   kind of special word, maybe it's like difficult to understand

GA0429

1   it.

2             THE COURT:  I see.

3             THE PROSPECTIVE JUROR:  Special --

4             THE COURT:  Okay.  You sound like you're doing a

5   pretty good job, I have to say, but only you can say about

6   your comfort level.

7             THE PROSPECTIVE JUROR:  Yes.

8             THE COURT:  Okay.  So maybe we'll speak a little

9   bit, and then you will let me know how you feel about it.

10  Okay?

11            THE PROSPECTIVE JUROR:  Okay.

12            THE COURT:  I think this morning you said you had

13  done a little looking up about the case on the internet; is

14  that right?

15            THE PROSPECTIVE JUROR:  Yes.

16            THE COURT:  And what did you look at?

17            MR. SCHOLAR:  Because from the beginning, I know

18  nothing about R. Kelly.  So and then when I go home, I asked

19  my daughter about that.  She said look on the internet.  So I

20  did some research.

21            THE COURT:  So what did you -- how long did you

22  spend on the internet?

23            THE PROSPECTIVE JUROR:  Not that long.  Just I know

24  like singer, and then about the child abuse, something like

25  that.

GA0430

PROCEEDINGS                                    103

1          THE COURT:  All right.

2          THE PROSPECTIVE JUROR:  I didn't go farther down.

3          THE COURT:  All right.  So one of the reasons we ask

4    you not to look at those articles, not to look up anything

5    about the case, is because we wouldn't want jurors to be

6    influenced by things that are in newspaper articles or things

7    like that.

8          So is there anything that you read that makes you

9    think you can't be a fair and impartial juror in the case?

10         THE PROSPECTIVE JUROR:  I don't think I could be

11   fair about that.

12         THE COURT:  You don't think you could be fair?

13         THE PROSPECTIVE JUROR:  Yes.

14         THE COURT:  Okay.  I think that we'll excuse this

15   juror then.  Thank you so much.

16         (Prospective Juror exits the courtroom.)

17         (Prospective Juror enters the courtroom.)

18         THE COURT:  What number is this juror?

19         THE COURTROOM DEPUTY:  93.

20         THE COURT:  I thought 91 was the next juror.  Sorry

21   about that.  91 is not here.

22         THE COURTROOM DEPUTY:  Sorry about that.

23         THE COURT:  So, okay, you're in the right place.

24   You can have a seat.

25         THE COURTROOM DEPUTY:  Have a seat.

GA0431

PROCEEDINGS                                104

 1            THE COURT:  So this is Juror Number 93, correct?

 2            THE PROSPECTIVE JUROR:  Yes.

 3            THE COURT:  Okay.  How are you doing?

 4            THE PROSPECTIVE JUROR:  Fine, thank you.

 5            THE COURT:  Good.  Good.  So just to remind you,

 6  don't tell us anything, you know, personal about you; where

 7  you live, where you work, things like that, okay?

 8            THE PROSPECTIVE JUROR:  Yes.

 9            THE COURT:  All right.  So I understand from your

10  questionnaire that you're a marathon runner.

11            THE PROSPECTIVE JUROR:  Yes, I am.

12            THE COURT:  Are you still doing it?

13            THE PROSPECTIVE JUROR:  Yes.

14            THE COURT:  Are they in person now or do you have to

15  log your own time?

16            THE PROSPECTIVE JURY:  No, it's in person.

17            THE COURT:  Okay.  And I also see that one of the

18  people you admire is the soccer player, Messi.

19            He switched teams; didn't he?  He's a free agent,

20  right?

21            THE PROSPECTIVE JUROR:  Yes.

22            THE COURT:  How do you feel about that?

23            THE PROSPECTIVE JUROR:  I think it's fine, yeah.

24            THE COURT:  You do?

25            THE PROSPECTIVE JUROR:  Sounds like a future.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                                    105

1          THE COURT:  All right.

2          Now we have gone through -- I have gone through

3   these questionnaires.  One thing I think you have in your hand

4   that piece of paper with the three names on it.

5          Do you know any of those people?

6          THE PROSPECTIVE JUROR:  No, I don't.

7          THE COURT:  Okay.  And another thing I'm going to

8   tell you about the case is that there will be some testimony

9   and exhibits that are related to sexual activity between

10  people who are of the same sex.

11         Is there anything about that kind of evidence that

12  you think would make you -- would affect your ability to be

13  fair and impartial to both sides?

14         THE PROSPECTIVE JUROR:  No, I don't think so.  No.

15         THE COURT:  Okay.  Nothing -- you can give both

16  sides a fair trial, even if you hear or see that kind of

17  evidence, correct?

18         THE PROSPECTIVE JUROR:  Yes.

19         THE COURT:  Okay.  I have a couple of other things I

20  want to speak with you about, but I just want to ask the

21  parties if there are any additional questions that they want

22  me to put to this juror?

23         MS. GEDDES:  Yes, Your Honor, question 101.

24         THE COURT:  Oh, yes.

25         So you said that you weren't sure whether or not

GA0433

PROCEEDINGS                          106

1    your employer would pay you while you were on jury duty.

2              Do you know the answer to that question?

3              THE PROSPECTIVE JUROR:  No, I don't.

4              THE COURT:  I'm going to ask to you find out.

5    Before I do that.  Do you think that that would be a problem

6    for you if you had to do jury duty for four weeks and not get

7    paid?

8              THE PROSPECTIVE JUROR:  Well, I am the one that

9    support my family.  I'm the only income that is there.

10             THE COURT:  Okay.  So I think for most people that's

11   probably true.

12             So what I'd like you to do is see if you can touch

13   base with your employer and let us know, okay?  Do you think

14   you can touch base with them later this afternoon?

15             THE PROSPECTIVE JURY:  Yes.

16             THE COURT:  Okay.  And let us know, all right?

17             THE PROSPECTIVE JUROR:  Okay.

18             THE COURT:  Just a couple more things.

19             We talked about this in the larger courtroom, but I

20   want to go over these things again.

21             The first is that Mr. Kelly is presumed to be

22   innocent, and the government has to the burden of proving his

23   guilt beyond a reasonable doubt.

24             If you're selected as a juror, I'll define that more

25   particularly, but is there any reason why you couldn't follow

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

PROCEEDINGS                                                107

1   that instruction?

2            THE PROSPECTIVE JUROR:  No, there is no reason.

3            THE COURT:  Okay.  And the other thing is, just more

4   generally, do you promise that you'll follow my instructions

5   on the law?

6            THE PROSPECTIVE JUROR:  Yes.

7            THE COURT:  Okay.  Also you can't look anything up

8   about the case.  You can't research it.  Anything like that.

9            Would you have any difficulty following that

10  instruction?

11           THE PROSPECTIVE JUROR:  No, I wouldn't.

12           THE COURT:  Okay.  And is there any reason that you

13  can think of why you wouldn't be able to give both sides a

14  fair trial?

15           THE PROSPECTIVE JUROR:  I don't know maybe -- maybe

16  it would make me feel uncomfortable about this.

17           THE COURT:  About the nature of the case?

18           THE PROSPECTIVE JUROR:  Yes.

19           THE COURT:  You think -- do you think -- I mean

20  obviously those are charges.  The purpose of the trial is to

21  determine whether those accusations are true.

22           Do you think you would find the subject material

23  uncomfortable?

24           THE PROSPECTIVE JUROR:  No, I don't think so.

25           THE COURT:  So what is it that you're uncertain

GA0435

PROCEEDINGS                                    108

1   about?

2            THE PROSPECTIVE JUROR:  About the case, that I have

3   a daughter, you know, and obviously makes me confused or I

4   don't know.

5            THE COURT:  You think -- would you be able to put

6   aside those feelings, if you --

7            THE PROSPECTIVE JUROR:  Yes.

8            THE COURT:  You think so?

9            THE PROSPECTIVE JUROR:  Yes, I do.

10            THE COURT:  So in a criminal case, while we're

11   picking a jury, you have to be absolutely positive that you

12   can put aside whatever feelings you have about the case, about

13   the nature of the charges or things like that, and give both

14   sides a fair trial; listen with an open mind to the evidence,

15   and listen to my instructions on the law, and give both sides

16   a fair trial.

17            There's -- if you can't do that, that's completely

18   fine.  But you're the only one who can really answer that

19   question, if you can put aside those feelings you have about

20   the nature of the charges.

21            Can you do that?

22            THE PROSPECTIVE JUROR:  Yes, I will be.

23            THE COURT:  Okay.  All right.

24            And, again, don't speak with anybody about the --

25   about the case at all, okay?

GA0436

PROCEEDINGS                                    109

```
1            THE PROSPECTIVE JUROR:  Okay.

2            THE COURT:  All right?  Anything else -- you look

3   like you have a question.

4            THE PROSPECTIVE JUROR:  It's not a question, it's

5   just a concern.  My English is just very basic.  And I don't

6   know if that will be kind of problem to continue with this.

7            THE COURT:  I have to say you sound very good to me.

8            Have you had any difficulty understanding anything

9   so far?

10           THE PROSPECTIVE JUROR:  So far, no.

11           THE COURT:  Okay.  Well, I think we're -- as I say,

12  I'm not having any trouble understanding you, and you seem to

13  be understanding me, and you filled out the questionnaire, so

14  I think we're okay.  Unless you have a real concern about it.

15           THE PROSPECTIVE JUROR:  If you think I'm okay, I'm

16  able to do it.

17           THE COURT:  Well, you tell me.  You've told me that

18  you've understood everything that you've heard so far.

19           THE PROSPECTIVE JUROR:  Yes, I did.

20           THE COURT:  Okay.  All right.

21           Ms. Greene will direct you where you're supposed to

22  go next, okay?

23           THE PROSPECTIVE JUROR:  Thank you.

24           (Prospective Juror exits the courtroom.)

25           (Prospective Juror enters the courtroom.)
```

PROCEEDINGS                                    110

```
 1          THE COURT:  Is this Juror 106?

 2          THE PROSPECTIVE JUROR:  Yes.

 3          THE COURT:  Good afternoon.

 4          THE PROSPECTIVE JUROR:  Good afternoon.

 5          THE COURT:  We're just going to make sure you have a

 6   microphone that you can use.  Just bear with us just a moment.

 7          All right, good afternoon.

 8          THE PROSPECTIVE JUROR:  Good afternoon.

 9          THE COURT:  How are you doing?

10          THE PROSPECTIVE JUROR:  I'm good.

11          THE COURT:  Good.  Good.  All right, well, I've gone

12   through your questionnaire, I just have a couple of things to

13   ask you about it.

14          There are a few that were left blank, and I'm just

15   going to go through those with you.  Oh.  One of the questions

16   has to do with whether you watch the news.  You said you watch

17   it several times a month.

18          What's -- where do you get your news?  Do you read

19   it on -- do you read the newspaper or do you watch television?

20          THE PROSPECTIVE JUROR:  I watch television.

21          THE COURT:  Oh?  Which channels do you like to

22   watch.

23          THE PROSPECTIVE JUROR:  Animal Planet.

24          THE COURT:  All right.  But what about -- I don't

25   know that they have a news desk at Animal Planet.  But is
```

PROCEEDINGS                            111

1    there some other place -- do you watch, I don't know, ABC or

2    CNN, or anything like that?

3              THE PROSPECTIVE JUROR:  Sometimes ABC.  Not all the

4    time.

5              THE COURT:  Okay.  All right.

6              And is there a person, a publicly-known person that

7    you admire?

8              THE PROSPECTIVE JUROR:  Not really.

9              THE COURT:  Okay.  And what about a publicly-known

10   person that you don't admire?

11             THE PROSPECTIVE JUROR:  I don't know.

12             THE COURT:  Can't think of anybody?  Okay.

13             And do you have any kind of music that you like to

14   listen to?

15             THE PROSPECTIVE JUROR:  Yeah.

16             THE COURT:  What do you like to listen to?

17             THE PROSPECTIVE JUROR:  Indian music.

18             THE COURT:  Okay.  And do you go on the internet,

19   whether it's websites, or blogs, or listen to podcasts or

20   Facebook, or anything like that?

21             THE PROSPECTIVE JUROR:  No.  No.

22             THE COURT:  Do you have Facebook?

23             THE PROSPECTIVE JUROR:  I have, but I had -- I don't

24   have the time.

25             THE COURT:  Okay.  All right.  And you are -- you're

GA0439

PROCEEDINGS                                    112

1   employed full time.  And, again, don't tell us the name of the

2   place that you work, but what -- you're a supervisor for what

3   kind of a place?

4              THE PROSPECTIVE JUROR:  It's a banking institution.

5              THE COURT:  Banking institution?  Okay.

6              And how long have you had that job?

7              THE PROSPECTIVE JUROR:  Thirty years.

8              THE COURT:  And you supervise about eight people; is

9   that right?

10             THE PROSPECTIVE JUROR:  Yes.

11             THE COURT:  Okay.  And in your spare time you say

12  you like to do foreign travel.

13             What else do you like to do?

14             THE PROSPECTIVE JUROR:  Take care of my house.

15             THE COURT:  Okay.  And you have one child; is that

16  right?

17             THE PROSPECTIVE JUROR:  Yes.

18             THE COURT:  And does that child work?

19             THE PROSPECTIVE JUROR:  No.

20             THE COURT:  Okay.  All right.

21

22             (Continued on the following page.)

23

24

25

GA0440

PROCEEDINGS                                        113

1          THE COURT:  There should be a piece of paper in

2    front of you that has three names.  Do you know any of those

3    people?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  And then one other thing I want to talk

6    to you about, some evidence that you might hear in this case.

7    If the evidence will involve either testimony and/or exhibits

8    that relate to sexual activity between two people who are of

9    the same sex, is there anything about that kind of evidence

10   that would affect your ability to be a fair and impartial

11   juror?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  Let me see from the lawyers if there is

14   anything additional that they want me to raise with this

15   juror.

16         MS. GEDDES:  Just one.

17         (Continued on the next page.)

18

19

20

21

22

23

24

25

GA0441

SIDEBAR CONFERENCE                                    114

1          (Sidebar conference.)

2          MS. GEDDES:  She indicated had she served on a civil

3   jury for a couple of days, but didn't indicate why.

4          THE COURT:  Okay, I bet I know.

5          (End of sidebar conference.)

6          (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JURY SELECTION                                    115

1              (In open court.)

2              THE COURT:  One thing I forgot to ask you about is

3     your prior jury service, a civil case in state court; is that

4     right?

5              PROSPECTIVE JUROR:  I'm not sure.

6              THE COURT:  Do you remember what kind of case that

7     it was?

8              PROSPECTIVE JUROR:  It was an accident.

9              THE COURT:  I see.  You only served two days.  Did

10    they settle or something like that?

11             PROSPECTIVE JUROR:  I don't know, I was dismissed

12    after the second day.  They select some other jurors.

13             THE COURT:  You went through this process and they

14    didn't -- you never actually heard any evidence.

15             PROSPECTIVE JUROR:  No.

16             THE COURT:  I see.  Okay, thank you so much for

17    clearing that up.

18             We talked about some of the next things I'm going to

19    talk to you about in the larger jury room.  I want to go over

20    a couple of them again.

21             The first is that Mr. Kelly is presumed to be

22    innocent.  The Government has the burden of proving his guilt

23    beyond a reasonable doubt.  I'll give you some more detailed

24    instructions about that concept if you're selected as a juror.

25    But what I want to ask you now is if you can follow that rule.

JURY SELECTION                                    116

```
 1              PROSPECTIVE JUROR:  Yes.

 2              THE COURT:  And you also have to follow all of my

 3    instructions on the law.  Will you be able to do that?

 4              PROSPECTIVE JUROR:  I'll try, yes.

 5              THE COURT:  Any reason why you couldn't?

 6              PROSPECTIVE JUROR:  No.

 7              THE COURT:  It's just that in every case a jury has

 8    to follow the law as the judge gives it to them.  Understand?

 9              PROSPECTIVE JUROR:  Yes.

10              THE COURT:  Can you do that?

11              PROSPECTIVE JUROR:  Yes.

12              THE COURT:  The other thing is that you can't look

13    anything up about the case.  You can't do any research,

14    anything like that.  Do you have any difficulty following that

15    rule?

16              PROSPECTIVE JUROR:  No.

17              THE COURT:  Is there any reason that you can think

18    of why you couldn't give both sides a fair trial?  Let me

19    rephrase the question.  Is there any reason why you couldn't

20    be fair and impartial both to the Government and to the

21    defense?

22              PROSPECTIVE JUROR:  No.

23              THE COURT:  You could be fair to both sides?

24              PROSPECTIVE JUROR:  Yes.

25              THE COURT:  All right.  Thank you so much.  Just one
```

JURY SELECTION                                    117

1    other thing, make sure you don't speak about this process to

2    anybody okay?

3                PROSPECTIVE JUROR:  Sure.

4                THE COURT:  Thank you so much.

5                (Prospective juror exits.)

6                THE COURT:  Our next juror is 108.

7                (Prospective juror enters.)

8                THE COURT:  Good afternoon.  I'll ask you some

9    questions about that in a second.  How are you doing.

10               PROSPECTIVE JUROR:  Good.  How are you?

11               THE COURT:  Good.  I'm going to ask you a couple of

12   questions based on your questionnaire.  The first thing I'll

13   note is that your wife is expecting a baby.

14               PROSPECTIVE JUROR:  Yes.

15               THE COURT:  How is she doing?

16               PROSPECTIVE JUROR:  She's well.

17               THE COURT:  You said this is giving some stress.

18   How far along is she?

19               PROSPECTIVE JUROR:  Seven and a half months.

20               THE COURT:  Happy news.  But this trial is going to

21   last about four weeks.  You think you can stay focused on the

22   case?

23               PROSPECTIVE JUROR:  I guess if I have to, yes.

24               THE COURT:  You indicated that it was causing you

25   some stress.

GA0445

1                PROSPECTIVE JUROR:  It's just, I feel like it would

2      be stressful regardless.  It's a change of pace.

3                THE COURT:  It does change your life a little bit.

4                And then what you have in front of you is a list of

5      three names.  Do you know any of those people?  Are you

6      familiar with them?

7                PROSPECTIVE JUROR:  No.

8                THE COURT:  I wanted to ask you, you said that you

9      either you build or in your spare time you do something with

10     remote control vehicles.  Tell me about that.

11               PROSPECTIVE JUROR:  Just a hobby.

12               THE COURT:  I know, but do you build them?

13               PROSPECTIVE JUROR:  Like there are kits, you build

14     them from scratch.

15               THE COURT:  Cars or planes?

16               PROSPECTIVE JUROR:  A little bit of both.

17               THE COURT:  Aside from that, what else do you do in

18     your spare time?

19               PROSPECTIVE JUROR:  Play guitar.

20               THE COURT:  Let me see if either side has any

21     additional questions for this juror.

22               MS. GEDDES:  Only the additional questions from last

23     week.

24               THE COURT:  I will do those.

25               MR. CANNICK:  No, your Honor.

GA0446

JURY SELECTION                                                119

```
 1              THE COURT:  It may be during the course of this case
 2    that you hear testimony and exhibits that are related to
 3    sexual activity between people who are of the same sex.
 4    Anything about that that would make it hard for you to be fair
 5    and impartial?
 6              PROSPECTIVE JUROR:  No.
 7              THE COURT:  We talked about a couple of things in
 8    the larger courtroom that I just wanted to go over with you
 9    here.  The first is that Mr. Kelly is presumed to be innocent
10    and the Government has the burden of proving his guilt beyond
11    a reasonable doubt.  If you're selected as a juror, I'll
12    explain that to you in more detail.  But is there any reason
13    that you wouldn't be able to follow that rule of law?
14              PROSPECTIVE JUROR:  No.
15              THE COURT:  Do you also promise that you'll follow
16    all of my instructions on the law?
17              PROSPECTIVE JUROR:  Yes.
18              THE COURT:  Can't look anything up on the Internet
19    or research the case at all.  You can't speak to anybody about
20    the case.  Any difficulty following that rule?
21              PROSPECTIVE JUROR:  No.
22              THE COURT:  Is there any reason that you can think
23    of that you could not give both sides a fair trial in this
24    case?
25              PROSPECTIVE JUROR:  No.
```

JURY SELECTION                                         120

1            THE COURT:  Thank you so much.

2            (Prospective juror exits.)

3            THE COURT:  Let me ask the parties, on this

4    particular questionnaire is Thomas Arnold somebody who is

5    related to Rosanne?

6            MS. GEDDES:  No.

7            THE COURT:  I think we saw that response a few

8    times.

9            (Prospective juror enters.)

10           THE COURT:  Good afternoon.  How are you doing?

11           PROSPECTIVE JUROR:  Very well.

12           THE COURT:  This is juror 110; is that correct?

13           PROSPECTIVE JUROR:  Yes.

14           THE COURT:  Thank you so much for filling out the

15   questionnaire.  I have a couple of additional questions to ask

16   you based on your questionnaire.

17           You said that your employer does not pay you if you

18   miss work for jury service; is that correct?

19           PROSPECTIVE JUROR:  I'm not really sure.  I know

20   there is a charge for jury duty, but how many days I have no

21   idea.

22           THE COURT:  All right.  If there were to come a time

23   when your employer didn't pay you for jury service, would that

24   pose a problem for you.

25           PROSPECTIVE JUROR:  Not a major problem; but yes, it

GA0448

JURY SELECTION                                          121

1    is hardship.

2              THE COURT:  It's always better to get paid than not

3    to get paid.

4              PROSPECTIVE JUROR:  Yes.

5              THE COURT:  I guess maybe what we'll have you do is

6    check to make sure.  You'd be starting the next phase would be

7    August 18, then we go for about four weeks okay, with some

8    days off.  So let us know for sure.  But as you sit here

9    today, as you sit here right now, if you were to find out that

10   they are only go to pay you for part of it, would that be a

11   hardship that you couldn't deal with?

12             PROSPECTIVE JUROR:  No, no.

13             THE COURT:  There were a couple of questions, just

14   two questions that you didn't answer.  That question was:

15   Which publicly known person do you admire the most and which

16   one do you admire the least.

17             Some people don't have an answer, but I wondered if

18   you do.

19             PROSPECTIVE JUROR:  I don't.  There are so many

20   people that I might admire for different reasons.  It wouldn't

21   be a special one.

22             THE COURT:  I was very curious in your answer to

23   what you do in your spare time.  What is the Association -- is

24   it, Of Old Crows?

25             PROSPECTIVE JUROR:  Yes.

JURY SELECTION                                    122

```
 1              THE COURT:  What is it?

 2              PROSPECTIVE JUROR:  Association Of Old Crows,

 3    electronic warfare engineers.

 4              THE COURT:  How often do you meet?

 5              PROSPECTIVE JUROR:  We meet typically once a year.

 6    There is a meeting Washington DC, and different chapters meet

 7    every quarter.  It's a professional association.

 8              THE COURT:  I just like the name.

 9              PROSPECTIVE JUROR:  It's not drinking buddies, not

10    at all.

11              THE COURT:  One of your children, your son, has

12    graduated from law school; is that right?

13              PROSPECTIVE JUROR:  Yes.

14              THE COURT:  About ready to start a clerkship in the

15    Tenth Circuit.  You must be very proud.

16              PROSPECTIVE JUROR:  Yes.

17              THE COURT:  For a portion of his time before he went

18    to law school he worked as a paralegal in the Manhattan DA's

19    office; is that right?

20              PROSPECTIVE JUROR:  Yes.

21              THE COURT:  Do you know what part of the office he

22    worked in?

23              PROSPECTIVE JUROR:  He was an associate there,

24    financial investigation into Abikas (ph) case.

25              THE COURT:  Anything about that relationship that
```

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

JURY SELECTION                               123

1    would make it hard for you to be fair and impartial in this

2    case?

3                PROSPECTIVE JUROR:  No.

4                THE COURT:  I think you have in front of you a piece

5    of paper with three names.

6                PROSPECTIVE JUROR:  Yes.

7                THE COURT:  Do you know any of those people?  Are

8    they familiar to you?

9                PROSPECTIVE JUROR:  No.

10               THE COURT:  Another thing about this case is that

11   there will be some testimony and some exhibits that have to do

12   with sexual activity between people who are of the same sex.

13   Is there anything about that kind of evidence that would make

14   it hard for you to be fair and impartial?

15               PROSPECTIVE JUROR:  No.

16               THE COURT:  Let me see if the lawyers have any

17   additional questions for this juror.  No.  Okay.

18          We discussed a few concepts in the big jury room, I

19   just want to focus on a couple of those and then we'll let you

20   go, at least for today.

21          The first is that Mr. Kelly is presumed to be

22   innocent.  The Government has the burden of proving his guilt

23   beyond a reasonable doubt.  If you are selected as a juror --

24   I'll obviously give you some more detailed instructions about

25   that concept.  But is there any, do you have any difficulty

JURY SELECTION                                    124

1   following that rule?

2             PROSPECTIVE JUROR:  No.

3             THE COURT:  As a general matter, you'll have to

4   follow all of my instructions on the law.  Any problem with

5   that?

6             PROSPECTIVE JUROR:  No.

7             THE COURT:  As a said before, you can't look

8   anything up on the Internet about the case, no research, you

9   can't speak with anybody about it, even about this process of

10  jury selection.  Any problem following that rule?

11            PROSPECTIVE JUROR:  No.

12            THE COURT:  Do you promise that you'll give both

13  sides a fair trial?

14            PROSPECTIVE JUROR:  Absolutely, yes.

15            THE COURT:  Thank you so much.

16            (Prospective juror exits.)

17            (Prospective juror enters.)

18            THE COURT:  This is juror number 112.

19            PROSPECTIVE JUROR:  Yes.

20            THE COURT:  How are you doing?

21            PROSPECTIVE JUROR:  Okay.

22            THE COURT:  All right.  We have your questionnaire.

23  I'm just going to go over a couple of things about it and ask

24  you some additional questions.

25            Since you got that piece of paper in your hand, that

JURY SELECTION                                    125

1    has three names on it.  Do you know any of those people?

2              PROSPECTIVE JUROR:  No.

3              THE COURT:  Those there just some additions to the

4    names you saw on the questionnaire.

5              So you're a law student; is that right?

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  What year?

8              PROSPECTIVE JUROR:  3L.

9              THE COURT:  You're starting 3L.

10             PROSPECTIVE JUROR:  Yes.

11             THE COURT:  When do you start?

12             PROSPECTIVE JUROR:  In two weeks from now.

13             THE COURT:  Do you think you can serve as a juror

14   when you're going to law school?

15             PROSPECTIVE JUROR:  I mean, I don't know.  I have

16   class, that might be an issue.

17             THE COURT:  I went to law school a long time ago,

18   but I remember it being a full-time thing.  I wonder if --

19   it's your third year, I wonder if another case might be better

20   for you.

21             PROSPECTIVE JUROR:  Perhaps.

22             THE COURT:  I think both sides agree.  I wish you

23   good luck in your career.  And you so much for participating.

24             PROSPECTIVE JUROR:  Okay.  Thank you.

25             THE COURT:  Do you want to be in the same work as

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

GA0453

JURY SELECTION                                          126

1   your parents.

2                 PROSPECTIVE JUROR:  Yes.

3                 THE COURT:  Okay, well, good luck.

4                 (Prospective juror exits.)

5                 THE COURT:  I think our next juror is 115.

6                 (Prospective juror enters.)

7                 THE COURT:  115?

8                 THE DEPUTY CLERK:  120.

9                 THE COURT:  Juror 115 didn't show up.

10                MS. GEDDES:  That's right.

11                THE COURT:  Is this juror number 120?

12                PROSPECTIVE JUROR:  Yes.

13                THE COURT:  Come one in.  How are you doing?

14                PROSPECTIVE JUROR:  I'm all right.

15                THE COURT:  Good.  I just want to ask you a couple

16  of questions based on your questionnaire.  The first question

17  I have is that you were uncertain whether your employer will

18  pay you if you're selected as a juror.  Do you know what the

19  answer to that question is?

20                PROSPECTIVE JUROR:  I think so.  But I don't think

21  anyone on my team has had to for this long yet.

22                THE COURT:  If you were not to be paid, would that

23  be an insurmountable hardship for you?

24                PROSPECTIVE JUROR:  Probably.

25                THE COURT:  Is there a way to find out?

GA0454

JURY SELECTION                                          127

```
 1                    PROSPECTIVE JUROR:  I have to get in touch with my

 2     boss.

 3                    THE COURT:  What kind of work do you do?  Don't give

 4     us the name of the place, what is the general nature of the

 5     work that you do?

 6                    PROSPECTIVE JUROR:  Media.

 7                    THE COURT:  How long have you been doing that?

 8                    PROSPECTIVE JUROR:  About two and a half years.

 9                    THE COURT:  What is your particular job in the media

10     company?

11                    PROSPECTIVE JUROR:  I'm a designer.

12                    THE COURT:  I see.  You said that you heard

13     something about the case before.  If you are selected as a

14     juror in this case, would you be able to put aside whatever

15     you heard about the case?

16                    PROSPECTIVE JUROR:  Yes.  I don't know many

17     specifics, I'm just aware of it.

18                    THE COURT:  Obviously the purposes a trial is to

19     determine whether the allegations have been proven or not.

20     And so you would have to put aside any preconceived notion you

21     have.  Can you do that?

22                    PROSPECTIVE JUROR:  Yes.

23                    THE COURT:  There should be a piece of paper that

24     has some names on it there.  Do you know any of those people

25     or have you heard of them before?
```

GA0455

JURY SELECTION                                    128

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  The evidence in this case will involve

3   some testimony and some exhibits that relate to sexual

4   activity between people who are of the same sex.  Is there

5   anything about that kind of evidence that would affect your

6   ability to be a fair and impartial juror?

7          PROSPECTIVE JUROR:  Of the same sex?

8          THE COURT:  Yes.

9          PROSPECTIVE JUROR:  No.

10         THE COURT:  Let me see from the lawyers if they want

11  to ask me anything else.

12         MS. GEDDES:  No.

13         MR. CANNICK:  Yes, your Honor.

14         (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

SIDEBAR CONFERENCE                    129

1          (Sidebar conference.)

2          MR. CANNICK:  Given her response to question number

3    92, I'd like to the Court to inquire as to whether or not she

4    would find another type of case better suited for her.

5          MS. GEDDES:  Can I see the question?

6          THE COURT:  Do you want to respond?

7          MS. GEDDES:  I just want to see it.

8          It would be appropriate to ask her a question to see

9    if she would listen to the witnesses Evaluate d the witnesses.

10          THE COURT:  I don't think I'm going to ask her off

11    the bat if another case would be better for her.

12          MR. CANNICK:  As long as you get there.  Thank you.

13          (End of sidebar conference.)

14          (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

GA0457

JURY SELECTION                                    130

1          (In open court.)

2          THE COURT:  Just one question.  You were asked in

3    the questionnaire about supporting the Me Too movement.  And

4    you responded that you believe women don't lie about sexual

5    harassment or being raped.  Obviously, this case will involve

6    allegations of sexual contact with various types.  You're

7    going to have to be able to evaluate all of the witnesses

8    including their credibility.

9          Do you believe that if -- I'm just basing this on

10   your answer -- do you think it's impossible for a woman who

11   says she's been raped to not be telling the truth?

12         PROSPECTIVE JUROR:  I don't think it's impossible,

13   but I do think in most cases women don't lie.

14         THE COURT:  If you were on this case, and if you

15   were to hear that women were testifying about either -- I'm

16   speaking in very general terms here -- about unwanted sexual

17   contact or forced sexual contact, you think it would be

18   unlikely that the person would not -- would be lying about

19   that; is that right?

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  I think you might be better suited to a

22   different kind of case.

23         I take it both sides agree; is that correct?

24         MR. CANNICK:  That's correct.

25         MS. GEDDES:  I'm happy to address it at sidebar.

GA0458

1          THE COURT:  Let's go to sidebar.

2          (Continued on the next page.)

SIDEBAR CONFERENCE                    132

1          (Sidebar conference.)

2          MS. GEDDES:  Your Honor, I think that she said that

3   not every woman would be telling the truth.  The question is

4   whether she would be able to evaluate the credibility of the

5   witnesses on the stand based from the evidence that is in

6   front of her.  I don't think she said anything that suggests

7   that she couldn't evaluate each witness as they come before

8   her.

9          THE COURT:  This is one of the features of the Me

10  Too movement that is problematic in criminal cases, that

11  people say they believe women whatever they say.  She's pretty

12  unequivocal.

13         MS. GEDDES:  She did say -- you asked the question

14  is it always the case.  She said, no, I don't think it's

15  always the case.

16         MR. CANNICK:  I think her final answer pretty much

17  nailed it in terms of her being able to be a fair and

18  impartial juror on this case.

19         THE COURT:  I think that's true.  There is also

20  another question that she gives having to do with having

21  sympathy for the, I think it's number 76, that she expresses

22  sympathy for --

23         MR. CANNICK:  And 94 also.

24         THE COURT:  The idea of sexually abusing children

25  makes me sick to my stomach.  That's a different category.

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

GA0460

SIDEBAR CONFERENCE                           133

1    Hopefully it makes everyone sick to their stomach.  The

2    question is to put it aside.  I think the Second Circuit would

3    have something to say to me if I put this juror on.

4                    (End of sidebar conference.)

5                    (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JURY SELECTION                                            134

1              (In open court.)

2              THE COURT:  Thank you so much for your patience.  I

3     also really appreciate your candor in this regard.  But I

4     think I'm going to excuse you for this case.  Thank you so

5     much.

6              (Prospective juror exits.)

7              THE COURT:  Just to be clear, I think there is a

8     line between people expressing opinions about the nature of

9     the charges.  It's natural, and I hope everybody feels this

10    way, that the nature of the charges is I think as the last

11    juror said in the questionnaire, it makes her sick to her

12    stomach.

13             We're not asking jurors to endorse behavior.  We're

14    asking that despite the nature of the charges they can give

15    both sides a fair trial.  I think this was slightly different

16    than that.

17             (Prospective juror enters.)

18             THE COURT:  Is this juror 134?

19             THE DEPUTY CLERK:  Yes.

20             THE COURT:  Good afternoon.  How are you doing?

21             PROSPECTIVE JUROR:  I'm okay.

22             THE COURT:  Good.  Since you got that piece of paper

23    in your hand, I'll start with that.  I want to know if you

24    know any of people listed on that sheet of paper?

25             PROSPECTIVE JUROR:  I do not.

GA0462

JURY SELECTION                                              135

1          THE COURT:  Okay.  You said in your spare time you

2     like to read, travel and cook; is that right?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  What do you like to read in particular?

5          PROSPECTIVE JUROR:  The Bible.

6          THE COURT:  And have you been able to travel since

7     Covid.

8          PROSPECTIVE JUROR:  No, I don't think so.  I haven't

9     been anywhere.

10          THE COURT:  And you also said that you heard

11     something about the allegations in this case.

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Can you promise that you'll put whatever

14     you heard aside if you're selected as a juror in this case?

15          PROSPECTIVE JUROR:  Possibly.

16          THE COURT:  Do you have a problem doing that?

17          PROSPECTIVE JUROR:  Maybe.

18          THE COURT:  Can you tell me why?

19          PROSPECTIVE JUROR:  Because of a question that I

20     answered no, because I wasn't sure.  So I have had some

21     experience when I was little with the charges that Kelly is

22     being charged with.

23          THE COURT:  You think that's just too close to home;

24     is that right?

25          PROSPECTIVE JUROR:  Yes.

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

JURY SELECTION                                    136

1              THE COURT:  It's probably not a good trial for you

2       then.  Thank you.  I'm sorry that happened to you, but thank

3       you for letting us know.

4              (Prospective juror exits.)

5              (Prospective juror enters.)

6              THE COURT:  This is juror 126; is that right?

7              PROSPECTIVE JUROR:  Yes.

8              THE COURT:  Good afternoon.

9              PROSPECTIVE JUROR:  Good afternoon.

10             THE COURT:  How are you doing?

11             PROSPECTIVE JUROR:  I'm good.  How are you?

12             THE COURT:  Good.  Let me just begin by asking you

13      about some of the answers that you gave.  You said you're in

14      the process of buying a house.

15             PROSPECTIVE JUROR:  Yes.

16             THE COURT:  When are you scheduled to close?

17             PROSPECTIVE JUROR:  September 20 is the last day we

18      want to close.  We're trying to close the week before that.

19      But my verified approval runs out September 20, so we're up

20      against the grate now.  Hopefully the week of the 13th.

21             THE COURT:  That would be one day; is that right?

22             PROSPECTIVE JUROR:  The closing itself is one day,

23      yes.

24             THE COURT:  The second thing, related, is that you

25      said that serving on a trial of this length would have some

JURY SELECTION                          137

1    financial impact; is that correct?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  Is that something that would interfere

4    with your ability to focus on this case?

5              PROSPECTIVE JUROR:  It could.  I work on mostly

6    commission -- I run financial services practice.

7              THE COURT:  That's what you wrote in the

8    questionnaire.

9              PROSPECTIVE JUROR:  I have a few hundred households

10   or clients, my partner and I.  Depending on the scenario of

11   the week, it could be a week or two weeks or three weeks where

12   it's quite and nothing is going on and I'm not distracted.

13   But quite honestly, if something came up, yes, I'd be lying if

14   I said no absolutely not.  If I'm going home at night, I'm

15   checking my e-mails for work, I'm checking it on the weekend.

16   If something is going on, I suppose it could.

17             THE COURT:  Is your kind of work the kind of work

18   that an emergency could crop up in the day?  Or is it

19   something that you could handle at night or on the weekends?

20             PROSPECTIVE JUROR:  Emergencies could be handled by

21   my partner and by my associate, quite honestly.  The financial

22   impact comes from just not being able to do the work.  I need

23   to work on growing the business, acquiring new clients, which

24   is done mostly during the day, whether prospecting events or

25   lunches, things that we do.  Much the training that we do that

JURY SELECTION                              138

1    generates commissions is done during market hours 9:30 to

2    four.  If this was a three-day, a week, or nine-to-12 trial, I

3    could do the other half of the day working.  It would be

4    pretty easy.  But it would be tough otherwise.

5               THE COURT:  I've never done a nine-to-12 trial.

6               PROSPECTIVE JUROR:  Maybe we should start.  It's

7    your courtroom.

8               THE COURT:  Not a thing.

9               If it's too much pressure on you financially then

10   I'll excuse you.  But only you can tell us if it's going to

11   interfere with your ability to be a fair and impartial juror.

12              PROSPECTIVE JUROR:  My paycheck in September would

13   be less if I served on a trial than if I weren't.

14              THE COURT:  And that's probably true for a lot of

15   people.  The question is, is it going to have so much of an

16   impact on you that you can't concentrate?  I'm not trying

17   to --

18              PROSPECTIVE JUROR:  Again, the financial impact

19   probably not, that I would be able to concentrate.  The

20   concentration is if there was an incident or something going

21   on that was distracting that I was thinking about.  I can't

22   forecast that.  Right now there is nothing going on.  It's

23   pretty quite.  The financial impact, which is just me and my

24   wife would have to wait longer to redo the kitchen.

25              THE COURT:  Let me ask the Government, do you have

JURY SELECTION                                        139

1   any objection to excusing this juror?

2              MS. GEDDES:  No, your Honor.

3              MR. CANNICK:  No.

4              THE COURT:  I think I'm going to excuse you.

5              I will say, this is a long trial.  Like I say we

6   don't have nine to 12.  There are shorter ones.  But that's

7   one of the obligations of citizenship is to serve on a jury,

8   if you can.  I ordinarily wouldn't excuse you if this were a

9   shorter case, but I do recognize that it can be a real

10  hardship for people.

11             Ms. Green will tell you where to go.  Thank you so

12  much.

13             (Prospective juror exits.)

14             (Prospective juror enters.)

15             THE COURT:  Is this juror number 133?

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  Good afternoon.

18             PROSPECTIVE JUROR:  Good afternoon.

19             THE COURT:  How are you doing?

20             PROSPECTIVE JUROR:  Good.

21             THE COURT:  I've gone through your questionnaire.  I

22  have a couple of additional questions to ask you.  The first

23  has to do with what is on the piece of paper.  Do you know any

24  of those people?

25             PROSPECTIVE JUROR:  No.

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

GA0467

JURY SELECTION                                                140

```
1                 THE COURT:  Okay.  Are you currently in school?

2                 PROSPECTIVE JUROR:  I actually just graduated.

3                 THE COURT:  Congratulations.  Are you looking for a

4    job?

5                 PROSPECTIVE JUROR:  Yes.  I'm doing a summer program

6    right now, but looking for a job.

7                 THE COURT:  Can the job wait until after this trial

8    is over if you're selected as a juror?

9                 PROSPECTIVE JUROR:  Yeah, I guess.

10                THE COURT:  In terms of things you like to do in

11   your spare time, you talk about some of the things you like to

12   do to keep your skills up in your area of expertise; is that

13   right?

14                PROSPECTIVE JUROR:  Yes.

15                THE COURT:  What else do you like to do in your

16   spare time?

17                PROSPECTIVE JUROR:  Nothing really interesting.

18   It's mostly just, I tend to be on social media a lot.  I tend

19   to, like, I have an interest in video games and video game

20   development.  That's one of my majors.  That's something I

21   tend to look into a little bit.  Other than that, it's just

22   social media, helping my mother out, things at home.  Not much

23   else.

24                THE COURT:  All right.  You said that you heard

25   something about this case before; is that correct?
```

GA0468

JURY SELECTION                                    141

1              PROSPECTIVE JUROR:  I think so.  I'm not exactly

2      sure.  I remember hearing something.  I wasn't paying

3      attention.

4              THE COURT:  To the extent that you did hear

5      anything, will you be able to put that aside and just listen

6      to the evidence that comes out during the trial?

7              PROSPECTIVE JUROR:  Yes.  Here's the thing, I don't

8      even remember what I heard.

9              THE COURT:  That should be an easy job.

10             PROSPECTIVE JUROR:  Yes.

11             THE COURT:  You said you spend a lot of time on

12     social media.  Have you looked up anything on social media

13     having to do with this case?

14             PROSPECTIVE JUROR:  No.

15             THE COURT:  Good for you.  I'll talk to you a little

16     bit later.  That's extremely important that you continue not

17     doing that.

18             You will hear some evidence in this case that

19     includes testimony and exhibits that are related to sexual

20     activity between people that are the same sex.  Anything about

21     that that makes you think you could not be a fair and

22     impartial juror?

23             PROSPECTIVE JUROR:  No.

24             THE COURT:  Let me see from the attorneys if they

25     have any additional questions they want me to ask you.  No.

JURY SELECTION                                         142

1    All right.

2             Finally, what I'd like to do is just discuss with

3    you some of the things we talked about in the ceremonial

4    courtroom.  The first has to do with the presumption of

5    innocence, that Mr. Kelly is presumed to be innocent.  And the

6    Government has to prove his guilt beyond a reasonable doubt.

7    If you are selected as a juror I'll give you more instructions

8    about what that means at the appropriate time.  But is there

9    any reason why you couldn't follow that instruction?

10            PROSPECTIVE JUROR:  No, not really.

11            THE COURT:  Not really?

12            PROSPECTIVE JUROR:  I'm just saying.

13            THE COURT:  Figure of speech, right?

14            PROSPECTIVE JUROR:  Yes.

15            THE COURT:  And then you have to follow all of my

16   instructions on the law.  Can you do that?

17            PROSPECTIVE JUROR:  Sure.

18            THE COURT:  I just spoke to you a little about

19   looking things up on the Internet or social media.  You'll

20   have to ignore all of that if you're selected as a juror in

21   this case.  You won't be able to speak about it with anybody

22   else.  Any difficulty following that rule?

23            PROSPECTIVE JUROR:  No.

24            THE COURT:  And do you promise that you'll be fair

25   and impartial to both sides?

JURY SELECTION                                              143

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Okay.  Thank you so much.

3          PROSPECTIVE JUROR:  No problem.

4          (Prospective juror exits.)

5          (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GA0471

1              THE COURT:  How many do we have left?

2              MS. GEDDES:  We have 16, subject to a few that have

3     to get back to us.

4              (Prospective juror enters.)

5              THE COURT:  Is this 135?  Okay.  Don't give us your

6     name or where you work or anything like that.  So I have gone

7     through your questionnaire and I just have a couple of

8     questions based on to have your answers.  One thing you said

9     was you weren't sure if your employer will pay you if you miss

10    work for jury service.  Do you know the answer to that

11    question?

12             PROSPECTIVE JUROR:  Not yet.

13             THE COURT:  Do you know how long it will take you to

14    find out?

15             PROSPECTIVE JUROR:  I will find out today.

16             THE COURT:  If it were the case that your employer

17    did not pay you for jury service, would that be a hardship for

18    you?

19             PROSPECTIVE JUROR:  No, not right now.

20             THE COURT:  So even if your work doesn't pay you,

21    you could still serve on a jury?

22             PROSPECTIVE JUROR:  Yes.

23             THE COURT:  Okay.  So one of the questions asks

24    whether you would be described as open minded and willing to

25    listen to other people's viewpoints and you said that you were

GA0472

JURY SELECTION                                          145

1   in between.  One of the things that jurors have to do is

2   listen to the opinions of their fellow jurors and share their

3   own views when they're deliberating.  Will you be able to do

4   that?

5              PROSPECTIVE JUROR:  Yes, I will.

6              THE COURT:  I mean, it's fine to have strong

7   opinions, but the thing is you have to be a good listener.

8              PROSPECTIVE JUROR:  Open mind.

9              THE COURT:  You can do that?

10             PROSPECTIVE JUROR:  Yes, I will.  I can.

11             THE COURT:  I also was interested in what you like

12  to do in your spare time.

13             PROSPECTIVE JUROR:  The work that I do, I spend a

14  lot of time doing it at home because I have to practice at

15  home.

16             THE COURT:  I see, so you've got -- your work is

17  your spare time too; is that right?

18             PROSPECTIVE JUROR:  Yes.

19             THE COURT:  I see, okay.  Now you also told us in

20  connection with this case that you heard something about it.

21  I'm just going to -- my question to you was whether you could

22  put what you heard aside and just listen to the evidence that

23  comes out during the trial.

24             PROSPECTIVE JUROR:  Yes I can.

25             THE COURT:  Any hesitation about that?

JURY SELECTION                                    146

1          PROSPECTIVE JUROR:  No, but this is why I never -- I

2    have never been involved in listening to the news and social

3    media because I -- there's always two sides to every story so

4    I've never been into it.

5          THE COURT:  That will be an excellent quality for

6    this case because you can't look up anything up on the

7    internet at all and you won't be able to look things up on

8    social media.  It doesn't sound like it would be a problem for

9    you, but can you promise that you will follow that rule?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  Any problem with that?

12          PROSPECTIVE JUROR:  No, there will not be a problem.

13          THE COURT:  Okay, great.  I also was curious about

14    your -- there are a couple of questions here which ask which

15    publicly known person you admire the most and why and there's

16    another question that says who's the person that you admire

17    the least.  And do you have answers to those questions?

18          PROSPECTIVE JUROR:  No.

19          THE COURT:  No?

20          PROSPECTIVE JUROR:  No.  I feel like that you admire

21    more like your family members, like my mom and she's deceased

22    right now and I do not look up or down at anyone.

23          THE COURT:  Thank you so much.  And then kind of

24    related, the question is, do you like to read books or

25    magazines or anything like that?

JURY SELECTION                                    147

1              PROSPECTIVE JUROR:  No.

2              THE COURT:  That is fine.  That's fine.  I

3    apologize, there's a piece of paper with names on it.  Do you

4    know any of those people?

5              PROSPECTIVE JUROR:  No.

6              THE COURT:  Okay.  And then the other thing I wanted

7    to speak to you about is some of the evidence in this case

8    that's going to involve testimony and exhibits that include

9    evidence of sexual activity between people who are of the same

10   sex.  Anything about that kind of evidence that would make it

11   hard for you to be fair and impartial?

12             PROSPECTIVE JUROR:  No.

13             THE COURT:  Let me check with counsel to see if

14   there are any additional questions they want me to put to this

15   juror.

16             No?  Okay.  I just want to go over a couple of

17   things that we talked about when we were in the larger

18   courtroom.  The first had to do with the fact that Mr. Kelly

19   is presumed to be innocent and the Government has to prove his

20   guilt beyond a reasonable doubt.  If you become a juror in

21   this case I will talk to you about that concept in more

22   detail, but for now I just want to know if you can follow that

23   law.

24             PROSPECTIVE JUROR:  Absolutely.

25             THE COURT:  And do you also promise that you will

GA0475

JURY SELECTION                                    148

1   follow all of my instructions on the law?

2           PROSPECTIVE JUROR:  Absolutely.

3           THE COURT:  We've already talked about the internet.

4   You are not going to look anything up about the case and then,

5   finally, do you promise that you will be fair and impartial to

6   both sides?

7           PROSPECTIVE JUROR:  100 percent.

8           THE COURT:  All right.  Thank you so much.

9   Ms. Greene is going to tell you where to go.

10          (Prospective juror exits.)

11          (Prospective juror enters.)

12          THE COURT:  Is this juror 138?  Yes, okay.

13   Good afternoon.  How are you doing?

14          PROSPECTIVE JUROR:  Freezing.

15   THE COURT:  Back here because of all the Plexiglass it's warm.

16          PROSPECTIVE JUROR:  I'd rather be cold.

17          THE COURT:  That is true.  I have been through your

18   questionnaire and I have a couple of additional things to ask

19   you.  The first has to do with that list.  That's in addition

20   to the list of names that you had in the questionnaire.  Are

21   any of those names familiar to you?

22          PROSPECTIVE JUROR:  No.

23          THE COURT:  And I note from the questionnaire that

24   one of your children is in the music industry.  What aspect of

25   the music industry?

GA0476

JURY SELECTION                                    149

1          PROSPECTIVE JUROR:  She's not working in it right

2    now.  She wants to work -- I really am not sure.  I know she's

3    looked into graphic design for videos, working with bands.

4    She's just -- there is no music industry right now so she's

5    not really doing anything with it, but that's the kind of

6    thing she wants to do is behind-the-scenes work in an office

7    for Warner Brothers or something like that.

8          THE COURT:  I see.  And I also -- you've been a

9    juror before; is that right?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  Two times in state court in criminal

12    cases?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  How long ago was that?

15          PROSPECTIVE JUROR:  The first one was in the '80s

16    and the last one was probably in the 2000s.

17          THE COURT:  Okay.  And you described that case as

18    sexual harassment.  Do you remember generally what the case

19    was about?

20          PROSPECTIVE JUROR:  Yes.  It was a cardiologist at a

21    hospital who was harassing one of the people he worked with

22    and she -- he harassed her to the point of -- she was a

23    lesbian and he kept saying he was going to turn her the other

24    way.  So that's what it was.

25          THE COURT:  Was that a civil or criminal case, do

*SN        RPR        OCR*

GA0477

JURY SELECTION                                          150

1    you remember?

2              PROSPECTIVE JUROR:  No, I don't.

3              THE COURT:  That is okay.  I wanted to get a sense

4    of what the case was about.  One of the things you will hear

5    in this case will involve testimony or exhibits that are

6    related to sexual activity between people who are of the same

7    sex.  Anything about that kind of evidence that would affect

8    your ability to be a fair and impartial juror?

9              PROSPECTIVE JUROR:  Nope.

10             THE COURT:  Okay.  Let me just see from the lawyers

11   if they have additional questions for this juror.  Okay.

12             And then I just want to go over some of the things

13   we talked about in the larger courtroom.  The first is that

14   Mr. Kelly is presumed to be innocent and the Government has to

15   prove his guilt beyond a reasonable doubt.  Is there any

16   reason why you couldn't follow that instruction?

17             PROSPECTIVE JUROR:  No.

18             THE COURT:  Okay.  And do you also promise that you

19   will follow all of my instructions on the law?

20             PROSPECTIVE JUROR:  Absolutely.

21             THE COURT:  Okay.  The other thing as I said before

22   is you can't do any research on the case to find out about any

23   of participants or the charges or anything like that?

24             PROSPECTIVE JUROR:  I've been dying to, but I

25   haven't.  But I have not.  I haven't looked anything up.

GA0478

JURY SELECTION                                        151

1           THE COURT:  And you really must continue to do that

2    because it really does have a bad effect on the ability to do

3    justice.

4           PROSPECTIVE JUROR:  I would think so because you're

5    hearing other people's opinions.

6           THE COURT:  So congratulations so far and please

7    continue to exercise that discipline.

8           PROSPECTIVE JUROR:  All right, thank you.

9           THE COURT:  And then my last question is whether you

10   can promise to be fair and impartial to both sides.

11          PROSPECTIVE JUROR:  Absolutely.

12          THE COURT:  Thank you so much.  Ms. Greene is going

13   to tell you where to go.

14          (Prospective juror exits.)

15          (Prospective juror enters.)

16          THE COURT:  This is juror 145.  Good afternoon.

17          PROSPECTIVE JUROR:  Good afternoon.

18          THE COURT:  How are you doing?

19          PROSPECTIVE JUROR:  I'm okay.

20          THE COURT:  Since you have that piece of paper let

21   me ask you that first.  Do you know any of the names that are

22   on that piece of paper?

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  Thank you.  Those are in addition to the

25   other names from the questionnaire.  So, is it still the case

*SN        RPR        OCR*

GA0479

JURY SELECTION                                    152

1    that you are a fraud investigator?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  And tell me about that.  Don't give me

4    the name of the place or anything like that, but what does

5    that involve?  And use the microphone.

6              PROSPECTIVE JUROR:  It's mostly like a place where

7    clients come for help and so when we do that, we need to

8    investigate.  So whatever they tell us we take it but we need

9    to have proof and then we investigate whether it's warranted,

10   whether or not they get the help they need based on the

11   evidence and the proof that they give us.

12             THE COURT:  It sounds interesting.

13             PROSPECTIVE JUROR:  It could be sometimes.

14             THE COURT:  And in your spare time I know you are

15   active in your church.

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  What else do you do in your spare time?

18             PROSPECTIVE JUROR:  I read a lot.

19             THE COURT:  What kinds of things do you like to

20   read?

21             PROSPECTIVE JUROR:  Books, fiction.

22             THE COURT:  You said in your questionnaire that you

23   heard something about the case before.  It doesn't sound like

24   you heard very much about the case, but I am going to ask if

25   you can put aside whatever you heard about the case and just

*SN        RPR        OCR*

GA0480

JURY SELECTION                                        153

1    rely on the evidence that you hear in the courtroom if you are

2    selected as a juror.

3             PROSPECTIVE JUROR:  Sure.

4             THE COURT:  Now, you said that -- I think this was

5    you, have you testified in front of a grand jury before?

6             PROSPECTIVE JUROR:  Yes.

7             THE COURT:  On how many occasions?

8             PROSPECTIVE JUROR:  Once.

9             THE COURT:  You hope you never have to do it again?

10            PROSPECTIVE JUROR:  That was the first time, I was

11   so nervous.

12            THE COURT:  How long ago was that?

13            PROSPECTIVE JUROR:  More than ten years ago.

14            THE COURT:  Were you also -- did you also serve on a

15   grand jury?

16            PROSPECTIVE JUROR:  No.

17            THE COURT:  I see.  And you've never been a juror

18   before?

19            PROSPECTIVE JUROR:  No.

20            THE COURT:  Okay.  Let me check with the lawyers to

21   see if they have any additional questions.  I think I forgot

22   to ask that one question.  I will definitely do that.

23   Do you have any additional questions to put to this juror?

24            MR. CANNICK:  No, Your Honor.

25            MS. GEDDES:  No, Your Honor.

                    SN        RPR        OCR

JURY SELECTION                                          154

1          THE COURT:  Okay.  You are going to hear evidence in

2     this case that involves testimony and exhibits that are

3     related to sexual activity between people who are of the same

4     sex.  Is there anything about that kind of evidence that makes

5     you feel that you couldn't be fair and impartial to both

6     sides?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  All right.  And then we talked about

9     some of these things in the ceremonial courtroom.  I'm just

10    going to go over just a few of them.  The first thing is that

11    Mr. Kelly is presumed to be innocent and the Government has

12    the burden of proving his guilt beyond a reasonable doubt.

13          If you are selected as a juror, I will explain that

14    rule, that law, in more detail, but will you be able to follow

15    that instruction on the law?

16          PROSPECTIVE JUROR:  Of course.

17          THE COURT:  And do you promise to follow all of my

18    instructions on the law?

19          PROSPECTIVE JUROR:  Of course.

20          THE COURT:  You can't look up anything on the

21    internet or read anything the case.  Some people find that

22    difficult to do.

23          PROSPECTIVE JUROR:  I'm not savvy with that.

24          THE COURT:  Well, that's a good quality for this

25    case but it's very important that you don't look anything up

GA0482

JURY SELECTION                                    155

1    or if there are any news articles that you read.

2              PROSPECTIVE JUROR:  No, no, not me.

3              THE COURT:  Do you promise that you will be a fair

4    and impartial juror to both sides?

5              PROSPECTIVE JUROR:  Of course.

6              THE COURT:  Thank you so much.  Ms. Greene is going

7    to take you to the next room.

8              (Prospective juror exits.)

9              (Prospective juror enters.)

10             THE COURT:  This is Juror No. 147?

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  Good afternoon.

13             PROSPECTIVE JUROR:  Good afternoon.

14             THE COURT:  How are you doing?

15             PROSPECTIVE JUROR:  Fine.

16             THE COURT:  So you indicate that you are a

17   superintendent; is that right.

18   PROSPECTIVE JUROR:  Yes.

19             THE COURT:  Don't tell us where you work but what

20   kind of a place do you work in?

21             PROSPECTIVE JUROR:  Transportation.

22             THE COURT:  I see.  And how long have you been doing

23   that?

24             PROSPECTIVE JUROR:  22 years.

25             THE COURT:  And you said in your spare time you like

                    *SN        RPR        OCR*

GA0483

JURY SELECTION                                      156

1    sports?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  Is there any particular sport that you

4    like to watch and play?

5              PROSPECTIVE JUROR:  Start with cock soccer, but I

6    can't play anymore.  I'm too old for that.

7              THE COURT:  Never too old.  But you watch it now?

8              PROSPECTIVE JUROR:  Every chance I get.

9              THE COURT:  Any other sports you like to watch?

10             PROSPECTIVE JUROR:  Baseball, football, Formula One

11   NASCAR races.

12             THE COURT:  That covers one them all.

13             PROSPECTIVE JUROR:  One more, cricket.

14             THE COURT:  What about basketball?

15             PROSPECTIVE JUROR:  I do watch basketball.

16             THE COURT:  Do you do anything else in your spare

17   time?

18             PROSPECTIVE JUROR:  No.

19             THE COURT:  You said in your questionnaire that you

20   heard something about this case before on television.  Is that

21   correct?

22             PROSPECTIVE JUROR:  Yes.

23             THE COURT:  And do you promise that you can put

24   aside whatever you heard about the case if you are selected as

25   a juror and just listen to the evidence?

GA0484

JURY SELECTION                                    157

1            PROSPECTIVE JUROR:  Sure, but I don't think it's

2    this particular case.

3            THE COURT:  You're thinking of a different case?

4            PROSPECTIVE JUROR:  Yes.

5            THE COURT:  Why do you think that?

6            PROSPECTIVE JUROR:  Because I thought it was from a

7    different state.

8            THE COURT:  Whether this case or not, whatever you

9    thought you heard will you be able to put it aside?

10           PROSPECTIVE JUROR:  Sure.

11           THE COURT:  Okay, great.  There is a list of names

12   on that piece of paper.  Do you know any of those people?

13           PROSPECTIVE JUROR:  No.

14           THE COURT:  And another thing about this case is

15   that you will hear some testimony and some exhibits that have

16   to do with sexual activity between people who are of the same

17   sex.  Anything about that kind of evidence that would make it

18   hard for you to be fair and impartial?

19           PROSPECTIVE JUROR:  No.

20           THE COURT:  Okay.  Let me see from the parties if

21   they have any additional questions to put to this gentleman.

22           MR. CANNICK:  Nothing from us.

23           MS. GEDDES:  Not from the Government.

24           THE COURT:  I want to go over a few things that we

25   talked about in the big jury room.  The first is that

*SN        RPR        OCR*

GA0485

JURY SELECTION                                      158

1  Mr. Kelly is presumed to be innocent and the Government has

2  the burden of proving his guilt beyond a reasonable doubt.  If

3  you are selected as a juror in this case I will explain more

4  about what that means, but do you promise to follow that

5  instruction?

6            PROSPECTIVE JUROR:  Yes.

7            THE COURT:  And do you promise to follow all of my

8  instructions?

9            PROSPECTIVE JUROR:  Sure.

10            THE COURT:  Do you also promise that you won't do

11  any research about the case and look up anything on the

12  internet?

13            PROSPECTIVE JUROR:  No.

14            THE COURT:  You won't do that?

15            PROSPECTIVE JUROR:  No.

16            THE COURT:  And finally, do you promise that you

17  will be fair and impartial to both sides?

18            PROSPECTIVE JUROR:  Sure.

19            THE COURT:  All right.  Thank you so much.

20            (Prospective juror exits.)

21            (Prospective juror enters.)

22            THE COURT:  And this is Juror No. 149?

23            PROSPECTIVE JUROR:  Yes.

24            THE COURT:  Good afternoon, sir.

25            PROSPECTIVE JUROR:  Good afternoon.

JURY SELECTION                                      159

1              THE COURT:  How are you doing?

2              PROSPECTIVE JUROR:  Good.

3              THE COURT:  Please use the microphone.  On that

4     piece of paper are some additional names in addition to that

5     list from the questionnaire.  Do you know any of those people?

6              PROSPECTIVE JUROR:  No.

7              THE COURT:  Okay.  So, you are retired now; is that

8     right?

9              PROSPECTIVE JUROR:  Yes.

10             THE COURT:  But in your spare time you are also in

11    the Fire Department Safety Officers Association?

12             PROSPECTIVE JUROR:  Yes.  It's one of the groups

13    that I belong to.  I belong to my local volunteer fire

14    department.

15             THE COURT:  And what tells do you do in your spare

16    time?

17             PROSPECTIVE JUROR:  That takes up a lot of my time

18    but I have grandchildren so I spend a lot of time with them.

19             THE COURT:  And your spouse is retired also; is that

20    right.

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  It makes it easier to spend time with

23    the grandchildren; right?

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  What did your spouse do before

GA0487

JURY SELECTION                                            160

1    retirement?

2            PROSPECTIVE JUROR:  She was a recreation therapist.

3            THE COURT:  Okay.  You've been a juror before is

4    that right?

5            PROSPECTIVE JUROR:  Yes.

6            THE COURT:  That was a civil case?

7            MS. GEDDES:  Yes.

8            THE COURT:  How long ago was that?

9            MS. GEDDES:  Six years.

10           THE COURT:  Okay.  But you didn't get to reach a

11   verdict; is that right?

12           MS. GEDDES:  No.

13           THE COURT:  Did they settle or what happened?

14           MS. GEDDES:  I'm not really sure we were being

15   interviewed and the judge asked to us leave the room and

16   thanked us for our service.

17           THE COURT:  Okay.  But nobody told you why?

18           PROSPECTIVE JUROR:  No.

19           THE COURT:  You say you also have a friend who's a

20   county court judge?

21           PROSPECTIVE JUROR:  Yes.

22           THE COURT:  Do you ever talk to that person about

23   his or her work?

24           PROSPECTIVE JUROR:  When he first got elected but

25   not since then.

*SN        RPR        OCR*

GA0488

JURY SELECTION                                            161

```
 1              THE COURT:  Let me see from counsel if they have any

 2    additional questions.  One moment, I forgot to ask you an

 3    additional question.  Another thing about this case is that

 4    you will hear some testimony and some exhibits that have to do

 5    with sexual activity between people who are of the same sex.

 6    Anything about that kind of evidence that would make it hard

 7    for you to be fair and impartial?

 8              PROSPECTIVE JUROR:  No.

 9              THE COURT:  Now I want to see from counsel if there

10    are additional questions to put to this gentleman.

11              MR. CANNICK:  No, Your Honor.

12              MS. GEDDES:  No, Your Honor.

13              THE COURT:  I am going to go over just a few more

14    things that I reviewed with you in the ceremonial courtroom,

15    but I want to talk to you briefly about them now.  Mr. Kelly

16    is presumed to be innocent and the Government has to prove his

17    guilt beyond a reasonable doubt.  If you are selected as a

18    juror in this case I will explain what that means in more

19    detail, but my question to you is whether you can follow that

20    law.

21              PROSPECTIVE JUROR:  Absolutely.

22              THE COURT:  All right.  And will you follow all of

23    my instructions on the law?

24              PROSPECTIVE JUROR:  You're the expert.

25              THE COURT:  Well, okay.  And then you can't look up
```

GA0489

JURY SELECTION                                    162

1    anything on the internet or do any research about the case at

2    all or talk to anybody about the case.  Can you follow that

3    rule?

4                PROSPECTIVE JUROR:  Yes.

5                THE COURT:  And finally do you promise that you will

6    be fair and impartial to both sides?

7                PROSPECTIVE JUROR:  Absolutely.

8                THE COURT:  Thank you so much.  Ms. Greene is going

9    to direct you where to go next.

10               PROSPECTIVE JUROR:  Thank you.

11               (Prospective juror exits.)

12               (Prospective juror enters.)

13               THE COURT:  This is Juror No. 150?

14               PROSPECTIVE JUROR:  Yes.

15               THE COURT:  Good afternoon.

16               PROSPECTIVE JUROR:  Good afternoon.

17               THE COURT:  How are you doing?

18               PROSPECTIVE JUROR:  I'm all right, you?

19               THE COURT:  Good, good.  I have gone through your

20   questionnaire.  I'm going to ask you a couple of additional

21   questions, okay?

22               PROSPECTIVE JUROR:  Okay.

23               THE COURT:  So at one point in your questionnaire

24   you said you are against long prison sentences which are

25   longer than one year?

JURY SELECTION                                    163

```
1            PROSPECTIVE JUROR:  Right, correct.

2            THE COURT:  So under our system jurors don't decide

3    anything having to do with sentencing.  If you are selected as

4    a juror in this case, that is not something that you can

5    consider.  That's up to the Judge.

6            PROSPECTIVE JUROR:  Okay.

7            THE COURT:  Are you going to be thinking about

8    potential sentences if you are selected as a juror?

9            PROSPECTIVE JUROR:  Correct, yes.

10           THE COURT:  You couldn't put that aside?

11           PROSPECTIVE JUROR:  I don't think so.

12           THE COURT:  Okay.  So even if I told you you can't

13   think about it you would still think about it?

14           PROSPECTIVE JUROR:  Yes, ma'am.

15           THE COURT:  That is okay.  I am glad you are telling

16   me your opinion.  I think I'm going to excuse you from this

17   case.  I do appreciate all the effort you went through in

18   filling out your questionnaire.  Ms. Greene is going to tell

19   you where to go, okay?

20           (Prospective juror exits.)

21           (Prospective juror enters.)

22           THE COURT:  Good afternoon.  This is juror 151; is

23   that right?

24           PROSPECTIVE JUROR:  Yes.

25           THE COURT:  How are you doing?
```

GA0491

JURY SELECTION                                    164

1              PROSPECTIVE JUROR:  I'm good.  Thank you.

2              THE COURT:  Good, good.  I have gone through your

3    questionnaire and I have a couple of additional questions for

4    you.

5              PROSPECTIVE JUROR:  Sure.

6              THE COURT:  One question I had was you and your

7    husband own a business and will jury service be a problem for

8    you for four weeks?

9              PROSPECTIVE JUROR:  Probably.

10             THE COURT:  Why?

11             PROSPECTIVE JUROR:  We're transferring the phone

12   calls now to his cell phone but I take up estimates and it

13   might be.

14             THE COURT:  So I guess my question is there anybody

15   else that can cover for you if you were selected as a juror in

16   this case?

17             PROSPECTIVE JUROR:  Not really, no. I can keep the

18   cell phone –– his business line is directed to his cell phone.

19   I mean, he could type up his own contracts.

20             THE COURT:  To see how much he needs you.  Jury

21   service is a pressure for everybody, but I'm trying to get a

22   sense if you could last –– we would be starting with the

23   opening statements and evidence on August 18th and we'd then

24   go for about four weeks with a couple of days off in there as

25   well?

*SN         RPR         OCR*

GA0492

JURY SELECTION                                           165

1          PROSPECTIVE JUROR:  I could handle it.

2          THE COURT:  Thank you so much.  Now, I do have a

3    couple of questions for you.  You said that your daughter is a

4    forensic psychologist?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  And if my recollection is correct that

7    she counsels young people; is that right?

8          PROSPECTIVE JUROR:  Yes, she does.

9          THE COURT:  And are they -- she's testified in

10   connection with her work; is that right?

11         PROSPECTIVE JUROR:  Like for domestic, in domestic

12   court.  Not for -- like if they're getting restraining orders

13   and stuff.  She got an internship in the Courts.

14         THE COURT:  So if there's a custody issue or

15   something like that, is she connected with those or is it in

16   other cases like child abuse cases?

17         PROSPECTIVE JUROR:  She's more of a volunteer with a

18   group called Vibes and she will sit with the victims, like, in

19   the court to advise them -- I'm trying to think how to explain

20   it.  She doesn't do criminal court with them.

21         THE COURT:  It's more family court type thing?

22         PROSPECTIVE JUROR:  Right, right.

23         THE COURT:  But in connection with her work as a

24   psychologist and a social worker, you said that she's -- in

25   the past she's worked at the Child Advocacy Center; right?

GA0493

JURY SELECTION                                          166

1          PROSPECTIVE JUROR:  She still volunteers there

2     though.  She worked there.  It's Safe Harbor so she counsels

3     teens -- preteens and teens.

4          THE COURT:  I see.  And she also deals with preteens

5     and teens that are victims of sex trafficking; is that right?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  And have you talked to her a lot about

8     the nature of her work?

9          PROSPECTIVE JUROR:  I ask questions but she doesn't

10    talk a lot about it.  There was just really two cases that she

11    ever talked about with me.

12         THE COURT:  Do you think you could put aside

13    whatever conversations you've had with her if you are selected

14    as a juror on this case and judge this case on its own?

15         PROSPECTIVE JUROR:  I think so.

16         THE COURT:  Any hesitation about that?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  I think you said this, and you can

19    correct me if I'm wrong, that you have posted something on

20    famous trials that you have commented on them?  Do I have that

21    right?

22         PROSPECTIVE JUROR:  Commented?

23         THE COURT:  Yes.

24         PROSPECTIVE JUROR:  Jodi Arias, Casey Anthony.

25         THE COURT:  I know the case, but were the trials on

*SN        RPR        OCR*

GA0494

JURY SELECTION                                    167

1    television?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  Did you make comments about them?

4              PROSPECTIVE JUROR:  Yeah, in discussions on Facebook

5    with a group of people and that was a long time ago.

6              THE COURT:  Was it?

7              PROSPECTIVE JUROR:  Yeah.

8              THE COURT:  And the piece of paper that you have in

9    front of you, do you know -- if I asked you this already I

10   apologize.  It's been a long day.  Do you know any of those

11   people?

12             PROSPECTIVE JUROR:  Well, the name Michael Trimarco

13   is familiar to me.

14             THE COURT:  Do you know in what context?

15             PROSPECTIVE JUROR:  Yeah, we grew up -- we grew up,

16   my family, with a Mike Trimarco.

17             THE COURT:  Could that be the same person?

18             PROSPECTIVE JUROR:  I mean, there was a whole

19   Trimarco family.

20             MS. GEDDES:  Could we ask whether or she knows what

21   that particular Mike Trimarco does to see if that's the same

22   individual?

23             THE COURT:  Do you know what the individual does for

24   a living?

25             PROSPECTIVE JUROR:  I haven't seen him in 40 years.

GA0495

1    He was a kid I grew up with.

2              THE COURT:  You haven't kept contact?

3              PROSPECTIVE JUROR:  No.

4              THE COURT:  Are you in contact with people in his

5    family?

6              PROSPECTIVE JUROR:  No.

7              THE COURT:  All right.  The other thing is that

8    there will be testimony in this case and some exhibits that

9    are related to sexual activity between people who are of the

10   same sex.  Is there anything about that kind of evidence that

11   would make it hard for you to be fair and impartial?

12             PROSPECTIVE JUROR:  No.

13             THE COURT:  Let me see from the parties if there's

14   anything additional you would like me to ask this juror.

15             MR. CANNICK:  Yes, Your Honor.

16             (Sidebar held outside of the hearing of the jury.)

17

18             (Continued on next page.)

19

20

21

22

23

24

25

GA0496

SIDEBAR CONFERENCE                              169

1          (The following sidebar took place outside the

2    hearing of the jury.)

3          MR. CANNICK:  I just had a follow-up on Mike

4    Trimarco, if she were to find out that it was the same Mike

5    Trimarco that she knew years ago and he testified here, would

6    she give his testimony more credit because she knew him prior.

7    And number 67 she said regarding the police officer --

8    something about being more truthful because I think she has a

9    certain expectation of them.  Can you just probe that a little

10   bit further?

11         THE COURT:  Sure.  I'm at a little bit of a loss

12   here because I don't know who these people are.  Who is Mike

13   Trimarco?

14         MS. GEDDES:  He's a representative from Canon who is

15   going to testify about the -- that Canon video cameras were

16   not produced in the state of Illinois and therefore the camera

17   crossed --

18         THE COURT:  Can't you stipulate to that?

19         MR. CANNICK:  I will speak with the team and let you

20   know.

21         THE COURT:  That sounds like scintillating

22   testimony, but I feel like we could do a stip.

23         MR. CANNICK:  That's why the temperature is so low

24   in here to keep you awake.

25         (Sidebar ends.)  (Continued on next page.)

1              (In open court; Jury present.)

2              THE COURT:  I just wanted to double check.  Was that

3    the question in connection with question 67?  I think it was.

4    Okay.

5              First of all, if this person turns out to be the

6    same Mike Trimarco that you grew up with, I don't know how you

7    would know that, I suspect he's changed in four years, but

8    would you still be able to evaluate his testimony fairly?

9              THE PROSPECTIVE JUROR:  Yes.

10             THE COURT:  Okay.  All right.

11             The other thing is, you were asked whether you

12   thought police officers were more likely to tell the truth

13   than other witnesses.  And you said that you have faith in

14   officers that they'll tell the truth.

15             If you're selected as a juror in this case, I'll

16   instruct you that, you know, police officers are not more

17   credible or less credible because just they happen to be

18   police officers.  There's some good, there's some bad, some

19   fall in between.  Obviously it's everybody's hope that the

20   police will tell the truth.

21             But do you believe that police are more likely to

22   tell the truth than other witnesses?

23             THE PROSPECTIVE JUROR:  I like to believe they are.

24             THE COURT:  Well, if you're selected as a juror in

25   this case, you're going to have to evaluate everybody as an

JURY SELECTION                                   171

1    individual.  And as I said, you know, police officers are kind

2    of like everybody else --

3              THE PROSPECTIVE JUROR:  I understand.

4              THE COURT:  -- all types, as I say good ones, bad

5    ones, and some in between.

6              THE PROSPECTIVE JUROR:  I understand.

7              THE COURT:  Okay.  And you will be able to follow

8    that instruction?

9              THE PROSPECTIVE JUROR:  Yes.

10             THE COURT:  Okay.  Did I get everything?

11             Okay.  All right.  I just want to go over a couple

12   of things that we talked about in this larger courtroom.

13             Mr. Kelly is presumed to be innocent, and the

14   government has to prove his guilt beyond a reasonable doubt.

15             Can you follow that instruction?

16             THE PROSPECTIVE JUROR:  Yes.

17             THE COURT:  Obviously if you become a juror, I'll

18   give you much more detail about what that means.

19             But you can follow that instruction?

20             THE PROSPECTIVE JUROR:  Yes.

21             THE COURT:  And do you promise that you'll follow

22   all of my instructions on the law?

23             THE PROSPECTIVE JUROR:  Yes.

24             THE COURT:  There is also this question about

25   looking things up on the internet.  You can't look up anything

GA0499

JURY SELECTION                                    172

1   having to do with the case.  And I think some of our other

2   jurors have commented that it's a temptation to want to find

3   out information about the case, but it's just absolutely

4   forbidden.

5               Is that a rule that you can follow?

6               THE PROSPECTIVE JUROR:  Oh, yes.

7               THE COURT:  Okay.  And you won't be able to speak to

8   anybody about the case at all.

9               THE PROSPECTIVE JUROR:  Right.

10              THE COURT:  Okay.

11              And then my last question to you is whether you

12  promise to be fair and impartial to both sides?

13              THE PROSPECTIVE JUROR:  I do.

14              THE COURT:  Okay.  All right.  Thank you so much.

15              Ms. Greene is going to direct you to where you have

16  to go next.

17              (Prospective Juror exits the courtroom.)

18              (Prospective Juror enters the courtroom.)

19              THE COURT:  Now is this Juror 155?

20              155, how are you doing?

21              THE PROSPECTIVE JUROR:  Yes.

22              Fine.  Thank you.

23              THE COURT:  So I've gone through your questionnaire

24  and I just had a couple of questions.

25              The first one is:  You say you're concerned it's

JURY SELECTION                                    173

1    going to be just too physically exhausting for you; is that

2    right?

3                    THE PROSPECTIVE JUROR:  Yes, Your Honor.

4                    THE COURT:  You feel like you're not up to the task?

5                    THE PROSPECTIVE JUROR:  Exactly.

6                    THE COURT:  I see.  Okay.

7                    I think I'm going to excuse you from this case,

8    because we don't want to do that to you.  Okay?

9                    THE PROSPECTIVE JUROR:  Okay.

10                   (Prospective Juror exits the courtroom.)

11                   THE COURT:  All right, okay.

12                   So be healthy, all right?

13                   THE PROSPECTIVE JUROR:  Thank you.  I'll try.

14                   THE COURT:  Okay.  Take care.

15                   (Prospective Juror exits the courtroom.)

16                   (Prospective Juror enters the courtroom.)

17                   THE COURT:  Okay, this is Juror 156.

18                   Good afternoon.  How are you doing?

19                   THE PROSPECTIVE JUROR:  I'm doing well.  How are

20   you?

21                   THE COURT:  That's all right.  I didn't mean to

22   scare you there.

23                   Let's start with that piece of paper in front of

24   you.

25                   Those are just some additional names to that list

JURY SELECTION                                    174

1    that you looked at in connection with the questionnaire.

2            Do you know any of the people on that list?

3            THE PROSPECTIVE JUROR:  No, I do not.

4            THE COURT:  Okay.  So I have been through the

5    questionnaire, and I just have a couple of questions for you

6    based on the questionnaire.

7            In your spare time, you talk about doing some

8    mentoring and volunteer opportunities.

9            Is that in connection with the sale force community,

10   or do you it do more generally?

11           THE PROSPECTIVE JUROR:  Both inside my corporation

12   and inside the sales force of the system.

13           THE COURT:  And what does that entail?

14           THE PROSPECTIVE JUROR:  Mostly entails helping

15   people who have gotten the training but don't know how to get

16   their first job.  Sometimes coaching them on interview

17   techniques.  Interview questions.  Mock interviews.  You know,

18   sometimes people don't know what it wear to interviews.

19   Things like that.

20           THE COURT:  I see.  And what else do you like to do

21   in your spare time?

22           THE PROSPECTIVE JUROR:  I don't have much spare

23   time.

24           THE COURT:  You have an eighth grader and a junior.

25           THE PROSPECTIVE JUROR:  Uh-huh.

JURY SELECTION                                    175

1          THE COURT:  Okay, so that probably keeps you plenty

2     busy.

3          THE PROSPECTIVE JUROR:  It does.

4          THE COURT:  In your answers you said that you have

5     heard something about either the defendant or the case; is

6     that correct?

7          THE PROSPECTIVE JUROR:  Well, I mean I know who he

8     is.

9          THE COURT:  Uh-huh.

10         But what I'm going to ask you is, it doesn't sound

11    like you follow, you know, this kind of stuff on television --

12         THE PROSPECTIVE JUROR:  No.

13         THE COURT:  -- or any other way.

14         Anything that you have heard about him before I'm

15    just going to ask you to forget about and to base -- to focus

16    on the evidence that you hear in the courtroom.

17         Can you do that?

18         THE PROSPECTIVE JUROR:  Yes, I can.

19         THE COURT:  Okay.

20         Now, the evidence is this case will also include

21    testimony and exhibits having to do with sexual activity

22    between people who are of the same sex.

23         Any reason that that would cause you any difficulty

24    in being fair and impartial?

25         THE PROSPECTIVE JUROR:  Absolutely not.

JURY SELECTION                                        176

1              THE COURT:  Okay.

2              Do either of the lawyers have any additional

3      questions?  No?  Okay.

4              I just want to review with you a couple of the

5      things that we talked about in the larger jury room.

6              The first is that Mr. Kelly is presumed to be

7      innocent, and the government has the burden to prove his guilt

8      beyond a reasonable doubt.  If you're selected as a jury in

9      this case, I'll explain what that means in more detail.

10             But do you promise that you'll follow that

11     instruction?

12             THE PROSPECTIVE JUROR:  Yes, I do.

13             THE COURT:  All right.  And will you follow all of

14     my instructions on the law?

15             THE PROSPECTIVE JUROR:  Yes.

16             THE COURT:  The other prohibition in this case, or

17     one of the prohibitions in this case, is that you can't look

18     anything up about the case at all; social media, anything.

19             Can you promise to abide by that restriction?

20             THE PROSPECTIVE JUROR:  I promise.

21             THE COURT:  And obviously not talk to anybody about

22     the case.

23             THE PROSPECTIVE JUROR:  No problem.

24             THE COURT:  And finally, do you promise that you'll

25     be a fair and impartial juror to both sides?

GA0504

JURY SELECTION                                        177

1           THE PROSPECTIVE JUROR:  Yes, I do.

2           THE COURT:  Okay.  Ms. Greene is going to direct you

3    where you have to go next.

4           (Prospective Juror exits the courtroom.)

5           (Prospective Juror enters the courtroom.)

6           THE COURT:  And this is Juror Number 160; is that

7    right?

8           THE PROSPECTIVE JUROR:  Yes.

9           THE COURT:  How are you doing?

10          THE PROSPECTIVE JUROR:  Good.

11          THE COURT:  Good.  Good.  I've reviewed your

12   questionnaire and I'm just going to ask you some additional

13   questions about some of your answers.

14          So the first question is, you indicated on your

15   questionnaire that you have a little bit of some vision

16   problems because of glaucoma; is that right?

17          THE PROSPECTIVE JUROR:  Yes.

18          THE COURT:  Go ahead.

19          MR. SCHOLAR:  My right eye is -- the vision.  But I

20   see you.

21          THE COURT:  Okay.  I just want to -- you'll be

22   looking at exhibits and things like that if you're selected as

23   a juror.

24          Is that going to be a problem for you?

25          THE PROSPECTIVE JUROR:  I don't think so.

JURY SELECTION                                    178

1          THE COURT:  Okay.  All right.  Thank you so much.

2          So I see in the question it says:  What do you do

3   basically in your spare time?  You said "Nothing".

4          Well, you wrote "Not applicable," and I didn't know

5   if that's because you don't have any spare time or...

6          THE PROSPECTIVE JUROR:  I did not know, you know,

7   outdoor activities, hiking.

8          THE COURT:  I see.  Okay.

9          So the other thing I wanted to talk to you about was

10  your answer to one of the questions.

11         So under our law, a defendant in a criminal case has

12  no obligation to testify or to put on a case at all.  A

13  defendant in a criminal case doesn't have to prove that he's

14  not guilty.  So for that reason, they're not -- a defendant is

15  not required to testify or to put on any evidence.

16         And so you said in your response that, you know, if

17  you have evidence to prove that you're innocent, why don't you

18  present it?

19         My question to you is, since I've explained to you

20  what the rule is, will you be able to follow that rule, that

21  you can't hold it against Mr. Kelly if he decides not to

22  testify or to put on the case?

23         THE PROSPECTIVE JUROR:  It's not a problem if that's

24  the rule.

25         THE COURT:  That's the rule.  That's the law.

JURY SELECTION                                        179

1                  And you can follow that rule?

2                  THE PROSPECTIVE JUROR:  Yes.

3                  THE COURT:  Okay.  Thank you so much.

4                  That piece of paper has some names on it, and I'm

5       just going to ask you to take a look at it and see if you

6       recognize any of those people.

7                  THE PROSPECTIVE JUROR:  Neither one of them.

8                  THE COURT:  Okay.  Those are just some additional

9       people to that list that you had in the questionnaire, okay?

10                 THE PROSPECTIVE JUROR:  Yeah.

11                 THE COURT:  All right.  In this case there's going

12      to be testimony and exhibits having to do with sexual activity

13      between people that are of the same sex.

14                 Is there anything about that kind of evidence that

15      would make it hard for you to be a fair and impartial juror?

16                 THE PROSPECTIVE JUROR:  No.

17                 THE COURT:  Okay.  Let me just find out from the

18      parties if there are any additional questions they want to put

19      to this gentleman.

20                 MS. GEDDES:  Nothing from the government.

21                 MR. CANNICK:  Just one second.

22                 Sidebar, Your Honor.

23                 THE COURT:  Sure.

24                 (Continued on the next page.)

25                 (Sidebar conference.)

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

SIDEBAR CONFERENCE                    180

1              (The following occurred at sidebar.)

2              MR. FARINELLA:  Question number 36 asks if he's able

3    to be fair and impartial.

4              THE COURT:  Do you want to ask him about that?

5              MR. FARINELLA:  It says he can't be fair and

6    impartial.

7              THE COURT:  I'm going to ask him a question about

8    it, okay?

9              (End of sidebar conference.)

10             (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; Jury present.)

2          THE COURT:  I've got one other question for you,

3     just give me a second, okay?

4          Oh, so one of the questions that you were asked on

5     the questionnaire has to do with the fact that Mr. Kelly is

6     known in the music and entertainment business, and you said

7     that it might be hard for you to be fair and impartial because

8     a public figure is expected to hold high standards of morality

9     and behavior.

10         So in this case, you're going to have to -- well,

11    let me ask you this:  Is the simple fact that he's a public

12    figure, is that going to make it hard for you to evaluate him

13    like anybody else?

14         THE PROSPECTIVE JUROR:  That statement has nothing

15    to do with that specific person.  It's a general statement.

16         THE COURT:  I see.  That's just your belief, but if

17    you're a juror in this case, do you promise to evaluate

18    Mr. Kelly just based on the evidence that you hear at trial?

19         THE PROSPECTIVE JUROR:  Yes.

20         THE COURT:  Okay, so you can be fair and impartial?

21         THE PROSPECTIVE JUROR:  Say that again?

22         THE COURT:  You can be fair and impartial?  You can

23    be a fair juror to both sides?

24         THE PROSPECTIVE JUROR:  Yeah.

25         THE COURT:  Any hesitation about that?

JURY SELECTION                                    182

1            THE PROSPECTIVE JUROR:  No.

2            THE COURT:  Okay.  All right.

3            On that, I do want to go over some of the things

4      that we talked about in the larger jury room.

5            So Mr. Kelly, like all defendants in criminal cases,

6      is presumed to be innocent, and the government has the burden

7      to prove his guilt beyond a reasonable doubt.

8            If you're selected as a juror in this case, I will

9      give you detailed instructions about what that concept means.

10           But do you promise that if you're selected as a

11     juror, that you will follow that principle?

12           THE PROSPECTIVE JUROR:  Yes.

13           THE COURT:  Okay.  Will you follow all of my

14     instructions on the law?

15           THE PROSPECTIVE JUROR:  Yes.

16           THE COURT:  And you're not going to be permitted to

17     do any research about the case, to look anything up on the

18     internet.

19           Do you promise that you will follow that

20     instruction?

21           THE PROSPECTIVE JUROR:  Yes, I do.

22           THE COURT:  Okay.  And the last thing I want to ask

23     you is that if you can promise me that you will give both

24     sides a fair trial?

25           THE PROSPECTIVE JUROR:  Yes, I can.

JURY SELECTION                                      183

1          THE COURT:  Any hesitation about that at all?

2          THE PROSPECTIVE JUROR:  None.

3          THE COURT:  Okay.  Thank you so much.  Ms. Greene

4    will tell you where to go.

5          THE PROSPECTIVE JUROR:  Okay, thank you.

6          (Prospective Juror exits the courtroom.)

7          (Prospective Juror enters the courtroom.)

8          THE COURT:  You can follow Ms. Greene up here, okay?

9    Thank you.

10          And this is Juror Number 161.  Good afternoon.

11          THE PROSPECTIVE JUROR:  Hi.  Good afternoon.  I'm

12    the last one.

13          THE COURT:  How are you doing?

14          THE PROSPECTIVE JUROR:  Good.

15          THE COURT:  Good, I'm glad it hear it.

16          So I've gone through your questionnaire, I've got a

17    couple of other questions for you, but since you've got that

18    piece of paper, those are some additional names that we'd like

19    to know whether you know those people or not?

20          THE PROSPECTIVE JUROR:  No, no, no, no.  I don't

21    know.

22          THE COURT:  Okay.

23          THE PROSPECTIVE JUROR:  My English is not that good.

24          THE COURT:  Okay.  Well, let me ask you.  You did a

25    good job of filling out the questionnaire.

JURY SELECTION                              184

1              THE PROSPECTIVE JUROR:  Oh, some questions I don't

2    have.  I no have.  I put everything "no".  That's it.

3              THE COURT:  I see.

4              THE PROSPECTIVE JUROR:  Yeah.

5              THE COURT:  Do you think that that would be a

6    problem for you if you were selected as a juror in this case?

7              THE PROSPECTIVE JUROR:  If someone can help me, it

8    would be okay.  Because I -- to be honest, this morning three

9    guys raise their hand.  I don't know why they raise their

10   hand.

11             THE COURT:  I see.  You know, I think that I'm going

12   to excuse you from this case, okay?

13             THE PROSPECTIVE JUROR:  Okay.

14             THE COURT:  Okay, but I appreciate you're coming in

15   and filling out the questionnaire.

16             THE PROSPECTIVE JUROR:  No problem, no.  I try my

17   best because on the sheet, you put, "Yes," you have to write

18   something.  I don't know how to write.

19             THE COURT:  I see.  Well, you know, I appreciate

20   you're taking the time and participating in this process.  We

21   can't -- our justice system can't function unless we have

22   people like you who are willing to do that.  Okay?

23             All right.  Thank you very, very much.

24             THE PROSPECTIVE JUROR:  Thank you.  Thank you.

25             (Prospective Juror exits the courtroom.)

PROCEEDINGS                                    185

1           THE COURT:  Donna, are we done?

2           THE COURTROOM DEPUTY:  We're done.

3           THE COURT:  Our next group of folks we let go just

4    because we didn't get to this them, so we're going to have

5    them come tomorrow in the morning.

6           Let me just get a sense of our numbers here, but I

7    think we'll just resume tomorrow.

8           If there are specific questions, I know the

9    government submitted them, if there are other specific

10   questions that you know you have about the jurors that are

11   coming up and you want to submit them, it's make things go a

12   little more smoothly but, you know, this worked pretty well

13   today, too.  But it's also easier for me, although it will be

14   another stack of papers that I have look at, but that's fine.

15          Okay, is there anything else that we have to talk

16   about today?

17          Anything from the government?

18          MS. GEDDES:  No, Your Honor.

19          THE COURT:  Anything from the defense?

20          MR. CANNICK:  No, Your Honor.

21          THE COURT:  All right, I'll see everybody tomorrow,

22   get moving as close to 9:30 as we can.  Okay?

23                  *     *     *     *     *

24          (Proceedings adjourned at 4:40 p.m. to resume on

25   August 10, 2021 at 9:30 a.m.)

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*