# 22-1481(L)

## 22-1982(CON)

# United States Court of Appeals

### For the Second Circuit

———— ❖ ————

UNITED STATES OF AMERICA,

*Appellee,*

—against—

ROBERT SYLVESTER KELLY, AKA R. KELLY,

*Defendant-Appellant.*

————

**On Appeal From The United States District Court
For The Eastern District of New York**

**THE GOVERNMENT'S APPENDIX
VOLUME IV OF V
(Pages GA792 to GA917)**

BREON PEACE,
*United States Attorney,
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000*

NICHOLAS J. MOSCOW,
LAUREN H. ELBERT,
KAYLA C. BENSING,
  *Assistant United States Attorneys,
    Of Counsel.*

# TABLE OF CONTENTS

Page

Defendant's Motion to Dismiss (DE 41),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated February 28, 2020...............................................................GA 1

Defendant's Motion to Dismiss, Motion to Strike (DE 42),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated March 2, 2020 ..................................................................GA 12

Superseding Indictment (DE 43),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated March 12, 2020 ................................................................GA 19

Joint Request to Charge (DE 117-1),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated July 7, 2021.....................................................................GA 42

Defendant's Objections to Request to Charge (DE 117-3),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated July 7, 2021...................................................................GA 131

Government Memorandum in Support of Motion in Limine (DE 133),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated July 23, 2021.................................................................GA 135

Defendant's Memorandum in Opposition to Motion in Limine (DE 146),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated July 31, 2021.................................................................GA 190

Defendant's Letter Motion Regarding Jury Instructions (DE 219),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 18, 2021 ........................................................GA 203

Defendant's Memorandum in Support of Motion for Acquittal
(DE 269-1),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated February 17, 2022...........................................................GA 211

Defendant's Memorandum in Support of Motion for a New Trial
(DE 270-1),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated February 17, 2022...........................................................GA 274

Defendant's Memorandum in Support of Supplemental Motion for a
New Trial (DE 276-1),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated March 21, 2022 ..............................................................GA 296

Pretrial Conference Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 3, 2021 ...............................................................GA 308

Jury Selection Transcript,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 9 through 11, 2021 .............................................GA 328

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 18, 2021 .............................................................GA 792

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 19, 2021 .............................................................GA 796

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 20, 2021 .............................................................GA 803

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 26, 2021 .............................................................GA 814

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 1, 2021 ..........................................................GA 853

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 14, 2021 ........................................................GA 870

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 15, 2021 ......................................................GA 872

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 22, 2021 ......................................................GA 886

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 23, 2021 ......................................................GA 897

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 24, 2021 ......................................................GA 901

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 27, 2021 ......................................................GA 907

Government Letter Regarding "For Cause" Challenges (DE 152),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 4, 2021 ...............................................................GA 918

Government Letter Regarding "For Cause" Challenges (DE 157),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 6, 2021 ...............................................................GA 924

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 23, 2021 .............................................................GA 928

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 25, 2021 .............................................................GA 949

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 30, 2021 .............................................................GA 952

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated August 31, 2021 ............................................................GA 954

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 2, 2021 .......................................................GA 960

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 3, 2021 .......................................................GA 962

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 9, 2021 .......................................................GA 986

Trial Transcript Excerpts,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated September 9, 2021 .......................................................GA 986

Government Exhibit 208(a),
  United States v. Kelly, 19-CR-286 (AMD).................................GA 1025

Government Exhibit 233(d),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated April 29, 2015............................................................GA 1028

Government Exhibit 240(b),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated December 10, 2015......................................................GA 1029

Government Exhibit 240(c),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated December 28, 2015......................................................GA 1030

Government Exhibit 240(f),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated May 10, 2016..............................................................GA 1031

Government Exhibit 240(g),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated May 16 through 17, 2015.............................................GA 1033

Government Exhibit 401,
  United States v. Kelly, 19-CR-286 (AMD).................................GA 1038

Government Exhibit 402,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated March 19, 2007 ...........................................................GA 1039

Government Exhibit 417(a),
  United States v. Kelly, 19-CR-286 (AMD).................................GA 1041

Government Exhibit 449,
  United States v. Kelly, 19-CR-286 (AMD).................................GA 1042

Government Exhibit 497(a),
  United States v. Kelly, 19-CR-286 (AMD),
    Dated December 6, 2017........................................................GA 1047

Government Exhibit 485(b)-T,
  United States v. Kelly, 19-CR-286 (AMD),
    Dated December 6, 2017........................................................GA 1049

Submitted Separately on Disc

Government Exhibit 328(a)
  United States v. Kelly, 19-CR-286 (AMD).................................GA 1063

Government Exhibit 329(a)
  United States v. Kelly, 19-CR-286 (AMD).................................GA 1064

Government Exhibit 341(a)
  United States v. Kelly, 19-CR-286 (AMD).................................GA 1065

Government Exhibit 342(a)
  United States v. Kelly, 19-CR-286 (AMD).................................GA 1066

Government Exhibit 343(a)
  United States v. Kelly, 19-CR-286 (AMD).................................GA 1067

1

```
1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - - - - X
3
   UNITED STATES OF AMERICA,      : 19-CR-00286(AMD)
4                                 :
                                  :
5                                 :
        -against-                 : United States Courthouse
6                                 : Brooklyn, New York
                                  :
7                                 :
                                  : Wednesday, August 18, 2021
8  ROBERT SYLVESTER KELLY,        : 9:30 a.m.
                                  :
9           Defendant.            :
                                  :
10
   - - - - - - - - - - - - - - - - X
11

12
            TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
13          BEFORE THE HONORABLE ANN M. DONNELLY
               UNITED STATES DISTRICT JUDGE
14

15
                  A P P E A R A N C E S :
16
   For the Government:  JACQUELYN M. KASULIS, ESQ.
17                      Acting United States Attorney
                        Eastern District of New York
18                      271 Cadman Plaza East
                        Brooklyn, New York 11201
19                 BY:  ELIZABETH GEDDES, ESQ.
                        NADIA SHIHATA, ESQ.
20                      MARIA E. CRUZ MELENDEZ, ESQ.
                        Assistant United States Attorneys
21

22
   For the Defendant:   AIELLO & CANNICK, Esq.
23                      69-06 Grand Avenue
                        Maspeth, New York 11378
24                 BY:  DEVEREAUX L. CANNICK, ESQ.

25
```

2

```
            A P P E A R A N C E S:   (Continued)


For the Defendant:      BLANK LAW, P.C.
                          444 S. Washington Avenue
                          Royal Oak, Michigan 48067
                        BY:  NICOLE BLANK BECKER, ESQ.


                        THE LAW OFFICE OF THOMAS A. FARINELLA
                          260 Madison Avenue
                          8th Floor
                          New York, New York 10016
                        BY:  THOMAS A. FARINELLA, ESQ.


                        THE C.H. SCHOLAR LAW FIRM, PLLC
                          225 Broadway
                          Suite 225
                          New York, New York 10007
                        BY:  CALVIN HAROLD SCHOLAR, ESQ.
```

```
Court Reporter:  Stacy A. Mace, RMR, CRR, RPR, CCR
                 Official Court Reporter
                 E-mail:  SMaceRPR@gmail.com
Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.
```

Proceedings                                                      4

1   be followed by written motions.

2           The motion to dismiss is denied in all respects.  I

3   have an exception to that ruling.  As I said, there will be a

4   written decision filed shortly.

5           With respect to the outstanding motions in limine, I

6   adhere to my decision that I made at our final pretrial

7   conference on August 3rd, but let me review the outstanding

8   motions in limine and let me know if I've forgotten one.

9           The first has to do with the alleged sexual abuse of

10  Jane Doe Number 7, a minor, in 1991.  That is granted only

11  insofar as there is evidence that Jane Doe Number 7 witnessed

12  the alleged sexual abuse of Jane Doe Number 1.  That's

13  admissible for the same reasons that I ruled that evidence

14  about Jane Doe 1 was admissible.

15          The remaining evidence is not admissible about Jane

16  Doe Number 7.  The conduct is alleged to have taken place

17  before the enterprise began.  So, I am excluding that.

18          The second category of evidence is the alleged

19  sexual abuse of Jane Doe Number 9, a minor, in 1995.  Evidence

20  that Jane Doe Number 9 informed the defendant she contracted

21  herpes from him is admissible.  It goes to knowledge for the

22  charged acts in Racketeering Acts Twelve and Fourteen, as well

23  as in Counts Six through Nine.  The evidence is not unduly

24  prejudicial and no more sensational than the conduct that's

25  charged.  The other allegations regarding Jane Doe Number 9

Proceedings                                                    5

1  are not admissible.

2          The third outstanding motion in limine was the

3  alleged exposure of Jane Doe Number 11 and 12 to a sexually

4  transmitted disease in 2001.  The evidence that Jane Doe

5  Number 11 informed the defendant that she contracted herpes

6  from him is admissible for the same reasons that I just

7  described with Jane Doe Number 9.

8          The evidence of the settlement agreements with

9  victims is also admissible.  It is direct evidence of the

10  enterprise and the means and methods, specifically the steps

11  that the defendant and other members of the enterprise took to

12  conceal what was going on and to perpetuate the enterprise.

13          The next category is the alleged unlawful

14  imprisonment of Jane Doe Number 14 in 2008.  That is

15  admissible.  It is not unduly prejudicial.  It is direct

16  evidence of the enterprise and its means and methods.

17          The only other issue was this question of whether

18  the parties were going to stipulate to the dates of concerts

19  that took place, what was it, in Georgia?

20          MS. GEDDES:  Yes, Your Honor, in Georgia.

21          THE COURT:  Did you stipulate to that?

22          MS. GEDDES:  It's my understanding that defense

23  counsel is going to stipulate to all of the dates, with the

24  exception of the one newspaper article the Government sought

25  to admit that showed that Demetrius Smith was present at one

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - - - - X
3
   UNITED STATES OF AMERICA,     : 19-CR-00286(AMD)
4                                 :
                                  :
5                                 :
         -against-                : United States Courthouse
6                                 : Brooklyn, New York
                                  :
7                                 :
                                  : Thursday, August 19, 2021
8  ROBERT SYLVESTER KELLY,        : 9:30 a.m.
                                  :
9          Defendant.             :
                                  :
10
   - - - - - - - - - - - - - - - - X
11

12
          TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
13         BEFORE THE HONORABLE ANN M. DONNELLY
              UNITED STATES DISTRICT JUDGE
14

15
              A P P E A R A N C E S :
16
   For the Government:  JACQUELYN M. KASULIS, ESQ.
17                       Acting United States Attorney
                         Eastern District of New York
18                       271 Cadman Plaza East
                         Brooklyn, New York 11201
19                   BY:  ELIZABETH GEDDES, ESQ.
                         NADIA SHIHATA, ESQ.
20                       MARIA E. CRUZ MELENDEZ, ESQ.
                         Assistant United States Attorneys
21

22
   For the Defendant:   AIELLO & CANNICK, Esq.
23                       69-06 Grand Avenue
                         Maspeth, New York 11378
24                   BY:  DEVEREAUX L. CANNICK, ESQ.

25

        SAM      OCR      RMR      CRR      RPR

210

A P P E A R A N C E S:  (Continued)


For the Defendant:       BLANK LAW, P.C.
                         444 S. Washington Avenue
                         Royal Oak, Michigan 48067
                         BY:  NICOLE BLANK BECKER, ESQ.


                         THE LAW OFFICE OF THOMAS A. FARINELLA
                         260 Madison Avenue
                         8th Floor
                         New York, New York 10016
                         BY:  THOMAS A. FARINELLA, ESQ.


                         THE C.H. SCHOLAR LAW FIRM, PLLC
                         225 Broadway
                         Suite 225
                         New York, New York 10007
                         BY:  CALVIN HAROLD SCHOLAR, ESQ.


Court Reporter:  Stacy A. Mace, RMR, CRR, RPR, CCR
                 Official Court Reporter
                 E-mail:  SMaceRPR@gmail.com
Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

Amschl - direct - Geddes                    370

1  Department?

2  A    4423.

3  Q    What is a call sign?  I probably should have started with

4  that.

5  A    It's a radio designated number.

6  Q    I'd like to direct your attention to June 13th of 2009.

7        Were you working that day?

8  A    I was.

9  Q    Do you recall what shift you were working that day?

10 A    Afternoons.

11 Q    And what are the hours of the afternoon shift?

12 A    4:00 p.m. to midnight.

13 Q    I want to direct your attention to 10:53, approximately

14 10:53 p.m. that evening.

15        What did you do that evening?

16 A    I was dispatched to a call.  It was an assist other

17 agency for Country Club Hills Police Department looking for a

18 missing juvenile.

19        THE COURT:  Slow down a little.

20 A    I was dispatched to a call for another agency.  It was

21 for Country Club Hills Police Department, also in Illinois,

22 for a missing juvenile.

23 Q    And you indicated that you were dispatched to a call.

24        What does that mean?

25 A    Meaning I received a call over the radio.

SAM    OCR    RMR    CRR    RPR

Amschl - direct - Geddes                          371

1  Q    And were you told to go somewhere?

2  A    Yes.

3  Q    Where were you told to go?

4  A    One Maros Lane.

5  Q    Is that also in Olympia Fields?

6  A    Yes, it is.

7         MS. GEDDES:  I'm showing the witness what's in

8  evidence as Government Exhibit 502(a).

9         (Exhibit published.)

10 Q    Do you recognize what's shown in 502(a)?

11 A    I do.

12 Q    What is that?

13 A    That is the front gate to One Maros Lane in Olympia

14 Fields.

15 Q    And is that the location where you were dispatched to on

16 June 13th of 2009?

17 A    It is.

18 Q    And you testified that you were going to look for a

19 missing juvenile.

20         Did you learn the name of the individual you were

21 going to look for?

22 A    Dominique ███████.

23         MS. GEDDES:  And I'm showing the witness and the

24 jury only what's in evidence as Government Exhibit 69(a).

25 Q    Underneath the photograph shown in 69(a), is that the

SAM     OCR     RMR     CRR     RPR

Amschl - direct - Geddes                                    372

1   name of the Dominique that you were -- who was listed as the

2   missing juvenile?

3   A    It is.

4   Q    Do you recall what happened when you responded to One

5   Maros Lane?

6   A    I was met by security.

7   Q    And what happened when you were met by security?

8   A    Security referred me to a phone call for the business

9   manager for Mr. Kelly.

10  Q    And by Mr. Kelly, who are you referring to?

11  A    Robert Sylvester Kelly.

12  Q    What was Robert Sylvester Kelly's association with One

13  Maros Lane?

14  A    He was the owner of the residence.

15  Q    And you testified that someone at security referred you

16  to the business manager, is that correct?

17  A    Yes.

18  Q    Did you learn the name of the business manager?

19  A    I did not.

20  Q    Did you learn the telephone number of the business

21  manager?

22  A    I did.

23  Q    As you sit here today, do you recall that telephone

24  number?

25  A    I do not.

SAM      OCR      RMR      CRR      RPR

GA0801

Amschl - direct - Geddes          373

1           MS. GEDDES:  I am showing the witness what's been

2   marked for identification as Government Exhibit 3500-GA1.

3   BY MS. GEDDES:

4   Q    And I am showing you page 4 of that.

5           Does that refresh your recollection as to the

6   telephone number for the business manager?

7   A    It does.

8   Q    What was the telephone number?

9   A    312-659-1040.

10  Q    Did you have an opportunity to speak with the business

11  manager after security referred you to him?

12  A    I did.

13  Q    What happened?

14  A    The business manager advised that the juvenile was 17,

15  and that he had asked her to leave the prior week.

16  Q    What, if anything, did the business manager say about

17  Mr. Kelly?

18  A    I'm sorry?

19           MR. CANNICK:  Objection.

20           MS. GEDDES:  Let me rephrase.  Withdraw that

21  question.

22  BY MS. GEDDES:

23  Q    Did you have an opportunity to speak with Mr. Kelly that

24  day?

25  A    No.

469

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - - - - X
3
   UNITED STATES OF AMERICA,      : 19-CR-00286(AMD)
4                                 :
                                  :
5                                 :
        -against-                 : United States Courthouse
6                                 : Brooklyn, New York
                                  :
7                                 :
                                  : Friday, August 20, 2021
8  ROBERT SYLVESTER KELLY,        : 9:30 a.m.
                                  :
9          Defendant.             :
                                  :
10
   - - - - - - - - - - - - - - - - X
11

12

           TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
13         BEFORE THE HONORABLE ANN M. DONNELLY
              UNITED STATES DISTRICT JUDGE
14

15
                   A P P E A R A N C E S :
16
   For the Government:   JACQUELYN M. KASULIS, ESQ.
17                       Acting United States Attorney
                         Eastern District of New York
18                       271 Cadman Plaza East
                         Brooklyn, New York 11201
19                 BY:   ELIZABETH GEDDES, ESQ.
                         NADIA SHIHATA, ESQ.
20                       MARIA E. CRUZ MELENDEZ, ESQ.
                         Assistant United States Attorneys
21

22
   For the Defendant:    AIELLO & CANNICK, Esq.
23                       69-06 Grand Avenue
                         Maspeth, New York 11378
24                 BY:   DEVEREAUX L. CANNICK, ESQ.

25

SAM      OCR      RMR      CRR      RPR

```
                    A P P E A R A N C E S:  (Continued)


 For the Defendant:      BLANK LAW, P.C.
                          444 S. Washington Avenue
                          Royal Oak, Michigan 48067
                         BY:  NICOLE BLANK BECKER, ESQ.


                         THE LAW OFFICE OF THOMAS A. FARINELLA
                          260 Madison Avenue
                          8th Floor
                          New York, New York 10016
                         BY:  THOMAS A. FARINELLA, ESQ.


                         THE C.H. SCHOLAR LAW FIRM, PLLC
                          225 Broadway
                          Suite 225
                          New York, New York 10007
                         BY:  CALVIN HAROLD SCHOLAR, ESQ.
```

```
 Court Reporter:  Stacy A. Mace, RMR, CRR, RPR, CCR
                    Official Court Reporter
                  E-mail:  SMaceRPR@gmail.com
 Proceedings recorded by computerized stenography.  Transcript
 produced by Computer-aided Transcription.
```

C. Harris - Direct/Ms. Cruz Melendez          615

1    to marriage?

2    A    Yes.

3    Q    And are you familiar with the procedures that were in

4    place in 1994 as well?

5    A    Yes.

6    Q    What's the procedure for obtaining a marriage license in

7    Cook County, Illinois in or around 1994?

8    A    Both people must be present with valid I.D.s over the

9    age of 18.

10   Q    So you mentioned valid I.D.s.  so what, if any,

11   documentation did a person seeking a marriage license during

12   that time period in 1994, need to present prior to obtaining

13   a license?

14   A    State I.D., driver's license, or U.S. passport.

15   Q    So you previously mentioned that individuals coming in

16   would have to provide identification, correct?

17   A    Yes.

18   Q    And you used the phrase, "both people"?

19   A    Yes.

20   Q    Who are the people that you are talking about?

21   A    The expected bride and groom.

22   Q    Now, if a person didn't have a state I.D. or driver's

23   license, what, if any, other forms of identification did the

24   clerk's office take?

25   A    They were required to produce two pieces of

C. Harris - Direct/Ms. Cruz Melendez                616

1    identification.

2    Q     Okay.  And what kinds of identification?

3    A     Birth certificate, consular card, foreign passport.

4    Q     Anything else?

5    A     No.

6    Q     Does the Cook County Clerk's Office ever accept baptism

7    records?

8    A     Oh, I'm sorry, yes.  Yes.

9    Q     What, if any, eligibility requirements existed in 1994

10   with respect to individuals seeking to get married in

11   Cook County, Illinois?

12   A     What was that?

13   Q     Eligibility requirements?

14   A     Well, you had to be 18 and older.  And as we also accept

15   minors but they must be accompanied by adults.

16   Q     When you say minors, how old of a minor must you be?

17   A     16, 17.

18   Q     So when you say, "must be accompanied by adult," which

19   adult are you referring to?

20   A     The parents.

21   Q     The parents of the minor?

22   A     Yes.

23   Q     Generally speaking, now and in 1994, how could an

24   applicant prove their age?

25   A     By the I.D.

C. Harris - Direct/Ms. Cruz Melendez          628

1   gone through here.  So the bride's name, address, the date of

2   birth, how is that information generated on this application?

3   A    With the identification given.

4   Q    So you testified earlier that identification is

5   necessary to obtain a marriage license, correct?

6   A    Yes.

7   Q    So does Government's Exhibit 803(a) reflect the form of

8   identification that was used by Robert S. Kelly?

9   A    Yes.

10  Q    So I want to direct your attention to the left top-most

11  entry here.  Do you see where it says I.D. (g) and ILDL

12  followed by the letters and numbers K40077747008.  Do you see

13  that there?

14  A    Yes.

15  Q    What does ID (G) mean?

16  A    I.D. for the groom.

17  Q    So the G in the parenthesis stands for groom?

18  A    Yes.

19  Q    Looking at where it says ILDL, what can you ascertain as

20  to the type of identification that was used by the groom?

21  A    Illinois driver's license.

22  Q    Okay.  So now I want to move to the right side of the

23  document.  Is the based on the information that's on this

24  document, was a particular form of identification also used

25  by the bride?

Case 22-1481, Document 127, 07/19/2023, 3544157, Page22 of 132

1   A    Yes.

2   Q    And is that reflected on 803(a)?

3   A    Yes.

4   Q    So I want to turn your attention to still the top of the

5   document, but on the right side.  Do you see here where it

6   says I.D. (b) in parenthesis and then ILIDPA and a series of

7   numbers following that?

8   A    Yes.

9   Q    Okay.  What does the (B) in parenthesis stand for?

10  A    Bride.

11  Q    Here where it says, "ILIDPA," what can you ascertain as

12  to the type of identification that was used by the bride?

13  A    Illinois Department of Public Aid.

14  Q    So you testified earlier that there are a number of

15  forms of identification that the clerk's office typically

16  requires to obtain a marriage license.  I believe when you

17  listed those things, a public aid identification card was not

18  included in that list, correct?

19  A    Yes.

20  Q    Is a public aid I.D. card one of the forms of

21  identification that would generally be accepted as an I.D. to

22  get a marriage license?

23  A    No.

24  Q    Who makes the ultimate decision when applicants come in

25  as to what form of I.D. to accept when the applicants are

C. Harris - Direct/Ms. Cruz Melendez        630

1    looking to get a large license?

2    A    The clerk.

3    Q    And is that the clerk who handles the application for

4    the bride and the groom?

5    A    Yes.

6    Q    Now, were the applicants here, Robert Kelly and Aaliyah

7    Haughton, were they required to sign the application?

8    A    Yes.

9    Q    And do we see those signatures on this document?

10   A    Yes.

11   Q    So I'm going to point your attention here where it says,

12   "affidavit," and do you see where my pen is here?

13   A    Yes.

14   Q    Does that signature says, "Robert S. Kelly"?

15   A    Yes.

16   Q    And moving to the right of that where it says, "bride,"

17   is that the signature of Aaliyah Haughton?

18   A    Yes.

19   Q    Or does it reflect to be the signature of Aaliyah

20   Haughton?

21   A    Yes.

22   Q    Just below those signatures, do you see a signature here

23   that says, "David D. Orr"?

24   A    Yes.

25   Q    Who is David D. Orr?

C. Harris - Direct/Ms. Cruz Melendez          631

1   A    He was the Clerk for the Cook County Clerk's Office at

2   the time.

3   Q    There was another signature to the right of David D. Orr

4   whose signature would that be?

5   A    The clerk that created the application.

6   Q    Okay.  So does this application reflect the date that

7   the application was created on?

8   A    Yes.

9   Q    Okay.  And what's that date?

10  A    I can't hardly see it.

11  Q    Sorry.  Say 8/30/1994?

12  A    Yes.

13  Q    Now, looking at this document, 803(a), do you see this

14  other date here where it says, "08/31/1994"?

15  A    Yes.

16  Q    Is this the effective on date?

17  A    Yes.

18  Q    So does that mean that 08/31/1994 is the date that the

19  marriage license would be effective?

20  A    Yes.

21  Q    So as you previously testified, the applicants, once

22  they obtain their marriage license, they would have to wait

23  until 08/31/1994 in order to be married?

24  A    Yes.

25  Q    So you explained to the jury earlier that after

C. Harris - Direct/Ms. Cruz Melendez          632

1  submitting an application that it's a general matter a

2  marriage license is then issued.  Based on your review of the

3  documents, was a marriage license issued for Robert Kelly and

4  Aaliyah Haughton?

5  A     Yes.

6  Q     I'm directing your attention to Government's Exhibit

7  803(b).

8          Can you explain to the jurors what we're looking at

9  here?

10  A     A marriage license.

11  Q     And how is the information on the marriage license

12  generated?

13  A     From the application.

14  Q     Okay.  So taking a look at the document here, do you see

15  here the name Robert S. Kelly?

16  A     Yes.

17  Q     And it says, "Robert S. Kelly of Chicago in the County

18  of Cook and State of Illinois of the age of 27 years."  Did I

19  read that portion correctly?

20  A     Yes.

21  Q     And, "Aaliyah D. Haughton of Chicago in the County of

22  Cook and the State of Illinois of the age of 18 years."  Did

23  I read that correctly as well?

24  A     Yes.

25  Q     How long after applicants fill out the marriage

C. Harris - Direct/Ms. Cruz Melendez          637

1          Can you explain to the jurors what Government's
2   Exhibit 803(c) is?
3   A    Certification of marriage.
4   Q    How is the information on the certification of marriage
5   generated?
6   A    Generated off the marriage license.
7   Q    So I'd like to first start from the top of the document
8   where it says, "License number."  Do you see that there?
9   A    Yes.
10  Q    It reads, "M19949428588."  Do you see that number?
11  A    Yes.
12  Q    Okay.  What does the M stand for there?
13  A    Marriage.
14  Q    And then the first four numbers, 1994.  What does that
15  mean?
16  A    The year.
17  Q    I'm sorry, just let me finish the question.
18  A    I'm sorry.
19  Q    No, it's okay.  1994.  What is that?
20  A    The year.
21  Q    So 1994?
22  A    Yes.
23  Q    Okay.  And is that followed by 9428588?
24  A    Yes.
25  Q    And, just for a moment, putting up Government's Exhibit

Harris - direct - Cruz Melendez                    640

1  DIRECT EXAMINATION

2  BY MS. CRUZ MELENDEZ:   (Continuing)

3  Q    And from the handwritten portion that's filled out by the

4  officiant?

5  A    Yes.

6  Q    And just below that, it says date recorded September 6,

7  1994.  Do you see that?

8  A    Yes.

9  Q    What does that mean?

10 A    The date it was returned and recorded.

11 Q    What was returned and recorded?

12 A    The marriage license.

13 Q    And we see here just below that, it says application date

14 August 30, 1994; correct?

15 A    Yes.

16 Q    And I will put up 803-A for a moment.  Is that the same

17 date as the date on the application?

18 A    Yes.

19 Q    Can you explain to the jurors when a marriage is

20 considered official?

21 A    Once we put it in our system.

22 Q    And, so, when you put it in your system, is that the

23 certificate of marriage?

24 A    Yes.

25 Q    Okay.  So once a certificate of marriage is issued,

GA0813

Harris - direct - Cruz Melendez                    641

1  that's when the marriage is official?

2  A    No.  Sorry.  Once we receive the marriage license back,

3  then we enter the marriage license to generate a certificate.

4  Q    Okay.  Now, I want to go back for a moment with respect

5  to the documents we see here.  If someone other than Robert S.

6  Kelly or Alliyah Haughton wanted to get either the certificate

7  of marriage, the marriage license, or the marriage

8  application, what, if anything, would they have to do?

9  A    Other than the bride and groom?

10 Q    Other than the bride and groom.

11 A    The certificate, they would come and search for a

12 certificate.

13 Q    What about the application?

14 A    Application, no.

15 Q    They couldn't get a copy of the application?

16 A    No.

17 Q    A member of the public couldn't get a copy of the

18 application; correct?

19 A    No.

20 Q    So based on the marriage certificate issued for Robert

21 Kelly and Alliyah Haughton, what was their marital status as

22 of date of this certificate of marriage, the Government 803-C?

23 A    You say who?

24 Q    The groom, Robert S. Kelly and Alliyah D. Haughton, once

25 the certificate of marriage was issued, what was their marital

GA0814

1469

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
        - - - - - - - - - - - - - X
3
     UNITED STATES OF AMERICA,     :    19-CR-286(AMD)
4
               Plaintiff,          :
5                                       United States Courthouse
          -against-               :    Brooklyn, New York
6
     ROBERT SYLVESTER KELLY,       :
7                                       August 26, 2021
               Defendant.          :    9:30 o'clock a.m.
8
        - - - - - - - - - - - - - X
9

10                      TRANSCRIPT OF TRIAL
                BEFORE THE HONORABLE ANN M. DONNELLY
11             UNITED STATES DISTRICT JUDGE, and a jury.

12
     APPEARANCES:
13

14   For the Government:         JACQUELYN M. KASULIS
                                 Acting United States Attorney
15                               BY: ELIZABETH GEDDES
                                     NADIA SHIHATA
16                                   MARIA E. CRUZ MELENDEZ
                                 Assistant United States Attorneys
17                               271 Cadman Plaza East
                                 Brooklyn, New York
18

19   For the Defendant:         DEVEREAUX L. CANNICK, ESQ.
                                 NICOLE BLANK BECKER, ESQ.
20                               THOMAS FARINELLA, ESQ.
                                 CALVIN HAROLD SCHOLAR, ESQ.
21

22   Court Reporter:            Charleane M. Heading
                                 225 Cadman Plaza East
23                               Brooklyn, New York
                                 (718) 613-2643
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.
```

CMH      OCR      RMR      CRR      FCRR

GA0815

Stephanie - direct - Shihata                    1622

1  Q    Do you see R. Kelly in the courtroom here today?

2  A    Yes, I do.

3  Q    Can you please point him out and identify him by an item

4  of clothing he's wearing.

5  A    He's there in the blue suit with a white mask on his

6  face.

7         THE COURT:  Indicating the defendant.

8  Q    Now, how old were you when you first saw the defendant in

9  person?

10 A    I was 16-years old at the time.

11 Q    And where did you first see the defendant in person?

12 A    At a place called the Rock 'N Roll McDonald's in downtown

13 Chicago.

14 Q    I'm showing the witness what's in evidence as Government

15 Exhibit 520.

16        Do you recognize the location in this photograph?

17 A    Yes.  That's the restaurant I just made reference to,

18 Rock 'N Roll McDonald's.

19 Q    Now who, if anyone, were you at the

20 Rock 'N Roll McDonald's with the day you first saw the

21 defendant?

22 A    I was there with my boyfriend, his best friend and the

23 girl that the best friend was dating, so it was like a double

24 date.

25 Q    And the boyfriend that you were there with at the time,

GEORGETTE K. BETTS, RPR, FCRR, CCR

Stephanie - direct - Shihata                          1623

1   where did you know him from?

2   A    From my first high school, OPRF.

3   Q    He went to that high school with you?

4   A    Yes, he did.

5   Q    And where did you see the defendant at the

6   Rock 'N Roll McDonald's?

7   A    I was standing at the register alone and he was seated at

8   the booth closest to the register.

9   Q    And what happened?

10  A    A man came up to me and he asked my age.  I told him I

11  was 16.  He said -- asked me if I knew R. Kelly, I said I did

12  and he kind of gestured towards him and he said that R. Kelly

13  wants you to call him and he gave me a handwritten note with a

14  phone number on it.

15  Q    And you said the man gestured towards him, who was the

16  "him" that the man gestured towards?

17  A    To R. Kelly.

18  Q    And did you see the defendant after the man pointed over

19  to him?

20  A    Yes, I saw him.

21  Q    What was the defendant doing?

22  A    Looking at me.

23  Q    What, if anything, did the man who approached you give

24  you?

25  A    He gave me a phone number and said it was Robert Kelly's

Case 22-1481, Document 127, 07/19/2023, 3544157, Page32 of 132

Stephanie - direct - Shihata                    1624

1   phone number.

2   Q    And how did he give you the phone number?

3   A    He handed it to me on a piece of paper.

4   Q    Do you recall how the number was written?

5   A    No.

6   Q    What, if anything, did you do after receiving the piece

7   of paper with the defendant's phone number on it?

8   A    I talked to my boyfriend and friends about it and then

9   threw away the phone number.

10  Q    Why did you throw away the phone number?

11  A    Because I didn't intend to call him.

12  Q    Did you actually meet the defendant at a later time?

13  A    I did.

14  Q    Around when was that?

15  A    A year later, the summer of 1999.

16  Q    How old were you then?

17  A    Seventeen.

18  Q    I'm showing the witness only what's been marked --

19  actually I'm sorry, one moment.

20       Going back to the day you saw the defendant at the

21  Rock 'N Roll McDonald's?

22  A    Yes.

23  Q    How old were you then?

24  A    Sixteen.

25  Q    I'm showing the witness only what's been marked for

GA0818

Stephanie - direct - Shihata                    1625

1  identification as Government Exhibit 244.  And before I ask

2  you a question about that, do you remember approximately what

3  time of year it was when you were at the

4  Rock 'N Roll McDonald's and saw the defendant?

5  A    It was summertime.

6  Q    And what year?

7  A    Of 1998.

8  Q    I'm showing you what's been marked for identification as

9  Government Exhibit 244.

10        Do you recognize this?

11  A    Yes, that's me in the same summer of 1998.

12  Q    That's a photo of you from the summer of 1998?

13  A    Yes.

14        MS. SHIHATA:  I move admit Government Exhibit 244.

15        MR. FARINELLA:  No objection.

16        THE COURT:  Okay, that's in evidence.  You can

17  display it.

18        (Government Exhibit 244 so marked.)

19        MS. SHIHATA:  Thank you.

20        THE COURT:  You want that jury only?

21        MS. SHIHATA:  Jury only, please.

22        (Exhibit published.)

23  Q    All right.  I think you had just testified that you

24  actually met the defendant approximately a year later; is that

25  right?

GEORGETTE K. BETTS, RPR, FCRR, CCR

Stephanie - direct - Shihata                      1626

1  A    Yes.

2  Q    And how old were you then?

3  A    Seventeen.

4  Q    And what time of year was it that you met him?

5  A    It was the summer of 1999.

6  Q    And was that near the time of your high school

7  graduation?

8  A    Yes.

9  Q    I'm showing the witness only what's been marked for

10 identification as Government Exhibit 243.

11       Do you recognize this photo?

12 A    Yes, that's me on the day of my graduation in 1999.

13 Q    The day of your high school graduation?

14 A    Yes.

15       MS. SHIHATA:  The government moves to admit 243.

16       THE COURT:  Any objection?

17       MR. FARINELLA:  No objection, your Honor.

18       THE COURT:  That will be just for jury only.

19       MS. SHIHATA:  Yes, your Honor.  Thank you.

20       (Government Exhibit 243 so marked.)

21       (Exhibit published.)

22 Q    Now the summer after your high school graduation, where,

23 if anywhere, were you working that summer?

24 A    I worked at a hotel in downtown Chicago.

25 Q    What did you do at that hotel?

Stephanie - direct - Shihata                    1627

1  A    I worked in the coffee shop, I was a barista.

2  Q    Do you recall what your shift was when you worked there?

3  A    I had to open the barista station at 5 a.m.  So I'd have

4  to be there at five and I think it ended around two.

5  Q    And that summer, 1999, where were you living?

6  A    I lived in two places, part time in Oak Park, which is

7  just outside of the city, and then also part time in the city

8  with my friends in an apartment.

9  Q    When you lived part time in Oak Park, who was that with?

10 A    With my aunt.

11 Q    And when you lived in the city, who was that with?

12 A    With two friends of mine that I went to high school with,

13 named Katherine and Jessie.

14 Q    And was the apartment with your friends closer to your

15 summer job?

16 A    Yes.

17 Q    You mentioned you were living in that apartment with two

18 friends one of whom was named Katherine; is that right?

19 A    That's correct.

20 Q    Without saying it, do you know Katherine's full name?

21 A    I do.

22 Q    I'm showing the witness only what's been marked for

23 identification as Government Exhibit 952.

24        Do you recognize that name?

25 A    Yes, that's her full name.

Stephanie - direct - Shihata                    1628

1  Q    Katherine's full name?

2  A    Yes.

3        MS. SHIHATA:  I move to admit Government Exhibit 952

4  to the jury only.

5        THE COURT:  Any objection?

6        MR. FARINELLA:  No objection, your Honor.

7        THE COURT:  That will be in evidence just for the

8  jury.

9        (Government Exhibit 952 so marked.)

10        (Exhibit published.)

11  Q    Did you and Katherine go to the same high school?

12  A    We did.

13  Q    And was that at The Chicago Academy of the Arts?

14  A    That's correct.

15  Q    What, if any, career aspirations did Katherine have at

16  that time?

17  A    Katherine was a singer.

18  Q    And did she want to pursue that as a career?

19  A    Yes, she did.

20  Q    How did you end up meeting the defendant in the summer of

21  1999?

22  A    When I was at work at the hotel a co-worker came in and

23  told us that R. Kelly was having an event at the Nike store,

24  which was just around the corner from the hotel that I worked

25  at.

GA0822

Stephanie - direct - Shihata                    1629

1   Q    And after you learned that information, what, if
2   anything, did you do?
3   A    I decided I would go over to see if he would remember me
4   in order to ask him if he would listen to my friend sing.
5   Q    And which friend was that?
6   A    Katherine.
7   Q    Do you recall where that Nike store was located?
8   A    It's on Michigan Avenue in downtown Chicago.
9   Q    Is Michigan Avenue in Chicago also known as The
10  Magnificent Mile?
11  A    Yes.
12  Q    What, if anything, did you do once you had this
13  information?
14  A    I walked over to the store in order to see him or meet
15  him and as I arrived he was coming out so --
16  Q    When you say "he" are you referring to the defendant?
17  A    Yeah, Mr. Kelly was coming out of the store as I was
18  walking in, so it was the perfect opportunity to get his
19  attention and so I did.
20  Q    What happened then?
21  A    I asked him if he remembered me and he said, yeah, and
22  something, you know, kind of very quickly, it was just like,
23  yeah.  And I said I wanted to ask you a question and he said,
24  yeah, walk with me to my car and we can talk and I said okay
25  so I --

Case 22-1481, Document 127, 07/19/2023, 3544157, Page38 of 132

GA0823

1  Q    Did you walk with the defendant to his car?

2  A    I did.

3  Q    And what happened then?

4  A    I asked if he would meet my friend Katherine, who had a

5  great voice, and I thought that maybe he could help her with

6  her career.

7  Q    And where did that conversation happen?

8  A    It took place in his car.  I was sitting in the passenger

9  seat at that point.

10 Q    So I think you indicated you saw the defendant as he was

11 walking out of the Nike store?

12 A    Yes, then his car was very close by so we were quickly to

13 the car and the conversation occurred in the car.

14 Q    Did he invite you in the car?

15 A    He did.

16 Q    And how, if at all, did the defendant respond when you

17 told him about listening to your friend sing?

18 A    He said, yeah, he thought we could arrange that, but he'd

19 like to get to know me and he also said that he likes to

20 cuddle and would I be okay with that, to which I said yes.

21 Q    What happened next?

22 A    He gave me a phone number and said to call him, and so I

23 did.

24 Q    Did you see the defendant again after that?

25 A    I did.  I met him at the studio, at his studio.

GA0824

Stephanie - direct - Shihata                    1631

1  Q    Now approximately how long after you met the defendant at
2  the Nike store did you see him again?
3  A    Within a week or two.
4  Q    And what was going on in your life at the time?
5  A    Um, that was definitely the hardest time of my life.  I
6  had a very low self esteem.  I had already been through sexual
7  trauma and abuse within my family, by my first boss, by men on
8  the street.  It was the hardest time of my life.  I was very
9  vulnerable.
10 Q    Okay.
11          MR. FARINELLA:  Objection, your Honor.
12          THE COURT:  Overruled.
13 Q    Now you said you went to the studio; is that right?
14 A    Yes.
15 Q    Do you recall where the studio was located?
16 A    Yes, it was just off of Chicago Avenue and right in
17 Cabrini-Green, right on the edge of Cabrini-Green.
18 Q    Is Cabrini-Green a neighborhood in Chicago?
19 A    Yes.
20 Q    Do you recall around what time of day it was that you
21 went to the studio?
22 A    It was the afternoon.
23 Q    What happened when you got -- well, withdrawn.  How was
24 it that you ended up going to the studio that day?
25 A    What do you mean?

GEORGETTE K. BETTS, RPR, FCRR, CCR

GA0825

Stephanie - direct - Shihata                    1632

1  Q    Had you communicated with the defendant prior to going to
2  the studio that day?
3  A    Yes.  So I spoke with him, he told me where to meet him
4  and I arrived on a bus, walked off the bus and over to the
5  studio.
6  Q    And how did you get into the studio?
7  A    There was a buzzer, like an intercom outside and so
8  someone that worked there let me in.
9  Q    And after you were let in, where, if anywhere, did you
10 go?
11 A    I was brought up to the second floor to a waiting room or
12 like a lounge room.
13 Q    And can you describe -- well, first, who brought you up
14 to that room?
15 A    An employee.
16 Q    And can you describe the room you were taken to?
17 A    Yeah.  It was a room at the end of a hallway.  There were
18 two sofas in it and there was a bathroom attached to that same
19 room.
20 Q    What floor of the studio was it on?
21 A    Second floor.
22 Q    What, if anything, did the employee who took you to that
23 room tell you once you got there?
24 A    To stay here and wait for him.
25 Q    And by "him" who are you referring to?

Stephanie - direct - Shihata                              1633

1  A     Robert Kelly.

2  Q     Did the employee then leave?

3  A     Yes.

4  Q     And were you alone in that room?

5  A     I was.

6  Q     How long did you stay in the room waiting for the

7  defendant?

8  A     I waited there for a few hours.

9  Q     And after a few hours, what happened?

10 A     He arrived, he came in and sat down next to me.

11 Q     The defendant?

12 A     Yes.

13 Q     And what do you recall happening next?

14 A     He came and sat down right next to me and laid his head

15 on my shoulder and said he was sorry that he took so long and

16 I said it was fine and there was a little bit of chitchat and

17 we had sex that day.

18 Q     How old were you at the time?

19 A     Seventeen.

20 Q     And who initiated the sexual intercourse that day?

21 A     He did.

22 Q     Apart from having sex with the defendant that day, did he

23 say anything -- do you recall anything about the conversation

24 or chitchat you had with him that day?

25 A     He said that he wanted me to call him daddy.

Stephanie - direct - Shihata                    1634

1   Q   Did you continue to see the defendant after that day?

2   A   I did.

3   Q   For about how long?

4   A   For about six months.

5   Q   And about -- during those approximately six months, about

6   how often did you and the defendant see each other?

7   A   About six to eight times per month.

8   Q   And where, generally, did you mostly see the defendant?

9   A   Mostly it was at the studio in that same room that I just

10  described.

11  Q   So the same studio as the one you went to the first time?

12  A   Yes.

13  Q   I'm going to show you what's in evidence as Government

14  Exhibit 525(u).

15          Do you recognize this?

16  A   Yes, that's the exterior of the studio.

17  Q   And you testified earlier about a call box to enter, do

18  you see that in this photograph?

19  A   Yes, it's -- yes, I do.

20  Q   And is it where I'm pointing my pen --

21  A   Yes.

22  Q   -- towards the middle left of the photo?

23  A   Yes.

24  Q   I'm showing you what's in evidence as Government

25  Exhibit 525P.

GEORGETTE K. BETTS, RPR, FCRR, CCR

GA0828

Stephanie - direct - Shihata                1635

1          Do you recognize this?

2    A    Yes, I do.

3    Q    What is this?

4    A    That's the room that I waited in.

5    Q    And is this the room where you generally regularly saw

6    the defendant?

7    A    Yes.

8    Q    I'm showing you what's in evidence as 525K, is this just

9    another photograph of that room?

10   A    Yes.

11   Q    And you mentioned the room had a bathroom attached; is

12   that right?

13   A    Yes.

14   Q    I'm showing you what's in evidence as Government

15   Exhibit 525J.

16          Do you recognize this?

17   A    Yeah, that's the restroom.

18   Q    Now in the course of the approximately six months that

19   you saw the defendant, what were the different ways you got to

20   the studio?

21   A    Public transportation, also I was picked up at times by

22   an employee of his --

23   Q    And -- sorry.

24   A    -- there might have been a taxi here and there.

25   Q    And when you would leave the studio, what were the

GEORGETTE K. BETTS, RPR, FCRR, CCR

Stephanie - direct - Shihata                    1636

1  different methods you would use to leave?

2  A    I'd get dropped off by an employee of his or at certain

3  points later in the relationship I had a car I could drive.

4  Q    And you mentioned sometimes you were picked up or dropped

5  off by an employee.  What type, if any, what type of employee

6  do you recall picking up or dropping you off sometimes?

7  A    I assumed it was a security person or a driver.

8  Q    And what led you to that conclusion?

9  A    Because that's the capacity in which I would see them

10  around either like with him when we were walking around or

11  driving us around.

12  Q    And do you remember any particular security employees the

13  defendant had working for him at the time you saw him?

14  A    I do remember one that I saw almost every time, I don't

15  remember his name.

16  Q    And do you remember what he looks like?

17  A    I do remember what he looks like.

18  Q    Can you describe him?

19  A    Yes, he was a black man, either short hair or bald.  Very

20  friendly, friendly face.

21  Q    I'm showing the witness what's in evidence as Government

22  Exhibit 23.  Do you recognize this individual?

23  A    Yes, that's the man that I'm referring to.

24  Q    Now, over the course of the approximately six months that

25  you saw the defendant, what were your interactions with him

Stephanie - direct - Shihata                    1637

1  like?

2  A    It would vary.  He was one of two ways.  He was either

3  very nice and charming, jovial, or he was very controlling,

4  intimidating.  He'd raise his voice at me and he could, you

5  know, put the fear of God in me very quickly.

6  Q    And you mentioned there were two sides, what, if

7  anything, in your experience would cause the defendant to go

8  from one side to the other?

9  A    It was hard to know what would do it but like, for

10 example, there was a time where that security, the driver, the

11 person that you just showed me the picture of, he wasn't there

12 and he had been like every single time, yeah, every single

13 time we hung out this man was there.  He'd either pick me up

14 or he'd be in the car with us or whatever and at one point he

15 wasn't there and I said, oh, where is the guy, he's always

16 here.  And it's just like casual and he immediately is, like,

17 what the fuck did you just say?  Don't ever fucking ask about

18 another man to me.  Like, mind your own business, don't ever

19 ask no stupid ass questions like that and terrified me.  I

20 didn't know that that would set him off.  So it was times like

21 that.

22 Q    Now during the approximately six months that you saw the

23 defendant, how often did the defendant have sex with you?

24 A    Every time.

25 Q    Every time you saw each other?

GEORGETTE K. BETTS, RPR, FCRR, CCR

GA0831

Stephanie - direct - Shihata                         1638

1    A    Yes.

2    Q    And what was sex with the defendant like?

3    A    It was humiliating.  He would be very specific in how he

4    wanted me to be.  He would put me in positions that he wanted

5    me to be in.  He would tell me that he wanted me -- he'd tell

6    me to get undressed and then he would position my body in a

7    way and he would then say, all right, I'm going to go and when

8    I come back I want you to be just like this.  So I would just

9    be completely naked with my butt in the air and just like

10   waiting there for him to come have his way.

11   Q    And how long would you have to wait sometimes?

12   A    Sometimes hours.

13   Q    And what, if anything, happened when the defendant

14   returned and you weren't in the position he had told you to be

15   in?

16   A    He would become very angry with me, yelling at me, what

17   the fuck, I told you to do it like this.  Um, and he'd be very

18   disappointed and angry.  He would often ejaculate on my face.

19   He orchestrated the sounds that I would make.

20              (Continued on the next page.)

21

22

23

24

25

GEORGETTE K. BETTS, RPR, FCRR, CCR

Stephanie - direct - Shihata                    1639

1  BY MS. SHIHATA:  (Continuing)

2  Q    What do you mean by that?

3  A    He would want me to moan.  Like if I made a sound, he

4  would say no, don't do it like that, make this kind of sound.

5  Q    Now, you mentioned he would often ejaculate in your face.

6  How did that make you feel?

7  A    Disgusted, less than.

8  Q    Less than?  Now, you testified earlier that when you

9  first met the defendant, you told him about your friend

10 Katherine and that she was a singer.

11 A    Yes.

12 Q    Did the defendant ever meet your friend Katherine?

13 A    He did.

14 Q    And how did that come about?

15 A    I asked him if he would meet with her.  He said that

16 would be fine and to bring her to the studio.

17 Q    And about how long had you been seeing the defendant at

18 that point?

19 A    It was pretty early on, I would say within the first

20 month or two.

21 Q    And after you had that conversation with the defendant,

22 who, if anyone, did you take to the studio?

23 A    I brought Katherine with me and my mom came with us as

24 well.

25 Q    Why did your mom come with you to the studio?

CMH      OCR      RMR      CRR      FCRR

Stephanie - direct - Shihata                    1640

1    A    My mom came with us because she had seen a ring that

2    Mr. Kelly gave me and it looked like an engagement ring but it

3    wasn't an engagement ring.  He didn't propose marriage to me

4    or anything like that, but she thought that that was

5    inappropriate and she wanted to see what the dynamic was

6    between him and I.

7    Q    And when your mom noticed that ring, what, if anything,

8    did you tell your mom about the circumstances of how you got

9    that ring?

10   A    I just said that he had given it to me and that we were

11   friends and it really wasn't a big deal.  I didn't want her to

12   know what was going on between him and I.

13   Q    And had you and the defendant had sex at that point?

14   A    Yes.

15   Q    And did you keep that from your mom?

16   A    Yes, I did.

17   Q    Now, turning back to the day that you, Katherine and your

18   mom went to the defendant's studio, what happened at the

19   studio after you, Katherine and your mom arrived?

20   A    We were brought up to a music room, a room in which he

21   records music, and she performed in that room.  My mom and I

22   sat and watched.

23   Q    When you say "she," who are you referring to?

24   A    Katherine.

25   Q    And when you say she performed, what did she do?

CMH        OCR        RMR        CRR        FCRR

GA0834

Stephanie - direct - Shihata                    1641

1  A    She sang a song for him.

2  Q    For the defendant?

3  A    Yes, for Mr. Kelly.

4  Q    And how, if at all, did the defendant react?

5  A    He said that she, she could sing, and then we were

6  quickly dismissed because he wasn't thrilled about my mom

7  being with us.

8  Q    So about how long were you in the studio on that occasion

9  if you recall?

10 A    About an hour, maybe even less.

11 Q    Do you recall seeing any of the defendant's associates

12 that day at the studio when you, your mom and Katherine were

13 there?

14 A    I don't remember.

15 Q    Other than the security individual that you identified

16 earlier, do you recall meeting any of the other, any other

17 people associated with the defendant?

18 A    Yes.

19 Q    Who do you recall meeting?

20 A    There were two rappers that were around pretty often.

21 Q    And what were their names?

22 A    Boo and Gotti.

23 Q    And I'm also -- I'm going to show you what's in evidence

24 as Government Exhibit 8.

25        Do you recognize this person?

CMH        OCR        RMR        CRR        FCRR

Stephanie - direct - Shihata                    1642

1    A    I do.

2    Q    Who is that?

3    A    That is Blackie.  He was introduced to me as Robert's

4    cousin/manager.

5    Q    And who introduced you to him?

6    A    Mr. Kelly did.

7    Q    Do you recall whether your friend Katherine ever met

8    Blackie?

9    A    She did meet him.

10   Q    Do you recall where she first met him?

11   A    I believe it was at the studio but I'm not positive.

12   Q    Other than the audition or the singing of the song that

13   Katherine did for the defendant, did the defendant have any

14   other involvement regarding Katherine and her music?

15   A    No.

16   Q    Now, at some point after you met the defendant, did you

17   and the defendant talk about your age?

18   A    Yes.

19   Q    And about how long after you met him at the Nike store

20   was that?

21   A    It was either the first or second time that we got

22   together at the studio.

23   Q    And how old were you at the time?

24   A    Seventeen.

25   Q    And what do you recall about that conversation with the

Stephanie - direct - Shihata                    1643

1  defendant?

2  A    I remember him asking me my age and me answering and

3  being a little nervous because I thought the age was 18, you

4  know, to be a consenting adult, but when I said I was 17, he

5  said it was fine.

6  Q    Did there come a time when the defendant videotaped you

7  engaging in sexual contact with him?

8  A    Yes.

9  Q    The first time this happened, how old were you?

10  A    I was 17.

11  Q    And was this after the conversation you had with the

12  defendant about your age?

13  A    Yes.

14  Q    How did it come about that the defendant videotaped you

15  at 17 engaging in sexual contact with him?

16  A    I -- we had set a time for me to meet him at the studio.

17  And so I was up in that same room and he called me in the room

18  and said that he was on his way to pick me up and that he

19  wanted to make a video of us having sex and that he would be

20  there shortly and I said okay.

21  Q    And when he asked you that, what was going through your

22  head?

23  A    Well, he didn't ask me.  He told me he would be there to

24  pick me up in order to do that and I was really scared and I

25  really didn't want to do it but I said okay right before I

GA0837

Stephanie - direct - Shihata                    1644

1   hung up.  So right after I hung up, I called my friend

2   Katherine and I said he just called me and said he wants to

3   record us having sex and she said get out of there.

4             MR. CANNICK:  Objection, Your Honor.

5             THE COURT:  Sustained.

6   Q    What, if anything, did you do after you called your

7   friend Katherine?

8   A    I did as he asked.

9   Q    Why?

10  A    Because I felt like I didn't have a choice.

11  Q    Did the defendant -- did you see the defendant after you

12  concluded that phone call with him?

13  A    Yes.  He showed up at the studio in a white van and I got

14  in and we drove to a house in Lincoln Park.

15  Q    And whose house did you understand that to be?

16  A    I understood it to be his home, Mr. Kelly's home.

17  Q    And do you recall anything about the name of the street

18  that house was on?

19  A    I believe it started with G.

20            MS. SHIHATA:  I'm showing the witness what's in

21  evidence as Government Exhibit 501(b).

22  Q    Do you recognize this photograph?

23  A    Yes, that's the home that we went to.

24  Q    What happened when you and the defendant arrived at his

25  home near Lincoln Park?

CMH       OCR       RMR       CRR       FCRR

GA0838

Stephanie - direct - Shihata                    1645

1  A    He -- we went inside and he quickly got a video camera

2  and he directed me on where to come in.  There is -- so when

3  you walk in, there's, like, a little walkway there and then

4  you come -- he wanted me to come around that and he was

5  filming as I came into the frame and he instructed me to

6  undress and told me to go over to the sofa.

7  Q    And did you do as he directed?

8  A    I did.

9  Q    You said he had a video camera with him, is that right?

10 A    Yes.

11 Q    Where did you see the video camera?

12 A    He was holding it.  It was a large video camera.

13 Q    And do you recall what type of video camera it was?

14 A    Yes, it's an old video camera that you'd have to put,

15 like, a VHS cassette tape into in order to record.

16 Q    What happened after -- you testified he was directing you

17 to take off your clothes and how to come into the frame, is

18 that right?

19 A    Yes.

20 Q    And where did he ask you to go?

21 A    Over to the sofa.

22 Q    And what happened after you went to the sofa?

23 A    He came up from behind me and started having sex with me.

24 Q    What, if anything, or where, if anywhere, was the video

25 camera at that time?

CMH        OCR        RMR        CRR        FCRR

Stephanie - direct - Shihata                          1646

1   A    It was on, in front of me.

2   Q    I'm sorry.  Could you just repeat that?

3   A    It was in front of me.

4   Q    And was the defendant still holding the video camera?

5   A    No, he had placed it down on the table.

6   Q    And at that point, had you, were you completely naked?

7   A    Yes.

8   Q    And was the video camera facing you?

9   A    Yes.

10  Q    And was it recording?

11  A    Yes, it was.

12  Q    And where was the defendant at that time?

13  A    He was behind me.

14  Q    And what was he doing behind you?

15  A    Penetrating me.

16  Q    Vaginally?

17  A    Yes.

18  Q    What, if anything, happened next?

19  A    He said that he wanted to get a dildo and wanted me to

20  put it in my mouth as he had sex with me.  And so he went and

21  got it and I did as he, as he asked.

22  Q    And when you say "got it," are you referring to a dildo?

23  A    Yes.

24  Q    And after he got the dildo, what did he do with it?

25  A    He put it in my mouth and then continued having sex with

Stephanie - direct - Shihata                    1647

1    me.

2    Q    From behind?

3    A    Yes.

4    Q    And where was the video camera at that point?

5    A    It was right in front of me.

6    Q    And was it still recording?

7    A    Yes, it was.

8    Q    And you testified this was a VHS video camera?

9    A    Yes.

10   Q    While the camera was recording you, was it facing you and

11   your private areas?

12   A    Yes, it was.

13   Q    Do you recall anything else about the house you were in

14   that day?

15   A    I only remember that it was a very wide open house and

16   that there was a huge fish tank in the same room with me and

17   that was it.

18   Q    Other than the room where the filming happened, did you

19   go anywhere else in the house that day?

20   A    No.

21   Q    Now, you mentioned that you had met two rappers

22   affiliated with the defendant named Boo and Gotti, is that

23   right?

24   A    Yes.

25   Q    And did you meet them during your time with the

Stephanie - direct - Shihata                    1648

1  defendant?

2  A    Yes.

3  Q    Now, in what context did you meet them if you recall?

4  A    I just met them because they were around a lot too.

5  Q    Did there come a time where you had a meal at a

6  restaurant with the defendant, Boo and Gotti?

7  A    Yes.

8  Q    And where did that take place?

9  A    At Houstons in Chicago.

10  Q    Is Houstons the name of a restaurant?

11  A    Yes.

12  Q    And during that meal, were you permitted to speak to Boo

13  and Gotti?

14  A    No.

15  Q    Why not?

16  A    I wasn't meant to speak to any other man besides

17  Mr. Kelly.

18  Q    According to who?

19  A    Mr. Kelly.

20  Q    Did you hear the defendant speak to Boo and Gotti during

21  that meal?

22  A    I did.

23  Q    And do you recall anything the defendant said to them

24  during that meal?

25  A    He mentioned that he likes young girls and that people

CMH      OCR      RMR      CRR      FCRR

Stephanie - direct - Shihata                    1649

1   make such a big deal of it but it really isn't a big deal

2   because even, look at Jerry Lee Lewis, he's a genius and I'm a

3   genius and we should be allowed to do whatever we want because

4   of what we give to this world.

5          MR. CANNICK:  Objection.

6          THE COURT:  I'm sorry.  Did you object?

7          MR. CANNICK:  Yes, Your Honor.

8          THE COURT:  Overruled.

9   Q    And did you know who the defendant was referring to when

10  he said Jerry Lee Lewis?

11  A    Yes, I did.

12  Q    Who was that?

13  A    An old singer who married a 12 year old, I think, or

14  something like that.

15  Q    How did the topic or how did that topic come up during

16  the meal?

17  A    That was the strangest part was that there was no,

18  nothing that the other guys said to lead to that.  It just

19  kind of came out of the blue.  Unless there was something said

20  that I didn't hear, it just came out of the blue.

21  Q    After the meal at Houstons restaurant in Chicago that

22  day, what, if anything, did the defendant ask you to do?

23  A    He asked me if I knew who Sharon Stone is and I said yes

24  and he asked me if I knew how she dresses, I said yes, and he

25  said that he had $300 and if he gave that to me, could I go

Stephanie - direct - Shihata                    1650

1  buy clothes in order to dress like her and I said that I

2  could.  So he took me over to the Water Tower and let me shop

3  for a time.

4  Q    And what is the Water Tower?

5  A    It's a, it is a tall building in Chicago, downtown

6  Chicago, that has a lot of different shops inside like

7  Nordstrom or Marshall Field's.

8  Q    And you mentioned Sharon Stone.  Who is that?

9  A    She's an actress.

10 Q    Now, you said, you testified the defendant -- did the

11 defendant take you to the Water Tower?

12 A    Yes.

13 Q    And what, if anything, did you do after the defendant

14 took you there?

15 A    So he dropped me off and let me go inside and shop for

16 myself and I did and I got the clothes and I wore them, I left

17 the stores in the clothes, and he wasn't there yet so I

18 decided that I would sneak and have a cigarette.  He didn't

19 know that I smoked cigarettes.  So I decided I'd have a

20 cigarette while I waited for him.

21         And he arrived without me noticing and he became

22 very angry when he saw me with a cigarette.  He came out of

23 the car and was, like:  What the fuck are you doing?

24         MR. CANNICK:  Objection, Your Honor.

25         THE COURT:  Overruled.

CMH      OCR      RMR      CRR      FCRR

Stephanie - direct - Shihata                1651

1   Q    You can continue.

2   A    Don't ever fucking smoke that shit.  What's wrong with

3   you?  Don't ever do that shit, especially not in front of me.

4        He was yelling at the top of his lungs and he was

5   standing right over me and I was very surprised that he was

6   just yelling so freely out in the public like that.

7   Q    How did that make you feel?

8   A    Terrified.

9   Q    During your time with the defendant, did you ever see him

10  play basketball?

11  A    Yes.

12  Q    And where would you see him play basketball?

13  A    There was one time where we went to a gym near downtown

14  Chicago, just outside of downtown Chicago.

15  Q    And what, if any, instructions did the defendant give you

16  regarding basketball games?

17  A    So we went, when we went inside, he showed me where to

18  sit and told me sit there, don't move, and so I did.  I

19  watched him play and then he came and collected me when it was

20  time to leave.

21  Q    And what happened next?

22  A    We got into an SUV with two people in the front driving

23  the car and a person in the passenger seat and then he and I

24  were sitting directly behind the front seats and he asked me

25  to perform oral sex on him and so I did.

GA0845

Stephanie - direct - Shihata                     1652

1  Q    And what, if anything, happened while you were doing

2  that?

3  A    So that was really disgusting because he had just played

4  basketball for an hour and, and so I was really ashamed while

5  I was doing it so I was trying, you know, to do it quietly and

6  get it done and he asked me, he stopped me and said that I

7  need to make noises while I was performing oral sex on him

8  because, obviously, he wanted the people in the car to know

9  and even the person in the passenger seat looked back and saw

10  me doing that.

11  Q    You said you were ashamed.  Why were you ashamed?

12  A    Because it's disgusting and it's something that should be

13  done in private.

14  Q    Did you want to be doing that in public?

15  A    No.

16  Q    Did there come a time when you traveled to Florida to see

17  the defendant?

18  A    Yes.

19  Q    Around when was that?

20  A    It was around my birthday which is October 16th.  It

21  would have been a little bit before or a little bit after.

22  I'm not sure.

23  Q    And where in Florida did you travel to?

24  A    Orlando.

25  Q    And how did that trip come about?

Stephanie - direct - Shihata                    1653

1    A    Mr. Kelly asked me to meet him there and so an employee
2    of his arranged for me to go there and he said I could bring
3    my friend Katherine and so I did.
4    Q    And you said this was close in time to your birthday,
5    either a little bit before or a little bit after, you can't
6    remember which, is that right?
7    A    That's correct.
8    Q    And was that your 18th birthday?
9    A    Yes.
10   Q    Now, what, if any, understanding did you have about what
11   the defendant was doing in Orlando at the time?
12   A    I understood that he was making music there.
13   Q    Recording music?
14   A    Yes.
15   Q    And before your trip, what, if anything, did the
16   defendant tell you about coming to see him?
17   A    Nothing, just to come down, we would have a good time.
18   Q    And how long was the trip supposed to last?
19   A    It was just for a long weekend.
20   Q    And you mentioned your friend Katherine.  Did she go with
21   you on the trip?
22   A    She did.
23   Q    And did the two of you travel from Chicago to Orlando?
24   A    Yes.
25   Q    Who, if anyone -- sorry.

Stephanie - direct - Shihata                    1654

1           Who made your travel arrangements?

2    A    One of Mr. Kelly's employees did.

3    Q    And was that for both you and Katherine?

4    A    Yes.

5    Q    And who paid for your travel?

6    A    Mr. Kelly did.

7    Q    For you and Katherine?

8    A    That's correct.

9    Q    And had you ever been to Orlando before?

10   A    I had been once when I was around nine years old.

11   Q    Did you know your way around Orlando?

12   A    Not at all.

13   Q    After you and Katherine flew to Orlando and landed at the

14   airport, what happened?

15   A    We were picked up and brought to a home that was

16   furnished but no one seemed to live there.  It seemed to be

17   like what an Airbnb would be now.

18   Q    Fair to say Airbnb didn't exist back then?

19   A    Yes.

20   Q    And was it like a rental property?

21   A    It seemed that way.

22   Q    And do you recall anything about where the house was

23   situated?

24   A    I remember it being in a cul-de-sac.

25   Q    What happened after you and Katherine got to the house?

GA0848

Stephanie - direct - Shihata                          1655

1   A    Nothing.  We were there for a long time, for a few days,

2   and we were not contacted by him.  I started to think maybe

3   that he had forgotten that I was even there.  We just sat in

4   the house alone.

5   Q    Did you leave the house at all?

6   A    No.

7   Q    Why not?

8   A    We weren't allowed to.  We didn't have a car, we didn't

9   have anyone to take us anywhere or do anything.

10  Q    Now, did there come a point when you saw the defendant on

11  that trip to Orlando?

12  A    Yes.  On the last day that I was there towards the end of

13  the day, he showed up.

14  Q    And what happened when the defendant showed up?

15  A    He picked me up in a sports car and we drove to the

16  studio that he was recording at.

17  Q    And when you say "we," who are you referring to?

18  A    He and I.

19  Q    The defendant and you?

20  A    Yes.

21  Q    And was there anyone else in the car?

22  A    Not that I recall.

23  Q    Do you recall whether your friend Katherine went to the

24  studio as well?

25  A    I don't remember.

Stephanie - direct - Shihata                              1656

1  Q    Now, what happened when you got to the studio in Orlando?

2  A    Mr. Kelly told me that he wanted to record me giving him

3  oral sex there at the studio.

4  Q    And what happened next?

5  A    And so I did.  He had a different video camera that day

6  and I performed oral sex on him while he held the camera.

7  Q    And how is this video camera different from the one at

8  the house in Lincoln Park?

9  A    It was more of a handheld camera, a smaller one.

10 Q    And how was he holding it during this encounter?

11 A    He just held it out like that -- (indicating) -- facing

12 us.

13 Q    And what part of your bodies was it facing?

14 A    My profile.

15 Q    Was it --

16 A    I mean --

17 Q    -- the top of your body, bottom, middle?

18 A    My face because I was performing oral sex on him so my

19 face and possibly my breasts.

20 Q    And where was your face at the time?

21 A    In his lap.

22 Q    And were you -- was his penis in your mouth?

23 A    Yes.

24 Q    How did that make you feel?

25 A    Just humiliated.

Stephanie - direct - Shihata                1657

1  Q    Did you want to be recorded that day?

2  A    No, I didn't.

3  Q    Do you recall whether you saw any of the other

4  defendant's employees or associates on your trip to Orlando?

5  A    I feel like I did see Blackie there but I can't be

6  specific as far as where I saw him.

7  Q    After that encounter where the defendant filmed you

8  having, giving him oral sex, did you see the defendant again

9  on that trip?

10 A    Just afterwards, we, he drove me back to the house and I

11 was crying in the car and I remember him not really knowing

12 how to deal with that and that was the end of that trip.

13 Q    Did you and Katherine return to Chicago from Orlando?

14 A    We did.

15 Q    And upon your return to Chicago, how were you feeling

16 about your time with the defendant?

17 A    I didn't want to be seeing him anymore.  I felt used and

18 humiliated and degraded and I just didn't want to be abused

19 anymore.

20 Q    Did you see the defendant again after your return to

21 Chicago?

22 A    I did.  I saw him at least once or twice after that.

23 Q    And why did you see him again after you returned to

24 Chicago?

25 A    Well, he had had these sex tapes of me and I wanted to

Stephanie - direct - Shihata                    1658

1  stay in good standings with him because I wanted to see if I

2  could get those from him.

3  Q    And did you discuss that with him?

4  A    Yeah.  I remember calling him and asking him if I could

5  meet with him and get the videotapes or even just destroy them

6  together and he gave me hope that we could.  So he said

7  something like:  Yeah, you know, we might be able to do that,

8  why don't you come down to the studio.  And at that point, I

9  knew that he didn't have any intentions of destroying the

10 tapes and that I would never see them again and that was the

11 last time that I spoke to him.

12 Q    Did you ever get the tapes from the defendant?

13 A    No, I didn't.

14 Q    Did you ever see him destroy the tapes?

15 A    No, I didn't.

16 Q    Since the last time you spoke to him and discussed those

17 tapes, have you spoken to the defendant since then?

18 A    No.

19 Q    Have you seen the defendant since then other than here

20 today in court?

21 A    No.

22 Q    And in relation to that trip to Orlando, approximately

23 when was your last communication with the defendant?

24 A    I would say either November or December of 1999.

25 Q    And you went to Orlando around your birthday, is that

STEPHANIE - REDIRECT - SHIHATA                1705

1  defendant about wanting to either get those videotapes or

2  destroy them?

3  A    No, that was not the first time.

4  Q    And how many times had you talked to him about that

5  before that phone call?

6  A    Twice before.

7  Q    And were those times in person?

8  A    Yes.

9  Q    And did the defendant destroy the tapes when you asked

10 him those times?

11 A    No, he did not.

12 Q    Did he give them back to you?

13 A    No, he did not.

14 Q    Did you conclude from that that going over there would

15 make no difference whatsoever?

16 A    Yes, I did.

17 Q    You were also asked some questions about the incident in

18 the car where the defendant told you to give him oral sex with

19 people in the front seat.

20        Do you remember those questions?

21 A    I do.

22 Q    The people in the front seat, who did they work for?

23 A    They worked for Mr. Kelly.

24 Q    Before today, have you ever spoken publicly about your

25 experience with the defendant?

GEORGETTE K. BETTS, RPR, FCRR, CCR

2239

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,    :    19-CR-286(AMD)

        Plaintiff,    :

     -against-    :    United States Courthouse
                     Brooklyn, New York

ROBERT SYLVESTER KELLY,    :

                   September 1, 2021
       Defendant.    :    9:30 a.m.

- - - - - - - - - - - - - X


TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ANN M. DONNELLY
UNITED STATES DISTRICT JUDGE, and a jury.


APPEARANCES:


For the Government:         JACQUELYN M. KASULIS
                          Acting United States Attorney
                          BY: ELIZABETH GEDDES
                             NADIA SHIHATA
                             MARIA E. CRUZ MELENDEZ
                          Assistant United States Attorneys
                          271 Cadman Plaza East
                          Brooklyn, New York


For the Defendant:         DEVEREAUX L. CANNICK, ESQ.
                          NICOLE BLANK BECKER, ESQ.
                          THOMAS FARINELLA, ESQ.
                          CALVIN HAROLD SCHOLAR, ESQ.


Court Reporter:         Andronikh M. Barna
                          225 Cadman Plaza East
                          Brooklyn, New York
                          (718) 613- 2178

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

Faith - Direct - Shihata                              2245

1    A    Because I had to wait for somebody to come open it.

2    Q    Now, you testified that at some point Diana did take you

3    to the bathroom inside the studio, correct?

4    A    Correct.

5    Q    And what did she do when -- after taking you to the

6    bathroom?

7    A    Once we got to the bathroom, she waited outside the stall

8    for me to finish, sat there while I washed my hands, escorted

9    me back to the Sprinter.

10   Q    So she physically went inside the bathroom with you?

11   A    Yes.

12   Q    Did she use the bathroom?

13   A    No.

14   Q    And then she escorted you back to the Sprinter?

15   A    Correct.

16   Q    Yesterday you testified that at some point Diana took you

17   from the Sprinter to a room at the studio; is that right?

18   A    Correct.

19   Q    In L.A.?

20   A    Yes.

21   Q    And you testified that initially at some point the

22   defendant came in the room quickly and left?

23   A    Correct.

24   Q    And then that you waited there for several hours; is that

25   right?

Faith - Direct - Shihata                    2246

1   A    Correct.

2   Q    I'm going to show you what's in evidence as Government

3   Exhibit 208(b).

4           Now, these are, again, texts between you and Diana?

5   A    Correct.

6   Q    And I think you testified yesterday about the text about

7   the bathroom that are on this page of the exhibit, so I won't

8   go over that again, but is there another text where you write

9   "Can I leave back to the room lol or he wants me to wait?"

10  A    Correct.

11  Q    And what room -- where were you when you sent that text?

12  A    I was in the studio still waiting on him.

13  Q    And when you say "back to the room," what were you

14  referring to?

15  A    My hotel room.

16  Q    And Diana responds about an hour later, "please wait," is

17  that right?

18  A    Correct.

19  Q    Now, by the way, the text in Government Exhibit 208(b)

20  between you and Diana, you provided those to the government;

21  is that right?

22  A    Correct.

23  Q    And do you recall in what manner you provided them to the

24  government?

25  A    I provided the screen recording of my text between me and

Faith - Direct - Shihata                    2247

1  Diana.

2  Q    And do you recall where you were when you provided the

3  screen recording?

4  A    In New York.

5  Q    Was that in the presence of agents?

6  A    Correct.

7  Q    And the time stamps in this exhibit, this screen

8  recording, was that in the local time where you were when you

9  made the screen recording?

10  A    Correct.

11  Q    So in New York time?

12  A    Correct.

13  Q    Now, why was it that you wrote -- that you texted Diana

14  to ask her if you could leave the room?

15  A    Because I had to get permission whenever I needed to go

16  somewhere.  Diana was the one to take me wherever I needed to

17  go, call an Uber if I needed to go somewhere.

18  Q    And according to who did you need permission for such

19  things?

20  A    According to R. Kelly, you needed his permission.

21  Q    Now, I think where we left off yesterday, you talked

22  about that after several hours, the defendant came into the

23  room you were in again; is that right?

24  A    Correct.

25  Q    And what, if anything, did he say when he came back into

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Faith - Direct - Shihata                    2248

1  the room?

2  A    Once he came back into the room he had told me that had I

3  stood up or showed some type of excitement about him entering

4  the room, that he would have came back sooner.

5  Q    Was he referring to the first time he came into the room?

6  A    Correct.

7           The first time he quickly came in the room, I didn't

8  get up, I didn't say "hey, Daddy."  I didn't show any type of

9  excitement.  So the second time when he came back, hours

10  later, he let me know that that was why.

11  Q    And what happened next?

12  A    Shortly after that, he came in.  He -- I was sitting on

13  the couch, so he had told me to come over to where he was

14  across the room.  There was a piano right there, maybe like

15  two little rollie chairs, and he sat in the chair.  And he

16  told me to take my clothes off again and walk back and forth.

17  I had told him that I was on my period.  I wasn't at the time,

18  but I told him I was.

19  Q    Why did you tell him you were on your period if you

20  weren't?

21  A    I didn't want to have sex with him.

22  Q    All right.  So you testified he told you to take your

23  clothes off?

24  A    Correct.

25  Q    And what, if anything, did you do?

Andronikh M. Barna, Official Court Reporter, RPR, CRR

GA0858

Kelly - Direct - Shihata                    2400

1   Q    I want to direct your attention to December 21, 2018 and
2   January 3rd, 2019.  On those dates did you receive a series of
3   texts related to Faith and others on those dates?
4   A    Yes.
5   Q    Do you recall what your phone number was at the time?
6   A    Yes.
7   Q    Without saying it, is it still your phone number now?
8   A    Yes.
9   Q    I'm showing the witness only what is marked for
10  identification as Government's Exhibit 958.  Do you recognize
11  this phone number?
12  A    Yes.
13  Q    What phone number is it?
14  A    My phone number.
15           MS. SHIHATA:  I move to admit Government's Exhibit
16  958?
17           MR. CANNICK:  No objection.
18           THE COURT:  That's in evidence.
19           (Government Exhibit 958, was received in evidence.)
20           MS. SHIHATA:  May we publish it to the jury only.
21  BY MS. SHIHATA:
22  Q    When you received these texts did you recognize the
23  number that sent them?
24  A    No.
25  Q    Sitting here today do you recall the phone number that

Rivka Teich, CSR, RPR, FCRR, RMR  Official Court Reporter

Kelly - Direct - Shihata                    2401

1   sent the text to you?

2   A    Yes.

3   Q    You recall the precise number?

4   A    Not the precise number, no.

5   Q    I'm showing the witness only what is marked for

6   identification as Government's Exhibit 230A.  Do you recognize

7   this exhibit?

8   A    Yes.

9   Q    It's a three-page exhibit, I'll just show you the pages.

10  Are these certain of the texts that you received from that t

11  number that you didn't recognize?

12  A    Yes.

13           MS. SHIHATA:  I move to admit Government's Exhibit

14  230A.

15           MR. CANNICK:  No objection.

16           THE COURT:  Those are in evidence.

17           (Government Exhibit 230A, was received in evidence.)

18           MS. SHIHATA:  May we publish it?

19           THE COURT:  Both?

20           MS. SHIHATA:  To the jury only.

21           THE COURT:  Okay.

22  BY MS. SHIHATA:

23  Q    The text in green, was that from you to the person who is

24  sending the text?

25  A    Yes.

Rivka Teich, CSR, RPR, FCRR, RMR  Official Court Reporter

Kelly - Direct - Shihata                           2402

1   Q    And at the very top it says two people do you see that?

2   A    Yes.

3   Q    Do you know who these texts were sent to?

4   A    Yes.

5   Q    Who is that?  Who received the text from the unknown

6   number?

7   A    Gloria Allred.

8   Q    Who were the texts -- you received the texts, correct?

9   A    I received them, yes.

10  Q    Were they also sent to your daughter Faith?

11  A    Yes.

12  Q    Had Faith recently changed her number at that time?

13  A    Yes.

14  Q    The phone number that sent you the text, I'm going to

15  turn to the second page, do you see that phone number here?

16  A    Yes.

17  Q    Can you read it out, please?

18  A    1(312)203-3030.

19  Q    Do you see a date January 3rd, 2019 then additional texts

20  from that phone number?

21  A    Yes.

22  Q    At the time you received the text from this (312)203-3030

23  number, was it fair to say that (312)203-3030 number was not

24  saved in your phone, correct?

25  A    Correct.

Rivka Teich, CSR, RPR, FCRR, RMR  Official Court Reporter

Kelly - Direct - Shihata                                    2403

1  Q    In fact, it shows up as the number here, correct?

2  A    Correct.

3  Q    Did you later provide screenshots of some of the texts

4  that you received from this (312)203-3030 number to your

5  attorney's office?

6  A    Yes.

7  Q    After you did that, did your phone associate the

8  (312)203-3030 number that sent those texts with your attorney?

9  A    Yes.

10 Q    At some point did a federal agent travel to Texas to take

11 photos of all the texts you received from the (312)203-3030

12 number?

13 A    Yes.

14 Q    I'm going to show the witness only what is marked for

15 identification as Government's Exhibit 230B.  If I may

16 approach, your Honor?

17         THE COURT:  Yes.

18 Q    Can you take a quick look at the document I just handed

19 you?

20         (Witness reviewing document.)

21         Having reviewed Government's Exhibit 230B, are these

22 photographs of the texts you received from (312)203-3030 from

23 your phone at the time?

24 A    Yes.

25         MS. SHIHATA:  I move to admit Government's Exhibit

Kelly - Direct - Shihata                              2404

1   230B.

2          MR. CANNICK:  No objection.

3          THE COURT:  That's in evidence.  Jury only?

4          MS. SHIHATA:  The first page can be to everyone.

5          (Government Exhibit 230B, was received in evidence.)

6          THE COURT:  Okay.

7   BY MS. SHIHATA:

8   Q    The date at the top, does that say December 21, 2018?

9   A    Yes.

10  Q    At the time these photographs were taken, was this when

11  after you had sent certain of the texts to your attorney?

12  A    Yes.

13  Q    You testified earlier that your iPhone -- was this an

14  iPhone, by the way?

15  A    Yes.

16  Q    Did your iPhone start to associate it with your attorney?

17  A    Yes.

18  Q    So where it says "maybe" and it's redacted, was that your

19  attorney's name?

20  A    Yes.

21  Q    The first two -- was this an image that was sent to you

22  your phone by that number?

23  A    Yes.

24  Q    Do you see there it says:  Survivor number three,

25  Jerhonda M. Pace Johnson?

Rivka Teich, CSR, RPR, FCRR, RMR  Official Court Reporter

GA0863

Kelly - Direct - Shihata                                      2405

1   A      Yes.

2   Q      Below that did it say, did the text you say:  Just a

3   sample.  We will seek criminal charges.  You've been warned.

4   A      Yes.

5   Q      Was there another image that was sent to you?

6   A      Yes.

7   Q      Were there various images that were sent to you after

8   that from that same number?

9   A      Yes.

10  Q      I'm going to turn to page three of Government's Exhibit

11  230B, this is for the jury only.  Looking towards the bottom

12  of the page, were you sent by this 312 number an image that

13  said:  Survivor number seven Faith.  Then Faith's last name?

14  A      Yes.

15  Q      I'm going to turn to page four of the exhibit, again for

16  the jury only.  Were you sent certain images of your daughter

17  Faith and certain photographs of text messages?

18  A      Yes.

19  Q      These are the images you were sent?

20  A      Yes.

21  Q      Does it appear to have some text below each line of

22  images?

23  A      Yes.

24  Q      Then these are the text messages, photographs of text

25  messages you were sent?

Kelly - Direct - Shihata                           2406

1   A    Yes.

2   Q    Below that does it say:  To be continued.

3   A    Yes.

4   Q    In green was that a message you sent back to the person

5   who sent you these texts?

6   A    Yes.

7   Q    You wrote:  Who sent this.

8   A    Yes.

9   Q    Then turning to page five of the exhibit.  After you

10  sent, "who sent this," did the person respond:  Criminal

11  charges to follow?

12  A    Yes.

13  Q    Then sent you some additional images of other people?

14  A    Yes.

15  Q    I want to turn to page 15 of the exhibit, this can be to

16  everyone.  Did the person who was sending you these texts

17  write:  Publishing soon.

18  A    Yes.

19  Q    Then how did you respond?

20  A    "Who is this texting.  Kash?"

21  Q    Were you referring there to the Kash that you had met at

22  the Applebee's?

23  A    Yes.

24  Q    What did you write after that?

25  A    "You are stupid and you were a real man just call and

Kelly - Direct - Shihata                    2407

1  let's talk about this.  It's Faith's mom."

2  Q    Was there a typo in what you wrote there?

3  A    Yes.

4  Q    When you said if you were a real man, who were you

5  referring to when you sent that?

6  A    Robert Kelly.

7  Q    Was that based on the content of the text that you had

8  received?

9  A    Yes.

10  Q    Did you then receive a response from the sender saying:

11  No, this is Colon.  My investigation will be done soon enough.

12  A    Yes.

13  Q    There is a response from you in green, correct?

14  A    Yes.

15  Q    It says:  No, seriously, call me back.  I have another

16  question.

17  A    Yes.

18  Q    Between the text where the sender said, "No, this is

19  Colon, my investigation will be done soon enough," and the

20  text from you that follows, did you receive a phone call?

21  A    Yes.

22          (Continued on next page.)

23

24

25

Kelly - Direct - Shihata                                    2408

1   DIRECT EXAMINATION

2   BY MS. SHIHATA:  (Continuing)

3   Q    And what happened on that phone call?

4   A    I don't recall.

5   Q    Did you receive a phone call from the same number that

6   was texting you?

7   A    Yes.

8   Q    And do you recall anything about what transpired on that

9   phone call?

10  A    I do recall him saying he was an investigator for Robert

11  Kelly.

12  Q    And did he say what he wanted you to do?

13  A    He wanted me to drop the case.

14  Q    Now, after you sent that text, did you receive texts

15  again from the same number on January 3rd, 2019?

16  A    Yes.

17  Q    And did the text say "pull the plug or you will be

18  exposed"?

19  A    Yes.

20  Q    And we went over just a moment ago the text that you had

21  received, photos, the photographs of your daughter and the

22  photographs of text messages that you received from this

23  number, correct?

24  A    Yes.

25       MS. SHIHATA:  And I am now showing the witness only

Kelly - Cross - Cannick                          2409

1   page 18 of Government Exhibit 230.

2              This is now just for the jury only.

3   Q    Again, is this just the actual images that were sent to

4   you?

5   A    Yes.

6   Q    And again, it was followed with "to be continued"?

7   A    Yes.

8              MS. SHIHATA:  No further questions.

9              THE COURT:  All right.  Cross-examination?

10             MR. CANNICK:  May I see that, please?

11  CROSS-EXAMINATION

12  BY MR. CANNICK:

13  Q    Good afternoon, ma'am?

14  A    Good afternoon.

15  Q    You testified and told us that you had received a text

16  from someone by the name of Colon?

17  A    Yes.

18  Q    And that person told you that he was an investigator?

19  A    Yes.

20  Q    And you testified and told us that that was an

21  investigator of Robert Kelly?

22  A    Yes.

23  Q    Do you know whether or not Robert Kelly had an

24  investigator by the name of Colon?

25  A    No.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

GA0868

Edmond - Direct - Cruz Melendez                2416

1           If we could publish this.  It's in evidence.

2   Q    Mr. Edmond, do you have a copy there of Government

3   Exhibit 803(b)?

4   A    Yes, I do.

5   Q    And what is this?

6   A    This is a marriage license from the state of Illinois.

7   Q    On Government Exhibit 803(b), I want to direct your

8   attention to the bottom portion of the marriage license.  Do

9   you see that there, the portion where there is handwriting?

10  A    Yes.

11  Q    So I want to direct your attention to that first line of

12  handwriting where it says "print name of person officiating."

13  Do you see that there?

14  A    Yes.

15  Q    And what does that say there?

16  A    Nathan J. Edmond.

17  Q    And did you write that?

18  A    Yes, I did.

19  Q    And to the right of that it says, "Elder Nathan J Edmond,

20  Sr."  Did you also write that?

21  A    Yes.  Yes, I did.

22  Q    What's an elder?

23  A    An elder is an ordained minister --

24  Q    And is it fair to say --

25  A    -- of the gospel.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Edmond - Direct - Cruz Melendez                    2423

1   A    About ten minutes or less.

2   Q    After you finished officiating the wedding, what happened

3   next?

4   A    After I finished officiating the wedding, you know, like

5   you standardly do, "you may kiss your bride," and they did.

6   And I think they walked back into the room.  I think I might

7   have said something to the gentleman that showed me the

8   license.

9          Normally, one of two things can happen:  Either the

10  minister keeps the license and turns it into the county or the

11  family keeps the license and turns it over to the county.  So

12  I thought that I was going to take it.  He said, "No, we'll

13  take it from here."  And that was it.

14  Q    And so did you turn in the license to the County Clerk's

15  Office?

16  A    No, I didn't.  They did.

17  Q    Did you receive any payment for officiating the wedding?

18  A    I think they offered me, what was it, 25 or $50, or

19  something like that, Keith might have said.  He might have

20  asked me.  I was just doing it as a favor.  I wasn't doing it

21  for, you know, no money.  I didn't think it was anybody

22  special and I didn't understand it at all.

23  Q    Mr. Edmond, I am now showing you Government Exhibit 89.

24          Do you have that there in front of you, a copy of

25  that?

Andronikh M. Barna, Official Court Reporter, RPR, CRR

GA0870

3408

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2
      - - - - - - - - - - - - - X
 3
      UNITED STATES OF AMERICA,    :    19-CR-286(AMD)
 4
              Plaintiff,           :
 5                                      United States Courthouse
          -against-               :    Brooklyn, New York
 6
      ROBERT SYLVESTER KELLY,       :
 7                                      September 14, 2021
              Defendant.           :    9:30 a.m.
 8
      - - - - - - - - - - - - - X
 9
10                    TRANSCRIPT OF TRIAL
            BEFORE THE HONORABLE ANN M. DONNELLY
11        UNITED STATES DISTRICT JUDGE, and a jury.

12
      APPEARANCES:
13

14    For the Government:         JACQUELYN M. KASULIS, ESQ
                                  Acting United States Attorney
15                                BY: ELIZABETH GEDDES, ESQ.
                                      NADIA SHIHATA, ESQ.
16                                    MARIA E. CRUZ MELENDEZ, ESQ.
                                  Assistant United States Attorneys
17                                271 Cadman Plaza East
                                  Brooklyn, New York
18

19    For the Defendant:         DEVEREAUX L. CANNICK, ESQ.
                                  NICOLE BLANK BECKER, ESQ.
20                                THOMAS FARINELLA, ESQ.
                                  CALVIN HAROLD SCHOLAR, ESQ.
21

22    Court Reporter:   SOPHIE NOLAN
                        225 Cadman Plaza East/Brooklyn, NY 11201
23                      NolanEDNY@aol.com
      Proceedings recorded by mechanical stenography, transcript
24    produced by Computer-Aided Transcription

25
```

SN        OCR        RPR

Chabot - direct - Geddes                           3581

1   A    That's correct.

2   Q    What, if anything, did you see the defendant holding on

3   that day?

4   A    On the left side of the defendant, a black bookbag.

5   Q    And who, if anyone else, did you see carry that black

6   bookbag that day?

7   A    The individual to the left, George Kelly.

8   Q    What did you see George Kelly do?

9   A    He went out of view out of my sight to the right, both

10  him and the defendant, and then George Kelly came back into

11  the view to the left walking back towards the area that he's

12  in in the photograph with the black bag.

13  Q    And did you see the defendant leave that day?

14  A    Yes.

15  Q    In what vehicle did the defendant leave?

16  A    It was a gray Mitsubishi SUV.

17  Q    How about George Kelly, did you see George Kelly leave

18  that area that day?

19  A    I did.

20  Q    In what vehicle did George Kelly leave that day?

21  A    In the Jeep that he is standing in front of.

22  Q    So they left in two separate cars?

23  A    Correct.

24  Q    I want to direct your attention to the following day.

25  Did you participate in a search that day?

GA0872

3632

```
 1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - X
 3
     UNITED STATES OF AMERICA,   :   19-CR-286(AMD)
 4
              Plaintiff,         :
 5                                   United States Courthouse
         -against-               :   Brooklyn, New York
 6
     ROBERT SYLVESTER KELLY,     :
 7                                   September 15, 2021
              Defendant.         :   9:30 a.m.
 8
     - - - - - - - - - - - - - X
 9

10                 TRANSCRIPT OF TRIAL
          BEFORE THE HONORABLE ANN M. DONNELLY
11        UNITED STATES DISTRICT JUDGE, and a jury.

12
     APPEARANCES:
13

14   For the Government:         JACQUELYN M. KASULIS, ESQ
                                 Acting United States Attorney
15                               BY: ELIZABETH GEDDES, ESQ.
                                     NADIA SHIHATA, ESQ.
16                                   MARIA E. CRUZ MELENDEZ, ESQ.
                                 Assistant United States Attorneys
17                               271 Cadman Plaza East
                                 Brooklyn, New York
18

19   For THE DEFENDANT:          DEVEREAUX L. CANNICK, ESQ.
                                 NICOLE BLANK BECKER, ESQ.
20                               THOMAS FARINELLA, ESQ.
                                 CALVIN HAROLD SCHOLAR, ESQ.
21

22   Court Reporter:   SOPHIE NOLAN
                       225 Cadman Plaza East/Brooklyn, NY 11201
23                     NolanEDNY@aol.com
     Proceedings recorded by mechanical stenography, transcript
24   produced by Computer-Aided Transcription

25
```

Proceedings                                                    3639

1   BY MS. GEDDES:

2   Q    I'm showing --

3               MS. GEDDES:  The Government offers 514(b).

4               THE COURT:  Any objection?

5               MR. CANNICK:  No objection.

6               THE COURT:  It's in evidence.

7               (Government Exhibit 514(b) received in evidence.)

8               (Exhibit published.)

9   BY MS. GEDDES:

10  Q    I'm showing what's in evidence as Government Exhibit

11  514(a) and 514(b).  Do you recognize those photographs?

12  A    I do.

13  Q    What are they photographs of?

14  A    The Mandarin Hotel and specifically room 1803 inside that

15  hotel.

16  Q    Who took those photographs?

17  A    I did.

18  Q    And did you take the other photographs that are contained

19  within 514(c) through 514(i)?

20  A    I did.

21  Q    And when you took those photographs, what was the

22  condition of the room?

23  A    It was occupied, but no one was present.

24  Q    I'm showing what's in evidence as Government Exhibit 311.

25              (Exhibit published.)

Proceedings                                3653

1          MS. GEDDES:  Government Exhibits -- oh, I'm sorry,

2     Government Exhibit 430-A, 430-B, 430-C and 430-D, all of which

3     are in evidence, as well as 449, where were those Government

4     Exhibits found?

5     A    The same storage unit.

6          MS. GEDDES:  And I'm showing what's in evidence as

7     Government Exhibit 427.

8          I'm sorry, 428.

9          (Exhibit published.)

10    Q    428 appears to be in document protectors.  How were

11    those -- where were those found and what was the condition in

12    which they were found?

13    A    That's the condition they were found in the protectors.

14         THE COURT:  Can I just ask a question?

15         In any instance where documents that you recovered

16    have protectors, is it fair to say that that's how they were

17    when you found them or did you put any protectors on anything?

18         THE WITNESS:  That's how they were found, Your

19    Honor.

20         THE COURT:  Okay, go ahead.

21    BY MS. GEDDES:

22    Q    Did you make any alterations other than putting letters

23    back together that had been ripped up?

24    A    No.

25         MS. GEDDES:  The Government offers Government

Chabot - Direct - Geddes                          3666

1   "1500-dollar fine for being sarcastic because that's what set

2   it off.  I fined Diana $2,000 tonight for the same effing

3   thing, her sarcasm.  You mother effers got me twisted if you

4   think you're going to be sarcastic with me and get away with

5   it.  Good night."

6           And then it goes on from there.

7           MS. GEDDES:  The government offers Government

8   Exhibits 912(a) and (b), 934(a) to (d).

9           THE COURT:  Any objection?

10          MR. CANNICK:  None.

11          THE COURT:  Okay.  That is in evidence.

12          (Government Exhibits 912(a) and (b), 934(a) to (d)

13  were received in evidence.)

14  Q    Are you familiar with the Super Bowl where the Chicago

15  Bears played the Indianapolis Colts?

16  A    I am.

17  Q    What date was it?

18  A    It was February 4th of 2007.

19  Q    Where was it held?

20  A    In Miami.

21  Q    I'm showing you what's in evidence as Government

22  Exhibits 328 and 329.

23          Have you watched the videos contained within

24  Government Exhibits 328 and 329?

25  A    I have.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Rosario - Direct - Cruz Melendez                3700

1  issuing I.D.s to our customers.

2  Q    And did the employees that you just discussed, did these

3  employees carry out the various official functions of the

4  Department of Public Aid as part of their job

5  responsibilities?

6  A    Yes.

7  Q    And fair to say that those were also authorized by the

8  executive branch under the oversight of the government?

9  A    Correct.

10  Q    Now, you referenced identification cards in your

11  testimony.  Were there employees at local offices who, as part

12  of their responsibilities, would issue Department of Public

13  Aid identification cards?

14  A    Yes.

15  Q    And were there also employees at these offices who were

16  responsible for taking photographs of recipients for the

17  purposes of the identification cards that were issued?

18  A    Yes.

19  Q    As an employee at the local Department of Public Aid

20  offices, were you an employee of the State of Illinois?

21  A    Yes.

22  Q    Were the other employees of the Department of Public Aid

23  also state employees?

24  A    Yes.

25  Q    And is that the same for in 1994 as well?

Rosario - Direct - Cruz Melendez                    3701

1   A    Correct.

2   Q    Who issued the employees' paychecks?

3   A    The Comptroller of the State of Illinois.

4   Q    And did you receive your paychecks from the Comptroller

5   of the State of Illinois?

6   A    Yes.

7   Q    And that includes in 1994, correct?

8   A    Correct.

9   Q    Now, were individuals seeking public benefits able to go

10  to these various Department of Public Aid local offices in

11  Cook County?

12  A    Yes.

13  Q    Generally speaking, what if any process was in place in

14  1994 for persons seeking public benefits at the local offices

15  in the Department of Public Aid?

16  A    When a customer came into one of the offices, they would

17  submit an initial paper application at that time.  We would

18  screen the application, give the customer a document to return

19  verifying documents, such as birth certificates, social

20  security cards, at the time INS I.D. for proof of residency in

21  the United States, rent receipts, utility bills, asset

22  information for the SNAP program and other documents.

23  Q    And you mentioned that you would give them a form to

24  provide that information?

25  A    Correct.

Rosario - Direct - Cruz Melendez                    3702

1  Q    Would they then have to come back?

2  A    Yes.

3  Q    What would they need to come back for?

4  A    For the interview.

5  Q    And just generally speaking, what would happen in an

6  interview?

7  A    They would be seen by an intake caseworker.  They would

8  gather the information that was provided, conduct the

9  interview, depending on the program that the customer was

10  applying for.  They would enter that information into our

11  automated intake system at the time; it's a legacy system we

12  no longer use.  And from that, we would make a determination

13  of potential eligibility for benefits.

14  Q    And in 1994, approximately how long would the process

15  you've just explained take, between initial application and

16  then the eligibility determination?

17  A    Up to 30 days.

18  Q    Now, once eligibility was determined, did recipients

19  receive identification cards from the Department of Public

20  Aid?

21  A    Yes, if the determination was that they're eligible for

22  the program.

23  Q    And is it fair to say that that process of receiving the

24  identification wasn't a same-day process?

25  A    It wasn't a same-day process.

Case 22-1481, Document 127, 07/19/2023, 3544157, Page94 of 132

Rosario - Direct - Cruz Melendez                    3703

1  Q    Now, was there a requirement that applicants needed to be

2  a resident of Illinois to obtain benefits?

3  A    Yes.

4  Q    And what information would an individual have to provide

5  to prove residency?

6  A    They just have to attest that they are a resident of

7  Illinois.

8  Q    And was there an age requirement for obtaining public

9  benefits?

10 A    Yes, for most, for the majority of the programs we

11 administer.

12 Q    And what was the age requirement?

13 A    Eighteen.

14 Q    Now, you mentioned that it was for most of the programs

15 you administered.  Were there exceptions to that 18-year-old

16 age limit?

17 A    Yes.

18 Q    And what was that exception?

19 A    Under the Medicaid program, if a young lady under the age

20 of 18 who was not residing with a parent and came in to apply

21 and indicated to us at the time that they were pregnant, they

22 potentially could be eligible for a Medicaid card.

23 Q    And what, if any, information would this underaged female

24 need to provide in order to be eligible for the Medicaid

25 program?

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Rosario - Direct - Cruz Melendez                3704

1  A    They would have to verify that they were pregnant.

2  Q    And if a minor female provided proof of her pregnancy and

3  needed medical benefits in 1994, did that female still need to

4  go through the same process of the application and eligibility

5  determination that you described?

6            MR. CANNICK:  May we approach, Your Honor?

7            THE COURT:  Sure.

8            (Sidebar.)

9            (Continuing on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                                          3705

1      (Sidebar conference held on the record in the

2  presence of the Court and counsel, out of the hearing of the

3  jury.)

4      MR. CANNICK:  Your Honor, I was trying to figure out

5  where this testimony was going and I think it finally hit me

6  that it seems this testimony is being elicited to establish

7  that Aaliyah was pregnant.  It has absolutely no evidence of

8  that.

9      Maybe I'm missing the boat.

10      THE COURT:  The AUSA is shaking her head.

11      MS. MELENDEZ:  That's incorrect.  What I'm

12  establishing is the general overall process for applicants to

13  obtain an identification card.  He indicated there was an

14  exception and I wanted to make clear what that exception is.

15      THE COURT:  Is this related to the cards that were

16  found in the search warrant?

17      MS. MELENDEZ:  No.  On the application for marriage

18  between Aaliyah and the defendant, there is an Illinois

19  Department of Public Aid number referenced at the top of that,

20  and there was testimony that that was what was used for the

21  purposes of indicating Aaliyah Haughton's age at the time.

22      THE COURT:  So I think I am the thick one here.

23  What is the bottom line?  What is he --

24      MS. MELENDEZ:  As a general matter, two things.

25      One is that the process would not have happened in

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Sidebar                                                3706

1    one day, which corroborates the idea that an individual --

2              THE COURT:  I see.

3              MS. MELENDEZ:  -- would have needed -- could have

4    been given some sort of currency or remuneration for the

5    purposes of bypassing that process.

6              THE COURT:  Okay.

7              MS. MELENDEZ:  And two, that a search of records for

8    Aaliyah D. Haughton came up with no records.

9              THE COURT:  All right.

10             MR. CANNICK:  Just a quick response.

11             We haven't gotten any testimony that someone -- we

12   haven't got any testimony that someone is saying that I

13   received a gratuity to expedite this process.

14             THE COURT:  This is that wonderful instruction I

15   give on circumstantial evidence, that I think there has been

16   evidence from that somewhat reluctant gentleman, whose name

17   escapes me right now.

18             MS. MELENDEZ:  Demetrius.

19             THE COURT:  Mr. Smith, that he paid somebody off at

20   the Department of Public Aid.

21             MR. CANNICK:  And we're not going to have any

22   testimony from anyone at the Department attesting to that?

23             THE COURT:  Well, we have the guy who made the

24   payment.

25             And now you have a guy who is saying this is what

Andronikh M. Barna, Official Court Reporter, RPR, CRR

GA0883

Sidebar                                                    3707

1    the real process is, and the testimony -- I take it that the

2    inference the government is seeking to draw is that they got

3    whatever documentation they needed in a very short time and it

4    never would have taken that long if they had done it the right

5    way.

6              Do I have that right?

7              MS. MELENDEZ:  That's correct.

8              MR. CANNICK:  I would have stipulated to that.

9              THE COURT:  That's not my -- but I think we have got

10   to be getting there.

11             MS. MELENDEZ:  We are.  There's a few documents I

12   need to show.

13             THE COURT:  And you do not have an objection to

14   those going in?

15             MR. CANNICK:  Documents already in evidence?

16             MS. MELENDEZ:  Not in evidence yet.

17             THE COURT:  Why don't you show them to him.  That

18   would be great.

19             (Sidebar ends.)

20             (Continuing on the following page.)

21

22

23

24

25

Case 22-1481, Document 127, 07/19/2023, 3544157, Page99 of 132

1   BY MS. CRUZ MELENDEZ:

2   Q    Mr. Rosario, I think just prior to the short break I had

3   asked you whether or not a minor female who was coming to the

4   Department of Public Aid seeking Medicare benefits would still

5   need to go through the process that you testified about with

6   regard to application, interview and eligibility

7   determination; is that correct?

8   A    Correct.

9   Q    And again, that process took approximately 30 days?

10  A    Correct.

11  Q    At any point, including in 1994, were employees working

12  at the Department of Public Aid authorized to receive money,

13  gifts, property or other remuneration in exchange for

14  bypassing this process that you testified about?

15  A    No.

16  Q    So, for example, would an employee working at a local

17  office be authorized to obtain cash in exchange for giving

18  someone an identification card without this person first

19  applying for benefits or going through the eligibility

20  process?

21  A    Correct.

22  Q    Did the Department of Public Aid regularly keep records

23  regarding individuals who sought and received benefits from

24  the Department of Public Aid?

25  A    Yes.

GA0885

Rosario - Direct - Cruz Melendez                3709

1  Q    And does the Department of Human Services and the
2  Department of Health and Family Services keep records from
3  when the Department was formerly part of the Department of
4  Public Aid?
5  A    Yes.
6        MS. MELENDEZ:  And, Your Honor, I believe there is
7  no objection to Government's Exhibit 903 and we would move it
8  into evidence.
9        MR. CANNICK:  No objection.
10       THE COURT:  Okay.  That is in evidence.
11       (Government's Exhibit 903 was received in evidence.)
12 Q    It may be semantics, but I just wanted to clarify.  I
13 previously asked you whether or not -- I gave you an example
14 that an employee working at a local office, would that
15 employee be authorized to accept cash in exchange for giving
16 someone an identification card without this person applying
17 for benefits or going through the eligibility process.  A
18 person would not be authorized; is that correct?
19 A    Right, they were not authorized to do that.
20 Q    So an employee would not be authorized to take cash to
21 bypass this process?
22 A    Correct.
23 Q    So I'm showing what's in evidence as Government's Exhibit
24 903.
25       Prior to your testimony here today, did you have an

Andronikh M. Barna, Official Court Reporter, RPR, CRR

4200

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2     - - - - - - - - - - - - - X
          UNITED STATES OF AMERICA,    :   19-CR-00286(AMD)
 3                                      :
                                        :
 4                                      :   United States Courthouse
              -against-                 :   Brooklyn, New York
 5                                      :
                                        :
 6                                      :   September 22, 2021
                                        :   9:30 a.m.
 7        ROBERT SYLVESTER KELLY,       :
                                        :
 8            Defendant.                :
       - - - - - - - - - - - - - X
 9
                    TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
10              BEFORE THE HONORABLE ANN M. DONNELLY
                     UNITED STATES DISTRICT JUDGE
11


12                        A P P E A R A N C E S :

13
       For the Government:        JACQUELYN M. KASULIS, ESQ.
14                                Acting United States Attorney
                                  Eastern District of New York
15                                271 Cadman Plaza East
                                  Brooklyn, New York 11201
16
                                  BY:  ELIZABETH GEDDES, ESQ.
17                                     MARIA E. CRUZ MELENDEZ, ESQ.
                                       NADIA SHIHATA, ESQ.
18                                     Assistant United States Attorneys

19     For the Defendant:         DEVEREAUX LEON CANNICK, ESQ.
                                  CALVIN HAROLD SCHOLAR, ESQ.
20                                NICOLE BLANK BECKER, ESQ.
                                  THOMAS A. FARINELLA, ESQ.
21
       Court Reporter:            DENISE PARISI, RPR, CRR
22                                225 Cadman Plaza East
                                  Brooklyn, New York 11201
23                                Telephone: (718) 613-2605
                                  E-mail: DeniseParisi72@gmail.com
24
       Proceedings recorded by computerized stenography.  Transcript
25     produced by Computer-aided Transcription.
```

*Proceedings* 4202

1   MR. CANNICK:  Your Honor, we would like to make

2   further argument on the requested charge.  Mr. Farinella has

3   some more authority for the Court's consideration.

4   THE COURT:  On what topic?

5   MR. FARINELLA:  Your Honor, the email that the

6   Government had sent with regard to the additional language.

7   THE COURT:  What language?  It's a very long charge.

8   MR. FARINELLA:  Well, there was an email sent by the

9   Government on Tuesday, September 21st, with regard to the

10  enterprise and adding additional language to the jury charge

11  to include additional language on the jury's instructions with

12  regard to the definition of enterprise.

13  THE COURT:  Okay.  Do you object to that?

14  MR. FARINELLA:  The language they're seeking to add,

15  Your Honor, they are -- in the cases that they cite, and the

16  language that it comes from, are cases where there are

17  conspirator or co-conspirator defendants.

18  THE COURT:  I don't think that matters, but go

19  ahead.

20  MR. FARINELLA:  Well --

21  THE COURT:  You're saying that giving the charge

22  hinges on whether there are other people that are also

23  charged?

24  MR. FARINELLA:  Well, yes.  I think that the cases

25  that I read deal with co-defendants -- co-conspirators who had

*Proceedings*                                                    4203

1   knew -- who knew of the illicit activity that they were

2   engaging in.  There are other acts, though, that may have

3   taken place, and they're trying to assert that they were

4   unaware of those other acts.

5           THE COURT:  No, I don't understand that to be the

6   case.  I think the law says that in an enterprise -- I don't

7   think all of the people that make up the enterprise have to be

8   aware -- well, maybe I'm wrong about that.  Let me ask the

9   Government.  I'm pretty sure that's right, but --

10          MS. GEDDES:  Yes, that's right.  The Government's

11  position is, as set forth in the language we proposed, that

12  every member of the enterprise does not need to know

13  everything that the enterprise is doing; and, importantly,

14  that the critical question for the jury is that the defendant

15  had the requisite criminal intent.  It makes no difference

16  whether other members of the enterprise had criminal intent,

17  and the reason for that is simple; that the law recognizes

18  that an enterprise allows someone to become much more

19  powerful.  And under racketeering, it states that a defendant

20  can use a legitimate enterprise to commit a pattern of

21  racketeering act, and that makes him guilty of racketeering.

22  It is irrelevant what the other members of the enterprise,

23  what criminal -- if any -- criminal intent that they had, and

24  I think that the language we propose just reflects that basic

25  black letter law that is, frankly, reflective of the language

GA0889

*Proceedings*                                                    4204

1   in the statute itself.

2          MR. FARINELLA:  Your Honor, in the first case they

3   cite, which is *USA vs. Rastelli*, the Court says, basically,

4   that the knowledge of the enterprise can be inferred from

5   eminence of close association with other co-conspirators with

6   the required knowledge and from participation with members of

7   the enterprise.

8          So what they're saying is that these are

9   co-conspirators who engaged in illicit illegal activity; and,

10  in this case, it's distinguishable, because this would be an

11  association of fact, technically -- an enterprise that's an

12  association of fact -- and I think there is a distinction, and

13  I think that this charge -- this additional language and

14  definition would cause confusion for the jurors.

15         THE COURT:  But I just don't understand, the

16  opposite of what you're saying is that everybody has to know

17  about it; is that your position?

18         MR. FARINELLA:  What I'm saying is that, for

19  example, in a conspiracy RICO case, for example, organized

20  crime, where there are members who are engaging in illegal

21  gambling, loan-sharking, while they all don't know of the

22  other's entire activities, they are all acting together for an

23  illicit means, a financial gain, reward at the end; and in the

24  event that they want to assert that they didn't realize that

25  someone else in the enterprise is going to be -- would commit

*Proceedings*                                                    4205

1   murder or other acts, they can't -- they can't allege the

2   ignorance to those issues, and I think that's what these cases

3   are discussing because they were all -- the cases in which are

4   cited deal with the -- with co-conspirators who all were

5   engaged in the illicit illegal activity and they knew that,

6   and so --

7            THE COURT:  Well that's one kind of racketeering

8   case.  I mean, there are those kind of classic racketeering

9   cases where the enterprise itself is illegal, but the law is

10  equally clear that the enterprise can be a not-illegal

11  enterprise, so that's just a different kind of case.  I don't

12  think you are going to find any case that says that every

13  person who makes up the enterprise has to know about every

14  single thing that's going on.  I'm quite certain that's not

15  the law.

16           MR. FARINELLA:  Well, when you're building an

17  association of fact, they have to have some understanding of

18  the underlying language that's charged in the indictment.

19           THE COURT:  I would love to see a case that says

20  that, but I don't think that's what -- I think the statute

21  itself says something quite different.

22           MR. FARINELLA:  Again, Your Honor, based upon my

23  reviewing of the cases that the Government cited, they were

24  not cases from association-of-fact cases; they were

25  co-conspirators who were alleging they weren't aware of

*Proceedings* 4206

1 certain activity.  That activity was actually intertwined

2 because they knew they were engaging in some illicit activity

3 for illegal -- that was illegal for financial reward.

4          THE COURT:  I don't have the cases at my fingertips,

5 but what charge did the judge give in that case?

6          MR. FARINELLA:  The charge said that for

7 co-conspirators who are engaging in illicit illegal activity

8 for financial reward can't say that they're not part of this

9 enterprise.

10          THE COURT:  Because they don't know every piece of

11 it.

12          MR. FARINELLA:  Correct.

13          THE COURT:  Are you saying that every member of the

14 enterprise has to be, I guess, indictable?  Is that what

15 you're saying; that they have to know that the enterprise was

16 criminal?  I don't think --

17          MR. FARINELLA:  Well, that's the question, Your

18 Honor.  So a CEO, for example, who is using his staff to

19 funnel in women -- or whatever, to engage in some sort of

20 activity -- that staff doesn't know what's happening.  You

21 know, it begs the question as to whether or not there's an

22 enterprise.  I mean, the fact remains that in this instance,

23 if the Court's going to contemplate this charge, then I think

24 it should be made clear that the enterprise itself can't be

25 just one person -- the person -- the defendant, himself, and

GA0892

*Proceedings*                                    4207

1   the enterprise.

2          THE COURT:  I think it says that.  The enterprise --

3   that's what the charge says.

4          So it's always helpful to me -- the reason why I

5   send out the charge in advance is so I can get feedback and

6   time to fit it in.  I'm not sure I understand what you want me

7   to do.  I don't think that you will find a case that requires

8   that every member of the enterprise act with the same criminal

9   intent as the person who is being charged.  I just don't think

10  that's the law.

11         What's required is the existence of the structure

12  that enables the defendant -- or whoever is being charged --

13  to carry out what the illegal activity is -- I think I have

14  that right -- and I don't think there's any additional

15  requirement that every single person who makes up that

16  enterprise has to also act with the same criminal intent.

17         If you have a case that says otherwise, I will

18  certainly look at it, but I think the language the Government

19  submitted is a correct statement of the law.

20         I'm just curious, I know Raniere hasn't been

21  appealed yet, but I'm sure this was the same charge that Judge

22  Garaufis gave in Raniere.

23         MS. GEDDES:  Certainly the submission that we

24  offered to the Court was drawn from the Court's charge in

25  Raniere.  I don't know that every last word is the same but --

*Proceedings* 4208

1      THE COURT:  Well, I have the Raniere charge, I

2  haven't compared them, but the RICO charge was similar, but I

3  think there was a RICO conspiracy charge in that case, too.

4  But, in any event, if you have a case and you want to submit

5  it, you can do that.  I just like to make sure that everybody

6  has what the charge is going to be before they sum up.  I'm

7  not inclined to change it.

8      MR. FARINELLA:  I appreciate that, Your Honor, and

9  this came as a separate email suggestion, so it wasn't in the

10 original charge.  This is an additional charge that the

11 Government has --

12     THE COURT:  I know that.  That's fine.

13     MR. FARINELLA:  I would appreciate if the Court

14 would just give me --

15     THE COURT:  Well, the summations are going to start

16 today, so time's a-wastin'.

17     All right.  Anything else?

18     I understand you are not calling the expert; is that

19 correct?

20     MR. SCHOLAR:  That is correct, Your Honor.

21     THE COURT:  Okay.  So we just have the one witness?

22     MR. SCHOLAR:  Yes, Your Honor.

23     MR. CANNICK:  We have one witness, Your Honor, and

24 we have some stipulations that are being worked on now.

25 Unfortunately, we don't get home before 5:00, and we have to

GA0894

*Proceedings* 4239

1       **A F T E R N O O N  S E S S I O N**

2       (In open court; jury not present.)

3       THE COURTROOM DEPUTY:  All rise.

4       THE COURT:  Everybody can sit down.

5       (Defendant enters the courtroom.)

6       THE COURT:  Okay.  Just before I hear from you on

7 this question of stipulations, with respect to the charge, I

8 did review *Boyle vs. United States*, which is a case that

9 Mr. Farinella submitted.  That doesn't stand for the

10 proposition that every member of the enterprise has to

11 participate or know about its activities.  But one thing I

12 will say about the Government's proposed charge, which is on a

13 really entirely separate matter, is that the -- I think the

14 first two sentences, moreover, it is not necessary to prove

15 that every member of the enterprise participated in or knew

16 about all its activities, rather it is sufficient that the

17 defendant know the general nature of the enterprise and know

18 that the enterprise extends beyond his individual role.

19      The next two sentences are -- well, I mean, the next

20 two sentences are really not appropriate for a case like this.

21 It may be appropriate in some other case, but the language

22 that it's not necessary to prove that the enterprise or its

23 members acted with criminal intent is -- I don't think is

24 appropriate in this case, so I'm not going to give that.

25      The other thing that I noticed just looking through

GA0895

*Proceedings* 4240

1   the charge is that there's no charge currently in the charge

2   about -- I think it's Louis who has an agreement with the

3   Government, and I assume you want that in the charge; correct?

4           MR. SCHOLAR:  Yes, Your Honor.

5           THE COURT:  So there's some language -- we probably

6   have it, but if somebody can submit that language to me, and

7   then to the extent that there should be a charge on Mr. Smith,

8   who I think was given immunity, I don't know if there needs to

9   be a charge for him.  Those are the only two that I can

10  recall.

11          MS. GEDDES:  Your Honor, with respect to Your

12  Honor's ruling about those second two sentences --

13          THE COURT:  I thought I could go through that so

14  quickly that you would forget about it.

15          MS. GEDDES:  Not so.

16          We anticipate that the defense is going to argue

17  that there was nothing illegal about the enterprise, and we're

18  not saying that there was something illegal about the

19  enterprise, and so that is why we wanted that additional

20  language to make clear that they -- the jury only needs to

21  find that defendant acted with criminal intent and not that

22  anyone else acted with criminal intent, because I think that's

23  going to be a significant focus of defense's closing.

24          THE COURT:  Well, I mean, I think that's an accurate

25  statement of the law, but I don't think the sentence that the

GA0896

*Proceedings* 4241

1   enterprise -- I think the rest of the charge adequately

2   conveys that, but that one sentence I don't think does.

3          Obviously, the defendant has to act with the

4   requisite intent.  I don't think anybody would quarrel with

5   that.  I think I say that in other places in the charge, but I

6   will add that sentence again.  I'm just not going to put

7   "under the circumstance of this case."  I think it would be

8   confusing to say that the enterprise doesn't -- when the

9   person who is the head of the enterprise is the defendant

10  under the Government's theory.  So, I mean, maybe there's a

11  different way to phrase it, but when you look at it, it's

12  confusing, and I think -- as applied to these facts.

13         The rest of the charge actually does have all of

14  that, so, I mean, if there's an argument that -- I mean, I

15  don't think it's a matter of dispute, at least it shouldn't

16  be, that enterprises can take all kinds of forms -- the charge

17  goes on at some length about that -- but I don't think that

18  that one sentence is appropriate, and so if something comes up

19  during the summation that makes me change my mind, we can

20  revisit that then.

21         So just with respect to the charge, then, the charge

22  with respect to -- I think it's cooperation agreement with

23  respect to Louis, and then with respect to Mr. Smith, I assume

24  the defense has no objection to that; is that correct?

25         MR. SCHOLAR:  No, Your Honor.

GA0897

4369

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2
      - - - - - - - - - - - - - X
 3
      UNITED STATES OF AMERICA,    :   19-CR-286(AMD)
 4
              Plaintiff,           :
 5                                     United States Courthouse
          -against-                :   Brooklyn, New York
 6
      ROBERT SYLVESTER KELLY,      :
 7                                     September 23, 2021
              Defendant.           :   9:30 o'clock a.m.
 8
      - - - - - - - - - - - - - X
 9

10                  TRANSCRIPT OF TRIAL
            BEFORE THE HONORABLE ANN M. DONNELLY
11          UNITED STATES DISTRICT JUDGE, and a jury.

12
      APPEARANCES:
13

14    For the Government:        JACQUELYN M. KASULIS
                                 Acting United States Attorney
15                               BY: ELIZABETH GEDDES
                                     NADIA SHIHATA
16                                   MARIA E. CRUZ MELENDEZ
                                 Assistant United States Attorneys
17                               271 Cadman Plaza East
                                 Brooklyn, New York
18

19    For the Defendant:         DEVEREAUX L. CANNICK, ESQ.
                                 NICOLE BLANK BECKER, ESQ.
20                               THOMAS FARINELLA, ESQ.
                                 CALVIN HAROLD SCHOLAR, ESQ.
21

22    Court Reporter:            Charleane M. Heading
                                 225 Cadman Plaza East
23                               Brooklyn, New York
                                 (718) 613-2643
24
      Proceedings recorded by mechanical stenography, transcript
25    produced by computer-aided transcription.
```

CMH     OCR     RMR     CRR     FCRR

GA0898

Summation - Geddes                                      4433

1    performing at a venue in Westbury on Long Island and there's a

2    photo of that in evidence.  Diana Copeland arranged for Faith

3    to stay at the Hilton in Melville Island and you can see

4    that -- you see over here in 625 where she was staying.  Her

5    name was misspelled, but -- her last name was misspelled and

6    redacted here anyway.

7            But you also know why the defendant flew Faith to

8    New York, it was for his purpose of engaging in sexual

9    activity with her.  As you know, and I mentioned earlier

10   today, the defendant regularly flew women across the country

11   to meet him for the purpose of sex.  And remember when Faith

12   told you about another trip in the future in LA with the

13   defendant, she didn't want to do have sex with him and so she

14   lied to him and told him she was on her period.  He was

15   annoyed and he said, why did you even come.  And he said that

16   because he brought her there for sex and it was no different

17   in May of 2017.  He wasn't bringing her for company, for

18   business advice, it was just for sex, plain and simple.

19           So once you know that the defendant transported

20   Faith to New York from her hometown is Texas, the only

21   remaining issue -- and that was for the purposes of sex, the

22   only remaining issue is whether the sexual activity that he

23   brought her here for was illegal, and it was.

24           In New York it is a crime to expose another person

25   sexually to an infectious venereal disease, an STD like herpes

Georgette Betts, Official Court Reporter

Summation - Geddes                                          4434

1  and it's a crime when you do that by engaging in unprotected

2  sexual intercourse with somebody without first telling them

3  that you have herpes and that they consent to sex under those

4  circumstances.

5           Now faith told you what happened when she got to New

6  York.  She went to his concert, the one at the venue shown

7  here, she went to the concert then she returned home to her

8  hotel room.  Then at six in the morning -- she had fallen

9  asleep, she received a phone call from the defendant, and you

10  can see the defendant's phone call in the phone records that

11  are in evidence as Government Exhibit 118A.  And again, you'll

12  see it shown here that there was a phone call from the

13  telephone number 312 area code ending 3886 to a phone that was

14  subscribed to by Faith.  And you know that 3886 phone number

15  is one of the defendant's because Faith actually had that

16  number saved in her phone for the defendant.  She told you

17  that's who it was.

18           So the defendant starts pounding -- he calls her,

19  she is waking up, she's groggy and then she starts to hear

20  pounding on the door and it's the defendant at her hotel room.

21  Faith answered the door, let the defendant in and he's

22  partially undressed so that he was naked from the waste down,

23  similar to how you saw him in the video with Dominique and

24  Alex.

25           And at first -- he then directed Faith exactly what

Georgette Betts, Official Court Reporter

Summation - Geddes                                    4435

1    to do, to rub on him.  First, Faith started -- having received

2    the directive, Faith starts to rub his shoulders but the

3    defendant made clear what he wanted, and told her to rub his

4    penis and moved her hand to that area and so she did.  He

5    continued with his direction and eventually positioned her on

6    all fours on the bed and inserted his penis in her vagina

7    while filming the encounter on his iPad, as you know, and have

8    heard that he does.

9         Now Faith testified to you that the defendant was

10   not wearing a condom or any other protection and never told

11   her that he had previously contracted that incurable STD.

12   Despite, as I've already discussed at length with you, that he

13   knew he had it.  He knew he had herpes.  And again, I want to

14   remind you that the government only needs to prove that the

15   defendant exposed Faith to that incurable STD.  It does not

16   need to prove that she actually contracted it from the

17   defendant, or contracted it at all.

18        Now in addition to just what I previously described,

19   the government can also show that the conduct was unlawful in

20   New York because it constituted reckless endangerment under

21   the law and the following elements is what the government

22   would need to prove beyond a reasonable doubt to show that the

23   defendant committed reckless endangerment by engaging in

24   unprotected sex with Faith without first telling her about his

25   incurable STD.

GA0901

4567

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,        : 19-CR-00286(AMD)
                                 :
                                 :
                                 :
        -against-                : United States Courthouse
                                 : Brooklyn, New York
                                 :
                                 :
                                 : FRIDAY, September 24, 2021
ROBERT SYLVESTER KELLY,          : 9:30 a.m.
                                 :
        Defendant.               :
                                 :

- - - - - - - - - - - - - - - - X


            TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
            BEFORE THE HONORABLE ANN M. DONNELLY
                 UNITED STATES DISTRICT JUDGE



                    A P P E A R A N C E S :

For the Government:  JACQUELYN M. KASULIS, ESQ.
                     Acting United States Attorney
                     Eastern District of New York
                     271 Cadman Plaza East
                     Brooklyn, New York 11201
                 BY: ELIZABETH GEDDES, ESQ.
                     NADIA SHIHATA, ESQ.
                     MARIA E. CRUZ MELENDEZ, ESQ.
                     Assistant United States Attorneys


For the Defendant:   AIELLO & CANNICK, Esq.
                     69-06 Grand Avenue
                     Maspeth, New York 11378
                 BY: DEVEREAUX L. CANNICK, ESQ.

GA0902

4568

```
 1
 2              A P P E A R A N C E S:   (Continued)

 3
     For the Defendant:      BLANK LAW, P.C.
 4                             444 S. Washington Avenue
                               Royal Oak, Michigan 48067
 5                           BY:  NICOLE BLANK BECKER, ESQ.

 6
                             THE LAW OFFICE OF THOMAS A. FARINELLA
 7                             260 Madison Avenue
                               8th Floor
 8                             New York, New York 10016
                             BY:  THOMAS A. FARINELLA, ESQ.
 9

10                           THE C.H. SCHOLAR LAW FIRM, PLLC
                               225 Broadway
11                             Suite 225
                               New York, New York 10007
12                           BY:  CALVIN HAROLD SCHOLAR, ESQ.

13

14

15

16

17

18   Court Reporter:  Stacy A. Mace, RMR, CRR, RPR, CCR
                        Official Court Reporter
19                      E-mail:  SMaceRPR@gmail.com
     Proceedings recorded by computerized stenography.  Transcript
20   produced by Computer-aided Transcription

21

22

23

24

25
```

SAM     OCR     RMR     CRR     RPR

Charge of the Court                                    4633

1  though this association is not recognized as a legal entity.

2  An enterprise does not have to be a formal business entity

3  like a corporation.  Nor must it be registered or licensed as

4  an enterprise or as a commonly recognized legal entity like a

5  corporation, a partnership, a business, or the like.

6  Instead, an enterprise may be merely an informal association

7  of individuals.  The term "enterprise" includes legitimate

8  and illegitimate enterprises.  An enterprise be can be a

9  vehicle used by a defendant to commit crimes.

10           The "enterprise" does not have to have a particular

11  name, or, for that matter, any name at all.  A group or

12  association of people can be an enterprise if these people

13  have associated together for a common purpose of engaging in

14  a course of conduct.  Mere similarity of conduct or the fact

15  that individuals may have assembled together and discussed

16  common aims and interests does not necessarily establish

17  proof of the existence of an enterprise, although you may

18  consider such factors.  Such an association of persons may be

19  established by evidence showing an ongoing organization,

20  formal or informal, and by evidence that the people making up

21  the association functioned as a continuing unit.

22           The Government must prove that an

23  association-in-fact enterprise, existed by evidence of an

24  ongoing organization, formal or informal, and by evidence

25  that the various associates functioned as a continuing unit.

GA0904

Charge of the Court                                    4658

1   draw from them.

2          In order to establish this element, it is not

3   necessary that the Government prove that engaging in illegal

4   sexual activity was the only purpose for crossing the state

5   line.  A person may have several different purposes or motives

6   for such travel, and each may prompt in varying degrees the

7   act of making the journey.  The Government must prove beyond a

8   reasonable doubt, however, that a significant or motivating

9   purpose of the travel across a state line was that the

10  defendant would engage in illegal sexual activity with Sonja.

11  In other words, that illegal activity on can't have been

12  merely incidental to the trip.

13         All right, the indictment charges that the defendant

14  transported Sonja with the intent that she engage in sexual

15  activity that violates three Illinois criminal laws.  The

16  first is under Illinois Criminal Code Section 5/12-16(a)(6),

17  aggravated sexual abuse; the second is 5/12-16(a)(7),

18  aggravated criminal sexual abuse.  I guess they are both that.

19  Yes, aggravated criminal sexual abuse and 5/12-16(a)(7),

20  aggravated criminal sexual abuse, and 5/12-15(a)(2), which is

21  criminal sexual abuse.

22         If you find that the conduct for which the defendant

23  transported or caused Sonja's transportation violated any of

24  these three laws, then you must find that this element is

25  satisfied, but you have to be unanimous as to which law was

SAM      OCR      RMR      CRR      RPR

GA0905

Jury Charge                                          4689

1          So the indictment says that he as I read before

2    that he engaged in unprotected sexual activity, intercourse,

3    with Faith without first telling her that he had herpes, and

4    without obtaining her consent to intercourse.  And it's

5    alleged to violate two sections of New York law.  New York

6    Penal Law 120.20 and Public Health Law 2307.

7          So to prove a violation of Penal Law

8    Section 120.20, the Government has to prove the following

9    elements beyond a reasonable doubt:

10         The first is that the defendant recklessly engaged

11   in conduct.

12         And the Government is that the reckless conduct

13   must have created a substantial risk of "serious physical

14   injury."

15         A person recklessly engages in conduct that creates

16   of a substantial risk of physical injury to someone else when

17   he engages in conduct that creates a substantial and

18   unjustifiable risk of serious physical injury to another

19   person when he is aware of and consciously disregards that

20   risk, and when that risk is of such nature and degree that

21   disregard of it constitutes a gross deviation from the

22   standard of conduct that a reasonable person would observe in

23   the situation.  The defendant's subjective intent is

24   irrelevant.

25         Serious physical injury means impairment of a

Jury Charge                                          4690

1  person's physical condition that creates a substantial risk

2  of death, or that causes death, or serious and protracted

3  disfigurement or protracted impairment of health or

4  protracted loss or impairment of the function of any bodily

5  organ.

6          The second law is New York Public Health Law

7  Section 2307 which reads that, "any person who knowing

8  himself or herself to be infected if an infectious venereal

9  disease has sexual intercourse with another shall be

10  punished.

11          And here's what the Government has to prove to

12  beyond a reasonable doubt to establish a violation of that

13  section.

14          First, that the defendant engaged in unprotected

15  sexual intercourse with Faith.

16          Second, that he knew that he was infected with an

17  infectious venereal disease which is herpes at the time that

18  he had sexual intercourse with Faith.

19          Third, that he did not inform Faith that he had

20  herpes and get her consent to engage in sexual intercourse

21  with him in these circumstances before he engaged in sexual

22  intercourse with her.

23          The second is Racketeering Act 12B, which is

24  coercion or enticement and that alleges that the defendant

25  coerced or enticed Faith or purposes of engaging in illegal

```
                                                          4720

 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    ------------------------------x
                                       19-CR-00286(AMD)
 3    UNITED STATES OF AMERICA,
                                       United States Courthouse
 4             Plaintiff,              Brooklyn, New York

 5             -against-               September 27, 2021
                                       9:30 a.m.
 6    ROBERT SYLVESTER KELLY,

 7             Defendant.

 8    ------------------------------x

 9              TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
               BEFORE THE HONORABLE ANN M. DONNELLY
10                  UNITED STATES DISTRICT JUDGE
                         BEFORE A JURY
11

12    APPEARANCES

13    For the Government:       UNITED STATES ATTORNEY'S OFFICE
                                Eastern District of New York
14                              271 Cadman Plaza East
                                Brooklyn, New York 11201
15                              BY:  ELIZABETH GEDDES, ESQ.
                                     NADIA SHIHATA, ESQ.
16                                   MARIA E. CRUZ MELENDEZ, ESQ.
                                Assistant United States Attorneys
17
      For the Defendant:        AIELLO & CANNICK, ESQ.
18                              60-06 Grand Avenue
                                Maspeth, New York 11378
19                              BY:  DEVERAUX L. CANNICK, ESQ., ESQ.

20                              BLANK LAW, P.C.
                                444 Washington Avenue
21                              Royal Oak, Michigan 48067
                                NOT PRESENT
22
                                THE LAW OFFICE OF THOMAS A. FARINELLA
23                              260 Madison Avenue
                                8th Floor
24                              New York, New York 10016
                                BY:  THOMAS A. FARINELLA, ESQ.
25
```

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

```
                                                          4721

 1  APPEARANCES: (continued)

 2  For the Defendant:       THE C.H. SCHOLAR LAW FIRM, PLLC
                             225 Broadway
 3                           Suite 225
                             New York, New York 10007
 4                           BY: CALVIN HAROLD SCHOLAR, ESQ

 5  Also Present:            SPECIAL AGENT CHABOT
                             KYRA WENTHEN, Paralegel,
 6                           United States Attorney's Office

 7  Court Reporter:          AVERY N. ARMSTRONG, RPR
                             Phone:  718-613-2419
 8                           Fax:    718-613-2639
                             Email:  AARM.EDNY@gmail.com
 9

10  Proceedings recorded by mechanical stenography.  Transcript
    produced by computer-aided transcription.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

PROCEEDINGS                    4765

1          (Jury enters the courtroom.)

2          (Time noted: 3:08 p.m.)

3          (In open court; Jury present.)

4          THE COURTROOM DEPUTY:  You maybe seated.

5          THE COURT:  Okay.  Ladies and gentlemen, I have

6   received your note indicating that you have reached a verdict.

7          Will the foreperson please rise.  All right.

8          As to Count One, racketeering, how do you find the

9   defendant; guilty or not guilty?

10         JURY FOREPERSON:  Guilty, Your Honor.

11         THE COURT:  As to Racketeering Act Number One,

12  bribery, proved or not proved?

13         JURY FOREPERSON:  Proved, Your Honor.

14         THE COURT:  As to Racketeering Act two, sexual

15  exploitation of a child, Stephanie, do you find proved or not

16  proved?

17         JURY FOREPERSON:  Proved, Your Honor.

18         THE COURT:  As to Racketeering Act Three,

19  kidnapping, Sonja, proved or not proved?

20         JURY FOREPERSON:  Not proved, Your Honor.

21         THE COURT:  Racketeering Act Four, Mann Act

22  Violations, Sonja.

23         What is your verdict with respect to Racketeering

24  Act 4(a), transportation; proved or not proved?

25         JURY FOREPERSON:  Not proved, Your Honor.

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

PROCEEDINGS                    4766

1          THE COURT:  What is your verdict with respect to

2    Racketeering Act 4B, coercion or enticement; proved or not

3    proved?

4          JURY FOREPERSON:  Not proved, Your Honor.

5          THE COURT:  Racketeering Act Five, the Mann Act

6    Violation, Jerhonda, what is your verdict; proved or not

7    proved?

8          JURY FOREPERSON:  Proved, Your Honor.

9          THE COURT:  With respect to Racketeering Act Six,

10   forced labor, Jerhonda; proved or not proved?

11         JURY FOREPERSON:  Proved, Your Honor.

12         THE COURT:  With respect to Racketeering Act Seven

13   sexual exploitation of a child, Jerhonda, is your verdict

14   proved or not proved?

15         JURY FOREPERSON:  Proved, Your Honor.

16         THE COURT:  Racketeering Act Eight, Mann Act

17   Violation, Jane.

18         What is your verdict with respect to Racketeering

19   Act 8(a), transportation; proved or not proved?

20         JURY FOREPERSON:  Proved, Your Honor.

21         THE COURT:  What is your verdict with respect to

22   Racketeering Act 8B, coercion or enticement; proved or not

23   proved?

24         JURY FOREPERSON:  Proved, Your Honor.

25         THE COURT:  Racketeering Act Nine, Mann Act, Jane.

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

PROCEEDINGS                    4767

1      What is your verdict with respect to Racketeering

2  Act 9A, transportation; proved or not proved?

3          JURY FOREPERSON:  Proved, Your Honor.

4          THE COURT:  What is your verdict with respect to

5  Racketeering Act 9B, coercion or enticement; proved or not

6  proved?

7          JURY FOREPERSON:  Proved, Your Honor.

8          THE COURT:  What is your verdict with respect

9  Racketeering Act 9C, coercion or enticement of a minor; proved

10 or not proved?

11         JURY FOREPERSON:  Proved, Your Honor.

12         THE COURT:  What is your verdict with respect to

13 Racketeering Act 9D, transportation of a minor; proved or not

14 proved?

15         JURY FOREPERSON:  Proved, Your Honor.

16         THE COURT:  Racketeering Act Ten, sexual

17 exploitation of a child, Jane.

18         What is your verdict, proved or not proved?

19         JURY FOREPERSON:  Proved, Your Honor.

20         THE COURT:  Racketeering Act Eleven, forced labor,

21 Jane.

22         What is your verdict; proved or not proved?

23         JURY FOREPERSON:  Proved, Your Honor.

24         THE COURT:  Racketeering Act Twelve, Mann Act

25 Violations, Faith.

PROCEEDINGS                    4768

1     What is your verdict with respect to Racketeering

2   Act 12A, transportation; proved or not proved?

3          JURY FOREPERSON:  Proved, Your Honor.

4          THE COURT:  What is your verdict with respect to

5   Racketeering Act 12B, coercion or enticement; proved or not

6   proved?

7          JURY FOREPERSON:  Proved, Your Honor.

8          THE COURT:  Please indicate which of the statutes

9   the sexual activity violated, reckless endangerment in

10  violation New York Penal Law 120.20, knowing exposure of

11  infectious venereal disease, violation of New York Public

12  Health Law Section 2307 or both?

13         JURY FOREPERSON:  Both, Your Honor.

14         THE COURT:  Racketeering Act Thirteen, forced labor,

15  Faith.

16         Is your verdict proved or not proved?

17         JURY FOREPERSON:  Proved, Your Honor.

18         THE COURT:  Racketeering Act 14, Mann Act, Faith.

19         What is your verdict with respect to Racketeering

20  Act 14A; proved or not proved?

21         JURY FOREPERSON:  Proved, Your Honor.

22         THE COURT:  What is your verdict with respect to

23  Racketeering Act 4B; proved or not proved?

24         JURY FOREPERSON:  Proved, Your Honor.

25         THE COURT:  Please indicate which of the statutes

PROCEEDINGS                    4769

1    the sexual activity violated, reckless endangerment in

2    violation of New York Penal Law Section 120.20, knowing

3    exposure of an infectious venereal disease, violation of New

4    York Public Health Law Section 2307 or both?

5              JURY FOREPERSON:  Both, Your Honor.

6              THE COURT:  As to Count Two, Mann Act

7    Transportation, Jane, how do you find the defendant; guilty or

8    not guilty?

9              JURY FOREPERSON:  Guilty, Your Honor.

10             THE COURT:  As to Count Three, Mann Act, coercion

11   and enticement, Jane, how do you find the defendant; guilty or

12   not guilty?

13             JURY FOREPERSON:  Guilty, Your Honor.

14             THE COURT:  As to Count Four, Mann Act, coercion of

15   a minor, Jane, how do you find the defendant; guilty or not

16   guilty?

17             JURY FOREPERSON:  Guilty, Your Honor.

18             THE COURT:  As to Count Five, Mann Act

19   Transportation of a minor, Jane, how do you find the

20   defendant; guilty or not guilty?

21             JURY FOREPERSON:  Guilty, Your Honor.

22             THE COURT:  As to Count Six, Mann Act

23   Transportation, Faith, how do you find the defendant; guilty

24   or not guilty?

25             JURY FOREPERSON:  Guilty, Your Honor.

```
                        PROCEEDINGS              4770
 1              THE COURT:  Please indicate which of the statutes
 2    the sexual activity violated, reckless endangerment in
 3    violation of New York Penal Law Section 120.20, knowing
 4    exposure of infectious venereal disease, violation of New York
 5    Public Health Law 2307, or both?
 6              JURY FOREPERSON:  Both, Your Honor.
 7              THE COURT:  As to Count Seven.
 8              I'm sorry, we just want to make sure everyone can
 9    hear you, so we're going to give you a microphone, okay.
10              JURY FOREPERSON:  Yes, Your Honor.
11              THE COURT:  All right.  As to Count Seven, Mann Act,
12    coercion and enticement, Faith, how do you find the defendant;
13    guilty or not guilty?
14              JURY FOREPERSON:  Guilty, Your Honor.
15              THE COURT:  Please indicate which of the statute the
16    sexual activity violated, reckless endangerment in violation
17    of New York Penal Law Section 120.20, knowing exposure of
18    infectious conveniently disease in violation of New York
19    Public Health Law Section 2307, or both?
20              JURY FOREPERSON:  Both, Your Honor.
21              THE COURT:  As to Count Eight, Mann Act
22    Transportation, Faith, how do you find the defendant; guilty
23    or not guilty?
24              JURY FOREPERSON:  Guilty, Your Honor.
25              THE COURT:  Please indicate which of the statutes
```

PROCEEDINGS                    4771

1   the sexual activity violated, reckless endangerment in

2   violation of New York Penal Law Section 120.20, knowing

3   exposure of infectious venereal disease in violation of New

4   York Public Health Law Section 2307, or both?

5           JURY FOREPERSON:  Both, Your Honor.

6           THE COURT:  As to Count Nine, Mann Act, coercion and

7   enticement, Faith, how do you fined the defendant; guilty or

8   not guilty.

9           JURY FOREPERSON:  Guilty, Your Honor.

10          THE COURT:  Please indicate which of the statutes

11  the sexual activity violated, reckless endangerment, knowing

12  exposure of infectious venereal disease, or both?

13          JURY FOREPERSON:  Both, Your Honor.

14          THE COURT:  You may be seated.

15          JURY FOREPERSON:  Thank you.

16          THE COURT:  Would either side like the jury polled?

17          MS. GEDDES:  No, Your Honor.

18          MR. SCHOLAR:  Yes, Your Honor.

19          THE COURT:  All right.  Ladies and gentlemen of the

20  jury, you have said that you found the defendant guilty of

21  Counts One through Nine.

22          Count One, racketeering.  Count Two, Mann Act

23  Transportation, Jane.  Count Three, Mann Act, coercion and

24  enticement, Jane.  Count Four, Mann Act coercion of a minor,

25  Jane.  Count Five, Mann Act Transportation of a minor, Jane.

```
                          PROCEEDINGS                    4772
 1    Count Six, Mann Act Transportation, Faith.  Count Seven, Mann
 2    Act coercion and enticement, Faith.  Count Eight, Mann Act
 3    Transportation, Faith.  And Count Nine, Mann Act coercion and
 4    enticement, Faith.
 5              Juror Number 1 is that your verdict?
 6              JUROR NUMBER 1:  Yes, Judge.
 7              THE COURT:  Juror Number 2, is that your verdict?
 8              JUROR NUMBER 2:  Yes, Judge.
 9              THE COURT:  Juror Number 3, is that your verdict?
10              JUROR NUMBER 3:  Yes, Your Honor.
11              THE COURT:  Juror Number 4, is that your verdict?
12              JUROR NUMBER 4:  Yes.
13              THE COURT:  Juror Number 5, is that your verdict?
14              JUROR NUMBER 5:  Yes.
15              THE COURT:  Juror Number 6 is that your verdict?
16              JUROR NUMBER 6:  Yes, Your Honor.
17              THE COURT:  Juror Number 7, is that your verdict?
18              JUROR NUMBER 7:  Yes.
19              THE COURT:  Juror Number 8 is that your verdict.
20              JUROR NUMBER 8:  Yes.
21              THE COURT:  Juror Number 9, is that your verdict?
22              JUROR NUMBER 9:  Yes, Your Honor.
23              THE COURT:  Juror Number 10, is that your verdict?
24              JUROR NUMBER 10:  Yes, Your Honor.
25              THE COURT:  Juror Number 11, is that your verdict?
```

PROCEEDINGS                    4773

1    JUROR NUMBER 11:  Yes, Your Honor.

2    THE COURT:  Juror Number 12, is that your verdict?

3    JUROR NUMBER 12:  Yes, Your Honor.

4    THE COURT:  The jury's verdict is recorded.

5    Ladies and gentlemen of the jury, this ends your

6    jury service.  You have answered the call to serve as citizens

7    and you've paid such careful attention throughout the course

8    of the trial, been here on time every day, and it's been clear

9    to me that you've listened carefully.

10   Whenever a jury carefully considers the evidence and

11   renders a verdict, you serve your community and the country.

12   As I told you when you were selected as jurors, we

13   cannot function without citizens who are willing to give up

14   their time as you have done in this case.  And so I thank you

15   for your service.  If you wouldn't mind waiting in your jury

16   room, I'd like to thank each of you personally.

17   All right.  Thank you.

18   THE COURTROOM DEPUTY:  All rise.

19   (Jury exits the courtroom.)

20   (Time noted: 3:21 p.m.)

21   THE COURT:  All right.  Everybody can have a seat.

22   Let me hear from the defense.  Anything that you

23   want -- do you want to reserve on your motions or do you want

24   to make them now?

25   MR. SCHOLAR:  Judge, we would ask for -- would ask

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*